IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| STEPHANIE BIEDIGER, KAYLA LAWLER ERIN OVERDEVEST, and KRISTEN CORINALDESI, individually and on behalf of all those similarly situated; LESLEY RIKER on behalf of her minor daughter, L████FR██, individually and on behalf of all those similarly situated;   and ROBIN LAMOTT SPARKS, individually, | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| QUINNIPIAC UNIVERSITY, | ) ) |
| Defendant. | ) ) |

CIVIL ACTION NO.

APRIL 16, 2009

## VERIFIED CLASS ACTION COMPLAINT

Plaintiffs STEPHANIE BIEDIGER, KAYLA LAWLER, ERIN OVERDEVEST, and KRISTEN CORINALDESI are female students and varsity athletes at Defendant QUINNIPIAC UNIVERSITY ("QU" or "Defendant"). Plaintiff LESLEY RIKER is the mother of L████R██, a 17-year-old high school senior who was recruited and admitted to QU for the purpose of playing on the women's varsity volleyball team starting next school year (2009-2010). Lesley Riker files this action as next friend on behalf of her minor daughter. These Plaintiffs (the "Student Plaintiffs") file this action individually and on behalf of a class of all other similarly situated females. Plaintiff ROBIN LAMOTT SPARKS is the head volleyball coach at Quinnipiac University. She files this action individually, and is referred to herein as "Coach Sparks" or "Sparks."

Plaintiffs allege as follows:

## STATEMENT OF THE CASE

1.      The Student Plaintiffs file this case as a class action on behalf of themselves and on behalf of a class of current, prospective, and future female students at Quinnipiac University ("QU") who want to participate in varsity women's volleyball or who want to participate in other varsity sports not offered by QU.  They similarly file this action on behalf of females who are deterred from enrolling at QU because it does not offer the sport in which they want to participate.

2.      Defendant discriminates on the basis of sex by, among other things, providing male students with a greater opportunity to participate in varsity intercollegiate athletics than it provides to female students.  This sex discrimination violates Title IX of the Education Amendments of 1972 (20 U.S.C. §1681 *et seq.*) and the regulations adopted pursuant thereto (34 C.F.R. Part 106) (collectively, "Title IX").  Instead of increasing athletic opportunities for females in order to meet its Title IX obligations, Defendant has announced that it will reduce women's opportunities by eliminating the women's varsity volleyball program.

3.      The Student Plaintiffs file this action to stop Defendant from discriminating against them and all others similarly situated.  They seek to prevent Defendant from eliminating women's volleyball or any other women's sport, and to require Defendant to add women's varsity athletic opportunities until Defendant offers male and female students an equal opportunity to participate in varsity athletics.

2

4.     Defendant has discriminated and continues to discriminate against Coach Sparks in the terms and conditions of her employment because of the sex of the student athletes she coaches. Defendant has failed to provide Sparks with the personnel and resources necessary to properly run her program, preventing her from being as successful as she could be with the proper support, thus limiting her career prospects.

5.     In connection with the elimination of the volleyball program, Defendant has informed Coach Sparks that she will be dismissed from her position as head coach effective June 30, 2009.  Pending her dismissal, Coach Sparks has been prevented from coaching or training the members of her team.  These actions on the part of Defendant also constitute discrimination against Coach Sparks because of the sex of her athletes.

6.     Coach Sparks files this action to stop Defendant's discrimination against her and against her program of female athletes.

## JURISDICTION AND VENUE

7.     The Student Plaintiffs' legal claim arises under 20 U.S.C. §1681, *et seq* and its interpreting regulations.  Jurisdiction is conferred on this court by 28 U.S.C. §§ 1331, 1343(3), and 1343(4).

8.     The Coach Plaintiff's legal claim arises under 20 U.S.C. §1681, *et seq* and its interpreting regulations.  Jurisdiction is conferred on this court by 28 U.S.C. §§ 1331, 1343(3), and 1343(4).

9.     Jurisdiction for declaratory and other relief is invoked pursuant to 28 U.S.C. §§2201 and 2202.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b).  These claims arose in Hamden, Connecticut, which is within the jurisdiction of this court.

