UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHANIE BIEDIGER, KAYLA LAWLER ERIN OVERDEVEST, and KRISTEN CORINALDESI, individually and on behalf of all those similarly situated; LESLEY RIKER on behalf of her minor daughter, L. R., individually and on behalf of all those similarly situated; and ROBIN LAMOTT SPARKS, individually, | ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO: 3:09-CV-00621(SRU) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| QUINNIPIAC UNIVERSITY, | ) ) | May 7, 2009 |
| Defendant. | ) | |

## JOINT PRE-TRIAL ORDER

The parties shall jointly submit, in one continuous document signed by counsel for all parties, a final pretrial memorandum (in compliance with Rule 16 of the Local Rules of Civil Procedure and in lieu of the pretrial memorandum required by the Standing Order Regarding Trial Memoranda in Civil Cases). **In addition to filing an original of the pretrial memorandum with the Clerk of the Court, counsel shall also provide to Chambers a courtesy copy of the pretrial memorandum and all attachments thereto, both in hard copy and on a 3 ½" computer diskette in WordPerfect or pdf format.** The pretrial memorandum shall contain the following information:

1.   **TRIAL COUNSEL:**

Plaintiffs:  Jonathan B. Orleans and Alex V. Hernandez.  Pullman & Comley, LLC.  (P) 203 330 2000; (F) 203 330 2288.  Kristen Galles (*pro hac vice*).  Equity Legal.  (P) 703 722 1071.

Defendant:  Mary A. Gambardella and Jonathan Bardavid.  Wiggin and Dana, LLP.  (P) 203-363-7600, (F) 203-363-7676.

2.   **JURISDICTION:** Jurisdiction is conceded.

3.      **JURY/NON-JURY:**   Non-Jury.

4.      **LENGTH OF TRIAL:**   2 days (for hearing on Motion for Preliminary Injunction)

5.      **FURTHER PROCEEDINGS:**   Unknown

6.      **NATURE OF CASE:**   Plaintiffs seek a preliminary injunction under Title IX of the Education Amendments of 1972, seeking reinstatement of the women's varsity volleyball program.  Defendant denies Plaintiffs are entitled to any relief sought.

7.      **STATEMENT OF THE CASE:**   N/A

8.      **TRIAL BY MAGISTRATE JUDGE:**   N/A

9.      **LIST OF WITNESSES:**   Each party shall provide the name, address, and a brief summary of the anticipated testimony of all witnesses by separately listing: (a) the witnesses the party expects to call at trial; and (b) the witnesses the party may call at trial if the need arises.  Witnesses not listed shall not be permitted to testify at trial, except for good cause shown.

Plaintiffs:

1.      **Stephanie Biediger** was a freshman member of the women's varsity volleyball team at Quinnipiac University during the academic year 2008-09, and has three more years of athletic eligibility.  She will testify about her experience as a member of the QU team, and the impact which the Defendant's elimination of volleyball has had and will have on her personal, academic, social, and athletic life.

2.      **Kayla Lawler** was a freshman member of the varsity volleyball team at QU during the 2008-09 academic year, and has three more years of athletic eligibility.  She will testify about her experience as a member of the QU team, and the impact which the Defendant's elimination of volleyball has had and will have on her personal, academic, social, and athletic life.

3.      **Erin Overdevest** was a senior member of the women's varsity volleyball team at Quinnipiac University during the academic year 2008-09.  However, because she sat out ("redshirted") a year, she has one more year of athletic eligibility.  She intends to remain at Quinnipiac to study for a Master's degree, and had intended to continue to play volleyball in 2009-10.  She will testify about her experience as a member of the QU team, and the impact which the Defendant's elimination of volleyball has had and will have on her personal, academic, social, and athletic life.

4.      **Lesley Riker** is the mother of 17 year old minor plaintiff identified by her initials,

L.R., who is a high school senior who has been accepted at the Defendant university for the fall semester of 2009. L.R. attends high school in Ohio where she participated in varsity volleyball and is a member of the school's equestrian team. Mrs. Riker will testify about the impact which the Defendant's elimination of volleyball has had and will have on her daughter's personal, academic, and athletic life.

