UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHANIE BIEDIGER, KRISTEN CORINALDESI, KAYLA LAWLER and ERIN OVERDEVEST, individually and on behalf of those similarly situated; LESLEY RIKER on behalf of her minor daughter, L.R., individually and on behalf of those similarly situated; and ROBIN LAMOTT SPARKS, individually, | : : : : : : : : : : | Civil Action No. 3:09-cv-621 (SRU) |
| PLAINTIFFS, | : : | |
| v. | : : : | |
| QUINNIPIAC UNIVERSITY | : : | |
| DEFENDANT. | : | May 14, 2009 |

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Defendant, Quinnipiac University (hereinafter "Quinnipiac" or the "Defendant"), hereby respectfully submits this Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction. This Memorandum further supports Defendant's request that, in the event this Court grants the injunction, that Plaintiffs be required to post a bond to secure Defendant's damages during the period in which an appeal will be taken, and the duration of any further proceedings in this action.

## I.    PRELIMINARY STATEMENT

On or about March 4, 2009, Quinnipiac announced that it would eliminate the men's outdoor track and golf teams, and the women's volleyball team. In addition to the elimination of three teams, as part of the reorganization of Quinnipiac's Department of Athletics, Quinnipiac

decided to elevate its women's competitive cheer team to varsity status effective in the 2009-2010 academic year. As a result of the reorganization, Quinnipiac will provide approximately 165 male, and 280 female student athlete participation opportunities in 2009-2010, which translates into an approximately 37.1% male and 62.9% female student athlete breakdown. Mr. McDonald testified during trial that, based on deposits received by May 1, the current student body breakdown would be hovering at about 63% female. However, he further testified that the number of deposits does not translate into actual student enrollment, as many students place deposits at more than one college to reserve spots while they make their final decisions. In short, he expects based on the gender breakdown for the last few years, that actual enrollment will be closer to that of last year, or approximately 61.7% female enrollment. (McDonald trial testimony)

On or about April 16, 2009, Quinnipiac women's volleyball players or recruits Stephanie Biediger, Kayla Lawyer, Erin Overdevest, Kristen Corinaldesi, Lesley Riker (on behalf of her minor daughter, L.R.), individually and on behalf of those similarly situated, and women's volleyball coach Robin Sparks, individually, (hereinafter collectively "Plaintiffs") filed a Motion For Temporary Restraining Order And Preliminary Injunction, seeking an Order that Quinnipiac reinstate its women's volleyball team. Plaintiffs contend that Quinnipiac's elimination of the women's volleyball team will deny them and members of a proposed class equal opportunity to participate in intercollegiate varsity sports at Quinnipiac, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et. seq.

In the Second Circuit Court of Appeals, it is well settled that a preliminary injunction may only be granted where the movant establishes (1) irreparable harm in the absence of the injunction, and (2) either a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping

2

decidedly in the movant's favor. Moreover, where as here, a moving party seeks that the court orders the non-moving party to perform an affirmative act (i.e., restore the women's volleyball team), under the second prong of the test, the movant must satisfy the higher standard of clear or substantial likelihood of success on the merits. Defendant contends that, based on the evidence presented and the record taken as a whole, Plaintiffs failed to satisfy their burden of proof so as to be entitled to the drastic remedy of a preliminary injunction.

### *Plaintiffs Failed to Establish Irreparable Harm*

Plaintiffs' request should be denied before the Court even proceeds to the subsequent elements of their burden since they failed to establish irreparable harm in the absence of an injunction. Among other things: (i) some Plaintiffs lack standing to bring maintain a Title IX claim,[1] and/or have not satisfied their burden of proving they will suffer the requisite imminent harm from the elimination of the team; (ii) the non-monetary damage Plaintiffs allege to have suffered is speculative and based on subjective disappointment; and (iii) all other harm suffered which might be remotely deemed irreparable is caused by certain Plaintiffs themselves or otherwise for which there is an adequate remedy at law. Noteworthy in this regard, and common to all the student Plaintiffs, it has been stipulated that Defendant already advised that it will honor the athletic (and academic) scholarships awarded to Plaintiffs, and further, Defendant will release any Plaintiff who requests it from her binding commitment to only play volleyball for Quinnipiac.

### *Plaintiffs Failed to Establish a Likelihood of Success*

Even if this Court were to determine that Plaintiffs have overcome their initial hurdle of establishing irreparable harm for which there is no adequate remedy at law, Plaintiffs

---

[1] Defendants have filed a separate motion to dismiss the complaint based in part on the fact that Plaintiff Sparks lack standing to pursue any of the claims raised in the complaint.

nevertheless failed to sustain their burden of establishing a "clear or substantial likelihood of success" on the merits of their Title IX claim—or even the lesser standard for prohibitory injunctions. Specifically, as a threshold matter, the Plaintiffs cannot establish that Quinnipiac intentionally discriminated against them on the basis of their sex, which is a prerequisite to their Title IX claim. Even more important, Plaintiffs failed to sustain their burden of establishing that Defendant cannot qualify for the safe harbor provision of Title IX's three-part test, commonly known as the substantial proportionality prong, or prong I. With the elimination of the men's golf and outdoor track teams, and the elevation of the women's competitive cheer team for the academic year 2009-2010, Quinnipiac will provide 37.1% of its intercollegiate athletic opportunities to male students and 62.9% to female students, which is more than substantially proportional to the anticipated undergraduate population for next year, given the number of deposits received—the historical record of the ultimate number of students who arrive. (Tr. Ex. $3^2$). Courts and commentators alike have acknowledged that where, as Quinnipiac has done here, a university establishes gender parity between its student body and its athletic lineup by adding or subtracting sports teams, it remains on Title IX's "sunny side," without having to engage in extensive compliance analysis.

That Quinnipiac will be on Title IX's "sunny side" for the 2009-2010 academic year represents an inconvenient truth for Plaintiffs. Plaintiffs desperately tried throughout these proceedings to distract this Court from the real issues, and to place inordinate and disingenuous focus on events dating back to the 70's, the 90's, and those arising out of the first year of roster management---which Defendant's witness, Tracey Flynn, labeled an "anomaly". Plaintiffs' need to shift focus from the undisputed facts regarding next year's hard numbers is obvious; unless

---

[2] Unless otherwise indicated all references to exhibits are to those that were admitted into evidence at the preliminary injunction hearing.

they sustain their burden of establishing that Defendant could never abide by its representations regarding compliance (either by callously challenging *in advance* whether Quinnipiac's women's competitive cheer team can be counted towards the athletic opportunities Quinnipiac offers for females, or whether certain teams such as indoor and outdoor track and cross country track can be counted separately when tallying the total number of athletic opportunities[3], or by unfairly pointing to "growing pains" during the first year of roster management—a year in which Quinnipiac was not relying on prong I compliance), the injunction must indeed be denied. Despite the Plaintiffs' efforts to create distractions and "media sound bites" in this case, the sole, pertinent question remains-whether Plaintiffs have sustained their burden of proving a likelihood of success on the question of whether Quinnipiac has set athletic opportunities broken down by gender which are substantially proportionate to the undergraduate population in the academic year 2009-2010.

### Plaintiffs Failed to Establish Sufficiently Serious Questions Going to the Merits and that They Win the Balance of Hardships Test

Likewise, alternatively, Plaintiffs cannot establish sufficiently serious questions going to the merits to make them a fair ground for litigation with a balance of hardships tipping decidedly in their favor. Again, because Plaintiffs cannot escape the fact that the numbers establish without a doubt that Quinnipiac is entitled to Title IX's safe harbor, the only additional remaining consideration would be whether the Plaintiffs can establish sufficiently serious questions to the merits with a balance of hardships tipping in their favor. As established by consistent, judicial precedent, a Court should balance the hardships affecting the University in addition to the ones affecting the moving party. Here, Quinnipiac has, *inter alia*, already terminated the contracts of the men's golf coach, advised of the termination of men's outdoor

---

[3] Notably, women's and men's participation opportunities for these sports would have been counted either three

track, and announced and allocated financial and other resources to the elevation of the women's competitive cheer team. Defendant still must resolve its undisputed space "crisis", which undoubtedly affects the entire student body, without being forced to expend funds it does not have to build a new facility, or make an existing facility suitable for volleyball. Were this Court to issue the injunction, Quinnipiac would have to take significant steps to undo the ground work it has laid out for the women's competitive cheer team, in addition to spending substantial financial resources to reinstate the women's volleyball team and obtain scarce building space to replace the facility the volleyball team has been using, which Quinnipiac targeted for other purposes starting next year. Moreover, Quinnipiac would be compelled to go "back to the drawing board", and possibly reduce additional men's athletic opportunities to retain proportionality for both genders.

Conversely, while Plaintiffs presented compassionate arguments regarding their potential harm, even if true, the harm proffered is based in disappointment, emotional distress, and unspecified, purely subjective feelings while enjoying a free education.[4] Any non emotional harm can be remedied through the future award of monetary damages in the event the claims brought forth herein are adjudicated in their favor. In short, the balance of harm not only fails to tip decidedly in Plaintiffs' favor, it does not even come close.

## II.   FACTUAL BACKGROUND

Quinnipiac is a private, coeducational university located in Hamden, Connecticut. During the past 2008-2009 academic year, it had an undergraduate enrollment of 2089 male students and 3366 female students, or a male-to-female percentage distribution of 38.3% to

---

times or once—across the board.

[4] If disappointment and distress were suitable damages for injunctive relief, query what plaintiff would not be able to obtain one.

61.7%, respectively. (Tr. Ex. 3)  In early 2009, Quinnipiac undertook to reorganize its athletic program, in conjunction with all University operations across the board, for budgetary and related reasons.  The first athletic program targeted for elimination was men's golf, then its women's volleyball team. (See Tr. Ex. 3. at 2; testimony of Jack McDonald)  Notably, these two sports on each side provided the smallest number of athletic opportunities; 8 for men's golf and 14/15 for women's volleyball.  Following further internal discussions, in particular regarding the steps needed to ensure Title IX compliance when cutting a women's sport, men's outdoor track suffered the same fate.  At the same time, Quinnipiac decided to elevate its nationally recognized women's competitive cheer team participants to varsity status, adding 40 spots for female athletic participation.   (Id.)   Indeed, these decisions were not made haphazardly, and undisputedly were not targeted at the volleyball team due to gender.[5]

More specifically, as Quinnipiac's Athletic Director, Jack McDonald, represented, budgetary and space pressures mandated a discussion of program cuts.  Men's golf and women's volleyball were identified first; with respect to women's volleyball, the space "crisis" had been discussed for some time. (See McDonald Dep[6]. pp. 11-14, 16-21; trial testimony)  The facility used for volleyball already was being used for a number of other purposes.  As Mr. McDonald testified, it was initially proposed that, rather than eliminate volleyball, the University could explore future building of a new facility for the program.  However, with the economic crisis occurring starting in 2007 and forward, it was clear the University could not include such expenditures into its budget. (See McDonald Dep. at pp. 11-4, 16-21, 26-34; trial testimony).  At

---

[5] Of significant interest, Plaintiffs' expert witness, Dr. Lopiano, was asked about her knowledge of the attorney with whom Defendant consulted in this regard, Janet Judge, Esq.  Despite professing some lack of information regarding Attorney Judge's proclaimed area of concentration/expertise, it is compelling that Dr. Lopiano's consulting group recommends Attorney Judge to parties seeking such advice and counsel.  Query why the group Dr. Lopiano founded would irresponsibly recommend an attorney to parties when so little is claimed to be known about that attorney. (See Tab D to this memo)

the same time, Mr. McDonald testified without contradiction that student enrollment at Quinnipiac was increasing by leaps and bounds over the past few years.

