# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

STEPHANIE BIEDIGER, KAYLA
LAWLOR, ERIN OVERDEVEST,
KRISTEN CORINALDESI, individually and
on behalf of all those similarly situated,
LESLEY RIKER, on behalf of her minor
daughter L.R., L.R., on behalf of all those
similarly situated, and ROBIN LAMOTT
SPARKS,
     Plaintiffs,

     v.

QUINNIPIAC UNIVERSITY,
     Defendant.

CIVIL ACTION NO.
3:09cv621 (SRU)

## RULING AND ORDER GRANTING PRELIMINARY INJUNCTION

Plaintiffs Stephanie Biediger, Kayla Lawlor, Erin Overdevest, Kristen Corinaldesi, and

L.R.,[1] each a current or incoming member of the Quinnipiac University varsity women's

volleyball team, and Robin Sparks,[2] their coach, seek a preliminary injunction to prevent the

school from eliminating women's volleyball as a varsity sport. Defendant Quinnipiac University

("Quinnipiac" or the "University") announced in March 2009 that, due to budgetary constraints,

it would be cutting two men's teams – men's golf and men's outdoor track – and the women's

volleyball team. It also announced a plan to add a varsity women's competitive cheer team in

order to maintain compliance with its obligations under Title IX of the Education Amendments

---

[1] Because L.R. is a minor, L.R.'s mother, Leslie Riker, has brought suit on her daughter's
behalf.

[2] Quinnipiac has challenged Sparks' standing to pursue the claims raised by this suit. It
concedes, however, that the issue of her standing has no impact on the issues raised by the
motion for preliminary injunction. Nothing in this decision is intended to address the issue of
Sparks' standing on the merits.

of 1972, as amended, 20 U.S.C. § 1681, *et seq.*, and the regulations adopted pursuant thereto, 34

C.F.R. § 106 (collectively, "Title IX").  The plaintiffs allege that Quinnipiac's plan is not

sufficient to put it into compliance with the requirements of Title IX and that a preliminary

injunction to prevent elimination of the volleyball team is necessary to preserve the status quo

pending a ruling on the merits of this case.

A hearing on the plaintiffs' motion for a preliminary injunction was held May 11-14,

2009.  The following are my findings of fact and conclusions of law concerning issues raised by

the motion for preliminary injunction.  Because the plaintiffs have successfully demonstrated

irreparable harm and have demonstrated a likelihood of success on the issue whether Quinnipiac

is actually providing genuine athletic participation opportunities for women in substantial

proportion to the undergraduate enrollment of women at Quinnipiac, the motion for a preliminary

injunction is granted.

I.      **Factual Background**

A.      <u>The Parties</u>

1.      *The Plaintiffs*

a.      Stephanie Biediger

Biediger was a freshman member of the volleyball team in 2008-2009 and was recruited

to play for Quinnipiac from her hometown in Texas.  Biediger attends Quinnipiac on a partial

academic scholarship and is pursuing a major in psychobiology; she plans to become a

neurosurgeon.  During the fall season she suffered an injury to her anterior cruciate ligament

("ACL"), but played through the end of the season, receiving the team's Most Valuable Player

award.  Biediger had surgery on her ACL on January 7, 2009, and is scheduled to undergo

another surgery over the summer; she therefore had anticipated "red-shirting" her sophomore year.[3]  Biediger had planned to pick up an additional major so that she could stay at Quinnipiac for a fifth year and complete her fourth year of athletic eligibility.

b.      Kayla Lawler

Lawler was a freshman member of the Quinnipiac volleyball team in 2008-2009 and was recruited by Sparks from her hometown in Indiana, where she participated in high school and club volleyball.  Lawler attends Quinnipiac on a full athletic scholarship and is majoring in psychology.  Her professional ambition is to obtain a Ph.D. in psychology, coach Division I volleyball, and/or play professional volleyball overseas.

c.      L.R.

L.R. is a high school senior from Ohio who was recruited by Sparks to play on the Quinnipiac volleyball team beginning in the fall of 2009.  She had expected to receive a partial athletic scholarship and partial academic scholarship, equal to the total cost of attending Quinnipiac.  After visiting Quinnipiac in the fall of 2008, L.R. decided to apply only to Quinnipiac and by November 2008 had committed herself to attend, thereby taking herself out of the pool of potential volleyball recruits for the remainder of the fall recruiting season.

d.      Erin Overdevest

Overdevest was a senior on the volleyball team during the 2008-2009 season, but she red-shirted the season due to shoulder surgery in June 2008.  Although Overdevest graduated this past May, because she is enrolled in a five-and-half-year bachelors/masters occupational therapy

_____

[3] Red-shirting is a common practice that allows injured athletes to defer a season of eligibility by sitting out a competitive season.

program at Quinnipiac, she had expected to play her final year of eligibility during the 2009-2010 season. She attends Quinnipiac on a partial academic scholarship and a partial athletic scholarship.

e.    Kristen Corinaldesi

Corinaldesi did not testify at the hearing, but she alleged in the Verified Complaint that she was a junior at Quinnipiac and a member of the varsity volleyball team during the 2008-2009 season. She alleged that she had planned to play volleyball during her senior year.

f.    Robin Lamott Sparks

Sparks is the head coach of the women's volleyball team at Quinnipiac. She was recruited to coach the team in the spring of 2007 by Quinnipiac's Athletic Director Jack McDonald. She is also an adjunct professor in communications at the University. Her current employment contract expires June 30, 2009, but Sparks expected her contract to be renewed until the announcement that the volleyball team would be eliminated.

2.    *Defendant Quinnipiac University*

a.    Athletic Department Representatives

Jack McDonald is Quinnipiac's Athletic Director, a position he has held since 1995. Before coming to Quinnipiac, McDonald was the athletic director at the University of Denver from 1990 to 1995. As Quinnipiac's Athletic Director, McDonald is responsible for managing the athletic department's budget, personnel (including coaches), Quinnipiac's recreational and intramural sports programs, and is "partially" involved with the University's physical education program. In addition, he is responsible for overseeing Quinnipiac's compliance with National Collegiate Athletic Association ("NCAA") rules and regulations and the requirements of Title

-4-

IX.

Tracy Flynn is Quinnipiac's Senior Women's Administrator and Assistant Athletic Director for Compliance. Flynn's job is to ensure that Quinnipiac adheres to NCAA rules and regulations. In addition, she oversees the University's athletic scholarship budget and the add/delete list, known officially as the Change of Status List. Both McDonald and Flynn share responsibility for compiling Quinnipiac's annual Equity in Athletics Disclosure Act ("EADA") report.

b.      Overview of Quinnipiac University and its Athletic Department

Quinnipiac University is a private, coeducational institution located in Hamden, Connecticut. For the 2008-2009 academic year, it had an undergraduate enrollment of 5,455 students. Broken down by gender, there were 2,089 male students and 3,366 female students, for a male-to-female percentage distribution of 38.3% to 61.7%. McDonald testified that, based on the deposits the University had received as of May 1, 2009, the undergraduate enrollment for the 2009-2010 academic year is expected to be 37% men and 63% women, with the caveat that those numbers could vary slightly up or down by the time the school year actually begins on August 31, 2009.

