UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x

STEPHANIE BIEDIGER, ET AL        :   No. 3:09cv-621 (SRU)
                                 :   915 Lafayette Boulevard
            vs.                  :   Bridgeport, Connecticut
                                 :
QUINNIPIAC UNIVERSITY            :   May 11, 2009

- - - - - - - - - - - - - - - - - x

PRELIMINARY INJUNCTION HEARING

B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

    FOR THE PLAINTIFFS:

        PULLMAN & COMLEY
            850 Main Street
            P.O. Box 7006
            Bridgeport, Connecticut 06601-7006
        BY:  JONATHAN B. ORLEANS, ESQ.
            ALEX V. HERNANDEZ, ESQ.

        LEGAL INSTITUTE FOR GENDER EQUITY IN ATHLETICS
            10 Rosecrest Avenue
            Alexandria, Virginia  22301
        BY:  KRISTEN GALLES, ESQ.

    FOR THE DEFENDANT:

        WIGGIN AND DANA, LLP
            400 Atlantic Street
            P. O. Box 110325
            Stamford, Connecticut  06911-0325
        BY:  MARY A. GAMBARDELLA, ESQ.
            JONATHAN BARDAVID, ESQ.

            Susan E. Catucci, RMR
            Official Court Reporter
            915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
            Tel: (917)703-0761

I N D E X

WITNESSES:

KAYLA LAWLER
Direct Examination by Mr. Hernandez................23
Redirect Examination...............................64
Cross Examination by Ms. Gambardella..............51
Recross Examination................................66

STEPHANIE BIEDIGER
Direct Examination by Mr. Orleans.................68
Redirect Examination...............................89
Cross Examination by Ms. Gambardella..............86
Recross Examination................................91

LESLEY RIKER
Direct Examination by Mr. Hernandez................92
Redirect Examination..............................114
Cross Examination by Ms. Gambardella.............106

ERIN OVERDEVEST
Direct Examination by Mr. Orleans................115
Redirect Examination..............................129
Cross Examination by Ms. Gambardella.............126

ROBIN SPARKS
Direct Examination by Mr. Orleans................131
Redirect Examination..............................234
Cross Examination by Ms. Gambardella.............201

Recross Examination...............................240

JOHN McDONALD
Direct Examination by Mr. Orleans................244

EXHIBITS:

Plaintiff's    Exhibits 2, 3, 7, 9, 10, 12, 14, 15, 16, 17,
               23, 34......(Full) 14
               Exhibits 1, 11......(Full) 18
               Exhibit 21......(Full) 19
               Exhibit 26......(Full) 20
               Exhibit 20......(Full) 184
               Exhibit 9, 10...(Full) 186
               Exhibit 8......(Full) 192/200
               Exhibit 38......(Full) 265
Defendant's    Exhibits A, B, C, E, H, K, M - X......
               (Full) 21
               Exhibit L......(Full) 220

1                    (9:30 O'CLOCK, A. M.)

2          THE COURT:  Good morning.  We have a number of

3  preliminary matters to take up before we begin the

4  hearing.  First one on my list is the question of the work

5  product protection for the document that was submitted to

6  me in camera at the pretrial conference.  I've had a

7  chance to read the Adelman decision, review the document

8  and review, I guess, the May 8 letter from Mr. Orleans as

9  well as a couple subsidiary cases that were submitted by

10  the parties.

11          Let me start with a question.  Who is Valda

12  Bellemonte (ph)?

13          MR. McDONALD:  He's the former Vice President

14  for Marketing, External Affairs at Quinnipiac.

15          THE COURT:  That's Mr. McDonald?

16          MR. McDONALD:  Yes.

17          THE COURT:  All right.  First off, is the claim

18  being made with respect to the cover memo or the

19  attachment or both?

20          MS. GAMBARDELLA:  The cover memo, Your Honor.

21          THE COURT:  All right.

22          MS. GAMBARDELLA:  It's our understanding as well

23  that Mr. Bellemonte had some generic discussions with

24  counsel surrounding the timeframe of that memo as well,

25  not Mr. McDonald directly by that point but Mr. Bellemonte

1    had as well.  But it's the cover memo that we produced,

2    the cover page of the attachment.

3           THE COURT:  And what is there to indicate that

4    this document was created because of the prospect of

5    litigation?  Can you tell me that generically looking at

6    the document?

7           MS. GAMBARDELLA:  Generically, Your Honor, part

8    of Mr. McDonald's responsibilities is to keep his finger

9    on the pulse of time line compliance.  He's the Director

10   of Athletics.  And given his broad base knowledge over the

11   years and over the years talking to attorneys and

12   consultants and so forth, understanding that an issue had

13   been triggered, that's the context in which the memo was

14   created.

15          THE COURT:  What distinguishes the document from

16   any other document discussing Title 9?  In other words,

17   the argument you're making would seem to me to be broad

18   enough to protect every document that Mr. McDonald created

19   that related to Title 9 compliance.

20          MS. GAMBARDELLA:  Your Honor, could I make it a

21   little bit easier for the court?

22          THE COURT:  Sure.

23          MS. GAMBARDELLA:  We'll withdraw the objection

24   on one condition.

25          THE COURT:  Okay.

1          MS. GAMBARDELLA:  My concern was not about

2     necessarily anything in that memo that reflected

3     specifically legal advice or admissions -- there's nothing

4     in there.  I'm sure that's why you're struggling.  My

5     concern is that they deemed waiver of other discussions,

6     documents that may or may not have been created around the

7     same time period, because what I don't want to get pinned

8     down to is what exact date was a lawyer contacted.  So,

9     without admission or waiver and without prejudicing the

10    defendant, we're just going to make it easy and withdraw

11    the objection.

12          THE COURT:  Okay.

13          MS. GAMBARDELLA:  Okay?

14          THE COURT:  All right, fine.  Thank you.

15          MS. GAMBARDELLA:  Thank you.

16          THE COURT:  Do you want this document back?

17          MS. GAMBARDELLA:  Sure.  I mean we can produce

18    it now to Mr. Orleans.  May I approach?

19          THE COURT:  Sure.

20          MS. GAMBARDELLA:  Thank you, Your Honor.

21          THE COURT:  Thank you.

22          (Hands counsel.)

23          THE COURT:  All right.  The next thing I wanted

24    to take up was the question of additional witnesses.  I

25    apologize, I was out of town on Friday and was not able to

1    address this apparently as it arose.  Have the parties

2    reached an agreement here or is there -- what's the

3    status?

4           MR. ORLEANS:  Well, Your Honor, we made a late

5    disclosure of a witness after the pretrial conference.  I

6    would represent to the court that we're somewhat concerned

7    about exposing her to potential retaliation by the

8    defendant.  We're hesitant to disclose her until we had

9    talked to her and were confident that she was prepared to

10   offer testimony, what she would say, so we made the

11   disclosure as promptly as we could after that pretrial

12   conference.  Since then, the defendant has disclosed two

13   additional witnesses that the defendant intends to call.

14          Ms. Gambardella and I have had no specific

15   discussion about that other than an exchange of emails in

16   which I think we each adhered to our position that we're

17   entitled to present the witnesses we've disclosed.

18          MS. GAMBARDELLA:  Your Honor, that wasn't

19   exactly the position that I took.  The position that the

20   defendant took is that if there was going to be a late

21   disclosure, and candidly, Your Honor, with all due respect

22   to my fellow counsel, the disclosure of the anticipated

23   subject matter was rather generic, so we were kind of

24   shooting in the dark here as to what the testimony was

25   going to be and why the disclosure was so untimely.

1          That having been said, what I represented to

2     opposing counsel was that in trying to anticipate what

3     would be added, if she was going to be permitted, despite

4     the late and untimely disclosure, to testify, we would

5     bring additional witnesses to testify as well.

6          So, it all rises and falls on whether or not

7     there will be an untimely disclosure, again, because we

8     are just guessing as to the specifics of the anticipated

9     testimony.  We heard the anticipated testimony would be

10    about roster management and recent developments in the

11    Athletic Department.  I don't know what that means.

12         THE COURT:  Well, I had the same reaction,

13    frankly, when I read it so why don't we try to figure out

14    a little more specifically what it is that Ms. Fairchild

15    is intended to testify about.

16         MR. ORLEANS:  Mr. Hernandez, you want to respond

17    to that?

18         MR. HERNANDEZ:  Yes, Your Honor.  And just so

19    the record is clear, I did speak to Ms. Fairchild

20    approximately a week before the pretrial conference but I

21    did not confirm with her at that time that she was, in

22    fact, prepared to testify in open court.  She was a

23    contemplated witness but we had not made the decision to

24    try and get her testimony.  We did try to reach her before

25    the pretrial conference.  I was unable to reach her again

1  to confirm she would, in fact, agree to testify until

2  after the pretrial conference.  So I just wanted to make

3  sure the record was clear in that regard.

4       Your Honor, Coach Fairchild would testify about

5  her experience with the Roster Management Program and her

6  relationship with the Athletic Department.  More

7  specifically, that the first year that roster management

8  was put in place, the number that she was given for the

9  softball team was 19; 19 being the target number of team

10  members that she was expected to report on the first day

11  of competition.  In her estimation, 19 was not an

12  unreasonable number.  The next year of roster management,

13  however, that number jumped to 25.  She had some

14  conversations with various members of the Athletic

15  Department in which she indicated that 25 was simply an

16  unreasonable number.

17       She also asked if she would be provided with

18  additional funding to cover these additional players

19  inasmuch they really only had approximately 18 uniforms

20  for actual players.  In so many words, she was directed

21  again and again to make her number, make the 25 for the

22  first day of competition.

23       When she reported to a member of the athletic

24  department that that number was too high and how was she

25  going to manage that large number of players, she was told

1    make sure that your added cut lists are current after the

2    first date of competition, which she obviously understood

3    to mean cut whoever you have to cut going forward to get

4    the numbers down to a realistic and manageable number as

5    far as traveling and the budget that was allocated for

6    softball.  And I anticipate that that would be the sum and

7    substance of her testimony, Your Honor.

8          THE COURT:  And the recent developments within

9    the Athletic Department?

10          MR. HERNANDEZ:  Yes, Your Honor.  She was

11    present at a meeting of coaches and members of the

12    Athletic Department approximately Wednesday of last week

13    where she and other coaches received instruction on roster

14    management and the university's plan, in effect, to put

15    the competitive cheer program in place and was told, in

16    effect, anyone who's not behind competitive cheer here at

17    Quinnipiac University needs to get out.  That would be the

18    substance of her testimony, Your Honor.

19          THE COURT:  All right.

20          MS. GAMBARDELLA:  Well, Your Honor, given what I

21    just heard, without commenting on the substance, then

22    there is really absolutely no valid reason why even the

23    prospect of this testimony being introduced here today in

24    the last several weeks could not have been revealed.

25          Now, to generically throw out here that they

1    wanted to make sure she wouldn't be retaliated against, I

2    would respectfully suggest to the court is not only

3    without basis and substance, but the whole purpose of

4    disclosures and pretrial memos, especially when we have

5    been compelled to conduct discovery in a most -- I don't

6    think you'll disagree -- almost inhumane fashion in terms

7    of the schedule, there's just no reason -- I mean counsel

8    and I have had discussions casually off the record over

9    the past few weeks about who we thought we might bring in.

10        Now, had this disclosure been made to me, I

11   might have deposed that witness, which I was entitled to

12   do, but based on the representations that have been

13   consistently made, I've been denied the right to depose

14   her on an expedited basis, I've been denied the right to

15   interview any other witnesses who might be impacted, and

16   I've been denied the right to prepare my rebuttal.

17        So, I would say to the court, respectfully,

18   aside from what's been said today, obviously we vehemently

19   deny all of it, that's what deadlines are for.

20        (Pause)

21        MS. GAMBARDELLA:  May I add one other thing,

22   Your Honor?  They are entitled to cross examine the

23   witnesses I have here in the Athletic Department if those

24   are the alleged people who had these conversations about

25   those conversations and then we can go from there.  If the

1    people that Coach Fairchild allegedly had these

2    conversations with are not representatives of the Athletic

3    Department, then they are irrelevant.

4              THE COURT:  Well, that's in fact how I would

5    like to proceed.  Let's see how things go without Coach

6    Fairchild and see whether at the end of the day or the

7    plaintiff's case or whatever, there's still a concern that

8    she needs to be called as a witness, in which case it

9    seems to me we can consider permitting her to be deposed

10   first and, if need be, we come back Wednesday or Thursday

11   for her testimony.

12             MS. GAMBARDELLA:  Thank you, Your Honor.

13             THE COURT:  Yes.  So, for now I'm going to

14   assume that these three witnesses, one for the plaintiff,

15   two for the defendant, will not be called, but that's an

16   open issue.

17             MS. GAMBARDELLA:  Correct.  Thank you.

18             THE COURT:  Okay.  All right, any other issues

19   to take up before we begin?

20             MR. ORLEANS:  Only a housekeeping matter, Your

21   Honor.  We've put the original plaintiff's exhibits up on

22   the bench with the original stickers.  We have the two

23   copies.

24             THE COURT:  Actually I think I may have one

25   already.  Is that possible?

```
 1              MR. ORLEANS:  That might be the defendant's.

 2              MR. HERNANDEZ:  Those one the plaintiff's.

 3              MR. ORLEANS:  Those are the plaintiff's.

 4              MS. GAMBARDELLA:  No, I believe ours are on the

 5     side so those have to be yours.

 6              THE COURT:  I have two volumes of plaintiff's

 7     exhibits and one volume, I believe, of defendant's

 8     exhibits.

 9              MR. ORLEANS:  And I think you had asked us to

10     deliver two copies of the original so I have a second set

11     of copies.

12              THE COURT:  Very good.  All right.

13              MR. ORLEANS:  Now, I should say -- I'm mistaken.

14     I thought we were short and we're not.  What I should say

15     about the exhibits, Your Honor, is that Ms. Gambardella

16     and I have had discussions this morning, we don't have a

17     list of stipulated exhibits to give to the court.  I don't

18     know how the court wants to proceed in terms of

19     determining which exhibits are stipulated in and which

20     ones are not.

21              THE COURT:  Okay.  We can simply do that on the

22     record, if you're prepared to do that.  You've reached

23     some stipulations, I take it?

24              MS. GAMBARDELLA:  We have.

25              THE COURT:  All right, that's helpful.  You
```

1    know, it occurs to me, can counsel just confirm that all

2    prospective witnesses other than parties or party

3    designees are outside?

4               MR. ORLEANS:  Yes, sir.

5               MS. GAMBARDELLA:  No, we have two witnesses who

6    are in the room and we are prepared to ask them to step

7    outside.

8               THE COURT:  Yes, you should do that.

9               (Witnesses leave)

10              MS. GAMBARDELLA:  That does it for us.

11              MR. ORLEANS:  Your Honor, on the plaintiff's

12   side, all of the parties are present and there are no

13   third party witnesses.

14              THE COURT:  Very good.  All right, so which

15   exhibits then can be admitted by stipulation?

16              MR. ORLEANS:  We want to do the plaintiffs'

17   exhibits first?

18              THE COURT:  Sure.

19              MR. ORLEANS:  Go ahead.

20              MS. GAMBARDELLA:  Exhibit 1 is objected to based

21   on relevance.

22              THE COURT:  Okay.  Why don't we do this, why

23   don't we go through the list of which ones are in and I'll

24   assume that everything else is objected to.

25              MS. GAMBARDELLA:  That's why you're the judge.

1              THE COURT:  All right.

2              MS. GAMBARDELLA:  Plaintiff's Exhibit 2 is not

3     objected to.  Plaintiff's Exhibit 3 is not objected to; in

4     fact, it's duplicative of one of Defendant's Exhibit A.

5     Exhibit 7 is not objected to.  Exhibit 9 is not objected

6     to.  Exhibit 10 is not objected to.  Exhibit 13 is -- can

7     I just consult --

8              THE COURT:  Sure.

9              MS. GAMBARDELLA:  Yes.  No objection to Exhibit

10    12.  Objection in part to Exhibit 13.  We do not object to

11    admission of status reports for '08-'09.  Exhibit 14 is

12    not objected to.  Exhibit 15, not objected to.  16, 17,

13    not objected to.  Exhibit 19, objected to in part.  The

14    defendant objects to any OCR letters dating prior to June

15    of 1996.

16              THE COURT:  Okay.

17              MS. GAMBARDELLA:  Into the second binder?

18              THE COURT:  Fine.

19              MS. GAMBARDELLA:  Okay.  Sorry, Judge.  No

20    objection to Exhibit 23.  No objection to Exhibit 34.  And

21    I think that does it for the plaintiff's exhibits.

22              THE COURT:  All right, good.  Each of those

23    Exhibits are full.

24              (Whereupon Plaintiff's Exhibits 2, 3, 7, 9, 10,

25         12, 14, 15, 16, 17, 23, 34 were marked full, as

1          indicated above.)

2              THE COURT:  What about defense exhibits?

3              MR. ORLEANS:  Your Honor, would it be

4      appropriate to have just a brief discussion about some of

5      the plaintiff's objections to try to shorten things up

6      rather than going through each of the witnesses on the

7      stand?  There's a category we might be able to deal with.

