```
 1                A F T E R N O O N   S E S S I O N.

 2                    (1:40 O'CLOCK, P. M.)

 3           MR. ORLEANS:  Plaintiffs call Robin Sparks.

 4    R O B I N    S P A R K S,   called as a witness on

 5    behalf of the Plaintiffs, having been duly sworn by the

 6    Court, testified as follows:.

 7           THE COURT:  Please be seated.

 8    DIRECT EXAMINATION

 9    BY MR. ORLEANS:

10    Q.   Good afternoon, Ms. Sparks.

11    A.   Hi.

12    Q.   Are you okay?

13    A.   Yeah.

14    Q.   Would you tell the court a little bit about your

15    background?

16    A.   I'm originally from Indiana.  I did my undergraduate

17    degree at Allstate University.  I did my masters degree in

18    public administration from the Maxwell School at Syracuse

19    University.

20         From there I received what is now called a

21    Presidential Management Fellowship.  I went to Washington

22    DC where I worked at NASA.  I spent a year then on the

23    House Appropriations Committee as a -- I forget what the

24    term is.  They sent me up there.  NASA paid my bills.

25    Came back to NASA.
```

1          Then was asked by Diane Finestein to join her staff

2     where I was in charge of Appropriations of the State of

3     california.  Was there until the Republicans won the

4     Senate and I lost my job, but the FBI called me because I

5     had turned them down before and I went to work at the FBI.

6          Was there for about four years, I guess, all

7     together, in the midst of which I was asked to be a

8     legislative director in the House of Representatives for a

9     Congresswoman from California.  Did that.

10          The FBI kept calling so I eventually went back.  And

11     my last jobs there were writing speeches for the director

12     in charge of the crimes subcommittee.

13          And then I met a boy, moved to New York, worked in

14     non profit part-time while I had my daughter.  And then

15     had just transitioned into, back to full-time work, a

16     position in a school where I worked at the University of

17     Albany where I was Director of Internships and Special

18     Programs, I think was my official title.  I was helping

19     graduate students find jobs in public policy.  I was

20     developing their, on my own, developing a marketing

21     program and anything else that the dean decided he wanted

22     me to do.

23     Q.   And in this period of time when you were at the

24     University of Albany, when was that?

25     A.   That was in 2007.

1    Q.   Okay.  And you said you were living in New York?

2    A.   Yes, in Troy, New York.

3    Q.   Okay.  In Troy, New York.  You're currently the

4    volleyball coach at Quinnipiac University?

5    A.   Yes.

6    Q.   How did you come to be hired as the volleyball coach?

7    A.   I was very involved with youth volleyball and

8    development of volleyball in upstate New York.  Actually I

9    had been starting in Washington DC, I started one of the

10    largest clubs now in Washington DC, Northern Virginia

11    Volleyball Association.

12        Then I moved to New York.  My husband and I were very

13    involved in developing club volleyball.  I ended up being

14    in charge of the eastern half of New York State for youth

15    volleyball, or club volleyball.  Ran a club, coached high

16    school, sat on the United States Volleyball Association

17    National High Performance and Elite Development Committee.

18    So I've been really involved.

19        I was on a bus going to the Empire State Games where

20    I coached the Adirondack teams, I got a phone call from

21    Jack McDonald out of the blue and he said, "Hi, I'd like

22    to talk to you about a volleyball job at Quinnipiac."

23    First thing I think I said --

24    Q.   Hold on just a second.  Give me a chance to ask a

25    question maybe.

1    A.    That's all right.

2    Q.    The Empire State Games, is that a high school

3    tournament?

4    A.    Empire State Games is in New York State.  It's

5    athletic competition for scholastic and open, so it's

6    adults as well.  The team I was coaching was the girls

7    scholastic team from the Adirondack region, which was

8    high school kids.  Could be as young as eighth grade if

9    they were capable of making the team, up until -- if they

10   had graduated from high school they were no longer allowed

11   to apply for scholastic at that time.

12   Q.    How had you learned to be a volleyball coach?

13   A.    I played actually in D C on an adult team that was

14   with USA Volleyball.  We traveled, went to nationals and

15   the like.  My coach had previously been a college coach.

16   His name is Dean Chumway (ph).  He still played when he

17   was in his 60's.  And he cornered me and said you need to

18   be a coach.  And I was like, what?  He said you really

19   should be a coach.  I know this club nearby, they need

20   somebody to coach their 18s team; would you be willing to

21   do it?  I said okay.  And that's how it started.

22   Q.    Take any courses --

23   A.    I have.

24   Q.    -- relating to coaching?

25   A.    Yes, I have been at the U. S. Olympic Training Center

```
1    for two different courses on high performance

2    development.  I've completed USA Volleyball's impact

3    certification and they have a coaching accreditation

4    program and I've gone through two of the three levels in

5    that.

6         I'm also licensed in New York State to coach.  I had

7    to -- I did not have to take all the courses they required

8    because I had so many courses in coaching, I wrote it up

9    to the State Department of Education and they granted me a

10   license.

11   Q.   Okay.  Now, you said you were on a bus to the Empire

12   State Games when you got a call from Jack McDonald?

13   A.   Yes.

14   Q.   Did you know who he was?

15   A.   No.

16   Q.   Would you describe that conversation for us, please?

17   A.   Well, first I think I said, what?  And he said he

18   would like to talk to me about the job.  He had gotten my

19   name from Sue Medley.  And I told him I was sitting on a

20   bus full of high school students and could I call him back

21   because I obviously -- I was on a school bus at that

22   point.

23   Q.   So he told you he was the athletic director at

24   Quinnipiac?

25   A.   Yes.
```

1  Q.   And he told you what the job was?

2  A.   Yes.

3  Q.   Okay.  And who was Sue Medley?

4  A.   She had been the interim coach the previous year.

5  She's also someone I've known a long time.  I've known her

6  since she started the program at the University of Maine

7  and she is someone who I worked with at the High

8  Performance Program in New York.

9  Q.   When you say that she was the interim coach, do you

10  mean she was the interim coach at Quinnipiac?

11  A.   Yes.

12  Q.   So, when you got this call from Mr. McDonald, were

13  you interested?

14  A.   Yeah.

15  Q.   Why were you interested?

16  A.   Well, it was a chance to move into the college

17  coaching ranks.  That's something I had always dreamed of

18  doing and so it was completely -- it was shocking but, of

19  course, it was very interesting to me.

20  Q.   And would you then describe the process by which you

21  were recruited and hired by Mr. McDonald?

22  A.   Well, I called him back, I believe, the next day when

23  I was not surrounded by fifty teenagers, talked to him

24  about the program a little bit.  He had said they were

25  looking for a full-time coach, I had come highly

1    recommended.  He encouraged me to come down for a visit

2    the next week informally to see the campus.  I knew -- I

3    had heard of the school.  The reputation is that it was

4    very pretty in the Northeast from kids that I coached in

5    high school, but that's really all that I knew at that

6    time.

7        I said, you know, we would consider it, could I get

8    back to him, I needed to talk to my husband.  I talked to

9    Ron, and he and I made a trip the next week.  It was the

10   end of July.  Drove down there one afternoon.  You know,

11   in the meantime I'd done some research on the school, just

12   so I knew what the school was like.

13   Q.   And when you came to Quinnipiac, did you meet with

14   anybody from the Athletic Department?

15   A.   Yes, I met with Jack McDonald and then -- my husband

16   and I both met with him, and then we had lunch with he,

17   Tracey Flynn, Becky Kohley, the field hockey coach, and

18   Michael Cole (ph), the tennis coach.

19   Q.   And just so that we are clear, Mr. McDonald is the

20   athletic director?

21   A.   Right.

22   Q.   And who is Tracey Flynn?

23   A.   The senior administrator and I believe the associate

24   director of compliance.  I'm not sure I got to him.

25   Q.   Now, going into these meetings, did you have any

1  concerns about Quinnipiac's commitment to volleyball?

2  A.   Yes.

3  Q.   And why was that?

4  A.   I obviously had talked to Sue a little bit, so I knew

5  that the program had been in transition and under a bit of

6  stress.  I also, I'm on line and there's plenty of

7  volleyball chat rooms and I always kept an eye on the

8  coaching transactions blogs just because I talk to coaches

9  all over the country and it had been discussed extensively

10  there.

11  Q.   Did you ask Mr. McDonald about that subject?

12  A.   Yes.

13  Q.   What did Mr. McDonald tell you about Quinnipiac

14  University's commitment to volleyball?

15  A.   He admitted that in the past it had not been great.

16  They upgraded their programs one at a time from when they

17  made the transition from Division II to Division I.  So

18  they went full-time head coaches one sport at a time.

19  Volleyball had always seemed to lag behind.  There hadn't

20  been a champion for it.  There had been a number of issues

21  and problems and probably well shared -- I'm not sure if

22  he said well shared between coaches and administration but

23  he admitted the administration support was not there for

24  the program in the past.

25  Q.   Okay.  You mentioned that sports had been upgraded.

1   I'm not sure that I understood your testimony.  Was this

2   in connection with Quinnipiac going Division I?

3   A.    That was my understanding.

4   Q.    Okay.  And when did Quinnipiac go to Division I, if

5   you know?

6   A.    Ten years ago.

7   Q.    But when Mr. McDonald described to you these problems

8   with or issues with respect to the commitment to

9   volleyball in the past, you know, what did you say to him

10  about that?

11  A.    I was concerned about moving my family and to take a

12  job that wasn't secure, for a program that wasn't secure.

13  If the program was still in flux, I wanted to know that

14  ahead of time.  It may not have precluded me from taking

15  the job but I felt like I needed to know if it was a

16  secure program now.  He assured me that there had been

17  quite a debate about whether or not to keep volleyball as

18  a sport at Quinnipiac, but that those discussions had

19  happened over the past year.  They had been put to rest.

20  They were going forward with a full-time head coach and

21  that -- it just took them a long time to get all the

22  approvals to get a full-time  head coach.  Hence, the

23  reason they were not able to advertise for the job when

24  the market is really open for coaching positions.

25  Q.    Did he say anything about his expectations of you in

1    terms of the program's competitiveness?

2    A.   He wanted to see -- I actually, I asked him those

3    questions.  He wanted the program to be in a Top Four

4    within four years.  He wasn't expecting, you know,

5    without -- there's only five scholarships and 12 are

6    permitted at Division I, so he wasn't -- there was not an

7    expectation that I needed to win the conference right

8    away.  I asked about the University's commitment to

9    increasing scholarships, and he had said yes, you know,

10   you have to prove yourself.  And I was good with that.

11   Q.   Is that a reference to athletic scholarships?

12   A.   Yes.

13   Q.   For the volleyball team?

14   A.   Yes.

15   Q.   Okay.  Did he mention any other benefits of coming to

16   work at Quinnipiac?

17   A.   Yes.  We talked quite a bit about what the atmosphere

18   was like in the department, the fact that people who went

19   to Quinnipiac to work stayed, and stayed for a long time.

20   We talked about the tuition benefit that the university

21   offers which, having been at the University of Albany

22   where there isn't one, I was very interested in.  It was

23   not just for myself, it would be a benefit for my children

24   and my husband, that they would get free tuition.  That

25   was something we took seriously into consideration because

1    my husband was getting ready for a masters and my younger

2    stepdaughter was a junior in high school at the time.

3    Q.   Did you ask Mr. McDonald anything about getting a

4    multi-year contract from Quinnipiac?

5    A.   Yes, I did, in fact.  It was something -- I talked to

6    a number of other coaches before I came to Quinnipiac

7    to -- that's a standard question I would ask and that was

8    one that was recommended to me and I asked for that, if I

9    could have a multi-year contract to demonstrate their

10    commitment to the program as well.  He said that the only

11    programs that got multi-year contracts were basketball and

12    ice hockey and even he didn't have a multi-year contract.

13    However, unless I did something horrible or broke NCAA

14    rules, there was no reason to think that my contract would

15    not be renewed.

16    Q.   Did you feel reassured by this conversation with

17    Mr. McDonald about the University's commitment?

18    A.   Yes.

19    Q.   During this visit to Quinnipiac that you've been

20    describing, did you discuss the University's commitment to

21    volleyball with anyone other than Mr. McDonald?

22    A.   Yes, it came up at lunchtime.

23    Q.   Okay.  And that's the lunch that you mentioned

24    earlier?

25    A.   Correct.

```
1   Q.   Can you tell us what was said at lunch about the
2   University's commitment to volleyball?
3             MS. GAMBARDELLA:  Your Honor, could we get a
4   foundation, make sure there's no hearsay involved?  Is it
5   the Mr. McDonald lunch?
6   BY MR. ORLEANS:
7   Q.   It's the lunch with Mr. McDonald, Ms. Flynn and two
8   faculty members?
9   A.   Two coaches.
10  Q.   Two coaches.
11  A.   And my husband.
12            MS. GAMBARDELLA:  Well, anything by the other
13  two coaches would be hearsay but I'm happy to concede no
14  hearsay with respect to representatives of the parties.
15            MR. ORLEANS:  The coaches are certainly
16  employees of the University working in the Athletic
17  Department.  I'm not sure that it's all that clear that
18  their statements wouldn't also be admissions of the party.
19            MS. GAMBARDELLA:  Coaches are --
20            THE COURT:  Probably not.  I mean they'd have to
21  be -- why don't we just try and limit --
22            MR. ORLEANS:  Let me see if I can focus the
23  question.
24  BY MR. ORLEANS:
25  Q.   At lunch, did Mr. McDonald or Ms. Flynn say anything
```

1    further about the University's commitment to volleyball?

2    A.   It was a conversation among all of us, so I don't

3    know that I could remember specific words that were used.

4    I know I can remember the flavor of the conversation and

5    being asked specific questions by other coaches and

6    Ms. Flynn, but I'm not sure that I can tell you exactly

7    who asked which question.

8    Q.   Okay.  Would you do the best you can and tell us what

9    Ms. Flynn asked you, if you remember?

10             THE COURT:  Well, questions are not hearsay so

11   it doesn't matter who asked a question.

12             MR. ORLEANS:  Okay, that's a good point.  Thank

13   you, Your Honor.

14   BY MR. ORLEANS:

15   Q.   You can tell us what questions you were asked by

16   others.  You have to be a little more careful about

17   statements others made about the University's commitment

18   to volleyball.

19   A.   Okay.  I was asked about my commitment to making the

20   program better.  I was asked if I saw this as a long term

21   opportunity.  It was my understanding they had had four

22   coaches in four years prior to my getting there, so

23   stability, I think, was something they were asking me

24   about quite a bit.  I was asked why I would want to take

25   that job and move my family and just, you know, transition

1    there.  So I was asked questions along those lines to see

2    what my commitment level was to the longterm stability and

3    turning around of the program.

4    Q.   And were there any further statements at that lunch

5    by Mr. McDonald or Ms. Flynn about the University's

6    commitment, beyond what you had heard from Mr. McDonald?

7    A.   You know, I'm not going to remember exact statements.

8    Q.   Okay, that's fine.  Now, at some point were you

9    offered the position?

10   A.   Yes.

11   Q.   How long after the visit that you've been describing

12   did you actually get an offer?

13   A.   I had to come back to meet the team, so I came back

14   down a week and-a-half or so later in the evening to have

15   pizza with the team, and I met with one of the other

16   athletic directors there, Billy Mecca.  Tracey Flynn was

17   in the office.  Jack McDonald was on the office.  So I had

18   a meeting with the team, they got a chance to ask me

19   questions, I got a chance to get to know them a little

20   bit, and then the offer came shortly after that when I was

21   back in New York.

22   Q.   Okay.  Now, you had said that the first visit was in

23   late July?

24   A.   Correct.

25   Q.   So, when you met with the team, was that during

1   preseason practice for the team?

2   A.   No, it was prior to preseason, so it wasn't the whole

3   team; it was those who could.

4   Q.   Whoever was around?

5   A.   Yes.

6   Q.   And you accepted the position?

7   A.   When the offer was made, I accepted the position if

8   they would find somewhere for me to live and put me up in

9   the Fall, because I was going to have to give two weeks'

10  notice and be there and there was no way I was going to be

11  able to move my family because the season was starting.

12  And to give two weeks' notice to get there would be after

13  the start of pre season.

14  Q.   So your family stayed in Troy and you worked in

15  Hamden for the Fall?

16  A.   Correct.

17  Q.   Other than that, did taking this position involve any

18  particular sacrifice on your part?

19  A.   Yeah, it was a pay cut.

20  Q.   About how much, do you recall?

21  A.   About 15,000.

22  Q.   What was your evaluation of the volleyball team at

23  that point?

24  A.   I think the team itself, we were missing some key

25  positions, so I knew we would have our work cut out for us

1  that season.

2  Q.   How many athletes did you have at that point?

3  A.   Ten.

4  Q.   And, of course, you hadn't recruited any of those

5  kids, right?

6  A.   No, no, I did not.

7  Q.   Aside from coaching the athletes that you had on the

8  team that existed when you got there, what else did you do

9  in terms of building the program once you arrived?

10 A.   First thing I did was to try to start a recruiting

11 program.  There had not been any that I could find record

12 of since -- that was before I got there.  So, my first job

13 was to, I knew I needed a center, so I was spending hours

14 on the internet talking to people, looking for athletes to

15 fill that position, along with the other positions we

16 needed to fill.  I knew I needed to bring in a big class

17 that first year so that we could get our numbers up and

18 balance out our positions.  So I spent a lot of time with

19 that, planned practices, do some scouting reports, tape

20 exchange with other teams.  They would ask for a game

21 film, I'd have to make copies of it, send that out.  Make

22 out the vacancies and start planning next year's schedule.

23 I had to make sure we had itineraries for every trial we

24 did.  There's compliance reports and budget things you

25 have to do.  I was quite busy.

1   Q.   Was there much of a recruiting program in place when

2   you arrived?

3   A.   There was none.

4   Q.   What did you have to do to really establish a

5   recruiting program?

6   A.   Started responding to athletes, I think was the first

7   thing.  And then I did a lot of research and sent a lot of

8   emails out to athletes all over the country to try to

9   express, you know, our interest in them, would they be

10  interested in coming to Quinnipiac.  And I really thought

11  it was important to get our name out so I spent a lot of

12  time making sure the juniors club circuit knew where I

13  was.

14  Q.   Now this was the Fall of 2007?

15  A.   Yes.

16  Q.   So, we're talking about recruiting athletes who were

17  then high school seniors who would enter in the Fall of

18  2008?

19  A.   Correct.

20  Q.   So, that would include Stephanie Biediger and Kayla

21  Lawler, would it not?

22  A.   Correct.

23  Q.   Did any of the athletes that you were recruiting,

24  were their parents asking you about Quinnipiac's

25  commitment to volleyball?

1    A.    Yes.

2    Q.    And what did you tell them?

3    A.    I told them the things that had been shared with me,

4    that the University was committed to restarting the

5    program.  I was hired to rebuild the program and make it

6    successful.  They hired me full-time; that demonstrated

7    their commitment to the program.  I talked about bringing

8    in a group to leave a legacy.  That was what the case was.

