```
 1            (Whereupon the luncheon recess was taken at 12:35

 2     o'clock, p. m.)

 3

 4

 5            A F T E R N O O N     S E S S I O N

 6                 (1:20 O'CLOCK, P. M.)

 7            MS. GAMBARDELLA:  Your Honor, we have a

 8     preliminary housekeeping matter.

 9            THE COURT:  Sure.

10            MS. GAMBARDELLA:  During the break, counsel and

11     I talked, what we have agreed is that when we reconvene,

12     which I think you said would be approximately 2:30?

13            THE COURT:  Well, 2:30 or at the earliest,

14     three.

15            MS. GAMBARDELLA:  Got it.  Irrespective where we

16     are with Mr. McDonald, which should be substantially

17     completed if not completed, we've agreed, we have a

18     competitive cheer coach who has been here now for two

19     days.  We've agreed, if it's okay with you, to take her

20     out of turn so she doesn't have to return tomorrow.

21            THE COURT:  That's fine.

22            MR. ORLEANS:  Fine with us.

23            MS. GAMBARDELLA:  And we can probably finish

24     with her within the additional time constraints you have

25     this afternoon.
```

1             THE COURT:  That's fine.

2             MS. GAMBARDELLA:  Great.

3    BY MS. GAMBARDELLA:

4    Q.   Okay.  Mr. McDonald, I just wanted to, before we

5    continue with the decision-making process for next year

6    about the elimination of the programs, I want to just run

7    by you one more piece of the expert's testimony.

8         The expert testified that the NCAA caps

9    indoor/outdoor cross country track at 18 events for the

10   year, and that then if you eliminate outdoor track, all

11   you need to do is get your indoor guys, men's indoor or

12   women's indoor to just run the 18 events.  What is your

13   response to that?

14   A.   Frankly foolish, impossible, impractical and nobody

15   would want to do that, including the atheletes.

16   Q.   Can you explain to the court briefly why you have

17   rendered that opinion?

18   A.   Well, 18 events in one season, you know, in the

19   indoor season is, what, December, January, February.

20   That's only 12 weeks.  If anything, student atheletes that

21   run middle or long distance, that's actually too many

22   events in that short span of time.  So it's just

23   impossible to do.  It's no solution.  We will not be doing

24   it.  We will run a normal indoor season.  So that is just

25   hard to believe someone would say that.

1    Q.   And, just briefly, has the admissions office made you

2    aware of the female/male enrollment breakdown based on

3    acceptance letters for next year?

4    A.   Yes.

5    Q.   And what is your understanding of the breakdown?

6    A.   So we can prepare for future proportional numbers,

7    there is -- 63 percent women have made deposits to

8    Quinnipiac.

9    Q.   Okay.  And, again, we've already gone through that

10   people don't necessarily show up who put deposits?

11   A.   No.

12   Q.   Okay.  Now, let's go back to the decision-making

13   process that is affecting next year.  Can you -- you've

14   already testified on direct from counsel that there was a

15   dictate that budgets be cut.

16   A.   Yes.

17   Q.   Is that accurate?  All right.  Tell me who first

18   articulated to you personally that need?

19   A.   My direct supervisor, Nel Bellemonte (ph).

20   Q.   And what specifically did he say to you about budget

21   cuts?

22   A.   That all departments will be asked to reduce their

23   budgets by five, ten percent.  Position freezes, potential

24   salary freezes.  At that point the salaries weren't

25   discussed as much but there was some clearly important

1   discussions on budget and cuts on budget that were going

2   to occur.

3   Q.   Now, you've already testified that the first proposal

4   you made did not include elimination of athletic programs

5   to achieve that five to ten percent goal; do you recall

6   that remember?

7   A.   That is correct.

8   Q.   Why didn't you include athletic programs in that

9   first proposal?

10  A.   It's just not what our business is about.  Our

11  business is to give the student atheletes a good

12  experience and, as athletic director, I know how important

13  each of those sports is to each of the kids, and that is

14  the last thing we would want to do.

15  Q.   And then you testified that he came back and said,

16  no, programs have to be included.  Do you remember

17  testifying to that?

18  A.   Yes.

19  Q.   Can you tell us more exactly what he said to you?

20  A.   Well, I think at this point the initial university

21  budgets that were submitted, there appeared, because of

22  some projections in the economy, some projections and all

23  sorts of financial, the financial world was still sinking,

24  that the initial proposals were not going to be enough.

