UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

STEPHANIE BIEDIGER, ET AL        :  No. 3:09cv-621 (SRU)
                                 :  915 Lafayette Boulevard
          vs.                    :  Bridgeport, Connecticut
                                 :
                                 :  May 13, 2009
QUINNIPIAC UNIVERSITY            :

- - - - - - - - - - - - - - - - x


PRELIMINARY INJUNCTION HEARING


B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

    FOR THE PLAINTIFFS:

            PULLMAN & COMLEY
                850 Main Street
                P.O. Box 7006
                Bridgeport, Connecticut 06601-7006
            BY:  JONATHAN B. ORLEANS, ESQ.
                ALEX V. HERNANDEZ, ESQ.

    FOR THE DEFENDANT:

            WIGGIN AND DANA, LLP
                400 Atlantic Street
                P. O. Box 110325
                Stamford, Connecticut  06911-0325
            BY:  MARY A. GAMBARDELLA, ESQ.
                JONATHAN BARDAVID, ESQ.

                Susan E. Catucci, RMR
                Official Court Reporter
                915 Lafayette Boulevard
              Bridgeport, Connecticut  06604
                 Tel: (917)703-0761

I N D E X


WITNESSES:

JOHN McDONALD
Redirect Examination by Mr. Orleans...........486/525
Recross Examination by Ms. Gambardella........512/526

GERMAINE FAIRCHILD
Direct Examination by Mr. Hernandez...............527
Redirect Examination.........................567/578
Cross Examination by Ms. Gambardella.............558
Recross Examination..........................576/579

BECCA KOHLI
Direct Examination by Ms. Gambardella.............582
Cross Examination by Mr. Hernandez...............598

DANIELLE CARO
Direct Examination by Ms. Gambardella.............594
Cross Examination by Mr. Hernandez...............598

TRACEY FLYNN
Direct Examination by Ms. Gambardella.............604
Redirect Examination............................ 646
Cross Examination by Mr. Hernandez...............626

-O-

```
 1                    (9:35 O'CLOCK, A. M.)
 2              THE COURT:  Good morning.  Unless there's
 3      anything to take up --
 4              MS. GAMBARDELLA:  There's an administrative
 5      matter and a substantive matter.
 6              THE COURT:  All right.
 7              MR. ORLEANS:  Want to take those up first?
 8              THE COURT:  Sure.
 9              MR. ORLEANS:  By administrative matter, do you
10      mean the schedule?
11              MS. GAMBARDELLA:  The schedule.
12              MR. ORLEANS:  Even before the scheduling, I have
13      one housekeeping.  Now, Your Honor, we noticed yesterday
14      that Defendant's Exhibit 1 in the book appeared, it was
15      copied only on one side of the page.  We only had the odd
16      number of pages because the original was double-sided.  So
17      we have one Defendant's Exhibit --
18              THE COURT:  Plaintiff's exhibit.
19              MR. ORLEANS:  Plaintiff's Exhibit 1.  I have
20      given a copy to counsel.  Here's the substitute for the
21      book and here are two extras for the court's copies of the
22      exhibit.
23              The administrative matter that counsel referred
24      to, Your Honor, has to do with the schedule.  I have a
25      proposal to make about scheduling, which is as follows.
```

 1          This morning we've given defense counsel the

 2     plaintiff's proposed designations from the deposition of

 3     Dr. Lopiano.  It's our anticipation that after the

 4     conclusion of the testimony this morning, we'll confer

 5     about that and try to work it out and try to get the

 6     submissions to Your Honor before the end of the day.  If

 7     there's anything that needs to be argued, we'll let you

 8     know about that.

 9          We would also propose to get our trial briefs to

10     you by the end of the day, assuming that some lawyer on

11     each side has a little time after the testimony to go back

12     and polish them up.

13          MS. GAMBARDELLA:  We'll get to it.

14          MR. ORLEANS:  And then we would be available for

15     closing argument at the court's convenience, tomorrow or

16     Friday, if that works, or any other time that works for

17     the Court.

18          THE COURT:  How about 1:30 tomorrow?

19          MS. GAMBARDELLA:  That's fine, Judge.

20          MR. ORLEANS:  Fine with me, Judge.  Thank you.

21          And the other more substantive matter, I'll let

22     Ms. Gambardella and Mr. Hernandez --

23          MS. GAMBARDELLA:  Your Honor may recall

24     yesterday some discussion about a witness that was added

25     late by the plaintiffs, Germaine Fairchild, and you'll

recall that Your Honor said you're just going to let

everybody's witnesses come in, and defendants took note of

that.

        That having been said, there was some discussion

about my ability to depose the witness and you may also

recall that I waived my right to insist on a deposition or

have you rule on it and said I would just interview her,

and we scheduled that for 8:00 o'clock this morning.

        It was a fiasco.  She was evasive, she was

obstructive.  It was clear she'd been instructed to make

me ask a specific question.  I'll give you an example.

        What conversations have you had with attorneys

for the plaintiffs about roster management?

        What do you mean?

        Have you spoken with attorneys for the other

side about roster management at Quinnipiac?

        Well, you didn't ask me that.

        I said, okay, I'm asking you that now.

        Yes.

        I said, what specifically did you tell

plaintiff's counsel or any of the plaintiffs, in

particular Coach Sparks, about roster management at

Quinnipiac?

        You're going to have to ask me specific

questions.

 1          I then proceeded for 20 minutes to administer

 2     Novocaine and then pull teeth out of her head and I got

 3     some information.  After that, I then asked the witness

 4     what is it that -- you've been disclosed for additional

 5     purpose of revealing, quote unquote, recent developments

 6     in the athletic department.  What is it that you advised

 7     the other side about this that would fall into that

 8     category?

 9          You're going to have to ask me specific

10     questions.

11          I said, look, forgive me, I can't be more

12     specific.  You've been disclosed for this purpose.

13          Mr. Hernandez jumps in and says "We told you in

14     court."  I said, look, Alex, you know, I have to tell you

15     I don't think it was much more specific than that.  But

16     I'm trying to interview her.  What are we going to do?

17          You're going to have to ask her specific

18     questions.

19          So I tried.  I mean something as simple as what

20     are the seasons -- she's the woman's softball coach.  What

21     are the seasons?

22          What do you mean season?

23          What seasons did you play?

24          Well, you're going to have be more specific.

25          I mean, Judge, that was 35 minutes this morning.

1    I finally gave up.

2         So, the reason I bring it up is, for the record,

3    it was not an interview, it was not a quality interview.

4    It was clearly obstructive and designed not to reveal

5    specific information to me.

6         So I'll be conducting part of my interview while

7    she's on the stand.  That's the only reason I wanted to

8    explain it to you.

9         THE COURT:  All right.  We'll see how that

10   testimony goes.

11        MS. GAMBARDELLA:  Thank you, Your Honor.

12        THE COURT:  And if we need to have a

13   postponement before --

14        MS. GAMBARDELLA:  Yep.

15        THE COURT:  -- before you take up your

16   witnesses.  We'll take that issue up at the time.

17        MR. HERNANDEZ:  Just briefly, Your Honor, I

18   don't want my silence to in way be construed as an

19   agreement with Attorney Gambardella's representation of

20   what transpired.  I am prepared to represent that there

21   was a meeting this morning and that's about as far as my

22   agreement with Attorney Gambardella goes.

23        THE COURT:  Okay.  All right.

24        MR. ORLEANS:  Mr. McDonald isn't on the stand --

25        MS. GAMBARDELLA:  We're ready.

```
 1              THE COURT:  Ready to go?   All right, sir.
 2    J O H N      M c D O N A L D,     called as a witness on
 3    behalf of the Plaintiffs, having been previously duly
 4    sworn by the Court, testified as follows:
 5              THE COURT:  Sir, you're still under oath.  Thank
 6    you.
 7    REDIRECT EXAMINATION
 8    BY MR. ORLEANS:
 9    Q.    Good morning, Mr. McDonald.
10    A.    Good morning Jon.
11    Q.    Mr. McDonald, yesterday when you testified you
12    mentioned you had the Maryland materials, is that correct?
13    A.    Yes.
14    Q.    Are you familiar with the materials that Quinnipiac
15    received from the University of Maryland about competitive
16    cheerleading?
17    A.    Yes.
18    Q.    And did those materials include any letter or ruling
19    of any kind from the OCR?
20    A.    Yes.
21    Q.    Endorsing competitive cheerleading as a varsity
22    sport?
23    A.    Endorsement, guidelines, criteria.  I don't have it
24    in front of me but there was some.
25    Q.    And I'm talking about something issued by OCR as
```

1    opposed to a letter to OCR.

2    A.    I --

3    Q.    Let me ask you to look at Defendant's Exhibit G.

4    A.    Got it.

5    Q.    And if you would continue, Defendant's Exhibit H,

6    Defendant's Exhibit I, does that comprise the Maryland

7    materials?

8    A.    Well, again, I don't have that packet with me but I

9    know there was a letter with OCR on the letterhead or --

10              MS. GAMBARDELLA:  It's F, Defendant's F.

11              THE COURT:  F and G, I think.

12              MS. GAMBARDELLA:  And G.

13              MR. ORLEANS:  F and G, okay.

14              MS. GAMBARDELLA:  H is the schedule.

15              MR. ORLEANS:  Okay.

16   BY MR. ORLEANS:

17   Q.    Take a look at Defendant's Exhibit F, Mr. McDonald.

18   A.    Okay.

19   Q.    Okay.  This is a letter to the Department of

20   Education from Deborah Yow, the Director of Athletics at

21   OCR, correct?

22   A.    Jon, I'm missing something here.  I got one from

23   Minnesota.

24   Q.    Defendant's F?  Here, let's see.  Maybe --

25   A.    I see, okay, this one.

1    Q.    This one, this is F?

2    A.    All right, thanks.  Sorry about that.

3    Q.    Sure.  F is a letter addressed to the Department of

4    Education from the University, from the University of

5    Maryland, from Deborah Yow of the University of Maryland,

6    correct?

7    A.    That is correct.

8    Q.    And G is a letter from David Haglund, the Associate

9    Athletic Director at Maryland to -- doesn't say who it's

10   from but, or who it's to but it's from Mr. Haglund at

11   Maryland and it encloses an article or website piece about

12   competitive cheerleading, correct?

13   A.    Yes.  This was, I think, a generic letter to schools

14   that expressed interest in cheerleading, competitive

15   cheer.

16   Q.    Okay.  Well, let me ask it this way.  Isn't it

17   correct that in the Maryland materials that you referred

18   to -- well, withdrawn.

19        The letter that is Exhibit F from Mr. Reynolds -- or

20   from Ms. Yow to Mr. Reynolds, was included in the Maryland

21   materials, isn't that right?

22   A.    Yes.

23   Q.    Okay.  And there wasn't anything that came back from

24   OCR to Maryland that said, yes, we approve, in words or

25   substance, was there?

```
1              MS. GAMBARDELLA:  Sorry --
2    A.   I thought there was.
3              MS. GAMBARDELLA:  Foundation for this witness's
4    knowledge of whether or not OCR sent something back to
5    Maryland.
6              MR. ORLEANS:  Well, the question is whether it
7    was included in the materials that he reviewed.
8              MS. GAMBARDELLA:  No, it's not included in the
9    materials.
10             THE COURT:  With that clarification, you can
11   answer.
12             THE WITNESS:  The question?
13             THE COURT:  Did you receive as part of the
14   Maryland materials a response from Mr. Reynolds to
15   Ms. Yow?
16             THE WITNESS:  I thought I did.  There was a lot
17   there, but there certainly was a sense of comfort seeing
18   it.
19             MS. GAMBARDELLA:  We'll stipulate, Your Honor,
20   that there's a reference in Exhibit F to a letter of 2003
21   from OCR to the University of Maryland.  Defendants do not
22   have possession of that and did not include it in any
23   materials, if that helps.
24             MR. ORLEANS:  I appreciate that.
25             MS. GAMBARDELLA:  Thank you.
```

BY MR. ORLEANS:

Q.   Now, you testified yesterday, Mr. McDonald, to

requests to elevate cheer to a competitive sport, and I'm

sorry, I didn't quite get clear whether you received those

requests from the coach or from students or from both?

A.   And as well as the institutions, gender plan, so

there was significant discussion on adding some woman's

programs.

Q.   Were there any requests made in writing to elevate

competitive cheer specifically to the status of varsity

sport?

A.   I don't think we put anything in writing to say we're

doing it but there's a lot of writing in our certification

study that says we're going to improve opportunities for

women.

Q.   I understand that, but the question I'm asking is

whether you received written requests from students or the

cheer coach or anyone else to elevate competitive cheer?

A.   No, never have in any other sport either.

Q.   Are you familiar, Mr. McDonald, with the American

Association of Cheerleading Coaches and Advisors?

A.   Vaguely.

Q.   Are you familiar with that organization's position on

the issue of cheerleading as a sport?

A.   Outside of what was discussed yesterday, I didn't

1    know much about that.

2    Q.   And are you familiar with the Women's Sports

3    Foundation?

4    A.   Yes.

5    Q.   And are you familiar with the Woman's Sports

6    Foundation's position on the issue of cheerleading as a

7    sport?

8    A.   Yes, just basically through discussions here.

9    Q.   And what's your understanding of the Women's Sports

10   Foundation's position?

11   A.   And, again, I'm going only by what's been documented

12   here; that there are those that don't think competitive

13   cheer is a varsity sport.

14   Q.   Okay.  And you were asked some questions yesterday

15   about your response to opinions expressed by Dr. Lopiano.

16   You know that Dr. Lopiano is, was formerly the President

17   of the Women's Sports Foundation, did you not?

18   A.   Yes, also an Athletic Director at the University of

19   Texas.

20   Q.   And you've known of Dr. Lopiano for years, haven't

21   you?

22   A.   Yes.

23   Q.   And you recognize her as an authority figure in the

24   area of woman's athletics?

25   A.   Very much, very much.

1   Q.   You have a lot of respect for her?

2   A.   Yes, I do.

3   Q.   Not that you always agree with her?

4   A.   That's also true.

5   Q.   Fair enough.  Did Quinnipiac consider adding a

6   gymnastics team?

7   A.   No.

8   Q.   Gymnastics is a recognized women's sport, isn't it?

9   A.   I know I have at the University of Denver.

10   Q.   Has any decision been made about how many

11   competitions the competitive cheer squad will engage in?

12   A.   I think that's -- no, there has not.  We've gone

13   from, I think now to the point of whatever is needed we

14   will do.

15   Q.   Now, you testified yesterday about some of the

16   problems that you saw in using the T D Banknorth Center

17   for volleyball; do you recall that testimony?

18   A.   Yes.

19   Q.   You did tell us that the competitive cheer squad will

20   be able to use the Burt Kahn court for at least some

21   portion of the year, is that correct?

22   A.   For competition.

23   Q.   For competition?

24   A.   Correct.

25   Q.   So, you do expect that space, that gym space in the

1    Burt Kahn court, that part of the rec building, to be

2    available for some part of the coming year?

3    A.   We have not been told otherwise so far, yes.

4    Q.   And in the T D Center, you talked about the fact that

5    there aren't locker rooms for volleyball, correct?

6    A.   That is correct.

7    Q.   And there's not a coach's office?

8    A.   That is correct.

9    Q.   Correct?  But just with respect to practicing and

10   playing on the floor, have you sought any bids or done any

11   research to determine what it would cost just to install

12   the necessary equipment to put up the nets, put lines

13   down, that sort of thing?

14   A.   No, we investigated that when we built the building.

15   When the decision was made not to have volleyball there,

16   it hasn't been discussed since.

17   Q.   Okay.  Now, you testified yesterday about roster

18   management and I think you said you're very committed to

19   hitting the numbers, is that right?

20   A.   Always been the case.

21   Q.   Okay.  And you said that you're happy that the people

22   in your department are trying to get to the numbers?

23   A.   Yes.

24   Q.   And you said that coaches, I'm not sure that I got

25   this right, but my notes say that you said coaches will

1    find ways but as long as they hit the numbers, you're okay

2    with it?

3    A.   I don't think that's implied.

4    Q.   Could you explain that?

5    A.   Well, let me give you a more generic picture of the

6    athletic department.  It's my job, I guess, either as

7    parent or an athletic director, to make sure people stay

8    within the policies that have been set forth.  Number of

9    scholarships, their budget numbers, the number of games.

10   This is not -- you know, people do have a tendency to

11   need a little bit of discipline, and I have always said no

12   one knows discipline and boundaries better than athletes.

13   So I think that in this case, in this particular case of

14   roster management, it's my job to be sure that they, as we

15   have used the term, hit the number.

16       Then, as it was discovered, some of them were, some

17   of them were not.  Again, whether it be in this particular

18   case of roster management or a case of yelling and

19   screaming at officials too much, it's my job to guide them

20   to be within all policies that are within the department.

21   So, to say -- so that's really what my job is.  In this

22   role of roster management, that's exactly what we're

23   attempting to do.

24   Q.   Okay.  Did you use the phrase yesterday coaches will

25   find ways?

1    A.    In all phases of things.  You know, I just don't mean

2    if the other team is shooting a lot of three pointers,

3    they've got to find a way of stopping the three pointers.

4    If the other team has a great power play, you have to find

5    a way of stopping the power play.  So, that term should

6    not be considered in just one phase of being a coach.

7    Q.    Coaches are inventive and creative people?

8    A.    That's why we like them for what they do.

9    Q.    Now, with respect to the squad list and the drop/add

10   reports, coaches don't generally drop or add when a

11   student athlete has to miss just a couple games, correct?

12   A.    I really don't know.

13   Q.    You don't know, okay.

14   A.    I mean there may be a worthy walk-on that might want

15   to get a chance to play on a weekend or a student athlete

16   might have a weekend seminar they need to go to with their

17   class so, coach, I can't go.  So, but again, I can't get

18   into that.  That's not my job, to worry about who's

19   starting and --

20   Q.    All right, and there's no policy then in the Athletic

21   Department that says to a coach, if a student is going to

22   be out for more than X number of contests, you must submit

23   a drop/add?

24   A.    That has not been the policy.

25   Q.    There's been a fair amount of discussion about the

1    EADA reports.  The EADA report for 2007, 2008, is actually

2    submitted to the Department of Education in around October

3    of 2008, is that correct?

4    A.    That is correct.

5    Q.    And the EADA report, when it is submitted, has a

6    section which is labeled Caveat.  Are you familiar with

7    that?

8    A.    No.

9    Q.    Okay.  So, you're not aware of whether there is a

10   section of the EADA report in which an institution has an

11   opportunity to explain about its numbers?

12   A.    That makes a little bit of sense, that there are --

13   I'm trying to think of some examples.  About, well,

14   unfortunately in this case we will have to say that we

15   dropped sports, so that would be a caveat to one of our

16   future EADA reports.

17   Q.    But when you file the EADA report in October of 2008,

18   for the 2007, 2008 year, you didn't feel that it was

19   necessary to put in any explanation about the, you know,

20   the drops and adds that had occurred on rosters that year?

21   A.    They have drops and adding on in my lifetime as an

22   athletic director.  And, to answer your question, no, we

23   didn't do it in 2007, 2008, because drops and adds are

24   always going to occur.  Clearly we've discovered some

25   issues here.  But, no, the answer to your question is no,

1    we didn't put it in, nor had we ever did before.

2    Q.    Okay.  Now, is Quinnipiac required to keep something

3    called, or maintain something called participation lists?

4    A.    I don't know the answer to that.  You may be able to

5    help me along but we have squad lists, academic

6    eligibility lists --

7    Q.    I'm thinking of a document that shows for each, for

8    each team, for each competition, who played.  Is that

9    information that's maintained?

10   A.    I'm going to give you an I don't know on that one,

11   okay?

12   Q.    That's something we should ask Ms. Flynn?

13   A.    Yes.  She'll have statistics for all the games,

14   but --

15   Q.    There was some discussion about track, and you said

16   that the NCAA has three claims in track, one for cross

17   country, one for indoor and one for outdoor, correct?

18   A.    That is correct.

19   Q.    At Quinnipiac there's one coach over all three of

20   those?

21   A.    There's a series of coaches but we have one director

22   of women's track and field which is very common

23   nationally.

24   Q.    Didn't I hear you say that it's one sport for the

25   entire year with three different seasons?  You look at it

1    that way as a track coach?

2    A.    Certainly it's three different sports.  No one knows

3    this more than me when I used to go to my athletic

4    director and say I'm coaching six sports, boss, so yeah,

5    it's referred to as track.  I mean it's clearly, that's

6    the public reference but whether it be EADA report or NCAA

7    counting of sports, it's six sports.

8    Q.    Well, when you coached, you coached cross country,

9    indoor and outdoor, correct?

10   A.    For men and for women.

11   Q.    For men and for women?

12   A.    Yes.

13   Q.    Mr. McDonald, could you look in the plaintiff's

14   exhibit book at Exhibit 39; it's in the front of the

15   second book.  It's the seasons of competition news chart

16   in the front pocket.

17   A.    We looked at this yesterday, didn't we?

18   Q.    Yes, we did, and in the interests of keeping this

19   short, I'm going to try to do this in a quick way.  Would

20   you look, find the list of athletes who used the season of

21   competition in men's cross country.  It's on the second

22   page.

23   A.    Okay.

24   Q.    Could you keep a finger there?

25   A.    Yep.

1    Q.   And then thumb through until you get to, it's bates

2    numbered D0047 and it has the list of athletes who used

3    the season of competition in men's indoor track it starts?

4    A.   See it.

5    Q.   You see that?

6    A.   Yes.

7    Q.   And then if you continue over to the next page, the

8    third part that I want you to look at is the list of

9    athletes for men's outdoor track?

10   A.   Okay.

11   Q.   Okay?  And take your time in looking at this.  All I

12   want to ask you is, would you agree with me that there is

13   significant overlap among those three lists?

14   A.   In both for the men and the women, yes.

15   Q.   That was the next question.  There's also significant

16   overlap for women, correct?

17   A.   Right.

18   Q.   And would you then agree with me, Mr. McDonald, that

19   -- well, withdraw it.

20        In the past, including this year, Quinnipiac had

21   men's cross country and women's cross, correct?

22   A.   Yes.

23   Q.   And it had men's indoor track and women's indoor

24   track?

25   A.   Yes.

1   Q.   And had men's outdoor track and women's outdoor

2   track, correct?

3   A.   Correct.

4   Q.   So that if you counted those as three sports, as you

5   did, and reported each participant in each sport --

6   A.   Correct.

7   Q.   -- there were a number of men who were counted three

8   times?

9   A.   Right.

10  Q.   And there a number of women who were counted three

11  times, correct?

