UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

STEPHANIE BIEDIGER, ET AL      :  No. 3:09cv-621 (SRU)
                               :  915 Lafayette Boulevard
          vs.                  :  Bridgeport, Connecticut
                               :
                               :  May 14, 2009
QUINNIPIAC UNIVERSITY          :

- - - - - - - - - - - - - - - - x


PRELIMINARY INJUNCTION HEARING


B E F O R E:

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

     FOR THE PLAINTIFFS:

          PULLMAN & COMLEY
               850 Main Street
               P.O. Box 7006
               Bridgeport, Connecticut 06601-7006
          BY:  JONATHAN B. ORLEANS, ESQ.
               ALEX V. HERNANDEZ, ESQ.

     FOR THE DEFENDANT:

          WIGGIN AND DANA, LLP
               400 Atlantic Street
               P. O. Box 110325
               Stamford, Connecticut  06911-0325
          BY:  MARY A. GAMBARDELLA, ESQ.
               JONATHAN BARDAVID, ESQ.

               Susan E. Catucci, RMR
               Official Court Reporter
               915 Lafayette Boulevard
             Bridgeport, Connecticut  06604
                  Tel: (917) 703-0761

I N D E X

WITNESSES:

JOHN McDONALD

Direct Examination by Ms. Gambardella..............656
Cross Examination by Mr. Orleans...................659

SUMMATIONS:

MR. ORLEANS......................................660

MS. GAMBARDELLA............................. .....687

-0-

1             (1:40 o'clock, p. m.)

2             THE COURT:  Good afternoon.  Where are we on the

3    expert?

4             MR. ORLEANS:  Your Honor, I received now from

5    defense counsel the defendant's cross designations of

6    expert testimony and I'm prepared to file with the court

7    our designation which I had given to counsel yesterday but

8    not filed.  I also brought with me the original

9    transcript, complete set of the DVDs and the complete set

10   of the plaintiff's exhibits.  We accidentally omitted to

11   copy the defendant's exhibits but when I get back to my

12   office we'll copy them and have them.

13            THE COURT:  Exhibits to the depositions?

14            MR. ORLEANS:  Yes, I think you should have them.

15   Certainly there's a great deal of overlap.  Many of the

16   documents that are marked as exhibits at the expert's

17   depositions have also been marked as exhibits in the

18   trial, but we just have them as deposition exhibits, so --

19            THE COURT:  All right.

20            MS. GAMBARDELLA:  We omitted a cross designation

21   of exhibits but we can supplement and email that later.  I

22   have a hard copy of the designations.  I don't think it

23   will be a complicated project for Your Honor to understand

24   what we're doing.

25            MR. ORLEANS:  Right, and we have no objection to

```
 1   defendant --

 2          THE COURT:  And so everyone's in agreement, I'm

 3   just going to take and view this?

 4          MR. ORLEANS:  You're going to view at least the

 5   portions we designated and cross designated and we're

 6   leaving it up to you.

 7          Let me hand up to your clerk the deposition

 8   transcript, the plaintiff's exhibits and the DVDs.  Here

 9   are the hard copies of both parties' designations.

10          (Hands Court.)

11          THE COURT:  Great.  Thank you.

12          MR. ORLEANS:  Your Honor, should we efile the

13   designations as well?

14          THE COURT:  Probably a good idea.

15          MR. ORLEANS:  All right, we'll do that when we

16   get back but we don't have to append copies of the

17   transcripts, or the whatever, to that?

18          THE COURT:  No.

19          MR. ORLEANS:  Good.

20          MS. GAMBARDELLA:  I have a really minor

21   housekeeping matter, Your Honor.  May defendants have

22   permission to file a brief today that exceeds the limit by

23   five pages?

24          THE COURT:  Sure.

25          MS. GAMBARDELLA:  Thank you.
```

1          MR. ORLEANS:  Your Honor, with respect to our

2     brief I regret to say it's still being polished and will

3     be filed by the end of the day.

4          MS. GAMBARDELLA:  Ours is basically ready and

5     we'll file it by the end of the day, efile.

6          THE COURT:  I'll look for those.  I did notice

7     efiling of Defendant's motion to strike the testimony of

8     Ms. Fairchild.

9          MS. GAMBARDELLA:  Your Honor, we prepared

10    closing remarks presuming the testimony is in and you can

11    reach your decision based on anything you want.

12         THE COURT:  I appreciate that, but let me

13    understand whether the defendant wishes to call any

14    additional witnesss in light of Coach Fairchild's

15    testimony.  Do you wish to recall her now to undertake --

16         MS. GAMBARDELLA:  No, I would have recalled

17    Mr. McDonald for a very finite purpose.

18         THE COURT:  You're free to do that.

19         MS. GAMBARDELLA:  Am I?

20         THE COURT:  Absolutely.

21         MR. ORLEANS:  Your Honor, we would just note our

22    objection to this.  We're caught a little by surprise.

23    Just if I could be heard, about two sentences, Your Honor?

24         THE COURT:  Sure.

25         MR. ORLEANS:  To the extent that this motion to

```
1    strike is based on our purportedly delayed disclosure of
2    Ms. Fairchild, the disclosure was less than 24 hours after
3    the pretrial conference.
4             THE COURT:  Fair enough, but my recollection is
5    the defendant never formally rested.  I think everybody
6    understood that the defendant was resting but we still had
7    the expert issue, we were in a tight time situation
8    yesterday where I was pushing counsel through because I
9    had other lawyers waiting for another matter.  And it
10   seems to me that if all the defense wants to do is call
11   Mr. McDonald back, it cures any concern in the motion and,
12   frankly, I'd rather have the full story, so --
13            MR. ORLEANS:  Understood, Your Honor.  I'll
14   withdraw that objection.  Thank you.
15            THE COURT:  All right.
16   J O H N     M c D O N A L D,     called as a witness
17   on behalf of the Defendant, having been duly sworn
18   previously by the Court, testified as follows:
19            THE COURT:  Sir, you're still under oath.
20            THE WITNESS:  Okay, thank you.
21            THE COURT:  Thank you.
22   DIRECT EXAMINATION
23   BY MS. GAMBARDELLA:
24   Q.   Thank you, Your Honor.  Good morning -- good
25   afternoon, Mr. McDonald.
```

1          Mr. McDonald, you were present in court when Ms.

2     Fairchild testified, correct?

3     A.    Yes, I was.

4     Q.    All right.  I just have a couple questions for you.

5          Can you tell me how coaches are told what their

6     budgets are going to be each year?

7     A.    They are basically told after the trustees are

8     approved in May that this is the number they will have for

9     the following fiscal year.

10    Q.    Are they told specifically how to allocate their

11    budget?

12    A.    In their operating budget they have a lump sum.  That

13    includes their travel, their lodging, equipment,

14    recruiting.  So they have a lump sum that it's their

15    discretion.  And some sports recruit a lot, let's say

16    men's ice hockey travels to Canada, and some sports don't

17    have a high recruiting budget because they recruit

18    locally.

19    Q.    So is it within their discretion to decide how to

20    spread the money around?

21    A.    Yes, it is.

22    Q.    Did you ever come to know that in 2007 or during that

23    academic year, as Ms. Fairchild --

24    A.    Child.

25    Q.    -- Fairchild suggested -- don't print that -- that

1    Ms. Fairchild suggested, that she had run out of money for

2    uniforms and equipment and that led to nine players

3    quitting, had you ever heard that before?

4    A.   No.

5    Q.   All right.  And so who is to determine how to spread

6    the money among the roster participants that they are

7    given to meet?

8    A.   It's up to each coach.

9    Q.   Okay.  And had she ever complained about her budget?

10   A.   No, no more than other people do for any kind of

11   financial issues, but the answer is directly no.

12   Q.   So you had no idea until yesterday of a suggestion

13   that she ran out of money for uniforms and that's why some

14   players quit in 2007?

15   A.   I was surprised.  Thought the other two coaches had a

16   different opinion on that.

17   Q.   And, finally, Mr. McDonald, can you tell us how her

18   particular budget compares to other teams' budgets?

19   A.   In teams of similar, we have sport of emphasis, such

20   as basketball and ice hockey, we would put them in one

21   section.  Most of the other sports are referred to as team

22   sports, soccer, lacrosse, field hockey, volleyball.

