UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

STEPHANIE BIEDIGER, ET AL      :  No. 3:09CV-621 (SRU)
                               :  915 Lafayette Boulevard
            vs.                :  Bridgeport, Connecticut
                               :
                               :  October 22, 2009
QUINNIPIAC UNIVERSITY          :

- - - - - - - - - - - - - - - - x

                    STATUS CONFERENCE

B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

    FOR THE PLAINTIFFS:

          PULLMAN & COMLEY
                850 Main Street
                P.O. Box 7006
                Bridgeport, Connecticut 06601-7006
             BY:  JONATHAN B. ORLEANS, ESQ.
                ALEX V. HERNANDEZ, ESQ.

          KRISTEN GALLES, ESQ.  (Via Telephone)
                10 Rosecrest Avenue
                Alexandria, Virginia  22301

    FOR THE DEFENDANT:

          WIGGIN AND DANA, LLP
                400 Atlantic Street
                P. O. Box 110325
                Stamford, Connecticut  06911-0325
             BY:  MARY A. GAMBARDELLA, ESQ.

          PROSKAUER ROSE
                1585 Broadway
                New York, N. Y.  10016
             BY:  EDWARD A. BRILL, ESQ.
                SUSAN D. FRIEDFEL, ESQ.

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917)703-0761

```
 1              (Whereupon the following session was held in

 2     chambers.)

 3                    (2:00 O'CLOCK, P. M.)

 4              THE COURT:  Good afternoon.  I'm going to go

 5     around the room and ask everybody to identify themselves

 6     for the record.

 7              MR. ORLEANS:  Jonathan Orleans for the

 8     plaintiffs.

 9              MR. HERNANDEZ:  Alex Hernandez for the

10     plaintiffs.

11              MS. GALLES:  Kristen Galles for the plaintiffs.

12              MR. BRILL:  Edward Brill, Proskauer Rose, for

13     the defendant.  And with me is my associate, Susan

14     Friedfel.

15              MS. GAMBARDELLA:  And Mary Gambardella, Wiggin &

16     Dana, also for the defense.

17              THE COURT:  All right.  I understand we're here

18     principally to try and get a schedule in place and I have,

19     from Mr. Brill's recent letter dated October 20th, a

20     modification of the defendant's point of view on

21     scheduling.

22              I've got the following -- just confirm these are

23     the dates that you're fighting about, perhaps.

24              We have motions to join parties:  Plaintiffs

25     proposed December 1; Defendants propose November 13.
```

1          Plaintiff's submission of class certification;

2     Plaintiffs propose January 15th; Defendants propose

3     November 13th of this year.

4          Jump in if I get anything wrong.

5          Motions to join additional parties:  Plaintiffs

6     propose January 1, with no competing proposal from the

7     Defendants.

8          MR. BRILL:  That's for the defendants to add

9     parties.  For the plaintiffs to add additional parties,

10    they are proposing December 1st.  We don't intend to

11    propose any additional parties so it's not applicable.

12          THE COURT:  All right.  Completion of discovery,

13    October 1st versus February 5th of 2010.

14          Completion of fact depositions, June 1 versus

15    December 22nd.  That's December 22nd of this year.

16          Plaintiff's designation of experts, March 1st

17    versus December 22nd of this year.

18          Completion of depositions of Plaintiff's

19    experts, April 15th versus January 15th.

20          Plaintiff's designation of rebuttal experts:

21    September 1st is the proposal from the Plaintiff.

22          Completion of depositions of Plaintiffs'

23    rebuttal experts:  October 1st.

24          Plaintiffs' designation of experts:  June 1 is

25    Plaintiff's proposal; January 22nd is the Defense

1    proposal.

2              Completion of depositions, Defendant's propose

3    September 1st versus February 5th.

4              Damages analysis:  March 1st versus

5    November 13th of this year.

6              And dispositive motions:  November 1st versus

7    February 1st.

8              Have I got it right?

9         MR. BRILL:  We didn't make a specific proposal

10   on dispositive motions based on the discovery schedule.  I

11   think it would have to be sometime after -- our new cutoff

12   is February 5th of 2010 so it would have to be sometime

13   after that.

14             THE COURT:  So --

15        MR. BRILL:  I would say 30 days before that.

16             THE COURT:  So March 30th, or -- excuse me,

17   March 5th.

18             MR. BRILL:  And the only other thing I would

19   note is that with respect to rebuttal experts, we didn't

20   propose a specific date.  We said the leave of court would

21   have to be required.

22             THE COURT:  Sure, okay.

23             MR. BRILL:  Otherwise you're all right there.

24             THE COURT:  Let's maybe discuss a little bit why

25   each side's proposal makes sense.  Mr. Orleans?

1          MR. ORLEANS:  You want to hear from us?

2          THE COURT:  Sure.

3          MR. ORLEANS:  Your Honor, essentially all of the

4    deadlines flow from the question of when are we going to

5    have a merits trial, working back from that.  The

6    defendant, I think, wants to have a merits trial as soon

7    as possible because the defendant would like to eliminate

8    the volleyball team before the next academic year.

9          Our view, Your Honor, is that even, even on the

10   most constricted view of what's at issue in the case,

11   which it is the defendant's view that the only thing

12   that's at issue in this case is the statistical component

13   with prong one of 2009 in the current year, you can't

14   really evaluate that until the current year has been

15   completed and, among other things, the defendant will not

16   have filed its NCAA reports until next October.  They have

17   never provided this kind of information any earlier than

18   October of the following academic year.

19         So, in our view it's just completely unrealistic

20   to think we could have a merits hearing before the

21   defendant, which the court has found to have manipulated

22   its participation figures in the past, can demonstrate or

23   before we know how the defendant has operated its program

24   for this entire year.  And, therefore, we think this

25   notion of having a merits trial sometime in the early part

1    of 2010 is just not practical or warranted under the

2    circumstances.

