# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

STEPHANIE BIEDIGER, KAYLA
LAWLER, ERIN OVERDEVEST,
KRISTEN CORINALDESI, and LOGAN
RIKER, individually and on behalf of all
those similarly situated; and ROBIN
LAMOTT SPARKS, individually,                    No. 3:09cv621 (SRU)
     Plaintiffs,

     v.

QUINNIPIAC UNIVERSITY,
     Defendant.

## RULING AND ORDER ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs Stephanie Biediger, Kayla Lawlor, Erin Overdevest, Kristen Corinaldesi, and

Logan Riker move to certify a class of similarly situated present and future female athletes whose

rights, protected under Title IX of the Educational Amendments of 1972 (20 U.S.C. § 1681 *et*

*seq.*) and the regulations adopted pursuant thereto (34 C.F.R. Part 106) (collectively, "Title IX"),

have been and will continue to be violated by defendant Qunnipiac University ("Quinnipiac" or

the "University").[1]  For the reasons that follow, that motion is granted in part and denied in part.

## I.    Background

The background of this case is detailed in my May 22, 2009 ruling granting a preliminary

injunction.  *See Bieidger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277 (D. Conn. 2009).  I restate

only those facts that are relevant to deciding plaintiffs' class certification motion.

The named plaintiffs are current students at Quinnipiac University and members of the

---

[1] Robin Lamott Sparks, the Quinnipiac University women's volleyball coach, is also a
named plaintiff in this case.  She, however, is suing only on her own behalf and is not claiming to
represent the putative class at issue here.  Therefore, when I refer to the individual or named
plaintiffs in this ruling, I refer only to the five students listed above, and not to Sparks.

University's women's volleyball team.  On March 4, 2009, Quinnipiac informed the women's

volleyball team that the program would be eliminated at the end of the 2008-2009 academic

year.[2]  At the time Quinnipiac informed the women's volleyball team of its termination, there

was a disparity between the percentage of women enrolled as undergraduates at the University

and the number of varsity athletic participation opportunities available to female students.  *See*

*id.* at 280-81 (noting that 61.7% of Quinnipiac's undergraduate enrollees in the 2008-2009

academic year were female, but, based on preliminary data, that 52.57% of the university's

athletic opportunities were for women's sports).  To fill the void left by women's volleyball and

improve the extant gender disparity in the University's athletic program, Quinnipiac planned to

elevate competitive cheer, then a club sport, to varsity status and to create new women's teams

for indoor and outdoor track.

On May 22, 2009, I granted the plaintiffs' motion for a preliminary injunction that barred

Quinnipiac from cancelling its women's volleyball program for the 2009-2010 academic year.  I

found that eliminating the women's volleyball 2009 season would cause the plaintiffs irreparable

harm, and that the plaintiffs had demonstrated a likelihood of succeeding on the merits because

Quinnipiac had failed to offer athletic participation opportunities in substantially proportional

number to the gender composition of its enrollees.  My ruling was based on evidence that

Quinnipiac engaged in "roster management," that is, Quinnipiac set floors for women's rosters

and, likewise, ceilings for men's rosters in order to create the appearance of gender equity in the

University's athletic program.  Under roster management, women's teams would cut excess

_____

[2] The men's golf and outdoor track teams were likewise informed that they would be
eliminated after the 2008-2009 academic year.

players, and men's teams would add needed players, after a team's first day of competition, the

date on which Quinnipiac collected roster data for its annual Equity in Athletics Disclosure Act

("EADA") report.  The apparent increased gender parity in Quinnipiac's EADA report was

exactly that: an apparition of substantially proportional athletic participation opportunities for

women.

