## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| STEPHANIE BIEDIGER, KAYLA LAWLER, ERIN OVERDEVEST, KRISTEN CORINALDESI, and LOGAN RIKER, individually and on behalf of all those similarly situated; and ROBIN LAMOTT SPARKS, individually, | ) ) ) ) ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| QUINNIPIAC UNIVERSITY, | ) ) |
| Defendant. | ) ) |

Civil Action No.
3:09cv621 (SRU)

### BRIEF OF THE UNITED STATES AS AMICUS CURIAE

Plaintiffs allege that Quinnipiac University is intentionally discriminating against its female student athletes on the basis of sex in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 et seq.  In March 2009, Quinnipiac University announced that it would cut three varsity athletics teams, including the women's volleyball team.  This suit followed, and is premised on several allegations of Title IX violations, including that Quinnipiac has failed and will continue to fail to provide female students an equal opportunity to participate in varsity intercollegiate athletics.  As this court has stated, based on the facts of this case, there is no question that, if the University fails to demonstrate that it provided athletic participation opportunities in substantial proportion to the gender composition of its full-time undergraduate enrollment, it will be out of compliance with Title IX, because Quinnipiac's elimination of the women's volleyball team precludes the University from demonstrating that it is committed to

expanding opportunities for women, or that it has fully accommodated women's interests and abilities.

Moreover, even if the University appears to provide substantially proportionate athletics opportunities, its athletics program must be carefully evaluated.  This is because the elimination of a viable women's sport with demonstrated interest and ability, combined with its troubling roster management practices and creation of varsity competitive cheerleading, which is not recognized by the organizations governing Quinnipiac's other varsity sports, cast doubt on whether the University is providing genuine substantially proportionate athletics opportunities for its female athletes in compliance with Title IX.

The United States files this brief to address the standards governing two legal issues before the court.  First, we address what constitutes a genuine athletic participation opportunity for purposes of Title IX compliance.  Second, we address the factors to be considered when determining whether Quinnipiac's newly created competitive cheerleading team constitutes a "sport" for purposes of Title IX compliance.[1]

## INTERESTS OF THE UNITED STATES

Plaintiffs' claim of unequal allocation of athletic participation opportunities poses several questions concerning the appropriate application of Title IX to a university's operation of its athletics program.  Given the federal government's responsibility to enforce Title IX, the United States has an interest in ensuring that the Title IX athletics regulations are properly interpreted and applied.

---

[1]  As the United States has not been privy to full discovery in this case, and as the court has not yet heard the evidence on this issue, the United States is not evaluating whether Quinnipiac's competitive cheer squad should be counted as a "sport" for Title IX purposes. Instead, we offer this amicus brief to assist the court in its analysis.

Title IX prohibits any institution receiving federal financial assistance from discriminating on the basis of sex. 20 U.S.C. § 1681(a). It is undisputed that Quinnipiac University receives federal financial assistance and is thus considered a "recipient" under the United States Department of Education ("ED") Title IX regulations. 34 C.F.R. § 106.2. Under ED's implementing regulations, no individual may be discriminated against on the basis of sex in any interscholastic, intercollegiate, club or intramural athletic program offered by a recipient. 34 C.F.R. § 106.41(a), et seq. Additionally, the United States Department of Justice, through its Civil Rights Division, coordinates the implementation and enforcement of Title IX among federal departments and agencies providing financial assistance to education programs or activities, including ED. Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 4, 1980); 28 C.F.R. § 0.51 (1998). The United States' enforcement efforts include participating in Title IX athletics cases as amicus curiae and plaintiff-intervenors. See, e.g., Communities for Equity v. Mich. High Sch. Athletic Ass'n, 459 F.3d 676, 703 (6th Cir. 2006); Cook v. Florida High School Athletic Ass'n, Civ. Action No. 3:09cv547 (M.D. Fla. 2009); Pedersen & United States v. S.D. High Sch. Activities Ass'n, Civ. Action No. 00-4113 (D. S.D. 2000). Consequently, the United States has an interest in the orderly development of the law regarding Title IX.

## STATEMENT OF THE CASE

On March 4, 2009, Quinnipiac University announced that it would cut three varsity athletics teams – women's volleyball, men's golf, and men's outdoor track – at the conclusion of the 2008-09 academic year. At the time of this announcement, it is undisputed that Quinnipiac was not offering athletics opportunities in substantial proportion to the gender breakdown of its full-time undergraduate enrollment. To increase the number of female athletic opportunities, Quinnipiac announced that it planned to elevate its cheerleading squad, then a club sport, to

varsity status.  Quinnipiac claimed that this action would increase the overall number of women's athletic opportunities sufficiently to satisfy the proportionality prong of the test governing compliance with Title IX's athletics requirements.

