# EXHIBIT A

## January 16, 1996 Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test

Brief of the United States as Amicus Curiae
Civil Action No. 3:09cv621 (SRU)



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE FOR CIVIL RIGHTS

JAN 16 1996

THE ASSISTANT SECRETARY

Dear Colleague:

It is my pleasure to send you the enclosed "Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test" (the Clarification).

As you know, the Office for Civil Rights (OCR) enforces Title IX of the Education Amendments of 1972, which prohibits discrimination on the basis of sex in education programs and activities. The regulation implementing Title IX and the Department's Intercollegiate Athletics Policy Interpretation published in 1979 -- both of which followed publication for notice and the receipt, review and consideration of extensive comments -- specifically address intercollegiate athletics. Since becoming Assistant Secretary, I have recognized the need to provide additional clarification regarding what is commonly referred to as the "three-part test," a test used to determine whether students of both sexes are provided nondiscriminatory opportunities to participate in athletics. The three-part test is described in the Department's 1979 Policy Interpretation.

Accordingly, on September 20, 1995, OCR circulated to over 4500 interested parties a draft of the proposed Clarification, soliciting comments about whether the document provided sufficient clarity to assist institutions in their efforts to comply with Title IX. As indicated when circulating the draft of the Clarification, the objective of the Clarification is to respond to requests for specific guidance about the existing standards that have guided the enforcement of Title IX in the area of intercollegiate athletics. Further, the Clarification is limited to an elaboration of the "three-part test." This test, which has generated the majority of the questions that have been raised about Title IX compliance, is a portion of a larger analytical framework reflected in the 1979 Policy Interpretation.

OCR appreciates the efforts of the more than 200 individuals who commented on the draft of the Clarification. In addition to providing specific comments regarding clarity, some parties suggested that the Clarification did not go far enough in protecting women's sports. Others, by contrast, suggested that the Clarification, or the Policy Interpretation itself, provided more protection for women's sports than intended by Title IX. However, it would not be appropriate to revise the 1979 Policy Interpretation, and adherence to its provisions shaped OCR's consideration of these comments. The Policy Interpretation has

Page 2 - Dear Colleague

guided OCR's enforcement in the area of athletics for over fifteen years, enjoying the bipartisan support of Congress. The Policy Interpretation has also enjoyed the support of every court that has addressed issues of Title IX athletics. As one recent court decision recognized, the "three-part test" draws its "essence" from the Title IX statute.

The draft has been revised to incorporate suggestions that OCR received regarding how to make the document more useful and clearer. For instance, the Clarification now has additional examples to illustrate how to meet part one of the three-part test and makes clear that the term "developing interests" under part two of the test includes interests that already exist at the institution. The document also clarifies that an institution can choose which part of the test it plans to meet. In addition, it further clarifies how Title IX requires OCR to count participation opportunities and why Title IX does not require an institution, under part three of the test, to accommodate the interests and abilities of potential students.

OCR also received requests for clarification that relate primarily to fact- or institution-specific situations that only apply to a small number of athletes or institutions. These comments are more appropriately handled on an individual basis and, accordingly, OCR will follow-up on these comments and questions in the context of OCR's ongoing technical assistance efforts.

It is important to outline several points about the final document.

The Clarification confirms that institutions need to comply only with any one part of the three-part test in order to provide nondiscriminatory participation opportunities for individuals of both sexes. The first part of the test--substantial proportionality--focuses on the participation rates of men and women at an institution and affords an institution a "safe harbor" for establishing that it provides nondiscriminatory participation opportunities. An institution that does not provide substantially proportional participation opportunities for men and women may comply with Title IX by satisfying either part two or part three of the test. The second part--history and continuing practice--is an examination of an institution's good faith expansion of athletic opportunities through its response to developing interests of the underrepresented sex at that institution. The third part--fully and effectively accommodating interests and abilities of the underrepresented sex--centers on the inquiry of whether there are concrete and viable interests among the underrepresented sex that should be accommodated by an institution.

In addition, the Clarification does not provide strict numerical formulas or "cookie cutter" answers to the issues that are inherently case- and fact-specific. Such an effort not only would belie the meaning of Title IX, but would at the same time deprive

Page 3 - Dear Colleague

institutions of the flexibility to which they are entitled when deciding how best to comply with the law.

