IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STEPHANIE BIEDIGER, KAYLA LAWLER,
ERIN OVERDEVEST, KRISTEN
CORINALDESI, and LOGAN RIKER,
individually and on behalf of all those
similarly situated; and
ROBIN LAMOTT SPARKS, individually,

                         Plaintiffs,

   against

QUINNIPIAC UNIVERSITY,

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

CIVIL ACTION NO:

3:09-CV-00621 (SRU)

June 24, 2010

**DEFENDANT'S BRIEF IN RESPONSE TO THE
AMICUS CURIAE BRIEF OF THE UNITED STATES**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES...................................................................................ii

A.    Quinnipiac Relied on OCR's Consistent Position ................................................ 2

B.    The Importance of a Flexible Approach.............................................................. 5

C.    To the Extent It Departs From Settled Principles, OCR's Amicus Brief Should Not
      Be Given Deference ........................................................................................ 7

      1.    An Inflexible Approach is Inconsistent with Earlier OCR
            Guidance ............................................................................................ 8

      2.    The Amicus Brief Does Not Offer a Reasoned Explanation
            for Any Change................................................................................... 10

      3.    The United States' Amicus Brief Does Not Focus on the
            Most Compelling Factors Set Forth by the OCR.................................... 12

CONCLUSION ............................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AFSCME v. A.I.G., Int'l Group Inc.,*,
    462 F.3d 121 (2d Cir. 2006) ................................................................ 10, 11

*Arrow Fastener Co. v. Stanley Works,*
    59 F.3d 384 (2d Cir. 1995) ....................................................................... 12

*Bowen v. Georgetown University Hospital,*
    488 U.S. 204 (1988) ................................................................................. 10

*Callaway v. Commissioner of Internal Revenue,*
    231 F.3d 106 (2d Cir. 2000) .............................................................. 10, 11

*I.N.S. v. Cardoza-Fonseca,*
    480 U.S. 421 (1987) ................................................................................... 9

*Lemoyne-Owen Coll. v. NLRB,*
    357 F.3d 55 (D.C. Cir. 2004) .................................................................. 11

*New York State Rest. Ass'n v. N. Y. City Bd. of Health*,
    556 F.3d 114 (2d Cir. 2009) ..................................................................... 7

*NLRB v. Metro. Life Ins. Co.*,
    380 U.S.438 (1965) .................................................................................. 11

*NYS Elec. & Gas Corp. v. Secretary of Labor*,
    88 F.3d 98 (2d Cir. 1996) ........................................................................ 11

*Point Park Univ. v. NLRB,*
    457 F.3d 42 (D.C. Cir. 2006) ............................................................ 11, 12

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ................................................................................. 11

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944) ................................................................................... 7

On the first day of trial, the United States filed an amicus curiae brief that focuses largely on the factors to consider in determining whether an activity is a sport. Significantly, the amicus brief states:

- The court – not OCR – must determine whether Competitive Cheer is a sport (Br. at 17-18);

- OCR emphasizes that it considers **all** of the factors set out in the OCR 2008 Dear Colleague Letter in determining whether an activity is a sport (Br. at 14);

- OCR has not yet made any determination as to whether Competitive Cheer qualifies as a sport, and would analyze this on a "case-by-case basis" (Br. at 14).

Upon examining all factors in the 2008 Dear Colleague Letter, as the United States says is necessary, it is clear that Quinnipiac's Competitive Cheer athletes participate in a varsity sport and should be counted in determining that the University provides substantially proportional athletic opportunities to women.

The OCR has provided two comprehensive, reasoned letters that set out a carefully determined array of factors to consider in making a case-by-case determination as to whether an activity is a sport.  To the extent the United States' amicus brief states that the Court should make a determination regarding whether Competitive Cheer is a sport by applying all the factors in the 2008 Dear Colleague Letter, Quinnipiac agrees.  Indeed, the Competitive Cheer team meets the vast majority of these factors.

