IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHANIE BIEDIGER, KAYLA LAWLER ERIN OVERDEVEST, KRISTEN CORINALDESI, and LOGAN RIKER, individually and on behalf of all those similarly situated; and ROBIN LAMOTT SPARKS, individually, | ) ) ) ) ) ) ) | Case No. 3:09-CV-621(SRU) |
| Plaintiffs, | ) | June 25, 2010 |
| v. | ) ) | |
| QUINNIPIAC UNIVERSITY, | ) ) | |
| Defendant. | ) ) | |

## TRIAL BRIEF

The Plaintiffs allege that Quinnipiac University discriminates on the basis of sex in the operation of its varsity athletics program, in violation of Title IX of the Education Amendments of 1972 (20 U.S.C. § 1682, *et seq.*) and the regulations adopted pursuant thereto (34 C.F.R. Part 106) by, among other things (1) failing to provide female students with an equal opportunity to participate in varsity intercollegiate athletics, (2) failing to provide female students with equal athletic financial assistance, and (3) failing to provide female athletes with comparable varsity athletic benefits. The Court has certified a plaintiff class consisting of :

> All present, prospective, and future female students at
> Quinnipiac University who are harmed by and want to end
> Quinnipiac University's sex discrimination in: (1) the allocation
> of athletic participation opportunities; (2) the allocation of athletic
> financial assistance; and (3) the allocation of benefits provided
> to varsity athletes.

By agreement of the parties approved by the Court, only Plaintiffs' First Claim for Relief, challenging the University's allocation of athletic participation opportunities and seeking, on behalf of the Plaintiff Class, an injunction, has been tried before the Court from June 21 through 25, 2010. The background facts of the case are set forth in the parties' prior briefing and the Court's May 22, 2009, ruling granting Plaintiffs' Application for a Preliminary Injunction. *See Biediger v. Quinnipiac University*, 616 F.Supp.2d 277 (D.Conn. 2009).

## TITLE IX BACKGROUND

Title IX of the Education Amendments of 1972 (20 U.S.C. §1681, *et seq.*) prohibits sex discrimination in education. The portion relevant to this case provides:

> No person in the United States shall, on the basis of sex,
> be excluded from participation in, be denied the benefits of,
> or be subjected to discrimination under any education program
> or activity receiving Federal financial assistance.

20 U.S.C. §1681(a). It is undisputed that Defendant receives federal financial assistance and that its athletic program is subject to the requirements of Title IX.

Two Title IX regulations apply specifically to athletics: 34 C.F.R. 106.37( c) (athletic scholarships) and 34 C.F.R. 106.41 (accommodation and treatment). The latter regulation provides in relevant part:

> (a)    General. No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person, or otherwise discriminated against in any interscholastic, intercollegiate, club, or intramural athletics offered by the recipient . . .

> ( c)    Equal opportunity. A recipient which operates or sponsors interscholastic, intercollegiate, club, or intramural athletics shall provide equal athletic opportunity for members of both sex.

In determining whether a school provides equal opportunity in athletics, OCR [the Department of Education's Office of Civil Rights] considers, among other things:

    (1)    whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes
    (2)    the provision of equipment and supplies
    (3)    scheduling of games and practice times
    (4)    travel and per diem allowance
    (5)    opportunity to receive coaching and academic tutoring
    (6)    assignment and compensation of coaches and tutors
    (7)    provision of locker rooms, practice and competition facilities
    (8)    provision of medical and training facilities
    (9)    provision of housing and dining facilities and services
    (10)   publicity

In 1979, the Office for Civil Rights ("OCR") issued a Policy Interpretation on "Title IX and Intercollegiate Athletics" in the Federal Register at 44 Fed.Reg. 71,413, *et seq.* (December 11, 1979) (the "1979 Policy Interpretation").  The 1979 Policy Interpretation defines equal opportunity in athletic participation through the use of the following three-part test:

    (1)    Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

    (2)    Where the members of one sex have been and are under-represented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of the members of that sex; or

    (3)    Where the numbers of one sex are under-represented among intercollegiate athletes, and the institution cannot show expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed.Reg. at 71418.

OCR's 1996 "Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test" (the "1996 Clarification") explains the meaning of each part of the test.  For part one, if a school's female enrollment is (for example) 52%, then its varsity intercollegiate athletic participation rate for females should also be 52%.  The difference between the number of varsity female athletes an institution actually has and the number it needs to reach 52% is the participation "gap."  If the size of the gap is larger than the expected size of a viable athletic team, then the institution does not comply with part one.  1996 Clarification at pp. 2-5.

For purposes of this trial, Defendant has stated that it does not and has not relied on parts two or three of the Three-Part Test.  Accordingly, this trial brief addresses only Part One. Plaintiffs contend that (1) Defendant's disparate "roster management" policy of mandatory caps on men's teams and mandatory minimums on women's teams discriminates on the basis of sex in violation of Title IX; (2) Defendant fails to satisfy prong one of the Three-Part Test even if it triple counts its runners and even if it is allowed to count its cheerleaders as varsity athletes for purposes of Title IX; (3) Defendant cannot count its existing cheerleading or stunt team as varsity athletes for purposes of Title IX; (4) Defendant cannot separately count its track runners as varsity athletes for purposes of Title IX because it does not provide them the varsity benefits it provides to its other sports teams; and (5) Defendant's history of discrimination against women in the operation of its athletic department mandates continued supervision by this Court.

## ARGUMENT

**I.    DEFENDANT'S ROSTER MANAGEMENT POLICY DISCRIMINATES ON THE BASIS OF SEX IN VIOLATION OF TITLE IX**

The plain language of the Title IX statute and athletics regulation precludes the different treatment of men's and women's athletic teams/programs.  Yet, Defendant has a policy that treats men's and women's athletic teams differently.  That policy caps or limits the squad sizes of men's teams to an absolute *maximum* number of male athletes.  Those limits are usually below the NCAA Division I and Northeastern Conference average squad sizes. In contrast, the policy places a floor under the squad sizes of women's teams, requiring them to carry an absolute *minimum* number of female athletes.  The women's squad limits are usually above the NCAA Division I and NEC average squad sizes.  By having an official policy that places ceilings on men's teams and floors on women's teams, Defendant treats men and women differently and thus discriminates on the basis of sex.  This official policy harms existing female athletes, and Defendant uses it to justify its failure to add more women's sports with new opportunities, thus harming still more women.

