IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------ X
STEPHANIE BIEDIGER, KAYLA LAWLER,
ERIN OVERDEVEST, KRISTEN             :    CIVIL ACTION NO:
CORINALDESI, and LOGAN RIKER,        :
individually and on behalf of all those    :   3:09-CV-00621 (SRU)
similarly situated; and              :
ROBIN LAMOTT SPARKS, individually,   :

                    Plaintiffs,      :    June 30, 2010

     against                         :

QUINNIPIAC UNIVERSITY,               :

                    Defendant.       :
------------------------------------ X

## DEFENDANT'S SUPPLEMENTAL BRIEF RESPONDING
## TO NEW ARGUMENTS IN PLAINTIFFS' TRIAL BRIEF

Plaintiffs filed their trial brief and proposed findings of fact and conclusions of law after closing arguments were over. Plaintiffs' contentions listed in the joint pre-trial order were bare-bones and did not discuss any specifics regarding their arguments. As a result, Quinnipiac first learned of several arguments and allegations Plaintiffs were making after the close of evidence, and the University was unable to present evidence to refute Plaintiffs' new and speculative assertions. Therefore, Quinnipiac requests leave of the Court to respond briefly to Plaintiffs' new arguments in order to demonstrate why they should not be considered by the Court.

### A.   Plaintiffs' Argument Regarding Varsity Benefits Provided to Track Athletes Was Never Made at Trial

Plaintiffs discuss at length in their trial brief a new argument that Quinnipiac cannot count its indoor track and field and outdoor track and field athletes as varsity

- 1 -

athletic participants because of the allegedly inadequate benefits provided to these teams. (Pl. Br. at 4, 12, 25-28) Plaintiffs never made this argument before or during trial and, therefore, Defendant never had an opportunity to respond to it.

Plaintiffs analyze Quinnipiac's indoor and outdoor track and field teams in the context of the "laundry list" of benefits set out in the OCR 1979 Policy Interpretation, but this list is *not* a checklist of benefits that must be provided for a sport to qualify as a varsity athletic participation opportunity. The list is used to assess whether schools provide equitable benefits to men's and women's teams. This is a separate and distinct analysis from the one before the Court, which turns on whether Quinnipiac provides equitable participation opportunities. Plaintiffs make a separate claim regarding benefits, and the parties stipulated that this benefits claim would not be tried in the June 2010 trial. Although there is some overlap between the question of whether a school maintains a team that provides genuine participation opportunities and whether that team receives benefits commensurate with the school's other teams, the applicable guidance for determining whether a school has a legitimate team is provided in OCR's 2008 Dear Colleague Letter (Ex. 109).

Plaintiffs offer no support in case law or OCR guidance for not counting athletes who participate in an NCAA sport where the team complies with all NCAA rules, simply on account of allegations concerning the marginal benefits provided to that sport. This novel and incorrect approach conflates a participation analysis with a benefits analysis. If Quinnipiac's outdoor track and field athletes were not counted as varsity athletes simply because the team uses a track that is located off-campus, or because one person is the head coach (which Jack McDonald testified is common for track and field

and cross country teams), this would open the door to schools using their own subjective analyses in determining whether they should count widely accepted varsity teams for Title IX purposes. Indeed, there is a significant risk of schools abusing such a new and never-before-recognized test to undercount male athletes.

Even if the Court were to analyze participation opportunities by looking at whether teams met this "laundry list" of factors, such an analysis cannot be performed without analyzing all of Quinnipiac's varsity teams (which Plaintiffs failed to do). The list is used to determine whether the benefits provided to male and female athletes are equitable, when analyzed as a whole, considering all sports at an institution. (OCR 1979 Policy Interpretation – Ex. 6; NCAA Gender Equity Manual at 38-39 – Ex. 25) The NCAA Gender Equity Guide discusses the "laundry list" of factors and notes that compliance "can only be established if the men's overall program and the women's overall program are equal in effect." (Ex. 25 at 39)

Plaintiffs have not presented evidence regarding the benefits provided to Quinnipiac's 19 varsity teams, and evidence regarding the University's indoor and outdoor track and field teams alone is obviously insufficient to assess whether these teams are treated like the University's other varsity teams, or whether, on balance, Quinnipiac's men's teams receive greater benefits than its women's teams.

