<pre>
                 UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

STEPHANIE BIEDIGER, ET AL      :  No. 3:09cv-621 (SRU)
                               :  915 Lafayette Boulevard
           vs.                 :  Bridgeport, Connecticut
                               :
                               :  June 21, 2010
QUINNIPIAC UNIVERSITY          :

- - - - - - - - - - - - - - - - x


                        BENCH TRIAL


B E F O R E:

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

     FOR THE PLAINTIFFS:

           PULLMAN & COMLEY
                850 Main Street
                P.O. Box 7006
                Bridgeport, Connecticut 06601-7006
             BY:  JONATHAN B. ORLEANS, ESQ.
                ALEX V. HERNANDEZ, ESQ.

           KRISTEN GALLES, ESQ.
                Equity Legal
                10 Rosecrest Avenue
                Alexandria, Virginia  22301

     FOR THE DEFENDANT:

           WIGGIN AND DANA, LLP
                400 Atlantic Street
                P. O. Box 110325
                Stamford, Connecticut  06911-0325
             BY:  MARY A. GAMBARDELLA, ESQ.


                                    (CONTINUED)
</pre>

```
PROSKAUER ROSE
      1585 Broadway
      New York, N. Y.  10016
BY:  EDWARD A. BRILL, ESQ.
      SUSAN D. FRIEDFEL, ESQ.
      REBECCA BERKEBILE, ESQ.




         Susan E. Catucci, RMR
         Official Court Reporter
         915 Lafayette Boulevard
      Bridgeport, Connecticut  06604
          Tel: (917)703-0761
```

I N D E X


WITNESSES:

KAYLA LAWLER
Direct Examination by Mr. Hernandez..................6
Cross Examination by Mr. Brill..................... 14

LOGAN RIKER
Direct Examination by Mr. Orleans................. 15

DONNA LOPIANO
Direct Examination by Ms. Galles....................29
Redirect Examination..............................245
Cross Examination by Mr. Brill....................147

MARK THOMPSON
Direct Examination by Mr. Hernandez................261


-0-

```
 1                    (9:00 O'CLOCK, A. M.)

 2              THE COURT:  Good morning.  Everybody prepared to

 3   proceed?

 4              MR. ORLEANS:  Yes, Your Honor.

 5              THE COURT:  All right.  Call your first witness.

 6              MR. HERNANDEZ:  Plaintiffs call Kayla Lawler.

 7              THE COURT:  Before we begin, my understanding is

 8   that we have a stipulation that the testimony from the

 9   preliminary injunction hearing shall be part of this

10   record as well and that I will simply ignore anything that

11   I deemed to be irrelevant for this proceeding.  Is that

12   right?

13              MR. BRILL:  That is correct except for the

14   deposition testimony of Dr. Lopiano.

15              MR. ORLEANS:  Your Honor, at the pretrial

16   conference you indicated that you thought that the record

17   was the record and that it was senseless to try to parse

18   it so that's our understanding.

19              THE COURT:  Okay.  Remind me, I'm sorry, what

20   was the concern about Lopiano?

21              MR. BRILL:  She gave a deposition in connection

22   with the preliminary injunction hearing, she didn't appear

23   and the parties agreed that she would simply testify in

24   this phase of the trial that her deposition that was given

25   prior to the PI hearing would not be considered part of
```

1     the trial record.

2             MR. ORLEANS:  We did stipulate to that, Your

3     Honor.

4             THE COURT:  Okay.

5             MR. ORLEANS:  I was under the impression from

6     your remarks at the pretrial conference that you were more

7     or less overriding that and indicating that you wanted the

8     entire record to be the record, but either way --

9             THE COURT:  Okay, well, hopefully it won't

10    matter.

11            MR. ORLEANS:  Hopefully it won't matter.

12            THE COURT:  I'm looking for a stipulation.  It

13    looks like we have one.

14            MR. BRILL:  Well, it's a significant difference

15    because --

16            THE COURT:  I'll abide by the stipulation.

17            MR. BRILL:  -- because I'm prepared to cross

18    examine her.

19            THE COURT:  I'll abide by the stipulation.

20            MR. BRILL:  Thank you, Your Honor.

21            MR. ORLEANS:  That's fine, Your Honor.  Thank

22    you.

23            THE COURT:  Please raise your right hand.

24

25

1    K A Y L A      L A W L E R,      called as a witness on

2    behalf of the Plaintiff, having been duly sworn by the

3    Court, testified as follows:

4            THE COURT:  Please be seated.

5    DIRECT EXAMINATION

6    BY MR. HERNANDEZ:

7    Q.   Good morning, Ms. Lawler.

8    A.   Good morning.

9    Q.   Could you please spell your name for the record and

10   give us your address?

11           THE COURT:  Actually don't give us your address.

12           MR. HERNANDEZ:  That's fine.

13           THE COURT:  Because this could wind up on the

14   internet.

15           MR. HERNANDEZ:  Thank you.

16   A.   K A Y L A, Lawler, L A W L E R.

17   Q.   And what state do you live in Ms. Lawler?

18   A.   Kentucky.

19   Q.   And you traveled, did you travel here for testimony

20   in this case?

21   A.   Yes.

22   Q.   When did you travel here?

23   A.   We left at 4:00 o'clock in the morning on Saturday

24   and we got here about 6:30 Saturday.

25   Q.   Who's we?

1    A.   My mother and I.

2    Q.   Is your Mom here today?

3    A.   Yes.

4    Q.   And are some your teammates here today as well.

5    A.   Yes.

6    Q.   Will you be able to stay throughout the entire trial,

7    Ms. Lawler?

8    A.   No.

9    Q.   Okay.  I'd like to talk to you a little bit about

10   last year, last season.  How did you do academically?

11   A.   I did very well.  I think that this second semester I

12   had a 3.8.  I think my cumulative for the two years is a

13   3.7, I believe.

14   Q.   And did you receive any awards or, any awards last

15   year?

16   A.   This past sophomore year I received the outstanding

17   sophomore award.

18   Q.   And how did you get that award?

19   A.   I had to get nominated by a faculty member.  And then

20   I had to fill out an application to receive it.  You had

21   to have above, I'm not sure the G P A was, and you had to

22   be actively involved in a couple of organizations on

23   campus.

24   Q.   And do you play any particular leadership role within

25   the team?

1   A.   I'm captain of the team for this coming season.  And

2   I've always been a floor captain before.

3   Q.   How were you chosen to be the captain.

4   A.   Coach asked me if I wanted to take on the role.

5   Q.   And what role does the captain play on the team?

6   A.   We're responsible for making sure everyone's where

7   they are supposed to be on time.  Keeping up the morale of

8   the team, keeping motivated.  If there's any problems,

9   sitting down and talking them through, making sure

10   everyone has their equipment, clean locker room, lots of

11   stuff.

12   Q.   Does that have an impact on team spirit and morale?

13   A.   Yeah, I think it's really important.

14   Q.   Are team spirit and morale important to the

15   competitive experience?

16   A.   Yes.

17   Q.   And over all, how has your experience been?

18   A.   I love my team.  We get really excited.  We're loud,

19   we're enthusiastic and that's how we play.  That's

20   important to us.

21   Q.   All right.  And as I recall, you train in Division I

22   volleyball through the entire year, is that correct?

23   A.   Yes.

24   Q.   All right.  As a Division I volleyball player at

25   Quinnipiac university, are you required to play any other

```
1    sports as a condition to being a member of the volleyball
2    team?
3    A.   No.
4    Q.   Do you know how the volleyball team did academically
5    last year?
6    A.   We had a very high G P A.  My freshman year we won an
7    award, I think we were, had the top G P A for a volleyball
8    team in the conference and there's a strong
9    possibility we could get that again this year.
10   Q.   Which schools did you compete against last year?
11   A.   All schools in our conference, Robert Morris, CCSU,
12   Dartmouth, Yale.  We also competed against some bigger
13   schools like St. Johns, that was one of our opening
14   tournaments, and then we also played Army, another big
15   competitive school.
16   Q.   And what's the farthest that you had to travel in
17   order to compete?
18   A.   This year the farthest was Pennsylvania.
19   Q.   How did you get there?
20   A.   By bus.
21   Q.   You didn't have to fly?
22   A.   No.
23   Q.   Is competing with other schools in the northeast
24   conference important to your competitive experience in
25   college?
```

1    A.    Yeah.  It helps us figure out where we stand locally,

2    schools that are similar to us, and also it's our

3    conference, you know, that's how we measure our skill

4    primarily.  You know, we want to be, you know, successful

5    in our conference.

6    Q.    Have you developed any rivalries with schools in the

7    northeast conference?

8    A.    Yeah.  Personally, my personal opinion, I know my

9    teammates feel the same, Central Connecticut State

10   University and also Robert Morris, I'd say those are two

11   of the biggest ones in our conference.

12   Q.    And does having a rivalry within the northeast

13   conference, is that important to your experience as a

14   competitive athlete in college?

15   A.    Yeah, definitely.

16   Q.    Why?

17   A.    I think that it's a different experience when you

18   come to college.  It's not like high school.  In high

19   school the high schools are close, you might know some of

20   the kids.  But in college it's a different experience.

21   You know, I didn't know much about the universities on the

22   East Coast.  I've never been out here before.  Developing

23   a rivalry against the people in our conference is a good

24   driving factor.  It motivates us, gets us excited to play

25   and just that competitive spirit.

1    Q.   What about locally, did you compete against any local

2    teams?  And by local, I mean within Connecticut?

3    A.   Yeah.  Besides in our conference we also compete

4    against Yale this year.

5    Q.   And traditionally have you competed against other

6    local schools like Fairfield U or Sacred Heart?

7    A.   Yeah, Sacred Heart.  We play a lot of schools in

8    Connecticut.

9    Q.   Okay.  And does the women's volleyball team have a

10   fan base at Quinnipiac University?

11   A.   Yeah.

12   Q.   And when you play at home, do some of your fans come

13   out to support you?

14   A.   Yeah.  We always have our parents, of course, Taylor

15   Payne's (ph) father, and we have classmates, roommates,

16   friends come out and support us.

17   Q.   Is that local hometown fan base, if you will,

18   important to your competitive experience?

19   A.   Very much.

20   Q.   How so?

21   A.   Just to have a fan base and to have support, know

22   that people are behind you, it's motivating, it makes you

23   want to win and it gets me pumped up, I guess.

24   Q.   Okay.  And what about when you travel to some of the

25   local schools like Fairfield U, Sacred Heart or Yale; do

1   you get support from your fan base?

2   A.   Yeah.

3   Q.   And what does that support involve?

4   A.   They come out, you know, they wear shirts, they

5   cheer, yell for us, do chants, sometimes they have signs.

6   Lots of stuff.

7   Q.   And is that fan base support at some of your local

8   competitions important to your experience as competitive

9   athletes?

10   A.   Very.

11   Q.   How so?

12   A.   I think it's a completely different feeling, you

13   know, if you're there and you don't have people cheering

14   you on, I mean you still go out, you play hard, but just

15   knowing they are there makes you play that much harder.

16   It's a motivator.

17   Q.   Okay.  I think last year we talked about the

18   importance of your relationship with your coach.  I'd like

19   to go into a slightly different area in that respect.  And

20   again, do you have to have access to your coach the entire

21   year?

22   A.   Yeah.

23   Q.   All right.  Now, if Coach Sparks were coaching

24   another team during your volleyball office season, that is

25   when you're not competing, would that have an impact on

1    your access to her?

2    A.    Definitely.

3    Q.    And what sort of impact would that have?

4    A.    Just knowing she didn't have the same time commitment

5    to us, she wouldn't be able to be there as much.  Spring

6    season is when we really break down technique and we

7    remold and we work on things we couldn't work on during

8    season to get better for our next season.  So just to know

9    she that has time to work with us and make us all better

10   and improve on our weaknesses is really important.

11   Q.    And how many people are on your volleyball team or

12   were on in '09, '10?

13   A.    I believe that we had eight or nine.

14   Q.    Okay.  And let's say that number were to next year

15   double; you had twice as many.  Let's say you had as many

16   as 20 people on your volleyball squad.  Would that have an

17   impact on you and your teammates' ability to have access

18   to your coach?

19          MR. BRILL:  Objection, Your Honor.

20   Hypothetical.

21          THE COURT:  I'll allow it.  It's lay opinion.

22   BY THE WITNESS:

23   A.    Yeah, definitely.  The fact that Coach has the

24   ability to work with us individually and do stuff with us

25   definitely helps make us get more touches, more

1    repetitions and help us get better individually so that we

2    can be a better team overall.

3    Q.   And when you go to use training facility for strength

4    and conditioning, do you go as a team?

5    A.   Yeah.

6    Q.   And if there were twice as many of you in the

7    training room, would that have any impact on your ability

8    to train effectively?

9    A.   Yeah.  If we have to wait on machines it would take

10   more time.  That's one of the things that happens.  If we

11   don't have morning weights but we if weight together later

12   than the other students in there, a lot of times it's hard

13   to do our workout.

14              MR. HERNANDEZ:  I have no other questions, Your

15   Honor.

16              THE COURT:  All right.  Cross?

17   CROSS EXAMINATION

18   BY MR. BRILL:

19   Q.   Good morning, Ms. Lawler.

20   A.   Good morning.

21   Q.   Were you here during the preliminary injunction

22   hearing?

23   A.   Yes.

24   Q.   Did you hear the testimony of Coach Sparks?

25   A.   Yes.

```
 1    Q.   Do you recall that she testified that ideally she'd
 2    like to have 15 to 16 players on the volleyball team?
 3    A.   Yes.
 4    Q.   Thank you.
 5              MR. HERNANDEZ:  No further questions, Your
 6    Honor.
 7              THE COURT:  Okay, thank you.  You're excused.
 8              MR. ORLEANS:  Your Honor, plaintiffs call Logan
 9    Riker.
10    L O G A N      R I K E R,     called as a witness on
11    behalf of the Plaintiff, having been duly sworn by the
12    Court, testified as follows:.
13              THE COURT:  Please be seated.  State your name,
14    spell your last name for the record?
15              THE WITNESS:  Okay.  Logan Riker.  Just last
16    name?  R-I-K-E-R.
17    DIRECT EXAMINATION
18    BY MR. ORLEANS:
19    Q.   Good morning, Ms. Riker.  How are you?
20    A.   Good, how are you?
21    Q.   What state are you from?
22    A.   Ohio.
23    Q.   You're one of the plaintiffs in this case?
24    A.   Yes, I am.
25    Q.   Now, you didn't testify at the preliminary injunction
```

1    hearing, did you?

2    A.    No, I did not.

3    Q.    And why was that?

4    A.    My mother came to testify for me because I was still

5    17 at the time.

6    Q.    And since then you've come in as a plaintiff and your

7    mother has dropped off; you must have turned 18, is that

8    correct?

9    A.    Yes.

10   Q.    And you're a member of the volleyball team at

11   Quinnipiac?

12   A.    Yes, I am.

13   Q.    You played this past year?

14   A.    Yes.

15   Q.    So where do you stand in school at this point?

16   A.    I am going to be a sophomore so I just completed my

17   freshman year.

18   Q.    And in order to be a member of the volleyball team at

19   Quinnipiac, have you been required to play any other

20   sports?

21   A.    No, I have not.

22   Q.    Did the volleyball team have a spring season this

23   year?

24   A.    We did have a spring season.  We had fewer players,

25   so --

1    Q.    I beg your pardon?

2    A.    We had fewer players.

3    Q.    Did you play volleyball in high school?

4    A.    Yes, I did.

5    Q.    How old were you when you started playing volleyball?

6    A.    On official team I was eight years old but before

7    that I claimed I was the assistant coach starting when I

8    was about five years old on my sister's teams.

9    Q.    When you were growing up through high school, was

10   volleyball important to you?

11   A.    It was the main thing in my life.

12   Q.    Would you just describe for the court briefly the

13   importance of volleyball in your life?

14   A.    Volleyball has been everything.  Since I was eight

15   years old I decided that I wanted to play in college at

16   an, obviously a collegiate level.  It's what I spent

17   probably ten months out of the year doing, training in,

18   getting better.  It was just something that I loved to do.

19   Q.    Did you play for a high school varsity team?

20   A.    Yes, I did.

21   Q.    Were you recruited to play volleyball by colleges?

22   A.    Yes, I was.

23   Q.    Okay.  Were you recruited by Quinnipiac?

24   A.    Yes, I was.

25   Q.    Were you recruited by other schools as well?

1   A.   Yes.

2   Q.   Why did you decide to -- well, withdrawn.

3        Could you just describe a little bit of what, what it

4   was like to be recruited; what was involved in being

5   recruited?

6   A.   There was a bunch of different things.  It's very

7   stressful.  My Mom did a lot of it for me because it was

8   too much.  There was a lot of letters being sent out.  I

9   mean coaches ask for tapes.  They come watch your games,

10  they come to tournaments.  There's a lot of talking to

11  coaches just telling them what kind of player you are,

12  finding out what the school is.  And obviously the most

13  important part of being, you know, a collegiate player is

14  student athletes have to make sure the school is a right

15  fit for you.

16  Q.   And did Coach Sparks come and see you play?

17  A.   Yes, she did.

18  Q.   When you were in high school?

19  A.   She never came to any high school games but she came

20  to my club tournaments.

21  Q.   That would be when you were a senior in high school?

22  A.   Yes.

23  Q.   And did she talk with you when she came to see you

24  play?

25  A.   Yes.

```
 1    Q.   And why did you -- well, withdrawn.
 2         When did you decide that Quinnipiac was the school
 3    for you?
 4    A.   I had visited -- Coach contacted me after one of my
 5    last games as a high school player and that was in late
 6    September or early November.  I decided to come out for a
 7    visit, which is showing interest mainly in that school.
 8    It was on Election Day, so like November 4 I think.
 9    Q.   And after you visited Quinnipiac, did you reach a
10    decision that you thought Quinnipiac was the place for
11    you?
12    A.   Yes, I did.
13    Q.   When did you learn that Quinnipiac had decided to
14    eliminate its volleyball team?
15    A.   In March after I had committed in November.
16    Q.   That would be March of 2009?
17    A.   Yes.
18    Q.   Right?  Not just this in past March but the March
19    before, right?
20    A.   Yes.
21    Q.   And when you learned that Quinnipiac had decided to
22    eliminate volleyball, did you investigate the possibility
23    of going elsewhere?
24    A.   Slightly.  It's very late in the recruiting period so
25    there weren't many top schools that I was interested in
```

1    that had a liberos (ph) position open.  Not many schools

2    had money which is obviously a huge factor in collegiate

3    volleyball.  You work so hard all your life you want to be

4    rewarded somehow.  And there weren't many options for that

5    in March and April.

6    Q.   Are you receiving scholarship aid from Quinnipiac?

7    A.   Yes.

8    Q.   Why did you decide to attend Quinnipiac even though

9    you knew that there was a lawsuit that might or might not

10   result in the elimination of the volleyball program?

11            MR. BRILL:  I object, Your Honor.  Relevance of

12   her recently coming to Quinnipiac.

13            THE COURT:  I'll allow it.  Again, you know,

14   it's a bench trial.

15            MR. BRILL:  All right.

16            THE COURT:  So it can roll off my back if it's

17   not relevant.  Go ahead.

