1          A F T E R N O O N    S E S S I O N.

2              (1:30 o'clock p. m.)

3          THE COURT:  Cross?

4          MR. BRILL:  Thank you, Your Honor.  Good

5    afternoon.

6    CROSS EXAMINATION

7    BY MR. BRILL:

8    Q.   Dr. Lopiano, your position in this case both at the

9    preliminary injunction hearing and today, is that

10   competitive cheer or cheerleading, as you refer to it, is

11   not a sport, is that correct?

12   A.   Correct.

13   Q.   And your position at the preliminary injunction

14   hearing and today is that cross country, indoor track and

15   field and outdoor track and field should not be counted as

16   separate sports, is that correct?

17   A.   Correct.

18   Q.   Did you read the judge's decision on the preliminary

19   injunction motion?

20   A.   I did not.

21   Q.   Are you aware that the judge found as a preliminary

22   matter that he rejected your position on both those issues

23   finding it likely that Quinnipiac would prevail on both

24   the competitive cheer and the track and field issues?

25   A.   I did not read the judgment so I do not know that.

1  Q.   No attorney advised you of that?

2  A.   I, I was just asked to do what I just did and, no, I

3  didn't.

4  Q.   So for the year that you've been serving as expert in

5  this case you never bothered to read the preliminary

6  injunction decision?

7  A.   I said I did not read the decision.

8  Q.   Okay.  Well, in Exhibit --

9         THE WITNESS:  No offense, Judge.

10         THE COURT:  None taken.

11  BY MR. BRILL:

12  Q.   In Exhibit M to your original report, you analyzed

13  Quinnipiac's participation numbers for 2009, 2010 in no

14  less than 11 different ways as I counted, does that sound

15  right to you?

16  A.   Exhibit L?

17  Q.   The original report?

18  A.   L.

19         MS. GALLES:  Object, and it's been withdrawn.

20         MR. BRILL:  I'm asking about her original

21  analysis.

22         THE COURT:  Okay.

23         MR. BRILL:  She analyzed it eleven different

24  ways originally.

25

1    BY MR. BRILL:

2    Q.   You analyzed it seven different ways in the revised

3    Exhibit M that you give me on Friday, correct?

4    A.   Okay, go slow.  The first question is what?

5    Q.   I withdraw that question.

6         Dr. Lopiano, in all of the assessments that you've

7    done of Quinnipiac's roster numbers, in all of your

8    reports and supplemental reports and amended reports, did

9    you ever analyze those numbers the one way the judge said

10   was likely correct, that is, to include competitive cheer

11   and triple count, as you put it, the track and field and

12   cross country athletes?

13   A.   I asked to follow, my understanding, my expert

14   understanding, was of NCAA rules and I don't --

15        MR. BRILL:  No.  Your Honor, would you instruct

16   the witness to please answer my questions on cross yes or

17   no?

18        THE COURT:  Well, if you want her to answer yes

19   or no, you need to ask her in your question, yes or no.

20   BY MR. BRILL:

21   Q.   Dr. Lopiano, yes or no, in your evaluations did you

22   ever assess, in the reports that you issued did you ever

23   provide an assessment of Quinnipiac's participation

24   numbers for 2009, 2010, including the competitive cheer

25   athletes and counting cross country, indoor track and

1   field and outdoor track and field as separate sports?  Yes

2   or no.

3   A.   Yes.  In my testimony in conjunction with the report.

4   Because in my conclusion for the supplemental report, I

5   did tell you what would happen if you put cheerleading

6   together with all three counted separately.  So in an

7   effort to be responsive to your question the answer is

8   yes.  Concerning --

9   Q.   But not in any of your reports, is that correct,

10  Dr. Lopiano?  Yes or no.  There's no chart in any of your

11  reports that looks at the numbers that way, putting aside

12  your testimony this morning.

13  A.   Yes, the conclusion of my supplemental report, that's

14  says exactly that.

15  Q.   Did you actually calculate what the percentage of

16  participation numbers for men and women would be on your

17  assumptions if you included competitive cheer athletes as

18  well as triple counting track and cross country athletes?

19  A.   Did I -- say this once more?

20  Q.   Did you make a calculation, taking the numbers that

21  you gave us this morning in your supplemental report, and

22  comparing the percentage of women participating in sport

23  at Quinnipiac to the percentage of women enrolled as

24  undergraduates, did you compare those numbers, including

25  competitive cheer athletes, as well as track and field and

1    cross country athletes counted separately?

2    A.    No, I only did participation gaps.

3    Q.    Well, I only got your supplemental report this

4    morning at six o'clock so forgive me if my math is wrong

5    but I want to see if I'm correct.

6         If you can look at that, if I turn it right side up.

7    You may want to refer to your supplemental report but am I

8    correct that, putting aside your count C which is a

9    counting for red flags, that you, without competitive

10   cheer you have 170 men and 248 women in count A?

11   A.    Can you tell me where this is in the report just so I

12   can -- because this is in the supplemental report, right?

13   Q.    Yes, in your supplemental report which we got today.

14   A.    Okay.

15   Q.    I want to make sure I'm understanding it correctly.

16   A.    Surely.

17   Q.    If you look at Exhibit 151?

18   A.    Okay.

19   Q.    Okay?

20   A.    Okay.

21   Q.    Column A, count A, you say 170 men?

22   A.    Right.

23   Q.    And count B you have with, including all runners,

24   triple count, as you put it, you have 248 women, right?

25   A.    What page are you on?

1    Q.   Well, I'm looking at your chart, that's Exhibit --

2    A.   Which page?

3    Q.   -- 151 and at the bottom of the first page it says

4    170 in men in count A and 176 in count B?

5    A.   Got it.

6    Q.   The next page, for total women, triple counting

7    runners, you have 248 for count A and 251 for count B?

8    A.   I don't see that in the second page.

9         THE COURT:  It's the third page.

10   BY MR. BRILL:

11   Q.   Third page?

12   A.   Okay, I have it.  Third page.

13   Q.   Now, you agree there were 30 athletes in the

14   competitive cheer team, correct?

15   A.   On the squad list, yes.

16   Q.   On the squad list.  So I did a little calculation of

17   when your numbers come out to if we add in competitive

18   cheer.  And tell me if I'm wrong.  If we add in the

19   competitive cheer athletes in count A, the percentage of

20   women is 62.1 percent versus 61 percent, 61.9 percent

21   enrollment which is 0.2 percent over representation of

22   women.  Do you need a calculator?  I happen to have one

23   here.

24   A.   No, no, I understand your point at all and --

25   Q.   No, the question is my math right?

1    A.    Is your math right?

2    Q.    Yes.  Do you agree with those calculations?

3    A.    I agree that you are absolutely close on, on prong

4    one, if you kept volleyball, which that does.  And you

5    counted cheer.  And so we're on the same page.

6    Q.    Okay, great.  Now, Quinnipiac did have a volleyball

7    team during 2009, 2010, didn't it?

8    A.    It did.

9    Q.    So there's no justification for counting

10   proportionality or measuring proportionality without a

11   volleyball team for 2009, 2010, is there?

12   A.    And I chose to do that.

13   Q.    You chose to --

14   A.    I gave all the options that I considered the court

15   might want to consider.

16   Q.    How could Quinnipiac leave the volleyball team out of

17   its report to the government of the sports that it

18   sponsored for 2009, 2010?  We had a volleyball team.

19   A.    It was my understanding you didn't want to have a

20   volleyball team, which is, you know, why I included that

21   possibility.  I thought that was the whole reason for the

22   lawsuit.  Maybe I'm wrong.  I apologize if I'm wrong but I

23   thought it was the dropping of the volleyball team which

24   led to this whole thing.

25   Q.    But you understand that Quinnipiac did have a

1    volleyball team in 2009, 2010, right?

2    A.    Absolutely.

3    Q.    And you agree that if you include the volleyball team

4    and you include the competitive cheer athletes that under

5    your count A or count B, prong one is satisfied?

6    A.    I have said that.

7    Q.    Thank you.

8    A.    If you triple count.

9    Q.    Thank you.

10   A.    Yes, sir.

11   Q.    Now, would you agree that as a general rule, the EADA

12   information can be used to calculate whether an

13   institution meets the substantial proportionality

14   requirement prong one and, if not, how large the

15   participation gap is?

16   A.    No.

17   Q.    But isn't that what you say in your report?

18   A.    I said that's all, that's all the information I had,

19   when I used the EADA.  As soon as I was supplied with the

20   eligibility list and the squad list, that was what I used

21   and what I prefer to use.

22   Q.    Do you have your report in front of you?

23   A.    Which one?

24   Q.    Your original report?

25   A.    Yes, which was, which was amended with my

1    supplemental report when I got the squad list.

2    Q.   I apologize for turning my back, Your Honor.  I'm

3    looking for a document.  Please turn to the fourth

4    unnumbered page of your report.  You have that?

5    A.   Yes.  Well, let me make sure.  Where are you on

6    this --

7    Q.   The language I highlight, isn't that on your report

8    --

9         THE COURT:  Okay, okay.  We have to have some

10   rules here because the court reporter's trying to take

11   down what everybody is saying and she can only do that for

12   one person at a time.  So, you need to not answer while

13   the question's being asked and you need to not talk while

14   the answer's being given.  Thank you.

15   BY THE WITNESS:

16   A.   Okay.

17   Q.   Did you find the page of your report --

18   A.   I found it and I see now, you have it on the screen

19   and I am reading your highlighting portion.

20   Q.   And that's what you said in your report, correct?

21   A.   That is correct.

22   Q.   Thank you?

23   A.   But I pointed out in my report --

24   Q.   No, no, there's no question.  There is no question

25   pending.

1          THE COURT:  You'll get a chance to explain when

2    your lawyer comes back up.

3          THE WITNESS:  No problem.

4    BY MR. BRILL:

5    Q.   Your lawyer will have a chance to ask you additional

6    questions on redirect, Dr. Lopiano.

7    A.   I understand.

8    Q.   So your only function now is to answer my questions

9    to the best of your ability.

10   A.   I apologize.

11   Q.   Thank you.  And the dated numbers are based on the

12   squad list as of the first date of competition, correct?

13   A.   Correct.

14   Q.   And the OCR --

15   A.   They are supposed to be.

16   Q.   The OCR guidance similarly states, does it not, that

17   as a general rule, all the athletes who are listed on a

18   team squad or eligibility list and/or on the team as of

19   first competitive event are counted as participants by

20   OCR?

21   A.   For EADA, yes.

22   Q.   Well, for OCR purposes, correct?

23   A.   Okay, say the question again.

24   Q.   Let me show you, this is an excerpt from the OCR

25   guidance, which I believe has been marked as Exhibit

1    Seven, and is it correct that the OCR says as a general

2    rule all athletes who are listed on the team squad or

3    eligibility list and are on team as of the first date,

4    first competitive event, are counted as participants by

5    the OCR?

6    A.    Yes.  May I make a clarification?  Were you asking me

7    about the EADA report or did you skip the EADA report?

8    Q.    I asked you about the EADA report first and now I'm

9    asking you about the OCR instructions.

10   A.    Okay, I did not understand the separation.  So now

11   we're off the EADA report and we're talking about what OCR

12   says?

13   Q.    Correct.

14   A.    Okay, that's fine.

15   Q.    And this is what OCR says, correct?

16   A.    That is partially what it says, yes.

17   Q.    Thank you.  Did you calculate the number of athletes

18   on Quinnipiac's teams as of the first date of competition

19   for each sport?

20   A.    I did.

21   Q.    And where does that appear on your report?

22   A.    Reads number four.

23   Q.    No, I didn't ask you to about reason for.  I said is

24   there a chart that you have this shows your calculation of

25   the number of athletes on each team as of the first date

1   of competition for that sport?

2   A.   I was never provided with a squad list that indicated

3   that.

4   Q.   So your answer is you didn't, you didn't calculate

5   that?

6   A.   I did not, I wasn't provided with that information --

7   no, no I take it back, I take it back.  Can I see the --

8   can I see the one -- could I see the one page Quinnipiac

9   document with start and end teams and it's my

10  understanding that that indicates the total number of

11  athletes on the squad list, and that does not represent

12  the number of athletes on the squad list on the first day

13  of competition.  It was the number of athletes on the

14  squad list who may or may not have been on there on the

15  first day of competition.  That was my understanding and

16  the reason I could not give you that number.  So if I am

17  incorrect I will stand corrected.

18  Q.   But so you're saying that you didn't have enough

19  information to calculate the number of athletes on the

20  squad list on the first date of competition?

21  A.   I was not provided with, I do not believe that the

22  squad list represented that.

23  Q.   But isn't that your very reason for, don't you say in

24  general I count all the athletes who are on the squad list

25  and practicing on the first date of competition of the

1    traditional season?

2    A.   So, all right, so reason for and is reason one

3    through four became administrative so the clearest count,

4    no matter what, was if you used -- okay, look.  When you

5    look at the supplemental report, and you're looking at all

6    of the things that are considered, it says as a general

7    rule all athletes are listed on team squad list or

8    eligibility list.  It's "or."  So I could have chosen

9    eligibility first or I could have chosen squad list first.

10   Since the squad list is not everybody on the first date of

11   competition but eligibility is for sure you use your

12   eligibility, I chose to use eligibility first and then to

13   see if anybody should be added as a result of first date

14   of competition when I could determine that they did not

15   use for eligibility and I was forced into that position to

16   calculate it because I was never provided with just first

17   date of competition.

18   Q.   What information did you lack that you say you would

19   need to calculate the squad list as of the first date of

20   competition?  Just describe as succinctly as you can what

21   you say you didn't have.

22   A.   That every -- the 33 members on the squad list were

23   not, were not all on there on the first day of

24   competition; some were added after the first day of

25   competition.  They didn't appear on the squad list.

1    Q.   No, what information, if you now were to sit down

2    with the information that you had and attempt to calculate

3    the numbers of athletes on Quinnipiac's teams as of the

4    first date of competition, what information would you need

5    that you don't already have?

6    A.   I'd have to look at it.  You want me to take time to

7    look at it --

8    Q.   In the year you served as expert did you ever ask,

9    did you ever say to your lawyers or to Quinnipiac, to ask

10   Quinnipiac for additional information so that you could

11   calculate the first day of competition squad list numbers?

12   A.   Yes, I absolutely did.  And I got the squad list in

13   May and said they were not clear.  And they went back to,

14   it was my understanding that they went back to the

15   compliance officer earlier this week and asked all the

16   questions I asked of them.  And then came back to, they

17   came back to me and it was when all the questions on

18   status were cleared up that I made this assessment.

19   Q.   So your explanation -- but do you agree that the

20   information that both OCR and EADA at least presumptively

21   say is most significant is the first day of competition

22   squad list numbers?

23   A.   No, because it says or it could be the eligibility

24   list.  So as a general rule it could be the eligibility

25   list which is seasons.  You use a season of competition or

1    first day of competition so I think I could go either way,

2    as long as I eventually combine them, starting with which

3    one.  You would rather me started with the first day of

4    competition and I did not.  You were right, I did not

5    start with the first day of competition.  I explained

6    why.

7    Q.   Now did you look at the numbers that Quinnipiac

8    supplied for the first day of competition?

9    A.   Let me check the squad list.  I just want to make

10   sure.

11   Q.   I'm talking about the charts that we gave to your

12   attorneys that summarized the first day of competition

13   squad list in every sport?

14   A.   Could you show me this chart?

15   Q.   Sure, I'll show it to you a little later in my cross

16   examination.

17   A.   Okay.

18   Q.   Rosters of teams can change for a variety of reasons

19   after the first competitive event, isn't that true?

20   A.   Yes.

21   Q.   In fact, as you said, it's a living document

22   throughout the course of the season.  Athletes could be

23   injured, correct?

24   A.   Correct.

25   Q.   They could be become ineligible for academic or other

1    reasons, right?

2    A.    Correct

3    Q.    Or they simply may decide to leave the team for

4    personal reasons?

5    A.    Correct.

6    Q.    And other athletes may legitimately be added to a

7    team during a season, correct, for such reasons as

8    clearing NCAA eligibility; would that be a reason to add

9    an athlete?

10   A.    Absolutely.

11   Q.    Transferring from another school, correct?

12   A.    Absolutely.

13   Q.    Or replacing an athlete who's injured in a key

14   position on a team, correct?

15   A.    Absolutely.

16   Q.    Like a goalie on a hockey team; if you lose a goalie

17   you need to get another goalie on the team, correct?

18   Would you agree with that?

19   A.    Yes.

20   Q.    This normal fluctuation in roster size would not

21   affect the determination of whether a school meets

22   substantial proportionality under prong one, would it?

23   A.    If it were normal fluctuation, it would not.

24   Q.    Thank you.

25   A.    We'd have to look at it over time.

1    Q.   And the EADA contains no requirement that if the

2    number of participants on a team changes during a season

3    that the institution has to either modify its report to

4    reflect the change or otherwise file any notice with the

5    government, does it?

6    A.   What report?

7    Q.   The EADA report.

8    A.   Okay, so -- ask that question again.

9    Q.   The dated report is filed on October 15 of each year,

10   correct?

11   A.   Correct.

12   Q.   And that report contains the squad numbers as of the

13   first date of competition for each sport, right?

14   A.   Correct, right.

15   Q.   And if those numbers change during the course of the

16   season, there's no requirement that the school modify or

17   amend its EADA report?

18   A.   That is correct, but EADA report is not Title IX

19   compliance assessment.

20   Q.   Thank you.  I'm going to try and specify when I need

21   a yes or no answer.

22        Now, you saw nothing in your review of information

23   regarding Quinnipiac rosters indicating the number of

24   participants on any team change for illegitimate reasons,

25   did you?

1    A.   Say it again.

2    Q.   Did you see anything in, or review information

3    regarding Quinnipiac rosters indicating that the number of

4    participants on any team was changed during the season for

5    illegitimate reasons?

6              THE COURT:  Talking about this past season?

7              MR. BRILL:  During 2009, 2010.

8    A.   I saw no definitive number from Quinnipiac about what

9    they counted for each team.  I don't know what this number

10   was.  All I saw was -- this is why I'm asking for this

11   chart.  All I saw was the, here's the squad list on the

12   start --

13             THE WITNESS:  I feel like I'm at a disadvantage,

14   Your Honor, not having the document I referred to in front

15   of me, that I'm trying to recall.

16   BY MR. BRILL:

17   Q.   What document is it, Dr. Lopiano?  You refer to your

18   own chart in Exhibit 151 --

19   A.   No, I need to refer to the Quinnipiac chart I'm

20   talking about.

21   Q.   Well, I'm withdrawing that question.  I'm asking you

22   to refer to Exhibit 151.

23   A.   Okay.

24   Q.   You have your own chart that says Quinnipiac numbers,

25   correct?  Start and end numbers for each team.

```
 1    A.    Okay, if I might --

 2          (Pause)

 3          All right, so --

 4    Q.    So you have --

 5    A.    This is the chart I'm looking for.  I would like to

 6    see the chart from which I derived these numbers.

 7    Q.    What is that chart?

 8    A.    Okay, now -- I can see it in my mind.  And -- let me

 9    look, see if it's in here.

10              MR. BRILL:  What exhibit is it?

11    BY MR. BRILL:

12    Q.    Exhibit B M in your exhibit book, Dr. Lopiano.

13    A.    B, I do not --

14    Q.    Exhibit B as in boy, M as in mother.

15              THE COURT:  I don't think the witness has

16    defendant's exhibits.

17              THE WITNESS:  I do not.

18              MR. BRILL:  Is there a convenient place to put

19    those?

20              MS. GALLES:  Your Honor, just like to make the

21    objection for the record now that we did object to this

22    based, to this exhibit because we didn't know the basis

23    for it or where the numbers came from.  So if he's going

24    to examine her about it  we would object to the

25    admissibility of it on foundation and -- primarily on
```

1    foundation.

2              THE COURT:  So you're objecting now?

3              MS. GALLES:  I'm objecting to -- yes, I'm

4    objecting to his asking the witness about it because

5    there's no foundation for the document as to where those

6    numbers came from.

7              THE WITNESS:  I do not have B M.

8              THE COURT:  Well, I'm not going to admit it at

9    this time.  I don't believe it was being offered at this

10   time.

11             MR. BRILL:  Only that the witness asked to see

12   it.

13             THE WITNESS:  I do not have E M in these

14   exhibits.

15             MR. BRILL:  Excuse me?

16             THE COURT:  No, B as in boy.

17             MR. BRILL:  B as in boy.

18             THE COURT:  It's in volume one.

19             THE WITNESS:  Okay I have it.

20   BY MR. BRILL:

21   Q.   Does that help you answer my question now?

22   A.   Would you repeat your question again please?

23   Q.   I think my question was whether in your review of the

24   information regarding Quinnipiac's rosters you found any

25   indication that the number of participants on any team

1   changed for illegitimate reasons during the course of the
2   year?
3   A.   Okay, say that again.  I didn't think that was a
4   question.  I'm sorry.  Say it again.
5   Q.   Maybe that wasn't the pending question.  I might have
6   gone back one question too far.
7          THE COURT:  Well, you were questioning about her
8   chart showing Quinnipiac's own numbers.
9          MR. BRILL:  Right, right, right.
10  BY MR. BRILL:
11  Q.   And my question was where you derive those numbers
12  from.
13  A.   When I looked at this chart, B M, right, and looked
14  at 31, I could not tell in looking at the squad list where
15  the 31 came from.  All I saw was 34.  And there is no
16  first date of competition on that chart.  So I chose then
17  to start with the eligibility list for that reason,
18  because I felt it was the more, it had more definitely
19  countable numbers and would be a more defensible
20  foundation for my count.
21  Q.   Well, let me --
22  A.   That's the only explanation I can give you.
23  Q.   Thank you.  I'm going to move on, Dr. Lopiano.
24          Did you find any men's sport in your review of all
25  the information that you had where you found athletes who

1    were cut immediately before the first day of competition

2    and that added back to the squad shortly thereafter?