## THE PARTIES

11.     Plaintiff Stephanie Biediger is a freshman female student at Defendant Quinnipiac University.  Plaintiff is a member of the QU women's varsity volleyball team. QU recently announced that it will not sponsor a volleyball program next school year or thereafter. Plaintiff will be irreparably harmed if Defendant is not restrained from eliminating its varsity volleyball program.  During the school year Plaintiff resides in Hamden, Connecticut, which is within the jurisdiction of this court.

12.     Plaintiff Kayla Lawler is a freshman female student at Defendant Quinnipiac University.  Plaintiff is a member of the QU women's varsity volleyball team.  QU recently announced that it will not sponsor a volleyball program next school year or thereafter. Plaintiff will be irreparably harmed if Defendant is not restrained from eliminating its varsity volleyball program.  During the school year Plaintiff resides in Hamden, Connecticut, which is within the jurisdiction of this court.

13.     Plaintiff Erin Overdevest is a senior female student at Defendant Quinnipiac University.  Plaintiff is a member of the QU women's varsity volleyball team.  QU recently announced that it will not sponsor a volleyball program next school year or thereafter. Plaintiff will be irreparably harmed if Defendant is not restrained from eliminating its varsity volleyball program.  During the school year Plaintiff resides in Hamden, Connecticut, which is within the jurisdiction of this court.

14.     Plaintiff Kristen Corinaldesi is a junior female student at Defendant Quinnipiac University.  Plaintiff is a member of the QU women's varsity volleyball

team.  QU recently announced that it will not sponsor a volleyball program next school year or thereafter. Plaintiff will be irreparably harmed if Defendant is not restrained from eliminating its varsity volleyball program.  During the school year Plaintiff resides in Hamden, Connecticut, which is within the jurisdiction of this court.

15.    Plaintiff L▅▅▅ R▅▅, represented in this action by her mother as next friend, is a high school senior who was recruited to attend Quinnipiac University starting next Fall in order to participate on the women's varsity volleyball team. L▅▅▅R▅▅ applied to and was accepted for admission at QU. She will be irreparably harmed if Defendant is not restrained from eliminating its varsity volleyball program.  In particular, Ms. R▅▅ relied on Defendant's offer of a volleyball scholarship when she turned down admissions offers and/or athletic scholarship offers from other schools.  It is very likely too late in the school year for her to obtain admission or an athletic scholarship from any other college. Plaintiff R▅▅ is a resident of Bowling Green, Ohio, but submits to the jurisdiction of this court for purposes of this legal action.

16.    Plaintiff Robin Lamott Sparks is the head volleyball coach at Quinnipiac University.  Plaintiff resides in Hamden, Connecticut, which is within the jurisdiction of this court.

17.    Defendant Quinnipiac University is a private university of higher education.  It is located in Hamden, Connecticut, which is within the jurisdiction of this court.

5

18.     Quinnipiac University receives federal financial assistance and the benefits therefrom.  Therefore, all programs at QU, including intercollegiate athletics, are subject to the requirements of Title IX.

## CLASS ALLEGATIONS

19.     The named Student Plaintiffs bring this action on behalf of themselves and, pursuant to Rule 23(A) and B(2) of the Federal Rules of Civil Procedure, on behalf of all those similarly situated.  In particular, the Student Plaintiffs seek to represent a class of all present, prospective, and future female students at Quinnipiac University who want to participate in the recently eliminated varsity sport of women's volleyball or who want to participate in other varsity sports not offered by QU.  They also seek to represent those females who are deterred from enrolling at QU because it does not offer the sport in which they want to participate.

20.     Each of the named Student Plaintiffs is a member of the proposed class and has been or will be injured by Defendant's sex discrimination and failure to provide female students with an equal opportunity to participate in varsity intercollegiate athletics at QU.  Defendant's announced elimination of the women's varsity volleyball program will exacerbate this discrimination and denial of equal opportunity by eliminating female athletic participation opportunities.

21.     The Student Plaintiffs seek to represent the proposed class because joinder of all class members and all persons harmed by Defendant's failure to provide equal opportunity to participate in varsity intercollegiate athletics is not just impracticable, but impossible.