5.     **Robin Lamott Sparks** is the coach of the volleyball team at QU. She will testify concerning her hiring by QU and the representations that were made to her to the effect that the University was committed to maintaining its volleyball program. She will testify about her efforts to recruit student-athletes to the University to play volleyball. She will testify about the impact of the University's decision to eliminate the volleyball program on her life, her family, her career, and on the members of the team. She will testify about her efforts to obtain and analyze information concerning the Defendant's compliance with Title IX. She will testify about the University's directive to her that she not practice with the team after March 4, 2009, and the impact of that directive on herself and on the members of the team. She will testify concerning her conversations with members of the Athletic Department staff about Title IX compliance at QU, and concerning her observations of Athletic Department practices relating to such compliance. She will also testify concerning her observations of the QU Cheerleading squad, and concerning her research into so-called "competitive cheer."

6.     **Dr. Donna Lopiano**, an expert witness in the field of collegiate athletics administration, Title IX and Title IX compliance, will testify by videotaped deposition taken May 5, 2009. The following is a brief (and necessarily incomplete) summary of her testimony:

Dr. Lopiano was asked to provide an opinion as to whether QU presently is in violation of Title IX's substantial proportionality requirement ("prong one"). She testified that based upon her review of, *inter alia,* QU's annual Equity in Athletics Disclosure Act ("EADA") reports, it is her opinion that the Defendant university has been in violation of Title IX for at least the last 14 years.

Dr. Lopiano further opined that QU cannot rely on prongs two or three of the "three-part test" under the Title IX regulations and policy interpretations to establish its compliance with Title IX in the current or past years.

Dr. Lopiano was asked to determine whether the manner in which the Defendant's Athletic Department counts men's and women's cross country, indoor and outdoor track participation is appropriate, and whether the number of opportunities to compete have been or will be properly counted. Based on the Defendant's EADA Reports and the letter to Attorney Orleans from Attorney Janet Judge, it is the witness's opinion that the Defendant is improperly counting sports opportunities. In her opinion, in order to properly count genuine participation opportunities, the Defendant is required to use

3

unduplicated counts of male and female track athletes (that is, a runner at QU who participates in more than one track season should only be counted once). Further, Dr. Lopiano opined that the Defendant's use of roster management, including unrealistic squad size targets, results in an undercounting of men's athletic participation and an over-counting of women's athletic participation at QU.

The witness was asked to give her opinion as to whether the Defendant's plan to expand its "competitive cheer" program would bring the University into Title IX compliance. Based upon her review of, *inter alia,* Department of Education Office for Civil Rights ("OCR") "Dear Colleague" letters from April of 1999 addressed to the University of Minnesota, and OCR's May 24, 2000 letter addressed to the University of Maryland, Dr. Lopiano concluded that in order for the Defendant's proposed Competitive Cheer program to count as a varsity sport for Title IX purposes, the University would have to meet a number of specific standards, none of which have been met to date. Further, Dr. Lopiano opined that an analysis of the projected male and female full-time undergraduate enrollments for 2009-10, and the number of competitive opportunities set forth in the Defendant's projected team rosters, reflects that if unduplicated counts of male and female track athletes are used, the expanded Competitive Cheer program will not provide sufficient female competitive opportunities to bring the Defendant into compliance with Title IX's proportionality requirement.

7.      Plaintiffs reserve the right to call additional witnesses in rebuttal.


Defendant:

1.      **John (Jack) McDonald**- Mr. McDonald will testify as to all aspects of this case including, without limitation, Quinnipiac's athletic program and Title IX compliance.

2.      **Tracey Flynn**- Ms. Flynn will testify as to all aspects of this case including, without limitation, record keeping for the Quinnipiac Athletic Department and Title IX compliance.

3.      **Mary Ann Powers**- Ms. Powers will testify as to all aspects of Quinnipiac's Competitive Cheer Team and its elevation to varsity status.

4.      **Janet Judge, Esq.**- Ms. Judge will testify for the limited purpose of discussing her communications with Plaintiffs' counsel Jonathan Orleans which predated the instant complaint and her knowledge of Dr. Donna Lopiano.

Defendant reserves the right to add or supplement witnesses based upon the evidence presented at the hearing or the evidentiary rulings made by this Court.