In particular with respect to the elevation of the cheer team, it was clear that given the cheer team already encompassed competitive cheer team elements; already had a facility and practice accommodations; a coach in place who could easily be elevated to full time; and had already been engaging in national and other competitive cheer competitions for the past four years or so; the University could most easily bear the financial strain of elevating this existing team to varsity status. (See McDonald Dep. at pp. 40, 41-45, 49, 50; trial testimony and Powers trial testimony)  The University had, in fact, already been in contact with pertinent athletic personnel at the University of Maryland, which was at the forefront of declaring competitive cheer as a varsity sport, and thus a Title IX "countable sport".  Joining a number of other schools in doing so, Defendant knew that Maryland had been in discussions with the OCR already about meeting the OCR recommended test for any sport to be counted for Title IX purposes.  (See Tr. Exs. E and F)  Having already received materials from Maryland, Defendant knew, given the existing features of the cheer team, it could match the features of the Maryland team and pass muster under OCR guidelines.  (See McDonald Dep. at pp. 41-45; trial testimony; trial testimony of Powers)

On or about March 4, 2009, Quinnipiac communicated the decision to eliminate the respective athletic teams to the affected athletes and the coaches, as well as through a press release. (See McDonald Dep. p. 145.)  Relevant to the instant action, Quinnipiac agreed to honor its athletic scholarships for the women's volleyball team members (see McDonald Dep. p. 105; trial testimony), and informed the volleyball coach, Plaintiff Robin Sparks, like the men's golf

---

[6] Cited excerpts from the various depositions conducted in this case are annexed herewith as Tabs A, B and C.

coach, that she would continue to receive her contractual salary until June 30, 2009 but her one year contract would not be renewed for the next academic year.

More than three weeks later, on or about March 27, 2009, counsel for the Plaintiffs wrote to Quinnipiac alleging that Quinnipiac was violating Title IX and, in particular, that the number of athletic participation opportunities for men and women were disproportionate to the makeup of the student body. (See Decl. of Jonathan B. Orleans in Supp. of Mot. for TRO and Prelim. Inj. ¶3.) By letter dated April 15, 2009, Attorney Judge, acting as counsel for Quinnipiac, responded substantively, and provided Plaintiffs with statistical data reflecting that Quinnipiac had established athletic participation opportunities for the upcoming year that would comply with Title IX's prong I. (Tr. Ex. 3.)

### Plaintiffs' Challenges to the Defendant's Proportional Plan

Plaintiffs' attack on this plan, albeit having been somewhat of a "moving target" over the past weeks, seems to currently consist of the following: (a) as Defendant has not met proportionality in any prior year, the Court should determine, as a matter of law and in advance, that Defendant cannot do so next year; (b) there has not been compliance with any other prong of Title IX in the past (with, to use a polite term, the "lightest" of evidence including the purely speculative opinion of their designated "expert"), and thus, the Court should determine that, as a matter of law, the Defendant's representations regarding proportionality for next year should be wholly rejected; (c) obsessively focusing on the first year of roster management at Quinnipiac, that the few occasions during that initial year (2007) where several coaches attempted to change the number of participants before/after first dates of competition should compel this Court to conclude, as a matter of law (and despite the total lack of evidence these incidents were approved, systemic, unaddressed, suggested, or that they continued beyond 2007), that Defendant's plans for next year should be disbelieved and rejected; (d) even if the athletic

9

participation opportunities presented are true, Defendant is not entitled to duplicate count indoor track, outdoor track, and cross country track; and (e) as a matter of law, and in advance, that Defendant's competitive cheer opportunities cannot count for Title IX prong I compliance.

However, contrary to these unsupportable and speculative assertions, as more fully set forth herein, Plaintiffs failed, at least at this procedural stage, not only to sustain their burden of establishing irreparable harm, but also to sustain their burden of proving these claims, and thus establishing a likelihood of success (either as to the higher or lower burden) on the merits of their claims--or otherwise to establish the balance of harm tips decidedly in their favor.

## III.    LEGAL STANDARD FOR ISSUANCE OF PRELIMINARY INJUNCTION

It is well settled that issuance of preliminary injunctive relief is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Moore v. Consol. Edison Co. of N.Y., Inc., 409 F.3d 506, 510 (2d Cir. 2005).  In order to obtain such relief, a party must demonstrate: (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) a sufficiently serious question going to the merits and a balance of hardships tipping decidedly in the moving party's favor. See Brennan's, Inc. v. Brennan's Restaurant, L.L.C., 360 F.3d 125, 129 (2d Cir. 2004).  Moreover, "[w]hen the movant seeks a 'mandatory' injunction-that is, as in this case, an injunction that will alter rather than maintain the status quo-she must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." See Doninger v. Niehoff, 527 F.3d 41, 47 (2d Cir. 2008) (denying preliminary injunction and applying heightened standard where party sought to reverse decision of school principal to bar student from running for student government.) Under this formulation, a showing of irreparable harm is required in either case; indeed, it has been held in this Circuit that "in most cases the moving party must first demonstrate that [irreparable] injury is likely before the other requirements for the other

requirements for the issuance of an injunction will be considered." <u>Zervos v. Verizon of N.Y.</u> <u>Inc.</u>, 252 F.3d 163, 172 (2d Cir. 2003) (quoting <u>Rodriguez v. DeBuono</u>, 175 F.3d 227, 234-235 (2d Cir. 1999)).    Additionally, as set out in more detail below, and contrary to Plaintiffs' contentions, Plaintiffs do not seek maintenance of the *status quo*, but rather, that this Court alter the *status quo*, subjecting Plaintiffs to a heightened standard at the injunction stage.

**IV.    ARGUMENT**

    **(1)    The Undisputed Facts Fail to Establish Irreparable Harm.**

"The showing of irreparable harm is '[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction,' and the moving party must show that injury is likely before the other requirements for an injunction will be considered.    To establish irreparable harm, a party seeking a preliminary injunction must show that 'there is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation.'    **And, irreparable harm must be shown to be actual and imminent, not remote or speculative**." <u>Kamerling v. Massaneri</u>, 295 F.3d 206, 214 (2d Cir. 2002) (citations omitted and emphasis added).    Plaintiffs, using their own testimony, cannot establish the requisite irreparable harm.    In other words, while Defendant continues to vehemently deny the substantive claims made by Plaintiffs, it is initially important to point out that Plaintiffs cannot establish that they will suffer the type of irreparable harm necessary for the grant of an injunction.    In this regard, a brief overview of the Plaintiffs' individual circumstances is warranted.

    •<u>Erin Overdevest:</u>    Like all the students, Ms. Overdevest cites primarily to emotional harm and disappointment as her potential damages, admitting that her "irreparable harm" is the inability to play a particular sport of choice for one academic year (notably, also applicable to the other Plaintiffs, women's volleyball is not a professional sport nor has she been targeted by any

"scout" or other professional opportunity). At the same time, like the other students, she will continue to attend Quinnipiac on full scholarship. Ms. Overdevest admits she missed an entire year of play last year due to injury and the need for surgery. Yet, at the same time, and probative to the other students' claims of "irreparable harm", never agreed that this one year "hiatus" harmed or will harm her ability to pick up right where she left off and be competitive again. She further testified that the reason for her attending Quinnipiac as an undergraduate, and continuing next year, is specifically because of Quinnipiac's occupational therapy program—admittedly well known nationwide—and not because of volleyball. In short, she clearly will not be denied some life altering opportunity, and concededly has completed her undergraduate education having played volleyball for all seasons she desired until graduation. Indeed, Ms. Overdevest testified that the only reason she has any eligibility left to play at the graduate level is because she was medically unable to play last season. Ms. Overdevest claims that had she known that the volleyball program was going to be cut in 2009-2010 she would have delayed surgery that she admits was medically necessary, and would have "endured the pain", so that she could have played 4 years' worth of volleyball—a tenuous and frankly incredible assertion at best. .

•Stephanie Biediger: Ms. Biedeger admitted that she is wholly unable to play volleyball next year "as a result of [her upcoming] surgery and rehab, [she] will have to sit out ("red shirt") [her] sophomore year which covers the 2009 volleyball season and the 2009-10 academic year." (See Decl. of Stephanie Biediger in Supp. of Mot. for TRO and Prelim. Inj. ¶10; trial testimony) Thus, the sole "harm" she represented would be suffered is that she cannot "rehab" with a team—hardly the type of irreparable harm injunctions are designed to prevent. Nevertheless, at the same time, Ms. Biediger conceded in Court that she has never been denied access to Quinnipiac's trainers or rehab facility and fully expects to have these services next year. These facts also deprive this Plaintiff of standing in the first place to assert rights, at least at this

12

procedural stage, as she cannot establish a "substantial likelihood that the judicial relief requested will prevent or redress the claimed injury." See, e.g., Doherty v. Rutgers School of Law-Newark, 651 F.2d 893, 900 ( 3d Cir. 1981). Moreover, Plaintiff Biedeger's allegation that "the timing of the announcement [of the elimination of the volleyball team] was too late for [her] ... to make other plans for next year" (Biediger Decl. ¶ 15), is disingenuous, at best, because she has an entire academic year to transfer as she recovers from her injury, while in the meantime enjoying a scholarship at Quinnipiac. Compelling to note with this Plaintiff as well, in response to the request that she admit not playing for the next year would "set her back", undercut her own and her fellow student Plaintiffs' claims by emphatically disagreeing with that statement. Again, she and Ms. Overdevest's own personal situations prove the Defendant's contention— that even if it were "too late" for any student Plaintiff to transfer for next year, the ability to play competitively would be not be permanently and/or irreparably destroyed. With this Plaintiff as well, she further admitted she is on academic scholarship, and attends Quinnipiac due to the major it offers which will enable her to become a neurosurgeon.