In the 2008-2009 academic year, Quinnipiac fielded 21 NCAA Division I varsity athletic teams: men's and women's basketball, men's and women's ice hockey, men's and women's lacrosse, men's and women's soccer, men's baseball, women's softball, women's field hockey, women's volleyball, men's golf, men's and women's tennis, men's and women's cross-country, men's and women's indoor track, and men's and women's outdoor track. Division I is the highest level of intercollegiate athletic competition within the NCAA. With the exception of the

ice hockey teams and the men's lacrosse team, Quinnipiac's varsity teams compete in the

Northeast Conference ("NEC").[4]  According to Quinnipiac's EADA report for 2007-2008, its

athletic participation opportunities were apportioned 45% for men and 54% for women.

According to its preliminary EADA data for 2008-2009, its athletic participation opportunities

were apportioned 47.43% for men and 52.57% for women.  Quinnipiac concedes that those

percentages were not in proportion to the undergraduate enrollment for those years.

On March 4, 2009, Quinnipiac informed the women's volleyball, men's golf, and men's

outdoor track teams that they would be eliminated at the end of the current academic year due to

budgetary constraints.  Sparks and the men's part-time golf coach were told their employment

contracts would expire on June 30, 2009 and would not be renewed.  The track teams at

Quinnipiac have a single head coach, but a part-time track coach is also expected to lose his or

her position as a result of the cuts.  In 2009-2010, Quinnipiac expects to field 19 varsity teams,

including a new women's competitive cheer team.  With the loss of men's golf and men's

outdoor track, and the addition of women's competitive cheer, Quinnipiac anticipates that its

athletic participation opportunities will be split 37.08% for men and 62.92% for women in 2009-

2010, which it maintains is in substantial proportion to its anticipated undergraduate enrollment

for the coming academic year.

B.     Quinnipiac Volleyball

Volleyball is a "fall" sport, meaning that the fall is its "championship season," when

teams play their official matches and when the sport's conference and NCAA championships are

---

[4] The ice hockey teams compete in the Eastern College Athletic Conference ("ECAC")
and the men's lacrosse team competes in the Great Western Lacrosse League ("GWLL").

held.  Like most Division I sports, however, volleyball is actually played year-round.

Specifically, the spring season provides players the opportunity to hone their technique and skills

through scrimmages with other teams.  Team practices are focused on sharpening technical skills,

such as foot-work and hand placement, and on strength-training.  The team's budget for the

2008-2009, not including coaches' salaries and athletic scholarships, was $70,384.

Prior to 2007, the Quinnipiac volleyball team was not a priority sport within the athletic

department; it had been slated for elimination in 2006 and, by 2007, had had four different

coaches in four years.  Beginning in 2007, McDonald undertook an effort to rebuild the

volleyball team to a competitive level within the conference.  In the spring of 2007, McDonald

recruited Sparks to come to Quinnipiac from Troy, New York, where she had been coaching a

club volleyball team.  Although Sparks had no collegiate coaching experience, she came highly

recommended by Quinnipiac's interim volleyball coach, and had been successfully coaching club

level volleyball for several years.

Knowing that Quinnipiac had almost cut the team the previous year, one of Sparks'

primary concerns with the position was Quinnipiac's commitment to the volleyball team.

According to Sparks, McDonald assured her that the discussions about cutting the team "had

been put to rest" and that the athletic department was seriously committed to building the

competitiveness of the team.  McDonald testified that he had been genuinely excited about the

volleyball program at the time Sparks was hired and that he had assured her of his long-term

hopes for the program.  Weighing the pay cut she would take and the difficulties associated with

uprooting her husband and children against McDonald's assurances of support for the team,

Sparks decided that the chance to build a competitive Division I volleyball team was not an

opportunity she could pass up.

Sparks understood that her goal, as set forth by McDonald, was to reach the top four of the NEC within four years.  To that end, armed with a budget for recruiting and five athletic scholarships to offer, Sparks undertook a serious recruiting effort in the 2007-2008 academic year for the incoming class of 2008-2009, contacting players and traveling to club volleyball tournaments.  As a result of those efforts, Sparks was able to attract several highly accomplished and skilled recruits to Quinnipiac, including plaintiffs Biediger and Lawler, for 2008-2009, and plaintiff L.R., for the incoming class of 2009-2010.  Overdevest, a graduating senior who had been on the team prior to Sparks' arrival, testified that the team's enthusiasm was high when Sparks was hired and began recruiting nationally.

The recruiting process for Division I volleyball can begin as early as a player's sophomore year in high school.  Although sophomores are not permitted to speak with college coaches directly, high school players interested in playing at the Division I level in college will seek out information about the schools and their summer volleyball camps during that period.  By junior year, prospective recruits are writing to coaches, speaking with coaches on the phone, and compiling video clips of themselves playing volleyball for a "game tape" they can present to interested coaches.  By senior year, coaches will begin extending formal offers of admission, along with any offers of scholarship money, and having prospective recruits come to visit campus.  Recruits may begin making formal commitments to schools in November of their senior year; a college's recruiting class is typically filled by December or January.

Several plaintiffs testified about the role that volleyball plays in their lives.  The plaintiffs, and Leslie Riker on behalf of L.R., all testified that they began playing volleyball in

elementary school.  The players recruited by Sparks – Lawler, Biediger, and L.R. (collectively, the "recruited plaintiffs") – testified that playing Division I volleyball had been a paramount goal for each of them since they began playing volleyball on a competitive basis in fourth or fifth grade.  In addition to playing volleyball for their high school teams, those recruited plaintiffs played for club teams during the off-season, traveling to interstate competitions on the weekends and thereby maintaining a year-round commitment to volleyball.

The recruited plaintiffs testified that they chose Quinnipiac not only for its academic offerings in the majors of their choice, but because they felt that they had formed a real connection and bond with the team and Sparks during their campus visits.  Lawler testified that the coach-athlete relationship was particularly important at the college level because playing Division I volleyball is a time-intensive activity, akin to a "full-time job."  Given the number of hours spent practicing, playing, and traveling with the team, all plaintiffs testified that the Quinnipiac volleyball team's cohesiveness and their good relationship with Sparks was significant to their decision to attend Quinnipiac and, subsequently, to seek a preliminary injunction to save their team.  Lawler also testified that she had spoken at length with McDonald during her campus visit, querying him about the school's commitment to the team, and receiving assurances that Quinnipiac was committed to the team, with McDonald pointing to Quinnipiac's decision to hire Sparks as evidence of its intent.

C.    Introduction of Roster Management at Quinnipiac

McDonald and Flynn testified about the athletic department's decision to implement "roster management" at Quinnipiac in order to achieve greater proportionality between the athletic participation opportunities available to women and the percentage of women

undergraduates. Under Quinnipiac's roster management policy, the athletic department sets the size of men's and women's teams' rosters to create a more proportional balance of athletic opportunities between the genders.  According to McDonald, the benefit of roster management is that it permitted the University to increase its participation opportunities for the underrepresented gender – here, women – without having to add more sports.  The decision to implement roster management arose out of the athletic department's 2006 gender equity self-study, which revealed that the school was not achieving gender equity in its athletic participation opportunities.

McDonald testified that there was little input from coaches on the issue of roster size, except in the case of "like" sports, such as men's and women's soccer, whose coaches were asked to agree on similar roster sizes.  In setting roster sizes, McDonald did not consider NEC average roster sizes, testifying he believed the NCAA average roster sizes were a more reliable indicator for how many players an average team could be expected to carry on its roster.