8              MS. GAMBARDELLA:  Counsel, could I just make a

9      clarification on the objection?  Letter dated prior to

10     January 1996, not June.  I'm sorry, Judge.  Thank you.

11             THE COURT:  That's fine.

12             MS. GAMBARDELLA:  Sorry, counsel.

13             MR. ORLEANS:  No problem.

14             The defendant has objected to any information

15     for, including information produced by the defendant, for

16     the year, the academic year 2007 and 2008 on the grounds

17     that it's irrelevant.  And I thought, based on our

18     on-the-record discussions relating to discovery and our

19     discussion at the pretrial conference, that the court had

20     indicated that the court would hear evidence pertaining to

21     2007, 2008, the current year and next year.  And,

22     therefore, I would ask that the objection, the relevance

23     objections to the 2007, 2008 exhibits be overruled at this

24     time so that we can have additional exhibits that will be

25     admitted into evidence right at the outset and save time

1    during testimony.

2         MS. GAMBARDELLA:  Your Honor, that's not the

3    totality of the relevance objection.  In some parts -- I

4    know we had this ruling in chambers, we're just stating it

5    for the record -- anything prior to, having to do with the

6    upcoming academic year we've taken the position is

7    irrelevant.  Putting that aside, some of these documents

8    are pulled from the Quinnipiac University website.  There

9    are roster numbers and charts created from roster numbers

10   on the website which, Mr. McDonald has already testified

11   and they have not disputed, is the least reliable squad

12   count.  So, in terms of the weight of that evidence, I

13   understand it goes to weight, not admissibility, however,

14   we would say that Quinnipiac website information is not

15   relevant.

16         We have produced documents that are more formal,

17   that are more official with actual squad sizes.  We should

18   be using those, not the website documents.  So that's

19   really more the objection versus just timeframe.

20         MR. ORLEANS:  Your Honor, with respect to the

21   website, in fact, not all of the 2007, 2008 documents are

22   website documents, but with respect to the website

23   documents, there's statements by the defendant, counsel

24   has just conceded that the objection goes to weight, not

25   admissibility, and she's right about that.  I think the

1    objection goes to weight, not admissibility of those

2    documents.

3             THE COURT:  Okay, well, let me say this.  In

4    terms of timing, it is my ruling that the 2007, 2008 and

5    later documents are relevant.  I understand defense

6    disagrees with that and you've preserved your objection.

7    So the timing issue, I think, is clear.

8             With respect to other objections, it sounds like

9    we may be able to take them up one at a time.  I'm not

10   going to issue a blanket ruling that any document off the

11   Quinnipiac website is necessarily inadmissible.  It may

12   well be that they are, but I think I'd like to see those

13   and take them up individually.

14            MR. ORLEANS:  Well, Your Honor, understanding

15   that ruling, let me ask defense counsel, if I might,

16   whether based on that ruling we might, and reserving the

17   defendant's objections, whether we might add Exhibit 1,

18   Exhibit 11, Exhibit 13.

19            THE COURT:  Well -- 13's in in part.

20            MR. ORLEANS:  It's already in in part.  But 1,

21   11 and 13 should now be in in total based on Your Honor's

22   ruling because none of those are website documents.  Those

23   are all documents that were produced by the defendant, I

24   believe.

25            MS. GAMBARDELLA:  Well -- I'm sorry.  With

1    respect to Plaintiff's 13, the relevance objection also

2    goes to the nature of the information, but I think it is

3    appropriate to take it up with the witness through whom

4    this will be introduced, so that we can explain it to you

5    while she's up there.  With respect to 1 -- what's the

6    other one?

7              MR. ORLEANS:  One and 11.

8              MS. GAMBARDELLA:  I agree it was a timeframe

9    issue, so --

10             THE COURT:  So that was your only objection to 1

11   and 11?

12             MS. GAMBARDELLA:  One and eleven, yes.

13             THE COURT:  Fair enough.  Exhibits 1 and 11 are

14   admitted as full.

15             (Whereupon Plaintiff's Exhibit 1 and 11 were

16        marked full.)

17             MR. ORLEANS:  If I could just have a moment,

18   Your Honor, I want to go through the list and see if we

19   can determine whether there are others that are objected

20   to.  Exhibits 21 and 22, I think, are also documents

21   produced by the defendant not taken from the website as to

22   which there is a relevance objection based on the timing

23   only.

24             MS. GAMBARDELLA:  Actually, you said 21 and 22?

25             MR. ORLEANS:  Yes.

1          MS. GAMBARDELLA:  21 is not just timeframe, Your

2    Honor, but it does go to weight, I'll admit that, not

3    admissibility.  22 has to do with funding and

4    scholarships.  And the basis of the relevancy objection

5    there, Judge, is that this case, by plaintiff's admissions

6    in all of their papers is about participation

7    opportunities and the number of participation

8    opportunities.  It's not about accommodations, equivalent

9    scholarships or anything like that, so that particular

10   document was dollar amounts, which I'm not sure is

11   pertinent, at least for today.  Some future time, it may

12   become relevant, but for today's purposes it's about

13   student athletes receiving a particular funding code.

14          MR. ORLEANS:  Well, maybe we should take, since

15   that's not purely a timing objection, maybe it may be more

16   appropriate to take that up when we get to it in the

17   evidence.  I'm just trying to deal with the timing

18   objections as a way of trying to --

19          THE COURT:  Did I understand 21 to be stipulated

20   as admissible?

21          MS. GAMBARDELLA:  Yeah, it really is a weight

22   objection, not admissibility.

23          THE COURT:  So Plaintiff's 21 is full.

24          (Whereupon Plaintiff's Exhibit 21 was marked

25      full.)

```
 1                    MR. ORLEANS:  Okay.  And then would the same be
 2       true for 26?
 3                    MS. GAMBARDELLA:  This is the ADEA report pulled
 4       off the website?
 5                    MR. ORLEANS:  Pulled off the Department of Civil
 6       Rights website.  You may actually have produced this one.
 7                    MS. GAMBARDELLA:  That's just a timeframe
 8       objection, so that one we can move.
 9                    THE COURT:  So 26 can be admitted?
10                    MS. GAMBARDELLA:  Yes.
11                    THE COURT:  All right.  26 is also full.
12                    (Whereupon Plaintiff's Exhibit 26 was marked
13            full.)
14                    MR. ORLEANS:  Twenty-eight?  No, that's website
15       so I understand we're dealing with that as we come to it.
16                    I think, Your Honor, that's all I have on the
17       pure timing objections.  Thank you.
18                    THE COURT:  All right.
19                    MR. ORLEANS:  Now, let me see if I can deal with
20       our objections to the defendant's exhibits.  We have no
21       objections, Your Honor, to A, B or C.  We have hearsay
22       objections to D, E, F and G.
23                    THE COURT:  Again why don't we just take up what
24       you don't have an objection to.
25                    MR. ORLEANS:  Okay, we have no objection to H --
```

1          MS. GAMBARDELLA:  I'm sorry, did you say E, no

2     objection?

3          MR. ORLEANS:  No, A, B and C no objection, H no

4     objection.  E, no objection, you're right.

5          MS. GAMBARDELLA:  That's okay.

6          MR. ORLEANS:  I apologize.

7          MS. GAMBARDELLA:  That's all right.

8          MR. ORLEANS:  That actually duplicates one of

9     ours.

10          MS. GAMBARDELLA:  Right.

11          MR. ORLEANS:  No objection to K.  And then

12     letter M through and including letter X.

13          THE COURT:  M as in Mary?

14          MR. ORLEANS:  M as in Mary, including -- through

15     and including X as in xylophone, no objection.

16          THE COURT:  Okay.

17          MR. ORLEANS:  And that's it.

18          (Whereupon Defendant's Exhibits A, B, C, E, H,

19          K, M - X were marked full.)

20          THE COURT:  Okay.  Anything else to take up

21     before we begin the testimony?

22          MS. GAMBARDELLA:  Your Honor, just as a

23     housekeeping matter, Defendant's Exhibits Y through BB, I

24     discussed with counsel that those would only go to the

25     extent certain of Dr. Lopiano's testimony is admitted with

```
1    respect to her opinions about competitive cheer, so I
2    don't think we need to take up time today with that.
3              MR. ORLEANS:  I don't anticipate we'll be taking
4    up time with those today.  We don't object to the
5    admissibility of those but they'll have to taken up in
6    context of the discussions of Dr. Lopiano's transcript
7    which, frankly, we're not ready to have today.
8              THE COURT:  Fine, okay.
9              MR. ORLEANS:  Your Honor, with respect to the
10   trial briefs that Your Honor had asked about, the last
11   housekeeping matter before I actually start the evidence,
12   we've had a discussion this morning I think both sides
13   have been working very hard and I think I can make a
14   request on behalf of both parties that Your Honor permit
15   us to file the trial briefs by the close of business
16   tomorrow just because we both got things in draft and none
17   of us are ready to submit them yet.
18             THE COURT:  That's fine.
19             MS. GAMBARDELLA:  No, I was perfectly ready --
20   no, I'm kidding.
21             MR. ORLEANS:  Very kind of you.
22             MS. GAMBARDELLA:  Add a little levity.
23             THE COURT:  That's fine.  All right.  Mr.
24   Orleans?
25             MR. ORLEANS:  Mr. Hernandez?
```

```
 1            MR. HERNANDEZ:  Your Honor, the plaintiffs
 2    called Ms. Kayla Lawler.
 3            THE COURT:  Please remain standing and raise
 4    your right hand.
 5    K A Y L A     L A W L E R,     called as a witness on
 6    behalf of the Plaintiffs, having been duly sworn by the
 7    Court, testified as follows:
 8            THE COURT:  Please be seated.
 9    DIRECT EXAMINATION
10    BY MR. HERNANDEZ:
11    Q.    Thank you, Your Honor.
12          Ms. Lawler, how old are you?
13    A.    I'm 19.
14    Q.    And where are you from?
15    A.    I grew up in Richmond, Indiana.  I just moved to
16    Louisville, Kentucky.
17    Q.    And how far have you gone in school?
18    A.    I just completed my freshman year.
19    Q.    And you're enrolled at Quinnipiac University, is that
20    correct?
21    A.    Yes.
22    Q.    What sorts of activities were you involved in in high
23    school?
24    A.    I, of course, played volleyball.  Basketball, tennis,
25    and I'm in a lot of clubs, like student government,
```

1    executive counsel, and I was also the year book editor.

2    Q.   And approximately how old were you when you began

3    playing volleyball?

4    A.   As far as club, fourth grade, but I got taught how to

5    play when I was really little.  My sister played in club

6    and her coaches showed me how to play when I was barely

7    old enough to touch a ball.

8    Q.   When you say you and your sister played club, what do

9    you mean by that?

10   A.   It basically means that you play volleyball

11   year-round.  After the high school season ends, we would

12   play on like a traveling team.  We went all over the U. S.

13   playing in tournaments.

14   Q.   Did there come a time when you committed yourself to

15   playing volleyball at the collegiate level?

16   A.   Yes, I actually decided I wanted to in fifth grade.

17   Q.   Fifth grade?

18   A.   Yes.

19   Q.   Now, you mention that your club team traveled around.

20   Could you tell the court some of the states that you

21   travelled to on your club volleyball team?

22   A.   We played in Indiana, Kentucky, Michigan, Illinois,

23   Texas, Florida, Pennsylvania.  Really, the list goes on

24   and on.

25   Q.   And what was your typical year like?  Like, let's say

1    starting in the summer when you were playing club

2    volleyball?

3    A.   Well, during the summer I played volleyball, it

4    usually ended in about, I'd say July, beginning of July,

5    but then I would, we would start high school volleyball

6    camps and conditioning as soon as that ended.  I was also

7    doing tennis and basketball during the summer and then the

8    volleyball season would start for high school, and as soon

9    as that was over, I'd have maybe one, two weeks off and

10   then I'd start club again and then start all over.

11   Q.   And by club, you mean club volleyball?

12   A.   Right.

13   Q.   Okay.  Did you graduate from high school?

14   A.   Yes.

15   Q.   And while you were in high school, did you take steps

16   to play collegiate volleyball?

17   A.   Yes, as a sophomore I knew I wasn't allowed to

18   actually speak to the colleges.  My parents and I sent out

19   letters asking for information about the schools and

20   camps.  Actually attended several camps.  And then my

21   junior year was when I spent an extensive amount of time

22   writing coaches and getting game tape ready and speaking

23   to them on the phone.

24   Q.   Okay.  Let's talk about that.  Could you explain for

25   the court what each of those steps involved that you just

1    talked about?

2    A.   Well, it took a lot of time.  I definitely dedicated

3    the spare time I had in high school to that.  We had to

4    send out game tapes to all the schools which had to be

5    made first, which took a very long time.  Email back all

6    the coaches, be available for them to call me.  It was a

7    lot of stress.  I was playing, I was going to school and

8    then playing more than one sport, like I played a Winter

9    sport and then I was playing club volleyball and I was

10   doing all this to try to fulfill my dream.

11   Q.   And when you say "game tapes" are you referring to

12   video of you playing volleyball?

13   A.   Yes.

14   Q.   What are some of the -- well, withdrawn.

15       What did you look for in colleges when you were a

16   junior in high school?

17   A.   Well, I was involved in honors classes in high

18   school, so I definitely wanted a college that was strong

19   academically.  I wanted to play volleyball obviously.

20   Then my relationship with the coach was extremely

21   important.  And I wanted to feel, I wanted to feel like

22   there was support and I wanted to feel comfortable at the

23   school.

24   Q.   And what are some of the schools that you began

25   looking at?

1    A.   I was speaking to Coastal Carolina, Eckerd, Florida

2    Southern, University of West Alabama, Louis University,

3    Quincy University, Wisconsin Parkside.  There were a lot

4    of schools that I communicated with.

5    Q.   All right.  Now, you mention that you felt that the

6    coach was important.  Did you meet the coaches of the

7    different schools that you were interested in?

8    A.   I went on visits to Louis, Florida Southern, Eckerd,

9    Wisconsin Parkside, Clarion, Quincy, I met all of those

10   coaches.

11   Q.   And why did you feel that the coach was important to

12   your decision?

13   A.   Well, you have to, you have to play for them for four

14   years, I mean, and with Coach -- I already had, I had

15   three offers when she called me up and I decided to go

16   visit.  Right off the bat with her I felt a connection

17   that I thought was really rare to find, especially with

18   Division I athletic.

19   Q.   Could you just explain for the court what the

20   relationship is like between a, for example, a high school

21   player and your coach?

22   A.   You mean as a high school athlete with my coach?

23   Q.   When you were a high school athlete.

24   A.   Well, it's definitely not like a college one.  I mean

25   you see them everyday after school for a couple of hours,

1  but that's really the only time you have, you know, to

2  deal with them.

3  Q.   And what is the relationship like between a

4  volleyball player, such as yourself, and your college

5  volleyball coach?

6  A.   Well, Coach Sparks and I definitely had an extremely

7  special relationship.  She was a great coach for me.  She

8  definitely makes me the player that I am now.  But we also

9  had a really good off-the-court relationship.  I mean, I

10  see her everyday, you know, during season.  It's like a

11  job.  She was like a mother to me also, another mother off

12  the court.  I could talk to her about anything.  Whenever

13  I needed her, she was there for me with both volleyball

14  and in life.

15  Q.   You mention that when you were looking at colleges

16  you were looking for support.  Could you explain for the

17  court what you mean by that?

18  A.   Well, it was pretty extraordinary, when I came on my

19  visit to Quinnipiac, I went to the Athletics Office and I

20  spoke with Jeff McDonald and Billy Mecca (ph) and they

21  were both extremely supportive and they said they were

22  behind the program and they wouldn't have hired Coach if

23  they weren't serious about trying to turn the program

24  around, and I felt like that support and that enthusiasm

25  was rare and I was just really excited.  I felt we were

1    all on the same page with trying to build a legacy.

2    Q.    You mention that you had three offers, is that

3    correct?

4    A.    Yes.

5    Q.    And who gave you those three offers?

6    A.    I had an offer from Quincy University, University of

7    West Alabama and Wisconsin Parkside at the time, and then

8    Centenary College had made me verbal offers on the phone

9    if I came to visit.

10   Q.    And could you just explain for the court what you

11   mean you had offers from those schools?

12   A.    They gave me a certain timeline to answer.  If I said

13   yes, I wanted to go there, then I had scholarship

14   available and I was verbally committing to come to their

15   school.

16   Q.    And how much of a scholarship were each of those

17   schools offering?

18   A.    There were two -- the Centenary College who had made

19   verbals was about half.  The others were full.

20   Q.    Full scholarship?

21   A.    Yes.

22   Q.    And that's before you met Coach Sparks, is that

23   correct?

24   A.    Yes.

25   Q.    Could you describe for the coach -- could you

1    describe for the court what your first visit to Quinnipiac

2    was like?

3    A.   As soon as as I got on campus, it was a different

4    feeling than any of the other places.  I had gone on a lot

5    of visits and none of them felt right and when I came to

6    Quinnipiac, it honestly was just a different feeling.  I

7    don't know how to explain it.  And then the warm welcome

8    that I felt and the support from everyone was incredible.

9    Q.   Did you meet your future teammates?

10   A.   I had met the girls that were currently on the team

11   but I was the first recruit to actually commit.  None of

12   the other girls who came in with me were there.

13   Q.   You mention that you spoke to Mr. McDonald and Billy

14   Mecca, is that correct?

15   A.   Yes.

16   Q.   And did you have any questions for Mr. McDonald about

17   Quinnipiac's volleyball program?

18   A.   Well, I was very concerned because I knew that they

19   had had not the greatest year previously.  I definitely

20   asked if they were intending on keeping the program around

21   and I was very assured that with hiring a coach that they

22   were serious about rebuilding the program.

23   Q.   Who told you that the university was serious about

24   rebuilding the program?