9    It was going to be a lot of hard work but they needed to

10   know that that's why I was there, was to restart that

11   program.

12   Q.    Now, did you have an assistant coach during this

13   time?

14   A.    No.

15   Q.    Now, you mention putting together the schedule; that

16   would have been the schedule for the following year that

17   you were putting together?

18   A.    Correct.

19   Q.    Now, could you just explain to us briefly how the

20   coach is involved in setting up a schedule for

21   competitions?

22   A.    The northeast conference will give you your

23   conference schedule, so that is established but that's not

24   nearly enough competition dates.  We're allowed 28

25   competition dates.  I knew going forward we probably would

1    not be a full compliment of players yet, because to bring

2    in eight or nine freshman with no upperclassmen just sort

3    of was going to be a very difficult situation.  So I went

4    ahead and scheduled so we would have a lot of competition

5    dates.  You're e-mailing coaches.  You're looking at their

6    RPIs to make sure you're not playing someone too far ahead

7    of you.  At least that's what I did.  You wanted to have a

8    challenge but not one that was going to be demoralizing at

9    the same time, especially since I knew I was going to have

10   an incredibly young team.  So, you're doing a lot of talk

11   like that, weighing different options.

12        And then at the same time I was playing in

13   tournaments because we stayed home twice for tournaments.

14   It's cheaper that way and it gives the team a chance to

15   play on campus, which I think is important.  So I was

16   actively recruiting teams to come to Quinnipiac for those

17   tournaments as well.

18   Q.   Were those tournaments -- now, we're talking now

19   about the planning that you were doing in the Fall of 2007

20   for the 2008, 2009 --

21   A.   Correct.

22   Q.   -- year?  The tournaments that you're talking about,

23   were they tournaments that would occur in the Fall season

24   or in the Spring?

25   A.   In the Fall.

1   Q.   Okay.   Now, I've heard, I think we've heard today

2   volleyball referred to as a Fall sport.   What does that

3   mean?

4   A.   That's when our championship segment is.

5   Q.   And this is under NCAA rules?

6   A.   Correct.

7   Q.   Okay.   Is there -- what does the team do outside of

8   the championship season?

9   A.   We have -- you're either in a 20 hour segment or an

10  eight hour segment and what that means is how many hours a

11  week you devote to your sport.   Outside of championship

12  segment, that's in the Spring semester, you can redeclare

13  a certain number of weeks, about four, depending on how

14  long -- you get to slot how many weeks between the two

15  segments, to go back into 20 hour.   The rest of that time

16  you're in an eight hour, you're doing skill development,

17  lifting, agility, that kind of training.   And then you go

18  back into a 20 hour.

19  Q.   And what about competition, can you have matches or

20  scrimmages or any kinds of competition in the Spring?

21  A.   In the Spring, there's normally very low key

22  tournaments, not necessarily -- officials can kind of

23  stipulate to the rules if you want to.   It's really a

24  chance to scrimmage against other teams.

25  Q.   Okay.   And did you have such scrimmages in the Spring

1    of 2008, your first Spring there?

2    A.    No, there was only four athletes on campus at that

3    point.

4    Q.    Did you schedule scrimmages for this Spring, the

5    Spring of 2009?

6    A.    Yes.

7    Q.    And have those, have the events that led to this

8    lawsuit affected the plans for those scrimmages?

9    A.    Yes.

10   Q.    How so?

11   A.    I was not allowed to work with the team anymore so --

12   we couldn't scrimmage anymore.

13   Q.    Okay.  We heard the players who testified this

14   morning testified a little bit about their academic

15   achievements; does the Northeast Conference recognize

16   academic achievement by athletes?

17   A.    Yes.

18   Q.    Were any of your players recognized this year for

19   their academic achievements?

20   A.    Yes.

21   Q.    How many?

22   A.    This past season, nine out of 11.

23   Q.    How about the season before?

24   A.    Eight out of ten.  A ninth made it but she was never

25   on the team past the first weekend.

1    Q.   Do you have any idea how she was recognized by the

2    conference if she wasn't actually on the team?

3    A.   No.

4    Q.   Now how about the schedule for the Fall of 2009?  You

5    testified a minute ago that you arranged that already.

6    If, if the preliminary injunction that we're asking for

7    today is granted, will you be able to maintain this

8    schedule?

9    A.   It won't be the same one but I do believe we'll be

10   able to put together a competitive schedule.  There's so

11   many schools in the northeast, that's really an advantage

12   of living here, that I'm confident that we'll be able to

13   put together a competitive schedule.

14   Q.   Now, you testified a few minutes ago that that first

15   Fall your family stayed in Troy and you came here,

16   correct?

17   A.   Correct.

18   Q.   At some point did your husband and daughter move to

19   Connecticut?

20   A.   Yes.

21   Q.   Okay.  When did that happen?

22   A.   Last summer.

23   Q.   Have you bought a house?

24   A.   We did.

25   Q.   Where's the house?

1    A.    In Hamden.

2    Q.    And your young daughter lives with you?

3    A.    Yes.

4    Q.    And you mentioned a younger stepdaughter; you have

5    stepchildren?

6    A.    I have two stepdaughters.

7    Q.    Do they live with you?

8    A.    No.  One was going to be a senior in high school so

9    she stayed in New York.

10   Q.    Let me come back to recruiting for a second here.

11   When you, when you recruit athletes for the volleyball

12   team, did you promise them scholarships?

13   A.    No, not -- I mean you start recruiting and when you

14   get to talking about scholarships, that's a long way down

15   the recruiting line, so you're starting off with a

16   conversation.  I would call athletes.  I like to talk to

17   them on the phone, get a sense of who they were, you know,

18   if I thought their personality would mesh with what we

19   needed to terms of personality along with their skill.

20   And as the conversation would develop, if we get to that

21   point, then we would talk about it and I would make an

22   offer on the scholarship, but that wasn't one of the first

23   things that was done.

24   Q.    But at some point before an athlete would commit, the

25   athlete would want to know whether there would --

1    A.    We would have a financial conversation, yes.

2    Q.    And under NCAA rules, are you permitted to promise a

3    scholarship, a multi-year athletic scholarship?

4    A.    No.  I think there's a presumption that scholarships

5    would be renewed, if -- barring they are not bad students

6    or breaking certain rules.  And then there's a certain

7    level of ethics and trust that you'll have with an

8    athlete.

9    Q.    Right, but would it be correct to say then you can't

10   put put a multi-year scholarship promise in writing?

11   A.    Correct.

12   Q.    Could you explain to us just a little bit more about

13   why you considered it important to recruit so widely and

14   to devote so much effort to recruiting?

15   A.    I'm pretty competitive, so I wanted to, I wanted to

16   win the conference.  And I wanted -- and I knew to do

17   that, we needed to have some really, some athletes with

18   some really long experience and extensive experience

19   playing.  Having been involved in help trying to develop

20   volleyball in the northeast, the northeast is actually one

21   of the parts of the country that's a little bit further

22   behind, I think, than other parts of the country, so I was

23   going out and looking for athletes with a lot of

24   experience and athletic ability and volleyball IQ to join

25   our program, while at the same time looking for northeast

1   athletes who are great athletes who never had that

2   opportunity who could compliment in incredibly well.  So I

3   thought it was really important to get out and bring in

4   some really great athletes who knew the game incredibly

5   well.

6        I also spent a lot of time, because I felt it was

7   important to rebuild the reputation of Quinnipiac in the

8   volleyball community, so I was out wearing anything

9   Quinnipiac at a lot of tournaments and even at tournaments

10  where I wouldn't necessarily be looking for athletes.  I

11  thought it was important for the University that I be seen

12  there because those kids will still be coming in as

13  students.  So --

14  Q.   When you're out on these recruiting trips and going

15  to tournaments and so forth, are you looking only at

16  seniors, high school seniors?

17  A.   No, you're starting to identify younger athletes.

18  Volleyball, for good or not, athletes are starting to

19  commit as young as freshmen to go on to play Division I.

20  A lot of sophomores and many schools have done recruiting

21  in their junior class, well ahead of time.

22  Q.   Now, when you were hired by Quinnipiac, were you

23  encouraged to run any summer volleyball games?

24  A.   Yes, I was encouraged to run summer volleyball games.

25  Q.   Did you do that?

```
1    A.   I did.  I ran two.

2    Q.   We're talking about Summer of '08?

3    A.   2008, correct.

4    Q.   Just briefly, a brief description of the two camps

5    you were in?

6    A.   I ran one day camp.  Quinnipiac did not allow us to

7    run overnight camps or I would have done that.  I ran a

8    day camp for a week, fifth graders on up.  I think we

9    might have had a fourth grader but it was open to any high

10   school athletes.  And then I, by my choice, ran an evening

11   clinic where athletes could pay by the night.  That's

12   something I did in Troy for athletes who may not be as

13   affluent so they can still get that kind of exposure and

14   get coaching and I thought it was pretty important to the

15   Hamden kids to have that option.

16   Q.   Now, did Quinnipiac pay you to run those camps?

17   A.   The money all goes into Quinnipiac and then you pay

18   people out of it and then whatever's left over, you can

19   pay yourself, but it goes to Quinnipiac's salary so taxes

20   are taken out.

21   Q.   So how much, if you know, how much did you earn from

22   the camps in the Summer of 2008?

23   A.   Last year?  Probably between 2,500 and 3,000 last

24   year.  It was small.

25   Q.   Did you consider that successful?
```

1   A.   For a first year and to get the word out, yes.

2   Q.   Did you have camps planned for the Summer of 2009?

3   A.   I did.

4   Q.   And are you still planning to run those camps?

5   A.   They were taken away when they took away the program.

6   Q.   Okay.  Could you salvage them if the preliminary

7   injunction were granted?

8   A.   Yes.  I just got an email from a mom on Friday

9   looking for a camp for their high school kid.

10  Q.   Now, we heard the testimony and you were in the room

11  for the testimony of Mrs. Riker, correct?

12  A.   Correct.

13  Q.   Okay.  Have you recruited a group of athletes to

14  enter Quinnipiac and play volleyball starting this Fall?

15  A.   Had I?  Yes.

16  Q.   Yes.  How many athletes had, before the announcement

17  the program would be canceled, how many athletes had given

18  you verbal commitments?

19  A.   I was up to six and had a seventh possibility.

20  Q.   Okay.  Did you expect any more commitments?

21  A.   Amongst that group but one still there -- she was,

22  two of them, all they wanted to do was just be on campus

23  but they had given me like everything that I want but I

24  refused to let an athlete say yes until they have actually

25  set foot on campus.  I think that's important.

1    Q.   How many athletic scholarships did you commit to this
2    group of incoming athletes for the Fall of 2009?
3    A.   I was planning to use the balance of what I had, so
4    approximately two.
5    Q.   So, I take it then that you're allowed to divide the
6    five total scholarships that you have, you're allowed to
7    divide up?
8    A.   Volleyball is what's called a head count sport so
9    $100 counts the same as $40,000.  Twelve athletes are
10   allowed to get athletic money.
11   Q.   And Quinnipiac allowed you then to divide up --
12   A.   I can divide it up.
13   Q.   -- those scholarships.  Okay.  And I think you said
14   you had been told you would get more scholarships
15   eventually?
16   A.   Eventually.
17   Q.   But you didn't, I take it you didn't, hadn't been
18   authorized any additional scholarships for this coming
19   Fall?
20   A.   Oh no, oh no.
21   Q.   So, you said that you used what you had left which
22   was about two for the group coming in in the Fall of '09?
23   And how many scholarships are committed to returning
24   students?
25   A.   Approximately three.

1    Q.    How many total athletes do you, would you have

2    expected to have on the team this coming Fall?

3    A.    I was hoping to be at 12 or 13, possibly 14, but that

4    was my hope.

5    Q.    Do you conduct try-outs?

6    A.    Yes.

7    Q.    When do you have tryouts?

8    A.    Every team team is required to have a try-out in the

9    Fall.

10   Q.    Have any students in your -- in the time you've been

11   at Quinnipiac, have any students made the team from

12   try-outs?

13   A.    In the first year one athlete did.

14   Q.    What kind of turn-out do you usually get at the

15   try-outs?

16   A.    This past year I had seven or eight athletes respond

17   to me and say they were interested.  I asked the athletes

18   to come to one practice to watch and fill out the

19   paperwork and then there was a day of try-outs.  Given all

20   that, only one athlete followed through and she did end up

21   trying out this year.  We offered her a spot to stay as a

22   practice player.  Her skill really wasn't up to the level

23   of skill of everyone else, so she declined.

24   Q.    So she was offered the practice spot?

25   A.    Yes.

1    Q.    But did not stay with the team?

2    A.    Correct.

3    Q.    Where does the team play?

4    A.    In the Burt Kahn Gym on the main campus.

5    Q.    That's Burt Kahn?

6    A.    Yes.

7    Q.    And do you practice there also?

8    A.    Yes.

9    Q.    Suppose that the Burt Kahn Gym were not available for

10   volleyball, are there other facilities on campus where

11   your team could practice?

12   A.    Yes.

13   Q.    What other facilities are available?

14   A.    There's a recreational center.  Don't know if I have

15   the professional name.  And the T D Banknorth Center.

16   Q.    Let's talk about the recreation center.  What's there

17   now?

18   A.    Indoor tennis is there and there's a floor.

19   Q.    Is there anything that you would have to -- that

20   would have to be purchased or otherwise acquired to

21   enable the team to practice in the tennis facility?

22   A.    To run it as an individual program, you really would

23   need a sport court in there, a portable court that could

24   be put down and taken up after the season is over.

25   Q.    And that's a floor?

1    A.   Yes.

2    Q.   Have you undertaken any investigation to determine

3    what it would cost --

4    A.   Yes.

5    Q.   -- to acquire a sport court to practice on at the

6    recreation center?

7    A.   Yes.

8    Q.   What did you find out?

9    A.   AVCA, which is the American Volleyball Coaches

10   Association, has an agreement with Madaflax (ph) and it

11   would cost approximately $11,000 to put their floor down,

12   their removable floor.

13   Q.   And that's a floor that could be put down for --

14   withdrawn.

15        Is that a floor that would be removable between

16   practices so that the facility could be used for other

17   purposes?

18   A.   It could be.  Probably labor intensive to do it

19   everyday but that is possible.  The standards, the hole

20   sleeves for the standards are already there.

21   Q.   When you say standards --

22   A.   The holes.

23   Q.   That hold the net up?

24   A.   Uh huh.  (Affirmative.)

25   Q.   If necessary, could you play competitions in the

1    sport court in the rec center?

2    A.    Yes.

3    Q.    And then you mention the T D Banknorth Center, is

4    that the Quinnipiac basketball arena?

5    A.    Yes.

6    Q.    And what would be necessary to enable the volleyball

7    team to practice or play in the basketball arena?

8    A.    There would need to be sleeves and metal plates

9    installed so that the net systems could be put in there,

10   and then lights.

11   Q.    And if the sleeves and plates were installed, would

12   the floor in the basketball arena still be usable for

13   basketball?

14   A.    Yes.

15   Q.    And do other schools in the northeast conference --

16   excuse me.

17        Do other volleyball teams in the northeast conference

18   practice or play in their school's basketball rinks?

19   A.    All but one, is my understanding.

20   Q.    And did you undertake any investigation to find out

21   what it would cost to put the sleeves and plates into the

22   basketball arena?

23   A.    Yes.

24   Q.    What did you learn about that?

25   A.    To put one court in --

1        MS. GAMBARDELLA:  Your Honor, could we get

2    foundation from where this information comes from?

3    BY MR. ORLEANS:

4    Q.   Sure.  How did you undertake the investigation?

5    A.   To do this I called Sports Import.  They are the

6    people that own our net system and who I worked with and

7    was planning to do some fixings of the net system.  They

8    recommended who they use for installation and I called

9    them as well.

10   Q.   Okay.  And what did you learn about the cost --

11       MS. GAMBARDELLA:  I'm going to object based on

12   hearsay and also these people are given quotes, they

13   haven't examined the Quinnipiac facilities, they don't

14   know anything about the facilities.  They haven't come in

15   and examined anything.  And so, to the extent they are

16   going to be relying on this to suggest that it's very

17   inexpensive to make these facilities suitable, I would

18   object.

19       MR. ORLEANS:  Well, you know, Your Honor, I

20   suppose I could have tried to subpoena the provider of the

21   service, but it seems to me that the coach did exactly

22   what you would expect somebody to do.  She investigated to

23   determine what this would cost and I think it's

24   sufficiently trustworthy to come in under the general

25   hearsay exception for whatever weight the court thinks is

1   appropriate.

2          MS. GAMBARDELLA:  And I think it's being offered

3   for the truth of the matter asserted.  I'm saying that,

4   aside from her inquiry, we haven't had an opportunity to

5   discuss what they were told to which they responded with

6   an estimate.  We don't know if -- obviously they haven't

7   come and looked at the space, so --

8          MR. ORLEANS:  We'll stipulate they haven't

9   looked at the space and Ms. Gambardella can cross examine

10  on --

11         MS. GAMBARDELLA:  Your Honor, it's classic

12  hearsay.  Classic.

13         THE COURT:  Did you obtain a quote or did you

14  simply ask how much it would cost?

15         THE WITNESS:  They gave it to me in writing, so

16  I asked them for a quote based on a brand new facility

17  that was probably did not have a basement.  They asked if

18  it had a basement and I said I don't believe so.  It's in

19  the basement.

20         MS. GAMBARDELLA:  We have never received any

21  such document.

22         MR. ORLEANS:  I don't have the document to

23  offer, Your Honor.

24         THE COURT:  All right.  Well, I'm going to

25  sustain the objection.

1          MR. ORLEANS:  All right.

2     BY MR. ORLEANS:

3     Q.   Now, Ms. Sparks, when did you learn that the

4     volleyball program at Quinnipiac is slated for

5     elimination?

6     A.   March 4th.

7     Q.   Of this past Spring?

8     A.   Correct.

9     Q.   How were you informed?

10    A.   We had practice and I came upstairs from practice and

11    Tracey asked me to come down to the Athletic Director's

12    office.  And then when I was in there Jack McDonald, Bill

13    Mecca and Tracey Flynn met with me and told me.

14    Q.   Okay.  What did they tell you?

15    A.   They told me the program was being discontinued for

16    economic reasons.

17    Q.   How did you respond?

18    A.   I was angry.  My first question was how much money

19    would I need to raise to keep the program going.  Jack

20    responded you're not keeping the program.

21    Q.   Do you remember anything further about that

22    conversation?

23    A.   Yes.

24    Q.   Go ahead.  Tell us what else occurred in that

25    conversation.

1    A.    I was pretty angry because they had made -- I had

2    moved my family here.  Oh my gosh -- they had just paid my

3    relocation fees within the year.  I hadn't even had a

4    chance to show what I could do as a coach, having only had

5    one recruiting class.  They reiterated that I'd done a

6    great job, I was a good citizen at Quinnipiac -- I think

7    that's what Jack said.  They thought this had nothing to

8    do with cost.  They were willing to make phone calls

9    wherever to help me get a job.  I told them that that

10   would not be that easy, given the fact that we just bought

11   a house and you can't turn around and sell the house.