25  And we then were asked to consider the dropping of sports.

1    Q.   What was the first sport that you proposed be cut?

2    A.   Men's golf.

3    Q.   And then at some point women's volleyball became the

4    topic of conversation, correct?

5    A.   Yes.

6    Q.   All right.  Can you tell us how that proceeded?

7    A.   Well, I think that women's volleyball became part of

8    this because of an university master plan of facilities

9    that was unfolding or, shall we say, even continuing since

10   we built the T D Banknorth Sport Center.

11   Q.   Can you please explain to his Honor what you mean by

12   that facilities master plan, did you call it?

13   A.   Yes.

14   Q.   Please.

15   A.   Quinnipiac has fortunately grown from 4,000 students

16   to about 7,000 students over the last 20 years or so

17   and --

18   Q.   Push the mic --

19   A.   Okay.

20   Q.   Great.

21   A.   And because of that growth in students, the need for

22   space for student activity, including athletics, was

23   clearly very high.  We needed more space in student

24   activities, more space at the student book store, more

25   space just for other students.  We expanded some athletic

1    facilities.

2         So, because of that, and because of the vacated Burt

3    Kahn court where men's and women's basketball was, the

4    university was looking at that space as a place to put

5    some of these activities or offices or meeting rooms or

6    what have you, so that the vacated Burt Kahn court became

7    a negotiating piece as to what are we going to do with it.

8         A lot of constituencies on compass were saying I want

9    this for chapter 11, I want it for an auditorium, I was it

10   for office space.  So it became -- we're there saying we

11   need it for volleyball.  We were very successful in

12   lobbying and proposing to the university that the Burt

13   Kahn court, for the need of space for volleyball.  We

14   would then agree to build a volleyball-only gymnasium or

15   court.

16   Q.   When was that discussed as a possible future

17   solution?

18   A.   I would say past fall of 2008 we were actually

19   walking with some university officials looking at some

20   spaces outside the athletic center to say it could go

21   here.

22   Q.   Was that actually a topic for possible future

23   exploration even before early '08, early academic year

24   '08?

25   A.   Yes.

1    Q.   When was that?

2    A.   Probably for the last year and-a-half.

3    Q.   Okay.

4    A.   As the need for this expanded student activity space

5    was happening.

6    Q.   So, the need for expanded space is not just for

7    athletic programs space?

8    A.   No.

9    Q.   It's university-wide, correct?

10   A.   Correct.

11   Q.   And so, continue with respect to this discussion

12   about facilities and the plan about facilities.

13   A.   Well, as we were looking at this space, then we

14   started getting into some very preliminary discussion of

15   how much space do you need, what's the size of the court,

16   what's the size of the out-of-bounds area, how many seats

17   do you think you might need?  We were going to use the

18   existing locker rooms.  It basically became a gymnasium

19   box that we were going to add to our current recreation

20   and athletic facilities.

21        So we penciled in a location, it was all on.  So, by

22   October, November, December, we were starting to feel

23   pretty good, asking the coach about the proper sizing and

24   what's the out-of-bounds space, the ceiling height, all

25   the things you need to build a first class facility.  And

1    then things turned very poorly in December, January,

2    February.

3    Q.   You mean in the economic --

4    A.   Economically.  And then the University put a freeze

5    on all sorts of things, including this additional space.

6    Q.   Okay.  So what building does the volleyball team --

7    well, this past year where were they practicing and where

8    were they having home competitions?

9    A.   They were practicing and playing in the Burt Kahn

10    court, which was the old basketball gymnasium.

11    Q.   Okay.  And what are the reasons why that particular

12    space and that particular was appealing to the university?

13    A.   It basically had a lot of space.  I mean you can

14    imagine a game court with two side courts.  I'm not going

15    to guess the square footage but it was a pretty good open

16    space that could be used for a variety of reasons.  They

17    thought maybe of putting in some offices where the old

18    wooden seats were, maybe shrinking it into, instead of two

19    intermural courts, make just one.  Maybe an auditorium.

20    But just a general meeting place for university functions

21    so that the other meeting space on campus, Alumni Hall,

22    those events that were there could move to the Burt Kahn

23    court and the spaces where the Alumni Hall was would be

24    used by the book store, campus activity, student activity,

25    what have you.  Just normal master planning.  I mean it's

1   very common.

2   Q.   The university's basically busting at the seams

3   space-wise?