12  A.   Correct.

13  Q.   But in 2009, 2010, when you will not have a men's

14  outdoor track squad --

15  A.   Correct.

16  Q.   -- there will be a number of men who will be counted

17  twice while there will be a number of female track

18  athletes who will be counted three times, is that correct?

19  A.   That is correct.

20  Q.   When you were coaching six sports, did your salary

21  reflect that you were coaching six sports?

22  A.   That was my point to my boss all the time, as is my

23  track coach to me.

24  Q.   But the track coach at Quinnipiac is not paid

25  significantly more than other full-time coaches, is he?

1    A.    He's paid a little bit more.

2    Q.    Little bit more?

3    A.    Because of the nature of the six sports and he

4    happens to have a boss who understands what it's like.

5    Q.    Now, you testified yesterday that you had never

6    before sought advance review by OCR when you added women's

7    sports, correct?

8    A.    That is correct.

9    Q.    Had you ever in the past added a women's sport that

10   was not recognized by the NCAA?

11   A.    When we added woman's ice hockey, it was recognized

12   by the NCAA as a multi-classified division.  There was no

13   Division I, II, III at the time so it was a

14   multi-classified division.  But to answer your question,

15   no.

16                MR. ORLEANS:  Moment, Your Honor?

17                (Pause)

18                MR. ORLEANS:  Nothing further at this time.

19   Thank you very much, Mr. McDonald.

20                THE WITNESS:  Thank you.

21                THE COURT:  Ms. Gambardella, let me jump in with

22   some questions because you may want to follow up after.

23                MS. GAMBARDELLA:  Of course, of course.

24                THE COURT:  Okay?  Mr. McDonald, you mentioned a

25   number of Athletic Department policies regarding, for

1   example, number of games, scholarships, et cetera.  How

2   were those policies communicated to the coaches?

3        THE WITNESS:  Two ways.  One is the NCAA manual.

4   Some, most of them, number of games, number of

5   scholarships, travel parties, a lot of that's in the NCAA

6   manual.  It's a 500 page document that's pretty big.

7        Also some of the things that made -- like, for

8   example, the one we've been discussing, roster management,

9   is published in a staff handbook that I distribute to the

10  staff and every staff, it's the Tuesday after Labor Day we

11  have our annual meeting, I publish this document.  You

12  have seen many pieces of it throughout the last few days

13  here.

14        So, between the two, and then there's

15  institutionallal policies as an employee, there's all

16  sorts of -- but I would say most of what we talked about

17  here is has been the NCAA manual and the Athletic

18  Department policies.  You know, the league has policies,

19  and the institution, but predominantly what we've seen in

20  the last two days has been from those two books.

21        THE COURT:  Okay.  And you I think may have

22  touched upon this just now, but how was the policy

23  regarding roster management communicated to coaches?

24        THE WITNESS:  That has been, again, since

25  certification and the discovery of we need to fix our

```
 1    numbers, roster management has -- well, that was May of
 2    2006 so the Fall of 2006, seven, eight and -- and eight,
 3    it's been in the staff handbook and discussed by me to the
 4    entire staff.
 5             THE COURT:  Okay.  Do we have copy of that as an
 6    exhibit?
 7             MS. GAMBARDELLA:  There may be excerpts.
 8             MR. ORLEANS:  My understanding is there are a
 9    number of documents that may have come out of it but I
10    don't think that a complete copy was produced to us.
11             MS. GAMBARDELLA:  Well, you asked us for that
12    and I'm sure we produced it.
13             THE WITNESS:  I have one in my bag.  It's my own
14    personal copy but I think I have one with me, the whole
15    document.
16             THE COURT:  I think it might be helpful to see
17    how that was communicated.
18             MS. GAMBARDELLA:  I have no issue with that.
19             THE COURT:  All right.
20             MS. GAMBARDELLA:  In fact, one of the coach
21    witnesses who I interviewed this morning had the excerpts
22    from it in her hand.  So --
23             MR. ORLEANS:  We certainly have no objection if
24    the defendant wants to produce and submit a copy of that
25    staff handbook and mark it as an additional exhibit.
```

1          MS. GAMBARDELLA:  We did produce a handbook,

2     excerpts of handbooks and so on and so forth.

3          THE COURT:  I don't know if I need the whole

4     handbook but I'm just looking for if there's a section on

5     roster management.

6          THE WITNESS:  Yes, it's the grid that -- it's,

7     again, we talk about, excuse me, but the coaches in terms

8     of some policy, how many on the bench, how many can get on

9     the bus, all sorts of things.  It's my role to try to

10    preserve money and equity and all sorts of things.  So

11    it's there and they always cringe, things like how many

12    can go back to preseason in volleyball?  Is it 15, is it

13    20?

14         THE COURT:  Okay.  I think it would be useful to

15    see that.

16         MR. ORLEANS:  Your Honor, respectfully, I

17    haven't seen the whole thing so I don't know everything

18    that's in it.  I'm sure the court can disregard what's not

19    useful to the court but we'd request that the whole thing

20    go in.  There might or might not be a section on

21    compliance with Title IX in a nondiscrimination policy and

22    so forth and the presence or absence of those things in

23    the book might be of significance.  I'd like to see the

24    court get the entire book.

25         THE COURT:  Why don't we do this.  Why don't the

1       two of you look it and see if there's any problems.  And

2       we can certainly shoot some copies here but --

3                   MS. GAMBARDELLA:  Show us where you're talking.

4                   THE WITNESS:  There's a famous page, I should

5       know the number by heart, but here it is.

6                   MS. GAMBARDELLA:  We have these pages.

7                   THE WITNESS:  That's my pen scratch here but

8       it's things like the number of games in scrimmages, the

9       number of nonofficial dates, you see the number of NCAA

10      players on the bench, travel party if they make the

11      championship, number to buy if you're buying tee-shirts

12      for the team, and then the roster management.

13                  MR. ORLEANS:  I think that page has been marked

14      as an exhibit.

15                  THE WITNESS:  Correct.  Now, whether I make

16      mention of roster management as a policy, it's probably

17      here but -- so most everything is in here.

18                  THE COURT:  Why don't you leave that with your

19      lawyer and then, again, take a look at it.  I think

20      whatever was communicated to coaches regarding roster

21      management would be helpful for me to see.

22                  MS. GAMBARDELLA:  We'll find it.

23                  THE COURT:  Okay.

24                  MR. ORLEANS:  Your Honor, the page that

25      Mr. McDonald was just referring to that includes the

```
 1    roster management targets for 2008, 2009 is in evidence as

 2    Defendant's Exhibit 23.

 3             MR. BARDAVID:  Plaintiff's.

 4             MR. ORLEANS:  I'm sorry, I keep saying

 5    defendants because I'm used to doing defense work.

 6    Plaintiff's Exhibit 23.

 7             THE COURT:  That's the roster sizes?  The box at

 8    the bottom?

 9             THE WITNESS:  Yes.  And it is says roster

10    management proposal for 2008, 2009 in the next line.

11             THE COURT:  All right.  And what does that word

12    "proposed" mean?  Is that your proposal to the coaches,

13    their proposal to you?  Someone else's proposal?

14             THE WITNESS:  I think you can see a bunch of

15    sports that says 25 or equal size for men or women.  You

16    know, the two soccer coaches in this case, yeah, they

17    might come back and say we think we can work with 27 or we

18    think we can work with 20, so those sports can adjust

19    because they're equal men and women and they're equal

20    sports in terms of how the game is played so that's sort

21    of what "proposed" means.

22             THE COURT:  And are these numbers targets, are

23    they caps?  How would you describe them?

24             THE WITNESS:  The best way to probably describe

25    it, Your Honor, is no one's getting a bonus if they hit
```

1    the number and no one is losing their job if they don't.

2    It's really -- you can only get to where you want to go as

3    a team, to work together, and you can only get to where

4    you want to go as an athletic department if you work

5    together.

6            For us, having clearly the commitment to get the

7    number, if every sport contributed one opportunity, that's

8    a team.  So that's sort of where we initially started and,

9    again, I think you've heard throughout this is that we

10   don't want to drop any sports.  And what's been apparent

11   the last few months is I'm not sure we can add a whole

12   bunch of sports either, so that's really where the

13   discovery came and the certification process, and this is,

14   I'm going call it an attempted solution.  And we have

15   improved.  We've gone from 50 to 51 percent opportunities

16   for women to 55 percent.  I know there's some criticism of

17   those numbers but it was a good attempt and it's going to

18   continue.

19           THE COURT:  All right.  And how were these

20   numbers tracked?  Who, if anyone, looks to see whether,

21   you know, lacrosse men are at 40 and women are at 30?

22           THE WITNESS:  Well, going back to this, the

23   discussions here, the first day of competition is a NCAA

24   squad list.  And you may have seen some of these squad

25   lists where you see little numbers circled in handwriting

1    in the lower right hand corner?  Some of that was the hit

2    number, and it's our cue.  I'm not sure they are all

3    exactly the same.  But before I sign that form,

4    particularly this past year, we sort of started in '06-'07

5    and we said, okay, let's try '07-'08, we got a little more

6    teeth into it because that was, they had a full year, and

7    now '08-'09 based on the discoveries of what we've

8    discussed here, it will be even more difficult.

9          But ultimately on the first day of competition,

10   and I even did that this year, the bus is in the parking

11   lot and the coach comes up and says I need you to sign my

12   squad list, and I say, well, you've got too many here or

13   you got too few here.  So it's ultimately, the final

14   signature is mine.  The coach signs, the compliance

15   officer signs and then I sign.

16          THE COURT:  On that EADA form?

17          THE WITNESS:  On the NCAA squad list, first day

18   of competition, where that number goes to the EADA form,

19   that's the number we use per direction and instruction.

20          THE COURT:  And after that first day the form is

21   completed, is there any concern about keeping the number

22   at the right number thereafter?  In other words, let's say

23   there -- was, it was certified that men's lacrosse was in

24   fact at 40.

25          THE WITNESS:  Yes, we sign the form it's 40.

1          THE COURT:  You sign the form.

2          THE WITNESS:  Right.

3          THE COURT:  You send the form in, and then at

4    some point after that you have your season?

5          THE WITNESS:  Correct.

6          THE COURT:  Is anybody counting heads or

7    worrying about who's really out there ready to play?

8          THE WITNESS:  And I think that's a point well

9    taken.  Particularly in a sport that plays in -- the

10   Spring sports that play in the Fall, softball, baseball,

11   lacrosse, they play it in the fall season, it's beautiful

12   in New England, probably better than it is in the Spring.

13   They'll play whatever we allow them to play.  Three of

14   those nontraditional game dates is in the back here.  But

15   from the September lacrosse game to the March lacrosse

16   game, those rosters change.

17         THE COURT:  Right.

18         THE WITNESS:  So, do we resign the squad list

19   form?  No, we don't.  Because we're until the required to.

20   It's not like we're not doing it because we're --

21         THE COURT:  No, I understand.  I'm just trying

22   to figure out whether these numbers are monitored in the

23   same way that you would be monitoring, for example,

24   numbers of games played.  Let's assume for a minute, I

25   assume that there are these numbers limits, the NCAA says

1    you can't play more than 27 lacrosse games in a season, I

2    assume there's some limit.

3              THE WITNESS:  Yes.

4              THE COURT:  And it turns out the lacrosse coach

5    decides to schedule 30 games.  Now, that comes to your

6    attention, I assume you'll do something about that and

7    you'll say, hey, drop three games.

8              THE WITNESS:  Well, we'll have a report that

9    indicates that we made a violation if we played all three.

10             THE COURT:  But let's assume you figure it out

11   before.

12             THE WITNESS:  Right.

13             THE COURT:  You're going to tell the coach drop

14   three games or we're going to be in violation.

15             THE WITNESS:  That is correct.

16             THE COURT:  But I haven't heard yet that the

17   same type of follow-up is being applied to the roster.

18             THE WITNESS:  And that's a very fair question.

19   There is no rule in the NCAA rule book about rosters as

20   there is about scholarships or schedules.

21             THE COURT:  Right.

22             THE WITNESS:  Okay?  Now, we're clearly

23   discovering and committed to it, and so in being

24   publicized about it so clearly, but there's no rule in the

25   NCAA rule book which says you must have 48 in men's

```
 1    lacrosse.

 2              MS. GAMBARDELLA:  Jack, he wants to know

 3    mechanisms in place to make sure that the coaches are

 4    going to keep to these numbers as a fair assessment of

 5    participation opportunities.  Is that fair, Judge?  You

 6    want to know --

 7              THE COURT:  Sure.

 8              MS. GAMBARDELLA:  -- how you make sure you keep

 9    to it.

10              THE WITNESS:  That's very fair, and we have

11    discovered these past few days, clearly it might be

12    something mentioned in the staff handbook, so I think we

13    ever been watching it.  It's very clear we've been

14    watching it.  It's very clear maybe some have taken

15    advantage of it, but it is what it is.  No one's broken a

16    law.

17              THE COURT:  Fair enough.  I'm not suggesting

18    that that's the case.  I'm just trying to understand, you

19    know, as Ms. Gambardella said, kind of what, what's the

20    process?  You have a policy, and kind of what happens --

21              THE WITNESS:  I think as I sit here, and sort of

22    you see some of the weaknesses, clearly the add/delete

23    sheet is now something that, you know, we're going to be

24    involved with or I will be involved with because of what

25    we've just been through.  So have we done that?  No.  You
```

```
 1    know, we just haven't because we never had before up until
 2    this case.  So I think that I can see, as I sit here
 3    seeing this, clearly the add/delete sheet was something
 4    going on on a normal day to day business kind of thing.
 5    So that's sort of -- my solution, if you're asking me were
 6    we watching it in '07-'08 like we watched the beginning,
 7    the first day?  The answer is no.
 8    RECROSS EXAMINATION
 9    BY MS. GAMBARDELLA:
10    Q.   And so -- I'm sorry, Judge.
11         THE COURT:  Go ahead.
12    Q.   The question is, you weren't relying on
13    proportionality in the first year you introduced roster
14    management, correct?  You weren't trying -- you weren't
15    relying on prong one in '07-'08?
16    A.   We never relied on prong one.
17    Q.   Right.  And so, and that was the year where roster
18    management was, we've all heard the testimony about the
19    growing pains and the stubbornness of the coaches, as you
20    put it, correct?
21    A.   Yes.
22    Q.   In '08-'09 you weren't relying on prong one?
23    A.   Correct.
24    Q.   And the evolution, roster management was introduced
25    for this evolution toward increasing women's athletic
```

1    opportunities?

2    A.    From the NEC certification self study, correct.

3    Q.    Correct.  And roster management was part of that?

4    A.    It was our solution to that discovery.

5    Q.    Right.  Now, what I think the court is trying to

6    ascertain is you've already told him the add/delete list,

7    I'm going to be a bigger part of that, monitoring that?

8    A.    Uh huh.  (Affirmative.)

9    Q.    What other administrative mechanisms -- let me ask

10   you this.  Have you had staff meetings with coaches about

11   next year's roster?  I know they don't have the final

12   numbers yet but have you had the meetings with them about

13   the importance of roster management for next year?

14   A.    It has been on the staff meeting agenda.  We meet

15   every Wednesday at ten, probably since December.

16   Q.    And what have you told the coaches about increasing

17   significance, as it's been evolving, about roster

18   management?

19   A.    I don't think I need to tell them anything after the

20   last couple of days, but clearly once this case is over

21   and once we know what we're doing and not doing, that we

22   will have new numbers.

23   Q.    No, I understand that.  But did you have a recent

24   staff meeting where you discussed the roster numbers are

25   coming and these are the numbers you've got to deal with?

1    A.   Yes.

2    Q.   When did you have that staff meeting?

3    A.   Mary, I'd probably say every week.  I mean the

4    last -- we were supposed to have one today.  I had

5    something else to do at ten o'clock today -- but last

6    Wednesday.

7    Q.   And have you been discussing with them this, you

8    know, the importance of roster management for next year?

9    A.   Yes, but not to the detail of where we're going.

10   Q.   Of the numbers?

11   A.   Because clearly, because we're clearly going to prong

12   one, okay?

13   Q.   Right.

14   A.   We clearly haven't been using prong one.

15   Q.   Got it.

16   A.   Nor did we have to.  But as we now go to prong one,

17   it's going to be going from a suggestion to a --

18   Q.   Do or die?

19   A.   -- pretty much.

20   Q.   Do or die.  And other than add/delete sheet, and

21   you're going to monitor those add/delete sheets

22   personally?

23   A.   Tracey, myself, compliance, I mean we all will --

24   yes.

25   Q.   Are you aware whether or not Tracey had conversations

1   with coaches in '07 about those two coaches who we saw on

2   the add/delete list?

3   A.   You'd have to ask Tracey that question, yes.

4   Q.   And what about instruction to coaches possibly by

5   outside consultants about prong one and roster management?

6   A.   We're all for that.  We haven't really thought about

7   that, but I don't think there's an athletic department

8   that is invested in this as mine is.  We meet more often

9   than other staffs.  We're invested in this, so -- but, you

10  know, we're going to hammer it home.

11       I think one thing about athletic departments is they

12  have a lot more guideline policies that other departments

13  on campus don't have.  I mean it's pretty significant.

14  And so my staff is really good about it.  They are not

15  perfect but they are committed to it.

16  Q.   What is your plan of attack if the one or two coaches

17  that we saw in 2007 -- you remember all of that, it's been

18  well discussed -- what is your proposal if that were to

19  happen this coming year, how would you deal with it as the

20  athletic director, knowing the commitment to prong one?

21  A.   Well, we have a staff evaluation that clearly lists

22  adherence to university policy, adherence to athletic

23  department policy and adherence to NCAA policy.  You know,

24  good, bad, indifferent, whatever is checkmarked, and then

25  you discuss it with them.

1        Now, if it were to continue, if the staff would be

2   egregious enough to liberally break any of those policies,

3   they would lose their job.

4   Q.   How would you deal with the fact of a coach dropping

5   somebody before a first day of competition and then

6   readding them after -- or withdraw that.

7        How would you deal with a coach who's not, who's not

8   committing -- at least throughout the season, I understand

9   there would be variations for injuries and one-up one-down

10  kind of thing.  How are you going make sure the coaches,

11  how are you going to assure this court that those coaches

12  next year that you committed to prong one are going to

13  keep those numbers?

14  A.   Well, I'm going to insure it.  It's just that I can't

15  say that enough, after what we've discovered here, there's

16  no question, I'd be a fool not to.  You know, however,

17  there's still going to be add/deletes, so at what point

18  do -- you know, if coach says he's hit his number, 40, and

19  using men's lacrosse, we've talked about it, I've hit my

20  number, I want to take a guy off or add a guy on, it

21  should be simple.  Take another one off.  So to stay at 40

22  at all times would be my --

23  Q.   No, I understand, I'm not talking about add/deletes

24  for legitimate reasons, one-up one-down, throughout the

25  season.  I'm talking about coaches who --

1    A.   I'd like to think that's not going to happen again.

2    Q.   I know you'd like --

3    A.   No, because the, the structure would be in place so

4    that when they do want to add that student athlete --

5    Q.   You're going to be looking at it?

6    A.   -- a flag's going to go up, to Tracey, the assistant

7    compliance.  You know, they want to spend money and it's

8    not in the budget, you know, alarms go off.  You want to

9    schedule an extra game that's not allowed, alarms are

10   going to go off.

11       So -- I'm not sure I'm answering your question but --

12   clearly, the discovery of the last few weeks has been

13   important to our department and I'll have a new vested

14   interest in my staff policy manual because of what's

15   happened here.

16               MS. GAMBARDELLA:  Okay, Judge?

17               THE WITNESS:  Did you have another question?

18               THE COURT:  No, I'm all set.

19               THE WITNESS:  Okay.

20   BY MS. GAMBARDELLA:

21   Q.   Has Janet Judge been asked to come in and potentially

22   consult and talk to coaches and so forth?

23   A.   To this date, no.

24   Q.   Is that part of your plan?

25   A.   Oh sure.

1    Q.    Okay.  All right.  You were asked the question about

2    the Women's Sport Foundation; is that a governing body?

3    A.    No.

4    Q.    What do you know about Donna Lopiano?

5    A.    I won't say a lot.  I don't know her personally.  I

6    may have mentioned here before that in 1992, '93 when I

7    was out at the University of Denver there was a call for a

8    National Gender Equity Task Force.  And Donna was on it,

9    my Senior Administrator in Denver was on it, Diane Went,

10   along with other key commissioners and really what I would

11   consider high ranking NCAA people who I respect in the

12   business, and they all clearly had differences of

13   opinions.

14       And so I know Donna from that.  She's made some, I

15   think, some excellent quotes in terms of the gender equity

16   movement over the last 30 years.  So I have great respect

17   for what she has done.  And she has been on the -- I don't

18   want to say a radical side but she has really been an

19   activist for women's athletics, and she should be.

20   Q.    Her opinion on competitive cheer counting as a sport

21   for Title IX compliance, that's no mystery, it's fairly

22   well publicized?

23   A.    Right.

24   Q.    Do you agree with it?

25   A.    Absolutely not.  I was extremely disappointed when I

1    first heard that.

2    Q.    Why?

3    A.    Donna has been involved in emerging sports for women

4    for the 30 years, synchronized swimming and water polo and

5    equestrian and it just seemed like -- and gender equity,

6    and here we are today, it's clearly a law.  You must abide

7    by it or, if you don't -- and excuse my French, but the

8    fact that it seems like, okay, gender equity is a good

9    thing, it's working, it's bringing the numbers that

10   everybody wants, and it seems like she's locked the door

11   behind her and said no more sports.  And I just find that

12   that's not what the theme and attitude was in the

13   seventies.  And --

14   Q.    You mentioned equestrian; that's horseback riding,

15   right?

16   A.    I think.

17   Q.    Okay.  That she's been a proponent of equestrian --

18   A.    I'm just throwing sports out there, so please, I'm

19   not going to say what I said is exact.

20   Q.    That's okay.  Is equestrian an NCAA sponsored sport?

21   A.    I think an emerging sport for women.

22   Q.    Not NCAA sponsored at this point?

23   A.    It's NCAA sponsored, and usually what that means is,

24   an emerging sport for women means that you can now

25   officially count, and that's the issues we're having here

1    with cheerleading.  And I'm not going to, again, be an

2    expert on that, but --

3    Q.    Right.

4    A.    -- the fact, but -- that's what it is.

5    Q.    Got it.  There are sports offered at some local

6    universities that aren't NCAA sponsored, correct?

7    A.    Yeah.  Squash, men's rowing.  Again, I don't know

8    this as well but there are many and there are sports that

9    we now have in our institutions who grew as non-NCAA

10   sports.