23   Baseball and softball are a little bit higher or a lot

24   higher, one third higher than those other sports?  So, her

25   budget was significant and has been and it's almost

```
1    tripled in the last eight years.

2    Q.   Are other coaches asked to supply more players on

3    less?

4    A.   Yes.

5    Q.   Just give us an example.

6    A.   Well, for example, men's/women's soccer has a number

7    of 25 which we heard a lot about yesterday.  This -- both

8    men's and women's soccer coaches have one full-time coach,

9    like softball, and one less part-time coach.  Softball has

10   two coaches.  The two soccers have only one paid coach.

11        So I think softball is well taken care of.  Lacrosse,

12   similar.  They have more players, 30 players for women, 35

13   for men, and their resources are the same or less.

14             MS. GAMBARDELLA:  I have no further questions.

15             THE COURT:  All right, cross?

16             MR. ORLEANS:  Very briefly, Your Honor.

17             MS. GAMBARDELLA:  Yeah yeah.

18   BY MR. ORLEANS:

19   Q.   Mr. McDonald, when Ms. Fairchild was given a roster

20   target of 25, was she given any increase in her budget to

21   reflect the increased number of players she would be

22   expected to carry?

23   A.   No, nor did anybody else.

24             MR. ORLEANS:  Nothing further.

25             THE COURT:  All right, sir, you're excused.
```

1    Thank you.

2              (Whereupon the witness was excused.)

3              MS. GAMBARDELLA:  Thank you so much, Your Honor.

4    Appreciate that.

5              THE COURT:  No problem.

6              All right.  I think as a formal matter, I will

7    deny the motion to strike simply saying that although the

8    disclosure was not handled ideally, I think under the

9    circumstances there's been no prejudice that hasn't been

10   addressed by the opportunity either to call other

11   witnesses or --

12             MS. GAMBARDELLA:  Yes, I appreciate that, Judge.

13   Thank you very much.

14             THE COURT:  Sure.  All right.  Is there anything

15   else to take up before closings?

16             MR. ORLEANS:  Not that I can think of, Your

17   Honor.

18             MS. GAMBARDELLA:  Well, stop thinking.

19             THE COURT:  I'm not going to give you any more

20   time.

21             MS. GAMBARDELLA:  I'm all set, Your Honor.

22             THE COURT:  All right.  Mr. Orleans?

23             MR. ORLEANS:  Judge, I don't want to overstay my

24   welcome.  How much time have you allocated to us?

25             THE COURT:  I'll be frank, I haven't really

```
1    allocated time.  I believe -- I'm going to ask my clerk to

2    confirm this, I believe I have a 3:00 o'clock, is that

3    right?

4              THE CLERK:  (Nodding head affirmatively.)

5              THE COURT:  So --

6              MR. ORLEANS:  I don't anticipate any trouble

7    meeting that at all.

8              THE COURT:  Okay.

9              MR. ORLEANS:  Your Honor, I'd like to step back

10   for a second and try and put the case in some kind of

11   context before I address the specific facts in law that

12   are applicable to this situation.

13             It's a Title IX case.  Title IX was enacted to

14   prevent sex discrimination in institutes that receive

15   federal funds.  And as applied to intercollegiate

16   athletics, Title IX requires that women receive equal

17   participation opportunities with men.  In practice, this

18   means that participation opportunities for women have to

19   be increased until their interests are accommodated as

20   fully and effectively as men's are.

21             The point of this little disposition about the

22   purposes of Title IX is to emphasize that it's not about

23   making the numbers.  I had the sense as I listened to the

24   testimony that at Quinnipiac, the desire to make the

25   numbers came to obscure the purpose of Title IX.
```

1          The purpose of Title IX is not about making

2     numbers, it's not about technical compliance with

3     reporting requirements of either the equity in Athletics

4     Disclosure Act or of the NCAA.  Title IX is about real

5     participation opportunities for real atheletes, some of

6     whom were sitting in this courtroom on Monday and Tuesday.

7          I would point the court respectfully to the

8     Cohen v. Brown University line of cases for that principle

9     that Title IX is about real opportunities, not just about

10    statistical compliance.  And I think that that notion runs

11    through most of the Title IX cases, that the participation

12    opportunities have to be real.  And I believe, we believe

13    that it's important to keep that fundamental principle in

14    mind as the court parses the facts and the law on the

15    preliminary injunction motion.

16          So, with that as an introductory, what I'd like

17    to do is first address the key facts and then the

18    applicable law.

19          Facts.  The plaintiffs.  You met the plaintiffs.

20    They are a thoroughly impressive group of young women and

21    a dedicated coach.  The loss of the opportunity to compete

22    in Division I volleyball would be an incalculable blow to

23    these women in a myriad of ways and I think that was

24    obvious in the testimony and I am sure that the court

25    understands that.

1          Second, Quinnipiac.  There's no dispute that

2     it's subject to Title IX.  I don't think that there's any

3     serious dispute that Quinnipiac is not currently in

4     compliance with Title IX on any prong of the three prong

5     test under the Title IX regulations.

6          Quinnipiac has admitted that it is not in

7     compliance with prong one, the proportionality standard,

8     in the current year or in the previous year.  And there's

9     some evidence in the evidence that it wasn't in compliance

10    in prior years either, including the NCAA self study that

11    was -- or the portion of it that was admitted into

12    evidence.

13         Quinnipiac asserted through some of its

14    witnesses and asserts in the self study that prior to the

15    upcoming year, it complied with Title IX through prong

16    two.  We dispute that.  We don't think that there is,

17    based on the evidence of record, a history and continuing

18    practice of program expansion.

19         THE COURT:  Is that really at issue at this

20    hearing?

21         MR. ORLEANS:  Well, it is to the extent that I'm

22    about to argue to you, Your Honor, that if they are out of

23    compliance now, they can't cut a women's team, and that is

24    something that I'm about to argue.  So I am asking the

25    court to make a determination whether Quinnipiac is

1    currently in compliance with Title IX.  That's the

2    relevance of the prong two issue.

3            I know the court heard the evidence, the self

4    study evidence that Quinnipiac has not added a women's

5    sport in nearly a decade.  And although I anticipate that

6    Quinnipiac will point to data that indicates some increase

7    in opportunities for women over the last decade, that

8    increase is not steady, even using Quinnipiac's numbers,

9    and for reasons I think the court is aware of at this

10   point, and that I'll get into a little more detail in a

11   few minutes, we don't think those numbers are entirely

12   trustworthy.

13           And I don't think there's any serious contention

14   that Quinnipiac could currently be in compliance under

15   prong three, there having been no systematic attempt at

16   all to assess the interests or abilities of the

17   under-represented sex.

18           We know, I don't think there's any dispute that

19   Quinnipiac now has a plan to cut two men's sports, golf,

20   outdoor track, and one woman's sport, volleyball.

21   Quinnipiac claims that it will be in compliance next year

22   through the use of roster management and by elevating a

23   club team in an unrecognized and controversial sport,

24   competitive cheer, to varsity status.

25           I'll just comment that I find there to be

1    something sad and cynical about Quinnipiac's approach to

2    this.  They've got an existing vibrant program with

3    athletes who are, you know, terrific human beings who

4    came -- who are highly skilled, who came to Quinnipiac to

5    play, a coach who they recruited, they've got a, you know,

6    a good program which they are prepared to cut and then go

7    through this exercise to appear to be in compliance using

8    roster management in ways that I don't think was intended,

9    that I don't think the concept is really intended to be

10   used.  And I think it's sad.

11        And it's also sad that one of the, one of the

12   results of all this is to appear to pit volleyball players

13   against cheer team members, which is certainly not

14   anything that we wanted or intended to occur.  And I'll

15   address that further in another minute or two as well.

16        Let me talk about roster management for a

17   second.  Roster management is, I think the testimony

18   established, the practice of managing roster sizes of

19   men's and women's teams, certainly with an eye toward

20   Title IX compliance, and it makes sense in a school, for

21   instance, where you typically get lots of walk-on

22   candidates for men's teams and there's a history of men's

23   coaches letting those walk-ons tryout, stay with the team

24   for the experience and practice and the skill development

25   and so forth.  And in that context, you know, when the

1    school is interested in providing proportional

2    opportunities, maybe it makes sense to say to the coaches,

3    let's keep the squad size to the traditional size or the

4    average size for the conference or the average size for

5    the NCAA.  We're not going to let you carry a bunch of

6    extra players.  But roster management seems to have been

7    used at Quinnipiac in a different way.

8              Men's, the men's roster sizes have been set not

9    uniformly but with some consistency below comparable squad

10   sizes in the conference or in the NCAA.  Women's squad

11   sizes have been set with some consistency above the

12   averages in the conference or in the NCAA.  And it seems

13   to me that the picture that we have of roster management

14   at Quinnipiac is, is of a technique that is being used to

15   distort real participation opportunities.  It enables the

16   university to report, and we're not claiming -- I should

17   be quite clear, we're not claiming that the university has

18   lied in its reporting.

19             I don't think we put on, I don't think the

20   evidence would support a claim that the reporting was

21   false under the EADA or NCAA rules.  The squad sizes that

22   were reported as of the first day of competition were

23   genuine squad sizes.  But the court heard the evidence

24   about, heard the evidence and can look at the documents,

25   the add/drop list and the season of competition use list

1    which are in evidence, to see that after the first day of

2    competition, things change so that the real participation

3    opportunities do not match what is reported on the EADA

4    reports or reported to the NCAA.  And that, it seems to

5    me, is not how roster management was intended to be used.