3            We also think that there are, you know, we have

4    some disagreements on the scope of discovery obviously.

5    We are intending to amend our complaint and we may very

6    well be adding retaliation claims.  We may be adding

7    claims relating to financial support for men's and women's

8    sports.  Those are going to create some additional

9    discovery issues and, again, it's not, not going to be

10   practical to complete the necessary discovery and schedule

11   a trial during the current academic year.

12           And, therefore, we have proposed a schedule that

13   gets us a trial reasonably early in the next academic year

14   so that if the plaintiffs -- if the defendant should win

15   at that stage, there would be adequate time then to make

16   whatever adjustments are necessary in the athletic program

17   and for the student athlete plaintiffs to find other

18   places to play if that's what they want to do.

19           THE COURT:  What's really at issue between the

20   parties is one more year of volleyball?

21           MR. ORLEANS:  Before merits are heard.

22           MR. BRILL:  It's true, our goal is to have a

23   trial, if possible, by early Spring so that we can have a

24   decision on the University's ability to eliminate the

25   volleyball team.  We don't think that there's all that

1    much discovery that would be needed with respect to that

2    issue.  And there's no reason that the facts would not be

3    available by, certainly by March.  The EADA numbers, we

4    already have the first day of competition for 14 out of 16

5    sports and the other two will be available within the next

6    two weeks.

7              With respect to the sports that start in the

8    Spring, so that the championship season starts in the

9    Spring, the last day -- or the first day of championship

10   competition is early March and there's no need to wait

11   until the end of the school year.

12             As we said in the Rule 26(f) report, there's

13   been significant changes made by the University with

14   respect to the issues that concerned the court at the

15   preliminary injunction hearing.  There's now an entirely

16   new set of controls over the roster numbers whereby the

17   Senior Vice President of Academic Affairs, who's

18   essentially the provost of the University, is directly

19   responsible for roster numbers, and no roster can be

20   changed, nothing can be added or deleted to the roster

21   without his approval.  Every roster is set by an

22   interactive process with the coach who signs off on the

23   adequacy of the roster in order to provide meaningful

24   participation experience.

25             The specific sports where the court found

there'd been a problem in the past, such as men's lacrosse
and women's softball, competitive cheer, those numbers
have all been substantially changed and we are prepared to
demonstrate, to have discovery on those issues and to have
a trial on our compliance with the substantial
proportionality test which can easily be accomplished by
the Spring.  There's not really much discovery that would
be necessary for that.  And it would be better, we
believe, to have that determination made in, you know, in
March or early April at the latest so that there is a
track record of the entire year of Fall sports and the
beginning of the competition season for Spring sports.

        But there's no reason to assume that any
problems that occurred in the past would continue based on
the changes that have been made, which the plaintiffs can
have discovery about and the court can have testimony
about and a demonstration that the, you know, the roster
numbers are now true and correct and that we're in,
completely in compliance with Title IX for this academic
year, and that, even eliminating the women's volleyball
team, the school would be in compliance going forward.

        So that is the issue between us and it's not a
small thing to say so they'll continue the volleyball team
for another year.  We've continued it for one additional
year beyond what the school had intended but -- I didn't

1    mention there's been another men's team that's been

2    eliminated, so three men's teams have been eliminated now

3    and, you know, the men athletes have borne the brunt of

4    that.  The coaches of those teams, money's been saved with

5    respect to those teams, and there is no reason that we

6    have to wait yet another year to determine whether the

7    volleyball team can be eliminated when all the evidence on

8    that would be available by early Spring.

9            With respect to -- it's difficult to address the

10   issue of new claims that the plaintiffs may add because we

11   haven't seen them, but I would say those claims would be

12   significantly different than anything that's now in this

13   case and that if they do amend the complaint, for example,

14   to raise issues of I think equal facilities or equal

15   support or with respect to other sports, those could

16   really be separated out for purposes of discovery at

17   trial.

18           And we're entitled to a ruling, you know, one

19   way or the other on the issue of the continuation of the

20   volleyball team.  We'd rather, frankly, have a trial on

21   the merits rather than having to make a motion to lift the

22   injunction, which obviously we could do if it turns out

23   that the case is going to continue on that length of time,

24   but there's really no reason to have to do that, have that

25   issue resolved in that procedural posture.

1        MS. GALLES:  Your Honor, this is Kristen Galles.

2    Can I speak in rebuttal or --

3        THE COURT:  Sure.

4        MS. GALLES:  Okay.  I actually would like to

5    point out that I would strongly disagree with Mr. Brill's

6    characterization about the counting of the numbers.

7    Actually for all of the Fall sports, their competitive

8    season has not started yet so there would -- there are no

9    EADA numbers, for example, for basketball, ice hockey, and

10   I believe they are claiming cheer as a Winter sport, even

11   though there is no set season.

12       And as for the Spring sports -- and although we

13   disagree, we believe OCR disagrees in terms of counting

14   indoor track as a separate sport, obviously that has not

15   even begun yet so they could not count those sports yet.

16       As for the Spring sports, outdoor track,

17   lacrosse, softball and baseball, again, those are all

18   sports where the EADA numbers obviously cannot be provided

19   and so, therefore, their first competition date, the only

20   numbers that Quinnipiac could provide under the schedule

21   they've proposed and could provide would be for the Fall

22   sports.