A bench trial on the plaintiffs' action for a full injunction and damages is set for June 21,

2010.  In advance of that trial, the plaintiffs have moved under Rule 23(b)(2) of the Federal Rules

of Civil Procedure to certify a class defined in the following terms:

> [T]he Student Plaintiffs seek to represent a class of all present, prospective,
> and future female students who are harmed by and want to end [Quinnipiac
> University's] sex discrimination in: (1) the allocation of athletic participation
> opportunities; (2) the allocation of athletic financial assistance; and (3) the
> allocation of benefits provided to varsity athletes.  They also file this action
> on behalf of females who are deterred from enrolling at [Quinnipiac] because
> of the sex discrimination in its athletic program, including its failure to offer
> the varsity sports in which they want to participate (despite [Quinnipiac's]
> failure to provide equal athletic participation opportunities to females).

Pls.' First Amended Class Action Compl. ¶ 19.  Quinnipiac challenges that motion on three

grounds: (1) the class is not ascertainable; (2) the class is not sufficiently numerous; and (3) the

named plaintiffs are inadequate class representatives.

## II.    Standard of Review

In order to succeed on their motion for class certification, the plaintiffs must prove that

their proposed class meets all of the requirements set forth in Rule 23.  *In re Initial Public

Offering Secs. Litig.*, 471 F.3d 23, 41 (2d Cir. 2006).  Rule 23(a) sets forth four conditions for

class certification: numerosity, commonality, typicality, and adequacy.  *Teamsters Local 445

Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 201-02 (2d Cir. 2008).  In addition

to those conditions, the plaintiffs must also demonstrate that the class they seek to certify is ascertainable; although that requirement is not inscribed in Rule 23(a), the need for a class to be ascertainable – i.e., the need for the class to "be readily identifiable so that the court can determine who is in the class, and thus, who is bound by the ruling" – is implicit in, and fundamental to, Rule 23's operation. *McBean v. City of New York*, 228 F.R.D. 487, 492 (S.D.N.Y. 2005).

Once the conditions of Rule 23(a) have been met, the plaintiffs must demonstrate that their class satisfies Rule 23(b)(2), which requires them to show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The burden remains on the plaintiffs to show that its proffered class satisfies all of the requirements of Rule 23. *McBean*, 228 F.R.D. at 492 (citing *Caridad v. Metro-N. Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999)). Furthermore, the plaintiffs must prove that the proposed class meets those requirements by a preponderance of the evidence, regardless of whether those requirements coincide with the merits of their claims. *Teamsters*, 546 F.3d at 202.

## III.    Discussion

Although the defendants challenge only three aspects of the plaintiffs' motion to certify a class – the class's numerosity, ascertainability, and the adequacy of its representation – this court "may certify a class only after making determinations that each of the Rule 23 requirements has been met." *IPO*, 471 F.3d at 41. I therefore address of the requirements seriatim, beginning with Rule 23(a).

-4-

A.      Rule 23(a) requirements

1.      *Ascertainabiliy*

Quinnipiac argues that the plaintiffs' proposed class is not ascertainable because it includes women whose membership hinges on their future, unknowable decisions to enroll at the Univeristy.  Quinnipiac also complains that the class depends on determinations of the class participants' subjective mental states, which renders the class unascertainable.

"A class is ascertainable if its members can be identified by reference to objective criteria and if such identifications can be made in an administratively feasible manner."  *Taylor v. Housing Auth. of New Haven*, 257 F.R.D. 23, 28 (D. Conn. 2009), *vacated on other grounds*, No. 3:09cv557 (JBA), 2010 WL 1278869 (D. Conn. Mar. 29, 2010).  The purpose of the ascertainability requirement is to ensure that the class is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."  *Mike v. Safeco Ins. Co. Of Am.*, 223 F.R.D. 50, 52-53 (D. Conn. 2004) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1760, at 120-21 (2d ed. 1986)).  The mere inclusion of future members does not cause a class to be unascertainable, as other Title IX cases reveal.  *See, e.g.*, *Cohen v. Brown Univ.*, 991 F.2d 888, 893 (1st Cir. 1993) (describing district court's certification of "a class of 'all present and future Brown University women students and potential students who participate, seek to participate, and/or are deterred from participating in intercollegiate athletics funded by Brown'").  Indeed, a class that includes future members is permissible so long as the future members are "under imminent threat of injury."  *In re Currency Conversion Fee Antitrust Litig.*, 229 F.R.D. 57, 63 (S.D.N.Y. 2005); *see also Messier v. Southbury Training Sch.*, 183 F.R.D. 350, 356 (D. Conn.