Plaintiffs brought suit challenging Quinnipiac's plans, and seeking both a preliminary injunction and a temporary restraining order to prevent Quinnipiac from eliminating the women's volleyball team.  On May 22, 2009, the court granted the preliminary injunction and, in so doing, found that the Plaintiffs had demonstrated a likelihood of succeeding on the merits of their Title IX claim because Quinnipiac had failed to offer athletic participation opportunities that were substantially proportional in number to the gender composition of its full-time undergraduate  enrollment.  Underlying this conclusion was significant evidence that the University had engaged in manipulation of its athletics team numbers as part of its roster management system, including setting floors, or minimum roster sizes, for its women's teams and ceilings, or maximum roster sizes, for its men's teams.

Plaintiffs filed an amended complaint on December 9, 2009, that set forth five claims. Plaintiffs' first claim is that Quinnipiac fails to provide female students an equal opportunity to participate in varsity intercollegiate athletics, and that this failure constitutes intentional sex discrimination in violation of Title IX and 34 C.F.R. § 106.41(c)(1).  Am. Compl. ¶ 90.[2]  In support of this claim, Plaintiffs allege that Quinnipiac misrepresents its athletic participation numbers by, among other things, requiring the women's teams to artificially increase their number of participants, resulting in some members lacking a genuine varsity athletics

---

[2]  On May 20, 2010, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), the court granted Plaintiffs' motion to certify a class of "all present, prospective, and future female students at Quinnipiac University who are harmed by and want to end" the University's sex discrimination in the allocation of athletic participation opportunities.  This class is certified with respect to all factual and legal issues relating to this claim.

participation opportunity; underrepresenting the number of male athletes on teams; and counting participants on its cheer squad.  Id. at ¶ 98.  On the basis of these misrepresentations, which Plaintiffs allege constitute an actionable violation of Title IX, Plaintiffs seek injunctive relief and damages.  A bench trial, limited in scope only to this claim, is set for June 21, 2010.[3]

## ARGUMENT

A close examination of Quinnipiac's genuine participation opportunities, as well as its decision to elevate cheerleading to a varsity sport, is necessary to determine if the University is in compliance with Title IX.  Before ruling on Plaintiff's First Claim for Relief, the court should consider the effect the University's plan, including the University's roster management techniques, will have on female students' ability to participate in intercollegiate athletics.  In addition, the court should evaluate **all** the factors outlined in ED's Office for Civil Rights ("OCR") 2008 Dear Colleague letter, discussed further below, to determine if Quinnipiac's competitive cheer team meets the criteria needed to be counted as a sport for purposes of Title IX.

## I.      Title IX Legal Framework

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a). The statute also "authorize[s] and direct[s]" each agency empowered to extend federal financial

---

[3]  Plaintiffs also claim that Quinnipiac is in violation of Title IX because it fails to provide an equal allocation of athletic financial assistance to its female student athletes; unequally allocates varsity athletic treatment and benefits to its female student athletes; and discriminated against the women's volleyball coach by eliminating her position and her volleyball program.  Am. Compl. ¶¶ 125, 132, 143.  Finally, Plaintiffs bring a Title IX retaliation claim based on Quinnipiac's treatment of the Plaintiffs after they complained about the elimination of the women's volleyball team.  Id. ¶ 151.

assistance to any education program or activity "to effectuate the provisions of [§ 1681] with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance with which the action is taken." Id. at § 1682.

On July 21, 1975, the Secretary of the Department of Health, Education, and Welfare (HEW) implemented regulations that, insofar as pertinent here, prohibit discrimination in athletic programs offered by a recipient of federal funds. 34 C.F.R. § 106.41(a); see also 45 C.F.R. § 86.41(c). The regulations also require recipients to provide equal athletic opportunity for members of both sexes, and specify ten factors, among others, that are to be considered in determining whether equal opportunities are available. 34 C.F.R. § 106.41(c). The first of those ten factors, which is the subject of this action, is "whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." Id.

In 1979, the Secretary of HEW published a policy interpretation in the Federal Register, the general purposes of which included "clarif[ying] the meaning of 'equal opportunity' in intercollegiate athletics." 44 Fed. Reg. 71413 (Dec. 11, 1979) (the "1979 Policy Interpretation"). With respect to the regulatory requirement that educational institutions "effectively accommodate the interests and abilities of members of both sexes," 34 C.F.R. § 106.41(c), the 1979 Policy Interpretation states that "[c]ompliance will be assessed in any one of the following ways:"

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or
> (2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a history and continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

See 44 Fed. Reg. 71418.  These three methods or "prongs" of compliance subsequently became known as the "Three-Part Test." [4]

In 1980, Congress created the United States Department of Education (ED).  Pub. L. No. 96-88, § 201, 93 Stat. 669, 671 (Oct. 17, 1979); E.O. 12212, 45 Fed Reg. 29557 (May 2, 1980).  By operation of law, all of HEW's determinations, rules, and regulations continued in effect after ED was created.  See 20 U.S.C. § 3505(a).  OCR enforces Title IX on behalf of ED.