Several parties who provided comments expressed opposition to the three-part test. The crux of the arguments made on behalf of those opposed to the three-part test is that the test does not really provide three different ways to comply. Opponents of the test assert, therefore, that the test improperly establishes arbitrary quotas. Similarly, they also argue that the three-part test runs counter to the intent of Title IX because it measures gender discrimination by underrepresentation and requires the full accommodation of only one sex. However, this understanding of Title IX and the three-part test is wrong.

First, it is clear from the Clarification that there are three different avenues of compliance. Institutions have flexibility in providing nondiscriminatory participation opportunities to their students, and OCR does not require quotas. For example, if an institution chooses to and does comply with part three of the test, OCR will not require it to provide substantially proportionate participation opportunities to, or demonstrate a history and continuing practice of program expansion that is responsive to the developing interests of, the underrepresented sex. In fact, if an institution believes that its female students are less interested and able to play intercollegiate sports, that institution may continue to provide more athletic opportunities to men than to women, or even to add opportunities for men, as long as the recipient can show that its female students are not being denied opportunities, i.e., that women's interests and abilities are fully and effectively accommodated. The fact that each part of the three-part test considers participation rates does not mean, as some opponents of the test have suggested, that the three parts do not provide different ways to comply with Title IX.

Second, it is appropriate for parts two and three of the test to focus only on the underrepresented sex. Indeed, such a focus is required because Title IX, by definition, addresses discrimination. Notably, Title IX's athletic provisions are unique in permitting institutions--notwithstanding the long history of discrimination based on sex in athletics programs--to establish separate athletic programs on the basis of sex, thus allowing institutions to determine the number of athletic opportunities that are available to students of each sex. (By contrast, Title VI of the Civil Rights Act of 1964 forbids institutions from providing separate athletic programs on the basis of race or national origin.)

OCR focuses on the interests and abilities of the underrepresented sex only if the institution provides proportionately fewer athletic opportunities to members of one sex and has failed to make a good faith effort to expand its program for the underrepresented sex. Thus, the Policy Interpretation requires the full accommodation of the underrepresented sex only to the extent necessary to provide

equal athletic opportunity, i.e., only where an institution has failed to respond to the interests and abilities of the underrepresented sex when it allocated a disproportionately large number of opportunities for athletes of the other sex.

What is clear then--because, for example, part three of the three-part test permits evidence that underrepresentation is caused not by discrimination but by lack of interest--is that underrepresentation alone is not the measure of discrimination. Substantial proportionality merely provides institutions with a safe harbor. Even if this were not the case and proportional opportunities were the only test, the "quota" criticism would be misplaced. Quotas are impermissible where opportunities are required to be created without regard to sex. However, schools are permitted to create athletic participation opportunities based on sex. Where they do so unequally, that is a legitimate measure of unequal opportunity under Title IX. OCR has chosen to make substantial proportionality only one of three alternative measures.

Several parties also suggested that, in determining the number of participation opportunities offered by an institution, OCR count unfilled slots, i.e., those positions on a team that an institution claims the team can support but which are not filled by actual athletes. OCR must, however, count actual athletes because participation opportunities must be real, not illusory. Moreover, this makes sense because, under other parts of the Policy Interpretation, OCR considers the quality and kind of other benefits and opportunities offered to male and female athletes in determining overall whether an institution provides equal athletic opportunity. In this context, OCR must consider actual benefits provided to real students.

OCR also received comments that indicate that there is still confusion about the elimination and capping of men's teams in the context of Title IX compliance. The rules here are straightforward. An institution can choose to eliminate or cap teams as a way of complying with part one of the three-part test. However, nothing in the Clarification requires that an institution cap or eliminate participation opportunities for men. In fact, cutting or capping men's teams will not help an institution comply with part two or part three of the test because these tests measure an institution's positive, ongoing response to the interests and abilities of the underrepresented sex. Ultimately, Title IX provides institutions with flexibility and choice regarding how they will provide nondiscriminatory participation opportunities.

Finally, several parties suggested that OCR provide more information regarding the specific elements of an appropriate assessment of student interest and ability. The Policy Interpretation is intended to give institutions flexibility to determine interests and abilities consistent with the unique circumstances and needs of an institution. We recognize, however,

Page 5 - Dear Colleague

that it might be useful to share ideas on good assessment strategies. Accordingly, OCR will work to identify, and encourage institutions to share, good strategies that institutions have developed, as well as to facilitate discussions among institutions regarding potential assessment techniques.