Inexplicably, although the United States' amicus brief repeatedly stresses the

importance of examining all factors from the 2008 Dear Colleague Letter, the brief itself

fails to address most of these factors.  To the extent the government's focus on two or

three discrete factors suggests that these factors warrant more weight than the other

factors, such a position should not be adopted by this Court or afforded deference

because (a) it conflicts with the agency's earlier interpretation, and (b) it is not a fair and

considered judgment and does not offer a reasoned analysis for the change.

### A.      Quinnipiac Relied on OCR's Consistent Position

For over ten years, OCR has held a consistent view on what factors a school

should look at to determine whether an activity constitutes a sport under Title IX.  On

April 11, 2000, OCR issued a letter to David Stead (the "2000 Letter"), noting that "OCR

does not rely on a specific definition of a sport."  The letter goes on to explain that OCR

assesses activities on a "case-by-case basis" and would take a variety of factors into

consideration.  OCR does not state that any of these factors is a mandatory

requirement, but notes that it will consider five principal factors:

- whether selection for the team is based upon objective factors related primarily to athletic ability;

- whether the activity is limited to a defined season;

- whether the team prepares for and engages in competition in the same way as other teams in the athletic program with respect to coaching, recruitment, budget, try-outs and eligibility, and length and number of practice sessions and competitive opportunities;

- whether the activity is administered by the athletic department; and,

- whether the primary purpose of the activity is athletic competition and not the support or promotion of other athletes.

Quinnipiac's Competitive Cheer team plainly satisfies each of these five factors. As this Court found in its preliminary injunction decision, Competitive Cheer "has all the necessary characteristics of a potentially valid competitive 'sport.' The elements and routines performed by competitive cheer teams require rigorous training and a high level of athletic and gymnastic ability, and could be easily described as 'group floor gymnastics.'" PI Decision at 33. The 2000 Letter goes on to note other evidence that "may be considered":

- whether organizations knowledgeable about the activity agree that it should be recognized as an athletic sport;

- whether the activity is recognized as part of the interscholastic or intercollegiate athletic program by the athletic conference to which the institution belongs and by organized state and national interscholastic or intercollegiate athletic associations;

- whether state, national, and conference championships exist for the activity;

- whether a state, national, or conference rule book or manual has been adopted for the activity;

- standardized criteria upon which the competition may be judged; and,

- whether participants in the activity/sport are eligible to receive scholarships and athletic awards (e.g., varsity awards).

In the 2009-2010 academic year, Quinnipiac's Competitive Cheer team met several of these additional factors that "may be considered" by OCR. The 2000 letter also noted the position of the Women's Sports Foundation, which includes the following elements: "a physical activity with an acknowledged primary purpose of competition between teams or individuals with a competitive structure comparable to other sports activities, governed by explicit rules defining the time, space and purpose of the contest and the conditions under which a winner is declared." 2000 Letter at 1 n.1.

3

The 2000 Letter has been widely looked to by universities (and, indeed, by this Court) as providing the list of factors to consider in determining whether an activity was a sport.  On September 17, 2008, the OCR issued a "Dear Colleague" letter, further explaining its considered judgment with respect to the factors a school should consider.  OCR explicitly noted that this guidance "does not represent a change in OCR's policy under *Title IX*."  Similar to the 2000 Letter, the 2008 Dear Colleague states that "OCR considers several factors related to an activity's structure, administration, team preparation and competition," which it goes on to list.  Again, the 2008 Letter notes that OCR makes an "overall determination" based on its consideration of the factors.  Plaintiffs' own expert witness, Dr. Lopiano, stated that the factors in the 2008 Dear Colleague Letter are "all the factors they look at in making a determination of whether or not this is a sport . . . ."