A comparison of Defendant's squad sizes to those of average NCAA and NEC squads demonstrates the consequences of the policy.  By subtracting one or a few men from each of Defendant's seven men's teams, Defendant eliminates a group equivalent to the size of an average volleyball team.  Defendant compounds this by adding one, a few, or even many extra women to many of the women's teams.  In doing so, it adds women who are unlikely ever to meaningfully contribute to, or even compete for, their teams.  It does not do so because the coaches or athletes want more players.  It does not do so to provide more women with real athletic opportunities.  It does so in order to avoid adding or keeping women's sports in which

women would have opportunities to actually compete.  By adding these extra women to existing

teams, Defendant sought to eliminate the already existing opportunities provided in women's

volleyball.  The goal of the entire exercise was not to provide women with meaningful athletic

participation opportunities or to improve the existing women's teams.  It was to cut women's

opportunities without appearing to violate Title IX.  Yet, this policy and practice is completely

contrary to the purpose of the law.

　　　　Moreover, by giving men's teams the same resources, scholarships, and coaches as before

-- but with fewer athletes -- the men receive more resources per capita than before.  They also

gain the benefits of smaller student-to-coach ratios, just like the benefits from any other smaller

teacher-to-student classroom sizes.  The coaches of women's teams, on the other hand, must

serve larger numbers of women with the same or similar budgets, scholarships, facilities, and

other resources.  Despite requiring larger women's squad sizes, Defendant did not give women's

coaches larger budgets to provide uniforms, equipment, travel, meals, and other benefits to the

additional women.  It did not hire more coaches to teach the additional women.  In the case of

track, it did not build them a facility or provide a single scholarship for the new women.  Instead,

more women had to share the same resources and higher student-to-coach ratios.

　　　　Defendant also did not provide the coaches with more recruiting or scholarship dollars to

find and recruit the additional athletes that its policy mandated.  It did not explain to coaches how

it expected them to find Division I caliber athletes to fill their higher quotas after the recruiting

season, after the letter of intent signing deadline, after the admissions deadline, and even after the

deposits deadline.  It thus put women's coaches and teams in the precarious position of carrying

athletes of vastly different abilities on what are supposed to be elite, Division I teams.  Defendant

continued this policy despite complaints and concerns raised by women's coaches about the large

sizes of their rosters or the skill levels of the additional athletes.[1]

The NCAA Gender Equity Manual warns against taking roster management too far:

> The negatives of roster management include the fact that, overall, some opportunities are lost for men. It also is possible that so many roster spots are eliminated that a team may be rendered non-competitive. A way to solve this problem would be to use the divisional team average of roster spots as a method to reasonably and fairly cap men's teams.
>
> The opposite problem could occur in women's teams. Roster management minimums for women's teams may be so high that there are too many people on a team for it to be a meaningful experience for all. Using the divisional average could be a way to reasonably and fairly construct roster management numbers for women's teams as well.

NCAA Gender Equity Manual, Ex. 25, at p. 180. As Dr. Lopiano explained in her testimony,

reasonable squad sizes depend both on the nature of the sport and the level of recruiting,

scholarship, and other resource support that an institution gives them. At Quinnipiac, it is clear

that Defendant does not provide those necessary, additional resources to its enlarged women's

teams.

---

[1] Women's softball coach Germaine Fairchild testified at the preliminary injunction hearing that her squad size minimum was too high for her sport and that she was forced to carry athletes who did not have Division I skill. Women's ice hockey coach Rick Seeley sent an email to the athletic director in April 2010, to explain that he had cut women who did not have the skill to play varsity but whom he had carried on the roster because of the mandatory minimum policy. Women's cross country coach Carolyn Martin sent an email to Mark Thompson stating that she could have cut 2-3 female cross country runners "and it would not hurt the team performance wise." She further stated that because she could not make cuts this year her "track team has some low quality women" and has "about 5 athletes that really should not have made the team." The same email exchange raises concerns about how low her budget was given the number of athletes she was required to carry.

The U.S. District Court for the Western District of Pennsylvania identified these same "roster management" schemes as suspect in its opinion in *Choike v. Slippery Rock University*, 2006 WL 2060576 (W.D.Penn. 2006), especially when no additional recruiting or scholarship money was provided to the women's teams to increase their existing squad sizes. In rejecting those practices, the Court stated, "the number of positions allocated [for women's teams] was derived, not from any research as to the needs or wants of the female students, but based purely on the number of positions that coaches wanted to make available to male athletes." *Id.*

Quinnipiac does the same thing. It directs its men's teams to carry smaller numbers of athletes than NCAA or NEC averages, and orders its women's teams to carry excessively large numbers purely in order to approach numerical compliance under prong one, without accounting for the actual needs of the sports or the actual skills of the women added. Defendant imposed this discriminatory policy upon its teams to avoid adding new women's sports. It did so without consideration of the athletic/educational needs of the students and without consideration of the expressed views of the coaches. There was no pedagogical or athletic reason to treat men's and women's teams differently in this way.

Defendant's counting games with its runners further emphasize the consequences of its policy to deflate men's numbers and inflate women's numbers. Defendant has long offered competitive women's and men's cross country teams. These same men and women then ran distance events in the spring. In some years, Defendant counted these athletes as both cross country and track runners. In other years, it counted each runner only once even though they ran spring distance races, because NCAA rules allow each cross country runner to participate in 5

spring track meets.  Despite the inconsistencies in how Defendant counted these runners, it at least counted  the men and women in the same way.

However, since eliminating the women's volleyball team, Defendant has also cut its men's outdoor (and later indoor) track teams, maintaining women's cross country, indoor track, and outdoor track.  It then limited the size of the men's cross country team to 13 athletes, padded the size of the women's cross country team to 18 athletes, and proceeded to count each male cross country athlete only once but each female cross country athlete three times.[2]  It also required its female cross country runners to participate in track as a condition of being on the cross country team, something it did not require of the athletes on any other varsity team, male or female.  As a result of this disparate treatment of the men's and women's cross country teams, Defendant counted 13 male runners as 13 athletes but counted 18 female runners as 54 athletes. It did so even though some of the female runners did not run a single race in any sport or were "redshirted" in some but not others.