In addition to applying the benefits analysis improperly, Plaintiffs base their analysis on insinuation and speculation rather than facts, and misstate the evidence. For example, Plaintiffs speculate, "Defendant has not provided any evidence about how the women get to the track facility they use" and "[i]t is Plaintiffs' belief that the athletes must transport themselves to/from the location." (Pl. Br. at 27) Plaintiffs make these

broad speculative statements without presenting any evidence comparing Quinnipiac's indoor and outdoor track and field teams to similar teams at other schools or to other teams within Quinnipiac. Plaintiffs also speculate that "Quinnipiac does not provide coaching resources adequate for four teams." (Pl. Br. at 28) Plaintiffs fail to conduct any actual analysis of the adequacy of coaching resources given to athletes on the indoor and outdoor track and field teams or compare them to the coaching resources provided to other teams, relying instead solely on conjecture.

Furthermore, Plaintiffs incorrectly assert that Quinnipiac "does not recruit its track athletes." (Pl. Br. at 26) Indeed, the squad lists for women's indoor and outdoor track and field reveal that 16 women were recruited in each of these sports, including two women who were not members of the cross country team (Patricia Massa and Rebecca Smith). Moreover, Coach Martin testified that for 2010-2011, she has recruited several track athletes who will not run cross country, including pure sprinters and jumpers. (Martin Tr. at 120-21)[1]

In sum, Plaintiffs' claims regarding Quinnipiac's track and field teams not being legitimate varsity teams were raised for the first time after the trial was over, when the University no longer had the option of presenting evidence to refute these speculative and meritless claims.[2]

---

[1]  Plaintiffs also allude to the fact that Quinnipiac counted members of the cross country, indoor track and field and outdoor track and field teams in an unduplicated manner in past years. (Pl. Br. at 8-9) Had Quinnipiac known that Plaintiffs were going to make this argument, the University's compliance officer, Tracey Flynn, would have been able to present evidence that this was a mere clerical error in Quinnipiac's 2007-2008 EADA report.

[2]  Plaintiffs also request for the first time in their trial brief that the Court "order Defendant to substantially upgrade its track program and to provide it" with certain benefits. (Pl. Br. at 29) This remedy is not even mentioned in Plaintiffs' First Amended Complaint.

- 4 -

### B. Plaintiffs' Speculation Regarding Appropriate Size of a Cross Country Team Should Be Disregarded

Plaintiffs also speculate about the appropriate size for a women's cross country team based on the number of athletes on the men's cross country team. (Pl. Br. at 9) Plaintiffs raised no issue in the joint pre-trial order about the size of the men's cross country team, and Defendant, therefore, did not put in evidence about the reasons for setting the roster sizes of the men's and women's cross country teams. There is no evidence to support Plaintiffs' belated assertion. In fact, the evidence suggests that the women's team gained a competitive advantage by having more athletes. Coach Martin testified about the significant advantages to having more athletes on a cross country team (including the ability to displace runners from other teams, increase competition against team members, and better deal with injuries), which caused her to request additional athletes on her women's cross country team for 2010-2011. (Martin Tr. at 108-109) She also explained that it was more difficult to recruit men for the cross country team after the men's indoor and outdoor track and field teams were eliminated. (Martin Tr. at 110) Thus, Plaintiffs' speculation regarding whether the women's cross country team was padded with runners and whether the number of women on the team is "unreasonable" should not be considered.

### C. Plaintiffs' Claims Regarding Resources Given to Women's and Men's Teams Are Baseless

Plaintiffs' broad assertions regarding the resources given to men's and women's teams are also baseless. Plaintiffs claim that by padding women's teams, "men receive more resources per capita than before" and "gain the benefits of smaller student-to-coach ratios." (Pl. Br. at 6) Plaintiffs did not introduce any evidence concerning the benefits received by the vast majority of the men's and women's teams at Quinnipiac

(despite the fact that Quinnipiac produced the budget and expenditure reports for all of its teams). There is no evidence that women's teams received lower budgets per athlete or had lower coach-to-participant ratios.