18   BY THE WITNESS:

19   A.   I came to Quinnipiac because in the first place if I

20   committed, like when I make a decision to do something I

21   dedicate myself to it.  I couldn't back out on my team.

22   Q.   And how do you feel about the prospects for the

23   volleyball team for the coming season?

24   A.   This coming season I can't wait to play.  I cannot

25   wait to get out in the gym.  And we're going to be really

```
1    strong.  We have some great recruits coming in.  So --

2              MR. ORLEANS:  Nothing further, Your Honor.

3              THE COURT:  All right.  Cross?

4              MR. BRILL:  No questions, Your Honor.

5              THE COURT:  All right, you're excused.  Thank

6    you.

7              MR. BRILL:  Your Honor, before we go to the next

8    witness, we have some deposition transcripts to hand up.

9    You want to do that now or --

10             THE COURT:  Whenever is fine.

11             MR. ORLEANS:  I was actually going to suggest it

12   might be a good time to take care of some housekeeping

13   matters before we call our next witness so why don't you

14   go ahead and I'll go after.

15             MR. BRILL:  Sure.  I have two deposition

16   transcripts of witnesses for the record.  First is the

17   videotape deposition of Samuel Seemes who's the track and

18   field expert that was called by the defendant who was not

19   available this week, together with his written report.

20   And the parties stipulated that the written report would

21   be admissible.

22             And we have the videotape deposition of Karen

23   Martin who's the track and field coach who is not able to

24   be here.  She gave birth just before the trial.  And we do

25   have the videotape of this deposition as well.
```

1            THE COURT:  Okay.

2            MR. BRILL:  Let me note for the record we don't

3     yet have the videotape from Mr. Seemes but I'm not sure

4     that it's particularly necessary.

5            THE COURT:  That's fine.  And just so we're

6     clear, I'm going to treat these not as trial exhibits but,

7     rather, simply as part of the record.  In other words, I

8     was going to treat it as if they gave oral testimony.

9            MR. BRILL:  Yes, that's the way we would expect.

10           MR. ORLEANS:  That is correct.

11           MR. BRILL:  Your Honor, another thing, Your

12    Honor, in the pretrial order the parties designated and

13    cross designated portions of Coach Martin's deposition

14    transcript.  We had not turned in our final cross

15    designation but we would like if the entire balance of the

16    deposition be read.  There's just a few pages in the cross

17    examination that have not been designated yet.

18           MR. ORLEANS:  Well, I'm sorry to make trouble

19    but the issue with Ms. Martin was we combined her

20    discovery deposition and her deposition for purposes of

21    trial into one deposition because at the time we took her

22    deposition, she was eight months pregnant and we knew she

23    wasn't going to be able to testify at trial, so it was my

24    understanding with respect to the cross examination

25    because I had never deposed her previously that I would be

1    able to designate portions of the cross examination for

2    purposes of trial and that the remainder of the cross

3    examination would not come in.  So --

4              MR. BRILL:  You're looking at me.  That was not

5    my understanding, Your Honor, but I certainly would have

6    re-asked her the same questions if I'd known that was Mr.

7    Orlean's understanding and there's nothing to that effect

8    on the record.  I don't think it's a big deal but there

9    are little gaps in a few pages here and there and I think

10   it should all be in read in context.

11             MR. ORLEANS:  I agree it's not a big deal.  I

12   think now that you know what happened, we're happy to have

13   you read the entire transcript.

14             THE COURT:  Very good.

15             MR. ORLEANS:  With respect to Mr. Seeme's

16   deposition, I think I received an email from

17   Ms. Berkebile -- am I pronouncing your name correctly?

18             MS. BERKEBILE:  Yes.

19             MR. ORLEANS:  Regarding the signature on that

20   deposition and any corrections?

21             MR. BRILL:  Right.

22             MR. ORLEANS:  We do not need for Mr. Seemes to

23   read and sign that deposition.

24             I did notice two transcription errors, not in

25   the testimony but in the questioning and perhaps at a

1    break I can find those and we can let Your Honor know what

2    those are later.  It's just two words that do change the

3    meaning of the questions that I'd like to get corrected.

4         THE COURT:  All right.

5         MR. ORLEANS:  The other housekeeping matter I

6    thought we ought to address is the exhibits because, Your

7    Honor, you had indicated that you were hopeful that we

8    might stipulate into evidence many of the exhibits and I

9    think we can stipulate into evidence many, not all of the

10   exhibits and I thought it might be useful to just go

11   through that at this time, particularly because our next

12   witnesses, Dr. Lopiano -- and she's going to be relying on

13   some of the exhibits.

14        THE COURT:  Okay.

15        MR. ORLEANS:  Unfortunately I don't have, with

16   respect to the plaintiff's list, I don't have a copy that

17   I can hand up that has the exhibits noted -- the

18   objections noted on it but I could indicate for the record

19   my understanding of what the, which ones the defendants

20   object to and I think the rest all go in.

21        THE COURT:  Okay, that's fine.

22        MR. ORLEANS:  Does that work?

23        THE COURT:  Yes, obviously.

24        MR. ORLEANS:  I'm just going to step up to the

25   podium so I have something to put it down on.

1            With respect to the first 39 exhibits that are

2    listed on our list, those are all of the exhibits that we

3    had identified for the pretrial, the preliminary

4    injunction, and we thought that we shouldn't, since that's

5    becoming part of the record we thought we shouldn't change

6    any of that at all, so our exhibit list notes some of

7    those have already been admitted.

8            I should report that as to Exhibit Four, my

9    understanding is that the defendant objects on the grounds

10   of relevance to the portions of the exhibit that were not

11   already admitted.  The defendant has objected to Exhibit

12   Five on the grounds of, on grounds of relevance.  To

13   Exhibit 8 on grounds of relevance to the extent not

14   already admitted.  To Exhibit 18 on grounds of relevance.

15   To Exhibit 22 and Exhibit 27 on grounds of relevance.

16            THE COURT:  All right.  Are the trial exhibit

17   numbers that were used at the preliminary injunction

18   hearing the same?

19            MR. ORLEANS:  Yes, that was -- I didn't want to

20   disturb that.  I thought it would be too confusing.

21            The defendant has objected to 30 on foundation

22   and relevance.

23            MR. BRILL:  Could I just ask, Jon, could you

24   give me a few minutes?  I'm having trouble --

25            MR. ORLEANS:  Absolutely, I'm sorry.

1          (Pause)

2          MR. BRILL:  Could we defer this, Your Honor?

3    Unfortunately I can't locate my copy of the objections

4    easily and I'm not sure we need to do this right now

5    before Dr. Lopiano's testimony.  If there are specific

6    exhibits she wants to rely on we can address those but I'm

7    not prepared to go through the whole list.

8          MR. ORLEANS:  That's fine.  I don't need to

9    inconvenience Mr. Brill.

10          THE COURT:  Okay.

11          MR. ORLEANS:  We'll continue that later.

12          MS. GALLES:  Your Honor, we would like to call

13    Dr. Donna Lopiano as the next witness please.

14          MR. BRILL:  Your Honor, before Dr. Lopiano takes

15    the stand -- she can sit down but before she begins her

16    testimony -- we did not make a motion in limine as to her

17    testimony but I do have two issues that I think would be

18    useful to sort out now rather than through objections in

19    the course of her testimony.

20          THE COURT:  All right.  Before she sits let me

21    jury just swear her in.  Would you raise your right hand

22    please?

23    D O N N A     L O P I A N O,     called as a witness on

24    behalf of the Plaintiff, having been duly sworn by the

25    Court, testified as follows:

1                    THE COURT:  All right, thank you.  You can sit.

2                    MR. BRILL:  She's being called as an expert, as

3          I understand, on Title IX and I don't frankly understand

4          the point of testimony on what a law means anymore than

5          Mr. Orleans and I could testify about what Title VII

6          means.  The court may find testimony of that useful as

7          background, I don't have any objection.  I think what is

8          more concerned is in her report she purports to say at

9          various times what she thinks the Office of Civil Rights

10         would do or what positions the Office of Civil Rights

11         would take on certain issues.  That to me, that's

12         absolutely beyond the bounds of what any expert -- she's

13         not even a lawyer but what an expert can say about what an

14         administrative agency could do with respect to the

15         situation where there's been no rulings, anymore than

16         Mr. Orleans or I could testify as to what we think the

17         EEOC or the Department of Labor might do in response to a

18         particular case where there's been no ruling.  So I think

19         that ought to be the guidelines for that frankly ought to

20         be understood before she begins because these are issues

21         that she addresses in her report.

22                    MS. GALLES:  Yes, Your Honor.  Several things I

23         guess I can respond to that.  Number one, is shown in her

24         CV is that these are exactly the issues that Dr. Lopiano

25         has testified about in every major Title IX litigation

1    that has come up in the last 30 years, so this is nothing

2    more than what she has done before and has been accepted

3    by courts in the case against Brown University, Colorado

4    State, Louisiana State University, and many others that

5    are listed on her CV.

6              Secondly, what she really does is because of her

7    expertise in gender equity, sports administration, having

8    been the former athlete -- women's athlete director at the

9    University of Texas, how do you apply these principles

10   practically in an athletic program.  And some of these

11   matters are simply calculating -- obviously the law says

12   here's how you do it but you have to calculate, you have

13   to use numbers.  Who are participants, why are they

14   participants.  And then how do you calculate if you have

15   how many men, how many women, just doing the math to show,

16   all right, that produces a gap of X.  Somebody has to do

17   that and Dr. Lopiano has indeed done that, so it's more in

18   terms of application rather than she may state that

19   obviously OCR says this, this is how I would apply it

20   here.

21             THE COURT:  All right.  In general, I'm going to

22   allow this testimony.

23             MR. BRILL:  Could I just clarify, Your Honor.

24   I'm sorry, I don't object to the testimony that Ms. Galles

25   described.  That's fine, but what I object to is with

respect to competitive cheer there have not been rulings

and Ms. Galles in her statement says the OCR will take

such and such a position or would have such and such a

view.  To me that is not permissible expert testimony.  If

she wants to apply her understanding of how you count

numbers in participation, I don't have no objection to

that, with respect to that.

THE COURT:  Again, it's a bench trial.  If

somebody comes up here and says the 2nd Circuit's going to

go this way or that way, you know, no one knows.  I think

we should keep the testimony moving and I'm really not

worried about sorting out these issues in the end.

I would ask though for a copy of plaintiff's

exhibits, assuming you have them.

THE CLERK:  Do we have copies for --

MR. ORLEANS:  Yes.  You have to be careful what

you ask for sometimes, Your Honor.

THE COURT:  Okay.

MS. GALLES:  All right, ready to go?

MR. ORLEANS:  I don't know if you're going to

need these, Dr. Lopiano.  Here you are.

DIRECT EXAMINATION

BY MS. GALLES:

Q.   All right.  Dr. Lopiano, I would first like to direct

your attention to what has been marked as Plaintiff's

1   Exhibit 99, which you have your own copy in front of you.

2   Could you please take a look at that and let me know --

3   A.   Are you talking about my expert report?

4   Q.   Yes.  Dr. Lopiano, I'd just like you to identify what

5   that is.

6   A.   This is a report dated May 15th, 2010, and it was my

7   original expert report that was, that was done without the

8   submission of the 2009, 2010 squad lists, which I just

9   received in this past week.  And that required me in order

10   to do a count of 2009, '10 based on the squad list, to

11   issue a supplemental report which I have done.

12   Q.   Okay.  And I am --

13   A.   But this is my original report.

14   Q.   Original report, Exhibit 99?

15   A.   Right.

16   Q.   Okay.

17   A.   I trust you on Exhibit 99.  I'll mark it.

18            MS. GALLES:  May I approach the witness, Your

19   Honor?

20            THE COURT:  Yes.  It's not necessary to ask.

21            MS. GALLES:  Okay, since we're -- all right.

22   BY MS. GALLES:

23   Q.   And could you please give this to the judge?

24       (Hands Court.)

25            MR. ORLEANS:  Just -- to identify that those are

1    the three supplemental exhibits, there's a supplemental

2    exhibit list, 149, 150 and 151.  And the report is 149,

3    this report.  The supplemental report is 149.  The -- do I

4    have my numbers right?

5              THE CLERK:  There's Exhibit A and --

6              MS. GALLES:  And Exhibit B.

7              MR. ORLEANS:  And they are attached.  I don't

8    think they are in the exhibit book.  I'm not sure.

9              THE CLERK:  I have 149.

10             MS. GALLES:  Oh, they are fast.

11             MR. ORLEANS:  My staff did a faster job than I

12   even knew.

13   BY MS. GALLES:

14   Q.   Okay.  So, Dr. Lopiano, what I have handed you and is

15   marked as Exhibit 149, and attached as Exhibits A and B

16   which have been marked as Exhibits 150 and 151, could you

17   please identify those for us?

18   A.   Yes, Exhibit 149 is my supplemental report dated June

19   20.  Let me make sure on that date.  Dated June 20, 2010.

20   And it has attached to it two charts, Chart A which is

21   150, and which is my athlete by athlete analysis of how I

22   counted each athlete on the squad list.

23        And then Chart B is a summary by sport of the three

24   different ways I counted a comparison to conference and

25   NCAA squad list.  And then in addition to showing -- I'll

1    explain all this in my supplemental testimony -- I did

2    four different calculations based on the court's pleasure

3    and whether it's going to consider triple counting, double

4    counting, unduplicated counting or single sport counting

5    of the runners.  So I'll explain all of that but I tried

6    to create in the supplemental report a very clear picture

7    of the choices that the court has in making a

8    determination on counts.

9    Q.    All right.  Dr. Lopiano, I'd like you to go to what

10   has been, what is marked as Exhibit A to your expert

11   report, but is Exhibit 100 of plaintiff's trial exhibits.

12   A.    Okay.

13   Q.    And that is your CV.  And since providing the CV that

14   is attached or that is marked as Exhibit 100, have you

15   since updated that or confirmed it for accuracy?

16   A.    Yes, I have updated it as of 6/13, 2010.

17   Q.    Okay.

18   A.    You have a copy of that, I believe.

19   Q.    Yes.  Dr. Lopiano, I'd like to present that to you.

20   (Hands witness.)  And is what I have just handed you the

21   most recent version of that, of your CV?

22   A.    Yes, it has very minor changes.

23   Q.    Okay.

24              THE COURT:  Mark that as 152.

25              MS. GALLES:  Okay.

1          (Whereupon Plaintiff's Exhibit 152 was marked

2      full.)

3          THE COURT:  Okay, I'm going to suggest this.

4  When exhibits are used with a witness, if there's going to

5  be an objection, just give me a heads up.

6          MR. BRILL:  I was waiting, Your Honor.  She

7  hadn't offered it.

8          THE COURT:  No, I know, I'm thinking we can

9  almost --

10         MR. BRILL:  All right, I'll state my position on

11  these exhibits.  There are no objection to 152, the CV.

12  We did not stipulate that the reports of Dr. Lopiano could

13  come into evidence.  Actually we didn't get the

14  supplemental report much I got it at six a. m. this

15  morning but I read it through.  They are hearsay obviously

16  and we agree that she would give her testimony orally.

17         I probably, depending on the testimony, would

18  not object to Exhibits A and B to the supplemental report

19  coming in, nor the limited purpose of summarizing her

20  analysis, but not for the truth of the statements that are

21  on there, many of which are hearsay, inaccurate, et

22  cetera, et cetera.  But if the plaintiffs want to put in

23  that chart simply to show that this is what I was

24  thinking, and this is how I made my calculations, then I

25  think it might be useful to have that in the record rather

1       than have them all orally, but certainly not for the

2       truth.  She misquotes from emails, et cetera.

3                   THE COURT:  I understand, I understand.

4                   MS. GALLES:  Okay.

5                   THE COURT:  Do you need the reports in?

6                   MS. GALLES:  Well, obviously we will want the

7       reports in it was our understanding because this, the

8       trial was significantly shortened, that the court

9       preferred that we enter the reports and that we only

10      highlight some of the most important stuff in her oral

11      testimony.  Otherwise, you know, we'd be here all day

12      having her go through the detail that's already in the

13      report.  And as an expert, obviously she is entitled to

14      rely on hearsay if it's the type of information that an

15      expert would generally rely upon.

16                  But I don't think, most of the materials that

17      she relies upon are either provided by Quinnipiac or are

18      the type of things that anyone in her position or a

19      athletic director's position would rely upon, such as NCAA

20      manuals, NCAA participation.

21                  THE COURT:  I think the concern are the reports

22      themselves are hearsay but I'm going to overrule that

23      objection in light of the procedure we're using in this

24      hearing, in light of the time limits that have, we've

25      imposed.  And that will work both ways, so --

1        MS. GALLES:  Okay, Your Honor.  So the report

2   and the supplemental report have been --

3        THE COURT:  Yes, 99, 149, 150, 151, 152 are

4   full.

5             (Whereupon Plaintiff's Exhibit 99, 149, 150,

6        151, 152 were marked full.)

7        MS. GALLES:  Now, in addition to her report

8   includes many exhibits that are also separately marked on

9   the exhibit list.  Would you like me to go through those

10  or would you like me to wait until I go through them with

11  Dr. Lopiano?

12       THE COURT:  Why don't you list them right now.

13       MS. GALLES:  All right.  Exhibit 100 is her

14  original CV and then Exhibit 152 is her updated CV.

15       THE COURT:  Right.

16       MS. GALLES:  Exhibit 101 was the disclosure

17  about the compensation for an expert.

18       THE COURT:  Okay.

19       MS. GALLES:  Exhibit 102 are charts that

20  Dr. Lopiano prepared in conjunction with the preliminary

21  injunction hearing that merely compare Quinnipiac's squad

22  sizes to the average squad sizes.

23       MR. BRILL:  Do you want my objections as we go

24  along, Your Honor?

25       THE COURT:  Let me get the list out and you can

```
1    object.  Basically we have 101 through what?

2              MS. GALLES:  Yes, sir, 101 through 114.

3              THE COURT:  All right, 101 through 114.  100 is

4    full.  That's just the old CV.  And I'm going to allow

5    that in, so 101 through 114, any objection to those?

6              MR. BRILL:  Yes, Your Honor.

7              THE COURT:  Okay.

8              MR. BRILL:  102 is completely irrelevant now.

9    This is having to do with proposed squad sizes from the

10   time of the preliminary injunction hearing and NCAA

11   averages at that time.  It just has nothing to do with the

12   case at this moment and would be confusing just to have

13   another set of numbers that we're not really dealing with

14   now.

15             THE COURT:  It might confuse the jury, it won't

16   confuse me.

17             MR. BRILL:  103 I have no objection to.  104 I

18   have no objection to.  105 I have no objection to.  106 I

19   have no objection to.  107, no objection.  108 I believe

20   is already in evidence, Your Honor.

21             THE COURT:  Okay, well no harm in having it

22   twice.

23             MR. BRILL:  Well then -- it is, these are

24   hearsay letters from the Office of Civil Rights written

25   to -- especially the second letter, responding to a
```

1    letter -- we don't know what the facts were.  It was

2    stated to the OCR when he was responding to the letter so

3    it's half of the story.

4              THE COURT:  All right, so 108 is already in in

5    another number?

6              MR. BRILL:  I believe so.

7              THE COURT:  But you're objecting to 108?

8              MR. BRILL:  Yes, you asked me if you wanted it

9    in again.

10             THE COURT:  So you're objecting to something

11   that's already in evidence?