3    A.   I'll have to look.  All right, so I'm looking for

4    male athletes who were --

5    Q.   Cut before the first day of competition and then

6    added back to the squad shortly thereafter.

7    A.   Or who were not put on until after the first date of

8    competition; they don't have to be cut, right?

9    Q.   No, my question was men's sport where athletes were

10   cut before the first day of competition and then added to

11   the squad shortly thereafter.

12   A.   I will look.

13        (Pause)

14        All right, so you're saying cut prior to, added

15   after.  I would never -- even without looking at this --

16   cut prior to, added after, doesn't make sense.  I wouldn't

17   think that there's one of those in here, because if they

18   were cut prior to, you just wouldn't put them on until

19   after.

20   Q.   Did you find any indication of male athletes who were

21   just added to teams right after the first date of

22   competition in a sport?

23   A.   Okay, that I would look for.

24   Q.   If you found such information, Dr. Lopiano, would it

25   not be reflected in your supplemental report that I gave

1    you this morning?

2    A.    What I can't tell is in looking at this chart what

3    the date of first competition was so I was just going to

4    look at the chart you just mentioned --

5    Q.    Thank you.

6    A.    -- for that.  And that doesn't tell me the date

7    either.  I think the answer is I would have to go back and

8    look at the first date of competition in Exhibit B and

9    compare it to my add notes in Exhibit A.  The 150, I would

10   have to look at my notes on the actual date of first

11   competition in B then go back and compare it to my other

12   notes in 150 in order to answer your question.

13   Q.    How much --

14   A.    And --

15   Q.    I'm sorry, how much time did you spend preparing the

16   supplemental report that we received this morning?

17   A.    (whistle)  I'd have to look at my hourly notes but

18   I've been working on it since Wednesday.  So I would guess

19   ten, 15 hours?

20   Q.    And would it not have been significant to you to

21   include in your supplemental report if you found a

22   situation where a team had unaccountly added athletes

23   right after the first day of competition, men athletes to

24   a team and then kept them on the team for the entire

25   season?

1    A.   I would think I would have picked it on a red flag

2    but since I had a reason that -- let me give you an

3    example.  Since I inserted a reason five which was that I

4    would count you if you were there on the first date of

5    competition for your second, for the nontraditional

6    season, then I did pick up athletes that I added in, and

7    for instance, the -- if you look at, if you look at the, I

8    think it's cross country.  Let me see.

9         Okay, if you look at the three on cross country --

10   Q.   I'm sorry, men or women?

11   A.   The men's cross country.  We're talking about men,

12   right?  So here are three cross country runners who ran,

13   were added after the first date of competition in

14   traditional season, right?  Who were picked up under

15   reason five because I added them because they were on the

16   squad list first day of competition for the nontraditional

17   season.  So, so -- since I picked them up I noted them in

18   the red flag.  But because they were counted, I did not

19   think it required a change in them.  I thought they were

20   properly counted by reason five.

21   Q.   Now, Dr. Lopiano, my question was whether you found

22   something I would say suspicious about a situation where

23   Quinnipiac seemed to be leaving men off the first day of

24   competition roster and then adding them in right after

25   that.  Now, the example you've given us has to do with the

1    men's cross country team, the first day of competition for

2    which was the beginning of September, right?

3    A.   For the traditional season.

4    Q.   For the whole, for the first day of competition for

5    the year.  The date for the EADA report was the beginning

6    of September, correct?

7    A.   For the traditional season, correct.

8    Q.   Yes, and that season ended at the end of the fall

9    semester, correct?

10   A.   No, they continued to practice into the

11   nontraditional --

12   Q.   The competitive season, the championship season ended

13   on November, the end of November for cross country, right?

14   A.   That is correct, and the nontraditional season was in

15   spring.

16   Q.   I didn't ask you about the nontraditional season,

17   okay?  These three runners were added to the team in

18   February, correct?

19   A.   Correct.

20   Q.   So this is not an example of people that were added

21   to the team right after the first day of competition, is

22   it?

23   A.   It is, if you count -- it is, it absolutely is, and

24   that's why it's red flag.  Because you can, if you count

25   them, you've got 16.  You don't you have 13, right?  So --

1    Q.   Dr. Lopiano, I'm sorry, maybe we're miscommunicating.

2    These runners were added --

3    A.   You were --

4    Q.   Excuse me, these runners were added to the team six

5    months after the first day of competition for that team,

6    correct?  Yes or no.

7    A.   Yes.

8    Q.   Okay.  So they were not added to the team right after

9    the first day of competition, were they?

10   A.    In the, in the nontraditional season they were not

11   added right after the first day of competition, they were

12   on the squad list for the first, the squad list at the

13   beginning of the nontraditional season.  And let me

14   explain why this could have been nefarious, as you would

15   suggesting.  There is an email from the coach saying that

16   because my squad is limited to this number, right?  And

17   because my seniors finished their nontraditional season,

18   I'll get rid of those guys and now I'm going to add these

19   guys to take their participation places.  And the question

20   is whether or not they should be counted.  And I would, I

21   am suspecting that QU would say no, and I would say yes,

22   reason five.  That that is exactly what happened.  Let me

23   see if I can check that.

24   Q.   Dr. Lopiano, nobody is debating with you at the

25   moment whether they qualified under some definition of

1    participant.  My question was whether you found evidence

2    that Quinnipiac was manipulating the squad size numbers as

3    of the first date of competition which was in September.

4    So I gather your answer is no, there was no -- the entire

5    cross country championship season finished without these

6    three runners on the team, correct?

7    A.    Without the three runners that started in the

8    nontraditional season.

9    Q.    Correct?  And you know that Coach Martin gave a

10   deposition in this case, is that correct?

11   A.    Yes.

12   Q.    And you did read her deposition, did you not?

13   A.    Yes.

14   Q.    And did you see her explain why these three athletes

15   were added in the spring?

16   A.    Yes, and I read an email to that effect.

17   Q.    Okay.  So there's no red flag about the fact that

18   these three men were added to the team in the spring to

19   start practicing for the fall in your view, is there?

20   A.    I didn't see, I didn't make an adjustment because of

21   it.

22   Q.    Is there any --

23   A.    I'm not trying --

24   Q.    I'm sorry, I don't want to waste -- we have precious

25   time.  Is there any other team that you can point to where

1    you believe the evidence showed that Quinnipiac added men

2    to a team right after the first date of competition with

3    the intent of misstating the number of players on the

4    roster?

5    A.   In that specific example of first, of first day of

6    the traditional sport season squad list, let me just

7    check.

8    Q.   Well, just to be clear, the first day of competition

9    can be either a nontraditional season or a traditional

10   season, right?

11   A.   Yes.

12   Q.   Depending on whether it's a fall sport or a spring

13   sport?

14   A.   Yes, and --

15   Q.   But the EADA report is based on the first day of

16   competition, whether it's traditional season or

17   nontraditional seasonal, correct?

18   A.   Yes, and I did not consider the EADA report for 2009,

19   '10, I did not.

20   Q.   It hasn't been filed yet, has it?

21   A.   But I'm not -- I'm counting -- I don't know why

22   you're bringing up EADA for 2009, '10.  I did not -- my

23   whole testimony is here.  I did not consider EADA for '09,

24   '10.  I considered the best possible information that was

25   available which is squad list and eligibility lists.  So I

1    don't know why you're bringing up EADA.

2    Q.   Because you have the number, don't you, Dr. Lopiano,

3    that Quinnipiac maintained in its official records,

4    whether it's on the summary chart or lots of other

5    documents that we supplied that showed the university's

6    count of athletes on the very first day of competition.

7    A.   In the traditional season.

8    Q.   Traditional or nontraditional, the first date of

9    competition.

10   A.   I don't know that, because when I look at the B M,

11   right?  It does not say the date.  It does not say when it

12   was determined, and the squad list doesn't either.  So I'm

13   sorry, I just couldn't milk that out of the data.  I can

14   trust that first column in E M, I can trust it and say,

15   are they right?  But no date was given to me.  I couldn't

16   check it which is why I went to eligibility first.

17   Q.   Well, whatever you went to first --

18   A.   That's the best I could do.

19   Q.   I'm sorry, the court has to make a determination here

20   as to whether Quinnipiac was engaged in manipulation of

21   the roster numbers, okay?  Let's be very blunt about it.

22   And you're serving as an expert witness to give us your

23   analysis of the rosters.  You've been serving as expert

24   for a year, correct?

25   A.   Go ahead.

1    Q.   Excuse me.  What can you point to to tell this court

2    that you found any indication with respect to the men's

3    rosters now, that any single team, the roster number that

4    Quinnipiac indicates in its documents, was manipulated or

5    less than you believe it should have been as of the

6    beginning of the season?

7    A.   A specific policy which limited the men to a cap,

8    which was different from a standard applied to women and

9    the women had a minimum threshold that they had to have.

10   So that in and of itself was a discretionary policy that

11   depressed the size of the men's teams and inflated the

12   size of the women's teams and that's what I pointed to as

13   manipulative.

14   Q.   Is that the best answer you can give to my question?

15   A.   Yeah, I think.

16   Q.   Now, women's teams, what evidence can you point to to

17   show the court that any women's and any women's team,

18   there were athletes who were included in the roster as of

19   the first day of competition by Quinnipiac but were cut

20   from or quit the team immediately thereafter?

21   A.   Say it again.

22   Q.   What evidence can you point to based on your analysis

23   of the roster information as to any women's team where

24   athletes were included on the roster by Quinnipiac as of

25   the first day of competition and then either cut or quit

1     the team immediately thereafter?

2     A.    I believe I went over one example.

3           (Pause)

4           Women's field hockey, Mucci, who was cut after the

5     first date of competition and I recommended an adjustment

6     in that.

7     Q.    What was the name of that --

8     A.    M-U-C-C-I, Mucci?

9     Q.    Did you know that Mucci was a foreign athlete from

10    Italy and the university was trying to get her

11    eligibility.  She was able to practice with the team for

12    the first one and-a-half months but then ultimately was

13    ruled ineligible by the NCAA?  Did you see that

14    information in the emails that you reviewed?

15    A.    No, I only saw that she was cut on 10/15.

16    Q.    So you don't know that she was cut because she was

17    declared ineligible by the NCAA?

18    A.    Usually it was in EE status; it was not cut.

19    Q.    If you assume what I was telling you was correct,

20    would that remove the red flag you have on Mucci?

21    A.    Yes, it would.

22    Q.    Okay.  Anybody else where you feel there was some

23    improper indication that women were cut from or quit teams

24    right after the first day of competition?

25    A.    Okay, ask -- the coach's -- okay.  So in the case of

1    women's ice hockey, all right?

2    Q.    Right.

3    A.    There was an email from this coach wanting to cut

4    these kids and everyone of them as I say just not to

5    count.  And he wasn't allowed to cut them until after they

6    had completed the -- he wasn't allowed to do it.

7    Q.    That's that's what you think that email said?

8    A.    Yes.

9    Q.    Did you see the email or did somebody describe it to

10   you?

11   A.    No, I have this email.

12   Q.    Okay.  Did you know that your attorneys asked to

13   speak to the women's ice hockey coach last week?

14   A.    Yes.

15   Q.    Do you know after they spoke to him, they decided

16   they would not call him as a witness in the case?

17   A.    I do not know that.

18   Q.    Did the attorneys tell you what the ice hockey coach

19   told them?

20   A.    They said that he did not reiterate what he said in

21   his email, and that's why it's red flagged and that's why

22   I've tried to separate this column so that the court can

23   absolutely decide not to use it if it doesn't want to.

24   But I'm pointing out what I was concerned with.

25   Q.    All right, but just to go back to my question --

```
 1    A.    Sure.
 2    Q.    Dr. Lopiano, let's start with Stacy Kmill on the
 3    women's ice hockey team.  The first day of competition for
 4    the --
 5    A.    Wait, wait.  What's her name?
 6    Q.    Stacy Kmill?
 7    A.    Are you on ice hockey?  I'm at field hockey, I'm
 8    sorry.  Now I'm on ice hockey.  Stacy Kmill.
 9    Q.    Do you see Stacy Kmill?
10    A.    No, I don't see her.  How do you spell it?
11    Q.    K-M-I-L-L?
12    A.    I don't see her.
13          THE COURT:  She's just past halfway down the
14    women's ice hockey.  It starts with a K, not a C.
15    A.    Sorry, sorry.  Okay, got it.
16    Q.    Now the women's ice hockey team, the first day of
17    competition is at the end of September, right?
18    A.    Correct.
19    Q.    And Stacy Kmill was deleted from the team on April
20    fifth, right?
21    A.    Correct.
22    Q.    You know she had a full scholarship?
23    A.    No.
24    Q.    You saw, you had the list of scholarships, didn't
25    you?
```

```
 1   A.   Well, are you asking me do I recall it?  I --

 2   Q.   Well, when you analyzed those numbers would it make

 3   any difference to your analysis, Dr. Lopiano, if I told

 4   you that Stacy Kmill had a full scholarship; she was on

 5   the team the entire championship season and competed in 34

 6   games?

 7            MS. GALLES:  I would just say objection,

 8   foundation.

 9            MR. BRILL:  I'm asking if that would make a

10   difference to her answer.

11            THE COURT:  I'll allow it.

12   BY THE WITNESS:

13   A.   That's a fair question so say it once more.

14   BY MR. BRILL:

15   Q.   Would if make a difference to you --

16   A.   I'm not trying to make it hard for you.  You speak

17   quickly and I'm trying to make sure I understand your --

18   Q.   I'll try and slow down.  That's fair.

19   A.   That's okay.

20   Q.   Would it make a difference to you if you were aware

21   Ms. Kmill was on full scholarship?

22   A.   Yes.

23   Q.   She was on the team the entire time, the championship

24   ice hockey season?

25   A.   Yes, it would.
```

1    Q.   And she competed in 34 games?

2    A.   Yes.

3    Q.   There's nothing suspicious about her --

4    A.   I agree.

5    Q.   Would it make a difference to you, let's look at

6    Brenda Poultry (ph) another one of your red flags, on ice

7    hockey?

8    A.   Okay.

9    Q.   Would it make a difference to you if you knew that

10   she was also on full scholarship?  That she competed in 37

11   games?  And she was on the team the entire championship

12   season?

13   A.   Yes, it would.

14   Q.   Nothing wrong with that, right?

15   A.   That is correct.

16   Q.   And would it make a difference to you if I told you

17   that both, that Jessica Puieg, P-U-I-E-G, who was deleted

18   from the team on April fifth actually competed and was on

19   the team the entire championship season?

20   A.   Yes, in general I would -- yes, the answer is yes.

21   Q.   And Christina -- I'm sorry.  And Katharine Colucci

22   (ph) competed, was on the team and competed the entire

23   championship season?

24   A.   Yes, I would make those adjustments.

25   Q.   And, in fact, none of those people who were deleted

1    from the ice hockey team were deleted or cut at any time

2    close to the first day of competition, isn't that true?

3    The first day of competition being in September and they

4    were cut from the team in April?

5    A.    That is true.  Fenoia (ph) is not one of those people

6    who you mentioned in terms of who had participated, right?

7    Q.    I left her out, and would it make a difference to you

8    if you knew that Christine Fenoia actually spent at least

9    the first part of the season practicing with the team even

10   though she did not compete?

11   A.    It says here she spent the whole time.

12   Q.    Excuse me?

13   A.    It says here she spent the whole time and the reason

14   why I red flagged it was because the coach wanted to cut

15   her and they were forced to keep them on the team, and I

16   don't know what else to tell you.  That the red flag notes

17   are my, you know, opinions in the third column which is

18   the most, which are the opinions you should most question.

19   And I fully admit two and what I try to do in column three

20   was because I was looking at Exhibit L and, you know,

21   concerned about this use of the policies, the use of --

22   you know, the numbers were getting really, whatever.  I

23   just tried to raise these issues as red flags.  So I'm

24   perfectly, you know, happy for the court to just weigh

25   that for exactly what it is.  Your information and my

1    understandings.  That's fine.

2    Q.   When you started to find these red flags did you ask

3    the attorneys for the plaintiffs to see if you could

4    actually talk to the coaches in the last two weeks?

5    A.   I just got all this stuff on Wednesday.  And here was

6    the court date.

7    Q.   You got what stuff on Wednesday?

8    A.   I got the answers to all my questions, was able to do

9    my analysis on Wednesday because the meeting with the

10   compliance person to clear up all my questions wasn't

11   until Monday.

12   Q.   So the answer is --

13   A.   I was out of town, I could not even get to this until

14   Wednesday.  And in preparing for court, I didn't -- I

15   thought there was nothing else we could do at that point.

16   Q.   Would it help you at this point to talk to some of

17   the coaches to clarify some of the red flags that you

18   have?  You know that Quinnipiac has offered from day one

19   to make any of the coaches available to the plaintiffs for

20   interviews or depositions; you're aware of that, right?

21   A.   If the court would like me to do that, I'd be happy

22   to do that but how did I know what question to ask them?

23   I mean --

24   Q.   I can't tell you that but --

25   A.   I didn't have anything to go on until Wednesday and I

```
 1    could have, should have but I didn't have anything to go
 2    on until Wednesday and I was looking at giving you a very
 3    light supplemental, so I mean I'm sorry if I didn't pull
 4    out all the plugs or try to.
 5    Q.    You would agree this is a very important case?
 6    A.    Absolutely.
 7    Q.    Both to the plaintiffs and to the defendant, correct?
 8    A.    Absolutely.
 9    Q.    Any additional information you need to make sure that
10    your report is correct, you'd like to have that
11    information, wouldn't you?
12    A.    If the court allows time for it, sure, but that
13    wasn't a possibility.  I did the best I could and I am,
14    I'm going repeat this again.  That because of my level of
15    confidence of C, I have completely separated that out,
16    completely been transparent with it and perfectly willing
17    to hear your criticism of it or correction of it.  I make
18    no qualms about that.
19    Q.    Okay.  Dr. Lopiano, just to make sure we've covered
20    it, is there any other team that you can point to where
21    you believe there was evidence that you discovered of
22    women who were included on the opening day roster in
23    effect to pad the roster or inflate the roster and then
24    shortly thereafter either deleted from the team or cut
25    from the team?
```

A.   See, you're putting two pieces of the puzzle together
and they are independent variables and I'll answer them
separately.  That it is a composite look at the data, so
you have to look at your, the QU numbers in the, in E M,
then you have to look at the average squad sizes to see
whether the policy itself created this inflation.  It
wasn't necessarily the way I counted that creates
inflation, or whether you just count somebody after or
count somebody before.  The inflation is created alone
with this differential policy about cap and floor.  So
that alone is a problem if you see that you don't match up
to your numbers, your average squad size numbers for
conference or for national.

Q.   Is that the best answer you can give to my question
at this time?

A.   Yes, the best I can do.

Q.   Now, Dr. Lopiano, there was nothing in the OCR
definition of a participant for determining prong one
compliance, there's nothing in that definition that
requires that an athlete actually needs to engage in
competition to be counted as a participant, correct?

A.   Correct.

Q.   In fact, OCR guidance specifically says that
participants include both walk ons and athletes who
practice but may not compete, correct?

1    A.    Correct.

2    Q.    And OCR complains that even athletes who do not

3    compete receive numerous benefits and services of being on

4    the team?

5    A.    And I so stated, correct.

6    Q.    Including intangible benefits of being a member of a

7    team and participating in a whole variety of ways.

8    Correct?

9    A.    Absolutely.

10   Q.    And isn't that one of your principal focuses for many

11   years as an advocate for increasing women's athletic

12   opportunities that it's important to get the life lessons

13   of being on a team?

14   A.    Absolutely, and those are the principal bases for my

15   reasons that I laid out for you and I considered at that

16   point.

17   Q.    And now, there's nothing in the OCR in definition of

18   participant that requires an athlete to compete at a

19   particular level of performance, is there?

20   A.    The Title IX requirement for giving the athlete the

21   same opportunities as men to participate at a particular

22   level is there.  It is not in this count section.  It's --

23   levels of competition is separate from the participation,

24   how you count.  You have two requirements under prong one.

25   Q.    Okay.  But in order to be counted as a participant --

1    A.    Right.

2    Q.    Let's say in order to count a member of a track team

3    as a participant, do you have to run a certain time in the

4    400-meter dash or can you count the slowest runner as well

5    as the fastest runner?

6    A.    No, it doesn't depend on performance, no.  You have

7    performance in competition all the time.