6

22.     The proposed class is known to exist but the identity of its members is and will continue to be fluid and unidentifiable during the course of this litigation because of the nature of college enrollment and athletic participation.  In particular, QU is a university with a student body whose members graduate after approximately four years from matriculation.  Its varsity student athletes are allowed only four years of athletic eligibility under the rules of the National Collegiate Athletic Association ("NCAA").  Accordingly, the members of the class harmed by Defendant's discriminatory actions constantly change as each class of students graduates and as another class of graduating high school students enrolls as freshmen at QU.

23.     Not all members of the plaintiff class are currently identifiable, because the class includes prospective and future students who will enroll at QU during the course of this litigation or who will be deterred from enrolling at QU because of Defendant's failure to provide equal athletic participation opportunities for female students, including the sports in which they want to participate.

24.     Not all members of the plaintiff class are currently identifiable because it includes not just volleyball players, but also all present, prospective, and future female students who want to participate in a varsity intercollegiate sport not offered at QU, such as crew, bowling, golf, and other sports.

25.     On information and belief, QU has never surveyed its present or prospective student body to assess their athletic interests and abilities.  Moreover, because QU recruits high school students to apply to and enroll at Defendant for the purpose of participating in varsity intercollegiate athletics, QU could increase and thus equalize athletic participation opportunities for female students by starting

7

virtually any new varsity sports team and then recruiting athletes to enroll and participate.

26.     It is unknown how many present, prospective, or future female students would enroll at QU or would participate in athletics at QU if QU stopped discriminating against women and if QU added more sports opportunities for women. The hundreds of additional class members who would apply to QU, who would be recruited by QU coaches to attend QU, and who would participate in athletics at QU if QU added the more than 100 athletic spots necessary to reach equal opportunity, are too numerous to make joinder practicable.

27.     The Student Plaintiffs satisfy the "commonality" requirement of Fed.R.Civ.P. 23(a)(2), because they share questions of law and fact in common with the proposed class, particularly whether QU violates Title IX by failing to provide female students with an equal opportunity to participate in varsity intercollegiate athletics. Because Title IX athletics claims require comparison of the sex-segregated men's and women's athletic opportunities as a whole, the issues are inherently class-based.

28.     The Student Plaintiffs satisfy the "typicality" requirement of Fed.R.Civ.P. 23(a)(3), because their claims are typical of those of the proposed class.  They all are denied or imminently will be denied an equal opportunity to participate in varsity athletics at QU because of Defendant's ongoing sex discrimination.  All want the Court to restrain QU from eliminating any women's varsity sports opportunities – particularly volleyball – and to require QU to add more women's varsity sports.

8

29.    The Student Plaintiffs are members of the proposed class and will fairly and adequately represent the interests of the class pursuant to Fed.R.Civ.P. 23(a)(4).  They intend to prosecute this action vigorously in order to secure fair and adequate injunctive relief for the entire class.

30.    The undersigned class counsel are experienced in federal civil rights litigation and class actions, especially under Title IX, and will adequately represent the interests of the class in this action.

31.    The Student Plaintiffs satisfy the class certification requirements of Fed.R.Civ.P. 23(b)(2), because Defendant has acted or refused to act on grounds generally applicable to the class - denying female students an equal opportunity to participate in varsity intercollegiate athletics - thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

## GENERAL ALLEGATIONS

## THE REQUIREMENTS OF TITLE IX

32.    Title IX, enacted in 1972, provides in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance .
> . .

20 U.S.C. § 1681(a).  The Civil Rights Restoration Act of 1987 made plain Congress' intent that the terms "program or activity," as used in Title IX, mean any program or activity so long as any part of the public institution receives federal financial assistance.  20 U.S.C. §1687.  Thus, Defendant is subject to Title IX even if none of

the funding for either its men's or women's athletic program comes from federal sources.

33.     In 1975, the Department of Health, Education and Welfare ("HEW" - the predecessor of the United States Department of Education ("DOE")) adopted regulations interpreting Title IX.  These regulations (the "Regulations") are codified at 34 C.F.R. Part 106.  (The DOE regulations adopting the HEW regulations are at 45 C.F.R. Part 86.)  The Regulations are enforced by the Office for Civil Rights ("OCR") within DOE.