10.    **DEPOSITION TESTIMONY:**  N/A

11.    **EXHIBITS:**  Each party shall identify all exhibits that it may present at trial, by providing a brief description of each exhibit, and by separately listing the exhibits that the party: (a) expects to offer at trial; and (b) may offer at trial if the need arises.  Exhibits not listed will not be admitted at trial except for good cause shown.

Plaintiffs:  Proposed Exhibit List is attached.

Defendants:

A.    Letter from Janet Judge to Jonathan Orleans.

B.    1996 OCR Clarification of the Three Part Test, dated January 16, 1996.

C.    U.S. Department of Education Frequently Asked Questions.

D.    Letter to Suzanne Martin from Harry A. Orris.

E.    Letter to David V. Stead from Dr. Mary Frances O'Shea, dated April 11, 2000.

F.    Letter to Gerald Reynold from Deborah A. Yow, dated September 29, 2003.

G.    Letter from David H. Haglund, dated May 2006.

H.    Sample Schedule from College National Competitive Cheer Championship for April 9, 2009.

I.    E-mail from David Haglund to Quinnipiac, *et. al.* dated September 28, 2006, regarding Maryland's Competitive Cheer Program.

J.    Article from Issue of American Cheerleading, regarding Quinnipiac's Competitive Cheer Team, dated April 2009.

**K.**    Quinnipiac Bobcats.com Article "Cheerleaders Place Sixth At National
Championships."

**L.**    E-mail from Robin Sparks to Quinnipiac student on the Competitive Cheer
Team.

**M.**    Video of Quinnipiac Competitive Cheer team found at
http://www.youtube.com/watch?v=VIGnrQkuX7U.

**N.**    NCAA 2008-2009 Division I Manual

**O.**    NCAA Sports Participation 1981-82-2006-07 Division I Men's Teams
Average Squad Size.

**P.**    2007-08 High School Athletics Participation Survey.

**Q.**    2008-2009 Women's Indoor Track Squad List.

**R.**    2007-2008 Women's Indoor Track Squad List.

**S.**    2008-2009 Women's Outdoor Track Squad List.

**T.**    2007-2008 Women's Outdoor Track Squad List.

**U.**    2008-2009 Men's Indoor Track Squad List.

**V.**    2007-2008 Men's Indoor Track Squad List.

**W.**    2007-2008 Men's Outdoor Track Squad List.

**X.**    2008-2009 Men's Outdoor Track Squad List.

In event the Court permits the testimony of Dr. Lopiano Defendant's may introduce
the following exhibits:

**Y.**    New York Times Article "Thanks to Title IX: Cheerleading Is Sport at
Maryland."

**Z.**      New York Times Article "Off the sidelines: cheerleading is now a varsity

sport at the University of Maryland, but not everyone is cheering."

**AA.**     Washington Times Article "No longer on the sidelines; Maryland team

competes, but doesn't cheer."

**BB.**     CBSSports.com Article "College give cheerleading a sporting chance."

### ANTICIPATED EVIDENTIARY PROBLEMS/ MOTIONS IN LIMINE:

<u>Plaintiffs:</u>      Plaintiffs received Defendant's proposed Exhibit List shortly before 12:40
p.m. on this date and have not yet determined whether they will object to any of
Defendant's proposed Exhibits.

<u>Defendant:</u>  Defendant objects to the testimony of Dr. Donna Lopiano in its entirety and
submits herewith a motion in limine.

Defendant will also object to the admission of all evidence submitted that is irrelevant,
too remote in time and which has minimal probative value which does not outweigh the
undue prejudice to Defendant.  This includes all testimony concerning Defendant's
compliance with Title IX for prior years.  Defendant also objects to Plaintiff's exhibits
nos. 1, 2, 4, 5, 6, 8, 9, 10, 11, 13, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 35,
36, 37.  Defendant reserves the right to further object at trial based upon Plaintiffs'
presentation of the evidence.

12.    **STIPULATIONS OF FACT AND LAW:**

1. Plaintiffs Stephanie Biediger, Kayla Lawler, Erin Overdevest and Kristen Corinaldesi are

female student athletes ("Student Plaintiffs") who attend Defendant Quinnipiac University in

Hamden, Connecticut ("QU").  They are members of the Defendant's varsity women's

volleyball team.