•L.R.: L.R, an incoming college freshman in the 2009-10 academic year, testified through her mother. Ms. Riker's own testimony revealed the lack of irreparable harm her daughter may suffer; or, in the alternative, if such harm will be suffered, it would be at her own hands, and not due to any actions by Defendant. Specifically, Ms. Riker testified that L.R. *was offered a scholarship to play Division 1 volleyball at Fairfield University* and that *her daughter*[7] has decided to place that offer on hold pending the outcome of this litigation. Ms. Riker conceded that the decision to place the offer on hold could result in her daughter losing out on this opportunity. Riker claims that L.R. would "prefer" to play volleyball at Quinnipiac, but no

---

[7] While it remains unclear whether she was offered a full or partial scholarship, even if partial, such harm would be remedied by money damages.

reasonable person can contend that L.R. would suffer *irreparable* harm from playing volleyball at another university that has the same level of athletic play as Quinnipiac. While Ms. Riker testified as to her daughter's emotional distress if not able to play volleyball, it is astonishing that, if true, this Plaintiff would decide to chance being "devastated" and wait until the outcome of this proceeding, rather than ensure her happiness playing volleyball elsewhere. Furthermore, on this topic, all the student Plaintiffs made inconsistent representations to this Court: in their initial submissions, they suggested the University's announcement came "too late" for them to transfer. Yet, they represented during the TRO proceeding that a hearing prior to May 15 was necessary so that incoming students could determine whether to go elsewhere, obviously suggesting these incoming Plaintiffs still had options to play volleyball at another school. Then, in Court, Ms. Riker and Ms. Lawler (discussed below) both admitted to receiving other transfer offers.[8] In this regard, all this Court heard was that is was "difficult" to visit schools and make applications to more schools.

•Kayla Lawler- Ms. Lawler completed her freshman year at Quinnipiac and also testified as to the emotional distress she associated with the elimination of the volleyball team. Like L.R., and of critical importance, Ms. Lawler testified that after she was notified that the volleyball team was being eliminated she contacted a number of Division I schools and was offered a full athletic scholarship to play volleyball next year at the University of Rhode Island. While claiming (at age 19) that her "life is over", she nevertheless declined the opportunity to play volleyball there because she "did not connect with the coach" during a one day visit. That Ms. Lawler chose to stay at Quinnipiac and turned down a full athletic scholarship elsewhere— ensuring that her "life would not be over" rather than risk a particular outcome here certainly

---

[8] Again, the first two students addressed clearly would not transfer in any event since their reason for attending Quinnipiac is connected with their academic majors and not volleyball.

does not sustain her burden of establishing the type of irreparable harm sufficient to issue a preliminary injunction. In addition to these facts brought out by Plaintiffs themselves, along with the stipulation that Quinnipiac will continue their scholarships through graduation, it was also agreed that Quinnipiac would release Plaintiffs from their National Letters of Intent to play volleyball at Quinnipiac, if requested (notably, L.R. has not even yet signed such Letter of Intent).

Given these facts, it is clear that every student Plaintiff failed to sustain their burden of proving irreparable harm. See Equity in Athletics, Inc. v. Dept. of Educ., 291 Fed.Appx. 517, 521 (4th Cir. 2008) (affirming the denial a Title IX preliminary injunction in part because, even if there was a recognizable harm "to the student-athletes of not being able to compete in the sport and at the university of their choice[,] ... the student-athletes would not lose their scholarship funding if they chose to stay[,]" and "the students were free to transfer to other colleges offering their chosen sport"); see also Miller v. Univ. of Cincinnati, No. 1:05-cv-764, 2007 WL 2783674, at *11 (S.D. Ohio Sept. 21, 2007) (denying preliminary injunction under Title IX to stop the elimination of the women's rowing team, where the court found that plaintiffs had not proved that they would suffer an irreparable harm because "[t]he University ha[d] committed itself to continuing scholarship assistance to any rower who will not be able to compete because of termination of the program[,]" and it "ha[d] also agreed to 'release' under NCAA rules any rower who wishe[d] to remain in competitive collegiate rowing to transfer to another school."); Butler v. National Collegiate Athletic Ass'on., No. 06-2319 KHV, 2006 WL 2398683, at *4 (D. Kan. Aug. 15, 2006) (finding that student who sought tro to play collegiate football for a sixth year would not suffer irreparable injury where his financial aid package was not affected by his elimination from the football team, and the loss of an opportunity for a professional football career was "speculative.").

With respect to the alleged harm for having to wait until next year to seek a transfer, such claim is belied by the facts, as noted *supra*, that a number of the Plaintiffs admitted at the hearing that they were offered opportunities to transfer to other Division 1 school to play volleyball and that they declined such opportunities. Other Plaintiffs admitted that sitting out a year, if necessary, would not "end" their ability to pick up where they left off the year after. Moreover, the Plaintiffs have not demonstrated why a one-year period of inability to engage in a formalized volleyball program at this particular university would result in such irreparable harm that a private school's discretionary assessments of how it directs its athletic programs, how it needs to manage its budget and other resources, and how it chooses to achieve proportionality, should be overturned by this Court.  Indeed, it bears repeating that Ms. Biedeger affirmatively **denied** at the hearing that her ability to play competitively again would be permanently destroyed by sitting out one year, and Ms. Overdevest claims Defendant should be compelled to permit her to play again despite sitting out last year.  Furthermore, not one of the Plaintiffs has proffered any facts to establish that they have been scouted or targeted by any professional volleyball program, or that they will be denied viable, cognizable opportunities to play professionally (even if such a thing for women's volleyball existed), or that such opportunities will be denied going forward. Again, despite the tenor of their testimony, Plaintiffs cannot dispute that their primary allegations are of upset and disappointment, which cannot, even under the most liberal analysis of the applicable legal standards, support the issuance of a preliminary injunction. Given the binding precedent applied to the facts presented, the student Plaintiffs woefully fail to establish irreparable harm, and for this reason alone their motion should be denied[9].

---

[9] It is also worth noting in this regard that none of the Plaintiffs have alleged that they are precluded from participating in other women's intercollegiate sports at Quinnipiac. For example, Plaintiff Lawler has a prior history of playing high school varsity basketball and tennis, (Lawler Decl. ¶ 5) which coincidentally are two intercollegiate women's teams Quinnipiac offers,  (see Tracey Dep. p.7; McDonald Dep. p. 66.) and for which Plaintiff Lawler

Plaintiffs' claim that irreparable harm is presumed in civil rights cases is wholly without support. At the outset it is noteworthy that none of the cases cited by Plaintiffs, (Able v. United States, 847 F. Supp. 1038, 1043 (E.D.N.Y. 1994), Vietnamese Fisherman's Ass'n v. Knights of the Klu Jlux Klan, 543, F. Supp. 198, 218 (S.D. Tex. 1982) and Gresham v. Windrush Partners, Ltd., 730 F.2d 1417, 1424 (11th Cir. 1984)), were decided pursuant to Title IX or actually hold that in all civil rights cases irreparable harm is presumed[10]. Indeed, these cases are contrary to the law of this circuit. Specifically, the Second Circuit has made clear that even in cases alleging constitutional violations that "[t]he law of this Circuit requires the party moving for a preliminary injunction to show that it will suffer imminent irreparable harm." Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir. 1995) (reversing district courts grant of preliminary injunction in §1983 civil rights case because no showing of irreparable harm.) Moreover, a number of Courts have denied injunctions in Title IX cases based upon the lack of irreparable harm. See e.g. Equity in Athletics, Inc. v. Dept. of Educ., 291 Fed.Appx. 517, 521 (4th Cir. 2008); Miller v. Univ. of Cincinnati, No. 1:05-cv-764, 2007 WL 2783674, at *11 (S.D. Ohio Sept. 21, 2007) (denying preliminary injunction under Title IX where the court found that plaintiffs had not proved that they would suffer an irreparable harm); Butler v. National Collegiate Athletic Ass'on., No. 06-2319 KHV, 2006 WL 2398683, at *4 (D. Kan. Aug. 15, 2006) (finding that student who sought temporary restraining order to play collegiate football for a sixth year would not suffer irreparable injury.) Thus, irreparable harm is not presumed in Title IX cases.

---

could try to join. Thus, Plaintiff Lawler and the other Plaintiffs cannot claim that they have lost all opportunities to engage in women's collegiate sports *merely* because the women's volleyball team was eliminated. This fact alone should preclude a finding of irreparable harm.

[10] The cases cited by Plaintiffs held that potential violations of the First and Fifth Amendment constitute irreparable harm and that housing discrimination constitutes irreparable injury. Indeed, Gresham notes that housing discrimination almost always results in irreparable harm, not that irreparable harm is presumed. See Gresham, 730 F.2d at 1424.

The student Plaintiffs also cannot establish that they lack an adequate remedy at law in the form of monetary damages. The Plaintiffs have admitted that the essence of their alleged harm resulting from the elimination of the women's volleyball team is financial. To illustrate, Biediger declared that the members of the volleyball team "are very unlikely to obtain athletic, academic, or financial aid scholarships at this late date." (Biediger Decl. 15; but see trial testimony of Ms. Riker and Ms. Lawler, whereby they admitted to such offers) Ms. Riker echoed such sentiments when she testified in Court that her daughter was offered an athletic scholarship to Fairfield University, but that the scholarship was less than the scholarship offered by Quinnipiac.

•Robin Sparks: Even if she withstands Defendant's pending Motion to Dismiss her claims due to lack of standing, it remains clear that Ms. Sparks' sole allegations of irreparable harm consist of potential job loss, and claims that such potential is related to the "gender of her students". While Coach Sparks may attempt to characterize her claim as one of discrimination arising under Title IX, it is clear that she is simply trying to assert the purported rights of her students, something she cannot do. See Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51, 58 (2d Cir. 1994) ("Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party.") Indeed, Coach Sparks seeks to have Quinnipiac reinstate the volleyball team, something that could only be accomplished by her students pursuant to Title IX, and clearly hopes that such relief will necessarily compel Quinnipiac to renew her contract. (See Compl. at ¶ 85) Further, to the extent that Coach Sparks is attempting to assert that she was individually discriminated against on the basis of the "gender of her students," such claim, at best, is preempted by Title VII, as it is well settled that Title VII provides a "carefully balanced remedial scheme" whereby employees may pursue private claims for employment discrimination. See Lakoski v. James, 66 F.3d 751, 754 (5th Cir. 1995).

Furthermore, in any event, Sparks cannot employ an injunction to prevent loss of employment, as such harm is never deemed to be irreparable. See Sampson v. Murray, 415 U.S. 61, 90-91, 94 (1974). Additionally, a number of Sparks' allegations sound in breach of contract and/or promissory estoppel, not in Title IX (or even Title VII) violations.[11] Like the students, then, Sparks' own allegations clearly establish that the essence of her alleged harm is likewise *financial*, patently remediable in an action for damages, and clearly bringing her claims outside the realm of injunctive relief. See Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004) ("If an injury can be appropriately compensated by an award of monetary damages, then an adequate remedy at law exists, and no irreparable injury may be found to justify specific relief.") (citing Borey v. Nat'l Union Fire Ins. Co., 934 F.2d 30, 34 (2d Cir. 1991)). Indeed, every plaintiff claiming wrongful discharge can point to unexpected career interruption; loss of future pecuniary value, etc. Yet, such harm is wholly inappropriate for injunctive relief, even if truly suffered.