Under the roster management policy system in place at Quinnipiac, McDonald and his senior administrative athletic department staff members set the final roster numbers for each varsity team.  The coaches are then expected to carry that number of athletes on their team on the first day of competition.  The first day of competition is significant because that is the day when roster sizes are computed for purposes of the EADA report.  The EADA report is an annual report that all coeducation universities receiving federal funding and participating in intercollegiate athletics must submit to the U.S. Department of Education pursuant to 20 U.S.C. § 1092.  The EADA report contains information about the University's undergraduate enrollment, broken down by gender; the number and type of men's and women's varsity teams; the number of participants on each team; the number, distribution, and average salaries of head and assistant

coaches; the amount of athletic scholarship money available to each gender; the total revenues, operating expenses, and total expenses for each team; and the amount of money distributed for recruiting purposes.  In October, each school must submit its EADA report for the previous academic year; for example, Quinnipiac has not yet submitted its EADA report for the 2008-2009 academic year, but plans to submit that report by October 2009.  Significantly, the EADA numbers are not updated over the course of the season to reflect additions to or cuts from the varsity rosters compiled as of the first day of competition.

Quinnipiac introduced the concept of roster management to its coaches in 2006-2007, but it was first implemented "with teeth" in the 2007-2008 season.  The roster management policy and roster numbers were discussed at the annual post-Labor Day athletic department staff meeting, and the policy was contained in the athletic department's staff manual.  McDonald described the reactions among the coaches as "fair to poor."  According to Flynn, the policy caused great distress among the coaches – some of the men's teams' coaches felt their roster numbers were too low and that some of the women's teams' coaches felt they were being required to carry too many people.  Flynn specifically recalled receiving complaints that their set roster numbers were too low from the coaches of men's lacrosse, men's baseball, men's cross country, and possibly men's soccer, and conversely, complaints that their set roster numbers were too high from the coaches of women's lacrosse, women's field hockey, women's softball, women's ice hockey, and women's cross country.  She recalled that coaches of both men's and women's teams reported to her that the roster numbers were not what they were accustomed to, that the roster targets were too low and too high, respectively, for their teams.  Although the women's field hockey and women's lacrosse coaches testified at the hearing that they were not

bothered by the increases in their rosters under Quinnipiac's roster management policy, Flynn's testimony contradicts those assertions.

The following chart sets forth the number of players on each Quinnipiac varsity team, as of the first day of competition in 2007-2008, as reported to the EADA:

| Men's Team  2007-2008 | Roster Size | Women's Team 2007-2008 | Roster Size |
|---|---|---|---|
| Baseball | 27 | | |
| Basketball | 14 | Basketball | 15 |
| Cross Country/Track | 13 | Cross Country/Track | 22 |
| Golf | 8 | | |
| Ice Hockey | 29 | Ice Hockey | 29 |
| Lacrosse | 35 | Lacrosse | 30 |
| Soccer | 25 | Soccer | 27 |
| Tennis | 9 | Tennis | 11 |
| | | Field Hockey | 23 |
| | | Softball | 26 |
| | | Volleyball | 12 |
| **Total:** | 160/355 | **Total:** | 195/355 |
| % | 45.07 | % | 54.93 |

As Flynn, Sparks, and Germaine Fairchild, head coach of Quinnipiac's softball team, testified, and as demonstrated by the add/delete lists for 2007-2008, however, those numbers did not remain static over the course of the season.  For example, the men's baseball coach reported 27 athletes as of the first day of competition, September 27, 2007.  The corresponding add/delete list for 2007-2008 shows that on September 17, 2007, the baseball coach "deleted" six players to reach that 27 roster number.  That same add/delete list further reveals, however, that on October 1, 2007, the baseball coach "added" those same six players back to the team, bringing his roster

-12-

back up to 33 athletes.  Because the EADA report does not account for add/deletes over the course of a season, that increase was never officially reported on any official Quinnipiac roster count.

The same phenomenon occurred with the men's lacrosse roster.  Before reporting the squad list for the first day of competition, the men's lacrosse coach "deleted" six players.[5]  Approximately one week later, the men's lacrosse coach added those same six players back to the roster, bringing his roster back up to 41 athletes.  The add/delete lists reveal that the men's ice hockey coach deleted and added one player in the same manner before and after the first day of competition for the 2007-2008 academic year.

Flynn testified that those changes to the add/delete lists caught her eye and that she was not pleased with what the lacrosse and baseball coaches had done.  Flynn said that she reported the roster manipulations to McDonald and expressed her concern that those roster add/deletes were not within the "spirit" of Title IX.  According to McDonald, such practices were "not acceptable" to him and that he relayed his feelings to the coaches during their weekly meetings and on other occasions.  McDonald testified that he never told the coaches that this was an acceptable practice and that such practices did not stem from any official athletic department policy or guidance on how to "make the numbers."  Flynn's testified she felt "disappointed" and "helpless" about the roster changes because she felt that there was no guidance from OCR on how to manage roster numbers.

---

[5] The official squad list for 2007-2008 shows those six players were deleted by October 4, 2007, the first day of official competition, although the add/delete list shows an official delete date of October 12, 2007.  According to the add/delete list, those same players were officially added back on October 15, 2007.  McDonald agreed that those six players were not counted for EADA reporting purposes.

The roster management numbers had the opposite effect on the women's side; in 2007-2008, several women's teams added players before the first day of competition, only to have those same players quit or get cut shortly thereafter. The following women's teams had duplicate adds and deletes, according to Quinnipiac's 2007-2008 add/delete list: the women's softball team added four players who were deleted shortly thereafter; the women's ice hockey team added four players prior to the first day of competition who subsequently quit; and the women's lacrosse team added two players before the first day of competition, who were also subsequently deleted.

Fairchild, the head coach of the softball team, offered credible testimony that indicates that even those numbers on the add/delete list do not provide the full story for women's team rosters under Quinnipiac's roster management policy. Fairchild, a former collegiate and professional softball player and coach, came to Quinnipiac in 2000 as an assistant coach and was promoted to her current position as head coach in 2001. At the hearing, when asked about her experience with the roster management policy, Fairchild testified that she felt pressured to add more players than were necessary under normal circumstances. Prior to the institution of roster management, Fairchild testified that she typically carried 16-18 players on her team. Before the 2007-2008 season's start, she was notified that she would be required to take at least 25 players on her team. Fairchild raised her concerns about her roster management targets to both McDonald and Flynn, explaining that her budget and coaching resources were only enough to support a team of 16-18 athletes and she could not provide a "legitimate Division I experience" to so many people. Nevertheless, Fairchild's budget remained static and Fairchild testified that she did not receive any guidance from the athletic department on how she was expected to accommodate so many extra players. Indeed, the Quinnipiac Athletics & Recreation Staff

Handbook is devoid of any explanation of roster management, merely noting that it is one of the coaches' responsibilities and outlining the target roster numbers for each team in chart form. Flynn also testified that the issue of roster management manipulation was never raised at weekly staff meetings. Fairchild testified that no one had consulted her about whether 25 was a realistic number of athletes for the softball team.