25   A.   I heard it both from Jack and Billy Mecca.

1    Q.    Did Mr. McDonald's representation to you that

2    Quinnipiac was committed to the volleyball program play a

3    part in your decision to come to Quinnipiac?

4    A.    Most definitely.  I mean the relationship with Coach

5    was extremely important but to know that I thought the

6    whole athletic office and the whole school was behind us

7    was definitely both reassuring for my mother and I.

8    Q.    And is the same true of representations by Billy

9    Mecca?

10   A.    Yes.

11   Q.    And for the record, is your mother here in court

12   today?

13   A.    Yes.

14   Q.    You also mentioned that your comfort level with the

15   school was important.  Could you describe for the court

16   what you mean by that?

17   A.    Well, as far as academically I wanted it to be a

18   classroom where I felt secure and I could have a personal

19   relationship with the teachers, but definitely, like I

20   said, with the coach and with the athletic program, I

21   wanted to feel like that we, that they could communicate

22   with me on a personal basis, that they knew who we were,

23   that, you know, they would come to our games, they were

24   supportive, and that I had a coach that would be -- that

25   cared about me on and off the court.

1   Q.   And obviously you eventually committed to Quinnipiac,

2   is that correct?

3   A.   Yes.

4   Q.   And how did you notify Quinnipiac that you were

5   coming?

6   A.   While I was on my visit, I told Coach that I was

7   accepting her offer and that I wanted to come.

8   Q.   And did you take any steps to notify the other

9   schools who had made you offers?

10  A.   Yes.  I talked to them on the phone or through email,

11  told them that I had committed to another school.

12  Q.   When did you first come to Quinnipiac to begin your

13  academic career?

14  A.   We came in the Fall of '08.

15  Q.   And did you arrive at the same time as the other

16  students?

17  A.   No, they actually let us come earlier.  They even let

18  us come, I believe, a week earlier than the other

19  athletes.

20  Q.   And when you say "us," who are you referring to?

21  A.   Our rival teams, sorry.

22  Q.   What was that week like?

23  A.   We had three days.  We had team practices at morning

24  and at night and then the individuals in the afternoon.

25  We went to practice together, then we go eat together.  We

```
1    were a very close group at that time.  I had a lot of
2    fun.
3    Q.   What were your days like when classes started?
4    A.   I woke up around 7:30.  I had 8:00 a. m.'s everyday.
5    I had class until lunch and then I would grab lunch and go
6    to practice.  We had to be there an hour ahead of time so
7    we could set up the nets and get dressed and stretch and
8    everything.  We would practice until dinnertime.  So,
9    after dinner -- or I would go to dinner after practice and
10   then after dinner I would go to my room, do work and then
11   do it all over again.
12   Q.   Is Quinnipiac a member of the NCAA?
13   A.   Yes.
14   Q.   And is Quinnipiac in a particular division in the
15   NCAA?
16   A.   We're Division I.
17   Q.   Could you describe for the court what it means for a
18   university to be in Division I?
19            MS. GAMBARDELLA:  Your Honor, foundation for
20   this witness?
21            MR. HERNANDEZ:  Asking her about her personal
22   experience, Your Honor.
23            THE COURT:  Well, the question was ambiguous, so
24   if you rephrase it to ask her at this point.
25
```

1   BY MR. HERNANDEZ:

2   Q.   Ms. Lawler, in your experience what's it like to be

3   part of a Division I program?

4   A.   It's definitely a full-time job.  It requires a lot

5   of dedication, a lot of hard work.  It's definitely very

6   time-consuming, but enjoyable.

7   Q.   And did there come a time when you and your teammates

8   began competing against other schools?

9   A.   Yes, once school started.  I'm not sure exactly how

10  far into the actual school year it was when our first

11  match was.

12  Q.   And just so we're clear, what year did you begin

13  attending Quinnipiac?

14  A.   Fall of '08.

15  Q.   Approximately how many competitions did you have in

16  '08?

17  A.   We had 35.  We had 35 matches.

18  Q.   Thirty-five matches.  And where were those matches?

19  A.   All along the east coast.  We went to Chicago this

20  year.  Maine, Pennsylvania, New Jersey, Delaware, Vermont.

21  Q.   And you mention that you became close with your

22  teammates in that first week.  Did those relationships

23  continue to mature?

24  A.   Yes, definitely.  I feel like that our team has

25  bond chemistry that is extremely hard to find anywhere

1   else.  It's unlike any that I've ever encountered in all

2   of the years that I played.

3   Q.   Is the bond and chemistry among teammates in

4   volleyball important to the success of the team?

5   A.   Definitely.  I mean if you're out there on the court,

6   or even someone on the bench, if one person has the wrong

7   attitude or has a negative response, it affects the whole

8   team.  It's very much team-oriented.

9        I mean, I'm a setter.  I have a hard time playing the

10   ball if I don't have a pass, and if I don't get my hitter

11   the ball, she's going to have a hard time getting the

12   kill.  It's very much feeding off of each other.

13   Q.   Is the -- has the bond and chemistry between you and

14   your teammates been important to your personal

15   development?

16   A.   Definitely.  I mean college is a hard adjustment and

17   to have these girls there for me while I'm going through

18   such a dramatic change and I'm so far from home, it was

19   very important for me.

20   Q.   Could you describe for the court what your training

21   program was like during the competitive season?

22   A.   Well, we practiced everyday.  We would break down

23   game tape, prepare for our matches.  We didn't do as much

24   lifting as normal because we were mostly freshmen and they

25   weren't, the trainers were unsure how much our bodies

1  could handle because we are playing so many matches and on

2  top of lifting, they didn't want us to wear down.  We

3  didn't have a lot of subs.  But I mean, as soon as the

4  season was over, we were doing lifting and agilities.

5  Q.   And by "lifting" are you talking about weight lifting

6  and strength conditioning?

7  A.   Yes.

8  Q.   And when you say you would break down game tape, what

9  does that mean?

10  A.   Scouting other teams, preparing, looking at how they

11  run their offense, how they play their defense, so we can

12  make adjustments to be ready to play them.

13  Q.   When did the competitive volleyball season end?

14  A.   I would say it doesn't really end.  I mean in the

15  Spring you're not playing as many matches but there's

16  still Spring tournaments and, you know, you're breaking

17  down your technique so that you can become a better

18  player.  In the Spring season, that's how it was for me

19  personally.  I was working on my hands, my foot work.  I

20  was expecting to be a completely different setter next

21  year.  So, even though we don't play as many matches,

22  you're still, you know, competing for something.

23  Q.   When you say you would break down your technique,

24  what does that mean?

25  A.   Coach and I were working on remolding how I held my

1    hands when I set the ball.  We were working on my foot

2    work, taking the right steps, accuracy, how fast I was.

3    And then the team was working on breaking down their

4    passing.  Just a lot of reps so we could become better at

5    what we struggled at.

6    Q.   And are these Spring matches that you play important

7    to your development as a volleyball player?

8    A.   Definitely.

9    Q.   What role did those off-season matches play?

10   A.   Well, it's a chance for you to take the technique

11   that you've been working on and put it into real game

12   situations.  In volleyball there doesn't seem to be one

13   point that's exactly the same, so you need to have the

14   other factors of other teams.  How do you bring in the

15   technique that you've been learning into the situation

16   with other teams.  It's very vital, I feel.

17   Q.   You just said in volleyball no point is exactly the

18   same.  What do you mean by that?

19   A.   It's hard to predict what's going to happen.  Even if

20   you know, you know the other team's hitter well or you

21   know their team well, a pass could change the play

22   completely, a hitter could miss-hit the ball.  Your hit --

23   as for me personally, one of my hitters could be --

24   decided that they weren't confident in themselves for that

25   point.  There's so many factors that you have to take in.

1   Q.   Obviously you put a lot of time and effort into your

2   development as a volleyball player.

3   A.   Yes.

4   Q.   Why?

5   A.   It's what I love.  I dedicated my whole life to

6   working, for working and playing in college.  When I found

7   out that I wasn't going to have volleyball anymore, I told

8   my mom my life was over.  I mean -- I honestly don't know

9   what I would do without it.

10   Q.   All right.  If we could just go back to the

11   scholarship for a second, was getting a full scholarship

12   important in your choice of schools?

13   A.   It helped.  I would say financially they offered to

14   give me a full, I mean that definitely helped.

15   Q.   Were you training in January of 2009?

16   A.   Yes.

17   Q.   And were you training in February of 2009?

18   A.   Yes.

19   Q.   All right.  Let's go to early March 2009.  Were you

20   training in the first week of March 2009?

21   A.   We were until March 4th.

22   Q.   Let's talk about March 4th.  Did you have practice

23   that day?

24   A.   Yes.

25   Q.   And what happened after practice?

1    A.   We received a text from Coach saying that we had a

2    meeting with the Administration.  None of us had any idea

3    why.  It was really short notice so neither one was able

4    to make it.  Everyone was there but our senior, Erin.  We

5    were taken into the power room which is where the student

6    athletes go to do their work.  Jack McDonald, Billy Mecca,

7    Tracey Flynn and I believe the other guy's name was Sean

8    Duffy.  I'd never seen him before.  They -- oh, and Ed

9    Lemean (ph), they were all there.  And they told us that,

10   Jack McDonald said that they were sorry but they were

11   going to have to end our season for next year because of

12   economic reasons.

13   Q.   What was your reaction at that time?

14   A.   I was shocked.  I started balling.  All of us were

15   sobbing.  And then Billy Mecca said nothing they could say

16   would make us feel any better, that we needed to continue

17   to be good citizens as we had been.

18   Q.   How long did this meeting last?

19   A.   I would say that all of the people that I said before

20   were only in there five to ten minutes.  Then they left

21   and we were all in there alone, the team and Coach.

22   Q.   How did you feel at that time?

23   A.   I was shocked and I felt betrayed.  Like I said

24   before, I thought my life was over.  And I knew that all

25   of my other teammates had committed just as much of their

```
 1   time as I had to do what they loved.  And to know that it
 2   was being taken away from all of us, it was such a
 3   horrible feeling, indescribable.
 4   Q.    When you say you felt betrayed, why?
 5   A.    Just the support that I had felt from the athletic
 6   office -- as I said, I spoke to Jack and Billy Mecca -- I
 7   really felt betrayed that they had, I felt they had
 8   promised me so much and I didn't understand how they could
 9   just take it away from me just like that.
10   Q.    Is the opportunity for you to compete, and
11   specifically as a volleyball player, important to you?
12   A.    Definitely.  I can't see myself not competing.  I
13   need it.  It makes me a better person.  It's helped me
14   with time management skills.  It's molded my character so
15   much to who I am today.
16   Q.    What did you and your teammates do after you learned
17   that the volleyball season was going to be canceled?
18   A.    Right after the meeting, a few of us went down to the
19   locker room.  We were all crying, calling our parents to
20   let them know.  We just sat in there for a while.  We were
21   all shocked.  We didn't know how to respond.
22   Q.    Who was with nut locker room?
23   A.    Stephanie Biediger, Kelly Cary (ph), and there were a
24   couple other girls that were in and out and then left at
25   different times.  My brain was honestly so -- a whirl that
```

1    I'm not exactly sure who all was in the know.

2    Q.   Did you contact your parents from the locker room?

3    A.   Yes.

4    Q.   How did you contact your parents?

5    A.   I called them on my cell phone.

6    Q.   And were you able to reach them?

7    A.   I reached my mother, yes.

8    Q.   What did you say to your Mom when you reached her?

9    A.   Well, she couldn't understand me at first because I

10   was crying so hard, but what I managed to mutter was that

11   our season was over.  I believe it was something like

12   that, like they just cut our program.  My mom couldn't

13   believe it.  And then, like I said, I told her my life was

14   over, I had no idea what I was going to do anymore.

15   Q.   Now, this all occurred on March 4th, is that correct?

16   A.   Yes.

17   Q.   And what was going on academically at that time?

18   A.   We were taking our midterms.

19   Q.   You were in the middle of midterms?

20   A.   Yes.

21   Q.   Did you have any midterms after this March 4th news?

22   A.   Yes, I did.

23   Q.   Which midterms did you have after that?

24   A.   I know that I had music and it was actually one -- it

25   was my lowest grade that I received.  It was an extensive

1    amount of studying actually.

2    Q.   Do you believe that the emotional impact of learning

3    that the volleyball team was being cut affected your

4    ability to take your music exam?

5    A.   Definitely.  Stef and I were in the library all day

6    those next few days and I, I was crying.  I had to go to

7    the bathroom to cry because it was the only thing that I

8    could think about, and then I would come back and try to

9    study.  And then I'd to have call my mom because I was

10   crying or I would call Coach to talk to her because I was

11   crying.

12   Q.   And did Spring break come around?

13   A.   Yes.

14   Q.   Approximately how long after this March 4th meeting

15   did Spring break come up?

16   A.   Our last day of classes was Friday, so two days

17   after, and that's the day that I flew home.

18   Q.   Okay.  Did you and your teammates meet again after

19   that locker room meeting and before you left for spring

20   break?

21   A.   Yes, we met on Thursday, the day after.

22   Q.   Where did you meet?

23   A.   In the locker room.

24   Q.   Who was there?

25   A.   All of us, I believe.

1   Q.   And did you and your teammates begin forming any

2   plans about what you were going to do?

3   A.   We were going to try to speak with President Lahey.

4   We were planning on making a power point presentation to

5   show him, we wanted to speak with them about like the

6   types of awards we had received academically, how strong

7   all of us were.  We were working on trying to present him

8   GPA numbers as far as averages with the different athletic

9   teams.

10  Q.   Did you do research for that presentation?

11  A.   Yes, we did.

12  Q.   And what sorts of awards had members of the

13  volleyball team won, academic awards?

14  A.   I know that our senior, Jenna Bomico (ph), had won

15  one but I'm not exactly sure as far as everyone else.  We

16  didn't -- I wasn't the one that was getting that

17  information.

18  Q.   Okay.  And did you take any other steps to try and

19  fix this?

20  A.   We contacted Channel 8 News.  We were trying to make

21  the community aware of what had happened to us and we

22  wanted to make the point that we felt that perhaps the

23  hockey or basketball teams could do something to help us.

24  Q.   Whose idea was it to contact Channel 8 News?

25  A.   I believe it was one of our seniors or upper

```
 1    classmen.  We were all trying to find information for the
 2    presentation and it was all going on so fast, I'm not
 3    exactly sure who the one person was that said, you know,
 4    who originally said, hey, let's call.
 5    Q.   Did members of the team contact Channel 8 News?
 6    A.   Yes.
 7    Q.   What happened after that?
 8    A.   We had an interview with them off campus.
 9    Q.   Where was that interview conducted?
10    A.   Erin Overdevest's apartment.
11    Q.   And she's one of your teammates, correct?
12    A.   Yes.
13    Q.   And is she a senior, or just finished her senior year
14    at Quinnipiac, is that correct?
15    A.   Yes.
16    Q.   When did this press conference with Channel 8 News
17    occur?
18    A.   I'm not exactly sure but I think, I think it was that
19    Thursday that we had the meeting in the locker room.
20    Q.   So, right before Spring break?
21    A.   Right.
22    Q.   I think earlier you mentioned that you flew home for
23    Spring break?
24    A.   Yes.
25    Q.   And what was Spring break like for you?
```

1    A.   It was supposed to be relaxing but it was definitely

2    a week of grief.  I didn't do much of anything.  I just

3    spent a lot of time with my family, talking about what had

4    happened, talking about how I felt.  Shed a lot of tears.

5    But the hopes were that after that week I would be able to

6    come back to school and do what I needed to do, you know.

7    And then we were hit with that we weren't able to practice

8    with Coach anymore.

9    Q.   We'll talk about that in a second.  Was there any

10   competitions scheduled after Spring break and after the

11   end of the year?

12   A.   Yes.

13   Q.   And do you know who you were supposed to compete

14   against?

15   A.   I'm not exactly sure but I know we had two

16   tournaments and I believe we were going to have a couple

17   teams to Quinnipiac to play us.

18   Q.   During Spring break, did you take any steps to find

19   out if you could go to a different school?

20   A.   We had to have a release letter from the school

21   before we could speak with other coaches.  My parents

22   called in and asked for that and they did get it to us and

23   we then -- a couple schools called me and we spoke with

24   them.

25   Q.   Did you speak to these other schools during Spring

1    break?

2    A.    Just two.

3    Q.    All right.  And this release letter, is that required

4    according to NCAA rules?

5    A.    Yes.

6    Q.    Let's talk about when you got back to Quinnipiac.

7    What was it like when you got back?

8    A.    Well, it was just as hard as the week before because

9    we encountered the problem that we couldn't practice with

10   Coach.  I honestly didn't know how I could transfer and

11   play at a Division I program if I couldn't practice with a

12   coach.  I'm a setter.  I need someone there giving me

13   feedback, so I definitely felt that that hurt me.

14        And then we would come and try to practice without

15   her and there'd be times when there were tables or chairs

16   set up on our court and we weren't on the schedule

17   anymore.

18   Q.    Did you have any training sessions with Coach Sparks

19   after you got back from Spring break?

20   A.    Not until we were allowed to.

21   Q.    Okay.  And how did you learn that you were no longer

22   allowed to work out with Coach Sparks?

23   A.    I'm not exactly sure.  I believe that Coach was the

24   one who told us.

25   Q.    Okay.  When you say you were no longer on the

1    schedule, what do you mean by that?

2    A.   There's a schedule that's posted right outside the

3    gym and we weren't on there anymore for our normal

4    practice time.