12   They -- I think -- I can't remember exactly.  I think it

13   was Jack or Billy asked that doesn't your husband work, it

14   shouldn't be that bad, and I explained to them that, no, I

15   was the primary bread winner in our family, this was that

16   bad, and that we would lose our house in July because we

17   sunk all of our savings into purchasing a home when we

18   thought we would be here for quite a while.

19   Q.    Were you told -- go ahead, I'm sorry.

20   A.    Oh, I asked if I could keep working with the team

21   because if I was going to have to help them find places to

22   transfer to, I knew it was really important that I get

23   fresh film of them.  They'd been lifting.  We changed

24   their technique.  They were different kids than they'd

25   been in the Fall.  I got a commitment for that.

1      We talked about -- I'm sorry, I'm just trying to make

2  sure I cover everything we talked about.  They asked me

3  if, you know, there was anything they could do right then.

4  I told them I didn't really feel like teaching my class

5  anymore but I didn't to have do it that week.

6      They asked -- they finally then told me that they

7  were cutting two men's sports and elevating cheer to a

8  varsity position.  I told them I found that completely out

9  of the spirit of Title IX and that upset me greatly.

10      I -- we continued to have a conversation and Jack

11  finally asked me if there was anything else he could do,

12  and I told him, yeah, you can tell me all the Title IX

13  violations around the department and he goes I don't think

14  I can do that.  I said, no, there's not anything else.  I

15  understood they were the messenger.  I did not -- this was

16  not a personal, that I was angry with them, but because

17  they had explained it, that they had done everything that

18  they could, and I believed them.

19  Q.    Now, you mentioned that you taught a class at

20  Quinnipiac; what class did you teach?

21  A.    I teach public relations for 11, which is sports

22  event management.

23  Q.    And do you teach that in both the Fall and the Spring

24  semester?

25  A.    Just in the Spring.  Well, I didn't teach this past

1    Fall.

2    Q.   Is that in a particular school at Quinnipiac?

3    A.   The School of Communications.

4    Q.   Okay.  Is that part of your position as coach?

5    A.   No.

6    Q.   And you also mention Title IX.  Now, at the time that

7    you had this conversation with Mr. McDonald and Ms. Flynn,

8    were you knowledgeable about Title IX?

9    A.   Yes.

10   Q.   How did you come to be knowledgeable about Title IX?

11   A.   It's -- I've always been interested in womens issues.

12   I worked in public policy in Washington, and so it's been

13   something that I personally have just educated myself and

14   followed.  I don't consider myself an expert but it's

15   something that I'm very interested in.

16   Q.   Let me get that clear.  Do you consider yourself to

17   be an expert?

18   A.   No.

19   Q.   But you're generally familiar?

20   A.   Yes.

21   Q.   Before you were told that the volleyball team was to

22   be eliminated, did you have any concerns about

23   Quinnipiac's compliance with Title IX?

24   A.   Yes.

25   Q.   And could you just explain what were the nature of

1    the concerns that you had?

2    A.    I had looked at that the EADA reports.

3    Q.    Now, what's EADA?

4    A.    Equity Athletic Disclosure Acts reports, the

5    Department of Education and Office of Civil Rights, I

6    believe.  Tracey Flynn had sent them to all of us in the

7    Fall, the women coaches at least, so I had looked at them

8    and looked at those reports and educated myself on those

9    issues.

10   Q.    And what did you see in looking at those, at the

11   reports that Ms. Flynn had sent you in the Fall?

12         MS. GAMBARDELLA:  Objection to the timeframe for

13   which reports you're talking about.

14         MR. ORLEANS:  Well, let me ask that question.

15   BY MR. ORLEANS:

16   Q.    The reports that Ms. Flynn sent you in the Fall that

17   you're testifying about, what period of time did they

18   cover?

19   A.    2007, 2008.

20   Q.    Okay.

21         MS. GAMBARDELLA:  Thank you.

22   BY MR. ORLEANS:

23   Q.    What did you determine from looking at those reports?

24   A.    I knew that we, our proportionality was way off.

25   Q.    Can you just explain what you mean when you talk

1    about proportionality?

2    A.   One of the prongs for Title IX is that your ratio of

3    male/female athletes needs to be close to your ratio of

4    male to female students on campus and we were not.

5    Q.   Okay.  Now, going back to the meeting where you were

6    informed that the team was to be eliminated, how was the

7    team then informed?

8    A.   They asked me to get the athletes together as soon as

9    as I could.  I knew we had a lot of night classes, but

10   they said they were going to make that announcement that

11   night so I needed to try to get the kids together before

12   the night classes.  So I texted, text-messaged all the

13   athletes to meet us at 5:00 o'clock to have a meeting with

14   the administration.

15   Q.   And where did that meeting take place?

16   A.   In the study hall room in the Athletic Department.

17   Q.   Okay.  And were all of the members of the team

18   present?

19   A.   No.  Erin Overdevest did not get there.

20   Q.   Okay.  You were in the courtroom this morning and

21   heard the testimony of Ms. Lawler and Mrs. Biediger about

22   that meeting?

23   A.   Yes.

24   Q.   Is that testimony accurate?

25   A.   Yes.

1    Q.   Okay.  Do you have anything that you want to add

2    about what occurred at that first meeting when the

3    students were told that the program was to be eliminated?

4    A.   You know, I think it was incredibly emotional.

5    Sorry.

6    Q.   It's okay.

7    A.   It was, you know, I was frustrated there was no

8    Kleenex in the room.  And I just, it was just

9    heartbreaking.  I don't think I can say anything else.

10   Q.   What, if anything, did you tell the students that you

11   would do to support them going forward?

12   A.   At that meeting?

13   Q.   At that meeting.

14   A.   Oh, you know, I think at that meeting they were

15   worried about me and I told them not to worry about me.

16   They needed to worry about themselves first, that I would

17   do anything that I could to help them.  I don't think I

18   made any promises at that point.  It was mostly just being

19   there.

20   Q.   Now, you heard the testimony -- go ahead.

21   A.   (Pause)

22   Q.   You heard the testimony about the students preparing

23   a power point in hopes of a meeting with President Lahey?

24   A.   Yes.

25   Q.   Were you involved in that?

1    A.    No.

2    Q.    And you heard the testimony about the students

3    contacting Channel 8?

4    A.    Yes.

5    Q.    And were you involved in that?

6    A.    No.

7    Q.    Did you make any contact with media at that point?

8    A.    The night before I had talked to the New Haven

9    Register because one of the athletes had contacted them.

10   And when the Register called the University, they would

11   not confirm that the program had been cut and I just, I

12   wasn't going to leave the kids hanging by themselves so I,

13   that's when I did call the reporter back and tried to be

14   as balanced as I could in my comments.

15   Q.    And when you say the night before, the night before

16   what?

17   A.    The night that we lost our program.

18   Q.    So, the night of March 4th you had a conversation

19   with a reporter from the Register who called you?

20   A.    Yes.

21   Q.    Now, could you describe what occurred over the next

22   few days after March 4th?  This was right before Spring

23   break, wasn't it?

24   A.    Yes.

25   Q.    So, would you describe what occurred over the next

1    few days specifically in connection with you and the

2    nature of the volleyball program?

3    A.   So, wait a minute, does that mean like what I did

4    personally, or --

5    Q.   Yes.  Were there any meetings that occurred?  Did you

6    have discussions with anybody about what you were going to

7    do?

8    A.   That night, you know, I stayed on campus.  I got home

9    after my daughter was in bed, so I was probably on campus

10   with the kids just being there for them until probably

11   around 8:00 o'clock at night, eight or nine.  Went home,

12   to just be home.  I did personally a lot of research that

13   night and didn't sleep.

14        The next day I came to campus.  There was a staff

15   meeting where they talked about it and I attended the

16   staff meeting and I thought it was very important to be

17   professional and be there.  I was in my office all day so

18   the kids did come find me and have questions at times

19   about different things and I would answer questions for

20   them.  You know, I knew they were working on things and I

21   was letting them be -- I thought it was pretty important

22   that they process things the way they needed to but I was

23   there to offer them support upstairs.  I'd walk them

24   downstairs from my office.

25        I had conversations with Tracey Flynn, Jack, Billy.

1    I talked to a lot of people the next day.

2    Q.   Okay.  Could you describe your conversations with

3    Tracey Flynn on or around March 5th after you had learned

4    about the elimination of the program?

5    A.   Yeah.  Tracey is a wonderful person and I know she

6    was really, really upset about what happened.  And I feel

7    bad because I think she was in a really tough spot.  She

8    was pretty afraid --

9            MS. GAMBARDELLA:  Your Honor, we have what

10   Tracey Flynn said and several witnesses' conclusions about

11   Tracey Flynn's state of mind.

12   BY THE WITNESS:

13   A.   Tracey told me that she felt handcuffed, that she was

14   worried about her job and she needed it.  Tracey told me

15   Quinnipiac had a major problem with proportionality, that

16   we needed to get a subpoena and an injunction as quickly

17   as we could.  Quinnipiac had done nothing to do planning

18   for cheerleading, so they had no written plan.  Tracey

19   told me she would not tell me anything I couldn't discover

20   on my own but would support me.  We talked about

21   proportionality.  We talked about cheerleading being

22   elevated.  She told me she had seen a memo prior to it

23   being released.

24   Q.   When you say a memo, what do you mean?

25   A.   The memo announcing the cut of volleyball and

1    elevating of cheerleading.  It had said originally we are

2    going to elevate the sport of cheerleading to varsity

3    status and she took the word "sport" out of the memo.  She

4    told me about the practice and policy of coaches adding

5    and deleting players around the first date of competition

6    for the EADA reports, and she told me she thought that

7    policy was bullshit.  She --

8    Q.    Stop there for a second.  Could you describe more

9    specifically what she told you about -- and I don't want

10   to mischaracterize your prior testimony -- about adding or

11   deleting athletes around the first day of competition?

12   A.    She said if we subpoenaed those records, it would not

13   take an idiot to figure out what's going on here.

14   Q.    Did you have an understanding what she was referring

15   to?

16   A.    Yes.

17   Q.    What was your understanding of what she was referring

18   to?

19   A.    That male coaches were dropping athletes prior to the

20   first day of competition and adding them back within

21   days or weeks of -- afterwards so they did not count

22   towards roster management numbers.

23   Q.    Now, when you say male coaches, do you mean --

24   A.    Male teams, I'm sorry.

25   Q.    And what about coaches of womens teams; did you have

1    any understanding --

2    A.    We did not talk about it at that time.  I had

3    knowledge from conversations I'd had with female coaches

4    about the numbers, the roster numbers being large for some

5    teams prior, like a long time prior to that.

6    Q.    Okay.

7    A.    I do think -- well.

8    Q.    Go ahead.  Is there something you wanted to add?

9    A.    You know, everybody was quite emotional, I think, in

10   those first few days and, you know, I don't think I talked

11   to anybody else on campus, frankly, about it.  I was a

12   little bit all over the place.  And, you know, shortly,

13   you know, I was encouraged to look at legal issues and I

14   didn't know what exactly all that would undertake, so I

15   started looking at all that later that day.

16   Q.    Okay.  Could you describe the impact that the timing

17   of this announcement had on you and your team in terms of

18   what options were available to you?

19   A.    March is really late for all of us to make

20   adjustments for the Fall.  Much as I encourage my athletes

21   they should explore all their options, as I should,

22   because that's the adult thing to do, the reality is for

23   the athletes, the first time period is in November and,

24   yes, there's another signing period starting in the

25   beginning of April but most programs are completely done

```
 1    on an individual level by March.  There, of course, would
 2    be some options, but whether or not they would be the
 3    right academic options for these athletes was another
 4    issue.  They are a very bright team and academics are very
 5    important to them, as they are to me.  I think, you know,
 6    transferring applications for the kinds of schools a lot
 7    of these kids had weighed against us, the deadlines were
 8    pretty quick or shortly thereafter.  I don't have a group
 9    of kids that make snap decisions.  So they did so much
10    research before ever committing to Quinnipiac, to ask them
11    to do it again within a week's time was a little tough.
12    Q.   And what about you?  What were your prospects for
13    finding another coaching job at that point?
14    A.   Not good.  For coach, head coaching jobs, normally
15    coaches are let go for a variety of reasons normally,
16    because they are not doing what the administration wanted
17    them to do, at the end of the season which is November.
18    And then a lot of interviewing goes on at the American
19    Volleyball Coaches Association Conference and the
20    championship tournament in December.  There's a lot of
21    them.
22        After that, and sometimes there are a second round
23    because you back-fill and that happens January, beginning
24    of February.  After that, there's not a lot of Division I
25    jobs that are open.  There's some Division II, not even a
```

1    lot there.  It's mostly assistants jobs at that point.

2         For me, the difficulty was that they would need to be

3    within driving distance of my family.  If I want to stay

4    in coaching, there hasn't been anything in commuting

5    distance come open because I have watched, and I'll have

6    to leave my family if I'm going to stay in coaching.

7    Q.   Have you actually applied for any coaching positions?

8    A.   Yes.

9    Q.   Where?

10   A.   Toledo, Cornell, Spring Hill, Franklin Pierce.

11   Q.   And what are your prospects for any of those

12   positions; do you know yet?

13   A.   No.

14   Q.   And would you be able to live in Hamden with your

15   family if you took any of those positions?

16   A.   No.

17   Q.   Now, let me just go back a minute to something you

18   were saying before.  You mentioned roster management, I

19   think?

20   A.   Yes.

21   Q.   Just explain what, in your understanding, what is

22   roster management?

23   A.   It's a technique that departments can use to keep,

24   try to achieve gender equity.

25   Q.   And what does it involve?

1    A.   They set targets for your roster size and you try to

2    meet them.

3    Q.   So there's a target roster size for each team?

4    A.   Yes.

5    Q.   Now, I take it that after you learned on March 4th

6    that the program was to be eliminated, I think we had

7    earlier testimony that Spring break started a couple days

8    after that.  How long is the Spring break?

9    A.   A week.

10   Q.   Were most of your team members gone during Spring

11   break?

12   A.   They were all gone.

13   Q.   At some point after they returned, did Mr. McDonald

14   give you any instructions about your presence in the

15   Athletic Department?

16   A.   On that Monday after practice.

17   Q.   And so the first Monday back?

18   A.   I think it was first Monday back.

19   Q.   What did he tell you?

20   A.   That I was not to work out with the team anymore.  He

21   said it made people in the department feel bad to have me

22   around.  They felt sorry for me and it made them very

23   uncomfortable, and it was his job to protect the

24   department.  They also thought that if they were seen with

25   me, they might lose their job.

1    Q.   Did he say anything else about why he was asking you

2    to stay away from the department?

3    A.   I asked him if someone higher up had asked for that

4    to happen and he said no.  I asked if it was because I had

5    asked for the EADA reports and he said no.  And he told me

6    that I needed to take care of my family and find another

7    position and I told him those kids were my family and

8    that's what I was doing, was trying to take care of all of

9    us.

10   Q.   Do you remember anything else about that

11   conversation?

12   A.   I told him that I needed to keep my office because I

13   had office hours because I taught, and he thought that I

14   would be able to do that.  He was going to call the

15   provost.  I reiterated that I thought it was really

16   important that I worked with the kids.  They needed help

17   transferring.  There's game films to be done, you know,

18   talking to coaches, all kinds of things.  He thought they

19   could handle it themselves.

20        I'm trying to think what else we talked about.

21        I'm getting a blank.

22   Q.   That's okay.

23   A.   Yeah, I think that's -- I think I told him that I

24   thought, you know, I was a professional, my contract was

25   until June 30.  I thought I should show up, that that was

1    my job, was to continue to do my job.  He felt that I

2    could do it from home and I didn't need to be there.  I

3    thought the fact that other people weren't comfortable

4    meant they needed to grow up.  I worked in, you know, with

5    people I wasn't always comfortable with in my career but

6    you have to grow up, you have to be a professional and

7    deal with it.  But he reiterated that I needed to be out

8    of the office.

9    Q.   Okay.  Ms. Sparks, are you familiar with the process

10   involved in getting new sports recognized by the NCAA?

11   A.   I'm familiar with it, yes.

12   Q.   You're not an expert in it, I take it?

13   A.   No.

14   Q.   Could you just tell us a little bit what your

15   familiarity is, what your understanding is of that

16   process?

17   A.   I'm at a Northeast Conference head coaching rep on

18   the committee for the ADEA, and sand volleyball became an

19   emerging sport this year, so I've been at many meetings

20   where we discussed the process of how we got sand

21   volleyball to become an emerging sport.  I talked to head

22   coaches and got their opinions on it, to be able to come

23   back to the Head Coaches Committee to let them know where

24   our conference schools felt about elevating the sand

25   volleyball.  I know that for, at least for sand

```
1    volleyball, you had to have -- I forget what schools, but

2    there are a number of schools that had to apply to have it

3    done.  They are delaying the implementation of it for a

4    year because the rules and the regulations and scholarship

5    and all this needs to be developed, but they are in that

6    process.

7    Q.   Okay.  Is it your understanding that the NCAA has a

8    process for recognizing emerging sports that any sport can

9    take advantage of?

10   A.   Correct.

11            MR. ORLEANS:  May I just have a moment, Your

12   Honor?

13            (Pause)

14   BY MR. ORLEANS:

15   Q.   You mentioned a minute ago, Coach Sparks, that you

16   had asked for EADA reports?

17   A.   Yes.

18   Q.   What -- can you elaborate on that?

19   A.   There are reports that are, the universities across

20   the country are required to file with the Office of Civil

21   Rights and they are legally required to make them

22   available to those who request.

23   Q.   And when did you ask for them?

24   A.   The 4th is Wednesday.  The 9th of March.

25   Q.   How did you go about asking for them?
```

1    A.    Put it in writing to Tracey and to Jack.

2          MR. ORLEANS:  I'm sorry, Your Honor, I'm a

3    little bit disorganized.  I thought we had this on our

4    list.  Here it is.  How should we handle this, Your Honor?

5    There's a document in the original, in the exhibit

6    notebook that I would like to show the witness.

7          THE COURT:  Well, the simplest way to do it is

8    just take the notebook of originals.

9          MR. ORLEANS:  You don't mind my giving her the

10   entire notebook, even though not every exhibit has been

11   admitted into evidence?

12   BY MR. ORLEANS:

13   Q.    All right.  This is one through 20.

14         (Hands witness.)

15         Coach Sparks, would you just take a look at Exhibit

16   20?

17   A.    Okay.

18   Q.    Is that a copy of your request to Mr. McDonald for

19   EADA reports?

20   A.    Yes, it is.

21   Q.    And did you receive any response to this request

22   prior to the filing of this lawsuit?

23   A.    Mr. McDonald emailed me that he would pass it up the

24   chain.

25   Q.    And other than that email that he would pass it up

1    the chain, did you receive any further response?