4   A.   Yes.

5   Q.   With respect -- you were in court when Ms. Sparks

6   testified along the lines of how easy it would be, and I

7   am paraphrasing, to simply take existing facilities, and I

8   think the two facilities mentioned were the rec center and

9   the T D Banknorth facility, how easy it would be to

10  accommodate the volleyball team there.  Do you recall that

11  testimony?

12  A.   Yes.

13  Q.   Okay.  Do you agree with it?

14  A.   No.

15  Q.   Okay.  Tell us why.

16  A.   Well, I think clearly the ease would be something for

17  a floor, but to be a first class Division I program,

18  there's more than just a floor that needs to go into the

19  rec center.  The seating, the score boards, there's media

20  statistic areas.  So, no, it really was a -- it really

21  would be almost -- what's the word -- not a Division I

22  atmosphere if we did that.

23  Q.   What's the importance of having a Division I

24  atmosphere?

25  A.   I think that's why the kids we heard in the testimony

1    yesterday, that that's what they wanted.  That's what the

2    families want.  We would much have preferred to have that

3    court that was designed specifically for volleyball than

4    to have a rec court converted to a volleyball court.

5    Q.   So it's not just about the floor?

6    A.   No.

7    Q.   What about the other facility she testified about?

8    A.   Five or six -- well, now maybe seven, eight years

9    ago, when we were programming the T D Banknorth sports

10   center at one point, we knew the university was busting at

11   its seams, we knew the general sentiment, that people had

12   their eye on the Burt Kahn court.  It's like as soon as

13   someone leaves, they want their office.  Well, as soon as

14   the athletic varsity teams left, there were many that

15   wanted the space in the Burt Kahn court.

16       So we proposed to include some volleyball facilities

17   in the T D Banknorth Sports Center.  And probably for a

18   few months I actually saw some plans drawn where there

19   would be a volleyball locker room and volleyball coaches

20   office and storage and all of the support things that

21   would go along with it.

22   Q.   So, what would have to be done to that facility to

23   make it suitable to host a Division I volleyball program?

24   A.   Today?

25   Q.   Now.

1   A.   Well, today would require, you know, like we said

2   yesterday, obviously doing some infrastructure with the

3   actual installation of the court, but we need a coach's

4   office, you'd need an athletic trainer, you'd need the

5   locker rooms, you would need the things that would go

6   along with it.  When the decision was made in that master

7   plan and the building was built then without volleyball,

8   to add it now would be, I think, very troublesome.

9   Q.   Did the University in its early exploration of

10  possibly building out other space for volleyball to keep

11  it or building an additional facility to keep it, obtain

12  any quotes over the past year, year and-a-half, to

13  accomplish those things?

14  A.   I'm sure a quote was established when we were going

15  to build that additional volleyball court as part of the

16  athletic and rec center.  I don't have the exact price.  I

17  didn't hear it.  But clearly the number was probably

18  higher than the economy would allow.

19  Q.   It wasn't $11,000, I take it?

20  A.   No.

21  Q.   Okay.  Was it even in the thousands of dollars range?

22  A.   It was in the millions.

23  Q.   And what is the volleyball season per NCAA

24  guidelines?

25  A.   The championship season is in the Fall.

1    Q.   Okay.  And so when is the season officially over for

2    volleyball pursuant to NCAA guidelines?

3    A.   The championship season ends at Thanksgiving or

4    thereabouts.  I know the NCAA championship goes a little

5    longer and that's a nontraditional season that happens in

6    the second semester.

7    Q.   You were asked about whether or not Quinnipiac has

8    ever done any -- and I don't remember if the word was

9    official or formal, so I'm sorry if I've forgotten the

10   exact words but the tenure of the question was whether or

11   not you did any formalized surveys to ascertain student

12   interest in particular athletic programs.  Do you remember

13   being asked that?

14   A.   Yes.

15   Q.   And you said no, there was no survey of that calibre,

16   correct?

17   A.   That is correct.

18   Q.   What are the methods that Quinnipiac uses to

19   ascertain student interest in particular athletic

20   programs?

21   A.   The methods are, and it's quite clear and that's

22   absolutely why we're doing cheerleading, it's very

23   uncommon, is quite regularly students would come to me to

24   ask for certain things, whether it be an intermural golf

25   or intermural lacrosse or club ice hockey or whatever,

rugby.  There's all sorts of things.  So it's really the

measuring those that come and ask for it.  And in this

case, over the last probably five years, the only team

that's asked to be varsity or recommending themselves to

be varsity was the competitive cheer group.