11   Q.    Men's crew, which might be equivalent to rowing,

12   that's not recognized in the NCAA -- that's not NCAA

13   sponsored --

14   A.    No.

15   Q.    -- correct?

16   A.    Men's rugby is the perfect example.  It's not varsity

17   but pretty much every school in the country has it.

18   Q.    But men's rugby is not currently an NCAA regulated or

19   sponsored sport, correct?

20   A.    Nor is it varsity --

21   Q.    Got it.

22   A.    -- but it's very very popular.

23   Q.    Right, and squash, you mentioned, which is offered at

24   Yale and Brown, for example?

25   A.    Trinity just won the national championships.

1   Q.   Okay.  All right.  Now, Jack, can you go to

2   Defendant's Exhibit C?

3   A.   Okay.

4   Q.   U. S. Department of Education.  This is sort of a new

5   thing.  It says here after the A B C, multi-sport

6   participants are to be included in each sport.  Student

7   athletes who participate in cross country and track should

8   be counted in each of those sports.  Do you see that?

9   A.   Yes, I do.

10  Q.   And what is your understanding of that?

11  A.   Just as it says.

12  Q.   That they can be counted -- if they participate in

13  more than one sport, they can be counted once for each

14  sport?

15  A.   That is correct.

16  Q.   Okay.  Now, let's just briefly revisit competitive

17  cheer.  Now we've already had Mary Ann testify so I'm just

18  going to try to run through this.

19       Competitive cheer will have a full-time coach; that's

20  Mary Ann Powers, correct?

21  A.   Correct.

22  Q.   There will be a part time coach separate and apart

23  totally for sideline cheering, correct?

24  A.   Correct.

25  Q.   There will be monetary resources devoted to keeping

1   those two coaches and those two ventures, for lack of a

2   better word, separate, correct?

3   A.   Yes.

4   Q.   There will be a budget for competitive cheer,

5   correct?

6   A.   Correct.

7   Q.   And we've seen that.  It will include allowance for

8   travel, lodging and items similar to the other sports

9   programs, correct?

10  A.   Yes.

11  Q.   All right.  There will be try-outs, correct?

12  A.   There has been, yes.

13  Q.   And eligibility requirements have already been

14  established and will continue to apply, correct?

15  A.   Yes, they will just do the same thing they do for the

16  other varsity sports.

17  Q.   There will be practice sessions required, correct?

18  A.   Yes.

19  Q.   And they will be similar in number to what other

20  athletic programs provide, obviously tailored for the

21  particular sport?

22  A.   Probably try to do the NCAA 20 hour rule, like we do

23  for others.

24  Q.   They will be competitive?

25       MR. ORLEANS:  Excuse me, I'm sorry to interrupt.

```
1    I hesitate to intrude but I have two objections to this
2    line of question.  First of all, it's extremely leading.
3    And, secondly, it's way beyond the scope of my cross
4    examination of Mr. McDonald.
5              MS. GAMBARDELLA:  I think he --
6              MR. ORLEANS:  We're just --
7              MS. GAMBARDELLA:  I think you crossed --
8              MR. ORLEANS:  We're just repeating what Ms.
9    Powers --
10             MS. GAMBARDELLA:  Well, I think you crossed him
11   on competitive cheer.  I'm pretty sure you did.
12             MR. ORLEANS:  You think I crossed him on
13   competitive cheer?
14             MS. GAMBARDELLA:  I think you did.
15             MR. ORLEANS:  I don't think so.
16             THE COURT:  It is very leading.  I'll allow the
17   scope but the questions have been quite leading.
18   BY MS. GAMBARDELLA:
19   Q.   Will there be competitive opportunities?
20   A.   Yes.
21   Q.   Will the primary purpose of competitive cheer be
22   athletic competition and not the support of other athletic
23   teams?
24   A.   Yes.
25   Q.   You've been asked about NCAA support or sponsorship
```

1    of competitive cheer.  Has the -- do you have any

2    knowledge of whether or not the NCAA more recently has

3    done anything which could be interpreted as some support

4    for competitive cheer?

5    A.    I know that the -- as far as the athletic training

6    and the sport prevention of injuries, the NCAA and the

7    athletic trainers have sort of prioritized cheerleading

8    because it has a very high risk for injuries in terms of

9    its coverage, so we're now going to ask that cheerleading

10   meet some of what they refer to as the NATA standards, and

11   that's the National Association of Athletic Trainers, so

12   they have worked on the injury part of this.

13        There is also -- total hearsay, but clearly it's

14   starting to become discussion as an emerging sport.  But

15   in terms of --

16             MR. ORLEANS:  I'll object in terms of --

17             MS. GAMBARDELLA:  We won't claim that.  We won't

18   claim it.

19             THE WITNESS:  Fine.

20             MS. GAMBARDELLA:  It's hearsay.  The witness --

21   BY THE WITNESS:

22   A.    But, anyway, the injury thing has clearly been

23   documented.

24             MS. GAMBARDELLA:  Okay.  May I have a moment,

25   Your Honor?

```
1                    THE COURT:  Sure.

2                    (Pause)

3                    MS. GAMBARDELLA:  Nothing further.

4                    MR. ORLEANS:  Your Honor, just a couple on

5     recross?

6                    THE COURT:  Sure.

7     FURTHER REDIRECT EXAMINATION

8     BY MR. ORLEANS:

9     Q.   Mr. McDonald, you said you were a little disappointed

10    in Dr. Lopiano's opinions because she supported NCAA

11    emerging sports for women in the past?

12    A.   Yes.

13    Q.   Okay.  Nobody has petitioned to make cheer an

14    emerging sport for women under the NCAA process, correct?

15    A.   I don't know the answer to that.

16    Q.   You don't know.  Okay.  It's not currently on the

17    NCAA emerging sport list, is it?

18    A.   No.

19    Q.   Okay.  And you talked about men's rugby as a

20    example of a non-NCAA sport that's played at a lot of

21    schools?

22    A.   One of them.

23    Q.   It's a club sport, right?

24    A.   Yes.

25    Q.   And Title IX distinguishes between various sports and
```

1    club sports, doesn't it?

2    A.    Yes, but we refer to rugby in the loops of other

3    sports, varsity sports; squash, rowing, so on.

4    Q.    And the Judge asked you some questions about the

5    efforts that you make to monitor and keep track of what

6    happens to roster sizes after the first day of

7    competition; do you recall that?

8    A.    Yes.

9    Q.    And essentially what I think I heard you say was

10   you're going to try to do better next year, right?

11   A.    I think I said we will do better.

12   Q.    Okay.  You already are required to carefully monitor

13   who actually plays in games, are you not?

14   A.    Do the squad list, yes.

15   Q.    Because that affects each athlete's eligibility?

16   A.    That is correct.

17   Q.    Whether or not they can play?

18   A.    And the scholarship that goes with it, yes.

19              MR. ORLEANS:  Nothing further.

20              MS. GAMBARDELLA:  Just one.

21   FURTHER RECROSS EXAMINATION

22   BY MS. GAMBARDELLA:

23   Q.    So, in addition to the add/delete form that you now

24   say are tools for this ongoing monitoring, are squad lists

25   now, even after the first date of competition, another

1    tool?

2    A.   Yes, they will be.

3    Q.   Okay.

4    A.   Yes.

5    Q.   Thank you.

6         THE COURT:  All right.  Sir, you're excused.

7    Thank you.

8         THE WITNESS:  All right, thanks.

9         (Witness excused.)

10        MR. HERNANDEZ:  Your Honor, the plaintiff calls

11   Coach Germaine Fairchild.

12        (Pause)

13        THE COURT:  That's fine, thank you.  Good

14   morning.  Please remain standing and raise your right

15   hand.

16   G E R M A I N E      F A I R C H I L D,    called as

17   a witness on behalf of the Plaintiffs, having been duly

18   sworn by the Court, testified as follows:

19        THE COURT:  Please be seated.

20        MR. HERNANDEZ:  Thank you.

21   DIRECT EXAMINATION

22   BY MR. HERNANDEZ:

23   Q.   Could you please state your first and last name and

24   spell your last name for the record?

25   A.   Germaine Fairchild.  Last name is F-A-I-R-C-H-I-L-D.

1    Q.   And where do you live, Ms. Fairchild?

2    A.   I live in Naugatuck, Connecticut.

3    Q.   How long have you lived in Connecticut?

4    A.   I have lived in Connecticut since 2000, the year

5    2000.

6    Q.   And where are you from?

7    A.   I'm from Bolder, Colorado.

8    Q.   Is that where you were raised?

9    A.   Uh huh.  (Affirmative.)

10   Q.   And could you tell the court about your educational

11   background?

12   A.   I began my college education at Oregon State

13   University in 1991.  After my freshman year I transferred

14   to the University of Tulsa where I completed my

15   undergraduate degree.  I have a bachelor of science in

16   environmental policy.  And I began work on my masters in

17   business administration at the University of Tulsa.

18   Actually continued that at Quinnipiac.  I took one class

19   at Quinnipiac and I've not finished that.

20   Q.   And did you compete in any sports in college?

21   A.   I did.  I competed in softball at Oregon State and at

22   the University of Tulsa.

23   Q.   And what's your present employment?

24   A.   I'm currently the head softball coach at Quinnipiac

25   University.

1   Q.   And softball is a woman's sport at Quinnipiac, is

2   that correct?

3   A.   Yes.

4   Q.   And are you a part-time or full-time coach?

5   A.   I'm a full-time coach.

6   Q.   How long have you been a coach at Quinnipiac?

7   A.   I began as the assistant, one of the assistant

8   coaches at Quinnipiac in -- I started in the Fall of 2000,

9   I believe.  I spent one year as assistant and then took --

10  was hired in November of the following year as the head

11  coach.

12  Q.   And when you began working at Quinnipiac, did the

13  University have a roster management program?

14  A.   No.

15  Q.   Did there come a time when Quinnipiac instituted a

16  roster management program?

17  A.   Yes.

18  Q.   And do you recall when that was?

19  A.   '06-'07 was the first year that roster management

20  numbers appeared in our athletic department policy manual.

21  Q.   And when you received that manual, did you receive

22  any instruction from anyone in the athletic department on

23  how to implement the roster management program?

24  A.   No.

25  Q.   Did you have any questions about the roster

1   management program at that time?

2   A.   Yes.  I would say in the first year, fewer questions

3   because our number that we were supposed to meet was 20,

4   which was more doable.  It's probably two to three people

5   higher than would be ideal for a single full-time coach to

6   provide a legitimate Division I experience for, but fewer

7   questions there because I felt 20 was doable, if you will.

8   Q.   Okay.  Let's break that down.  How many women had

9   been on the softball team in the years leading up to

10  '06-'07, approximately?

11  A.   I would say approximately, if I had to pick an

12  average, we'd probably averaged around 18, but there were

13  also years where we only had 16, 17, so we fluctuated.  It

14  really depends on personnel.  You know, do you have two or

15  three pitchers who only pitch and don't do anything else

16  or do you have two or three pitchers that play other

17  positions and hit?  Then that, you know, then that takes

18  your necessary number down or up.

19  Q.   And in connection with the '06-'07 roster management

20  program, did anyone consult with you about fixing the

21  target number of 20 before they told you that was your

22  target number?

23  A.   No.

24  Q.   Okay.  And what was your reaction when you learned

25  that you had a target of 20 players for the '06-'07

```
 1    season?

 2              MS. GAMBARDELLA:  Your Honor, are we talking

 3    '06-'07?

 4              MR. HERNANDEZ:  Yes, because it informs her

 5    reaction to the '07-'08 number, Your Honor.

 6              MS. GAMBARDELLA:  I'm going to object to the

 7    relevance of this witness's reaction.

 8              THE COURT:  Well, rephrase the question.

 9    BY MR. HERNANDEZ:

10    Q.   Your '06-'07 number you mentioned was 20, is that

11    correct?

12    A.   That is correct.

13    Q.   All right.  And I believe earlier you said that you

14    believed 20 was a little bit on the outside, I believe as

15    you put it, number to provide a legitimate Division I

16    experience.  Could you explain to the court what you mean

17    by that?

18    A.   Well, you're the only full-time coach for the

19    program, and the assistant coaches are very part-time,

20    meaning they are paid very little.  So you, as the only

21    coach who's really there day in and day out, since your

22    assistants are there sporatically, some days yes, some

23    days no, some games yes, some games no.  So you're the

24    only person there day in, day out, to coach hitting, to

25    coach catching, to coach pitching, to coach infield
```

1    defense, to coach outfield defense.  When you really break

2    it down and look at softball, baseball, you know, there

3    are a lot of areas of the game that needs attention.  And

4    it's, you've got -- with one full-time head coach, you get

5    much past 18 players and it's -- you cannot provide a

6    legitimate Division I experience.

7         The players come in having been recruited to play

8    Division I softball and that means being able to compete

9    against other programs that do have the resources to coach

10   each phase of the game and have more than one coach to do

11   it.  So it just is not reasonable to think that one

12   full-time coach is going to be able to provide a

13   legitimate experience.

14        But also understand that a lack of budget dollars can

15   affect the number of student athletes on a team.  If a

16   coach with a given budget cannot extend equipment,

17   uniforms, and travel to the number, the excessive number

18   of players on a team, then those players aren't going to

19   want to stay.  So, you know, and you're asking some of

20   your players to not get the benefits of being a Division I

21   athlete once you move past a certain number.  So --

22   Q.   Did you have a budget in '06-'07 to support a 20

23   member woman's softball team?

24   A.   We made it work.

25   Q.   And how many players do you recall having at the

1   first scheduled competition for '06-'07?

2   A.   First scheduled competition '06-'07 -- 19.  In the

3   first scheduled competition in the Fall or in the Spring?

4   Q.   Okay, that's a good question.  How is the women's

5   softball season divided up?

6   A.   You have 132 days allowed you by NCAA rules to

7   compete in, excuse me, in full team mode.  During those

8   132 days, you can practice up to 20 hours a week and you

9   can compete against outside competition.  As a coach you

10  can divide that 132 days into two segments at your own

11  discretion.  Obviously you have to save the lion share of

12  it for the Spring season, your championship season.  So we

13  take, in softball, approximately 30 to 35 of those days

14  and use them for a short Fall season.  So the difference

15  between the Fall season and the Spring season is important

16  because the EADA numbers that are generated are generated

17  based on your roster size as of your first date of

18  competition for softball of your nonchampionship season.

19  Q.   Would that be in the Fall?

20  A.   That would be in the Fall.  So by the time you start

21  your championship season in the Spring, those numbers that

22  were reported to the EADA are potentially, and in our case

23  are, very different.

24  Q.   Let's talk about the Spring '07 season; how many

25  players did you field?

1    A.   In the Spring of '07, we fielded -- I have that

2    written down here -- 19, Spring '07.

3    Q.   All right.  And drawing your attention to '07-'08 --

4    are you refreshing your recollection with something?

5    A.   Yes.

6    Q.   Could you just explain for the record what it is that

7    you're refreshing your recollection?

8    A.   These are just copies of the athletic department

9    policy manual page that outlines roster management.  And

10   so I just put my own notes at the bottom saying what my

11   actual number was for the Spring.

12              THE COURT:  Okay.  I'm just going to ask you to

13   put that away.  If you need to refer to it, just say I

14   don't recall and then counsel will allow you to look at

15   it.

16              THE WITNESS:  Okay.

17              THE COURT:  That way the record is clear whether

18   your own memory -- you're testifying from your own memory

19   or from the document.

20              THE WITNESS:  Okay.

21              THE COURT:  Thank you.

22              MR. HERNANDEZ:  Thank you.

23   BY MR. HERNANDEZ:

24   Q.   Did you receive a roster management target number for

25   the '07-'08 softball season?

1    A.    Yes.

2    Q.    When did you receive that target number?

3    A.    When we have our annual staff meeting in the, I

4    believe it's usually the first Tuesday after Labor Day

5    every year, we have that, and that is published in the

6    athletic department policy manual which is distributed at

7    that meeting.

8    Q.    Okay.  And what was your target roster management

9    number for the '07-'08 softball season?

10   A.    Twenty-five.

11   Q.    Did anyone consult with you about that number before

12   you learned that your '07-'08 target roster number was

13   going to be 25?

14   A.    No.

15   Q.    I think you mentioned that 20 was sort of on the edge

16   of the number that you could coach and provide an, I

17   believe as you put it, a legitimate Division I experience,

18   is that correct?

19   A.    Yes.

20   Q.    Could you explain to the court whether 25 is a

21   reasonable number?

22   A.    It absolutely is not.

23   Q.    Could you explain to the court why not?

24   A.    Well, as I've stated before, you have one full-time

25   head coach trying to get the proper number of reps for

1    each player in each area of the game, as well as get them,

2    not just the reps but also the coaching time.

3         And so, for instance, when we break down into our

4    eight hour a week segment, now you're faced with

5    scheduling individual workouts, which there are two hours

6    a week for each player during the eight hour mode.  Only

7    two of those eight hours may be skill-related.  The other

8    six are strength and conditioning.  So you have per week

9    25 players who are going to come to the coaching staff

10   twice a week for an hour at a time.  You can actually

11   divide it up into less than hour slots but that's not

12   possible with, with only one coach.

13        So one hour apiece.  So you're looking at 50 hours a

14   week of individual time with your student athletes and

15   that's just individual workout time with them.  That

16   doesn't include your office work, the other things you

17   need to do to run a program.  So, now you would be faced

18   with telling I would say at least half of them, I'm sorry,

19   I don't have time to work with you.

20   Q.   Did you take any steps to make your 25 target number?

21   A.   Yes.  We hold an open tryout every Fall, as we're

22   required to do.  And knowing that our number is 25, we

23   knew we wouldn't be cutting anyone, at least not, not

24   until our first date of competition because we needed them

25   all to count.

1   Q.   Now, when you say you needed them to count, what do

2   you mean by that?

3   A.   Well, in order to make your roster number, it was

4   left -- the coaches were more or less left to their own

5   intelligence to figure out that, you know, you have to

6   have 25 as of a certain date.  That information was never

7   volunteered.  It was just here's your number, put 25

8   people on your team and that's it.

9   Q.   Did this new target number of 25, were you allotted

10  any additional part-time coaches?

11  A.   No.

12  Q.   Was your pay increased?

13  A.   No.

14  Q.   Were you provided any additional equipment?

15  A.   No.

16  Q.   Did your budget change?

17  A.   No.

18  Q.   Did you have any concerns about this 25 target

19  number?

20  A.   Me personally, huge concerns, because I am a champion

21  of my sport -- and I'm actually using a Jack McDonald

22  quote there.  I require excellence in everything that I do

23  related to softball.  I played it professionally, I have

24  coached it professionally, and it is my passion.  And so,

25  looking at the prospect of providing an excellent

1   experience for 25 people, by myself essentially, is

2   extremely, extremely frustrating because -- nothing's

3   impossible but it's very difficult, put it that way.

4   Q.   Did you bring your concerns about your new 25 target

5   number to the attention of anyone in the athletic

6   department?

7   A.   Yep.

8   Q.   Who did you express your concerns to in the

9   Quinnipiac University Athletic Department?

10  A.   I have brought it up with Jack McDonald and I have

11  brought it up with Tracey Flynn, mainly.

12  Q.   All right.  When did you first register your concerns

13  with Jack McDonald?

14  A.   In my performance reviews, which those happen

15  annually during the month of June, usually late May to

16  June.

17  Q.   And did he provide you with any guidance on your new

18  target number of 25?

19  A.   No.

20  Q.   What complaints did you register with Mr. McDonald at

21  that time?

22  A.   Simple question; are you going to increase our

23  budget?

24  Q.   And what did he say?

25  A.   No.

1   Q.   Did you ask him for any guidance on how to manage

2   this new target number of 25?

3   A.   To be honest with you, at that point in time I didn't

4   really know the right questions to ask.  Now I do, but at

5   that time my response was frustration.  Just sort of throw

6   my hands up and go, not sure how I'm going to get this

7   done.

8        And I think there's a difference in perspective.  I

9   mean from my perspective, I wasn't sure how I was going to

10  get it done because I only know one way in my sport and

11  that is the way of excellence.  But from their

12  perspective, I know the general attitude and I believe the

13  statement that was made is the kids will adjust.

14  Q.   Who said the kids will adjust?

15  A.   Jack.

16  Q.   And this is after you expressed your concern about

17  providing legitimate Division I experience?

18  A.   Uh huh.  (Affirmative.)

19  Q.   You have to answer yes.

20  A.   Oh, yes.  Sorry.

21  Q.   So, let's cut to the first day of competition in '07.

22  How many student athletes did you have on that date in

23  '07?

24  A.   First date of Fall '07?

25  Q.   Yes.

1    A.   So the '07-'08 year?

2    Q.   Yes.

3    A.   The first date of competition, Fall of '07, we

4    carried 26 players.

5    Q.   So you made your number?

6    A.   We made our number, plus one.

7    Q.   And just so we're clear, when we're talking about

8    numbers, we're talking about students?

9    A.   Yes, the student athletes.

10   Q.   Living, breathing people?

11   A.   Yes.

12   Q.   They aren't just numbers; they are people?

13   A.   At that point in time they were people.

14   Q.   Now, how many -- did there come a time when you lost

15   players in the Fall of '07?

16   A.   Yes.  After having carried them, I carried all of our

17   walk-on candidates for approximately two weeks from the

18   date of our tryout up until our first date of competition.

19   So for two weeks, the softball practice was full of 26

20   people.

21        Upon our first date of competition, which was, I

22   believe it was Saturday or Sunday -- Mondays are off dates

23   so Tuesday, I began to notify the student athletes who I

24   feel were not going to make our team that I would offer

25   them a practice squad spot.  What I told them is that I

1    don't -- I cannot provide them with equipment, I can't

2    provide them with travel and I cannot provide them with

3    uniform.  But if they would like to remain in contact with

4    our coaching and have access to our coaching, I would be

5    happy to extend them that practice squad opportunity.

6    Q.   And when you told these players that you were not

7    going to be able to offer them travel, did you have money

8    budgeted for their travel?

9    A.   No.

10   Q.   When you told them that you weren't going to be able

11   to provide them with equipment, was there money budgeted

12   for equipment for those players?

13   A.   No.

14   Q.   Did you register your concerns about this 25 person

15   target number with Tracey Flynn?

16   A.   Yes.

17   Q.   And when did you first register your concerns with

18   her?

19   A.   Sometime between the annual staff meeting and our

20   tryout, because that's the period of time in which I was

21   trying to figure out how we're going to handle it.

22   Q.   So are we talking about the Summer of '07?

23   A.   Yes.

24   Q.   Okay.  What did you say to Ms. Flynn?

25   A.   Basically just asked how, how -- asking for her

1    suggestions, if you will, how to do this, how to get it

2    done.  How to -- I don't know how to get it done.