6           So, to sum up that little piece of the argument,

7    I think it's fair to say based on the evidence that the

8    court heard, that there's a history of roster management

9    at Quinnipiac causing some disconnect between the

10   reporting and the reality; some overstatement of women's

11   opportunities and understatement of men's opportunities on

12   a fairly consistent basis over a period of time.

13           THE COURT:  Is there case law in which courts

14   have held that the EADA reports, if they show

15   proportionality as of the first day of competition, that

16   there's a further inquiry under Title IX?

17           MR. ORLEANS:  I don't know of a case that has

18   put it that way, Your Honor, but I was going to come to

19   the Chokey against Slippery Rock University case which is

20   a case that addresses roster management.  I don't recall

21   the opinion specifically addressing the question of the

22   EADA reports, but I guess what I would say about that is

23   that I think that the language in the cases that appears

24   in many cases, as I've said, that what you're supposed to

25   be looking at under Title IX is real participation

1    opportunities, which suggests that if there's evidence

2    that the EADA reports, even if technically compliant with

3    the requirements of that statute, which of course is a

4    separate statute from Title IX, if those reports don't

5    reflect genuine participation opportunities, then the

6    court ought to look beyond those reports to the evidence

7    of what the real participation opportunities are.

8           Now, let's talk about next year for a second.

9    The roster management targets for next year raise a

10   substantial risk that the disconnect between roster

11   management targets and team participation opportunities is

12   going to continue.  And you'll see that in the testimony

13   of Dr. Lopiano when you view that, that deposition and

14   read that testimony.  And you can also see it if you

15   compare the roster management target squad sizes which

16   appear in Plaintiff's Exhibit 3, the letter from Janet

17   Judge to me with the averages in the NCAA or in the

18   Northeast Conference.  And you'll see that the squad sizes

19   for men are consistently a little more than the relevant

20   averages and the squad sizes -- excuse me, I'm backwards.

21   Squad sizes for men are consistently a little lower,

22   target sizes and the squad sizes for women are

23   consistently a little higher.

24          And we think that that suggests that the roster

25   management targets are not realistic.  And even if those

1    targets are made, they will not reflect real participation

2    opportunities.

3         You also heard some evidence that I'm not sure

4    you would have been able to put totally in context until

5    you read the Lopiano testimony, about the way track

6    athletes are counted.  And, you know, I suspect, Judge

7    that you know more about track than I do, so I'm not here

8    to instruct the court on the sport of track, but I would

9    suggest that to the extent that EADA or the NCAA regs

10   permit track athletes to be counted in each of the three

11   seasons, the cross country season in the Fall, the indoor

12   season in the Winter, and the outdoor season in the

13   Spring, that that may also, and in Quinnipiac's case, does

14   distort the counting of genuine participation

15   opportunities.  Because -- and Dr. Lopiano goes into this

16   at some length -- if you have men's and women's teams that

17   are both three season teams and you triple-count all of

18   them, then mathematically it's more or less of a wash.

19   But if, as Quinnipiac proposes, you have a men's team that

20   ostensibly runs in two seasons and a women's team that

21   ostensibly runs in three, then you're distorting the real

22   participation opportunities.  It looks like you have more

23   opportunities for women and fewer for men than you really

24   do, and you'll read and see Dr. Lopiano's testimony on

25   that.

1          And I think Mr. McDonald agreed with, agreed

2     with me when he testified, that if you count, you know,

3     you count the men twice and you count the women three

4     times, you may not be counting participation opportunities

5     in a fully accurate way.

6          So, we think that when you take into account all

7     that evidence, even if you assume that the 40 member

8     competitive cheer team ought to be counted as a sport, do

9     the math.  Quinnipiac won't be in compliance with prong

10    one because they have overstated the number of

11    opportunities for women, understated the number of

12    opportunities for men, and they'll be out of compliance

13    without volleyball in the Fall.

14         Now, let me talk about cheer.  This isn't, as I

15    said, it's not that volleyball players against the

16    cheerleaders.  Nobody is saying that the competitive cheer

17    squad are not athletes.  I think it was obvious from the

18    videotape that we all viewed that what they do is very

19    athletic.  It was obvious from the testimony of Ms. Powers

20    as she described the skills that they have to have, that

21    they are athletes.  But that is a different question from

22    whether the sport of competitive cheer has yet established

23    the circumstances that are necessary to count it as a

24    legitimate varsity sport, varsity intercollegiate sport

25    for Title IX purposes.

1            The best place to go for this is to the letter

2       of April 11, 2000, from Dr. O'Shea of the Office for Civil

3       Rights at the Department of Education, to David Stead or

4       Stead of Minnesota State High School League.  It is

5       Plaintiff's Exhibit 30 something.  I'm sorry that I don't

6       recall the precise number but --

7                 MS. GAMBARDELLA:  Your guess is as good as mine.

8                 MR. ORLEANS:  I'm sorry?

9                 MS. GAMBARDELLA:  Your guess is as good as mine.

10                MR. ORLEANS:  I thought you would have that

11      committed to memory.

12           That letter, which obviously is in evidence,

13      lists a set of criteria, a set of factors that OCR will

14      consider in evaluating whether an activity is a sport.

15                THE COURT:  Thirty-four?

16                MR. ORLEANS:  That is Exhibit 34, and I believe

17      that the way that the exhibit is set up, there is a letter

18      of May 20th, if I recall, that is the first page and the

19      second -- then the letter from, the letter of April 11,

20      2000, begins on the second page of the exhibit if I

21      remember correctly.  Is that consistent with what you're

22      seeing, Your Honor?

23                THE COURT:  Yes.

24                MR. ORLEANS:  And on the second page of the

25      letter, OCR goes through a list of criteria that it will

1    consider in determining whether an activity is a sport.

2    Says it's going to consider these on a case by case basis.

3         And these criteria include such things as

4    whether the activity is limited to a defined season.

5    Competitive cheer is not.

6         Whether the primary purpose of the activity is

7    athlete competition and not the support or promotion of

8    other athletes.  That's at least questionable in the case

9    of competitive cheer.

10        Whether organizations knowledgeable about the

11   activity agree that it should be recognized as a sport.

12   There's been no evidence of that presented by Quinnipiac,

13   and I think when you look at Dr. Lopiano's testimony,

14   you'll see that she relies on statements from the American

15   Association of Cheer, Coaches and Advisors and from the

16   Women's Sport Foundation that it should not be recognized

17   as a sport.

18        I think there's evidence in the record that it's

19   not recognized by the NCAA, by the Northeast Conference.

20   It's not on the NCAA's emerging sport list because nobody

21   has requested that it be put there.

22        Whether state, national or conference

23   championships exist for the activity.  Certainly no

24   conference championships.  The national championships that

25   Coach Powers testified about and Mr. McDonald testified

1    about I think we were able to establish are, you know, run

2    by private organizations.  It's sort of a pay to play

3    situation.  There's no play in -- there's no tournament

4    structure that leads the best to the national

5    championship.  You send in your application and your entry

6    fee and you go.

7            There are no uniform rules.  And the existence

8    of a state, national or conference rule book is one of the

9    OCR criteria.  And, significantly, Quinnipiac has not

10   taken advantage of the process offered by OCR to request

11   OCR to come in and perform an evaluation and assist

12   Quinnipiac in setting this activity up to be a competitive

13   sport.

14           So it would be our view, reflected in the

15   opinion of our expert, Dr. Lopiano, that although cheer,

16   competitive cheer may very well be considered a varsity

17   intercollegiate sport for purposes of Title IX at some

18   point in the perhaps not too distant future, you can't

19   count it now.

20           All right.  That was my, that was intended to be

21   my disposition on the facts.  I think I went a little bit

22   into the law, but let me address the preliminary

23   injunction standard with you.  After all, that is what

24   brings us here.

25           First, we have to show irreparable harm.  No

1    court that has been confronted with a group of female

2    athletes whose team has been taken away, program has been

3    eliminated, has failed to find that they were irreparably

4    harmed.  As far as I'm aware, I don't know a case.

5         The denial of the opportunity to compete, to

6    participate in an intercollegiate varsity athletic

7    competition is considered and has been considered by many

8    courts to be irreparable harm.

9         Second hurdle for the plaintiffs.  Can we show a

10   likelihood of success on the merits.  As we've stated to

11   Your Honor several times, our view of the law is that if

12   Quinnipiac is not currently in compliance, and it's not,

13   then it must become compliant before it may reduce

14   existing opportunities for women.

15        We think that that is inherent in the language

16   of the three prong test.  The first prong,

17   proportionality, is written in the present tense.  It asks

18   whether right now the institution is, it provides

19   proportional opportunities.  The second and third prongs

20   are really written in the past tense.  They look backward,

21   is there a history of program expansion?  Has there been

22   an effort to identify and accommodate the interests of the

23   under-represented gender?  There is no prong of this test

24   that looks forward and says, well, are you going to be

25   compliant in the future.