23       And then, secondly, we aren't just talking about

24   EADA numbers.  As the court found, EADA is just sort of a

25   presumption of, hey, here's what the school says are the

1    numbers.  What really counts for Title IX purposes are who

2    actually has an opportunity, and as was shown at the

3    preliminary injunction hearing, you need to look behind

4    those to find out, hey, how many men had genuine

5    opportunities and actually participated in the entire

6    season but were not counted for EADA purposes.  And, in

7    the alternative, how many women were being counted but

8    never actually participated in a contest because they were

9    cut or because they were improperly playing under the EADA

10   in the Fall as opposed to the Spring.

11        And then, of course, there's the whole, we

12   believe, the whole idea of the triple counting of track,

13   which legally is improper, and we will need the full

14   year's worth of information in order to demonstrate our

15   allegation that, hey, Quinnipiac really only has a cross

16   country team, it does not have a track team, and part of

17   showing that is going through and seeing who's

18   participating at what time in what event, what are the

19   schedules.  Are they really running this as a separate

20   track team or is this really just a cross country team

21   that runs in a few track meets.

22        All those things, of course, are very

23   fact-intensive and would require the full year's view of

24   what is going on because, of course, you know, our

25   contention is Quinnipiac has not complied with Title IX in

37 years.  The court found that it did not comply, so the
volleyball team was reinstated.

So Quinnipiac's position is, okay, we promised
to comply for the 2009-2010 school year and so we need to
really complete the 2009-2010 school year and to
essentially audit what's happened during that 2009-2010
school year in order to see whether they, indeed,
fulfilled that promise to come into compliance for this
year.  Thank you.

MR. BRILL:  May I respond to that, Your Honor?

THE COURT:  All right.  As I understand the
plaintiff's position, the discovery that's necessary
before a trial on the current claims would be the
participation numbers?

MR. ORLEANS:  I don't think it's limited to
that, Your Honor.  There would be current participation
numbers, there would be inquiry into the operation of the
cheer program because, as Your Honor observed in the
preliminary injunction proceedings, competitive cheer
might, if it were properly administered and run, be
appropriately counted as a varsity athletic opportunity,
but it also might not, and so we're going to need to
inquire as to how it's being operated and run.

Mr. Brill has mentioned changes to the operation
of the athletic program at Quinnipiac which are intended

1    to insure compliance and we need to inquire into those

2    because, frankly, without going into all the details, we

3    are not entirely convinced that the changes that he's

4    outlined will actually function to assure compliance with

5    Title IX.

6            For example, the interactive process that he

7    mentioned, under which coaches were ostensibly consulted

8    about their roster sizes, might have been read by the

9    coaches as coercive or retaliatory, and I think we're

10   going to need to depose every coach to inquire about how

11   that went and whether the letter that they were required

12   to sign reflected their real opinions.  So I think there's

13   really quite a bit to be done.

14           In addition, for preliminary injunction

15   purposes, I understood that Quinnipiac relied entirely on

16   prong one of Title IX.  I believe that that was stipulated

17   or announced at some point in open court.

18           MS. GALLES:  Uh huh.  (Affirmative.)

19           MR. ORLEANS:  But I don't know that that's going

20   to be true on a merits hearing.  In other words, as Your

21   Honor knows, Title IX -- prong one, the statistical

22   compliance is a safe harbor for a university whose

23   compliance with Title IX is challenged, but if the

24   university does not comply with prong one, the

25   university -- it's still open to the university to show

1    that it is in compliance with Title IX by demonstrating

2    compliance with prongs two or three.  And unless the

3    university is prepared to stipulate that its only defense

4    is a prong one defense, then we have to conduct some

5    discovery in order to prepare for a possible contested

6    trial on prongs two and three.  So --

7              THE COURT:  All right, let's sort that out.

8              MR. BRILL:  We do stipulate that that's our

9    defense, is prong one, and we agree to the areas that

10   Mr. Orleans has identified for discovery, but that's not a

11   year's worth of discovery.  Other than deposing every

12   coach, which I'm not sure is justified, he is entitled to

13   discovery in our view into the operation of the cheer

14   program and into the, the roster calculations.

15             I'm not, you know, I'm not taking a position now

16   about deposing every coach but certainly some discovery

17   into how the new system operated and how the coaches have

18   responded to the interactive process would be appropriate.

19   But we think two months, which we proposed, is more than

20   adequate for that and it doesn't take a year.

21             Can I go back to responding to what she said for

22   a minute?

23             THE COURT:  Sure.

24             MR. BRILL:  There were three points she made in

25   her remarks, that the EADA numbers are not available until

1    the competitive season starts; that's just factually

2    inaccurate, Your Honor.  I didn't make copies of this but

3    I have the schedule of the first day of competition for

4    every sport which is what the EADA numbers are based on,

5    and 14 of the 16 sports have had their first day of

6    competition.  The spring sports do have competition in the

7    fall, that's not the championship season but they do have

8    a competition.  The only two remaining are men's and

9    women's basketball which are coming up within the next ten

10   days and, frankly, there's no real issue about the

11   basketball rosters in any event but the EADA numbers are

12   now -- will be set within the next two weeks.

13          I agree also that the EADA numbers are not to be

14   the be all and end all of the matter, and that's why I

15   said that we agree that the hearing could take place in

16   the early Spring, after the spring season championship

17   competitions have begun.  But I don't think anything in

18   the judge's prior -- in your prior opinion, or common

19   sense, would say you need to wait for the entire season to

20   be completed before you can make a determination.

21          The concerns that the court had with respect to

22   roster manipulation or any people practicing that, all of

23   these occurred shortly after the competition had begun and

24   it's not necessary to wait until the school year is over

25   to see whether these numbers are legitimate.