1998) (noting, in dictum, that "a (b)(2) class may include future members who stand to benefit from a favorable outcome in the case"); *Robertson v. Nat'l Basketball Ass'n*, 389 F. Supp. 867, 897 (S.D.N.Y. 1975) (referencing other cases in which certified classes have included future members). As the plaintiffs have defined their class, any future members would be subject to such an imminent threat of injury: if future members eventually enroll at Quinnipiac, they will be harmed by the University's alleged sex discrimination in its athletics program.

Quinnipiac stands on stronger ground when it argues that the class is not ascertainable because it calls for the court to make judgments about putative members' subjective mental states. The plaintiffs' proposed class includes two potential groups, or subclasses, whose definitions include subjective components: (1) current, prospective, and future students who are harmed by and want Quinnipiac to cease its alleged sex discrimination; and (2) women who have not and will not enroll at Quinnipiac because of Quinnipiac's allegedly discriminatory athletic programming. Each subclass must be assessed separately to determine its ascertainability.

There is no ascertainability problem with respect to the first group. Although the language of the proposed subclass contains a subjective element – namely, the members' desire that Quinnipiac comply with Title IX's mandate – that element is superfluous to the class's definition. The subclass's key constitutive feature is the objective harm caused by Quinnipiac's failure to provide substantially proportional athletic participation opportunities, financial assistance, and benefits. The plaintiffs already proved by a preponderance of the evidence at the preliminary injunction hearing that Quinnipiac will likely be found liable for sex discrimination. *See Biediger*, 616 F. Supp. 2d at 296 (holding that Quinnipiac likely violates Title IX because its "practice of setting floors for women's rosters under its roster management policy does not

produce sufficient genuine participation opportunities for women").  That evidence is enough to

prove at the class certification stage that there is a class of female students harmed by

Quinnipiac's lack of equitable athletic participation opportunities, financial assistance, and

benefits.  *See Teamsters*, 546 F.3d at 202 (holding that courts must find facts relevant to the

requirements of Rule 23 by a preponderance of the evidence, even if such facts overlap with the

merits of the case).  Presumably, current, prospective, or future female students who are injured

by the gender disparity in Quinnipiac's athletics offerings would want the University to remedy

that imbalance.  The class definition's language about its members "want[ing] to end" the

University's alleged discrimination is therefore prolix; if the words were struck from the class

definition, the plaintiffs' proposed class would still include the same people adversely affected by

the gender disparity in Quinnipiac's athletics program, all of whom could be ascertained by

objective, administratively feasible criteria.  Furthermore, even if that were not true, and there

were class members who did not favor the plaintiffs' suit to end Quinnipiac's alleged

discrimination, that would not necessarily upset the class's ascertainability.  *See Messier*, 183

F.R.D. at 356 (listing cases holding that "diversity of opinion within a class does not

automatically defeat class certification").  Thus, I find that the subjective component for this first

group presents no ascertainability problem.[3]

---

[3] The first subclass essentially presents the same class that was certified in *Cohen*, 991
F.2d 888, which included all present and future female students who participated in, sought to
participate in, or were otherwise deterred from participating in Brown University's varsity
athletics program.  The plaintiffs' rewriting of the class definition in terms of female students
who are "harmed by and want to end" Quinnipiac's alleged discrimination appears to have been
intended to cleave from the plaintiff class all female athletes who stand to benefit from
Quinnipiac's plans for its athletic department.  Those students likely include the current and
future members of the women's competitive cheer, indoor track, and outdoor track teams.