In response to questions about the established standards in the regulations and the Three-Part Test, ED issued a "Dear Colleague" letter and accompanying clarification document.  See Jan. 16, 1996 Clarification of Intercollegiate Athletics Policy Guidance:  The Three-Part Test ("1996 Clarification") (attached hereto as Exhibit A).  The 1996 Clarification provides specific factors that guide an analysis of each part of the Three-Part Test and examples to demonstrate how these factors will be considered.  The Clarification "confirms that institutions need to comply only with any one part of the three-part test to provide non-discriminatory participation

---

[4] OCR also "considers the quality of competition offered to members of both sexes in order to determine whether an institution effectively accommodates the interests and abilities of its students."  Jan. 16, 1996 Clarification of Intercollegiate Policy Guidance:  The Three-Part Test at 2; see also 44 Fed. Reg. at 71418 (institutions must provide both "opportunities for individuals of each sex to participate in intercollegiate competition and for athletes of each sex to have competitive team schedules which equally reflect their abilities.");  Apr. 20, 2010 Letter from Russlynn Ali, Assistant Secretary for Civil Rights at ED at 2 n.9 (citing 44 Fed. Reg. at 71418).  An examination of the available competitive opportunities for purposes of assessing a university's effective accommodation of both male and female athletes is a distinct inquiry from the competition as it relates to whether an activity is a "sport" for purposes of Title IX.  A discussion of the latter follows.  See infra Section III.

opportunities for individuals of both sexes." Id. at 2.[5]  OCR issued another "Dear Colleague"

letter in 2008 that "provides clarifying information to help institutions determine which

intercollegiate or interscholastic athletic activities can be counted for the purpose of Title IX

compliance." See Sep. 17, 2008 Letter from Stephanie Monroe, the then-Assistant Secretary for

Civil Rights of the Department of Education ("2008 Letter") (attached hereto as Exhibit B).

During the preliminary injunction hearing, Quinnipiac specifically asserted Prong One

compliance for the 2009-10 school year.  Order Granting Preliminary Injunction (hereinafter

"Order") at 31.  As the court correctly noted, therefore, if Quinnipiac fails to meet Prong One, "it

will be out of compliance with Title IX."  "By eliminating a women's team while there is

sufficient interest to field one, the University will have failed to demonstrate that it is committed

to expanding opportunities for the underrepresented gender – women – or that it has fully and

effectively accommodated the interests and abilities of that underrepresented gender." Id. at 31-

32.  As the court found, the University thus cannot meet either Prong Two or Prong Three of the

Three-Part Test.

## II.    Genuine "Participation Opportunity" for Purposes of Assessing Title IX Compliance

When determining whether a university is in compliance with Prong One, ED and the

courts place a significant emphasis on ensuring that the participation opportunities offered by the

---

[5]  ED also issued further clarification documents in 2003 and 2005.  In 2003 ED issued a document titled "Further Clarification of Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance," which provided additional guidance about the Three-Part Test, including that eliminating teams in order to demonstrate compliance with Title IX is "a disfavored practice."  July 11, 2003 Letter from Gerald Reynolds, the then-Assistant Secretary for Civil Rights of ED at 2.  The 2005 document, "Additional Clarification of Intercollegiate Athletics Policy:  Three-Part Test – Part Three," was recently withdrawn by ED through the release of a new "Dear Colleague" Letter.  See Apr. 20, 2010 Intercollegiate Athletics Policy Clarification: The Three-Part Test – Part Three.  The 2010 document addressed the standards for compliance with Prong Three of the Three-Part Test and so is inapplicable to the instant action.

university are "real, not illusory." Dear Colleague letter accompanying the 1996 Clarification at

4. Thus, in determining compliance with Prong One, recipients must count "actual athletes" –

and not simply available slots – in determining the number of true participation opportunities

offered by an institution. Id. The 1979 Policy Interpretation defines "participant" as those

athletes who:

> (a) are receiving institutionally-sponsored support normally provided to athletes
> competing at the institution (e.g. coaching, equipment, medical and training room
> services) on a regular basis during the sport's season; and
> (b) are participating in organized practice sessions and other team meetings on a regular
> basis during a sport's season; and
> (c) are listed on the eligibility or squad lists maintained for each sport; or
> (d) are injured, thus cannot meet (a), (b), or (c) above, but continue to receive financial
> aid on the basis of athletic ability.