OCR recognizes that the question of how to comply with Title IX and to provide equal athletic opportunities for all students is a significant challenge that many institutions face today, especially in the face of increasing budget constraints. It has been OCR's experience, however, that institutions committed to maintaining their men's program have been able to do so--and comply with Title IX--notwithstanding limited athletic budgets. In many cases, OCR and these institutions have worked together to find creative solutions that ensured equal opportunities in intercollegiate athletics. OCR is similarly prepared to join with other institutions in assisting them to address their own situations.

OCR is committed to continuing to work in partnership with colleges and universities to ensure that the promise of Title IX becomes a reality for all students. Thank you for your continuing interest in this subject.

Sincerely,

*Norma V. Cantú*

Norma V. Cantú
Assistant Secretary
 for Civil Rights

Enclosure

JAN 16 1996

# CLARIFICATION OF INTERCOLLEGIATE ATHLETICS POLICY GUIDANCE: THE THREE-PART TEST

The Office for Civil Rights (OCR) enforces Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. (Title IX), which prohibits discrimination on the basis of sex in education programs and activities by recipients of federal funds. The regulation implementing Title IX, at 34 C.F.R. Part 106, effective July 21, 1975, contains specific provisions governing athletic programs, at 34 C.F.R. § 106.41, and the awarding of athletic scholarships, at 34 C.F.R. § 106.37(c). Further clarification of the Title IX regulatory requirements is provided by the Intercollegiate Athletics Policy Interpretation, issued December 11, 1979 (44 Fed. Reg. 71413 et seq. (1979)).[1]

The Title IX regulation provides that if an institution sponsors an athletic program it must provide equal athletic opportunities for members of both sexes. Among other factors, the regulation requires that an institution must effectively accommodate the athletic interests and abilities of students of both sexes to the extent necessary to provide equal athletic opportunity.

The 1979 Policy Interpretation provides that as part of this determination OCR will apply the following three-part test to assess whether an institution is providing nondiscriminatory participation opportunities for individuals of both sexes:

1. Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

2. Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of the members of that sex; or

3. Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a history and continuing practice of program expansion, as described above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed. Reg. at 71418.

---

[1] The Policy Interpretation is designed for intercollegiate athletics. However, its general principles, and those of this Clarification, often will apply to elementary and secondary interscholastic athletic programs, which are also covered by the regulation. See 44 Fed. Reg. 71413.

Thus, the three-part test furnishes an institution with three individual avenues to choose from when determining how it will provide individuals of each sex with nondiscriminatory opportunities to participate in intercollegiate athletics. If an institution has met any part of the three-part test, OCR will determine that the institution is meeting this requirement.

It is important to note that under the Policy Interpretation the requirement to provide nondiscriminatory participation opportunities is only one of many factors that OCR examines to determine if an institution is in compliance with the athletics provision of Title IX. OCR also considers the quality of competition offered to members of both sexes in order to determine whether an institution effectively accommodates the interests and abilities of its students.

In addition, when an "overall determination of compliance" is made by OCR, 44 Fed. Reg. 71417, 71418, OCR examines the institution's program as a whole. Thus, OCR considers the effective accommodation of interests and abilities in conjunction with equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes to determine whether an institution provides equal athletic opportunity as required by Title IX. These other benefits include coaching, equipment, practice and competitive facilities, recruitment, scheduling of games, and publicity, among others. An institution's failure to provide nondiscriminatory participation opportunities usually amounts to a denial of equal athletic opportunity because these opportunities provide access to all other athletic benefits, treatment, and services.

This Clarification provides specific factors that guide an analysis of each part of the three-part test. In addition, it provides examples to demonstrate, in concrete terms, how these factors will be considered. These examples are intended to be illustrative, and the conclusions drawn in each example are based solely on the facts included in the example.

**THREE-PART TEST -- Part One: Are Participation Opportunities Substantially Proportionate to Enrollment?**

Under part one of the three-part test (part one), where an institution provides intercollegiate level athletic participation opportunities for male and female students in numbers substantially proportionate to their respective full-time undergraduate enrollments, OCR will find that the institution is providing nondiscriminatory participation opportunities for individuals of both sexes.