Quinnipiac's Competitive Cheer team satisfies the vast majority of the factors set forth in the 2008 Dear Colleague Letter.  In the 2008 Letter, OCR includes two conditional factors dependent upon whether pre-season and/or post-season competition is available:

- If pre-season and/or post-season competition exists for the activity, whether the activity provides an opportunity for student athletes to engage in the pre-season and/or post-season competition in a manner consistent with established varsity sports; for example, whether state, national and/or conference championships exist for the activity;

- If post-season competition opportunities are available, whether participation in post-season competition is dependent on or related to regular season results in a manner consistent with established varsity sports.

4

Notably, both of these provisions contemplate that an activity could be a sport

regardless of whether it offers post-season competition opportunities, and only lists

factors to consider "if" post-season competition opportunities are available.

The 2000 Letter and the 2008 Dear Colleague Letter are consistent in their

guidance that OCR makes fact-specific decisions based on an overall analysis of the

factors, and that no single factor or set of factors is required for an activity to be a

sport.[1]

## B.    The Importance of a Flexible Approach

This flexibility in determining what constitutes a sport is not only encompassed in

the well-reasoned guidance from OCR that has been consistent over the past ten years,

but it is also imperative for schools to develop new sports.  In the 2008 Dear Colleague

Letter, OCR states:

> It is OCR's policy to encourage compliance with the *Title IX*
> athletics regulation in a flexible manner that expands, rather
> than limits, student athletic opportunities.  By disseminating
> this list of factors, OCR intends to provide institutions with
> information to include new sports in their athletics programs,
> such as those athletic activities not yet recognized by
> governing athletics organizations and those featured at the
> Olympic games, if they so choose.

New sports necessarily will meet some but not all of the OCR factors because

they are still in the process of growing and gaining support.  Nevertheless, new sports

are important and valuable.  OCR explained this crucial underpinning of its analysis,

---

[1]      The United States notes that while the Court's analysis at the preliminary injunction stage was
guided by the Stead Letter, the OCR's policy is embodied in the 2008 Dear Colleague Letter.
The factors set out in these two letters are very similar, so Quinnipiac will address them together.
Indeed, Plaintiffs' expert witness, Dr. Lopiano, testified that the Women's Sports Foundation was
consulted in the development of the 2008 Dear Colleague Letter, and that the 2008 letter "tracks"
the previous letter and is "just a more clear enunciation of what OCR is going to look at."  Trial Tr.
at 138-39.

noting, "Expanding interscholastic and intercollegiate competitive athletic opportunities through new sports can benefit students by creating and stimulating student interest in athletics, taking advantage of athletic opportunities specific to a particular competitive region, and providing the opportunity for access to a wide array of competitive athletic activities."

In light of OCR's guidance in the 2000 Letter and 2008 Dear Colleague Letter and the Court's Preliminary Injunction decision based on that guidance, Quinnipiac offered athletic opportunities to 30 talented athletes in 2009-2010, who practiced, received coaching, and competed on the school's varsity Competitive Cheer team. While it is true that in the 2009-2010 academic year, the University's Competitive Cheer team did not meet every single factor set out in OCR's 2000 Letter or 2008 Dear Colleague Letter, the team clearly satisfies the overwhelming majority of the factors. The 2000 Letter and the 2008 Dear Colleague Letter both make clear that these factors are not a checklist, where an activity must satisfy every single factor in order to be deemed a sport. Instead, OCR takes a holistic approach, keeping in mind the importance of flexibility to develop new sports that provide the significant benefits of "creating and simulating student interest in athletics." 2008 Dear Colleague Letter at 4.

This flexible approach comports with the concept of "emerging sports" developed by the NCAA. A sport can gain "emerging sport" status from the NCAA (and thus receive a presumption that the sport can be counted under Title IX) by showing that there are at least 10 schools that either offer or intend to offer a varsity team in the coming years and that a total of 20 schools sponsor either varsity or club teams. The concept of an "emerging sport" recognizes that sports do not just magically appear fully

formed.  It takes time for a cadre of teams to develop and for those teams to coordinate

and organize regular and post-season competition.  If, however, schools are unable to

count these new varsity teams for purposes of Title IX, this will be a severe disincentive

from choosing a new sport that would benefit schools, students and the athletic

community by "creating and stimulating student interest."  This result would be

completely antithetical to the purpose of Title IX and all of OCR's established guidance

on the subject.