For example, Defendant counted Rachel Ann Morelli as three separate athletes in three separate sports even though she did not run any cross country or outdoor races and only ran a few indoor 800m races.  Defendant counted Christine Donnelly as three separate athletes in three separate sports even though she did not run a single race all year -- or at least none that appears in

---

[2]        The fact that Defendant carried only 13 male cross country runners but 18 female cross country runners further confirms that the university was padding its women's teams. Coach Martin even stated in her March 31, 2010, email to Vice President Thompson that 14 athletes was enough to field both a varsity men's cross country team and a junior varsity team to run in "open invitationals."  If 14 men are enough to field both a varsity and JV team, requiring 18 women -- or even more next year -- seems highly unreasonable.  The *Choike* court reached this same conclusion when Slippery Rock mandated that the women's cross country team carry significantly more athletes than the men's team.

the results for any of the meets.  Defendant counted Kaitlin Kelly three times even though she

only ran cross country.  It counted Holly Banaian three times even though she ran only one cross

country race and 2 long distance spring races, which she could have done in any event as a cross

country athlete.[3]  It did the same for Kelly Sorrell, counting her three times even though she ran

cross country and only one indoor long distance race; again, something she could have done just

as a cross country athlete.  Defendant counted Kristen Stevens three times even though she did

not run a single indoor race and ran fewer than 5 races during the outdoor season.  It did the same

for Christine Cristobal, who ran only in "open" cross country meets, ran no outdoor meets, and

ran fewer than 5 indoor meets.  By claiming redshirt designation, Defendant counted Andrea

Szarkowicz three times even though she ran only track distance events and no cross country.

Overall, Defendant counted these 8 women as if they were 24 separate athletes competing in

separate sports, even though some never ran a race of any kind or ran solely as cross country

runners with fewer than 5 track meets.  Even if one were inclined to count runners three times for

cross country, indoor track, and outdoor track, Defendant clearly is manipulating the rules to

make it appear to have more competing athletes than it actually does.

On top of this counting game, Defendant claimed to add 12 female track athletes who

were not recruited and did not receive aid.  It then double-counted them no matter how many

times they ran.  Plaintiffs contend below that Defendant never operated its track program as a

true varsity team.  For purposes of this section, however, it is important to point out that by

manipulating the counting of its male and female runners, Defendant turned legitimate men's and

---

[3]       As Figure 17-1 of the 2009-2010 NCAA Division I Manual indicates, cross
country runners can participate in up to 7 regular season meets in the fall and 5 regular season
meets in the spring.

women's cross country teams of 13 or so runners each into 13 males and 78 females in its count

for EADA and Title IX purposes.   These disparate counting and roster policies are facially

discriminatory and thus violate Title IX , no matter how many athletes are counted.

## II.   DEFENDANT VIOLATES PRONG ONE OF THE THREE-PART-TEST NO MATTER HOW ATHLETIC PARTICIPANTS ARE COUNTED

It is undisputed that Defendant's 2009-2010 enrollment included 2134 full-time

undergraduate males and 3518 full-time undergraduate females (61.9%).  Accordingly,

Defendant must provide substantially 61.9% of its varsity intercollegiate athletic participation

opportunities to female students.[4]  This is the essence of prong one of OCR's Three-Part Test and

the essence of actual equity, that is, giving each student the same chance to participate.

The 1979 Policy Interpretation clearly defines who should be counted for purposes of

prong one of the Three Part Test.  It defines a "participant" as those athletes

a.   Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, *e.g.*, coaching, equipment, medical and training room services, on a regular basis during a sport's season; and

b.   Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and

c.   Who are listed on the eligibility or squad lists maintained for each sport; or

d.   Who, because of injury, cannot meet (a), (b), or (c) above but continue to receive financial aid on the basis of athletic ability.

---

[4]       Defendant admits that next year's enrollment, based upon deposits received from incoming freshman and continuing students, will be weighted even more heavily in favor of women, so that Defendant will have to offer even more athletic opportunities for women then than it does now.  Moreover, Robin Sparks testified that Defendant notified its coaches that because of the university's continuing emphasis on health professions, the athletic department should expect the trend toward a higher proportion of female enrollment to continue.

44 Fed.Reg. at 71415.  Under this definition, athletes must receive the "laundry list" of benefits

normally provided to an institution's varsity teams under 34 C.F.R. 106.41(c).

The 1996 Clarification provides general rules about how to apply this definition:

> Under this definition, OCR considers a sport's season to commence
> on the date of a team's first intercollegiate competitive event and to
> conclude on the date of the team's final intercollegiate competitive
> event.  As a general rule, all athletes who are listed on a team's squad
> or eligibility list and are on the team as of the team's first competitive
> event are counted as participants by OCR.

As this Court noted in its preliminary injunction decision, and as Dr. Lopiano noted in her

trial testimony, these definitions must be applied in a common sense way in furtherance of the

purposes of the statute they interpret, Title IX.  The NCAA's Gender Equity Manual (Ex. 25)

follows the same approach:

> According to the 1996 Clarification, participants are those who are
> listed on the NCAA squad lists as of the first date of competition in
> the sport.  It should be noted, however, that at least one court case has
> taken a slightly broader view on the definition [of participant].  It
> defined a participant as one who participated in a majority of the
> season.  The more accurate test is a combination of the two, using the
> first date of competition as the baseline.  Typically, the OCR will
> check for situations in which squad numbers increase or decrease
> significantly after the first date of competition, especially in sports
> such as crew and track and field.  As a general rule, coaches and
> compliance officers must be aware that the names listed on the squad
> lists as of the first date of competition are significant for gender
> equity purposes, but also mindful that additions or cuts after the first
> date of competition should be documented and may be included in the
> mix, depending on the circumstances.

NCAA Gender Equity Manual at 23.

This approach also accounts for the differences between squad lists and eligibility lists.