In fact, the small amount of evidence on this point indicates that women's teams may have had favorable sizes/budgets/coaching staff compared to men's teams. For example, Mark Thompson informed Germaine Fairchild that the women's softball team had the same coaching staff with 20 athletes as the men's baseball team had with 31 athletes, and that the softball budget was consistent with that provided to comparable teams. (Ex. CG) Similarly, there were 30 athletes on the men's ice hockey team and only 26 athletes on the women's ice hockey team, which may indicate that the women's team had more resources per athlete. Moreover, the evidence shows that there were significant increases in the budgets for the women's teams that requested and received substantial increases in their roster sizes for 2010-2011.

### D. **Plaintiffs' Miscalculations of Participation Opportunities**

Plaintiffs make obvious miscalculations in their analysis of male and female athletic participation opportunities. In paragraph 203 of Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Plaintiffs assert that if the Court subtracts the 30 varsity competitive cheer athletes from the participants in 2009-2010, this would mean women would only have 56% of the participation opportunities. This is incorrect – Plaintiffs subtract 30 athletes from the number of female athletes (the numerator), but fail to subtract 30 athletes from the total number of athletes (the denominator). In fact, if 30 athletes are subtracted from the number of female athletes and from the number of total athletes, women represent 59.51% of the athletes at Quinnipiac, which is just over a 2% participation gap.

Similarly, in paragraph 211, Plaintiffs incorrectly state that in 2010-2011, subtracting the 14 volleyball players will leave a 2.3% participation gap. Plaintiffs subtract 14 volleyball players from the number of women athletes (dropping the numerator from 296 to 282), but fail to drop those same 14 spots from the total number of athletes (a decrease of 464 to 450). Once this is done, the participation gap is less than 1%.

E.   **Non-NCAA Sports Counted for Title IX**

Finally, Quinnipiac would like to address briefly a question raised by the Court during closing arguments. The Court inquired as to whether there were examples of sports that were not recognized by the NCAA, which schools could nevertheless count for purposes of Title IX. Because Plaintiffs decided not to call their expert on NCAA rules – Dr. Yiamouyiannis – evidence on this point was mostly lacking at trial.[3] The EADA User Guide (Ex. 48) lists the sports schools can enter in reporting their participation numbers. This list includes several sports that are not recognized in any way by the NCAA (as championship sports, emerging sports, or non-championship sports), including rodeo, table tennis and weight lifting. (Ex. 48 at 21)  This list also includes "other," implying that there are even more sports that may be counted that are not recognized by the NCAA.

---

[3]   Dr. Yiamouyiannis's answer to question 25, on page 17 of her report, is instructive as to the fact that the male sports listed as non-championship sports in the NCAA participation report (Ex. 105), such as sailing, are not NCAA sports, even though schools must nevertheless follow a limited number of NCAA rules (governing such areas as academic eligibility) and report participation numbers to the NCAA.

- 8 -

| | |
|---|---|
| Dated: June 30, 2010 | PROSKAUER ROSE LLP<br><br>By: /s/ Edward A. Brill<br>    Edward A. Brill<br>    Federal Bar No. phv015747<br>    Susan D. Friedfel<br>    Federal Bar No. phv03585<br>1585 Broadway<br>New York, NY  10036<br>Tel:  212.969.3000<br>Fax:  212.969.2900<br>ebrill@proskauer.com<br>sfriedfel@proskauer.com<br><br>WIGGIN AND DANA<br>Mary Gambardella, Esq.<br>Federal Bar No. ct05386<br>400 Atlantic Street<br>Stamford, CT  06911-0325<br>Tel:  (203) 363-7662<br>Fax: (203) 363-7676<br>mgambardella@wiggin.com<br><br>*Attorneys for Defendant* |