12             MR. BRILL:  I'm essentially asking the court to

13   reconsider the ruling on that objection.

14             THE COURT:  Well, okay.  I'm going to allow it

15   in.  Go ahead.

16             MR. BRILL:  109, we have no objection.  110, no

17   objection.  111, I don't know.  111, the court has ruled

18   is irrelevant for the most part.  These are the EADA

19   numbers going back to 1995.

20             THE COURT:  Right.  Again there's no point in

21   redacting this document.  I can read it, I can understand

22   what it says.

23             MR. BRILL:  I'm just stating for the record my

24   position about it so it's clear to the reader of the

25   record that there's been a ruling that this document is

```
 1    largely irrelevant.

 2              THE COURT:  All right.

 3              MR. BRILL:  Exhibit M, which is reported as

 4    Exhibit 112 --

 5              MS. GALLES:  We withdraw it.

 6              MR. BRILL:  That's withdrawn?  Okay.  113, no

 7    objection.  Is that the last one or are we going --

 8              THE COURT:  114.

 9              MS. GALLES:  114.

10              MR. BRILL:  No objection.

11              THE COURT:  Okay, so 101 through 111, 113 and

12    114 are full.

13              (Whereupon Plaintiff's Exhibit 101, 111, 113,

14         114 were marked full.)

15    BY MS. GALLES:

16    Q.   Okay.  Dr. Lopiano, I'd like to just -- your CV is

17    now in evidence but just to provide some context to the

18    court for the, for your expertise, I would like you to

19    please describe briefly your employment history as it

20    relates to gender equity and intercollegiate sport

21    administration?

22    A.   Yes, in terms of employment, for 18 years I served as

23    director of women's athletics at the University of Texas

24    in Austin in Division I program, consistently among the

25    top ten in the United States.
```

1          For 15 years I served as the Executive Director, CEO

2     of the Women's Sports Foundation, an expert research

3     efficacy programming organization in terms of gender

4     equity and increased opportunities for girls and women to

5     participate in sports and physical activity.

6          For the last two -- time flies here -- two years, two

7     and-a-half years, I started my own consulting business

8     called Sport Management Resources.  I'm president and I

9     have three other independent contractors, all of which are

10    either researchers or experts in gender equity and other

11    areas of interest in terms of athletic programs from fund

12    raising to good compliance and eligibility systems, to any

13    athletic administrative topic that a student needs help

14    with that our directors could be of assistance, expert

15    athletic directors could be of assistance in.

16         That's the nature of the company with every one of

17    the principals having, again, college professors and

18    support management in addition to serving as

19    administrators and researchers themselves.

20    Q.   And does any of that consulting involve gender equity

21    issues?

22    A.   Absolutely.  The schools will hire us to perform a

23    comprehensive Title IX assessment for them and to make

24    recommendations as to how they might come into compliance.

25    Q.   Are there any other issues on your CV that you would

1    like to highlight or is that a sufficient summary?

2    A.    It's up to you.

3    Q.    Well, I would like you to describe your background

4    with the AIAW.  Could you please explain what that is, and

5    what your role was?

6    A.    In terms of non-employment leadership experience, I

7    was president of the association for athletics for women

8    which was predecessor government's organization for

9    women's championships, conducted women's championships

10   just like the NCAA did before the NCAA included women.  It

11   existed for approximately ten years.

12        When AIW went out of existence, when NCAA took over

13   women's championships, I served in various leadership

14   roles within the NCAA, either on committees or chairing

15   various committees, that are detailed in the CV but it

16   ranged from rewriting entire NCAA manuals so people could

17   understand it to other issues in intercollegiate

18   elections.

19   Q.    I'd like to focus on your mention of the OCR.  While

20   you were athletic director at Texas and while you were

21   president of the AIAW, did you provide any input or

22   consulting services to the Office for Civil Rights

23   relating to gender equity issues?

24   A.    Yes, not when -- I was president of AIAW in 1981, I

25   believe it is, but in the early 1970s when I was a member

1    of the executive board, director of national championships

2    for AIW, I was intimately involved in all of the beginning

3    OCR work on Title IX's application to intercollegiate

4    athletics, their protections and the '75 policy

5    interpretation.

6         On a number occasions, I testified before Congress on

7    the need for and the contents of these regs.  I also, I

8    worked on the first Title IX investigators manual which

9    was developed as a training tool for all of the regional

10   Title IX coordinator offices.  And was brought in along

11   with another colleague of mine in support manager resource

12   Dr. Christine Grant that we both engaged in training all

13   the regional offices as to how to apply Title IX to

14   intercollegiate programs and how to use it.  At the time

15   it was a draft, this investigators manual.

16        Also worked with OCR.  They contacted the Women's

17   Sports Foundation in my capacity there, helped them

18   develop their definition of sport criteria, which they

19   have used in not only letters responding to questions from

20   the individual institutes but it was also used in the 2008

21   recent Dear Colleague letter that really summarized how

22   one was, OCR was going to look at what activities would be

23   considered sports.

24        Also worked in, if I haven't said this already, I

25   also worked on the '96 clarification with Norma Cantoo

1    (ph) and staff there in terms of the three prong test, all

2    of that work.

3        And as the head of the Women's Sports Foundation and

4    as a former, you know, athletic director, every year I

5    would meet, we would meet with OCR.  It was part of our

6    work to be experts to people who called into the

7    foundation seeking resources and advice.  And typically we

8    would get calls from parents saying this is the situation

9    at the school, you know, is this allowed under the law.

10   Who can I go to?  We would point them to OCR, we would

11   point them to educational resources, point them to legal

12   documents.

13       So it was very important for us to stay absolutely up

14   to date as to where OCR was on all of these questions and

15   we would formally meet with them once a year and the

16   women's sport agency still does that.

17   Q.   I just want to clarify, I'm not sure if you mentioned

18   it or not, but in several different places in this case

19   and indeed in your report, it refers to the 1979 policy

20   interpretation.  I believe there was a 1975 memo but there

21   also was a 1979 policy interpretation.

22   A.   It was recodified when --

23   Q.   So I just want to be clear, is the 1979 policy

24   interpretation also one that you provided expertise to OCR

25   on?

1    A.   Yes, basically '79 was recodified when Department of

2    Health Education and Welfare was changed to DOE, so it

3    changed.

4            MR. BRILL:  I'm sorry, Your Honor, could you ask

5    the witness to speak more directly into the microphone.

6    Maybe it needs to be adjusted, I'm having trouble hearing.

7    A.   I apologize.  Is that better?

8            THE COURT:  Don't get too close because you'll

9    get on -- okay.

10            THE WITNESS:  Raise your hand and I'll try to

11    enunciate more clearly.

12    BY MS. GALLES:

13    Q.   Now, Dr. Lopiano, I'd like to have full disclosure

14    here for the court, I'd like you to look at what's been

15    marked as Exhibit B of your report which is exhibit --

16            THE COURT:  It's 101.

17            MS. GALLES:  101.

18    BY MS. GALLES:

19    Q.   And just are you being compensated for the work that

20    you have done in this case?

21    A.   Yes, I am.

22    Q.   Okay.  And could you please let us know what your

23    rates are for this work?

24    A.   Exhibit 101 specifies that if I -- I get $175 an hour

25    for consulting with attorneys, two hundred dollars an hour

1    for preparation of written reports and research related to

2    such reports, $250 an hour for a deposition or court

3    testimony.  No charge for hours traveling.  On site visit

4    for Title IX analysis, it's $1,500 a day.  These are

5    nonprofit rates, these are reduced rates.  If the

6    plaintiffs had deeper pockets, they would be much higher.

7                THE COURT:  Let me just briefly interrupt and

8    just let all counsel know that when a document's in

9    evidence, you can either just say, Judge, look at 101 and

10   you'll see what she's paid, or you can actually read from

11   it or you can --

12               MS. GALLES:  Okay.

13               THE COURT:  Save time doing that.

14               MS. GALLES:  So go ahead and zip through unless

15   we want to emphasize it.  Yes, sir, we will do that.

16   BY MS. GALLES:

17   Q.  All right.  Then, Dr. Lopiano, I'd like to jump ahead

18   to the substance of your original report.  There is a part

19   A that says athletic participation opportunities dash

20   general.  And it describes how you approach prongs one,

21   two and three in general, not with respect to Quinnipiac

22   but in general.  Okay?

23               MR. BRILL:  Could you just point us to what page

24   you're -- the pages aren't numbered.

25               MS. GALLES:  Yes.

```
 1              MR. BRILL:  Could we agree to number of pages?
 2              MS. GALLES:  It starts right here.
 3   BY THE WITNESS:
 4   A.    So this roman five capital A, that's where you are?
 5   In the report, Roman numeral five capital A?
 6   Q.    Yes, roman numeral five, capital A.
 7   A.    Okay.
 8   Q.    Could you go through, there's some parts A -- let's
 9   focus on subpart A about athletic participation
10   opportunities in general.  Is what's in your report an
11   accurate summary of your approach to application of the
12   three part test?
13   A.    Yes, it is.
14   Q.    Okay.  Now, I only want to highlight a few points in
15   there.  I'd like you to go to the page that has the 1979
16   policy interpretation language in it.
17   A.    Could you tell me where you are?
18              THE COURT:  Three more pages.
19   BY MS. GALLES:
20   Q.    Right here. (Indicating)
21   A.    Okay.
22   Q.    There you go.  Now, on this particular page, you
23   reference the 1979 policy interpretation and again in your
24   supplemental report, in the front page of your
25   supplemental report, you reference the 1979 policy
```

1    interpretation and the 1996 clarification.  I just want to

2    ask you, did you use or apply the definitions in those OCR

3    documents when conducting your analysis?

4    A.   Yes, I did.

5    Q.   Okay.  Now, on the top of that page, you state that

6    when schools count male and female athletes differently in

7    this way they breach the purpose and intent of Title IX

8    and by definition they discriminate on the basis of sex.

9    Could you please explain what you meant by that statement?

10   A.   When an athletic program establishes a policy that

11   says I want to have certain size teams and I want these

12   teams to be different sizes for male and female because in

13   athletics, we have separate programs, we treat them

14   differently, you are discriminating on the basis of sex.

15   And if the result of that policy results in a different

16   experience for men and women, it is discrimination on the

17   basis of sex, especially if women get the short end of the

18   deal.

19        So, for instance, when Quinnipiac says to the mens

20   program you can have no more than this number of athletes

21   and that number of athletes is equal to an average squad

22   size or lower than average squad size which is an ideal

23   size squad for instruction and participation, it's

24   matching up to everyone else that they are playing

25   against, they have a set up, a structure, a sport program

1    that is like who they are playing.  When they say to the

2    women's program that you have a, a minimum floor that you

3    have to have a number, if the reach the number for your

4    squad that is larger than a national average, I want you

5    to generate more in participants for purposes of counting,

6    for instance, and they inflate by that policy,

7    artificially inflate the size of the team, they create a

8    team size that hurts both participants who would be on a

9    normal size and these extra inflated participants because

10   not everyone is going to be able to get the same

11   instructional attention on the part of the coaches that

12   the kids who would have been on a normal size game or your

13   best athletes would have gotten much more attention, and

14   the kids who now share all this who are, you know, who are

15   for all intents and purposes kind of extras are taking

16   away from that instructional responsibility.  And also, it

17   dilutes the amount of money you put into the program that

18   now your, usually your per capita expenses are going to be

19   less and, therefore, your benefits and treatment of those

20   larger teams are going to be less than the small teams.

21        So it's a real red flag whenever you see policies

22   that are different for men and women.  Ideally it is

23   perfectly acceptable and most institutions do this.  They

24   say I want you to cap men and women, I want you to cap

25   teams at average squad sizes that are consistent with the

1    teams you play against.  That's fair because that's who

2    I'm competing with and these average squad sizes then are

3    ways that I can financially control expenditures and it's

4    a reasonable financial control that affects men's and

5    women's teams equally.  It's nondiscriminatory.

6    Q.   So you're saying if you apply the same rules, are you

7    saying that you if you apply the same rules to men and

8    women it's okay, but if for men it's one and women

9    another, that's when it's discriminatory?

10   A.   Yes, and they have the negative effect on one, it's

11   discriminatory.

12   Q.   Now, I'd like you to go to the next page of your

13   report where the second paragraph says by padding women's

14   teams.  Do you see that?

15   A.   I do.

16   Q.   Okay.  And is that -- is there anything else you

17   wanted to add to that or is that what you were just

18   describing?

19   A.   That is what I was just describing.

20   Q.   Okay.  Now, in the, the next paragraph, it talked

21   about they, meaning coaches, do not want to carry men

22   athletes who will never compete or who do not have the

23   athletic ability to contribute to the team overall.  True

24   varsity teams are elite by their very nature and thus such

25   cuts must be made.  Could you please explain what you

1    meant by that statement?

2    A.    Yes.  High schools, colleges, universities kind of

3    differ in terms of how big they want their squad and how

4    elite they want their squads, but there's no question,

5    individual ones, this is the most elite level, and you

6    always are looking to maximize the student/instructor

7    ratio.  So, having a reasonable size team so you can

8    optimize coaching and the development of each of these

9    athletes is absolutely critical in Division I.

10       So that these squad sizes padded is, is very

11   antithetical to an elite athlete's success because, as I

12   just explained, it diminishes success for students and

13   makes you less competitive vis a vis your opponents.

14   Q.    Just to confirm their Division I is the most elite

15   level of college athletics?

16   A.    Yes, it is.

17   Q.    And would you expect to have the most talented or

18   most accomplished athletes at the Division I level?

19   A.    Absolutely.  And in Division I, usually you look at

20   all recruited student athletes, you're looking at, you

21   know, vast majority of them are on athletic scholarship

22   and you are looking at the athletes who are going to

23   school to get the most out of that school's teaching staff

24   and the experience itself.

25   Q.    Okay.  Now, further down in the report, sort of the

1    last paragraph on that page, when it talks about how the

2    schools find their athletes?

3    A.    The paragraph --

4    Q.    Same page of the last paragraph, when investigating

5    the squad numbers?

6    A.    Okay.

7    Q.    Could you please explain the importance, if any, of

8    recruiting athletes at the Division I level?

9    A.    Yes.  Schools are obligated in treating their men's

10   and women's programs equally.  These athletes who

11   participate in it should be coming from the same place.

12   If your men's programs said I am going to recruit the best

13   athletes from all over the country or the best athletes

14   from all over the region and are recruiting from an

15   incoming class of high school graduates, that is very

16   different than recruiting on your campus kids who are

17   unsolicited because of their athletic talent for coming to

18   your school who may or may not have exceptional talent.

19   So Title IX would expect the school to treat its women's

20   and men's program in the same way to make the commitment

21   to spend money on recruiting and to go out and recruit the

22   very best athletes and to provide the same quality of

23   experiences for both men and women.  So recruiting's very

24   important.

25   Q.    Which leads in to my next question.  Would you expect

1    a Division I school to recruit most of its athletes as

2    opposed to just wait, see who shows up for the first day

3    of practice?

4    A.    Absolutely.  Usually 90 percent of who's going to be

5    on your team the coach knows about probably three or four

6    months before the, prior to the subsequent season.

7    Coaches are a year to a year and-a-half ahead of who they

8    are going to identify as potential recruits and are

9    recruiting them in their sophomore, junior and senior

10   years in high school.  This is not just a, you know, last

11   minute, you know, call.  It's a, recruiting is an art form

12   in Division I.  The most successful coaches in Division I

13   have to be as good recruiters as they are instructors.

14   Q.    So, let's go back to when you were the athletic

15   director at the University of Texas.  If you're adding a

16   new sport, a new Division I sport, what process would you

17   use?  Would you simply just start it up tomorrow or what

18   would be the steps that you would take to add a new sport?

19   A.    The process is you would start at least a year in

20   advance, you hire the best coach you possibly could, you'd

21   establish a scholarship budget that would commit to a

22   certain number of scholarships over a four year period,

23   wouldn't give them all away in the first year because you

24   would have to stagger your squad.  But you might give up

25   to half away in your first year you if you were able to

```
1    use some transfers, college transfers as well as incoming

2    freshmen, so would you recruit from the junior college as

3    well as a high school class, but it would take in a

4    Division I school at least a year in advance a commitment

5    to budget, commitment to scholarships, a real commitment

6    to, you know, hiring assistant coaches, doing all your

7    publicity materials.  As I said, recruiting is extremely

8    important in Division I.

9    Q.   Now I'd like you to move to the next part of your

10   report where it says prong two.  Do you see that?

11   A.   Yes, I do.

12   Q.   Okay.  And does the prong two text of your report

13   accurately summarize your views relating to prong two of

14   the three part test?

15   A.   Yes, it does.

16   Q.   Okay.  The next part of your report deals with prong

17   three.  Does that part of your report adequately describe

18   your views and opinions regarding prong three of the three

19   part test?

20   A.   Yes, it does.

21   Q.   Now, the next part of your report under section A

22   talks about levels of competition.  Could you please

23   explain what you mean by levels of competition?

24   A.   Yes.  There are many levels of competition in terms

25   of interscholastic activity between schools.  Clubs, which
```

1    are nonvarsity teams, can compete against each other.

2    Intermural teams can, champions of basketball murals at

3    one school can compete against basketball champions from

4    another school.

5         And a team, individual one in particular, is expected

6    to play all of its contests, majority of its contests

7    against someone of an equal competitive level.  So if I

8    were running a Division I basketball program I would be

9    expected to play all other Division I schools and, as a

10   matter of fact, I would be penalized if I did not.

11        The selection procedure for national championships,

12   for example, the power ratings are all based on your, who

13   your opponents are.  So there's a real specific

14   expectation, especially in Division I, but according to

15   Title IX, applicable to all schools, college, high school,

16   whatever, that you must provide men and women with the

17   same competitive levels.

18        So you would expect to see in Division I, I'm

19   competing against other varsity teams playing the same

20   number of contests against athletes of my high elitist

21   level.

22   Q.   So if the men's programs at your Division I school

23   play primarily other Division I men's programs, would you

24   expect that the women's teams at that school should also

25   primarily compete against Division I institutions?

1    A.    Absolutely.  When you look at schedules you should

2    not expect to see in Division I level any competition that

3    wasn't in a bona fide Division I school.

4    Q.    Now, on the next page still within that levels of

5    competition?

6    A.    And not just Division I competition against the

7    school, a varsity team at that school.  Not a club team at

8    that Division I school or exhibition team against this

9    Division I school.

10   Q.    Okay.  Now, I next want to focus you, you first in

11   that section talk about the level of exhibit and then you

12   talk about how many competitions.  Why does it matter how

13   many competitions when you're comparing men and women?

14   A.    The more you play against high level competition the

15   better you get and so you should still, you should -- men

16   and women should have the same opportunity to become as

17   good as they can be and you do that by designing your

18   competitive schedule and having it to be comparable for

19   men and women.

20   Q.    Now, does the NCAA have any rules placing a limit on

21   the number of games or other competitions that you can

22   engage in?

23   A.    Yes.  It does, in all sports.  And I believe we have

24   exhibits in the NCAA manual and 17.1, 17.2, that

25   specifically talk about every single sport and the number

1    of, maximum competitions that are allowed within an entire

2    period of time or in two separate competitive seasons.

3    And that is because coaches know that's what makes teams

4    good.  They are going to take it to the absolute limit.