8    Q.    And similarly there's no such requirement in the

9    definition for participant for EADA purposes, correct?

10   There's no --

11   A.    Okay, wait, wait.  You're confusing me with your

12   question.  So say --

13   Q.    There's no requirement for -- the purposes of EADA

14   counting and reporting, there's no requirement that a team

15   member satisfy a certain level of performance?

16   A.    No.

17   Q.    And, in fact, it's quite common for teams to include

18   athletes who will never compete, correct?

19   A.    Oh absolutely.

20   Q.    For example, many men's football teams have well over

21   100 athletes, even though the NCAA limits division I

22   schools to 85 football scholarships, correct?

23   A.    Yes.

24   Q.    In fact, you yourself have referred to the 120th man

25   on a football team as the tackle dummy, right?

1    A.    I was just going to say that.  You beat me to it.

2    Q.    And that 120th man is probably never going to see the

3    playing field, is he?

4    A.    That is right.

5    Q.    But he receives coaching insurance, practice time and

6    all the other accouterments of being on the team, right?

7    A.    Yes.

8    Q.    And you would consider being a tackle dummy on the

9    football team as a legitimate varsity experience, wouldn't

10   you?

11   A.    If he participated in the whole season, if he did all

12   those things, that is a legitimate experience.

13   Q.    And in your report, and I believe in your testimony,

14   you've talked about reasonable squad sizes, correct?

15   A.    Correct.

16   Q.    And you suggested, actually in your report you state

17   that schools that fully fund a sport with large travel

18   budgets and large coaching squads may reasonably carry one

19   or two more athletes than schools that have limited

20   budgets and high coach to athlete ratios, do you remember

21   that statement from your report?

22   A.    I don't but I would not disagree with that statement.

23   Q.    But isn't it true that squad sizes of a given sport

24   often vary by more than one or two athletes at given

25   schools?

1    A.   Squad sizes do vary from school to school.

2    Q.   And in fact --

3    A.   And if you're saying do they, do they vary by more

4    than one to two, statistically I would say they probably

5    would, but all you'd look at is averages in terms of

6    trying to make some kind of a comparison.

7    Q.   Well, let's take a look at the NCAA average.  The

8    NCAA squad sizes that you attach as an exhibit to your

9    report, I believe this is Plaintiff's Exhibit 103?

10    A.   What year is this?

11    Q.   This is what you attached to your report.  I believe

12    it's 2008, 2009, if you look at the top.  And so just to

13    run down --

14    A.   So this is, so this is --

15    Q.   Can you see that from where you are?

16          THE COURT:  It's Exhibit D to your original

17    report.

18          THE WITNESS:  Thank you.

19    A.   Okay, got it.

20    Q.   Well, I just want to review with you that the squad

21    sizes for these women's teams range enormously; don't

22    they?  For example, women's field hockey from 17 to 28.

23    Women's golf, from five to eleven.  Women's lacrosse, from

24    15 to 30.  Women's soccer from 21 to 30.  Women's

25    softball, from 14 to 29.  And so on.  It's going town to

1    outdoor track which ranges from 17 to a high of 55.

2    A.    Right.  And your question is?

3    Q.    So my question is you cannot tell just from the size

4    of a team whether it's providing genuine athletic

5    opportunities to all athletes on the team, can you?

6    A.    No, as I said, you have to a look at the total

7    situation and when you have a policy and cap and floor and

8    then you have averages which are out of sync and that's

9    the only point I'm making, I think that's a valid thing to

10   look at.

11   Q.    From now on, I'd like --

12   A.    You can tell by my 151, by looking at those averages

13   and the two numbers, the court can make its assessment

14   whether or not there's inflation or too small.

15   Q.    From this point on, Dr. Lopiano, I'd like you to

16   answer yes or no to the extent that you can.

17   A.    On every question?

18   Q.    Yes.

19   A.    Okay.

20   Q.    The NCAA average squad sizes are just averages,

21   correct?

22   A.    Yes.

23   Q.    You don't know the range of squad sizes that schools

24   have reported for any given sport to the NCAA, have you?

25   A.    No.

1   Q.   Some deviation from the average one way or the other

2   would be expected, correct?

3   A.   Yes.

4   Q.   And not every school has the same squad size in every

5   sport, do they?

6   A.   Try it without the negative.

7   Q.   Schools have different size squads of the same sport,

8   correct?

9   A.   Yes.

10   Q.   Would you agree that as long as a school is providing

11   women on its teams with genuine participation

12   opportunities within the meaning of the OCR guidelines,

13   there is nothing wrong with a school providing greater

14   participation opportunities in a sport than the NCAA

15   average?

16   A.   There's two considerations -- I would not agree with

17   that.

18   Q.   You would not -- I've asked for those questions to be

19   answered yes or no.

20          THE COURT:   That's fine.

21   A.   Okay.

22   Q.   Now, schools report squad sizes to the NCAA based on

23   the first date of competition, correct?

24   A.   I do not know that.

25   Q.   I'm showing you an excerpt from Exhibit GI which is

1    the current NCAA work sheet, in particular page 23.

2    A.   G I?

3    Q.   I guess, G I.

4    A.   And this is, I have a Big Forest Open -- this is

5    not -- I have the times of the meet.

6    BY MR. BRILL:

7    Q.   I'm sorry, it's G K.  I apologize.  You need any

8    assistance finding the exhibit?

9    A.   What am I looking for within this document?

10   Q.   It's on page 23.

11   A.   Twenty-three?

12   Q.   Yes.

13   A.   Got it.

14   Q.   Okay.

15   A.   It says --

16   Q.   Are you familiar with this?

17   A.   Does it say table one, participation?

18   Q.   Yes.  Are you familiar with this NCAA work sheet?

19   A.   I've seen them before.

20   Q.   Well, just so the record is clear, the NCAA has its

21   own reporting requirement separate from EADA, correct?

22   A.   Yeah, the NCAA requires you to complete these, all

23   NCAA work sheets from which the EADA is derived so you

24   don't have to do two separate ones.

25

1    Q.   Well, actually you do have to do two separate ones

2    now, isn't that --

3    A.   But this is your work sheet.

4    Q.   And the NCAA report is filed January 15th of each

5    year, is that correct?

6    A.   I --

7    Q.   You don't know?

8    A.   No.

9    Q.   But you agree that the NCAA form defines

10   participation as a student athlete as of the date of the

11   varsity team's first scheduled contest, is either listed

12   as team member or practices with the varsity team and

13   receives coaching or receives athletically related aid,

14   but those factors are measured as of the first date of

15   competition, correct?

16   A.   Yes.

17   Q.   So would you agree with me that the average squad

18   sizes published by the NCAA are based on first day of

19   competition squad sizes?

20   A.   Yes, that's exactly what it says here.

21   Q.   So you didn't compare, your comparison of total

22   participation versus the average first day squad size is a

23   meaningless comparison, isn't it?  It's apples to oranges?

24   A.   I am trying to -- what I tried to do is say these are

25   actual real participants, right?  And to compare that to

1     an average squad size.

2     Q.   But some of those participants, as you said, joined

3     the teams during the season after the first day of

4     competition, right?

5     A.   That is correct.

6     Q.   And that would be the case on many other, many NCAA

7     teams, correct, across the United States?

8     A.   So you are saying that there is a statistical error

9     inherent in using NEC or NCA squad list and comparing it

10    to a participant count.

11    Q.   I'm saying that you're comparing two things that are

12    not comparable.

13    A.   I think you are agreeing with what I just said,

14    right?

15    Q.   I don't know if there's a question pending but do you

16    recognize --

17    A.   I don't either.  I'm just supposed to be saying yes

18    or no.

19    Q.   Do you recognize a discrepancy between your count --

20    A.   Yes, I understand your point completely.  I

21    understand your point completely, yes.

22    Q.   Thank you.  And in your report, you say that a

23    recruited athlete with Division I skills does not want to

24    waste valuable NCAA limited practice time --

25    A.   Where are you now?

1    Q.   On page eight of your report, I'm sorry.

2    A.   Now my original report or my old one?

3    Q.   Your original report.

4    A.   All right.

5         (Pause)

6    Q.   Pages aren't numbered, unfortunately.

7    A.   I apologize for that.

8    Q.   But --

9    A.   This is the page that starts with the schools

10   carries?

11   Q.   It's the last sentence of the first paragraph right

12   above where the heading says prong two on page eight --

13   A.   Last sentence of the first paragraph?

14   Q.   Right, you see, did you not, that recruited athlete

15   with division --

16   A.   Wait, I'm not with you.

17   Q.   May I approach the witness and point it out to her,

18   Your Honor?

19   A.   Thank you.

20        THE COURT:  You don't need to ask.

21   Q.   (Indicating)

22        A recruited athlete with Division I skills.  Do you

23   see that sentence?

24   A.   Yes.

25   Q.   Okay.  Do you want to read that into the record?

1    A.   A recruited athlete with Division I skills does not

2    want to waste valuable NCAA -- a recruited student athlete

3    with Division I skills does not want to waste valuable

4    NCAA dash limited practice time training with students

5    with substantially less skill who will never compete.

6    Q.   Is that assertion based on any research by you?

7    A.   This is --

8    Q.   Yes or no.  Did you do any research before you made

9    that assertion?

10   A.   Okay, you're confusing me, yes or no.  Okay, so it

11   was not derived from research, only experience.

12   Q.   Does it apply to the star quarterback on a football

13   team who was forced to share his practice time with the

14   tackle dummy?

15   A.   It depends on the context.

16   Q.   Isn't it true, Dr. Lopiano, that most Division I

17   teams and all sports have a range of athletes from stars

18   to the starters to the substitutes down to the bench

19   warmers; isn't that a common pattern?

20   A.   It is but I hope you're looking at this, counselor,

21   this statement as the general introduction and not a

22   characterization of the specific fact situation, right?

23   You're not --

24   Q.   Many teams -- are you finished with your answer?

25   A.   Yes.

1   Q.    Many teams have walk ons who will compete

2   infrequently, if ever, right?  As well as scholarship

3   players, correct?

4   A.    Yes.

5   Q.    And OCR, as you testified earlier, recognizes the

6   significant benefits to those nonrecruited walk on

7   athletes who do not compete but otherwise fully

8   participate on a team, correct?

9   A.    That is correct.

10  Q.    And incidentally, you talked about how people are

11  recruited; do you know of any Quinnipiac University

12  athlete of any sport who is recruited from the dining hall

13  or the physical education classes?

14  A.    I do not specifically by name, no.

15  Q.    Now, your position as you stated is that indoor track

16  and field and outdoor track and field are always the same

17  sport, is that correct?

18  A.    Correct.

19  Q.    In fact, you testified at your deposition in this

20  case that indoor and outdoor track is always considered

21  the same sport, no ifs, no ands and no buts; do you

22  remember that testimony?

23  A.    Correct.

24  Q.    But you are aware that the NCAA treats indoor track

25  and field and outdoor track and field as separate sports,

1    aren't you?

2    A.    Yes, for different purpose.

3    Q.    Conducts separate championships in each sport?

4    A.    Yes.

5    Q.    Counts its sport separately for meeting minimum

6    number of sports sponsorships necessary to qualify as

7    Division I?  It counts its sports separately for purposes

8    of meeting minimum number of sports sponsorships necessary

9    to qualify as a Division I, two or three school, isn't

10   that correct?

11   A.    Yes, for those purposes.

12   Q.    And, in fact, Dr. Lopiano, isn't it true that the

13   NCAA bylaws which you refer to --

14   A.    I'm sorry, the NCAA --

15   Q.    The NCAA bylaws, provide that cross country and

16   indoor track and field and outdoor track and field shall

17   be considered as separate sports?

18   A.    NCAA, not Title IX.

19   Q.    Is that what the NCAA bylaws provide, Section

20   14.2.3.3?

21   A.    The NCAA; not talking Title IX.

22   Q.    But that is what the NCAA bylaws provide, correct?

23   A.    Yes.

24   Q.    And you were aware of that, correct?

25   A.    Yes absolutely, because it's for a different purpose.

1    The counting, what the NCAA is trying to do is to --

2    Q.   No no, I'm not asking you what the NCAA is trying to

3    do, Dr. Lopiano.  I'm asking you very different specific

4    questions, okay?

5    A.   Sorry.

6    Q.   Now, the EADA also provides for separate reporting of

7    cross country indoor track and field and outdoor track and

8    field, correct?

9    A.   Correct.

10   Q.   Did you consider the fact that --

11   A.   Uhm -- it allows -- I would like to look at the

12   EADA -- they have changed the EADA report to move from

13   separate reporting to combine the reporting and I would be

14   more comfortable looking at the EADA report currently to

15   remind myself, you know, how that's put.

16   Q.   We'll come back to that.  So, Dr. Lopiano, you don't

17   consider it even an if, an and or a but that the NCAA

18   considers track and field, indoor and outdoor, to be

19   separate sports?

20   A.   Absolutely not.  They are for separate purposes.

21   Q.   Not even an if, and or but?

22   A.   That's right.

23   Q.   Now, in your report, I'm not sure if this was in your

24   testimony but it's in your report; you said this, that if

25   Quinnipiac does not enter athletes into most events, it's

1   not operating a track and field team, let alone a varsity

2   team; do you recall saying that?

3   A.   This is in my report?  Can you point it out to me?

4   Q.   Is this your position as you sit here today, that if

5   Quinnipiac does not enter athletes into most events --

6   A.   Could you tell me whether I said that in my report?

7   Q.   Well unfortunately --

8   A.   No.

9   Q.   -- I deleted the references to your report from my

10   outline because I didn't think it was going to be in

11   evidence.  I can find it later.  But just listen to my

12   question and see if you agree with it as you sit here

13   today or not.

14       If Quinnipiac does not enter athletes into most

15   events at a track and field meet, is it operating a track

16   and field team, let alone a varsity team?

17   A.   I could not agree with the statement you're saying

18   without it being in context.  That, it's unfair of you to

19   pull that out of an analysis of QU's legitimacy and

20   whether it's really running a track program.  That's one

21   little piece of the puzzle.

22   Q.   I'm asking you that piece of the puzzle.

23   A.   Because if you had all -- runners, distance runners,

24   and nobody was in a field event and nobody as in

25   traditional -- they were, nobody's is was in any of the

1    traditional other events, it could bring into question

2    whether or not you were really conducting your cross

3    country nontraditional season in your, through your indoor

4    and outdoor which the NCAA allows, and that was the

5    context in which I was trying to make those statements.

6    Q.   Well, let me just ask you a yes or no question so

7    it's clear.  Is it your position that if Quinnipiac does

8    not enter athletes into most events at a track and field

9    meet that it's not operating a legitimate track and field

10   team, yes or no?

11   A.   I repeat that I cannot --

12   Q.   Can you answer that yes or no?

13   A.   I cannot answer yes or no because it is out of

14   context.

15   Q.   Well okay, that's fine you can stop there,

16   Dr. Lopiano.  Yes or no or I cannot answer yes or no is

17   fine.

18   A.   I cannot answer yes or no.

19   Q.   Didn't you, you gave testimony in the case of

20   Mansurian (ph) against University of California Davis.  Do

21   you recall that case?

22   A.   I recall having been an expert.

23   Q.   And you recall giving deposition testimony in that

24   case?

25   A.   It was sometime ago.  You'll -- do I recall exactly

1    what I said?  If you show me I will try to recall.

2    Q.   Do you remember saying in Mansurian -- incidentally,

3    Mansurian involved a claim by three women varsity

4    wrestlers that they had been improperly denied the

5    opportunity to continue as varsity wrestlers, correct?

6    A.   Correct.

7    Q.   And didn't you testify in that case that a school

8    could have a viable competitive varsity track team or

9    wrestling team with one athlete?

10   A.   Because of wrestling being able to compete one on one

11   according to weight class, yes.

12   Q.   And you said a track team could have as little as one

13   athlete, correct?

14   A.   To enter a meet.

15   Q.   Could have a varsity track team with with one

16   athlete, correct, wasn't that your testimony?

17   A.   Yes.

18   Q.   But it's not possible for a single track and field

19   athlete to compete in the majority of events at a meet, is

20   it?  Not even Bruce Jenner could do that?

21   A.   How does that, how does that relate?  I'm -- I'm

22   trying to get the context of your question.

23   Q.   Is it possible for a single track and field athlete

24   to compete in the majority of the events at a track and

25   field meet?  Yes or no.

A.   I'm not getting the connection.

Q.   Well, maybe the judge gets it.

A.   I'm one person, would I ever put that one person into all track and field events; is this your question?  As a coach probably not.

Q.   It's not physically possible?

A.   But it's not a team.  You're taking it out of context.  I'm talking about to be considered varsity team, not whether one athlete can enter how many different events.

Q.   Well, as you surely know, do you not, the NCAA requires a minimum of 14 athletes on an indoor or outdoor track and field team, correct?

A.   Right.

Q.   The NCAA does not require that a school participate in both track and field events, correct?

A.   Say that again?  Sorry.

Q.   Yes or no, the NCAA does not require that a school participate in both track and field events?

A.   Correct.

Q.   The NCAA does not require that a school participate in any minimum number of events or any number combination of events to sponsor an indoor or outdoor track and field team, correct?

A.   It does.  No, it does.

1    Q.   What's that?

2    A.   The NCAA does.

3    Q.   I didn't hear the answer, I'm sorry?

4    A.   The NCAA does.

5              THE COURT:  The answer is no.

6    Q.   Can a school sponsor a team, let's say a track team,

7    with fewer than 14 athletes for the purposes of Title IX

8    even if it didn't comply with the minimum participation

9    requirements of the NCAA?

10   A.   Okay, say that again.

11   Q.   Okay.  Let's say I'm a small school, I only have ten

12   women that are coming out for track and field, so I want

13   to operate at a track and field team with ten women and

14   count them for OCR purposes even though it's not a, it's

15   not a NCAA compliant track team.

16   A.   So they don't play in the minimum number of contests

17   with the NCAA?

18   Q.   Right.

19   A.   Whatever, it's just can I participate in this sport.

20   Q.   And count --

21   A.   And entering into all these events, yes.

22   Q.   You can count it for OCR purposes, correct?

23   A.   I think you have to look at the experience itself to

24   make sure it's legitimate.  Like you're doing

25   hypotheticals right now and out of context and it's making

1    me nervous.  Because if you only participated in one or

2    two events and it wasn't comparable and this whole

3    counting or legitimacy under Title IX, without looking at

4    the totality of the fact situation and saying I looked at

5    this, I looked at this, that's a little general --

6    Q.   I'm sorry, I'll try to get specific if that's easier

7    for you, Dr. Lopiano.  In your supplemental report that

8    you testified about this morning, you looked at one

9    possible way of counting Quinnipiac's track athletes as

10   only counting the 18 women who participated on the cross

11   country team, right?

12   A.   That was one of the -- last one.

13   Q.   The that was one of your options?

14   A.   The last one, yes, I believe, yes.  So you're talking

15   about on the conclusion page, you're talking about if they

16   only count cross country, the very last one with my

17   signature.

18   Q.   Right, but you know from reading the deposition of

19   the track coach there were 12 other women who were not on

20   the cross country team who were on the indoor and outdoor

21   track and field team who participated, practiced and

22   actually ran events throughout the entire indoor track and

23   field season and the outdoor track and field season,

24   correct?

25   A.   Are you --

1    Q.   I'm asking if there were 12 women who were in the, on

2    the cross country team but actually participated, ran

3    races consistently in the indoor track and field season,

4    the outdoor track and field season?

5    A.   Yes.

6    Q.   Well, can you explain any possible basis to exclude

7    those 12 women from your count?  Why is that even an

8    option for the court, Dr. Lopiano?

9    A.   Because it's my understanding that I was not the

10   expert on track, and that there, that these four options

11   would be considered by the court and I was asked to give

12   my numbers for each of these options so that's why I put

13   it there.

14   Q.   Who gave you the options you were to address?

15   A.   Legal counsel asked me for my opinion.

16   Q.   So the same counsel who asked you to consider an

17   option not counting 12 athletes who actually competed

18   throughout two seasons, that's the same counsel that told

19   you to leave out or didn't mention to you that you should

20   look at competitive cheer?

21   A.   Whoa, whoa.  That's a very convoluted statement.  So

22   say it again, just say it slowly.

23   Q.   Is it the same counsel --

24   A.   Same counsel.

25   Q.   -- who advised you not to look at the impact of

1  including competitive cheer on your calculations --

2  A.    No, no, counsel did not advise me to do that.  I say

3  competitive cheer is not a sport.  Counsel did not advise

4  me that.

5  Q.    That was your own decision?

6  A.    That is right.

7  Q.    But --

8  A.    I didn't, I'm not passing judgment on these four, all

9  right?  I'm saying these are all the possibilities I think

10  that are going to be raised were raised within the

11  preliminary injunction that I wanted to make sure you had

12  complete choices here.  It was just a, you know, a way for

13  me to try to be comprehensive and not to dictate, you

14  know, by narrowing options.

15  Q.    But what --

16  A.    That's all.

17  Q.    You expect your options to be reasonable ones,

18  wouldn't you?