34.     With regard to athletic programs, 34 C.F.R. § 106.41(a) provides that interscholastic athletics are included within the "program or activity" requirements of Title IX:

> No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

35.     34 C.F.R. § 106.41(c) specifies ten (10) factors that may be considered in the determination of equal athletic opportunity:

1.     Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

2.     The provision of equipment and supplies;

3.     Scheduling of games and practice time;

4.     Travel and per diem allowance;

5.     Opportunity to receive coaching and academic tutoring;

6.     Assignment and compensation of coaches and tutors;

10

> 7.    Provision of locker rooms, practice and competitive facilities;
>
> 8.    Provision of medical and training services;
>
> 9.    Provision of housing and dining facilities and services;  and
>
> 10.   Publicity.

Another factor to be considered is a school's "failure to provide necessary funds for teams for one sex." *Id.*

36.    In 1979, the OCR issued a policy interpretation of Title IX and the Regulations as applied to intercollegiate athletics.  This policy interpretation is found at 44 Federal Register 71,413 (1979) (the "Policy Interpretation").

37.    The Policy Interpretation provides that, in order to comply with Title IX and 34 C.F.R. § 106.41(c), schools must provide equal athletic opportunities in three general areas:   (1) equal athletic participation opportunities (34 C.F.R. §106.41(c)(1)), (2) equal treatment and benefits to those with participation opportunities (34 C.F.R. §106.41(c)(2)-(9)), and (3)equal athletic financial assistance (34 C.F.R. §106.37). At the present time, only equal athletic participation opportunities are at issue in this case.  These fall under 34 C.F.R. §106.41(c)(1).

38.    According to the Policy Interpretation, compliance in the area of equal athletic participation opportunities is determined under the following three-part test:

> (1)  whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments;
>
> (2) where the members of one sex have been and are under-represented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

11

(3) Where the members of one sex are under-represented among intercollegiate athletes and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

*See* 44 Fed. Reg. 71,418.

39.     This three-part test was further clarified after notice and comment in OCR's 1996 Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (the "1996 OCR Clarification").

40.     Every federal court of appeals that has considered the three-part test has upheld it as valid and has given it substantial deference in applying Title IX or in assessing Title IX compliance.

41.     The Regulations require that sponsors of intercollegiate athletics (such as Defendant) take such remedial actions as are necessary to overcome the effects of sex discrimination in violation of Title IX.  *See* 34 C.F.R. §106.3(a).  On information and belief, Defendant has not taken any recent remedial actions to satisfy its obligations under Title IX.  Nor has Defendant ever provided females with an equal opportunity to participate in varsity athletics.

42.     The Regulations also require that federal fund recipients like Defendant adopt nondiscrimination policies and grievance procedures, appoint and train Title IX officers to receive and investigate sex discrimination complaints, and disseminate this information to all students, faculty, and employees.  34 C.F.R. §§106.8 & 106.9. The Regulations further require that recipients promise and confirm compliance by

12

filing an Assurance of Compliance with DOE each time they apply for or receive federal financial assistance.  34 C.F.R. §106.4.

43.    The Regulations further require that sponsors of interscholastic athletics comply with the athletics regulations within three years of their effective date (which was July 21, 1975).  On information and belief, Defendant did not comply with the athletic regulations by the 1978 compliance deadline or at any time thereafter. Now, more than 30 years later, Defendant still does not fully comply with Title IX.

44.    The Title IX Regulations expressly prohibit employment discrimination in educational programs.  34 C.F.R. §106.51 et seq (Subpart E).  Section 106.51(a)(1) states that,

> No person shall, on the basis of sex, be excluded from
> participation in, be denied the benefits of, or be subjected
> to discrimination in employment . . . under any education
> program or activity operated by a recipient which receives
> or benefits from Federal financial assistance.

45.    Section 106.51(a)(3) states: "A recipient shall not enter into any contractual or other relationship which directly or indirectly has the effect of subjecting employees or students to discrimination."

46.    Title IX's prohibition of discrimination on the basis of sex covers, among other things: compensation, job assignments, fringe benefits, and any other term, condition, or privilege of employment.  34 C.F.R. §106.52(b).  Title IX prohibits sex discrimination in employment based upon the sex of the employee and based upon the sex of the students taught or athletes coached.