2. Plaintiff L.R. is a minor represented by her mother, Lesley Riker.  L.R. is a high school senior who has been accepted to attend QU in September 2009 and was promised an athletic scholarship to play on the Defendant's varsity women's volleyball team.

3. Robin Lamott Sparks is the women's varsity volleyball coach at QU and has been so employed since 2007.  She also is an adjunct professor in communications at the Defendant university.

4. Defendant QU is a private university which receives federal financial assistance and is subject to Title IX of the Education Amendments of 1972, 20 U.S.C. Section 1681-88 ("Title IX").

5. Jack McDonald is the Defendant University's Athletic Director.  As such, he is responsible for managing the Athletic Department's personnel, budget, fund-raising and revenue efforts, athletic events and campus athletic facilities.  With the assistance of his staff, he also contributes to oversight of QU's compliance with all applicable rules and regulations of the National Collegiate Athletic Association ("NCAA") and with Title IX.

6. Tracey Flynn is employed by the Defendant university in its Athletic Department and holds the titles of Senior Women's Administrator ("SWA") and Assistant Athletic Director for Compliance.


13.   **TRIAL TO COURT/JURY**

      (a) **Court:** Each party shall submit proposed findings of fact and conclusions of law, citing relevant authority where appropriate.

      **Plaintiffs' Proposed Findings of Fact and Conclusions of Law will be submitted at the pretrial conference.**

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW:

**FINDINGS OF FACT**:

(i) Plaintiff Erin Overdest is a graduatin g senior. Complaint ¶13.

(ii) Plaintiff Robin Sparks alleges non-renewal of her contract due to the "gender of her students".

(iii) Plaintiffs' scholarships are being honored through the next academic year.

(iv) Plaintiffs' gym time was never cancelled.

(v) Plaintiffs are all current and incoming members of the University volleyball team.

(vi) Plaintiffs who are incoming students requested an expedited hearing in order to determine whether they should agree to attend Quinnipiac University, thus indicating they can still accept other opportunities at other schools at which they were accepted and play on a volleyball team.

(vii)   None of the Plaintiffs presented evidence that they have been scouted by or targeted by any professional volleyball programs for after graduation.

(viii)   On or about March 4, 2009, Defendant announced for budgetary and related reasons, effecting academic year 2009-10, it was eliminating three athletic programs; women's volleyball, men's golf, and men's outdoor track.

(ix)    At the same time, Defendant announced that, effective academic year 2009-10, it would elevate its existing competitive cheer team to varsity status.

(x)     Plaintiffs were permitted to play volleyball during the entire academic year 2008-09.

(xi)    The only assertion by Plaintiffs regarding alleged "harm" for the current academic year is that they could not practice with their Coach.  The Defendant agreed to permit such practice following the hearing on Plaintiffs' request for a temporary restraining order held on April 17, 2009.

(xii)   Defendant has had a competitive cheer team in place at the University for a number of years.  This team performs and competes in activities wholly distinguishable from sideline cheerleading.

(xiii)  The coach of the competitive cheer team is Mary Ann Powers.

(xiv)   The Defendant's competitive cheer team placed 6th in national competitions.

(xv)    Defendant presented Plaintiffs with information, prior to the filing of this suit, reflecting its athletic participation opportunities for academic year 2009-10.

(xvi)   Defendant's information reflected that such participation opportunities, broken down by gender, would be proportionate to the gender breakdown of anticipated enrollment for next year.

(xvii)   Defendant has committed to evolving toward such proportionality for the past several years.

(xviii)  This information also reflects separate counting of athletes per program, and counting indoor and outdoor track, and cross country track, as three separate programs for both men and women.

(xix)    Such counting is permitted by NCAA guidelines.

(xx)     The Office of Civil Rights has not indicated that competitive cheer may not be counted for purposes of Title IX compliance; to the contrary, it has repeatedly indicated that competitive cheer may count if the multi-part test established is met.

(xxi)    The University of Maryland competitive cheer team guidelines have been reviewed by the Office of Civil Rights and have been approved.

(xxii)   Defendant here has maintained a competitive cheer team that Plaintiffs have not proven cannot satisfy such test, and thus, count toward compliance with prong I of Title IX.