The two cases Plaintiffs have cited to support their contention that the elimination of the Quinnipiac women's volleyball team will constitute irreparable harm to them are patently distinguishable. First, Cohen v. Brown Univ., 991 F.2d 888, 901 (1st Cir. 1993) dealt with a situation where the defendant university demoted two women's intercollegiate teams, and no men's teams. Nor were other women's athletic opportunities being elevated at the same time. Thus, the irreparable harm was implicitly premised on "a finding that the University did not meet or even closely approach the 'substantial proportionality' threshold because it offered too few varsity opportunities for women." Id. at 903. Moreover, a close reading of Cohen reveals that, after considering the students' loss of competitions, recruitment, and coaching, the Court of

---

[11] Sparks has suggested a potential claim for retaliation in connection with a request she not practice with her team. However, this allegation is not raised in the Complaint and, in any event, is not suitable for injunctive relief as such

Appeals *merely* deferred to the district court. Indeed, it noted that the plaintiffs' alleged harms "exist to some degree," and that the "overall record supports, **even though it does not compel**, the court's assessment of their cumulative severity." Id. at 905 (emphasis added). In contrast to Cohen, Quinnipiac's evidence establishes that it will achieve substantial proportionality, in 2009-10, and, most critical, Quinnipiac is not solely eliminating women's, or even women's and men's, sports, and is simultaneously adding 40 female athletic opportunities. Indeed, the facts specific to the Plaintiffs here clearly demonstrate they cannot rely on a disproportionate plan in place on which to base such a presumption. Most critical to note, Cohen was decided by a First Circuit court, which adds, as part of its threshold inquiry for issuance of an injunction, a consideration of the public interest—not part of the test applied by this Circuit. In any event, even in Cohen, the Court acknowledged the Plaintiffs' obligation first and foremost to establish irreparable injury which was *not presumed*.

Similarly, in Favia v. Indiana Univ. of Pa., 812 F. Supp. 578, 583 (W.D. Pa. 1993), the court found likelihood of irreparable harm after the university cut the women's gymnastics and field hockey teams, likely because the cuts resulted in a 19.1% disparity between the percentage of the female undergraduate population and the percentage of women athletes. Thus, a reasonable interpretation of Favia is that a plaintiff faces risk of irreparable harm as a result of the elimination of spots in women's teams when there would exist disparity under prong I, which is not the case at Quinnipiac in 2009-2010 as it is simultaneously adding athletic opportunities to females. (Tr. Ex. 3.)

### (2)(a)   Plaintiffs Cannot Establish a Substantial, or General Likelihood of Success on the Merits

---

"harm" has already occurred.

Even if Plaintiffs are found to have sustained their burden of proof as to irreparable harm, which they cannot, Plaintiffs must then establish a substantial likelihood of success on the ultimate merits of their claims. As set forth above, contrary to the representation of their burden at this procedural stage, Plaintiffs are seeking to alter the *status quo* (*i.e.,* reinstate an eliminated sports program which, in turn, will necessitate further decision reversals). Among other things, Defendant has already notified the men's golf coach of his contract termination; disbanded the team, deleted the budget allocation for that program, added 40 spots for varsity competitive cheer, upgraded the competitive cheer team's web site to reflect it is a varsity sport, scheduled additional varsity cheer competitions (see McDonald Dep. Pp. 63, 116; McDonald trial testimony); announced that it will eliminate men's golf and outdoor track programs, and most recently, approved scholarships for the competitive cheer team. If the Court compels Defendant to reinstate volleyball, among these things, the Defendant would have to potentially re-assess the statistics to ensure compliance with Title IX and reinstate other men's programs; and/or reduce spots in other men's programs; and/or cancel varsity cheer after it has already been announced. The almost insurmountable space crisis at the University still has to be resolved. Resources already committed to other functions would have to be retracted. Such actions can hardly be deemed to constitute "maintenance of the status quo." Consequently, Plaintiffs clearly bear the heightened burden of establishing "clear or substantial likelihood of success on the merits." See Doninger, 527 F.3d at 47. At the same time, even under the lesser standard, given the record evidence, Plaintiffs' request for a preliminary injunction is improper given the information provided regarding Defendant's Title IX compliant plan.[12]

---

[12] Notable in this regard, Plaintiff's counsel advised that this information was not substantively addressed in his papers because Quinnipiac's attorney, Janet Judge, did not forward her substantive response until just prior to his filing of this action on April 16, 2009. Such an explanation is unavailing; all Plaintiffs had to do was wait one more day to file and present papers that were complete in their presentation of the facts. Equally noteworthy, Plaintiffs

### (i)    Plaintiffs Cannot Establish Intentional Discrimination

As a threshold matter, the Plaintiffs cannot establish that Quinnipiac intentionally discriminated against them on the basis of their sex, which is a prerequisite to their Title IX claim. Cannon v. Univ. of Chicago, 648 F.2d 1104, 1109 (7th Cir.), cert. denied, 454 U.S. 1128 (1981) ("Similarly, Title IX requires that a plaintiff show intentional sex discrimination."- holding plaintiff's claim that medical school's admission policies had disparate impact on women was insufficient to meet Title IX's intentionality requirement, even when the university ostensibly knew of the impact of said policies); see also Fulani v. League of Women Voters Educ. Fund, 684 F. Supp. 1185, 1193 (S.D.N.Y. 1988); Nagel v. Avon Board of Education, 575 F. Supp. 105, 109 (D. Conn. 1983).

Here, the record establishes that Quinnipiac and the officials involved in the elimination of the volleyball's team had gone out of their way to achieve Title IX compliance under the substantial proportionality safe harbor for next year.   McDonald testified that, early on, the University enlisted Janet Judge, an attorney with vast Title IX compliance experience, to assist them in ensuring Title IX compliance.   (See McDonald Dep. p. 33; McDonald trial testimony) In fact, McDonald's initial reduced budget for the Athletic Department proposed keeping all sports, including women's volleyball.   (Id. at p. 35.)   Further, once it was clear that teams were to be eliminated, the first team McDonald offered to eliminate was men's golf.   (Id. at p. 49;

---

waited until March 27, 2009, approximately three weeks after Quinnipiac announced the cancellation of the volleyball program on March 4, 2009, to even contact Defendant concerning the possibility of this action. (See Decl. of Jonathan B. Orleans in Supp. of Mot. for T.R.O. and Prelim. Inj. ¶ 3.)  This inexplicable delay should be considered by this Court in determining whether the demand for an unreasonably short time frame for the hearing in this case potentially prejudiced the Defendant, and even if Plaintiffs may even bring a Title IX claim at all.  See Gebser v. Lago Vista Ind. Sch. Dist., 524 U.S. 274, 289, 118 S.Ct. 1989 (1998) ("Presumably, a central purpose of requiring notice of the [alleged Title IX] violation 'to the appropriate person' and an opportunity for voluntary compliance before administrative enforcement proceedings can commence is to avoid diverting education funding from beneficial uses where a recipient was unaware of discrimination in its programs and is willing to institute prompt corrective measures.").

McDonald trial testimony)  He also lobbied to obtain the commitment of the Quinnipiac's senior administration that, "if Quinnipiac was going to drop sports, particularly a women's sport, that [Title IX's] prong one needed to be met."  (Id. at 40.)

Tracey Flynn, Associate Director of Athletics for Compliance and Student Services and Senior Woman Administrator, testified that she raised the issue of Title IX compliance early on in a meeting to discuss the elimination of women's volleyball, and explored with McDonald the fact that they would have to also cut men's sports.  (Flynn Dep. p. 18-19.)  Further, Ms. Flynn testified that Quinnipiac instituting roster management starting in the 2007-08 academic year was specifically achieved to work toward increasing the percentage of women's athletic opportunities (and eventually achieve compliance with prong one of Title IX) over the years.  (See Flynn Dep. p. 80; trial testimony.)  Thus, the record clearly establishes that Quinnipiac exerted diligent, good faith efforts to comply with Title IX, and not one iota of evidence that it intentionally discriminated against the Plaintiffs on the basis of their sex by eliminating the women's volleyball team can be presented.  Consequently, Plaintiffs cannot establish likelihood of success on the merits of their claim because they could not demonstrate that Quinnipiac engaged in intentional discrimination, which is a condition precedent for a Title IX violation.  See Cannon, 648 F.2d at 1109.  In any event, not one Plaintiff testified, because they cannot do so, that the elimination of the team was due to the gender of the players.

      (ii)     **Lack of Standing Itself Defeats a Showing of a Likelihood of Success**

As previously discussed, Plaintiff Sparks lacks standing.  Therefore, *a fortiori*, she cannot establish likelihood of success on the merits.[13]  Additionally, Plaintiff Biedeger is unable to

---

[13] Indeed, Plaintiffs cannot adjudicate prior compliance or non-compliance with Title IX by Defendant, as they have not even alleged a denial of opportunities to participate in athletic programs of their choice.

participate at all in volleyball next year, and thus, also lacks standing to establish a likelihood of success here.

> **(iii)    Plaintiffs cannot Prevail because Quinnipiac Stays on Title IX's Sunny Side by Meeting Title IX's Substantial Proportionality Safe Harbor (a.k.a, prong 1) for the 2009-2010 Academic Year.**

The courts have adopted a three-part test for determining whether a school complies with Title IX. See Boucher v. Syracuse Univ., 164 F.3d 113, 117 (2d Cir 1999) ("Under the implementing regulations, there are three safe harbor defenses to a claim of unequal accommodation of student interest in varsity athletics.") (citing 34 C.F.R. § 106.41(c)(1); 44 Fed.Reg. 71413 (1979)). Here, to establish a Title IX violation, Plaintiffs bear the initial burden of establishing that Defendant cannot satisfy the first prong; i.e., "whether intercollegiate opportunities for male and female student are provided in numbers substantially proportionate to their respective enrollments. See Cohen, 991 F.2d at 901. If, and only if, Plaintiffs meet this burden does the burden then shift to Defendant, which can still establish compliance with Title IX provided they can satisfy the second or third prong of the test. Id. However, if Plaintiffs fail to satisfy their burden on the first prong, the Court need not even address the other two prongs. See Cohen, 991 F.2d at 897-98 ("**[A] university which does not wish to engage in extensive compliance analysis may stay on the sunny side of Title IX simply by maintaining gender parity between its student body and its athletic lineup.**") (emphasis added); Boulahanis v. Bd. of Regents, 198 F.3d 633, 639 (7th Cir. 1999) ("Because the University has achieved substantial proportionality ..., it is presumed to have accommodated the athletic interests of that sex."); Horner v. Kentucky High School Athletic Ass'n., 43 F.3d 265, 275 (6th Cir. 1994) ("'[S]ubstantial proportionality' provides a safe harbor for recipients of federal funds."); accord

Roberts v. Colorado State Bd. Of Agric., 998 F.2d 824, 829 (10th Cir. 1993).[14]  While Defendant

maintains its objection to the Court's acceptance of any such legal conclusions, it is interesting to

note that Plaintiffs' own designated expert, Donna Lopiano, agrees with this analysis.  (Lopiano

Depo. p. 158.)