Fairchild explained precisely why 25 players represented a budget challenge and a strain on coaching resources. For example, during the off-season, under NCAA regulations, softball players are permitted to practice for 8 hours a week, with two hours devoted to skills training and six hours to strength and conditioning. At Quinnipiac, those two skills-training hours are spent one-on-one with Fairchild. Fairchild testified that 50 hours a week of individual time with her student-athletes, combined with office work and all the other tasks required to run a Division I program, would have strained her coaching resources beyond her capabilities. Fairchild did not receive any increase in budget, extra equipment, additional assistant coaches, or a raise in salary to account for and/or accommodate the extra players.

To balance the athletic department's expectation that she "make" her roster target of 25 players with the realities of providing a legitimate Division I experience for her team, Fairchild resolved to take all the players that tried out in the fall of 2007, but not to keep that many players on her travel team. As of the first day of competition on September 21, 2007, she reported 26 athletes on her roster, the same number reported on Quinnipiac's 2007-2008 EADA report. On the Tuesday following the softball team's first day of competition, Fairchild called several of the walk-ons and informed them that, although they were welcome to stay on the team's "practice squad," she did not have any money in her budget to provide them with uniforms or equipment,

-15-

nor could they travel with the team to away games.  Fairchild testified that over the next several months nine players quit the team; Fairchild began the championship season that spring with 17 student-athletes on her roster.

The same scenario repeated itself in 2008-2009.  Fairchild testified that she had 13 veterans and 10 newcomers in the fall of 2003, for a total roster number of 23 players.  Fairchild testified that, once again, she accepted every walk-on player until after the first day of competition, when she informed several players that they would only have a spot on the team's practice squad.  Between the first day of competition in the fall and the beginning of the championship season that spring, Fairchild testified that 6 players quit the team, leaving 17 players who actually competed on the softball team during the spring 2009 season.  Because the roster number was 23 on the first day of competition, however, Quinnipiac's estimated EADA report figures state there were 23 participation opportunities on the softball team.  Fairchild testified that she did not renew her concerns with McDonald prior to the 2008-2009 season because she believed that the athletic department administrators were set on maintaining the "status quo" of roster management reporting and that nothing had changed in their attitude towards the policy from the previous year.  Flynn corroborated Fairchild's testimony that the athletic department did not take any steps following the 2007-2008 season to educate their coaches on the roster management policy.

The following is a chart of roster sizes in 2008-2009 as stated in the Quinnipiac athletic department staff manual and Quinnipiac's EADA reported numbers:

| Men's Team | QU's 2008-2009 Roster Management Target | EADA 2008-2009 Report (estimated) | Women's Team | QU's 2008-2009 Roster Management Target | EADA 2008-2009 Report (estimated) |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

| | | | | | |
|---|---|---|---|---|---|
| Basketball | 15 | 15 | Basketball | 15 | 15 |
| Baseball | 27 | 27 | | | |
| Soccer | 25 | 25 | Soccer | 25 | 25 |
| Golf | 8 | 8 | | | |
| Tennis | 9 | 11 | Tennis | 9 | 11 |
| Lacrosse | 40 | 39 | Lacrosse | 30 | 29 |
| Cross Country | 15 | 13 | Cross Country | 20 | 19 |
| Ice Hockey | 28 | 32 | Ice Hockey | 28 | 25 |
| Indoor Track | 20 | 22 | Indoor Track | 25 | 28 |
| Outdoor Track | 20 | 20 | Outdoor Track | 25 | 25 |
| | | | Field Hockey | 25 | 24 |
| | | | Softball | 25 | 23 |
| | | | Volleyball | 15 | 11 |
| **Total:** | 207/424 | 212/447 | **Total:** | 217/424 | 235/447 |
| **%** | 48.82 | 47.43 | **%** | 51.18 | 52.57 |

The athletic department's overall experience with roster management in 2008-2009, according to Flynn and McDonald, was more positive because they received fewer complaints from the coaches. According to Flynn, the coaches were less shocked with the roster management targets than they had been the previous year, and they had grown more accustomed to the concept and had more time to figure out how to make their roster targets. Flynn testified that in overseeing the add/delete list for the teams, she did not see the same type of roster manipulation as in 2007-2008. McDonald characterized the coaches' commitment to roster management in 2008-2009 as "better."

Although Flynn testified that she saw less roster manipulation through the add/delete lists than the previous year, it had not disappeared. For example, McDonald testified that there were

actually six more players on the men's lacrosse team in 2008-2009 than were reported on the first day of competition due to a disciplinary incident, which resulted in those players being suspended prior to the first day of competition in the fall.  McDonald conceded that those six players indeed re-joined the team for the championship season in the spring.  Furthermore, as Fairchild testified, although the women's softball team reported having 23 players as of the first day of competition in the fall, only 17 athletes were on the roster by the time the championship season began in spring 2009.

Although the squad lists, add/delete lists, and the 2008-2009 "Season of Competition Used" list are useful guides to each team's roster numbers, they do not provide the full picture. Indeed, McDonald conceded that, although the add/delete lists show the six men's lacrosse players were "deleted" in fall 2008, the list does not indicate that they were added back to the team at any point, even though McDonald testified they did play for the team and despite the fact that the Season of Competition Used list for 2008-2009 includes those six players' names. Furthermore, as demonstrated by Fairchild, in 2007-2008 and 2008-2009, more players actually quit her team than were reflected on the add/delete lists.  In addition, the 2008-2009 add/delete list indicates that one player, Michael Bartlett, was deleted from the men's baseball team on September 19, 2008, before the first day of competition.  The list does not indicate that Bartlett was added back to the team at any point, but a comparison with the Season of Competition Used list indicates he was added back to the baseball team on October 13, 2008, after the first day of competition.  Thus, if anything, the add/delete lists under-report the number of duplicate adds and deletes being made to Quinnipiac varsity teams.

Another practice that appears to have gained momentum in 2008-2009, at least among the

men's teams, was adding new freshmen or sophomore athletes after the first day of competition.

For instance, the men's basketball team added three freshmen on November 12, 2008, after the

October 28, 2008 EADA report date.  Two athletes were added to the men's cross country team

on September 2, 2008, after the team's reported first competition – the Stony Brook Invitational

– on August 29, 2008.[6]  Finally, men's golf added one athlete approximately one week after the

first date of competition.  Only a complete audit of the teams' rosters and game day reports can

conclusively determine the true number of athletes competing on each team.  Still, it appears that

there were at least 13 participating male athletes who went unreported in 2008-2009.

     D.     Quinnipiac's Decision to Cut Teams

     In early February 2008, under budgetary pressures, Quinnipiac University Vice President

Val Belmonte directed McDonald to make a 5-10% cut in the athletic department's budget for

2009-2010.  McDonald testified that his first budget proposal eliminated 5% from the athletic

department budget without cutting any teams.  Belmonte rejected McDonald's proposal and told

him, specifically, to cut the volleyball team.  Because there was a space crunch on campus – the

University undergraduate population has nearly doubled in the last 20 years – it seems that the

University administration was interested in using the facility where the volleyball team practiced

and held competitions, the Burt Kahn Court, as another available space for meetings, activities,

offices, and additional intramural sports courts.  Before the budget crunch, there had been

     [6] Plaintiffs' Exhibit 12 does not include the men's cross country squad list for 2008-2009,
nor has the defendant included that squad list in its track squad list exhibits.  Because the  2008-
2009 men's cross country schedule in Plaintiffs' Exhibit 29 lists August 29, 2008 as the first
competition date, I am confident that the cross country runners added on September 2, 2008 were
not included on that squad list for EADA reporting purposes.  Although the EADA estimate says
there were 13 athletes on the men's cross country team, the Seasons of Competition Used
indicates that 15 athletes competed on the men's cross country team in 2008-2009.

discussions about building the volleyball team its own gymnasium or court at the athletic and rec center.