5    Q.   Have you had any conversations with members of the

6    Athletic Department about the status of your athletic

7    scholarship?

8    A.   My parents had called in over Spring break, I think,

9    and asked for in writing that they would honor my full

10   scholarship if I chose to stay, and it took them a little

11   while to get it ready.  I believe my mom called again

12   after we came back from Spring break and -- but they gave

13   it to us in writing that they would honor our

14   scholarships.

15   Q.   And how long, to your understanding, will Quinnipiac,

16   will they recognize your athletic scholarship?

17   A.   They had said by word that they would for the next

18   three years if I remained, but in writing it only said for

19   next year because I believe that's NCAA rules, that that's

20   all they put in writing.

21   Q.   But you'd been told you'll have an athletic

22   scholarship for the next three years?

23   A.   Right, if I choose to stay.

24   Q.   And could you describe for the court what it would be

25   like for you to stay at Quinnipiac on a full athletic

1    scholarship and at the same time not be able to play

2    volleyball?

3    A.   I would be miserable.  Quinnipiac, it's a great

4    school, but knowing that something I dedicated my entire

5    life to and it's been taken away from me and I remained at

6    a place that, where I experienced that, it would be a

7    constant reminder everyday, and knowing that something

8    that I worked so hard to obtain was taken away from me and

9    I remain there not doing what I loved.

10   Q.   Did you take any steps when you got back from Spring

11   break to transfer to another school?

12   A.   Yes.  I communicated with schools through telephone

13   and email but it was actually difficult to do that.  They

14   were all asking for game tapes and I didn't really have

15   any.  It was hard to get some from Coach because she

16   wasn't, she wasn't available on campus.

17       My mother called Jack McDonald and had a conversation

18   with him about that.  He didn't seem to be aware that --

19   they sent out a blanket letter which was to all schools

20   saying that we were allowed to speak with them.  That was

21   really like the release letter or -- and he didn't seem to

22   know.  He thought that the schools were able to contact us

23   if they were contacting the athletic administration.  I

24   believe he assumed that they had our emails and they

25   didn't.

1        And, like I said, it was hard to get game tape from

2   Coach.  But I did, my parents and I took some initiative

3   to do that on our own but it was hard.  I was in college,

4   I was taking college classes.  You need to go on visits to

5   the places you're talking to.  And it was so late in the

6   recruiting process, it was hard to get me out there in

7   time.  And most of the money that they had available,

8   they'd already offered to other players.

9   Q.   When you say "they," are you referring to other

10  schools that you were interested in?

11  A.   Yes.

12  Q.   And when you say that these other schools had already

13  offered money, what are you talking about?

14  A.   They had given their scholarships to players who had

15  accepted them already.

16  Q.   All right.  And is having a volleyball program in

17  place in 2009, 2010, is that important to you if you're

18  going to take steps to transfer to another university?

19  A.   Most definitely.

20  Q.   Could you describe for the court why that is?

21  A.   Sitting out for a year of competition, if I wanted to

22  transfer, I would be so far behind.  Everyone, all the

23  other girls at the other schools would be having that

24  experience, they'd be having the chance to play and that's

25  just something that can't be replaced.  If I wanted to

```
1    have my skills be at the level they needed to be to
2    compete at a Division I program and go into their season
3    ready to play their season, I would be so far behind.
4    Q.   All right.  I think earlier you talked about game
5    tapes in the context of your being a high school student.
6    If you're trying to transfer, do the universities that are
7    looking at you, do they want to see game tapes as well?
8    A.   Yes.
9    Q.   And to the extent they want to see game tapes, are
10   they looking for high school game tapes or more current?
11            MS. GAMBARDELLA:  Your Honor, this is all
12   hearsay.
13            MR. HERNANDEZ:  She knows from her personal
14   experience, Your Honor, what's involved.
15            THE COURT:  Yes, I'll allow it.  She's not,
16   she's not describing what somebody else said.  She's
17   describing requirements of a program.  I'll allow that.
18            MS. GAMBARDELLA:  That's fine.
19   BY THE WITNESS:
20   A.   They wanted college game tape.  That's what they very
21   much preferred.
22   Q.   And is it your understanding that you're expected to
23   produce current game tapes?
24   A.   Yes.
25   Q.   All right.  Have you had an opportunity to visit any
```

1    schools since you learned that Quinnipiac was cutting its

2    volleyball program?

3    A.    I visited the University of Rhode Island.

4    Q.    Could you tell the court what that was like?

5    A.    The girls were all really great but the head coach

6    and I definitely didn't have the type of relationship that

7    Coach Sparks and I had.

8    Q.    And, again, your relationship with the coach is

9    important, is that correct?

10   A.    Extremely important.

11   Q.    Okay.  Have you declared a major?

12   A.    I'm a psychology major.

13            MR. HERNANDEZ:  If I could just have a moment,

14   Your Honor?

15            (Pause)

16            MR. HERNANDEZ:  I have no other questions at

17   this time, Your Honor.

18            THE COURT:  All right, thank you.  Cross?

19   CROSS EXAMINATION

20   BY MS. GAMBARDELLA:

21   Q.    Good morning, Ms. Lawler.

22   A.    Good morning.

23   Q.    You said your major is psychology?

24   A.    Yes.

25   Q.    And you are going into your sophomore year, correct?

1    A.    Yes.

2    Q.    Why psychology?

3    A.    I actually just switched during second semester.  I

4    really liked both of the psych professors that I had this

5    year, and I was it was something I considered doing before

6    I came to Quinnipiac.

7    Q.    So, what your professional aspirations as they exist

8    right now?  I know it could change like the wind blows a

9    different way, given your age, but what currently are your

10   professional aspirations for after college?

11   A.    I'm working to get my Ph.D.  I'd like to be a

12   psychology professor, but I really always wanted to coach

13   Division I volleyball.

14   Q.    Okay.  But this terms of making a living after

15   graduation, is it your goal to graduate with a psychology

16   degree?

17   A.    Yes.

18   Q.    Okay.  Have you been ever approached by any scouts or

19   recruiters for the potential to play volleyball

20   professionally after you leave college?

21   A.    No, but I had a goal of trying to play overseas.

22   Q.    I'm sorry, I didn't hear --

23   A.    I had a goal of trying to play overseas.

24   Q.    But the answer is no to the question?

25   A.    Not yet.

1    Q.    Okay.  Now, you said that when you were in high

2    school, you were active also in basketball and tennis as

3    well as volleyball.  Did I understand that correctly?

4    A.    Yes.

5    Q.    Tell me more about your participation in those three

6    sports during high school.  Were you on the teams?

7    A.    Yes.

8    Q.    Did you have relationships with the coaches?

9    A.    Yes.

10   Q.    Was team spirit and team work important to you?

11   A.    Yes.

12   Q.    Okay.  Do you know that Quinnipiac has a womens

13   basketball team?

14          MR. HERNANDEZ:  Object -- objection, Your Honor,

15   beyond the scope.

16          THE COURT:  I'll allow it.

17   BY MS. GAMBARDELLA:

18   Q.    Do you know that Quinnipiac has a womens basketball

19   team?

20   A.    Yes.

21   Q.    Have you ever tried out for the womens basketball

22   team at Quinnipiac?

23   A.    No.

24   Q.    All right.  Would you say that in high school you

25   devoted time equal between those three sports or was there

1    some other percentage of devotion of time to those three

2    athletic pursuits?

3    A.    I definitely devoted more to volleyball.

4    Q.    Now, you testified -- by the way, how are your grades

5    this year?

6    A.    The first semester I had 3.7 --

7    Q.    Very good.

8    A.    -- and so far I have all A's.

9    Q.    All A's?

10   A.    As far as what's been posted.

11   Q.    So, you think you've seen most of your final grades

12   at this point?

13   A.    I've only seen two out of five.

14   Q.    All right, and how did you do on the two out of five?

15   A.    A's.

16   Q.    Very good.  Congratulations.  Now, you've testified

17   that you now know your scholarship is being honored at

18   least for the upcoming academic year that you have in

19   writing, correct?

20   A.    Yes.

21   Q.    And you've been told verbally, because NCAA

22   guidelines prohibit any further assurances, that your

23   scholarship will be honored through the rest of your

24   college education if you remain at Quinnipiac, correct?

25   A.    No one directly spoke that to me, but it was put in

1    the memo that they released.

2    Q.    All right.  Do you have any reason to believe that

3    they will not honor what they put in that memo?

4    A.    I feel that they have to, but I feel they gave me

5    their word as far as the program and they took that back,

6    so I'm a little nervous.

7    Q.    In effect, do you have anything in writing from prior

8    to when you came to Quinnipiac as a freshman which

9    guaranteed you scholarships then throughout the four

10   years?

11   A.    I believe it has to be resigned every year.

12   Q.    Okay, so is that your way of telling me, no, I don't

13   have anything in writing that says I will get a

14   scholarship every year?

15   A.    Yes.

16   Q.    Okay, thank you.  Do you have anything in writing

17   that -- I'm going to withdraw that.

18        You said when you came to the school you talked to

19   Mr. McDonald.  Let me just make sure I have your words

20   correctly.  Either Mr. McDonald or Mr. Mecca, or both,

21   they talked to you about trying to turn the program

22   around.  Do I have that right?

23   A.    They said with hiring Coach, they were dedicated to

24   turning it around, yes.

25   Q.    What was your understanding of what was meant by

1    turning it around?

2    A.   I thought that we had four years to make it to around

3    the middle conference.

4    Q.   But do you have an understanding of what it was they

5    were trying to turn around?

6    A.   The record.  The support, I'd say -- sorry.  The

7    program in its entirety.

8    Q.   Did anybody give you a sense that the volleyball

9    program when they said they were trying to turn it around,

10   that there was some uncertainty in the past with respect

11   to volleyball?

12   A.   Yes.

13   Q.   Okay.  And did anybody explain to you the basis for

14   the uncertainty about the program in the past?

15   A.   No.

16   Q.   Okay.  And I thought you said -- and please feel free

17   to correct me -- that they talked about rebuilding the

18   program; is that something I heard you say?

19   A.   Yes.

20   Q.   All right.  And what was said to you was that they

21   were hiring Coach Sparks as part of that attempt to

22   rebuild the program, correct?

23   A.   Yes.

24   Q.   Did you get any sense from that, Ms. Lawler, that

25   there was a possibility that rebuilding the program might

1    not work?

2    A.    No.

3    Q.    Okay.  Did anybody guarantee you in writing that for

4    the next four years they would never eliminate any

5    athletic program, including volleyball?

6    A.    No.

7    Q.    When you were looking at schools, colleges, did

8    you -- you testified you looked at other schools.  At the

9    time you were leaving high school and looking at college,

10   were you looking at other schools that offered psychology

11   as a major as well?

12   A.    I was looking at a few different majors because I

13   wasn't exactly sure what I wanted to do at that time.

14   Q.    All right.  And so you have no way of knowing how

15   other schools that have got psychology programs, the

16   schools you were looking at, might or might not compare to

17   Quinnipiac, would that be correct?

18   A.    Yes.

19   Q.    All right.  You testified about the opportunity for

20   transfer and I heard a couple of different things so

21   indulge me and let's go through them again.

22        You said when you heard the volleyball program was

23   going to be eliminated, you did contemplate exploring

24   transfer opportunities, correct?

25   A.    Yes.

1    Q.   And would that be for the year that's coming up in

2    the fall?

3    A.   Yes.

4    Q.   All right.  And then you said you went to look at the

5    University of Rhode Island, correct?

6    A.   Yes.

7    Q.   Did you go to look at the University of Rhode Island

8    because you still had time to potentially transfer there

9    if you wanted to?

10   A.   Yes.

11   Q.   In fact, when you heard the announcement in the

12   beginning of March, it was not too late technically for

13   you to transfer to the University of Rhode Island at that

14   point, correct?

15   A.   Technically, no, but I really felt I needed time to

16   grieve.

17   Q.   Got it.  And, in fact, you could have investigated

18   other schools where it was still possible for you to

19   transfer, would that also be correct?

20   A.   I could have, yes.  It was just difficult with my

21   schedule.

22   Q.   Understood.  Did you ask anybody in administration or

23   any of your professors for excused absences from class to

24   go visit other schools?

25   A.   No.  I only got to the point of visiting with one

1   other school.

2   Q.   All right.  But in terms of it being difficult with

3   your schedule, my question is did you ever ask any

4   professor for additional excused absences, given the

5   circumstances, to go visit a couple other schools?

6   A.   No.

7   Q.   And where you live?

8   A.   Kentucky.

9   Q.   Thank you.  Are you aware of the mens programs being

10  cut at the same time, Ms. Lawler?

11          MR. HERNANDEZ:  Objection, beyond the scope,

12  Your Honor.

13          MS. GAMBARDELLA:  Your Honor, this witness went

14  into great length, without objection from me, about

15  disappointment, team spirit and all of that, and I'm just

16  trying to get the bar here as to -- this is about gender

17  and so I'm just trying to establish, it would only be a

18  question or two, about her sense of disappointment about

19  the men.

20          MR. HERNANDEZ:  I think that would call for her

21  speculation, Your Honor.  Definitely beyond the scope of

22  my direct at this point.

23          THE COURT:  Well, as I said at the pretrial, I'm

24  going to allow a little extra scope.  I'll allow it.

25

1    BY MS. GAMBARDELLA:

2    Q.    Ms. Lawler, are you aware that mens athletic programs

3    are being cut as well?

4    A.    Yes.

5    Q.    Do you think they are disappointed?

6    A.    Yes.

7    Q.    Do you think their lives are over?

8    A.    I would feel -- no, but I feel they may feel it just

9    as bad, yes.

10   Q.    After finals did you go to any parties?

11   A.    No.

12   Q.    Did you go and socialize with friends?

13   A.    Yes.

14   Q.    Dinner, lunch out with friends?

15   A.    Yes.

16   Q.    When you were home on Spring break, did you socialize

17   with friends?

18   A.    No.

19   Q.    Did you socialize with your family?

20   A.    Yes.

21   Q.    And you said so far you did pretty well on your

22   finals, right?

23   A.    Yes.

24   Q.    Okay.  You still plan to major in psychology even if

25   you transfer somewhere else?

```
1    A.   Yes.

2    Q.   Plan to graduate from college?

3    A.   Yes.

4    Q.   Plan to be successful?

5    A.   Hopefully.

6    Q.   Is your life really over?

7              MR. HERNANDEZ:  Objection.  Argumentative, Your

8    Honor.

9              MS. GAMBARDELLA:  I'll withdraw it.

10   BY MS. GAMBARDELLA:

11   Q.   How did the womens volleyball team at Quinnipiac do

12   competition-wise?

13   A.   We didn't have a very good record.

14   Q.   And how many were on the team as of the end of the

15   semester?

16   A.   Of --

17   Q.   Volleyball?

18   A.   Volleyball, okay.  I believe there was nine or ten.

19   Q.   Okay.  When the season started, only if you remember,

20   when the season started, how many participants were there

21   on the volleyball team at Quinnipiac?

22   A.   The same.

23   Q.   Okay.  When you say Spring season, do you mean Spring

24   academic semester, January to May?

25   A.   Yes.
```

```
 1    Q.   All right.  In fact, are you aware of the NCAA rules
 2    about when competitions must end?
 3    A.   No.
 4    Q.   Okay.  Are you aware, through Coach Sparks or any
 5    other source, of the NCAA rules about when womens
 6    volleyball competitions must end?
 7    A.   As far as during the season?
 8    Q.   Well, what is the volleyball season?  Let me ask you
 9    that.
10    A.   It's when we play all our matches.
11    Q.   It's a fall sport, isn't it?
12    A.   Technically, yes.
13    Q.   Okay.  Has anybody told you that the last date of
14    final examinations for the regular academic year at the
15    institution is when the regular playing season must end,
16    per NCAA guidelines?  Has anybody ever told you that?
17    A.   No.
18    Q.   I take it you'll be home for the summer?
19    A.   Yes.
20    Q.   You're going to be working?
21    A.   Yes.
22    Q.   Do you have a job lined up?
23    A.   Yeah.
24    Q.   What are you going to be doing?
25    A.   I worked at Abrocrombie and Finch over the Winter so
```

1    I'm going back there and try to get a couple other jobs.

2    Not sure yet.

3    Q.   Okay, great.

4           MS. GAMBARDELLA:  May I have a moment, Your

5    Honor?

6           THE COURT:  Sure.

7    BY MS. GAMBARDELLA:

8    Q.   You're going to be playing volleyball this summer?

9    A.   Hopefully, yeah.

10   Q.   How are you going to do that?

11   A.   I just moved so I'm not sure where my connections are

12   yet but I'm planning on trying to find some.

13   Q.   Did you go home -- you were home, I take it, between

14   your senior high school and your freshman year of college,

15   correct?

16   A.   Yes.

17   Q.   Did you play volleyball during the summer at home?

18   A.   Yes.

19   Q.   How did you do that?

20   A.   I played with my high school team and I went to the

21   place where I played club and worked with some of the

22   coaches.

23   Q.   Great.  And now for this upcoming summer, correct me

24   if I'm wrong, you said you're looking into your contacts

25   or your connections, I forget which word you used --

1   A.   I said connections because I moved away from where I

2   lived last summer.

3   Q.   Got it.  What are the possibilities, to your

4   understanding, to give you an opportunity to play

5   volleyball this summer?

6   A.   I've only been in Kentucky really for a few weeks but

7   my sister was a club coach so I feel I can maybe go to

8   their facilities.