2    A.   No.

3    Q.   Did you receive the EADA reports that you requested

4    prior to the filing of the lawsuit?

5    A.   No.

6              MR. ORLEANS:  Your Honor, I'll ask that that be

7    admitted.

8              MS. GAMBARDELLA:  It's not -- I'm not sure how

9    it's really relevant but I'll waive any objection.

10             THE COURT:  Okay.  Exhibit 20 is full.

11             (Whereupon Plaintiff's Exhibit 20 was marked

12        full.)

13   BY MR. ORLEANS:

14   Q.   Now, Coach Sparks, could you take a look at the

15   exhibit that is behind Tab 8?  Or I should say that I

16   think we may have confused our numbering between eight,

17   nine and ten, but I'm going to try and separate that out

18   with this witness and have her properly identify those

19   three documents.

20        You have that in front of you?

21   A.   Yes.

22   Q.   Okay.  Do you recognize that?

23   A.   Yes.

24   Q.   Is that something that you created?

25   A.   Yes.

1    Q.   All right.  Could you explain what it is, please?

2    And there are two pages -- let me start with the top page

3    and you can explain the next page.

4    A.   There was documents that were supplied -- I don't

5    know the right word -- from the University over this, and

6    I was looking for things to do and Dr. Lopiano requested

7    that I compile them in a form, so I took the information

8    and put it into a chart.

9    Q.   Okay.  So you -- this is a summary of data that you

10   obtained from other documents?

11   A.   Correct.

12   Q.   Okay.  Could you just explain what the columns are on

13   the first page of Exhibit 8 for identification?

14   A.   Yes.  The Q. U. current is the current roster

15   management targets.

16   Q.   Now, when you say "current," is that --

17   A.   2008-9.

18   Q.   2008-9?

19   A.   Yes.  Proposed is from the letter from Janet Judge,

20   there was a chart there.

21   Q.   Okay.  You understood that to be --

22   A.   '09-10.

23   Q.   -- roster management targets for Q. U. '09-10?

24   A.   Yes.

25   Q.   Okay?

1     A.    The NEC average came from a chart of NEC squad sizes.

2     Q.    Stop there for a second.  Would you look at the

3     document that's behind Tab 9; that's been marked as

4     Exhibit 9 for identification?

5     A.    Yes.

6     Q.    Is that the document you're referring to that has NEC

7     squad sizes?

8     A.    Yes.

9     Q.    Okay.

10          THE COURT:  Exhibit 9 is full and Exhibit 10 is

11    full.

12          MR. ORLEANS:  And exhibit 10 is full.  Thank

13    you, Your Honor.

14          (Whereupon Plaintiff's Exhibits 9 and 10 were

15        marked full.)

16    BY MR. ORLEANS:

17    Q.    Okay?

18    A.    Yes.

19    Q.    So the next column is NCAA average?

20    A.    Correct.

21    Q.    And what's the source of that information?

22    A.    It's a chart the University supplied.

23    Q.    Okay, and is that the chart that is marked as Exhibit

24    10?

25    A.    Yes.

1    Q.   Two page chart, there's a page for men and a page for

2    women, I think?

3    A.   Yes.

4    Q.   All right.  Then continuing on through the chart that

5    you created, the summary, the column that says Q. U.

6    current versus NEC, what's that?

7    A.   Just the difference between the Q. U. current column

8    and the NEC average column.

9    Q.   Okay.  And Q. U. proposed then is the difference

10   between the original --

11   A.   Q. U. proposed column and the NEC average column.

12   Q.   Okay.  And what about the last two columns?

13   A.   They are the same comparisons but using NCAA average

14   column instead.

15   Q.   Okay.  Now, if we can go to the next page of Exhibit

16   8 for identification?

17   A.   Yes.

18   Q.   How is this chart different from the first page of

19   Exhibit 8?

20   A.   The difference is that the 2005, 2006 gender equity

21   report that the NCAA has has a chart with roster sizes for

22   NCAA schools, Division I, that don't have football.  So

23   that was the source document.

24   Q.   So you used that information?  Where did you obtain

25   that information?

```
 1    A.    (Pause)

 2    Q.    Was there a document that you looked at?

 3    A.    There was.  It was -- it's a big fat document.

 4    Q.    Hold on.

 5          MR. ORLEANS:  May I have just a moment, Your

 6    Honor?

 7          (Pause)

 8    BY MR. ORLEANS:

 9    Q.    I'm just showing you this document.  I'm sorry, I

10    don't have a copy but I'll bring it to you in a moment.

11          Is this the document that contains the NCAA

12    nonfootball schools information that you just referred to?

13    A.    I looked at it electronically so I don't think these

14    are the charts that I saw, no, because I had 2005, 2006

15    and that's 2006, 2007.

16          MR. ORLEANS:  Your Honor, I'd like to offer into

17    evidence the first page of Exhibit 8 as a summary.

18    Obviously the materials upon which it is based are in

19    evidence by stipulation.  Since I don't have the

20    underlying data for the second page, I won't offer it at

21    this time.

22          MS. GAMBARDELLA:  Your Honor, here's the

23    objection.  This chart was created for use by the expert.

24    There is information on here which was never before

25    disclosed to us.  And I get the first two columns, that's
```

1     easy enough.  Q. U. current proposed for next year.  In

2     terms of everything else, it was never disclosed to us the

3     specific documents from where that information was

4     obtained.  It was used by the expert extensively in

5     deposition, and part of the issues, you know, we've had in

6     this case is the specificity and sufficiency of the

7     disclosures.

8                 It also contains information on the bottom with

9     respect to a number of other teams that no foundation has

10    been laid for this witness to have put that information on

11    there.

12                So, we haven't had an opportunity to see about

13    the accuracy of these numbers, what it reflects, why they

14    are relevant.  And that's why we had that disclosure

15    order.

16                MR. ORLEANS:  Your Honor --

17                MS. GAMBARDELLA:  I would like the opportunity

18    to check the accuracy of the chart before it comes in.

19    I'd like an opportunity to check the accuracy of the chart

20    now that that's been disclosed before it's moved into

21    evidence.

22                MR. ORLEANS:  Your Honor, I'm not sure that I

23    fully understand counsel's objection that something hasn't

24    been disclosed.  The documents on which this chart is

25    based on, the chart is a summary, are Quinnipiac

 1    University documents that are in evidence and that have

 2    been marked as Plaintiff's Exhibits 9 and 10.

 3              She referred also for the Q. U. proposed column

 4    to a letter from Janet Judge which I believe has been

 5    stipulated into evidence as Plaintiff's Exhibit 3.  So all

 6    of the foundation documents were well known, are in fact

 7    in evidence, and the chart itself was also disclosed.  It

 8    was marked as an exhibit at the Lopiano deposition.

 9              MS. GAMBARDELLA:  To which we objected.  We

10    objected at the Lopiano deposition.

11              MR. ORLEANS:  I understand there was an

12    objection but --

13              THE COURT:  All right.  What's the information

14    that you believe is not substantiated by another exhibit

15    in the record?

16              MS. GAMBARDELLA:  Here's the problem, Your

17    Honor.  You may recall that we had a conference call with

18    the court --

19              THE COURT:  No, no, that's not my question.  My

20    question is you said, you suggested there's information at

21    the bottom about teams --

22              MS. GAMBARDELLA:  Oh, yes.  Ice hockey, Q. U.

23    does not run a full team.  Members of the NEC seem to be a

24    mixed bag.  And there's stuff under that that has nothing

25    to do with volleyball over which this witness was a coach.

1    So that information is on there gratuitously.  I'm not

2    sure the foundation for this witness to have provided that

3    information.

4              THE COURT:  Okay.  So, except for the notes, if

5    you will, on the bottom --

6              MS. GAMBARDELLA:  We'd like to check the

7    numbers.

8              THE COURT:  Well, of course.  You'll have that

9    chance and it can be corrected or stricken, if need be,

10   but if page one is as it appears to be, simply a

11   compilation of information from other admitted exhibits,

12   it would seem to be admissible.

13             MS. GAMBARDELLA:  Yes, but in my own defense,

14   Judge, which is why I started on the path that I started,

15   you may recall we had an issue with the expert witness

16   disclosure where I got disclosures such as NCAA manual,

17   Northeast Conference website, and one of the problems we

18   had with it was, wait a minute, we're talking a lot of

19   documents we produced; from what specific document, what

20   specific section was this derived?  This is the first time

21   we're hearing specifics about that, so we would like to

22   check the accuracy of the numbers and that's why I went

23   down that path.

24             THE COURT:  Of course, so I'm going to admit it

25   subject to --

```
1            MS. GAMBARDELLA:  Thank you.

2            THE COURT:  -- any correction that you come up

3       with.  So Exhibit -- the first page of Exhibit 8, other

4       than the notes at the bottom, is admitted as a full

5       exhibit subject to any correction upon comparison with

6       the --

7            MS. GAMBARDELLA:  Right, so notes on the bottom

8       are not part of the record.

9            THE COURT:  Unless I --

10           MR. ORLEANS:  Your Honor, if I might lay a

11      foundation for the notes at the bottom, have the witness

12      explain what they are and how she knows the information

13      that's contained in them, the court can rule on the

14      admissibility of the notes on the bottom.  Would that be

15      all right?

16           THE COURT:  Fine.  At this point I'm admitting

17      what I just said, and if you want to seek to lay the

18      foundation for the notes, feel free.

19           (Whereupon Plaintiff's Exhibit 8 was marked

20           full.)

21      BY MR. ORLEANS:

22      Q.   Let me see what I can do about that.

23           Coach Sparks, see the notes at the bottom of Exhibit

24      8?

25      A.   Yes.
```

1    Q.   Talking about the first page now.  When you say "Ice

2    hockey is not a member of the NEC, this comparison is not

3    relevant, I do not have the EADA roster numbers," what do

4    you mean?

5    A.   Quinnipiac's hockey teams do not participate in the

6    Northeast Conference.  They participate in the ECAC.  I'm

7    not sure what it's called.  It's the East Coast Athletic

8    Conference maybe.  So that there are some Northeast

9    Conference schools that run ice hockey.  It's just not the

10   same conference.  Like the ice hockey doesn't belong to

11   that conference.

12   Q.   So, your point here is just --

13   A.   Just to explain that since the chart was comparing

14   the conference averages with Quinnipiac, if Quinnipiac's

15   not in the conference for that sport, it didn't seem

16   relevant.

17   Q.   So the comparison --

18         MS. GAMBARDELLA:  Sorry, I didn't mean to

19   interrupt.

20   BY MR. ORLEANS:

21   Q.   So, the comparison between Quinnipiac's squad size

22   and the conference average squad size, the Northeast

23   Conference average squad size, in your view was not a

24   relevant comparison because Quinnipiac's not in the

25   conference?

1    A.   Correct.

2    Q.   Okay.

3          MS. GAMBARDELLA:  Your Honor, so I'm going to

4    ask it all be stricken.  That's a legal conclusion that

5    this witness is not entitled to make.

6          MR. ORLEANS:  She's just offering --

7          MS. GAMBARDELLA:  It sounds to me like she's

8    suggesting that there should be some negative impression

9    of roster numbers because of this ice hockey thing.  I'm

10   not sure, if it's not relevant, I'm not sure why it's even

11   on here.  I'm not sure why it's mentioned and I'm not sure

12   why this witness is talking about ice hockey.

13         MR. ORLEANS:  Your Honor, it's simply

14   explanatory.  I'm trying to lay a foundation for the notes

15   and I'm just trying to explain what the note means and why

16   it's there.

17         THE COURT:  Right.  I don't hear a formal

18   objection.

19         MS. GAMBARDELLA:  Foundation.  I don't believe

20   there's been a foundation for that particular note to be

21   let in on this particular exhibit.

22         THE COURT:  I'll allow it.  I mean it's a matter

23   of public record whether ice hockey is in the Northeast

24   Conference or the ECAC.

25         MS. GAMBARDELLA:  No, I understand.  It's the

1      statement that the comparison is not relevant.  I'm still

2      not sure --

3                  THE COURT:  What I took that to mean -- and if

4      this isn't what it means, then counsel can let me know.

5                  MS. GAMBARDELLA:  Your guess is as good as mine.

6                  THE COURT:  There's an NEC, Northeast Conference

7      average column, and --

8                  MS. GAMBARDELLA:  Right.

9                  THE COURT:  -- because ice hockey doesn't

10     compete in the Northeast Conference, the number that's

11     listed there technically is not a Northeast Conference

12     average.  It's an average for ECAC.

13                 MR. ORLEANS:  I think the witness's testimony is

14     she didn't have the ECAC numbers, so the number that's

15     there is the Northeast Conference number.

16                 THE COURT:  Notwithstanding the fact that --

17                 MR. ORLEANS:  Notwithstanding the fact that

18     Quinnipiac doesn't play in that conference.  And she's

19     just pointing out that in her chart, for whatever worth

20     that has to a person who's reviewing the chart.

21                 THE COURT:  I don't see a great problem with

22     that.

23                 MR. ORLEANS:  All right.

24     BY MR. ORLEANS:

25     Q.   Let's take the second one.  This is a footnote that

1    refers back up to indoor track.

2    A.    Correct.

3    Q.    You see that, the pound sign?

4    A.    Correct.

5    Q.    And you say here Quinnipiac University does not run a

6    full team; what do you mean by that?

7    A.    Quinnipiac doesn't have sprinters or field events

8    with their track team.

9    Q.    Okay.  With the indoor track team?

10   A.    Correct.

11   Q.    And when you say members of the NEC seem to be a

12   mixed background of full and partial teams, what do you

13   mean by that?

14   A.    Just that's what it seemed to be to me, that some

15   were more full and some of them were not.

16   Q.    And when you say it seemed to be that way to you,

17   based on what?

18   A.    The spread of the numbers and the size of the

19   rosters.

20   Q.    So, is this again an explanatory note for someone

21   who's reviewing the data to understand what's there?

22   A.    Yes.

23   Q.    All right.  And the next note, the -- I don't even

24   know what to call that sign.

25   A.    The ampersand sign.

1    Q.   The ampersand sign?

2    A.   Yes.

3    Q.   This refers back to the outdoor track?

4    A.   Correct.

5    Q.   And when you say that Quinnipiac mens outdoor track

6    doesn't run a full team, what's the basis for that

7    statement?

8    A.   It's the same thing, that it's not sprinters and

9    field events.

10   Q.   Okay.  And then, finally, the ampersand sign, that's

11   a reference to mens lacrosse?

12   A.   Yes.

13   Q.   And is that line then similar to the first note that

14   we discussed, your pointing out that Quinnipiac is not

15   competing in the Northeast Conference in mens lacrosse?

16   A.   At this time, correct.

17   Q.   At this time.  Okay.

18          MS. GAMBARDELLA:  Your Honor, I'm going to move

19   to strike all those notes.  Just, for example, Quinnipiac

20   has sprinters in indoor/outdoor track.  She's not the

21   coach.

22          THE COURT:  All right.  There's nothing to

23   strike because they were not admitted.  He's now going to

24   offer them.

25          MR. ORLEANS:  I was going to move their

1    admission.

2            THE COURT:  Now you have a objection to the

3    offer.  Okay.  What's the response to the objection?

4            MR. ORLEANS:  I'm sorry, Your Honor?

5            THE COURT:  What's the response to the

6    objection?

7            MR. ORLEANS:  The response to the objection,

8    Your Honor, the chart is a summary and the notes explain

9    entries in the chart so that the reader of the chart can

10    better understand what information is contained.  To the

11    extent that the notes offer the witness's conclusions, she

12    can be crossed examined on them and the defense certainly

13    can offer other information if they think the information

14    is inaccurate.

15            THE COURT:  What is the, what's the significance

16    of the NEC average column on this chart?

17            MR. ORLEANS:  We are attempting to show that

18    the, by comparing the Quinnipiac proposed roster sized

19    targets with existing roster sizes in the NEC, where

20    Quinnipiac mostly competes, and elsewhere, that

21    Quinnipiac's roster size targets are either not realistic

22    or are subject to or intended to be manipulated, so that

23    they, the roster size targets do not present a true

24    picture, an accurate picture of womens participation

25    opportunities.  And that's our, that's our theory, and the

1     information here is intended to support that argument.

2              I was about to ask the witness just to give an

3     example by taking a line going across and explaining what

4     the entries mean, but I think the court probably

5     understands what the entries, what the entries mean.

6              MS. GAMBARDELLA:  Your Honor, he's entitled to

7     do that; I just don't understand why it's this witness.

8     This is not -- he has not laid a foundation for this

9     witness, so now what I think I hear him saying is you

10    should conclude that because ice hockey is not a member of

11    the NEC, that the fact that the NEC -- I don't know where

12    the NEC average comes from but the fact that those numbers

13    are identical is irrelevant, and so it shouldn't be

14    probative at all.  I'm going to go with saying, look, you

15    know, there are teams that are pretty close.  We've

16    already pointed out to the court that some of the

17    information she just gave you about track is inaccurate.

18    He can talk to the athletic director all day tomorrow if

19    he would like about these numbers and where they come

20    from.  It's not this witness.

21             THE COURT:  Okay, hears the problem.  The first

22    page of eight, other than the notes, is in evidence.

23             MS. GAMBARDELLA:  No, I understand that.

24             THE COURT:  And so all we're doing is deciding

25    whether the explanatory notes, which are presumably

1    intended to make the chart more accurate, should be

2    admitted or not.  It seems to me that it makes sense to

3    admit those notes and then if you want to challenge it

4    with other evidence, demonstrate somehow that it's wrong,

5    get a stipulation of some sort, you should feel free.  But

6    I'm going to go ahead and admit the notes and give them

7    whatever weight it turns out they deserve at the end of

8    the case.

9            (Whereupon Plaintiff's Exhibit 8, as described

10       above, was marked full.)

11           MR. ORLEANS:  If I could just have a moment,

12   Your Honor?

13           (Pause)

14   BY MR. ORLEANS:

15   Q.   Just a couple more questions, Ms. Sparks.

16       Do you have to take any NCAA certification classes as

17   a coach to be a Division I coach?

18   A.   I have to pass a test, yes.

19   Q.   And what's involved in that?

20   A.   It's a test so that -- it's a lot of stuff.  It's to

21   certify you were recruiting off campus, so it's over

22   recruiting rules, some academic eligibility.  There's a

23   great big book that you have to know certain chapters on.

24   Q.   Does volleyball as a sport have a national governing

25   body?

1    A.   Yes.

2    Q.   What's the national governing body?

3    A.   USA Volleyball.

4    Q.   Okay.  And is volleyball recognized as a sport by the

5    NCAA?

6    A.   Yes.

7    Q.   The NCAA has a championship volleyball tournament for

8    women?

9    A.   Yes.

10   Q.   Were you interested in getting into that

11   tournament?

12   A.   Everybody's interested.

13           MR. ORLEANS:  I have nothing further, Your

14   Honor, at this time.

15           THE COURT:  Why don't we take our afternoon

16   break before cross.  Let's take about 15 minutes and come

17   back at 3:25.  We'll stand in recess.