Q.   And what about -- you were asked some questions about

recruiting, the timing of recruiting.  Is there -- are

there also recruiting efforts on campus during

orientations and things like that?

A.   Yes.

Q.   Can you describe the kinds of recruiting efforts that

are exerted during orientation for an incoming class, for

example?

A.   Well, yesterday while I was here in court, I was

supposed to be at a Junior Open House for juniors who are,

parents who are thinking about Quinnipiac.  And so that it

begins with that one in May, and then there will be three

open houses for the seniors in the Fall.  And then there's

also what they call Student Admitted Day in March so the

parents who have been accepted, and the families and the

student atheletes, will come and meet us.  At each one of

those five or six events, the athletic department has a

scheduled meeting, seminar, Q and A time with me and/or

the coaches.  So we're very actively involved with the

admissions office.

1    Q.   Are there also inquiries made by students who are --

2    at the time periods they are considering whether or not to

3    come to Quinnipiac?

4    A.   Yes.

5    Q.   In terms of athletic programs?

6    A.   Yes.

7    Q.   Is that one way you ascertain interest in particular

8    athletic programs?

9    A.   Yes, it is.  We also have a, quote unquote, little

10   thing on the website that says I want to do baseball or

11   basketball or different sports.  But, yeah, that's what we

12   do.

13   Q.   Okay.  I just want to briefly touch on competitive

14   cheer because I don't want to be duplicative with what the

15   coach has already testified to.

16        So, why elevate now to varsity level the cheer team?

17   A.   Well, there's two reasons.  One is they want to be

18   and they've been successful and they've been competing for

19   a while.  It was also something that we looked at

20   seriously between the NCAA certification process when we

21   said that we would increase opportunities by four to

22   seven percent and competitive cheer and some other sports

23   were considered.  And then, as well as, and the most

24   recent news was our mandate to get to our number if we

25   were to drop a woman's sport.

1        So clearly, all of the -- cheerleading didn't come

2   out of the blue.  It's been on the radar.  We had

3   discussions even about elevating the coach prior to this

4   situation, but economy and budgets didn't allow.  So her

5   salary has gone from, I don't know, maybe $3,000 to its

6   current level of 20 over the last six years because of

7   this competitiveness, time commitment, what have you, so

8   cheerleading has always been on the -- has always been

9   there.

10  Q.   You were asked a question by counsel about whether or

11  not the University has had the Office of Civil Rights do

12  an advanced assessment of whether or not your competitive

13  cheer program as elevated to varsity level would pass

14  muster for their purposes in deciding whether or not it

15  would count for Title IX purposes.  Do you remember that

16  question?

17  A.   Yeah, I do.

18  Q.   Okay.  Why didn't you get an advance assessment from

19  the Office of Civil Rights?

20  A.    We didn't do it when we had an indoor/outdoor track.

21  We didn't do it when we had field hockey and lacrosse and

22  we didn't do it when we had women's ice hockey.  So -- and

23  nor did I know that that was a requirement.  The

24  University of Maryland added the sport.  We had their

25  documentation from, again, our previous self study.  We

1    had their documentation -- if anything, Maryland was

2    recruiting us to join their ranks.  So we saw what the

3    Department of Education sent to them.  So that's why we

4    didn't do it.  It wasn't a book of criteria that says this

5    is what you do when you add a woman's sport.

6    Q.   Were you aware of the Office of Civil Rights

7    Guidelines with respect to when a sport, any sport can be

8    counted for Title IX compliance purposes?

9    A.   Yes, little bit.  Basically using what Maryland sent

10   to us.

11   Q.   Has the Office of Civil Rights ever audited the

12   University?

13   A.   No.  I would tell you back in 1997, '98, we went to

14   the Office of Civil Rights in Boston to discuss with them

15   our standings and let them know some of our plans.  So

16   that was a self -- but, no, there's nobody that's come to

17   our office at all.

18   Q.   Are you -- as part of your responsibilities as

19   athletic director, do you keep up with Office of Civil

20   Rights documents, communications and advisories with

21   respect to the multi-part test for determining whether

22   something qualifies as a sport?