3    Q.   And what did Ms. Flynn say?

4    A.   Well, I think upon -- and she's our direct sport

5    supervisor for softball, so any concerns that I would have

6    obviously would go to her first as our direct sport

7    supervisor.  She simply shared with me some facts about

8    how the system operates to help educate me better about

9    how it works.

10   Q.   And what facts did Tracey Flynn share with you at

11   that time?

12   A.   That the EADA report is the reason why we are

13   engaging in these roster management practices, is why we

14   all need to make our number, and that report is generated

15   as of your first date of competition against outside

16   competition in the Fall.

17   Q.   And did she provide any guidance as far as the

18   add/cut list?

19   A.   At that point in time, no.  She simply gave me a fact

20   about how things were done.

21   Q.   Okay.  Did there come a time when she discussed the

22   add/drop list with you?

23   A.   Upon figuring out now using my own -- putting pieces

24   together, just, I remember being asked by her to just keep

25   your roster change forms up-to-date.

1    Q.    Okay.  And when did she direct you to keep your

2    roster change forms up-to-date?

3    A.    As we began to turn them in, because obviously the

4    Tuesday after the tryouts, there's a bunch of add forms

5    that go in electronically, and then as those student

6    athletes begin to make the decision or those possible

7    student athletes begin to make decisions to not, no longer

8    participate, now you're sending the same form in but they

9    are now delete or drop forms or delete forms.  So it's the

10   same form, it's just a different box that you check, and

11   she just asked that you keep those up-to-date so that she

12   could attempt to keep her paperwork straight, which I'm

13   sure is difficult.

14   Q.    Okay.  And do you know what your -- what was your

15   target number for '08-'09?

16   A.    Twenty-five.

17   Q.    And did that present the same problems?

18   A.    Yes.

19   Q.    Did you renew your concerns with Jack McDonald?

20   A.    No.

21   Q.    Why not.

22   A.    Because nothing changed.  There was, there was no --

23   nothing had changed so I assumed that what I had heard in

24   the past with regard to my concern was the same.

25   Q.    So --

1    A.    Basically going forward, okay, '06-'07, okay, 20, on

2    the outskirts but doable.  25, how I do handle this?

3    Figure it out.   That's going to be the status quo here.

4    That's what we're going to do.

5    Q.    Okay.  And did you express any concerns about the

6    '08-'09 number with Tracey Flynn before the beginning of

7    the '08 competitive season?

8    A.    I would say, if at all, it was just probably a

9    reiteration of the same, like -- 25 again.  Keeping up

10   with those roster change forms.

11   Q.    And what was Tracey Flynn's reaction?

12             MS. GAMBARDELLA:  Reaction to what?

13   Q.    To your statement?

14   A.    Just probably an affirmative nod and, yep, that's the

15   way we do it.  I'm not saying she said that, I'm saying

16   that's probably what her affirmative nod meant.

17   Q.    So she nodded her head and that's what you understood

18   her to mean by that?

19   A.    Yes.

20   Q.    Status quo?

21   A.    Status quo.

22   Q.    Did you meet your target roster management number in

23   the beginning of the '08 Fall season?

24   A.    No.

25   Q.    How many students did you have at tryouts?

1    A.    At tryouts we had ten, I believe.  Now, that would

2    include some recruited and/or invited walk-ons, so not

3    including the returners, the veteran players.

4    Q.    How many veterans did you have?

5    A.    Thirteen.

6    Q.    So, you had the 13 veterans and ten for tryouts on

7    top --

8    A.    Ten new players.

9    Q.    All right.  And how many players did you have in the

10   Fall of '08 on the first date of competition?

11   A.    First date of competition, 23.

12   Q.    All right.  And is that the number that you reported

13   to the university?

14   A.    Yes.  Actually when I go through and work it out, I

15   actually have 24, but I'm not sure how a certain student

16   athlete was handled because of a recurring injury.  I'm

17   not sure how compliance handled her, if they handled her

18   as an undergraduate coach or what.  But my number in '08,

19   as I calculated it, is 24 but I believe the documentation

20   says 23.

21   Q.    Okay.  And did you have to drop any students after

22   the first date of competition?

23   A.    I did not.  I have not cut a player.  I have always

24   offered them an opportunity to remain in touch with

25   coaching if they wanted to try to improve their skills and

1    tryout for our team again.

2    Q.    And how many softball players did you have beginning

3    the championship season in Spring of '09?

4    A.    Nineteen.

5    Q.    And what happened to those other players?

6    A.    They quit.

7    Q.    And were you able to provide them with -- well, what

8    did you say to those players, the ones who ended up

9    quitting?

10          MS. GAMBARDELLA:  What is the relevance of what

11   she said to the players who quit, Judge, in the Spring?

12          THE COURT:  Yes, sustained.

13          MS. GAMBARDELLA:  Okay.

14   BY MR. HERNANDEZ:

15   Q.   Were you able to offer the players who you didn't

16   think were going to make the team, were you able to offer

17   them travel with the team?

18   A.   No.

19   Q.   Did you have money budgeted for travel for those

20   players?

21   A.   No.

22   Q.   Were you able to offer those players who eventually

23   quit, uniforms?

24   A.   No.

25          MS. GAMBARDELLA:  Players who quit, uniforms?

1    BY MR. HERNANDEZ:

2    Q.   Were you able to offer the players who eventually

3    quit, equipment?

4    A.   No.

5    Q.   Did you have money budgeted for equipment?

6    A.   No.

7    Q.   And have you had any conversations with Ms. Flynn

8    since this lawsuit was brought?

9    A.   I have.

10   Q.   All right.  And drawing your attention to late last

11   year, Fall of last year, did you and Ms. Flynn have an

12   opportunity to talk about how to make changes at

13   Quinnipiac University with respect --

14           MS. GAMBARDELLA:  Objection.  This is very

15   leading.

16           MR. HERNANDEZ:  I have to frame the situation,

17   Your Honor.  I have to draw her attention to a

18   conversation.  That's the only way I can do it.

19           THE COURT:  Ask the question and see if there's

20   an objection.

21   BY MR. HERNANDEZ:

22   Q.   Before March of '09, did you and Ms. Flynn have any

23   conversations about lawsuits?

24   A.   I would say that the conversation did not begin

25   because we were talking about lawsuits.  I would say that

in the course of expressing frustration, which I will say
that I do a lot and I lean on Tracey a lot as our sport
supervisor to ask for her wisdom in dealing with the way
that things are done -- and everybody has their different
bones to pick, I understand that. But in relying on her
to help me quell some of this frustration, I think I made
some really good points in conversations with her that
honestly let her with no other response other than, the
only way anything's going to change around here is if
someone is willing to sue.

Q.   Who said the only way anything is going to change
around here is if someone is willing to sue?

A.   Well, it probably could have gone a couple different
ways but I can recall in one of the conversations saying
that myself and having her agree with me, and I can recall
probably another conversations where she said, you're
right, the only way anything's going to change is if
someone sues.

Q.   And when she mentioned, or when you were talking
about a lawsuit, had you also been discussing the roster
management program at Quinnipiac University?

A.   Yes.

        MS. GAMBARDELLA:  Your Honor, Mr. Hernandez just
testified.

        MR. HERNANDEZ:  I believe the question and

1   answer stands on its own, Your Honor, and the objection

2   has to be timely.  It's on the record.

3        THE COURT:  Well, I'm going to strike the answer

4   and ask you to ask it again.

5   BY MR. HERNANDEZ:

6   Q.   What other subjects did you discuss with Ms. Flynn in

7   this conversation where you and she agreed that the only

8   way anything was going to change at Quinnipiac University

9   was if somebody brought a lawsuit?

10  A.   Well, roster management.  And, you know, I know

11  perhaps outside of the athletic department it seems like

12  such a small thing perhaps to an outside view, but I have

13  never asked for my salary to be increased.  I've never

14  even -- I haven't even asked for my assistant coach's

15  salary to be increased.  I've never even asked for a full

16  time assistant in response to being asked to provide a

17  legitimate Division I experience for 25 people.  The only

18  thing I ever asked is that we be given a budget that

19  supports that number of people.  So the only, the only --

20  the main source of my frustration as a coach has been

21  roster management, being asked to carry 25 people without

22  the resources to do so.  So, in that conversation, in most

23  conversations, that's the source of the frustration.

24  Q.   All right.  And I'm going to draw your attention

25  to -- well, withdrawn.

1        Does the Athletic Department have regular staff

2   meetings?

3   A.   Yes.

4   Q.   And how often are those staff meetings?

5   A.   Once a week.

6   Q.   When during the week?

7   A.   Wednesdays at ten a. m., usually ten a. m.

8   Q.   And who attends the weekly Wednesday staff meetings?

9   A.   As many coaches as are available.  Some coaches are

10  at practice, some of us who teach in the physical

11  education department are teaching class at that time, as

12  was my case.  Administrators usually are in attendance

13  unless they, again, have another duty.  But I would say

14  typically most of the coaches attend regularly, not all

15  coaches.  And Jack McDonald, Tracey Flynn, Lyneene

16  Richardon, Andy Castagnola, Billy Mecca, from an

17  administrator, they usually are in attendance.

18  Q.   Okay.  And did there come a time when you learned

19  that the women's volleyball program was being eliminated

20  at Quinnipiac?

21  A.   I think I heard about it when everybody else heard

22  about it, when it was announced in, obviously -- well, it

23  was sort of announced on website.  It was actually kind of

24  hard to find, it was a little bit buried on the website.

25  I believe it was even password protected, but obviously

1    the media got a hold of it too.

2    Q.   And have there been weekly staff meetings since this

3    lawsuit was brought?

4    A.   Yes.

5    Q.   Drawing your attention to last week, did you attend

6    last Wednesday's athletic staff meeting?

7    A.   I did.

8    Q.   Okay.  And who led that meeting?

9    A.   Jack.

10   Q.   And was Tracey Flynn present at that time?

11   A.   Yes.

12   Q.   Was there any discussion about the roster management

13   program at Quinnipiac University at that meeting?

14   A.   Yes.

15   Q.   Who talked about the roster management program at

16   that meeting?

17   A.   Jack.

18   Q.   What did Jack McDonald say about Quinnipiac

19   University's roster management program at last week's

20   meeting?

21   A.   He said he felt that for the most part our coaches

22   had done it correctly and that we were not in violation of

23   any rule or law, and that he thought we would come through

24   this.

25   Q.   And was there any discussion at that meeting about

1    the competitive cheer program?

2    A.    Yes.

3    Q.    And what was said about the competitive cheer

4    program?

5    A.    I believe it was anyone who thinks that competitive

6    cheer -- or I believe he did not refer to it as

7    competitive cheer, he referred to it as cheerleading --

8    and anyone who believed that cheerleading does not belong

9    at the varsity athletic level should not be in NCAA

10    sports.

11    Q.    And the Jack that you're referring to, was that Jack

12    McDonald?

13    A.    Yes.

14    Q.    And was Tracey Flynn present at that meeting?

15    A.    Yes.

16    Q.    Since this lawsuit was instituted, have you received

17    any guidance on the future use of the roster management

18    program at Quinnipiac University?

19    A.    No.

20    Q.    Have you received any memoranda, sort of for lack of

21    a better word, disowning the past use of roster

22    management?

23            MS. GAMBARDELLA:    Objection.

24            MR. HERNANDEZ:    I'll withdraw the question.

25    It's not a good question.

1   BY MR. HERNANDEZ:

2   Q.   Were any instructions on roster management provided

3   at last week's meeting?

4           MS. GAMBARDELLA:  Asked and answered.

5           MR. HERNANDEZ:  It's a different question.

6   A.   No.

7           THE COURT:  I'll allow it.

8   BY MR. HERNANDEZ:

9   Q.   I'm sorry, could you --

10  A.   The question was were any further instructions

11  provided regarding roster management?

12  Q.   Correct.

13  A.   No.

14          MR. HERNANDEZ:  If I could just have a moment,

15  Your Honor?

16          (Pause)

17  BY MR. HERNANDEZ:

18  Q.   The Fall add-ons, that is the walk-ons as opposed to

19  the recruited softball players, in your opinion did they

20  have Division I level skills?

21  A.   No.  Well, some of them didn't, some of them did not.

22  We did keep a couple of them.

23  Q.   All right.  Did the presence of those players who did

24  not have Division I skills have any impact on the rest of

25  the team?

```
1    A.   Yes.  Not this past season but in the Fall of '07,
2    beginning the '07-'08 year, I had more than one meeting
3    with my captains that they requested with me to ask me why
4    we were keeping this many people.  And, mind you, I ended
5    up with 26 counting, which means I had 26 people at
6    practice for two weeks.  Now, this is -- they are senior
7    here and they are ready to go, they want to really figure
8    out who's going to fit in where and get this thing ironed
9    out.  So they're, they requested meetings with me to ask
10   why are we keeping all these people for two weeks of our
11   Fall season?  Our Fall season is only going to last five
12   weeks, why are we doing this?  And I didn't feel
13   comfortable telling them exactly what my plan was so I
14   just said, look, this is what we have to do and you just
15   need to support the coaches on this.
16   Q.   Did that have any impact on the morale of the team?
17   A.   Yes.
18             MS. GAMBARDELLA:  Your Honor --
19   A.   I think that's why they were in my office asking me
20   about it, is because they, it was affecting their --
21             MS. GAMBARDELLA:  I object.
22             THE COURT:  Just a moment.  When she objects,
23   you need to stop.
24             MS. GAMBARDELLA:  This is totally irrelevant.
25   Team morale and how -- I mean players have different skill
```

```
 1    sets.  Are we going do have a little trial about how every

 2    other team in Quinnipiac where some players are better

 3    than others, the team doesn't like it?  This is way beyond

 4    the issues and participation opportunities.

 5              MR. HERNANDEZ:  I'll move on, Your Honor.  I

 6    believe the question and answer stand for themselves.

 7              THE COURT:  All right.

 8              MS. GAMBARDELLA:  No, we want the answer

 9    stricken.

10              MR. HERNANDEZ:  I heard the objection --

11              THE COURT:  I'll deny the motion to strike.

12              MS. GAMBARDELLA:  Thank you.

13    BY MR. HERNANDEZ:

14    Q.   As a Division I coach, are you expected to try to

15    recruit players for your team?

16    A.   Yes.

17    Q.   And do you recruit players for the Quinnipiac

18    softball team?

19    A.   Yes.

20    Q.   And after you were given these new target management

21    numbers, did you receive any additional funds to help you

22    recruit more Division I quality athletes to fill up your

23    target number?

24    A.   No.

25    Q.   How many softball athletes actually competed during
```

1    the Spring 2009 season?

2    A.    Seventeen.

3    Q.    Seventeen.  And, again, for the EADA reports you

4    reported 26, is that correct?

5    A.    No, 23.

6    Q.    Twenty-three?  All right.

7    A.    Twenty-six was the year before.

8    Q.    Twenty-three, okay.  So a difference of five, is that

9    fair say to say?

10   A.    Uh huh.  (Affirmative.)

11              THE COURT:  Six.

12              MS. GAMBARDELLA:  Six.

13              THE WITNESS:  Six.

14   BY MR. HERNANDEZ:

15   Q.    How many softball athletes actually competed during

16   the Spring 2008 season?

17   A.    Spring 2008 was 17 as well.

18   Q.    All right.  And, again, how many were reported for

19   EADA purposes in the --

20              MS. GAMBARDELLA:  Objection.

21   A.    Twenty-six.

22              MS. GAMBARDELLA:  Spring?  I'm not sure Spring

23   competition is reported to EADA.

24              THE COURT:  No, no.

25              MR. HERNANDEZ:  I don't think she understood my

1    question.

2            THE COURT:  The question was "How many

3    participants in the Spring and the follow up was how many

4    were reported, paren, in the Fall, close paren, on the

5    EADA report.  He was asking how many were on the report.

6    The report is put in in the Fall.  He's contrasted the

7    Fall number and the Spring number.

8            MS. GAMBARDELLA:  Right, but you don't report

9    two numbers to the EADA.

10           THE COURT:  No, correct.  He's only asked about

11   what number was reported.

12           MS. GAMBARDELLA:  Got it.

13           THE COURT:  You can answer.

14   BY MR. HERNANDEZ:

15   Q.   Did you understand my question, Ms. Fairchild?

16   A.   I did.

17   Q.   Thank you.  How many were reported in the EADA

18   reports for the 2007, 2008 season?

19   A.   Twenty-six in '07-'08.

20   Q.   Okay.

21   A.   Twenty-three in '08-'09.

22   Q.   Okay.  And this time I've got the number right, a

23   difference of nine, is that correct?

24   A.   Yes.

25   Q.   Okay.

1          MR. HERNANDEZ:  I have no other questions, Your

2     Honor.

3          THE COURT:  All right.  Cross?

4          (Pause)

5          THE COURT:  Why don't we do this.  Why don't we

6     take a ten minute break, all right?  And we'll come back

7     at 11:30.  Stand in recess until then.  Thank you.

8          (Whereupon a recess was taken from 11:20

9        o'clock, a. m. to 11:30 o'clock a. m.)

10    CROSS EXAMINATION

11    BY MS. GAMBARDELLA:

12    Q.   Good morning, Ms. Fairchild.

13    A.   Good morning.

14    Q.   This morning one of the questions I asked you in our

15    meeting was your understanding of the purpose for the

16    introduction of roster management at the university and

17    your answer to me was to achieve proportionality, do you

18    remember that?

19    A.   Yes.

20    Q.   Okay.  Is that, in fact, your understanding of why it

21    was introduced, to achieve proportionality?

22    A.   That is what I understand it to be now --

23    Q.   Okay.

24    A.   -- through my own research.

25    Q.   Through your own research?

1    A.    Yes.

2    Q.    Okay.  Now, you indicated that you met and maintained

3    for the most part a number of 23 participants last year,

4    correct?

5    A.    Twenty-three in '08-'09.

6    Q.    Yes, the year we just finished?

7    A.    Yes.

8    Q.    And in '07-'08?

9    A.    '07-'08, the number reported to the EADA?

10   Q.    No.

11   A.    That the number we're talking about?

12   Q.    No, we're talking about the number over the course of

13   the season on average of participants that you maintained

14   in the academic year we just finished, let's retreat back

15   there.

16   A.    I can't tell you.  I don't know what you mean by the

17   number on average.  That doesn't make any sense.

18   Q.    The first day of competition for '08-'09 was 23, is

19   that correct, or was it 26?

20   A.    In '07-'08?

21   Q.    Okay.

22   A.    Okay?

23   Q.    Yes.

24   A.    Upon the first date of competition in the Fall, 26.

25   Q.    Okay.  And through that Fall season, how many players

1    did you maintain?

2    A.   Until they started quitting, I maintained all of them

3    but they began to quit.

4    Q.   The three or four quit?

5    A.   The nine, we had nine quit.

6    Q.   Nine quit.  Okay.  Do --

7    A.   And not all at the same time.

8    Q.   Got it.

9    A.   That's why I can't answer, I can't say on -- at

10   different times they decided they wanted to quit.

11   Q.   Understood, understood.  Students quit other teams

12   after the season starts, wouldn't you agree with that?

13   A.   I would.

14   Q.   For a variety of reasons, would you agree with that?

15   A.   I would.

16   Q.   Now, you said that no one gave you -- well, I think

17   the question was did anybody give you guidance and the

18   answer was no, with respect to how to achieve the numbers.

19   Do you remember that question and that answer?

20   A.   I do.

21   Q.   You are the coach of the women's softball team,

22   correct?

23   A.   Correct.

24   Q.   Isn't it a fact that what the athletic department

25   told you was they'd give you discretion and judgment in

1    determining how to get to those numbers?

2    A.   That was never stated to me.

3    Q.   Well, what was your understanding of why it was being

4    left up to you?

5    A.   I didn't have an understanding.  That's why I went to

6    Tracey Flynn, and actually Jack McDonald first in my

7    performance evaluation thing.  I don't know how to meet

8    this number.

9    Q.   And did you testify on direct that Tracey Flynn had

10   given you, she had discussed some ideas and direction in

11   that regard?

12   A.   I think what I said earlier was that she provided me

13   with one basic fact.

14   Q.   It had to get done.

15   A.   No.

16   Q.   Okay.

17   A.   Do you remember what the fact was?

18   Q.   No, but here's how it works.  I get to ask you, okay?

19   A.   Well, I said it earlier.

20   Q.   I heard what you said.

21   A.   Would you like me to restate it?

22   Q.   No.  Now, does every athletic program at Quinnipiac

23   have assistant coaches in addition to full-time coach?

24   A.   I assume so.  I'm not, you know --

25   Q.   But you don't know?

1    A.    I see assistant coaches around and I know who they

2    work for.  I mean can I talk about every program?

3    Q.    Yes.

4    A.    I can't.  I'm the softball coach.  I can't speak for

5    other programs.

6    Q.    That's a way of telling me you don't know the answer

7    to that question.

8    A.    Not in fact, no, I don't.

9    Q.    Okay.  And, indeed, in terms of the budget

10   constraints which you had articulated concerns about

11   throughout the past couple of years and for next year, do

12   you remember that testimony?

13   A.    Uh huh.  (Affirmative.)

14   Q.    Is it not the case that every athletic program at

15   Quinnipiac has budget constraints?

16   A.    Absolutely true.

17   Q.    And every coach is going to have to figure out how to

18   budget enough to make it work for the number of

19   participants allotted to those particular teams; would

20   that be true?

21   A.    The number of participants allotted --

22   Q.    Team members.  Let's stick with team members.  Every

23   coach is going to have to figure out how to spread the

24   money around for the team, correct?

25   A.    Correct.

1    Q.   And are you aware that there are cuts that are going

2    to be implemented across the board in every athletic

3    program for next year?

4    A.   Yes.

5    Q.   So everybody's going to have the same problem,

6    wouldn't you agree with me?  Men's coaches and women's

7    coaches?

8    A.   No, I would not agree with you.

9    Q.   They are not all going to have the same problem

10   trying to make, to figure out how to make it work with

11   less money?

12   A.   You're saying all --

13   Q.   All the coaches?

14   A.   -- of all the sports teams at Quinnipiac?

15   Q.   Yes.

16   A.   Again, I'm not an expert but basically you're asking

17   me my opinion.  I'm not an expert.

18   Q.   No, I'm not --

19   A.   I don't know, I mean I don't know.

20   Q.   If you don't know, that's a perfectly acceptable

21   answer.

22   A.   Well, I will not agree to the statement that all

23   teams will endure the same budget cuts.

24   Q.   How do you know?

25   A.   Well, if certain actions that have been taken in the

1    last two weeks are any indication, all indications are

2    that there are four programs at the university that are

3    not enduring much in the way of budget cuts.