1              THE COURT:  The way you stated that test was the

2    university can not eliminate opportunities for women.

3    Does that mean that they cannot cancel a women's team or

4    does that mean they cannot, they cannot have fewer

5    opportunities next year than they have this year total?

6              MR. ORLEANS:  We think, Your Honor, that it

7    means that they cannot eliminate a currently existing set

8    of women's opportunities, i.e., a current women's team,

9    until they have first gotten into compliance.  And I

10   wanted to read you a quotation from the <u>Barrett against</u>

11   <u>Westchester University</u> case, which I think makes that

12   point, if I can find where I put it down.

13             Here it is.  <u>Barrett</u> was a case where the

14   university announced, Westchester -- <u>Barrett against</u>

15   <u>Westchester County of Pennsylvania</u>, it's an Eastern

16   District of Pennsylvania case from 2003.  The university

17   announced the elimination of women's gymnastics and men's

18   lacrosse and the addition of women's golf.  The plaintiffs

19   were members of the gymnastics team who sought a

20   preliminary injunction to reinstate the program.  And the

21   court said "The defendants argue that they have simply

22   replaced the participation opportunities in gymnastics

23   with those of the future women's golf team.  In light of

24   the present status of the women's golf team, this argument

25   is unpersuasive.  At present what defendants offer as a

1   replacement for a team with a tradition and history of

2   accomplishment is a mere promise of a golf team for next

3   Spring.  Unless and until Westchester University offers

4   proportional participation opportunities to its male and

5   female athletes, Westchester University violates the third

6   prong of the accommodation test when it eliminates women's

7   intercollegiate teams."

8          In every case that I'm aware of, Your Honor,

9   where an university has proposed to eliminate an existing

10  team, an existing women's team, whether or not it

11  simultaneously proposed to replace those lost

12  opportunities with some other set of opportunities, the

13  court has entered a preliminary injunction to prevent the

14  elimination of those existing opportunities on the ground

15  that the university was at that moment out of compliance.

16          THE COURT:  So, just to press you a little bit,

17  in your view.

18          MR. ORLEANS:  I do -- sure, I'm sorry.

19          THE COURT:  An university that's out of

20  compliance with Title IX could not eliminate football and

21  women's volleyball, thereby increasing proportionality

22  because it was doing it in a way that eliminated a woman's

23  team.  In other words, they are cutting 80 football slots

24  and then cutting 15 volleyball slots, so they have a net

25  of 65 more opportunities net.

1          MR. ORLEANS:  And if that -- can I extend the

2    hypothetical just a bit?  If that action alone would put

3    the university into compliance, could they do it?  Our

4    argument would be no.  You got to get into compliance

5    first.  Cut the football team this year, then you're in

6    compliance, then you want to look at cutting women's

7    opportunities down the road, you can do that.  But our

8    argument would be you can't cut the women's opportunities

9    until you're already in compliance.

10          However, having said that, it's not necessary

11   for the court to agree with me on that statement of the

12   position in order to find for the plaintiffs in this case,

13   because we think it is also true, and it is also the law,

14   that a plan to comply where there has been no compliance

15   is not sufficient, particularly where that plan is not

16   credible due to the history of a misuse of roster

17   management.

18          And for that case, for that argument, I would

19   rely first on the Barrett case that I just mentioned,

20   which is a case where there was a plan to replace, to add

21   women's golf and the court entered an injunction and said,

22   you know, maybe you'll get a golf team but right now it's

23   only a promise and we're not going to let you eliminate

24   the gymnastics team on the basis of a promise of a golf

25   team.

1          But even more on point is the Chokey case from

2     the Western District of Pennsylvania in 2006, decided by

3     the Chief Judge of the district, which is really

4     remarkably analogous to this case.  And I want to take a

5     few minutes to point out ways in which it's parallel.

6          Slippery Rock University, whose initials I can't

7     help but notice are S R U --

8          THE COURT:  I noticed the same thing.

9          MR. ORLEANS:  I thought you probably might

10    have -- announced the elimination of three women's sports

11    and five men's sports.  It later rescinded the elimination

12    of one of the women's sports which was field hockey.

13         The plaintiffs in the case included a group of

14    student athletes, members of the swim team and a coach.

15    Just as we have here.  Slippery Rock proposed, like

16    Quinnipiac does, to achieve proportionality through the

17    use of roster management and the addition of a lacrosse

18    team which previously had been a club sport, just as

19    Quinnipiac here proposes to achieve proportionality

20    through roster management in the addition of a, quote

21    unquote, "competitive cheer team" which Mr. McDonald

22    described as having been something like a club sport.

23         The court in the Chokey case looked first at the

24    history, noting that the university had conducted some

25    internal studies and was aware of its past noncompliance.

1    The court rejected an argument made by the university

2    that, you know, gosh, we've got budget issues and our

3    existing facility isn't adequate, we have to make major

4    capital improvements in order to continue the swim team.

5    The court said, you know, it's been good enough, it's

6    still usable, kind of like the Burt Kahn court at

7    Quinnipiac.

8             The court rejected a roster management plan that

9    really, when you read the case, is remarkably similar to

10   Quinnipiac's.  It was a plan in which roster sizes had

11   been set to achieve proportionality.  What they did at

12   Slippery Rock apparently was they got all the coaches in a

13   room and they said we need this many men's spaces and this

14   many women's spaces, you guys negotiate it out.  And they

15   let the coaches haggle it out.  It's not described in

16   great detail in the opinion.  You don't know whether the

17   athletic director was involved in this or not.  But what

18   is clear is the goal of the roster management plan, just

19   as here, was we've got to make the numbers.

20            The court notes that the new women's lacrosse

21   team was given a target of 24 players, even though the

22   club team only had 17.  In our case, the new women's

23   competitive cheer team has been given a target of 40

24   players, even though the current team only had I think 31

25   or 32, and even though Coach Powers testified that she's

1    only got 18 committed to coming back next year.

2           Neither the club lacrosse team nor

3    representatives of the student body had asked that

4    lacrosse be elevated to status of a varsity sport in the

5    Chokey case.  Just as here, there really is not, I don't

6    think, solid evidence that the cheer squad had requested

7    elevation to a varsity sport.  I thought the testimony on

8    that was a little bit less than clear.  Mr. McDonald said

9    they'd been talking about it for a while.  He said he'd

10   received requests, but Coach Powers said she hadn't made

11   them so I think the evidence is, at best, inconclusive on

12   that.  Certainly there's no written record of any request

13   having been made, and on those facts, the court found that

14   the use of the proposed lacrosse team as a means of

15   achieving proportionality was, quote unquote, not

16   particularly meaningful.

17          Because of the allotment of more positions than

18   it previously had had as a club team, and there was no

19   coach hired.  That's not the case here.  There were no

20   players that had been recruited.  That is the case here.

21   There were no scholarship funds that had been set aside.

22   That's also the case here.  We heard that there might be

23   scholarships but we don't know for sure.  And clearly

24   Quinnipiac went into this process without having made any

25   serious and comprehensive and detailed plan about how they

1    were going to elevate cheer to the status of a varsity

2    sport.

3            The court then looked at the roster management

4    system at Slippery Rock and concluded that the increase in

5    roster sizes for women's teams would be a paper increase

6    only.  And it did that by comparing the roster management

7    targets at Slippery Rock to average squad sizes.

8            The Judge says, "I find it odd that women's

9    cross country would be allocated 28 positions while men's

10   cross country would be allocated only 16 positions."

11           THE COURT:  Yes, I see it, 14, 25.

12           MR. ORLEANS:  Yes.  Similarly, he says, "Or why

13   men's soccer would be allocated 25 positions while women's

14   soccer would be allocated 28."  And once again, there's a

15   very similar differential in our case.

16           And then the court says that, you know,

17   "Slippery Rock has never satisfied substantial

18   proportionality.  It urges that it will become compliant,

19   that it has plans to become compliant through the use of

20   roster management but," says the court, "having a plan to

21   ameliorate inequities is not the same as having

22   ameliorated them.  "A plan was not convincing to the court

23   in view of the history of men's teams increasing roster

24   sizes, despite the established limits and the apparently

25   artificial increase in roster sizes for the women's

1    teams."

2          So, certainly it's our view, Your Honor, that

3    Chokey is right on point and it stands for the proposition

4    that, you know, a plan is not sufficient to comply with

5    Title IX on these facts under those circumstances.

6          What's more, Your Honor, even if the court is

7    willing to entertain the prospect that a plan to comply is

8    as good as actual compliance -- excuse me -- the plan has

9    to be credible.  And for all the reasons that I discussed

10   earlier, our view is that Quinnipiac's plan depends on

11   roster sizes and on counting methods that are not credible

12   or appropriate in view of Title IX's purpose of increasing

13   real participation opportunities, not just technical

14   compliance or apparent opportunities.