1          We're, you know, we are the ones who are at

2    risk, frankly, in saying that we're content to have a

3    trial on the merits in March or April.  If we can't

4    convince the court at that time that the numbers are

5    legitimate and reliable, then it's our risk, it's not the

6    plaintiff's risk.  And we believe that the combination of

7    the changes that we made and having, you know, some

8    significant period of time, a championship competition for

9    every sport would be more than enough for the court to

10   make a ruling that whatever problems that there were in

11   the past are no longer an issue.

12         As I said, the University is in compliance and

13   there's no reason to believe that eliminating women's

14   volleyball would take us out of compliance and we'd like

15   to have that ruling in the Spring, out of fairness to the

16   volleyball players as well as out of fairness to the

17   University, because if it's delayed until late Spring or

18   Summer, and then the court rules that Quinnipiac can go

19   ahead and eliminate the volleyball team, you know, they

20   are going to be complaining that it's too late for the

21   volleyball players to make plans for next year.

22         I mean, frankly, we would like to have the

23   hearing right now or a month from now, but we recognize

24   that the court may need and the plaintiffs may need some

25   additional record of compliance and some additional facts,

1    but we think that ought to be done at the earliest

2    reasonable opportunity and that would be fairer to both

3    parties.

4            THE COURT:  Well, I tend to agree that we ought

5    to do the merits trial at the earliest fair date.

6            MS. GALLES:  Your Honor, could I chime in and

7    sort of rebut what he had stated or do you want me to shut

8    up?

9            (Laughter)

10           MS. GALLES:  I'm not there so I can't read the

11   dynamics, I apologize.

12           THE COURT:  I don't think I've ever told a

13   lawyer to shut up so I'm not going to start now.

14           MS. GALLES:  You may have wanted to.

15           THE COURT:  Well, fair enough.

16           MS. GALLES:  I just think it might be helpful to

17   explain in terms of the discovery and why we need it and

18   why it's not going to be available until after the full

19   school year is over.

20           THE COURT:  Sure.  Let me give you my initial

21   thoughts and then perhaps you can even make your comments

22   reflect your reaction to that.

23           I'm always reluctant to have a decision that I

24   make on procedural grounds, the scheduling of a trial, the

25   timing of discovery, affect the substance of the

```
 1     discovery.  And if we extend this trial too late, it's a
 2     form of relief for the plaintiffs which occurs without any
 3     evaluation of whether that relief is justified on the
 4     merits, and so my preference would be to do an earlier
 5     trial consistent with everyone's ability to get ready for
 6     it, and I think the suggestion of severing out claims is a
 7     good one.
 8             I understand the need to undertake discovery
 9     even potentially for the bulk, if not the entire academic
10     year, but I'd like to be in a position to try the case
11     very quickly thereafter and perhaps in May or June.  So
12     let me get your reaction to that.
13             MS. GALLES:  Yes, sir.  First off, the reason
14     why we definitely would need -- number one, we definitely
15     disagree with Mr. Brill in terms of his assertions of the
16     measuring date for the numbers for the EADA.  It's our
17     position Spring sports, we don't report them until the
18     competitive season, but beyond that, because essentially
19     our belief is -- and if you look at the past treatment of
20     the cross country program at Quinnipiac is that Quinnipiac
21     has only a cross country program, has always only had a
22     cross country program, and only recently in order to
23     manipulate its numbers in order to falsely reflect a prong
24     one that they have done this idea of claiming they have an
25     indoor track team, an outdoor track team.  You know, we
```

1    believe that's absolutely not the case, and we need to be

2    able to prove that.  We were not allowed to go into

3    discovery in the preliminary injunction stage to really

4    investigate that and to present the expert to demonstrate

5    what really is going on and has gone on and how track

6    works and, you know, that's a very fact-intensive inquiry

7    that will require certainly for Quinnipiac to finish what

8    it claims to be its full track season in order for our

9    experts to look at, hey, who's running track, what events

10   are they running, what is the schedule, is this being run

11   as a cross country program, is this being run as a track

12   program?

13             And so obviously that kind of factual

14   information is not going to be available until after the

15   track season and I don't believe the track season ends

16   until late May, early June.  That's when the NCAA

17   championships are.

18             THE COURT:  I was going to guess that

19   Quinnipiac's outdoor track season ends closer to late

20   April, early May.  Does anybody have this information?

21             MS. GALLES:  We have the championship dates.

22             THE COURT:  Well, the NCAA -- let's be frank,

23   Quinnipiac probably isn't going to send anybody to the

24   NCAA championships.

25             MS. GALLES:  I have no idea.  I have no idea.

1   So we would obviously need -- in addition, we definitely

2   would need all of that factual information.

3        Secondly, in terms of the cheer issue, no court

4   and OCR has never ever accepted cheer as a competitive

5   sport.  Quinnipiac is trying to get this done or

6   recognized as a sport for the first time ever, and I

7   believe OCR continues to disagree that it is a competitive

8   sport, and so if we're going to be setting that kind of

9   precedent that is contrary to 37 years of Title IX

10  precedent, at least from the executive agency in charge of

11  it, of saying that this is a sport, we really do need the

12  factual inquiries and we intend to have, you know, expert

13  witnesses come in and explain why this is not a sport, why

14  it's not being run as a sport, even if it were open to

15  being a sport.  And that is going to require obviously a

16  full look at the cheer program, and since cheer doesn't

17  have a competitive season, you know, we would have to look

18  at all the way through when Quinnipiac claims that its,

19  you know, cheer season is over.