The plaintiffs' second group is more problematic.  That subclass contains women who did not, or will not, enroll at Quinnipiac because of the University's gender disparity in athletic opportunity and benefits.  Quinnipiac claims that this group should not constitute part of the plaintiffs' proposed class because it would require individual inquiries of potential class members to determine whether they ever seriously considered attending Quinnipiac and whether they decided not to enroll because of the University's failure to provide equal athletics participation opportunities and benefits for its female students.  I agree that this subclass is not ascertainable.  The second group within the plaintiffs' proposed class is sufficiently amorphous and unwieldy to upset the efficiency that a class action is supposed to achieve.  Unlike the first subclass, which is composed of a definite and identifiable pool of possible members (at its broadest, all current, prospective, and future female athletes at Quinnipiac), the second subclass could conceivably be every person who decided, or who will decide, not to attend Quinnipiac. That pool would then have to be narrowed by determining the members' motivations for their decision not to enroll in the University.   The plaintiffs do not offer any solution for how the class could be ascertained in an administratively feasible fashion, and I cannot imagine how the class's membership could be identified objectively and without inordinate time and expense.

The second proposed group also suffers from at least two other deficiencies.  First, the plaintiffs have introduced no evidence to establish that there is, in fact, a group of aggrieved non-students that would constitute this part of the class.  The preliminary injunction hearing focused entirely on the discrimination that Quinnipiac's female students face; the plaintiffs submitted no evidence about how current or future non-students were affected by the University's athletic programming, other than, perhaps, testimony from volleyball players about the challenges of

leaving Quinnipiac and enrolling in another institution to continue their collegiate volleyball

careers. *See Biediger*, 616 F. Supp. 2d at 292. Therefore, the plaintiffs have not met their burden

in establishing that such a subclass exists. Second, I am concerned whether people who have not

enrolled and have no plans of enrolling at Quinnipiac have standing to bring this Title IX claim.

The question of standing was not briefed by either side in their submissions relating to the

plaintiffs' class certification motion, and it is not necessary to my ruling; hence, a thorough

analysis is not needed. Still, it seems questionable that a person who has been merely deterred

from enrolling in a school has suffered an injury that Title IX can redress. *See Preyer v.*

*Dartmouth Coll.*, 968 F. Supp. 20, 25-26 (D.N.H. 1997) (holding that plaintiff lacked standing to

sue under Title IX because she was not a student, and citing supporting cases). At the very least,

it is clear that none of the named plaintiffs are members of this subclass: they are all students at

Quinnipiac who were not deterred from enrolling. Even if one assumes that being dissuaded

from matriculating at Quinnipiac constitutes a remediable injury and that non-students have

standing to sue under Title IX, the named plaintiffs have not suffered the same alleged injury as

the proposed subclass of non-students. They claim to have been denied equitable athletic

participation and benefits; by contrast, non-students could only claim to have been denied the

ability to attend their preferred school. Thus, the named plaintiffs do not appear to have the

requisite standing to serve as class representatives for the proposed group of non-students

deterred from enrolling at Quinnipiac. *See Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards &*

*Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) ("'To have standing to sue as a class representative it

is essential that a plaintiff . . . be a part of that class, that is, he must possess the same interest and

suffer the same injury shared by all members of the class he represents.'" (quoting *Schlesinger v.*

*Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)).

For those reasons, I conclude that the class of current, prospective, and future female students who are harmed by and want to end Quinnipiac's alleged sex discrimination in its athletics program is an ascertainable class.  Non-students who were deterred from enrolling at Quinnipiac may not be included in the class, however, because they, as a separate group or subclass, are not ascertainable and the plaintiffs have not met their burden to prove that they meet the Rule 23 requirements with respect to that subclass.