44 Fed. Reg. 71415. "Participants" also include (i) walk-on athletes, (ii) athletes who compete

on teams sponsored by the institution even though the team may be required to raise its own

operating funds, and (iii) athletes who practice but do not compete. 1996 Clarification at 3.

These individuals are included because they "receive numerous benefits and services, such as

training and practice time, coaching, tutoring services, locker room facilities, and equipment, as

well as important non-tangible benefits derived from being a member of an intercollegiate

athletic team." Id. Thus, any inquiry into a university's compliance under Prong One must

include an examination of whether or not each athlete is actually receiving these "significant

benefits." Id. As one of the central considerations of this Prong is "actual benefits provided to

real students," Dear Colleague letter accompanying the 1996 Clarification at 4, the court must

assure itself that the numbers presented by Quinnipiac reflect actual participation opportunities,

as evidenced by the actual benefits and quality of opportunities being offered to each student

athlete.

In this case, the court made clear that it had "no confidence" that the numbers reported on Quinnipiac's Equity in Athletics Disclosure Act (EADA) report[6] are "accurate indicators" of genuine opportunities, based upon Quinnipiac's manipulation of those numbers as part of its roster management system.  Order at 37.  Specifically, the court cited evidence that Quinnipiac set floors for women's team rosters and ceilings for men's team rosters in order to create the appearance of gender equity in the University's athletic program.  Id. at 34-38.  Under these roster management practices, women's teams would be forced to carry players for whom they could not provide adequate coaching, uniforms, equipment, and practice time to ensure a legitimate National Collegiate Athletic Association (NCAA) Division I varsity athletics experience.  These "padded roster numbers," therefore included several players whose "principal role [was] to provide a gender statistic."  Id. at 34-35.  Then, shortly after the day of the first scheduled contest for the team – which is the EADA reporting deadline, see 20 U.S.C. § 1092(g)(1)(B)(i) – some of these women would quit or get cut from the team, presumably because the team could not provide them a true participation opportunity.  Conversely, men's teams would delete players from their rosters immediately before the EADA reporting deadline, only to add them back afterwards.  The court thus found that these practices in combination – inflated numbers of genuine participation opportunities on women's teams and unreported players on men's teams – resulted in the reporting of inaccurate roster numbers.  Order at 37.

---

[6]  Under the EADA, 20 U.S.C. § 1092(g), co-educational universities receiving federal funding and participating in intercollegiate athletics must report certain data, including student enrollment and student athletic participation, annually to ED.  The EADA, however, was not promulgated under Title IX, and the two statutes serve different purposes.  Thus, while OCR may examine EADA numbers, it does not rely on EADA data to determine if a school is in compliance with Title IX.  Instead, OCR makes an independent determination of the number of athletic participation opportunities and evaluates the data related to the factors outlined above to determine if the university is offering genuine opportunities.

As the court noted, setting a floor for rosters is, in and of itself, an unacceptable practice for achieving substantial proportionality when, as is the case here, there is evidence that women's teams are "not actually providing genuine participation opportunities for all roster members." Id. at 35.  The court cited to the credible testimony presented by Plaintiffs that the Quinnipiac athletics department set unsustainably large women's team sizes, well above average squad sizes[7] and the coaches' needs, and did not provide commensurate increases in funding, staff, equipment, and other benefits that are an inextricable part of a genuine participation opportunity.  Id. at 36 (citing testimony of the Quinnipiac women's softball coach that she did not receive any increase in budget, extra equipment, coaching staff, or her salary, to account for the additional players she was required to carry on her team).

Because, as the court noted, the "focus" of Prong One is "genuine participation opportunities," attempts to set roster sizes at unsustainably high levels to achieve substantial proportionality are "simply unacceptable."  Id. at 36 (emphasis in original).  When there is reason to doubt that the reported numbers are an accurate reflection of genuine athletic participation opportunities, there is reason to "look behind those numbers" and examine the quality of opportunities being offered.  Id.  The court did just that here after determining that Quinnipiac's roster management practices resulted in an inaccurate accounting of the actual opportunities offered by the University.  The United States agrees that Quinnipiac's manipulation of roster numbers, which resulted in deceptive reporting of the number of genuine participation opportunities offered to its students, requires the court to closely examine **any**

_____

[7]  As the court found, average squad sizes, as determined by the NCAA , to which Quinnipiac belongs, are useful in determining whether a roster size might be unsustainably large as they are examples of what other universities find sufficient to field a viable and competitive team.  See Order at 36.

reported numbers during the bench trial in order to ensure that it can accurately assess the University's athletics program and Title IX compliance.