OCR's analysis begins with a determination of the number of participation opportunities afforded to male and female athletes in

the intercollegiate athletic program. The Policy Interpretation defines participants as those athletes:

a. Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and

b. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and

c. Who are listed on the eligibility or squad lists maintained for each sport, or

d. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

44 Fed. Reg. at 71415.

OCR uses this definition of participant to determine the number of participation opportunities provided by an institution for purposes of the three-part test.

Under this definition, OCR considers a sport's season to commence on the date of a team's first intercollegiate competitive event and to conclude on the date of the team's final intercollegiate competitive event. As a general rule, all athletes who are listed on a team's squad or eligibility list and are on the team as of the team's first competitive event are counted as participants by OCR. In determining the number of participation opportunities for the purposes of the interests and abilities analysis, an athlete who participates in more than one sport will be counted as a participant in each sport in which he or she participates.

In determining participation opportunities, OCR includes, among others, those athletes who do not receive scholarships (e.g., walk-ons), those athletes who compete on teams sponsored by the institution even though the team may be required to raise some or all of its operating funds, and those athletes who practice but may not compete. OCR's investigations reveal that these athletes receive numerous benefits and services, such as training and practice time, coaching, tutoring services, locker room facilities, and equipment, as well as important non-tangible benefits derived from being a member of an intercollegiate athletic team. Because these are significant benefits, and because receipt of these benefits does not depend on their cost to the institution or whether the athlete competes, it is necessary to count all athletes who receive such benefits when determining the number of athletic opportunities provided to men and women.

3

OCR's analysis next determines whether athletic opportunities are substantially proportionate. The Title IX regulation allows institutions to operate separate athletic programs for men and women. Accordingly, the regulation allows an institution to control the respective number of participation opportunities offered to men and women. Thus, it could be argued that to satisfy part one there should be no difference between the participation rate in an institution's intercollegiate athletic program and its full-time undergraduate student enrollment.

However, because in some circumstances it may be unreasonable to expect an institution to achieve exact proportionality--for instance, because of natural fluctuations in enrollment and participation rates or because it would be unreasonable to expect an institution to add athletic opportunities in light of the small number of students that would have to be accommodated to achieve exact proportionality--the Policy Interpretation examines whether participation opportunities are "substantially" proportionate to enrollment rates. Because this determination depends on the institution's specific circumstances and the size of its athletic program, OCR makes this determination on a case-by-case basis, rather than through use of a statistical test.

As an example of a determination under part one: If an institution's enrollment is 52 percent male and 48 percent female and 52 percent of the participants in the athletic program are male and 48 percent female, then the institution would clearly satisfy part one. However, OCR recognizes that natural fluctuations in an institution's enrollment and/or participation rates may affect the percentages in a subsequent year. For instance, if the institution's admissions the following year resulted in an enrollment rate of 51 percent males and 49 percent females, while the participation rates of males and females in the athletic program remained constant, the institution would continue to satisfy part one because it would be unreasonable to expect the institution to fine tune its program in response to this change in enrollment.

As another example, over the past five years an institution has had a consistent enrollment rate for women of 50 percent. During this time period, it has been expanding its program for women in order to reach proportionality. In the year that the institution reaches its goal--i.e., 50 percent of the participants in its athletic program are female--its enrollment rate for women increases to 52 percent. Under these circumstances, the institution would satisfy part one.

OCR would also consider opportunities to be substantially proportionate when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team, i.e., a team for which there is a sufficient number of interested and able students and enough available

4

competition to sustain an intercollegiate team. As a frame of reference in assessing this situation, OCR may consider the average size of teams offered for the underrepresented sex, a number which would vary by institution.

For instance, Institution A is a university with a total of 600 athletes. While women make up 52 percent of the university's enrollment, they only represent 47 percent of its athletes. If the university provided women with 52 percent of athletic opportunities, approximately 62 additional women would be able to participate. Because this is a significant number of unaccommodated women, it is likely that a viable sport could be added. If so, Institution A has not met part one.

As another example, at Institution B women also make up 52 percent of the university's enrollment and represent 47 percent of Institution B's athletes. Institution B's athletic program consists of only 60 participants. If the University provided women with 52 percent of athletic opportunities, approximately 6 additional women would be able to participate. Since 6 participants are unlikely to support a viable team, Institution B would meet part one.