> **C.      To the Extent It Departs From Settled Principles, OCR's Amicus Brief Should Not Be Given Deference**

Although an agency may submit an amicus brief, the views expressed in such a

brief are not afforded any special deference, and are instead only considered for their

"persuasive value."  *New York State Rest. Ass'n v. N. Y.  City Bd. of Health*, 556 F.3d

114, 130 (2d Cir. 2009) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Under this *Skidmore* deference, "[t]he weight of [an agency's] judgment in a particular

case will depend upon the thoroughness evident in its consideration, the validity of its

reasoning, its consistency with earlier and later pronouncements, and all those factors

which give it power to persuade . . . ."  *Id.*

To the extent the OCR's amicus brief seeks to alter the multi-factor analysis

provided in the 2000 Letter and the 2008 Dear Colleague Letter, it should not have any

"power to persuade" this Court because the focus in the last section of the amicus brief

on just two of the factors in those letters (1) is inconsistent with the OCR's long-standing

analysis relied on by Quinnipiac and countless other schools, and (2) the amicus brief

offers no explanation for any shift in OCR's approach.

*1.      An Inflexible Approach is Inconsistent with Earlier OCR Guidance*

The government correctly lists a page and a half of various factors that OCR

considers in determining whether an activity is a sport on pages 15-16 of its brief.

Although the government states that the court "will need to examine each factor," the

brief itself does not make any attempt to provide a holistic analysis of Quinnipiac's

Competitive Cheer program.  (Br. at 18.)  Instead, the brief proceeds to "highlight a

couple of the factors to illustrate how the court should evaluate whether true competition

exists for Quinnipiac's cheer team as compared to other Quinnipiac varsity sports."  *Id.*

The government's "illustration" fails to consider the *vast majority* of factors from the

2000 Letter and the 2008 Dear Colleague Letter that Quinnipiac's Competitive Cheer

team plainly met in 2009-2010 (*e.g.*, the primary purpose of the activity is to provide

athletic competition, the team has ample practice and competition opportunities, and the

team is administered by the athletics department in the same manner as every other

varsity team at Quinnipiac).

Instead, the "illustration" provided by the government focuses exclusively on two

facts that Quinnipiac concedes: in 2009-2010, the Competitive Cheer team did not

engage in post-season competition and is not yet recognized as an NCAA or NEC

sport.  For example, the government states in its brief that the "court should determine

whether either the NCAA and NEC, which govern all other varsity sports at the

University, held a championship during the 2009-2010 season."  (Br. at 20)  The

position that a Division I school can only offer new sports that are already NCAA

championship sports is *directly contrary* to OCR's guidance in the 2008 Dear Colleague

Letter, which states that the factors are designed to provide institutions information "to

8

include new sports in their athletics programs, *such as those athletic activities not yet recognized by governing athletics organizations.*"

Indeed, the same factors the government "highlights" in its brief would also prevent almost any new activity from being considered a sport.  This pronouncement essentially requires that NCAA schools only offer sports that are already NCAA championship sports.[2]  If schools were forced to follow the government's unexplained position, this would undoubtedly thwart the development of any new sports.  Again, this contradicts OCR's long-standing position that it encourages compliance with Title IX in a "flexible manner that expands, rather than limits, student athletic opportunities."  2008 Dear Colleague Letter.

OCR expressly envisioned in its 2008 Dear Colleague Letter that sports can evolve.  There is simply no way for a new sport to evolve if no schools can lead the way by categorizing their teams as varsity.  Schools would have to all coordinate to elevate the same teams to varsity status at precisely the same time and have all the post-season opportunities and conference championships in place.  This is impractical for many reasons, and this view is directly contrary to OCR's statements regarding flexibility and the value of adding new sports expressed in the 2008 Dear Colleague Letter.