As Dr. Lopiano testified, the OCR policies clearly state that athletes on the eligibility lists should

be considered -- especially when those athletes actually compete and actually use up a year of athletic eligibility -- even if they are not on the squad list on the first date of competition.  Careful review of which athletes have the indicia of an actual varsity participation opportunity under the totality of the circumstances is especially important in cases like this one in which schools try or have tried in the past to manipulate their numbers around the definition by focusing on the "first date of competition" language and nothing else.

Defendant has provided no analysis or list of which athletes it counts for purposes of Title IX.  Instead, it relies on a chart it claims to show first day of competition and last day of competition roster sizes.  Thus, it is not possible to assess Defendant's counting of "participants." Presumably, these numbers reflect athletes who were technically on the squad list as of the first date of competition but who were not registered as cut or quit until later.  Presumably, Defendant also would count athletes who were not on the squad lists as of the first date of competition but who were added thereafter, who actually competed, who actually received varsity benefits for at least a full semester, or who were on the squad list for the first date of competition during the nontraditional season.  Plaintiffs cannot be certain because Defendant conducted no athlete-by-athlete or team-by-team analysis of its numbers.[5]

Dr. Lopiano, on the other hand, painstakingly analyzed Defendant's actual squad lists, eligibility lists, seasons of competition used lists, and change of status summaries to learn as much as she could about each individual athlete on each team's squad list.  She then created a detailed chart that explained which athletes she counted and why, including which components

---

[5]     Plaintiffs do not argue that Defendant intentionally added or dropped athletes right around the first competition date as it did in prior years.  Plaintiffs presume that Defendant either stopped the rampant abuse of that procedure, or stopped leaving evidence of it in its documents.

of the OCR definitions she relied upon.  Her detailed analysis, findings, and conclusions are set

forth in Exhibits 149-151, which Plaintiffs incorporate herein by reference.

Dr. Lopiano analyzed each athlete under three different counting scenarios.  Under the

first scenario, she counted each athlete who strictly fit the definitions and general rules for

"participant" provided in the 1979 Policy Interpretation and 1996 Clarification under Reasons 1-

4.  She identified each such athlete with an "A," as shown on each team's chart at Exhibit 150.

These counts included all athletes who actually played in competition (thus using eligibility per

the eligibility list), each athlete who was a medical redshirt (as designated by Defendant), each

athlete who was a non-medical redshirt but who received all the benefits of other varsity athletes

on the team (as designated by Defendant), and each athlete who was on the squad list as of the

first date of competition during the team's championship season.  There simply cannot be any

dispute about the counting of these "A" athletes under the strictest OCR definitions.  Dr. Lopiano

then totaled the number of "A" athletes on each team and recorded those numbers in Column A

of Exhibit 151.

Dr. Lopiano next applied her many years of expertise in gender equity and athletic

administration to explain additional Reasons 5-8 for counting athletes that she contends fall

under OCR's definitions of "participant."  Under Reason 5, she counted all athletes who were not

on the squad list on the first date of competition of the championship season but who were on the

squad list on the first date of competition of the team's nontraditional or second season.  In her

testimony, she reviewed Figures 17-1 and 17-2 of the NCAA Division I Manual to explain how

most NCAA sports (*e.g.*, softball, baseball, lacrosse, soccer, field hockey, crew, *etc.*) have more

than one competitive season.  Because the OCR does not distinguish between seasons, she stated

14

that all athletes under Reason 5 should count as participants on the first day of competition.

Doing so fits squarely within the OCR rule about counting athletes who are on the squad list as

of the first date of competition.

Under Reason 6, Dr. Lopiano counted each athlete who received all of the benefits of

varsity participation for at least a full semester but who, for whatever reason, was not on the

squad list as of the first date of competition.  She did not include athletes who were only briefly

on the team.  She counted only athletes that Defendant's own documents show regularly

participated for at least a full semester.  Under Reason 8, Dr. Lopiano noted that there were two

athletes (one male and one female) who were fifth year students on athletic aid but who had

exhausted their competition (but not practice) eligibility.  She did not know if they practiced, so

she counted them identically.

Dr. Lopiano designated athletes she counted under Reasons 5, 6, & 8 as a "B" in the

"where counted" column on her team-by-team analysis at Exhibit 150.  She then totaled the "B"

athletes by team and added them to the "A" athletes to reach a total for each team in Column B of

Exhibit 151.  She testified that she believes that all of these athletes fall under a common sense

application of the OCR rules for participant and should be counted.

Dr. Lopiano's Reason 7 was not actually a means of counting athletes.  Instead, it was a

means of "red flagging" athletes that she counted but whose circumstances raised some concern

for her regarding whether the athlete actually participated or actually received varsity benefits.

She also noted that some women's teams carried so many athletes over the NCAA or NEC

averages that she questioned whether the noncompeting athletes received a genuine varsity

experience.  However, in most cases she did not change her count as a result of her concerns.

15

She merely noted the question for the Court's own consideration.  In a very few instances, she decided to adjust the count based upon the totality of the circumstances for that athlete.  She did so by placing a +1 or -1 by the athlete's name in Exhibit 150.  She then accounted for these adjustments in Column C of Exhibit 151.  Thus, Column C is the only count in which Dr. Lopiano considered the red flags, and even then she usually did not adjust the count at all.[6]

After counting the actual number of male athletic participants, Dr. Lopiano calculated the number of female athletes that Defendant should have had in order to reach the substantial proportionality mark of 61.9% female.  In each and every case, no matter how athletes were counted, Defendant provided fewer opportunities for women than it should have under Prong One.  Dr. Lopiano then subtracted the lower, actual number of female athletes from the higher, proportional number of female athletes to determine the "gap," which is the number of additional female athletes to whom Defendant should have provided athletic participation opportunities.  The "gap" for each means of counting -- from the most conservative, strictest Column A to the red flagged Column C, and for every means of counting track -- is set forth on the last page of Dr. Lopiano's supplemental report at Exhibit 149 and attached hereto again as **Exhibit A**.