5    You would expect to see in Division I everyone playing at

6    or close to whatever those maximum limits are.

7    Q.   So if the men's teams are playing 90 to 100 percent

8    of the maximum allowed by the NCAA, would you expect that

9    they, the women's teams at that same institution should

10   also be playing at 90 to 100 percent?

11   A.   Absolutely.

12   Q.   Now, I'm going to, for the moment I'm going to skip

13   over your discussion of cheerleading and move to part B of

14   the report, athletic opportunities at Quinnipiac

15   University.

16             MR. BRILL:  I'm sorry, what page are you --

17   BY MS. GALLES:

18   Q.   On are you on that page, Dr. Lopiano?

19   A.   Yes.

20   Q.   First, on that page I understand that you wanted to

21   make a correction on the first paragraph of that page

22   about this where it says the NCAA has long notified its

23   members?

24   A.   At the top of that page.

25   Q.   Yes.

```
1    A.   In the paragraph that starts the NCAA -- that third

2    sentence in the front page, that should instead be on page

3    two.

4    Q.   I just want to --

5              MR. BRILL:  I'm sorry, could you -- explain that

6    to me?  I don't see that.

7              MS. GALLES:  Sure.

8              THE WITNESS:  It's a minor editorial.

9    BY MS. GALLES:

10   Q.   Now, going below to the part B, the athletic

11   participation opportunities at Quinnipiac University?

12   A.   Uh huh.  (Affirmative.)

13   Q.   Okay.  In assessing the application of the three

14   prong test to Quinnipiac, did you believe that it was

15   necessary to assess their historical compliance?

16   A.   I did.

17   Q.   And why is that?

18   A.   There was real concern because there was no squad

19   list numbers, no numbers to go on.  When I examined the

20   EADA reports, there were, when you looked at them back to

21   1996, when they were first required --

22   Q.   Let me step back --

23   A.   Sorry.

24   Q.   I want to talk about the abstract.

25             MR. BRILL:  Can I, Your Honor, there was rulings
```

1    made on the motion in limine that this evidence is not

2    relevant, and I understand Your Honor can sort through

3    what's relevant and what's not but there was a record that

4    may go up to a higher court and I am concerned --

5              THE COURT:  I think they can sort it out too.

6              MR. BRILL:  Excuse me?

7              THE COURT:  I have confidence they can sort it

8    out too.

9              MR. BRILL:  I'm not sure.  I'm sorry, I haven't

10   tried a case before Your Honor and I don't know if you

11   just want me to sit here and not saying anything about

12   relevance?

13             THE COURT:  You should object whenever you want

14   but let's wait for a question because right now we don't

15   have a question.

16             MR. BRILL:  Thank you.

17   BY MS. GALLES:

18   Q.   Dr. Lopiano, speaking in the abstract, if you are

19   assessing whether a school is or is not compliant with the

20   three prong test of Title IX, okay, would you look only at

21   this year's data or would you think it would be important

22   to look at several years' worth of participation data?

23   A.   When you're assessing the three prong, you must look

24   back to 1975.  It is critical for a prong two because if

25   you show a diminution, you drop a sport, show a diminution

1    of opportunities for women, or if you don't add an

2    opportunity for the under represented two or three years,

3    then you're not able to comply with two.

4        Also if you're going to use prong one, you have to

5    use prong one all the time.  You just can't say I was, I

6    met prong one in 1975 and that was it.  I'm prong one.

7        So I wanted to go back to see whether they had

8    traditionally reached prong one, whether they were ever in

9    compliance with prong one and whether I could have

10   confidence that, especially in the cases when it was first

11   presented, there they were creating a theoretical prong

12   one structure, I felt it really important to go back to

13   see if they were capable of even doing it theoretically.

14   And which is why I went back historically.

15   Q.   And when you advised schools about compliance with

16   gender equity issues and you do your own analysis for when

17   the schools hire you, do you go back and assess the

18   historical compliance of prong one?

19   A.   Absolutely.  You must because there are three

20   independent tests and the school may be able to meet any

21   one of these three tests and you're obligated as a

22   consultant to tell them which one is better for them,

23   which one are they closer to, which is easier for them.

24   Which, you know, is not, not possible for them.

25   Q.   Now, if, if a school has never relied on prong one in

1    the past, would it be even more important to look at the

2    historical, how they measure up historically regarding

3    prong one?

4              MR. BRILL:  Object to the leading nature of

5    these questions.  We're getting into an important matter

6    and Ms. Galles should not be feeding the answers to the

7    witness.

8              THE COURT:  All right, rephrase the question.

9    BY MS. GALLES:

10   Q.  If a school has never complied with prong one in the

11   past, would your response be any different?

12   A.  I would always look back for any school, even if they

13   had not complied with prong one I would be very focused on

14   this with prong one.  However, to really look at the size

15   of the gap and whether what they were thinking of doing

16   was even possible.  If the gap is 100 or 200 students and

17   they are expecting to make that up in one year, for

18   instance, to have four sports in one year, five sports in

19   one year, it would influence how I speak to the school

20   about prong one.  So you always go back and look and that

21   gap over time is very important for prong one and two.

22   Q.  And if --

23   A.  And three.  If they were to cut a sport which

24   demonstrates interest.

25   Q.  And if the school never complied with prong one

1    before and was saying that going forward they want to

2    comply with prong one, would their historical compliance

3    or noncompliance have any affect on their credibility in

4    your mind?

5    A.   Only in the way I just said, that if the gap was

6    excessively large, if I look back and said and saw that

7    they were close, for instance, I would be more inclined

8    to --

9    Q.   More inclined to what?

10   A.   More inclined to trust they could achieve that and in

11   a relatively short period of time.  If there were huge

12   gaps or, in this case, where there were --

13   Q.   I don't want to talk about particular gaps right now.

14   We're just talking in the abstract, why it is or is not

15   important.

16   A.   Right.

17   Q.   Okay?  And based upon that reasoning and your

18   assessment of other schools, did you believe it was

19   similarly necessary to do that for Quinnipiac in this

20   case?

21   A.   Yes, and I did that in Exhibit one --

22   Q.   L?

23   A.   111.

24   Q.   I don't want to have you talk about that yet.  I just

25   want to say, okay -- and did you indeed in Exhibit L

1    calculate that historical compliance or noncompliance with

2    prong one?

3    A.   Yes, I did.

4              MR. BRILL:  What exhibit are you referring to?

5              MS. GALLES:  I'm sorry --

6              THE COURT:  111.

7    BY MS. GALLES:

8    Q.   And is that analysis reflected in Exhibit L to your

9    report?

10   A.   It is, based on EADA numbers.

11   Q.   Now --

12             MS. GALLES:  Your Honor, so given the foundation

13   that we have just laid regarding the importance of the

14   historical significance of the numbers, we would ask the

15   court to reconsider its ruling and allow Dr. Lopiano to

16   testify about the chart that she prepared and why it was

17   important.

18             THE COURT:  Well, 111's in evidence so you can

19   certainly testify about it.  Frankly I'll decide later

20   whether I'm going to reconsider.

21             MS. GALLES:  Okay.  So you're going to allow her

22   to testify about it?

23             THE COURT:  Sure.

24             MS. GALLES:  Okay.

25

1    BY MS. GALLES:

2    Q.   So, Dr. Lopiano, would like you to look at Exhibit

3    11?

4              THE COURT:  111.

5              MS. GALLES:  Yes, thank you, sir.

6    BY MS. GALLES:

7    Q.   Exhibit 111 which is Exhibit L to your report, okay?

8    And it states Quinnipiac University historical EADA

9    figures, 1995 to 2009?

10   A.   Right.

11   Q.   Okay, could you please explain what this chart is?

12   A.   Yes.  If I were to look at the row numbers in row six

13   and seven, for every year --

14   Q.   You know what, Dr. Lopiano -- if you would give me a

15   moment, Your Honor, I think we have it all on one big

16   sheet of paper and it might be easier for her to read.

17   May I grab that?

18             MR. BRILL:  Your Honor, would this be a good

19   time for a short recess?  Do you have a specific time when

20   you like to break?

21             THE COURT:  I generally break closer to 11.  We

22   started a little early today so maybe we can go a little

23   sooner but -- do you need a break?

24             MR. BRILL:  I would appreciate a short break,

25   Your Honor.

1          THE COURT:  All right, we can take a break.  Why

2     don't we take 15 minutes.  We'll stand in recess until

3     10:35.

4          MR. HERNANDEZ:  Thank you.

5          (Whereupon a recess was taken from 10:20

6        o'clock, p. m. to 10:40 o'clock, a. m.)

7          THE COURT:  Ms. Galles, before you start let me

8     quickly put on the record, I wanted to explain a little

9     further my ruling on the report.  Obviously it's hearsay,

10    normally I don't allow an expert report into evidence but

11    the witnesses here, and the report is in lieu of her

12    testimony.  You're free Mr. Brill to cross her on any

13    aspect of the report, so unlike your typical hearsay

14    judgment which you don't have the opportunity to cross the

15    proponent of the statement, here you do and it just seems

16    to me we'll never get this case concluded if we don't take

17    some shortcuts, including admitting the report and

18    allowing you to cross from it.  So I just wanted to

19    explain that further.

20         MR. BRILL:  I appreciate that, Your Honor.

21         THE COURT:  Sure.

22    BY MS. GALLES:

23    Q.   Dr. Lopiano, I'd like to go back to the part of your

24    report, section B, athletic participation opportunities at

25    Quinnipiac University, and where it says prong one, the

```
 1    first, the first part of that section, it talks about your

 2    analysis of the participation data for Quinnipiac for

 3    1995, '96 through 2008, 2009.  Is the chart at Exhibit 11

 4    a compilation of that data?

 5              THE COURT:  111.

 6              MS. GALLES:  Yes, thank you, Your Honor.

 7    BY MS. GALLES:

 8    Q.    111 a compilation of that data?

 9    A.    Yes, it is.

10              THE COURT:  Let me just interrupt briefly, the

11    mic on the tables are very sensitive and when documents or

12    other things touch them they make that noise, so just, if

13    you could can be careful of those.  Thanks a lot.

14              MS. GALLES:  Okay.

15    BY MS. GALLES:

16    Q.    So, Dr. Lopiano, if you could please just explain,

17    did you create Exhibit 11?

18    A.    Yes, I did.

19    Q.    Okay.  Could you please explain what it shows?

20    A.    Yes.  Not only is this for '95 to '96 but this method

21    of computation is the one you'd use for '09, '10, using

22    the squad list and supplemental report.  So in

23    understanding how the numbers mathematically are derived

24    is a really important concept.  We can disagree on the

25    counts later on but you have to know how gaps are created
```

1    so I can explain it.  Let me take, for instance --

2    Q.   Could I just back up for one moment?

3    A.   Sure.

4    Q.   For those charts did you analyze squad lists or did

5    you just use the Equity in Athletics Disclosure Act

6    reports that were used?

7    A.   I just used Equity in Athletics Disclosure Act

8    reports.  No squad lists were available.

9    Q.   So please continue.

10   A.   Yes, so if we focus on column C, which is 1995, '96

11   as an example, Title IX prong one requires that your

12   percentage of males and females in the athletic program be

13   proportional to the percentage of males and females in

14   your general student body, full-time, undergraduate

15   enrollment.  So if you look at rows six and seven you're

16   looking at QU's undergraduate enrollment for men and

17   women, and when you look at nine and ten, you're looking

18   at what they that represents as a portion, the percentage.

19   All right?

20        So, and then if you count up, let's just assume these

21   counts are okay right now, you see that at line 24, you

22   have 138 men in the program --

23   Q.   Just I just want to be clear that like, for example,

24   men's teams, and 13 through 23, are those the numbers of

25   athletes for those men's teams?

A.   Right, for each team.  So you add up on the total

number of participants on each team, and the total for all

of the men's teams is at line 24, which is 138.

You do the same thing for women's teams.  So add up

everything in line 27 to line 38, and you get the total

women, 107.

Now, you want to solve for the gap, you know, how

many women do you need to get up to 66.5 percent.  This is

solving the gap.  You know three variables.  You know how

many men you have, which would be fixed.  You know what

that should represent.  The proportion 33.5 percent.  You

don't know how many women you have but you know they

should represent proportion 66.5 percent.  So --

Q.   Okay.

A.   -- you mathematically you have in this case, 138, the

men's participants is the 33.5, as, equals, X is to

66.5 percent.  And if you then do the math, you get X

equals 138 times .665 divided by .335.  And you get a

number that is represented at line 40 as 274.  You solve

for X.  So X is the number of women have that should be in

the program if women were 66.5 percent of the student

population.

And then you simply take the number of women who were

actually in the program which is 107, and you subtract it

from that 274 and you have 167 as the gap.

 1          So it's a pretty simple mathematical computation.

 2     This, the mathematical computation should not be in

 3     question.  It's how one counts.  Obviously that is always

 4     the question, but that's the basic thing to, you know,

 5     that's the tool that you have to have for prong one

 6     analysis.

 7     Q.    So for each each year, did you calculate the number

 8     of women or number of women's athletic opportunities that

 9     there would have to be or should have been in order to

10     provide the same proportionality as the undergraduate

11     enrollment?

12     A.    Yes, and those numbers will appear on row 41.

13     Q.    Okay.  Well, row 40 is the number of athletes you

14     should have in row 41?

15     A.    Is the gap.

16     Q.    Is the gap?

17     A.    Yes.

18     Q.    And after making those calculations for Quinnipiac,

19     what did you find?

20     A.    I found that obviously they were very significant.

21     These were huge numbers that would require the addition of

22     a great many teams.

23     Q.    So in terms of -- let's focus on the 2000s.  So if we

24     look at 2001 through 2002 all the way up through the end

25     of the chart?

1    A.    Right.

2    Q.    Okay?  Could you summarize, for example, for 2001,

3    2002, what is the gap number?

4    A.    The gap number is 153.  Goes from 153, 155, 178, 139,

5    174, 111, 63, 102.  And whenever I see changes in numbers

6    like that, for instance, it goes 174 down to 63, it always

7    raises a red flag for me, why is this happening when there

8    are no sports added or dropped.  And so, this was great

9    indicator for me that something had changed in the

10   mechanisms of counting for the numbers of sports and I had

11   looked just much more carefully at this.  Why were these

12   fluctuations happening when they weren't normal

13   fluctuations in team size.  It's not unusual for team size

14   to fluctuate from year to year, two to four, or

15   participants up, down.  You might have a lot of injuries,

16   you have a better recruiting class coming in next year

17   than you do this year.  Little fluctuations are really

18   explainable but there aren't big program changes.  Very

19   unusual to see number changes like this.  So that's what

20   else I would get from this chart.

21   Q.    Okay.  So given that the size of the gap numbers,

22   would you expect, and this goes up through 2008, 2009

23   where the last gap number was 102, given gap numbers of

24   that size would you expect that a school could come into

25   compliance with prong one within one year?

A.   No, but not looking from these numbers, just from --

if you take 102 within the context of what it takes to

start a program and having at least a year to, you know,

start developing a team and everything else, I thought it

would be very difficult to do that.

Q.   Okay.  Now, you identified the change in number; was

there anything about that -- when you said you thought

that that was strange, is there anything more about that

that you wanted to identify?

A.   Well, if you look at both men and women stopped

counting individual teams in cross country, indoor outdoor

track, which is perfectly allowable with the EADA reports,

they chose to combine cross country and track participants

and that is, it is there that we see these big number

differences, these changes in numbers that just make me

want to look closer as to why you would go from 64 to 26

to 22 to 73 on line 35 at the last four years.  You know,

those are really substantial changes.  And the same with

the men.  It would make me want to look closer to say,

well, what's going on here.  So that's all that I would

get from this kind of analysis.

Q.   Okay.

A.   But again I am much more comfortable dealing with

squad list than I am with EADA reports.  EADA are

notoriously weak.

1    Q.   But based on using the EADA reports through 2008,

2    2009, did Quinnipiac meet the proportionality prong under

3    any of those years?

4    A.   In none of those years and it was really far off.

5    Q.   Okay.  Now --

6             MR. BRILL:  I apologize, Your Honor, the

7    witness' voice is dropping off at the end, I'm having a

8    lot of trouble hearing the end of her sentences here.

9             THE COURT:  I think she said it really far off.

10            MR. BRILL:  Thank you.

11   BY MS. GALLES:

12   Q.   Now, Dr. Lopiano, I'd like you to jump ahead in your

13   report to where there's a small A, we're talking about big

14   subset B, small letter A.

15   A.   B one?  One A?  Or --

16   Q.   We're jumping to go right here.  (Indicating)

17   A.   Okay.

18   Q.   Now, that part of your analysis where it starts A,

19   using QU zone, 2008, 2009 on part A --

20   A.   Correct.

21   Q.   -- B and C?

22   A.   Right.

23   Q.   Now, the original report was based upon what you had

24   for roster numbers?

25   A.   The original report was based on EADA numbers and

1   rosters and therefore my supplemental report replaces

2   these sections.

3   Q.   Okay, so I just want to be clear, so since you

4   prepared this report --

5   A.   Right.

6   Q.   -- have you reviewed the squad lists and seasons of

7   competition provided by Quinnipiac?

8   A.   Yes, I have and that is what I based my 2009, 2010

9   analysis on.

10  Q.   Okay, so the A, B and --

11  A.   C.

12  Q.   -- small A, small B and small C sections had been

13  replaced by your supplemental report?

14  A.   Yes.

15  Q.   Okay.  And does your supplemental report, does that

16  address just 2009, 2010?

17  A.   Yes, it does.

18  Q.   Okay.  I'd like you to pull up your supplemental

19  report that's been marked as Exhibit 149?

20  A.   Right.

21  Q.   And you've already identified it for us and just

22  to -- does this exhibit accurately reflect your analysis

23  and your opinions regarding the 2009, 2010 participation

24  numbers for Quinnipiac University?

25  A.   Yes, it does.

1    Q.    Okay.  Now, I just want to give you a chance to

2    explain to the court, you said for the prior years you

3    looked at EADA.  For 2009, 2010, how did you go about

4    counting athletic participants for men and women?

5    A.    Well, first I depend on two documents.  One was the

6    squad lists dated May 26, 2010 which was provided by QU,

7    and the other was the seasons of competition used.

8    Another document that said whether each athlete had used

9    the season in competition.  And then I, in taking those

10   documents, I created a methodology for determining a

11   count.  Do you want me to --

12   Q.    Yes, hold on one second please.  I believe the

13   defendants, the defendants have marked the squad list as

14   Exhibit E M, and the seasons of competition used list as

15   Exhibit E T.  I'm going to show these to you and let me

16   know whether these are indeed the documents that you

17   reviewed.  (Hands witness.)

18   A.    Yes, these are the documents that I reviewed.

19   Q.    Okay.  So on the --

20   A.    These are the documents that I have used in creating

21   my chart table 150.

22   Q.    So if we look at for example, let's just take

23   baseball, for example?

24   A.    Right.

25   Q.    Okay?

1           THE COURT:  Let me just interrupt you and see if

2    I can get our copies of the defendant's exhibits.

3           (Pause)

4           THE COURT:  Go ahead.

5           MS. GALLES:  Okay.

6    BY MS. GALLES:

7    Q.   So, Dr. Lopiano I'd like you to focus on the squad

8    list first.  So let's take baseball, for example.  There

9    are a list of 33 men's names on the baseball squad list.