19  A.    Absolutely.

20  Q.    Well, what possible explanation could there be not to

21  count, even if it's just once, not to count 12 women who

22  had varsity participation experience on both the indoor

23  track team and outdoor track team but weren't cross

24  country runners?

25  A.    The explanation is simply that it's possible and I

1    don't know if a subsequent expert, right, is going to

2    characterize those athletes the way you just characterized

3    them.

4    Q.    But you read in Coach Martin's testimony, right?

5    A.    But you're trying to milk a stone here.

6          THE COURT:  Let me interject here there's no

7    point in the two of you arguing with each other.

8    Counsel's point is there's 12 women who aren't included in

9    the report.  I got that.

10         MR. BRILL:  I'll move on, Your Honor.

11         THE COURT:  Okay.

12   BY MR. BRILL:

13   Q.    Do you know Dr. Athena Yiamouyiannis?

14   A.    I do.

15   Q.    And you coauthored some books with her or articles,

16   haven't you?

17   A.    I do not know.

18   Q.    Would you consider --

19   A.    She's a colleague I served on, you know, numerous

20   committees with her and organizations.  I don't remember

21   whether I coauthored anything with her.

22   Q.    Would you consider her to be an expert on Title Nine

23   gender equity issues?

24   A.    Yes, I think she's quite capable.

25   Q.    Are you familiar with the book chapter authored by

1    her on gender equity sports sponsorship and participation?

2    A.    Not offhand.

3    Q.    Well, let me show you --

4    A.    When was it published?

5    Q.    In 2009.

6              MR. BRILL:  I'm going to come back to that, Your

7    Honor.  I'm trying to locate the chapter now.

8    BY MR. BRILL:

9    Q.    Let me go onto another topic.  That's roster

10   management.  Would you agree, Dr. Lopiano, that roster

11   management can be a useful tool for institutions -- I'm

12   going to ask these questions yes or no, that's my first

13   few questions, if you could try.  Would you agree that

14   roster management can be a useful tool for institutions to

15   satisfy prong one of the three part test?

16   A.    Yes.

17   Q.    Would you agree that roster management can properly

18   include both limits on the size of men's teams and

19   increasing the size of women's teams?

20   A.    As long as the standard is equally applied and that

21   would be a desirable result.  As long as the policy

22   standard were applied equally in terms of caps and

23   obviously women aren't to under represent, or over

24   represent, the intent of the cap policy would not be to

25   artificially depress either side but allow it to go to its

1    equal number.

2    Q.    That was a long way of saying yes or no.  I asked

3    that these questions be answered yes or no.

4         I have one more yes or no question for you.  Would

5    you also agree or would you agree that roster management

6    is permissible as long as it does not hurt men's teams to

7    the point that they are not viable or so long as it does

8    not increase women's teams to the point that they do not

9    really have a viable varsity athletic experience, for

10   example, if the added women do not receive coaching, do

11   not compete, do not receive uniforms, et cetera?

12   A.    Not according to the example, the extreme example.

13   Your beginning premise as a generality was pretty decent

14   but your example of completely and extreme position being

15   completely without coaching, that's not how it happens.

16   It happens that the, every athlete has a lower coach

17   instructional time when there are more athletes.  It's not

18   a complete absence of teaching or the complete absence of

19   something.

20            MR. BRILL:  Your Honor, I'm getting frustrated.

21   I would appreciate it if would you ask the witness when I

22   do ask for a yes or no answer if she confine herself to

23   yes or no.  It's taking up my time on cross examination.

24            THE COURT:  You should, if you can answer yes or

25   no or I can't answer yes or no.

1    BY MR. BRILL:

2    Q.   Dr. Yiamouyiannis (sic), the three sentences that you

3    did just read were taken verbatim from your expert report

4    in the Mansurian case, is that not true?

5    A.   I don't know that.

6    Q.   Let me show you excerpt from your report and see if

7    you recognize it.   This was the cover that is the case in

8    which you submitted an expert report?

9    A.   Yes, it is.

10   Q.   And your discussion of roster management is on the

11   next page?

12   A.   Could I see that little section?

13   Q.   Yes, sure.

14   A.   Could do I have to read from here?   Okay.

15   Q.   I think we have an extra copy.

16   A.   I think I'm doing okay.

17   Q.   I was given this by the plaintiff so I assume they

18   have a copy.   It's Dr. Lopiano's expert report in the

19   Mansurian case.   I don't want to offer the whole report, I

20   just want to call the witness' attention to the page that

21   I was referring to on roster management.

22        (Hands witness.)

23   A.   Thank you.

24   Q.   I just want you to read that and without going into

25   detail because we have the document, whether that report

1   that you gave in Mansurian accurately reflects your

2   position on roster management.

3   A.   If you take the entire section in its totality it

4   does but I am hesitant to agree with, without reading the

5   whole thing, to agree with one statement out of context

6   and I think that's only fair.

7   Q.   That is fair.

8           MR. BRILL:  And, Your Honor, I'll offer that

9   section of the report as the next defendant's Exhibit.

10          MS. GALLES:  No objection.

11          THE COURT:  All right, that's fine.

12          THE CLERK:  That's G L.

13          MR. BRILL:  That's G L, thank you.

14          THE COURT:  You'll prepare an excerpt that

15   includes just the portion that you're offering?

16          MR. BRILL:  Excuse me?

17          THE COURT:  Can you prepare a copy that has only

18   the portion that you are offering?

19          MR. BRILL:  Yes, that's what I handed to the

20   clerk and we'll make a copy.

21          MS. GALLES:  Your Honor, we would object to

22   taking a snippet out of the report, Dr. Lopiano said if

23   you take the whole thing in context.  We do not object to

24   the entire report coming in but if he's only going to take

25   out a small part --

```
 1              THE COURT:  I think he offered a section.

 2              MR. BRILL:  The entire section on roster

 3    management, Your Honor.

 4              THE COURT:  If you -- do you object to the

 5    section on roster management being --

 6              THE WITNESS:  I haven't seen it.

 7              MS. GALLES:  No objection if the entire report

 8    comes in.  In terms of the section on roster management,

 9    we'd like to reserve.

10              THE COURT:  Take a look.  He's offered it so

11    take a look, see if you object.

12              MS. GALLES:  I actually don't have a copy.

13              MR. ORLEANS:  Could we look at a copy?

14              MR. BRILL:  And Dr. Yiamouyiannis --

15              MS. GALLES:  Dr. Lopiano.

16    BY MR. BRILL:

17    Q.   Dr. Lopiano, thank you.  I've now located the article

18    by Dr. Yiamouyiannis which is contained as Defendant's

19    Exhibit G C, if you would take a look at that.

20              MS. GALLES:  Your Honor, if the entire portion

21    regarding roster management is what is being offered we

22    have no objection.  We just don't want a small snippet.

23              THE COURT:  So G L is full.

24              (Whereupon Defendant's Exhibit G L was marked

25         full.)
```

```
 1              THE COURT:  And you'll prepare, can you prepare
 2     a non-highlighted copy of that?
 3              MR. BRILL:  Yes, Your Honor, sure.
 4              THE COURT:  That would be great.
 5     BY THE WITNESS:
 6     A.    I have the exhibit.
 7     Q.    Have you located G C?
 8     A.    G C, I have it.
 9     Q.    Are you familiar with this article, the book chapter?
10     A.    I can't say that I have.  I haven't read the whole
11     thing but I can't say that I have.
12     Q.    Let me show you an excerpt from it and ask if you
13     agree with your fellow expert, Dr. Yiamouyiannis.  In
14     discussing the issue of sports participants, there she
15     says she talks about the duplicated count, unduplicated
16     count?
17     A.    Could you just give me the page?  Where is this?
18     Right here?  It's easy for me to read here, so -- is
19     this --
20     Q.    It's on, the page number's at the top, it's page
21     48 --
22     A.    Okay, hold it.  Okay, this has to do with the Equity
23     in Athletic Disclosure Act?
24     Q.    Correct.
25     A.    Okay, and your question?
```

1   Q.   Why don't you take a moment to read that whole

2   paragraph on sports participants?

3   A.   I'd like to read this whole section if I could.

4   Q.   The whole section on sports participant you can read.

5   A.   I'd like to read the whole section what it's talking

6   about.

7        (Pause)

8        All right, okay, and your question is?

9   Q.   I want to know if you agree with her statement in the

10  paragraph on sports participants, actually the two

11  statements that I've highlighted, first duplicated count

12  is used for determining sport participation opportunities

13  at prong one of the three prong test.  Do you agree or

14  disagree?

15  A.   The EADA --

16  Q.   Yes or no, Dr. Yiamouyiannis -- Dr. Lopiano, I

17  apologize.

18  A.   You know you're really good because I can't even say

19  Athena's last name so I really -- it's good practicing.

20  Q.   I simply want to know, yes or no, do you agree with

21  her statement that the duplicated count is used in

22  determining sport participation opportunities under prong

23  one of the three prong test?

24  A.   Yes, for every sport.

25  Q.   And did you also agree with her statement that this

1    means that an athlete competing in indoor track, outdoor

2    track and cross country would count three times for

3    determining a sport participation opportunities but only

4    once for purposes of assessing financial aid?

5    A.   No, unless -- and I believe I said this before in my

6    testimony that you had the same teams for men and women

7    and it was a statistical wash.

8    Q.   So your position is that how you count cross country,

9    indoor outdoor track and for cross country, indoor outdoor

10   track depends on whether the schools have both men's

11   teams in those sports and women's teams in those sports in

12   general, Dr. Yiamouyiannis --

13   A.   Dr. Lopiano.

14   Q.   Dr. Lopiano.  I'm very sorry.  Does your position

15   depend on whether a school has both men's and women's

16   teams in those sports?

17   A.   Historically, my position does.  When the, when there

18   are different assessments used for men's and women's multi

19   sport, multiple or --

20   Q.   Would it raise -- I'm sorry, did you finish your

21   answer?

22   A.   Yes, I did, thank you.

23   Q.   Would it raise a red flag for you, Dr. Lopiano, if

24   you reviewing an EADA report for a school that eliminated

25   three men's sports and women's, and a women's sport in the

1    following year -- let me start this over again.

2        Would it raise a red flag for you if you were

3    reviewing an EADA report for a school that eliminated

4    men's cross country, men's outdoor track and men's indoor

5    track and eliminated a women's sport as well and the

6    following year reported zero male athletes who were track

7    and cross country and 133 women on the cross country and

8    track teams combined?

9    A.   Yes.

10   Q.   That would raise a big red flag for you, wouldn't it?

11   A.   Yes.

12   Q.   You would want to look into this and see what the

13   story was, wouldn't you?

14   A.   Right.  I would not be counting three sports in that

15   situation.

16   Q.   Now, are you familiar with something called an NCAA

17   gender equity guide?

18   A.   Yes.

19   Q.   As a matter of fact I think you offered it as an

20   exhibit in connection with your testimony?

21   A.   You're correct.

22   Q.   At the preliminary injunction hearing, correct?

23   A.   Correct.

24   Q.   And that was published in 2008?

25   A.   I don't recall.

```
1    Q.   I believe that's Exhibit 25?

2    A.   Do you want me to check that publication?

3    Q.   If you want to look at it, yes.  It's Plaintiff's 25.

4    A.   It's plaintiff's --

5    Q.   Plaintiff's 25?

6    A.   I thought it was in -- okay.

7    Q.   And are you familiar with the discussion of roster

8    management in the NCAA gender equity?

9    A.   No, I can read it again if you point me where it is.

10   Q.   On pages 180 and 181.

11   A.   How much of this do you want me to look at?

12   Q.   I just wanted to ask you if you were familiar with

13   the NCAA's position that the practice of adding spots to

14   current women's teams increases women's opportunities

15   without adding a brand new women's sport team which

16   carries a challenge of securing money for salaries for a

17   new staff, operating budget, and sometimes new facilities?

18   A.   And your question is?

19   Q.   Were you familiar with the fact that that is the part

20   of the NCAA's statement on roster management contained in

21   their gender equity?

22   A.   I would object to taking, pulling that out and not

23   reading that from the very top and understanding what

24   roster -- how they are presenting roster management, when

25   previously over represented sex with all, with no limits
```

1    as to their participation typically men, and then you're

2    trying to raise opportunities for women you have limited

3    financial resources.  Then by using the same cap for men

4    and women will be the same cap for men and women which

5    roster manages both in an equal basis, yes, those overly

6    represented athletes may have the, may be disadvantaged in

7    not having the opportunity to compete that they previously

8    had.  I agree with that statement and that context.

9    Q.   So you would agree with the final summary here that

10   in summary, if maximums for men and minimums for women are

11   truly fair, this practice can assist administers in

12   predicting more accurately future expenditures in each

13   sport?

14   A.   No.

15   Q.   No, you don't agree with that?

16   A.   No, I think it has to be a cap for both, not have

17   maximums and minimums, there should be caps without

18   floors.

19   Q.   That is what I just showed you, you recognize is the

20   position of the NCAA in the gender equity guide?

21   A.   That's their gender equity guide.

22   Q.   Okay, I want to move onto the subject of competitive

23   cheer.  You, at least in your report and I believe in your

24   testimony this morning, you said that -- I'm going to

25   refer to the sport as competitive cheer, do you understand

1   I'm not talking about sideline cheerleading?

2   A.    I do.

3   Q.    That in order for competitive cheer to be counted as

4   a sport, Quinnipiac would have to schedule, have to have a

5   full schedule of competition against other varsity

6   programs, is that your testimony?

7   A.    It is one of the criteria we looked at.

8   Q.    And you state that a competition against the club

9   team would not qualify the team as varsity, correct?

10  A.    You'd have to look at all of those criteria in

11  totality.  You couldn't say that any one of them was, you

12  know, this completely discriminates you, you have to look

13  at all of them.

14  Q.    But you do say in your report the competition against

15  a team does not count in qualifying a team as varsity,

16  correct?

17  A.    I explained this in my testimony.  That you can have

18  anything you want on your schedule, that you don't see

19  that in Division I, and you -- it would be a -- if the men

20  don't have it and the women are forced to play lower level

21  competition, that that is the point of contention, in

22  terms of equal opportunity for women to have a varsity

23  experience.  The men don't have, you know, club teams on

24  their schedules.  You would look at that as a reason to be

25  concerned.

1    Q.   Dr. Lopiano, let's talk about emerging sports for

2    men.  Isn't it true, yes or no, that schools who sponsor

3    teams competing in emerging sport often compete in club

4    teams, yes or no?

5    A.   Yes, it's the nature of emerging sports in fact at

6    NCAA, which cheerleading is not.

7    Q.   Excuse me?

8    A.   Which cheerleading is not.

9           MR. BRILL:  Please, Your Honor, please ask the

10   witness not to volunteer statements.  I asked her a

11   question and I didn't ask her whether cheerleading --

12          THE WITNESS:  That was my --

13          THE COURT:  All right, okay.

14          MR. BRILL:  I'm sorry, it's becoming

15   antagonistic.

16          THE COURT:  She understands.  Next question.

17   BY MR. BRILL:

18   Q.   You recognize, don't you, that the NCAA rules with

19   respect to emerging sport expressly require there be 20 or

20   more varsity teams or competitive club teams that exist on

21   college campuses in order for a sport to qualify as

22   emerging sport?

23   A.   If you say that's what's in the rule book, I believe

24   you.  The details of it right now this second without

25   looking at the rule, I can't attest to.

1    Q.    You don't know if in fact all 20 of these teams could

2    be club teams, correct?

3    A.    Without -- you're asking me without even looking at

4    the NCAA rules to say something is correct and I'm very

5    uncomfortable with that.

6    Q.    All right.  In fact, isn't it true that a number of

7    sports currently recognized as emerging sports by the NCAA

8    do not have even ten schools that sponsor the sport at a

9    varsity level?

10   A.    I do not know that.

11   Q.    Well, look at Exhibit F to your report, which is

12   Exhibit 105 in the exhibit book.

13   A.    Under page, NCAA participation, which page --

14   Q.    Page 65?

15   A.    Thank you.

16   Q.    And that page shows the current list of recognized

17   emerging sport, does it not?

18   A.    Okay, so you're on page --

19   Q.    Sixty-five.

20   A.    Sixty-five.  Okay, emerging sports.  Got it.

21   Q.    And if you look down to the bottom and if you look to

22   the right hand column which is headed overall, in other

23   words, combined divisions one, two and three?

24   A.    Right.

25   Q.    The total number of schools sponsoring each one of

1    those sports appears there, is that correct?

2    A.    That is correct.

3    Q.    So there's one in archery, two in badminton, five in

4    rugby and eight in swimming, right?

5    A.    Right.

6    Q.    So doesn't it follow that schools competing in these

7    emerging sports necessarily are competing against teams

8    other than other varsity teams?

9    A.    That would be a good deduction.

10    Q.    And isn't it also true that a sport does not need to

11    be recognized as a NCAA championship or emerging sport for

12    a school to count that sport as a varsity sport for Title

13    IX purposes?

14    A.    Okay, repeat that question.

15    Q.    A sport does not need to be recognized by the NCAA as

16    either a championship sport or an emerging sport in order

17    for a school to count that sport for Title IX purposes?

18    A.    Yes, it does.

19    Q.    Well --

20    A.    Okay, so -- okay.  You started this by saying let me

21    talk about cheerleading; are we talking about cheerleading

22    or not?

23    Q.    I'm asking the questions, Dr. Lopiano.

24    A.    No, you prefaced, you prefaced all of this with let

25    me talk about cheerleading.

```
 1              THE COURT:  Ma'am, let him ask the next
 2    question.  Okay.
 3    A.    Okay.  Go ahead.
 4    Q.    Let make it simple.  There are schools that sponsor
 5    men's varsity squash, for example, right here at Yale they
 6    have a squash team for men, don't they?
 7    A.    Right.
 8    Q.    And squash is not, men's squash is not a championship
 9    sport.  In fact, emerging sport are only for women, right?
10    A.    Right.
11    Q.    So squash is not an NCAA sport?
12    A.    Right.
13    Q.    Can you count squash for Title IX purposes?
14              THE COURT:  Well, squash is a male
15    nonchampionship sport.  Is that an emerging sport or not?
16              MR. BRILL:  No, it's not an NCAA recognized --
17    this page only talks about emerging sports for women.
18    BY MR. BRILL:
19    Q.    There are no emerging sports for men, is that
20    correct, Dr. Lopiano?
21              THE COURT:  There are not emerging sports for
22    men?
23              MR. BRILL:  No.
24              THE COURT:  Not even nonchampionship sports.
25              MR. BRILL:  You have to go to the next page.
```

1            THE COURT:  That's what I'm looking at, page

2     six.  What are non championship sports for men.

3            MR. BRILL:  There are none.  There are only

4     championship sports for men.

5            THE COURT:  Archery, badmitton, bowling,

6     equestrian, rowing, rugby and squash are listed --

7            MR. BRILL:  Oh, I see what you're saying.  Those

8     are sports -- you want me to explain?  Those are sports

9     that schools can self report to the NCAA, that they

10    participate in the sport even if it's not a championship

11    sport.  So the NCAA will report participation statistics.

12    We can clarify this with Dr. Yiamouyiannis who worked at

13    the NCAA when she testifies but those are sports that are

14    not recognized by the NCAA.  In other words, those sports

15    don't count for purposes of determining minimum sports

16    sponsorship for any other purpose except the NCAA collects

17    statistics on them.  And we can confirm that with

18    Dr. Yiamouyiannis.

19            THE COURT:  Okay.

20    BY MR. BRILL:

21    Q.   In any event, let me go on.

22         Women's wrestling is not a NCAA championship or

23    recognized emerging sport, is it?

24    A.   It is not listed.

25    Q.   And in the Mansurian case, however, you took the

1    position that women wrestlers at U C Davis were varsity

2    athletes, correct?

3    A.   Yes.

4    Q.   And you testified, did you not, that it didn't matter

5    whether they competed against wrestlers on other college

6    teams?

7    A.   That is correct.

8    Q.   You testified in that case competition against other

9    women who were open amateur athletes was sufficient?

10   A.   That is correct.

11   Q.   And in fact, you said neither Title IX nor NCAA rules

12   require them to compete against other college teams,

13   right?

14   A.   That is correct.  This is all NCAA.  You're not

15   saying that Title IX requires.

16   Q.   Didn't you testify specifically --

17   A.   Yes, and I'm just clarifying that you said, you're

18   saying that's what I said in terms of NCAA.

19   Q.   And in Mansurian, didn't you testify -- Mansurian was

20   about Title IX, was it not?

21   A.   It was.

22   Q.   And didn't you testify that nothing in either Title

23   IX or the NCAA rules require those wrestlers at U C Davis

24   to compete against other college teams?

25   A.   Right, and the reason why I'm clarifying this is I

1    feel as though you're taking this little small piece of

2    testimony in Mansurian which does not relate to the larger

3    list of what it takes to be a sport and you're insinuating

4    because I said wrestling was a sport which has a national

5    governing body which has all the pieces of the puzzle,

6    that you're going to then say, oh well, wrestling is a

7    sport, cheerleading is a sport and, you know, it's apples

8    and oranges and you're trying to lead me to that point and

9    I don't think it's accurate for the court.

10    Q.  Well, I'm asking you to relax and not worry about

11    where I'm leading you, Dr. Lopiano, and just answer my

12    question.  All I'm asking you in this case you testified

13    in your report -- let's go back and see it, that in order

14    to count as a varsity sport, that a team would have to

15    compete against other college competition?