13

## FACTUAL ALLEGATIONS

47.     Quinnipiac University sponsors a broad varsity intercollegiate athletic program.  It sponsors sports and teams for both men and women, including men's ice hockey, women's ice hockey, men's basketball, women's basketball, men's cross country, women's cross country, men's track, women's track, men's lacrosse, women's lacrosse, men's soccer, women's soccer, men's tennis, women's tennis, men's baseball, women's softball, men's golf, women's field hockey, and women's volleyball. In choosing which sports to offer to which sex of students, QU chooses how many varsity athletic participation opportunities to provide to male students and how many athletic participation opportunities to provide to female students.

48.     Quinnipiac University is a member of the NCAA and the Northeast Conference, and participates in Division I, the highest level of intercollegiate competition.  As such, QU offers athletic scholarships to members of its varsity athletic teams.

49.     Like other Division I schools, Quinnipiac University recruits high school students to apply to and to enroll at QU for the purpose of participating in QU's varsity athletic teams.  On information and belief, few if any QU varsity athletes are walk-ons (*i.e.*, students who try out for and earn a spot on the team without being recruited by the coaches).

50.     On information and belief, QU has always provided its male students with proportionally more opportunities to participate in varsity intercollegiate athletics than it has offered its female students, thus denying female students an equal opportunity to participate in this educational program.

14

51.    Defendant's discrimination against females is so great that it cannot
legally eliminate any female athletic participation opportunities unless and until it
eliminates a substantial number of male athletic participation opportunities (bringing
the men down to the level at which QU has stunted the women).  On information
and belief, Defendant cannot eliminate such a large number of male athletic
participation opportunities without reducing the number of spots it offers below what
is required for NCAA Division I membership.  Thus, Defendant cannot legally
eliminate any women's teams, but instead must add women's teams until QU offers
equal athletic opportunity to both male and female students.

52.    The Student Plaintiffs were recruited to attend QU in order to
participate on its women's varsity volleyball team.  Some are currently on the team,
while L█████ R████ was recruited to enroll as a freshman and to start play during the
2009-2010 academic year.  All Student Plaintiffs expected to participate in volleyball
during each of their years at QU and planned their academic, personal, and
financial lives accordingly.  They would not have enrolled at QU but for the
opportunity to participate in women's varsity volleyball and, in many cases, the
receipt of an athletic and/or academic scholarship.

53.    Defendant recently announced that it will no longer sponsor women's
varsity volleyball starting next academic year (2009-2010).  Because the volleyball
team averages 12-15 female athletes each year, the elimination of the volleyball
program will eliminate 12-15 athletic participation opportunities for female students.
QU already discriminates against its female students by offering too few athletic

15

opportunities.  By eliminating volleyball, QU will make this discrimination worse –
even if it also eliminates some men's opportunities.

54.     After QU's announcement, the student Plaintiffs, their parents, and
Coach Sparks complained to QU athletic director Jack McDonald and other QU
personnel about the planned elimination of the women's varsity volleyball program.
They complained that the elimination of the program would make QU's
discrimination against its female students worse by offering females even fewer
athletic participation opportunities.   They demanded that QU not eliminate the
program, but QU affirmed its intent to do so and informed the head coach that her
job will end June 30, 2009.

55.     Since its announcement, QU has denied the volleyball team, including
the Student Plaintiffs, access to the gym for practice and/or spring competition, and
has prohibited Coach Sparks from conducting practices with the team.

56.     On March 27, 2009, Plaintiffs' counsel sent Defendant a letter
complaining about the elimination of the women's varsity volleyball program,
explaining why the elimination of the program constitutes sex discrimination in
violation of Title IX, and requesting a dialog about continuation of the volleyball
program.  Defendant failed to respond by the requested response date of April 1,
2009.  By letter dated April 15, 2009, after receiving notice of this action, counsel for
transmitted a letter responding to Plaintiffs' demand letter.

### INJUNCTIVE RELIEF

57.     Plaintiffs are entitled to injunctive relief that restrains Defendant from
continuing to discriminate on the basis of sex, restrains Defendant from eliminating

16

the women's varsity volleyball program, and requires Defendant to provide its female students with an equal opportunity to participate in varsity intercollegiate athletics by sponsoring additional women's varsity athletic opportunities based upon the interests and abilities of Defendant's present, prospective, and future students.