(xxiii)  Plaintiffs have presented no evidence to establish that the athletic participation opportunities presented by Defendant cannot be filled and are otherwise "unrealistic" or "incredible".

(xxiv)   If Defendant is compelled to reinstate the volleyball program, it will be forced to reverse a number of decisions made and actions already taken, not the least of which is to expend significant sums it cannot provide to satisfy its space constraints it has been enduring for several years.

11

**PROPOSED LEGAL CONCLUSIONS**:

(i) Plaintiff  Erin Overdest lacks standing and her Title IX claim is moot because she is a graduating senior, V. Class Action Compl. ¶ 13  See, e.g., See Cook v. Colgate University, 992 F.2d 17, 19 (2d Cir. 1993) ("We agree with Colgate that the end of the ice hockey season and the graduation of the last of the plaintiffs render this action moot.  None of the plaintiffs can benefit from an order requiring equal athletic opportunities for women ice hockey players."); Pederson v. Louisiana State University, 213 F.3d 858, 874 (5th Cir. 2000) ("As is so often the case in suits for injunctive relief brought by students, graduation or impending graduation renders their claims for injunctive relief moot.")


(ii) Plaintiffs cannot establish that they would suffer irreparable harm is that the record establishes that Quinnipiac will continue the Student-Plaintiffs' scholarships through graduation, and release any Student-Plaintiffs who request it from their National Letters of Intent to play volleyball at Quinnipiac Equity in Athletics, Inc. v. Dept. of Educ., 291 Fed.Appx. 517, 521 (4th Cir. 2008) (affirming the denial a Title IX preliminary injunction in part because, even if there was a recognizable harm "to the student-athletes of not being able to compete in the sport and at the university of their choice ... the student-athletes would not lose their scholarship funding if they chose to stay at [the university]" and "the students were free to transfer to other colleges offering their chosen sport"); see also Miller v. Univ. of Cincinnati, No. 1:05-cv-764, 2007 WL 2783674, at *11 (S.D. Ohio Sept. 21, 2007) (denying plaintiff's motion for preliminary injunction under Title IX to stop the elimination of the women's rowing team where the court found that the plaintiffs had not proved that they would suffer an irreparable because "[t]he University ha[d] committed itself to continuing scholarship assistance to any rower who will not be able to compete because of termination of the program" and it "ha[d] also agreed to 'release' under NCAA rules any rower who wishe[d] to remain in competitive collegiate rowing to transfer to another school."); Butler v. National Collegiate Athletic Ass'on., No. 06-2319 KHV, 2006 WL 2398683, at *4 (D. Kan. Aug. 15, 2006) (finding that student who sought a temporary restraining order to play collegiate football for a sixth year claiming that he would suffer irreparable injury because he would be unable to complete his education and lose his opportunity to be scouted and recruited by the National Football League ("NFL") would not suffer irreparable injury where his financial aid package was not affected by his elimination from the football team, and the loss of an opportunity for a professional football career was "speculative.")

(iii)    Plaintiffs' allegations clearly establish that the essence of their alleged harm is financial, which is remediable in an action for damages-perhaps suing Quinnipiac for the scholarship amount she would need to play at another school—which clearly

brings their claims outside the realm of a claim for injunctive relief. <u>See</u> <u>Register.com, Inc. v. Verio, Inc.</u>, 356 F.3d 393, 404 (2d Cir. 2004) ("If an injury can be appropriately compensated by an award of monetary damages, then an adequate remedy at law exists, and no irreparable injury may be found to justify specific relief.") (<u>citing</u> <u>Borey v. Nat'l Union Fire Ins. Co.</u>, 934 F.2d 30, 34 (2d Cir. 1991)).

iv) Plaintiffs bear the heightened burden of establishing "'clear' or 'substantial' likelihood of success on the merits" because they seek a mandatory injunction as they seek that the Court order Defendant to reinstate volleyball, among other things, the Defendant would have to potentially re-assess the statistics to ensure compliance with Title IX and reinstate other men's programs; and/or reduce spots in other programs; and/or cancel Varsity Cheer after it has already been announced, and cancel scheduled Competitive Cheer varsity competitions. Resources already committed to other functions would have to be retracted. Such actions can hardly be deemed to constitute "maintenance of the status quo." <u>See</u> <u>Doninger</u>, 527 F.3d at 47.