Plaintiffs start by asserting that lack of proportionality, ignoring Quinnipiac's own

admission it had not historically relied on prong I compliance prior to this coming year, outright

proves, as a matter of law, Defendant cannot rely on that prong for next year.  They then move to

discussion of the second two prongs, and cryptically proffer that the University has a

demonstrated history of failure under these prongs as well—again, notably without proffering

any concrete evidence-as opposed to speculation based on erroneous facts-to support those

allegations.    For example, Plaintiffs fail to identify even one student who, in the past,

demonstrated an interest in any particular athletic program but was denied that opportunity

(relevant at a minimum to the third prong).  See 44 Fed. Reg. 71, 448.  Notable in this regard as

well, these Plaintiffs cannot adjudicate a purported non-compliance with prong III.  Likewise, in

support of their assertion that Quinnipiac has failed to comply with prong II, Plaintiffs offer an

unsupported and arbitrary so-called "expert opinion" that the OCR requires a two to three year

look-back requirement for compliance with prong II and that because Quinnipiac did not add a

women's sport in the past two years it has not complied with Prong II.  Indeed, Plaintiffs' expert

---

[14] Commentators also acknowledge that, if a university satisfies prong one, it is in compliance with Title IX, without need for further analysis.  See Jerome Dees, Access or Interest: Why Brown has Benefited African-American Women More than Title IX, 76 UMKC L. Rev. 625, 631 (2008) ("The substantial proportionality test has been the litmus test in assessing institutional compliance with Title IX."); Brian L. Porto, Halfway Home: An Update on Title IX and College Sports, 34 SUM Vt. B.J. 28, 29 (Summer 2008) ("Colleges have tried to satisfy the substantial proportionality test, especially after the Department of Education's Office for Civil Rights (OCR), which has been responsible for enforcing Title IX since 1980, published a 'Clarification' of its enforcement policy in 1996. The Clarification stated that satisfaction of that test was a 'safe harbor' that all but assured no additional scrutiny of the gender equity in a college's athletic program.)

made the bald assertion that Quinnipiac does not understand Prong II. Plaintiffs' expert failed to provide any authoritative source for this proposition, but relied only on a vague reference to verbal statements in the past by unidentified OCR representatives. (Lopiano Dep. pp. 181-83). Contrary to Plaintiffs assertions Quinnipiac does not fundamentally misunderstand Prong II of Title IX and as testified by Jack McDonald Quinnipiac has a history, during the past fourteen years of Mr. McDonald's tenure as athletic director, of adding women's sports teams and increasing opportunities for women, *including* increased financial support and scholarships.

In short, such cryptic comments fall far short of the type of evidence required to sustain a request for injunctive relief irrespective of whether the higher or lower burden is applied by the Court. See Cohen, 991 F.2d at 895 ("a court assessing a Title IX compliance may not find a violation solely because there is a disparity between the gender composition of an educational institutional student constituency, on the one hand, and its athletic programs, on the other hand.") Thus, these allegations regarding purported noncompliance in the past, designed simply to inflame the Court and public against this Defendant, are nothing more than an attempt to divert attention away from the most probative fact; i.e., that Plaintiffs have failed to proffer any viable, probative evidence to support their claims intended to remedy potential future conduct. As Plaintiffs cannot sustain their burden as to the first prong, the injunction request is without merit.

Here, Quinnipiac made a decision to reorganize it programs, to eliminate some of the male sports, to eliminate women's volleyball and to elevate its competitive cheer team to a varsity sport, particularly during difficult, economic times. (See McDonald Dep. p. 135.) Even the cases cited by Plaintiffs concede that "Title IX does not require institutions to fund any particular number or type of athletic opportunities-only that they provide those opportunities in a nondiscriminatory fashion if they wish to receive federal funds." Cohen, 991 F.2d at 906. Hence, "institutions may still comply with Title IX by cutting athletic programs such that men's

and women's athletic participation rates become substantially proportionate to their representation in the undergraduate population." Roberts, 998 F.2d at 830; see also Neal v. Bd. of Trustees of the California State Univ., 198 F.3d 763, 769-70 (9th. Cir.1999).  Although Plaintiffs may be disappointed that Quinnipiac chose to eliminate women's volleyball, at the end of the day, the statistics establish that, for the upcoming 2009-10 sports season, Quinnipiac offers athletic opportunities for male and female athletes in substantial proportion to the university's gender makeup; the only critical fact probative to the instant proceeding.  See Equity in Athletics, Inc., 291 Fed.Appx. at 521 (affirming denial of preliminary injunction barring university's elimination of men's and women's athletic teams and finding that university should be able to chart its own athletic opportunities without judicial oversight.); Neal, 198 F.3d at 769-70 (holding that eliminating men's sports programs to create proportionality does not violate Title IX.)

Specifically, at this stage, the Plaintiffs' claims concern only participation opportunities, and nothing else. (Pls.' Mem. of Law in Supp. of their Mot. for TRO, p.14) ("Only equal athletic participation opportunities are currently at issue in this case.")  Defendant has already resolved it intends to comply with prong I, and Plaintiffs bear the burden of proof that Defendant cannot do so.  See Horner, 43 F.3d at 275 ("The plaintiffs bear the burden of proof on subsection (1), that of showing statistical disparity.") (citations omitted).  Moreover, what Plaintiffs fail to even address is the fact that, even if this Court deems Defendant failed to comply with prong I, the Court may not compel the Defendant to retain any particular athletic program, such as the volleyball team. Equity in Athletics, Inc. v. Dept. of Educ., 504 F. Supp. 2d 88, 100 (W.D. Va. 2007) ("Title IX does not establish a right to participate in any particular sport in one's college and there is no constitutional right to participate in intercollegiate ... athletics.") (citing Gonyo v.

Drake Univ., 837 F. Supp. 989, 994 (S.D. Iowa 1993); Miami Univ. Wrestling Club v. Miami Univ., 302 F.3d 608, 615 (6th Cir. 2002)).

Thus, even if the Plaintiffs were to prevail here, the Court should at most issue an order requiring that Quinnipiac establish a plan of compliance, without constraining Quinnipiac to take specific actions. See Cohen, 991 F.2d at 906-07 ("the many routes to Title IX compliance make specific relief most useful in situations where the institution, after a judicial determination of noncompliance, demonstrates an unwillingness or inability to exercise its discretion in a way that brings it into compliance with Title IX"); Chalenor v. Univ. of North Dakota, 291 F.3d 1042 (8th Cir. 2002) (because the school chose to pursue compliance under prong 1 it was allowed to shape the participation opportunities in the manner it desired to be in compliance).

Query, then, how Plaintiffs succeed given that the Defendant would have the option to comply with prong I by either: (a) eliminating other men's programs or spots thereon; or (b) instituting a different women's athletic program that can more easily satisfy its needs at this time. See Cohen, 991 F.2d at 898-899 n. 15 ("Title IX does not require that a school pour ever-increasing sums into its athletic establishment. If a university prefers to take another route, it can also bring itself into compliance with the first benchmark of the accommodation test by subtraction and downgrading, that is, by reducing opportunities for the overrepresented gender while keeping opportunities stable for the underrepresented gender (or reducing them to a much lesser extent"); see also Roberts, 998 F.2d at 830 (10th Cir. 1993)("We recognize that in times of economic hardship, few schools will be able to satisfy Title IX's effective accommodation requirement by continuing to expand their women's athletics programs"); 1996 OCR Clarification ("The three-part test gives institutions flexibility and control over their athletics programs.") As the Cohen court aptly stated:

28

The beacon by which [courts] must steer is Congress's unmistakably clear mandate that educational institutions not use federal monies to perpetuate gender-based discrimination. At the same time, [courts] must remain sensitive to the fact that suits of this genre implicate the discretion of universities to pursue their missions free from governmental interference and, in the bargain, to deploy increasingly scarce resources in the most advantageous way.

Cohen, 991 F.2d at 907.

> ### (iv) Plaintiffs' Attacks on Quinnipiac's Calculations of its Substantially Proportional Athletic Activities for the 2009-2010 Academic Year are Unfounded.

**•Past Data is Irrelevant and Inadmissible:[15]**

Plaintiffs and their purported "expert" Dr. Donna Lopiano are erroneously fixated on Quinnipiac's Equality in Athletics Disclosure Act Reports[16] ("EADA Reports") and other data — going back to the academic year 1995-1996 — to suggest that, because Defendant did not rely on substantial proportionality prong in the past to comply with Title IX, it *cannot, as a matter of law,* comply with prong I in the *upcoming* 2009-10 academic year. Such reliance in historical data is misplaced for a series of reasons, and unsupported by law or fact. In a recent evidentiary ruling, this Court limited the scope of discovery to the academic years 2007-08, 2008-09 and 2009-10, and deemed such information to be admissible at hearing. Assuming *arguendo* that the Court would consider the data for any prior year, at this stage, this Court would be incapable of remedying any alleged harm for those past years. It is undisputed that Plaintiffs played varsity volleyball for Quinnipiac in the 2008-09 academic year—which means that a *prospective* preliminary injunction for academic year 2009-10 would not address any alleged Title IX violations for *past* years. Accordingly, for purposes of a preliminary injunction, the Plaintiffs

---

[15] Defendant's motion *in limine* to preclude the introduction into evidence of its EADA Reports or other compliance data prior to academic year 2008-09 was granted in part; data reflecting academic year 2007-08 was permitted. Similarly, as will be discussed *infra*, Defendant has also moved to preclude Dr. Donna Lopiano's "expert" testimony.

[16] EADA Reports reveal, *inter alia*, the proportion of Title IX athletic opportunities for male and female student athletes in relation to their respective percentage of the total undergraduate population

should not be permitted to rely on *past* violations, even if established (which Defendant denies can be established), and their claims are moot even for the most recent 2008-09 academic year.

Further, Quinnipiac's past history of Title IX compliance efforts under prong I in particular is irrelevant to the pertinent issue at hand, which is to determine whether this Court should find that Quinnipiac brings itself into compliance with Title IX for the academic year 2009-10.[17]   In short, the Plaintiffs try to use data from past years to show that, because Quinnipiac behaved in a certain way with regards to prong I in the past, in the future, it must be found as a matter of law that it will behave in that same way, and its proposals should not be given any credibility or weight whatsoever.  Such extrapolation of Quinnipiac's past behavior to predict the future is logically flawed because it assumes that all the relevant factors influencing Quinnipiac's Title IX behavior in the past will remain constant in 2009-2010, and further ignores the undisputed fact that, starting in 2006, Quinnipiac committed to overall improvement during the following five years to increasing female participation opportunities, which it has done.  Such an assumption is even more faulty because Quinnipiac faces a *new* factor that will provide added motivation to ensure it meets Title IX's requirements in the 2009-10 academic year; this class action.  Plaintiffs' reliance on past Title IX data is akin to an attempt in a civil case to admit character evidence or evidence of past wrongs or acts to establish a propensity or likelihood that the conduct at issue is also unlawful, which is impermissible under the current evidence rules. See Fed. R. Evid. 404(b) ("Evidence of other ... wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."); see also Burns v. Slippery Rock Univ. of Pennsylvania, 2008 WL 166903, at *2 (W.D. Pa. 2008) (excluding

---

[17] Even assuming *arguendo* that the historical EADA reports establish that Quinnipiac did not comply with prong one in the past fourteen years, that would not be the end of the inquiry as Plaintiffs suggest.  In such a hypothetical scenario, Quinnipiac would be entitled to satisfy Title IX with prongs two or three in each of those years.  Thus,

evidence of employee's poor performance during time period different than the one at issue in an employment discrimination case under Rule 404(b)).