As amended, the current proposed 2009-2010 athletic department budget would cut men's golf, men's outdoor track, and women's volleyball, in addition to making additional cuts to the budgets of other varsity teams, for an overall savings of 7%, or $132,000, from last year's budget.

E.      Elevation of Competitive Cheer to Varsity Status

Recognizing that cutting both men's and women's varsity sports could push Quinnipiac further out of Title IX compliance, Quinnipiac made the strategic decision to elevate women's competitive cheerleading to varsity status.  Already a very popular club team activity at Quinnipiac, McDonald and the Quinnipiac administration determined that there would be enough interest to field a varsity cheer team that would be focused solely on competing at local, regional, and national cheerleading competitions.  McDonald concedes that Quinnipiac has not sought advance clearance of that decision from the Department of Education's Office of Civil Rights ("OCR"), which oversees Title IX compliance.  McDonald testified he believed it was unnecessary after studying materials and OCR correspondence obtained from the University of Maryland, which also fields a varsity competitive cheer team, and the fact that Quinnipiac has never sought advance clearance from OCR when it added other women's sports, including field hockey, ice hockey, and lacrosse.  McDonald testified that OCR has never done an audit of Quinnipiac's athletic program to determine its compliance with Title IX.

In 2008-2009, the 31-member Quinnipiac cheer squad had a dual-focus: cheering at the men's and women's basketball games, an activity referred to as "sideline cheer," and also

entering cheer competitions in its spare time.  The new competitive cheer squad would have an increased budget of $50,000, up from $12,000, and the current head cheer coach, Mary Ann Powers, would be promoted to a full-time position and given a raise of approximately $20,000 to $25,000 for a total salary of $40,000 to $45,000.  In addition, McDonald anticipates the new varsity cheer squad will be supported by two athletic scholarships.

In addition to the new competitive cheer team, McDonald anticipates fielding a separate non-varsity sideline cheer squad to continue cheering at the men's and women's basketball games, which will be coached by the current part-time cheerleading assistant coach.  Those two squads would share the present cheerleading practice space on Court Four of the school's "rec center."

Powers, Quinnipiac's cheer coach since 1998, testified about the current cheer squad, its record at competitive cheer events, and her plans for the future varsity competitive cheer team at Quinnipiac.  A typical cheer team practice regimen includes gymnastics skills training, practicing partner stunts and tumbling exercises, as well as conditioning and strength-training.  The current team's primary focus is to cheer at the men's and women's basketball games, although it has managed to compete in, on average, between three and six cheer competitions, including nationals, each year.  Routines for these competitions typically last two-and-a-half minutes and include a variety of elements, including standing tumbling, jumps, pyramids, basket tosses, running tumbling, partner stunts, and dance.

Being elevated to varsity status means that the Quinnipiac competitive cheer squad members will have all the benefits and obligations of other varsity athletes on campus, including having access to the varsity athletic trainers and submitting to the academic requirements for

varsity athletes, including "power hour" requirements.[7]  Powers testified that she expects the team to enter more competitions.  The team will devote three practices per week to practicing their cheer routines and elements and two practices per week to strength-training and conditioning.  Powers anticipates the team's competitive schedule will run from September to April, including one or two competitions in the fall and six to eight in the spring, culminating in the National Cheer Association ("NCA") national championship, where the Quinnipiac cheer squad finished in sixth place in their division this past April.

The athletic department's roster management target for the new team is 40.  Powers testified that she has 62 women interested in trying out this fall, including 18 returning cheer squad members.  Powers has not undertaken any formal recruiting efforts for the upcoming season.  Although Powers has no doubt she will be able to fill those spots, the cheer squad this year only had 31 members and that 40-person roster target does not include the separate sideline cheer team.  Last year Powers had 58 students try-out for the 2008-2009 season and she took 34.  Local and regional competitions typically allow 36 cheerleaders on the floor, although the NCA championships only permit squads of 20 cheerleaders to compete.

Powers acknowledged that there is no national, non-profit competitive cheer federation to set standardized competition rules or to organize and oversee competitions.  There are no other competitive cheer teams within the NEC.  There are two national cheer championships put on by the Universal Cheer Association and the NCA, entities which are owned and operated by the for-

_____

[7] According to Quinnipiac athletic department staff manual, varsity student-athletes must complete a certain number of monitored, on-campus study hall hours, known as "power hours." The number of weekly hours a student-athlete must log is determined by that student's grade point average.

profit corporation, Varsity, Inc.  According to Powers, Varsity, Inc. promotes private cheer training at cheer camps, sponsors cheer competitions, and sells apparel.

Eligibility to compete in those championships is not governed by conference or league records, indeed the type of competition where one's record is the basis for advancing to higher levels of competition does not exist in the competitive cheer world.  Each team chooses which competitions to enter.  Entry to the national championships is determined by submitting an application that includes video footage of the team performing.  The Quinnipiac varsity cheer squad's eligibility to compete at nationals is not affected by its elevation to varsity status; it will compete and be eligible for the same competitions in which the cheer squad competed as a non-varsity team, although it will compete in more cheer competitions.  Quinnipiac has not yet sought to have competitive cheer recognized as an emerging sport by the NCAA.

F.      Anticipated 2009-2010 Roster Management Targets

Shown below are the Quinnipiac athletic department roster management targets for the 2009-2010 season, compared to the NCAA average squad sizes:

| Men's Teams | 2009-2010 Roster Management Target | NCAA Average Squad Size | Women's Teams | 2009-2010 Roster Management Target | NCAA Average Squad Size |
|---|---|---|---|---|---|
| Basketball | 15 | 15.5 | Basketball | 15 | 14.6 |
| Baseball | 25 | 35.3 | | | |
| | | | Field Hockey | 24 | 22.2 |
| Soccer | 23 | 27.4 | Soccer | 26 | 25.7 |
| | | | Softball | 22 | 19.4 |
| Tennis | 10 | 10.1 | Tennis | 12 | 9.3 |
| Lacrosse | 36 | 44.5 | Lacrosse | 30 | 27.2 |
| Cross Country | 14 | 14.8 | Cross Country | 25 | 16.2 |

| Ice Hockey | 28 | 28.4 | Ice Hockey | 26 | 25.1 |
|---|---|---|---|---|---|
| Indoor Track | 14 | 37.3 | Indoor Track | 30 | 36.6 |
| | | | Outdoor Track | 30 | 35.8 |
| | | | Cheerleading | 40 | N/A |
| **Total:** | 165 | | **Total:** | 280 | |
| **%** | 37.08 | | **%** | 62.92 | |

Looking forward to the 2009-2010 season, McDonald testified that he sees it as his obligation to make sure the coaches understand the need to "hit their number." McDonald acknowledged, however, that no one is going to get a bonus for hitting their number, nor will anyone get fired if they fail to adhere to those targets. McDonald explained the roster management goals as something that the department will work together to achieve as a team. He anticipated adding more to the staff manual to describe the process and to explain why roster management is important. McDonald noted that perhaps more closely monitoring the add/delete changes to rosters will be necessary.