9   Q.   And play all summer?

10  A.   Perhaps.

11  Q.   Train?

12  A.   Not with a coach.

13  Q.   Train without a coach?

14  A.   Yes.

15  Q.   Okay.

16          MS. GAMBARDELLA:  That's all I have, Your Honor.

17          THE COURT:  Anything further?

18          MR. HERNANDEZ:  Just briefly, Your Honor.

19  REDIRECT EXAMINATION

20  BY MR. HERNANDEZ:

21  Q.   Ms. Lawler, how does the competition that you would

22  be doing in the summer compare with the Division I level

23  competition that you would be doing at Quinnipiac?

24  A.   Not at all.

25  Q.   Would you explain for the court what you mean by not

1    at all?

2    A.   Well, I don't know any girls my age yet in Kentucky

3    so, number one, I'd be working by myself.  It's not a

4    match.  It's not playing against another Division I team

5    and the type of training with a coach or I won't be with a

6    team.  It's just definitely not the same.

7    Q.   And I think earlier you mentioned that volleyball is

8    technically a Fall sport.  What do you mean by

9    technically?

10   A.   That's when our season is but I play year-round so

11   it's, it's a year-round sport for me.

12   Q.   Okay.  And what's your understanding as far as you

13   know -- to the extent that you did look into other

14   schools, what's your understanding as to the availability

15   of scholarship for you for next year at other schools?

16   A.   University of Rhode Island was the only school that

17   could have offered me a three year full scholarship.  The

18   rest wanted me to walk on and give me a scholarship maybe

19   for the last two years.

20   Q.   Okay.

21          MR. HERNANDEZ:  I have no other questions, Your

22   Honor.

23          MS. GAMBARDELLA:  Just one.

24

25

```
1    RECROSS EXAMINATION

2    BY MS. GAMBARDELLA:

3    Q.   Do you agree with me, Ms. Lawler, even if Quinnipiac

4    was going to have volleyball next fall, you could not

5    practice with Coach Sparks over the Summer; would that be

6    correct?

7    A.   Yes.

8    Q.   All right.  And are you suggesting you have no

9    opportunities to play Division I volleyball this Summer?

10   A.   No.

11   Q.   You're not suggesting that or you are suggesting

12   that?

13   A.   I am suggesting that.  Sorry.

14   Q.   Thank you.

15           MS. GAMBARDELLA:  All done, thank you.  Hold

16   on --

17   BY MS. GAMBARDELLA:

18   Q.   So, you were offered a full scholarship to the

19   University of Rhode Island for three years?

20   A.   They, they had committed it to another girl around

21   the same time he was speaking to me about it.

22   Q.   But they offered it to you initially?

23   A.   No.  He said that's what they had available but then

24   he offered it to another girl and she accepted.

25   Q.   Is that because you didn't accept quickly enough?
```

1    A.   He wanted me to tell them I wanted to come into there

2    in about a day.

3    Q.   So you didn't accept quickly enough, correct?

4    A.   Yes.

5    Q.   Okay.  And you didn't want to go to the University of

6    Rhode Island, I thought you said earlier, because you and

7    the coach didn't hit it off or something like that, or you

8    didn't like -- something like that?

9    A.   We didn't have the type of relationship that Coach

10   Sparks and I had.

11   Q.   But had you accepted, within that tight time period,

12   you could have had a three year full scholarship to the

13   University of Rhode Island and could have played

14   volleyball, right?

15           MR. HERNANDEZ:  Objection.  Argumentative, Your

16   Honor.

17           THE COURT:  I'll allow it.

18   BY MS. GAMBARDELLA:

19   Q.   I'm not trying to argue with you, Ms. Lawler.  I'm

20   just trying to clarify for the record.

21   A.   I don't know that from my knowledge.  He said this is

22   what we have and we're either going to give it you or this

23   girl.

24   Q.   Got it.  I appreciate that.

25           MS. GAMBARDELLA:  Thank you, Judge.

```
 1                THE COURT:  All right, thank you.  You're
 2     excused.
 3                (Witness excused.)
 4                MR. ORLEANS:  Your Honor, plaintiffs call
 5     Stephanie Biediger.
 6     S T E P H A N I E   B I E D I G E R,    called as a
 7     witness on behalf of the Plaintiffs, having been duly
 8     sworn by the Court, testified as follows:
 9                THE COURT:  Please be seated.  Thank you.  Could
10     you spell your name for the record, please?
11                THE WITNESS:  B-I-E-D-I-G-E-R.
12                THE COURT:  Thank you.
13     DIRECT EXAMINATION
14     BY MR. ORLEANS:
15     Q.   Good morning, Ms. Biediger.
16     A.   Good morning.
17     Q.   Are you a student at Quinnipiac?
18     A.   Yes.
19     Q.   How old are you?
20     A.   Nineteen.
21     Q.   Were you a member of the volleyball team this year?
22     A.   Yes.
23     Q.   Did you win any awards as a member of the volleyball
24     team?
25                MS. GAMBARDELLA:  Your Honor, could I ask
```

1    counsel just to speak up, just a tad?

2              MR. ORLEANS:  I'll do my best.

3              MS. GAMBARDELLA:  Thank you, I appreciate that.

4    BY THE WITNESS:

5    A.    Yes, I did.  I got the team MVP.

6    Q.    What's that for?

7    A.    Most Valuable Player.

8    Q.    What about your academic achievements this year?

9    A.    I got Northeast Conference Honor Roll, or I don't

10   know the exact name of the award.

11   Q.    How's your grade point average?

12   A.    My Fall semester was a 3.92 and this semester so far,

13   from what I know, it's a 4.0.

14   Q.    What's your major at Quinnipiac?

15   A.    Psychobiology.

16   Q.    And could you explain to the court just very briefly

17   in language that those of us who are not psychobiologists

18   can understand, what is psychobiology?

19   A.    It's a double major basically between psychology and

20   biology.

21   Q.    And is that a four year bachelor's degree program?

22   A.    Yes.

23   Q.    Where are you from?

24   A.    Houston, Texas.

25   Q.    And what sports did you play in high school, if any?

1    A.    I played volleyball and golf.

2    Q.    How did you divide your time between volleyball and

3    golf in high school?

4    A.    It went pretty much all to volleyball.

5    Q.    Okay.  Golf was not a major activity for you?

6    A.    Not major but it was something I enjoyed to do.

7    Q.    Did you play club volleyball as well as playing with

8    your high school team?

9    A.    Yes, I did.

10   Q.    Okay.  How many years did you play club volleyball?

11   A.    Since I was ten, so eight.

12   Q.    And was your club team a travel team, as you heard

13   Ms. Lawler describe?

14   A.    Yes.

15   Q.    Could you tell us some of the places that you visited

16   with your club team?

17   A.    We went to Atlanta, Baltimore, Florida, Chicago,

18   California, Indiana, all around Texas, a lot of places,

19   Utah.

20   Q.    And on your high school team, did you win any state

21   awards as a high school player?

22   A.    Yes, we were state runner up my sophomore year.  We

23   were in the final four my junior year and then we were

24   state champions my senior year.

25   Q.    What about you individually; did you win any awards?

A.    Yes.  I made second team allstate my sophomore year
as well as my senior year, and first team all districts my
sophomore and senior year.

Q.    In high school, what part of the year was the
volleyball season for the high school team?

A.    Fall.

Q.    And what times of the year did you play with your
club team?

A.    Everything other than Fall.

Q.    You played year round?

A.    Yes.

Q.    During the high school season, how many matches per
week on the average?

A.    About two, two or three.

Q.    And during the club season, and the rest of the year,
how many?

A.    If we had a tournament that weekend, it could be
anywhere from like 8 to 12.

Q.    And did you practice everyday?

A.    Not with my team.  I practiced twice a week with my
team and every other day I went to do velocity sports
training.  I drove an hour and-a-half away, an hour
and-a-half each way to sports performance training.

Q.    Now, when did you start -- withdrawn.

       When did you decide that you wanted to play

1    volleyball in college?

2    A.    As soon as I found out I could.

3    Q.    And how old were you then?

4    A.    Ten.

5    Q.    How old were you when you started looking at colleges

6    to play volleyball?

7    A.    I was contacted by my first college when I was at the

8    end of my freshman year and then during my sophomore user

9    I started really looking.

10   Q.    When you were in high school and starting to think

11   about your college education, did you consider any

12   colleges that didn't have Division I volleyball?

13   A.    Not that didn't have any volleyball.  I did consider

14   Division III briefly right before I committed to

15   Quinnipiac when I decided I needed to go to a place that

16   was really highly academic.

17   Q.    Okay.

18   A.    But only briefly and not seriously.

19   Q.    Could you just describe for the court how you went

20   about looking at colleges, say, in your junior and senior

21   years of high school?

22   A.    Well, they would usually contact you and then you

23   would research the school and see if it's a program that

24   fits you and if you, if you and the coach get along -- and

25   that's really, really important.  You see if you like the

1    part of the country it's in, you know, the academics fit,

2    they have your major that you want to do.  But I mean,

3    above all, it was mainly volleyball.

4    Q.   Now, you heard Kayla Lawler's testimony; did you

5    provide game tape to college coaches?

6    A.   Yes.

7    Q.   And did you visit a number of colleges to investigate

8    their volleyball programs and their academics?

9    A.   Yes, all over the country.

10   Q.   Could you tell the court a few of the colleges that

11   you visited?

12   A.   I visited Valparaiso University, Lehigh University, I

13   think Providence, Wichita State, Iowa State, Quinnipiac,

14   all the schools in Texas, all the big schools in Texas.

15   And I think that sums it up.

16   Q.   How were your high school grades?

17   A.   I think that I ended up with an about a 3.7.  I'm not

18   exactly sure the number.

19   Q.   And were your SAT scores pretty good?

20   A.   1960.

21   Q.   Why did you ultimately choose to go to Quinnipiac?

22   A.   Because for me it had a lot to do with Coach.  After

23   all my injuries with my knee, not a whole lot of colleges

24   were willing to take a chance on me the way Coach was.

25   They were willing to accept me but as like a damaged

1    player, like not putting any real commitment behind me.

2    Q.   Now, did Coach Sparks visit you in Texas?

3    A.   No.

4    Q.   Okay, but did you talk to her?  Did you make a visit

5    to Connecticut?

6    A.   I talked with her on the phone for countless hours

7    and I met with her.  She came to one of my club

8    tournaments in Indiana.

9    Q.   And when, if you remember, did you make the choice to

10   commit to Quinnipiac?

11   A.   I would say probably in March of my senior year.

12   Q.   Okay.  Did Coach Sparks offer you an athletic

13   scholarship?

14   A.   She -- the school hadn't given her enough to recruit

15   with so she was only given -- she had already promised out

16   all of her athletic scholarships and she promised me that

17   she would give me money as it became available.

18   Q.   Okay.  What about an academic scholarship from

19   Quinnipiac; did you receive one?

20   A.   Yes, I have the highest.

21   Q.   And about how much is that, if you know?

22   A.   I think it's about 18,000 but I'm not exactly sure.

23   Q.   Now, you mention that you had some injury issues

24   before you came to --

25   A.   Yes.

```
 1    Q.    -- college.  Would you just briefly describe that?
 2    A.    I tore my ACL January of 2006 and then I retore it
 3    again in March or May -- March of 2006.  And I had two
 4    additional surgeries after that, mostly cartilage damage
 5    and removal of hardware.
 6    Q.    Were you able to play volleyball during your senior
 7    year of high school?
 8    A.    Yes.  I was cleared by my surgeon, yes.
 9    Q.    What position do you play on the volleyball team?
10    A.    Outside hitter, right side hitter, sometimes libero.
11    Q.    Sometimes --
12    A.    Libero.  They play only defense.
13    Q.    Okay.  But the hitter is the one who spikes the ball
14    over the net, right?
15    A.    Yes.
16    Q.    Now, when did you first come to Quinnipiac?
17    A.    Fall of '08.
18    Q.    Okay, and you heard --
19    A.    Yeah, we came --
20    Q.    -- Kayla's testimony about coming early for preseason
21    practice?
22    A.    Yes.
23    Q.    Okay, and you also came for that?
24    A.    Yes.
25    Q.    Now, I'm mindful of Judge Underhill's suggestion to
```

 1    counsel that we not be too repetitive with our testimony

 2    this morning of the plaintiffs, so let me ask you this,

 3    Ms. Biediger.  You heard Kayla Lawler's testimony about

 4    her life as a member of the volleyball team --

 5    A.   Yes.

 6    Q.   -- during her freshman year?  Was there anything in

 7    that testimony that you disagree with?

 8    A.   Well, for me, I had to come about two and-a-half

 9    hours before practice so that I could do rehab on my knee

10    and get myself ready to practice with my injury, and then

11    I had to stay about 30 minutes to 45 minutes after

12    practice to do ice on the stem.

13    Q.   Okay.  And so this is extra work that you have to do

14    as a result of your injury?

15    A.   Yes.

16    Q.   And you heard Kayla's testimony about the team's

17    chemistry and emotional bonding among the players?

18    A.   Yes.

19    Q.   Do you agree with her testimony about that?

20    A.   Wholeheartedly, yes.

21    Q.   Now, did your -- withdrawn.

22         You've described the extra work that you had to do to

23    rehab your knee during this past year.  Did the knee

24    impact your play in the competitive season in the Fall of

25    2008?

1    A.   Yes.   There were a lot of games that I played with an

2    immense amount of pain, but I knew that my team needed me

3    so I played through it and there were some times that I

4    couldn't practice because we had had too many matches over

5    the weekend, and then the last weekend of the season I had

6    to get a cortisone injection and play with pain killers.

7    Q.   Now, did you feel any less a part of the team because

8    you weren't necessarily able to make every practice or

9    every game?

10   A.   No.   I was still at every practice, I just wasn't

11   participating in the drills.

12   Q.   Did there come a point in late 2008 or early 2009

13   when you had surgery?

14   A.   Yes.

15   Q.   Okay.   What kind of surgery did you have?

16   A.   I had to have my third ACL surgery.   I played the

17   entire season without one and I didn't know it, and so

18   they replaced my ACL and they cleaned up a lot of

19   arthritic damage that I had going on underneath my kneecap

20   and had to take out a bunch of cartilage.

21   Q.   Okay.   And when did that surgery take place?

22   A.   January 7th.

23   Q.   Could you -- I take it you must be on a rehab program

24   now?

25   A.   Yes.

1   Q.   Could you describe for Judge Underhill just briefly

2   what's involved in the rehab you've been doing since that

3   surgery?

4   A.   I have to get there and use a heat pack to warm up,

5   and then I usually do straight leg raises and quadriceps

6   which is basically just flexing your quad.  And then I

7   have to do squats and lunges and things like that.  Then I

8   usually try and do 15 minutes on the bike or on the

9   elliptic, depending on how it feels.  But I feel lately I

10  haven't been able to do my relab to the extent that I like

11  because I've been in a lot of pain.

12  Q.   I'm going to come back to that in a second.  In

13  addition to the rehab that you've just described, during

14  this Spring semester did you also devote other time to

15  volleyball?

16  A.   Not that I could play but, yes, I had to be at the

17  practices.  I attended all the lifts.  We had Sunday

18  scrimmages that we would scrimmage to meet some of the

19  coed teams, some of the guys that played on the intermural

20  teams, and I would come to those even though I couldn't

21  play.  And then the trainers wouldn't be there for me to

22  do rehab so I was just coming to watch.

23  Q.   And did you have an understanding that the team had

24  some Spring games scheduled?

25  A.   Yes, we had two tournaments and I think we were going

1    to have a couple colleges come down and play us for

2    scrimmages.

3    Q.   Now, again, you heard Kayla Lawler's testimony about

4    the importance of the work that gets done in the Spring.

5    Do you agree with that?

6    A.   Wholeheartedly, yes.

7    Q.   Anything you want to add to what you heard her say?

8    A.   I know that as a hitter, it's really important -- a

9    Spring semester, Spring season, is really important

10   because during the season your tendon gets broken down

11   because you have so many games and you have so little time

12   to practice and actually work on your skill and you have

13   just so many games, it's hard to really hone in on your

14   skills, and so during the Spring semester, that's really

15   where we get a lot of our work and training done.

16   Q.   Now, did you attend the meeting that Ms. Lawler

17   described at which the team was informed that Quinnipiac

18   planned to eliminate the program for next year?

19   A.   Yes, sir.

20   Q.   Would you describe how you reacted when you heard

21   that news?

22   A.   As devastating as it is for me to hear you're about

23   to have another knee surgery, you're just not going to be

24   able to play anymore, this was so much worse, I've never

25   experienced this kind of devastation in my life.

1   Q.   She described a number of girls crying; were you one

2   of those?

3   A.   Yes.

4   Q.   Were you involved in the meeting in the locker room

5   that Ms. Lawler described?

6   A.   Yes.

7   Q.   Okay.  And were you involved in the efforts over the

8   next few days to contact the media?

9   A.   Yes.

10  Q.   And to research the issues and so forth?

11  A.   Yes.

12  Q.   Okay.  Did you go home for Spring break?

13  A.   Yes.

14  Q.   Now -- and did you investigate at all the possibility

15  of transferring somewhere else to play volleyball?

16  A.   Yes.  It would be very difficult for me to do so

17  because I am rehabing an injury and it's an extensive

18  injury.  So, because I'm not able to play right now, I'm

19  kind of a promise, like it's going to be really difficult

20  for me to find a school to play.  I did look into it and

21  at the point that we were told, most of the deadlines for

22  the schools that I could attend had already been passed.

23  Q.   Is that something that you looked into, what were the

24  deadlines for transfer applications at other schools?