18           (Whereupon a recess was taken from 3:10 o'clock,

19       p. m. to 3:25 o'clock, p. m.)

20   CROSS EXAMINATION

21   BY MS. GAMBARDELLA:

22   Q.   Good afternoon, Ms. Sparks.  Do you prefer Mrs. or

23   Ms.?

24   A.   Doesn't matter.

25   Q.   Okay.  Doesn't matter, all right.  I'd like to start

1   with Plaintiff Exhibit 8.

2       Ms. Sparks, when you compiled the NEC or NCAA

3   averages or when you extracted the averages, did you do

4   any research as to whether or not the schools whose

5   averages are reflected in that chart comply with prong one

6   of Title IX?

7   A.   No.

8   Q.   Did you do any investigation to discern whether or

9   not any of the schools whose averages are reflected in

10  those numbers implement the use of roster management to

11  attempt to achieve Title IX compliance?

12  A.   No.

13  Q.   Would you agree with me that averages include numbers

14  that encompass broad ends of a spectrum?  In other words,

15  there could be a school with a team of -- and I'm not even

16  going to pick a sport -- 30 for whatever reason; 30 is

17  their number.  And then a team in another part of the

18  country, same athletic program, with ten, correct?

19  A.   Yes.

20  Q.   And that's how they get the average, correct?  That's

21  how you got the averages.

22  A.   I'm not understanding what --

23  Q.   What is your understanding of the NCAA average?

24  A.   That I merely took the information Quinnipiac

25  supplied and put it on the chart.

1    Q.    So you have no foundation for understanding how the

2    average was arrived at, is that correct?

3    A.    I merely took that chart.

4    Q.    Okay.  So you're not regurgitating the numbers from a

5    chart?

6    A.    From the chart Quinnipiac supplied, yes.

7    Q.    I understand that, but the chart Quinnipiac supplied

8    reflects information provided in response to requests by

9    the plaintiff, correct?

10   A.    I don't know.

11   Q.    Okay.  Now, did you review roster numbers -- strike

12   that.

13         Did you determine or did you do any research as to

14   the percentage of schools across this country who are in

15   compliance with prong one of Title IX?

16   A.    No.

17   Q.    Did you do any research into the number of schools

18   across the country who use roster management as a tool to

19   try to achieve Title IX compliance?

20   A.    No.

21   Q.    Have you ever coached an indoor track team?

22   A.    No.

23   Q.    Have you ever coached an outdoor track team?

24   A.    No.

25   Q.    Have you ever coached an ice hockey team?

1   A.   No.

2   Q.   Did you testify on direct that the indoor -- let me

3   see if I have the note right.  It's not in the note but

4   you said one of the track teams at Quinnipiac does not

5   have sprinting events; did I hear that correctly?

6   A.   Correct.

7   Q.   What do you mean by that?

8   A.   I've had conversations with the cross country coach

9   that he's requested sprinters and field events to make a

10  full team.

11  Q.   And field events, he's requested sprinters?

12  A.   And field events.

13  Q.   And field events.  And what led you to -- I'm going

14  to strike that for the moment.

15       Do you know how NEC averages are arrived at?

16  A.   No.

17  Q.   Do you know who is surveyed by the NEC to come up

18  with these averages?

19  A.   No.

20  Q.   Are NCAA averages binding on any particular school in

21  this court's consideration of Title IX compliance?

22  A.   I have no idea what you mean by that.

23  Q.   Well, you are Title IX knowledgeable, you testified

24  on direct, correct?

25  A.   I know some about it, yes.

1    Q.    Are NCAA guidelines binding on this court, in your

2    knowledge?

3    A.    I still don't understand.  I still am not

4    understanding what you mean.

5    Q.    Well, are NCAA averages binding on this court in

6    determining whether or not Quinnipiac's roster sizes

7    proposed for next year would be realistic or not?

8    A.    I'm sorry.  I'm being dense because I'm just not --

9    Q.    What's the importance of NCAA averages?

10   A.    It tells the average side of a squad.

11   Q.    Any other significance?

12   A.    So that if you want to know what the average size of

13   a squad is, you can look at that number.

14   Q.    Would you say that men's rowing could be considered a

15   sport for Title IX compliance purposes?

16   A.    I'm not -- if it's -- I'm not sure if it's on the

17   list that's been approved by NCAA or not.

18   Q.    That's my next question.  Is it an NCAA listed sport?

19   A.    I would need the list in front of me.  I don't know

20   that offhand.  I know that womens rowing was emerging at

21   one time.

22   Q.    Emerging but not an NCAA recognized sport, correct?

23   A.    Once you are on an emerging sport list, you have to

24   start following NCAA rules.  So, once you get on that

25   list, you have to, you have to comply with all the NCAA

1    rules.

2    Q.   Is it your understanding that only NCAA sponsored

3    sports can count as sports for Title IX compliance

4    purposes?

5    A.   I'm not positive on that.

6    Q.   I think that about does it for Exhibit 8.

7         Now, let's go back to your testimony about your

8    contract with the school and the discussions leading up to

9    your signing of the contract with Quinnipiac to coach

10   woman's volleyball, okay?

11        First, as a preliminary matter, isn't it true,

12   Ms. Sparks, that every Division I coach needs to be NCAA

13   certified?

14   A.   No.

15   Q.   Okay.  In order to do recruiting off campus, don't

16   you have to be NCAA certified?

17   A.   Correct.

18   Q.   So, let's talk about your discussions that you went

19   through with Mr. McDonald and Ms. Flynn about the

20   commitment to rebuilding the volleyball program.  Do you

21   remember your direct testimony on that?

22   A.   Yes.

23   Q.   Thank you.  After you had those discussions, did you

24   execute a contract with the University?  A written

25   contract?

1    A.   A signed contract, is that what you're asking?

2    Q.   Yes.  Did you sign a contract?

3    A.   Yes.

4    Q.   What was the duration, the term of the contract

5    period?

6    A.   One year.

7    Q.   Was there any term in the contract that guaranteed

8    you it would be renewed?

9    A.   I only had Jack's word on that.

10   Q.   Okay.  Let's try that -- let me ask it again.  Was --

11   do you have a term in that written contract that

12   guarantees you it would be renewed?

13   A.   I testified to that earlier.  No.

14   Q.   Okay.  And the discussions you had with Mr. McDonald

15   were prior to your finally executing the contract, the

16   onces that you testified to earlier, correct?

17   A.   Do you mean --

18            THE COURT:  Which came first, the discussions or

19   the signing of the contract?

20            THE WITNESS:  Those kinds of discussions

21   happened before and after I signed the contract.

22   BY MS. GAMBARDELLA:

23   Q.   Before you signed the contract, you understood there

24   was a commitment to volleyball, correct?

25   A.   Correct.

1    Q.    You signed a contract that gave you a one year term
2    without any guarantee in the written document for renewal
3    of the contract beyond the one year, would that be
4    correct?
5    A.    Yes.
6    Q.    And then you moved your family, correct?
7    A.    After signing a second one, yes.
8    Q.    What do you mean a second one?
9    A.    I had a second contract.
10   Q.    Understood.  Did the second contract provide for a
11   one year term?
12   A.    Yes.
13   Q.    Was there any guarantee in the second contract that
14   it would be renewed beyond that one year, in the contract?
15   A.    In the contract, no.
16   Q.    Now, you said that you took a $15,000 pay cut to come
17   to Quinnipiac and you moved your entire family from -- was
18   it Troy, New York?
19   A.    Correct.
20   Q.    And where were you at the time just before
21   Quinnipiac?
22   A.    University of Albany.
23   Q.    Albany?
24   A.    Uh huh.  (Affirmative.)
25   Q.    Did you have a written contract with the University

1    of Albany?

2    A.   I don't know that it's a contract.  I had an offer

3    for the, a written offer on the job but I don't know that

4    they do contracts.

5    Q.   Why did you take a pay cut to go to Quinnipiac?

6    A.   Because the opportunity to coach a Division I -- it

7    would have been really difficult to jump into that and

8    just to jump into Division I.  I would have probably had

9    to start with a Division III and work my way up.  It was a

10   great opportunity to do my passion full-time.  We knew

11   they were offering tuition benefits with it, which was

12   huge.  I was hoping, and I executed this Spring, teaching

13   on the side, so I had an adjunct position.  And then if I

14   really, really worked hard with summer camps, I knew I

15   could make up the difference.

16   Q.   Now, you testified on direct that you were asked

17   about making the program better, the volleyball program at

18   Quinnipiac.  Do you remember that?  Was there a discussion

19   about how you could make the program better?

20   A.   With whom?

21   Q.   With Mr. McDonald, with Ms. Flynn?

22   A.   Yes.

23   Q.   Okay.  Better than what?

24   A.   What it had been in the past.

25   Q.   What was your understanding of what it had been in

1    the past?

2    A.    A little bit more than a recreational program for a

3    while.

4    Q.    Okay.  And so you understood that your opportunity

5    was to try and build that program up beyond that level,

6    correct?

7    A.    Yes.

8    Q.    And is it your testimony today that you really had an

9    understanding that no matter what might happen, that

10   volleyball would never be cut?

11   A.    Yes.

12   Q.    Okay.  But you have nothing in writing in that

13   regard, correct?

14   A.    No.

15   Q.    How did your team do last year?

16   A.    We were vastly improved from the year before.

17   Q.    Did how did your team do competitively last year?

18   A.    We were competitive with everyone we played against.

19   Q.    Okay.  Is there some some kind of status or -- I

20   might not be using the right terminology, but where did

21   you rate in terms of the competitions in which you played?

22   A.    We -- there are many stats that you can look at to

23   rate your competitiveness.  You are in the top three in

24   every statistical category since Quinnipiac has been

25   keeping stats for their volleyball program.  So we were

1    top seated agents for aim and the top three tactical

2    percentage, hitting percentage, games, all of those.  Our

3    final record was not what we would have wanted.  We lost

4    27 games by two or three points, we started five freshman.

5    I was very happy.

6    Q.   You lost 27 games out of how many?

7    A.   Our final record was five and something.  The games

8    are the individual -- they should have been called sets

9    because they change from games to sets.

10    Q.   You lost 27 games out of how many?

11    A.   Sets?

12    Q.   Well, what's the difference between a set and a game?

13    A.   There can be up to five --

14          THE COURT:  Just a second, I know there is a

15    miscommunication going on.

16          MS. GAMBARDELLA:  Yes.

17          THE COURT:  The point is there were 27 sets lost

18    by two or three points.

19          MS. GAMBARDELLA:  Two or three points.

20          THE COURT:  This is not a win/loss reference.

21    This is the number of sets within a particular --

22          THE WITNESS:  Match.

23          THE COURT:  -- match.  Right.

24    BY MS. GAMBARDELLA:

25    Q.   Okay.  How many matches did you lose last year?

1    A.   We were five and -- I'm not sure -- I actually do not

2    know how many we lost.

3    Q.   Did you hear one of the plaintiffs testify that we

4    didn't do very well?

5    A.   Our record was not as high as we would have wanted,

6    no.

7    Q.   Now, Ms. Sparks, were you aware that other coaches'

8    contracts were not going to be renewed for next year as

9    well?

10   A.   When?  Are you asking like right now?

11   Q.   Are you aware of that right now?

12   A.   Yes, one.

13   Q.   And who's the coach whose contract is not being

14   renewed?

15   A.   The golf coach.

16   Q.   Men's golf?

17   A.   Correct.

18   Q.   Correct?  Now, you testified on direct that you are

19   not allowed to guarantee scholarships beyond one year in

20   writing, correct?

21   A.   Correct.

22   Q.   All right.  Do you know why that is?

23   A.   NCAA rules.

24   Q.   Do you know why the NCAA has that rule?

25   A.   I wasn't part of making those rules, no.

1    Q.   So that's your way of telling me, no, you don't,

2    correct?

3    A.   Correct.

4    Q.   All right.  Then you said there was a presumption

5    there will be renewed.  What do you base the presumption

6    on?

7    A.   Jack McDonald doesn't like to take scholarships away

8    from athletes once they've had them.

9    Q.   I see.  Summer volleyball camps are not for college

10   students?

11   A.   No.

12   Q.   Okay.  Now, let's talk about your conversation with

13   Tracey Flynn that you testified to earlier.  What's your

14   understanding of Tracey Flynn's responsibilities at the

15   University?

16   A.   She's in charge of compliance.  She's senior womens

17   administrator.

18   Q.   What do you mean by in charge of compliance?

19   A.   She ensures that we follow NCAA rules.

20   Q.   You were friendly -- you are friendly with Tracey

21   Flynn, or you were?

22   A.   I like Tracey very much.

23   Q.   You were friendly with her, correct?

24   A.   Correct.

25   Q.   Did you guys have lunch together?

1  A.   No.

2  Q.   You talked every once in a while?

3  A.   Yes.

4  Q.   Do you think it's all that unreasonable for the

5  person in charge of Title IX compliance to be concerned

6  with how this lawsuit might turn out?

7  A.   No.

8  Q.   Now, you said you talked to Tracey Flynn about roster

9  management, correct?

10  A.   Briefly, yes.

11  Q.   Well, you said on direct that Tracey Flynn told you

12  that there was a practice of adding deletes and it was

13  bullshit, I think were your words?

14  A.   Correct.

15  Q.   Correct.  What year was she talking about?

16  A.   She was encouraging me to pursue that issue and she

17  did not reference a year.  She just said there was a

18  practice.

19  Q.   Okay.  And so she didn't reference a year in

20  particular?

21  A.   No.  She talked about this on March 4th or 5th.

22  Q.   When you came to Quinnipiac for academic year 2007,

23  were you told about the implementation of roster

24  management at Quinnipiac?

25  A.   I learned about it; I wasn't told about it.

1  Q.   Okay.  How did you learn about it?

2  A.   From the women's lacrosse coach.

3  Q.   Did you ask anything in the Athletic Department about

4  what that meant?

5  A.   I had a conversation I think with Jack Kendracy (ph)

6  about what they wanted me to do.

7  Q.   What did they want you to do?

8  A.   Get 15 players on my team.

9  Q.   Did they tell you why?

10  A.   They said that was the number that was our target.

11  Q.   Did he tell you why roster management was being

12  implemented at Quinnipiac University?

13  A.   No.

14  Q.   To this day do you know why roster management was

15  implemented at Quinnipiac University?

16  A.   Yes.

17  Q.   Why?

18  A.   Because their gender equity report from 2006 said the

19  numbers were way off and they needed to increase

20  opportunities for women.

21  Q.   And they are trying to do that with what they are --

22  what they articulated was they are trying to do that with

23  roster management, isn't that correct?

24  A.   No one had said that to me.

25

1    Q.   Do you know if that's not the case, Ms. Sparks?

2    A.   In terms --

3    Q.   Ms. Sparks, haven't you heard testimony in this

4    lawsuit -- you were at all the depositions, right?

5    A.   Yes.

6    Q.   Okay.  Have you heard the testimony of Mr. McDonald

7    that the implementation of roster management for academic

8    year 2007 was specifically for the purpose of improving

9    Quinnipiac's numbers?

10   A.   Yes.

11   Q.   You heard that, right?

12   A.   Yes.

13   Q.   Do you have any facts that you can offer as evidence

14   today to indicate that is not true?

15   A.   That they were not --

16   Q.   That that's not the real reason?

17   A.   I'm just not understanding exactly what you're asking

18   about evidence.

19   Q.   What facts -- are you contending that that's not

20   true?

21   A.   That what's not true?

22   Q.   That Quinnipiac introduced roster management in an

23   effort specifically to improve its numbers?

24   A.   That's what Jack said.

25   Q.   Do you know whether or not that's -- he was being

1    truthful?

2    A.    No.

3    Q.    Did you -- were you present for Tracey Flynn's

4    deposition?

5    A.    Yes.

6    Q.    Didn't she say the same thing?

7    A.    I don't recall.

8    Q.    That's fine.  Acceptable.

9          Do you think Tracey Flynn is competent at her job?

10   A.    I have no reason to believe otherwise.

11   Q.    Do you think that if Tracey Flynn saw a practice that

12   would be contrary to Title IX compliance or the spirit of

13   Title IX compliance, do you think she's the kind of person

14   that would try to take care of it?

15   A.    Tracey told me she was worried about losing her job

16   and retaliation, so --

17   Q.    When did she say retaliation?  That's not a word you

18   used on direct.  When did she say that?

19   A.    We talked about -- she talked about losing her job,

20   doing this could lose her job.

21   Q.    I see.  And I'm going ask you again, Ms. Sparks,

22   given her position in the University, isn't it reasonable,

23   given that we are human beings, that she might fear loss

24   of her job depending on how this lawsuit turns out?

25   A.    I don't know if that's reasonable or not.

1    Q.   And you were angry when you found out that the

2    volleyball team was going to be eliminated, correct?

3    A.   Of course.

4    Q.   Did you tell other coaches how angry you were?

5    A.   I don't know that I told everyone specifically but I

6    think -- I mean I talked to so many people right

7    afterwards, I probably said I was angry.

8    Q.   When you say --

9    A.   Can't imagine I wouldn't have.

10   Q.   I'm sorry, I didn't mean to interrupt you.  I'm

11   sorry, Judge, I didn't mean to interrupt.

12          THE COURT:  She said "I can't imagine I wouldn't

13   have."

14   BY MS. GAMBARDELLA:

15   Q.   When you say "so many people," you mean at school?

16   A.   Well, I talked to people outside of school.

17   Q.   Okay.  When you say you talked to so many people,

18   does that include people at school?

19   A.   I just want to make sure of the question.  Let me get

20   through who I talked to in the days --

21       (Pause)

22       I'm not sure that I said that I -- well, I think --

23   I'm trying to think to be accurate.

24       I spoke to three, maybe four coaches and

25   administrators, and that's about all I talked to right

1    afterward.

2    Q.   So you talked to people at school about your anger;

3    do I have that correctly?

4    A.   I think I might have expressed being hurt and angry

5    and upset, yes.

6    Q.   Yes.  Did you ever go into the Athletic Director's

7    offices and say loudly, "It's not over."

8    A.   No, not like that.  I never would have said that.

9    Q.   Did you say --

10   A.   No.

11   Q.   -- it's not over?

12   A.   No.

13           MS. GAMBARDELLA:  Excuse me, Judge.

14           (Pause)

15           MS. GAMBARDELLA:  Your Honor, I would like to

16   show the witness a document before I move its admission.

17   It's premarked as Plaintiff's Exhibit L.

18   BY MS. GAMBARDELLA:

19   Q.   (Hands witness.)

20       Mrs. Sparks, is that an email that you authored and

21   sent to a student represented by Defendant's Exhibit L?

22   A.   In response to her email, yes.

23   Q.   That is your email, correct?

24   A.   Correct.

25           MS. GAMBARDELLA:  Your Honor, we move its

1    admission.

2              MR. ORLEANS:  Your Honor, objection.  Relevance.

3              MS. GAMBARDELLA:  Your Honor, this witness

4    suggested that she was told not to come to play with her

5    team in retaliation.  She said what was told to her, and

6    was generic at best, this email goes directly to some of

7    the things that were going on that contributed to what the

8    coaches testified to.