23   A.   Yes.  It's one of the most supportive parts of our

24   position.  It's been a changing situation for many, many

25   years, but it's one of the bench marks of being in

1    intercollegiate athletics that you need always to be aware

2    of anything that you do, this has to be considered.

3    Q.   And as part of that, have you reviewed this document,

4    it's from the United States Department of Education Office

5    of Civil Rights.  It's date-stamped January 16th, I think

6    it's '96.  That starts with Dear Colleague.  It's

7    Defendant's Exhibit B, as in boy, for identification.

8         (Hands witness)

9              THE COURT:  Actually B is a full exhibit.

10             MS. GAMBARDELLA:  It is?  Great.  Thank you.  Is

11    my notebook up there, Jack, or is it just plaintiff's

12    exhibits?

13             THE CLERK:  It's right here.

14             MS. GAMBARDELLA:  Thank you so much.  Thank you

15    so much.

16    BY MS. GAMBARDELLA:

17    Q.   Can you look at Defendant's Exhibit B, which is an

18    exhibit?  Do you recognize the document?

19    A.   Yeah, it's been a while but yes.  I mean --

20    Q.   Okay.  Go to page 2 of 17.

21    A.   Okay.

22    Q.   Bottom paragraph.  "In addition, the clarification,"

23    which is this document, "does not provide strict numerical

24    formulas or cookie cutter answers to the issues that are

25    inherently case and fact specific.  Such an effort not

1    only would belie the meaning of Title IX but at the same

2    time, deprive institutions of the flexibility to which

3    they are entitled when deciding how best to comply with

4    the law."

5        And then I just want to read one more section to you

6    and then I'm going ask you about your understanding.

7    Bottom of page three.  "OCR focuses on the interests and

8    abilities of the under-represented sex only if the

9    institution provides proportionately fewer athletic

10   opportunities to members of one sex and has failed to make

11   a good faith effort to expand its program for the

12   under-represented sex."

13       And one more section, I'm sorry.  Page four -- one,

14   two, third full paragraph from the top, third or fourth

15   line in.  "An institution can choose to eliminate or cap

16   teams is a way of complying with part one of the three

17   part test."

18       Last line of that paragraph, "Ultimately Title IX

19   provides instructions with flexibility and choice

20   regarding how they will provide nondiscriminatory

21   participation opportunities."

22       Now, what is your understanding of what the OCR is

23   intending to convey in those sections?

24   A.   It's always been each institution, whether it be

25   academic majors or athletic teams, but in this case

1    particularly athletic teams, has the right to pursue what

2    sports it would like to have.  For example, Quinnipiac

3    doesn't have football.  So in this case, the OCR says, in

4    my mind, and says that you have the ability to pick the

5    sports you want, provided you meet the criteria of, that's

6    been set forth by the Office of Civil Rights.  So --

7    Q.    If you go to page 15.  "OCR will determine whether

8    there is sufficient unmet interests among the institution

9    students."  And then it goes on, and then there are some

10   bullet points that you can review.

11        "OCR will look for interests by the under-represented

12   sex as expressed by the following indicators, among

13   others."

14        Going through those bullet points, which one of those

15   indicators are utilized by Quinnipiac in assessing the

16   unmet interests of female students?

17   A.    Well, clearly number one, is the request by students

18   and admitted students a particular sport be added.

19   Request an existing club sport be elevated.  I mean -- so,

20   you know, again, most all of them, you know, most all of

21   them fit in some ways.

22   Q.    Okay.  Can you look at Defendant's Exhibit C?

23   A.    Yes.

24           MS. GAMBARDELLA:  Is this exhibit, Defendant's

25   Exhibit C, is it in?

```
 1                   THE COURT:  It's full.

 2                   MS. GAMBARDELLA:  All right, thank you.

 3       BY MS. GAMBARDELLA:

 4       Q.   Looking at Defendant's Exhibit C, this is U. S.

 5       Department of Education frequently asked questions sheet.

 6       And question five is Who counts as a participant and how

 7       are the unduplicated counted participants calculated.  And

 8       then it says, "Participants are students who, as of the

 9       day of a varsity team's first scheduled contest, are

10       listed on the varsity team's roster, and receive

11       athletically related student aid and practice with the

12       varsity team and receive coaching from one or more varsity

13       coaches.  Any study who satisfies one or more of the above

14       criteria is a participant."

15           All right.  What's your understanding of what that

16       means?

17       A.   It's relatively very accurate as to what we do.

18       Q.   And for purposes of your EADA reporting, do you

19       follow those guidelines?

20       A.   Yes, as we've said before.

21       Q.   Exhibit D?

22                   THE COURT:  D is not in evidence.

23                   MS. GAMBARDELLA:  All right.  Just for the

24       record, Your Honor, this is an October 18th, it's stamped

25       October 18, 2001, U. S. Department of Education, Office
```