4    Q.   Okay.  Well, do you agree with me that athletic

5    programs at Quinnipiac, in addition to women's softball,

6    are going to have to deal with budget cuts?

7    A.   Yes.

8    Q.   That would include men's programs also, correct?

9    A.   Some, yes.

10   Q.   Now, your concerns were about excellence in Division

11   I experience, that your budget was tight to support the

12   number of players you were expected to support.  Those

13   were the concerns that you had articulated to Jack and

14   Tracey throughout the past couple of years, correct?

15   A.   Correct.

16   Q.   Okay.  Let me just see -- now, would you agree with

17   me that if there are different skill levels on any team at

18   Quinnipiac, that could in a sense in some way affect the

19   other players, correct?

20   A.   (Pause)

21   Q.   That's true for any team, isn't it, Ms. Fairchild?

22           MR. HERNANDEZ:  Objection, Your Honor.  It's

23   obvious the witness is thinking about what her answer's

24   going to be.

25           MS. GAMBARDELLA:  I withdraw it.

1    MR. HERNANDEZ:  I object to Ms. Gambardella

2    interrupting the witness while she's trying to form her

3    answer.

4    MS. GAMBARDELLA:  I'm just trying to make the

5    question more direct and easier, Judge.  I'll withdraw the

6    last two questions, okay?

7    BY MS. GAMBARDELLA:

8    Q.   Differing skill levels of team players could affect

9    every team, correct?

10   A.   If they were asked to entertain players who don't

11   have the skill level, but not every team is asked to do

12   that.

13   Q.   Ms. Fairchild, do you believe that on the athletic

14   programs at Quinnipiac, everybody on the team has the same

15   skill level?

16   A.   No.

17   Q.   Okay.  If some players play better than others, does

18   that potentially affect the team?

19   A.   It's not about -- I don't think the question is about

20   people playing better than others.  There's a difference

21   between playing better than others and skill level.

22   Q.   Okay, let's choose your phrase.

23   A.   Mantle and Maris, you know, even the greatest hitter

24   supposedly in baseball is still going to go 0 for five

25   some days, so --

1    Q.   Every team will have different skill levels on the

2    team, correct?

3    A.   Correct.

4    Q.   And you already testified at some point, and I don't

5    remember if it was last year or the year before, there was

6    a team member -- and if I'm wrong, correct me -- who said

7    why do we have so many people practicing?  Was that a team

8    member that said that to you?

9    A.   Uh huh.  (Affirmative.)  I'm sorry, yes.

10   Q.   I'm sorry, I didn't mean to interrupt you.

11   A.   Well, I have a habit of saying uh huh and I have to

12   say yes.

13   Q.   That's okay.  Yes, and your answer was because this

14   is what has to be done?

15   A.   Yes.

16   Q.   Right?

17           MS. GAMBARDELLA:   One moment.

18           (Pause)

19   BY MS. GAMBARDELLA:

20   Q.   Some of the other men's programs have more

21   participants, more roster -- let me withdraw it.

22        They have more team members than you have, correct?

23   A.   Which sports?

24   Q.   Any of them?

25   A.   The relevance of my answer depends on which sport

1    you're talking about.

2    Q.   Do any men's teams have more participants than the

3    participants on the women's softball team?

4    A.   Sure, yes.

5    Q.   And they are going to be expected to fill those

6    numbers as well, correct?

7    A.   Well, they are actually wishing they could fill those

8    numbers.

9    Q.   Are they going to be expected, like you were

10   expected, to fill those roster targets?  Yes or no.

11   A.   They are going to be expected to hold their rosters

12   to that number.

13   Q.   Thank you.

14           MS. GAMBARDELLA:  No further questions.

15           THE COURT:  All right.  Redirect?

16   REDIRECT EXAMINATION

17   BY MR. HERNANDEZ:

18   Q.   Ms. Fairchild, do you feel that you are expected to

19   hold your rosters to the target management number?

20   A.   Yes.  I feel we are, I feel I, as a sports coach of a

21   women's sport that is not a head count sport, am expected

22   to meet a high number.  It is my opinion and, again, only

23   my opinion, that men's teams are expected to hold down

24   their roster number.

25   Q.   Okay.  And what do you base that on?

1    A.    The athletic departmental policy manual sheets.  It's

2    right there in front of you.

3    Q.    Okay.  And, again, you've been at Quinnipiac since

4    2000?

5    A.    Yes.

6    Q.    All right.  Almost a decade now?

7    A.    Yeah.

8    Q.    Time flies.

9    A.    Yes, it does.

10   Q.    You know what you're talking about.

11   A.    Yes.

12   Q.    I believe you were asked about roster management as a

13   tool, and I believe Ms. Gambardella asked you it was your

14   understanding that roster management is a tool to achieve

15   proportionality.  Do you recall her asking you about that?

16   A.    I do.

17   Q.    And when you refer to proportionality, are we

18   referring to gender equity; that is, male/female

19   participation?

20   A.    Yes.

21   Q.    All right.  And when you refer to roster management

22   as a tool to achieve proportionality, when you were

23   talking about that, is that your understanding of what the

24   tool is supposed to be used for?

25   A.    My understanding and what is written in the OCR

1    guidelines, is that roster management is the practice of

2    limiting the number of male student athletes who can walk

3    onto a team.  Now, if you extrapolate that rationally --

4            MS. GAMBARDELLA:  Your Honor, she is not an

5    expert on OCR guidelines.  So her --

6            MR. HERNANDEZ:  There was no objection to the

7    question, Your Honor.  She should be allowed to answer.

8            MS. GAMBARDELLA:  Okay.

9            THE COURT:  Well, okay, she's objecting now.

10           MS. GAMBARDELLA:  I object.

11           THE COURT:  Let's just -- let's ask the question

12   again.

13   BY MR. HERNANDEZ:

14   Q.   Could I have the question read back, please?

15           THE COURT:  "When you refer to roster management

16   as a tool to achieve proportionality, when you are talking

17   about that, is that your understanding of what the tool is

18   supposed to be used for?"

19   BY MR. HERNANDEZ:

20   Q.   You can answer.

21   A.   In our --

22           THE COURT:  Just a moment.  All right, just a

23   moment.  Is there an objection?

24           MS. GAMBARDELLA:  Yes, the objection is the --

25   she's starting to answer about OCR guidelines and the

1    meaning and the implication and the application, so if

2    he's asking her her understanding at Quinnipiac, I have an

3    issue with that.

4              MR. HERNANDEZ:  That's a different question and

5    that's coming up next.

6              MS. GAMBARDELLA:  Please don't interrupt me,

7    counsel.

8              THE COURT:  All right, one at time.

9              MS. GAMBARDELLA:  Thank you.

10             THE COURT:  What's the objection?

11             MS. GAMBARDELLA:  The objection to the question

12   is, A, goes beyond the direct; B, goes beyond the cross.

13   He's already asked her -- and the only question I asked

14   her was, I asked her this morning her understanding at

15   Quinnipiac, whether was it was a tool with which she

16   achieved proportionality.

17             MR. HERNANDEZ:  She didn't say Quinnipiac.

18             THE COURT:  All right.  One at time.  Let's get

19   the objection.  You can respond.  Anything further on the

20   objection?

21             MS. GAMBARDELLA:  No.

22             THE COURT:  What's the response?

23             MR. HERNANDEZ:  I believe counsel opened the

24   door to this area.  She asked the witness about what

25   roster management is for and what the purpose of it is and

1    I believe I have a right to explore that with this witness

2    because I believe that there's some subtleties between the

3    answers as given and how roster management is actually

4    implemented at Quinnipiac and I would like to explore

5    that.

6         MS. GAMBARDELLA:  We can look it up on the

7    record but my exact question was this morning during our

8    interview, did I ask you and did you tell me you

9    understood the goal of roster management at Quinnipiac

10   University was to achieve proportionality.  That was the

11   question I asked.

12        THE COURT:  Let's just be clear.  There's no, I

13   don't understand there be an interest in examining roster

14   management beyond Quinnipiac.  Am I correct or incorrect

15   about that?

16        MR. HERNANDEZ:  Well, I think it's relevant,

17   Your Honor, because to the extent that Quinnipiac is

18   holding roster management out as a neutral device to

19   achieve gender equity but if in fact it is being

20   implemented in a nonneutral way, I think we have to make a

21   distinction between the tool as it is intended to be used

22   and how it's actually being implemented at Quinnipiac.

23        THE COURT:  But there's no, there's nothing in

24   the record anywhere that roster management is a tool

25   that's used anywhere other than Quinnipiac, so let's just

1    focus in on Quinnipiac, and the difference can be the

2    theory of roster management and the practice of roster

3    management.

4              MR. HERNANDEZ:  Fair enough, Your Honor.

5              THE COURT:  But let's just focus in on

6    Quinnipiac.

7              MR. HERNANDEZ:  Fair enough, Your Honor.

8    BY MR. HERNANDEZ:

9    Q.   Ms. Fairchild, based on your now ten years'

10   experience at Quinnipiac and your recent experience from

11   '07 to the present with roster management at Quinnipiac,

12   is roster management, as it's implemented at Quinnipiac,

13   do you believe it's being used to achieve gender equity

14   proportionality?

15   A.   No.

16             MS. GAMBARDELLA:  Your Honor -- Your Honor, I

17   didn't ask her her belief.  I said her understanding from

18   Quinnipiac.  This witness's beliefs are not relevant

19   unless we lay a foundation.  And I didn't ask her for her

20   opinion and I didn't ask her any questions other than

21   what's been articulated to her.

22             THE COURT:  Well, I'm going to sustain the

23   objection.  I don't even understand what you're asking.

24   The question is ambiguous.  So just, let's rephrase it and

25   try again.  In other words, is this -- is the question

```
 1    whether she believes gender equity is actually being
 2    achieved or whether she believes that's the purpose of the
 3    question -- or of the practice.
 4              MR. HERNANDEZ:  I understand, Your Honor, and
 5    for the record, the witness was in the midst of answering
 6    my question when Attorney Gambardella interrupted her.  I
 7    believe she was preparing to explain that.
 8    BY MR. HERNANDEZ:
 9    Q.   Ms. Fairchild, is roster management, as it has been
10    explained to you, as you have been not instructed on how
11    to implement it, is it being implemented at Quinnipiac in
12    a manner to achieve gender equity proportionality?
13    A.   No.
14    Q.   Could you --
15              MS. GAMBARDELLA:  Objection, foundation.
16              THE COURT:  Well, I'll allow it.
17    BY MR. HERNANDEZ:
18    Q.   Your answer was no; could you explain to the court
19    why you believe that roster management, to the extent that
20    it has been a direction to the coaches, is not being used
21    in a manner to achieve gender equity at Quinnipiac?
22    A.   Roster management is, is I think a tool that is put
23    in place to limit male walk-ons, to help athletic
24    departments reach proportionality and take into
25    consideration budgetary constraints, among other things.
```

1          What happens at Quinnipiac, however, is we basically

2     end up counting unused roster spots.  Twenty-six, the

3     number in '07-'08 was 26.  I didn't feel -- I didn't have

4     26 players on my team, I did not have 26 players who

5     received actual benefits, actual people.  It is supposed

6     to be -- an opportunity to participate is defined as the

7     following.  Real people receiving real opportunities,

8     receiving real benefits.  Travel, uniforms, equipment,

9     among other things.

10         The fact of the matter is that with many of the

11    women's programs at Quinnipiac, there's a number that's

12    being reported to the EADA that says this number of female

13    student athletes are receiving actual benefits.  That's

14    not accurate.  The number of -- for softball, the number

15    of female student athletes receiving actual benefits --

16    these are people now we're talking about, not numbers --

17    was 17, not 26.

18    Q.   Okay.  I believe counsel asked you about the cuts as

19    far as financing for women's sports and men's sports, do

20    you recall that --

21    A.   Yes.

22    Q.   -- series of questions?  Now, have the cuts that have

23    been implemented at Quinnipiac been discussed at these

24    weekly staff meetings?

25    A.   Yes.

1    Q.   Who's getting what and who's losing what?  Has that

2    been discussed?

3    A.   Not specifically.  We've simply been told that there

4    will be ten percent across the board, but we as coaches

5    are not in control of how that ten percent is cut from

6    each budget.  Ten percent will be cut and we're told what

7    we can and cannot do.  So I actually renege -- there have

8    been some specifics on how the budget cuts will be

9    implemented, yes.  Fall sports, Spring sports, how it will

10   affect early arrival on campus to prepare for your season

11   prior to the start of the semester.  How it will affect

12   the first date that you're allowed to compete, the first

13   date you're allowed to practice, those types of things.

14   Q.   And are those cuts to sports, are they having similar

15   impact on the men's teams as well as the women's teams?

16   A.   Actually when you break it down, there are some

17   pretty clearcut differences in how those cuts affect

18   women's sports and how they affect men's sports.

19   Q.   So, there is a disparity in how the men's and women's

20   teams are being treated; is that fair to say?

21        MS. GAMBARDELLA:  Objection, Your Honor.  Your

22   Honor, you know, there's no foundation laid when I asked

23   her the same question she said I can't speak to other

24   teams about whether or not they are feeling an effect

25   across the board.  Now we're really getting into the

1    budget cuts, accommodations, which are in the part of this

2    hearing.

3              THE COURT:  All right.  Sustained.

4    BY MR. HERNANDEZ:

5    Q.   Ms. Fairchild, I may have forgotten to ask you

6    earlier, but could you explain to the court why it is you

7    agreed to testify in this lawsuit?

8              MS. GAMBARDELLA:  I didn't ask the witness that.

9    Beyond the scope of the cross.

10             THE COURT:  I don't think it matters.

11             MR. HERNANDEZ:  Thank you, Your Honor.

12             THE COURT:  Thank you.  Anything further?

13   RECROSS EXAMINATION

14   BY MS. GAMBARDELLA:

15   Q.   Your understanding of roster management is that it's

16   to limit male walk-ons to help reach proportionality

17   within budget constraints; did I hear that right?

18   A.   Yes.

19   Q.   That's your understanding of roster management

20   according to OCR documents?

21   A.   No, my understanding is actually much broader than

22   that, but --

23   Q.   That's part of your understanding?

24   A.   It's part of my understanding.

25             MR. HERNANDEZ:  Your Honor --

1    Q.   To limit male walk-ons to help reach proportionality?

2    A.   It's part of my understanding, yes.

3    Q.   Okay.  Your roster spots, your targeted roster spots

4    for '08-'09 were how many?

5    A.   What do you mean by targeted?

6    Q.   What was the roster number given you for last year?

7    A.   The number to meet?

8    Q.   Yes.

9    A.   For '08-'09?

10   Q.   Yes.

11   A.   Twenty-five.

12   Q.   Was it 23?

13   A.   That's the number I --

14   Q.   I'm sorry, it was 25 and you achieved 23?

15   A.   I only achieved 23, correct.

16   Q.   Okay.  And the crux of your complaints concern the

17   quality of experience for your players given budget

18   constraints and the number of participants; do I have that

19   summarized correctly?

20   A.   I would also add availability of coaches.

21   Q.   Got you.  The quality of the experience.

22   A.   Uh huh.  (Affirmative.)

23   Q.   Okay.

24   A.   Yes.

25   Q.   And do you have any special training in EADA

1    reporting?

2    A.   No, I don't.

3    Q.   In fact, isn't the number that goes on the EADA

4    report the number of participants on the first day of

5    competition?

6    A.   By definition I believe that is correct.

7    Q.   Right.  And when you were asked for the number of the

8    first day of competition, did you lie and give a false

9    number ever?

10   A.   No.

11        MS. GAMBARDELLA:  No further questions.

12   FURTHER REDIRECT EXAMINATION

13   BY MR. HERNANDEZ:

14   Q.   Based on your experience with roster management, is

15   the number you report for EADA purposes on the first date

16   of competition, while accurate, nevertheless misleading?

17        MS. GAMBARDELLA:  Your Honor --

18   A.   Yes.

19        MS. GAMBARDELLA:  -- I didn't even go there.

20        MR. HERNANDEZ:  That was her own questioning.

21        MS. GAMBARDELLA:  She's not an EADA expert.

22        THE COURT:  I'm going to allow it.  I think it's

23   within the scope of what was just asked.  She answered it.

24   BY MR. HERNANDEZ:

25   Q.   The number is misleading, is that right?

1    A.    Yes.

2             MR. HERNANDEZ:   Thank you.   No other questions,

3    Your Honor.

4    FURTHER RECROSS EXAMINATION

5    BY MS. GAMBARDELLA:

6    Q.    Ms. Fairchild, have you ever been responsible for

7    EADA reporting?

8    A.    No.

9    Q.    Have you ever filled out a form for Quinnipiac?

10   A.    Fill out what form?

11   Q.    EADA report form for Quinnipiac?

12   A.    I have filled out official documentation from our

13   compliance office.

14   Q.    Yes.   Have you filled out an EADA report?

15   A.    That is used by compliance.

16   Q.    Have you filled out an -- I'm sorry.

17   A.    And sent to the EADA.   No, that is not in my job

18   description.

19   Q.    Right.   And the different categories on the EADA

20   report itself, are you responsible for filling any of that

21   out?

22   A.    No, I'm not.

23   Q.    Is it part of your job description to understand what

24   numbers go where and what information goes where?

25   A.    Apparently it is incumbent upon us to understand it.

1    Q.   Is it part of your job responsibility at Quinnipiac,

2    Ms. Fairchild, to understand that?

3    A.   I would say that it should be.  I mean --

4    Q.   I didn't ask --

5    A.   Well, okay, but -- you asked me this but I've never

6    actually been given a job description on paper like these,

7    you know, bullet point, these are in your job description.

8    I think as a NCAA coach, you're responsible for knowing as

9    much as you possibly can about why things work the way

10   they do, how they work, so that you can make informed

11   decisions about how to run your program.

12   Q.   You fill out Quinnipiac generated forms that ask you

13   questions and you fill in answers, correct?

14   A.   Submit them to compliance, yes.

15   Q.   That's not at Quinnipiac?  That's Quinnipiac,

16   correct?  Quinnipiac University's department?

17   A.   Yeah.

18   Q.   Thank you.

19   A.   Yes.

20   Q.   And what they do to interpret what goes where on the

21   EADA report, you do not participate in that, do you?

22   A.   No, I do not.

23            MS. GAMBARDELLA:  Thank you.

24            MR. HERNANDEZ:  No other questions, Your Honor.

25            THE COURT:  Thank you, you're excused.

```
 1              (Witness excused.)
 2              MS. GAMBARDELLA:  Your Honor, I have two other
 3    coaches outside.  But -- I'm sorry.
 4              MR. ORLEANS:  Your Honor, the plaintiffs rest.
 5              THE COURT:  Okay.
 6              MS. GAMBARDELLA:  For the record, and for the
 7    record I believe we can move on.  I think since the
 8    plaintiffs have rested it would be appropriate to deny the
 9    request for injunction.  The plaintiffs have failed to
10    sustain any burden of proof in this case which includes
11    the first one which is the irreparable harm to be remedied
12    by the injunction.  But we can move on.  I just want to
13    state that for the record.
14              THE COURT:  You've preserved it.  I will deny
15    that motion.
16              MS. GAMBARDELLA:  Okay.  I was going to call --
17    I'm going call the coaches because one of them has a
18    commitment and they should be relatively quick so we can
19    get through them pretty quickly.
20              MR. ORLEANS:  What's Your Honor's schedule.
21              THE COURT:  Yes.  I was going to break at 12:30.
22    I don't know if we can get them accomplished by then.
23              MS. GAMBARDELLA:  We might.
24              THE COURT:  We ought to try.  If we can't, then
25    we'll see where we are at 12:30.
```

```
 1              MS. GAMBARDELLA:  College try.

 2              THE COURT:  Please remain standing and raise

 3      your right hand.

 4      B E C C A    M A Y    K O H L I,    called as a

 5      witness on behalf of the Defendant, having been duly sworn

 6      by the Clerk, testified as follows:.

 7              THE COURT:  Please be seated and state your name

 8      for the record?

 9              THE WITNESS:  My name is Becca May coally.

10              THE COURT:  Last name is spelled --

11              THE WITNESS:  K-O-H-L-I.

12              THE COURT:  Thank you.

13      DIRECT EXAMINATION

14      BY MS. GAMBARDELLA:

15      Q.   Good morning, Ms. Kohli.

16      A.   Good morning.

17      Q.   Thank you for coming.  You're employed with

18      Quinnipiac University, correct?

19      A.   I am.

20      Q.   In what capacity?

21      A.   I'm head field hockey coach.

22      Q.   For women's?

23      A.   Women's field hockey, yes.

24      Q.   Thank you.  And how long have you been at Quinnipiac?

25      A.   Finishing my 14th year.
```

1    Q.   So the start year -- I'm terrible at math.

2    A.   1995.

3    Q.   All right.  Are you familiar with the introduction of

4    roster management at Quinnipiac University?

5    A.   Yes.

6    Q.   Okay.  Can you pinpoint for us what year, if you can,

7    roster management was introduced at Quinnipiac University?

8    A.   About four years ago.

9    Q.   Okay.  And can you give us your understanding from

10   what you read at Quinnipiac in manuals or what was told to

11   you by anybody in the Athletics Department of the purpose

12   of the introduction of roster management?

13   A.   Main purpose was for us to up our women's teams, in

14   order to keep support of the men's teams, and also to

15   match the University's men's to women's ratio.

16   Q.   What was the general atmosphere among the coaches in

17   terms of embracing this concept the first year it was

18   introduced?

19        MR. HERNANDEZ:  Objection, Your Honor.  General

20   atmosphere?  She can testify about what her reaction was

21   but I don't know what the general atmosphere means.

22        MS. GAMBARDELLA:  I'll withdraw the question and

23   rephrase it.

24   BY MS. GAMBARDELLA:

25   Q.   Did the coaches have -- did you have conversations

1    with coaches -- and this is just a yes or no for now,

2    don't tell me what they said -- the first year of roster

3    management introduction about the fact that this was being

4    introduced?

5    A.   Yes.

6    Q.   All right.  And how many coaches would you say you

7    had conversations with?  Just give us a general feeling.

8    A.   Two, three?

9    Q.   Okay.  And amongst the two or three and including who

10   you spoke with, what was your sense of the willingness to

11   embrace this concept, at least -- just keep to the first

12   year it was introduced.

13            MR. HERNANDEZ:  Objection, hearsay.

14            THE COURT:  I'll allow it.

15   BY THE WITNESS:

16   A.   I would say I felt it was probably warranted and I

17   was fine with it getting on board.  It wasn't going to be

18   a huge issue.  I actually had asked for more on my roster

19   for a few years, so personally it was something I was just

20   expected to do, was asked to do so I would do.