15         So, we don't think that the court even has to

16   get to the question of whether cheer should be counted in

17   order to find that we've established a likelihood of

18   success, because based on the three slightly different

19   approaches that I've just outlined to Your Honor, you can

20   find that we have a likelihood of success on the merits

21   even without getting to the issue of whether cheer should

22   be counted and the 40 slots allocated to cheer should

23   count toward proportionality.  But for the reasons that I

24   discussed earlier, we don't think that cheer should count

25   if the court decides to reach that issue, and I won't

1    belabor those issues again.

2         Now, under the 2nd Circuit preliminary

3    injunction standard, even if the court were to conclude

4    that the plaintiffs have not shown a likelihood of success

5    on the merits, the court still should issue the

6    preliminary injunction if we have established fair grounds

7    for litigation going to the merits and a balance of the

8    hardships tipping decidedly in our favor.

9         For all the reasons that I've been through in my

10   remarks today, as well as what we've put in our, our

11   proposed findings and conclusions and what you've seen in

12   our trial brief, and based on the nearly three days of

13   seriously contested hearing that we had, we think it's

14   very clear that there are fair grounds for litigation

15   going to the merits in this case.

16        And as to the balance of the hardships, you

17   know, every court in those Title IX cases that has looked

18   at a university's argument about financial hardship versus

19   the harm to plaintiffs being deprived of competitive

20   opportunities, has found that the potential harm to the

21   plaintiff outweighs any hardship to the university.

22        And on those lines I would just note that I

23   thought the testimony was significant regarding the Burt

24   Kahn court and the T D Banknorth arena.  It appears from

25   Mr. McDonald's testimony that there was a budget crunch at

1    the university, he was told to reduce the budget by ten

2    percent, he cut the budget without cutting volleyball.

3    Then he was told that he had to cut volleyball.  And, as

4    he explained, the reason for that is the that university

5    has a space crunch, there are plans to use the space

6    occupied by the Burt Kahn court for other purposes, they

7    were going to build a new volleyball gym but they are no

8    longer plan to build a new volleyball gym.

9          But he went on to say that the cheer squad is

10   going to practice and/or compete in the Burt Kahn court

11   next year, so clearly there are plans to convert it in the

12   foreseeable future and there is evidence in the record,

13   there's evidence from Coach Sparks although there was some

14   hearsay, some evidence excluded on the basis of hearsay,

15   there are inexpensive ways to make it possible for the

16   volleyball team to continue to practice and play at

17   Quinnipiac either in the rec center or on the tennis court

18   or at T D Banknorth until things shake out.  You know, the

19   economy can look different in a year or when this

20   litigation is concluded and it might be at that point it

21   would be possible to create an appropriate facility.

22         But it's a little odd, I thought, to say, well,

23   you know, we can't provide them with a first class

24   Division I opportunity in T D Banknorth because we don't

25   have locker rooms and offices for them so we'll just cut

1    out their program all together.  As far as a balance of

2    the hardships goes, I think that really pretty much speaks

3    for itself.

4          Finally, Your Honor I want to take note of an

5    argument that the defendant made, I think in its proposed

6    findings and conclusions, but perhaps in its brief in

7    opposition to the Temporary Restraining Order motion; I'm

8    not sure.  And that was essentially an argument that the

9    court ought not to micromanage the university and tell it

10   how to run its program, what sports it needs to have.

11   Frankly, where you've got a group of plaintiffs who have

12   been harmed, that sort of argument is really nonsense.

13         I would refer the court to the Roberts against

14   Colorado State University case where that argument is

15   specifically addressed, but, you know, we've got a group

16   of named plaintiffs who have been harmed by a specific

17   action.  They are seeking equitable relief and it's

18   obvious, seems obvious to me at least, that the remedy

19   ought to be tailored to provide them with the relief that

20   they seek and, therefore, it is not, certainly is not

21   beyond the court's authority or misuse of the court's

22   discretion to enter an injunction regarding the

23   reinstatement of this specific program pending the end of

24   the litigation.  The end of litigation may be different,

25   and I would note in the Cohen and Brown University case,

the court initially entered a preliminary injunction that restrained Brown from denying two women's sports to club status.  When they got to the end of the case -- and in that case, there was a mediated partial settlement so it didn't proceed totally along in a -- straightforwardly along litigation lines, but at the end of the road, the university was invited to submit its own plan for compliance, which the court evaluated to determine whether it would be in compliance, and then approved.  And, in fact, the last appellate decision in the line of cases in Cohen and Brown has the appellate court ruling that the district court should be more differential to the proposal that Brown submitted.  And that's completely appropriate when you get to the end of the road in this case, and Brown -- and the university has been ordered to make itself compliant and it gets to submit a credible plan for court approval to do so.

But at the preliminary injunction stage, it certainly is appropriate for the court to enter relief that's tailored to the plaintiffs who came to court seeking relief.

So, I thank you very much for your patience in letting me go on for so long, Your Honor.  In summary, we think that there's no question that we've established irreparable harm.  We think that we're likely to succeed

1    on the merits, whether the court takes any of the number

2    of views of the merits and how they should be approached.

3    If the court should decide that we haven't quite gotten

4    over the hump of establishing likelihood of success, we

5    certainly think it's clear that there are fair grounds for

6    litigation going to the merits and we think that the

7    balance of hardships tips decidedly in our favor and we,

8    therefore, respectfully request that the court enter a

9    preliminary injunction reinstating the Quinnipiac

10   University women's volleyball program with all of the

11   benefits of varsity status at Quinnipiac University,

12   including practice time, training, competition,

13   facilities, equipment, scholarships, and the coach.

14              Thank you very much, Your Honor.

15              THE COURT:  Thank you.

16              MS. GAMBARDELLA:  Good afternoon, Your Honor.

17              THE COURT:  Good afternoon.

18              MS. GAMBARDELLA:  Your Honor, Title IX is a

19   shield, not a sword.  This case is, indeed, has become

20   about, it's come to be about whether or not a private

21   university has the discretion to allocate resources,

22   manage its budget in extremely tough economic times, while

23   simultaneously seeking compliance with a law that clearly

24   is very important to them to be in compliance with.

25              Title IX.  You heard in closing what counsel

1    feels and what makes sense for Quinnipiac University, but

2    every single case that we will proffer on this issue is

3    very careful, courts have are very careful to say this is

4    not about telling schools what programs they can maintain

5    and not maintain.  Schools can make business decisions as

6    long as they are compliant.

7            Now, what they'd like you to do, what they are

8    asking this court to do, is find as a matter of law that

9    they should be punished because three years ago in

10   connection with a self study, a voluntary self study where

11   they committed to making the numbers better over time,

12   that because they didn't cut it by some deadline on prong

13   one, that you should determine as a matter of law you'll

14   never cut it, you can't cut it and the court is going to

15   tell you until you cut it, you've got to keep women's

16   volleyball.  You've got to keep a particular program.

17           Now, Your Honor, this has never been about

18   gender.  Title IX is about gender.  It's about equity in

19   opportunities across gender lines.  You did not hear one

20   plaintiff testify that volleyball was targeted because

21   they are women.  Not one.  And very nicely, I believe, on

22   cross examination of my clients, it was established how

23   much they struggled with this decision.

24           Now, while I assume the point they were trying

25   to make was you struggled so isn't that proof that you

1    shouldn't have done it, what defendant asserts is that it

2    very nicely established they struggled.  This was not an

3    easy decision.  As you acknowledged yesterday or the day

4    before, nobody's happy about this, but the bottom line is

5    a school is entitled to achieve compliance and articulate

6    on what prong it is going to rely.

7          Now, counsel has said to you that he believes

8    the evidence demonstrated, believes the evidence

9    demonstrated that we admit we've never been in compliance

10   with any prong.  Now, I don't know what hearing counsel

11   was at, with all due respect, but I don't think we've ever

12   taken the position.  In fact, the position has been that

13   if we were adjudicating past compliance, we would be

14   relying on different prongs and there's been not shred of

15   evidence, real evidence, to suggest that we're wrong.

16         Not one plaintiff has standing to adjudicate

17   those two prior years.  Every plaintiff, student

18   plaintiff, is a member of a volleyball team that got to

19   play last year.  Their need was met.  They got to play

20   last year.  There was one plaintiff, two plaintiffs who

21   didn't get to play because of injuries, not because of

22   anything Quinnipiac did.  So I'm not sure where that

23   contention comes from, but I am here to clarify, the

24   record will speak for itself, we have never said we're not

25   in compliance.

1          And the only other piece of so-called evidence

2     that the plaintiffs have proffered to substantiate that

3     claim, even if it's relevant, which we're not conceding it

4     is relevant at all, is Dr. Lopiano's unsubstantiated

5     testimony with respect to prong two particularly, and she

6     said and you'll read it, "They've never been in compliance

7     with prong two because they haven't added a woman's sport

8     since whatever year they added ice hockey."