20        And also in terms of -- here's why separating

21  out the claims is not really possible.  Title IX, unlike

22  other discrimination claims, when you're talking about

23  athletics, you're talking about a sex segregated

24  environment, and so either you violate Title IX or you

25  don't.  It's not like just the volleyball team, you know,

1    claim or complaint, you know, dealt with, hey, Quinnipiac

2    does not offer enough opportunities to female students,

3    and that would be far more than just volleyball.

4    Obviously the preliminary injunction was to only get

5    volleyball reinstated but, you know, how you work Title IX

6    is you have the three part test, number one being the

7    substantial proportionality, and if you are off on the

8    substantial proportionality and, you know, if they are

9    conceding they don't meet two or three, then, hey, you

10   need to be adding additional women's sports, and we are

11   contending that one of the issues is we believe that there

12   should be a women's track team.  We don't believe that

13   they offer one, but they believe that there should be and,

14   indeed, that the prior coach for many years had requested

15   that he have a women's track team, that he have sprinters

16   and jumpers and throwers and all that, and was repeatedly

17   denied the chance for that.

18           And so -- and as we also indicated, there are

19   many, many sports in the conference that Quinnipiac does

20   not have, and so when you -- so Title IX has a programatic

21   view of whether you comply with Title IX.  We couldn't

22   have separate lawsuits of, all right, the young women, the

23   people who want a separate legitimate women's track team

24   and the bowling team and the gymnastics team and the swim

25   team and the volleyball team, we don't have four or five

1    separate lawsuits trying to each get a team because,

2    frankly, Quinnipiac's numbers aren't that bad.  You know,

3    we may be fighting over, hey, they should have two or

4    three of these sports, not all five of these sports.  So

5    they all have to be, and this is to decide which of the

6    sports they should be having, all need to be adjudicated

7    in one litigation and, of course, you know, we can't have

8    inconsistent verdicts of having volleyball players only

9    over here and track people only over here, and again,

10   unlike Title VII where you might violate it as to one

11   employee but not violate it as to another employee in the

12   Title IX context because of the sex segregated nature, you

13   either violate it or you don't, and so you really have to

14   adjudicate all of the participation problems at least in

15   one lawsuit.

16            And, and because of that, again, the preliminary

17   injunction was only volleyball because that's the only one

18   where we were trying to prevent it from being dropped as

19   opposed to requiring Quinnipiac to increase its

20   opportunities, or in the realm of track, to make a

21   legitimate opportunity with a legitimate track team, not

22   what we would consider a faux track team, and that's the

23   reason why you can't really separate out any claims

24   related to the participation issues.

25            THE COURT:  Okay, I think we have the date --

 1            MR. ORLEANS:  Yes, Your Honor.  According to the

 2    Quinnipiac 2009-10 Athletics and Recreation Staff

 3    Handbook, the Women's Outdoor Track Championship will be

 4    May 1 and 2; Men's Lacrosse is May 2 through 4; Softball

 5    is May 14 and 15, and; Baseball is May 20 through 22.

 6            MR. BRILL:  Could I see that?

 7            MR. ORLEANS:  Absolutely.

 8            (Hands Counsel)

 9            MR. ORLEANS:  If I could make just a couple of

10    brief points -- I don't want to wear out our welcome here.

11    It seems to me that even a trial in April or May, even if

12    we were to have a trial in April or May --

13            THE COURT:  I was thinking May or June.

14            MR. ORLEANS:  Well, we're then going to run into

15    the same problem we ran into last year as far as what

16    happens to the volleyball girls, what happens to these

17    athletes.  You know, Coach Sparks is recruiting now and

18    you're going to have students who were accepted, you're

19    going to have problems with people.  What happens to their

20    scholarships?  Where do they go?  Can they find other

21    opportunities?  I'm sure you recall the testimony on those

22    points.

23            So that even if we have a trial that soon, it

24    seems to me that, as a practical matter, Quinnipiac will

25    be compelled to maintain the volleyball program for one

1    more year, and as long as it's going to have to do that,

2    there's no reason to rush into that trial.  We could just

3    as well have the trial in the Fall as in the Spring

4    because the whole reason Quinnipiac wants the trial in the

5    Spring is to be able to eliminate the volleyball program

6    that much sooner.

7            And, secondly, I would say with all respect to

8    the defendants' position, they are operating under a

9    preliminary injunction and it should be as limited in time

10   as possible.  I would say it's really their own fault.

11   They decided to announce this change in March of 2009,

12   giving very little time for students or their parents to

13   make alternative plans.  They could have, when they

14   announced that they were eliminating the volleyball

15   program, they could have said we're eliminating the

16   volleyball program a year from now, and given the students

17   and their parents and the coach and so forth time to make

18   alternative plans.  They didn't.  When we filed the

19   lawsuit, they could have stipulated to something like

20   that.

21           In other words, it was fully within Quinnipiac's

22   control to handle this in a way that would have gotten

23   them a merits trial in ample time to eliminate the team

24   for next year, but they chose not to.  They timed their

25   announcement, they chose their defense in such a way that

```
1    now here we are trying to schedule a merits trial and it's
2    virtually impossible to schedule that merits trial in time
3    to allow them to eliminate the program for 2010-2011, and
4    it's nobody's fault but the defendant's.
5              And so it seems to me that, you know, it's
6    appropriate to give us adequate time to prepare the case
7    and have the trial, and if the plaintiff should lose the
8    trial, then the student athletes should have a reasonable
9    opportunity to find other places to go.
10             MS. GALLES:  And, Your Honor --
11             MR. BRILL:  I'm sorry --
12             MS. GALLES:  -- one more thing I would like to
13   throw in about why we need to make sure we have adequate
14   time to prepare the trial, is that in reality this case is
15   not just about Quinnipiac.  This is a -- these practices
16   are going on nationwide in terms of schools are, you know,
17   like tax cheats.  We believe that there are many, many
18   schools that are going -- in order to appear like they are
19   in compliance with prong one, when in fact they are not,
20   they are being taught these same techniques.  And because
21   of that, schools and lawyers all over the country are very
22   intensely looking at this particular case and, indeed, it
23   will likely be sort of a test case on these issues and
24   what schools can do, can't do, should do, whether these
25   manipulations are allowed or not.  And because of that,
```

1    you know, we really need to make sure that this case is

2    done right because everybody is going to be looking to it

3    as to what is allowed or not allowed going forward for

4    many years to come.