2.    *Numerosity*

Rule 23(a) limits certification to those classes that are "so numerous that joinder of all members is impracticable."  The plaintiffs need not establish the precise number of class members in order to meet the numerosity requirement; but a class that is shown to include 40 or more people is presumptively large enough to satisfy Rule 23(a).  *Robidoux v. Celani*, 987 F.2d 931, 935-36 (2d Cir. 1993).  In addition to sheer numbers, a court may consider other factors that would cause joinder of all members to be impracticable, such as judicial economy, the members' geographic distribution and financial resources, and "requests for prospective injunctive relief which would involve future class members."  *Id.* at 936.

Quinnipiac argues that the plaintiffs have not demonstrated numerosity because they have not shown that a significantly large number of female students are harmed, and will continue to be harmed, by the University's purported sex discrimination.  At the preliminary injunction hearing, however, the plaintiffs more than met their present burden to prove that the number of their putative class members will be large enough to render joinder impracticable.  First, consider the group of current students who are denied equitable athletic participation opportunities – i.e.,

the students who are unable to participate in varsity athletics because of Quinnipiac's relatively

few roster spots and sports teams for women.  At the preliminary injunction hearing, the

plaintiffs proved that this group, by itself, meets Rule 23(a)'s numerosity requirement.  If the

2008-09 academic year is taken as a baseline, 61.7% of Quinnipiac's undergraduate population

were women, while women made up only 52.57% of the University's athletes; reciprocally, that

year 38.3% of Quinnipiac's undergraduate population and 47.34% of its athletes were men.

*Biediger*, 661 F. Supp. 2d at 280-81.  Assuming that the University kept constant the number of

men's roster spots at 212, the number reported in the 2008-2009 EADA report, *id.* at 286,

Quinnipiac would have to add 107 additional roster spots for female students in order to create a

perfectly proportional athletics department.[4]  If the University cut its men's golf and outdoor

track teams, thus eliminating 28 men's roster spots (as it planned to do in conjunction with

cutting its women's volleyball team), *id.*, and kept constant the remainder of its men's sports

teams, Quinnipiac would have to add 61 additional women's roster spots to achieve perfect

proportionality.[5]  Finally, even if the University cut its men's golf and outdoor track teams and

---

[4] There were 235 women's roster spots in the 2008-09 academic year.  If the 212 male athletes were to constitute 38.3% of the University's total roster positions, there would have been approximately 554 total athletes competing at Quinnipiac.  That results in 342 total women, an increase of 107 positions from Quinnipiac's 2008-2009 EADA numbers.

Admittedly, perfect proportionality exceeds the "substantially proportionate" Title IX safe harbor for universities.  *See Biediger*, 616 F. Supp. 2d at 294 (quoting *Cohen*, 991 F.2d at 897).  Nonetheless, it is helpful for the purpose of gauging the approximate size of the plaintiff class.

[5] With the 28 roster spots eliminated – 8 golfers and 20 track participants – there would be 184 male athletes.  In order for them to constitute 38.3% of the University's total roster positions, there would have to be approximately 480 total athletes competing at Quinnipiac.  That results in 299 total women, an increase of 61 roster spots from Quinnipiac's 2008-2009 EADA numbers.

trimmed the rosters of its other men's sports as it planned to do for the 2009-2010 season, thus bringing the total number of male athletes to 165, *id.* at 290, Quinnipiac would still have to add 31 women's roster spots.[6]

Each of those calculations, when the 12 volleyball players who would lose their positions are included, establishes a class that is presumptively large enough for the purposes of Rule 23's numerosity requirement; in each hypothetical, there are 40 or more positions that female students are not being offered – or, in the case of the volleyball team, soon will not be offered – and could be filled.[7]  And that is to say nothing about the entire population of Quinnipiac's current female athletes (excepting the volleyball players, who were already counted as athletes denied athletic participation opportunities) who are purportedly being harmed by the University's unequal provision of financial assistance and benefits.  That population, based on the 2008-2009 EADA data, amounts to 223 players, which is surely large enough for the purposes of Rule 23(a)'s numerosity requirement.  Supplementing the numbers of class members are the prospective and future female students who will be denied equal athletic participation opportunities, financial assistance, and benefits.  The fact that the plaintiffs are suing for prospective injunctive relief to benefit future class members also bolsters the conclusion that the plaintiffs' proposed class is amply numerous to be certified; seeking injunctive relief on behalf of future members is a