In order to ensure that each reported participant is receiving the significant athletic benefits and services that accompany a genuine opportunity, OCR examines factors such as "training and practice time, coaching, tutoring services, locker room facilities, and equipment and intangible benefits" received by each participant.  1996 Clarification at 3.  When, as here, a university purports to have increased the number of participants on a team, the court should also look to see if this change was accompanied by a commensurate increase in resources, in order to ensure that the additional athletes are receiving genuine athletic participation opportunities.  See, e.g., Mansourian v. Regents of Univ. of California, 602 F.3d 957, 970 (9th Cir. 2010) (questioning the lack of additional grants-in-aid, or any other effect on the university's athletics budget, accompanying the alleged creation of a new team).

In short, Prong One cannot be satisfied by numbers "viewed in a vacuum," but rather only when athletic participation opportunities are meaningful.  Choike v. Slippery Rock Univ., 2006 WL 2060576 at *6 (W.D. Pa. July 21, 2006).  As this court has noted, "what matters for purposes of complying with Title IX in spirit and in fact" is not equality in numbers alone, but rather the corresponding genuine athletic participation opportunities.  Order at 38.[8]

## III.     Determining Whether Competitive Cheer Constitutes a "Sport" for Purposes of Title IX Compliance

A separate, but related, inquiry regarding the number of genuine athletic participation opportunities offered at Quinnipiac is whether the members of its newly formed competitive

---

[8]  In addition to evaluating whether a university effectively accommodates the interests and abilities of its students, a comprehensive compliance evaluation under Title IX also includes an assessment of the laundry list of factors referenced above and addressed in the 1979 Policy Interpretation.  See 1996 Clarification at 2; supra Part I.

cheer team may be counted in that number.  This question initially hinges on whether the activity

may be considered a "sport" for Title IX compliance.  In September 1975, HEW first provided

guidance on Title IX, stating "cheerleaders and the like, which are covered more generally as

extracurricular activities" are not part of an institution's "athletic program" within the meaning

of Title IX.  Letter from Peter E. Holmes, OCR, to Chief State School Officers, Superintendents

of Local Educational Agencies and College and University Presidents (Nov. 11, 1975) at 3

(attached hereto as Exhibit C).  In 2008, OCR issued guidance on this point in the form of a

"Dear Colleague" letter that was designed to assist institutions in determining which activities

can be counted for purposes of Title IX compliance, as more fully described below.  2008 Letter.

OCR, however, has not recognized cheerleading or competitive cheer as a sport.[9]  Moreover, the

EADA requires a university to obtain a "letter from the Office [for] Civil Rights confirming that

the OCR has determined that … cheerleading is a varsity sport," before it will accept any EADA

report in which an institution counts cheer among its varsity athletics teams.  User's Guide for

The Equity in Athletics Act Web-Based Data Collection, U.S. Dep't of Educ. Off. of

Postsecondary Educ. 19 (2009).  To date, OCR has issued no such letters.

　　　In granting the preliminary injunction, this court did not determine whether Quinnipiac's

competitive cheer program should count as a sport for Title IX purposes.  See Order at 33.  The

court, however, did give a preliminary assessment and in so doing reviewed the contents of a

letter written to the Executive Director of the Minnesota State High School League (MSHSL) in

response to an inquiry about what activities constitute sports.  Letter from Dr. Mary Frances

------

[9]  As discussed below, OCR determines if an activity is a sport on a case-by-case basis.
2008 Letter.

O'Shea, OCR, to David Stead, MSHSL (April 11, 2000).[10]  After reviewing this letter, the court

determined that while Quinnipiac's competitive cheer program likely "has all the necessary

characteristics of a potentially valid competitive 'sport,'" and that there is a "legitimate basis

from which competitive leagues can be built," cheer does not satisfy at least two criteria of

OCR's guidelines.  Id. at 33 ("…competitive cheer does not presently have a non-profit

governing body and …lacks the hallmarks of progressive-style competition…").

As referenced above, in 2008 OCR issued guidance to all institutions to assist them in

determining which of their athletic activities may be counted for the purposes of Title IX

compliance.  See 2008 Letter.  First, OCR will presume that an institution's established sports

can be counted under Title IX if that institution is a member of an intercollegiate athletic

organization, there are "organizational requirements, which address the factors identified [in the

Letter]," and compliance with these requirements are "not discretionary" for the institution.  Id.

at 2.  OCR noted that several intercollegiate athletic organizations, such as the NCAA and the

National Association of Intercollegiate Athletics (NAIA), or state high school associations have

organizational requirements which address the factors deemed relevant by OCR.  Id. at 2.  This

presumption can be rebutted, however, by "evidence demonstrating that the institution is not

offering the activity in a manner" that satisfies the factors outlined in the remainder of the Letter.