## THREE-PART TEST -- Part Two: Is there a History and Continuing Practice of Program Expansion for the Underrepresented Sex?

Under part two of the three-part test (part two), an institution can show that it has a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of the underrepresented sex. In effect, part two looks at an institution's past and continuing remedial efforts to provide nondiscriminatory participation opportunities through program expansion.[2]

OCR will review the entire history of the athletic program, focusing on the participation opportunities provided for the underrepresented sex. First, OCR will assess whether past actions of the institution have expanded participation opportunities for the underrepresented sex in a manner that was demonstrably responsive to their developing interests and abilities. Developing

---

[2] Part two focuses on whether an institution has expanded the number of intercollegiate participation opportunities provided to the underrepresented sex. Improvements in the quality of competition, and of other athletic benefits, provided to women athletes, while not considered under the three-part test, can be considered by OCR in making an overall determination of compliance with the athletics provision of Title IX.

5

interests include interests that already exist at the institution.[3] There are no fixed intervals of time within which an institution must have added participation opportunities. Neither is a particular number of sports dispositive. Rather, the focus is on whether the program expansion was responsive to developing interests and abilities of the underrepresented sex. In addition, the institution must demonstrate a continuing (i.e., present) practice of program expansion as warranted by developing interests and abilities.

OCR will consider the following factors, among others, as evidence that may indicate a <u>history of program expansion</u> that is demonstrably responsive to the developing interests and abilities of the underrepresented sex:

- an institution's record of adding intercollegiate teams, or upgrading teams to intercollegiate status, for the underrepresented sex;

- an institution's record of increasing the numbers of participants in intercollegiate athletics who are members of the underrepresented sex; and

- an institution's affirmative responses to requests by students or others for addition or elevation of sports.

OCR will consider the following factors, among others, as evidence that may indicate a <u>continuing practice of program expansion</u> that is demonstrably responsive to the developing interests and abilities of the underrepresented sex:

- an institution's current implementation of a nondiscriminatory policy or procedure for requesting the addition of sports (including the elevation of club or intramural teams) and the effective communication of the policy or procedure to students; and

- an institution's current implementation of a plan of program expansion that is responsive to developing interests and abilities.

OCR would also find persuasive an institution's efforts to monitor developing interests and abilities of the underrepresented sex, for

---

[3] However, under this part of the test an institution is not required, as it is under part three, to accommodate all interests and abilities of the underrepresented sex. Moreover, under part two an institution has flexibility in choosing which teams it adds for the underrepresented sex, as long as it can show overall a history and continuing practice of program expansion for members of that sex.

6

example, by conducting periodic nondiscriminatory assessments of developing interests and abilities and taking timely actions in response to the results.

In the event that an institution eliminated any team for the underrepresented sex, OCR would evaluate the circumstances surrounding this action in assessing whether the institution could satisfy part two of the test. However, OCR will not find a history and continuing practice of program expansion where an institution increases the proportional participation opportunities for the underrepresented sex by reducing opportunities for the overrepresented sex alone or by reducing participation opportunities for the overrepresented sex to a proportionately greater degree than for the underrepresented sex. This is because part two considers an institution's good faith remedial efforts through actual program expansion. It is only necessary to examine part two if one sex is overrepresented in the athletic program. Cuts in the program for the underrepresented sex, even when coupled with cuts in the program for the overrepresented sex, cannot be considered remedial because they burden members of the sex already disadvantaged by the present program. However, an institution that has eliminated some participation opportunities for the underrepresented sex can still meet part two if, overall, it can show a history and continuing practice of program expansion for that sex.

In addition, OCR will not find that an institution satisfies part two where it established teams for the underrepresented sex only at the initiation of its program for the underrepresented sex or where it merely promises to expand its program for the underrepresented sex at some time in the future.

The following examples are intended to illustrate the principles discussed above.

At the inception of its women's program in the mid-1970s, Institution C established seven teams for women. In 1984 it added a women's varsity team at the request of students and coaches. In 1990 it upgraded a women's club sport to varsity team status based on a request by the club members and an NCAA survey that showed a significant increase in girls high school participation in that sport. Institution C is currently implementing a plan to add a varsity women's team in the spring of 1996 that has been identified by a regional study as an emerging women's sport in the region. The addition of these teams resulted in an increased percentage of women participating in varsity athletics at the institution. Based on these facts, OCR would find Institution C in compliance with part two because it has a history of program expansion and is continuing to expand its program for women in response to their developing interests and abilities.