The government's amicus brief should not be given any weight because it is inconsistent with the OCR's guidance that has been in place for over ten years.  *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to

---

[2]       In fact, the NCAA does not require a sport to have post-season competition in order to be recognized as an Emerging Sport.  (Plaintiffs' Exhibit 52.)

considerably less deference than a consistently held agency view.") (internal quotation

marks and citations omitted); *Callaway v. Commissioner of Internal Revenue*, 231 F.3d

106, 132 (2d Cir. 2000) ("the consistency of an agency's position remains a factor to be

considered in assessing the deference due that position"); *see also Bowen v.*

*Georgetown University Hospital*, 488 U.S. 204 (1988) (deference is not given when an

agency litigation position is "wholly unsupported by regulations, rulings, or

administrative practice").

>    2.    *The Amicus Brief Does Not Offer a Reasoned Explanation for Any*
>          *Change*

To the extent the government's amicus brief sharply departs from its prior

guidance, and it does so without even acknowledging that it has taken this turn, let

alone explaining its rationale.  The brief "highlights" select factors, but does not attempt

to explain why these particular factors ought to be highlighted any more than the many

factors Quinnipiac's Competitive Cheer team satisfies.  The government does not

identify anything about the factors it chose that is uniquely important to a case-by-case

analysis of Competitive Cheer.  Indeed, the only difference between the select factors

the government analyzes and the other factors is that the Competitive Cheer team

clearly meets the other factors.

The Second Circuit examined a similar conflict in *AFSCME v. A.I.G., Int'l Group*

*Inc.*, 462 F.3d 121 (2d Cir. 2006), where an agency submitted an amicus brief that was

in conflict with a prior statement.  The court found that while an agency can change its

interpretation, it "nevertheless has a duty to explain its departure from prior norms."  *Id.*

at 129 (internal quotation marks and citations omitted).  The court went on to note that,

much like in this case, "[i]n its amicus submission, the SEC fails to so much as

10

acknowledge a changed position, let alone offer a reasoned analysis of the change." *Id.* Accordingly, the court deferred to the agency's long-standing interpretation rather than its unexplained new position expressed in an amicus brief. *See also Callaway*, 231 F.3d at 132 (noting that the weight to be given to an agency's interpretation is based on how "fair and considered" the agency's position is); *NYS Elec. & Gas Corp. v. Secretary of Labor*, 88 F.3d 98 (2d Cir. 1996) ("When an administrative agency addresses a question in an inconsistent manner, departing from a position it has previously taken, it must make a clear statement of its new rule and reasons for making the change in order for an appellate court to conduct an intelligible judicial review").  Thus, the United States' amicus brief should not be given weight because it does not explain the rationale behind the decision to focus on two of the many factors identified by OCR.

The government's failure to explain its rationale is all the more egregious because, by highlighting only two of the multiple factors from the 2000 Letter and the 2008 Dear Colleague Letter, the government has completely ignored the remaining factors.  It is well-settled than an administrative agency must disclose the basis of its decisions and "give clear indication that it has exercised the discretion with which Congress has empowered it." *NLRB v. Metro. Life Ins. Co.*, 380 U.S.438, 443 (1965) (internal citation and quotation marks omitted).  Administrative action simply cannot be sustained without clear and concise reasoning for its decision. *SEC v. Chenery Corp.*, 332 U.S. 194 (1947).  Furthermore, where an agency applies a multi-factor test through case-by-case adjudication (an approach the government advocated in the 2000 Letter and the 2008 Dear Colleague Letter), the agency must state "which factors are significant and which less so, and why." *Point Park Univ. v. NLRB*, 457 F.3d 42, 50

(D.C. Cir. 2006) (*quoting Lemoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004)).  In this case, the United States has utterly failed to explain its rationale for highlighting two factors of its multi-factor test, while utterly ignoring the remaining factors.  Without such an explanation from the government, this Court cannot rely upon the United States' analysis in its amicus brief.  *See Point Park*, 457 F.3d at 50-51.