Again, in each and every case, no matter how calculated, there was a participation gap that exceeded the size of a volleyball team.  Even under the most generous means of counting (one that Dr. Lopiano stated was far more generous to QU than she would advise) -- using Column A, allowing the padding of women's teams, counting all of Defendant's 30 team

---

[6]         As one example of a red-flagged athlete, Dr. Lopiano decided not to count one field hockey player who was on the squad list as of the first date of competition but who was cut shortly thereafter, never played, was not recruited, and did not receive athletic aid.   The athlete was on the team a very short time and left involuntarily (*e.g.*, was cut).

members, and triple counting its female runners -- Defendant only met prong one by keeping the

volleyball team.  Under every other counting scenario, using Column A, B, or C and using any

combination of counting runners, the gap is even *wider*.  Thus, under no scenario can Defendant

satisfy Prong One of the Three-Part Test, and under no scenario does Defendant comply with

Title IX.

Defendant counters that no matter what the gap turns out to be, it promises that it will

increase the number of women on existing teams (including cheer) enough to offset eliminating

12 volleyball players.  This position fails for two reasons.  First, it takes us back to the

preliminary injunction stage at which this Court rightly held that a promise to comply in the

future is not sufficient to justify eliminating teams today.  *See also Choike*, 2006 WL 2060576 at

*7.  Second, by taking away actual varsity volleyball competition opportunities and reallocating

those slots to other, already padded teams, Defendant exacerbates its existing problems.  The

additional athletes likely will not compete or contribute to the existing squads and will not likely

receive varsity benefits, particularly any reasonable chance at actual participation.  Moreover,

those additional athletes will take away resources from the athletes who  have the requisite skill

levels to compete and the actual chance to do so.

Finally, Defendant has not explained how it intends to find those athletes.  It told the

coaches their new squad minimums after their seasons ended, after recruiting ended, after the

national letter of intent signing date, after doling out scholarship money, after the admissions

deadline, and after the deposits deadline for next year's freshmen.  Any realistic Division I

athlete already has decided where she will go to school next year.  Additional padding isn't

plausible -- even if Defendant suddenly and finally provided the recruiting, scholarships, and

resources to do so.  In short, Defendant does not have a legitimate plan for complying with Title

IX next year or any year.

## III.   DEFENDANT CANNOT COUNT ITS CHEERLEADERS AS VARSITY ATHLETIC PARTICIPANTS FOR PURPOSES OF TITLE IX

Although Plaintiffs contend that Defendant fails to meet prong one of the Three-Part Test

no matter how one counts cheerleading, Defendant insists that it should be able to count its

"competitive cheer" team for purposes of Title IX.  Plaintiffs disagree.  If the Court reaches this

issue, Plaintiffs urge it to conclude that neither cheerleading, nor competitive stunt, nor any

similar program administered by Defendant, can be counted as a varsity sport for purposes of

Title IX.  While some day such a sport may evolve, it has not done so yet, especially not at the

varsity, intercollegiate level.

Schools cannot count an athlete for purposes of Title IX unless he/she participates in a

varsity sport that meets the criteria set forth by OCR in its Dear Colleague letter dated 09-17-

2008 and incorporated into the amicus brief of the United States.  Ex. 109.  *See also* Ex. 25,

NCAA Gender Equity Manual, at pp. 20-22.  If an activity does not meet those criteria, schools

can still offer students the opportunity to participate in it, but they cannot count those participants

as athletes under Title IX.  Plaintiffs emphasize this point because they in no way seek to take

away cheer opportunities of any kind.  Plaintiffs merely want to ensure that male and female

athletes receive equal sport opportunities under Title IX.

Cheerleading historically has served primarily in a supporting role to varsity sport teams.

Indeed, for most of its existence, cheerleading was the only physical activity that females were

allowed to participate in because schools did not offer varsity sports for girls and women.

Female cheerleaders supported male athletes long before Title IX was enacted.  Even as some

cheerleading squads started to compete on the side, they retained their essential character as cheerleading teams.  But rather than add new varsity sport opportunities for females, some schools have tried to count their already existing cheerleaders as athletes, in order to create the appearance of proportionality.  Doing so did not create any new opportunities for women and did not provide them with genuine varsity sports opportunities.  Thus, OCR justly saw the need to develop criteria for the definition of sport and for when cheerleading can be considered a sport.  *See* OCR Dear Colleague letter dated 09-17-2008, and OCR letter to Minnesota High School League dated 04-11-2000 (Exhibits 108 & 109).  As set forth in the amicus brief of the United States and in Plaintiffs' Proposed Findings of Fact and Conclusions of Law and as explained by experts Donna Lopiano and Jeff Webb, Defendant's cheerleading program does not meet those criteria.

At the intercollegiate level, it is clear that cheerleading is not a varsity sport.  Because too many schools were improperly counting cheerleaders, the U.S. Department of Education revised its guidelines for reporting varsity athletes under the Equity in Athletics Disclosure Act, 20 U.S.C. § 1092(g), to require that schools obtain a determination letter from OCR stating that the activity qualifies as a varsity sport at that particular institution.

> To be considered a sport under the EADA, an activity's primary purpose must be to engage in intercollegiate competition.  If you indicate in the caveat box that your other sports are dancing and/or cheerleading, please also specify in the caveat box that your institution has a letter from the Office of Civil Rights confirming that OCR has determined that dancing and/or cheerleading are varsity sports at your institution.

Exhibit 110 at p. 19.

The United States noted in its amicus brief that OCR has never issued such a letter.  In fact, Defendant admits that it has never even sought such a letter.  Nor has it sought technical

assistance from OCR about what it must do in order to qualify its cheer team as a varsity sport for purposes of Title IX.  If Defendant truly believed that it was honestly offering cheer as a varsity sport, then it should have contacted OCR long before trial.  It did not do so.

During the preliminary injunction hearing and prior to this year, Defendant insisted that its sideline cheerleading team was a varsity sports team because it competed at the National Cheerleaders Association national tournament in Daytona, Florida.  However, NCA's president, Jeff Webb, testified at trial that NCA does not run cheer as a varsity sport.  NCA merely gives predominantly sideline teams a chance for year-end competition fun.  That competition consists of a 1-minute cheer and crowd response segment and a 2.5-minute dance/stunt routine.  The team's entire competitive experience is over in 3.5 minutes.  That format is not conducive to varsity sport.