10   Okay?  When deciding who should count as a participant, do

11   you just count all 33 names or how do you decide who you

12   count and who you don't count?

13   A.   This is, this is the heart of my analysis in terms of

14   understanding how I count it so I would feel more

15   comfortable if I could be allowed to take you through the

16   methodology.

17   Q.   Sure.

18   A.   And to connect all the dots here.

19   Q.   Okay.

20   A.   Because there are many choices that the court is

21   going to have to make in terms of what count it accepts.

22   Q.   Okay.

23   A.   Okay.  So if you look at the methodology section on

24   page one of my report.

25   Q.   Your supplemental report?

A.   Supplemental report.  And then if you look at Exhibit

150, right?  Which is the count chart that I created, I am

going to connect the two dots here.

Q.   Okay.

A.   As to which counts relate to what.

Q.   Okay.

A.   So first I took the absolutely clearly expressed in

OCR documents instructions to who to count.  So I started

with the '79 policy interpretation that you see on page

one.  And I looked at those, A B C and D, and I said we

absolutely have to use this as guidance and then in the

1996 clarification, in terms of when OCR considers a sport

season to commence and to conclude, and how it determines

who's listed on a squad list or an eligibility list, that

we had to take that and based on these definitions, I

created this nine reason count, methodology that I

assigned to each athlete the reason why I counted them.

And I made sure to connect it to the OCR guidance or I'm

pointing out when there is leeway in that guidance that

requires some interpretation because it's not absolutely

clear.

     For instance, when the -- I've never received a QU

count, all I received from QU was here are the number of

kids on my squad list in the beginning of the year, here

are my number of the kids on the squad list at the end of

1    the year, but there is no what are the count for this

2    sport.  There are two different numbers.  There is no what

3    did you count, so I ahd to create this system.

4    Q.   So did you go through each athlete by athlete to

5    determine whether he or she should count as participant?

6    A.   Yes.

7    Q.   And just to make, I believe you said nine reasons, I

8    only see eight here.

9    A.   Did I say nine?  I'm sorry, eight.

10   Q.   So is it eight or is it nine?

11   A.   It's eight.

12   Q.   Okay.

13   A.   And if you look at Exhibit 150, if you look at the

14   columns, reason one is going to correspond to reason one.

15   See the column that said reason one repeated?

16   Q.   So could you please -- so in your report, reason one

17   athletes who participate in any competition?

18   A.   Exactly.  So I'm just making the connection with this

19   chart.  So reason one says that I counted any athlete who

20   actually participated in a competition during the year,

21   whether in a NCAA traditional or nontraditional seasonal

22   sport who would be charged with a season of eligibility.

23   And I took that off of the eligibility list provided by

24   QU.

25   Q.   Is that off of the seasons of competition?

1    A.    That is right.

2    Q.    Used?  Which would be E T?

3    A.    Right.  Reason two corresponds directly with you have

4    to count athletes who cannot participate because of injury

5    but who received athletic aid and that corresponds to on

6    the first page, D, who because of injury cannot meet A B

7    or C above but continued to receive financial aid based on

8    athletic ability.  And that is reason two on my 150 chart,

9    right?

10        Number three is a red shirt.  A red shirt is an

11   athlete and it says very specific NCAA definition.  An

12   institution determines whether there's red shirt and I

13   accepted all the red shirt determinations by QU.

14   Q.    Could you please, explain for folks who are not well

15   versed in college athletics --

16   A.    I'll explain what it is.

17   Q.    -- well versed in college athletes what a red shirt

18   is?

19   A.    A red shirt is one who does not use a season of

20   eligibility because they don't compete in the sport but

21   not only -- they practice, but you don't have to count

22   them and they haven't received some substantial benefits

23   of participation which kind of preserves your year of

24   eligibility.  They cannot travel with the team, they can't

25   wear their team uniforms in open competitions.  They are

```
 1    legitimate practice player that the NCAA recognizes as a
 2    way of preserving your eligibility but they count as a
 3    participant because they are there all the time.
 4    Q.    So you're practicing every day, receiving --
 5    A.    Everything except travel, wearing the uniform.
 6    Q.    And competing?
 7    A.    Exactly.  And competing in the, whether in
 8    intercollegiate competition, or wearing the uniform of the
 9    school.  So that's number three on that chart.
10    Q.    Okay.
11    A.    Number four, I counted every athlete who was on the
12    squad list and practicing on the first day of competition
13    of the traditional season even if they didn't compete,
14    which is corresponding to the first page, definition of --
15    C.    I'm sorry, the '96 clarification as a general rule all
16    athletes who are listed on a team squad list are on the
17    team as of the first competitive event are counted as
18    participants by OCR.  So those were --
19    Q.    So on the first go around, you counted all those
20    folks under number four?
21    A.    Right.
22    Q.    So even if they quit later in the season for purposes
23    of reason four, you counted them?
24    A.    That is correct.
25    Q.    Okay.
```

A.    Okay.   Now, what's important here is in my final

analysis I'm giving the court three options of counting.

The first option is these four reasons.   I feel like they

are the most conservative, strongest tied, non

interpretive ways of counting that clearly match up to

specific language that is offered by OCR.   There are four

additional reasons that I'm going to explain that I

believe are supported but not on point by the language.

And I'll explain why.

Q.    Okay.

A.    They are different circumstances and the court can

decide whether or not it wants to use this middle ground

of counting.   And then I'm going to show you a third one.

Q.    Okay.

A.    So under reason number five, many sports have more

than one competitive season.   So basketball, for instance,

goes from the first, a first practice date all the way

through, you know, the end of after the championship, cuts

across two semesters.   Soccer has a traditional season and

non traditional season.   Lacrosse has a traditional, a

nontraditional season and they are separated in two ways.

Sometimes they are separated by dates, the NCAA actually

says you can start the first one on this date, go to this

date, now you've got to break and you can start on this

day and go to this date.   Or it may say you can only play

1    20 in the first period and five in the second or seven in

2    the first, five in the second.  So it makes distinctions

3    and creates a double competitive season.

4         So the question I had to ask was, because you're

5    going have a multiple sport participants, all right, you

6    have somebody compete in soccer in the fall and choose to

7    compete in Lacrosse in the spring, so what what happens

8    when somebody enters in a nontraditional season, starts

9    playing in a nontraditional season, right?  Has not

10   practiced before and is -- or may or may not have

11   practiced before but is on the squad list for that second

12   nontraditional season, I said that if they were on the

13   squad list for that second nontraditional season they

14   should count under reason five and I've specifically noted

15   that athlete so you knew why I counted that.

16   Q.   So let me give you an example.  Let's take soccer,

17   okay?  Soccer, when is the traditional season for soccer?

18   A.   The traditional season for soccer is in the fall.

19   Q.   And --

20   A.   I mean the traditional season is in the spring.

21   Q.   Okay, so at the college level there's a non

22   traditional season in the spring, okay?  So if someone

23   joined the soccer team after, you know, the first date of

24   competition in the fall, that person --

25   A.   She wasn't counted under reason four.

1    Q.    Because this person was not on the --

2    A.    Listed on the first date of competition.

3    Q.    On the first date of competition.  Would that person

4    then be picked up under reason five because they would

5    exist on the squad list by the time of the first date of

6    competition?

7    A.    Yes.

8    Q.    Of the nontraditional season?

9    A.    Yes, that's exactly what reason five does.  That is

10   the case.  Because, and the reason why you have to get

11   into reason five to eight is because when you look at the

12   language of, especially who counts on the squad list, it

13   says as general rule, right?  So you have to use a rule of

14   reason at some point in time and that is what I'm doing in

15   five, six, seven and eight.

16   Q.    Well, and also with the -- let's look at the

17   definition of the 1979 policy interpretation and the 1996

18   clarification.  Does it anywhere talk about -- when it

19   talked about season does it say traditional season or non

20   traditional season?

21   A.    No, the language just talks about better seasons and

22   seasons.  It doesn't get into this kind of detail which is

23   why you have to look at it as a general rule and that you

24   have to apply it, and what I was expected to do was to

25   apply it evenly for males and females and that it would be

1   logically applied.  So that the experience, you know, in

2   my mind was if you stood with a team for an entire

3   semester and you received the benefits of competition and

4   all of that, it's like if you go to a class for five week

5   they are not giving you a refund, you got something from

6   that school that was substantial.  So that those reasons

7   five, reasons six, both of these, this was my standard

8   that they participated in practice for a substantial part

9   of the year.

10  Q.   We haven't got to number six yet --

11  A.   Right.

12  Q.   -- so I want to confirm, four is on the squad list as

13  the first date of competition of the traditional season?

14  A.   Yes.

15  Q.   And number five, they are on the squad list as of the

16  first day of competition of the non traditional season?

17  A.   And they weren't on, in the --

18  Q.   For number four purposes?

19  A.   Right, right.

20  Q.   Okay, could you please explain what your reason

21  number six is?

22  A.   Yes, reason number six is that if an athlete

23  practiced and received varsity benefits during traditional

24  season, nontraditional season, or a year long season when

25  they cut across two semesters, did not compete, didn't

1   meet reason number one, was not designated as red shirt

2   which is two, was not on the squad list which on the first

3   day of competition, four or five, I made a reasonable

4   judgment whether that person should be counted based on

5   whether he or she received a full semester of instruction

6   and coaching and all the accouterments of being a varsity

7   athlete.

8   Q.   So, for example, let's, you use the example that

9   basketball being one long season as opposed to broken into

10  two segments, okay.  Basketball season say starts in

11  October, you have the first game in November, the person

12  someone joins the team after Thanksgiving.

13  A.   Right.

14  Q.   So that person is not on the squad list of the first

15  November game?

16  A.   Correct.

17  Q.   But joined, you know, at Thanksgiving or after finals

18  in December.  Okay?  Is that an example of a person that

19  would fall under number six?

20  A.   Yes, somebody who participated, occupied a

21  participants lock for the majority of the season, even

22  though they were not on the squad list that first day.

23  Q.   And also I just want to point out for, sort of maybe

24  distinguish high school from college, in high school you

25  may think of soccer season as the fall, you play in the

1    fall and then you're done.  What happens at the college

2    level?  You're a college athlete, do you just play in that

3    one season and you're done?  Or please explain how it

4    works at the college level?

5    A.   High school is much more restrictive in terms of

6    allowing student athletes to play for an entire year in

7    any sport so you're not likely to see a double season in

8    high school at all.  This is a peculiarly collegiate

9    university, high level lead score phenomena because the

10   NCAA was trying to control the, or to balance the time one

11   spends in sport not making it excessive so it would hurt

12   academics, so there became these, you know, segmented

13   seasons or these manipulations of what originally probably

14   was this thought of a season, being on one squad list one

15   season.  So that's why I had to get into five.

16   Q.   So in order to make that clearer, I would like us to

17   pull out the -- when making these determinations, would

18   you or any athletic administrator rely on the NCAA's

19   Division I manual, in terms of when the seasons are?

20   A.   Yeah, I think I mentioned before that I use 17.1, and

21   17.2, in the Division I manual which shows either by

22   competition splits or by dates when seasons could start.

23   Q.   I would just like to make that clear so we can show

24   exactly what you're looking at.

25   A.   I have one.

1    Q.   Okay.

2            MR. BRILL:  I'm sorry, is there an exhibit

3    number?

4            MR. BRILL:  E P, Edward Peter.

5    BY MS. GALLES:

6    Q.   So this --

7            THE COURT:  Let me just make sure that there's

8    agreement that E M, E T and E P are full exhibits?

9    Mr. Brill?  E M, E T, E P, you have no objection?

10           MR. BRILL:  Yes, no problem, Your Honor.

11           MR. ORLEANS:  The plaintiff has not, does not

12   intend to object.

13           THE COURT:  All right, those are full.

14           (Whereupon Exhibits Exhibit EM, ET, EP were

15       marked full.)

16   BY MS. GALLES:

17   Q.   All right.  Dr. Lopiano, I'd like you to focus on the

18   NCAA Division I manual and turn to what are figure 17.1

19   and 17.2.  Okay?

20   A.   All right.

21   Q.   Okay.  Could you please explain what these are in the

22   context of what you were talking about in terms of

23   seasons?

24   A.   Yes, if you look at 17.1, it is, it is clear whenever

25   you see two -- let's say, look at lacrosse, women's, there

1    are two segments.  Championship segment would be your

2    traditional season.  Your other segment would be your

3    nontraditional season.  You're allowed 17 dates of

4    competition in your championship segment and only five in

5    your other segment, but it clearly says this is a two

6    season sport.

7         If you look at basketball, which is a one season

8    sport, right?  You can play 27 or 29 contests, really

9    depends, there are rules about the nature of those

10   contests but it's a season that covers both a fall and a

11   spring semesters.  There would only be one squad list

12   assessment on there.  But I should say something about

13   squad lists.

14        A squad list is, a squad list is a living document.

15   It is not a, most people think that a squad list is a list

16   of everybody who was there on the date of the first

17   competition.  It is not.  It's an electronic record of

18   when everybody started.  So it could include a kid who was

19   not -- in fact, the squad list that we examine, they

20   include plenty of youngsters who were not on the squad

21   list on the first date of the competition but they are

22   there because they are participants.  And what I'm trying

23   to do is to say are you a countable participant when

24   you're on that squad list.

25             MR. BRILL:  Your Honor, I have not been

1    objecting and I don't intend to interpose many objections

2    but we don't really have questions and answers here.

3    Ms. Galles goes from one topic to another and I think the

4    it would be better for the record -- I'm sorry,

5    Dr. Lopiano segwayed into a discussion of squad lists that

6    had nothing to do with the question and I would prefer if

7    we could have question and answer for the sake of the

8    record.  Thank you.

9              THE COURT:  Ms. Galles?

10   BY MS. GALLES:

11   Q.   All right.  Let's step back to figure 17.1 and 17.2.

12   So, did you rely on the segment descriptions there in

13   assessing whether there was a traditional and a

14   nontraditional season of the sport?

15   A.   Yes, I did.  In every case in which competitions had

16   to be split into two, I said there was a traditional and a

17   non traditional season with regard to figure 17.1.  In

18   every case in 17.2, when there was a, two competition

19   seasons that were defined by dates, then I used that as a

20   split season also.

21   Q.   Okay.  All right, so -- I'm sorry but we've kind of

22   melded this a little bit together.  Have you, have you

23   finished your description of your reason number six?

24   A.   No.

25   Q.   Or not?  Okay, I'll let you explain reason number

1    six.

2    A.    No, I finished my description of reason number six as

3    this, this person who participated, you know, occupied

4    this participation time under the '79 policy A and B,

5    practice sessions, received all the institutional support,

6    insurance, coaching, equipment, everything else for a

7    majority of the season.  And that was number six.

8    Q.    Okay, and it states on here whether you received at

9    least a full semester or more of the usual benefits, so is

10   that the standard that you used?

11   A.    That is.  I thought that was a reasonable standard.

12   They definitely occupied a participation slot.

13   Q.    So under six you did not count people who maybe were

14   there for just two or three weeks?

15   A.    That is correct.

16   Q.    Okay.  Let's move onto number seven.  Could you

17   please explain what number seven means?

18   A.    Right.  In number seven, there were specific athletes

19   that raised a red flag in my mind as to whether or not

20   they should be counted.  And I wanted to specifically show

21   that reason and to explain whether I thought that they

22   were, they should be counted or not.  They may have been

23   counted in reasons one through six but I said this might

24   not be legitimate, or they might not have been counted and

25   I thought they should for a given reason but that, case by

1    case those should be looked at individually.

2    Q.   So when you -- on the ones designated red flagged --

3    A.   It's a comment in general, if they were designated

4    red flag it's a comment in general I had a concern.  If I

5    recommended a change in count because of that concern, it

6    appears in caps, bold, you know, exactly who it is that I

7    think should have been counted and wasn't or should not

8    have been counted and was.

9    Q.   All right.  Is there anything else on --

10   A.   And if you look at Exhibit One, for instance, let me

11   see if I can show you one where -- Exhibit 111 -- 150

12   rather.  If you go one, two --

13   Q.   If you tell us the team?

14   A.   Yes, the third page in is men's cross country.

15   Q.   Okay.

16   A.   And I had red flagged three athletes, right?  But I

17   have done nothing about recommending whether -- I think

18   they should be counted exactly as they were and not

19   discounted, all right, but it's a real concern and I

20   wanted to point this out.  So in each case the court would

21   have to look at this and say, you know, this really makes

22   sense.

23   Q.   Okay.  Now, reason number eight, could you please

24   explain what reason number eight is?

25   A.   Right, reason number eight is the NCAA permits

1    somebody who has used up their eligibility to continue on

2    a fifth year so they use four years of eligibility, they

3    are now in their fifth year at school, they are completing

4    their degree.  They are allowed to get financial aid, to

5    be on financial aid or not be on financial aid but they

6    are allowed to compete with the team.

7    Q.   Can they --

8    A.   Not compete with the team -- practice with the team,

9    to receive the benefits of training rooms, insurance,

10   everything, and typically in Division I these are kids who

11   could be going pro.  They could be competing on outside

12   teams.  They are pretty high level athletes.  So they

13   choose to keep participating with the team and occupying a

14   participation slot.  So for any athlete who was this

15   category, that they received fifth year aid, they weren't

16   eligible and they continued participating, I said reason

17   eight.

18        Now, there are only two athletes like that and I

19   don't know whether they, either of them participated or

20   not, so I counted them as participants equally.  That

21   there was one male, one female, and so I said you are

22   obviously receiving all these benefits throughout the

23   whole year.

24   Q.   So you applied the rule in the same way to both men

25   and women?

A.   Men and women, it's just one and one so it's a minor
piece.
Q.   Okay.  Now, right after your reasons, there's the
paragraph that states, of course.  Could you please read
that and explain that?
A.   I think I've said this before, that first you have
rules that even say as a general rule, they are general
conceptual rules, this is how you should do it, there are
always fact situations that are going to be questionable
in somebody's mind or I wonder if it complies, whether it
doesn't, that's one piece.

     The other piece is that it has become in vogue in
trying to achieve prong one compliance that there would be
efforts to look for loopholes in these rules so you won't
have to catch somebody.  For instance, if you knew that
everybody who's on the, who has to play on -- who's on the
squad list on the first day of competition counts, I can
tell somebody don't come out for the team until after the
first date of competition and they wouldn't have to count.
So you could lower, let's say, a male team size that day
if you consistently did it.  That's why it's so important
to be able to not have any definitive single, you know,
you're only there on the first date of competition.  They
participate the day after and throughout the rest of the
year they can play they can do whatever.  So it's really

1    important, I think, to look at the application of the rule

2    based on the totality of the circumstances.  That's my

3    point in that section paragraph, to make sure there's no

4    loophole seeking in this.

5    Q.   Okay.  So let's look how you applied this.  Is there

6    any particular sport you would like to start with or do

7    you just want to go with page one?

8    A.   I would like to, I would like to connect the dots for

9    the court between, so I've established the eight rules and

10   I've shown you how to copy each athlete.  Now I want to

11   show you how Exhibit 151 fits.

12   Q.   I'd like to use an example of a squad how you count

13   it and then connect the dots.  Like to go through baseball

14   and talk about why you did or you didn't?

15   A.   Okay.

16   Q.   All right?  Let's look for example at the baseball

17   squad list and your Exhibit 150?