16    A.  Yes.

17    Q.  But you testified --

18    A.  Among those and among others.

19    Q.  But that was one of the factors you pointed to?

20    A.  Right, exactly.

21    Q.  And I'm only asking so that factor you said in

22    Mansurian, that factor did not matter in Mansurian, did

23    it?

24    A.  Yes --

25    Q.  Yes or no?

1    A.    Yes, it was one of the factors.

2    Q.    You said it didn't matter in Mansurian that they

3    didn't compete against other colleges, right?

4          Do you want me to show you the testimony?  Would that

5    help you?

6    A.    The way you're phrasing the question is confusing me.

7    Say it once more.  Say it once more.  I said that in

8    Mansurian.  All I'm concerned about is context, apples and

9    oranges, but that's okay.  I will say yes -- it's yes.  If

10   it's in context along with the other stuff, the other

11   criteria of a sport.

12   Q.    Isn't it true that, well -- withdrawn.  Withdraw

13   that.

14         Are you aware that Quinnipiac has recruited athletes

15   for the competitive cheer team for 2010, 2011?

16   A.    2010, 2011.

17   Q.    For next year?

18   A.    No.

19   Q.    And you talked about how schools would need a one

20   year ramp up period to start a new sport, but are you

21   aware that in this case members of the Quinnipiac sideline

22   cheerleading squad were engaging in competitive events for

23   several years before 2009, 2010?

24   A.    Was I aware they were?

25   Q.    Yes.

1    A.    Engaging in competitive events?

2    Q.    Yes.

3    A.    Yes.

4    Q.    And nothing in Title IX, OCR rules or the NCAA

5    regulations require a national search for coach of a new

6    sport or any sport for that matter --

7    A.    Absolutely not.

8    Q.    Correct?

9    A.    Yes.

10   Q.    And have you ever seen a Quinnipiac university

11   competitive cheer team compete?

12   A.    No.

13   Q.    Have you ever seen any member of the NCSTA -- do you

14   know what the NCSTA is?

15   A.    I think something told me that.

16   Q.    The National Competitive Stunts and Tumbling

17   Assocation?

18   A.    Your question is what?

19   Q.    Have you ever seen any school that's a member of the

20   NCSTA compete in competitive cheer?

21   A.    No.

22   Q.    So when you testified this morning that in your

23   opinion competitive cheer is not a sport, you were

24   saying that without ever having witnessed anybody engage

25   in competitive cheer, is that correct?

1    A.   Watching a sport isn't required.  I don't get your

2    point, in other words.  I didn't watch it.

3    BY MR. BRILL:

4    Q.   I'm not making a point, Dr. Lopiano.  This is not a

5    debate.  I just want to get facts on the record.

6    A.   I have not seen those schools participating in

7    competitive cheer.

8    Q.   Now, the April 11th, 2000 letter that you referred

9    to --

10   A.   April 11 --

11   Q.   2000 letter from OCR, Exhibit 108.

12   A.   Okay.

13   Q.   Do you have that?

14   A.   Okay.

15   Q.   That letter states that OCR's practice is to assess

16   each activity on a case by case basis, correct?

17   A.   Correct.

18   Q.   Taking into account the types of inquiries described

19   in the letter to determine whether the activity is a

20   sport, correct?

21   A.   Are you reading from it?  Are you quoting from it?

22   Q.   Yes.

23   A.   Then I would assume it's correct.  I didn't follow

24   exactly where you were.  I was wondering whether you were

25   asking me or whether it was them.

1    Q.   Now, the 2008 Dear Colleague letter which is Exhibit

2    109, that's the one that you said clarified in some

3    respects --

4    A.   109, okay.

5    Q.   That didn't change the OCR's position that it does

6    not have a specific definition of the term sport and

7    instead makes a determination in each case based on case

8    by case evaluation, correct?

9    A.   That is correct.

10    Q.   And nothing in that letter suggests that competitive

11    cheer is not subject to the same case by case

12    determination, is there?

13    A.   That is correct.

14    Q.   And OCR, in fact, if you look at the first page of

15    the letter I think you'll see, if you agree with me, the

16    second page, I'm sorry, that OCR considers the factors

17    listed to make a, quote, overall determination, close

18    quote, of whether the activity can be considered part of

19    an institution's intercollegiate athletic program for

20    purposes of Title Nine compliance, correct?

21    A.   Correct.

22    Q.   And OCR also emphasized in that letter, does it not,

23    that its policy is to encourage compliance with Title IX

24    in a flexible manner that expands rather than limits --

25    A.   Are you reading from this?  So I'm, I'm attesting to

1    whether or not you're reading correctly?

2    Q.   Do you see that in the letter?  I can point the --

3              THE COURT:  If it's in evidence you can just

4    read it.  You don't have to have her acknowledge it says

5    that.

6              MR. BRILL:  Rightly.  I'll read this into the

7    record.

8              THE COURT:  Fine.

9              MR. BRILL:  It is OCR's policy to encourage

10   compliance with Title IX, and this is on the last page the

11   second to the last paragraph, to encourage compliance with

12   Title IX athletics regulations in a flexible manner that

13   expands rather than limits student athletic opportunities.

14   By disseminating this list of the factors OCR intends to

15   provide institutions with information to include new

16   sports in their athletic programs, such as those athletic

17   activities not yet recognized by governing athletics

18   organizations and those featured at the Olympics games if

19   they so choose.  Expanding interscholastic and

20   intercollegiate athletic opportunities to new new sports

21   can benefit students by creating and stimulating student

22   interest in athletics, taking advantage of athletic

23   opportunities specific to a particular competitive region

24   and providing the opportunity for access to a wide array

25   of competitive athletic activities.

```
1    BY MR. BRILL:

2    Q.   And going back to the NCAA gender equity guide, if

3    you would, Dr. Lopiano, Exhibit 25?

4    A.   I'm sorry, say it again?

5    Q.   Paragraphs Exhibit 25.

6    A.   Okay.

7    Q.   Would you turn to page 20 which is what is a

8    athletics team for purposes of Title IX.

9              MS. GALLES:  I'm sorry, what page did you say

10   please?

11             MR. BRILL:  Page 20.  Plaintiff's Exhibit 25,

12   page 20.  It's paragraph three A, what is an athletics

13   team for purposes of Title IX.

14   BY MR. BRILL:

15   Q.   Do you see that?

16   A.   I do.

17   Q.   And, Your Honor, I'd just like to point, could I just

18   call the court's attention to the following?

19             THE COURT:  Absolutely.

20             MR. BRILL:  Language that appears on page 21?

21   Although men's rowing clearly appears to meet the test,

22   the status of other team activity such as competitive

23   cheerleading, rodeo and judo are not as clear the OCR has

24   taken the position that cheerleading squads, for example,

25   or support services and not varsity programs.  This view
```

1    has begun to change as competitive opportunities for

2    cheerleading have increased nationally and as schools

3    offer coaching, practice facilities, equipment and

4    scholarship opportunities to squad members who compete

5    against squads at other colleges and universities.  It

6    should be noted that the OCR and its regional officers

7    have not uniformly accepted competitive cheerleading as a

8    sport under Title Nine but, rather, continue to evaluate

9    each program on a case by case basis.

10   BY MR. BRILL:

11   Q.   Now, Dr. Lopiano, do you know if the NCAA has issued

12   any further statement with respect to competitive cheer

13   since the 2008?

14   A.   I do not know.

15   Q.   In your report, you refer to a statement in the NCAA

16   form --

17   A.   Which report?

18   Q.   I'm sorry, your original report, you refer to a

19   statement in the NCAA and EADA reporting form that was

20   used in 2002, Plaintiff's Exhibit Seven?

21   A.   Where are you in this report?

22   Q.   I'm sorry?

23   A.   Where are you?

24   Q.   I'm not, I can't give you the exact page now but do

25   you recall that you referred to the 2002 reporting form

1    Exhibit Seven?  Would you look at Exhibit Seven.

2    A.   Plaintiff's Exhibit Seven?

3    Q.   Seven, yes.  I think this was the form that you said

4    there was something on page two, you changed your report

5    to say the statement appeared on page two.

6    A.   So it's my let's see  --

7         THE COURT:  Exhibit G.

8    A.   No, that's an exhibit.  I didn't mark an exhibit

9    there.  This is also, the NCAA is pointing out without

10   looking at the exhibit --

11   Q.   Let me just short circuit this, Dr. Lopiano.  Try and

12   save sometime.  You refer, first of all, 2002 there was no

13   college sponsoring competition only, competitive cheer

14   team, correct?

15   A.   I do not know.

16   Q.   You don't know of any school that was sponsoring a

17   competition?

18   A.   I don't know that.

19   Q.   And do you know whether that same form that was used

20   in 2002 is being used today by the NCAA form that was

21   introduced as Plaintiff's Exhibit Seven?

22   A.   Where is Plaintiff's Exhibit Seven?

23        MR. ORLEANS:  Plaintiff Exhibit Seven is the

24   1996 clarification.

25        MR. BRILL:  Oh, it is?

```
1          MR. ORLEANS:  Yes.
2          MR. BRILL:  Then I have the wrong exhibit number
3   and I apologize.  I'll come back to that.
4   BY MR. BRILL:
5   Q.   Now, the Women's Sport Foundation position on
6   cheerleading that you said you helped draft, what year was
7   that adopted?
8   A.   I cannot recall.
9   Q.   It was prior to 2003, was it not?
10  A.   I don't know.
11  Q.   Do you know whether at the time you adopted that
12  position, that the Woman's Sport Foundation adopted the
13  position, whether there was any compete only competitive
14  cheer team at any college?
15  A.   I do not know.
16  Q.   And that report does say under certain circumstances
17  cheerleading could be considered a sport, correct, in the
18  view of the Women's Sports Foundation, correct?
19  A.   Yes.
20  Q.   And that those circumstances are set forth in the
21  statement, correct?
22  A.   Correct.
23  Q.   Now, I want to ask you about the language that you
24  referred to in your testimony this morning that appears in
25  the, on page 19 of the instructions to the EADA form.  I
```

1    believe that's Defendant's, I believe that's Exhibit 110

2    but my exhibit numbers may be slightly discombobulated,

3    the NCAA instructions.

4    A.    Yes.

5    Q.    And the paragraph you read earlier says and let me

6    just read it again -- to be considered a sport under --

7    A.    So what page is this?

8    Q.    This is on page 19 of that exhibit.  To be considered

9    a sport under the EADA, an activity's primary purpose must

10   be to engage in intercollegiate competition.

11        Stopping there for a minute, do you know whether or

12   not the Quinnipiac University competitive cheer team has

13   has a primary purpose of engaging in intercollegiate

14   competition?

15   A.    I would guess it does.

16   Q.    It does.  And the second sentence says if you

17   indicate in the caveat box that your other sports are

18   dancing and/or cheerleading, please also specify in the

19   box that your institution has a letter from the Office of

20   Civil Rights confirming that the OCR has determined that

21   dancing and/or cheerleading are varsity sports at your

22   institution, right?  That's what you were pointing to this

23   morning?

24   A.    Right.

25   Q.    Now, that instruction first appeared in the EADA

1   instructions for reports to be filled out for 2009, 2010,

2   correct?

3   A.   I don't know.

4   Q.   That was not in the, you don't know that that was not

5   in the instructions prior to this year?

6   A.   No -- I cannot recall.

7   Q.   Okay.  Do you know whether OCR has provided any

8   written explanation of that instruction?

9   A.   The only reference I can -- well -- I do not know, I

10  do not know.

11  Q.   And assuming, and we'll link this up, Your Honor,

12  that the instruction first appeared for reports to be

13  filed for the '09, '10 year, those reports aren't due

14  until October of 2010, correct?

15  A.   You're asking me to assume --

16  Q.   You know what?  I don't need to ask you to assume

17  anything --

18  A.   I'm just trying to get your question.  You're trying

19  to get me to say yes to that, assuming that --

20  Q.   I'm going withdraw my question.

21  A.   This is my first time, this is the first time this

22  appeared, right?  If that is true, you would like me to

23  say yes or no whether I agree that it would apply to the

24  next year for the first time, and if you want me to assume

25  that, I will be willing to say yes, if both of those

1    things, if that's true.

2    Q.   And so you asserted this morning and you state on

3    your report that a school, in your opinion a school cannot

4    count cheer as part of --

5    A.   Where are you?  Are you on my report now, back to my

6    original report?

7    Q.   Well, you testified to it this morning, Dr. Lopiano.

8              THE COURT:  Let me interrupt.  Mr. Brill, how

9    long how much longer do you have?

10             MR. BRILL:  I have about two more minutes, Your

11   Honor.

12             THE COURT:  All right, let's go.

13   BY MR. BRILL:

14   Q.   You heard this morning that a school cannot count

15   cheer as part of prong one unless and until it receives

16   approval from the OCR?

17   A.   That is correct.

18   Q.   That's your testimony, right?  And didn't you testify

19   to precisely the opposite of that at your deposition in

20   this case in advance of the preliminary injunction

21   hearing?

22   A.   I don't believe I did.

23   Q.   I'd like to show the witness a copy of her pages 207

24   to 209 of her deposition, Your Honor.

25             THE COURT:  Well, if you're impeaching her why

1  don't you --

2          MR. BRILL:  What's that?

3          THE COURT:  If you're peaching her, why don't

4  you simply read it out loud, question and answer.

5          MR. BRILL:  Thank you.  It's a rather long

6  passage, I apologize.  I'm going to -- actually I'll put

7  it up on the Elmo so you can follow along.

8          Didn't you testify at this point at your

9  deposition, all right, I asked you for your -- for the

10 authority for what I perceived to be your contention that

11 this multi part test had to be administered in advance for

12 OCR to even begin to apply the five part test and you

13 referred me to the case by case basis language, did I

14 understood?

15         I'm going skip the colloquy of counsel and you

16 answered, I repeat what I said earlier, two to three times

17 that I have never -- you may have mismisunderstood but I

18 have never said that singularly it is a case by case

19 statement which the reason why an institution should have

20 OCR come in and look at it.  I said it was that in

21 combination with the suspect nature of cheerleading and

22 the inability of cheerleading to comply with this test,

23 these test queries that would lead me to believe that

24 there was a high risk proposition for anyone to depend on

25 just establishing cheerleading and assuming that it would

1    be considered a sport.  So I --

2            Question:  But it's not.

3            Answer:  No, you keep on going back to this case

4    by case when that's not what what I said.

5            Question:  Okay, so to clear it up, there is no

6    legal requirement that this assessment be done in advance.

7    It is your recommendation it would be unwise not to do it

8    with OCR, but there is no legal requirement that an

9    advanced in assessment can done with OCR of its

10   competitive cheer team as part of the compliance test that

11   it done in advance.

12           Answer:  It is absolutely true that every

13   institution puts its athletic program together and until

14   OCR or a court looks at it, these issues do not come up.

15   My point with cheerleading is that this is a very high

16   risk area for you to have cheerleading be the lynch pin

17   for your prong one or any prong compliance, and that's why

18   I recommended it, and --

19           Question:  Fine.

20           Answer:  I recommended that OCR come in first.

21           Question:  Okay, but so there is no legal

22   requirement OCR come in first, is that true or false?

23   There's no legal requirement OCR do this in advance?

24           Answer:  Yeah, there is no requirement that OCR

25   come in and attest to anything about your sport program.

1          Question:  Thank you.

2          In fact every sport presumably would be

3     subjected to this multi part test.

4          Question:  Every sport presumably can be put to

5     this test by OCR in audit, correct?

6          Answer:  Absolutely, and my point -- sorry.

7     Absolutely, and my point was with in record to

8     cheerleading that this is an activity that is so highly

9     suspect and without the federation and governance and

10    national championship basis of all other sports that are

11    in athletic programs commonly, that you'd have to be a --

12    not astute athletic director to put your institution at

13    risk like this.

14         Question:  So it's risky not to do it in advance

15    when it's not required?

16         Answer:  That's a fair statement.

17         And you gave this testimony at the preliminary

18    injunction, did you not?

19    A.   Well --

20    Q.   Yes or no.  I'd like to know, yes or no, is that your

21    testimony?

22    A.   Yes, in the context of legality.

23    Q.   Thank you.

24    A.   That it does not appear in the Title IX regs that you

25    have to check cheerleading with, with your -- with OCR.

1    It appears in a clarification letter that I was

2    distinguishing between legal and what that requirement was

3    that you have to get OCR approval.  And it's legal that I

4    was answering to.  You kept on saying is it legally

5    required, is it legally required, and I'm making a

6    difference between Dear Colleague letter which says you

7    shall and what was in, you know, the regs.  That is my

8    intent.

9              MR. BRILL:  Your Honor, I'm sorry.  I do have a

10   follow up question.

11             THE COURT:  Go ahead, Mr. Brill.

12   BY MR. BRILL:

13   Q.   Yes.  Dr. Lopiano, what clarification letter were you

14   referring to that requires the school to get OCR

15   permission in advance before counting it as a sport for

16   Title IX purposes?

17   A.   When it says -- you know, getting tired here.  When

18   is it says in instructions to the EADA report that you

19   don't include cheerleading without first getting a letter

20   from OCR, the EADA instructions to me are not a, a part of

21   the EADA law.  It's instructions.  And this was, this

22   excerpt, Your Honor, was after a long interchange about

23   what was the nature of this requirement.  Was it a legal

24   obligation, was it a high risk proposition, was it

25   somewhere in the middle, and I was saying it was here and

1    it was here.  That it wasn't part of the original law, it

2    is definitely an OCR position.  And also as an athletic

3    director I wouldn't dare like make that the lynch pin of

4    any prong one compliance piece without getting that letter

5    and that was my position.  And it still is my position.

6    Q.   And there's nothing that you can point to, is there,

7    Dr. Lopiano, that would require a school to give OCR

8    approval of a competitive cheer team before counting as a

9    varsity sport except for the instructions to the EADA form

10   that I showed you just a few minutes ago?

11   A.   That is correct.

12   Q.   And as you testified we don't know what the OCR meant

13   by that because it's not self explanatory?

14   A.   (Pause)

15        Are you asking me something?

16        MR. BRILL:  I withdraw that, Your Honor.  I

17   don't want to be arguing with the witness.  I think her

18   testimony is clear.  I'd like, before I close my cross I'd

19   just like a minute during break to review my notes.  Or

20   would you rather --

21        THE COURT:  Why don't you do it now.  I'd rather

22   break after you finish cross.

23        MR. BRILL:  I'll close my cross now.

24        THE COURT:  Okay.  All right.  Let's take a 15

25   minute break and stand in recess until 3:55.

```
1              (Whereupon a recess was taken from 3:55 o'clock,

2         p. m. to 4:10 o'clock, p. m.)

3    REDIRECT EXAMINATION

4    BY MS. GALLES:

5    Q.   Dr. Lopiano, I'd like to, if you would start off

6    where Mr. Brill left off which is Exhibit K of your

7    report, the EADA users guide?

8    A.   Okay.

9    Q.   Now, Mr. Brill, if it is true as he indicated that

10   this section about --

11   A.   Where are you?

12   Q.   This is page 19, yes?

13   A.   Okay.

14   Q.   If it is true that that section is new, and that it

15   will only apply to to 2009, 2010, okay, if that is true,

16   then wouldn't Quinnipiac have to get such a letter to

17   count its cheer starting next year?

18           MR. BRILL:  Objection, Your Honor.  This witness

19   is not in a position to interpret the OCR language.

20   With -- she said she has, they've not issued a

21   clarification of this language.  Anybody in this courtroom

22   can interpret if as well as this witness.

23           MS. GALLES:  He examined her extensively about

24   her view of it.

25           MR. BRILL:  There are two opposing thoughts in
```

1   that paragraph.

2           THE COURT:  Well, all right, I think it's speaks

3   for itself.

4           MS. GALLES:  Okay.

5   BY MS. GALLES:

6   Q.   Dr. Lopiano, I want to refer you to page four of your

7   supplemental report, please.

8   A.   Okay.

9   Q.   Where we're talking about the numbers.

10  A.   Yes.

11  Q.   Okay.  Mr. Brill kept saying that you weren't

12  counting cheer and you weren't counting cheer.  Now, on

13  those numbers, if there were an order to account for

14  cheer, how would you do that?  Like if there were 30

15  cheerleaders, then the numbers would be --

16  A.   I explained in each of these cases that you would add

17  30 -- sorry, 30 would offset the -- if I'm looking at the

18  conclusion, the first column A, and cheer would count,

19  then the gap of 28 would be reduced with, to two as long

20  as you kept volleyball.  And if you didn't keep

21  volleyball, then it's 41 minus 30, it would be 11 and

22  you'd have to add another team like golf or something that

23  would make up that discrepancy, and that applies to every

24  single column.  You would make that adjustment in what the

25  gap would be.

1    Q.   So with the number, with the calculation of the gap,

2    that tells you how many sports, additional sports

3    opportunities Quinnipiac would have to provide?