58.     Failure to grant the requested injunctive relief will cause irreparable harm to the Plaintiffs by continuing Defendant's discrimination against them and QU's present, prospective, and future female students, and by forever denying them an equal opportunity to participate in varsity intercollegiate athletics.  If Defendant is not restrained from eliminating women's varsity volleyball, Plaintiffs will never again have the opportunity to participate in this valuable educational experience – one that provides academic, physical, psychological, social, and even economic benefits for the rest of the participants' lives.   There is no adequate remedy at law for this harm.

59.     The continuing, irreparable harm caused by Defendant's discriminatory actions far outweighs any possible harm that granting the injunctive relief might cause Defendant.  Preliminarily enjoining Defendant's elimination of the varsity women's volleyball program in particular merely ensures retention of the status quo during the course of this litigation, because these athletes have limited (if any) opportunities to pursue their interests and abilities elsewhere – especially at this late date.  Defendant will suffer no harm by reinstating the women's varsity volleyball program, other than  the monetary cost of the program that it has already borne for more than 25 years.

60.     The lifelong harm caused to Plaintiffs by Defendant's discrimination is irreparable and can never be adequately compensated with money.  This harm far

outweighs any monetary cost incurred by Defendant to continue the volleyball program or to add athletic opportunities for women. Importantly, Defendant could choose to allocate its budget and athletic opportunities more equitably merely by shifting its longstanding favoritism toward men to a more equal allocation between men and women. Meanwhile, Defendant will gain public relations and enrollment advantages by coming into compliance with Title IX and by offering more opportunities for its female students.

61.    The injunctive relief that Plaintiffs request will promote the public interest in that it will increase educational opportunities for female students, will end sex discrimination at QU, and will promote compliance with federal law. Congress decided that such nondiscrimination is in the public interest when it enacted Title IX. It has reaffirmed that public interest over the past 37 years by defeating each and every attempt that has been made to weaken Title IX. Equal opportunity for all students – male and female – is at the core of this case, is at the core of American identity, and is clearly in the public interest.

62.    Coach Sparks is entitled to the injunctive relief she requests – enjoining Defendant from eliminating the volleyball program and her job as volleyball coach – for the same reasons that the Student Plaintiffs are entitled to such relief.

## ATTORNEYS' FEES

63.    Plaintiffs have been required to retain attorneys to prosecute this action. Plaintiffs are entitled to recover reasonable attorneys' fees and expenses pursuant to 42 U.S.C. §1988.

18

## FIRST CLAIM FOR RELIEF:  TITLE IX

### (Unequal Athletic Participation Opportunities)
**(on behalf of Student Plaintiffs and the proposed class)**

64.     Plaintiffs reallege and incorporate herein by this reference paragraphs 1 through 63 of this complaint.

65.     The Student Plaintiffs bring this claim as a class action as set forth in the Class Allegations.

66.     By offering certain opportunities to male students to participate in intercollegiate athletics, Defendant has demonstrated its belief that athletic opportunities provide educational benefits that should be supported by the University.  Plaintiffs agree that athletic opportunities provide valuable educational benefits.  For this very reason, the Student Plaintiffs - and the class they represent - should have equal access and opportunity to receive the benefits that the male students at QU receive from intercollegiate athletics.  QU historically has not provided and currently does not provide its female students with such equal access and opportunity.

67.     Defendant determines the number of athletic participation opportunities that it will provide to male and female students by choosing which sports it will offer to each sex and by deciding how many athletes it will allow to participate on each sports team.

68.     Defendant fails to provide female students an equal opportunity to participate in varsity intercollegiate athletics in violation of Title IX and 34 C.F.R. §106.41(c)(1).

19

69.    Defendant fails to comply with each prong of the three-part test described above.  In particular:

      (1)    The ratio of female to male athletes at Defendant is not substantially proportionate to the overall ratio of female to male undergraduate students at Defendant.

      (2)    Defendant does not have a history or continuing practice of athletics program expansion for women.

      (3)    Defendant has failed to fully and effectively accommodate the athletic interests and abilities of its female students by, among other things, eliminating their opportunity to participate in varsity volleyball.