v) Plaintiffs' cannot establish any likelihood of success because they cannot demonstrate that Quinnipiac intentionally discriminated against them on their basis of their sex, which is a prerequisite to their Title IX claim. <u>Cannon v. University of Chicago</u>, 648 F.2d 1104, 1109 (7th Cir.), <u>cert. denied</u>, 454 U.S. 1128, 102 S.Ct. 981, 71 L.Ed.2d 117 (1981) ("Similarly, Title IX requires that a plaintiff show intentional sex discrimination") (holding plaintiff's claim that medical school's admission policies had disparate impact on women was insufficient to meet Title IX's intentionality requirement, even when the university ostensibly knew of the impact of said policies); <u>see also</u> <u>Fulani v. League of Women Voters Educ. Fund</u>, 684 F. Supp. 1185, 1193 (S.D.N.Y. 1988); <u>Nagel v. Avon Board of Education</u>, 575 F. Supp. 105, 109 (D. Conn. 1983).

vi) As a jurisdictional matter, several Plaintiffs lack standing. Therefore, *a fortiori*, they cannot establish likelihood of success. For example, Plaintiff Robin Lamott Sparks' claim must be dismissed, as she lacks standing to assert the rights of her students. While Coach Sparks may attempt to characterize her claim as one of discrimination arising under Title IX, it is clear that she is simply trying to assert the purported rights of her students, something she cannot do. <u>See</u> <u>Golden Hill Paugussett Tribe of Indians v. Weicker</u>, 39 F.3d 51, 58 (2d Cir. 1994) ("Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party.")

vii) Plaintiffs' Sparks Title IX claim is preempted by Title VII. It is well settled that Title VII provides a "carefully balanced remedial scheme" whereby employees may pursue private claims for employment discrimination. <u>See</u> <u>Lakoski v. James</u>, 66 F.3d 751, 754 (5th Cir. 1995). In short, because Coach Sparks and other members of the class lacks standing, the plaintiffs cannot establish likelihood of success on the merits.

viii) Plaintiffs cannot show likelihood of success because Quinnipiac "stays on Title IX's sunny side by meeting Title IX's substantial proportionality safe harbor (a/k/a, prong I) for the 2009-2010 Academic Year. See Cohen v. Brown Univ., 991 F.2d 881, 901 (1st Cir. 1993). If, and only if, Plaintiffs meet this burden does the burden then shift to Defendant, which can still establish compliance with Title IX provided they can satisfy the second or third prong of the test. Id. However, if Plaintiffs fail to satisfy their burden on the first prong, the Court need not even address the other two prongs. See Cohen, 991 F.2d at 897-98 ("[A] university which does not wish to engage in extensive compliance analysis may stay on the sunny side of Title IX simply by maintaining gender parity between its student body and its athletic lineup.") (emphasis added). Boulahanis v. Bd. of Regents, 198 F.3d 633, 639 (7th Cir. 1999) ("Because the University has achieved substantial proportionality..., it is presumed to have accommodated the athletic interests of that sex."); Horner v. Kentucky High School Athletic Ass'n., 43 F.3d 265, 275 (6th Cir. 1994) ("'[S]ubstantial proportionality' provides a safe harbor for recipients of federal funds."); accord Roberts v. Colorado State Bd. Of Agric., 998 F.2d 824, 829 (10th Cir. 1993). Quinnipiac will be in compliance with prong 1 in the 2009-10 academic year.

ix) Quinnipiac may "comply with Title IX by cutting athletic programs such that men's and women's athletic participation rates become substantially proportionate to their representation in the undergraduate population." Roberts, 998 F.2d at 830; see also Neal v. Board of Trustees of the California State Universities, 198 F.3d 763, 769-70 (9th. Cir. 1999). Plaintiffs have not sustained their burden of proof that for the upcoming academic year, Defendant cannot and will not satisfy the proportionality test, prong I, of Title IX.