**•Contrary to Plaintiffs' Assertions, under Applicable OCR Regulations and Agency Precedent, it is Proper for Quinnipiac to Count the Positions in the 2009-10 Varsity Competitive Cheer Team Towards its Total Number of Athletic Opportunities for Women.**

Plaintiffs argue that varsity competitive cheer program spots cannot be counted for purposes of assessing compliance with Title IX. Plaintiffs' purported "expert," Dr. Lopiano, claims to rely on several documents, including stale letters from the Department of Education, Office of Civil Rights ("OCR"), National Collegiate Athletic Association ("NCAA") guidelines and a position from the Women's Sports Association in testifying in this regard.[18] Assuming *arguendo* that Dr. Lopiano's testimony is admissible, *her* opinion that competitive cheer programs do not constitute athletic opportunities for purposes of Title IX should be disregarded for a plethora of reasons. First and foremost, in its April 2000 letter to David Snead OCR stated that, when it evaluates the opportunities provided by an institution's intercollegiate sports, "OCR does not have a specific definition of the term 'sport'", and "[i]nstead, OCR considers several factors related to an activity's structure, administration, team preparation and competition[19]." (Tr. Ex. E.)

OCR guidanc e in  this regard  applies  to all sports,  and employs  a five-part test for determining if and when varsity competitive cheerleading can be counted for Title IX purposes.

---

including the historical data would exponentially increase the complexity of this hearing because Defendant would be entitled to introduce evidence of compliance with prongs two or three for each of those years.

[18] Defendant has filed a pending Motion in Limine to Preclude the Expert Testimony of Dr. Donna Lopiano, on among other grounds, the fact that the bulk of her testimony asserts legal conclusions and usurps the function of this Court in deciding what is Title IX law. Worth noting, at least one court opted to not rely on her "expert" opinion in deciding legal issues in a Title IX case in the context of a motion for summary judgment. Humphreys v. Regents of University of California, 2006 WL 1867713, at *4-5 (N.D. Cal. Jul. 6, 2006).

[19] This statement was reiterated in recent guidance provided by the OCR in September 2008. Although not an exhibit at trial the September 2008 OCR Dear Colleague letter is annexed hereto as MOL Tab E.

(Tr. Ex. E)  The materials from the University of Maryland reflecting OCR input, for example, refer to a fixed season, eligibility requirements and judging criteria, available championships and scholarships, and recognition by an athletic conference, it is permissible to count them as a Title IX sport.  (Tr. Ex. F.)

In addition, on May 2006, David H. Haglund, Univ. of Maryland's Athletic Director, wrote to representatives from other athletic administrators: "In September I wrote to provide you a brief update on the [university's] competitive cheer program, now completing its third full season as a fully-fledged varsity sport. ... [our decision to upgrade the university's competitive cheer program] came after lengthy consultation with [OCR] to ensure that our team met standards consistent with Title IX purposes and guidelines." (See Tr. Ex. G.)  Plaintiff's "expert" suspected the accuracy of these letters, even suggesting they were deliberately inaccurate to "create a paper trail", without any evidence to support such suspicions.  She further based her opinion regarding Defendant's ability to provide competitive cheer opportunities which would count for Title IX compliance based on inaccurate and incomplete information regarding Defendant's current cheer team elements.  (See Lopiano Dep. at pp. 218-22; 223-28; 237-43.)  At the same time, Dr. Lopiano's well established, predisposition against competitive cheer is highly publicized and no secret to the sports community.  Id.  See Tr. Exs. Y, Z, AA and BB[20].

In short, even with a less than fully developed evidentiary record, Plaintiffs cannot sustain their burden so as to compel drastic injunctive relief that Quinnipiac's cheer team can never meet OCR's criteria to have its upgraded 2009-10 competitive cheer team count as athletic opportunities for women to meet Title IX's substantial proportionality safe harbor.  (McDonald Dep.  p. 116) (discussing the upgrade of Quinnipiac's Competitive Cheer Team's website and

stating that "it has all of the same features that we give to all the other varsity sports: roster, schedule, stats, pictures, ya-da-ya-da-ya-da. We've already scheduled four to six varsity competitions, some at home, some away. (See trial testimony). Also, Mary Ann Powers, the current coach of Quinnipiac's Competitive Cheer team, testified as to all aspects of Quinnipiac's competitive cheer program, the types of athletic skills the participants in the cheer squad must possess (vis–à–vis to eligibility requirements and judging criteria), the types of competitions in which the cheer squad participates, the significant and ever increasing interest of current and incoming students in varsity competitive cheer, and her requests to Quinnipiac over the span of several years to elevate competitive cheer to varsity status. Her testimony unequivocally established that these competitive cheer student-athletes are no less athletic than any volleyball player, or gymnast, but are ridiculed and demeaned by people such as Plaintiff Sparks.[21]

Equally compelling, Quinnipiac has proffered evidence that it is committed to and can meet the OCR standards to count competitive cheer as a Title IX sport in the upcoming 2009-10 academic year because, even though competitive cheer was not considered a varsity sport in the 2008-09 academic year, its existing team *already* competes in national competitive cheer championships (and will continue to do so), having very recently placed sixth, on April 11, 2009 in a Division I competition at the NCA/NDA Collegiate Cheer and Dance *Championship*. (See Tr. Ex. K.) In addition, Quinnipiac plans to offer scholarships to members of the Competitive Cheer Team, having committed preliminarily to six scholarships over the next three years. (See McDonald Dep. p. 62; trial testimony.) McDonald already testified that, given that it takes time

---

[20] Although these exhibits were not admitted into evidence at the hearing, Defendant indicated that they were being offered to the extent the Court permitted Plaintiffs to submit excerpts of the deposition of Dr. Lopiano. As the Court has permitted such designations, Defendant respectfully submits these article as evidence of Dr. Lopiano's bias.

[21] See Tr. Ex. L) ("They cut volleyball and elevated cheerleading .... My mom could be a cheerleader, but not an athlete." )

to develop sports programs, even if in the short-term the total expenditure on competitive cheer will be less than what it was on women's volleyball in 2008-09, over time, it will probably match the budget of at least three other sports programs (i.e., soccer, baseball and softball). (See McDonald Dep. p. 118-19.) Moreover, given that Quinnipiac will honor the women volleyball team's scholarships through graduation, it logically follows that, with Quinnipiac's limited athletics' budget, it may take some time to give the women's competitive cheer program all the financial resources it deserves, but the commitment exists.[22]

In stark contrast, Plaintiffs have, at this time, completely failed to proffer even one iota of evidence to establish that the Defendant's varsity competitive cheer team will fail OCR's test and, in any event, such allegations at this juncture would be speculative and premature at a minimum. (See McDonald Dep. p. 49.) (See also Tracey Dep. p. 83) (testifying that Quinnipiac's Athletic Department refers to the University of Maryland's documents regarding competitive cheer as "the Bible"). Plaintiffs make much of the lack of a governing body, but do not dispute, because they cannot, that the existence of a governing body is only one of the considerations by the OCR in evaluating whether a particular sport will be counted toward Title IX compliance. See Tr. Ex. E.

As to most of the documents Dr. Lopiano relies on to argue that competitive cheer is not a Title IX sport, it is curious that several of them are not legally binding or are taken out of context. For example, NCAA guidelines are not binding on this Court. In addition, it is noteworthy that a document by the Women's Sports Association's Position on Cheerleading as a Varsity Sport, on which Dr. Lopiano relied, concedes that, "[i]f the primary purpose of ...

---

[22] As a matter of common sense and fairness, the Court should not punish Defendant by comparing expenditures in the upcoming year for competitive cheer with volleyball's former budget. Further, the Court should count the women's volleyball players' "honored" scholarships as part of the Defendant's total budget expenditure on women's athletics.

cheerleaders is to compete against other ... cheerleaders on a regular season and post season qualification basis in much the same structure as basketball or gymnastics and if the team conducted regular practices in preparation for such competition while under the supervision of a coach, these activities could be considered sports." (Tr. Ex. 36.) Thus, because Quinnipiac's cheer program will be run using much the same structure as say basketball, and it can indeed comply with the OCR's test, it is inescapable that it must be counted for Title IX compliance purpose for the upcoming 2009-10 academic season.

Additionally, as previously mentioned, Dr. Lopiano's *opinion* should be discounted on the basis that she is personally biased against the sport of competitive cheerleading. Dr. Lopiano has made no secret of her personal opinions regarding the possibility of competitive cheer teams being countable for Title IX purposes—nor has Plaintiff Sparks.[23] (See Tr. Ex. Y) (Lopiano declared in an article: "is [competitive cheerleading] a bona fide athletic opportunity for women or a convenient one for the athletic department?"). Dr. Lopiano's comments are likely based on misconceptions about competitive cheerleading, and to avoid making the same mistake, this Court should bear in mind that competitive cheer participants should not be confused with the cheerleaders who attend college football and basketball games, staying on the sidelines and simply "cheering." Rather, cheerleading at the varsity level constitutes a highly skilled, athletic undertaking similar in many ways to synchronized swimming, an Olympic sport.

Dr. Lopiano's widely disseminated distaste for acknowledging competitive cheer as a sport for purposes of Title IX not only fails to constitute evidence for purposes of the Court's entry of an injunction, it also actually goes to impeach the credibility of the Plaintiffs' "expert."

---

[23] Coach Powers will also testify that these female cheer athletes are being harassed and discriminated since this litigation began, and prior. Indeed, the Plaintiffs are not the only individuals who feel disappointment—indeed, their peers who happen to be interested in another sport are not only feeling disappointment, they are also feeling harassed, ridiculed, and targeted for diminution in worth as athletes.

To repeat, the OCR has articulated the ways in which this activity can indeed be counted as a sport for Title IX purposes, and irrespective of Dr. Lopiano's or the Plaintiff Starks' personal opinions, entry of the drastic remedy requested must be based on factual evidence applied to OCR's standards.

Oddly, Plaintiffs may also argue that the Quinnipiac competitive cheer team should not be counted as a sport because they contend that no survey has been done to establish there is interest. However, the facts that there has been and continues to be a significant, articulated interest in such a venture, with established success at the national level, in combination with testimony from McDonald that the women's competitive cheer team raises up to $30,000 in funds by hosting a competitive cheer team for girls of all ages. Coupled with the cheer coach's discernment of ever increasing student interest over the years, her own requests that the competitive cheer team be recognized officially as such, and elevated to varsity level, constitute insurmountable evidence of interest of which Dr. Lopiano seems acutely unaware. (See McDonald Dep. pp. 56-57; Lopiano Dep. at pp. 232-35, 240-44.)