## II.    Discussion

### A.    Standard of Review

"A party seeking a preliminary injunction must demonstrate: (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 116 (2d Cir. 2009) (internal quotation and citation omitted). "Such relief, however, is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Grand River Enter. Six Nations,*

*Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation omitted).

Quinnipiac argues, in addition, that the plaintiffs should be held to the higher standard required to prove a mandatory injunction.  The injunction sought here is more fairly characterized as a prohibitory injunction, and not a mandatory injunction, because, by its terms, it would restrain the University from carrying out its decision to eliminate the volleyball team in the upcoming academic year.  The injunction, therefore, would preserve the status quo rather than requiring the University to undertake an affirmative act.  *See Phillip v. Fairfield Univ.*, 118 F.3d 131, 133-34 (2d Cir. 1997) (characterizing the injunction sought as prohibitory, not mandatory, because it would restrain the NCAA from interfering with the university's decision to offer the student an athletic scholarship and an opportunity to participate on the basketball team, thus preserving the status quo rather than commanding some positive action).

B.      Irreparable Harm

The student plaintiffs contend that they will be irreparably harmed by the University's decision to disband the volleyball team because they have a limited amount of time to compete in college athletics and specifically chose to attend Quinnipiac to play volleyball.  I agree.  The decision to eliminate the team at the end of the year limits their chances of transferring to another school for the 2009-2010 academic year, requires them to sit out a season of competitive volleyball, and negatively affects their skills and marketability in the Division I volleyball recruiting market.  The fact that the student plaintiffs have the ability to transfer to other Division I schools after next year and that Quinnipiac has agreed to honor their scholarships despite the volleyball team's elimination does not protect the plaintiffs from irreparable harm.

Courts have consistently held that, given the fleeting nature of college athletics, plaintiffs

will suffer irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis.  For example, in *Ganden v. National Collegiate Athletic Association*, 1996 WL 680000, at * 6 (N.D. Ill. 1996), the Court noted that, because elite collegiate athletes have only a limited span of competitiveness, losing a year of competition to transfer schools would irreparably inhibit their development as athletes.  Because the plaintiff would have lost an entire year of competition, described as "a significant proportion of his swimming career," the *Ganden* Court held that in the absence of an injunction, the plaintiff was likely to suffer "irreparable harm for which he ha[d] no adequate remedy at law."  *Id.*  Noting that "women athletes who compete interscholastically . . . develop skill, self-confidence, learn team cohesion and a sense of accomplishment, increase their physical and mental well-being, and develop a lifelong healthy attitude," the Court in *Favia v. Indiana University of Pennsylvania*, 812 F. Supp. 578, 583 (W.D. Pa. 1993), concluded that, because "[t]he opportunity to compete in undergraduate interscholastic athletics vanishes quickly, but the benefits do not," the elimination of their collegiate gymnastics and field hockey teams would cause the plaintiffs to suffer irreparable harm.

Quinnipiac cites to cases where the courts have held that plaintiffs did not suffer irreparable harm where they had the opportunity to transfer to another school and where they did not lose their scholarship money after having their team eliminated.  *See Equity in Athletics, Inc. v. U.S. Dep't of Ed.*, 291 Fed. Appx. 517, 521 (4th Cir. 2008); *Miller v. Univ. of Cincinnati*, 2007 WL 2783674, at *11 (S.D. Ohio 2007); *Butler v. Nat'l Collegiate Athletic Ass'n*, 2006 WL 2398683, at *4 (D. Kan. 2006).  I believe that those cases give insufficient consideration to the unique circumstances college athletes face, making short shrift of the brief time-span in which

they are permitted to compete and failing to consider the loss that even a year of competition would have on the skills and competitiveness of elite Division I athletes such as the student plaintiffs in this case.

The plaintiffs in this case have devoted a significant portion of their lives to training for the opportunity to compete on a Division I volleyball team in college, spending countless hours competing on high school and club teams and participating in the rigorous and time-consuming recruiting process, all the while maintaining a college preparatory high school course load.  The interruption in competition and the need to break into new programs with new coaches and established rosters will necessarily stunt the plaintiffs' development as volleyball players at the highest level of amateur competition.  The harm the plaintiffs will suffer is not primarily monetary, so the continuation of their scholarships cannot cure or prevent it.

A quick review of the plaintiffs' personal circumstances demonstrates further why the loss of their volleyball team would cause irreparable harm.  Biediger is expected to undergo ACL surgery this summer and red-shirt the coming season.  Red-shirting is distinguishable from simply sitting out a season as she would be forced to do in the absence of an injunction.  Even though she will be unable to compete, by remaining a member of a viable and competitive team Biediger will be able to remain focused on the game, will benefit from continuity in coaching, and will be in the best position to earn playing time when she is physically able to return. Furthermore, as an injured player, Biediger will have a difficult, if not impossible, time finding another Division I program to take her on.  Overdevest must remain at Quinnipiac for the completion of her unique occupational therapy program.  The elimination of the Quinnipiac team will eliminate her last year of eligibility to play volleyball.  Finally, Quinnipiac makes much of

the fact that Lawler and L.R. were offered fleeting opportunities to transfer to other schools in March. There is no evidence in the record, however, that opportunities at those schools remain on the table or that they represent comparable athletic and academic opportunities to Quinnipiac. Therefore, the plaintiffs will likely be forced to sit out the next season and hope to transfer to another school for the 2010-2011 season. As explained above, losing a year of competition would cause unquantifiable harm to their elite volleyball training and skill development.

For the foregoing reasons, I find that the plaintiffs have successfully demonstrated that they will suffer irreparable harm in the absence of an injunction saving their team from elimination for the coming season.

Although not necessary to this decision, it is worth noting that the harm to Quinnipiac from issuance of an injunction will not be substantial.[8] When Quinnipiac's stipulation to provide the plaintiffs with their full academic and athletic scholarships for the duration of their education at Quinnipiac is taken into account, combined with the increase in the budgets and coaches' salaries for the cheerleading squads, it is clear that Quinnipiac did not stand to save a significant sum of money over the short term through the elimination of the volleyball team. Maintaining the team for the duration of this lawsuit will not cause it to spend a substantially greater sum of money than it had already committed to spend. As for the issue of space, I am unconvinced that the "space crunch" at Quinnipiac is so severe that the University would be unable to accommodate the volleyball team's practice and competition schedule on the Burt Kahn Court where they currently play, or to make other arrangements for the team.

---

[8] Thus, requiring the plaintiffs to post a bond to protect against harm to Quinnipiac from issuance of an injunction later vacated is unnecessary.

C.     Likelihood of Success on the Merits

      1.     *Title IX*

Every university that receives federal funding and offers varsity interscholastic athletics

to its students is subject to Title IX.  Title IX states, in pertinent part:

> No person in the United States shall, on the basis of sex, be excluded from
> participation in, be denied the benefits of, or be subjected to discrimination
> under any education program or activity receiving Federal financial assistance
> . . . .

20 U.S.C. § 1681(a).  "[P]rogram or activity" includes "all of the operations of . . . a college,

university, or other postsecondary institution, or a public system of higher education."  20 U.S.C.