25  A.   Yes.

1    Q.   Okay.  And what did you find out about those

2    deadlines?

3    A.   That they were very strict and they don't really have

4    any exceptions and they were pretty much either a week

5    past the date they told us we would need to transfer or

6    stay, and then either that or they had already passed in

7    January.

8    Q.   Okay.  Are you thinking of any particular schools

9    that you looked into for that purpose?

10   A.   Mostly ivy league schools or the patriot league;

11   those are the only schools that really offer my major.

12   Q.   Is your major an unusual major to be offered in

13   undergraduate schools?

14   A.   Yes, it's fairly new.

15          THE COURT:  What was that last answer?  Excuse

16   me.

17          THE WITNESS:  It's fairly new.

18          THE COURT:  Fairly new.

19   BY MR. ORLEANS:

20   Q.   New, as an undergraduate major, as far as you know

21   from your experience of applying to colleges?

22   A.   Yes.

23   Q.   Now, let's assume for the moment that you were able

24   to get into another school that has a psychobiology major

25   and a Division I volleyball program; how would you feel

1    about the prospect of transferring from Quinnipiac and

2    playing elsewhere?

3    A.   I would feel terrible about it because I don't want

4    to have to rebuild my life somewhere else.  I already

5    built it here and I don't want to have to tear it down and

6    rebuild it somewhere else.  And I'm not going to find a

7    relationship with another coach like I have with Coach

8    Sparks, and I'm not going to find the same team somewhere

9    else.

10   Q.   Again, you heard Kayla testify about the importance

11   of the relationship with the coach?

12   A.   Yes.

13   Q.   And do you agree with her testimony on that score?

14   A.   Wholeheartedly.

15   Q.   Okay.  Let's assume that the court enters the

16   preliminary injunction that we're asking for and that

17   there is a volleyball program at Quinnipiac, at least this

18   coming year.  Will you be able to play this Fall, given

19   your knee?

20   A.   Unfortunately, no.

21   Q.   Is there a possibility that you're going to have

22   additional surgery?

23   A.   Yes, it's penciled in for July 1st.

24   Q.   Is that definite or is that only a possibility at

25   this point?

1    A.   At this point it's not definite.  If my team plays, I

2    will play.  I've worked through a lot of pain, I can do it

3    again, but it's being recommended that I not by my doctors

4    and by my trainer.

5    Q.   Now, if you have the surgery, would you red shirt for

6    the year?

7    A.   Yes.

8    Q.   Can you explain to the court what I mean by "red

9    shirt"?

10   A.   You agree to not play in any games and you still get

11   a year of eligibility.  Your year of eligibility isn't

12   counted against you.

13   Q.   But even if you did that, would you be involved with

14   the team in the 2009, 2010 year?

15   A.   Yes, of course.

16   Q.   Would you tell the court what you would expect your

17   involvement to be if you are sitting out from competition?

18   A.   Well, I would probably take on more of an assistant

19   coach role.  I would be, you know, I would help in

20   practices when I was physically able to do so, and I would

21   be on the sidelines, you know, supporting my team, giving

22   feedback, giving serving zones, everything that Coach is

23   supposed to do, I'd take on that role.

24   Q.   Would you be able to do rehab with the team?

25   A.   I would be able to do rehab but I doubt anybody else

1    would be in there with me.

2    Q.   All right.  And you wouldn't expect to be able to

3    play at all during the Fall?

4    A.   I might be able to start practicing a little bit of

5    basic skills towards the end of it.

6    Q.   How about in the Spring of 2010; would you expect to

7    be able to scrimmage if there were Spring scrimmages

8    scheduled?

9    A.   Yes.

10   Q.   Can you describe how you would expect to feel if you

11   go ahead with the surgery and then there is no volleyball

12   program?

13   A.   It would be really hard to motivate myself to know

14   that I don't have a team that I'm coming back to.  One of

15   the things that has always helped me with rehabilitating

16   an injury is to see that my team needs me, you know, they

17   want me to get well as far as I can.  That's been, what's

18   kind of been a driving force behind my rehab, and if I

19   don't have that, it's going to be really hard to get up in

20   the morning and go to rehab every single day.

21   Q.   Now, if you have this surgery and you do red shirt

22   for the 2009, 2010 year, how many years of Division I

23   athletic eligibility would you have left?

24   A.   Three.

25   Q.   And would you plan to compete in volleyball until you

1    graduate from Quinnipiac if there's a program?

2    A.    Yes.

3    Q.    Okay.  Now -- and if you graduated from Quinnipiac

4    and still had a year of eligibility left, what do you

5    anticipate you would do with the extra year of

6    eligibility?

7    A.    Me and Coach had talked about it a lot and I'm going

8    to do a five year program, and I'm thinking about picking

9    up an additional major in math and then I would be able to

10   play all five years and still be an undergrad.

11   Q.    And what's your professional ambition after college?

12   A.    I want to be a neurosurgeon.

13   Q.    Aim high.

14   A.    That's what I do.

15   Q.    Stephanie, is there anything else that you would like

16   to explain to the court about what it means to you to be a

17   Division I athlete?

18   A.    In volleyball, aside from the Olympic team, it's the

19   highest you can achieve, it's the highest level of

20   competition you can achieve.  And that's -- me and sports,

21   that's what I've always been about.  When I was a

22   sophomore, the first college coach who I ever talked to

23   asked me what was my ambition, what did I want to do at a

24   D-I team, I said I want to go to the national tournament

25   and I want to win it, and I still mean that.  So, it means

1    everything to me.  It's how I, you know, get through my

2    day.  It's what I live for.

3              MR. ORLEANS:  Moment, Your Honor?

4              (Pause)

5              MR. ORLEANS:  I have nothing further at this

6    time, Your Honor.  Thank you.

7              THE COURT:  Thank you.  Cross?

8    CROSS EXAMINATION

9    BY MS. GAMBARDELLA:

10   Q.   Ms. Biediger, right?

11   A.   Yes.

12   Q.   Said it right?  Doctor in the making?

13   A.   Yes.

14   Q.   Good for you.  So, you can't play at all next year?

15   A.   I can't play in the Fall season.

16   Q.   Do you know when your doctor will clear you to play

17   again?

18   A.   I think he anticipates by January of 2010.

19   Q.   Depends on how the surgery goes, right, however?

20   A.   Yes.  Depends how the rehab goes and how I handle the

21   pain.

22   Q.   So, do you agree with me if you couldn't pay all next

23   year, you won't be able to compete again in volleyball,

24   isn't that true?

25   A.   No.

1    Q.   So, you disagree with that statement?  Sitting it out

2    for a year doesn't stop you from being competitive again,

3    correct?

4    A.   Not if I have a team with me.

5    Q.   Correct.  And so you have next year, at least for a

6    semester next year, you start looking at transfer

7    opportunities if really what you want to do is have an

8    opportunity to go elsewhere with a volleyball team,

9    correct?

10   A.   Yes.

11   Q.   So, people who sit it out for a year for whatever

12   reason can come back and be competitive at volleyball?

13   A.   If they are sitting on the sidelines of a team, yes.

14   Q.   Well, why do you say there has to be a team at the

15   sidelines?

16   A.   Well, sitting out a year is -- it's hard for any

17   athlete.  It's the hardest thing we can do.  And in my

18   experience, the only way to get through it really is to

19   have a team, and I can sit on the sidelines of a team but

20   I can't just sit in my dorm room for a year not competing

21   or at least being at a competition.

22   Q.   Is there an NCAA rule you know about or anything in

23   writing where -- that it supports what you just told me?

24   A.   Rule?  I'm sorry, I don't understand the question.

25   Q.   A rule that I cannot compete again in volleyball

1    after sitting it out for a year unless there was a, quote

2    unquote, team at the sidelines?

3    A.    No, you can sit out, you can sit it out at a college.

4    Your eligibility -- it doesn't have to be with a team,

5    but --

6    Q.    Okay.  And you're not on an athletic scholarship

7    right now?

8    A.    No, ma'am.

9    Q.    Okay.  And I thought I heard -- Mary.  Ma'am makes me

10   feel really old --

11   A.    Okay.

12   Q.    -- okay?  Did I hear you say you were promised an

13   athletic scholarship?

14   A.    I was not promised anything definite, nothing

15   concrete, but I was promised that if something came along,

16   she would give it to me, yes.

17   Q.    Are you graduating this week?

18   A.    No.

19   Q.    As an undergrad?

20   A.    No.

21   Q.    What year are you going to be in next year?

22   A.    Sophomore.

23   Q.    You're going to be a sophomore?

24   A.    Yes.

25   Q.    I thought I heard masters degree but that was just

1    me.

2               MS. GAMBARDELLA:  One moment, Your Honor.

3               (Pause)

4    BY MS. GAMBARDELLA:

5    Q.    Were you ever denied access to the med room?

6    A.    The med room?

7    Q.    At Quinnipiac?

8    A.    The training room?

9    Q.    Yes.

10   A.    Not that I know of.

11   Q.    Has anybody told you you will be denied excess next

12   year?

13   A.    No.

14              MS. GAMBARDELLA:  That's all I have.

15              THE COURT:  Anything further?

16   REDIRECT EXAMINATION

17   BY MR. ORLEANS:

18   Q.    Ms. Biediger, if you have the surgery and can't

19   compete in 2009, 2010, would you still consider yourself

20   part of the team?

21   A.    Yes.

22   Q.    Would you be part of the team and always accept being

23   able to compete?

24   A.    Yes.

25   Q.    And do you have any sense of what your prospects for

1    being able to transfer to another Division I volleyball

2    program would be after having this additional surgery?

3    A.    Slim to none.

4    Q.    And why do you say that?

5    A.    Well, I am injured right now so it's really hard for

6    me to show another coach that I have the ability to

7    compete for a position and compete for a scholarship.

8    Coach Sparks knows what I can do.  She knows what I can go

9    through and what I can put myself through but, I mean, for

10   another college, it's just a promise and so far promises

11   haven't been that, you know, good and it would be really

12   difficult for me to find another college with the

13   psychobiology program that is comparable to Quinnipiac's

14   and that can give me any financial aid whatsoever like

15   academic scholarships because most of the universities

16   that I could transfer to don't give enough academic

17   scholarship, probably don't give athletic scholarships,

18   and are really expensive.  So it would be really hard for

19   me to find a fit like Quinnipiac.

20   Q.    And when you say that, that you would only be a

21   promise as a volleyball player to another Division I

22   program, do you mean that it would be a big risk for a

23   coach to take a chance on giving you a spot?

24        MS. GAMBARDELLA:  Objection, Your Honor.  It's a

25   little leading.

1              MR. ORLEANS:  It's a little leading, Your Honor.

2     I'm hoping you'll allow it anyway.

3              THE COURT:  I got the point.

4              MR. ORLEANS:  That's fine, I'll withdraw it.

5     Nothing further.  Thank you.

6     RECROSS EXAMINATION

7     BY MS. GAMBARDELLA:

8     Q.   Just one question.

9          Ms. Biediger, if you compete at all in 2010, won't

10    you lose your medical waiver?

11    A.   No, it only counts for the Fall season, for the

12    championships.

13    Q.   But sitting here today, you don't know how the

14    surgery's going to go, you don't know how long the rehab's

15    going to take after that and you don't know when your

16    doctor could unequivocally clear you, correct?

17    A.   I believe that -- I believe in myself and that I can

18    get on the court by 2010.

19    Q.   I get you.  You don't know when your doctor will

20    emphatically be able to clear you to play again, correct?

21    A.   Not an exact date, no.

22    Q.   Okay.

23              MS. GAMBARDELLA:  That's it.  That's all, Your

24    Honor.

25              THE COURT:  Thank you.  You're excused.

```
 1              THE WITNESS:  Thank you.
 2              THE COURT:  Why don't we take our morning break
 3    at this time and come back at 11:45.  We'll stand in
 4    recess.
 5              (Whereupon a recess was taken from 11:35
 6         o'clock, a. m. to 11:45 o'clock, a. m.)
 7              MR. HERNANDEZ:  Your Honor, the plaintiff calls
 8    Lesley Riker.
 9              THE COURT:  Let me just note I've got a criminal
10    proceeding at 12:30 and in light of the fact that
11    everybody's pretty spread out in here, I'm going to do it
12    next door.  So I will need to break at 12:30 and I think
13    we might as well take our lunch hour at that time.  I will
14    try and do the proceeding, eat lunch, and be back at 1:30,
15    but if I'm late, I just wasn't able to get it done.
16              MS. GAMBARDELLA:  So we can leave —
17              THE COURT:  Leave your things there, that's
18    fine.
19              Ma'am, please remain standing and raise your
20    right hand.
21    L E S L E Y      R I K E R,     called as a witness on
22    behalf of the Plaintiffs, having been duly sworn by the
23    Court, testified as follows:
24              THE COURT:  Spell your last name, please?
25              THE WITNESS:  R-I-K-E-R.
```

1          THE COURT:  Thank you.

2    DIRECT EXAMINATION

3    BY MR. HERNANDEZ:

4    Q.    Ms. Riker, where do you live?

5    A.    Rolling Green, Ohio.

6    Q.    And thank you for joining us this morning.

7          When did you leave to come to court?

8    A.    2:30 this morning.

9    Q.    All right.  And you flew into LaGuardia?

10   A.    Yes, I did, and made it here.

11   Q.    And you are the mother of one of the plaintiffs in

12   this case, is that correct.

13   A.    Yes.

14   Q.    And she is identified in the complaint by the

15   initials L. R., is that correct?

16   A.    That is correct.

17   Q.    All right.  How old is L. R. at this time?

18   A.    She's 17.

19   Q.    When will she be turning 18?

20   A.    Next Sunday.

21   Q.    Where did you grow up?

22   A.    Waterville, Ohio.  About 20 minutes from Lake Green,

23   Toledo area, if that helps.

24   Q.    And did you play any competitive sports when you were

25   in high school?

```
1    A.   We didn't have too many at the time because I

2    graduated in 1972.  We had the first coed track meet in

3    the State of Ohio.  That was a big thing back then.  I

4    would have played anything I could have but we didn't have

5    too much.  We had the Girls Athletic Association, served

6    popsicles after the games, but that was primarily it.  But

7    any sport I could do, I did.

8    Q.   So you were active athletically yourself?

9    A.   Very.

10   Q.   And did you attend college after high school?

11   A.   Yes, I did.

12   Q.   Where did you to college?

13   A.   Bowling Green, state university.

14   Q.   What did you major in?

15   A.   Physical education and health.

16   Q.   Was competitive sports opportunities important to you

17   in college?

18   A.   Yes.

19   Q.   What sorts of competitive opportunities were

20   available to you when you were going --

21          MS. GAMBARDELLA:  Your Honor, I don't mean -- I

22   understand Mrs. Riker's here to testify on her daughter's

23   behalf, but what her experiences are with athletic

24   opportunities, I'm not sure they are relevant.

25          MR. HERNANDEZ:  It goes to the importance which
```

1    L. R. and her mother attach to competitive sport

2    opportunities.

3            MS. GAMBARDELLA:  Mrs. Riker is not a plaintiff,

4    nor does she have standing.

5            MR. HERNANDEZ:  I understand that.

6            MS. GAMBARDELLA:  I know any testimony about her

7    daughter, that's fair game, but -- I would just object for

8    the record to relevance and materiality.

9            THE COURT:  I'll allow this question but then I

10   think we should move to another area.

11           MR. HERNANDEZ:  Yes.

12   BY MR. HERNANDEZ:

13   Q.   Were competitive sports opportunities important to

14   you when you were coming through college?

15   A.   Yes, I think that's why I chose my degree.  I wanted

16   to further the sports and coaching.

17   Q.   And are competitive sports opportunities important to

18   your daughter?

19   A.   Yes, very.  She's played volleyball since she was

20   eight years old, fourth grade.

21   Q.   Are competitive sports opportunities important to

22   your relationship with your daughter?

23   A.   Yes.  I coached her couple different sports.  She

24   played softball and volleyball both.

25   Q.   Could you I ask you just to pull that mic a little

1  closer to you so we can hear you throughout the court?  It

2  won't bite you.  You can just lean into it.

3      How old was L. R. then when she began playing

4  competitive sports?

5  A.   Eight years old.  She's played softball and

6  volleyball both.

7  Q.   Did she compete in any other sports in high school?

8  A.   In high school?  She was on the equestrian team.

9  Q.   How did she do on that?

10  A.   They won second division in their high school, or it

11  was actually in the state.  She does have that very

12  competitive skill.

13  Q.   Did there come a time when your daughter expressed an

14  interest in playing volleyball competitively at the

15  collegiate level?

16  A.   When she was eight year old she had a coach that was

17  a college girl at the time.  She really -- I mean that's

18  what started it all.

19  Q.   Was her relationship with her coach important to her

20  growing up?

21  A.   Oh, I think so.  She idolized her and still, most of

22  the coaches she has, she does.

23  Q.   Drawing your attention to the Fall -- actually the --

24  well, withdrawn.

25      When did L. R. begin researching schools?

1    A.   Both of us started last year.  She was being

2    contacted actually as early as a sophomore because we

3    played in AAUs in Florida and we were third in the nation

4    down there so that drew a lot of attention to her.

5    Q.   When you say she was being contacted, who was

6    contacting her?

7    A.   Just different schools would send out kind of

8    informal letters, what they were allowed to send out at

9    the time.

10   Q.   Do you recall the names of some of the schools that

11   were interested in your daughter?

12   A.   We got stuff from the University of Connecticut --

13   yeah, UConn, Florida State, North Carolina, just

14   different, lots of different schools.