9              MR. ORLEANS:  Your Honor, it's a private email

10   between the coach and a student, in which the student

11   expresses some concern about the coach and the coach

12   responds.  I'm having trouble seeing the relevance.

13             MS. GAMBARDELLA:  Your Honor, this email is to a

14   member of the cheer team at Quinnipiac.

15             THE COURT:  Well, it doesn't strike me as

16   especially relevant but I don't see any great reason to

17   keep it out either, so I'm going to admit Exhibit L as a

18   full exhibit.

19             (Whereupon Defendant's Exhibit L was marked

20        full.)

21   BY MS. GAMBARDELLA:

22   Q.   Ms. Sparks, looking at what's what's been admitted as

23   Defendant's Exhibit L, there is a -- Judge, does everybody

24   feel comfortable not mentioning the student's name on the

25   record?

1          MR. ORLEANS:  We have no objection to that.

2     We're happy not to mention the student's name --

3          MS. GAMBARDELLA:  Okay.

4          MR. ORLEANS:  -- in the record.

5     BY MS. GAMBARDELLA:

6     Q.   There's an email from a student to you, March 5th,

7     "Hey, Coach, wanted to say how sorry I am about what

8     happened to your program.  Just wanted to let you know

9     that you are in my thoughts."

10         Did you receive this email on or about March 5th of

11    2009?

12    A.   Early, early morning, yes.

13    Q.   Was this young lady a student in your class?

14    A.   Yes.

15    Q.   What's the class that you teach?  What's the name of

16    the class?

17    A.   Sports Event Management.

18    Q.   Did you talk about this litigation in your class?

19    A.   No.

20    Q.   And so she tells you that she's sorry about what

21    happened to your program and your response is, "Thanks.

22    We won't go without a fight.  They cut volleyball and

23    elevated cheerleading which flies in the face of the

24    spirit of Title IX.  My mom could be a cheerleader but not

25    an athlete.  It's been a long day and I know I'll have

1    lots of stories for all of you in class."

2        Did you write that?

3    A.   Yes.

4    Q.   Is this young lady a member of the cheer team?

5    A.   Yes.

6    Q.   You think that's appropriate to write to a student?

7    A.   Yeah, I don't think there's anything wrong with that.

8    Q.   Do you have any idea how she felt when she got that?

9    A.   I was responding to her.  I mean maybe it wasn't

10   clear what I meant by the, my mom and a cheerleader and

11   I'm happy to explain it, but I don't think I said anything

12   mean to her.

13   Q.   Why didn't you just say thank you?

14   A.   It was one o'clock in the morning and less than 12

15   hours after I just found out.  It was really a nice email

16   to get from a student.  I didn't even know she was a

17   cheerleader at the time but that's irrelevant.  And I

18   responded.

19   Q.   And what does "I will have lots of stories for all of

20   you in class" mean?

21   A.   It just meant that it had been a long day, I'm tired,

22   I have no idea what's going on and, you know, it was just

23   a reference to stories.

24   Q.   You meant about this litigation, didn't you?

25   A.   No, I did not.

1    Q.    Okay.  Now, let's talk about your testimony about

2    EADA reports.  What is your understanding of the number of

3    participants that is to be reported on EADA reports?

4    A.    I'm sorry, I wasn't very focused.  Could you ask me

5    that again, please?

6    Q.    What is your understanding, if you have one, about

7    the appropriate number of athletic participants that is to

8    be reported on an EADA report?

9    A.    Number of participants on -- on your first date of

10   competition.

11   Q.    On your first day of competition.  And would you

12   agree with me that squad sizes change over the course of a

13   season for a variety of reasons?

14   A.    Correct.

15   Q.    Do you have an understanding of whether or not

16   schools are required to modify their EADA report figures

17   throughout the season as these numbers change?

18        MR. ORLEANS:  Objection.  Lack of foundation,

19   Your Honor.  She doesn't -- the witness doesn't complete

20   the EADA reports, doesn't submit the information.  She's

21   not responsible for that.

22        MS. GAMBARDELLA:  Well, she felt comfortable

23   telling us that the EADA reports show that the University

24   doesn't comply with Title IX.  I think I'm entitled to

25   peruse her basis for that.

1            MR. ORLEANS:  I don't think that makes her an

2    expert on how you measure --

3            MS. GAMBARDELLA:  You're right, she's not an

4    expert.  You're right.

5            MR. ORLEANS:  We didn't offer her as an expert.

6            THE COURT:  It may be more efficient to just

7    bring this up through a witness, another witness.

8            MS. GAMBARDELLA:  I'm sorry?

9            THE COURT:  It may be more efficient to bring it

10    up through another witness.  Obviously she's --

11            MS. GAMBARDELLA:  That's fine.

12            THE COURT:  She's already indicated she has

13    essentially -- I don't want to overstate it, but not much

14    understanding of how these numbers are prepared.

15            MS. GAMBARDELLA:  Great.

16            THE COURT:  Is that fair?

17            THE WITNESS:  Fair.

18    BY MS. GAMBARDELLA:

19    Q.    Okay.  Had you ever made a complaint to the

20    University prior to this timeframe, we're talking March,

21    about Title IX compliance while you were there?

22    A.    No.

23    Q.    Did you know how to make a complaint if you had one?

24    A.    No.

25    Q.    Did you know who Tracey Flynn was?

1    A.    Yes.

2    Q.    Did you know what her job was?

3    A.    There's no written Title IX compliance like how you

4    go about doing it.  Here, people told me that's how you

5    would do it but no one specifically said this is how you

6    go about doing it.

7    Q.    Ms. Sparks, do you know what Tracey Flynn's

8    responsibilities were in 2007?

9    A.    Yes.

10   Q.    You knew where to ask for EADA reports, correct?

11   A.    I asked Jack for them, yes.

12   Q.    You knew where to go to ask for those documents,

13   correct?

14   A.    Yes.

15   Q.    And you got the documents off the website in which

16   they are publicly posted, correct?

17   A.    (Pause)

18   Q.    Or your lawyers did, right?

19   A.    Some of the numbers came off there.  I mean it's

20   really, when you go back looking, it's very difficult to

21   do that, but yes.

22   Q.    Well, I didn't -- I didn't ask you how difficult it

23   was.  What I'm asking is do you know whether or not your

24   attorneys got all off the website the posted EADA reports

25   for Quinnipiac University?

1    A.   I think they are on there from 2000.

2    Q.   And documents, additional EADA reports were produced

3    in this litigation, correct?

4    A.   Yes.

5    Q.   Do you know whether or not the golf coach was allowed

6    to retain his office through June 30th?

7    A.   Yes, he was.

8    Q.   And how do you know that?

9    A.   I asked Jack.

10   Q.   When you say that Jack took away your office, are you

11   suggesting that -- but you continued to teach, correct?

12   A.   Correct.

13   Q.   All right.  And so are you suggesting you had no

14   computer or phone or anything available to you in

15   connection with your teaching responsibilities?

16   A.   He said that I could -- how would you put it?  I had

17   said that I really needed the office for office hours

18   because I was required to offer office hours.  He had said

19   he would check with the provost to see if that was okay,

20   and I was told I could continue to come in to just do the

21   office hours.  And so we never had a further conversation

22   about whether or not he got approval.  I just quietly

23   would come into the room and leave quietly.

24   Q.   So you were allowed to do the office hours?

25   A.   I was.

1    Q.    Okay.  Now, let's talk about the cheer team at

2    Quinnipiac.  Have you ever coached the cheer team at

3    Quinnipiac?

4    A.    No.

5    Q.    Have you ever seen them practice?

6    A.    No.

7    Q.    Are you sure about that?

8    A.    Seen them practice?

9    Q.    Yes.

10   A.    I'm positive.

11   Q.    Have you ever seen Mary Ann Powers, the coach, train

12   them?

13   A.    No.

14   Q.    Never had a conversation with her about what you may

15   have observed in the training of the competitive cheer --

16   I'm sorry, the cheer team?

17          MR. ORLEANS:  Your Honor, before she answers, I

18   object to this line of questioning as beyond the scope of

19   the direct.  I don't recall any testimony from Ms. Sparks

20   about the cheer team.

21          MS. GAMBARDELLA:  I thought -- correct me if I'm

22   wrong -- she made a comment that competitive cheer is not

23   consistent with the spirit of Title IX, or something like

24   that.

25          THE COURT:  That was in the exhibit that you

```
 1   just admitted.  I'm not sure it was on direct.
 2           MS. GAMBARDELLA:  No, it was something -- Your
 3   Honor, it was definitely something else.  It was
 4   testimony.  The exhibit I admitted --
 5           THE COURT:  Well, fine, whatever.  I don't think
 6   it's a big deal.
 7           MR. ORLEANS:  I just, I think that a line of
 8   questioning about the cheer squad, we're going to have the
 9   coach of the cheer squad here to testify and she can
10   testify about the cheer squad.
11           MS. GAMBARDELLA:  If this witness wasn't
12   competent to testify about the cheer squad -- and I'm
13   sorry, I remember them eliciting testimony that she said
14   to somebody --
15           THE COURT:  Fair enough.  Ask your question.  I
16   don't see a problem.  I'm going to overrule the objection.
17   I don't see a problem asking this line of questioning.
18   BY MS. GAMBARDELLA:
19   Q.   Have you ever spoken with -- I'm sorry if I got an
20   answer already.  I lost track.  Have you ever spoken with
21   Mary Ann Powers about what you observed during her
22   training or practice sessions with the competitive cheer
23   team?
24   A.   No.
25   Q.   I think that -- have you seen any competitive cheer
```

1    events in which Quinnipiac cheer team members have

2    participated?

3    A.    Yes.

4    Q.    What ones have you seen?

5    A.    The videos online.

6    Q.    Do you know whether or not they have competed

7    nationally with other competitive cheer teams, with other

8    university competitive cheer teams?

9    A.    Do you mean --

10   Q.    Do you know if Quinnipiac's cheer team has been in

11   competition with other universities' competitive cheer

12   teams?

13   A.    I know they've been in competitions with cheer teams

14   that compete.

15   Q.    What's the difference?

16   A.    Well, there are sideline cheer teams that happen to

17   compete.

18   Q.    Is it your contention that the competitions in which

19   the Quinnipiac cheer team has participated is only

20   sideline cheer competitions?

21   A.    I wouldn't know that.

22   Q.    Do you know any details about the training they

23   undergo in order to be able to compete?

24   A.    Nope.

25   Q.    Are you saying that they are not athletes?

1    A.    Nope.

2    Q.    Do you have any knowledge of the level of expressed

3    interest at Quinnipiac in having a varsity level

4    competitive cheer team?

5    A.    No.

6    Q.    If competitive cheer activities are not an NCAA

7    sponsored sport, do you know whether or not Tracey Flynn

8    would have responsibility to understand the details of

9    those activities at Quinnipiac before the elevation of

10   varsity?

11   A.    I don't know how they were being overseen.

12   Q.    Men's lacrosse is not part of the NCAA -- it's not a

13   NEC recognized sport or part of the averages, correct?

14   A.    They are not a member of the NEC.

15   Q.    I just want to briefly revisit Exhibit 8, and if I

16   can have a minute, Your Honor.

17        (Pause)

18        Focusing strictly on Q. U. current and Q. U. proposed

19   columns, right?  Q. U. current would be academic year to

20   '08-'09, the one we just finished, correct?  It's your

21   chart, right?

22   A.    Yeah --

23             MR. ORLEANS:  Your Honor, would Ms. Gambardella

24   please let the witness answer the question?  She was

25   looking at the chart.  Give her time, please.

```
 1              MS. GAMBARDELLA:  I will, I'm sorry.  I'm

 2    obviously getting too interested in time crunches here.

 3    BY MS. GAMBARDELLA:

 4    Q.    I apologize, Ms. Sparks.  Does Q. U. current in that

 5    column refer to this academic year we've just finished?

 6    A.    The chart that they supplied, yes.

 7    Q.    I'm sorry?

 8    A.    The chart that Quinnipiac gave for '08-'09.

 9    Q.    No, I'm talking about Exhibit 8 --

10    A.    Right.

11    Q.    -- which you compiled.

12    A.    There was a chart that the University supplied that

13    showed '08-'09 numbers and that's where that came from.

14    Q.    So, Q. U. current on your chart reflects the

15    Quinnipiac's numbers from '08 to '09?

16    A.    Yes.

17    Q.    Great.  Now, just running down the comparisons of

18    Q. U. current to Q. U. proposed, correct?

19    A.    Uh huh.  (Affirmative.)

20    Q.    Baseball men's 27, and the proposed is only two spots

21    different, do you see that?

22    A.    Yes.  I'm sorry.

23    Q.    Basketball is going to remain the same, see that?

24    A.    Yes.

25    Q.    Cross country, one spot down, correct?
```

1    A.    Yes.

2    Q.    Golf's been eliminated?

3    A.    Correct.

4    Q.    Ice hockey is the same?

5    A.    Correct.

6    Q.    Lacrosse is going to lose four men's spots?

7    A.    Correct?

8    Q.    Soccer, two?

9    A.    Yes.

10   Q.    Tennis going to gain one?

11   A.    Yes.

12   Q.    Indoor track is going to lose six men's spots,

13   correct?

14   A.    Correct.

15   Q.    And outdoor track's being eliminated.

16         Running down women's, basketball is going to remain

17   the same, correct?

18   A.    Correct.

19   Q.    Cross country is going to gain five womens spots,

20   correct?

21   A.    Correct.

22   Q.    Field hockey will lose one spot; ice hockey, two;

23   lacrosse, the same; soccer will gain one; softball will

24   lose three; tennis will gain three; and so on and so

25   forth.  Do you see that?

A.    Yes.

Q.    Okay.  What information do you have about the teams'
ability to play during this, any of these teams' ability
to play with those numbers this past year that we've just
completed?

        MR. ORLEANS:  Objection, Your Honor.
Foundation.  I don't understand the question either.

        MS. GAMBARDELLA:  Well, this witness has made a
claim that I understand that because these roster numbers
are not the same as the averages, that that's somehow
probative as to whether or not you should find they are
realistic.  If I'm wrong about that, I'm willing to
withdraw the question.

        MR. ORLEANS:  Your Honor, I don't know that this
witness has made any claim.  We put this -- this is
information, the data that she complied and put into chart
form.  We put the information in through her but she has
not made a claim.  We'll make our argument from the chart
at the appropriate time.

        MS. GAMBARDELLA:  I'll withdraw the question.

BY MS. GAMBARDELLA:

Q.    Do you have any information regarding Quinnipiac's
teams as reflected by that chart the academic year we've
just completed and whether or not those were actually the
number of athletic participation opportunities that

```
1    existed as of the point recommended by the document you

2    took these numbers from?

3    A.   I'm not quite sure what you're asking, I'm sorry.

4    Q.   I'll withdraw the question.

5         MS. GAMBARDELLA:  I have no further questions.

6    REDIRECT EXAMINATION

7    BY MR. ORLEANS:

8    Q.   Coach Sparks, you were asked about the relationship

9    between assurances you received from Mr. McDonald about

10   Quinnipiac's commitment to volleyball and when you signed

11   your employment agreement.  Do you recall that?

12   A.   Yes.

13   Q.   And I thought I heard you say that you got assurances

14   both before and after you signed the first contract?

15   A.   Yes.

16   Q.   Okay.  Could you just elaborate a little bit on what

17   assurances you received from Mr. McDonald after you signed

18   your first employment contract?

19   A.   Well, we have our review at the end of the year, so

20   last year my review, he talked about how pleased he was

21   with the progress we were making.  He gave me a really

22   great review except for our record, which he understood I

23   didn't have a full team so it was kind of hard.  He

24   reiterated that I was making the progress that they wanted

25   to see and to continue to make that progress and that they
```

1    were supportive of our program.

2    Q.   And that was before you signed your second employment

3    contract?

4    A.   Yes.

5    Q.   Okay.  Did you receive any further assurances from

6    Mr. McDonald about Quinnipiac's commitment to the

7    volleyball program after you signed your second contract?

8    A.   He -- I think there was, between he and it may have

9    been Bill Mecca, just so incredibly pleased once the

10   athletes got here on the increased level of

11   competitiveness.  I got a commitment from an athlete at

12   the end of February that I know Billy and Tracey were both

13   really excited about because of how it was going to help

14   our program in the future, and they were really excited

15   and pleased with where I was taking the program and

16   looking forward to seeing how we were going to do once

17   those kids grew up.

18   Q.   Did they say anything about your being able to be at

19   Quinnipiac longer than just one more year?

20   A.   Well, they --

21            MS. GAMBARDELLA:  Objection, leading.

22   A.   I'm sorry?

23            MS. GAMBARDELLA:  Leading.

24            MR. ORLEANS:  I'll rephrase.

25

1    BY MR. ORLEANS:

2    Q.   Did they give you any reassurances about your

3    continued employment?

4    A.   They were looking forward to seeing how I would

5    develope the freshmen when they were seniors.  They were

6    really looking forward to seeing them further develop.

7    Q.   And how about from Mrs. Flynn; did Tracey Flynn give

8    you any further assurances?

9    A.   I think there were the same type of comments there.

10   You know, these were student athletes who were great as

11   students and just really good kids and had made huge

12   strides from what anybody had seen in volleyball at

13   Quinnipiac, so people were excited to see how competitive

14   they would be once they got older and more experienced.

15   Q.   Now, you said you were aware that the men's golf

16   coach was not renewed?

17   A.   Correct.

18   Q.   Okay.  If you know, was the men's golf coach a

19   part-time or full-time employee?

20   A.   Part-time.

21   Q.   You also testified on cross that your roster

22   management target for the current year was 15, is that

23   correct?

24   A.   Yes.

25   Q.   And did you consider that to be a realistic target

1    for the size of your squad this year?

2    A.   I would like -- well, I think it might have been hard

3    to get to 15 this year.  That's a number I would have

4    liked to carry, 15 or 16, frankly.

5    Q.   You would.  Okay.  All right.

6         Now, you testified in response to Ms. Gambardella's

7    questions that you did express to some people in the days

8    immediately after you learned the program would be cut

9    that you were hurt and angry and upset, correct?

10   A.   Yes.

11   Q.   Did you tell any of those people that you were

12   planning to file a lawsuit?

13   A.   No.

14   Q.   Okay.  And do you still have Plaintiff's Exhibit L in

15   front of you?

16   A.   Yes.

17   Q.   I'm sorry, that's Defendant's Exhibit L, I apologize.

18        Now, at the time that you sent this, that you sent

19   the email which is contained in Plaintiff's Exhibit L

20   (sic) on March the 5th, had you contacted counsel?

21   A.   No.  It was 1:00 o'clock in the morning.

22   Q.   Okay.  And did you know whether the student who had

23   emailed you and to whom you were responding was a member

24   of the cheerleading squad?

25   A.   No, I did not know.

1    Q.   Since March 5th, have you had any interactions with

2    this student?