1    for Civil Rights, letter to Ms. Suzanne Martin of Michigan

2    High School Athletic Association.

3            My only question about the document is if this

4    is a document that Quinnipiac has obtained in connection

5    with its exploration of competitive cheer for Title IX

6    compliance purposes.  It's not offered for the matter

7    asserted.

8            MR. ORLEANS:  Your Honor, I'm not sure how it

9    could not be offered for the truth of the matter asserted.

10   May I voir dire the witness on the document just very

11   briefly?

12           THE COURT:  Well, it hasn't been offered yet, I

13   think.  Is there a question to the witness?

14           MS. GAMBARDELLA:  Well, the question is is this

15   part of the materials that Quinnipiac has looked at in

16   exploring the elevation to varsity competitive cheer and

17   their state of mind about whether or not it would pass

18   muster under OCR, is this part of the materials.

19           THE COURT:  Okay.  Is there an objection to that

20   question?

21           MR. ORLEANS:  There's no objection to the

22   question, no.

23           THE COURT:  Okay.  Sir, you can answer that.

24           THE WITNESS:  I'm not familiar with this

25   particular case.  Certainly our coach can tell you a lot

```
 1    more.  She has been very active in supplying information

 2    to us.

 3              MS. GAMBARDELLA:  Okay, I'll deal with it --

 4              THE WITNESS:  I certainly heard about Michigan

 5    but I can't say -- our bench mark has been the University

 6    of Maryland.

 7              MS. GAMBARDELLA:  Okay, then I messed up the

 8    exhibits.

 9              THE COURT:  Ms. Gambardella, when you have a

10    chance, the first page says one of four.  I have three

11    pages.

12              MS. GAMBARDELLA:  Is that D, Your Honor?

13              THE COURT:  Yes.  And I can't tell that.  The

14    hole punch was put in right where that appears on the

15    second and third page.

16              MS. GAMBARDELLA:  We'll see what we can do about

17    that.  No problem.

18              THE COURT:  Okay.  Let me just tell counsel who

19    are here for the 2:00 o'clock, we're going to be hearing

20    that argument next door in Judge Hall's courtroom,

21    Courtroom Number 2 which is down the hall this way, if

22    you'd like to get set up down there.  Thank you.

23              MS. GAMBARDELLA:  That's a lot of lawyers.

24    Thought we had a lot of lawyers.

25              (Pause)
```

1    BY MS. GAMBARDELLA:

2    Q.   Okay, Exhibit F, it's the Maryland materials.

3    A.   Okay.

4    Q.   Are these materials that you're familiar with?

5    A.   Yes.

6    Q.   Okay.  Are these materials part of the materials that

7    the University is looking at in exploring its elevation of

8    competitive cheer and its counting for Title IX purposes?

9    A.   Yes.

10   Q.   What is the reason that these materials were obtained

11   by the University for that purpose?

12   A.   Again, through the NCAA certification process, when

13   it was identified that we needed to increase our

14   opportunities for women, competitive cheerleading was

15   clearly one of the sports we strongly considering.

16   There's a thing in our business called Coach Talk and then

17   they talk to each other and the University of Maryland

18   administration contacted us and said would you like more

19   information?  We did ask, we would like to receive

20   confirmation on its standing with OCR, and ultimately

21   these materials started coming from this point to the

22   certification process in 2006.

23           MS. GAMBARDELLA:  I'm going to move its

24   admission for that.

25           MR. ORLEANS:  Your Honor, we have -- may I voir

1    dire the witness very briefly on this?

2            THE COURT:  Sure.

3    VOIR DIRE EXAMINATION

4    BY MR. ORLEANS:

5    Q.   Mr. McDonald, this is a document that you received

6    from the University of Maryland, correct?

7    A.   Yes.

8    Q.   Okay.  And you're not the author of the document?

9    A.   (Shaking head in the negative.)

10   Q.   It wasn't addressed to you when it was originally

11   written, correct?

12   A.   Correct.

13   Q.   And no copy was sent to you when it was originally

14   written, correct?