21   Q.   Were you given any instructions, specific

22   instructions as to how to achieve the roster number or the

23   target that you were given?

24   A.   No.

25   Q.   Were you expected to be given specific instructions?

1   A.   No.

2   Q.   Okay.  Tell me why not.

3   A.   I think I kind of at that point assumed I needed to

4   either increase my recruiting or take a better look at the

5   walk-ons that come to our program, so I just on my own

6   made that decision.

7   Q.   Was it particularly offensive to you that it was left

8   to your judgment as to how to fill those spots?

9   A.   No.

10  Q.   Okay.  Why wasn't it offensive to you?

11  A.   I think I committed to many of the things that I was

12  asked to do as a coach in terms of what you're doing with

13  your team and what you're not doing with your team, so I

14  just put it on with the rest of the things I do with my

15  team.  So I listen to the administration, I do what's

16  asked and I did that.  I guess, I'm guess I'm kind of that

17  type.

18  Q.   What is your understanding from what you either read

19  in terms of documents through the athletics department or

20  what's been told to you as to the importance of those

21  roster numbers?

22  A.   I mean we have our staff handbook.  I totally

23  understand in that, in the staff handbook, in many

24  situations we go back to and refer to it for many things,

25  many numbers.  But it was just something I was expected to

```
1    do and I did.  I mean I can't imagine -- I don't think the
2    question, as a department, that we sit around and have a
3    lot of conversations about it.  It's just -- it's in the
4    handbook.
5    Q.   Are you aware of, are there budget constraints that
6    apply to your particular athletic program?
7    A.   No.
8    Q.   And are you aware of budget reductions that are going
9    to be implemented going forward?
10   A.   I have, yes.  With the economy, we've heard of things
11   that are going to change.  We don't know our budgets for
12   next year but I do know that's coming.
13   Q.   And how many roster spots were you asked to fill for
14   '08-'09?
15   A.   Twenty-five.
16   Q.   And did you fill them?
17   A.   I filled 24.
18   Q.   Okay.
19        MS. GAMBARDELLA:  One moment, Your Honor.
20        (Pause)
21   BY MS. GAMBARDELLA:
22   Q.   Can you tell me your overall experience at Quinnipiac
23   as a women's athletic coach?
24   A.   As a coach?  It's a wonderful atmosphere for me.
25   I've had opportunity to go to places.  I've been here
```

1    obviously a very long time.  I believe in Quinnipiac and

2    what it's done over the past 14 years so I'm very happy

3    there.  I'm very happy as a coach for the atmosphere in

4    terms of feeling good everyday coming to work.  So I'm

5    very happy as a coach, very happy.

6    Q.   If you had any concerns or -- concerns about your

7    team and your budget or anything else concerning your

8    team, who would you feel free to go to and discuss that

9    with?

10   A.   I would go to any three of the AD's.  I would go with

11   Tracey Flynn or Bill Mecca or Jack McDonald.

12   Q.   Have you ever felt deprived of any resource in that

13   regard in terms of information and being able to air your

14   concerns?

15   A.   No.

16   Q.   Were you at a meeting recently, I think it was last

17   Wednesday, a staff meeting?

18   A.   Yes, I'm at every Wednesday staff meeting.

19   Q.   You're at every Wednesday staff meeting.  And

20   Mr. McDonald spoke at that meeting?

21   A.   Yes.

22   Q.   And did he speak about roster management going

23   forward?

24   A.   Yes.

25   Q.   And what, to the best of your recollection and in as

1    much detail as you can recall, did he say at that meeting?

2    A.   We are going to have our roster numbers just like

3    every year we have our roster numbers and we're going to

4    need to get those numbers.  I had a private conversation

5    asking Jack what my number would be and he said we would

6    he would get to that point in the very near future and

7    that we would need to be held to those, like a normal

8    year.

9    Q.   Did he say anything about competitive cheer?

10   A.   He said that it's looking like cheerleading might

11   become a varsity sport, yes.

12   Q.   Anything else about cheer?

13       Let me ask you this.  Did he say anything like if you

14   don't believe competitive cheer can be varsity, you don't

15   belong here?

16   A.   No.

17           MS. GAMBARDELLA:  One moment, Your Honor.

18           (Pause)

19           MS. GAMBARDELLA:  No further questions at this

20   time.  Hold on, you're not done.

21           THE WITNESS:  I'm not going anywhere, just

22   relaxing.

23           THE COURT:  Cross?

24

25

```
1    CROSS EXAMINATION

2    BY MR. HERNANDEZ:

3    Q.   Ms. Kohli, thank you for coming down.  You were

4    waiting in the hallway before you came to testify, is that

5    correct?

6    A.   Yes.

7    Q.   And was there a break a little while ago when

8    Ms. Gambardella went out and spoke to you in the hallway?

9    A.   Yes.

10   Q.   And you know what this case is about, correct?

11   A.   Yes.

12   Q.   The women's volleyball team has brought a Title IX

13   lawsuit, correct?

14   A.   Correct.

15   Q.   All right.  And when Ms. Gambardella came out and

16   spoke to you, did she explain to you what was going on in

17   the courtroom?

18   A.   She said we would be coming in to talk about roster

19   management.

20   Q.   Okay.  And did she discuss the testimony of any of

21   the witnesses with you?

22   A.   No, just that G was still testifying.

23   Q.   Okay.  You are the head of the field -- you're the

24   coach of the field hockey team, correct?

25   A.   Yes.
```

1   Q.   And you've been there for 14 years?

2   A.   Yes.

3   Q.   And did there come a time when you learned that

4   Quinnipiac was cutting back on its athletic budget?

5   A.   My athletic budget?

6   Q.   No, on Quinnipiac's athletic budget?

7   A.   This year, you mean?

8   Q.   Correct.

9   A.   I know we're going to have cuts for next year.

10  That's what I know.

11  Q.   When did you learn about impending cuts?

12  A.   I think the first indication of that came in January,

13  and then pretty steadily over all our staff meetings in

14  the Spring.

15  Q.   Okay.  And did there come a time when you learned

16  that your job was secure?

17          MS. GAMBARDELLA:  What was the --

18  A.   Was I told was my job secure?

19  Q.   Uh huh.

20  A.   I don't know if -- I didn't have that conversation

21  with anyone.

22  Q.   Okay.  Are you on a year to year contract with the

23  University?

24  A.   Yes, renewed yearly.

25  Q.   Okay.  But you are aware that there are some

1   budgetary concerns at the University generally?

2   A.   Campus-wide, yes.

3   Q.   And programs are getting cut?

4   A.   Yes.

5   Q.   As a matter of fact, an entire women's sport has been

6   cut?

7   A.   Yes.

8   Q.   All right.  Did you receive additional funding for

9   recruiting, in order to recruit more players for your

10  team?

11  A.   For 2009 coming or this season?

12  Q.   Both actually.

13  A.   I don't know next year's budgets but I have never had

14  inadequacies in any recruiting budgets, so no, I haven't

15  received any extra monies but I don't have inadequacies.

16  Q.   Okay.  Did the target management numbers for your

17  team, were you consulted on fixing that number?

18  A.   I'm not -- I'm not sure what you're asking in terms

19  of budget.

20  Q.   Did anybody in the athletic department speak to you

21  about what a realistic target management number would be

22  for field hockey?

23          THE COURT:  Roster management.

24  Q.   Roster management, I'm sorry.

25  A.   I'm sorry.  Did somebody tell me what they want my

1    roster number to be at?  Is that what you're asking?

2    Q.   Did anyone ask you what a realistic number would be?

3    A.   My opinion, I don't think so.  I think I had lobbied

4    for more.  I wanted to have a few more on my team in terms

5    of the NCAA numbers versus Quinnipiac's numbers.  But, no,

6    for next year I have not put in for what I need for a

7    roster.

8            MR. HERNANDEZ:  If I could just have a moment,

9    Your Honor?

10           THE COURT:  Sure.

11           (Pause)

12   BY MR. HERNANDEZ:

13   Q.   Drawing your attention to that ring binder in front

14   of you?

15           THE COURT:  Excuse me, counsel someone may be

16   making a delivery?

17           MR. ORLEANS:  I know what that is.  Thank you.

18   BY MR. HERNANDEZ:

19   Q.   Drawing your attention to Plaintiff's Exhibit 8, it's

20   in one of those binders there in front of you.

21   A.   A or --

22           THE COURT:  Eight.

23           MR. HERNANDEZ:  Looks like those are the defense

24   exhibits.

25           (Hands witness.)

1    BY MR. HERNANDEZ:

2    Q.   Drawing your attention to 8 at the bottom, does it

3    say women's teams?

4    A.   Yes.

5    Q.   And do you see where it says field hockey?

6    A.   Yes.

7    Q.   All right.  And is -- would you agree that Quinnipiac

8    University's current -- both their current and proposed

9    number of players for field hockey is higher than the NEC

10   average and the NCAA conference average?

11           MS. GAMBARDELLA:  Your Honor, I did not ask this

12   witness anything about NCAA averages or NEC averages.

13           THE COURT:  She made an answer that she wanted

14   more players to become closer to the NCAA average so I'm

15   going allow the question.

16           MS. GAMBARDELLA:  I missed it.  My fault.

17   BY THE WITNESS:

18   A.   Yes, I see that, yes.

19   Q.   So Quinnipiac field hockey numbers are actually

20   higher --

21   A.   Yes.

22   Q.   -- than the NCAA average number squad size and the

23   NEC average squad size, squad number?

24   A.   Yes.

25           MR. HERNANDEZ:  All right, I have no further

1    questions, Your Honor.

2         MS. GAMBARDELLA:  I have nothing further.

3         THE COURT:  You're excused.  Thank you.

4         THE WITNESS:  Thank you.  Leave that?

5         (Witness excused.)

6         MS. GAMBARDELLA:  We're going to call Danielle

7    Caro.

8         THE COURT:  Please remain standing and raise

9    your right hand.

10   D A N I E L L E     C A R O,     called as a witness on

11   behalf of the Defendant, having been duly sworn by the

12   Court, testified as follows:

13        THE COURT:  Please be seated.  Thank you.

14        MS. GAMBARDELLA:  Your Honor, before I walk off

15   with this, this says this is my original.  I don't know

16   how it got here.

17        THE COURT:  It should be with the clerk.

18        MS. GAMBARDELLA:  I'm going to give it back.

19   DIRECT EXAMINATION

20   BY MS. GAMBARDELLA:

21   Q.   Good morning, Ms. Caro, how are you?

22   A.   Good, thank you.

23   Q.   Are you currently employed by Quinnipiac University?

24   A.   Yes, I am.

25   Q.   And in what capacity?

1    A.    I am the head woman's lacrosse coach.

2    Q.    How long have you been at women's, the head women's

3    lacrosse coach at Quinnipiac University?

4    A.    Just finished my fourth year.

5    Q.    Okay.  Do you have a recollection at some point in

6    time roster management was introduced at Quinnipiac?

7    A.    Yes.

8    Q.    And what is your best recollection as to when that

9    was introduced?

10   A.    Within the last few years.

11   Q.    All right.  And what was, either through reading

12   athletic departmental policies or what was told to you by

13   athletic department representatives, the purpose of the

14   introduction of roster management?

15   A.    My understanding was to help us achieve gender

16   equity.

17   Q.    All right.  Do you remember what your roster target

18   number was for '08-'09?

19   A.    Yes, for this year it was 30.

20   Q.    Thirty.  And what did you achieve?

21   A.    I had 29 young women on my roster.

22   Q.    All right.  Now, Ms. Caro, can you tell me whether or

23   not you're aware that there will be some budget reductions

24   going forward next year?

25   A.    Yes.

1    Q.   And what is your understanding about how that may

2    affect you as a coach?

3    A.   I think, you know, just in talking to our

4    administrators and hearing at staff meetings that we're

5    going to have many cuts, specifically some of the cuts

6    they mention were reduction in number of contests being

7    played, reduction in the amount of travel we'd be

8    permitted to do, things of that nature.

9    Q.   So, your budget allocation with respect to travel

10   your understanding is going to be cut, is that correct?

11   A.   I believe so.

12   Q.   Do you know whether or not cuts will affect men's and

13   women's teams?

14   A.   I believe so.

15   Q.   Okay.  Can you please testify as to your overall

16   experience at Quinnipiac University as an athletic coach?

17   A.   Are you -- what specifically are you asking me?

18   Q.   Overall in the four years, what kind of experience --

19   has it been a positive experience?

20   A.   Yes, generally very positive experience.

21   Q.   Can you just explain to his Honor briefly what are

22   some of the things that, on which you base your opinion

23   that it's been a generally positive experience for you?

24   A.   Well, I've worked at several institutions and I

25   obviously am working here now and I want to continue to

1    work at Quinnipiac, so I've had a generally positive

2    experience.  Good support from administration, great

3    colleagues, other coaches.  It's a very collegial

4    atmosphere and it's a fun place to work.

5    Q.   What's your understanding of the importance of

6    staying to the roster number that has been assigned to

7    you?

8    A.   My understanding is that we, every single program has

9    a number assigned to them and we're all supposed to

10   achieve that roster number, you know, on an annual basis

11   or at least attempt to achieve it.

12   Q.   Just want to check the chart, Judge.

13        I'm sorry, did you testify as to what your

14   recollection was of the roster number target you had last

15   year, the year we're just finishing, was 30?

16   A.   Yes.

17   Q.   And you achieved 29?

18   A.   I believe so, yes.

19   Q.   Okay.

20   A.   I'd have to check my records to say with 100 percent

21   certainty but I feel pretty good about that.

22   Q.   Okay.  Were you at an ATF meeting last Wednesday?

23   A.   Yes, we have a staff meeting almost every Wednesday.

24   Q.   Did Mr. McDonald talk about roster management?

25   A.   We've had a notation on our agenda that says roster

1    management numbers are coming.  We have not gotten

2    specific numbers for '09-'10 yet.

3    Q.   Did Mr. McDonald say something like if you don't

4    agree competitive cheer is a varsity sport, you don't

5    belong here?

6    A.   I don't recall him saying that.

7    Q.   Okay.  Thank you.

8         MS. GAMBARDELLA:  No further questions.

9         THE COURT:  Cross?

10   CROSS EXAMINATION

11   BY MR. HERNANDEZ:

12   Q.   Yes, just briefly.

13        You've been the lacrosse coach for four years, is

14   that correct?

15   A.   Yes.

16   Q.   And your roster management number was 30 this year,

17   is that correct?

18   A.   Yes.

19   Q.   All right.  And about how many times do you play in a

20   given season?

21   A.   During our regular season this year we had 14 games

22   scheduled.

23   Q.   Fourteen games.  And were all 14 games against

24   different teams?

25   A.   Fourteen different teams in the regular season.  When

1    you go to the conference tournament we had two additional

2    games and they were repeat of teams we had played earlier

3    in the season.

4    Q.    Teams you had played earlier?

5    A.    Yes, in our conference.

6    Q.    When you go to that championship, do they assign

7    standings to the different teams?

8    A.    Yes.  The top four teams go and you're seated one,

9    two, three, four, based on your regular season's winning

10   percentage.

11   Q.    So, your actual championship competition is

12   determined by how you do during the regular season, is

13   that correct?

14   A.    Correct.

15   Q.    All right.  So the championship isn't sort of an

16   stand-alone competition, correct?

17   A.    Will, I guess it's a new season because you could

18   just barely squeak in as the fourth best team in your

19   conference championship.  You could actually win that

20   championship and have the opportunity to continue to

21   compete for a NCAA championship.

22   Q.    Okay.  And is that the way the championships are

23   determined in other women's sports?

24   A.    I believe all the NEC sports have a conference

25   tournament that's based on your finish in the regular

1   season as to whether you qualify.

2   Q.   So, you have to do well in the season in order to get

3   into the championship, is that correct?

4   A.   Correct.

5   Q.   And then in the championship, there's actual head to

6   head games and the best team at the end wins, is that

7   correct?

8   A.   Yes.

9   Q.   All right.  Is it your understanding that the budget

10  for athletics at Quinnipiac is being cut across the board?

11  A.   That's my understanding, yes.

12  Q.   Okay.  And do you know, have you heard the number ten

13  percent; does that sound about right?

14  A.   I think it's definitely been mentioned before that

15  roughly they were looking at cutting ten percent across

16  the board.

17  Q.   Okay.  And ten percent across the board means men's

18  teams, women's teams, everybody's going to take a ten

19  percent hit, is that correct?

20  A.   That would be my understanding, yes.

21  Q.   And as far as roster management goes, is it your

22  understanding that roster management is there to decrease

23  the number of male walk-on participants?

24  A.   No one has ever said that to me.

25  Q.   Okay.  And when you got your target roster management

1    number, was that higher or lower than the number you were

2    used to fielding?

3    A.   I believe it was that number for my entire four years

4    here, and it was definitely higher than teams I have

5    coached before, but I also previously started three brand

6    new programs so I probably had atypically low numbers at

7    my previous coaching positions.

8    Q.   Okay.  So when the roster management number was given

9    to you, it was higher than what you were used to, is that

10   fair to say?

11   A.   Yeah, that's fair to say.

12   Q.   Okay.  And the, the ten percent cut, would you agree

13   that -- well, let me ask you this.  When you received your

14   target number, did you receive any additional funding to

15   recruit athletes for your team?

16   A.   I think the budget was already set in concert with

17   the number when I got there.  I don't know if the previous

18   coach had received anything, but I was hired in the summer

19   and so the budget for that year had already been

20   established and the numbers had already been established.

21   Q.   Okay.  Would you agree with me that if the target

22   numbers for the men's team are being pushed down and the

23   target numbers for the women's teams are being pushed up,

24   and there's a ten percent across the board budget cut,

25   it's going to affect the women's teams more than the men's

```
 1    teams?
 2              MS. GAMBARDELLA:  Objection.  Lack of
 3    foundation.  I didn't ask her any of this on direct.  I
 4    can't begin to tell you the objection -- he's trying to
 5    make this witness something that I didn't introduce her to
 6    be.
 7              THE COURT:  I think it's -- you can save that
 8    for argument.
 9              MR. HERNANDEZ:  Thank you, Your Honor.
10    BY MR. HERNANDEZ:
11    Q.   So you've competed against a number of teams in this
12    area, is that correct?
13    A.   Yes.
14    Q.   And I would ask you to look at Plaintiff's 14.  I'm
15    sorry, Plaintiff's 8.  It's in the back there.  Just pull
16    that tab there to eight and you can turn that sideways
17    there.
18         Do you see an entry there for women's teams at the
19    bottom?
20    A.   Yes.
21    Q.   And do you see the entry for women's lacrosse?
22    A.   Yes.
23    Q.   And I think we agree that your target management
24    number is 30, is that correct?
25    A.   Yes.
```

1  Q.   And so Plaintiff's Exhibit 8 accurately reflects your

2  start number, correct?

3  A.   Yes.

4  Q.   Thirty, is that fair to say?

5  A.   Yes.

6  Q.   And going across the right there, would you agree

7  that Quinnipiac's number 30 is higher than the NEC average

8  of 23.44?

9  A.   Yes.

10  Q.   Okay.  And would you agree that it's also higher than

11  the NCAA average, which is 27.2?

12  A.   Yes.

13  Q.   All right.

14           MR. HERNANDEZ:  I have no other questions, Your

15  Honor.

16           MS. GAMBARDELLA:  I have no questions.

17           THE COURT:  Thank you, you're excused.

18           THE WITNESS:  Thank you.

19           (Witness excused.)

20           MS. GAMBARDELLA:  You said 12:30 break, am I

21  wrong?

22           THE COURT:  Well, I am out of time for the rest

23  of the day, in essence.  If you needed another ten minutes

24  I can squeeze it out.

25           MS. GAMBARDELLA:  I'm not going to be able to do

1    it in ten minutes.

2             THE COURT:  What are you trying to do?

3             MS. GAMBARDELLA:  Tracey Flynn.  I have one more

4    witness.

5             THE COURT:  How long is she going to take?

6             MS. GAMBARDELLA:  I might have half an hour.

7    Twenty minutes -- I mean half an hour.  We're just going

8    to try not to have any duplication.

9             MR. HERNANDEZ:  I will have some questions, Your

10   Honor.

11            THE COURT:  All right.  Let's get her on here.

12   T R A C E Y      F L Y N N,     called as a witness on

13   behalf of the Defendant, having been duly sworn by the

14   Clerk, testified as follows:

15            THE COURT:  Please be seated.

16   DIRECT EXAMINATION

17   BY MS. GAMBARDELLA:

18   Q.   Good morning, Ms. Flynn.

19   A.   Good morning -- good afternoon.

20   Q.   Good afternoon.  You're right.  Okay.

21        You are employed at Quinnipiac University, correct?

22   A.   Yes.

23   Q.   How long have you been employed at Quinnipiac?

24   A.   Since September of 2001.

25   Q.   And what is your position at Quinnipiac?

1    A.   My job title is Associate Director of Athletics for

2    Compliance and Student Services and Senior Woman

3    Administrator.

4    Q.   And that has been your title consistently through

5    your tenure there?

6    A.   Yes, it has.

7    Q.   And to whom do you report?

8    A.   My direct supervisor is Jack McDonald.

9    Q.   Can you tell us your primary job responsibilities?

10   A.   My primary responsibility is to ensure that I educate

11   our coaches, student athletes, athletic department staff,

12   university, on NCAA rules and to insure that we are

13   complying with NCAA rules.

14   Q.   Uh huh.

15   A.   That would be the majority of my job.  Another part

16   of my job is overseeing the athletic scholarship budget,

17   and that includes incoming students, athletes, returning

18   student athletes and summer school.  Those are my primary

19   responsibilities.

20   Q.   Do you have any responsibilities with respect to

21   completion of EADA reports for the University?

22   A.   Yes.  My, my responsibility has been to share the

23   participation numbers of our student athletes, both male

24   and female, to also share the numbers of athletic

25   scholarships per sport and those -- the third part, I work

1    together with the athletic director and our senior

2    associate athletic director, Billy Mecca, to go through

3    the page of what coaches are male, female, full-time for

4    head coaching, assistant coaches.  So, those are my three

5    areas that I contribute to the EADA report.

6    Q.    Do you have an understanding of the number of

7    participants that goes on the EADA report and when it's

8    set, what's the timeframe from which it's extracted?

9    A.    The EADA report lists in its directions, I find it in

10   the frequently answered questions section for the report,

11   and it tells you as of the first date of competition in a

12   sport the numbers that or the student athletes that are on

13   your roster that are receiving athletic aid or are

14   receiving coaching, and I think there's a third one.  I

15   can't remember that but that's kind of why I always go

16   back to the frequently asked questions each year and

17   remind myself who I'm expected to count.