9          And she said -- we asked where she got that from

10    and she said it's a two, three look-back, and when pressed

11    on cross, she couldn't point to one authoritative source

12    for that proposition.  And on cross, what she finally said

13    was, well, I can't find it but I think I had some

14    conversation with some OCR person sometime ago.

15         The bottom line is the materials you have in

16    front of you establish very clearly that's a subjective

17    test.  It's an analysis on a case by case basis, and we

18    have never conceded not to be in complains with prong two

19    or prong three.  But the bottom line is for purposes of

20    today, for this hearing, these plaintiffs can't adjudicate

21    that.

22         Now, that having been said, what the defendant

23    has articulated here is that it is, it has introduced

24    roster management which not one case or authoritative

25    source has said is not appropriate.  In fact, the opposite

1    has been said.  We read it to Mr. McDonald and I asked him

2    about his understanding.  They put it in as an exhibit.

3    Roster management is an acceptable mechanism to achieve

4    compliance with Title IX.  OCR doesn't love men's sports

5    to be cut, to be sacrificed to achieve it, but it's

6    acceptable.

7              THE COURT:  Let me press you a little bit on

8    that.

9              MS. GAMBARDELLA:  Sure.

10             THE COURT:  I understand OCR to have approved

11   efforts by a university to come to compliance with Title

12   IX either by cutting a men's sport.

13             MS. GAMBARDELLA:  Yes.

14             THE COURT:  Or by capping participation in men's

15   sports.

16             MS. GAMBARDELLA:  Yes.

17             THE COURT:  Putting aside for a minute the

18   motion that roster management is perhaps not technically a

19   cap, depending on how strictly it's enforced, but put that

20   aside.

21             MS. GAMBARDELLA:  Sure.

22             THE COURT:  Do you have authority supporting the

23   roster management of floors for teams as opposed to caps

24   for men's teams?  In other words, is permissible roster

25   management limited to capping men's participation rather

1  than working both sides?

2          MS. GAMBARDELLA:  No.  Roster management is not

3  restricted to capping the size of men's teams, although

4  that's permissible to use that aspect.  You can cap men's

5  participation opportunities while simultaneously

6  increasing opportunities for female athletes to achieve

7  proportionality.

8          THE COURT:  I don't doubt that you can increase

9  the opportunities; the question is whether you can set

10 floors as well as caps.  In other words --

11         MS. GAMBARDELLA:  Floors meaning a minimum?

12         THE COURT:  Meaning a minimum.  In other

13 words --

14         MS. GAMBARDELLA:  Yes.

15         THE COURT:  And what authority do you have for

16 that proposition?

17         MS. GAMBARDELLA:  Yes.  Well, the OCR advisory

18 opinions and some of the cases that we cite for you in the

19 brief you will get this afternoon, talk about roster

20 management which can include setting numbers of teams.

21 Now, I don't have a case that says you may establish a

22 floor.  What it says is you can establish sizes of teams,

23 either capping men's or increasing females to achieve

24 proportionality.

25         And I must mention, too, that not one of the

1    cases, and I'll deal with <u>Chokey</u> in a minute, have a

2    scenario where men's teams have been cut or capped and a

3    woman's team cut, and simultaneously adding additional

4    female participation opportunities which we're seeking to

5    do here which I'll talk about.

6            But there's no exact wording for what you're

7    looking for, Judge, but what the cases establish is that

8    roster management includes the concept of capping and

9    increasing female opportunities, which is consistent with

10   potentially saying you can't have less than so many

11   females on this team.  We have to achieve proportionality.

12           Now, there's been a contention that our numbers

13   are not realistic, and I'll get to why there's been no

14   evidence of that for Quinnipiac, but -- am I answering

15   your question?

16           THE COURT:  Well, I understand that's your view.

17   I guess what I'm looking for is authority supporting that

18   view.

19           MS. GAMBARDELLA:  Sure.

20           THE COURT:  I don't need it this minute if it's

21   in the brief.

22           MS. GAMBARDELLA:  It's in the brief.  Aside from

23   the OCR advisory, which talks about what roster management

24   means, then I would say --

25           THE COURT:  Which exhibit is that?

```
1              MS. GAMBARDELLA:  What's that?

2              THE COURT:  Which exhibit number?

3              MS. GAMBARDELLA:  That is the 1996 -- they are

4    in both exhibits.

5              MR. ORLEANS:  If it's the 1996, it's Plaintiff's

6    Exhibit 7.

7              MS. GAMBARDELLA:  Plaintiff's 7.  One of the

8    things that the advisory does talk about is having enough

9    to support a viable team.  They do talk about that.  It's

10   in the brief.  Let me find it.

11             There's OCR -- Exhibit 7 but it might have been

12   renumbered -- OCR 1996 clarification, trial exhibit, I

13   think we have it as 7.  OCR considers a sport season --

14   I'm sorry.

15             OCR has made it clear roster management is

16   acceptable and --

17             THE COURT:  Well, you look at Exhibit 7, page

18   four, the second and third full paragraphs --

19             MS. GAMBARDELLA:  Page four?

20             THE COURT:  Yes.

21             MS. GAMBARDELLA:  Uh huh.

22             THE COURT:  All right.  That third full

23   paragraph says, three sentences in, "An institution can

24   choose to eliminate or cap teams as a way of complying

25   with part one of the three part test.  So that suggests
```

1     you can cap a team.

2              MS. GAMBARDELLA:  Uh huh.

3              THE COURT:  The paragraph above talked -- it's

4     obviously not quite what we're talking about here but

5     basically it says that the OCR will not count unfilled

6     slots, potential positions.  Doesn't matter that you have

7     to have actual --

8              MS. GAMBARDELLA:  Right.

9              THE COURT:  -- actual, real, not illusory

10    participation.

11             MS. GAMBARDELLA:  Right, and admittedly, Your

12    Honor, even the cases interpreting this say that what OCR

13    is saying is that, for example, I can't say we have 50

14    participation opportunities on a lacrosse team but they

15    have to be actual opportunities.  In other words, we have

16    to know we can put the heads in those opportunities, if

17    that makes sense, so it does eventually have to be actual,

18    you have to put the bodies in the slots to comply.  So, in

19    other words, we couldn't rely and say we're going to

20    increase lacrosse to 50 --

21             THE COURT:  I understand.

22             MS. GAMBARDELLA:  -- and then look back, we have

23    40, and assuming that we're not talking about people that

24    dropped out through normal attrition or whatever,

25    injuries, say, well, we had 50 opportunities.  You have to

1    work hard at filling them, there's no doubt about that.

2              THE COURT:  Right.

3              THE COURT:  Okay.

4              MS. GAMBARDELLA:  This page also says

5    under-representation alone is not indicative of

6    discrimination necessarily.

7              Thanks, Jon, I really appreciate it.  All right.

8              Now, what they suggested to the court is that

9    what you should order us to do is reinstate volleyball

10   because it's no big deal to convert an existing facility

11   for them to play volleyball and have competitions.  The

12   evidence on that was clear and consistent that it's not

13   just a matter of putting sleeves in a floor or just

14   letting them play, Your Honor.  There is a considerable

15   amount of, there are a considerable amount of decisions

16   that have to be accommodated here.

17             One is they've already cut out two men's sports.

18   They've already notified the golf coach that his contract

19   will not be renewed and the team has been disbanded.  They

20   have already explained ad nauseum the space crisis at the

21   university.  I mean the volleyball team, for lack of a

22   better word, was selected in large part, not just because

23   of budget cuts but there's a space crisis at Quinnipiac

24   University.  And the proposed resolution is that the court

25   order the university to figure out how to figure that out

1    on their own, spend more money, build another facility,

2    build another team and then drop us.  That's not the

3    intent of Title IX.  Title IX's intent is to provide

4    equitable gender opportunities, not tell schools how to

5    manage their resources and manage their budgets.  Maybe

6    the proposal would be raise tuition across the board for

7    students so we can figure out how to resolve a crisis that

8    does affect all students.

9            So, let's talk about what the plaintiffs need to

10   prove, what is their burden of proof.  It's interesting to

11   the defendant that they ended with irreparable harm.

12   Irreparable harm is the first hurdle, not the last.  The

13   first hurdle is to establish that they will suffer

14   irreparable harm.  So what is the irreparable harm, taking

15   everything plaintiff said as true, that they will suffer

16   in the absence of reinstatement of the volleyball team?

17           Erin Overdevest, and I'm sorry if I'm

18   mispronouncing her name, like all the students, focused

19   primarily on emotional harm, upset and disappointment.

20   Because she can't play a sport of her choice while she's

21   going to school for free, she will continue on full

22   scholarship, and what she admitted is that she missed an

23   entire year of play last year because of her injury.  When

24   pressed on cross, what she claimed is that doesn't take

25   her out of the running to continue to play volleyball

1    competitively.  She didn't agree that the one year hiatus

2    would harm her or her ability to pick up right where she

3    left off and be competitive again.