5         MR. BRILL:  I'm sorry to have to respond but

6    there's a lot to respond to.  First of all, obviously I

7    don't think comparison to tax cheats or saying that people

8    all around the country are looking at this case has

9    anything to do with the schedule that we realistically

10   need to set here.

11        There's a whole body of case law under Title IX,

12   and what we're talking about here is a very specific

13   factual inquiry relating to what Quinnipiac has done.  And

14   it's simply not true to say that if we have a trial, as

15   the court suggested, if we had a trial in May -- it would

16   be a very short trial, presumably it's not going to take

17   very long for the court to make a ruling.  If the ruling

18   is in defendant's favor, we will eliminate the volleyball

19   team and the plaintiffs, we've told the plaintiffs that.

20   We've been telling them that all along.

21        That's our plan, either to have a trial on the

22   merits or to file a motion to eliminate the preliminary

23   injunction.  So there's no surprises here and people can

24   make their plans accordingly.  Both sides are at some risk

25   but that's what happens when you have litigation.  And we

1    don't think, again, we don't think it's fair to force the

2    University in effect to continue for another year, simply,

3    but if the earliest opportunity to have these claims tried

4    on the merits is in May, we'd be prepared to have the

5    trial earlier but the plaintiffs say no, they need more

6    discovery.  So, you know, if they want more discovery and

7    more time, the cost of that is not having an early

8    decision for them.

9            As I said, if they want to have a hearing in two

10   months over continuation of the preliminary injunction,

11   we'd be prepared to put our evidence in at that point, but

12   we think it makes more sense to do as much discovery as

13   reasonably possible and to have a trial on the merits.  I

14   don't think you need to go to the NCAA championships to

15   make a ruling.  I think by April or early May the seasons

16   will have been substantially complete.  It would make

17   little sense to say the University is going to wait until

18   the last two weeks of the season or the last few weeks

19   under the season and it will be manipulating a roster.

20   There was no evidence that that type of thing was

21   happening and it wouldn't make any sense.

22           I think what the court identified in the past

23   was that there was one or two, or two or three instances

24   where teams had put in a number for the EADA report and

25   then immediately after that, changed the roster numbers.

1    There's no showing that during the course of a season,

2    once the championship competition had begun, that there

3    was some wholesale effort to change the rosters.

4              And, again, the last -- the first day for every

5    Spring sport of competition is no later than, March 5th I

6    think is the last date that any Spring sport starts

7    competition.  So by March and April, you've got two full

8    months at a minimum of championship competition.  If you

9    waited until early May for a trial or mid May, that's two

10   and-a-half months.  That's almost the entire semester and

11   there's no reason that discovery can't be completed by

12   that date.

13             As far as the issues about the track team, I

14   don't really understand what the claim is but if there's

15   some claim that the indoor/outdoor women's track teams are

16   not bona fide and haven't been, first of all, there's

17   history of the track teams in the past and, as I

18   understand, there's been some discovery as to that

19   already, and there's been expert testimony about that.

20             So you have the past experience with the

21   indoor/outdoor track teams and you certainly have the

22   complete indoor track season that's been completed by the

23   beginning of the spring semester.  And, as I said, you'd

24   have two months of the outdoor track season which is

25   substantially the entire season by the end of April.

```
 1              The other argument that was made was that
 2     somehow you can't segregate out the claims.  I really
 3     don't understand that, the only claim here that we're
 4     talking about having a trial on is the substantial
 5     compliance and proportionality claim.  That's the same
 6     whether you're talking about the volleyball team or any
 7     other team.
 8              If the University is in compliance with Title
 9     IX, the case law is very clear it's completely within the
10     university's discretion whether -- how it's going to
11     comply, whether to eliminate men's teams, add women's
12     teams, or add a different women's team.  The court has no
13     role in that and the plaintiffs have no role in that.  If
14     we're not in compliance, then obviously the court can
15     issue whatever remedy is appropriate under those
16     circumstances.  But if we are, that's only one issue to be
17     tried.
18              And, by the way, the plaintiffs here, at least
19     so far, are only volleyball players, so the issue of
20     there's some unmet need to start a women's rugby team or
21     some other kind of women's team for people that aren't
22     being plaintiffs, that's not really part of this case at
23     the moment.  Right?  I mean the only issue that's properly
24     before this court on these complaints with these
25     plaintiffs is whether the volleyball team can be
```

1       eliminated.

2               MS. GALLES:  Your Honor, I would completely

3       disagree on two points.  First of all, in order to decide

4       whether the volleyball team should stay reinstated, as a

5       point of legal analysis, it requires a program-wide

6       analysis, which means that even if this were only about

7       volleyball, it would require us to do the very

8       fact-intensive analysis of what's going on in particular

9       with the track and the cheer programs.  We might agree

10      that in terms of the numbers manipulation in the other

11      sport, what goes on early in the season may be what is

12      most important, although, again, we would indicate what

13      they showed for lacrosse, like the men's lacrosse, they

14      were not reporting the men and it took us to see the

15      entire year of schedule and NCAA data to find out that,

16      oh, indeed, these men had played many times throughout the

17      season and had not been counted.  How would we know that

18      until after that lacrosse season was over?