---

[6] For 165 male athletes to constitute 38.3% of the University's total roster positions, there would have to be approximately 431 total athletes competing at Quinnipiac.  That results in 266 total women, an increase of 31 roster spots from Quinnipiac's 2008-2009 EADA numbers.

[7] Of course, that statement assumes that there are students presently at Quinnipiac who would want to and could fill those added positions.  Although I recognize that there may not, in fact, be students who could fill all of those roster spots at this moment, any partial shortage of current class members is compensated by other potential class members, such as prospective and future female students who would want to and could play in newly created varsity positions.

separate, additional factor militating in favor of a class's numerosity. *Robidoux*, 987 F.2d at 936. *See, e.g.*, *Boyd v. Interstate Brands Corp.*, 256 F.R.D. 340, 358 (E.D.N.Y. 2009) (holding that class was sufficiently numerous, in part, because the plaintiffs sought injunctive relief on behalf of future class members); *Shariff v. Goord*, 235 F.R.D. 563, 570 (W.D.N.Y. 2006) (holding that effect of judgment on future class members contributed to decision that class was sufficiently numerous for certification).

Altogether, then, the plaintiffs' proposed class is large enough to meet the numerosity requirement of Rule 23(a). Quinnipiac's challenge on this point is unpersuasive and fails.

### 3. *Commonality and typicality*

In order to certify a class, there must be "questions of law or fact common to the class" and "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(2)-(3). The commonality and typicality requirements "'tend to merge' because 'both serve as guideposts for determining whether the named plaintiffs' claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Taylor*, 257 F.R.D. at 30 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982)). Quinnipiac does not dispute that the commonality and typicality requirements are met. Indeed, the two requirements are essentially built into the class definition: in order to be a class member, a person must be a female student who has been or will be harmed by Quinnipiac's alleged sex discrimination. In other words, the class definition presupposes that its members have been subjected to, and seek redress for, an identical legal wrong. The proposed class satisfies Rule 23(a)'s commonality and typicality requirements.

-13-

4.      *Adequacy*

Rule 23(a)'s final requirement is that the class representatives "will fairly and adequately protect the interests of the class."  The class representatives' adequacy generally involves a two-part demonstration: "first, that the lead plaintiffs' interests are not 'antagonistic' to the other members' interests, and second, that the plaintiffs' attorneys are 'qualified, experienced and able to conduct the litigation.'"  *Haddock v. Nationwide Fin. Servs., Inc.*, 262 F.R.D. 97, 117 (D. Conn. 2009) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)).  Quinnipiac challenges only the first part of that standard and argues that the class as currently defined creates a conflict of interest between segments of the University's population of female athletes.  In particular, Quinnipiac contends that the class representatives' interests are antagonistic to the interests of female students who participate on the University's competitive cheer, outdoor track, and indoor track teams.

There is no question that there could be an adequacy problem if the plaintiffs' proposed class included those students.  The class definition, however, is limited to "all present, prospective, and future female students who *are harmed by and want to end* [Quinnipiac University's] sex discrimination" (emphasis supplied).  To be a class member, a person must be injured by Quinnipiac's current and planned athletic programming.  By its own terms, then, the plaintiffs' proposed class presumptively excludes the competitive cheer and track participants who, the University maintains, present a conflict of interest; any students who are not "harmed" by Quinnipiac and would not "want to end" its practices, e.g., because they are likely to benefit from the University's future athletics programming, are not class members.  Therefore, there is no conflict.  In the event that the "harmed by and want to end" language too vaguely stakes the