Id. at 2.  If the presumption does not apply, or has been rebutted effectively, OCR will analyze

each activity on a case-by-case basis, and will consider **all** of the following factors to make an

---

[10]  While the court's analysis at the preliminary injunction stage was guided by the
MSHSL letter, OCR's 2008 Letter, which was written as general policy guidance rather than in
response to a specific institution's request, is the one that constitutes OCR's policy.  As such, the
United States relies on the 2008 Letter when reviewing institutions' programs and requests that
the court do so also.

overall determination of whether an activity can be considered a sport for purposes of Title IX

compliance:

I.     <u>Program Structure and Administration</u> – Taking into account the unique aspects inherent in the nature and basic operation of specific sports, OCR considers whether the activity is structured and administered in a manner consistent with established intercollegiate or interscholastic varsity sports in the institution's athletics program, including:

    A.   Whether the operating budget, support services (including academic, sports medicine and strength and conditioning support) and coaching staff are administered by the athletics department or another entity, and are provided in a manner consistent with established varsity sports; and

    B.   Whether the participants in the activity are eligible to receive athletic scholarships and athletic awards (e.g., varsity awards) if available to athletes in established varsity sports; to the extent that an institution recruits participants in its athletics program, whether participants in the activity are recruited in a manner consistent with established varsity sports.

II.    <u>Team Preparation and Competition</u> – Taking into account the unique aspects inherent in the nature and basic operation of specific sports, OCR considers whether the team prepares for and engages in competition in a manner consistent with established varsity sports in the institution's intercollegiate or interscholastic athletics program, including:

    A.   Whether the practice opportunities (e.g., number, length and quality) are available in a manner consistent with established varsity sports in the institution's athletics program; and

    B.   Whether the regular season competitive opportunities differ quantitatively and/or qualitatively from established varsity sports; whether the team competes against intercollegiate or interscholastic varsity opponents in a manner consistent with established varsity sports;

       When analyzing this factor, the following may be taken into consideration:

       1.   Whether the number of competitions and length of play are predetermined by a governing athletics organization, an athletic conference, or a consortium of institutions;

       2.   Whether the competitive schedule reflects the abilities of the team; and

       3.   Whether the activity has a defined season; whether the season is determined by a governing athletics organization, an athletic conference, or a consortium.

    C.   If pre-season and/or post-season competition exists for the activity, whether the activity provides an opportunity for student athletes to engage in the pre-season and/or post-season competition in a manner consistent with established varsity sports;

for example, whether state, national and/or conference championships exist for the activity; and

D. Whether the primary purpose of the activity is to provide athletic competition at the intercollegiate or interscholastic varsity levels rather than to support or promote other athletic activities.

When analyzing this factor, the following may be taken into consideration:

1. Whether the activity is governed by a specific set of rules of play adopted by a state, national, or conference organization and/or consistent with established varsity sports, which include objective, standardized criteria by which competition must be judged;

2. Whether resources for the activity (e.g., practice and competition schedules,[11] coaching staff) are based on the competitive needs of the team;

3. If post-season competition opportunities are available, whether participation in post-season competition is dependent on or related to regular season results in a manner consistent with established varsity sports; and

4. Whether the selection of teams/participants is based on factors related primarily to athletic ability.

We take this opportunity to discuss several of the unique aspects inherent in the nature and basic operation of competitive cheer to assist the court in determining whether Quinnipiac University's competitive cheer team should, or should not, be recognized as a sport for Title IX purposes.

**A.      Recognition by an Intercollegiate Athletic Organization**

OCR has established a rebuttable presumption that an institution's established sports satisfy Title IX's requirements when the activity is recognized as a sport by intercollegiate athletic organizations, such as the NCAA or NAIA, and when the "organizational requirements satisfy [the factors outlined in the 2008 Letter] and compliance with the requirements is not discretionary."  2008 Letter at 2.  In examining this factor, OCR focuses not on the national availability and popularity of the activity, but rather on the recognition of the activity as a sport

---

[11]  For purposes of this analysis, there is no presumption that the amount of time dedicated to competition must be equal to or greater than the amount of time dedicated to practice.

by those knowledgeable organizations and associations.  As such, the court's first inquiry should be whether competitive cheer has been recognized as part of an intercollegiate athletic organization.