By 1980, Institution D established seven teams for women.

Institution D added a women's varsity team in 1983 based on the requests of students and coaches. In 1991 it added a women's varsity team after an NCAA survey showed a significant increase in girls' high school participation in that sport. In 1993 Institution D eliminated a viable women's team and a viable men's team in an effort to reduce its athletic budget. It has taken no action relating to the underrepresented sex since 1993. Based on these facts, OCR would not find Institution D in compliance with part two. Institution D cannot show a continuing practice of program expansion that is responsive to the developing interests and abilities of the underrepresented sex where its only action since 1991 with regard to the underrepresented sex was to eliminate a team for which there was interest, ability and available competition.

In the mid-1970s, Institution E established five teams for women. In 1979 it added a women's varsity team. In 1984 it upgraded a women's club sport with twenty-five participants to varsity team status. At that time it eliminated a women's varsity team that had eight members. In 1987 and 1989 Institution E added women's varsity teams that were identified by a significant number of its enrolled and incoming female students when surveyed regarding their athletic interests and abilities. During this time it also increased the size of an existing women's team to provide opportunities for women who expressed interest in playing that sport. Within the past year, it added a women's varsity team based on a nationwide survey of the most popular girls high school teams. Based on the addition of these teams, the percentage of women participating in varsity athletics at the institution has increased. Based on these facts, OCR would find Institution E in compliance with part two because it has a history of program expansion and the elimination of the team in 1984 took place within the context of continuing program expansion for the underrepresented sex that is responsive to their developing interests.

Institution F started its women's program in the early 1970s with four teams. It did not add to its women's program until 1987 when, based on requests of students and coaches, it upgraded a women's club sport to varsity team status and expanded the size of several existing women's teams to accommodate significant expressed interest by students. In 1990 it surveyed its enrolled and incoming female students; based on that survey and a survey of the most popular sports played by women in the region, Institution F agreed to add three new women's teams by 1997. It added a women's team in 1991 and 1994. Institution F is implementing a plan to add a women's team by the spring of 1997. Based on these facts, OCR would find Institution F in compliance with part two. Institution F's program history since 1987 shows that it is committed to program expansion for the underrepresented sex and it is continuing to expand its women's program in light of women's developing interests and abilities.

8

**THREE-PART TEST -- Part Three: Is the Institution Fully and Effectively Accommodating the Interests and Abilities of the Underrepresented Sex?**

Under part three of the three-part test (part three) OCR determines whether an institution is fully and effectively accommodating the interests and abilities of its students who are members of the underrepresented sex--including students who are admitted to the institution though not yet enrolled. Title IX provides that a recipient must provide equal athletic opportunity to its students. Accordingly, the Policy Interpretation does not require an institution to accommodate the interests and abilities of potential students.[4]

While disproportionately high athletic participation rates by an institution's students of the overrepresented sex (as compared to their enrollment rates) may indicate that an institution is not providing equal athletic opportunities to its students of the underrepresented sex, an institution can satisfy part three where there is evidence that the imbalance does not reflect discrimination, i.e., where it can be demonstrated that, notwithstanding disproportionately low participation rates by the institution's students of the underrepresented sex, the interests and abilities of these students are, in fact, being fully and effectively accommodated.

In making this determination, OCR will consider whether there is (a) unmet interest in a particular sport; (b) sufficient ability to sustain a team in the sport; and (c) a reasonable expectation of competition for the team. If all three conditions are present OCR will find that an institution has not fully and effectively accommodated the interests and abilities of the underrepresented sex.

If an institution has recently eliminated a viable team from the intercollegiate program, OCR will find that there is sufficient interest, ability, and available competition to sustain an intercollegiate team in that sport unless an institution can provide strong evidence that interest, ability, or available competition no longer exists.

a) **Is there sufficient unmet interest to support an intercollegiate team?**

---

[4] However, OCR does examine an institution's recruitment practices under another part of the Policy Interpretation. See 44 Fed. Reg. 71417. Accordingly, where an institution recruits potential student athletes for its men's teams, it must ensure that women's teams are provided with substantially equal opportunities to recruit potential student athletes.