The Court should not accept the government's unexplained focus on certain factors, which ignores many other factors.  Indeed, district courts must also provide a thorough analysis of what factors they consider when analyzing a multi-factor test.  *See, e.g.*, *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 400 (2d Cir. 1995) (requiring district court cases to complete "a thorough, delineated analysis of the eight *Polaroid* factors").

### 3. The United States' Amicus Brief Does Not Focus on the Most Compelling Factors Set Forth by the OCR

There is no obvious reason why the United States chooses to "highlight" the specific factors discussed in its brief.  Indeed, there are numerous other factors that go more to the heart of whether an activity is a sport.  For example, a primary concern with respect to Competitive Cheer is whether "the primary purpose of the activity is to provide athletic competition at the intercollegiate or interscholastic varsity levels rather than to support or promote other athletic activities."  Quinnipiac's Competitive Cheer team's sole purpose is to provide athletic competition.

Another factor of paramount importance is the athleticism involved in the activity, which is encompassed in the question of whether the selection of teams / participants is based on factors "related primarily to athletic ability."  As Coach Mary Ann Powers testified, she selected members of her team based on their athletic abilities and skills.

12

Finally, another significant factor that the United States fails to discuss in its brief is whether an activity is structured and administered consistent with other varsity sports in a school's athletic program.  Quinnipiac's Competitive Cheer team is administered like every other varsity team at the University.  Athletes on the Competitive Cheer team receive coaching, practice, train, obtain equipment, and engage in positive play and power hours just like every other varsity athlete at the University.

Post-season competition is plainly not required under the OCR's 2008 Dear Colleague Letter, which prefaces the two references to post-season competition by conditioning the factor on "*if*" pre-season and/or post-season competition exists for the activity.  The United States grossly misstates this factor, which is just one of many factors to be weighed, by stating that "[T]o be counted as a sport, therefore, Quinnipiac's competitive cheer team should participate in regular season, pre-season and/or post-season competition opportunities in a manner consistent with other established Quinnipiac varsity sports."  (Br. at 18.)  Neither the 2000 Letter nor the 2008 Dear Colleague Letter establishes any such requirement.

Moreover, the United States' brief incorrectly notes that the NEC and NCAA "require each sport to employ a progressive-style competition leading to post-season play." (Br. at 19)  Jack McDonald, the Athletic Director at Quinnipiac, testified that there are several well-established sports in the NEC that do not employ such a progressive-style competition leading to conference post-season play, like indoor and outdoor track and field and men's and women's golf.  (Trial Tr. at 529.)

13

## CONCLUSION

The government's brief properly recognizes that the Court needs to make a

determination whether Quinnipiac's Competitive Cheer team is a sport for purposes of

Title IX by careful consideration of **all** of the factors identified by OCR in its 2000 and

2008 guidance letters.  To the extent that the government is suggesting that two of

those factors be given special weight, however, the brief should not be given deference

as it represents an unexplained and illogical departure from the agency's position for the

past ten years and would serve to block--rather than encourage--the development of

new sports representing new athletic opportunities for women.


Dated:  June 24, 2010                                        PROSKAUER ROSE LLP

                                                             By: /s/ Edward A. Brill
                                                                 Edward A. Brill
                                                                 Federal Bar No. phv015747
                                                                 Susan D. Friedfel
                                                                 Federal Bar No. phv03585
                                                             1585 Broadway
                                                             New York, NY  10036
                                                             Tel:  212.969.3000
                                                             Fax:  212.969.2900
                                                             ebrill@proskauer.com
                                                             sfriedfel@proskauer.com

                                                             WIGGIN AND DANA
                                                             Mary Gambardella, Esq.
                                                             Federal Bar No. ct05386
                                                             400 Atlantic Street
                                                             Stamford, CT  06911-0325
                                                             Tel:  (203) 363-7662
                                                             Fax: (203)363-7676
                                                             mgambardella@wiggin.com

                                                             *Attorneys for Defendant*

14