Defendant apparently concedes that cheerleading is not a varsity sport, because it is in the process of morphing its team into a "competitive stunt and tumbling" team.  Just this year (2010), Defendant helped start a brand new organization, the National Competitive Stunt and Tumbling Association ("NCSTA"), that conducts stunt competitions in a brand new format.  This format was created and used for the first time this year.  No high schools, club, or other groups have ever practiced in this new "sport," let alone competed in it.  Defendant competed in the new format twice this year for the first time ever.

Five or six other institutions are also working in this direction.  They have yet to ask the NCAA to recognize this new activity as an emerging sport.  They do not yet have enough schools on board to submit a petition to the Committee on Women's Athletes.  NCSTA does not know what its final rules will be.  It includes only six schools spread out across the country.  Indeed, if

20

the stunt team had sued Quinnipiac to try to force it to recognize the team as a varsity sports

team, they would have lost because (among other reasons) there is insufficient competition of any

kind -- let alone varsity intercollegiate competition -- in Defendant's normal competitive region.

Surely, if female students could not force Defendant to add a stunt team, Defendant should not be

allowed to force a stunt team on them in lieu of already existing, viable and recognized varsity

sports.  Some day this new activity may merit recognition as a varsity sport, but today is not that

day.

IV.     **DEFENDANT CANNOT COUNT ITS TRACK PARTICIPANTS FOR PURPOSES OF TITLE IX**

        As set forth above, Defendant has manipulated its running program so that it counts its

men only once and its women three times, even though for all practical purposes Quinnipiac only

sponsors a cross country team that runs distance events in the spring.  Under NCAA rules, these

athletes could run in five track meets in the spring as cross country athletes, without claiming the

status of an indoor or outdoor track team.  There is no reason to count these same distance

runners three times except to manipulate Defendant's Title IX numbers.

        Under normal circumstances, schools may count cross country and track athletes

separately.  However, Plaintiffs contend that no school should be able to count indoor and

outdoor track separately and that Defendant should not be able to count its track team as a varsity

sport at all for purposes of Title IX, because it fails to provide its track athletes with the "laundry

list" of varsity sport benefits provided to athletes in its other sports.

                a.      Defendant cannot count indoor and outdoor track separately

        Indoor and outdoor track are different seasons of the same sport and thus the athletes who

participate in them should not be counted twice.  As Dr. Lopiano explained, most NCAA sports

compete in two entirely separate seasons.  Softball, baseball, golf, tennis, lacrosse, field hockey, rowing, and soccer all compete in separate fall and spring seasons.  Cross country is also allotted 7 fall meets and 5 spring meets.  NCAA Div. I Manual at Figures 17-1 & 17-2.  Yet, no one counts the athletes in any of these sports twice because they compete in two entirely separate seasons.  Even when an athlete plays as a baseball pitcher in the fall and as a baseball outfielder in the spring (two entirely different skill sets), no one counts him twice.  Similarly, when a woman plays as a soccer forward in the fall but as a soccer goalie in the spring, no one counts her twice.  Yet, Defendant apparently believes that it should be able to count twice a female athlete who runs 3000m indoors and 3000m outdoors, or three times because she also runs 3000m in cross country.  This simply does not make sense.

It makes even less sense when one considers that an athlete who runs 3000m and high jumps in the same met, or even in 18 separate meets, is never counted as two separate athletes even though the skills she performs are quite different.  If she ran 3000m in February and 3000m in March, she would count as two athletes, but if she ran 3000m in February and high jumped in February, she would be counted only once.  Again, this does not make sense.  The fact that such things happen only in running sports strengthens the argument.  Defendant does not have fall soccer players who play winter baseball and spring lacrosse.  Nor does it have fall field hockey players who play winter ice hockey and spring softball.  This does not happen because unlike running, these are separate, distinct sports.  Moreover, the championship seasons of these sports are longer than the combined seasons of indoor and outdoor track.

Different track meet sponsors include different events in their meets.  While some indoor meets run 400m, others run 500m; while some run 55m, others run 60m races.  Indeed the variety

of events sponsored at different meets within a single "indoor" season is greater than the difference in events between the indoor and outdoor seasons, especially for Defendant because it does not even compete in those events in the first place (*e.g.*, sprints, hammer, javelin). Defendant's track results demonstrate this variety of different events at track meets, and Defendant's expert conceded it as normal.

It also does not make sense to argue that indoor tracks are often made of different material than outdoor tracks, because Defendant's own track expert testified that track teams regularly run on many different indoor surfaces within a single season, just as they run on many different outdoor surfaces. Also, indoor track ovals vary greatly in size. Thus, someone could run 400m on a 150m oval indoor track one week and on a 250m oval indoor track the next week. There is nothing that would turn the 400m dash on a 400m outdoor track into a different sport.

In addition, Dr. Lopiano testified about the many different surfaces used for other sports. Defendant's softball team probably plays on dirt, grass, finely ground gravel, and turf all in the same season depending upon its schedule. Similarly, Defendant's soccer team probably plays on grass, turf, or many other different surfaces within its same season or between its two separate seasons. Many sports (particularly tennis) also play both indoors and outdoors during a season without being counted as separate sports. Tennis is played on many different surfaces and even has its own national indoor championship in addition to the NCAA outdoor championships. And yet, no one counts tennis as two, separate sports.

Defendant does not provide any legitimate physical, pedagogical, kinesiological, Title IX, or common sense reason for counting a runner three times or for counting indoor and outdoor track as separate sports. Its only argument is that the NCAA allows schools to count indoor and

outdoor track as separate sports for purposes of meeting the minimum sports sponsorship requirements for NCAA Division I membership.  This argument has absolutely nothing to do with Title IX.  It also ignores the numbers manipulation that results when schools like Quinnipiac use runners to single count men and triple count women who do the exact same thing -- run long distance.