18   A.   Okay.

19   Q.   Okay?  Now, there are 33 names on the baseball squad

20   list?

21   A.   Correct.

22   Q.   Okay?  Of those 33 names, now let's back up now --

23   I'm seeing why you wanted to do that, to make that

24   connection to A B and C.  Okay.  Let's back up.  Did you

25   count these, you indicated that?

1    A.   Now I see it, an error in the -- it doesn't continue

2    but --

3              MR. BRILL:  I'm sorry, Your Honor, maybe we can

4    move the mic but I cannot hear.

5    A.   Okay.

6              THE COURT:  She was talking under her breath and

7    she says she sees an error in the chart.

8              MR. BRILL:  I didn't hear that, I apologize.

9              MS. GALLES:  Okay.

10   BY MS. GALLES:

11   Q.   So so we're looking at, let's just look at the

12   baseball chart, for example.

13   A.   Right.

14   Q.   Okay?  So we list the, you list there the 33 names of

15   the baseball athletes?

16   A.   That is correct.

17   Q.   Okay.  And reasons one, two, three and four, what are

18   those?

19   A.   All right, and I would like to note an error in this

20   chart.

21   Q.   Okay.

22   A.   You will see on the very last line that there under

23   reason number two, there is a number two.  That should be

24   zero.

25   Q.   Nobody's marked in there, it's just a summary?

1    A.    Correct, the rest of it is correct but -- sorry.  So

2    29 of those 33 athletes actually -- 29 --

3              MR. BRILL:  I'm sorry, Your Honor, which column

4    has the two you're correcting?

5              THE WITNESS:  In reason number two.

6              MR. BRILL:  Got it, thank you.

7    BY THE WITNESS:

8    A.    Sorry.  It's embarrassing to have that occur on your

9    first chart.

10             So, if you look at the bottom row where it says total

11   33 on the squad list, on the column reason one which

12   indicates they competed, 29 of those athletes on the squad

13   list were counted because they competed in one or more

14   games.  None were reason two or three or four.  There were

15   two athletes that I counted by virtue of reasons five and

16   six.  And so in the case of Anis Campal (ph), I probably

17   mispronounced that -- this athlete practiced and received

18   varsity benefits the entire first semester.  The first

19   date of competition in baseball was scheduled to be in

20   that semester.  There are three contests that were

21   supposed to be played in the first semester and he's on

22   the squad list but the events never occurred.  All right?

23   They never occurred.  They should have occurred, they were

24   rained out.  And so I said to myself, both in terms of it

25   was the nontraditional season, he would, the first part of

1    baseball is nontraditional.  He was on the squad list for

2    the nontraditional season, so five would apply.  And six

3    would also apply because he continued to receive benefits

4    for the whole remainder of the year.

5    Q.   Okay.

6    A.   Until the end of the semester.

7    Q.   Could you please explain what other notes are?

8    A.   Other notes, Q is quit, C is cut, I might have used C

9    or a cut, OR is other reason.

10   Q.   And are those Quinnipiac designations?

11   A.   These are all Quinnipiac designations from the squad

12   list.

13   Q.   Okay.  So we don't necessarily know why they were cut

14   or why they quit or what the other reason is?

15   A.   Right.

16   Q.   Okay.

17   A.   I would like to connect the dots.

18   Q.   Okay, go ahead.

19   A.   To be here because otherwise this is going to be an

20   exercise you're not going to understand.

21   Q.   Okay.

22   A.   If you go to 151, all right, and you see my summary

23   counts in 151, so on 151, right, and you see columns at

24   the top which say Lopiano count A, Lopiano count B,

25   Lopiano count C, and Lopiano count A is this first four

1    reasons definitely okay.  Lopiano count B is anybody who

2    on the first four reasons, four, five, six, seven, eight.

3    And so this becomes where I have exercised my expert

4    opinion that they should count.  But you can, the court

5    needs to look at that and decide whether they believe me

6    or not or whether I was reasonable as an expert in making

7    a specific application of a general rule.

8         And then Lopiano C is when I made an adjustment to

9    either A or B, I'm recommending an adjustment because

10   something specific happened where I think this person

11   should not have been counted or they should have been

12   counted for a very unusual circumstance, a red flag.  So

13   that's how chart 151 -- 150 --

14   Q.   151?

15   A.   151 relates to --

16   Q.   150?

17   A.   150 relates to 151, and when I talk about my

18   conclusions I'll try to be very clear in terms of how

19   these all relate to participation gaps and decisions on

20   how to count but that is the -- the execution of the

21   methodology in full to come up with the summary chart and

22   my conclusions at the end of 152.

23   Q.   Okay, so for the baseball chart that you prepared?

24   A.   Right.

25   Q.   Okay?  How athletes fell into reasons one through

1    four?

2    A.   You see were counted, that column A equals 29, so A

3    is the first column, the Lopiano count A, in 151.  So 29

4    athletes fell in reasons one through four, only two

5    athletes fell in reasons five to six, and there were no

6    changes recommended in terms of red flags.

7    Q.   So, if we go to Lopiano count B of 151, it shows the

8    original 29?

9    A.   Plus --

10   Q.   Plus the two that fell into five through eight?

11   A.   That's right.

12   Q.   For a total of 31?

13   A.   Thirty-one.

14   Q.   And so you did not make any --

15   A.   So does everybody follow that?

16   Q.   Well --

17   A.   No, I want to make sure.  I want to make sure.  I'll

18   say more about it if it's not clear.  But if you look

19   at --

20   Q.   We can tell you're a professor.

21            THE COURT:  Show of hands?

22   A.   But if you look at 151 and you, it becomes clear, and

23   if you look at Lopiano count B under B, you see 29 plus

24   two equal 31.

25            THE COURT:  I've got it.  You're doing this for

1    me.

2    BY MS. GALLES:

3    Q.    All right.  Well then let's, should we jump to one

4    where you actually made an adjustment so we can explain

5    the --

6    A.    Okay.

7    Q.    -- the red flag issue?  Okay?

8    A.    Okay.

9    Q.    Let's -- well, so you went through and did this

10   analysis for every single Quinnipiac --

11   A.    Student.

12   Q.    -- team?

13   A.    Every team, every team and every athlete who was on

14   the squad list.

15   Q.    Okay.  Now, let's jump ahead to women's field hockey.

16   A.    Okay.

17   Q.    Okay.  Women's field hockey.  There are 27 women on

18   the squad list.  Could you please explain how you counted

19   the people on the Quinnipiac, how you counted field hockey

20   players?

21   A.    Yes.  And so if you look at reason one, there were 20

22   of the 27 who actually competed.  None under reason two,

23   none under reason three.  There were five who were counted

24   by virtue of reason four.  They were on the squad list at

25   the beginning of the traditional season.  There was one

1    who participated or practiced a full semester.  She was on

2    the squad list of a, of the nontraditional season.  She

3    came on into the spring, she's still playing.  That is a

4    dual sport athlete, was still playing ice hockey and

5    started in the nontraditional spring season of, you know,

6    of the year, so they was a five.  So there's one in five.

7    Q.    So how many fell, how many did you count under

8    reasons one through four?

9    A.    Twenty-five.

10   Q.    Okay.  How many --

11   A.    So if you look under where I counted.  Right, it says

12   A, reasons one to four were A.  25 were counted.

13   Q.    And how many were counted under reasons five through

14   eight?

15   A.    And reasons five through eight is one.

16   Q.    So B equals one?

17   A.    B equals one.

18   Q.    Okay.  Now --

19   A.    And -- go ahead.

20   Q.    I'm going to say now under the red flag notes, it

21   looks like you've made notes under four or five different

22   names?

23   A.    Yes.

24   Q.    But you made only one adjustment, it says C equals

25   minus one?

```
 1    A.    Yes.

 2    Q.    So could you please explain your red flag notes?

 3    A.    Yes.

 4    Q.    For the field hockey team?

 5    A.    Yes, I have to be, I was trying to be very

 6    conservative with my red flags, that I have to have some,

 7    either an email evidence or some confirmation of something

 8    happening or that really said, come on, what are you doing

 9    here?  And otherwise I let it go.  I wanted this to be a,

10    a very conservative adjustment, not something very

11    liberal, so in the case of one athlete --

12    Q.    Can we go through -- because you didn't count all of

13    the red flags?

14    A.    That's exactly right.

15    Q.    Could we into through an example of when you counted

16    a red flag and when you didn't?

17    A.    Sure.  So when look at Katharine Calucci (ph), that

18    was the one I mentioned, right?  So here is, I counted her

19    and I thought this was really funny.  She was not, she was

20    cut from the ice hockey team.  She came over to the field

21    hockey team even though she was not off of the ice hockey

22    team yet, and she was added onto three.

23    Q.    And when was she --

24    A.    This was a nontraditional season.  You have to look

25    at the ice hockey to see  -- but I just, this is kind of
```

1    unusual to see an ice hockey, field hockey, you know,

2    combo added that late in the year, cut from one squad.

3    It's like -- this kind of never happens in Division I.

4    Q.    Okay.  Now, let's also look for an example; there is

5    a woman named Meghan Lillibrige (ph), okay?  That's marked

6    red flag there.  Why was that marked as a red flag?

7    A.    She was not on A, she didn't play.  She, you know,

8    seemed to receive varsity benefits, she was cut on two, 26

9    on a, in the nontraditional season.  And so she -- how I

10   do say this -- she, I didn't think -- I'm trying to think

11   how to say this.

12   Q.    Well, let me see.  If you're in the Division I --

13   A.    She, she counted, she counted because she was on the

14   squad list and I didn't want to change that count.  Even

15   though she was cut.  And --

16   Q.    So would you --

17   A.    I considered it.

18   Q.    So, for example, with the first two, the Ms. Calucci

19   and the Ms. Lillibrige, you flagged them but you counted

20   them anyway?

21   A.    Yes.  It's highly unusual to cut someone after your

22   traditional season unless there's something wrong but I

23   didn't know if there was anything wrong.

24   Q.    So it could have been totally legitimate?

25   A.    Yes.

1    Q.   So you counted her because she fell under one of the

2    rules?

3    A.   Right.

4    Q.   Okay.  Now --

5    A.   I didn't want to change it.

6    Q.   Now, let's look at the one person where you did the

7    red flag and adjusted the cut -- or, excuse me, adjusted

8    the count accordingly?

9    A.   Right, here's a good example of, here's an athlete

10   who does not get on the squad list in her traditional

11   season.  She's not there on the first day of competition

12   but right after it she gets cut.  So she hasn't received,

13   she's cut on 10/15, right?  So how -- what benefits did

14   she -- how long did she occupy this participation slot?

15   Q.   So this --

16   A.   So even though she was, you know, counted because she

17   was on the squad list, it's a great example of she was

18   counted because she was on the squad list but she

19   disappeared immediately, she was cut.  She could have been

20   cut the day before the squad list.  And it's so close

21   in --

22        MR. BRILL:  Excuse me, I object.  This is

23   speculative testimony about what could have happened to an

24   athlete.  This witness doesn't know why this athlete was

25   cut.  She can explain the chart and what she's basing it

1   on, but for her to talk about circumstances with

2   individual athletes that's not in evidence I just think

3   goes beyond her competency.  She doesn't know anything

4   about the circumstances under which this athlete was cut

5   and she has not made any inquiries up until today.

6           THE COURT:  Okay, let's continue.

7   BY MS. GALLES:

8   Q.   Yes, Ms. Lopiano, you're not trying to make any value

9   judgments about why she was or why she wasn't cut, are

10  you?

11  A.   No, I'm giving you the reason.

12  Q.   So you're just looking at the date she was cut?

13  A.   Exactly right.  And the real question is is she

14  occupying a participation slot, receiving all the benefits

15  under A, B in the clarification, she's there for only two

16  weeks.  Even if she was cut for any reason, no matter how

17  bad the reason, why isn't that fishy?

18  Q.   So if she was -- and she was there less than a full

19  semester and less than a full season?

20  A.   Yes, looks for a month, maybe.  And that's why I

21  really have been careful to segment my Exhibit 151 C so

22  that the court can, if they don't like me making that kind

23  of a judgment then don't count that number, you know, that

24  column.

25  Q.   Okay.  So let's move, for example, let's jump to

1    women's lacrosse.

2    A.    Okay.

3    Q.    Okay?  Now the women's lacrosse chart, okay, there

4    are 30 names on the squad list.  Could you please explain

5    how you handled each of these 30 athletes?

6    A.    This is women lacrosse.

7    Q.    Women's lacrosse, yes.

8    A.    So there were 30 athletes on a squad list, reason

9    one, 25 competed so they count.  No one was counted in

10   terms of being injured, and on eight one was counted

11   because they were red shirt designated by QU.  And two

12   were counted because they were on the squad list at the

13   beginning of the season and continued to practice.

14   Q.    So --

15   A.    Well, they were on the squad list at the beginning of

16   the season, that's right.

17   Q.    So how many athletes fell under reasons one through

18   four?

19   A.    Twenty-six -- I'm sorry, 28.

20   Q.    Twenty-eight?

21   A.    My glasses.

22   Q.    Now you have two athletes in reasons five through

23   eight.  Could you please explain how you handled those two

24   athletes?

25   A.    Both of those athletes were on the squad list in the

1    nontraditional season.  The nontraditional season is the

2    fall for lacrosse and they participated and they were on

3    this, on the squad list in that nontraditional season and

4    they participated the whole fall.

5    Q.   Okay.  Now those particular athletes --

6    A.   Quit.

7    Q.   They quit before the start of the traditional season?

8    A.   That's right.

9    Q.   So --

10   A.   Which is the reason for -- for the red flag.  That's

11   pretty unusual.

12   Q.   So what -- but you did count them?

13   A.   Yes.

14   Q.   But you did not make, so -- are they counted under B?

15   A.   I didn't want to change them.  I felt that I didn't

16   want to change them because it really occupied a semester

17   of participation even before they quit.

18   Q.   So --

19   A.   Even though it's understandable, you don't keep

20   somebody for that period of time and then -- it's funny.

21   That's all.

22   Q.   But because those athletes were there the entire fall

23   and up into the spring, you went ahead and counted them?

24   A.   Yes, and what I think is important about this red

25   flag thing is I'm really, I really do think that it, it's

going to be demonstrated by Exhibit 151, that for the
women's teams there was an attempt to pad, to -- there was
a definite policy in place that established a minimum for
your team that was higher in many cases, in many sports
than an average game size.  So my red flags, I was looking
for who are these athletes that really weren't serious
about playing, who were put on a team to meet the minimum
and then whose experience wasn't worthwhile or were cut
later.  That was the red flag I was looking at because of
the indicator of Quinnipiac team size being off the
average team size and this policy that was in place.

Q.   Okay.  I just want to make sure that in, that in
terms of the red flags, were you making any kind of value
judgment regarding individual athletes?

A.   I don't understand your question.

          MR. BRILL:  Object to the form of the question.

BY MS. GALLES:

Q.   Yes, it was poorly worded.  I want to focus on the
red flag, the fact that you maybe red flagged a particular
athlete, I just want to make sure that you weren't trying
to disparage any particular athlete by marking it as a red
flag?

A.   No, I was just trying to demonstrate to the court the
relationship between this circumstance of this dual policy
application and how it creates pressures on the coaches

1    having, you know, to keep kids when they shouldn't or

2    wanting to add kids when they can't.

3    Q.   And also for the red flags, you're not, you couldn't

4    make a determination whether that, the odd circumstances

5    were for an appropriate reason or an inappropriate reason,

6    could you?

7    A.   I did not know why they were cut or why they quit,

8    absolutely right.

9    Q.   So, in deciding what to -- did you see, did you just

10   rely on the totality of the circumstances as you could see

11   from the documents provided by Quinnipiac?

12   A.   Yes.  As I said, if I ever recommended an adjustment,

13   I really felt that it was a compelling circumstance.

14   Q.   Okay.  I guess --

15            MS. GALLES:  Since this is a bench trial, may I

16   ask, we could go through each one of the lists but, as you

17   said, you got it.  Do you want us to go through each one

18   or just we kind of use an example of each one and we can

19   jump to the --

20            THE COURT:  I understand the charts.  I

21   understand the analysis.  If there's particular teams that

22   you want to focus on, you should do that.

23   BY MS. GALLES:

24   Q.   Dr. Lopiano, were there any particular teams that you

25   wanted to focus on or did you want to move to Exhibit 151?

1   A.    I can move to 151 upon which I base my conclusions.

2   I can move to my conclusions which might be most helpful.

3   Q.    Okay.  Well, let's -- please explain for the court

4   what Exhibit 151 is?

5   A.    Well, Exhibit 151 is, it is a review, a summary table

6   that is based --

7           THE COURT:  Let me just say I think you already

8   kind of explained it.  You have the squad list numbers,

9   the numbers that the university used, your count A, your

10  count B, your count C, and then I assume NEC and NCAA and

11  average squad sizes for conferencing for Division I

12  schools.

13          THE WITNESS:  Correct, and the reason I put the

14  last two columns in was so there could be a comparison to

15  QU's numbers which was beginning and start dates, so you

16  could make a decision as to whether or not there was an

17  artificial depression in team size or a padding of team

18  size.

19          THE COURT:  Okay.

20          THE WITNESS:  Just have it all in one chart so

21  you can look at it.

22  BY MS. GALLES:

23  Q.    So, for Lopiano count A, those are all the athletes

24  that were counted only under reasons one through four, how

25  many men did you count?

1    A.    170.

2    Q.    Okay.  So --

3    A.    That's right, yes, 170.

4    Q.    So for Lopiano count B, people that fell under

5    reasons one through eight, how many males did you count?

6    A.    176.

7    Q.    Okay.  Now, Lopiano count C where you adjusted for

8    red flags, how many males did you count?

9    A.    The number remained the same so I didn't make any

10   adjustments in the male athletes.

11   Q.    Okay.  So now, let's jump to the chart regarding

12   women.

13   A.    Okay.

14   Q.    Or the page relating to women.  So the first page

15   summarizes the men, let's go to the second page.  Okay.

16   You've broken them out to the female athletes except for

17   the runners?

18   A.    Correct.

19   Q.    Okay?  So under Lopiano reasons one through four, how

20   many women did you count?

21   A.    Before the runners, 170.

22   Q.    And under Lopiano count B which is reasons one

23   through eight?

24   A.    172.

25   Q.    Okay.  And Lopiano count C where there was the red

1  flag adjustments, how many did you count?

2  A.   164.

3  Q.   Okay.  All right.  Now, for -- now, let's jump to the

4  third page of that exhibit.

5  A.   Right.

6  Q.   Okay?  Where it says cross country, track, indoor

7  track, outdoor?

8  A.   Yes.

9  Q.   So where do those numbers come from?

10  A.   The cross country comes right off the cross country

11  squad list.  I simply duplicated the track, track indoor

12  and track outdoor, the exact same list.

13  Q.   So you actually looked at the squad list?

14  A.   That is correct.

15  Q.   And had the same?

16  A.   Same numbers.

17  Q.   Or the same?

18  A.   Same people.

19  Q.   Okay.

20  A.   Same participants.  And, as you know, in my analysis

21  I consider that that would be one season, indoor, outdoor

22  track, that's one team.

23  Q.   So for it says cross country, under A B and C, it

24  says 18; what does that mean?

25  A.   That means that reasons one through four, there were

1    18 cross country runners that were counted for those

2    reasons and there was no change.  There were no five dates

3    and there were no red flag adjustments.