4    A.   That is correct.

5    Q.   And no matter what they claim those opportunities

6    are, cheer, track, rugby, whatever?

7    A.   Correct.

8    Q.   Now, I'd like to direct your attention to your

9    charts, the Exhibit A or I believe it's 150?

10   A.   Okay.

11   Q.   And I just want to make clear that reasons one

12   through five -- okay, well, let's look, for instance,

13   reason number two, they are injured and still on aid; can

14   that be tied directly to the 1979 or 1996 policy

15   clarification?

16   A.   Yes.

17   Q.   Okay?  Reason number three, a red shirt as designated

18   by the school, can that be tied directly to the 1979 and

19   '96 clarification?

20   A.   Yes.

21   Q.   The reason number four, that's on the squad list on

22   the first day of competition just as Mr. Brill discussed,

23   correct?

24   A.   Yes.

25   Q.   Okay.  And reason number one is they actually played

1    in a game, does it not?

2    A.    Yes.   That's also tied to the same thing as, it's in

3    general the squad eligibility list.

4    Q.    And so you looked at the eligibility list to see if

5    they used up their NCAA eligibility for the year?

6    A.    Yes.

7    Q.    Okay, and reason number five is if they were on the

8    squad list the first day of competition in the

9    nontraditional seasonal?

10   A.    Correct.

11   Q.    Okay.   So for reasons one through five, are those

12   tied directly to what Mr. Brill was discussing in terms of

13   the first day of competition or actually competing?

14   A.    I believe they are.

15   Q.    Okay.   So, also in terms of the ice hockey, Mr. Brill

16   gave some examples of those ice hockey athletes, those six

17   athletes that he identified that you red flagged, you

18   actually, did you actually count them in your column A?

19   A.    I'm trying to find --

20             MR. ORLEANS:   The women's ice hockey.

21   A.    Women.

22   Q.    Women's ice hockey, yes?

23   A.    Yes, all but Christine Fenoia.

24   Q.    Okay, so the six that he was talking about, that he

25   was talking about earlier in terms of column A, you

```
 1      counted these ice hockey women, right?

 2                 THE COURT:  Four of the six.

 3                 MS. GALLES:  Excuse me?

 4                 THE WITNESS:  Yes, you're absolutely right.

 5                 THE COURT:  Carry Wilson, two of them are

 6      listed.

 7                 THE WITNESS:  They were, they were counted in

 8      different column.

 9                 MS. GALLES:  Yes, so I'm looking at were they

10      counted for under --

11                 THE WITNESS:  One through four?

12                 THE COURT:  One through four.  Got it, okay.

13      BY MS. GALLES:

14      Q.   And were all six of them counted in columns A and B

15      of your summary chart?

16      A.   Yes.

17      Q.   Okay, so the only place --

18      A.   Yes, one through four, yes.

19      Q.   So the only place where you made an adjustment was in

20      column C, the red flag column?

21      A.   That is correct.

22      Q.   Okay.

23                 THE COURT:  Are we going to seat the Seeley

24      email?

25                 MR. BRILL:  I'm sorry, what did you ask, Your
```

1    Honor.

2              THE COURT:  Are we going to see the S-E-E-L-E-Y

3    email?

4              MR. ORLEANS:  Yes, Your Honor.

5              MR. BRILL:  Well, over our objection, Your

6    Honor.  The emails are hearsay.  We offered to have Hope

7    Seeley available, they spoke to him --

8              THE COURT:  Okay, if it's not being offered at

9    this moment, I'm just asking whether that's going to be

10   offered at some point or whether we should talk about it

11   through this witness.

12             MR. ORLEANS:  It will be offered, Your Honor.

13             THE COURT:  Okay.

14             MS. GALLES:  So we can talk about that later.

15   BY MS. GALLES:

16   Q.   I also wanted to speak about average squad sizes.

17   Mr. Brill put up NEC with broad ranges of the squad sizes

18   for various sports, okay?  If you saw an unusually high

19   number of athletes at any school, not just Quinnipiac, an

20   unusually high number of women in a sport, would that

21   raise a red flag for you?

22   A.   If -- in comparison to the averages.

23   Q.   Yes.

24   A.   It would make me look closer.  And that's what the

25   red flag's intended to do.

1    Q.   And I also want to refer you to Exhibit 25.

2    Mr. Brill took you through the NCAA's discussion of roster

3    management.  Exhibit 25.

4    A.   Okay.  Okay, page number?  Page number?

5    Q.   Page 180.

6    A.   Okay.

7    Q.   Okay, on the Elmo here I've sort of put a, that

8    little bracket is mine.  Okay?

9    A.   Okay.

10   Q.   You read different parts of that section.  I would

11   like you to read the part that I've outlined.  Start where

12   the negatives, see where it says the negatives?

13   A.   The negatives of roster management include the fact

14   that overall, some opportunities are lost for men, it also

15   is possible that so many roster spots are eliminated that

16   team may be rendered noncompetitive.  The way to solve

17   this problem would to be use the traditional team average

18   of roster response as a method to reasonably and fairly

19   cap men's teams.

20   Q.   Okay.  Is that statement regarding one of the

21   negative aspects of roster management one that you agree

22   with?

23   A.   Yes.

24   Q.   Okay.  Would you please read the next paragraph?

25   A.   The opposite problem could occur in women's teams.

 1    If roster management for women's teams may be so high

 2    there are too many people on a team for it to be a

 3    meaningful experience for all.  Using the divisional

 4    average should be a way to reasonably and fairly construct

 5    roster management numbers for women's teams as well.

 6    Q.   Is that, does that paragraph, would you agree with

 7    that particular paragraph as it relates to roster

 8    management?

 9    A.   Yes, my statement, as long as you use the same caps

10    and they are based on average sizes, that that makes

11    sense.

12    Q.   Now, Mr. Brill was talking a lot about Mansurian and

13    women's wrestling.  Is there, do you know of any dispute

14    in the athletic community as to whether wrestling is a

15    sport?

16    A.   No.

17    Q.   And does such a dispute exist regarding cheerleading?

18    A.   Yes.

19    Q.   Now, Mr. Brill also talked about what if you only

20    have a track team with eight or ten athletes on it.  If

21    you were an athletic director and you had only eight or

22    ten athletes on your track team, what would you do?

23    Presuming you're a Division I institution like Quinnipiac?

24    A.   The reason why I'm hesitating with the question is I

25    can't imagine Division I institution not having bona fide

1 track team that would be large enough to compete.  That's

2 all I can say.  What would I do?  I would never have one

3 that small.  That's --

4 Q.  Would you go out and recruit athletes in order to

5 fill those additional spots?

6 A.  Oh absolutely.  My point is that Division I is you're

7 on a level, when you've say I'm going to participate in

8 these sports, you're pretty much saying I'm going to play

9 with these guys under those circumstances and these are

10 going to be my team sizes and things like that.  So

11 whenever you posit just even hypotheticalcally really

12 small teams in Division I or half hearted efforts at

13 particular sports, it doesn't compute to Division I

14 athletics.

15 Q.  Well, I'd like to tie that back into or, into the

16 1979 policy interpretation which is on the front page of

17 your supplemental report.

18 A.  Okay.

19 Q.  Okay?  And for A, it says that you would count

20 participants who are receiving the institutionally

21 sponsored support normally provided to athletes competing

22 at the institution involved, e.g., coaching, equipment,

23 middle and training room services on a regular basis

24 during a sports season, okay?  Could you please explain

25 what that means?

1   A.   Well, the Title IX isn't only about counting based on

2   where are you in the season or anything else.  It's a

3   whole laundry list of requirements, comparative tests that

4   look at how you treat men in your institution, how you

5   treat women in your institution, and it's a list about 11

6   factors and it looks at everything.  And that's, that's

7   this total program look.  That has to be made, and you

8   look at supplies, it's access to the same quality coaches,

9   it's size of schedule, it's quality of schedule, it's

10  access to post season play, it's housing, it's

11  transportation, it's support staff.  It's everything.  And

12  when you look at these things, you really are taking the

13  total program look and that's why it's so important to be

14  fact specific with this.

15  Q.   So if you were looking at varsity, Division I varsity

16  program, and all of the men's teams have level A of

17  varsity benefits, and then you look over at the women's

18  teams, and would it raise any red flags for you as to

19  whether it's a varsity team or not if only a woman's team

20  didn't have a facility to practice in?

21  A.   That in and of itself as a single factor would not.

22  I don't think you can take any one thing and say

23  absolutely, if you fail this test you're out of here or

24  you're in.  It is total program.  And what is good about

25  the OCR regs asking for technical assistance, doing all

1   this is schools are being invited to come in and do this

2   test and to help you to be confident with certainty that I

3   am doing the right thing here and I'm not going to get

4   caught, and that is the struggle that I have with, you

5   know, with cheerleading, that knowing all of this, you

6   have to be a, it's almost an absence of fiduciary

7   responsibility on the part of the administrator not to do

8   it.

9   Q.   Now, I want to focus on, however, looking back at

10  you're looking at the totality of the circumstances, under

11  what circumstances might there be red flags as to whether

12  a program is being run as a Division I varsity program?

13  What kinds of things would you look at?

14  A.   I think you have to look at the, all of the tests

15  under participation which are levels of competition, and

16  whether you're, you know, supporting that program in terms

17  of the same level as the men, as well as numbers of

18  opportunities, whether -- and then you go into the laundry

19  list of recruiting, you know, support -- it's looking at

20  all of it.  I don't know how else to -- I think I keep on

21  saying this, that this total program comparison is, it's

22  not just words.  It's very important to do it that way.

23       And I think it speaks to Mr. Brill's point in terms

24  of flexibility, that this is very flexible.  That's why I

25  don't know why people wouldn't ask for technical

1   assistance to determine it.  That's what confuses me,

2   because if you trust in the flexibility, if you trust in

3   the law, then you go and you, you know --

4   Q.   Sure.

5   A.   You get the word out.

6   Q.   I'd also like to, we were talking about wrestling

7   we're talking about cheer.  If an athletic director, if I

8   came up to you and said my school, my school is going to

9   start Run Pass Tackle next, would that raise a red flag to

10  you as to whether that could be counted as a sport at the

11  Division I level?

12  A.   Yes.

13  Q.   And why is that?

14  A.   Because I don't know if there's a N G B in that

15  sport.  I don't know anything, I don't know whether or not

16  any of the list of criteria could probably be met with the

17  name of this new thing.  I don't know if anybody plays it,

18  if there's --

19  Q.   So would you supply the same criteria as were

20  discussed in the 2008 --

21  A.   Yes.

22  Q.   -- OCR Dear Colleague letter?

23  A.   Absolutely.  Run pass, whatever -- Frisbee.

24  Q.   And then also if Quinnipiac wanted to provide

25  cheerleading or competitive cheerleading opportunities to

1    its female students, there's nothing that would stop them

2    from doing so and just not counting them for Title IX

3    purposes, is there?

4    A.    True.

5              MS. GALLES:  I think we're done, Your Honor.

6              THE COURT:  All right.  All right, whose your

7    next witness?

8              MR. HERNANDEZ:  Mark Thompson.

9              MR. BRILL:  I have some redirect, Your Honor.

10             THE COURT:  Recross.

11             MR. BRILL:  Just two to three questions.

12             THE COURT:  Well, we ought to figure out if we

13   want to do this in this context or not.

14             MR. BRILL:  Oh, that's fine.  I don't have

15   anything that's that significant.  That's going to --

16             THE COURT:  I think a lot of judges cut it off

17   after redirect and I think in light of the limited time

18   that we have, it might be useful to do that.

19             MR. BRILL:  Could we just have a good cause

20   exception?

21             THE COURT:  Good cause exception.

22             MR. BRILL:  Thank you.

23             THE COURT:  If the redirect gets into a whole

24   new area and there was no objection.

25             MR. BRILL:  I don't need to.

```
 1            THE COURT:  Okay, thank you.

 2            (Whereupon the witness was excused.)

 3            MR. BRILL:  Before we move to Dr. Thompson,

 4   could we raise two procedural issues?  The plaintiffs are

 5   planning to call Mr. Web tomorrow and we had raised an

 6   issue on Friday about the privileged nature of the

 7   communication.

 8            THE COURT:  I will get you a ruling quickly.

 9            MR. BRILL:  And we did make and I know they

10   haven't had a chance to respond but we also made a motion

11   in limine this morning as to his testimony.  I wonder

12   there could be some at least some response to that before

13   he's called to testify.

14            MR. ORLEANS:  Not only have we not had a chance

15   to response, we've barely had a chance to read it.

16            THE COURT:  I haven't read it either.

17            MR. BRILL:  It was a lot shorter than mine.

18            MR. ORLEANS:  We'll be prepared to address it

19   tomorrow, Your Honor, but --

20            MR. BRILL:  Okay, that's fine, thank you.

21            THE COURT:  Okay.  Okay, let me just express a

22   little concern about time.  I had set down four days for

23   this trial thinking eight hours each day.  Two for

24   plaintiff, two for defense.  Obviously that's not going to

25   work out.
```

 1          MR. ORLEANS:  Your Honor, I think we had been

 2     under the impression you had set down five days.

 3          MR. BRILL:  Yes, we had.

 4          THE COURT:  Well, that was my sense of your

 5     impression since we spent a lot of time on the last

 6     witness.

 7          MR. ORLEANS:  It's a little bit hard to know how

 8     long anyone is going to take.  If we're calling Thompson

 9     next, are you going to do your, essentially your direct as

10     part of --

11          MR. BRILL:  Yes.

12          MR. ORLEANS:  -- as part of your cross?  So he's

13     going to go for a while and certainly it's not impossible

14     that we would done by the end of the day on Thursday, Your

15     Honor, but --

16          THE COURT:  Well, let me just urge everyone,

17     I've tried to hint to both sides that there are ways to

18     make this a lot faster.  You may have a reason for reading

19     something into the record, you can point me to the

20     paragraph, I can read it a lot faster than it can be read

21     into the record and you can read it into the record rather

22     than asking the witness to adopt it.  We've essentially

23     adopted a practice of if an exhibit is used without

24     objection it's a full exhibit.  I think that helps, but

25     all I'm trying to say to you is I'm going to be out of the

```
1    country for a significant period of time and so we don't

2    have flexibility on the back end and we need to be aware

3    of where we are and get this case done and I think it can

4    get done but it's going to take everybody's cooperation.

5    So remember this is a bench trial, it's not a jury trial.

6    I'm relatively intelligent, I can follow things.  You

7    know --

8                 MR. BRILL:  It would help if you granted our

9    motion in limine, Your Honor, that would --

10                THE COURT:  I haven't read it.

11                MR. ORLEANS:  I'm not sure we'd stipulate to

12   that, Judge.

13                THE COURT:  I've got to at least read it.  But

14   I'm not trying to squeeze anybody, I'm just trying to say

15   I think you can do the same case you intend to do faster

16   than it's been going today.

17                MR. ORLEANS:  May I just ask, Judge, if we're

18   not done by the end of the day on Thursday, do you have

19   time for us on Friday or is that out of the question?

20                THE COURT:  I have some time.  I have a speaking

21   engagement in the middle of the day in Stamford

22   unfortunately.  We'll get it done this week.  I just

23   really --

24                MR. ORLEANS:  I agree.

25                THE COURT:  It means moving some other people
```

```
 1    and not getting some things that I'd like to get to as

 2    well, so your cooperation is appreciated.  I'm going to

 3    shorten this speech and leave it at -- who do we have?

 4              MR. HERNANDEZ:  Plaintiffs call Dr. Mark

 5    Thompson.

 6    M A R K     T H O M P S O N,    called as a witness on

 7    behalf of the Plaintiff, having been duly sworn by the

 8    Court, testified as follows:

 9              THE COURT:  Please be seated.  State your name,

10    spell your last name for the record please.

11              THE WITNESS:  My name as Mark Thompson.

12    T-H-O-M-P-S-O-N.

13    DIRECT EXAMINATION

14    BY MR. HERNANDEZ:

15    Q.   Sir, you're an employee of Quinnipiac University?

16    A.   Correct.

17    Q.   You are a doctor, is that correct?

18    A.   Correct.

19    Q.   What do you hold a doctorate in?

20    A.   Economics.

21    Q.   Where did you get your doctorate in economics?

22    A.   Georgia State University.

23    Q.   You're a numbers guy.

24    A.   That is correct.

25    Q.   All right.  I may be referring to your transcript of
```

```
 1    your deposition during the course of your testimony so I
 2    have your sworn testimony from before, that's just up
 3    there for your convenience in case we need to refer to it.
 4         Sir, what is your present title at Quinnipiac
 5    University?
 6    A.   Senior vice president for academic and student
 7    affairs.
 8    Q.   And what areas fall under your portfolio?
 9    A.   I'm responsible for all the deans of all our schools
10    report to me, in addition against the academic portion.
11    The student affairs portion is student affairs for
12    essential life health services and I'm also responsible
13    for athletics and recreation.
14    Q.   Okay.  So is that, do I count correctly that's four
15    different portfolios that fall underneath your purview?
16    A.   If you count athletics and recreation as two
17    separate.
18    Q.   Okay, we'll say three.
19    A.   Okay, that's fine.
20    Q.   Combining athletics and recreation?
21    A.   (Nodding head affirmatively.)
22    Q.   All right.  That seems like an awful lot to cover.
23    Approximately how much of your time percentage wise is
24    covered by academics?
25    A.   It varies depending upon what's happening in any
```

1    given time.  For example, this past year, quite a bit of

2    academics was covered as a result of our regional

3    accreditation that occurs every ten years, so it varies

4    from time to time.  Would you like a general --

5    Q.   Yes, roughly about what percentage of your time in

6    this past year was devoted to the academic portion of your

7    portfolio?

8    A.   Just in the past year?

9    Q.   Yes.

10   A.   I would say approximately 40 percent of my time.

11   Q.   Okay.  And what about student affairs; how much of

12   your time is consumed by that?

13   A.   I would say probably about 20 percent, 20,

14   25 percent.

15   Q.   All right.  So that leaves approximately 40 percent

16   for athletics and recreation, is that correct?

17   A.   Yes.

18   Q.   Okay.  Now, when did you take athletics and

19   recreation under your umbrella?

20   A.   This became part of my responsibilities July 1st of

21   2009.

22   Q.   All right, well, when did you first begin working on

23   athletics and recreation issues for Quinnipiac University?

24   A.   There was some preparation prior to July 1st, 2009,

25   where I was part of some meetings with management over the

1    course of April, May, June.

2    Q.   What were those meetings about?

3    A.   In part some budget decisions that were made with

4    respect to elimination of teams and when the lawsuit was

5    filed, some preparation as I was getting ready to take

6    over the responsibilities July 1st.

7    Q.   Okay.  And did you have an opportunity to begin

8    working on proposed roster management numbers for the year

9    2009, 2010?

10   A.   Yes.

11   Q.   And do you recall when you first prepared such a

12   roster?

13   A.   I think my work on roster numbers began sometime

14   probably beginning of May, middle of May, 2009.

15   Q.   Okay.  Showing you Plaintiff's 146, do you recognize

16   Plaintiff's 146?

17   A.   Yes.

18   Q.   And is that your handwriting in the lower right hand

19   corner, May 20, 2009?

20   A.   Yes.

21   Q.   Is that approximately when you drafted your first

22   proposed roster management numbers?

23   A.   Yes.

24   Q.   So when you came in and assumed athletics and

25   recreation, one of your first tasks was to begin working

1    on roster management target numbers for '09, '10, is that

2    correct?

3    A.   Correct.

4    Q.   All right, and for the sake of reference, Plaintiff's

5    146, can we agree, sir, that that is all of the proposed

6    roster management target charts that you generated during

7    the course of your -- here I'll hand it up, to you.

8    During the course of your tenure to date as being in

9    charge of athletics and recreation?

10            MR. BRILL:  Your Honor, could you advise the

11   witness that he has the exhibits in the books next to him?

12            THE COURT:  Sure, that's fine.

13            MR. BRILL:  I'm not sure he has a document.

14   BY MR. HERNANDEZ:

15   Q.   And, sir, just to keep things moving, is that your

16   hand writing in the lower right hand corner in each of

17   these documents?

18   A.   Yes.

19   Q.   Okay.  So --

20   A.   Sorry, just making sure.  These appear to be all of

21   the ones that I worked on, yes.

22   Q.   Okay.  Now, sir, when did you become aware that a

23   lawsuit was filed against your employer Quinnipiac

24   University?

25   A.   I don't remember the exact date but whatever date it

1    was that the lawsuit was filed or the day thereafter.

2    Q.   And did there come a time when you learned that Judge

3    Underhill entered his decision and order granting the

4    plaintiff's motion for a preliminary injunction?

5    A.   I'm sorry, what did you say?  Would you say that one

6    more time?

7    Q.   Did you learn that Judge Underhill ruled in the

8    plaintiff's favor as far as the preliminary injunction?

9    A.   Yes, I did.

10   Q.   And you're aware that a published decision was issued

11   as a result of that, is that correct?

12   A.   Yes.

13   Q.   All right.  And as I understand it from your

14   deposition transcript, you've had an opportunity to read

15   that decision, correct?