70.    According to information provided by Defendant to the federal government in its annual Equity in Athletics Disclosure Act reports, Defendant's female undergraduate enrollment rate is approximately 62% while its female athletic participation rate is only about 50%.  Furthermore, on information and belief, Defendant underreports male participation in varsity athletics and overreports female participation.  Defendant does not provide female students with varsity athletic participation opportunities in a number substantially proportionate to female undergraduate enrollment.

71.    Defendant failed to meet the 1978 regulatory deadline for compliance with Title IX's requirement for equity in athletic participation opportunities.  Defendant has never met its compliance obligations and has not added any new female varsity sports in over 10 years.  Defendant cannot show a history or continuing progress of program expansion for women.  Instead, by eliminating women's varsity volleyball, the Defendant has gone backwards.

72.     Plaintiffs have the interest and ability to participate in women's varsity volleyball. High school students (the source of Defendant's incoming, prospective, and future students) also have the interest and ability to participate in volleyball. Competition exists in volleyball, because it is a major NCAA sport and QU has offered the sport for many years – as have other schools in the Northeast Conference.

73.     Defendant will exacerbate its existing pattern and practice of sex discrimination in its allocation of athletic participation opportunities if it is not restrained from eliminating female athletic participation opportunities in varsity volleyball.

74.     Plaintiffs seek a declaration that Defendant discriminates on the basis of sex by failing to offer female students an equal opportunity to participate in intercollegiate athletics.

75.     Plaintiffs seek expedited preliminary and permanent injunctive relief requiring Defendant to stop discriminating in the operation of its athletic department and ordering Defendant not to eliminate volleyball or any women's varsity athletic team or opportunity.

76.     As a result of Defendant's discriminatory actions, the Student Plaintiffs have been denied and/or imminently will be denied their civil right to pursue an equal opportunity to participate in varsity intercollegiate athletics. They have been denied the educational, economic, physical, psychological, and social benefits of athletic participation. They have incurred or imminently will incur economic and compensatory damages associated with, among other things, lost opportunities,

21

applying/transferring to other schools, moving to other schools, transferring/losing

graduation credits, emotional distress, lost self-esteem, humiliation, and the denial of

equal opportunity because of sex.

77.     If Defendant is not restrained from eliminating the women's varsity

volleyball program, all of these female athletes will forever lose the opportunity to

participate in intercollegiate sports – an opportunity that lasts only four years in a

lifetime but has lifelong educational, economic, physical, psychological, and social

benefits.

## SECOND CLAIM FOR RELIEF:  TITLE IX

### (Discrimination in Employment & Termination)
### (on behalf of Coach Sparks)

78.     Plaintiffs reallege and incorporate herein by this reference paragraphs

1 through 77 inclusive of this complaint.

79.     On information and belief, QU considered eliminating certain sports in

2006, including volleyball.  However, after conducting the self-evaluation required to

maintain its NCAA Division I status, QU realized that it was not in compliance with

Title IX and that it could not eliminate a women's sport without violating Title IX and

without jeopardizing its NCAA certification.

80.     In August 2007, QU hired Coach Sparks to be the head volleyball

coach.  Knowing that QU had considered elimination of volleyball in 2006, Coach

Sparks inquired  about QU's commitment to the team.  QU assured Coach Sparks

that it intended to maintain and fully support the women's volleyball program into the

future.

22

81.    Based upon these promises, Coach Sparks accepted the job and moved her family from Troy, New York, to Hamden, Connecticut. Coach Sparks, as the primary income earner in her family, would not have uprooted herself, her husband, and her daughter, or accepted a reduction in her earnings, but for the promises made to her about QU's long-term commitment to the volleyball program.

82.    Coach Sparks began recruiting athletes for the volleyball team soon after her hiring. She began training and coaching the existing athletes in August 2007, and coached them throughout the fall 2007 competition season. Although college volleyball teams play their regular season games during the fall, they practice, condition, and scrimmage nearly year-round. Thus, coaches must train, coach, counsel, recruit, and operate the program year-round.

83.    In March 2009, QU announced that it will eliminate the women's varsity volleyball team, and her job as its coach, effective June 30, 2009. This constitutes discrimination against Coach Sparks on the basis of sex.