x) If the Court deems Defendant failed to comply with prong 1, the Court may not compel the Defendant to retain any particular athletic program, such as the volleyball team. Equity in Athletics, Inc. v. Dept. of Educ., 504 F. Supp. 2d 88, 100 (W.D. Va. 2007) ("Title IX does not establish a right to participate in any particular sport in one's college and there is no constitutional right to participate in intercollegiate ... athletics.") (citing Gonyo v. Drake Univ., 837 F. Supp. 989, 994 (S.D. Iowa 1993); Miami Univ. Wrestling Club v. Miami Univ., 302 F.3d 608, 615 (6th Cir. 2002)).

xi) Past Quinnipiac EADA reports and Title IX compliance data are irrelevant and inadmissible.

xii) Plaintiffs' expert's testimony is inadmissible. See Motion in Limine.

xiii) Under applicable OCR regulations and agency precedent, it is proper for Quinnipiac to count the positions in the 2009-10 Varsity Competitive Cheer Team towards its total number of athletic opportunities for women in 2009-10. See OCR

Letters re Univ. of Md.

xiv)  Quinnipiac may use roster management to achieve prong I in 2009-10 because OCR has made it clear that roster management is acceptable, and participants are counted by season as of the first date of competition. See OCR 1993's Clarification ("OCR considers a sport's season to commence on the date of a team's first intercollegiate competitive event... As a general rule, all athletes who are listed on a team's squad or eligibility list and are on the team as of the team's first competitive event are counted as participants by OCR.")

xv)  OCR Regulations and case law clearly establish that Quinnipiac may use so-called "duplicate" athlete counts in calculating its athletic opportunities for men and women for the 2009-10 Academic Year. See OCR's 1996 Policy Clarification, Guidance from the Department of Education; Miller v. Univ. of Cincinnati, No. 1:05-cv-764, 2008 WL 203025, at *7 (S.D. Ohio 2008)(slip copy) (citations omitted).

xvi)  In addition, the balance of hardships does not tip decidedly in Plaintiffs' favor so as to entitle them to a preliminary injunction because Quinnipiac would suffer financial harm and lose control over its athletic program, which is a right courts recognize that academic institutions have. Equity in Athletics, Inc., 291 Fed.Appx. at 521.

xvii)  The Court should not grant the pending Plaintiffs' Motion for Waiver or Security required by Rule 65(c) because the evidence establishes that there is a strong likelihood of harm to the Defendant if it ultimately prevails on the merit after a preliminary injunction is issued.  See  International Controls Corp. v. Vesco, 490 F.2d 1334, 1356 (2d Cir.), cert. denied, 417 U.S. 932 (1974) ("[A] district court may dispense with security where there has been no proof of likelihood of harm to the party enjoined.").

xviii)  In conclusion, the Plaintiffs' request for a preliminary injunction is denied.

(b) **Jury:**  N/A


14.     **AVAILABILITY OF WITNESSES:** Each party shall ensure the availability at trial of each witness listed by that party unless the Court and counsel are advised to the contrary not less than forty-eight (48) hours prior to the commencement of the evidence.

15.    **PRETRIAL REQUIREMENTS:**   The requirements established by this Order may not
be modified by agreement of counsel.


THE PLAINTIFFS,


By:_____/s/_____
Jonathan B. Orleans (ct05440)
Alex V. Hernandez (ct08345)
Pullman & Comley, LLC
850 Main St., P.O. Box 7006
Bridgeport, CT  06601-7006
Telephone:  (203) 330-2000
Facsimile:  (203) 576-8888
Email:  jorleans@pullcom.com
Email:  ahernandez@pullcom.com

David McGuire (ct27253)
American Civil Liberties Union Foundation
    of Connecticut
2074 Park Street, Suite L
Hartford, CT  06106
Telephone:  (860) 523-9146
Email:  dmcguire@acluct.org

Co-counsel admitted *pro hac vice*:

Kristen Galles
Equity Legal
10 Rosecrest Avenue
Alexandria, VA  22301
Telephone:  (703) 722-1071
E-Mail:  kgalles@comcast.net


THEIR ATTORNEYS

THE DEFENDANTS,

By:_____/s/_____
Mary Gambardella, Esq.
mgambardella@wiggin.com
Federal Bar No. ct05386
Jonathan Bardavid, Esq.
jbardavid@wiggin.com
Federal Bar No. ct27763
Wiggin and Dana LLP
400 Atlantic Street
Stamford, CT 06911-0325
Phone: (203) 363-7662
Fax: (203) 262-7676
*Attorneys for Defendant*