Thus, to repeat, Plaintiffs' anticipated claim that competitive cheer cannot be deemed a sport for Title IX purposes is wholly without merit and, at a minimum, significant factual disputes exist in this regard that cannot be resolved in Plaintiffs' favor at the injunction stage. What Plaintiffs want is clear; that this Court tell their fellow female students they are less than athletes; less important than they are; that Plaintiffs' disappointment is more important than the disappointment and distress of those women; and that their sport of choice should be demeaned, ridiculed, and not supported.

**•Quinnipiac may Rely on Roster Management to Achieve Substantial Proportionality During the 2009-10 Academic Year.**

Plaintiffs and Dr. Lopiano contend that Quinnipiac cannot use a practice known as roster management, or setting fixed limits on the number of spots in each team's rosters, because, according to them, it underestimates opportunities for men and overestimates opportunities for women. One side of the coin of this argument is that fixing, say a women's basketball team's roster at for example 25 athletes, forces coaches to "fill" spots in teams without a real opportunity for athletes to play significant minutes. The other side of the coin deals with contentions that coaches will not include names of male athletes in team's rosters by the time the EADA reports are due in early fall, before a first game in the sport is played, to show less opportunities for men, only to then add the names of male athletes during the season, when there are no EADA reports required. However, OCR has made it clear that roster management is acceptable, and participants are counted by season as of the first date of competition. See OCR 1996's Clarification ( Tr. Ex 7) ("OCR considers a sport's season to commence on the date of a team's first intercollegiate competitive event...As a general rule, all athletes who are listed on a team's squad or eligibility list and are on the team as of the team's first competitive event are counted as participants by OCR.") Simply, there is no need for Quinnipiac, under Title IX, to constantly update the OCR with information about the number of students playing in teams. Furthermore, there are valid reasons to add or delete players from rosters during the season, such as managing player injuries or unavailability due to academic ineligibility. Plaintiffs' own expert, on cross examination, agreed roster management is an acceptable mechanism for achieving Title IX compliance[24]. (See Lopiano Dep. at pp. 199-200.)

---

[24] In addressing the Court's question during closing arguments as to whether there is authority for the proposition that a school can set a floor number of participants for a women's team, there is no authority that prohibits Quinnipiac from doing so. To the extent the Court is concerned about unrealistically high numbers for a women's team, the OCR guidelines provide an inherent check against setting unrealistically high numbers by requiring actual participants. A school therefore that set unrealistically high numbers, not Quinnipiac, would be unable to fulfill them and would be at risk for a Title IX suit. Furthermore, there is no testimony that the numbers set for women's

Plaintiffs' most notable attempts to distort and continuously misrepresent evidence during these proceedings involved records produced concerning changes in rosters after the first date of competition in 2007. While it is true that the preliminary records show that Quinnipiac had some growing pains, including "stubbornness by coaches", where a couple of coaches in 2007-08 made a few roster modifications— the uncontroverted evidence, again, evidence which Plaintiffs consistently and repeatedly attempted to distort and inflate, was as follows: (a) during the first year of roster management, several coaches, in trying to achieve roster numbers set by the Athletic Department, added/deleted participants after the first date of competition, the pertinent date for EADA reporting (including Germaine Fairchild, one of Plaintiffs' witnesses); (b) these occurrences were not suggested, encouraged, or in any way condoned by Quinnipiac, nor pursuant to any official policy; (c) to the contrary, the testimony of both Jack McDonald and Tracy Flynn confirmed that when they learned about these occurrences they immediately took steps to rectify the situation, including advising these coaches that such occurrences could not continue in the future; (d) these occurrences were not systemic, intentional "manipulations" to defraud the government, and occurred during the difficult, first roster management year. Most critical, ***they did not recur in 2008***, and McDonald and Flynn both amplified their observation that coaches, starting in the second year of 2008, understood and became accustomed to the

---

teams, which are nearly identical to last year are unrealistic, nor have Plaintiffs presented any evidence that the roster numbers for next year are illusory. The only testimony in that regard was from the softball coach who testified that in **2007-08** she lost a number of players after the first day of competition. The softball coach conceded that for last year she filled 23 of the 25 roster spots and did not testify that the issues in **2007-08** repeated. Moreover, there was no testimony from any other women's coach that the numbers set for their teams were unrealistic. To the contrary the only other two women's coaches testified that they met their number last year, and indeed at least one coach wanted more spots for women on her team.

Last, even if this Court were to conclude that the target number for softball aimed slightly higher by a few spots, Quinnipiac would still satisfy prong one of the test. It bears repeating that Quinnipiac's roster management plan is based upon the highest possible enrollment for women next fall. As Mr. McDonald testified this number can only go down, thus providing Quinnipiac with a window of 10-20 extra spots for women.

purpose and importance of the roster numbers—and how to get to them. Plaintiffs are actually seeking to punish Quinnipiac for introducing a voluntary tool to improve opportunities for females, in line with the NCAA self certification assurances, combating initial resistance from *coaches*, keeping accurate records and for rectifying past anomalies. Moreover, Plaintiffs were unable to contradict, with evidence, Defendant's testimony that roster management was introduced to aid Quinnipiac to improve female athletic opportunities and achieve compliance with Title IX over the years. (See Flynn Tracey Dep. p. 80; McDonald and Flynn trial testimony.)

Furthermore, it is simply not the case that roster management results in women's teams clogged with "bench warmers," because Quinnipiac carefully calculates its target roster sizes for women's teams (and for men's teams) based on several factors such as the size of teams at other universities, and the needs of each sport. (See McDonald Dep. pp. 140-41.) Plaintiffs' repeated references to NEC and NCAA averages bear no weight, and indeed represent potentially broad ranges in the spectrum. NEC surveys are not even reliable indicators of actual averages, and the Plaintiffs could not contradict, with evidence, that team sizes often vary by school for a variety of reasons. (McDonald testimony; Sparks' testimony).

Most troublesome, Plaintiffs continually attempted to focus on these 2007 occurrences; 2007 coach resistance and concerns; and 2007 "bumps" to assert that such occurrences compel this Court to discount the testimony proffered by all of Defendant's witnesses to the contrary. In support of their claims as well, Plaintiffs sprung on Defendant the untimely testimony of one other coach, Germaine Fairchild, the women's softball coach.

Ms. Fairchild's testimony consisted of her repeated complaints about budgetary constraints, and problems she encountered in 2007 with keeping participants after the first day of competition. She agreed that she was obligated to keep to her 2007-08 roster target of 25 (and

actually started with 26), but 9 players allegedly quit connected with purported lack of funds for "uniforms" and "equipment." She further complained about lack of sufficient budget funds for other aspects of her program. Finally, she testified that while the roster size for 2007-08 was 25, she was not provided with a sufficient budget to support more than 17 to 19 participants.

A closer look at Ms. Fairchild's testimony is more than warranted here. First, she wholly neglects to address the testimony of McDonald that coaches are provided with a budget, not allocated, and are given total *discretion regarding how to spend the money*. So, if she fell short on money for a sufficient number of uniforms, it was due to her lack of ability to budget properly. Clearly, Ms. Fairchild is fixated on her tight budget, which is something all coaches face. Second, she ignores the undisputed fact that her budget was more than $89,000 for 25 participants in 2007-08 (which fell from 26 to purportedly 17 or so by end of season); and the budget remained the same for 2008-09 for the same 25 participants yet, in 2008-09, by her own testimony, she kept 23 participants and "made it work." (Fairchild testimony and Tr. Ex. 38). At the same time, she testified she was told by Flynn she had to make her roster numbers (confirming Defendant's commitment), even to the chagrin of some of her players. She understood, therefore, that this number was fixed, important, and set by policy, period, and she testified that the roster management approach was set out in policy manual(s) and discussed at staff meetings. Interesting in this regard, it is noteworthy that Ms. Fairchild was patently hostile and uncooperative on the stand, being very helpful to Plaintiffs' attorney yet blatantly uncooperative in answering questions on cross.[25] Fairchild neglected to address the fact that not all coaches have assistant coaches to help as she does (McDonald Trial testimony), and that some are handling even higher numbers of participants with similar budget constraints. (e.g., men's

---

[25] Defendant is further submitting on this date its motion to strike Ms. Fairchild's entire testimony.

and women's soccer each have a roster of 25, with one less assistant coach, and lower budget than women's softball. (McDonald Trial testimony)

Consistent with Fairchild, two other women's coaches testified consistent with Ms. Fairchild that roster management was articulated; its importance stressed; the commitment established; and that they understood they had to "make the numbers". However, in sharp contrast to Ms. Fairchild, both testified as to their positive experiences at Quinnipiac; comfort with their roster numbers; adequate support in all aspects of their programs, and their commitment to honoring those numbers going forward. Moreover, Becca Kohli, the women's field hockey coach testified in response to a question on cross-examination regarding recruitment that coaches are provided a budget and it is up to each coach how to spend their budget. Thus, to the extent Ms. Fairchild complains that her budget for recruitment was not sufficient, it was up to Ms. Fairchild to properly budget and her failure to do so does not create a Title IX violation.

In sum, then, the significance of Plaintiffs' inordinate, albeit questionable and disingenuous focus on 2007, the anomaly year, and total lack of any attention to the following year and the significant improvements to which the Defendant's witnesses testified consistently, should not escape the Court's attention. Plaintiffs failed simply to contradict, with evidence, McDonald's and Flynn's testimony that in 2009-10, the target numbers are deemed policy like the NCAA rules on the number of games and scholarships. The rosters and add/delete will not occur absent approval of McDonald and Flynn in a manner consistent with current NCAA rules.

Plaintiffs reliance on Choike v. Slippery Rock University, 2006 WL 2060576 (W.D.Pa. 2006) for the proposition that adding spots or setting a floor number for women is not proper roster management is entirely misplaced. First and foremost in Choike the Court concluded that the schools target roster numbers for women for the upcoming year were not believable because the school had a policy of permitting all women walk-ons to make the team and had never made

41

the target numbers in the past. See Choike, 2006 WL 2060576 at *5. Here there has been testimony that roster management, including requiring increased opportunities for women began in 2006, and all three women's coaches who testified at the hearing conceded that they were able to make or come very close (within one or two spots) of their roster targets last year. Thus, contrary to the situation in Choike, the proposed roster numbers, which are nearly identical to last years numbers, are not illusory. Likewise, Plaintiffs' reliance on Choike for the proposition that a school cannot eliminate a women's team and replace it with a women's club sport to achieve proportionally is also misplaced. In Choike the school chose to elevate club lacrosse despite the fact that no student or coach asked for such elevation and there was no evidence that the school was planning to fund lacrosse, including scholarships, at the varsity level and the school had not even hired a full time coach. Id at *5. Here, there has been extensive testimony by Mr. McDonald and Coach Powers that the members of the Quinnipiac Cheer team have been interested in varsity status for a number of years, and Quinnipiac is financially committed to Competitive Cheer, including elevating the current coach to full time status; increasing the budget by over $30,000; and providing two scholarships for next year.