§ 1687(2)(A).  With respect to athletic programs, the Code of Federal Regulations provides that

interscholastic athletics are included within the meaning of "program or activity" covered by

Title IX:

> No person shall, on the basis of sex, be excluded from participation in, be
> denied the benefits of, be treated differently from another person or otherwise
> be discriminated against in any interscholastic, intercollegiate, club or
> intramural athletics offered by a recipient, and no recipient shall provide any
> such athletics separately on such basis.

34 C.F.R. § 106.41(a).  The regulations further state that a covered university offering varsity

athletics to its students must "provide equal athletic opportunity for members of both sexes."  34

C.F.R. § 106.41(c).  The regulations set forth ten non-exhaustive factors that should be

considered when determining whether a university is providing "equal opportunity:"

> (1) Whether the selection of sports and levels of competition effectively
> accommodate the interests and abilities of members of both sexes;

> (2) The provision of equipment and supplies;

> (3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

*Id.* In addition, another relevant consideration "in assessing equality of opportunity for members of each sex" is whether there is a "failure to provide necessary funds for teams for one sex." *Id.*

A Policy Interpretation, issued by OCR in 1979 (the "OCR Policy Interpretation"), delineates three areas of regulatory compliance: (1) equal athletic financial assistance; (2) equal treatment and benefits for athletic teams; and (3) effective accommodation of student interests and abilities. *See Cohen v. Brown Univ.*, 991 F.2d 888, 897 (1st Cir. 1993) (citing the OCR Policy Interpretation, 44 Fed. Reg. 71413). The plaintiffs' Title IX claims arise under the third area, effective accommodation.

The OCR Policy Interpretation provides three ways – commonly referred to as prongs one, two, and three – for a university to comply with the requirement to provide effective accommodation of students' interests and abilities:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive

to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among
intercollegiate athletes, and the institution cannot show a continuing practice
of program expansion such as that cited above, whether it can be
demonstrated that the interests and abilities of the members of that sex have
been fully and effectively accommodated by the present program.

*Id.* (quoting the OCR Policy Interpretation, 44 Fed. Reg. at 71418).

Prong one provides a "safe harbor" for universities.  *Id.*  "[A] university . . . may stay on

the sunny side of Title IX simply by maintaining gender parity between its student body and its

athletic lineup."  *Id.* at 897-98.  Prongs two and three allow a university lacking "substantially

proportionate" athletic participation opportunities to remain in compliance by demonstrating "an

ongoing effort to meet the needs of the underrepresented gender" or where the university can

demonstrate it has fully and effectively accommodated the interests and abilities of the

underrepresented sex.  *Id.* at 898.

        D.     <u>Prong One of Title IX Compliance: Gender Equity</u>

Quinnipiac has explicitly relied on prong one for Title IX compliance for the upcoming

2009-2010 academic year.  It argues that with its combination of roster management, elimination

of the men's golf, men's outdoor track, and women's volleyball teams, and the elevation of

women's competitive cheer to varsity status, it will be providing athletic participation

opportunities for its male and female students in substantial proportion to the expected gender

composition of the full-time undergraduate population at Quinnipiac, that is, 63% women and

37% men.

There is no question that, if Quinnipiac fails to meet prong one of Title IX compliance, it

will be out of compliance with Title IX.  That is because, by eliminating a women's team while

there is sufficient interest to field one, the University will have failed to demonstrate that it is committed to expanding opportunities for the underrepresented gender – women – or that it has fully and effectively accommodated the interests and abilities of that underrepresented gender.

Plaintiffs ask me to make a legal determination that Quinnipiac's method of counting track athletes is improper and that the elevation of the women's cheer squad to varsity status does not create real inter-collegiate athletic participation opportunities for women. It is not necessary to discuss those issues in any great detail. As explained further below, the record demonstrates that Quinnipiac will not likely satisfy prong one of Title IX compliance due to problems with its roster management policy and its reliance on setting roster floors for women's teams.

It is worth noting, however, that the plaintiffs do not appear likely to prevail in their arguments that Quinnipiac cannot "triple count" its women track athletes or that competitive cheer is not a "sport" for purposes of Title IX. Cross country, indoor track, and outdoor track have separate NCAA championships and are, at their heart, different sports. Cross country is fundamentally separate from either indoor and outdoor track – it is run in all weather, outdoors, through mud, gravel, or grass, on trails, up and down hills and through woods and open fields, and no two courses are the same. All runners in a cross country meet run the same course, with the team score determined by the finishing place of the fastest runners on each team. Indoor and outdoor track are quite similar, but the size, composition, and surface of the tracks are different. Furthermore, not all outdoor track events are available during the indoor track season. Unlike cross country, not all team members compete in the same event, and scoring is the sum of the results of individual and relay events. In short, there is nothing suspect about the way Quinnipiac counts its cross country and track athletes.

Competitive cheer, although not presently an NCAA-recognized sport or emerging sport, has all the necessary characteristics of a potentially valid competitive "sport." The elements and routines performed by competitive cheer teams require rigorous training and a high level of athletic and gymnastic ability, and could be easily described as "group floor gymnastics." Notwithstanding the facts that competitive cheer does not presently have a non-profit governing body and that its schedule lacks the hallmarks of progressive-style competition where a team's season record determines its eligibility to compete in culminating conference and national championships, the gymnastic nature of competitive cheer, its broad popularity, and the high level of national competition, provide a legitimate basis from which competitive leagues can be built.[9]

_____

[9] Although I am not deciding the issue whether competitive cheer constitutes a "sport" for purposes of Title IX compliance, I note that the OCR issued a letter in 2000, stating that it would consider the following factors relevant when determining, on a case-by-case basis, whether cheerleading would be considered a sport:

- whether selection for the team is based upon objective factors related primarily to athletic ability;
- whether the activity is limited to a defined season;
- whether the team prepares for and engages in competition in the same way as other teams in the athletic program with respect to coaching, recruitment, budget, try-outs and eligibility, length and number of practice sessions and competitive opportunities;
- whether the activity is administered by the athletic department;
- whether the primary purpose of the activity is athletic competition and not the support or promotion of other athletes;
- whether organizations knowledgeable about the activity agree that it should be recognized as an athletic sport;
- whether the activity is recognized as part of the interscholastic or intercollegiate athletic program by the athletic conference to which the institution belongs and by organized state and national interscholastic or intercollegiate athletic associations;
- whether state, national, or conference championships exist for the activity;
- whether a state, national, or conference rule book or manual has been adopted for the activity;

Although they are likely to lose the two issues just discussed, the principal reason that plaintiffs are likely to succeed on of the merits of their claims is that Quinnipiac's practice of setting floors for women's rosters under its roster management policy does not produce sufficient genuine participation opportunities for women.  In defending its practice of setting roster targets, Quinnipiac relies on a 1996 ORC Clarification (the "OCR Clarification") of the three-prong Title IX compliance test.  Pl. Ex. 7.  That clarification does accept roster management practices, including capping participation opportunities and cutting teams, as acceptable measures to achieve substantial proportionality.  *Id.* at 4.  The clarification further states that "[a]s a general rule," those athletes listed on a squad list on the first day of competition will count as participants by the OCR and that participants who do not compete, but only practice with a team, will also count as participants.  *Id.* at 8.  The 1996 Clarification and accompanying "dear colleague" letter cautions, however, that "participation opportunities must be real, not illusory."  *Id.* at 4.  It does not suggest that setting a floor for rosters is an acceptable practice for achieving substantial proportionality, particularly where there is evidence that those teams with padded roster numbers are not actually providing genuine participation opportunities for all roster members counted when determining proportionality.