15   Q.   All right.  Let's talk about the Fall high school

16   volleyball season.  Approximately when did that begin?

17   A.   Well, they start training in June with open gyms and

18   then they can actually do different small tournaments in

19   July.  Their season actually starts then, the first full

20   week or second full week of August.

21   Q.   And did your daughter compete in the Fall 2008

22   volleyball season?

23   A.   Yes.

24   Q.   Approximately how many games did she have?

25   A.   Oh geez, like 22, 20 -- it depends on whether you

1    want to count the tournament.

2    Q.   Was there travel involved?

3    A.   Yes.  We went to Cleveland for some of the high

4    school stuff.

5    Q.   Was your daughter actively looking at different

6    universities in the Fall of 2008?

7    A.   Yes.

8    Q.   What are some of the schools that she was looking at?

9    A.   She really liked Florida State.  She liked the coach

10   in the contacts she had with him.  When we found out about

11   Quinnipiac she was really interested in that obviously.

12   There was, Fairfield University was contacting her at the

13   time as well.  Dayton, lots of different schools.

14   Youngstown State within Ohio, smaller schools as well.

15   Q.   Did she visit any of those schools?

16   A.   Yes, we've been to several different schools just

17   playing tournaments and seeing the campuses a lot that

18   way.  As far as formal visits, Ohio State because my

19   daughters went there.  We travelled all around Akron.  But

20   as far as the volleyball schools, not -- she's done

21   Fairfield and Quinnipiac.

22   Q.   Did she submit any college applications in the Fall

23   of 2008?

24   A.   Quinnipiac, and that was it once she came here.  This

25   was where she was going to go.

1    Q.   So she was interested in a number of schools but

2    after visiting Quinnipiac, that was it for her?

3    A.   Yes.

4    Q.   Is that the only college that she applied to?

5    A.   Yes.

6    Q.   Were you involved in her decision to come to

7    Quinnipiac?

8    A.   No, I pretty much left that up to her because she

9    was -- that was her life.  I had to, you know, we would

10   support her in whatever way she was going to go but gave

11   her options of -- you know, it's a long distance, but this

12   was what her decision was.

13   Q.   And when was she accepted at Quinnipiac?

14   A.   Accepted accepted?  Well, December or January.  I

15   can't remember what the date was.

16   Q.   Okay, so late '08, early '09, is that fair to say?

17   A.   Yes.

18   Q.   Now, before she was formally accepted at Quinnipiac,

19   did she make a commitment to come to Quinnipiac and

20   compete on their volleyball team?

21   A.   Yes, she verbally committed I think two days after

22   the first national letter of intent was allowed.

23   Q.   Could you describe for the court what you mean by the

24   national letter of intent?

25   A.   There's an early signing period in November that --

1    I'm not very good at these dates.  They can sign to commit

2    to a school at that point in time.  And once they do that,

3    their name is taken off a list for any other recruiters to

4    contact them.  And it's basically the same with a verbal

5    commitment.  And with our club, once she committed, it was

6    posted on a website and then on any coach that had any

7    interest in her would see that she was committed and would

8    no longer send anything.

9    Q.   Okay.  Just so I understand this clearly, is the

10   national letter of intent, when that comes out, is that

11   the earliest date on which a student can verbally commit

12   to play competitive sports at a university?

13   A.   No, they can verbally commit as early as sophomores,

14   I believe.  I'm not really good at dates on this stuff.

15   Q.   Okay.

16   A.   You can verbally commit earlier but you cannot

17   formally commit with other than that national letter until

18   Fall of your senior year.

19   Q.   Okay.  And again, the practical effect of committing,

20   would it be fair to say, that effectively takes a high

21   school student athlete out of competition, out of

22   recruiting by other schools?

23   A.   Yes.

24        MS. GAMBARDELLA:  Your Honor, it's just a little

25   leading again.  This is his witness.

```
1              THE COURT:  Right, but I mean frankly, the
2   national letter, it's well known.  I don't think there's
3   any dispute about how it works.
4   BY MR. HERNANDEZ:
5   Q.   You mentioned that your daughter played club
6   volleyball --
7   A.   Yes.
8   Q.   -- as well, is that correct?
9   A.   Yes.
10  Q.   And after your daughter visited Quinnipiac, what --
11  A.   What happened to --
12  Q.   Yes, what happened after that?
13  A.   She actually made a decision at the time to step down
14  a level, not play on the national team so that she could
15  go into a program at school called DECA which is the
16  Directive of Education Club of America.  It's a marketing
17  business plan for kids in high schools.  And by doing
18  that, she didn't have to commit to some of the major
19  tournaments she had gone to before.  And also by doing
20  that, because she was already committed, we weren't
21  traveling to tournaments that coaches would see her play,
22  so that made a difference.  But it also allowed her to do
23  very well.  She won the state with her DECA competition.
24  Went to nationals last week.
25  Q.   And what's your understanding of what your daughter
```

1    wants to study when she comes to college?

2    A.    Business marketing.

3    Q.    And are you familiar with Quinnipiac's business

4    marketing program?

5    A.    Yes.  She was very excited about all the different

6    opportunities for internships and stuff.

7    Q.    Did Quinnipiac offer your daughter, your family

8    scholarship money?

9    A.    Yes.

10   Q.    And if you could just describe that for the court?

11   A.    Half academic and then -- or half volleyball and then

12   academic monies to help supplement.

13   Q.    Okay.  Did there come a time when you learned that

14   Quinnipiac was eliminating its womens volleyball program

15   for the 2009, 2010 academic year?

16   A.    Yes, I think it was March 5th Coach Sparks called and

17   she had been contacted by a coach at our club who was one

18   of the directors that day and just wanted to know if she

19   had talked to Coach Sparks, and we had no idea why he

20   would ask that particular question.  He'd read it on the

21   internet apparently.

22   Q.    And were you with your daughter when she learned

23   about Quinnipiac's decision?

24   A.    Yes.

25   Q.    Were you on the phone when Coach Sparks spoke to your

1   daughter?

2   A.   Yes.

3   Q.   So all three of you were on the line at the same

4   time?

5   A.   I was right beside her.  I'm sorry, I don't mean --

6   yes.

7   Q.   All right.  Could you describe for the court what

8   happened?

9   A.   Well, I'm sorry, it's emotional.  She pretty much

10  really broke down and I didn't know why.  And she said

11  that the program was eliminated.  And it's like, oh, okay.

12  Kind of wipes out her dreams.  (Witness crying)  It was

13  pretty traumatic for her.  She pretty much shut down at

14  home for a while.

15  Q.   When you say she shut down, what do you mean by that?

16  A.   I think she was really depressed because that was her

17  dream for so long to play in college and then, you know,

18  all of a sudden the rug was pulled out from under her.

19  Sorry.  It's been a long day.

20  Q.   Did you and your family take any steps to try and get

21  your daughter into another university?

22  A.   Yes.  We tried to contact some different schools.

23  Most places, their recruits are already pretty much taken

24  by the Fall.  There's still some, you know, options for

25  some other players along the way but pretty much the major

1    positions are gone early on.  And she's a DS libero, and I

2    mean, as we were told one time, they are kind of like a

3    dime a dozen.  There's a lot of people who could be a

4    hitter and then they become a DS libero because it's a

5    spot that everybody, you know, they are active and they

6    are good passers.  But, you know, she just, she worked so

7    hard for it.  It's just, it was so hard to see that happen

8    to her.

9    Q.   Just so that we're clear, you learned about

10   Quinnipiac University in early March of this year, is that

11   correct?

12   A.   Of its demise, yes.

13   Q.   Yes.  What was the calendar like as far as

14   applications for academic positions at that time?

15   A.   Most applications were closed in late January or

16   early February as far as trying to get in the school.  Her

17   dream school had already been Ohio State and that, they

18   are early enrollment.  Theirs was in December, so they

19   were definitely closed by January.

20   Q.   Have you and your daughter taken any steps to try and

21   get into another university since you learned of

22   Quinnipiac's decision?

23   A.   Yes, we were contacted by Fairfield again and they

24   are kind of on a second to come basis.

25   Q.   That would be Fairfield University here in

1    Connecticut?

2    A.   Yes.

3    Q.   Is that correct?

4    A.   Yes.

5    Q.   And how far along is that process?

6    A.   We're on hold because we are awaiting for this

7    outcome first.

8    Q.   Is it still your daughter's intention to attend

9    Quinnipiac University and play volleyball if there is a

10   program in the Fall?

11   A.   Yes, definitely.

12   Q.   All right.

13           MR. HERNANDEZ:  If I could have just a moment,

14   Your Honor.

15           (Pause)

16   BY MR. HERNANDEZ:

17   Q.   Has Fairfield University offered any scholarship in

18   connection with their program?

19   A.   Partial athletic for only two years.

20   Q.   Only for two years?

21   A.   Yes.

22   Q.   And how does the numbers that Fairfield University is

23   talking about scholarship-wise compare with the promise

24   that Quinnipiac made to you and your family?

25   A.   It's significantly lower because there's no academic

1    money.

2              MR. HERNANDEZ:  I have no other questions, Your

3    Honor.

4              THE COURT:  All right.  Cross?

5    CROSS EXAMINATION

6    BY MS. GAMBARDELLA:

7    Q.   It's afternoon now, so good afternoon.

8    A.   Thank you.

9    Q.   Do you prefer Mrs. or Ms. --

10   A.   It doesn't matter.

11   Q.   -- Riker?  Doesn't matter?  All right.

12        Mrs. Riker, you just testified that Fairfield

13   University is on hold; what does that mean?

14   A.   She's waiting on the outcome of what happens here

15   because this is her first love.

16   Q.   She'd been accepted to Fairfield?

17   A.   No.

18   Q.   Okay.

19   A.   We would push her through --

20   Q.   I'm sorry?

21   A.   They would have to push her through athletically.

22   Q.   Have they indicated to you that that is something

23   they'd be willing to entertain, Fairfield?

24   A.   Yes, if it's not too late.

25   Q.   Right, but it was your decision to put it, quote

1    unquote, "on hold" pending the outcome of today's

2    proceedings, would that be correct?

3    A.    I guess it's more the finances.

4    Q.    Got it.  But we'll break that down in just one

5    second, okay?  Bear with me.

6    A.    Okay.

7    Q.    But it's your decision on her behalf to put it on

8    hold until the judge rules in this proceeding today,

9    correct?

10   A.    Her decision, yes.

11   Q.    Okay.  And so it could be that by the time the court

12   rules, it might be too late because it was on hold,

13   correct?

14   A.    Yes.

15   Q.    Now, Mrs. Riker, do you remember signing an affidavit

16   to be submitted with the complaint papers in this case?

17   A.    Uh huh.  (Affirmative.)

18            MS. GAMBARDELLA:  Your Honor, may I approach

19   with a copy of it?  It's already part of the court file.

20   May I approach?

21            THE COURT:  Sure.  You don't need to ask to

22   approach.  It's okay.  Let me just interrupt briefly.

23            Mr. Einhorn, are you here for 12:30?  We're

24   going to be next door.

25            MR. EINHORN:  Okay, I'll wait there.  Thank you.

1   BY MS. GAMBARDELLA:

2   Q.   Ms. Riker, this is indeed the affidavit you signed?

3   A.   Yes.

4   Q.   Sworn to on April 16, 2009, correct?  And that is

5   your signature on the last page?

6   A.   Uh huh.  (Affirmative.)

7   Q.   All right.  I'd like to call your attention to

8   paragraph six of the affidavit, and the redactions are to

9   take your daughter's name out because she's still a minor,

10  you know that, right?

11  A.   Right.

12  Q.   Okay.  So it says that your daughter was promised an

13  athletic scholarship and an academic scholarship; do you

14  see that?

15  A.   Yes.

16  Q.   Is that correct?

17  A.   Yes.

18  Q.   Has the university, Quinnipiac, promised to honor

19  those scholarships for next year?

20  A.   Not -- no, I mean -- that was never stated when I

21  talked to the AD.

22  Q.   Did you ask?

23  A.   I asked what was going to happen with it and he said

24  those that had been playing would have the scholarship for

25  another year.

1   Q.   Do you now have an understanding that her scholarship

2   will be honored, these scholarships for next year, if she

3   chooses to remain?

4   A.   Do I -- say that again?

5   Q.   Have an understanding --

6   A.   No, not really with her.  Not signing a national

7   letter of intent, I didn't know what was going on.

8   Q.   Okay, fair enough.  And then paragraph 11 says, "The

9   timing of the announcement was most unfortunate.  We were

10  given very little time to find another school."

11       Does that -- am I correct in assuming that means you

12  had some time to try and explore other opportunities for

13  your daughter?

14  A.   Not before applications were due.

15  Q.   Well, what does "little time" mean?  In other words,

16  why didn't you say we had no opportunities to look for

17  another school?

18  A.   Because I didn't write the legalese on this.

19  Q.   Did you read it before you signed it?

20  A.   Yes.

21  Q.   But she is accepted -- well, she has an opportunity

22  at Fairfield, which you've put on --

23  A.   She didn't at this time.

24  Q.   Got it.  So that's a change since you signed it?

25  A.   Yes.

1    Q.   Okay.  Thank you.  Paragraph 12 says, "As of now, the

2    only other Division I school that has offered L. a place

3    on their team for 2009 has been able to offer only a

4    partial scholarship and for two years."

5         Are you with me on page three?

6    A.   Yes.

7    Q.   What school is that?

8    A.   That would have been Fairfield.

9    Q.   And this says they offered her a place on their team

10   for '09 with a partial scholarship for two years.

11   A.   They had talked about that long time ago before we

12   committed to Quinnipiac as well.

13   Q.   All right.  When it says as of now, this was signed

14   on April 16th of this year.  So as of that point in time,

15   was this accurate?

16   A.   She had contacted us after March, yes.

17   Q.   Okay.  At this point in time, was paragraph 11 and 12

18   accurate?

19              MR. HERNANDEZ:  Your Honor, could we have a

20   clarification of what "this point in time" means?  Is that

21   April 16 or today?

22              MS. GAMBARDELLA:  April 16.

23   BY MS. GAMBARDELLA:

24   Q.   April 16, is that an accurate statement?

25   A.   She didn't visit them until about two and-a-half

1    weeks ago, so I mean it was, it was an offer made but it

2    had to be -- I mean, it had to be contingent on other

3    things, whether she could get into the school.  We had to

4    make a late application and she was thus not accepted.

5    Q.   Do you agree with me it doesn't say that in this

6    application, that there were contingencies, correct?

7              MR. HERNANDEZ:  Objection.  Argumentative, Your

8    Honor.

9              THE COURT:  I'll allow it.

10   BY MS. GAMBARDELLA:

11   Q.   It doesn't say that, correct?

12   A.   No.

13   Q.   Did you make any inquiry with anybody at Quinnipiac

14   University with the prospect of asking them to intervene

15   or assist your daughter in calling other potential schools

16   to discuss possible late recruitment of your daughter?

17   A.   Did I?

18   Q.   Yes, did you?

19   A.   Call them?  I don't think so.

20   Q.   Did your daughter?

21   A.   She may have.  I don't know.

22   Q.   Had you ever heard, given your background in

23   athletics yourself as a student, that there are late

24   recruiting efforts in summers for colleges?

25   A.   Yes, but we also wanted a good school that had good

1  business and stuff, and the options were getting slim.

2  Q.   And Quinnipiac has good business?

3  A.   Yes.

4  Q.   Unique major -- or you may not have used the word

5  unique, that's my word, but the major that she's selected

6  at Quinnipiac is fairly new, I think that's what you said?

7  A.   No, not that I know of.

8  Q.   All right.  There are good internships?  Maybe that's

9  what you said.

10  A.   Yes.

11       MS. GAMBARDELLA:  One moment, Your Honor.

12       (Pause)

13  BY MS. GAMBARDELLA:

14  Q.   Did you testify that Ohio State was your daughter's

15  dream school?

16  A.   Yes, it was, because the whole family had gone there

17  and that was what she would have wanted to do, and then

18  when she came here, that all changed.

19  Q.   Do they have a volleyball team in Ohio?

20  A.   Yes, but she was never recruited there.

21  Q.   Okay.  Have you tried to see if she can transfer

22  there or did you back in March, early March?

23  A.   Yes.

24  Q.   Okay.  And it's your testimony that, what, it was too

25  late?

1    A.    Yes.

2    Q.    Who told you it was too late?

3    A.    I called the admissions office.  She would have had

4    to sit out the Fall.

5    Q.    Did you ask anybody in Quinnipiac to possibly

6    interface with somebody at Ohio State about late transfer?