3    A.   Yes.

4    Q.   Could you describe those interactions?

5    A.   She's in my class.  She's a good student.  She

6    recently emailed me about obtaining an internship and

7    asking for some paperwork that I had, which I gave her.  I

8    mean I have interactions with her like I did any of my

9    other students.

10   Q.   Now, you said in this email to her that cutting

11   volleyball and elevating cheerleading flies in the face of

12   the spirit of Title IX.  Did you think that she would know

13   what you were referring to when you mentioned Title IX?

14   A.   I always assume kids know what Title IX is but that

15   may have not been the case.

16   Q.   Had you discussed Title IX in your class?

17   A.   Not in that class, no.

18   Q.   Had you discussed Title IX in some other class?

19   A.   Yes.

20   Q.   In what other class had you discussed Title IX?

21   A.   I've been asked the last two years to be a guest

22   lecturer in a study class about gender issues and the

23   like.

24   Q.   All right, and was this student in any of those

25   classes, if you know?

1    A.    No, I don't think so.

2    Q.    Okay.  When you said in this email my mom could be a

3    cheer leader but not an athlete, what did you mean?

4    A.    My mom wanted to be a basketball player really bad.

5    Believe it or not, my grandmother played scholastic

6    basketball in Waneta, Illinois, and that's what my mom had

7    wanted to do.  But in her high school, the only option if

8    you wanted to do anything athletic was to be a cheerleader

9    or a drum major and she couldn't be a basketball player.

10         To me, Title IX was about giving women opportunities

11   beyond that.  That's what people were fighting for, so

12   that, you know, I could be a volleyball player, basketball

13   player, a cross country track runner, all those things,

14   and when they said they were getting rid of our sport and

15   elevating cheerleading, to me that seemed like we were

16   taking a step backwards on Title IX.  That's what my mom

17   already could do and not what I was doing right now.

18   Q.    And did you ever talk about this lawsuit in your

19   Sport Events Management class?

20   A.    No.

21   Q.    Incidentally, were you a cheerleader in high school?

22   A.    I was.  I actually come from a family of cheerleaders

23   and I did not cheer in high school because you could not

24   cheer and play volleyball or another sport at the same

25   time.  But I did go to cheerleading camp and I did compete

1    when I was in junior high and my sister competed all the

2    way up through her varsity year.

3    Q.   Thank you.

4            MR. ORLEANS:  Nothing further.

5            MS. GAMBARDELLA:  Very quickly.

6    RECROSS EXAMINATION

7    BY MS. GAMBARDELLA:

8    Q.   Do you know whether or not over the past few years

9    the number of athletic opportunities provided to women

10   have increased at Quinnipiac?

11   A.   In terms -- like --

12   Q.   Numbers?

13   A.   EADA or --

14   Q.   No, the actual numbers of athletic participation

15   opportunities in the past few years, have they increased

16   at Quinnipiac?

17           MR. ORLEANS:  Your Honor, I object to the

18   question.  The defense has attempted strenuously to keep

19   out any information that goes back before 2007, 2008.  I

20   don't think it's fair to ask this witness about the "past

21   few years" because of that.

22           MS. GAMBARDELLA:  That's what I meant.  I'm

23   sorry.

24   BY MS. GAMBARDELLA:

25   Q.   2007.  Have the number of total athletic

1    participation opportunities for women at Quinnipiac

2    overall increased, if you know?

3    A.    From 2007 to 2008?

4    Q.    Yes.  Do you know?

5    A.    From -- because the official reports aren't out, you

6    wouldn't know if the 2007, 2008 went up to 2008, 2009.

7    Q.    So, that's your way of telling me you don't know,

8    correct?

9    A.    The information is not available, no.

10   Q.    So, you don't know from any other source, correct?

11   A.    I would have to have those numbers in front of me,

12   those reports, to know offhand.  I'm sorry.

13   Q.    You don't have to apologize.  "I don't know" is a

14   perfectly acceptable answer.

15        And one last question:  You didn't give all that

16   history about your mom in the email, right?

17   A.    No.  It was 1:30 in the morning.

18              MS. GAMBARDELLA:  No further questions.

19              MR. ORLEANS:  Nothing further, Your Honor.

20              THE COURT:  Thank you, you're excused.

21              (Witness excused.)

22              MR. ORLEANS:  Your Honor, could I -- before we

23   continue, could I ask about scheduling?  It's 4:20.  Our

24   next witness, as I've discussed with counsel, would be

25   Mr. McDonald.  I don't know if we'll finish him.  I don't

1    know whether cross of Mr. McDonald would become a direct

2    of Mr. McDonald.

3         MS. GAMBARDELLA:  I think that's what we

4    discussed.

5         MR. ORLEANS:  We discussed that in chambers and

6    I don't know how much time you have available for us

7    tomorrow.

8         THE COURT:  Well, I was really hopeful we would

9    finish today.  Obviously we're far from that.  Tomorrow I

10   have hearings at 11:00 and 2:00, which could last anywhere

11   from 20 minutes to an hour each.  Otherwise the day is

12   open.  So --

13        MR. ORLEANS:  May counsel and I have a moment to

14   confer?

15        (Pause)

16        MR. ORLEANS:  All right, Your Honor, counsel

17   proposed that we would start Mr. McDonald now, get a

18   little ways with him at least, and then continue tomorrow

19   morning at 9:30 and we'll just be willing to recess while

20   you take care of the other business that's before the

21   court.  And if it's okay with the court, then we'll

22   continue, you know, when the court's available.

23        THE COURT:  All right, that's fine.  That's

24   certainly what I would suggest.  I wouldn't want to waste

25   the time that we have today.

1          But help me understand where we are in

2   plaintiff's case in general.

3          MR. ORLEANS:  Well --

4          THE COURT:  You have, in effect, Mr. McDonald

5   and your expert?

6          MR. ORLEANS:  Correct.

7          THE COURT:  And also the possibility of the

8   softball coach?

9          MR. ORLEANS:  Right, possibly.  The expert's

10  testimony is obviously key.  We haven't all had time to do

11  our designations and cross designations.  We'll try to

12  work out for you what we can agree to and what we don't

13  agree to.  Through Mr. McDonald, I'd like to get some

14  parts of the plaintiff's case.  I also anticipate the

15  cross of Mr. McDonald after his direct testimony.  But

16  Mr. McDonald, I think, will essentially conclude the

17  plaintiff's case, reserving the right to call the coach

18  once we see how the rest of the evidence comes in.

19          THE COURT:  Okay.  The live case, meaning --

20          MR. ORLEANS:  Yes.

21          THE COURT:  All right, fair enough.

22  Mr. McDonald?

23          MR. ORLEANS:  The plaintiff calls Mr. McDonald.

24          MS. GAMBARDELLA:  He'd like to bring his water.

25  Is that all right?

1          THE COURT:  Fine.  Please raise your right hand.

2   J O H N      M C D O N A L D,     called as a witness on

3   behalf of the Plaintiffs, having been duly sworn by the

4   Court, testified as follows:

5          THE COURT:  Very good.  Please be seated.

6          MR. ORLEANS:  If you'll indulge me, I just need

7   a minute to get myself together.

8   DIRECT EXAMINATION

9   BY MR. ORLEANS:

10  Q.   Good afternoon, Mr. McDonald.

11  A.   Good afternoon.

12  Q.   Do you have the notebook of the plaintiff's exhibits

13  before you?

14  A.   Yes.

15  Q.   Would you take a look at Exhibit 3, please?  Could

16  you just explain to the court what that document is?

17  A.   This appears to be a response letter from Janet Judge

18  to you about this case.

19  Q.   And you say it appears to be.  Mr. McDonald, didn't

20  you, in fact, submit a declaration to the court

21  authenticating a copy of this --

22  A.   Yes.

23  Q.   -- document?  So can I call your attention to the

24  second page?  See the chart there on the second page?

25  A.   Yes.

1    Q.   What's reflected in that chart?

2    A.   This is the proposed rosters for 2009-10.

3    Q.   When you say proposed rosters, can I use the term

4    roster management targets?

5    A.   Yes.

6    Q.   Okay.  And these are the roster management targets

7    for the varsity teams at Quinnipiac for 2009, 2010, is

8    that right?

9    A.   Yes.

10   Q.   With respect to the -- well, withdrawn.

11        Actually could you take a look at Exhibit 2, please?

12   See Exhibit 2, Mr. McDonald?

13   A.   Yes.

14   Q.   Do you recognize that document?

15   A.   Not really.  I think this comes from -- it's not

16   something I generate.  It does look like the numbers are

17   accurate.

18   Q.   Okay.  Looking at the first column --

19   A.   Yes.

20   Q.   -- which has the letters in it, are those

21   abbreviations for sports teams?

22   A.   Yes.

23   Q.   And this is a document that's produced in the

24   Athletic Department at Quinnipiac; you know that much,

25   don't you?

1    A.   Yes.

2    Q.   And do the -- then the second column, that's labeled

3    participation?

4    A.   Yes.

5    Q.   What are those numbers?

6    A.   This is a -- some of the current numbers on our teams

7    probably from the first day of competition squad list.

8    Q.   So, as far as you know, are these the numbers that

9    Quinnipiac expects to report on its EADA report in the

10   Fall 2009 for the 2008-'09 academic year?

11   A.   Yes.

12   Q.   In fact, that is the title of the document, isn't it?

13   A.   Yes.

14   Q.   Okay.  Now, I just wonder if we could compare the

15   participation numbers on Exhibit 2 with the roster

16   management targets on Exhibit 3.  I take it -- I'm going

17   to target -- work from Exhibit 2.  MBA is men's baseball?

18   A.   Correct.

19   Q.   27 players on the squad on the first day of

20   competition?

21   A.   That is correct.

22   Q.   When was the first day of competition?

23   A.   Usually in baseball it's the second, third week in

24   September.

25   Q.   So, you do that back in the Fall?

```
1    A.    Yes.

2    Q.    Even though the game is mostly played in the

3    Spring?

4    A.    Most sports are in the Fall even though they might

5    have their championship season in the Spring.

6    Q.    And so the participation number for baseball for

7    this, for the current year is 27 and the roster target

8    next year is 25, correct?

9    A.    Yes.

10   Q.    For basketball, it's 15 and 15, correct?

11   A.    Correct.

12   Q.    For men's cross country, participation this year was

13   13 and the target for next year is 14, correct?

14   A.    Correct.

15   Q.    For men's ice hockey, participation this year was 32

16   and the target for next year is 28?

17   A.    Correct.

18   Q.    For men's lacrosse, participation this year was 39,

19   and the target for next year is 36?

20   A.    Correct.

21   Q.    For men's soccer, participation this year was 25 and

22   the target for next year is 23?

23   A.    That's right.

24   Q.    For men's tennis, participation this year was 11 and

25   target for next year is ten, correct?
```

1    A.    Correct.

2    Q.    Okay.  And then I can't -- what's the line in that's

3    shaded in?

4    A.    Looks to me like --

5    Q.    Men's track indoor and men's track outdoor?

6    A.    That's right.

7    Q.    Okay.  Men's track indoor, participation this year

8    was 22 and the target for next year is 14?

9    A.    That's right.

10   Q.    And for outdoor track, participation this year was

11   20, and and that's being eliminated for next year,

12   correct?

13   A.    That's right.

14   Q.    Now, just with respect to the athletes -- and I'm not

15   trying to engage in a discussion about how you count

16   participation opportunities but I just would like to know

17   whether there is overlap among the athletes who run men's

18   cross country, men's indoor track and men's outdoor track?

19   A.    What do you mean by overlap?

20   Q.    Are there some athletes who run all three?

21   A.    There's some.

22   Q.    Are there some athletes who run two of the three?

23   A.    Yes.

24   Q.    And are there some who run only one of the three?

25   A.    Correct.

1    Q.   Now, after the first day of competition, when --

2    well, withdrawn.

3         On the first day of competition, you count squad size

4    for purposes of the EADA reports, correct?

5    A.   And the NCAA requires the squads to submit it before

6    the first day of competition.

7    Q.   So for both, you have to have a -- you have to make a

8    count on the first day of competition, correct?

9    A.   Correct.

10   Q.   And that, those -- those are the numbers that you

11   report on the EADA, am I right?

12   A.   That's the instructions of the EADA, that's their

13   instructions.

14   Q.   Okay.  After the first day of competition, players

15   may be dropped from a squad, correct?

16   A.   Anything could happen, yes.

17   Q.   Okay.  Players may be added to a squad?

18   A.   That is correct.

19   Q.   Correct.  And there's no requirement that that be

20   reported to the EADA?

21   A.   It's not in their instructions.

22   Q.   Okay.  Would you agree with me, Mr. McDonald, that

23   if -- just taking a hypothetical example, if the EADA

24   report for men's baseball reflects that there were 27

25   participants on the first day of competition, but in

1    reality -- withdraw.  I'm going to phrase this properly.

2        Would you agree with me, Mr. McDonald, that if the

3    EADA report for men's baseball -- and this is a

4    hypothetical question, I'm not claiming that these are

5    real numbers -- but if the EADA report for men's baseball

6    reports 25 athletes on the first day of competition and

7    sometime after the first day of competition several

8    athletes are dropped from the squad and do not play, that

9    the EADA report is not providing an accurate measure of

10   actual participation?

11   A.   I can't say that is true.  The EADA is what it is and

12   we do what we're asked to do.

13   Q.   Okay.  All right.  Now, you have some familiarity

14   with Title IX, do you not?

15   A.   Little bit.

16   Q.   Is compliance with Title IX part of your

17   responsibility as Athletic Director at Quinnipiac?

18   A.   Yes.

19   Q.   If I refer to prong one of the Title IX test, do you

20   know what I mean?

21   A.   Yes.

22   Q.   What's your understanding of what prong one is?

23   A.   Proportionally, the proportions are the same as the

24   University's gender proportions.

25   Q.   And when you say the University's general

1    proportion --

2    A.    Gender.

3    Q.    Gender proportions.

4    A.    Yes.

5    Q.    So, would I be correct to say that prong one requires

6    that the proportion of women and men, women's and men's

7    participation opportunities in varsity intercollegiate

8    athletes should be the same as the proportions of women

9    and men in the undergraduate student body -- full-time

10   undergraduate student body, if I could add that?

11   A.    To meet prong one, it's not a requirement of prong

12   one; it's a requirement to meet one of the three prongs.

13   Q.    Okay.

14   A.    But prong one is do you meet gender proportions.

15   Q.    Okay, and is the description I just gave of gender

16   proportions, is that an accurate description?

17   A.    Yes.

18   Q.    Now, would you agree that Quinnipiac University is

19   not in compliance with prong one in its athletic programs

20   this year?

21   A.    '08-'09?

22   Q.    '08-'09, yes.

23   A.    Yes.

24   Q.    And would you agree that Quinnipiac University was

25   not in compliance with prong one in, in the previous year,

1   2007, 2008?

2   A.   Yes.

3   Q.   Would you agree that Quinnipiac University has not

4   added a women's sport since it added ice hockey in 1998?

5   A.   I think that the year is off.

6   Q.   Okay.

7   A.   I think we added the tracks in '98-'99 and the

8   women's ice hockey was around somewhere 2001, 2002.

9   Q.   I need the second volume of original plaintiff's

10  exhibits.   Thank you.

11       Mr. McDonald, I'm showing you what has been marked as

12  Plaintiff's Exhibit 37 for identification.   Do you see

13  that?

14  A.   Yes.

15  Q.   The front page says Quinnipiac University NCAA

16  Certification, Self Study, Final Report, May 2006?

17  A.   That is correct.

18  Q.   Do you recognize that document?

19  A.   Yes, I do.

20  Q.   What is it?

21  A.   It's the self-start required by the NCAA Division I

22  institutions to go through a Division I certification.

23  Used to be every five years, now it's every ten.   But we

24  just completed this process in May of 2006.

25  Q.   Okay.   And what does that mean, Division I

1    certification?

2    A.   It's a requirement that the NCAA has asked Division I

3    members to go through a self study and a peer review visit

4    to make sure that your basic philosophies and policies are

5    in sync with the NCAA.

6    Q.   How long has Quinnipiac been a Division I school?

7    A.   This is our tenth year.

8    Q.   And, in fact, you were on the steering committee that

9    conducted this study, correct?

10   A.   Yes.

11   Q.   And this is a document created as part of the

12   business of the University to comply with NCAA rules?

13   A.   Yes.

14   Q.   And it's available to the public on the Quinnipiac

15   University website, is it not?

16   A.   Yes.

17        MR. ORLEANS:  Your Honor, I'd offer this as a

18   full exhibit.

19        MS. GAMBARDELLA:  Your Honor, in terms of the

20   purpose of this exhibit, here's what I understand or I

21   think I understand plaintiffs are about to do.

22        They are going to set out to prove, I think,

23   that in prior years -- we already admitted on the record

24   that we did not rely on prong one for compliance with

25   Title IX for this year we're just finishing and last year,

1    and I think what he's going to try to do is prove

2    noncompliance with any of the other two prongs in the

3    prior two years.  There are two reasons why that is not

4    pertinent.

5            Whether or not it's pertinent with whether or

6    not we comply with prongs two or three has nothing to do

7    with whether or not we can achieve proportionality for the

8    upcoming year, number one.  And, number two, these

9    plaintiffs don't have standing, at least not at this

10   procedural stage, to adjudicate prior compliance in prior

11   years.  No one's complained about that in the complaint.

12   No one has articulated standing for adjudicating those

13   issues.

14           THE COURT:  Well, what's the purpose of the

15   exhibit?

16           MR. ORLEANS:  At the moment, Your Honor, the

17   purpose of the exhibit is a chart that appears on page 111

18   that shows when Quinnipiac added various sports.  If I

19   could just ask Mr. McDonald how long it's been since they

20   added a woman's sport, we're not sure about what year ice

21   hockey was added, and there's a chart that's going to show

22   that.

23           But more generally, Your Honor, to respond to

24   the objection, as the court knows from the discussions

25   that we've had previously, you know, it's our position

1    that the University's current noncompliance with Title IX,

2    as well as its historic noncompliance with Title IX, are

3    relevant and material facts for the court to consider in

4    deciding whether the promise of compliance for the Fall is

5    adequate to defeat our claim for injunctive relief.  And

6    I'm fully aware the court's rulings, we're not planning to

7    go deep into the past and I'm not planning to question

8    this witness extensively about prongs two and three.  At

9    the moment I just wanted to get in something about the

10   University's history of adding women's sports.

11          MS. GAMBARDELLA:  Your Honor, he's seeking to

12   refresh the witness's recollection with this particular

13   chart as to when they added -- was it women's ice hockey?

14          MR. ORLEANS:  Yes.

15          MS. GAMBARDELLA:  Okay.  I'm changing my

16   objection to one of relevance to adjudicating prong two.

17   I don't have an issue with that.  I'm not sure why we have

18   to move in the whole document.

19          THE COURT:  For now can we stipulate that

20   woman's ice hockey was added as a sport at Quinnipiac in

21   1998?