15   A.   No.

16           MR. ORLEANS:  Your Honor, I have no objection to

17   the offer of this exhibit for the limited purpose that it

18   is something that Quinnipiac considered in making the

19   decisions that it's made, but I object strenuously on

20   hearsay grounds to its admission for the truth of any

21   statement that's contained within it.

22           MS. GAMBARDELLA:  That's the limited purpose.

23           THE COURT:  That's what you're offering it for?

24           MS. GAMBARDELLA:  That's not for the truth of

25   the matter asserted, but it goes to their due diligence,

1    if you will, for lack of a better word.

2              THE COURT:  All right, fair enough.  Exhibit F

3    is full for those purposes.

4              (Whereupon Defendant's Exhibit F was marked

5         full.)

6    BY MS. GAMBARDELLA:

7    Q.   All right.  I want to jump to conversations that

8    Ms. Sparks testified about that you had with her prior to

9    her signing the first contract and then a second contract.

10   Do you recall that testimony, Jack?

11   A.   Yes, I do.

12   Q.   All right.  Did you ever tell Ms. Sparks, in words or

13   in writing, that she would be assured that her contract

14   would be renewed for more than one year at a time?

15   A.   No.

16   Q.   Okay.  How can you be so sure of that?  You heard her

17   testimony.

18   A.   Well, number one, university, including my own, all

19   salary is yearly.  We certainly have intent for support

20   for everybody, like all the staff, but we are all given

21   one year contracts, with the exception of our basketball

22   and ice hockey coaches, but all employees receive an

23   annual contract.

24   Q.   Did you ever make a commitment to Ms. Sparks as long

25   as she, and I forget her exact words, performed or I think

1    it was performed, she can be assured that contract would

2    be renewed after one year?

3    A.    No, we had no -- there was no long term, you're here

4    forever, kind of discussion.

5    Q.    Did you ever make assurances to Coach Sparks about

6    the long term commitment to volleyball, meaning -- she

7    testified on cross, I asked her, are you testifying that

8    you expected volleyball to be maintained indefinitely.

9    And do you remember me asking that?  And she said yes, I

10   did.

11        Did you ever make any statements assuring her that

12   the volleyball program would be maintained indefinitely?

13   A.    No.

14   Q.    Okay.  What did you tell her about the University's

15   commitment to volleyball at that time?

16   A.    Clearly, number one, it's never my intent to drop any

17   sport.  You've heard that already today.  I think from

18   that perspective, her role as a volleyball coach was

19   excellent, well done.  All of us in the Athletic

20   Department were very impressed with what she's been doing.

21   So I think in many cases like her, you know, we were

22   surprised it came to an end, but there was no -- it's not

23   my role to give any employee more assurances than the

24   university can provide and -- but this was no disrespect

25   to what she had done with the program.  She'd done a

1    remarkable job.  We looked forward to working with her

2    more, but there was never anything in writing or verbal --

3    and I have been asked these questions many times by other

4    employees so I don't think that at any point my -- my

5    support for her certainly was high but that doesn't mean

6    anybody's getting tenure or a lifetime contract because of

7    it.

8    Q.   Do all your coaches have written contracts?

9    A.   Yes.

10   Q.   And what are the terms of every coach's written

11   contract?

12   A.   July 1 to June 30.

13   Q.   In terms of scholarships available for competitive

14   cheer next year, are those the final numbers or are they

15   subject to revision, if necessary?

16   A.   I think with experience, everything is subject to

17   experience, but we're starting from this, the point we

18   mentioned, and every year things change.

19             MS. GAMBARDELLA:  I need one moment, Your Honor.

20             THE COURT:  Sure.

21             (Pause)

22             MS. GAMBARDELLA:  No further questions at this

23   time, Your Honor.

24             THE COURT:  Okay.  I think this would be a good

25   time to break.  The court reporter has got to move her

1    equipment next door.  So when we come back, which would

2    be -- I'll tell you, it will be no sooner than 2:30, if

3    you want to get some fresh air, and it will be as soon

4    after 2:30 as I can get here.

5              MS. GAMBARDELLA:  And you agree Ms. Powers --

6              MR. ORLEANS:  We've agreed to that.

7              THE COURT:  All right, thank you.  We'll stand

8    in recess.

9              (Whereupon a recess was taken from 2:00 o'clock,

10        p. m. to 3:10 o'clock, p. m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25