18   Q.    And where does the University get the number from in

19   terms of the EADA reporting requirement, number of

20   participants?  How do you get that number?

21   A.    Separate from the EADA report, the NCAA has its own

22   expectations, its own rules and regulations, and they also

23   have had for many years something called the squad list.

24   It's been an electronic form for about ten or 12 years

25   now.  And I author and maintain that squad list throughout

1   the entire year.  So one of the most important things

2   about that NCAA squad list is the very first date of

3   competition, because for the very first date of

4   competition, you need to be sure who is eligible to go out

5   on the field and compete that day; who, if the team has an

6   away game, who's eligible to ride on the bus and receive

7   the benefit of transportation.  So, the biggest day in

8   NCAA compliance for teams playing in their seasons is that

9   very first date of competition.

10  Q.   Now, looking quickly, there's a binder in front of

11  you and hopefully it's plaintiff's, but can you look at

12  Number 11, Tab 11 just very briefly.  Is that your

13  handwriting at the bottom?  There was the number 27 with a

14  circle, is that you?

15  A.   Yes.

16  Q.   Where does that number come from?

17  A.   It comes from, this is the baseball squad list and

18  the baseball squad list is three pages long and I would

19  have gone down the far right column.

20  Q.   Yes.

21  A.   And started looking at -- I count from the, I refer

22  from the right column and then I write notes in the side

23  if that's applicable.  So that 27 is the culmination of me

24  counting the first page of names and then the second

25  name -- the second page of names.  It's the summary.  It's

1    the sum of those two pages.

2    Q.    And the handwritten marks crossing the, the

3    cross-outs in the far right, what does that signify?

4    A.    That they didn't count.

5    Q.    Okay, got you.

6    A.    So if -- and there are times when if you look at

7    other squad lists I've done, maybe something I've adapted,

8    I've started to number like one, two, three -- it's kind

9    of, with my record keeping, I kind of go back to the time

10   in seventh and eighth grade when you learn about when

11   scientists do experiments and they come up with some

12   theory or policy, or some theory that they proved, it's

13   only if they can replicate, other people can replicate

14   their results so that's kind of the way I put together all

15   of my documents.

16   Q.    Would the number in the lower right of the circle

17   then be the number you report on the EADA report for first

18   day of competition?

19   A.    Yes.

20   Q.    Okay.

21   A.    In this case yes.

22   Q.    Now, when was roster management introduced at

23   Quinnipiac University?

24   A.    I can't remember the exact date.

25   Q.    Uh huh.

1    A.   But I know we had gone through an NCAA certification

2    process and as a result of that, we implemented a variety

3    of things.  And 2007, 2008 was the first time that I can

4    recall that roster management was being talked about and

5    it showed up in the 2007, 2008 policy and procedures

6    manual.

7    Q.   And what was the purpose of the introduction of

8    roster management?

9    A.   We had learned through the NCAA certification process

10   that our numbers of female/male participants in athletics

11   was not -- it wasn't the same or similar to the

12   participants of the University body.

13   Q.   You mean the enrollment?

14   A.   Enrollment.

15   Q.   General enrollment?

16   A.   Yes.  So one of the things we did for gender equity,

17   and it's a whole report based on a five year plan, we had

18   talked about and had agreed to offer in the plan that we

19   would do, make efforts over the next five years to

20   increase our participation for women four to

21   seven percent.  So we were trying to be more equitable

22   from a gender equity standpoint.

23   Q.   What is the goal of the University next year in terms

24   of Title IX compliance?

25   A.   Well, Title IX compliance in my mind is different

1    than gender equity, and I feel like I spend a lot of time

2    telling people that, but for the next year, the University

3    is going to be using the proportionality prong of Title IX

4    law for athletics to -- I think lost my train of thought

5    in that sentence -- but we're going to go for prong one

6    proportionality and that's the University's plan.

7    Q.   Is part of your responsibility to monitor, keep track

8    of adds and deletes from squad lists throughout the

9    seasons?

10   A.   Yes, I coordinate that function.

11   Q.   And how do you do that?  How do you monitor that?

12   A.   I have kind of an entire umbrella program that helps

13   me build this and maintain this throughout the year.

14   Q.   You mean roster management?  I had roster management

15   as my title for managing all the numbers and who's going

16   where and who's eligible, and then my athletic director

17   stole my title himself, but there's a change of status

18   form and it's electronic, it's been electronic for a few

19   years now, and when coaches have a player that quits, that

20   is going to transfer so is leaving the team now, is being

21   cut, maybe they haven't shown up for practice for a few

22   days, they will -- they are expected to send me this

23   change of status form.  And then that change of status

24   form is how I go on and update the database that produces

25   those squad lists, and I update another database and I

1    have a distribution list that I send to sports

2    information, sports medicine, alumni, a variety of people

3    that might need to know that somebody's either been added

4    or deleted from a team.

5    Q.    We're going to turn to the add/delete list just

6    specifically for a couple of years, Tracey, but first --

7    A.    Okay.

8    Q.    -- can you tell me what your responsibilities will be

9    going forward into next year on roster management and

10   making sure that it's adhered to?

11   A.    I expect that I will be the person on the front line

12   with Title IX compliance.  It would very much parallel

13   what my experience is and what my job is currently to

14   comply with NCAA rules.

15   Q.    Just tell us some of the steps you'll be taking

16   that -- I guess what you've been taking all along but that

17   you'll continue to take for next year?

18   A.    Well, actually for Title IX compliance, and this

19   proportionality, we're entering a new phase because we've

20   never claimed to be in proportion or meet proportionality

21   but we now are going to be pursuing that and my

22   expectations would be, kind of off the top of my head but

23   I am a planner, and, again, similar to what I currently

24   do, I would expect that once we announce to the coaches

25   and inform them what their numbers are going to be, we'll

1    probably have some kind of a group

2    presentation-slash-meeting to discuss what the importance

3    of these numbers are, make sure or try to make sure

4    everybody's got the same understanding and knowledge of

5    Title IX and the commitment the University has made.

6        I've already, as part of my normal job, have asked

7    coaches to tell me who's going to be on your team next

8    year.  It's kind of referred to as build a team.

9    Freshmen, returners, transfers.  So, that's already

10   happened.

11       Now, knowing that, and having an opportunity to

12   educate our coaches on the things I just mentioned, I

13   would expect that throughout the summer I will be checking

14   in with each of the coaches to see where they are and

15   monitoring that right up through the start of the first

16   date of competition.  And those activities are really no

17   different than what I do for NCAA purposes.  Are your

18   freshmen cleared through the national clearing house?  Is

19   your ineligible player at the end of the school year, now

20   that he's gone or she's gone through summer school, one or

21   two, is she eligible?  Yes.  So --

22   Q.   And have coaches been already told since roster

23   management was introduced, about the purpose of roster

24   management?

25   A.   Yes.

1    Q.    Yes.   Okay.

2    A.    Yes.   When roster management was introduced in 2007,

3    2008, they -- Jack would have told us in staff meetings,

4    would be the fashion that would be the most likely forum

5    because we meet every week almost the entire year, because

6    athletic certification was such, it's such a huge deal on

7    any campus when you go through it, and there was a time

8    when the certification report was in a final draft

9    version, that it was made available to athletic department

10   staff members, it was posted on our website, and the

11   gender equity report was in there.   So there was that

12   whole climate of athletic certification that he would have

13   told us.

14   Q.    All right.   Would you go to Exhibit 13, which I'll

15   refer to you as the now infamous change --

16   A.    Is that Tab 13?

17   Q.    Tab 13, infamous change of status list.

18   A.    Yes.

19   Q.    Now, I'm going to call your attention to 2007, 2008;

20   were there any occurrences in 2007 and 2008 with respect

21   to this list that caught your attention?

22   A.    Yes, there was a few.

23   Q.    Okay.   Can you tell us what those were?

24   A.    The first one was the baseball coach had come, or the

25   baseball coach had either come to me or sent me via a

1    computer -- he's not computer literate so if anybody hands

2    it in handwritten, it would be him -- and gave me a list

3    of names on the form indicating that he was dropping these

4    players.  And I thought, okay.  We had had a conversation

5    a week or so prior and one of the things that I had said

6    to him when he was like how am I going to get to my

7    numbers, this is tough.  And I explained to him, you know,

8    it might just -- you're going to have to have the hard

9    conversation.

10   Q.   The hard conversations about what?

11   A.   You only have so many slots, you've been asked to

12   stay to a certain number, and you're going to have to sit

13   with some of those athletes and say I don't have room for

14   you on my roster, we're being asked to maintain a roster

15   of whatever the number is, and that's what I mean by the

16   hard conversation.

17        And part of that conversation I think was he asked,

18   you know, wow, that's tough -- he's quite the gentleman,

19   but he was like that's tough, and I said, you know, I can

20   appreciate it's tough because for a number of years women

21   have not had the opportunity to participate, whether it

22   was a sport that wasn't being offered for them, and maybe

23   you could talk with one of our women's coaches that played

24   college sports and see how that conversation might have

25   gone.

1    Q.   So, you basically in summary told him, can't do it,

2    you've got to drop the players?

3    A.   He knew he had to do it, he just wasn't sure how he

4    should be doing it, or --

5    Q.   Now, you notice on this form as well there's a number

6    of, there's the same sort of incident with the women's

7    softball coach, adding a bunch of people on 9/11/2007.

8    It's on the second page -- or maybe it's the third page?

9    A.   119?

10   Q.   Or 119, 120, if you cross reference.  You see that,

11   correct?

12   A.   Softball?

13   Q.   Women's softball.

14   A.   Yes.

15   Q.   Okay.

16   A.   On 119 I see five softball players had quit.

17   Q.   Did you have, ever have conversations with Coach

18   Fairchild about roster management?

19   A.   I think I've had -- yes, because I believe I've had

20   some kind of conversation with every one of our coaches,

21   so yes.

22   Q.   Did Coach Fairchild ever express to you concerns

23   about her budget and filling her spots given her budget,

24   anything along those lines?

25   A.   I think those were maybe more recent conversations.

1    In reference to this list?

2    Q.    Yes.

3    A.    I don't recall it was budget concerns in 2007, 2008.

4    Q.    All right.  Now, flipping to 2008 -- Tracey, let me

5    ask you this.  What was the -- in 2007, the academic year,

6    that is the first year roster management was introduced,

7    correct?

8    A.    Yes.

9    Q.    Were more than one or two of the coaches expressing

10   concerns about it?

11   A.    I'd say in general just about every coach had a

12   concern.

13   Q.    Okay.  And what were the -- just give an example of

14   the types of concerns?

15   A.    In general, there was coaches of the men's sports

16   that weren't sure, wow, these numbers, I've got to cut

17   people or what does this mean?  And then generally in the

18   women's sports, it was, wow, where am I going to find more

19   women for my team.  So I think --

20   Q.    It was a cross section --

21   A.    In general, those are the themes.

22   Q.    Did that change in '08-'09?

23   A.    Yes, I felt like there was a change in the climate.

24   It was 2008, 2009.  Coaches had a year for planning

25   purposes and had grown accustomed, I think 2007, 2008, it

1    was brand new and it was a new concept on our campus.   One

2    year later there were still some struggles but coaches

3    were really making an effort to meet those numbers.

4    Q.   And did you continue to review the change in status

5    list for 5809?

6    A.   Continue to review --

7    Q.   Is it part of your job to maintain the add/delete

8    list?  I think you said it was.

9    A.   Yes, the change in status list.

10   Q.   Did you observe the same type of incidents that we

11   just talked about in '07-'08, women's softball, and I

12   think you said men's baseball, did you see a recurrence of

13   that in '08-'09?

14   A.   I really felt that 2007, 2008 was an anomaly year

15   because -- no, I guess the succinct answer is no.

16   Q.   Do you have, based on conversations and meetings with

17   the coaches, confidence that the coaches as a whole

18   understand the importance of roster management in

19   particular for next year?

20   A.   I think the coaches understood the importance of

21   roster management these previous two years because their

22   athletic director had said this would be a policy.  I do

23   think that as we enter into a new phase and the commitment

24   of the University to meet proportionality, that our

25   coaching staff need to be educated in the change.

1    Q.    Since the announcement -- have you had -- did Coach

2    Sparks call you?

3    A.    Yes.

4    Q.    Do you remember getting a phone call from her right

5    after the announcement?

6    A.    No.

7    Q.    When did she call you?

8    A.    The phone call that I most remember from Coach Sparks

9    was after the University had gotten news there was going

10   to be a Temporary Restraining Order.

11   Q.    Yes.

12   A.    So I believe it was -- no, it wasn't before -- it

13   wasn't -- it was just before the Temporary Restraining

14   Order and I got a call from her and she asked me if I

15   would like to join, be part of this lawsuit.

16   Q.    What did you say?

17   A.    I was startled and I said something to the effect

18   that I wasn't interested, no.  I had to repeat myself

19   several times in between her talk.

20   Q.    She was persistent somewhat?

21   A.    Yes, and she was trying to convince me and I just

22   really didn't want to go in that direction.  I just didn't

23   want to be part of it.

24   Q.    Tracey, Coach Sparks has testified in this courtroom

25   that you told her what documents to subpoena to help her

1    in this case.  Did you ever have a conversation with Coach

2    Sparks giving guidance as to what documents to subpoena?

3    A.   I can't believe I would ever say such a thing.

4    Q.   Did you ever tell Coach Sparks that the roster

5    management was bullshit, or words to that effect?

6    A.   I don't -- no, that's not the way I really talk.  And

7    I have mentioned even in my deposition or I've discussed

8    at length in my deposition that I was not happy with some

9    of the things that had happened with these changes of

10   status lists and I've expressed that to my boss.

11   Q.   Okay.  Now, Coach Fairchild also testified today.

12   She said she had conversations with you wherein she

13   expressed concerns about, related to roster management.

14   Did you have conversations with Coach Fairchild -- you

15   said yes but more recently -- what was the substance of

16   the conversations with Coach Fairchild?

17   A.   I have had conversations with Coach Fairchild for two

18   years on this topic.  We -- I work more closely with her

19   than probably any other coach as I'm her administrative

20   liaison, and so we've been talking about the numbers, how

21   people were trying to get there, how she might get there,

22   meet her commitments.  But as I've already mentioned

23   today, that I think it was just recently that she was --

24   this was really one of the first times I was hearing about

25   concern what's my number's going to be and how we're going

1   meet that with the budget.  And we talked about some

2   specific things.  I think one of the things she said is it

3   cost $250 for her to outfit a player, so I remember

4   specifically that element.

5   Q.   Are budget constraints affecting teams pretty much

6   across the board, especially for next year?  Let's say

7   next year?

8   A.   Well, I'm not closely involved with the budget.

9   Q.   Okay.  Did Coach Fairchild ever say to you "The only

10  way things are going to change around here is if somebody

11  is willing to sue"?

12  A.   I don't know that to be true.  I don't know that she

13  said that.

14  Q.   Well, she said she said it and you said at some point

15  that's right.  Do you remember agreeing with her that --

16  A.   No, I don't even remember her talking about suing.

17  And she's so much more of a -- I mean she's, I find her to

18  be very knowledgeable in what she does.  We have very good

19  conversations.  She educates me a lot.  She has good

20  insight.  She works really hard.  I don't know that she

21  would just cop a, well, let's just go sue.  She just

22  doesn't strike me as that kind -- that that's the way she

23  would see solving a problem.

24          MS. GAMBARDELLA:  May I have a moment, Your

25  Honor?

1              THE COURT:  Sure.

2              (Pause)

3    BY MS. GAMBARDELLA:

4    Q.   One question.  Tracey, if we went back to 2007 with

5    the coaches that we went through, the add/delete, you had

6    conversations.  If you ever saw something like that

7    happen, what would you do?

8    A.   If I ever saw that happen in the future?

9    Q.   Next year, yes.

10   A.   Well, one, I don't expect it to happen because I

11   would, with my athletic director and whoever else we might

12   involve as we educate the coaches, this would be one way

13   we would be saying, this is not what you do and this is

14   what we're not doing to comply with proportionality.

15        However, if I did see something looked like that was

16   happening, I'd be out of my chair and into the athletic

17   director's office faster than one might think I could

18   move.

19   Q.   And you're the one on the front lines in terms of

20   these add/delete lists, correct, and you report in to

21   Jack?

22   A.   Yes, I am.

23              MS. GAMBARDELLA:  Thank you, Your Honor.

24              THE COURT:  Let me ask a quick question before

25   we have cross.

1          Ms. Flynn, can you turn to Exhibit 11, please?

2          THE WITNESS:  Tab 11?

3          THE COURT:  Tab 11, right.  You were talking

4     about the far right column.  Could you look at the next

5     two columns, change in status, reason, date; what does the

6     C R stand for?

7          THE WITNESS:  Cut -- oh, I'm sorry, they are

8     different codes.  The first one is saying that the student

9     was cut from the team and the second one is that he was a

10    red shirt.  He never played in any competition prior to

11    leaving the team on 9/17.

12         THE COURT:  Okay.

13         THE WITNESS:  So, to give you an example, he

14    came, if he was to join the team the following year, when

15    I would roll over his documents from, or his record on our

16    software from 2007 to 2008, if you go over to, way far to

17    the left, it's about the fifth column left to right,

18    number of seasons utilized?  You see that?  Because there

19    is a R code there, it would not add a number to the

20    seasons of competition.

21         THE COURT:  And what if that same player were

22    added back in during this same season?  For example, a

23    week later?

24         THE WITNESS:  If a player was added back in, we

25    would go to the screen, change of status, that part of the

```
 1      screen in the software, I would -- there's a special note
 2      section.  I would come down and write "on 9/27/2007, cut"
 3      and I would go back up where that originally was and
 4      change it to add it and the date that he was added back.
 5                THE COURT:  And so what happens to the red shirt
 6      status?
 7                THE WITNESS:  The red shirt status would remain
 8      the same and then in the Spring when we would solicit
 9      again or when we solicit, which we do for each sport at
10      the end of each of their seasons.  If he played, then we
11      were go to that screen and change it to, we would uncheck
12      "red shirt" and we would go over and check the box
13      "participated in competition".
14                THE COURT:  All right.  And so if this player
15      was cut and red shirted on 9/27, and then was added back
16      to the roster soon thereafter, they would still be
17      considered a red shirt until the Spring season?
18                THE WITNESS:  Until he competed, yes.
19                THE COURT:  What if he completed in the Fall?
20                THE WITNESS:  If he competed in the Fall, as of
21      the date he got cut he hadn't competed, that's the red
22      shirt.  At the end of the Fall baseball season, we do a
23      team list and ask who competed.  Then we go back in and
24      update everybody's records.  His record would change, as I
25      already described, and in subsequent printings of the
```

1    squad list, that would be reflected.

2              MS. GAMBARDELLA:  Could I ask a follow-up then,

3    Judge?

4              THE COURT:  Sure.

5    BY MS. GAMBARDELLA:

6    Q.   Would a separate form have to be filled out to make

7    sure that the information was added to the add/delete

8    form?

9    A.   Yes.  If he's going to be added back to -- if he's

10   going to be added back or added to a team, another whole

11   change of status form would have to be submitted.

12   Q.   And you see that sooner than the end of -- I'm not

13   sure --

14   A.   Yes, correct.

15   Q.   You see this sooner than --

16   A.   The roster is a living, breathing document and it can

17   change from one day to the next.  Kids can quit on any

18   given date, so the other thing is time to be at the end of

19   each of the seasons.

20             MS. GAMBARDELLA:  Thank you.

21             THE COURT:  The other thing being the red shirt.

22             THE WITNESS:  Did they participate in

23   competition.

24             THE COURT:  So, even though somebody's status is

25   red shirt, they can compete, and if they compete --

1          THE WITNESS:  Then their status is updated.

2     Their status is updated.

3          THE COURT:  But there's not a minimum period of

4     red shirt.  I think of red shirt as sitting out the

5     season.  You read about true freshman versus red shirt

6     freshman.

7          THE WITNESS:  Right.  The thing about the red

8     shirt is NCAA rules direct us that for sports such as

9     baseball, softball, men's and women's lacrosse, men's and

10    women's tennis, their season of, their championship

11    segment of the year is in the Spring.  If they are playing

12    a nonchampionship segment, which is the Fall, and they

13    compete in one game or for one minute in a lacrosse game,

14    for any one minute, they have used a season of

15    competition.

16          In sports such as field hockey, men's and

17    women's soccer, volleyball, if they don't compete at all

18    in the Fall, they may dress every game, travel everywhere

19    but never get in the game, they would be marked as a red

20    shirt.  Now, they go to their nonchampionship segment, if

21    the team has arranged for scrimmages, things that don't

22    come back to the team record and they compete, we -- the

23    rules do not have us go back and change that they have now

24    competed.  They have -- they are not considered to have

25    used a season of competition.  It's a quirk in the rule.

1          THE COURT:  So, in other words, with baseball,

2     which is -- the championship season is in the Spring.

3          THE WITNESS:  The Spring.

4          THE COURT:  The Fall competition doesn't count

5     toward a year of eligibility, is that what you're saying?

6          THE WITNESS:  No, I'm saying it does count.

7          THE COURT:  It does count.

8          THE WITNESS:  Correct, it does count.  So if

9     they play in the Fall, they would get a season of

10    competition.  They could play in the Fall and then not

11    play the whole Spring, be on the bench, be in uniform and

12    travel.  At the end of the year they'd still be charged

13    with a season of competition.

14         THE COURT:  Okay, thank you.  Cross?

15    CROSS EXAMINATION

16    BY MR. HERNANDEZ:

17    Q.   Ms. Flynn, you work for Quinnipiac University,

18    correct?

19    A.   Correct.

20    Q.   And they asked you to come and testify, correct?

21    A.   Correct.

22    Q.   And that's why you're here?

23    A.   Yes.

24    Q.   And you understand the nature of this lawsuit?

25    A.   Generally, yes.

1    Q.   Okay.  As a matter of fact, the lawsuit is attacking

2    the practices of Quinnipiac University's Athletic

3    Department?

4    A.   Yes.

5    Q.   You understand that?

6    A.   I understand that.

7    Q.   Okay.  Now then, I believe you mentioned that in

8    '07-'08, there were, there was -- you discovered there was

9    a practice of, in the women's teams, of loading up the

10   roster before the first date of competition and then a

11   loss of a significant number of those players after the

12   first date of competition?

13        MS. GAMBARDELLA:  Objection.  Misstates the

14   testimony.  She never used the word practice.

15        MR. HERNANDEZ:  Well, I'll withdraw that

16   question.

17   BY MR. HERNANDEZ:

18   Q.   Did you discover that the add/drop list reflected

19   that in the women's teams, the numbers would be beefed up

20   before the first date of competition and then there'd be

21   some significant attrition after the first date of

22   competition?