4         But, most compelling, she said she chose

5    Quinnipiac and chose to remain at Quinnipiac because of

6    its nationally reknowned occupational therapy program.

7    She never once said I picked Quinnipiac because of

8    volleyball.  So the bottom line is she will not be denied

9    any life altering opportunity and she'll get to finish her

10   education on scholarship.

11        She did testify that had she known volleyball

12   would be eliminated, she was a graduate student, Your

13   Honor, she's got one year left to play, she would have

14   braved it through the pain and played last year and

15   delayed her surgery, which testimony we can only category

16   as tenuous and, frankly, somewhat incredible.

17        Ms. Biediger admitted that she's completely

18   unable to play volleyball next year because she's got to

19   have surgery.  The sole harm she represented, therefore,

20   is that she can't, quote unquote, rehab with her team,

21   which is hardly the type of irreparable harm the dramatic

22   remedy of injunction is designed to prevent.  At the same

23   time, she admitted she's never been denied access to the

24   med room and she fully expects to be able to access those

25   services next year.

1           This alone deprives her of standing for at least
2      this procedural stage to adjudicate anything for next
3      year, and her claim in her declaration that the timing of
4      the announcement made it too late to transfer is
5      incredibly tenuous and actually somewhat disingenuous
6      because she can't play next year.  She has all of next
7      year to transfer if what she needs to do with her life is
8      play volleyball.  And she goes to Quinnipiac next year for
9      free.
10          Now, what's important to note is, you may recall
11     that I asked her if she admitted that not playing next
12     year would set her back so badly that her competitive
13     volleyball life would be over, and she refused to agree
14     with me, which not only undercuts her own claim but serves
15     to undercut everybody else's.
16          The two students who are out of commission, so
17     to speak, for a year would not concede that that ends
18     their volleyball career, for lack of a better word.
19          And she's on an academic scholarship, not
20     athletic.
21          The minor, L. R., testified through her mother.
22     She testified that despite where we started, and this has
23     been kind of a moving target in this case, Judge, when we
24     first started from the papers, the representation was by
25     the time Quinnipiac made the announcement it was too late

for those students to transfer.  Now we find out that,

contrary to that representation, what we heard was, well,

it was difficult to look at schools and find a transfer,

but what we learned from Mrs. Riker is that her daughter

has been offered a scholarship to play Division I

volleyball at Fairfield University and it's her daughter's

unilateral decision to put that on hold.  And she admitted

on cross examination that she is stalling to see what you

do.

So, if her daughter's irreparable injury is

personal devastation, then query why on earth would you

risk that, wait for this, instead of accepting a viable

offer from a terrific school to play Division I volleyball

next year?  And chance this?  So, query, is it really

irreparable harm?  Is she really -- has she really

satisfied her burden on that point?

So, obviously the representation we started

with, it was too late to transfer, it's not true.

Ms. Lawler completed her freshman year at

Quinnipiac and testified as to similar emotional distress.

She testified at the age of 19 that her life is over and

she testified that after she was told volleyball was being

eliminated, she contacted a number of Division I schools

and has been offered a scholarship to play Division I

volleyball at the University of Rhode Island.  So what did

1    she do with that?  She declined it because, quote, she

2    didn't "connect with the coach," end quote, on a one day

3    visit.  Now, if a 19 year old young lady's life is over if

4    she doesn't play volleyball, query whether or not any

5    so-called irreparable harm is of her own doing or of

6    something that we did.

7         It was also undisputed, not only will her

8    scholarships continue but that any letters of intent, and

9    mind you, the minor, L. R., hadn't even signed hers,

10   Quinnipiac is going to let them out of it so they can play

11   elsewhere.  That alone, in terms of the student

12   plaintiffs, defeats their claim.  They cannot sustain

13   their burden of proving irreparable harm, which is the

14   first hurdle before you get to likelihood of success.

15        And we've cited some cases in our brief where

16   courts in the same inquiry, Title IX cases under similar

17   facts, have said denying a preliminary injunction under

18   Title IX in one case, Miller v. University of Cincinnati,

19   preliminary injunction was denied in a Title IX case to

20   prevent the elimination of a women's rowing team because

21   the court found the plaintiffs had not proven they would

22   suffer irreparable harm because the university committed

23   to continuing their scholarships to any rower would not be

24   able to compete because of termination of the program and

25   agreed to release, under NCAA rules, any rower who wished

1    to remain in competitive collegiate rowing to transfer.

2    And there are a number of cases to that point.

3           So, what's the harm?  Defendants respectfully

4    assert that by their own admissions, it's not irreparable,

5    at least not of the type required for issuance of an

6    injunction.

7           All right.  Let's talk about what's left and

8    that would be, if anything else, it would be financial, if

9    there's a differentiation in scholarships or some extra

10   costs associated with their, the elimination of their

11   team, that obviously by their very definition is not

12   suitable for injunctive relief.

13          Let's talk about Plaintiff Sparks for a moment.

14   You know we have a motion to dismiss for lack of standing

15   so I'm not going to belabor the point except to say that

16   everything we contended in that motion was confirmed by

17   her own testimony on the stand.  Her only claim of

18   irreparable harm is she's going to lose her job.  And she

19   says in her complaint that that's related to the gender of

20   her students but it is unequivocally clear and

21   consistently held she may not ride the coattails of her

22   students.  She cannot adjudicate their rights; they are

23   all plaintiffs and, therefore, she has no standing.

24          She wants Quinnipiac to reinstate the team.

25   That's not her irreparable harm.  And because she's hoping

1    it will compel Quinnipiac to renew her contract.  If her

2    claim is individual discrimination based on her own

3    gender, which is not alleged in the complaint, that's a

4    Title VII claim which preempts Title IX in this particular

5    scenario.  An injunction to prevent loss of employment is

6    never allowed, and we will cite a variety of cases for

7    that proposition.

8         The rest of her claims sound in breach of

9    contract or promissory estoppel, not Title IX violations.

10   So, even if she has standing on Title IX, all of her

11   claimed damages are financial, and there's an adequate

12   remedy at law.

13        THE COURT:  Let me just interrupt you briefly

14   and let me tell the participants who are here for the

15   3:00 o'clock proceeding we'll be starting about 15 minutes

16   late.  You're free to stay or feel free to go.  We'll not

17   start before 3:15.

18        MS. GAMBARDELLA:  Thank you.

19        So, let's leave irreparable harm.  And, again,

20   they can't overcome that to even get to likelihood of

21   success, so let's go quickly to likelihood of success.

22        We have heard a variety of inflammatory and

23   misleading and unsupportable allegations about this

24   university for three or four days, and in the media.  The

25   university's never been in compliance.  We did hear the

1    university finesses its EADA reports and engaged in

2    fraudulent EADA reporting.  This morning I heard that's no

3    longer the contention, but we heard that before.  We've

4    heard that the defendant plays fast and loose with roster

5    management.

6            So, what is the evidence that was brought to you

7    to substantiate those claims?  What are the challenges to

8    the hard numbers?  The plaintiffs -- or the defendant's

9    proportional numbers for next year.  They say we've not

10   been in proportionality in any prior year and, therefore,

11   you should determine as a matter of law, don't believe

12   them.  They've said there's not been compliance with any

13   other prong in Title IX in the past with, to be

14   respectful, the lightest of evidence, and that you should

15   determine as a matter of law, don't believe them.

16           They've obsessively, obsessively focused on the

17   first year of roster management at Quinnipiac, 2007,

18   initial year, where several coaches attempted to change

19   numbers before and after first days of competition and,

20   therefore, you should conclude as a matter of law and

21   despite the total lack of evidence that the incidents were

22   approved, systematic, unaddressed, encouraged, suggested

23   or even that they continued beyond the first year, which

24   Ms. Flynn herself said was an anomaly.  And, therefore,

25   because of those occasions, don't believe them.

1          They said even if the athletic participation

2     opportunities are true, we can't duplicate or duplicate

3     count indoor, outdoor, cross country, and as a matter of

4     law, in advance, you should hold our competitive cheer

5     team could never count.  And plaintiffs have it wrong,

6     Judge.  They said defendants haven't proved it would

7     count.  They have to prove it wouldn't.  We don't have to

8     prove it would.

9          So, what was the evidence on competitive cheer?

10    They have a standard season, they have a budget, they have

11    been completing.  It is not the Chokey case, Slippery

12    Rock.  In Chokey -- which is, by the way, heavy on legal

13    conclusions and fairly light on facts -- in Chokey, the

14    court found, made a factual determination that nobody

15    wanted to elevate lacrosse.  Now, again, in the hearing

16    that defendant was in, Ms. Powers testified and

17    Mr. McDonald testified the students have been asking for

18    it.  They are still inquiring about it.  That alone is

19    wholly distinguishable.  We think Chokey is

20    distinguishable on other bases which we'll peruse in our

21    brief and I won't take up time now.  But Chokey also

22    involved a situation where roster management was being

23    introduced.  Roster management was introduced three years

24    ago.  They've gone through their growing pains.  And you

25    heard about the commitment, you heard about the

1  monitoring, you heard about the forms, you heard about the

2  squad lists.  And they need to prove and wholly failed to

3  sustain their burden at an injunctive hearing, injunction

4  hearing that the OCR would never approve the competitive

5  cheer team to count.