19              And the same in terms of -- more important, in

20      terms of the track team, yes, we are alleging that the

21      indoor and outdoor track teams are not legitimate teams.

22      We have always alleged that and that means can they be

23      counted for prong one purposes?  Our position is no, they

24      cannot be counted for prong one purposes because they are

25      not legitimate teams and that means we do have to have an

1      intense analysis and intense review of what's going on in

2      the track program in order to decide whether the

3      university meets prong one for purposes of the volleyball

4      team.

5              So that's why this -- when he keeps saying, you

6      know, about volleyball, no, you have to look at how the

7      numbers are counted in every single sport and the reality

8      of what's going on underneath those numbers.  That's why I

9      keep using the auditing analogy.  Those numbers have to be

10     audited and examined in order to decide what to do in

11     terms of the volleyball program.

12             But then, in addition to that, we would disagree

13     that this case is only about volleyball.  This case is

14     about equal opportunity and making sure that Quinnipiac

15     indeed complies with all three prongs.  They've admitted

16     they are not relying on prongs two and three.  We believe

17     we have shown that they did not and have never complied

18     with prong one in the 37 years of Title IX, and so,

19     therefore, hey, they need to be.  And they can't cut any

20     more men's teams in order to remain at the Division I

21     level.  They are sort of stuck with what they have.

22             And so, in order to comply with prong one, they

23     are going to need, we believe, to add more women's teams.

24     And part of our, why we wanted time for the motion to

25     amend, although there is clearly case law that our

1    particular plaintiff can represent a class of all female

2    students who want to add a sport or participate in a sport

3    not offered by the school, in order to remove all doubt,

4    you know, we are expecting to have plaintiffs come in who

5    indeed are particular to those sports and, again, they all

6    have to end up being in the same lawsuit to decide, all

7    right, Quinnipiac, did you comply with prong one?  You

8    know, if you do, fine.  If you don't, then you're going to

9    have to add all these sports.

10            And I would say that Quinnipiac keeps talking

11   about the burden of volleyball.  Well, you know,

12   Quinnipiac for 37 years has gone without complying with

13   Title IX, has gone without providing its female athletes

14   with an equal opportunity to participate, and so what they

15   claim is a burden is really compliance with what has long

16   been federal law.  And, again, it presumes that they keep

17   counting a cheer team that has not even competed in a

18   single event yet.  So you're looking at the balancing of

19   the inequities and the public interest.  Obviously keeping

20   the volleyball team is of utmost importance.

21            THE COURT:  Let me inquire whether Quinnipiac

22   would be prepared to provide within 48 hours every

23   intercollegiate contest, a certified roster of the

24   participants in the sporting event for the rest of this

25   case through the trial date?

1           MR. BRILL:  Unfortunately I can't answer that
2     yes or no.  I mean my inclination would be to say yes but
3     I don't know how quickly that's available.
4           THE COURT:  Well, okay.  Doesn't to have be 48
5     hours; I mean 72 hours, whatever.
6           MR. BRILL:  Whatever reasonable period is
7     possible, we would certainly be willing to do that.
8           THE COURT:  I mean we should not have to have
9     intense discovery to figure out who participated in sports
10    events.  Presumably when you take the field in a baseball
11    game, you provide the referee with a list of your players
12    and indicate who's going to be playing.
13          MR. BRILL:  I think there is a participation
14    report done.
15          MS. GAMBARDELLA:  There is.
16          MR. ORLEANS:  Of course we want to see not only
17    who is listed on the roster but who actually plays.
18          THE COURT:  Right.
19          MS. GALLES:  Who competed.
20          MS. GAMBARDELLA:  I believe it is reported that
21    way.
22          THE COURT:  I think that should be provided
23    voluntarily, and if not voluntarily, by order of the
24    court, after every contest for this academic year.  And
25    that being said, I think we should try the case on the

1    merits beginning May 3rd.

2            MR. BRILL:  May --

3            THE COURT:  Three.  I'm assuming this case can

4    be tried in about a week, and I would strongly urge both

5    sides to forego dispositive motions so that the parties

6    can instead -- with a bench trial, there's no point in

7    having a dispositive motion right before the bench trial

8    because if you're going to win summary judgment, you're

9    going to win the bench trial.

10           MR. ORLEANS:  Are you agreeable to that?

11           MR. BRILL:  Yes.

12           MR. ORLEANS:  Okay.  So are we.

13           THE COURT:  And that way you can focus on

14   getting your discovery done and preparing your witnesses

15   and having an efficient trial.

16           We should at the appropriate time talk about

17   mechanisms to make that trial efficient, and I am very

18   open to trial by submission of deposition transcripts that

19   are highlighted.

20           MS. GAMBARDELLA:  By fire.

21           THE COURT:  You know, putting on affidavits for

22   direct, having crosses, however we want to do it in a way

23   that makes this thing efficient but, at the same time,

24   fair.  But I really think that both sides have raised

25   strong points about the timing, suggested timing of the

1    trial.  The fundamental thing for me, it seems, is I think

2    that there is a reasonable compromise if we get it done

3    the first week of May, it's not ideal for the volleyball

4    players who want to switch schools, but it, I think, gives

5    the plaintiffs the opportunity to take the discovery they

6    need to get prepared, and to have essentially a full

7    academic, almost a full academic or athletic season for

8    every sport and for both sides to make their arguments

9    based upon that record.

10             MS. GALLES:  Your Honor, could I just raise one

11   issue around that date?