class's membership, the definition may be modified later to clarify this point.  *See* Fed. R. Civ. P. 23(c)(1) ("An order that grants or denies class certification may be altered or amended before final judgment."); *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 201 (2d Cir. 2000) ("Rule 23 gives the District Court broad discretion to modify the definition of the class even after certification . . . .").  In addition, any members who do not want to be represented in the class, or who believe they are erroneously included in the class, may opt out if they so choose.  *See McReynolds v. Richards-Cantave*, 588 F.3d 790, 800 (2d Cir. 2009) ("The right of a class member to opt-out in Rule 23(b)(1) and (b)(2) actions is not obvious on the face of the rule; however, 'the language of Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in (b)(1) and (b)(2) class actions.'" (quoting *Eubanks v. Billington*, 110 F.3d 87, 94 (D.C. Cir. 1997))).

Quinnipiac does not attack the quality of the plaintiffs' attorneys, and I have no reason to doubt their ability to represent the proposed class effectively.  The named plaintiffs are therefore adequate representatives and their proposed class satisfies all of the requirements of Rule 23(a).

B.    Rule 23(b) requirements

The plaintiffs seek to certify a class only for the purpose of obtaining declaratory and injunctive relief.  *See* Pls.' First Amended Class Action Compl. ¶ 32 (describing class's entitlement to declaratory and injunctive relief).  The only parties seeking damages in this case are the named student plaintiffs and Robin Lamott Sparks.  Thus, the plaintiffs seek to certify their proposed class pursuant to Rule 23(b)(2), which permits certification of a class if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

-15-

whole." *See Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 162 (2d Cir. 2001) ("The (b)(2) class action is intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury."). Quinnipiac does not claim that the proposed class would be unfit for Rule 23(b)(2) classification. Nor could it. As explained above, the class definition presupposes that Quinnipiac has uniformly discriminated against the class members by failing to allocate equal athletic participation opportunities, financial assistance, and benefits to them. Injunctive and declaratory relief against Quinnipiac would remedy the class's alleged collective harm. Hence, Rule 23(b)(2) certification is appropriate.

**IV.   Conclusion**

The plaintiffs' motion for class certification (doc. # 107) is GRANTED in part and DENIED in part. It is hereby ORDERED that the following class shall be certified pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure:

> All present, prospective, and future female students at Quinnipiac University who are harmed by and want to end Quinnipiac University's sex discrimination in: (1) the allocation of athletic participation opportunities; (2) the allocation of athletic financial assistance; and (3) the allocation of benefits provided to varsity athletes.

That class is certified with respect to all factual and legal issues relating to the plaintiffs' first, second, and third claims for relief against Quinnipiac in their First Amended Class Action Complaint. Those claims seek declaratory and injunctive relief for, respectively, Quinnipiac's unequal allocation of athletic participation opportunities, unequal allocation of athletic financial assistance, and unequal allocation of athletic treatment and benefits.

The plaintiffs' proposed group of non-students who have been or will be deterred from enrolling at Quinnipiac because of the University's alleged sex discrimination shall not be

certified as a part of this class.  That group is not ascertainable and the plaintiffs have failed to prove that such a subclass of people exists.

Pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, the court hereby designates the following as class counsel: Alex V. Hernandez and Jonathan B. Orleans of Pullman & Comley, LLC; Kirsten Galles of Equity Legal; and David McGuire of the ACLU Foundation of Connecticut.  The class representatives shall be the named student plaintiffs: Stephanie Biediger, Kayla Lawler, Erin Overdevest, Kristen Corinaldesi, and Logan Riker.

The plaintiffs shall submit a proposed class notice for the Court's approval within seven (7) days of this ruling and order.

It is so ordered.

Dated at Bridgeport, Connecticut, this 20th day of May 2010.

/s/
Stefan R. Underhill
United States District Judge