Quinnipiac is a member of the Northeast Conference (NEC) of the NCAA.  Besides cheer, all of Quinnipiac's varsity sports are governed by the NEC and NCAA, and as a result Quinnipiac is bound by the bylaws of both organizations.  Cheer, however, is not recognized as a varsity sport by the NEC or NCAA.  According to Quinnipiac, five universities that sponsor varsity cheer, including Quinnipiac, came together in September 2009 to "form the National Competitive Stunts and Tumbling Association (NCSTA) – a governing body – to further the development of the sport."  Joint Pre-Trial Brief, filed June 6, 2010 (Doc. 145) ("Pre-Trial Br."), at Def. Contentions ¶ 16.  While Quinnipiac asserts that the NCSTA intends to apply for emerging sport status to the NCAA, it has not done so.  Id. at Def. Contentions ¶ 20.[12]  To date, the NEC has not identified competitive cheer as a sponsored sport, and the NCAA has not recognized competitive cheer as a sport or emerging sport.[13]

## B.   Fact Specific Inquiry into Whether Quinnipiac's Cheer Constitutes a "Sport" for Purposes of Title IX Compliance

Since the presumption does not apply, the court should examine if Quinnipiac's cheer is offered in a manner that satisfies the factors outlined in OCR's 2008 Letter.  As noted above,

---

[12] An emerging sport is a sport recognized by the NCAA that is intended to provide additional athletics opportunities for female student athletes. http://www.ncaa.org/wps/portal/ncaahome?WCM_GLOBAL_CONTEXT=/wps/wcm/connect/ncaa/NCAA/About+The+NCAA/Diversity+and+Inclusion/Gender+Equity+and+Title+IX/New+Emerging+Sports+for+Women (follow "criteria" hyperlink).

[13] NEC Bylaws at 66, available at http://www.northeastconference.org//Sports/general/2008/ncaacompliance.asp (follow "Northeast Conference Compliance - 2008-09 Northeast Conference Policy Manual" hyperlink); NCAA Bylaws, at 214-15, 297-298, available at http://www.ncaa.org/wps/portal/ncaahome?WCM_GLOBAL_CONTEXT=/ncaa/ncaa/legislation+and+governance/rules+and+bylaws (follow "Division I – Download or Purchase" hyperlink).

these factors relate to an activity's structure, administration, team preparation, and competition. Although after hearing evidence the court will need to examine each factor, we would like to highlight a couple of the factors to illustrate how the court should evaluate whether true competition exists for Quinnipiac's cheer team as compared to other Quinnipiac varsity sports.

If an activity is to be counted as a sport for purposes of Title IX, it should have substantial similarities to existing and established varsity sports in the institution's athletic program.  2008 Letter at 3.  To be counted as a sport, therefore, Quinnipiac's competitive cheer team should participate in regular season, pre-season and/or post-season competition opportunities in a manner consistent with other established Quinnipiac varsity sports.  Id.  This requires a searching inquiry into the cheer team's competitive opportunities as compared to those of Quinnipiac's other established varsity teams.

With regard to the regular season, the court should examine whether a team's "regular season competitive opportunities differ quantitatively and/or qualitatively from established varsity sports," as well as "whether the team competes against intercollegiate varsity opponents in a manner consistent with established varsity sports."  Id.  This analysis involves consideration of how the minimum number and average number of opportunities for competition for a sport compare with those prescribed in other sports.  Since all other Quinnipiac varsity sports are governed by the NCAA and NEC, the court should turn to the standards of those organizations. The NCAA (i) defines the playing season, (ii) limits the number of games within a season, and (iii) establishes competition guidelines for member institutions.  NCAA Bylaws at 213-221. Moreover, the NEC (i) requires teams to play a certain number of conference games per year and (ii) schedules all conference games.  NEC Bylaws at 67.  For example, for both men's and

women's basketball, the NEC requires each university to play at least 18 games against NEC teams, excluding championships. Id. at 133, 145.

The court should also pay particular attention to Quinnipiac's cheer schedule. For instance, during the 2009-10 season, Quinnipiac's cheer team participated in ten meets. Pre-trial Br. at Def. Contentions ¶ 18. While Quinnipiac asserts that it plans to increase the number of NCSTA meets in which Quinnipiac participates, in the 2009-10 season, of these ten meets, only two were under the newly designed NCSTA format. Id. at Def. Contentions ¶¶ 18-19. The court should also examine the types of teams against which Quinnipiac competed at these meets. One inquiry, for instance, is whether it competed against NEC varsity teams, as the university's other varsity sports do, and against other NCAA Division I varsity teams, as its other varsity sports do. Due to the circumstances regarding cheer, another relevant inquiry is whether any varsity teams it competes against meet the factors outlined in the 2008 letter to qualify as a sport as well as how many competitors are needed in order for the event to qualify as a competition.