9

OCR will determine whether there is sufficient unmet interest among the institution's students who are members of the underrepresented sex to sustain an intercollegiate team. OCR will look for interest by the underrepresented sex as expressed through the following indicators, among others:

- requests by students and admitted students that a particular sport be added;

- requests that an existing club sport be elevated to intercollegiate team status;

- participation in particular club or intramural sports;

- interviews with students, admitted students, coaches, administrators and others regarding interest in particular sports;

- results of questionnaires of students and admitted students regarding interests in particular sports; and

- participation in particular interscholastic sports by admitted students.

In addition, OCR will look at participation rates in sports in high schools, amateur athletic associations, and community sports leagues that operate in areas from which the institution draws its students in order to ascertain likely interest and ability of its students and admitted students in particular sport(s).[5] For example, where OCR's investigation finds that a substantial number of high schools from the relevant region offer a particular sport which the institution does not offer for the underrepresented sex, OCR will ask the institution to provide a basis for any assertion that its students and admitted students are not interested in playing that sport. OCR may also interview students, admitted students, coaches, and others regarding interest in that sport.

An institution may evaluate its athletic program to assess the athletic interest of its students of the underrepresented sex using nondiscriminatory methods of its choosing. Accordingly, institutions have flexibility in choosing a nondiscriminatory method of determining athletic interests and abilities provided they meet certain requirements. See 44 Fed. Reg. at 71417. These assessments may use straightforward and inexpensive techniques, such as a student questionnaire or an open forum, to identify

---

[5] While these indications of interest may be helpful to OCR in ascertaining likely interest on campus, particularly in the absence of more direct indicia, an institution is expected to meet the actual interests and abilities of its students and admitted students.

students' interests and abilities. Thus, while OCR expects that an institution's assessment should reach a wide audience of students and should be open-ended regarding the sports students can express interest in, OCR does not require elaborate scientific validation of assessments.

An institution's evaluation of interest should be done periodically so that the institution can identify in a timely and responsive manner any developing interests and abilities of the underrepresented sex. The evaluation should also take into account sports played in the high schools and communities from which the institution draws its students both as an indication of possible interest on campus and to permit the institution to plan to meet the interests of admitted students of the underrepresented sex.

b) **Is there sufficient ability to sustain an intercollegiate team?**

Second, OCR will determine whether there is sufficient ability among interested students of the underrepresented sex to sustain an intercollegiate team. OCR will examine indications of ability such as:

- the athletic experience and accomplishments--in interscholastic, club or intramural competition--of students and admitted students interested in playing the sport;

- opinions of coaches, administrators, and athletes at the institution regarding whether interested students and admitted students have the potential to sustain a varsity team; and

- if the team has previously competed at the club or intramural level, whether the competitive experience of the team indicates that it has the potential to sustain an intercollegiate team.

Neither a poor competitive record nor the inability of interested students or admitted students to play at the same level of competition engaged in by the institution's other athletes is conclusive evidence of lack of ability. It is sufficient that interested students and admitted students have the potential to sustain an intercollegiate team.

c) **Is there a reasonable expectation of competition for the team?**

Finally, OCR determines whether there is a reasonable expectation of intercollegiate competition for a particular sport in the institution's normal competitive region. In evaluating available competition, OCR will look at available competitive opportunities in the geographic area in which the institution's athletes primarily compete, including:

- competitive opportunities offered by other schools against

11



   which the institution competes; and

- competitive opportunities offered by other schools in the institution's geographic area, including those offered by schools against which the institution does not now compete.

Under the Policy Interpretation, the institution may also be required to actively encourage the development of intercollegiate competition for a sport for members of the underrepresented sex when overall athletic opportunities within its competitive region have been historically limited for members of that sex.

**CONCLUSION**

This discussion clarifies that institutions have three distinct ways to provide individuals of each sex with nondiscriminatory participation opportunities. The three-part test gives institutions flexibility and control over their athletics programs. For instance, the test allows institutions to respond to different levels of interest by its male and female students. Moreover, nothing in the three-part test requires an institution to eliminate participation opportunities for men.

At the same time, this flexibility must be used by institutions consistent with Title IX's requirement that they not discriminate on the basis of sex. OCR recognizes that institutions face challenges in providing nondiscriminatory participation opportunities for their students and will continue to assist institutions in finding ways to meet these challenges.