In contrast, there are NCAA reasons why indoor and outdoor track should be counted as the same sport.  The NCAA ties them together for purposes of counting scholarships and competition.  A school with a track team can allocate its track scholarships across its track athletes in any way it chooses.  This practice does not occur in any other sports.  Baseball and lacrosse scholarships are not tied together, nor are field hockey and basketball scholarships. Track scholarships are tied together because they arise from the exact same physical activity.

Similarly, the NCAA allows a maximum of 18 regular season track meets for the indoor and outdoor seasons combined.  A school with only indoor track can run 18 meets.  A school with just outdoor track can run 18 meets.  A school with both is still limited to 18 meets.  Thus, by adding indoor track to outdoor track (or vice versa), a school does not create a single additional participation opportunity or even a single additional race for an existing participant.

Moreover, a school with only an indoor team could run 6 meets indoors and 12 meets outdoors (or vice versa) and still call itself an indoor team or an outdoor team, counting its track athletes only once.  Nothing would change -- no additional meets, no additional athletes, no additional scholarships.  Ironically, Defendant runs the bare minimum number of meets (even including its post-season conference meet in its minimum) so that even though it counts two separate track teams, it does not run as many meets as many schools with outdoor track alone.

24

And even in the meets it runs, it essentially runs a cross country team.

In sum, Defendant should not be allowed to manipulate its Title IX count by counting female runners three times or track-only runners two times, especially when its combined seasons provide less actual competition than most schools' outdoor seasons alone.

b.   <u>Defendant cannot count its track athletes because it does not provide its track athletes with the varsity benefits required to count its track program as a varsity sport.</u>

The OCR definition of participant states that for purposes of Title IX, a school may only count those athletes "Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, *e.g.*, coaching, equipment, medical and training room services, on a regular basis during a sport's season." In other words, only those athletes who receive the same laundry list of varsity benefits set forth in 34 C.F.R. 106.41(c)(2)-(9) may be counted as varsity athletes for purposes of Title IX. As the NCAA Gender Equity Manual comments, "Designating a sport as a competitive team is not enough. Schools must also support the team in an equitable fashion." Ex. 25 at p. 22. The amicus brief of the United States accentuates this point. Not all athletes are counted for purposes of Title IX . . . even when they are athletes and even when they participate in actual sports. They must also receive all the benefits provided to varsity athletes. If they do not, then they are essentially club athletes.

Defendant does not provide sufficient benefits to its track team. The fact that Defendant only sponsors women's track makes this fact even more glaring, and precludes it from counting its track athletes as participants in a varsity sport. The plaintiff class includes the track athletes. Thus, Plaintiffs strongly urge the Court to find that Defendant cannot count its track athletes unless and until it provides them with the varsity benefits necessary to make them a varsity team.

25

Because Defendant cannot possibly comply with Title IX without counting its track athletes, Defendant must make these changes and must substantially upgrade its treatment of the track athletes. If it does not, then women, and only women, will fail to receive the benefits required for "participant" status.

This "laundry list" of benefits includes the following:

(1)     the provision of equipment and supplies
(2)     scheduling of games and practice times
(3)     travel and per diem allowance
(4)     opportunity to receive coaching and academic tutoring
(5)     assignment and compensation of coaches and tutors
(6)     provision of locker rooms, practice and competition facilities
(7)     provision of medical and training facilities
(8)     provision of housing and dining facilities and services
(9)     publicity

The 1979 Policy Interpretation also adds recruiting and support services. *See also* NCAA Gender Equity Manual, Ex. 25 at pp. 38-71. As set forth below, Defendant fails to provide the following benefits and should be ordered to remedy them if it wants to count track athletes for purposes of Title IX.

(1)     Recruiting. Defendant does not recruit its track athletes. According to its own squad lists, Defendant recruited only one of its track athletes. It did not provide athletic aid to any of them, although it did provide aid to both its men's and women's cross country runners. When a Division I school regularly recruits and provides athletic scholarships to its men's teams, it must do the same for its women's teams. Yet, indoor and outdoor track (women-only sports at Quinnipiac) do not receive these benefits. Without providing scholarships or substantial recruiting resources, the track coach cannot possibly recruit track athletes (as opposed to cross country distance runners) with the requisite skill to compete at the Division I level. Thus, it is

not surprising that the few track-only athletes are not competitive in the meets in which they compete.  Defendant does not recruit such athletes and does not even try to be competitive in track beyond its distance events.  This practice does not occur in any other sport.

(2)      Equipment and supplies.  Defendant does not have much of the equipment that a track team should have.  It does not have a high jump pit or bar; a pole vault pit, bar, or pole; it does not have weight event implements, and it does not have hurdles.

(3)      Schedule.  Defendant generally schedules its varsity sports teams at or near the maximum number of competitions allowed by NCAA rules, except for women's indoor/outdoor track.  Defendant schedules its track programs at the bare minimum allowed to count them toward Division I membership.  It has to count its post-season meets to meet that minimum, even though the NCAA does not count them towards the maximum.

(4)      Travel/transportation.  Defendant does not have track facilities on campus.  Yet, Defendant has not provided any evidence about how the women get to the track facility they use, which is located at a high school in an entirely different town.  It is Plaintiffs' belief that the athletes must transport themselves to/from the location.

(5)      Facilities.  Most important of all, Defendant does not have a track. Defendant has a facility for every men's sport, but no competition-worthy facility at all for women's indoor/outdoor track.  The women must travel to a high school track in another town just for outdoor practice.  Because the women do not have a track, they must compete "away" for all of their meets.

(6)      Coaching access.  Defendant provides only one full-time head coach who must be shared among women's cross country, women's indoor track, women's outdoor track,

and men's cross country.  Quinnipiac does not provide coaching resources adequate for four

teams.  No other varsity team at Quinnipiac has to share its coach with any other team. The

running teams also share two part-time coaches.  Again, no other varsity teams have to do this.

Moreover, these coaches only have experience in distance events.  Quinnipiac does not have

coaches for field events or sprint/hurdle track events.  No wonder Defendant does not recruit

such athletes.

       (7)     Coaching compensation/benefits.  Although she coaches four separate

teams, the running coach, Carolyn Martin, does not receive four times the salary of a head coach.

       (8)     Housing/dining & publicity.  No known disparity.