4    Q.    Okay.  So, but you didn't do any analysis of who

5    competed in what track or, excuse me, what cross country

6    meets or anything like that, did you?

7    A.    No.

8    Q.    You just looked at who was on the squad list?

9    A.    Yes.

10   Q.    On the first day of competition?

11   A.    No.  For whatever reason.

12   Q.    That you listed?

13   A.    Right.

14   Q.    Okay.  So let's go to the indoor, what's the number

15   that's recorded for the indoor?

16   A.    For reasons one through four it's 30.  Reasons one

17   through eight it's 30.  And for, I didn't make any changes

18   for adjustments or red flags.

19   Q.    So let's jump to the total runners.

20   A.    All right.

21   Q.    I'd like to start with the, just explain for the

22   unduplicated count, if we looked at the actual number of

23   athletes, how many female runners are at Quinnipiac?  How

24   many are there?

25   A.    This is my teaching person --

1    Q.   Okay.

2    A.   -- speaking now, right?  I have combined the

3    definition of unduplicated, trial count whatever in my

4    conclusion in a more clear fashion that replicates exactly

5    what you see here as triple runners counted, double count,

6    unduplicated.  I really feel, I tried to make my

7    conclusions absolutely reflective of this chart.  But to

8    train on my conclusion in the clearest way possible so

9    that the court can make judgments.  So if counsel would

10   permit, I would rather attack it that way.  If I'm allowed

11   to.

12   Q.   Okay, would you like to explain what you mean by

13   triple count, double count?

14   A.   Yes.

15   Q.   Please explain.

16   A.   This is the heart of it right here.  I'm going

17   through the supplemental report, the second to the last

18   page on page four, which says conclusion.  And if you

19   follow this one, this is -- we're making this clear.  If

20   the court decides to triple count QU's female runners,

21   which means counting cross country, indoor and outdoor, as

22   separate teams and separate seasons and does not choose to

23   count cheerleading, I do not consider cheerleading a sport

24   for the reasons that are already covered, right?  Then

25   I've calculated using the mathematical formula I told you

1    about before, exactly what the gaps are under each of my

2    counts with and without volleyball.  So if you look at

3    this first one, right?  So here is the triple count

4    scenario.  There's a gap of 28 without volleyball, so this

5    is --

6    Q.   No, with volleyball it says?

7    A.   I'm sorry, with volleyball.

8    Q.   What do you mean by when you say with volleyball?

9    A.   That means counting volleyball.

10   Q.   So they don't eliminate volleyball?

11   A.   So with volleyball counted the gap is still 28, so if

12   they eliminated it it would make it worse it would make it

13   41 without volleyball.

14   Q.   Okay.

15   A.   Right?  So that's what happens under the triple count

16   scenario.

17   Q.   And again, we talked about it earlier but just to

18   drive into this chart, when you say gap of 41, what do you

19   mean?

20   A.   I took everyone through the mathematical

21   determination of gap.  So what I mean by gap is that's the

22   difference between the number that Title IX would require

23   for prong one compliance and what they actually have.

24   Right?  Under these two circumstances.  And so you can

25   see, I didn't, you know, count cheerleading, right there

1    are 30 cheerleaders.  You can see if you counted the 30

2    cheerleaders, right, that in the, with volleyball, right,

3    with volleyball there, you would be right there in terms

4    of prong one.  You'd be right there.  You'd have to keep

5    volleyball, right?  And that's assuming cheerleading is

6    viable, which you know where I am, all right?

7         So if you then wanted to count cheerleading without

8    volleyball, right, you'd have to -- that number would be

9    41 minus 30, right?  So you'd still be 11 short and you

10   would still have to add another team for women because

11   you'd add a golf team and do it, so that's how it worked

12   throughout each of these counts.

13   Q.   So when I focus on that first chart that you're

14   presenting in your conclusion, that's under count A?

15   A.   Triple count.

16   Q.   Excuse me, that's under, counting under A so it's

17   just the four reasons that are --

18   A.   Yes.

19   Q.   -- the letter of the definition?  That's triple

20   counting each, triple counting the running -- excuse me,

21   the runners?

22   A.   Right.

23   Q.   Okay.  But that is not including cheerleading?

24   A.   Exactly.  And Count One does not take any into

25   consideration for red flags or squad size padding.

1    A.    Well --

2    A.    Unless a change was made in C, it wouldn't.

3    Q.    Right, so under A it doesn't?

4    A.    No.

5    Q.    You just accepted the squad sizes?

6    A.    Reasons one through four are all that is included

7    under Lopiano count A.

8    Q.    So they would, the athletes would have been counted

9    even if they were on an unusually large squad size?

10   A.    Yes.

11   Q.    So let's move onto Lopiano count B under triple

12   counting.

13   A.    Okay.

14   Q.    Explain what that means?

15   A.    So, I used one through eight as reasons, I did not

16   count cheerleading, I did count volleyball and the gap was

17   35.

18   Q.    Okay, and you triple counted the runners?

19   A.    This is all triple counting the runners, right.  And

20   then I did the same thing, without counting volleyball,

21   what the gap would be, so it's 48 if you got rid of

22   volleyball.

23   Q.    Okay.  And so then let's look at Lopiano count C

24   under the triple counting scenario.

25   A.    Same explanation, that in this, in this case, without

1    counting cheerleading, counting volleyball, the gap would

2    be 44.  Without cheerleading, without counting volleyball

3    the gap would be 56.

4    Q.   Now, let's move onto your next chart in your

5    conclusion.

6    A.   Right.

7    Q.   Okay?

8            THE COURT:  Let me just short circuit, I think I

9    understand that chart.  I mean feel free to spend as much

10   time as you want but --

11           MS. GALLES:  Okay.

12           THE WITNESS:  The whole chart?

13           THE COURT:  I understand it.

14           THE WITNESS:  The whole chart including the next

15   three things?

16           THE COURT:  The difference is how you're

17   counting the runners.

18           THE WITNESS:  Exactly.

19           THE COURT:  Okay.

20           THE WITNESS:  He's got it.

21           MS. GALLES:  Okay.

22   BY MS. GALLES:

23   Q.   Is there anything else you wanted to say about how

24   you're counting the runners?

25           THE COURT:  I'd like to hear a little

1    explanation for why the runners should be counted in a

2    particular way.

3            MS. GALLES:  Okay.

4            THE COURT:  I don't know if this is the point at

5    which you intend to do that but at some point, why should

6    I pick any one of these scenarios rather than another?

7            MS. GALLES:  Actually we had another expert who

8    was going to address that but Dr. Lopiano --

9            THE COURT:  No, that's fine.  We can do it then.

10   I understand the numbers.  If she's not the expert to talk

11   about that, that's fine.

12           MS. GALLES:  Well --

13           THE WITNESS:  I did opine in my original report,

14   and I feel strongly about this, that under no circumstance

15   should you ever count indoor and outdoor as two separate

16   sports in two separate seasons.  It is counter intuitive.

17   These are the same exact rosters participating indoors

18   shorter distances.  Like long and short course swimming,

19   you don't split swimming up into long courses is a

20   different sport than short course.  And they are right

21   next to each other, indoor and outdoor.  Under no

22   circumstances would I ever consider those two to be

23   separate sports except one, and this is historical

24   statistical, before people started manipulating these

25   track numbers, when men's sports ran legitimate cross

country indoor and outdoor and women's sports ran

legitimate cross country indoor and outdoor, they

statistically offset each other, right?  They counted

everybody in cross country.  Everybody knew everybody in

indoor, everybody in outdoor, and statistically they were

a wash.  They just cancel each other out.

Now, when you start saying, oh, we don't have

have an indoor and outdoor for men, right, then if you

weren't to triple count, you see where you go with that.

The same kids are getting counted 30, 30.  You have not

increased the number of kids participating at all.  You

haven't increased that many.  They are the same kids

participating in indoor and outdoor, and in this situation

with Quinnipiac, there was such evidence in the

preliminary injunction --

MR. BRILL:  I object, Your Honor, to the witness

summarizing evidence at the preliminary injunction.

THE WITNESS:  I'm sorry.  There were, if you

look at even Exhibit L, we saw that this whole program was

built on distance runners who, according to NCAA rules

could, a cross country team could participate in cross

country and indoor and outdoor and never count, never

count as indoor and outdoor, that they were allowed to

pick up distance events in those two seasons.  And

wouldn't count.

1          And so the reason why I feel strongly about this

2     is whenever I see a different counting of men and women,

3     there is the danger of nefarious counts, that they are

4     doing it purposely to do prong one, and that's why I'm so

5     cautious before I -- that's why I don't even look at

6     triple counts anymore.

7     BY MS. GALLES:

8     Q.   Well, let's look at, let's go to the NCAA manual and

9     you previously referred to figure 17.1, and 17.2.  Okay?

10         Now, in there there's a, you indicated the separate

11    softball seasons, there's a championship segment and

12    there's an other segment?

13    A.   Right.

14    Q.   So when is the championship segment of softball?

15    A.   It's in the fall.

16    Q.   The championship season of softball?

17    A.   Of softball, is in, in the spring, I'm sorry.  I

18    don't know why I say fall.

19    Q.   You used to be a softball coach?

20    A.   I'm an American softball player.  I apologize.  And

21    in the spring season, the championship season, you would

22    can play 56 and in your nontraditional, you can play --

23    Q.   So let's just look at softball.  There's a

24    traditional and a nontraditional fall and a spring season?

25    A.   Correct.

1    Q.   Now, if someone plays pitcher on the softball team in

2    the fall, and plays right field in the spring, are those,

3    is that person counted as two different athletes?

4    A.   No.

5    Q.   Okay.

6    A.   Only one.

7    Q.   And now, let's look at lacrosse for an example.

8    There's a fall season and spring season, okay.  If there's

9    an attacker in the fall season and a goalie in the spring

10   season, is that athlete counted as two different sports?

11   A.   Nope, count as one.  And that's a great example where

12   you see some of the lacrosse games that are actually

13   field, in field houses like indoor track, where you just

14   because it's indoor and outdoor, you don't make them

15   separate seasons.

16   Q.   So that's in the next thing.  Now, let's look at, you

17   know, as a -- were you a former softball player?

18   A.   Yes.

19   Q.   Were you a former softball coach?

20   A.   Yes.

21   Q.   So are you familiar with the different surfaces that

22   softball plays on?

23   A.   Yes.

24   Q.   Does softball sometimes play on dirt?

25   A.   Yes.

1    Q.   Does softball sometimes play on grass?

2    A.   Yes.

3    Q.   Does softball sometimes play on gravel?

4    A.   Gravel, artificial turf.  There's lots of different

5    surfaces.

6    Q.   We used to call it kitty litter.  It's not dirt but

7    it's that little gravelly stuff.  Does softball play on

8    something like that?

9    A.   Yes.

10    Q.   Does some softball teams play on astro turf or some

11    other type of artificial surface?

12    A.   Yes.

13    Q.   Now, do you count softball as a different sport based

14    on the surface that it's played on?

15    A.   No.

16    Q.   Now, let's look at the sport of tennis.  Okay.  Now

17    did you use to be a tennis coach?

18    A.   No.

19    Q.   You didn't.  Okay, sorry.  Now, let's look at, is

20    there a spring and a fall, do college tennis teams play in

21    both the fall and the spring?

22    A.   They do.

23    Q.   Now, on tennis do they sometimes play on concrete

24    courts?

25    A.   Yes.

1   Q.   Do they sometimes play --

2   A.   Very seldom on Division I however.

3   Q.   Do they sometimes play an asphalt courts?

4   A.   Yes, it's usually a composite of some court or clay

5   or grass.

6   Q.   So is there -- are there different surfaces that the

7   same ten player might play on during the course of the

8   season?

9   A.   Yes, and there's another example where tennis can go

10  indoor for a competition, doesn't count as a separate

11  sport.  Tennis is typically in the northeast.  If you have

12  a field house facility, you'll just play indoors when

13  you're scheduled and you're rained out.

14  Q.   So when it's snowing or raining --

15  A.   And it's not a separate season, right.

16  Q.   So for a tennis player, do you count that tennis

17  player as an athlete in separate sports based on the type

18  of tennis surface that that person plays on?

19  A.   No.

20  Q.   Do you count that tennis player as participating in

21  separate sports depending upon whether that tennis player

22  plays indoors or outdoors?

23  A.   No.

24  Q.   Now, let's use football for an example.  Are there

25  different types of surfaces that football, college

1    football teams play on?

2    A.    Yes, and if you're going in the same direction you

3    can play indoors or outdoors; they don't count as separate

4    seasons.

5    Q.    Okay.  So, and -- okay.

6    A.    The only other thing I'd like point out, if you look

7    at 17 --

8              MR. BRILL:  Your Honor, there's no question

9    pending.  The witness is not here to give a lecture, she's

10   here to answer questions.

11   BY MS. GALLES:

12   Q.    Is there anything else you would like to add to that

13   response, Dr. Lopiano?

14   A.    Just in showing, when you look at NCAA figure one,

15   NCAA figure 17.1 and you look at track and field, they

16   combine indoor and outdoor in figure 17.1.  And to 18

17   contests over those two indoor and outdoor periods.  So --

18   Q.    So could a track team, if you had a track team that

19   ran nine events indoors and nine events outdoors, that

20   would fall under the 18 maximum?

21   A.    Yes.

22   Q.    Okay.  And if that school eliminated what it called

23   its indoor program, could those athletes continue to run

24   in 18 meets?

25   A.    Yes.

1    Q.    Okay, so --

2    A.    And could even run in indoor.

3    Q.    Okay.  So they could still continue to run in nine

4    indoor and nine outdoor?

5    A.    That's a good question.  In order to count as indoor,

6    they have to do a minimum, you know, indoor so the example

7    is a poor one.

8    Q.    But what I'm trying to get at is they could still run

9    18 meets and just call it outdoor?

10   A.    Yes.

11   Q.    Okay.  In that instance, if you had a school that had

12   a men's track program, had 18 meets combined indoor

13   outdoor, then the school said we're going to eliminate our

14   men's indoor track program, okay, could those same men

15   still continue to compete in 18 meets but just in call it

16   outdoor track?

17   A.    Yes.

18   Q.    Okay.  Now, also within a track meet, is there like

19   100 meter dash in, for example, outdoor track meets?

20   A.    Because I was never a track coach, may I leave that

21   to a different expert?

22   Q.    Okay.

23   A.    If you're going to get into detailed events in track.

24   Q.    What I'm trying to get into to is when we were

25   talking about the double counting, triple counting and

1    single counting --

2    A.   Right.

3    Q.   If a track athlete competed in the 100 meter dash and

4    the shot put in the same outdoor meet, is that athlete

5    counted as one track athlete or two track athletes because

6    he or she competed in two totally different kinds of

7    events?

8    A.   One track athlete.  The number of events and types of

9    events do not matter.

10   Q.   So now if we start looking at, if in February a track

11   athlete runs 400-meters indoors, and then in March that

12   track athlete runs 400-meters outdoors, is that athlete,

13   how is that -- is that athlete counted as participating in

14   two separate sports under any of the triple, double,

15   single counting scenarios that you provided?

16   A.   Obviously I contend they should be counted as one,

17   and that my scenario, my second scenario in terms of the

18   double count would allow indoor and outdoor as one.

19   Triple count would count them as two, that athlete in --

20   that does that.

21   Q.   So under your triple counting scenarios --

22   A.   Right.

23   Q.   Okay.  An athlete who ran 400-meters in every single

24   event -- or excuse me.  Every single meet would be counted

25   as two different athletes if they ran indoors and

1    outdoors?

2    A.   That is correct.

3    Q.   Okay.  But an athlete who ran 400-meters and threw

4    the shot put but only did so outdoors would be considered

5    as one athlete?

6    A.   That is correct.

7    Q.   Okay.

8              MS. GALLES:  Could we take a short break, Your

9    Honor, or -- just kind of need to use the restroom.

10             THE COURT:  Sure.  All right.

11             MS. GALLES:  Or were you planning to do a lunch

12   break soon or --

13             THE COURT:  I was thinking of maybe 12:30 or one

14   but I'm not sure where you are with the witness, how much

15   longer do you think you have with the witness?

16             MS. GALLES:  We do have a bit longer to go.  I

17   just --

18             THE COURT:  All right, let's take a five minute

19   recess.

20             MS. GALLES:  Thank you.

21             THE COURT:  Stand in recess until 12:15.

22             (Whereupon a recess was taken from 12:10

23        o'clock, p. m. to 12:15 o'clock, p. m.)

24   BY MS. GALLES:

25   Q.   Dr. Lopiano, before moving on I just want to make

1    sure that, is there any -- anything else in your

2    supplemental report that you have left to explain or have

3    we finished that?

4    A.   Unless you have any other questions.  I think I said

5    enough probably, or if the court has any questions.

6    Q.   Okay, well, I'd like to just go back to your original

7    report.

8    A.   Okay.

9    Q.   Which is Exhibit 99, and you have in front of you.

10   Now, this whole analysis of the supplemental report was

11   dealing with prong one, is that right?

12   A.   That is correct.

13   Q.   Okay.  Now, in your original report, you provide a

14   brief analysis of prongs two and three.  Could you please

15   go to that section of your report.  It's like section B?

16   A.   Yes.

17   Q.   And then prongs two and prongs three?

18   A.   Yes.

19   Q.   Okay.  Do you have that in your report?

20   A.   I do.

21   Q.   Okay, so does the brief section under prong two

22   accurately reflect your opinion regarding prong two in

23   this matter?

24   A.   Yes, it does.

25   Q.   Okay, and does the section under prong three

1    accurately reflect your opinion in this case?

2    A.   It does with one correction, I've noticed an error in

3    three F.

4    Q.   Okay.

5    A.   That reference should go to Exhibit G which is 106.

6    Q.   Okay.

7    A.   And not E.

8    Q.   Okay.  So, if you were an athletic director in

9    Connecticut, and you were going to add a new sport, what

10   do you look at to decide which new sport you should add?

11   A.   Well, under this, under prong three, I have showed

12   with exhibits and with explanations where I would look for

13   what sports to add.  So I would look in my conference, the

14   Northeastern Conference, and I would say what sports are

15   changed because I have to make competitive equal post

16   season competition opportunities available for my women

17   and look there first, for sure, because you form a

18   conference because it's the same kind of schools.  You

19   want your kids to compete against the same academically

20   stressed or unstressed kind of athletes.  You also pick

21   your schools because they are in reasonable geographic

22   proximity.  It is the natural first place to look when you

23   add sports.

24        So you can, especially if your conference already has

25   those sports, you have a schedule, instant schedule.  You

1    don't have to worry about getting a nonconference games.

2    The hardest thing in Division I is on put a, to add a new

3    sport, to not have it be in your conference and to find

4    enough games to complete a new schedule because

5    everybody's all scheduled with their own conference.  And

6    there aren't any opportunities for non conference schools,

7    so that would be my absolutely first choice.

8         Then it makes sense to look at other schools in my,

9    in my state.  What are they doing?  Because those are my

10   nonconference opponents.  So first you look at your

11   conference, then you look at your nonconference schools in

12   your state because those are the ones who are at complete

13   my schedule.  You never play just a conference schedule,

14   you have to keep both.  So that would be natural.