16   A.   That is correct.

17   Q.   And did you understand that Judge Underhill found a

18   problem with the way Quinnipiac University was adding,

19   strike that.  Was dropping male student athletes shortly

20   before the first date of competition and then adding them

21   on again after the first date of competition?

22   A.   Yes, I read that as part of his ruling.

23   Q.   All right, and according to your deposition

24   testimony, was that, was it your understanding that was

25   the sum and substance of the problem that Judge Underhill

1    had with Quinnipiac University's use of roster management?

2    A.   Yes, I think that was the primary concern.

3    Q.   All right.  Now, as a result of that, you undertook

4    to monitor roster management, is that correct?

5    A.   Yes, correct.

6    Q.   And could you explain for Judge Underhill what steps

7    you took in order to manage what you understood to be the

8    most important part of Judge Underhill's decision?

9    A.   There was a several step process on my part of it,

10   there was an educational process and part was an

11   implementation process.

12        The educational process was to familiarize myself

13   with Title Nine legislation, NCAA regulations and so

14   forth.  And in order to accomplish that, I reviewed

15   government available information from Department of

16   Education, Office of Civil Rights, so I reviewed NCAA

17   documents such as the ones that referred to under gender

18   equity.  I engaged the help of an expert in the field to

19   help me understand the appropriate way to implement roster

20   management for compliance with Title IX.

21        In the implementation piece, following that work in

22   order to familiarize myself with various laws and

23   regulations, I then followed up with a meeting with head

24   coaches to discuss my own concerns about roster management

25   insuring that we made it very clear that we were to be in

1    compliance with Title IX, NCAA regulations.  And at that

2    time I talked a bit about my own analysis, at least a

3    preliminary analysis of the roster numbers and what I

4    thought they might be for the up coming year.

5         But I thought this part of the process was to have

6    the vetting with the individual coaches who know their

7    sport and their situation best with respect to

8    competition, travel schedule, budgets and so forth.  So I

9    invited the coaches to come to me individually to discuss

10   their individual sport and any concerns and get their

11   input with respect to what the appropriate roster number

12   would be that did reflect a genuine experience for each of

13   the participants in each of those teams.

14        There's a secondary invitation that followed that so

15   some of the coaches did come and see me and I was

16   concerned that not all of them had come so I sent a

17   secondary invitation.  Eventually I did speak with all of

18   the coaches on a one to one basis to get their input.

19        And in addition to that, I indicated to the coaches

20   that we would be having formal training for all of them in

21   Title IX compliance as well as NCAA regulations.  And this

22   was a process that went forward over the course of a

23   couple months.  And again, the most important part for me

24   was making sure from the coach's perspective, given their

25   knowledge about their particular sport and so forth that

```
1    they would represent a number that was reasonable with

2    respect to genuine participation.

3    Q.   Okay.  Sir, my question was the steps that you took

4    to educate yourself on Title Nine.  Do you recall being

5    asked the following question and giving the following

6    answer -- page ten, beginning at line eight -- on

7    May 14th, 2010.

8         Question:  And after becoming in charge of athletics

9    and recreation, did you take any steps to educate yourself

10   on the university's requirements under Title IX?

11        Yes.

12        And what steps did you take?

13        It was more along the lines of educating myself with

14   respect to Title IX in general, not limited to the

15   university's website, talking with attorneys, talking with

16   Tracy -- I can't remember Tracy's last name.

17        Tracy Flynn?

18        Tracy Flynn, thank you.  Our compliance officer in

19   athletics, an expert in Title IX, who asked to come help

20   with my understanding of Title IX was all about.

21        And later you said that's okay, that pretty much

22   covers what I did.

23   A.   Yes, at the time, as I remember, yes.

24   Q.   Sir, I'd like to talk to you about this process that

25   you mentioned about finding out what a reasonable target
```

1    roster management number would be.  Do you have a contract

2    with Quinnipiac University?

3    A.    Employment contract?

4    Q.    Yes.

5    A.    Yes.

6    Q.    When does that expire?

7    A.    My current contract expires June 30th of 2011.

8    Q.    Are you being compensated for your time being here

9    today?

10   A.    Not outside the employment contract.

11   Q.    And I think you mentioned that you sent an email to

12   the coaches asking them for their input on reasonable

13   roster management numbers, is that correct?

14   A.    I sent both an email, I also asked -- first sent that

15   invitation and asking for their respect input, yes.

16   Q.    Did that email come before or after you sent out

17   proposed target roster management numbers?

18   A.    I think, my recollection was that it was a meeting

19   that occurred either late May or I think it was early June

20   actually and at that point I did go over some numbers that

21   I thought represented what was close to NCAA average squad

22   sizes and my email followed that meeting, inviting them to

23   come speak with me individually.

24   Q.    Did the email you sent to the coaches include

25   proposed roster management numbers for '09, '10?

1    A.    I don't believe, I don't believe so.  I think that

2    the discussions took place at the face to face meetings.

3    I do not believe that I attached a spread sheet at that

4    point.

5    Q.    Did you have a face to face meeting with each and

6    every coach?

7    A.    Right.

8    Q.    As a result of this email?

9    A.    Either through the personal invitation I made for the

10   head coach meeting or via email which was a secondary

11   invitation to come speak to me.

12   Q.    Did there come a time where you emailed proposed

13   target roster management numbers to the coaches?

14   A.    I don't believe that I ever sent an email directly to

15   the coaches.  My recollection could be wrong.  My

16   recollection was that if I did email something, it was to

17   our athletic director Jack McDonald.

18   Q.    Did you ask him to further those to the coaches?

19   A.    I asked him to make sure that he communicated with

20   the coaches for the purpose of having their input, yes.

21   Q.    And after forwarding the proposed target roster

22   management numbers for '09 dash '10, did you invite the

23   coaches to come and speak to you about those proposed

24   numbers?

25   A.    Yes.

1    Q.   Okay.  And did they come and speak to you about those

2    proposed numbers?

3    A.   Yes.

4    Q.   Did any of them express problems with the proposed

5    numbers for '09, '10?

6    A.   It wasn't anything I would consider to be a, anything

7    I would consider to be significant in terms of the numbers

8    on the teams.  It was more concern about their own

9    understanding of the process and Title IX compliance

10   regulations.

11   Q.   And sir, did the coaches at the time that you met

12   with them, did they have an employment contract with

13   Quinnipiac University?

14   A.   Yes, they did.  It was May of last year -- June of

15   last year so they would have had a contract at that time.

16   Q.   All right, and when did their contract expire?

17   A.   In general when we issue contracts it ends the fiscal

18   year that ended June 30.

19   Q.   And did were the coaches contracts renewed as of

20   July 1, 2009?

21   A.   No, they were not.

22   Q.   All right.  And, in fact, are all of the coaches at

23   Quinnipiac University at this time employees at will?

24   A.   Yes, in addition to all the other administrators at

25   our university.

```
 1    Q.   After the coaches became employees at will, did you
 2    solicit the target roster management numbers for '09, '10?
 3    A.   Yes.
 4    Q.   Sir, how many coaches are there for the combined
 5    men's, women's cross country and women's indoor and
 6    outdoor track?
 7    A.   I'd have to take a minute to count, but I can tell
 8    you that there's -- I'm sorry, for cross country indoor
 9    outdoor track?  That's one coach who has responsibility
10    for men's cross country, women's cross country, women's
11    indoor and women's outdoor track.
12    Q.   Is that Coach Martin?
13    A.   Yes.
14    Q.   All right.  Do you know how many men are on the cross
15    country team?
16    A.   I'd love to look back and see the cross numbers but
17    whatever the roster number was is what they started their
18    season with.
19    Q.   And is it your understanding that Coach Martin has to
20    coach the men's and women's cross country team at the same
21    time, the same season?
22    A.   Yes.
23    Q.   All right, and after that she coaches the women's
24    indoor track?
25    A.   As I said, she has responsibility for men's and
```

```
 1    women's cross country, indoor track and outdoor track for

 2    women.

 3    Q.    And so after indoor track, she coaches outdoor track,

 4    is that correct?

 5    A.    I'm not clear in terms of -- given my

 6    responsibilities, the breadth of my responsibilities, I

 7    can't tell you precisely when indoor track ends and

 8    outdoor track begins but, as I said, she has

 9    responsibility for all four teams.

10    Q.    Sir, is it your understanding that in this litigation

11    your employer's position is that each of those sports

12    men's cross country, women's cross country and women's

13    indoor and outdoor track, are four separate sports?

14    A.    Yes, that is correct.

15    Q.    Is she paid four times as much as the other head

16    coaches?

17    A.    I don't know what her salary is relative to the other

18    coaches without looking at it.  I know approximately what

19    her salary is personally but I don't know how it compares

20    off the top of my head with others.

21    Q.    Does she have any assistant coaches?

22    A.    Yes.

23    Q.    All right, how many assistant coaches does she have?

24    A.    Again, I'd have to look.  I think she has at least

25    two.
```

1   Q.   Okay.  Sir, you had an opportunity to hear

2   Dr. Lopiano testify about the importance of fairness in

3   the proportional allocation of competitive opportunities,

4   do you agree?

5   A.   Yes.

6   Q.   All right.  You're an economist, right?

7   A.   Yes.

8   Q.   Would you agree, sir, if we have a limited resource,

9   R, and you divide it by a certain number, you get a

10  percentage?

11  A.   Yes.

12  Q.   All right.  And the bigger the number underneath

13  gets, the smaller the amount of resources are going to be

14  that gets spread around, correct?

15  A.   Yes.

16  Q.   All right.  Sir, in connection with your educating

17  yourself about Title IX, did you have an opportunity to

18  review the NCAA's gender equity and intercollegiate

19  athletics handbook?

20  A.   Yes, I have.

21  Q.   On gender equity?

22  A.   I did look at this.

23  Q.   Did you forget that you had read it when you

24  testified?

25  A.   I didn't remember all the things I did at the time.

1    Q.    Okay.  And sir, did you have an opportunity to look

2    at the NCAA gender equity handbook -- well, you tell me

3    when you first saw it.

4    A.    I would say it was probably June of last year, June

5    of 2009.

6    Q.    All right.  And, sir, as I understand it, your

7    primary, your understanding of the primary concern of the

8    court was this roster manipulation, is that correct?

9    A.    Yes.

10   Q.    All right.  And that's what you were looking at?

11   A.    I was looking at the entire, when I take

12   responsibility for somebody, I take it very seriously so

13   my review was not limited just to the question that you

14   just asked me, it was my responsibility in its entirety.

15   Q.    Now, did there come a time when Coach Martin

16   requested that she increase the number of women's

17   athletes?

18   A.    Yes, that came with regard to the setting of roster

19   for the upcoming academic year.

20   Q.    And was she granted her request to increase the

21   target roster management number for the women's track?

22   A.    Yes, she was.

23   Q.    All right.  And, sir, draw your attention to, if we

24   can just back up a little bit to Plaintiff's Exhibit 85,

25   you have a copy up there and I'll throw it up here.

1      Do you recognize, sir, Plaintiff's 85 as an email

2  chain between yourself and Jack McDonald, the athletic

3  director?

4  A.  Yes.

5  Q.  And sir, was that email dated Tuesday, July 21st,

6  2009, from Jack McDonald to you?

7  A.  Yes.

8  Q.  All right.  And did that have an attachment?

9  A.  Yes, it did.

10  Q.  Okay, and what was attached to that email?

11  A.  You'll have to put it back so I can see.  If you can

12  put two back on the first page?  The reason I'm asking the

13  question is because it indicates there's a sample there

14  with respect to baseball and -- I'm sorry, could you move

15  it down so I could see the top?

16  Q.  Sure.

17  A.  Thank you.  Okay, thank you.  Yes, I think, I believe

18  the attachment is the ones you just showed, the excel

19  spread sheet.

20  Q.  Is this your response to Jack McDonald's email, "I

21  think this looks good, I attached the roster numbers, we

22  are seeking in case you don't have the latest"?

23  A.  Yes, that's what I said.

24  Q.  And this is your attachment, correct?

25  A.  I believe that is correct, that's right, yes.

1   Q.   All right, and this email was sent by you to Jack

2   McDonald on July 21st, 2009, correct?

3   A.   Correct.

4   Q.   This is after the coaches had become at will

5   employees at Quinnipiac University, is that correct?

6   A.   That is correct.

7   Q.   All right.  And what was the purpose of

8   transmitting -- well, withdrawn.

9        Did you send another proposed target roster

10  management, set of target roster management numbers to

11  Mr. McDonald on or about September 1st of 2009,

12  Plaintiff's Exhibit 86?

13  A.   Yes.  Could I see the attachment, please?

14  Q.   Sure.  First of all, do you recognize --

15  A.   Yes, I recognize.

16  Q.   The plaintiffs --

17  A.   Yes, I recognize it, yes.

18  Q.   And showing you the attachment --

19           MR. BRILL:  What is the exhibit number, please?

20           MR. HERNANDEZ:  Eighty-six, Plaintiff's 86.

21  A.   Yes.

22  Q.   All right.  This is your email?

23  A.   Yes.

24  Q.   All right, sir, did you have an email exchange with

25  Coach Martin, referring to Plaintiff's Exhibit 84, on or

1   about November 16th of 2009.  This is an email chain, do

2   you recognize it?

3   A.   Maybe just a bit bigger.  I can look if -- it's one

4   of the exhibits there.  Thank you, that's perfect.  Yes, I

5   recognize that.

6   Q.   And that begins on November 16th from Carolyn Robin

7   (ph) to Tracy Flynn and just so that we're clear, is

8   Carolyn Robin the maiden name of Carolyn Martin?

9   A.   Yes, it is.

10  Q.   So that we're clear.  And this email is Carolyn

11  Martin requesting an opportunity to add some add ons to

12  the women's track team?

13  A.   Yes.

14  Q.   All right, and Tracy responds, correct?

15  A.   Yes.

16  Q.   All right, and she sent that email to you, is that

17  correct?

18  A.   That is correct.

19  Q.   All right, and did you respond in email dated

20  November 19th, 2009?

21  A.   Yes.

22  Q.   And was your response, quote, "Dear Tracy, Does this

23  represent the process of building her roster up to the

24  required 30"?

25  A.   Yes.

1    Q.    Those are your words?

2    A.    Yes.

3    Q.    Required?

4    A.    Yes, she had her roster target at 30 and she was

5    required to meet that.  That's a management issue.

6    Q.    That was mantory, correct?

7    A.    Yes, as with every team there's a target number and

8    my expectation is coaches being held accountable for those

9    numbers, and yes.

10   Q.    And we were talking here about a women's team,

11   correct?

12   A.    It's the same standard for both men and women.

13   Q.    Okay, and did you convey to Coach Martin that she was

14   required to build up her roster to 30?

15   A.    As I said, for every coach there's a target cross

16   number that they are expected and held accountable to

17   meet.

18   Q.    I believe the word you used in your email was

19   required, is that correct?

20   A.    And I'm answering it's required of every coach.

21   Q.    Thank you.  Sir, drawing your attention to

22   Plaintiff's Exhibit 81, this is the -- first page, it's a

23   four page document.  Email chain, Plaintiff's Exhibit 81.

24   Beginning on the last page, does this represent an email

25   chain that you were copied on?

1   A.   Yes.

2   Q.   All right.  And is that, does that represent an email

3   exchange between yourself and Carolyn Robin also known as

4   Carolyn Martin?

5   A.   I don't know if there's others included along the way

6   but yes, that's, there's exchange between myself and

7   Carolyn, yes.

8   Q.   And Carolyn Martin again is an at will employee at

9   Quinnipiac University coaching four teams?

10  A.   Correct.

11  Q.   Sir, did she send an email to you; is this her email

12  to you in which she says, this is highlighted, "I would

13  like to increase my number from 18 to about 24"?

14  A.   Yes.

15  Q.   That's what she said?

16  A.   Correct.

17  Q.   Did she also say for women's track I currently have

18  30 women on the team and made no cuts this year so my

19  track team has some lower quality women with next year's

20  increase in cross country I will probably need a slight

21  bump up in track, I think 35 would be sufficient.

22  A.   Yes, that's what she says.

23  Q.   All right, and you read this email?

24  A.   Yes, I did.

25  Q.   All right.  And later she said "I'm willing to work

```
 1    with these numbers to help the overall goal.  Please let
 2    me know what you think.  Thank you so much for your
 3    support.  This year's gone very smoothly with all the
 4    changes.  Thanks again, Carolyn"?
 5    A.   Yes, that's what she wrote.
 6    Q.   And did you actually speak to her about this email?
 7    A.   Yes, I did.
 8    Q.   All right.  Did you meet with her after you received
 9    this email?
10    A.   Yes.
11    Q.   Where did you meet with her?
12    A.    In my, either in my office or in the athletics
13    center, I don't remember which.
14    Q.   What did you talk about?
15    A.   I asked some questions.  I was concerned about the
16    impact of increasing the team on her budget.
17    Q.   And what was, did you have concerns about any other
18    aspects about her program other than the budget?
19    A.    I did ask her questions regarding her statement about
20    lower quality women.  She did qualify that later by saying
21    that, despite her statement in her email which she
22    indicated was -- I'll give you one example, there was one
23    participant in the team she felt contributed in a way in
24    terms of strategy that she offered that she wasn't
25    necessarily highly competitive in terms of her
```

1    performance, but that she was a significant component of

2    the team as a result of this strategy and what she brought

3    to what they might be doing differently.

4         I also questioned her on the number, the increased

5    number she sought and, again, that was mostly around my

6    concern that she have a sufficient budget to insure that

7    she could handle the additional number that she's

8    requesting.

9    Q.   All right.  And so if I'm correct, your concerns with

10   her were budget -- that was one, correct?

11   A.   Correct.

12   Q.   All right.  Two was whether the add ons were

13   competitive, is that correct?

14   A.   Yeah, well, again, it was more than around my concern

15   that she was able to offer legitimate experience for the

16   side roster she was requesting.

17   Q.   All right.  And based upon her representations to

18   you, you allowed her to have these people, is that

19   correct?

20   A.   That is correct.

21   Q.   All right, and so what we're looking at here is an

22   addition of six women to the cross country team, is that

23   correct?

24   A.   I believe that's what -- I'd have to refer to the

25   final roster for --

1   Q.   Well, I'm referring to her email.

2   A.   Okay, that's what she proposed.  I don't remember

3   that's precisely what I approved.

4   Q.   Okay, and --

5   A.   I believe it is but I'd have to look back at the

6   numbers.

7   Q.   And she was proposing a 30 percent increase in the

8   number of women on cross country, is that correct?

9   A.   Correct.

10  Q.   All right.  And did you offer to increase her salary

11  by 30 percent of one fourth of whatever her income was?

12  A.   No, I did not.

13  Q.   Did she also request an increase of five women to the

14  women's track team?

15  A.   Yes, she did.

16  Q.   Did she tell you where these women were coming from?

17  A.   No, she didn't.

18  Q.   Did you eventually learn some of them were walk ons,

19  she was attempting to add them with walk on athletes?

20  A.   No, she did not share that information with me.

21  Q.   And, again, the increase from 30 to 35, that would be

22  a 20 percent increase, is that correct?

23  A.   Correct, approximately.

24  Q.   Sir, drawing your attention to the email that you

25  eventually sent on or about May 7th in the same email

1    chain, were your concerns stated in that email, did you

2    say you had a couple of concerns, two concerns, first is

3    with the budget and second about the quality of the

4    athletes?

5    A.   And also I put in the question about genuine

6    experience.

7    Q.   And when you -- well, withdrawn.

8         All right.  Did you eventually approve an increase in

9    her roster?

10   A.   Yes, I'd have to again look at the roster plan to

11   know what the exact number was but yes, there was an

12   increase.

13   Q.   Okay.  You know, along with increasing her roster,

14   did you also increase the number of assistant coaches that

15   were available to help her?

16   A.   No, I did not.

17   Q.   All right, did you require her to work longer hours

18   to coach these additional female student athletes?

19   A.   No.

20   Q.   Did you take any steps to get more scholarship

21   funding to help bring quality Division I student athletes

22   to her track team?

23   A.   No.  We did increase her operating budget.

24   Q.   By how much?

25   A.   I believe her budget was around 50,000-dollars and we

1    increased it by another $10,000.  A coach does have

2    discretion how they utilize their budget so I'm not quite

3    sure what her plans are in terms of how she plans to use

4    that.

5    Q.   You didn't ask her?

6    A.   No, I think that's the responsibility of a coach

7    who's doing their job to have an understanding how best to

8    utilize their budget.

9    Q.   Sir, you had an opportunity, I believe you said, to

10   read the gender equity and intercollegiate handbook,

11   correct?

12   A.   Correct.

13   Q.   Sir, would it surprise you to learn it's actually the

14   responsibility of the university to make sure that the

15   coaches are spending their money appropriately?

16   A.   No, it wouldn't surprise me at all.  I think the same

17   with regard to my academic program, the primary oversight

18   is with the dean of the school, for example, or the

19   chairman of a department, chairperson of the department.

20   And then the university would review whether or not they

21   are within their budget limits and have some sense as to

22   whether or not they are using their budgets appropriately.

23   And that's standard, comes through in review things with

24   respect to accreditation, when accreditation visits occur

25   and so forth.