84.    As a result of Defendant's actions, Coach Sparks has been and will be damaged in the form of lost employment, lost compensation and benefits, lost professional status and reputation, and lost resources for her to do her job. Such discrimination has caused and will cause Coach Sparks pain, humiliation, emotional distress, and other damages to be proven at trial. Coach Sparks' damages are heightened by the fact that Defendant announced its intention to eliminate volleyball and Coach Sparks' job several months after the end of the volleyball competition season and thus long after the "hiring season" for college volleyball coaches. Nearly all jobs are now filled for the 2009-2010 school year, so that Coach Sparks

23

will very likely be unable to find a job or coach a team until 2010-2011 at the earliest.

85.     Coach Sparks seeks an injunction to prevent elimination of the volleyball program and her job.  She seeks continued employment as head coach of the QU women's volleyball program, but without discrimination in the terms and conditions of her employment, including pay and benefits and the financial and personnel resources necessary to fully and properly perform her job, develop her skills and career, and operate her team at the Division I level.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

A.     Certify the first claim as a class action on behalf of all present, prospective, and future female students at QU who seek to participate in varsity intercollegiate volleyball or any other sport not currently offered by QU;

B.     Enter an order declaring that Defendant has engaged in a past and continuing pattern and practice of discrimination against female students on the basis of sex in the operation of its athletic program, in violation of Title IX and the regulations promulgated thereunder;

C.     Issue a preliminary and a permanent injunction restraining Defendant from continuing to discriminate against female students on the basis of sex, restraining Defendant from eliminating the women's varsity volleyball program (or any women's athletic opportunities), and requiring Defendant to provide females with an equal opportunity to participate in varsity intercollegiate athletics by sponsoring

24

additional women's varsity athletic opportunities based upon the interests and abilities of Defendant's present, prospective, and future students;

     D.     Issue an injunction that restrains Defendant from eliminating Coach Sparks' employment and requires Defendant to continue her employment as head volleyball coach but without discrimination in the terms, conditions, and resources of that employment;

     E.     Maintain jurisdiction over this action to monitor Defendant's compliance with the Court's orders;

     F.     Award the Student Plaintiffs compensatory damages and other monetary relief as permitted by law, and award Coach Sparks back pay and benefits, compensatory damages, and other monetary relief as permitted by law;

     G.     Award Plaintiffs their reasonable attorneys' fees and expenses; and

     H.     Order such other and further relief as the Court deems appropriate.

PLAINTIFFS DEMAND A TRIAL BY JURY AS TO ALL ISSUES TRIABLE

BY A JURY.

Dated: April 16, 2009

Respectfully submitted by:

Jonathan B. Orleans (ct05440)
Alex V. Hernandez (ct08345)
Pullman & Comley
850 Main Street
Bridgeport, CT 06601
(203) 330-2129 (phone)
(203) 576-8888 (fax)
jorleans@pullcom.com
ahernandez@pullcom.com


David McGuire (ct27523)
ACLU Foundation of Connecticut
2074 Park Street, Suite L
Hartford, CT 06106
(860) 523-9146 (phone)
(860) 586-8900 (fax)
jmatthews@aclu-ct.org


Co-counsel to be admitted *pro hac vice*:

Kristen Galles
Equity Legal
10 Rosecrest Avenue
Alexandria, VA  22301
(703) 683-4491
(703) 683-4636
kgalles@comcast.net


ATTORNEYS FOR PLAINTIFFS

26

## VERIFICATION

I, Robin Lamott Sparks, am a plaintiff in the above-captioned action.  I have read the foregoing complaint and know the contents thereof.  The factual statements therein relating to my claim are true based upon my own knowledge, except as to those matters which are alleged on information and belief, and as to those matters, I believe them to be true.

I swear under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of April, 2009, at Bridgeport, Connecticut.

Robin Lamott Sparks

Bridgeport/73061.1/JORLEANS/754765v1

## CERTIFICATION

A copy of this Verified Class Action Complaint has been emailed to Defendant on this date, and shall be served on the named Defendant in accordance with the Plaintiff's service obligations under Federal Rule of Civil Procedure 4.

Dated:  April 16, 2009

_____
Jonathan B. Orleans  (ct05440)
Alex V. Hernandez  (ct08345)