**ATTACHMENT A**

## PLAINTIFFS' PRELIMINARY LIST OF EXHIBITS

1. QU EADA Report 2007-2008 (Lopiano Ex. 6, McDonald Ex. 11)

2. QU EADA Data 2008-09  (Lopiano Ex 8)

3. Ltr from Janet Judge to JBO (Lopiano Ex. 17)

4. EADA Reports 1995-96 through 2006-2007

5. D. Lopiano Chart:  QU Historical EADA Figures (1995-2009) (Lopiano Ex. 9)

6. 1979 Policy Interpretation (Lopiano Ex. 2)

7. 1996 Clarification (Lopiano Ex. 3)

8. NEC Squad Size Chart (part of Lopiano Ex. 14) [D 0243]

9. NCAA Squad Size Chart (part of Lopiano Ex. 14) [D 0244-45]

10. D. Lopiano "Squad Sizes" Chart (part of Lopiano Ex. 14)

11. QU Squad Lists 2007-2008  (McDonald Ex. 3)

12. QU Squad Lists 2008-2009  (McDonald Ex. 1, 2)

13. Change In Status Reports 2007-08 and 2008-09  (McDonald Ex. 4)

14. QU Cheer Website (old) (McDonald Ex. 7)

15. QU Cheer Website (new) (McDonald Ex. 8, plus additional material from current website)

16. Press Release re Cheer Championship (McDonald Ex. 5)

17. Memo from Vice President Lynn Bushnell about elimination of athletic programs, dated March 4, 2009 re cutting volleyball, elevating cheerleading program

18. OCR Memo to Chief State School Officers, etc., September 1975 (Lopiano Ex. 18)

19. OCR letters re cheerleading and definition of "sport"  (Lopiano Ex. 19)

20. Letter from Robin Sparks to Jack McDonald dated 3/9/09 re: request for EADA reports 1996 to present (McDonald Ex. 9)

21. 2007-08 Men's Cross Country /Track Schedule & Results (McDonald Ex. 10)

22. Student-Athletes Receiving a Particular Fund Code dated 4/23/09 re: 2007-08 Academic Year (McDonald Ex. 14)

23. 2008-2009 Scheduling, Pre-Season, Vacation & Travel Guidelines / Coaches – Roster Sizes (Flynn Ex. 15)

24. Donna A. Lopiano Professional Resume (Lopiano Ex. 1)

25. NCAA Publication:  "Gender Equity in Intercollegiate Athletics:  A Practical Guide for Colleges and Universities – 2008" (Lopiano Ex. 4)

26. EADA Institution Data re: 7/1/2007-6/30/2008 (Lopiano Ex. 5)

27. Instructions for Federal Government and NCAA Athletics Programs Reporting (Lopiano Ex. 7)

28. QU Men's Cross Country /Track 2008 Roster (Lopiano Ex. 10)

29. QU 2008-2009 Schedules (Lopiano Ex. 11)

30. Chart:  Quinnpiac University Comparison of Athletics Participation Numbers (Lopiano Ex. 12)

31. Assurance of Compliance – Civil Rights Certificate (Lopiano Ex. 13)

32. Northeast Conference webpage (Lopiano Ex. 15)

33. NCAA Championships List – Men's & Women's Sports (Lopiano Ex. 16)

34. Letter from Mary Frances O'Shea to David Stead of Minnesota State High School League re: definition of "drill team and "cheerleading" (Lopiano Ex. 20)

35. Memorandum from Jim Lord, Executive Director of American Association of Cheerleading Coaches & Advisors to Mary Frances O'Shea dated 8/26/98 re: cheerleading as a Title IX sport (Lopiano Ex. 21)

36. Women's Sports Foundation: Cheerleading, Drill Team, Danceline and Band as Varsity Sports: The Foundation Position (Lopiano Ex. 22)

37. Quinnipiac University NCAA Certification Self-Study:  Final Report (May 2006)

Bridgeport/73061.1/JORLEANS/759952v1