In sum, as set forth *supra* roster management is a permissible tool to achieve compliance with Prong 1 of Title IX. Try as they might, Plaintiffs cannot escape the fact that the roster management plan for 2009-2010 represents real opportunities for female athletic participation and is in compliance with the letter of the law.

### •OCR Regulations and Case Law Clearly Establish that Quinnipiac may use so-called "duplicate" athlete counts in calculating its Athletic Opportunities for Men and Women for the 2009-10 Academic Year.

In what borderlines on stubbornness or perhaps even frivolity, Plaintiffs and Dr. Lopiano challenge Quinnipiac's substantial proportionality calculations for the 2009-10 academic year in yet another ill-considered way. At the risk of oversimplification, Plaintiffs suggest, without any

legal basis, that Quinnipiac cannot use so called "duplicate" counting to calculate its student athletic opportunities for the upcoming academic year 2009-10, which is the year at issue for purposes of the preliminary injunction[26]. In other words, Plaintiffs argue that, for example, if a single female athlete participates in varsity cross-country and also in a varsity track team, Quinnipiac should only count the two team spots the female athlete occupies as a single athletic opportunity. (See Lopiano Dep. p. 194.) Following that methodology, Plaintiffs would rely on "unduplicate numbers" (e.g., one female athlete in two teams counts as only one female athletic opportunity) that ostensibly would result in Quinnipiac not meeting the substantial proportionality prong in academic year 2009-10. Unfortunately for Plaintiffs, the NCAA, OCR, and courts have expressly stated that institutions like Quinnipiac are allowed, if not required, to count a double-athlete as two separate athletic opportunities for purposes of Title IX compliance. (See Tr. Ex. N.) In fact, one of this Court's sister courts dealt with and disposed of the same argument relying *inter alia* on OCR's 1996 Policy Clarification, Guidance from the Department of Education, and the well-known Cohen case:

> Plaintiffs' argument depends on using the unduplicated count of athletes, that is, counting an athlete only once, regardless of how many different roster spots that athlete occupies on different teams. *Plaintiffs offer no authority for using the unduplicated count and, to the contrary, the Department of Education prescribes the duplicated count.*

Plaintiffs then assert that the University also incorrectly reports the number of male and female athletes by counting indoor track and field, outdoor track and field, and cross-country as separate

---

[26] Plaintiffs also appear to assert that the numbers selected for next years rosters are not credible because they differ from the average squad sizes of the NCAA and NEC. First neither the NEC nor NCAA averages are binding on any school and are simply averages. (See undisputed McDonald Testimony.) Plaintiffs also fail to note that the proposed squad sizes for the 2009-2010 academic year are nearly identical to last year squad sizes at Quinnipiac. Moreover, even assuming that the number of roster spots for female athletes is inflated as Plaintiffs suggest, the current roster management numbers have a window of between 10-20 extra spots for women, depending on the actual enrollment numbers for women for next academic year. Thus, even if this Court were to discount some of the roster spots set aside for women next year, which Defendant disputes, Quinnipiac would still be in substantial proportionality under prong one.

sports. Their expert points to the inconsistency in such counting by Defendant over the years. However, contrary to these inferences, the Department of Education established this format, requiring reporting of 'All Track Combined.' Additionally, the NCAA guidelines permit, or even require, such unduplicated counting[27]. (See Tr. Ex. N.) Thus, it is proper for the University to count an athlete who competes on the cross-country team, indoor track team and outdoor track team as competing on three separate teams. Miller v. Univ. of Cincinnati, No. 1:05-cv-764, 2008 WL 203025, at *7 (S.D. Ohio 2008) (slip copy) (citations omitted). Thus, this Court should summarily dispose of Plaintiffs unfounded request that the Court rely on an "unduplicated" count, very much like the Miller court did. Finally, Dr. Lopiano's extensive discussion about why these sports are the "same", specifically her theory that the men who used to run outdoor track could compete eighteen times during the fall, thus making up for the lost outdoor events, reflected a fundamental lack of facts about Defendant's indoor track, outdoor track and cross country track teams. Indeed, had she investigated these facts, she would have learned that, by her own definition of when sports can count separately, she would have been compelled to agree Defendant could follow the counting format they intend to follow for next year. (See Lopiano Dep. at pp. 191, 194, 196-200, 277-78; McDonald trial testimony)

Aside from this discussion, Dr. Lopiano could not provide any authority whatsoever for her contentions, and, in fact, upon cross examination, admitted that if the Defendant's teams operated per her description of the characteristics of "separate sports", they could indeed be

---

[27] It is noteworthy that the NCAA treats indoor and outdoor track as separate sports. Schools are required to submit **separate** certified squad lists for both indoor and outdoor track. Similarly, pursuant to the NCAA rules to qualify as a Division 1 school, a school must sponsor a minimum number of sports. For purposes of meeting the minimum sports requirement the NCAA treats indoor and outdoor track as separate sports. Clearly if indoor and outdoor track were **one** sport, as Dr. Lopiano suggests, the NCAA would only count it once. Last, the NCAA sponsors both an outdoor track and indoor track championship. (See Tr. Ex. N; undisputed McDonald Testimony.) Thus, any claim that indoor and outdoor track and cross-country is one sport is simply nonsensical, and in any event, contradicted by the testimony of Mr. McDonald regarding the facts pertinent to Quinnipiac's sports.

counted more than once. (See Lopiano Dep. at pp. 189-92, 277-78.) In any event, given this disagreement, what does become clear is that Plaintiffs cannot sustain their burden at this stage that Defendant can never be able to withstand scrutiny under Title IX by counting these sports separately.

**(2)(b) Plaintiffs Cannot Alternatively Establish Serious Questions as to the Merits, Nor that the Balance of Hardships Tips Decidedly in their Favor**

Even if this Court were to find that somehow the Plaintiffs demonstrate irreparable harm, and that there are questions as to the merits, the Plaintiffs' claim would still fail as a matter of law because they cannot show that the balance of hardships tips decidedly in their favor. Given the scarcity of Title IX cases in this Circuit, this Court should look for guidance to the analysis used in other courts to address a comparable factor to the tipping of harms. In this regard, Equity in Athletics, Inc., 291 Fed.Appx. at 521, is instructive.

In Equity, when the Fourth Circuit Court of Appeals balanced the harms a university would suffer if the court ordered it to not eliminate several athletic teams against the harm the athletes would face if the injunction was not issued and the teams were eliminated. In a reasonable approach, the court explained that, if the balance of harms is fairly equal, then a stronger showing of likelihood of success is required. Id. at 521. Here, like in Equity, the Plaintiffs are not losing their athletic scholarships, which in the balancing of harms, minimizes the athletes' purported harm. See id. Moreover, like the university in Equity, Quinnipiac introduced evidence that it would have to endure financial harm and administrative hardships to reinstate the volleyball team. Thus, this Court should follow Equity's reasoning to conclude that Quinnipiac "not having control over which athletic programs it offer[s] and the administrative difficulty and cost to [it] of having to reinstate the eliminated [volleyball] program[]" results in the absence of an imbalance of hardships in the favor of the Plaintiffs. Id.

45

**B.      Plaintiffs Should Be Required to Post Bond**

Finally, if granted a preliminary injunction, Plaintiffs should be required to post security.[28] Fed. R. Civ. P. 65(c), states that security, in the amount deemed proper by the Court, must be given before a preliminary injunction shall issue.  Here, the Court should not grant the pending Plaintiffs' Motion for Waiver or Security required by Rule 65(c) because the evidence establishes that there is a strong likelihood of harm to the Defendant if it ultimately prevails on the merit after a preliminary injunction is issued.  See International Controls Corp. v. Vesco, 490 F.2d 1334, 1356 (2d Cir.), cert. denied, 417 U.S. 932 (1974) ("[A] district court may dispense with security where there has been no proof of likelihood of harm to the party enjoined.")  As discussed above, Quinnipiac would endure financial and other hardships if compelled to reinstate the women's volleyball team, including figuring out how to devote already scarce resources to procure building space comparable to the space the women's volleyball team formerly utilized to meet other student and staff needs.  Thus, the situation at hand is materially different from cases in which courts have waived security to indigent individuals seeking a preliminary injunction.  Indeed, even courts that have waived security for indigents have done so hesitantly.  See Heather K. by Anita K. v. City of Mallard, 887 F. Supp. 1249, 1268 (N.D. Iowa 1995) ("[E]ven where the plaintiffs are indigent, a careful weighing of the equities is still required before the bond requirement can be waived.") (citations omitted).  In short, the Court should require the Plaintiffs to post bond because, otherwise, Quinnipiac may be injured by the issuance of an injunction later determined to be erroneous.[29]

---

[28] Defendant has filed their opposition to Plaintiffs' Motion for Waiver of Security.

[29] If the Court grants Plaintiffs' Motion for a Prelim. Inj., Defendant respectfully requests a separate hearing to offer evidence establishing its potential damages so that the Court has a basis to assess what a proper bond amount should be required of the Plaintiffs.

## V.     **CONCLUSION**

In sum, Plaintiffs have failed to sustain any burden they bear in connection with their demand for entry of a preliminary injunction, and have similarly failed to put forth any evidence to support their claim that Quinnipiac is not, or will not be, as a matter of law, in compliance with Title IX for the upcoming academic year. Moreover, the record before this Court at this procedural stage, which is undisputed by Plaintiffs, establishes that the opportunities for participation in men's and women's sports for the 2009-2010 season are proportionate to the gender breakdown of Quinnipiac's anticipated student body. Thus, regardless of whether the Court applies the heightened standard for altering the status quo or the standard for maintaining the status quo, Plaintiffs' request for a preliminary injunction should be denied. If this request is granted, the message will be to Universities and to the public that schools are not permitted to manage their budgets, assess the expenditure of resources, nor, contrary to well established judicial precedent, manage their athletic rosters in the process to ensure Title IX compliance. Such a result is not supported by any ruling of any Court, and should not be supported here. Indeed, Title IX is a shield, not a sword.

Finally, as also previously outlined, in the event this Court deems entry of a preliminary injunction to be warranted, Defendant respectfully requests that Plaintiffs be required to post

sufficient bond for the period of Defendant's appeal thereof and further proceedings, as appropriate.

WIGGIN AND DANA LLP

By: *Mary Gambardella*

Mary Gambardella, Esq.
Federal Bar No. ct05386
Jonathan Bardavid, Esq
Federal Bar No. ct27763
Erick I Díaz No. ct27023
400 Atlantic Street
Stamford, CT 06911-0325
(203) 363-7662
*Attorneys for Defendant*

48

## CERTIFICATE OF SERVICE

I hereby certify that, on May 14, 2009, a copy of the foregoing was filed electronically, and notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing, and specifically to the following counsel of record:

Jonathan Orleans, Esq.
Pullman & Comley, LLC
850 Main Street
P.O. Box 7006
Bridgeport, CT 06601
203-330-2000
*Counsel for Plaintiff*

Jonathan Bardavid, Esq.