There is a significantly different impact on athletic participation opportunities resulting

---

- • whether there is state, national, or conference regulation of competition officials along with standardized criteria upon which the competition may be judged; and
- • whether participants in the activity/sport are eligible to receive scholarships and athletic awards (e.g., varsity awards).

Pl. Ex. 19, Letter from Dr. Mary Frances O'Shea, National Coordinator for Title IX Athletics, Office for Civil Rights, U.S. Department of Education, to David V. Stead, Executive Director, Minnesota State High School League (April 11, 2000).

from the use of roster floors than from the use of roster caps. A roster cap implies the need to cut players who would otherwise qualify for a team based upon interest and ability – players who can meaningfully benefit from and contribute to team play. In contrast, a roster floor implies the need to add players who otherwise would not qualify for a team based upon interest and ability – players whose principal role is to provide a gender statistic, rather than a meaningful contribution to the team. Floors impose an obligation on coaches to pump up roster numbers and to "carry" players otherwise unsuited to further team goals. Not surprisingly, I have found no caselaw or other authority that sanctions the use of floors – in contrast to the use of caps – as a means of satisfying prong one of Title IX compliance.

At least one court has addressed the feasibility of a roster management policy akin to the one presented by Quinnipiac in this case. In *Choike v. Slippery Rock University*, 2006 WL 2060576, at *7 (W.D. Pa. 2006), the Court rejected the defendant university's attempt to rely on its roster management policy as proof of its compliance with prong one of Title IX because university officials admitted that "attempts to achieve substantial proportionality through roster limits in the past have failed," noting that men's team coaches had been permitted to increase roster size despite the established roster limits set by the administration. The Court further noted that "the increase in roster size for the majority of women's teams appears to be purely artificial," noting that the numbers were not driven by any research into the needs or wants of the female students. *Id.* The university provided no evidence that the teams would be able to fill the extra spots or that the budgets for those sports had been increased accordingly. *Id.* at *8. Therefore, the attempt to use roster management to achieve substantial proportionality was "simply too speculative at this juncture to satisfy Title IX." *Id.*

In arguing that it has satisfied prong one of Title IX compliance, Quinnipiac relies heavily on its EADA roster number reports.  Title IX, however, requires more than merely showing gender equity on the EADA report.  Although an EADA report can be used to make a prima facie showing of substantial proportionately, plaintiffs are permitted to look behind those numbers, as they have done here, to determine whether those EADA numbers actually represent genuine, not illusory, athletic participation opportunities.

The plaintiffs in this case offered credible testimony that the athletic department's roster management numbers did not accurately reflect the actual number of genuine participation opportunities available to both genders at Quinnipiac.  Where the focus of prong one of the Title IX compliance test is *genuine* participation opportunities, it is simply unacceptable for a university to set roster numbers at unsustainably high levels, well above average NCAA squad sizes and the individual coaches' need, in order to "make the numbers" for purposes of claiming to have achieved substantial proportionality.  As effectively demonstrated by Fairchild's testimony about the players on her team, those students filling the extra roster spots are not receiving genuine opportunities to participate and the roster count on the EADA report fails to capture the numerical reality.

Certainly further evidence and analysis of Quinnipiac's roster management policy as it affects the individual teams is necessary before reaching an ultimate conclusion on the merits of Quinnipiac's claim that it provides genuine participation opportunities to its male and female students in substantial proportionality to the gender composition of the undergraduate population.  For the time-being, however, one need only look to the testimony of McDonald and Fairchild to determine that, during the 2008-2009 academic year, there was a participation gap of at least 12

roster slots that went unreported in the EADA numbers – there were six unreported players on

the men's lacrosse team and there were six fewer genuine participation opportunities on the

women's softball team than were reported.  The actual participation gap – if repeated during the

upcoming year – would throw off the gender proportionality to a degree that retaining the

women's volleyball team would only just restore proportionality.

Furthermore, I have no confidence that the EADA numbers Quinnipiac is relying on upon

to prove substantial proportionality are accurate indicators of genuine athletic participation

opportunities.  There is no evidence to suggest that Quinnipiac coaches are likely to stop

engaging in the types of roster manipulations made during the past two seasons, so it is

reasonable to expect that the reported roster numbers in 2009-2010 will not be significantly more

accurate than those reported in 2007-2008 and 2008-2009.  Moreover, without reaching the issue

whether the women's cheer team is a Title IX-eligible sport, it is at least clear that Quinnipiac is

relying on a very optimistic estimate of the number of cheerleaders to whom it will be able to

offer genuine participation opportunities.  Considering that there were only 31 cheerleaders in the

past year, counting both sideline and competitive cheer, and only 18 of those are returning to the

team next year, 40 roster slots is highly ambitious.  Quinnipiac, therefore, cannot rely on those

projected figures to boost itself into the territory of substantial compliance for the upcoming

academic year.[10]

Even if Quinnipiac's roster numbers are accurate, it still has a problem complying with

_____

[10] This is especially true because Quinnipiac has no actual experience maintaining both competitive and sideline cheer on which to make a realistic projection of the numbers it can sustain.  The estimate of 40 participants, therefore, lacks a foundation in past practice that would instill it with credibility.

Title IX because it relies on a roster management policy of setting roster floors.  The plaintiffs have successfully demonstrated that the practice of setting roster floors does not correspond to an equal number of genuine athletic participation opportunities, which is what matters for purposes of complying with Title IX in spirit and in fact.  Either one of those problems – inaccurate roster numbers or setting false roster floors – is sufficient to knock Quinnipiac out of compliance with Title IX.

### III.     Conclusion

Plaintiffs have met their burden of proving irreparable harm and a likelihood of success on the merits that Quinnipiac is not providing genuine athletic participation opportunities in substantial proportionality to the gender composition of its full-time undergraduate enrollment.  Therefore, a preliminary injunction to prevent the elimination the women's volleyball team is necessary pending determination of the merits of plaintiffs' claims.

Therefore:

**IT IS ORDERED** that the defendant, Quinnipiac University and its agents, officers, directors, trustees, employees, and anyone acting in concert with them who receives actual notice of this order, are hereby enjoined from:

a.      eliminating Quinnipiac's women's varsity intercollegiate volleyball team or any other women's teams or athletic participation opportunities;

b.      involuntarily terminating the employment of the coaches of Quinnipiac's women's varsity intercollegiate volleyball team;

c.      reducing its financial, material, or other support for the Quinnipiac women's varsity intercollegiate volleyball team or any other women's intercollegiate team;

and

d.      restricting or denying Quinnipiac's women's varsity intercollegiate volleyball

team access to facilities, coaching, training, or competitive opportunities.

This preliminary injunction shall remain in full force and effect until the final judgment in

this action or until further order of the Court, whichever occurs first.  This injunction shall issue

without bond.

Accordingly, the motion for preliminary injunction (**doc. #2**) is **GRANTED**.

It is so ordered.

Dated at Bridgeport, Connecticut, this 22nd day of May 2009.

/s/ <u>Stefan R. Underhill</u>
          Stefan R. Underhill
          United States District Judge