7    A.    No, I did not.

8          MS. GAMBARDELLA:  I have no further questions.

9    Or just a moment.  Sorry.

10         (Pause)

11   BY MS. GAMBARDELLA:

12   Q.    Did your daughter sign a national letter of intent?

13   A.    No.

14   Q.    You testified that a student is taken out of

15   contention when she signs a national letter of intent, did

16   I hear that correctly?

17   A.    Uh huh.  (Affirmative.)

18   Q.    But your daughter didn't?

19   A.    No, but our club writes it down as a commitment.

20   Q.    Got it.

21   A.    That's what --

22   Q.    Okay, thank you.

23         MS. GAMBARDELLA:  No further questions.

24

25

```
1    REDIRECT EXAMINATION

2    BY MR. HERNANDEZ:

3    Q.   Just briefly.  Mrs. Riker, was cost, the overall cost

4    of the college education a factor in you and your family's

5    decision to go to Quinnipiac?

6    A.   Yes, with that, the help we were going to get and the

7    volleyball help.

8    Q.   And, again, Quinnipiac was being more generous at

9    that time?

10   A.   Yes.

11   Q.   All right.

12            MR. HERNANDEZ:  No other questions, Your Honor.

13            MS. GAMBARDELLA:  Nothing further.

14            THE COURT:  Thank you, you're excused.  You can

15   just leave that there.

16            MR. HERNANDEZ:  And, Your Honor, just so I

17   understand the order of sequestration, she is allowed to

18   remain in the courtroom, is that correct?

19            THE COURT:  Correct.

20            MR. HERNANDEZ:  Thank you.

21            (Witness excused.)

22            MR. ORLEANS:  Your Honor, the plaintiffs call

23   Erin Overdevest.

24

25
```

```
 1    E R I N      O V E R D E V E S T,      called as a
 2    witness on behalf of the Plaintiffs, having been duly
 3    sworn by the Court, testified as follows:
 4              THE COURT:  Please be seated.  And spell your
 5    last name for the record, please.
 6              THE WITNESS:  O-V-E-R-D-E-V-E-S-T.
 7    DIRECT EXAMINATION
 8    BY MR. ORLEANS:
 9    Q.   Good afternoon.  We both need to adjust our
10    microphones.
11    A.   We're all set.
12    Q.   Good afternoon, Ms. Overdevest.
13    A.   Good afternoon.
14    Q.   Are you currently a student at Quinnipiac University?
15    A.   I am currently a student.
16    Q.   And what year are you?
17    A.   I just graduated from undergraduate and I am going to
18    be pursuing my masters degree in occupational therapy.
19    Q.   And has it been your -- well, withdrawn.
20         Is the -- how long is the occupational therapy
21    program?
22    A.   It's a five and-a-half year program so it's not
23    really my decision to -- you know, I have that year
24    and-a-half left for pursuing my --
25    Q.   You've been in that five and-a-half year program for
```

1    a while?

2    A.    Yes, from the start.

3    Q.    Okay.   Congratulations on your graduation.

4    A.    Thank you.

5    Q.    How old are you?

6    A.    I am 22.

7    Q.    Were you a member of the volleyball team this year?

8    A.    I was.

9    Q.    Did you compete?

10   A.    I did not compete due to shoulder surgery in June.

11   Q.    Could you just briefly describe what was the nature

12   of the shoulder surgery that you had?

13   A.    Well, I had torn my labrum and stretched out the

14   tendons so there's instability in that capsule.   I can get

15   into detail on that.

16   Q.    I think that's enough.

17   A.    So it would pop out at times.

18   Q.    And so were you then for this academic year, the

19   2008, 2009 year, were you a red shirt?

20   A.    Yes, I was a red shirt, medical red shirt.

21   Q.    How long -- how many years of eligibility, athletic

22   eligibility do you have left remaining?

23   A.    I have one more year.

24   Q.    If there is a program at Quinnipiac, a volleyball

25   program, do you plan to compete next year?

A.    Most certainly do.  I mean volleyball is a huge part
of my life.

Q.    How long have you been playing volleyball?

A.    I've been playing for eight years.

Q.    You heard the testimony of Kayla Lawler and Stephanie
Biediger about the chemistry on the team.  Do you agree
with that testimony?

A.    I indeed do.

Q.    And you heard the testimony about the relationship
with Coach Sparks.  Could you describe your relationship
with Coach Sparks?

A.    Well, on the court like, I mean, I am a captain so I
have to meet with her consistently throughout the season,
and then off the court she's somebody you can go to and
approach with any problems that you may have outside of
volleyball.  So, kind of what Kayla had said, she's kind
of like your second mom, so you have a good relationship
with her.

Q.    During your college career, how much of your time
have you devoted to volleyball?

A.    Insurmountable amount of time.  I would say even this
past season, even though I was injured, I would devote
even more time because I not only went to practices to
support my teammates but, on top of that, I had to do
weight training and also rehab on my own time, and then I

1   also travelled with the team.  So a great amount of my

2   time was devoted to volleyball.

3   Q.   Now, the surgery that you described, did you -- could

4   you have postponed that surgery and played this year?

5   A.   I could have postponed that surgery but I felt that

6   decision for me to have the surgery, I wouldn't have been

7   able to be like as competitive and much use to my team.  I

8   wouldn't have been able to compete at the level that I

9   wanted to compete at.

10  Q.   Let me ask you this.  If you had known that there

11  would be no volleyball program in 2009, 2010, would your

12  decision have been different?

13  A.   Most definitely would have.  I would have definitely

14  played through the pain and competed.

15  Q.   Now, did you originally come to Quinnipiac to play

16  volleyball?

17  A.   I did not come to necessarily play volleyball.  I

18  came for the occupational therapy program.  It's a really

19  well known program across the nation and that five

20  and-a-half years, it's hard to come by.

21       But I did come with some idea that there's a

22  possibility that I could have played volleyball here.

23  Hence that I trained all throughout that Summer.  I

24  attended camps at the University of North Carolina and the

25  University of Pennsylvania and also trained one-on-one

1    with a coach at Villanova University, so, in hopes that I

2    would be able to play at Quinnipiac.  I also tried to

3    contact the coach at the time and I sent in some media of

4    me playing, but there was a coaching change at that time

5    so nobody got back to me.

6    Q.   Did you receive an athletic scholarship from

7    Quinnipiac?

8    A.   Not at that time.  I had an academic scholarship.

9    Q.   And have you ever had any -- withdrawn.

10        Is your academic scholarship good beyond your

11   bachelor's degree?

12   A.   Yes, it is.

13   Q.   So you still have some academic scholarship coming in

14   the next year?

15   A.   Yes, I do.

16   Q.   Okay.  And have you had any conversations with Coach

17   Sparks about an athletic scholarship?

18   A.   Well, I currently receive an athletic scholarship and

19   I've been receiving that since sophomore year and I was

20   expecting to receive that in my masters while I was

21   playing volleyball.

22   Q.   And do you have an understanding as to whether

23   Quinnipiac's statement that it will honor existing

24   scholarships applies to your scholarship?

25   A.   I have some hesitations with that.  The letter that

1    we received, it said one year of undergraduate studies,

2    that's the scholarships, and I am a graduate.  So that

3    letter really doesn't necessarily pertain to me so I don't

4    have anything in writing.  All I have is verbal statements

5    that were made by Jack McDonald in the media.

6    Q.   And what's your understanding of what Mr. McDonald

7    has said about honoring your scholarships specifically?

8    A.   I have still some hesitations from what Tracey

9    Flynn -- I approached her when I got that letter asking

10   this doesn't really pertain to me, it says undergraduate;

11   I'm in a graduate program.  And she said don't worry,

12   we'll take care of it.  So I really haven't necessarily

13   pursued that.

14   Q.   Okay.  Have you ever received any written

15   confirmation that you'll receive your athletic scholarship

16   next year even if there's no volleyball program?

17   A.   No.

18            MS. GAMBARDELLA:  I don't mean to interrupt but

19   my client has authorized me to say that her scholarship is

20   being honored.

21            MR. ORLEANS:  Okay, thank you.

22   BY MR. ORLEANS:

23   Q.   Now, you heard the testimony earlier about the

24   meeting in which the members of the team learned that the

25   program is to be canceled?

1    A.    Yes.

2    Q.    Were you in that initial meeting?

3    A.    I was not at that meeting at that time.  I attend

4    classes from eight -- that particular day I attended

5    classes from eight until five and then I went straight to

6    rehab and I don't check my phone.  I'm not on my phone,

7    ever.  It's hard to reach me.  But so I did not get the

8    text to attend the meeting so I was not in attendance at

9    that meeting.

10   Q.    How did you learn that the program was cut?

11   A.    I tried contacting Coach because I received a text

12   too late to attend that meeting, and continued to call her

13   and then she -- I finally got her and she told me the news

14   with what the meeting was supposed to be about and that

15   they cut our program.

16   Q.    How did that make you feel?

17   A.    I mean I wasn't necessarily in shock.  I was really

18   upset, not necessarily for the reason of me but for my

19   teammates.

20         When an individual comes on a recruiting trip, you

21   know, they interact with the team and we told this team

22   like, yeah, they asked us what we felt about our program

23   and it was like, you know, we're continuing and we -- it's

24   looking up.  I mean we have a new coach, she's a full-time

25   coach now, she just moved from New York City -- or New

1    York, upstate New York, and now we're having like the

2    new -- we're finally able to recruit again.  So I mean it

3    was looking promising.  So I promised these individuals --

4    not promised but I told them, you know, what I felt.  And

5    so I felt really upset, and for them because they came

6    from around the country in hopes to play for four years.

7    Q.   Are you -- I'm not sure that I understand what

8    individuals you're referring to that you had told these

9    things to.

10   A.   Our freshman class, so Kayla Lawler, Stephanie

11   Biediger, Alyssa Nailer (ph), Kelly Cary.

12   Q.   And what about recruits?  What about current high

13   school seniors?  Had you had similar conversations with

14   any seniors who visited the campus?

15   A.   Yes, not only them but also their parents.

16   Q.   Now, at some point in the past, had -- to your

17   knowledge, had there been discussion about Quinnipiac

18   eliminating its volleyball program?

19   A.   Yes.  It came in the Spring of 2006, I learned off

20   campus through our coach at that time, Brian Woodcock,

21   that they were eliminating our program, and then from

22   there though, we had a season to participate in but we

23   couldn't recruit at that time.

24   Q.   And when you learned of that in the Spring of 2006,

25   what year would you have been in in school?

1    A.    I would still be a freshman.

2    Q.    That was the Spring of your freshman year?

3    A.    Yes.

4    Q.    Now, at some point then after that, Quinnipiac hired

5    Coach Sparks, correct?

6    A.    Well, first we had the hiring of Coach Medley (ph)

7    for that season, because it wouldn't have been a full-time

8    position and it's very hard to get a D-I coach, that takes

9    a lot of commitment by the coach, and to not be hired

10   full-time, it's a huge commitment.  So at that time we did

11   not have --

12   Q.    How long was Coach Medley there?

13   A.    She was there for a year.

14   Q.    So that would have been your sophomore year?

15   A.    That would have been my sophomore year, yes.

16   Q.    And at the beginning of your junior year --

17   A.    Yes.

18   Q.    -- Coach Sparks came in?

19   A.    Yes.

20   Q.    Now, did anybody who was part of the Athletic

21   Department make any statements to you around the time that

22   Coach Sparks was hired about the future of the program?

23   A.    I was unable to attend the meeting that we met with

24   Coach Sparks but -- so I wasn't addressed one on one with

25   anybody from Athletics.

1    Q.   Did Mr. McDonald or Ms. Flynn ever say anything to

2    you about the future of the volleyball program at

3    Quinnipiac?

4    A.   I mean the whole Athletic Department was excited

5    about the future of our program because we finally were

6    able to hire a coach full-time again and be able to

7    recruit and we had recruits from all over the country and

8    great talent coming in, so just only makes you excited for

9    the future of the program.

10   Q.   Now, if we could go back to the point where you

11   learned that the program is slated to be eliminated.  You

12   heard the testimony about the meetings in the locker room

13   and so forth.  Were you involved in those efforts?

14   A.   Yes, I was.

15   Q.   What was your role in those efforts?

16   A.   I guess since I had gone through it before, I kind of

17   knew what to expect and what to do.  So I came up with the

18   idea of putting together a power point presentation and

19   meeting with President Lahey and approaching him that way.

20   Q.   And did the team ever have that meeting with

21   President Lahey?

22   A.   No, we did not.  The way everything took place, we

23   were unable to have that meeting with Lahey.

24   Q.   There was testimony that somebody contacted Channel

25   8; were you involved in that at all?

1    A.    Yes, it was a team effort.

2    Q.    Now, are you familiar with an organization called the

3    Student Athletic Advisory Council?

4    A.    Yes, I am a representative of the volleyball team for

5    that organization.

6    Q.    Can you explain what the organization is?

7    A.    It's an athletic committee of students and it's just

8    the voice our opinions and of the student athletes and

9    lets us be heard in that way.

10   Q.    And who are the members of that organization?

11   A.    Usually there's two representatives from all the

12   sports and then also Tracey Flynn heads that and comes to

13   all the meetings.

14   Q.    So there are two representatives from each team?

15   A.    Uh huh.  (Affirmative.)

16   Q.    Do the -- did the cheer team send representatives to

17   those meetings?

18   A.    No, they did not.

19   Q.    And we're talking now about this year, the 2008, 2009

20   year?

21   A.    Yes.

22   Q.    Did they have seats on the council, if you know?

23   A.    No.

24   Q.    And how long have you been the representative from

25   the volleyball team to the SAAC?

1    A.    Since my sophomore year.

2    Q.    In all the time you've been a representative of the

3    volleyball team on the SAAC, has the cheer team ever sent

4    representatives to that body?

5    A.    No, they have not.

6    Q.    Now, if Quinnipiac University has a volleyball

7    program in the Fall, will you play?

8    A.    Yes, I will.

9    Q.    Is it important to you?

10   A.    I mean it's huge for me.  It's a big part of my life,

11   not only for time management but also the competition.

12   There's nothing like competing at that D-I level.  After

13   it, I will not be able to find that form of competition

14   anywhere else.  And also it's a family and somebody to

15   turn to when you're having issues outside of volleyball.

16            MR. ORLEANS:  I have nothing further at this

17   time.  Thank you very much.

18            THE COURT:  Cross?

19            MS. GAMBARDELLA:  I'll be five minutes.  I

20   promise.

21            THE COURT:  That's fine.

22   CROSS EXAMINATION

23   BY MS. GAMBARDELLA:

24   Q.    Good afternoon.

25   A.    Good afternoon.

1    Q.   That committee you just talked about, what was the

2    name of it again?

3    A.   SAAC.

4    Q.   SAAC.  SAAC has places for currently recognized

5    varsity level sports at this university, correct?

6    A.   Correct.

7    Q.   So, you have no idea whether or not next year if

8    cheer is elevated to varsity, whether or not they'll have

9    seats on that committee next year, correct?

10   A.   No.

11   Q.   Okay.  You're getting your masters in occupational

12   therapy?

13   A.   Yes.

14   Q.   And that was what was your draw to Quinnipiac, their

15   reputation for that particular program, correct?

16   A.   Yes.

17   Q.   Okay.  Was your eligibility to play extended a year

18   until next year because of your injury?

19   A.   Yes, because of my medical register.

20   Q.   Did a doctor clear you to play last year?

21   A.   No, I was still rehabing, but I would have been

22   cleared.  It was my decision, up to me, for the surgery

23   though.

24   Q.   So you would have, I think you said, braved it

25   through the pain or something like that, right?

1  A.   Yes, I would have played.

2  Q.   Had you braved it through the pain, you would not be

3  eligible to play next year; is that correct?

4  A.   That is correct.

5          MS. GAMBARDELLA:  Moment?

6          (Pause)

7  BY MS. GAMBARDELLA:

8  Q.   Did you get a medical waiver in order to get this

9  extended or a hardship waiver?  I'm not sure of the

10  correct terminology.

11  A.   A medical register.  I mean that's just the NCAA

12  rule.  And I sign off, yes.

13  Q.   So, in order for you to be able to extend your

14  eligibility for an extra year, your doctor had to say you

15  couldn't play last year, correct?

16  A.   No, it's not that.  It was my decision.  I made that

17  decision in early -- to have that surgery so I could rehab

18  and then possibly practice.  I could have played.  There

19  was nothing inhibiting me from playing.  It was ultimately

20  my decision for that.  So it wasn't the doctor.

21  Q.   It was elective surgery?

22  A.   Not necessarily elective surgery.

23  Q.   You had to have the surgery, correct, on doctors

24  recommendation?

25  A.   No.

1    Q.    No?

2    A.    I mean -- it's, I mean I had to have had it either

3    after I played that season or I could have had it before,

4    so I mean it was going to happen.

5    Q.    Right.  The timing was somewhat discretionary?

6    A.    Yes, exactly.

7    Q.    So, you're suggesting you would have played despite

8    the need for surgery last year?

9    A.    Yes, most definitely.

10   Q.    Are you aware of the -- you know what a hardship

11   waiver is under NCAA guidelines?

12   A.    No, I'm not --

13   Q.    Okay.  You don't know what it is.  I know that's

14   distracting back there.  Do you know what a NCAA hardship

15   waiver is?

16   A.    Just waiving my rights for the eligibility of like

17   playing.  I don't know, I have never -- no.

18   Q.    That's a perfectly acceptable answer.

19   A.    All right.

20   Q.    Thank you.

21   A.    You're welcome.

22   REDIRECT EXAMINATION

23   BY MR. ORLEANS:

24   Q.    Just so we can clarify the situation with respect to

25   your registration, how many years of eligibility have you

1   had so far?

2   A.   I have played three years.

3   Q.   You've played three years; you're not asking for a

4   fifth year of eligibility, are you?

5   A.   No.

6   Q.   You weren't eligible to play this year because you

7   were red shirt, is that correct?

8   A.   Yes.

9          MR. ORLEANS:  Nothing further.

10          MS. GAMBARDELLA:  Nothing further.

11          THE COURT:  You're excused.  Thank you.

12          (Whereupon the witness was excused.)

13          THE COURT:  We'll take our lunch break at this

14   point.  I will try and be back at 1:30 and would ask that

15   all of you be ready to go at that time.  Have a nice

16   lunch.

17          (Whereupon the luncheon recess was taken at 12:35

18   o'clock, p. m.)

19

20

21

22

23

24

25