22          THE WITNESS:  I -- could I say something?

23          THE COURT:  Well, I was asking the lawyers a

24   question.

25          THE WITNESS:  Oh.

1          MS. GAMBARDELLA:  I don't know that I can

2     because he just testified to one year and, in fact, we

3     looked, you know, so I don't know if there's another

4     explanation for the year in this chart.  And he can

5     testify to that.

6               THE COURT:  Have you looked at the chart, sir?

7               THE WITNESS:  Yes.

8               THE COURT:  All right.

9               MS. GAMBARDELLA:  Thank you.

10    BY MR. ORLEANS:

11    Q.   Mr. McDonald --

12              THE COURT:  I'm going to hold -- I'm not going

13    to admit the document.

14              MR. ORLEANS:  Hold in abeyance for the moment?

15    Okay.

16              THE COURT:  Yes.  So I'm not going to rule yet

17    on the objection, but I'm not going to let you have it in

18    yet.

19    BY MR. ORLEANS:

20    Q.   Mr. McDonald, do you recall specifically when women's

21    ice hockey became a varsity sport at Quinnipiac?

22    A.   Well, yes.  Their first varsity game was, pretty sure

23    it was 2001, 2002.

24    Q.   Okay.

25    A.   The announcement may have occurred specifically when

1    we made the time announcement of the elevation of both

2    men's and women's ice hockey to sports emphasis, and I

3    think that's where this 1998 came from, but I can't --

4    Q.   Well, we'll just come back to this at a later time.

5         Mr. McDonald, would you agree with me that as of

6    March 4th of this year there was sufficient interest and

7    ability in the current student body and in the likely

8    incoming class at Quinnipiac to field the varsity

9    volleyball team?

10   A.   Yes.

11   Q.   And is it the case that Quinnipiac University did not

12   consider competitive cheer a varsity sport before

13   March 4th, 2009?

14   A.   No.

15           THE COURT:  Let me just go back so the record's

16   completely clear, your prior question about volleyball had

17   to do obviously with women's volleyball.

18           MR. ORLEANS:  Yes, it did.

19           THE COURT:  That's how you understood it?

20           THE WITNESS:  Yes.

21           MR. ORLEANS:  Thank you, Your Honor.

22   BY MR. ORLEANS:

23   Q.   Mr. McDonald, when did Quinnipiac first consider

24   competitive cheer a varsity sport?

25   A.   Well, it's been with us for the 14 years I've been

1     Athletic Director.  You just mentioned the document here a

2     second ago through the process, that we are very aware

3     that we have a commitment to increase our opportunities

4     for women, and that through this process there was a

5     number of sports that were considered that we could or

6     should add, and we did a significant amount of

7     investigation about, in this case, competitive cheer.

8     Q.   I don't think you've quite answered my question,

9     Mr. McDonald.  Let me try and rephrase it.

10         When did Quinnipiac University first hold out cheer,

11    competitive cheer, as a varsity intercollegiate sport?

12    A.   When we first discussed it.

13    Q.   No, when did you first hold it out -- isn't it the

14    case -- withdrawn.  I'll rephrase it one more time.

15         Isn't it the case, Mr. McDonald, that on March 4th or

16    perhaps March 5th of this year, in 2009, Quinnipiac

17    announced to its students and to the world that it was

18    elevating cheerleading to the status of a varsity sport?

19    A.   That is correct.

20    Q.   And isn't it also the case that Quinnipiac had never

21    before March 4th or March 5th of this year announced to

22    its students and to the world that it was elevating

23    cheerleading to the status of a varsity competitive sport?

24    It's a yes or no question, Mr. McDonald.

25              MS. GAMBARDELLA:  Well, Your Honor, that's

```
1    not -- if he can't answer it yes or no, he should be

2    permitted to explain his answer.

3              MR. ORLEANS:  I think he could do that on his

4    examination by defense counsel.

5              THE COURT:  He can say by way of answering the

6    question yes or no -- it's either yes or no or I can't

7    truthfully answer that yes or no.  Those are the options.

8              THE WITNESS:  Well, I'll take option three, I

9    can't --

10   BY MR. ORLEANS:

11   Q.   You can't answer that yes or no?

12   A.   Correct.

13   Q.   Okay.  Now, with respect to the University's plans

14   for the upcoming academic year as reflected in Attorney

15   Judge's letter, which is Exhibit 3, you're eliminating

16   men's golf?

17   A.   Yes.

18   Q.   And does that mean that the men's golf coach has lost

19   his job?

20   A.   Yes.

21   Q.   Was he a full-time or part-time coach?

22   A.   Part-time.

23   Q.   And you're eliminating men's outdoor track, correct?

24   A.   Yes.

25   Q.   And are there any coaches losing their jobs in
```

1   connection with that?

2   A.   Yes.   There's a possibility of a part-time track

3   coach losing their job.

4   Q.   How are the track teams, men's and women's, currently

5   coached?

6   A.   There's one full-time person for all six sports with

7   a series of six part-time people.   Part-time male and

8   female cross country, part-time male and female indoor

9   track, and part-time male and female outdoor track, for a

10  total of six.

11  Q.   And is it your testimony then that one of those six

12  part-time coaches may be let go in connection with the

13  elimination of indoor track?

14  A.   Yes.

15  Q.   Or outdoor track, excuse me.   So, Coach Sparks is the

16  only full-time coach who has lost her job as a result of

17  this reorganization?

18  A.   There has been a significant amount of other full

19  time employees but Robin is the only full-time coach.

20  Q.   Only full-time coach.

21       Now, Mr. McDonald, is there currently an approved

22  budget for varsity sports at Quinnipiac for the upcoming

23  academic year?

24  A.   It will actually be tomorrow.

25  Q.   Okay.

1    A.   The trustees approve the University budget tomorrow,

2    May 12th.

3    Q.   Okay.  And are you familiar with the budget that the

4    trustees are expected to approve?

5    A.   Yes.

6    Q.   Okay.  Could we mark this as 30-A for identification,

7    please?  Plaintiff's.

8            (Hands witness.)

9            MR. ORLEANS:  Your Honor, just parenthetically

10   this is a document that was produced after the pretrial

11   conference on Thursday which is why it didn't already

12   appear on the plaintiff's list.

13   BY MR. ORLEANS:

14   Q.   Mr. McDonald, showing you what we've marked as

15   Plaintiff's Exhibit 38 for identification, do you

16   recognize that?

17   A.   Yes.

18   Q.   Tell me what it is, please?

19   A.   This is the budget that we submitted to the finance

20   office for approval and discussion over the last few

21   months.

22   Q.   Okay.  So there's, there's a column that says

23   approved 2008, 2009 budget; is that the budget for the

24   current academic year?

25   A.   Yes.

1    Q.   You see the column I'm talking about?  And then

2    there's a column that says nine, ten, proposed?

3    A.   Yes.

4    Q.   The next column over, you see that one?

5    A.   Yes.

6    Q.   And then there's, then the next column which is

7    shaded and somewhat difficult to read, says LGM proposed

8    nine, ten budget?  You see that?

9    A.   I see the LGM.  I'm having a tough time with the

10   numbers but I understand what that is.

11   Q.   I'm sorry.  This is what I was sent so it's the best

12   I've got.

13   A.   I have it on my computer if you'd like it.

14   Q.   Could you just explain to me what's the difference

15   between those two columns, the nine, ten proposed and the

16   LGM proposed?

17   A.   As I mentioned, through this process, each year, and

18   particularly this year, you know, it's an Athletic

19   Department, you add or subtract percentages to the

20   previous year's budget.  Just using men's basketball, it's

21   the very top of the list, or we just went through and we

22   added, subtracted or left the same some of the budgets.

23   We were told in your second column of nine, ten proposed

24   of 1.8 million, that that wasn't enough and that we needed

25   to take more.  And the LGM proposed budget that we can't

1    read, is less than the second column.

2        So, there's some differences that occurred between

3    the nine, ten proposed and the LGM proposed.

4    Q.   What does LGM stand?

5    A.   LGM is the financial system of the senior vice

6    president of finance.

7    Q.   The name?  What's the name?

8    A.   Lucille -- I don't know what the G stands for, I

9    think it's Giano Maratollo (ph).

10   Q.   And is the nine, ten proposed column, the first nine,

11   ten proposed column, is that the proposal that you made

12   and delivered to your superior early in the budget

13   process?

14   A.   Yes.

15   Q.   Yes.  Now, these figures don't include salaries, do

16   they?

17   A.   No.

18   Q.   And they don't include scholarships?

19   A.   That is correct.

20   Q.   What do these figures include?

21   A.   These are, you know, there was the operating budget

22   of travel, administration, officials, meals, lodging, I

23   mean all of the things that -- what we refer to as the

24   operating budget.

25   Q.   Okay.  And apart from the operating budget and the

1    salaries and the scholarships, is there anything else that

2    goes into the budget for varsity sports?

3    A.    Those three are clearly the ones that we are

4    responsible for.  There are some on the University, you

5    know, security and things that they budget through their

6    department.

7    Q.    And could you look at the second page --

8    A.    Sure.

9    Q.    -- of the exhibit, please?  What's that?

10   A.    This looks to be the previous year's process.

11   '07-'08 approved, proposed, the same -- very similar sheet

12   to what you saw for this process.

13   Q.    Okay.  So there's -- in the middle there's an

14   approved budget for '07-'08, which might have been

15   adjusted but apparently was not.  There's a column for an

16   adjusted budget but the total at least is the same.  You

17   agree with me so far?

18   A.    Yes, it looks --

19   Q.    Okay.

20   A.    This page is approved '08-'09.  Last column appears

21   to be in sync with the first column in the next page.

22   Q.    So, there's a requested budget for '08-'09 and then

23   an approved budget for '08-'09 which carries over to the

24   next page, is that right?

25   A.    Correct.

1    Q.   Are these documents that you prepared?

2    A.   I prepared numbers but to be submitted.  I have my

3    own spread sheet that's submitted but the University has

4    its own master template for each department.  So this

5    document I do not prepare but I did supply the numbers to

6    put in it.

7    Q.   And you recognize it as a document that's prepared by

8    the University for part of its budgetary process?

9    A.   Yes.

10            MR. ORLEANS:  I'll offer this, Your Honor.

11            MS. GAMBARDELLA:  No objection.

12            THE COURT:  Exhibit 38 is full.

13            MR. ORLEANS:  That would be 38.

14            (Whereupon Plaintiff's Exhibit 38 was marked

15        full.)

16   BY MR. ORLEANS:

17   Q.   Now, Mr. McDonald, when you made your initial budget

18   proposal for the '09-'10 academic year, that's the

19   proposal that's reflected in the middle column of the

20   first page of Exhibit 38, correct?

21   A.   That is correct.

22   Q.   And you had been told before you made that proposal

23   that you needed to submit a budget with a five to ten

24   percent reduction in expenditures from the previous year,

25   correct?

```
1    A.    In all three phases.

2    Q.    In all three phases, meaning in the operating budget,

3    the salaries budget and the scholarship budget?

4    A.    Scholarship, that's right.

5    Q.    Well, with respect to the operating budget -- well,

6    withdrawn.

7          You developed a budget proposal that achieved that

8    objective of reducing expenditures by five to ten percent

9    without cutting any sports, isn't that right?

10   A.    Initially, that is correct.  I can't say five to ten

11   percent but we did propose a budget of somewhere around

12   5 percent.

13   Q.    Okay.  And on the operating budget at least, would

14   you agree with me that the difference between the

15   $2,019,973 approved figure for '08-'09, and the $1,887,196

16   figure for -- well, withdrawn.  Withdrawn.

17         I thought you testified a minute ago that your

18   initial -- that this middle column reflected your initial

19   proposal, Mr. McDonald?

20   A.    The '09-'10 proposed.

21   Q.    Right.

22   A.    That was, yes, that was one of the -- I shouldn't say

23   the first ones but it was sort of maybe the second to last

24   proposal before --

25   Q.    All right.  So this document, I'm noticing that this
```

1    document has zeros for men's golf, men's outdoor track and

2    women's volleyball?

3    A.    That is correct.

4    Q.    You see that in your proposal?

5    A.    Yes.

6    Q.    So, this is not the proposal that you initially made

7    that would have preserved all of those sports?

8    A.    That is correct.

9    Q.    Now, if you'd go to the second page which shows the

10   budget for '07-'08 compared to the '08-'09 budget,

11   cheerleading is not included in this budget, is it?

12   A.    This is the varsity teams.

13   Q.    Right, and cheerleading was not a varsity team in

14   '07-'08?

15   A.    But this was part of the Athletic Department

16   budget.

17   Q.    Well, what -- obviously there are other parts of the

18   Athletic Department budget besides this, correct?

19   A.    That's correct.

20   Q.    But that is the budget for the varsity teams,

21   correct?

22   A.    Correct.

23   Q.    And cheerleading is not on them?

24   A.    That is correct.

25   Q.    And for '09-'10, you put cheerleading on as a varsity

1    team?

2    A.   Yes.

3              THE COURT:  Let me interject, because if you

4    take the approved '08-'09 budget, last column at page two,

5    and compare that to the approved '08-'09 budget, first

6    page, first monetary column, there is a $12,000 women's

7    cheerleading and that's the difference between the 2

8    million in '07 and the 2,019,000.  So, that 12,000 was

9    that -- what was that in '08-'09?

10             THE WITNESS:  Okay?

11             THE COURT:  You can --

12             THE WITNESS:  In the proposals for the future

13   year, we saw, you can see in the very last column for

14   percentage of increase, decrease, it was helping us divide

15   the budget, we put in cheerleading as a varsity sport to

16   help us project the budget for '09-'10 which, for

17   cheerleading, we plan to be a part of.  So we just brought

18   in the budget for cheerleading that he spent in the

19   Athletic Department in '08-'09 but it wasn't listed as a

20   varsity sport in '08-'09 but we wanted to put it here so

21   we could show we're planning for it to be a sport along

22   with the others.  Does that make sense?

23             THE COURT:  Yes.  The same column, makes sense,

24   you see a comparison between what you spent in '08-'09 and

25   '09-'10.

1              THE WITNESS:  Right.

2              THE COURT:  Right.

3              THE WITNESS:  And this would happen in

4     operating, it will happen in salaries and it will happen

5     in scholarships.

6     BY MR. ORLEANS:

7     Q.   So, you're expecting to spend $50,000 on the

8     operating budget for cheerleading in '09-'10, as opposed

9     to the 12,000 that was spent in '08-'09, correct?

10    A.   That is correct.

11    Q.   And what about -- you know, we weren't supplied with

12    a document for the salaries.  Do you recall what is going

13    to happen to salaries on the cheerleading line?

14    A.   Yes.

15    Q.   Okay.

16    A.   And the reason we don't have it is because we haven't

17    submitted that.  The University's going through the

18    operating right now.  Obviously because of the salary

19    freeze, things won't be changing too much initially but

20    there is a proposal for a competitive full-time salary in

21    women's cheerleading.

22    Q.   What would that amount be?

23    A.   A little over 40, $45,000.

24    Q.   And that's a proposal but you don't have any

25    assurance that that's going to be approved, is that

1    correct?

2    A.    That's also right.  And also please know there is an

3    existing $20,000 in part-time salaries that we're already

4    paying initially.

5    Q.    And would you expect to continue to pay that, the

6    part-time salary, in the next year?

7    A.    That would get encompassed into the full-time amount.

8    Q.    All right.  Do you anticipate there will be a

9    sideline cheer squad next year in addition to a

10   competitive cheer squad?

11   A.    Yes.

12   Q.    Do you anticipate that the same person will coach

13   both?

14   A.    No.

15   Q.    So, will there have to be a salary for the coach of

16   the sideline cheer squad?

17   A.    Yes.

18   Q.    How much do you estimate that would be?

19   A.    We're going to be proposing $10,000 and usually what

20   we do is, and again, that could be one person at ten, it

21   could be two at five or three at three.  Again, we'll let

22   the sideline folks cheerleading and kickline and all the

23   other dance groups decide how they want to do that.

24   Q.    So, in total, for competitive and sideline clear, you

25   would estimate the salary proposal that you're making that

1    hasn't yet been approved at between 50- and 55,000, is

2    that right?

3    A.   There's another part-time assistant cheer coach

4    that's currently there.  We pay her 3,000, $4,000.  That

5    would stay as an assistant competitive cheer coach.

6    Q.   And I'm sorry, that's three or 4,000?

7    A.   Yes.

8    Q.   So, I'm just trying to get to a total.  For next, for

9    this coming year if your proposal is approved, you will

10   have a full-time cheer coach at 40 to 45, a part-time

11   sideline coach at about ten, and an assistant competitive

12   cheer coach at about four, so we're looking at somewhere

13   between 54 and $59,000 total?

14   A.   But that wouldn't include the sideline cheer as part

15   of the budget.  That's a completely separate area.

16   Q.   So you don't expect, again, you don't expect that any

17   of the athletes who cheer competitively will also do

18   sideline cheers, right?

19   A.   We're not planning that.  We're budgeting

20   accordingly, so that sideline cheer budget will not be in

21   the varsity athletic line.

22   Q.   Do you expect you would permit the competitive cheer

23   athletes to do sideline cheer?

24   A.   It's going to be coach's question.  You know,

25   sometimes athletes do, kids play varsity sports and

```
 1   intermurals all the time, much to their coach's chagrin,
 2   but that will be something that the coaches will work on.
 3   Q.   Okay.
 4   A.   But that's not the expectation.  It's not the budget
 5   for that.
 6   Q.   Now --
 7             THE COURT:  Mr. Orleans, it's just about
 8   5:00 o'clock.
 9             MR. ORLEANS:  Yes, Your Honor.
10             THE COURT:  And I've got a TRO hearing at 5:15.
11             MR. ORLEANS:  No rest for the weary, Judge.  I'm
12   happy to break now.
13             THE COURT:  I wanted to ask one clarification
14   question.  Going back to the $20,000 for the women's
15   cheering, the first page of Exhibit 38, that $12,000 was
16   competitive cheer expense for '08 and '09?
17             THE WITNESS:  That $12,000 was for both, because
18   we only had one cheer group.  The sideline cheer and our
19   competitive cheer were one and the same group of people,
20   so they use that 12,000 really for both.
21             THE COURT:  And the 50,000 though in the
22   proposal is only for the competitive cheer?
23             THE WITNESS:  That is correct.
24             THE COURT:  All right.
25             MR. ORLEANS:  This is a fine time to break.
```

1          THE COURT:  I propose we come back at 9:30.

2          MR. ORLEANS:  We'll be here.

3          THE COURT:  Fine.  All right, thank you.  We'll

4     stand adjourned.

5          (Whereupon the above matter was adjourned at 5:00

6     o'clock, p. m.)

C E R T I F I C A T E


          I, Susan E. Catucci, RMR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.




          /S/ Susan E. Catucci
          _____

              Susan E. Catucci, RMR
              Official Court Reporter
              915 Lafayette Boulevard
          Bridgeport, Connecticut  06604
               Tel: (917) 703-0761