23   A.   I wouldn't say I discovered.  I would say maybe

24   noticed.  What was happening is during the Fall, almost

25   all of our sports are having tryouts, and so, yes, women

```
1    were trying out for teams.  I know that was happening in
2    softball.  Very common.  And some people don't make
3    tryouts and I, you know, years ago -- I don't really keep
4    track of it anymore but years ago when I first was working
5    there, we might have 100-plus students trying out for
6    teams and maybe 30 might make it, so --
7              THE COURT:  Mr. Hernandez, let me just interrupt
8    and let counsel in the Bronson matter know we're running a
9    bit late here and we're going to start in chambers about
10   1:30.  Thank you.
11   BY MR. HERNANDEZ:
12   Q.   You noticed that with the women's teams, is that
13   correct?
14   A.   No, I noticed it with one women's team.
15   Q.   Okay.  And with respect to the men's teams, you
16   noticed the obverse; that is, that participants were cut
17   before the first date of competition and then added after
18   the first day of competition?
19   A.   I noticed it with the baseball team and then I
20   noticed it with the men's lacrosse team, and then I went
21   and expressed my concern to my supervisor.
22   Q.   Okay, and your supervisor is whom?
23   A.   Jack McDonald.
24   Q.   Okay.  And when you reported this to Jack McDonald,
25   what did he say?
```

1    A.   I don't know what he said.  I was deeply disappointed

2    that at least, at the very least the baseball coach had

3    done this, and I told him I didn't think this was the

4    spirit of the law, this is not what -- we weren't trying

5    to do this.  This is not what we wanted to happen to meet

6    roster and management numbers, and I explained this to him

7    in terms of both the baseball team and the men's lacrosse

8    team.

9    Q.   Now, a number of coaches complained about their

10   target number, is that correct?

11   A.   I heard a number of grumblings either directly or

12   indirectly.

13   Q.   Okay, and as a matter of fact, a number of women's

14   coaches came to you and expressed their concern that their

15   numbers were too high, isn't that correct?

16   A.   Yes.

17   Q.   And which women's coaches expressed to you their

18   concern that their target numbers were too high?

19   A.   Women's lacrosse, women's field hockey, women's

20   softball, women's ice hockey.  I don't recall women's

21   soccer.  Women's basketball didn't have an issue.  Maybe

22   women's cross country.  And I'm trying to think if I

23   left -- that's the best of my recollection right now.

24   Q.   Okay.  And just so that we're clear, these new target

25   numbers, it's my understanding these numbers were higher

1  than the number of players that they were used to bringing

2  in for practice and then to field the team?

3  A.   Yes.

4  Q.   So, the target numbers, these are numbers that were

5  provided by the athletic department, is that correct?

6  A.   Yes.

7  Q.   And in substance, they were a directive to, for

8  example, the women's lacrosse team, you need it make this

9  number, is that fair?

10  A.   This is your target number, yes.

11  Q.   Same was true for women's field hockey?

12  A.   Yes.

13  Q.   All right.  And softball, ice hockey and women's

14  cross country, to your recollection?

15  A.   Well, everybody was given numbers.  The ones that you

16  just mentioned were the ones that I recall expressing some

17  concern.

18  Q.   And these are the coaches -- to the extent that the

19  coaches expressed a concern about their numbers being too

20  high, what did the women's lacrosse coach tell you about

21  her number being too high?

22  A.   I don't remember the specifics.  I think I just took

23  away the fact that it was a number she wasn't accustomed

24  to.

25  Q.   And what about the women's field hockey coach?  What

1    concern did she express to you about her number being too

2    high?

3    A.   I don't recall that she -- it may have been expressed

4    directly to me but I had heard that, in that first year of

5    2007, 2008, that her requested number, or her target

6    number was higher than the number that she's allowed to

7    bring back early for preseason practice.

8    Q.   Okay, we'll get back to that.  And what about the

9    women's ice hockey team; what did she say to you about her

10   number being too high?

11   A.   Just --

12   Q.   Sorry?

13   A.   Just it was too high.  It was too high or -- it

14   certainly wasn't something they were accustomed to.

15   Q.   And what about the women's cross country coach; what

16   concern did she express to you about her number being too

17   high?

18   A.   He -- for him, it was a combination because he was

19   also working with the men's cross country team, so he was

20   facing a lower number for men than he was used to, and a

21   higher number than he was used to for women.

22   Q.   Okay.  And just so that we're clear, when these

23   target management numbers came out with numbers that are

24   higher than the women's coaches were used to having to

25   manage, did these new numbers come with any additional

1   funding for recruiting athletes to fill those spots?

2   A.  I don't work with the budgets.  I've said I work with

3   the athletic scholarship budgets, so I don't work with

4   the, what I would call operating budgets where recruiting

5   would come from, so I don't know that what -- I don't know

6   what kind of budget adjustments were made.

7        The other thing is, and it's my understanding, that

8   we don't have recruiting budgets.  We have an operating

9   budget and it's the coaches' discretion to earmark what

10   they think they are going to need for recruiting what they

11   are going to need for travel.

12   Q.  Fair enough.  These new target numbers which these

13   various women's coaches found to be too high, did these

14   higher numbers come with a higher operating budget?

15   A.  I don't know the answer to that because I don't work

16   with the budgets.

17   Q.  Did any of these coaches complain to you that these

18   new higher target numbers failed to provide with

19   comparable increases in their budgets?

20   A.  I don't recall 2007, 2008 but, as I already

21   mentioned, just even recently I know coaches which, for

22   instance, the -- the softball coach has said that she was

23   concerned how she was going to get her numbers with her

24   budget.

25   Q.  All right, let's talk about scholarship.  The higher

1   number for women's lacrosse, higher target number, did

2   that come with a higher allocation of scholarship money

3   for women's lacrosse players?

4   A.   There have been changes, have been increases in our

5   scholarship budget each of the last -- actually the

6   last -- since I've been there, and so I believe in 2007

7   there were -- I would have to look at a chart to speak

8   specifically but I know there have been increases in some

9   of our scholarship budgets for women.

10  Q.   When you learned that the women's field hockey team

11  was complaining that her target number was too high, did

12  you take any steps to follow up with her to address her

13  concerns?

14  A.   I don't recall that I did.

15  Q.   Okay.  And just -- remind me again, your position is

16  Senior Women's Administrator?

17  A.   Senior Woman Administrator.

18  Q.   Senior Woman Administrator.  And can you just explain

19  for the court what your duties and responsibilities are as

20  the SWA?

21  A.   My primary understanding of my role as an SWA is to

22  represent the University at Northeast Conference meetings

23  that require or expect an SWA to be in attendance and to

24  represent the University as the SWA when called for at the

25  NCAA level.

1         And the other thing that I primarily do is the NCAA

2    sends out a variety of documents via mail or electronic

3    mail and I'm on that mailing list.  So I have the

4    opportunity to keep in some kind of knowledge of what's

5    going on across the membership of the NCAA.

6    Q.   All right.  And I believe you mentioned that -- well,

7    let me ask you this.  Were any steps taken after the

8    '07-'08 year to educate the coaches about the proper use

9    of roster management?

10   A.   No.

11   Q.   And, again, '07-'08 is the year in which you

12   discovered that there were problems with, among others,

13   the men's baseball team, is that correct?

14   A.   I thought there were problems.

15   Q.   And what were the other men's teams that you thought

16   there were problems with?

17   A.   I thought there was problems with the men's lacrosse

18   team.

19   Q.   Any other men's teams that you thought there was a

20   problem with?

21   A.   No.

22   Q.   Okay.  But I think you said you were disappointed by

23   that, is that correct?

24   A.   I was disappointed, and I will add now, felt a little

25   helpless because there's nothing -- I had the NCAA manual

1    to fall back on and its interpretations and its rules, but

2    OCR doesn't -- I'm not aware of anything that offers how

3    to manage your rosters.  They just want on the first date

4    of competition you to list what you've got.  So it was, I

5    when into Jack, my supervisor, and it was like there's

6    nothing to tell them that they can't do it but I don't

7    think this is what you intended; this is not spirit of the

8    law.

9    Q.   And, again, his reaction was what?

10   A.   Listened to me.  And I felt -- he listened to me.

11   Q.   He listened to you.  And, again, your testimony is

12   that after you brought this to his attention there was no

13   effort to educate the coaches about the proper use of

14   roster management after the '07-'08 period?

15   A.   Not that I'm aware of, but those coaches don't report

16   to me as a supervisor so I don't know if he had had

17   meetings with them but there was no -- like I'm used to

18   doing department-wide rules education.

19   Q.   Got you.

20   A.   I was not aware there was a department-wide --

21   Q.   Got you.  You do attend the weekly athletic

22   department meetings, however, don't you?

23   A.   Yes.

24   Q.   Okay.  And after this issue with the '07-'08 roster

25   management became an issue, let's just say it became an

1    issue, was this problem addressed at any of the weekly

2    athletic department meetings?

3    A.   I would say no.  I just finished saying I was not

4    aware of any rules education en masse.

5    Q.   Okay.  I believe earlier you said that there has been

6    a change in attitude among the coaches, and I believe you

7    tied that to the phrase "as we educate the coaches."  What

8    education has been given to the coaches about the

9    perceived problem with the '07-'08 roster management?

10   A.   I lost my train of listening; would you repeat the

11   question?

12   Q.   Okay, I'll just move on.  I have some other areas to

13   cover.

14        All right.  The increased numbers for the women was a

15   problem with the women's lacrosse team, women's field

16   hockey, and I believe with respect to women's field hockey

17   you mentioned that the number was higher than the number

18   of students that that coach could bring back early for

19   practice, is that correct?

20   A.   Preseason practice, correct.

21   Q.   Preseason practice.  Do you know how many

22   participants of the women's field hockey the coach was

23   allowed to bring back early for preseason practice?

24   A.   No.  Those numbers are tied to housing for preseason.

25   Outside of what I do, there's another staff member so -- I

1    have no -- I couldn't refer to what anybody's preseason

2    numbers are.

3    Q.    Okay.  And just so we're clear, the people who come

4    back early, would it be fair to say these are people who

5    have already made the team?

6    A.    For the most part, yes, there's -- yes.

7    Q.    They are probably veterans, is that fair to say?

8    A.    No.

9    Q.    Not necessarily?

10   A.    Not necessarily.

11   Q.    Could be recruited freshmen?

12   A.    Yes.

13   Q.    Freshmen who have been recruited specifically to play

14   whichever of these sports we're talking about, fair

15   enough?

16   A.    Yes.

17   Q.    All right.  And in any event, do you know if any

18   steps were taken to check the early number, the number of

19   early participants with the coaches of these various teams

20   before those target numbers were instituted?

21   A.    Do I know if that was done?

22   Q.    Yes.

23   A.    I don't know that it was done.

24   Q.    Okay.  But certainly with respect to women's field

25   hockey there was a disconnect, is that fair to say?

1    A.   Yes.

2    Q.   And do you know the name of the women's field hockey

3    coach?

4    A.   Yes.

5    Q.   And who's that?

6    A.   Becca May Kohli.

7    Q.   Becca May Kohli.  And she's also an employee of

8    Quinnipiac, is that correct?

9    A.   Yes.

10   Q.   And she's the woman who testified earlier?  Was she

11   out in the hallway earlier?

12   A.   She was in the hallway earlier.

13   Q.   She came in for a while and then she came back out,

14   but -- you obviously don't know what happened but she was

15   a witness, do you understand that?

16   A.   Yes.

17   Q.   And what is the name of the women's lacrosse coach?

18   A.   Goes by Danny Caro.

19   Q.   Danny Caro.  And is her real name Danielle Caro?

20   A.   I think so.

21   Q.   All right.  Now, when -- did you learn that Danny

22   Caro had a problem with this new target number for women's

23   lacrosse?

24   A.   She came in and spoke to me about it.

25   Q.   What did she say to you?

1    A.   I can't recall in 2007, in 2008, about that academic

2    year, but I know we had conversations about it last

3    Summer.

4    Q.   Okay.

5    A.   She would stop by and, you know, because we had been

6    working with her roster on who's eligible, who's passed

7    the clearing house, and she goes I'm working toward my 30,

8    I'm working toward my 30, and she would -- I felt like she

9    embraced that number, she knew that's what she needed to

10   work for, and then she got concerned because a student

11   athlete on the team -- if somebody that would be a

12   returning scholarship athlete has been wavering about

13   whether she wanted to really come back, she wanted to come

14   back to school but she didn't know if she really wanted to

15   play lacrosse, and so that was a back and forth for a

16   while.  And, as it turned out, she was not going to -- did

17   not want to play but we kept her scholarship intact.  And

18   that was something that Jack typically does and talked, or

19   her Dad had called him, I guess.  He called and asked, so

20   she kept her scholarship for the year.

21        And then she had a couple other recruits she was

22   talking with, or -- yeah, recruits, girls that were coming

23   in their freshmen year.  And then right before the start

24   of the school year or maybe the first week of school,

25   there had been a girl on her team already for at least a

1    year that was having some kind of problem.  I don't

2    remember if it was her herself or her family --

3              THE COURT:  Ms. Flynn, I'm just going to cut you

4    off a little bit.  Let's try and refocus the question.

5              MR. HERNANDEZ:  Yes, I didn't want to interrupt

6    the witness.

7              THE COURT:  I don't have personal concerns but

8    I've got four lawyers waiting.  I'm hoping to have

9    something to eat before I take up late the 1:00 o'clock

10   that's waiting, so I'd urge everybody to be as efficient

11   as they can.

12   BY MR. HERNANDEZ:

13   Q.   Just so we are clear, to the extent that Danny Caro

14   had a problem with her target number, she told you it was

15   too high, is that correct?

16   A.   Not this -- not this coming into this past year, she

17   was committed to 30 people and she was working towards 30

18   people, 30 women.

19   Q.   '07-'08, her concern was the number was too high, is

20   that correct?

21   A.   Yes.

22   Q.   She didn't ask for a higher number, did she?

23              MS. GAMBARDELLA:  Your Honor, he's asking the

24   same question over and over and over again.

25              MR. HERNANDEZ:  It's a different question.

1             THE COURT:  It's all right.  Sustained.

2    BY MR. HERNANDEZ:

3    Q.   Would you agree with me, Ms. Flynn, then that in the

4    2007, 2008 calendar year, Quinnipiac University was not in

5    compliance with its obligations to provide substantially

6    proportional opportunities to compete for men and women

7    student athletes?

8    A.   Well, we weren't focused on trying to do that in 2007

9    and 2008.  The athletic director had said that we were

10   meeting Title IX by prong two, so that was not our -- that

11   wasn't the University's intent, to meet substantial

12   proportionality in 2007, 2008.

13   Q.   Okay.  Do you recall giving a deposition in this

14   case?

15   A.   Yes.

16   Q.   And do you recall being asked exactly the same

17   question and agreeing that in 2007, 2008, Quinnipiac

18   University was not in compliance with prong one of Title

19   IX?

20             THE COURT:  It's been stipulated to, so it's all

21   right.

22             MR. HERNANDEZ:  I'm sorry?

23             MS. GAMBARDELLA:  It's stipulated.  She just

24   gave a consistent answer.

25             THE WITNESS:  I just said we weren't.

```
1              THE COURT:  We have a stipulation, don't we?

2              MS. GAMBARDELLA:  Yes.  We have a stipulation we

3    did not rely on prong one for those years.

4              MR. HERNANDEZ:  That's fine, that's fine.

5    BY MR. HERNANDEZ:

6    Q.   Do you know when Quinnipiac last added a women's

7    varsity sports team?

8    A.   I believe it was 2001, 2002; it was my first year at

9    the school.

10   Q.   Was that women's ice hockey?

11   A.   Yes, it was.

12   Q.   And do you know what kind of team, women's time they

13   added before that?

14   A.   I know there have have been teams added.  I know it's

15   in our athletic certification report.  I could not tell

16   you with accuracy when or which teams or which, in which

17   order.

18   Q.   All right.  Now, let's cut to February of this year.

19   Did there come a time that Jack McDonald reported to you

20   that the University was going to have to cut women's

21   volleyball?

22   A.   Yes.

23   Q.   All right.  And at that time did he tell you that the

24   University needed the building that the women's volleyball

25   team was working out in?
```

1    A.    That they needed -- yes.

2    Q.    All right.  And at that time he just decided it was

3    because the University wanted the building, is that

4    correct?

5    A.    To that effect, yes.

6    Q.    Yes, okay.  And is it your testimony that there was a

7    problem with the roster management numbers, the way these

8    were being reported, in the first year and that was in

9    '07-'08?

10             MS. GAMBARDELLA:  What was that question?

11             MR. HERNANDEZ:  You're right, it's a bad

12   question.

13   BY MR. HERNANDEZ:

14   Q.    Is it my understanding that you testified that to the

15   extent that there was a problem with the way numbers were

16   being reported in connection with roster management, that

17   that was an issue in '07 and '08?

18   A.    I don't recall ever indicating that the numbers we

19   were reporting in 2007 and 2008 were wrong.

20   Q.    All right.  And is there still a problem with the way

21   coaches are using roster management at Quinnipiac

22   University?

23             MS. GAMBARDELLA:  She never -- Your Honor, this

24   is mischaracterizing the testimony.

25

```
 1    BY THE WITNESS:

 2    A.   I don't know what you mean by "using roster

 3    management."

 4    Q.   Okay.  Is there presently a problem in the '08-'09

 5    year with the manner in which coaches at Quinnipiac

 6    University are employing the roster management program?

 7    A.   I personally feel they have a done a real nice job in

 8    working towards what the athletic director set out as

 9    something he wanted us to do.

10    Q.   Okay.  Is it your testimony that it's not happening

11    anymore?

12              MS. GAMBARDELLA:  What's not happening?

13              THE WITNESS:  Yes.

14              MR. HERNANDEZ:  This problem with the roster

15    management.

16              MS. GAMBARDELLA:  What problem?

17    BY MR. HERNANDEZ:

18    Q.   You reported a problem to Mr. McDonald, is that

19    correct?

20    A.   In 2007, 2008, I did speak expressly to Jack McDonald

21    and said that I did not think some of the actions of our

22    coaches was in the spirit of what we were trying to do in

23    terms of meeting the roster management program he had

24    established and that I didn't think it was in the spirit

25    of the law.
```

1          Did I think we were following the law?  Yes.  Because

2     I counted numbers based on the criteria in the question

3     and answer section of the EADA report and website, so I

4     did report numbers as they met that rule.  I didn't like

5     the way we got there, that was my opinion, and I -- that's

6     the opinion I expressed to Jack.

7          And, I might add, I don't think I've expressed that

8     to Jack this past year.

9     Q.   Okay.  And did some of the men's coaches express a

10    concern that their target management numbers were too low?

11    A.   Yes.

12    Q.   And which coaches reported that concern?

13    A.   Men's lacrosse, men's baseball -- again, I'm going

14    alphabetically or scanning the list in my head of sports.

15    Men's cross country and maybe -- maybe men's soccer.

16              MR. HERNANDEZ:  If I could just have a moment,

17    Your Honor?

18              THE COURT:  Sure.

19              (Pause)

20              MR. HERNANDEZ:  I have no further questions,

21    Your Honor,.

22              MS. GAMBARDELLA:  I'll get you out of here in

23    five minutes, I promise.

24

25

1  REDIRECT EXAMINATION

2  BY MS. GAMBARDELLA:

3  Q.   Tracey, the concerns about too high/too low, were

4  those all in the first year of roster management,

5  basically, the once you've been testifying about?

6  A.   I think they were shocked.  I think our coaches were

7  absolutely shocked in 2007 and 2008.

8  Q.   Is that the first year?

9  A.   That first year.

10  Q.   Okay, go ahead.  I'm sorry.

11  A.   I think they continued to be concerned but they are

12  more accustomed to what they are doing and equipped and

13  have had longer, more time to learn ways in which to meet

14  that policy.

15  Q.   And then the higher numbers for women were for what

16  purpose?

17  A.   To provide more opportunities for women to

18  participate in on a team.

19  Q.   And you testified they were higher than what the

20  women's coaches were accustomed to?

21  A.   Yes.

22  Q.   Okay, and one final question.  Counsel kept asking

23  you about "instruction" that coaches were given in roster

24  management.  I'm not going to use that word.

25  A.   Okay.

1    Q.   You've already testified coaches were given

2    information about roster management, correct?

3    A.   Yes.

4    Q.   The importance of roster management, correct?

5    A.   Yes.

6    Q.   And what you're trying to achieve with roster

7    management, correct?

8    A.   Yes.

9    Q.   Thank you.

10             THE COURT:  Recross?

11             MR. HERNANDEZ:  No, Your Honor.  Thank you.

12             THE COURT:  Thank you, you're excused.

13             (Witness excused)

14             THE COURT:  Does that end the evidence?

15             MS. GAMBARDELLA:  Yes.

16             THE COURT:  What are we going to do about the

17   expert?

18             MR. ORLEANS:  We delivered to defendant's

19   counsel our proposed designations as well as the videotape

20   this morning.

21             THE COURT:  How do you want to proceed on that?

22             MS. GAMBARDELLA:  We've been multi-tasking very

23   hard.  We're going to cross designate.  We can, if you

24   give us a timeframe we'll have our cross designations but

25   he's concerned about objections.  I mean we could -- we've

```
 1   already made our objections, Your Honor.  In terms of the
 2   entire testimony we've already had a partial ruling as to
 3   timeframe.  If you give me a deadline to submit our cross
 4   designations and anything else we have to say on that --
 5             THE COURT:  Let's do this --
 6             MS. GAMBARDELLA:  I'm happy to waive further
 7   argument.
 8             MR. ORLEANS:  So are we, Your Honor.  We'd be
 9   happy --
10             MS. GAMBARDELLA:  It's time to rule.
11             MR. ORLEANS:  We'd be happy to have you look at
12   the, look at what we designated and what the defense
13   designates and let Your Honor decide what it's worth to
14   you.
15             THE COURT:  Fine.  All right.  So why don't you
16   get that to me by our closing argument time tomorrow and
17   I'll look for your briefs at that time as well.
18             So I'll see you tomorrow at 1:30 for argument,
19   and you'll give me whatever you're going to give me and
20   I'll take a look at it and take it from there.
21             MR. ORLEANS:  Thank you.
22             MS. GAMBARDELLA:  Thank you for your patience.
23             THE COURT:  Thank you all.  We'll stand in
24   recess.
25
```

1              (Whereupon the above matter was adjourned at 1:35

2     o'clock, p. m.)

C E R T I F I C A T E


        I, Susan E. Catucci, RMR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.




        /S/ Susan E. Catucci
        _____

            Susan E. Catucci, RMR
            Official Court Reporter
            915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
             Tel: (917) 703-0761