6       OCR has indicated there's a test for a sport to

7  be classified as such for Title IX compliance purposes.

8  Not every element of the test has to be met, it's a case

9  by case analysis and there's absolutely no authority for

10  the proposition that we had to do this in advance.  Other

11  sports aren't assessed by OCR in advance.  OCR reacts to

12  complaints.  So, to suggest -- even their own expert, what

13  I got her to say was, well, it's not required but it would

14  be unwise.  Well, the University of Maryland has had

15  discussions with OCR.  That's an exhibit in the complaint.

16  And things are changing with respect to competitive cheer,

17  Judge, and they just have failed to produce sufficient

18  evidence for you to find as a matter of law in advance

19  they'd never count.  It's not illusory, it's not a

20  promise; they exist.  The roster numbers are easily

21  filled.

22       Let me move to why they are fixated on that.

23  They are fixated on 2007 because 2008 doesn't help them.

24  2008, you didn't see those occasions, and no matter how

25  they try to inflate that there were few occasions, one of

them by Ms. Fairchild adding before competition and then

dropping, no matter what else they do, they can't prove to

you, they can't satisfy their burden that past

noncompliance is egregious, that there's fraudulent

reporting, that there's intent, that there are

shenanigans.  They haven't sustained their burden as a

matter of law and, in any event, it assumes that all

behavior will remain constant throughout next year.

I'd like to just jump now to -- I don't have

much longer, Judge -- Dr. Lopiano's opinion about

competitive cheer should be totally disregarded.

Dr. Lopiano didn't know that Quinnipiac engaged in

competitions.  She didn't know it existed.  She said it's

only sideline cheer.  They don't exist.  When asked about

the source of her information, she said I pulled the

roster off the website.  She didn't take five minutes to

get any facts.  She also didn't use real squad lists.  She

used the least reliable source, website rosters, which

Mr. McDonald testified, uncontroverted, are the least

reliable source.

And her predisposition against competitive cheer

is no secret.  She's been quoted over and over and over

again -- in fact, she told me at deposition she would like

us to start a bowling team; that would have been better

for her.  And there are lots of NCAA sports like squash

1    and sailing and things like that that she probably

2    wouldn't have had a problem with, but she is predisposed

3    against competitive cheer.  She is not neutral with

4    respect to that opinion, Judge.  She's an activist.  She

5    is not a neutral expert in the traditional sense of the

6    word.  She did no research into Quinnipiac whatsoever.

7            But that conceded, if the primary purpose would

8    be to compete on a regular season, like basketball or

9    gymnastics, and regular practices are conducted while

10   under the supervision of the coach, these activities could

11   be considered sports.

12           Let's just talk briefly about the duplicate

13   counting.  The evidence is uncontroverted, they are

14   different seasons, different competitions, different

15   sports.  And what they would like this court to find as a

16   matter of law is because there's overlap, some overlap,

17   they don't get to count it three times.  The NCAA does it,

18   other schools do it and, according to their own expert,

19   they could count more than once if there's different

20   events and so forth, and she, indeed there again, relied

21   on completely erroneous information about Quinnipiac

22   University.  And there's absolutely no regulation or case

23   or authority for the proposition that you can never count

24   those sports three times.

25           So, here again, they are asking you as a matter

1    of law to say Quinnipiac's teams could never count more

2    than once.

3           Let's just address quickly coaches' testimony.

4    One coach was put up complaining about her budget.  She

5    said that her budget constraints wouldn't allow her to

6    support 26 teams (sic) and while she didn't come out and

7    say it exactly, she suggested they don't have enough money

8    for uniforms and so forth.  That was 2007, and the coaches

9    all were struggling a little bit, but in 2008, she

10   admitted she had a roster target of 25 and she got to 23.

11   The budget didn't change.  She was asked about her budget

12   and she said I made it work.  She doesn't like it, nobody

13   likes it, but the testimony of Becca Kohli and

14   Mr. McDonald this morning confirms that the coaches are

15   given the budgets and they decide how to spread it out.

16   If she didn't spread out enough for uniforms for 26, 24,

17   23 players, it has nothing -- there's nothing that the

18   university did or didn't do.

19          And you heard testimony about the budgets and

20   everybody else's constraints this morning.  Conversely in

21   stark contrast, we have two women's coaches who said --

22   and actually Ms. Fairchild agreed with this -- roster

23   management is a policy.  Roster management targets have to

24   be met.  Numbers can be higher than what they are

25   accustomed to, but at this juncture one of the coaches

1    wants more.  They do it.  They figure it out.  They are

2    not offended it's left to them, that it's left to their

3    discretion.  So do we punish them?  Do we punish

4    Quinnipiac because they said to coaches, you have to

5    determine your tryouts, you have to determine your skill

6    levels, and you have to determine your budget?  Should we

7    spoon-feed them like children and tell them every dollar

8    they need to spend?  Plaintiffs haven't proven that that

9    alone sustains their burden on an injunction.

10         Finally, in the alternative, even if they prove

11   irreparable harm, likelihood of success, which we say they

12   cannot, they can't alternatively establish -- it's serious

13   questions on this, it's not the questions -- serious,

14   meaning the court is on the fence.  If the court is on the

15   fence, then there's a balance of hardships test.  Based on

16   the arguments I've already raised about lack of

17   irreparable harm, and the harm to Quinnipiac if you

18   reinstate, if you order the team to be reinstated,

19   including, not just space crisis which still has to be

20   figured out, men's golf, do we have to eliminate more

21   men's sports to achieve proportionality to them, if this

22   team is reinstated?  Do we have to go back to square one

23   with our budgets.  What do we do with competitive cheer,

24   which already they think they are going to be varsity?

25   They are excited, they are ready to compete.  They exist,

 1   Judge.  There are a number of returning, there are a

 2   number more.  Ms. Powers had tons of interest in this.

 3            So, it's clear that the -- even if you get

 4   there, the balance of hardships decidedly tips in

 5   Quinnipiac's favor.

 6            No expert should be permitted to persuade this

 7   court on legal conclusions or assessments of credibility.

 8   No expert should be allowed to use their political agenda

 9   to convince you, especially when based on erroneous

10   facts.  In sum, it's the defendant's assertion that the

11   plaintiffs have failed to meet, to sustain their burden as

12   to every element of that burden.  And I'm going to end

13   with the way I began.  Title IX is a shield, not a sword.

14            Thank you, Your Honor.

15            THE COURT:  All right, thank you.

16            Mr. Orleans, I'm going to forego rebuttal.

17            MR. ORLEANS:  That's fine, Your Honor.

18            THE COURT:  You know, I have been living with

19   this case this week and it raises difficult and

20   interesting questions and I can anticipate, I think,

21   arguments both of you would make as to the evidence and

22   the law and we have many folks waiting.

23            I do want to thank counsel and the parties for,

24   I'm tempted to say a good game.  I thought it was handled

25   well by everyone, that there was good sportsmanship

1   exhibited.  And it doesn't make the case any easier but I

2   certainly appreciate that in any case, and thank all of

3   you for that.

4        I will get a decision to you as quickly as I

5   can.  I always cringe to say that because I've said that

6   and sometimes it's been months but in this case I know

7   it's important to get it out quickly.  I do need to take a

8   look at the expert's testimony.

9        And there's a last housekeeping matter I wanted

10  to follow up briefly on a comment, Ms. Gambardella, you

11  made.  My understanding at the beginning of the trial with

12  the stipulated exhibits was that those exhibits were being

13  admitted as full exhibits.  If there are exhibits that

14  you've stipulated to that you're offering and in fact

15  don't want me to consider --

16        MS. GAMBARDELLA:  No, no.  I'm sorry, I don't

17  mean to cut you off.

18        THE COURT:  There was one point --

19        MS. GAMBARDELLA:  I know what it was.  It was, I

20  actually said it because it was the video, do you remember

21  the video that was admitted?  What happened is in our

22  haste to make sure we got everything loaded, I was

23  forwarding to my colleague a video and we were supposed to

24  select one so I was just loading up three and then we

25  selected one and we had all three.  So all I was saying to

1    Mr. Orleans was I'm not going to submit the three, even

2    though I indicated so.  So that was an anomaly.

3              THE COURT:  So everything that's in the record

4    is in the record?

5              MS. GAMBARDELLA:  Yes.

6              THE COURT:  All right, thank you all.  We'll

7    stand in recess.  I'll be back in five minutes for the

8    next matter.

9              (Whereupon the above matter was adjourned at 3:15

10   o'clock, p. m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Susan E. Catucci, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ Susan E. Catucci
_____

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917) 703-0761