12             THE COURT:  Sure.

13             MS. GALLES:  Whether that's finals week.  We

14   expect to have many of these students testifying and do we

15   know when finals are?  I understand that you want to do it

16   early but, depending upon when finals are, it may require

17   to do it one week later or --

18             THE COURT:  My belief is the finals may be

19   somewhat later but we ought to confirm that.

20             MS. GALLES:  Okay.  So that it would not

21   conflict with the final exams.

22             MS. GAMBARDELLA:  What were the dates of our

23   hearing?

24             MR. ORLEANS:  11th and 12th.

25             MS. GAMBARDELLA:  Because finals week, I

```
 1    believe, was around there or the week after, last year.

 2               MR. BRILL:  We'll confirm that relatively

 3    quickly.

 4               THE COURT:  Because it's a bench trial, if it

 5    turns out we have some students that need to testify, I

 6    can work you in earlier too, so those students can testify

 7    in April.

 8               MS. GAMBARDELLA:  Your Honor, may I inquire, so

 9    if the complaint is -- Ed, if you don't mind -- if the

10    complaint is amended and there are more claims brought, is

11    there a bifurcated discovery period or would discovery on

12    any other claims brought in be simultaneous?  I'm not

13    sure --

14               MR. BRILL:  We'd have to see what the new claims

15    were, probably.

16               THE COURT:  That's what I was going to say.

17    Let's see how it goes.

18               MR. BRILL:  There's one -- I'm sorry, were

19    you --

20               THE COURT:  No.

21               MR. BRILL:  We had, as I understand it, the

22    defendant had not answered the original complaint because

23    there was some understanding the complaint was about to be

24    amended, we had an informal understanding about that, so I

25    think we ought to have something formal now.  If there is
```

1   going to be an amended complaint, we'd just like to wait

2   to answer the amended complaint, if that makes sense.

3           MR. ORLEANS:  Yes, we don't have any problem

4   with the defendant not answering until an amended

5   complaint is filed, and we'll endeavor to get the amended

6   complaint filed as soon as we can.

7           I should just tell Your Honor I've got a trial

8   in front of Judge Thompson coming up in November and I'm

9   pretty swamped for the next few weeks, but we do have

10  other lawyers working on the case as well.  We'll do our

11  best to get an amended complaint filed reasonably promptly

12  and, as we indicated in the Rule 26 report, we will

13  substitute Logan Riker, who's now 18, for her mother.  And

14  I understand there's no objection to that.

15          MR. BRILL:  No.

16          THE COURT:  Ms. Gambardella, going back to the

17  question about simultaneous discovery, I think discovery

18  should, unless there's a good reason not to, should

19  proceed with respect to any issues that are --

20          MS. GAMBARDELLA:  I assume that's what you meant

21  but just wanted to make sure.

22          THE COURT:  If a coach is going to be deposed,

23  it would be unfortunate, I think, to limit it to --

24          MS. GAMBARDELLA:  Agreed.

25          THE COURT:  -- issues that are going to be

```
1    tried.

2              MR. ORLEANS:  And we agree as well.  No point in

3    deposing a coach twice.

4              MS. GAMBARDELLA:  Absolutely not.

5              MR. ORLEANS:  Explore all the issues.

6              MS. GAMBARDELLA:  Thank you.

7              THE COURT:  In terms of other deadlines, rather

8    than trying to work through these now, because I have a

9    sentencing scheduled, frankly, I'm going to ask counsel to

10   go back --

11             MR. ORLEANS:  I think we should be able to work

12   something out.

13             THE COURT:  I'm hopeful in light of the trial

14   work you can work back, and if you have trouble, give me a

15   call and we'll sort it out.

16             MR. BRILL:  Working back from the trial date.

17             THE COURT:  But my hope is everybody can agree

18   what makes sense with all these other deadlines based upon

19   the trial date.

20             In terms of a pretrial memo, I don't need that

21   more than, say, a week before trial starts.  And if you

22   think there's going to be a need to do so, I could even

23   get it later than that.  If I could get it three or four

24   days before trial, that should be enough.  So if you

25   believe that there's critical last minute discovery that
```

1    has to get included in a trial memo, then let me know and

2    we'll try and accommodate that.

3              MR. ORLEANS:  Certainly, Your Honor.

4              THE COURT:  All right.  What else can we

5    usefully take up today?

6              MR. BRILL:  I think that's about it for today.

7              MR. ORLEANS:  Pretty much it for today.

8              MR. BRILL:  We need some time to try and work

9    things out based on this trial date.

10             THE COURT:  I'll look for hopefully a joint

11   motion, if not a joint schedule.

12             MR. ORLEANS:  We'll set a schedule.

13             MR. BRILL:  We're certainly free to begin

14   discovery at this point?

15             THE COURT:  I don't think anybody should hold

16   back on discovery.

17             MR. ORLEANS:  Okay.

18             THE COURT:  The case is proceeding and it ought

19   to proceed, and the only thing I would say is if you hit a

20   bump in the road, call me sooner than rather than later so

21   we can try and work it out.  I would not want a dispute

22   about whose deposition is going forward first or what is

23   going to happen, anything to slow this case down and

24   interfere with the trial date.

25             MR. ORLEANS:  There are no indications thus far

1    we'll be subject to that sort of dispute.

2              THE COURT:  I've had those before though, trust

3    me.

4              MR. ORLEANS:  So have I.

5              THE COURT:  All right, thank you all.

6              (Whereupon the above matter was adjourned at 3:00

7    o'clock, p. m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Susan E. Catucci, RMR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.



        /S/ Susan E. Catucci
        _____

            Susan E. Catucci, RMR
            Official Court Reporter
            915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
            Tel: (917) 703-0761