In addition, the court should examine whether post-season competitive opportunities, such as a state, national, or conference championship, exist for the activity and whether the team engages in these competitions in a manner consistent with established varsity sports. 2008 Letter at 3; Order at 33 n.9. The court previously noted that competitive cheer has no "non-profit governing body and that its schedule lacks the hallmarks of progressive-style competition where a team's season record determines its eligibility to compete in culminating conference and national championships[.]" Order at 33. The NEC and NCAA, to which as noted above, Quinnipiac belongs, require each sport to employ a progressive-style competition leading to post-season play. For example, Quinnipiac's men's and women's basketball teams may participate in the NEC Conference Tournament only if they finish in the top eight teams based on

regular-season winning percentage.  NEC Bylaws at 131, 139.  The court should look closely to

the types of Quinnipiac cheer's post-season opportunities for the 2009-2010 season, and examine

how such opportunities compare to those provided to other Quinnipiac varsity sports.  For

instance, the court should determine whether either the NCAA and NEC, which govern all other

varsity sports at the University, held a championship during the 2009-2010 season.  Additionally,

the court should evaluate whether a championship sponsored by the NCSTA took place in the

2009-2010 season that provided an opportunity for student athletes to engage in post-season

competition in a manner consistent with Quinnipiac's established varsity sports.

### CONCLUSION

As stated above, the United States submits this friend-of-the-court brief to further

explicate the Government's position concerning the standards used to determine when a genuine

athletic participation opportunity exists and to clarify what factors must be reviewed to

determine if cheer is a sport for Title IX purposes.

Respectfully submitted,


_/s/ John Hughes_____          _/s/  V. Kathleen Schleeter_____

DAVID B. FEIN                             THOMAS E. PEREZ
United States Attorney                    Assistant Attorney General
District of Connecticut                   Civil Rights Division
                                          AMY I. BERMAN (D.C. Bar 480541)
BY:                                       CHRISTOPHER S. AWAD (MD Bar)
JOHN HUGHES                               V. KATHLEEN SCHLEETER (VA Bar 77294)
Assistant United States Attorney          Educational Opportunities Section
Connecticut Financial Center              Civil Rights Division
157 Church Street, 23rd Floor             United States Department of Justice
New Haven, CT  06510                      950 Pennsylvania Ave., NW
Tel:  (203) 821-3700                      Patrick Henry Building, Suite 4300
Fax:  (203) 773-5373                      Washington, D.C.  20530
Federal Bar #:  ct05289                   Tel:  (202) 514-4092
john.hughes@usdoj.gov                     Fax:  (202) 514-8337

v.kathleen.schleeter@usdoj.gov
christopher.awad@usdoj.gov
amy.berman@usdoj.gov

OF COUNSEL:

JAN GRAY
Office for Civil Rights
VANESSA A. SANTOS
Office of the General Counsel
United States Department of Education

Dated:  June 21, 2010

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

STEPHANIE BIEDIGER, KAYLA LAWLER,    )
ERIN OVERDEVEST, KRISTEN              )
CORINALDESI, and LOGAN RIKER,        )     Civil Action No.
individually and on behalf of all those   )   3:09cv621 (SRU)
similarly situated; and              )
ROBIN LAMOTT SPARKS, individually,   )
                                     )
              Plaintiffs,            )
                                     )
v.                                   )
                                     )
QUINNIPIAC UNIVERSITY,               )
                                     )
              Defendant.             )
                                     )

**CERTIFICATE OF SERVICE**

        I hereby certify that on June 21, 2010, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Jonathan B. Orleans
Alex V. Hernandez
Pullman & Comley, LLC
850 Main St., P.O. Box 7006
Bridgeport, CT  06601-7006
Email:  jorleans@pullcom.com
Email:  ahernandez@pullcom.com

Kristen Galles
Equity Legal
10 Rosecrest Ave.
Alexandria, VA  22301
Email:  kgalles@comcast.net

David McGuire
American Civil Liberties Union Foundation
   of Connecticut

5

2074 Park Street, Suite L
Hartford, CT  06106
Email:  dmcguire@acluct.org

Edward A. Brill
Susan D. Friedfel
Proskauer Rose, LLP
1585 Broadway
New York, NY  10036
Email:  ebrill@proskauer.com
Email:  sfriedfel@proskauer.com

Mary A. Gambardella
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT  06911
Email:  mgambardella@wiggin.com


Dated:  June 21, 2010


/s/ John Hughes_____
Assistant United States Attorney