In addition to failing to provide its track athletes with nearly all of the benefits of the

laundry list, Defendant fails to sponsor a complete team.  It enters only distance events and has

found a few existing, non-recruited students to participate in 400m hurdles, 200m, and triple

jump.  In fact, Defendant enters less than half the events at the track meets it attends.  Imagine if

a football team competed without an offensive line or defensive backs or if a baseball team

competed without an outfield.  That is what Defendant does to its track athletes.  They can never

win a meet because they do not have the athletes to enter half or more of the events.

Thus, although Defendant claims to carry 30 women on its outdoor track roster (and the same 30

on its indoor track roster), those 30 women compete in less than 10 different events.

Coach Martin bluntly testified that she focuses on improving the personal performances

of the athletes who do compete.  Because of this practice, Defendant does not enter indoor track

meets that keep score except the NEC conference meet.  No other Quinnipiac varsity team

competes its entire schedule -- or even a substantial part of its schedule -- without keeping score.

 Such competitions would be mere scrimmages and would not count toward NCAA maximum

contest dates.  Yet, that is exactly what Defendant makes its women's track team do.

 Despite the best efforts of Coach Martin to do the best she can with the athletes she has,

Defendant simply fails to provide her or the team with the most basic resources necessary for

varsity status.  Most importantly, without a track, without field equipment, without coaches for

non-distance events, without scholarships, and without the recruiting and other resources to find

track athletes (not just cross country runners who run distance track events), Defendant cannot

count its track team as varsity sport athletes for purposes of Title IX.  Plaintiffs urge the Court to

order Defendant to substantially upgrade its track program and to provide it with all the benefits

missing above before it can count the team under Title IX.

**V. DEFENDANT'S UNDISPUTED HISTORICAL AND RECENT DISCRIMINATION AGAINST WOMEN IN THE PROVISION OF ATHLETIC PARTICIPATION OPPORTUNITIES WARRANTS CONTINUED COURT SUPERVISION OF DEFENDANT'S ATHLETIC PROGRAM BY THIS**

 Defendant has failed to provide its female students with an equal opportunity to

participate in intercollegiate varsity athletics during the entire existence of its program.

Defendant's own EADA reports show that despite consistent female enrollment over 60%,

Defendant never reached even 50% female athletic participation until the eve of this law suit.

Even after Defendant noted its own noncompliance as part of its NCAA Division I Certification

Self-Study, it took no action to increase athletic participation opportunities for women.  Instead,

it engaged in the counting manipulations described herein and at the preliminary injunction

hearing.  Even after losing the preliminary injunction hearing, Defendant took no steps to provide

new opportunities for women in athletics.  It instead insisted on counting its cheerleaders and

padding its existing women's teams with athletes whom it could not possibly have expected ever

to compete.  Even if Defendant had come up with a way to "hit the numbers" this year, it does

not have sufficient credibility to justify an expectation that it will meet Prong One without

continued court supervision.  It has never complied with Title IX, and it has never devised a

legitimate plan to do so.  In light of this recalcitrant attitude and historical (and ongoing)

discrimination, Plaintiffs submit that Defendant's athletic program warrants court supervision

unless and until Defendant can demonstrate a genuine and ongoing commitment to and

demonstrated performance of Title IX compliance.


Dated: June 25, 2010

PLAINTIFFS

By:_____/s/_____
Jonathan B. Orleans (ct05440)
Alex V. Hernandez (ct08345)
Pullman & Comley, LLC
850 Main St., P.O. Box 7006
Bridgeport, CT  06601-7006
Telephone:  (203) 330-2000
Facsimile:  (203) 576-8888
Email:  jorleans@pullcom.com
Email:  ahernandez@pullcom.com

Kristen Galles (*pro hac vice*)
Equity Legal
10 Rosecrest Avenue
Alexandria, VA  22301
Telephone:  (703) 722-1071
E-Mail:  kgalles@comcast.net

David McGuire (ct27253)
American Civil Liberties Union
Foundation  of Connecticut
2074 Park Street, Suite L
Hartford, CT  06106
Telephone:  (860) 523-9146
Email:  dmcguire@acluct.org

30

# EXHIBIT A

**CONCLUSION**

If the Court decides to triple count QU's female runners (to count cross country, indoor track and outdoor track as separate sports and separate seasons), then I calculate the following gaps (without counting cheerleading):

|            | Lopiano Count A | Lopiano Count B | Lopiano Count C |
|------------|-----------------|-----------------|-----------------|
| With VB    | 28              | 35              | 44              |
| Without VB | 41              | 48              | 56              |

If the Court decides to double count QU's female runners (to count cross country runners once as a separate sport in a separate season and to count track runners once, with track as a single sport conducted in two separate seasons), then I calculate the following gaps (again without cheerleading):

|            | Lopiano Count A | Lopiano Count B | Lopiano Count C |
|------------|-----------------|-----------------|-----------------|
| With VB    | 58              | 65              | 74              |
| Without VB | 71              | 78              | 86              |

If the Court decides to apply the unduplicated count of QU's female runners (counting each person participating in cross country or track once), then I calculate the following gaps (again without cheerleading):

|            | Lopiano Count A | Lopiano Count B | Lopiano Count C |
|------------|-----------------|-----------------|-----------------|
| With VB    | 76              | 83              | 92              |
| Without VB | 89              | 96              | 104             |

If the Court decides to count only QU's cross country team (counting each person participating in cross country once and determining that track as conducted by Quinnipiac is not a varsity sport, then I calculate the following gaps (again without cheerleading):

|            | Lopiano Count A | Lopiano Count B | Lopiano Count C |
|------------|-----------------|-----------------|-----------------|
| With VB    | 88              | 95              | 104             |
| Without VB | 101             | 108             | 116             |

QU does not meet the proportionality prong of Title IX's three-part test under any of these scenarios. In each case, QU must keep volleyball and must add more athletic opportunities for its female students.

## <u>CERTIFICATION</u>

I hereby certify that on the date hereon, a copy of the foregoing Trial Brief was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Dated:  June 25, 2010

/s/ Jonathan B. Orleans_____
Jonathan B. Orleans (ct05440)

ACTIVE/73061.1/JORLEANS/2184870v1