15        And I've detailed here where I looked at all of those

16   websites or EADA reports of schools in Connecticut and

17   I've created tables.

18   Q.   And is that the chart on Exhibit O of your --

19   A.   Yes.

20   Q.   Okay.

21   A.   Which is 113.

22   Q.   113.

23   A.   Okay.  And then of course QU's an NCAA one school.  I

24   would look at NCAA championships that are offered because

25   I have an obligation, would have a obligation to run a

1   sport that has a national championship competition because

2   national championship access is provided to women and so

3   you would look for a sport where you could give that to

4   your new female athletes also.

5        And then you'd look at, because you're recruiting

6   from high schools and you're recruiting from open amateur,

7   open amateur teams in your area, you look at Connecticut

8   high schools and see what their sport participating was.

9   And the national federation of state high school athletic

10  associations does an annual survey of what sports are

11  sponsored by high schools in, like, if you look at Exhibit

12  G, which is 106 -- like you could, if you look at the

13  second set of averages by just keep turning pages.

14       About four pages in, you can look up Connecticut and

15  then right across and you can see how many kids are

16  participating in every single sport in Connecticut at the

17  high school level.  That's your recruiting pool, so you

18  would look at that.

19       And then looking at other state high school

20  associations not in Connecticut.  So we're so close to New

21  York, so close to Massachusetts and so you would continue

22  to use that kind of resource for that.

23       And I always, we're also diversity consultants.  You

24  know, lots of schools are very eager to increase diversity

25  so, you know, I always recommend that you look for diverse

1    schools to increase that kind of profile.

2    Q.   All right.  Now, have we sufficiently discussed the

3    prongs one, two and three of your analysis?

4    A.   Unless you have further questions.

5    Q.   No.  Okay, just weren't to make sure there isn't

6    anything else you wanted to say.  Let's jump toin your

7    original report, okay?  Let me find the page here.  You

8    address cheerleading.

9        This would be the first place where you address

10   cheerleading is in section eight, part five, cheerleading,

11   when does an activity count as a sport.  Would you please

12   find that particular part of your report?

13   A.   I have it.

14   Q.   You found it?  I'd like to start with when, when you

15   were CEO of the Women's Sports Foundation, could you, well

16   could you explain or describe the purpose or function of

17   the Women's Sports Foundation?

18   A.   The Women's Sports Foundation is the expert in

19   women's sports in the United States.  It's recognized by

20   most to be the place to go for research, for informational

21   resources, information on general, on gender equity,

22   policy issues, advocacy.  Definitely the Women's Sports

23   Foundation are an advocate for gender equity and increased

24   opportunities for women's sports remedying historical

25   discrimination.

1        So we are -- that's what the Women's Sports

2    Foundation does.  We have done studies of OCR, we've --

3    Q.   So as CEO of the women's Sports Foundation did you or

4    the foundation develop any positions or policy papers

5    relating to cheerleading and sport?

6    A.   Yes.

7    Q.   Okay.  I'd like to direct you to, it's Exhibit H of

8    your report and it's also Exhibit 107?

9    A.   Exactly.

10   Q.   This is a document with the Women's Sports Foundation

11   logo and it says cheerleading.  Okay, could you please

12   take a look at that and tell us what it is?

13   A.   Yes, this is a position paper developed by Women's

14   Sports Foundation and we do this, we did this regularly on

15   all, on any issue that was high public concern and if

16   you'd gone to the Women's Sports Foundation website and

17   type in search "position papers" you'd find any number of

18   these, but this was developed under my direction.  I as

19   the executive director and CEO was in charge of the

20   advocacy director, and developed all position papers in

21   the area of gender equity, so I was the principal author

22   on this one.

23   Q.   Okay.  And could you please explain -- did you just

24   say that you were the principal author of this one?

25   A.   Yes.

1    Q.    Okay.  Could you -- and was this indeed adopted as

2    the position of the Women's Sports Foundation?

3    A.    Yes, it was.  And let me just say in terms of -- say

4    something about my authoring, my background in terms of my

5    page includes a sociology of sports and the study of sport

6    and so the definition of sport, the thing I teach if I

7    were to be a teacher in colleges and universities would be

8    this, what makes something a sport and what isn't a sport.

9    When would chess be a sport and when would it not.  When

10   would softball be a sport and when could it not.  So this

11   is in my bailiwick of expertise.

12   Q.    Okay.  Could you please then summarize for us what,

13   what the position of the Women's Sports Foundation is

14   that -- or the position that you wrote and that was

15   adopted by the Women's Sports Foundation?

16           MR. BRILL:  Objection, Your Honor.  The document

17   in evidence speaks for itself.  Don't need to summarize

18   it.

19           THE COURT:  Well, if they want to summarize, I

20   have no problem because it's in evidence if they want to

21   summarize it.

22   BY THE WITNESS:

23   A.    What I think is fair to say in keeping with the

24   court's time, that we met with OCR on this, we had

25   extensive discussions on what makes a sport a sport --

1         MR. BRILL:  Your Honor, I'm sorry to interrupt.

2    The witness is not answering questions so it's difficult

3    for me to object.  If she'd been asked did you meet with

4    OCR and what did OCR say to you, I would be objecting to

5    hearsay.  She was asked the question to summarize this

6    document, not to talk about conferences she had with aOCR

7    years ago.

8         MS. GALLES:  All right.  Well, I will let you

9    rule --

10        THE COURT:  No, are you withdrawing the

11   question?

12        MS. GALLES:  Yes.

13        THE COURT:  Okay.

14   BY MS. GALLES:

15   Q.   Dr. Lopiano, before preparing this particular

16   position paper, did you do any research or take any steps

17   in order to investigate the cheerleading situation and

18   whether it should or should not be a sport?

19   A.   The answer is yes.  I can't remember --

20   Q.   And what --

21   A.   -- the time, whatever, but the Women's Sports

22   Foundation involvement with cheerleading is a neutral one.

23   The Woman's Sports Foundation position is the more sports

24   for women, the better.  And so we want more sports for

25   women to evolve and I have no objection to competitive

1    cheerleading or the Woman's Sports Foundation doesn't have

2    any objection to legitimate, objective cheerleading sports

3    and we indeed encourage the American cheerleading

4    association, which is a sideline cheering association

5    because of this opportunity for new sports.  For the last

6    15 years, we kind of met with them and said, look, you're

7    in a perfect position to develop competitive cheerleading

8    as a sport that we can count and involve girls in --

9            MR. BRILL:  Your Honor, I'm sorry to interrupt.

10   That is a narrative.  This is a very sensitive area of the

11   case.  I would appreciate questions and answers by the

12   witness, not deviating into conversations she had 15 years

13   ago with some other organization that is not even a

14   government organization.  If we could take it question and

15   answer, I'll be able to object and the court can rule.  I

16   don't want to have to interrupt the witness and I didn't

17   object when she was giving a lecture essentially on prior

18   testimony but I would really ask that she be asked

19   questions that I have an opportunity to object and she

20   answer the question.

21           THE COURT:  All right.  Well, I think she is

22   answering the question.  Did you do any research or take

23   any steps in order to investigate the cheerleading

24   situation and whether it should or should not be a sport.

25           It is a fairly long answer but I don't see a

1    problem with it.  Why don't we get another question.

2    BY MS. GALLES:

3    Q.   Dr. Lopiano, you were talking about the steps you

4    took with the American Cheerleading Association.  Is

5    that --

6    A.   And so we said we need an NGB.  You're in a perfect

7    position to be the NGB.  There has to be a set of rules,

8    you have to come up with a different name, otherwise

9    people are going to think it's sideline cheerleading.  So

10   we worked with that group and I believe that group has

11   incorporated and wants to get into this --

12   Q.   I just wanted to talk about what you particularly

13   have knowledge about.  Any other -- so do you personally

14   have a beef regarding cheerleading?

15   A.   No, competitive or sideline.  Competitive or

16   sideline.

17   Q.   Okay, so let's get back to the position paper that

18   you wrote for the Women's Sports Foundation; could you

19   please summarize that position paper for us?

20   A.   I believe it's would be self explanatory.

21   Q.   Okay.

22   A.   But it defines sport, with a number of points.

23   Q.   All right.  Now, do sideline cheerleaders sometimes

24   compete?

25   A.   Absolutely.

```
1    Q.   And the fact that a sideline cheerleader competes,
2    does that turn into a sport in your opinion?
3             MR. BRILL:  Your Honor, first of all, there's no
4    foundation for this witness testifying about sport and
5    competitive cheer.  They have a expert on competitive
6    cheer and we don't know the spent of extent of this
7    witness' knowledge about it.  If she's --
8             THE COURT:  She hasn't been asked about
9    competitive cheer.  She's being asked about sideline
10   cheer.
11            MR. BRILL:  Well, she was asked about a sideline
12   cheerleader competing and we have no evidence that she has
13   foundation on this issue.  I don't know how far she's
14   going to testify about sideline cheer and competitive
15   cheer but I don't believe she has any sufficient
16   foundation, and they have a witness coming tomorrow as an
17   expert on the sport of -- what we've -- the sport of
18   competitive cheer and sideline cheer.
19            THE COURT:  Well, okay.  You want to lay a brief
20   foundation?
21            MS. GALLES:  Sure.
22   BY MS. GALLES:
23   Q.   Dr. Lopiano, during -- you've described for some of
24   us, over the last say ten or 15 years, have you been
25   involved in working with cheerleading groups in order to
```

1   help develop or evolve cheerleading into a competitive

2   sport?

3   A.   Yes, I have.

4   Q.   Okay.  Based upon those years of those discussions,

5   have you developed an understanding of what sideline cheer

6   is?

7   A.   Yes.

8   Q.   Okay.  And what is your definition of sideline clear?

9   A.   When the primary purpose of the activity involves the

10  encouragement of student spirit, their appearances at the

11  competitive event of someone else or as a school

12  auditorium event, it is a student -- student spirit focus.

13  It is not competing against another cheerleading team in

14  order to determine who's the best cheerleader.

15  Q.   And do sideline cheerleaders, do they sometimes

16  compete?

17  A.   Yes, they could or they could not.

18  Q.   Okay.

19  A.   It's very common for cheerleaders in sideline

20  cheerleading groups have a one or two events a year where

21  they compete with each other, or festivals where they

22  compete against each other and put an exhibitions of their

23  routines and are judged better than someone else.

24  Q.   Okay, and the fact that, as you say, the sideline

25  team goes and attends a few competitions a year, in your

1    opinion would that be enough to convert what those

2    sideline cheerleaders do into a sport?

3    A.    No.

4    Q.    Okay.  Now, you prepared the Women's Sports

5    Foundation paper; I'd also like you to look at what's

6    Exhibit I to your report which is Exhibit 108 of the, of

7    plaintiff's exhibits.  That's an OCR letter?

8    A.    Correct.

9    Q.    Okay.  And at any time in your, like you said, over

10   the years of your working on the cheer issue, were you

11   ever consulted by or did OCR ever request input from you

12   to provide guidance on cheerleading and sport?

13   A.    Yes, we were consulted in the development of this

14   response and they, we met with them, shared with them our

15   definitions of sport, and helped create this list of

16   factors.

17   Q.    Okay, I'd like to jump to page two of that, of the

18   letter where it says types of inquiries and OCR may also

19   consider?

20   A.    Correct.

21   Q.    All right.  So did you work with OCR in the creation

22   of those criteria?

23   A.    Yes.

24   Q.    Okay.  And are those criteria generally accepted in

25   the sports world as establishing the factors for when an

1   activity can be considered a sport?

2           MR. BRILL:  Objection, Your Honor.  Generally

3   accepted in the sports world is vague and not material.

4   The question here is whether something is a sport for

5   purposes of Title IX, and we have specific criteria that

6   we can give the court.

7           THE COURT:  All right, but I'll allow the

8   question.

9   BY THE WITNESS:

10  A.   This is OCR and as opposed to a generally accepted,

11  the point was well made that this is what OCR says.  It is

12  going to look at, these are all the factors they look at

13  in making a determination of whether or not this is a

14  sport vis-a-vis a sideline cheerleading activity.

15  Q.   Now, I'd also like you to look at Exhibit J which is

16  Exhibit 109.  This is OCR.  Could you please describe for

17  us what this particular letter is?

18  A.   This is, this letter was issued in September of 2008.

19  Instead of applying generally to cheerleading it applies

20  to the definition of sport in general.  And it follows and

21  tracks the extent letter which was the previous exhibit

22  and is even a little more comprehensive than that.  It

23  clearly, I think it's just a more clear enunciation of

24  what OCR is going to look at.

25  Q.   Okay.  So let's jump to Exhibit 110, which I believe

1   is Exhibit K of your report.  Exhibit K are the users

2   guide for the Equity in Athletes Exposure Act; do you see

3   that?

4   A.   Yes.

5   Q.   I'd like to direct your attention to page 19 where it

6   says information you need to complete this screen?

7   A.   Yes.

8   Q.   Okay.  Could you please read the second bullet point?

9   A.   "To be considered a sport under the EADA an

10  activity's primary purpose must be to engage in

11  intercollegiate competition.  If you indicate in the

12  caveat box that your other sports are dancing and/or

13  cheerleading, please also specify in the caveat box that

14  your institution has a letter from the Office of Civil

15  Rights confirming that the OCR has determined that dancing

16  and/or cheerleading are varsity sports in your

17  institution."

18  Q.   Does the OCR provide technical assistance to schools?

19  A.   Yes, it does.

20  Q.   Could you please explain what that means?

21  A.   That any institution can go through to a regional

22  office and ask them to assess a specific fact situation at

23  your institution and indicate whether it complies or

24  doesn't comply with policy, laws, what have you.

25  Q.   So could a school go to OCR and ask for technical

1    assistance about whether their cheerleading program meets

2    the OCR criteria for a sport?

3    A.   Absolutely.  And I have confirmed that no school ever

4    has.

5              MR. BRILL:  Your Honor --

6    A.   I'll tell you --

7              MR. BRILL:  I move the last portion to be

8    stricken.  That was not responsive and I did not have an

9    opportunity to object to the hearsay which she just put on

10   to the record.

11             THE COURT:  That's fine, that's stricken.

12   BY MS. GALLES:

13   Q.   As you sit here today, are you aware of any school

14   that has ever gone to OCR to -- and received an OCR

15   determination that their cheerleading program is a sport?

16   A.   No.

17   Q.   Okay.  As you sit here today, are you aware of any

18   college that has, or it says here that your institution

19   has a letter from the Office of Civil Rights confirming

20   that OCR has determined that dancing and/or cheerleading

21   are varsity sports at your institution; are you aware of

22   any colleges that have received such a letter from the

23   OCR?

24   A.   No.

25   Q.   Do you know whether the NCAA sanctions cheer as a

1    sport?

2    A.    It does not.

3              MR. BRILL:  Objection, Your Honor.  How could

4    she know that?  There's no foundation for this witness to

5    testify what the NCAA thinks about this.

6              THE COURT:  That was the question.  I'll allow

7    it.

8    BY MS. GALLES:

9    Q.    Whether they sanction a championship in cheer?

10   A.    They do not.

11   Q.    Do you know whether the NCAA has -- do you know what

12   an emerging sport is at the NCAA?

13   A.    I do.

14   Q.    And what is an emerging sport?

15   A.    An emerging sport are those NCAA non championship, or

16   sports related that is not sponsored championships which

17   it has identified as being prospective NCAA sports.  NCAA

18   has a minimum number of institutions that are required

19   before championship could be established.  And in an

20   effort to remedy historical discrimination, has lowered

21   this number for a classification of sport called emerging

22   sports in an effort to help those sports get what they

23   need to be comparable to men.  So it has a classification

24   of such sports that is administered by the committee on

25   women's athletics.

1   Q.   Okay.  Do you know whether the NCAA classifies any

2   form of cheerleading as an emerging sport?

3   A.   It does not.

4   Q.   Okay.

5        MS. GALLES:  Your Honor, could I just take a

6   moment to make sure I've covered everything and to confer

7   briefly with counsel?

8            THE COURT:  Sure.

9        (Pause)

10  BY MS. GALLES:

11  Q.   Now, on the emerging -- you mentioned that it

12  requires a minimum number of schools in order to be

13  designated a championship sport or an emerging sport; do

14  you know why there is a minimum number of school

15  requirement for that?

16  A.   I would opine just logically that before the NCAA's

17  going to spend significant resources to sponsor a national

18  championship, it pays expenses of everyone to go to

19  national championships, that it has to be assured that a

20  minimum number of institutions are participating in this

21  sport.

22  Q.   Now, in your report you state that your opinion

23  that -- let's see.  All right, I'd like to go to the last

24  paragraph in part five, A five where you talk about

25  cheerleading.

1              MR. BRILL:  Could you show me what --

2              MS. GALLES:  Sure.

3              (Pause)

4    BY THE WITNESS:

5    A.   The NCAA has long notified?  That one?

6    Q.   Yes.  Okay.  You go onto say that given this

7    longstanding direction from OCR and the NCAA, I do not

8    believe that any school can count cheerleaders as athletes

9    for purposes of Title IX whether the school classifies

10   these cheerleaderies as sideline cheerleaders or

11   competitive cheerleaders.  Is this an accurate statement

12   of your opinion?

13             MR. BRILL:  Your Honor, I have an objection.

14   Not to whether it's accurate or not but whether it's

15   admissible.  I mean the witness has identified the only

16   OCR positions that exist on this and this goes to the

17   issue I raised earlier.  She's identified the OCR

18   standards, she's testified that she's not aware of any OCR

19   letter that approves this, but she's not competent to give

20   an opinion as to, you know, what the OCR would do here.

21   It's just -- beyond her, beyond her expertise and beyond

22   her ability for her to testify to say what OCR may or may

23   not do about this in the future.

24             MS. GALLES:  I'm not asking her what OCR would

25   do.  I'm asking about whether she as an expert in sport

1    and a expert in woman's sports, sociology of sports,

2    whether she would recognize cheerleading as a sport at

3    this time.

4              THE COURT:  I'm going to allow it.

5    BY THE WITNESS:

6    A.    The answer is no.  It doesn't fulfill the majority of

7    criteria established by the OCR.  And as paragraph, this

8    paragraph you're referring to, it's clear the NCAA does

9    not support it.  In the 2008 letter which was issued by

10   OCR, it specified specifically that support of the

11   governing association was one of the criteria, and we also

12   know that without OCR approval, that you can't count it.

13   So that is the basis for my opinion that it should not be

14   counted.  It simply hasn't evolved enough right now to be

15   considered a sport.

16   Q.    But are you open to that at some point in the future

17   it might evolve into something that could be considered a

18   sport?

19   A.    Absolutely.

20   Q.    But as it exists today, what is your opinion?

21   A.    It is not a sport.  It's not even close.

22             MS. GALLES:  I believe that's it for direct

23   exam, Your Honor.

24             THE COURT:  Okay, why don't with break for

25   lunch.  Normally I would take an hour for lunch.  Is

1    everybody willing to try and squeeze that a little bit?

2              MS. GALLES:  I'm sorry, I didn't hear.

3              THE COURT:  How long do you need for lunch?

4              MR. BRILL:  Forty-five minutes, Your Honor?

5              MR. ORLEANS:  That's fine with us, Your Honor.

6              THE COURT:  Let's shoot to come back at 1:30 or

7    just after.  Have a nice lunch.

8              (Whereupon the luncheon recess was taken at 12:50

9    o'clock, p. m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25