1    Q.    Okay.  And, sir, drawing your attention to

2    Plaintiff's Exhibit 96, does this represent an email

3    chain, for the record referring to bate stamp numbered D

4    13322 and 13323.  Do you recognize this email chain, sir?

5    A.    Yes.

6    Q.    All right.  Does that begin on -- on May 3rd from you

7    to the head coaches?

8    A.    Yes.

9    Q.    And did Coach Dave Clark respond by email to your

10   request for input about the target numbers?

11   A.    Yes, he did.

12   Q.    All right.  And in fact, he emailed you back the very

13   next day, correct?

14   A.    Correct.

15   Q.    All right, do you recall this email?

16   A.    Yes, I do.

17   Q.    And what team does Coach Dave Clark coach?

18   A.    He's the women's soccer coach.

19   Q.    I'm sorry?

20   A.    Women's soccer.

21   Q.    Women's soccer.  Okay, and did you as of May 4th,

22   2010 let him know what the target roster management number

23   was that you and the university were looking for out of

24   him for women's soccer?

25   A.    No, I think he was assuming that his number might be

1    the same as the prior year.

2    Q.    Okay.  And did he tell you if he had a choice he

3    would have a roster of 22 to 24 players?

4    A.    Yes, that's what he wrote.

5    Q.    "In the current climate I understand that I need to

6    have a definitive number that would be as high as 27"?

7    A.    Yes, he wrote that.

8    Q.    All right.  And did he also go onto say "I will work

9    with what the school needs but keep in mind that 27 is not

10   a manageable number for a sport such as soccer"?

11   A.    Yes, he wrote that as well.

12   Q.    All right.  And eventually he was given a break on

13   his target number, is that correct?

14   A.    I was concerned about --

15            MR. BRILL:  Objection, objection to the

16   characterization in the question.  Given a break.

17            THE WITNESS:  I would object to that

18   terminology.  I don't give people a break.  I take this

19   very seriously and I listened very closely to what he had

20   to say via his email, and I did reduce his roster number

21   because he did express a concern about -- my

22   interpretation of a manageable number and his concern

23   about a change in the opportunity.

24   BY MR. HERNANDEZ:

25   Q.    Would say it be fair to say that Coach Clark, coach

1    of the women's soccer team, expressed that he believed

2    that the school had a need with respect to target roster

3    management numbers for women's soccer?

4    A.   Yeah, and I hoped that my response to him took his

5    end of it very seriously and in reducing his roster taking

6    away any concerns he had about trying to meet the target

7    needs.  I responded very seriously to his concern about

8    his needs.

9    Q.   And by needs, earlier you had told the coaches that

10   they were required to meet their roster numbers, is that

11   correct?

12   A.   Again, it came after the invitation of the coaches

13   and after the rosters were set following what I think was

14   an appropriate process in making a determination about

15   change and opportunities.

16   Q.   Sir, let's talk for a moment, if we could, about

17   genuine competitive opportunities.  What's your

18   understanding of what the NCAA looks for as far as a

19   genuine competitive opportunity?

20   A.   Came out in earlier testimony actually today.  Could

21   include participating in competitions, it could include a

22   role whereby someone is helping with practice.  It can

23   include an experience of being on, part of a team in terms

24   it was comradery and so forth that comes, but essentially

25   it means that benefits flow as a result of the person's

1   being a member of a team.

2   Q.   And sir, do you understand that as far as substantial

3   proportionality goes, when you compare the men's program

4   to the women's program, they have to be fair?

5   A.   I'm not clear what you mean.  I understand

6   substantial proportionality being the percentage of

7   opportunities for men's and women's athletics need to

8   match the full undergraduate population.

9   Q.   That's a number, right?  Correct?

10   A.   Yes.

11   Q.   50/50, 60/40, whatever that may be?

12   A.   Correct.

13   Q.   And, sir, would you agree with if the population were

14   50 percent women and 50 percent men and the participation

15   rate were 50 percent female and 50 percent male, that

16   would be numerical proportionality?

17   A.   If you're asking whether or not there are any more

18   analysis to understand about whether or not the 50/50

19   split represented genuine opportunity or whether it was

20   window dressing, I would say what you're saying is I'd

21   have to know -- your question is at best a way for me to

22   respond is I'd have to know more about the situation.

23   Q.   Okay.  Sir, are you aware that Quinnipiac University

24   prepared a self audit as far as gender equity when it

25   joined Division I?

1    A.    I believe it was in 2006.

2    Q.    All right.  Did you read the university's gender

3    equity plan?

4    A.    Yes, I did.

5    Q.    All right, when did you read that?

6    A.    Again it was approximately a year ago.  I may have

7    read it before then when the report was released but I

8    don't recollect exactly when but I remember the last time

9    I read it was about a week ago.

10   Q.    And included in the gender equity plan, were there

11   some proposed student surveys?

12   A.    Yes, I think there were.

13   Q.    Okay, to your knowledge -- to your knowledge were

14   your surveys ever sent out?

15   A.    You're referring to the end of the year or end of the

16   season surveys?

17   Q.    Well, there's actually two surveys, right?  Is that

18   correct?

19   A.    I don't know, I'd have to go back and look.  The once

20   I'm familiar with are the end of the season or end of the

21   year surveys to get some inputs from the students with

22   respect to their experience and, yes, my understanding is

23   those have been done.

24   Q.    And have you had an opportunity to see any of the

25   student surveys that came back?

```
1    A.   No, I haven't seen them.
2    Q.   All right, and do you know if those surveys have ever
3    been sent out?
4    A.   Sent out to whom?
5    Q.   To student athletes?
6    A.   If you're requesting a response --
7    Q.   Yes.
8    A.   Yes.
9    Q.   And I'm not talking about the end of the year survey.
10   A.   Okay, you'll have to tell me which survey you're
11   referring to.
12   Q.   All right, we'll get to that in a second.
13   A.   All right.
14   Q.   Sir, who is the Title IX coordinator at Quinnipiac
15   University?
16   A.   Sarah Steele, S-T-E-E-L-E.
17   Q.   And have you had a chance to speak to her about
18   Quinnipiac University's problem with roster management?
19   A.   I don't feel we have a problem with roster management
20   so I haven't discussed it with her.
21   Q.   All right.  Who is Jo Martin?
22   A.   Jo Martin is one of the representatives, she's a
23   faculty member from our legal studies department who
24   serves on the student advisory committee, student athlete
25   committee.
```

1    Q.   All right.  Sir, in connection with your role as

2    being in charge of athletics and recreation, did you take

3    any steps to monitor whether any nontrack athletes were

4    running or practicing with any of the cross country

5    runners?

6    A.   No.

7    Q.   Did you take any steps to find out if there were any

8    male student athletes who were practicing with whatever

9    male team, who were not being recorded on rosters?

10   A.   No.

11   Q.   Are you aware, sir, that Coach Martin requires all of

12   her cross country athletes to run track?

13   A.   No.  No.

14   Q.   Sir, do you know if anyone at Quinnipiac University

15   in charge of Title IX compliance has made any efforts to

16   speak with Coach Sparks to investigate the allegations of

17   sex discrimination at Quinnipiac University?

18   A.   I'm not aware of that, no.

19   Q.   Have you taken any steps to speak with her about the

20   allegation the of sex discrimination at Quinnipiac

21   University?

22   A.   I've spoken to Coach Sparks like the other coaches

23   with respect to their roster numbers, the same questions

24   with respect to any concerns they had about their subjects

25   or resources, schedules and so forth, but we did not

1    talk specifically about gender equity concerns.  I see

2    that as a broader issue than just one team at a time.

3    Q.   Sir, have you had an opportunity to compare the total

4    expenses for the men's athletic program against the

5    women's athletic program?

6    A.   Yes, I have looked at it.

7    Q.   When did you look at it?

8    A.   Again this was probably about a year ago, probably

9    June or July of last year and than I did see it again,

10   October when we submitted the EADA report for '08, '09 or

11   '07, '08, whichever one we submitted last October.

12   Q.   Sir, I'd like to talk with you about the timing of

13   when coaches are made aware of what their target numbers

14   are going to be.  All right?  When in 2010 did you or the

15   athletic director notify the coaches as to what their

16   target numbers were going to be for the coming year, 2010,

17   '11?

18   A.   Finalized numbers were only provided to them recently

19   within the last couple weeks, and this was a problem that

20   came up as a result of the last meeting I had with head

21   coaches.  So my hope is that the process going forward is

22   going to go, we're going to know well in advance now that

23   I have a better understanding about recruiting issues and

24   so forth.  It did come, I consider it to be late this year

25   but I'm moving forward.  My hope is we'll come at an

1    appropriate time for them to make it easier in terms of

2    recruiting and so forth.

3    Q.   Okay.  And when you say late, when were they

4    notified?

5    A.   Again, as I said, they were notify within the last

6    two weeks.  I don't remember exactly what date it was.

7    Q.   So would it be fair to say first week of June?

8    A.   Sometime around then, yes.

9    Q.   Would this have been after June 1st?

10   A.   I believe so.

11   Q.   All right.  And, sir, what is your understanding as

12   to when depositis are due from prospective candidates?

13   A.   Deposits are due on July 1st -- I'm sorry, June 1st.

14   Q.   June 1st, correct?

15   A.   Yes, correct.

16   Q.   All right.  And the target roster management numbers

17   were made available to the coaches after June 1st, is that

18   correct?

19   A.   I should say that most of them were in advance of

20   that in items of verbal communications from me but the

21   actual final roster plan in terms of being on a spread

22   sheet was distributed, did not come until after June 1st.

23   Q.   Okay.  And sir, are you aware that after, sometime

24   after the budget is set for the coming year the university

25   sometimes imposes mandatory costs on the teams, for

1    example, an increase in the cost of insurance?

2    A.    No.

3    Q.    What about increased expenses for things like

4    training?

5    A.    No.

6    Q.    All right.  You're not aware that after the numbers

7    are set and the budget is set, that sometimes a team's

8    expenses will go up?

9    A.    No, I'm not, but again, my question to coaches was

10   very specific with regard to their budgetary needs.  They

11   did not offer this information to me.

12   Q.    And you did not learn that either, correct?

13   A.    I'm not aware of it, no.

14   Q.    All right.  Sir, showing you what we've marked as

15   Plaintiff's Exhibit 143, all right, this is an

16   inter-department envelope addressed to Robin Sparks marked

17   Confidential.  Do you know whose handwriting that is?

18   A.    No, I don't.

19   Q.    All right.  And is that dated June 9, 2010?

20   A.    Yes.

21   Q.    All right.  And drawing your attention to the

22   attachment, the second page, do you recognize the latter?

23   A.    Yes, this is the part of the process that I

24   implemented that requested the coach's certification of

25   their number with respect to, again, it's a reasonable

1    number on their team and can be supported by the budget

2    and represents genuine experience for the athletes on the

3    team.

4    Q.   And this letter was actually addressed June 1st, is

5    that correct?

6    A.   That is correct.

7    Q.   But it wasn't put into enter office mail until

8    June 9 --

9            MR. BRILL:  Objection, Your Honor.  There's no

10   testimony it was his office mail.  Actually there's no

11   evidence about this at all.  We don't know whose

12   handwriting that is, who sent it to Robin Sparks and when.

13           THE COURT:  Well, 143 is in evidence and it says

14   what it says.

15           MR. BRILL:  Excuse me?

16           THE COURT:  143 is in evidence and it says what

17   it says.  We don't need to ask the witness to agree.

18           MR. BRILL:  You're saying you're accepting it

19   into evidence now?

20           THE COURT:  We have a practice when an exhibit

21   is used absent an objection, it becomes a full exhibit.

22   143, there's no objection -- do you have a objection to

23   143?

24           MR. BRILL:  No, I don't object.

25           THE COURT:  Okay, so it's there.  It says

1    whatever it says.

2    BY MR. HERNANDEZ:

3    Q.   And, sir, did you make it clear to the coaches at

4    Quinnipiac University that after target roster management

5    numbers were set, their rosters really should not change

6    without your permission?

7    A.   That is correct.

8    Q.   Or without your review, is that correct?

9    A.   That is correct, I indicated I had final approval on

10   any changes to the rosters.

11   Q.   Okay.  And, but the bottom line was that the caps on

12   the men's teams were fixed as far as you were concerned?

13   A.   I don't believe that we had caps or ceilings on any

14   of our teams.  I think that's evidenced through some of

15   the changes we made in roster numbers from last year to

16   this year, having one year's experience with last year's

17   roster numbers.

18   Q.   But the roster numbers going forward for 2010, 2011,

19   those --

20   A.   It's a number.  I don't consider it to be either a

21   cap or a ceiling.

22   Q.   Okay.

23   A.   Or a floor, I'm sorry.

24   Q.   You do not consider it, correct?

25   A.   It's a number and it's just like any number.  Again,

1    in an economic department if there's a number that needs

2    to be met with respect to a faculty student ratio to

3    maintain accreditation standards, it's not a floor or a

4    ceiling, it is a number that is required accountability

5    with respect to them managing that number.

6    Q.   And sir, you eventually approved an increase in Coach

7    Martin's roster management number for her women's track

8    team, is that correct?

9    A.   Yes, I approved a roster increase for Coach Martin.

10   Q.   And when you approved that increase, did you consider

11   the relative level of accessibility of her as a coach to

12   the other student athletes?

13   A.   I believe I addressed that when I asked her about

14   the, her resources and what she needed and she responded

15   she could have that size roster and provide an opportunity

16   to athletes.

17   Q.   And, sir, you expanded the women's track team,

18   correct?

19   A.   Correct.

20   Q.   All right.

21   A.   Indoor and outdoor.

22   Q.   All right.  Were they given additional locker space?

23   A.   I don't know.

24   Q.   You don't know?

25   A.   No.

```
1    Q.   Did you look into whether their locker space would be

2    sufficient for these added student athletes?

3    A.    As I testified before, the question was posed to the

4    coach specifically about how this would impact resources

5    available to her athletes and she indicated there was no

6    problem.  She had reasons for wanting this.  This was a

7    large group for competitive reasons and they did, as I

8    said, increase the operating budget which was primarily my

9    concern.

10   Q.   Did you look into the locker room question?

11   A.    Personally, no.  Again, I rely on coaches to respond

12   to my questions with respect to how they'll be impacted

13   about any of these changes.

14   Q.   Did you take into consideration access to training

15   facilities in light of this increased number of women on

16   the women's track team?

17   A.    Again, I think this was covered by my question with

18   respect to her ability to provide a genuine opportunity to

19   her athletes.

20   Q.   Sir, I'd like to talk to you if I could about the

21   competitive cheer squad.  Did the university solicit to

22   hire a head coach?

23   A.    I don't understand the question.

24   Q.   Did the university hire a head coach for the

25   competitive cheer?
```

1    A.    Yes.

2    Q.    And were you involved in that process at all?

3    A.    No.

4    Q.    All right.  Sir, I'm going to show you Plaintiff's

5    Exhibit 82.  Do you recognize Plaintiff's Exhibit 82?

6    A.    No, I have not seen that before.

7    Q.    You have not seen that before?

8    A.    No.

9    Q.    Sir, in connection with competitive cheer, is it the

10   university's intention to increase the roster of the

11   competitive cheer team for the coming year?

12   A.    Yes, the coaches requested an increase from 30 to 36.

13   Q.    All right, and again that's a 20 percent increase, is

14   that correct?

15   A.    Not quite but pretty close.

16   Q.    All right, and did you approve that increase?

17   A.    Yes, I did.

18   Q.    All right.  When you approved the increase, did you

19   consider the experience of the head coach in coaching

20   competitive cheer?

21   A.    No.

22   Q.    You did not?

23   A.    No.

24   Q.    Did you consider her ability to recruit student

25   athletes when approving the increase in the competitive

1   cheer squad?

2   A.    No.

3   Q.    Did you consider Coach Powers' access to support

4   staff when you agreed to increase her roster for the

5   competitive cheer team?

6   A.    Again, same question I posed to any coach who made a

7   request of changing their roster numbers and it was with

8   respect to the impact on the student athletes.

9   Q.    And, sir, are you aware that Coach Powers, the head

10  coach for the competitive cheer team, has not passed the

11  NCAA recruiting test?

12  A.    Not until it was brought to my attention during the

13  deposition.

14  Q.    And your deposition was in May of this year, correct?

15  A.    Correct.

16  Q.    Just a few weeks ago?

17  A.    Correct.

18  Q.    All right, and  notwithstanding the fact that she --

19  well, just so that we're clear, do you understand if she

20  ha has not passed the NCAA recruiting test, she's not

21  allowed to recruit off campus?

22  A.    No, I did not know that.

23  Q.    Okay.  Sir, would you agree that if a coach is unable

24  to recruit off campus, that has an impact on how the team

25  is run?

1    A.    Yes, it obviously has an impact that limits the scope

2    of the degree of where the coach can recruit, yes.

3    Q.    And that would also have an impact on the competitive

4    experience of the members of the competitive cheer team,

5    correct?

6    A.    I don't see a connection there.

7    Q.    You do not?

8    A.    No.

9    Q.    Would you be surprised, sir, that the NCAA considers

10   recruiting to be a real hallmark, lynch pin of a qualified

11   head coach?

12   A.    Yes, I do.

13   Q.    You are surprised or --

14   A.    No, I'm sorry, I understand that that's an important

15   part of what a coach would do, recruiting a team to be

16   competitive.

17   Q.    All right, and when you approved increases to Coach

18   Martin's women's track team, were you aware of her

19   experience as a track coach?

20   A.    No.

21   Q.    Have you had a chance to look at her resume?

22   A.    No.

23   Q.    All right.  Do you know what her experience is as far

24   as recruiting, referring to Coach Martin?

25   A.    No.

1    Q.   Do you know if she has taken any steps to recruit off

2    campus for the student athletes that she proposes to add

3    to her roster?

4    A.   No.

5    Q.   Sir, would you agree that if Coach Martin is coaching

6    the entire year, she has no off season, correct?

7    A.   Again I'm not quite sure when seasons end and begin

8    but I would say she has a significant portion of the year

9    she has coaching responsibilities.

10   Q.   And would it be fair to say that since she's coaching

11   year round, four teams in a year, she doesn't have the

12   luxury of down time, noncoaching time to recruit?

13   A.   I don't know how Coach Martin divvies up her time

14   between different responsibilities.

15   Q.   Would you agree if she's spending a substantial

16   amount of her time coaching three -- strike that, four

17   teams during the year, she's not going to have as much

18   time available to recruit?

19   A.   Again I think it's speculative to make that

20   statement.  I don't know how she divvies up her time.  I

21   don't know how she utilizes her assistant coaches.

22   Q.   So what I'm hearing from you when you approved an

23   increase to her roster management numbers for the women's

24   track team, you didn't ask her about her ability to

25   recruit with these added responsibilities?

1    A.   Again, the question was with respect -- I did not go

2    through all 12 standards of the OCR letter, for example,

3    or, you know, go down a check list of various things.  The

4    conversation was please tell me how this impacts your

5    ability to provide a genuine opportunity to your student

6    athletes.

7    Q.   All right, and we would agree that the quality of the

8    competitive experience is determined by the 12, the 12

9    point check list propogated by OCR?

10   A.   I'm sorry, say that one more time.

11   Q.   We would agree that determining the quality of the

12   competitive experience is driven by that 12 point check

13   list?

14   A.   I think it's important to pay attention to the 12

15   points, yes.

16            MR. HERNANDEZ:  I have no further questions.

17            THE COURT:  All right, why don't we break here

18   for the day.  I understand we're going to be picking up

19   with both cross and your direct of this witness?

20            MR. BRILL:  Yes, I'll finish up this witness

21   tomorrow morning, Your Honor.  I would expect to have

22   probably an hour.

23            THE COURT:  Okay.

24            MR. ORLEANS:  And we'll proceed with Mr. Webb, I

25   expect.

```
 1              THE COURT:  All right.  All right, thank you
 2     sir.  You may step down.
 3              (Whereupon the witness was excused.)
 4              THE COURT:  We'll take up motion in limine, when
 5     do you want to respond to that?
 6              MR. ORLEANS:  You want something written, Your
 7     Honor?
 8              THE COURT:  It's up to you, I can hear your
 9     argument in the morning.
10              MR. ORLEANS:  Let us take a look at it, if we're
11     going to have something in writing we'll try to get it
12     emailed before we go home tonight, first thing in the
13     morning so you can see it tomorrow morning if we're going
14     respond.  If we're not going to respond in writing we'll
15     let you know when you take the bench and be prepared to
16     argue.
17              THE COURT:  Okay, very good.  Anything else we
18     should take up today?
19              All right, thank you all.  We'll stand
20     adjourned.
21              (Whereupon the above matter was adjourned at 5:20
22     o'clock, p. m.)
23
24
25
```

C E R T I F I C A T E


        I, Susan E. Catucci, RMR, Official Court
Reporter for the United States District Court for the
District of Connecticut, do hereby certify that the
foregoing pages are a true and accurate transcription of
my shorthand notes taken in the aforementioned matter to
the best of my skill and ability.




        /S/ Susan E. Catucci
        _____

            Susan E. Catucci, RMR
            Official Court Reporter
            915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
            Tel: (917) 703-0761