```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

STEPHANIE BIEDIGER, ET AL        :  No. 3:09cv-621 (SRU)
                                 :  915 Lafayette Boulevard
              vs.                :  Bridgeport, Connecticut
                                 :
                                 :  June 22, 2010
QUINNIPIAC UNIVERSITY            :

- - - - - - - - - - - - - - - - x


                          BENCH TRIAL


B E F O R E:

      THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

      FOR THE PLAINTIFFS:

            PULLMAN & COMLEY
                  850 Main Street
                  P.O. Box 7006
                  Bridgeport, Connecticut 06601-7006
            BY:   JONATHAN B. ORLEANS, ESQ.
                  ALEX V. HERNANDEZ, ESQ.

            KRISTEN GALLES, ESQ.
                  Equity Legal
                  10 Rosecrest Avenue
                  Alexandria, Virginia  22301

      FOR THE DEFENDANT:

            WIGGIN AND DANA, LLP
                  400 Atlantic Street
                  P. O. Box 110325
                  Stamford, Connecticut  06911-0325
            BY:   MARY A. GAMBARDELLA, ESQ.


                                      (CONTINUED)
```

```
PROSKAUER ROSE
      1585 Broadway
      New York, N. Y.  10016
BY:   EDWARD A. BRILL, ESQ.
      SUSAN D. FRIEDFEL, ESQ.
      REBECCA BERKEBILE, ESQ.




        Susan E. Catucci, RMR
        Official Court Reporter
        915 Lafayette Boulevard
      Bridgeport, Connecticut  06604
          Tel: (917)703-0761
```

I N D E X

WITNESSES:

MARK THOMPSON

Cross Examination by Mr. Brill..................318
Redirect Examination by Mr. Hernandez..........354

JEFF WEBB

Direct Examination by Ms. Galles................371
Cross Examination by Ms. Friedfel...............423

−0−

1              (9:05 O'CLOCK, A. m.)

2          THE COURT:  Good morning.  Should we start with

3     the motion in limine?

4          MR. HERNANDEZ:  Yes, Your Honor.  I'm prepared

5     to address that for the court on behalf of the plaintiffs.

6          The defendants had filed this motion, this claim

7     with respect to two of the plaintiff's witnesses, expert

8     witnesses Mr. Webb and Ms. Yiamouyiannis, and I'll deal

9     with them in turn.

10          First of all, they move to preclude Mr. Webb

11     from testifying about what constitutes a varsity sport.  I

12     take that to mean that they are moving to preclude him

13     from testifying about what constitutes a varsity sport

14     within the meaning of Title IX and/or OCR.  He's not being

15     called as an expert witness in these fields so I do not

16     anticipate that that will be an issue.

17          THE COURT:  Okay, all right.

18          MR. HERNANDEZ:  The next, they next move to

19     preclude testimony about whether Quinnipiac's competitive

20     cheer should be properly counted as a varsity sport.  They

21     didn't qualify it and I'm looking at the bottom of page

22     two of their motion.  I take that to mean, I take the

23     adjective "properly" to mean under Title IX slash OCR

24     compliance.  Again, Mr. Webb is not an expert, he's not

25     being called as expert in Title IX or OCR compliance.  I

1    don't anticipate that that will be an issue.

2         Lastly, they move to preclude testimony about

3    the NCSTA, the National Competitor Stunts and Tumbling

4    Association, or its meet format.  He is prepared to

5    compare and contrast the rules and format of his

6    organization with those of the NCSTA, but as far as

7    offering an expert opinion as to whether the NCSTA rules

8    constitute a sport, he's not, he's not testifying about

9    that.

10        He's going to be testifying that in his view the

11   competitive cheer community is of varying minds and I

12   use -- many, many different minds about whether cheer

13   should be considered a sport at all, so I don't anticipate

14   that the substance of their motion will be an issue.

15        They are also objecting to the testimony of

16   Ms. Yiamouyiannis.  She is testifying primarily as a

17   expert in what the requirements are under NCA, under the

18   NCAA.  I take it from their motion that they are moving to

19   preclude Ms. Yiamouyiannis from testifying about the, what

20   the rules are for cross country and/or track.  She's not

21   being called as an expert with respect to those particular

22   areas.

23        She is, however, going to inform her opinion

24   about what the NCAA requires by way of reference to what

25   the rules are in cross country and in and outdoor track

1    but she's not going to be giving an expert opinion about

2    those particular sports, so --

3              THE COURT:  Okay.

4              MR. HERNANDEZ:  So to the extent that there are

5    objections about specific questions posed to the witness

6    regarding opinion, I'd invite counsel -- we'll bring the

7    witness, they can bring their objections.

8              THE COURT:  That was going to be my suggestion.

9    Okay.  All right?  Very good.  So, in effect the motion in

10   limine is denied largely as mute but without prejudice to

11   raising objection to specific inquiries made of either of

12   these witnesses.

13             MR. BRILL:  Unless the court has something else

14   to address preliminary, I was thinking of the privilege

15   issue.  I have one or two also preliminary matters.

16             THE COURT:  Well, okay.  On the privilege issue,

17   I have reviewed the materials supplied to me --

18             MR. ORLEANS:  Excuse me, Your Honor.  I don't

19   mean to interrupt.  If you're going to address, may I just

20   go out in the hall and bring Ms. Galles and Mr. Webb into

21   the room because --

22             MR. HERNANDEZ:  I'll get them.

23             THE COURT:  Sure.

24             MR. ORLEANS:  If you just give us one moment I

25   think they are out there.

1          MR. BRILL:  I can make use of the one minute for

2    two very quick points, Your Honor.

3          THE COURT:  Sure.

4          MR. BRILL:  First of all, we did receive

5    yesterday an amicus brief from the United States.

6          MR. HERNANDEZ:  Yes.

7          MR. BRILL:  I assume the court saw it.  And we

8    would like an opportunity to respond to that.  If we can

9    have until the end of the week.

10          MR. HERNANDEZ:  To respond to the brief or to

11    respond to the motion?

12          MR. BRILL:  No, the motion.  I can see the brief

13    is being filed and we accept it.  We'd like to respond to

14    the substance of the brief.

15          THE COURT:  That's fine.

16          MR. BRILL:  And secondly, there was some

17    discussion yesterday about Mr. Seely, the women's ice

18    hockey coach.  We had spoken to them.  He can be available

19    to come in Thursday and testify briefly.  He was on our

20    witness list as a possible witness.  I just want to advise

21    the court and the plaintiffs that we will make him

22    available, and there's no need to worry about hearsay or

23    nonhearsay.  The emails are going to come in at this

24    point.

25          THE COURT:  Okay.  All right, well, in terms of

1    the privilege issue, I have a little trouble reviewing it

2    based on what I've seen in part because I don't know the

3    relationship and/or the positions of some of the folks who

4    are the addressees of the communications.  I will say that

5    the, the substance of the communication that begins

6    with -- it's dated May 4, 2010 at 10:56 a. m. -- does not

7    appear to me to be a privileged conversation.

8              The other one appears to be privileged, assuming

9    that it hasn't been waived by CC'ing someone who's not in

10   the attorney-client relationship.  In other words,

11   Mr. Webb, Mr. Bill Seely, S-E-E-L-Y, Jim Lord or Bill

12   Boggs, I don't know who these people are.

13             MS. GALLES:  Would you like me to address that,

14   Your Honor?

15             THE COURT:  Sure.

16             MS. GALLES:  Mr. Jeff Webb is the CEO and those

17   other gentlemen are management employees of Mr. Webb's

18   organization.

19             THE COURT:  All right.

20             MS. FRIEDFEL:  Your Honor, may I -- I think

21   there's a dispute as to that because Jim Lord is copied on

22   that email, I believe.

23             THE COURT:  Yes.

24             MS. FRIEDFEL:  And Mr. Lord testified at his

25   deposition that he is only employed by Varsity Brands for

1    purposes of obtaining their benefits package and that he

2    receives his salary from them, he's on their payroll;

3    however, he's the conduit to AACCA, which is I think it's

4    American Association of Cheerleading Coaches or something

5    like that, and that he's the executive director of that

6    organization and he does not actually have a formal

7    position with the Varsity Brands.

8              THE COURT:  Well --

9              MS. FRIEDFEL:  I don't want to dispute this.  I

10   just want to make the record clear for Your Honor.

11             THE COURT:  Fair enough.  I think if these folks

12   are all either current employees or paid by Varsity, then

13   that's sufficient to secure the privilege with respect to

14   the April 13, 2010, 3:50 p. m. communication.  But the

15   other one seems to me -- and I'm happy to hear any

16   argument on that but it does not appear to be related to a

17   legal, the provision of legal advice or the request for

18   legal advice, or seems to be --

19             MS. GALLES:  Your Honor, we would just take the

20   position that this is all part of developing a legal

21   strategy and that was part of the background working

22   discussion related to creating that legal strategy.  So --

23             THE COURT:  Well, I understand why you take that

24   position.  I don't agree.

25             MS. GALLES:  Okay.

1          MR. HERNANDEZ:  So that one should be disclosed.

2     I don't think it's a significant document.  I don't think

3     it's going to cause the defense to jump up and down.

4          MS. GALLES:  Sure, Your Honor.  We just wanted

5     to -- obviously we're sort of the conduit for that and

6     they wanted it asserted and that's what we did.

7          THE COURT:  I appreciate that.  Okay.  And just

8     for the record, I am going to grant the motion for leave

9     to file an amicus brief by the United States, which is

10    Document 153.

11         MS. FRIEDFEL:  Your Honor?

12         MR. HERNANDEZ:  Yes.

13         MS. FRIEDFEL:  With respect to the waiver of the

14    privilege by the disclosure to Ms. Galles, I was going to

15    address that issue but I do want to note that they took

16    the position they were redacting the document solely at

17    the direction of Varsity Brand's attorney and they were

18    just doing it for expediency sake and they weren't maybe

19    as concerned about it, but Mr. Orleans had the documents

20    in full form to send to you.  So it's not like they

21    redacted the version and just took the redacted version

22    because they were acting at the instruction of Varsity

23    Brands' attorney.  They kept the fully, the full document

24    and not only with Ms. Galles but then Mr. Orleans saw it.

25    So it doesn't seem to me they were really maintaining a

1    privilege.

2            MR. HERNANDEZ:  In light of representations made

3    to me about the circumstances under which it was turned

4    over and in light of the expedience that was been kind of

5    imposed upon this case, in part by my decision to speed up

6    the trial by a week, I don't see a problem with the way

7    it's been handled.

8            All right.  Are we ready to go?

9            MR. ORLEANS:  Yes, sir.

10           THE COURT:  We have Mr. Thompson I think?

11   M A R K     T H O M P S O N,     called as a witness on

12   behalf of the Plaintiff, having been previously duly sworn

13   by the Court, testified as follows:

14           THE COURT:  You're still under oath.

15           THE WITNESS:  Yes.

16           MR. BRILL:  We're on the clock?

17           THE COURT:  We're on the clock.

18   CROSS EXAMINATION

19   BY MR. BRILL:

20   Q.   Good morning, Mr. Thompson.

21   A.   Good morning, Mr. Brill.

22   Q.   I'd like to give a little bit more of your background

23   than you were able to give yesterday.  Will you tell me he

24   how long you've been at Quinnipiac and what positions

25   you've held during the course of your employment?

1   A.   Sure.  I've been at Quinnipiac University for 12

2   years.  First appointment was as associate within the

3   school business which I held that position for five years.

4   I was five years within the school of business, and then

5   last two years I've had health position, senior vice

6   president for academic and student affairs.

7   Q.   Who do you report to?

8   A.   I report to the president of the university, John

9   Lahey.

10  Q.   What is the President's cabinet at Quinnipiac?

11  A.   The President's cabinet includes the vice presidents

12  and senior vice presidents who are responsible for the

13  major function of the university.

14  Q.   Now, you testified yesterday about your span of

15  authority over three or four different areas.  Could you

16  just much describe very briefly for the court your

17  management philosophy with respect to those different

18  areas?

19  A.   Given the breadth of responsibilities I have, my

20  philosophy is that we seek to hire the folks who clearly

21  have the experience and the ability to take on the duties

22  and responsibilities without significant oversight on my

23  part.  My leadership philosophy is that you trust the

24  folks that you have hired.  You look at their expertise

25  and you have some assurance they can carry out these

1    duties and responsibilities.  I intervene in case -- we do

2    manual reviews and so forth but I do certainly intervene

3    in cases where I feel that there is an issue that needs to

4    be addressed.

5    Q.   Would you apply any different philosophy with respect

6    to the coaches in carrying out their responsibilities than

7    you do, for example, with the department chairman or a

8    faculty member?

9    A.   No, it would be the same type of handling of

10   leadership and management of those folks.

11   Q.   Can you take a look at Exhibit B N, which is in the,

12   I'm going to be using mostly the defendant exhibits this

13   morning, if you have those handy.

14        (Pause)

15   A.   Yes.

16   Q.   Could you identify that document?

17   A.   This is the EADA report that was submitted by

18   Quinnipiac University.

19   Q.   This is the --

20   A.   Excuse me, iPad report.

21   Q.   What is the iPad report?

22   A.   IPad report is our required government document that

23   all colleges and universities submit.

24   Q.   Does this report contain the undergraduate

25   enrollments for men and women for 2009, 2010?

1    A.    Yes, it does.

2    Q.    Now, going back to the process of setting the

3    roster --

4              MR. BRILL:  Your Honor, I'm trying to make this

5    quick so I'm not going to like go over the numbers, but if

6    you have a question about where we are?

7              THE COURT:  I think I can read.

8              MR. BRILL:  Okay, fine.

9    BY MR. BRILL:

10   Q.    What was your, what was your approach when you first

11   took over responsibility as senior vice president for

12   academic and student affairs, what was your approach to

13   going about taking over responsibility for the athletic

14   department?

15   A.    With respect to roster management?

16   Q.    More in general, more generally.

17   A.    More broadly, it would be the same concerns I'd have

18   over the same things that are important to me with respect

19   to my areas of responsibility, that I have to have a

20   thorough understanding of the operations of the

21   department, any needs that they have, what goals and

22   strategies they have in place, ways that I can support

23   them and certainly in the areas of compliance and

24   adherence to law and regulations, being sure we are -- in

25   fact our house is in order.

1    Q.   And did you have any concerns that you developed as

2    you took over responsibility for the athletics area?

3    A.   I did, and it came as a result of the filing of this

4    lawsuit and also the ruling on the preliminary injunction.

5    Q.   What were those concerns?

6    A.   I had three concerns with respect to roster

7    management in particular.  And I in reviewing what had

8    happened, my feeling was there were three issues.

9         One issue was that the person who was responsible for

10   athletics and recreation prior to me I feel did not give

11   sufficient oversight to what happened especially with

12   respect to Title IX compliance and roster management.

13        And, secondly, I don't think the coaches were

14   properly trained in Title IX compliance.

15        And the third issue I had was with respect to roster,

16   claims for roster manipulation, that was of particular

17   concern to me.  My findings in reviewing that were that

18   two of our coaches out of, I think we had 18 at the time,

19   two of our head coaches did engage in some adding/deleting

20   that I considered to be inappropriate.

21        I did immediately, because the men's baseball coach

22   and men's lacrosse coach, I did immediately speak to both

23   of them, told them it was not acceptable and it was not in

24   compliance with Title IX, it would not be accepted going

25   forward.  And I asked for an explaination as to why they

1    did it.  Their explanation was that they -- basically what

2    it boiled down to, they had a tough time making a

3    leadership decision, management decision, to cut certain

4    players from the roster and keep them off the roster as a

5    way of appropriately manage it.  Essentially what it

6    boiled down to was they had some of the players that they

7    liked personally and did not want to burn them by not

8    including them on the team.

9         But, in any event, there is no -- my finding was

10   there was no wide spread manipulation.  It was limited to

11   those two teams.  There was certainly no university policy

12   of padding or manipulating or ceiling or floors.  And the

13   problem as I found it was addressed immediately and I was

14   given every assurance that things are in order.

15   Q.   And when you set about to take over responsibility

16   for the roster management program, what was your overall

17   approach, if I can ask you that, general terms?

18   A.   It started with my own education with respect to both

19   NCAA regulations and Title IX compliance, including the

20   help of an expert in the field and, then again, I was

21   very -- I thought it was very important to understand in

22   particular from the head coach's perspectives, given they

23   are closest to the sport that you're responsible for and

24   meet the circumstance you might be faced with, to hear

25   directly from them any concerns and get their input in

1    terms of what an appropriate roster size would be.

2        In addition, at a head coaches meeting I informed

3    them very specifically about my expectations around

4    compliance, not just with Title IX but compliance more

5    broadly in all aspects, and told them that they will be

6    held accountable for their actions but we would go through

7    an appropriate process to look at NCAA average squad

8    sizes, NEC squad sizes in some cases, that I would get

9    their personal opinions.

10       What we basically went through were three mental

11   processes of back and forth and personal meetings with the

12   coaches that ultimately set the roster numbers for '09,

13   '10.  I felt that we, that I personally went out of my way

14   in this case, given that I did have concern to insure that

15   the process was appropriate and that we ended up with

16   numbers that did represent in fact genuine opportunities

17   for all athletes.

18   Q.   Dr. Thompson, yesterday the plaintiffs introduced a

19   set of charts of various roster targets beginning in I

20   think June through September.  Is there someone on your

21   staff that you had prepare those charts for you?

22   A.   No, I did those myself.

23   Q.   Each one of those charts?

24   A.   Each one, yes.

25   Q.   And when you talk about roster numbers, just to

1    clarify, were you talking about caps for the men's teams

2    and minimums for women's teams?

3              MR. HERNANDEZ:  Objection.  Leading.

4              THE COURT:  I'll allow it.

5    A.   Absolutely not.  My process was to insure that for

6    each team that the number that we ultimately arrived at

7    given all of the input that I described before represented

8    what was a genuine opportunity for the athletes to be

9    participating on that team.

10   Q.   And what did you tell the coach, both in the

11   individual meetings and the June 2nd meeting, about what

12   you expected of them with respect to the target roster

13   targets once they were developed?

14   A.   Well, start with the discussion again questioning

15   them around their budget facilities, their coaching staff

16   and so forth to make sure that they understood the breadth

17   of the question I was asking with respect to insuring that

18   in fact they had resources to be able to offer input for

19   athletes.

20        Once that number was set and following a lengthy

21   process of talking and thinking about what resources were

22   in place, once that number was set, I told them very

23   clearly they are being held accountable for having that

24   number on their roster.  I felt it was appropriate to do

25   that, again, given that we clearly are expected to comply

1    with Title IX, and I felt that the process was sufficient

2    in terms of receiving their input directly in terms of

3    what they felt was an appropriate number.

4    Q.    Did you tell any of them that their jobs were at risk

5    if they did not meet their roster targets?

6    A.    No, I did not tell them that.  I did tell them they

7    would be held accountable for achieving the number on the

8    roster.

9    Q.    Did you ever mention the terms "at will employment"

10   in any of your discussions with the coaches?

11   A.    No, I did not.

12   Q.    Incidentally when was the change at the university

13   from employment contracts to at will employees?

14   A.    The decision to go to at will employment for folks

15   who are in administrative positions which would include

16   head coaches in this, as part of that, in that category,

17   was actually made January or February of 2009.  This was

18   actually before any decisions with respect too cutting of

19   teams or budget cuts and so forth.

20   Q.    How did that come about?

21   A.    It came about as a result of a review of our Human

22   Resource policies at the university and we decided that it

23   was inconsistent with what our corporate practices in

24   terms of issuing contracts to administrative employees.

25   In addition we were putting in place an annual fee process

1    as part of what we were doing.  But the decision to do

2    that was completely unrelated to anything having to do

3    with decisions regarding discontinuance of any of the

4    teams in the athletics department.

5    Q.   And are there any coaches that do have employment

6    contracts?

7    A.   There are four coaches that do have rolling five year

8    contracts.  Those are the men's and women's head

9    basketball coach and men's/women's head ice hockey

10   coaches.  Those are sports of emphasis on our campus and

11   in order to secure highest quality head coaches for these

12   particular sports, we feel it's an appropriate practice

13   for those four.

14   Q.   If you would look at Exhibit B R?  Now, I think this

15   actually went in yesterday as a plaintiff's exhibit.

16            THE COURT:  I believe it did.  I don't hear any

17   objection.

18            MR. HERNANDEZ:  It's already in.

19            MR. BRILL:  Excuse me.

20            MR. HERNANDEZ:  It's already in.

21   BY MR. BRILL:

22   Q.   So, Dr. Thompson, there's reference in this email to

23   giving the coaches a roster memo.  Can you tell us what

24   the roster memo referred to?

25   A.   Roster memo was part of formulizing the process to

1   insure that in fact it was clear on the part of the

2   coaches that they are being held accountable and also I

3   wanted to have confirmation, written confirmation from

4   them or something that they signed indicating in fact they

5   did give consideration to that roster number and that it

6   did represent genuine opportunity for the participants on

7   the team, that they had sufficient budget to carry it out

8   and again to bring more formality of the introduction of

9   setting roster numbers.

10  Q.   And if you turn your attention now to Exhibit B O,

11  can you identify these as the letters that were signed by

12  the coaches as to the rosters?

13  A.   Yes, those are copies of the letter.

14  Q.   Now, I notice that the letters are all dated July 22

15  but were some of them in fact revised after that day?

16  A.   They were as a result of additional input from

17  coaches with respect to their roster numbers.

18  Q.   Did all the coaches sign?

19  A.   No.

20  Q.   Which coaches did not sign?

21  A.   The volleyball coach and the softball coach did not

22  their letters.

23  Q.   Now, I want to go through a number of email

24  communications fairly quickly just to show the

25  correspondence that you had with the various coaches and

1    I'll begin with B X.  This is competitive cheer and I

2    don't need to go into these in any detail but just to put

3    them into the record, can you tell us very briefly what

4    communications you had with the competitive cheer coach

5    about the roster size and whether you made any adjustments

6    based on the input of the coach?

7    A.   This, originally our plan was to have 40 on the

8    competitive cheer team and this was a request by the coach

9    in response to my invitation to have a personal meeting

10   with each head coach.  Ultimately we set the roster at 30.

11   Her concern was that was not a large number number.

12   Q.   The coach wanted a larger number?

13   A.   Yes.

14   Q.   And did she explain why?

15   A.   She did, for several reasons.  One is that she was

16   familiar with the schools that we're competing against and

17   the size squads they had, which are typically 36 to 42,

18   somewhere in that neighborhood.

19        And an additional concern on her part was that it's a

20   high injury sport and she wanted to have sufficient

21   players in the event that someone became injured.

22        And also, she was looking for multiples of six, so

23   her request was actually to have 36 and the reason for the

24   multiple of six was because they apparently practice in

25   groups of six.

1   Q.   And why did you reject her request to have a higher

2   roster at that point?

3   A.   It was a couple of things.  Being that it was the

4   first year, wanted to insure that things went relatively

5   smoothly.  There was sufficient resources.  In addition, I

6   also was aware of the ruling by Judge Underhill in the

7   preliminary injunction that he felt that 40 would seem to

8   be too high of a number.

9   Q.   Now, could you turn your attention to Exhibits B Y

10  through C A.  And again just tell us briefly about the

11  communications you had with the women's basketball coach?

12  A.   The women's basketball coach for 2009, '10, my intent

13  was to set the roster at 15.  She requested an additional

14  two players as walk ons.  She felt that the number of 17

15  at the time was what she needed in order to field a

16  competitive team.  In response to that request I did ask

17  her the questions I ask of all coaches who made requests

18  with respect to resource availability, budgets and so

19  forth, and I did grant her the increase to 17 as a result

20  of her request.

21  Q.   And did she subsequently ask for further adjustment

22  in the roster?

23  A.   She did.  She asked for one additional player and

24  again it was a situation of concern about the

25  competitiveness of the team and I did grant that

1    additional player later on.

2    Q.   Now, on women's ice hockey, if you turn your

3    attention to C B, do you recall conversations with the ice

4    hockey coach Mr. Seely?

5    A.   Yes, Coach Seely actually I believe my intent was

6    again looking at my primarily plan which I presented, the

7    intent was to set the roster at 27 initially.  Coach Seely

8    came to me me again at my invitation to talk about how he

9    felt about that, the number 27.  He indicated to me during

10   the course of our conversation that he felt 26 was

11   appropriate and his reasoning was he had already

12   identified 25 student athletes to play on the team and

13   actually that day was added a 26th person visiting on

14   campus, so I set the roster at 26 as an as a result of her

15   inquiry.

16   Q.   Did he agree to that number?

17   A.   Yes, he did.

18   Q.   If you look at Exhibit C D through C E, which relate

19   to women's soccer, can you tell us what conversations you

20   had the women's soccer coach?

21   A.   Dave Clark was the women's soccer coach.  The plan

22   was to set his roster at 27.  He expressed no concern at

23   that point about 27.  His concerns were around questions

24   with respect to training, Title IX compliance and so

25   forth, so it was limited to that.

1          As a result of not expressing concern at that time I

2     left the roster at the number 27.

3     Q.   Did he ever come to you during the course of the year

4     to say that number was too high or unmanageable?

5     A.   No, he came to me more recently in terms of giving

6     his input at my invitation for setting the roster numbers

7     for next year.

8     Q.   And did you in fact adjust the roster for women's

9     softball for next year based on his input?

10    A.   Women's soccer?

11    Q.   I'm sorry, yes.

12    A.   Yes, I did.  He said, well, as discussed yesterday he

13    felt 27 was not a manageable number after years of

14    experience and he indicated he had hope for a reduction of

15    one to two players to reduce the roster from 27 to 25 as a

16    result of his concern.

17    Q.   Okay, on women's softball you said that the softball

18    coach was the one of two coaches who did not sign the

19    letter?

20    A.   Yes.

21    Q.   Did you have communications with Germaine Fairchild

22    the softball coach about the roster size?

23    A.   I did.

24    Q.   Can you just tell us briefly what these

25    communications were?

1    A.   It was both written communications and emails that

2    are in C F, but if the face to face conversation that I

3    had with Coach Fairchild enforcement roster number was she

4    felt that 20 was a number that she could provide an

5    opportunity, a genuine opportunity for her players.  The

6    reason she stated she did not sign the roster letter was

7    despite her feeling that 20 was a manageable number, she

8    felt by signing the number it would be in conflict with

9    the testimony she gave at the preliminary injunction

10   hearing, where she recollected saying that 17 to 19 would

11   be a preferred number.  But she did not express any

12   concerns about 20, but that's the reason she gave for not

13   signing the letter, in concern about her prior testimony.

14   Q.   Did there come a time where Coach Fairchild wanted to

15   change the roster either by adding or deleting athletes?

16   A.   Yes.

17   Q.   Tell us what happened.

18   A.   As we approached the first day of competition for the

19   softball team, I believe it was on a Saturday, late in the

20   day on Friday which is the day prior to the first day of

21   competition, I received a request that she wanted to add a

22   21st player.  I denied the request because she did not

23   provide me with a rationale as to why she wanted to do it.

24   It was a last minute request that I didn't feel I had

25   sufficient information to make the decision to add the

1    player.  It turned out later in that past the followed the

2    first week of competition, the issue was that she needed

3    an additional catcher particularly for practice where she

4    had an injury for one of her catchers, and not having the

5    secondary catcher would have simply, in her words, torn up

6    the other catcher by over utilizing the person.  So my

7    decision was to add the 21st player once I understood what

8    the rationale was, I had concern about the welfare and the

9    well being of the catcher who she thought may be injured

10   as a result of not adding the second person.

11   Q.  Just to be clear, even though this was a women's

12   team, the women's team coaches didn't have the right

13   automatically to add players to the teams?

14   A.  No, absolutely not.

15            THE COURT:  I take it, Mr. Brill, that you're in

16   effect offering C T?

17            MR. BRILL:  C F through C H actually.

18            MR. HERNANDEZ:  No objection.

19            THE COURT:  All right, very good.

20            (Whereupon Defendant's Exhibit CF through CH was

21       marked full.)

22   BY MR. BRILL:

23   Q.  Turning your attention to C I which is volleyball,

24   did you have any conversations with Coach Sparks about the

25   roster number of volleyball?

1    A.    I did.  And it was again same invitation that went to

2    all the coaches and her originally intent was to set the

3    roster at 14 which is in the NCAA average squad size but

4    as a result of conversations it was set at 12.

5    Q.    Did Coach Sparks subsequently request either adding

6    or increasing or decreasing that roster?

7    A.    Yes.  Coach Sparks wanted to add a 13th player.  I

8    don't remember the exact time but -- I don't remember it

9    as well as I do the softball situation but it was a

10   request that came out of 13, to add a 13th player but no

11   rationale that made it clear to me as to why she wanted

12   that, to add a player, and I denied that request.

13   Q.    If you'd look at Exhibit C J through C K on men's

14   basketball, again can you briefly tell us the

15   conversations you had about the size of the men's

16   basketball roster?

17   A.    Tom Moore, the head coach, made a request and as a

18   result of more information with how we handle who should

19   be included and who shouldn't be, questions around

20   injuries, players on full scholarship, for example,

21   whether or not they should be included.  Not taking that

22   into account, he felt that 15 was the appropriate size for

23   his team.  When he found out additional information with

24   in terms of who should count and who know shouldn't and

25   had an injured player who was on scholarship and another

1   player, I can't remember the situation but it was a

2   similar situation where the person had an account but

3   clearly couldn't play, he requested an increase to 17 and

4   his concern was he wanted to be able to field a

5   competitive team and given this was a sport of emphasis

6   for us -- excuse me -- I increased the number to 17.

7   Q.   And looking at Exhibit C L through C O on men's ice

8   hockey, again --

9   A.   This was actually a lengthy exchange with Ran Pecnold

10  (ph) who is our head coach for the men's ice hockey team

11  who wanted to increase his roster to 30, was I think

12  intended to be set at 28 if I remember correctly.  I

13  denied the request because I didn't feel that there was

14  any need to add those players.  After speaking with him

15  several times it became clear that his concern was that

16  he, again being a sport of emphasis, he wanted to be able

17  to field a competitive team.

18       In addition to this, in our conversations he shared

19  with me something I didn't know and that was that the

20  locker facilities at our new sports center included 30

21  lockers for both men's ice hockey and women's ice hockey,

22  and given the input and his concerns about competitiveness

23  of the team, I ultimately did agree to increase his number

24  from 28 to 30 as a result, with the assurances that there

25  would be a genuine opportunity for 30 players.

1    Q.   And looking at Exhibit C P, which is men's lacrosse,

2    do you recall conversations with the men's lacrosse coach?

3    A.   Yes, I do.  And this was a situation actually to look

4    back at my notes from June until, where we ultimately

5    ended up.  My recollection in this case was that Eric

6    Becca (ph) who is our head coach for lacrosse requested an

7    increase.  My intent was to have it at 39.  He had

8    requested a roster size of 41, again, around concerns

9    about fielding a competitive team and I did grant his

10   request to have that set at 41.

11   Q.   Now, you finalize the, you remember when the roster

12   numbers were actually finalized for the '09, '10 year?

13   A.   It was shortly after the letters were issued, the

14   letters were issued I believe July the 2nd, it was shortly

15   before that numbers were finalized at that point.

16   However, again, there were some changes that occurred as

17   situations came up, as we got close to the first date of

18   competition for some of the teams.  And part of that was

19   my own process in terms of learning more clearly my own

20   learning curve in terms of counting and so forth.

21   Q.   And yesterday you were shown an exhibit dated

22   September 1st of 2009, and again I have the defendant's

23   exhibit number But you were shown a plaintiff's exhibit

24   with a roster plan of September 1st.  Was that the final,

25   was that the day when you finally reached the final roster

1    plan for the year?

2    A.    Yes, I believe that is correct.

3    Q.    So the entire process took June, July and August?

4    A.    It was a three month process, yes.

5    Q.    Now, did you do anything to monitor the rosters after

6    that, those final numbers were established at the

7    beginning of September?

8    A.    Yes, I made it very clear to all of the head coaches

9    as well as the administrative staff and in athletics, I

10   wanted final approval over any changes to the rosters

11   throughout the academic year.  So I did monitor very

12   closely in terms of the individual cases.  Every case that

13   came up was reviewed by me personally to insure that it

14   was an appropriate request.

15   Q.    And how did you evaluate the requests that came to

16   you?

17   A.    Tracy Flynn would provide me -- generally what would

18   happen is Tracy Flynn would provide me information with

19   respect to the situation.

20   Q.    Who's Tracy Flynn?

21   A.    Tracy Flynn is our compliance officer in athletics or

22   in some cases the head coaches would email me directly

23   with the situation if they wanted my input, so through one

24   of those two avenues, information was provided me to allow

25   me to make a decision on a case by case basis.

1   Q.   Did you apply different standards for women's and

2   men's teams?

3   A.   No.

4   Q.   Let me call your attention to Exhibit B V?

5   A.   B V?

6   Q.   B as in boy, V as in Victor.  What, this is an email

7   that you sent out on November 12th to Jack McDonald, Tracy

8   Flynn and Robert Tipson?

9   A.   Yes, correct.

10  Q.   Who is Robert Tipson?

11  A.   Yes, Jack McDonald is on our athletic director, Tracy

12  Flynn, Bob Tipson are both compliance officers.

13  Q.   And what led to this email?

14  A.   I had a concern regarding one case, I don't remember

15  what it was in particular that did not feel -- it came to

16  my attention so I wanted to clarify it one more time that

17  it was my expectation that all requests would be approved

18  by me.

19  Q.   Now, there's a reference in the first paragraph to

20  the Title IX presentation?

21  A.   Yes.

22  Q.   What is that referring to?

23  A.   I made arrangements for all of our head coaches and

24  our administrative staff in athletics to have Title IX

25  training.  The original intent was to have it in

1    September.  Unfortunately the person who was scheduled had

2    a family situation and that preclude her from being there

3    on that day but it did occur in early November.

4    Q.   I'd just like to direct your attention to several

5    examples of email correspondence regarding deletions and

6    additions.  And I'm not going to go through these in any

7    great detail but if you could look at Exhibit C Q to begin

8    with.

9    A.   Yes, I have it.

10   Q.   C Q, just tell us very briefly what the situation was

11   there.

12   A.   This is a request that came from our field hockey

13   coach.  Her request was to -- sorry, I have to read this

14   one briefly.

15        (Pause)

16        She wanted to add a player to her spring roster for

17   remainder of the spring season and it was someone she

18   wanted to give an opportunity for a try out for the

19   upcoming year, and I did approve that request.

20   Q.   If you look at Exhibits C R through C S, C U and C X,

21   those are four separate exhibits that all pertain to the

22   men's lacrosse team and I don't think we need to go

23   through these in any detail but, again, do you have any

24   general understanding of the changes that were made to the

25   men's lacrosse team and approved by you?

```
1    A.    Yes, and I think this is an example of the

2    seriousness that the head coaches took with respect to my

3    request to approve this and with respect to Title Nine

4    compliance.

5    Q.    Was the men's lacrosse coach one of the coaches you

6    felt had not understood?

7    A.    Yes, he's one of the two coaches I felt had engaged

8    in some inappropriate action and I addressed immediately.

9    But in effect he's asking about the, in this email he had,

10   he had a student who was away for a semester coming back

11   in January as a student so he wasn't a student in the fall

12   semester, and another student coming in as a transfer

13   student, both of whom he wanted to add to the team.   The

14   41 that he had in his roster included some walk ons and

15   his question was if I make a request to add these two to

16   my team, should I delete two walk ons and my response was

17   yes.

18   Q.    And if you look at Exhibit D E which is the women's

19   soccer, communications with the women's soccer team coach?

20   A.    Did you say E E?

21   Q.    D as in David, E as in Edward.

22   A.    Yes, I have it here.

23   Q.    And actually Dave Clark, the same coach who

24   complained subsequently that 27 was too high, correct?

25   A.    That is correct.
```

1    Q.   Can you tell us what this communication, what you
2    recall about the communications with Mr. Clark?
3    A.   In this email he indicates he had three players
4    trying out for the team during spring semester, he wanted
5    to add one of these players to the roster so she could
6    play in the upcoming games.  He indicated that by this
7    point in the season he had seven seniors who were not
8    playing and essentially was down to 17 active players.  As
9    a result of his explanation, I did approve his request to
10   add the one player to the team.
11   Q.   Now, now there are -- were there other examples of
12   such communications?
13   A.   There's more examples than you probably need to go
14   through, that's obviously up to you, but there are several
15   examples of correspondence between myself and head coaches
16   along these lines.
17   Q.   Now, turning your attention to the spring of this
18   year, Dr. Thompson, did there come a time when you talked
19   to the coaches about the process for setting the rosters
20   for the upcoming academic year?
21   A.   I did -- there was a meeting of all the head coaches
22   that occurred, my recollection is that was in May.
23   Purpose of the meeting was twofold; one was to get their
24   input as a collective group as who how they felt in '09,
25   '10 and addressing any concerns that they had.

1           As I mentioned yesterday the primary concern was the

2     timing with respect to setting of the roster for the

3     upcoming year so they could effectively recruit and so

4     forth, which I will address.  And then the second reason

5     was to, again, make a personal invitation to have each one

6     of them provide me input with respect to their individual

7     team and how things went in '09, '10 and any input they

8     had with respect to setting numbers for '10, '11.

9     Q.   During the course of the year, was there any coaches

10    on a men's team or women's team who came to you to tell

11    you they felt their roster size was either too large or

12    too small?

13    A.   During --

14    Q.   During the course of the year?

15    A.   No.

16    Q.   And how did the meeting that you held with the

17    coaches in the spring, was there any --

18    A.   No.

19    Q.   -- discussion along those lines?

20    A.   No, not at the meeting.  You're talking about the

21    large --

22    Q.   The large meeting?

23    A.   No.

24    Q.   Now, did you have email communications with coaches

25    about their roster sizes for the up coming year?

1   A.   I did.

2   Q.   I'm just going to ask you to look briefly at Exhibits

3   B W.

4            MR. ORLEANS:   That is B as in boy.

5            MR. BRILL:   B as in boy, W as in wind.   I'm not

6   going to go through these individually.   I just want to

7   identify them for the record, and then D Y through E K, if

8   you would just flip though those exhibits.

9   A.   D as in dog?

10   Q.   D as in dg, Y as in year.   E as in Edward, K as in

11   kite.

12   A.   (Pause)

13        Yes, I recognize all these emails.

14   Q.   All right.   I don't want to go through them right

15   now.   I have a few specific questions about the process of

16   setting rosters for the next year.   Before I do, I'm

17   sorry, I want to go back in time because there's one thing

18   I forgot to ask you about.

19        For the process of setting the rosters for '09, '10,

20   there's no email correspondence but did you speak with the

21   track and field and cross country coach about any

22   adjustment to the preliminary roster number that you had

23   suggested?

24   A.   Yes, I did.   My primarily plan was based on NCAA

25   average squad sizes which I think were 38, if I remember

1    correctly, somewhere in that neighborhood for the track

2    indoor and outdoor track.

3         I met with the prior coach who's no longer with us,

4    Sean Green (ph) and he indicated to me that the NCAA

5    average squad sizes for track include both track and field

6    which we don't have here.  So my response to him was what,

7    given that information what do you think is the

8    appropriate roster size?  And his response was 30, so I

9    reduced from my plan based on his input down to 30 for

10   both indoor outdoor track teams.

11   Q.   Coming back now to this spring, can you just tell me

12   if you remember what sports you adjusted the roster sizes

13   on for this coming year?  And actually, maybe it will be

14   easier for you if I refer you to Exhibit B Q.

15        Again this might be -- I'm not sure if this is

16   already in evidence as a plaintiff's exhibit but I'm going

17   to refer to it with the defendant's exhibit number and

18   this is 2010, '11 roster comparison to the current year.

19   A.   Yes.

20   Q.   And could you just describe briefly the changes that

21   you made, and any conversations you had with the coaches

22   about those changes?

23   A.   Would you just like me to roll through this?

24   Q.   If you can just do it briefly.  There was not too

25   many.

A.    All of the changes came at the request of the coaches
and their input, so that was the only reason I made the
change.  Men's basketball was increased by two as a result
of coaches input.  Again, this was his concern about
competitive team and some injuries that he had, so that
changed from 17 to 19.

The change in men's soccer -- excuse me, women's
soccer we addressed with Coach Clark indicating he felt 27
was not the number that he felt was appropriate.  He
requested a reduction from one to two and reduced down to
25.

Women's lacrosse coach, Caro, C-A-R-O, actually
requested an increase in her roster to 36.  I asked her
questions about that.  I had significant concern with such
a significant increase and whether or not her budget could
handle that and coaching staff and so forth.  And in the
course of our conversation, it became clear to me that her
budget was such that that was too high of a number.  And
the thing that really prompted me to come to a decision
not to meet her request was she indicated she had 30
uniforms.  And so I told her, and I think there's an email
actually, I questioned her on that, did she mention that
she add 30 uniforms.  But as a result of her input and
after my questioning, I decided that 30 was an appropriate
number for that team and I did not grant her request to go

1    to 36.

2         On the cross country, women's cross country and

3    indoor/outdoor track, these requests came from the head

4    coach, Carolyn Martin.  She did indicate in her email to

5    me her reasons for wanting to increase it.  That was again

6    having to do with fielding competitive teams, but she did

7    indicate to me that this wasn't an issue where she'd have

8    to recruit, she already identified athletes that she felt

9    wanted to join the team but also actually represented

10   higher quality than what she had on the team for the '09,

11   '10 year.  I did question her extensively with respect to

12   the impact on her budget, the coaching staff and so forth

13   and she indicated to me that everything was sufficient to

14   be able to provide opportunities for this number of

15   females on these teams, but I did increase her operating

16   budget by, I think it was, I know it was $10,000.  I think

17   her original budget was 50,000-dollars or thereabouts, and

18   increased it to about $60,000.

19   Q.   And actually if you take a look at Exhibit 81 which

20   you were shown yesterday, which was, that's a Plaintiff's

21   exhibit, which was correspondence with Coach Martin?

22   A.   I don't think I have that one here.  This is -- oh,

23   I'm sorry.

24   Q.   (Hands witness)

25   A.   Thank you.  Yes, I have it.

1  Q.   If you would look at her email to you, that begins at

2  the bottom of the first page and continues at the top of

3  the second page that Mr. Hernandez did not direct your

4  attention to that portion of the exhibit.  Is this -- is

5  this what you were referring to when you said that she'd

6  already given you have information about her recruiting

7  and projected athletes for the following year?

8  A.   Yes.

9  Q.   And, in fact, with respect to any teams that you

10 decided to change the rosters from '09, '10 to '10, '11,

11 had you notified the coaches of your decisions before the

12 final letters were sent out in early June?

13 A.   I did.  Most coaches knew within a couple of weeks

14 after the meeting with head coaches what their number was

15 going to be.  The only hold-up on the final roster numbers

16 was actually the softball coach's not being available.

17 She wanted to talk, unfortunately she was out of town and

18 she indicated she would contact me for a personal meeting

19 when she got back, which hasn't occurred yet, but I felt

20 the email information communication we had gave me

21 sufficient information to make that final determination.

22 Q.   And in fact, of the coaches on the women's teams that

23 requested an increase that you granted, that is, in the

24 track and field team and the competitive cheer team, did

25 the coaches indicate to you the state of their recruiting

1    at the time that they requested the increases?

2    A.    I didn't hear the last part.

3    Q.    Did the coaches advize you of the state of their

4    recruiting for next year at the time that they requested

5    the increases?

6    A.    Yes, they gave me information with respect to her

7    recruiting, where they were with it.

8    Q.    And what did they tell you?

9    A.    Essentially they had identified students who could

10   participate and were competitive and so forth so I had no

11   concerns with respect to anyone they were recruiting.  The

12   only other one I didn't cover was softball, and that, I

13   did reduce that from, from '08, '09 was reduced from 22 to

14   20, I believe, and 20 was a number again that coach felt

15   was an appropriate number but she had a concern about

16   signing the letter, as I mentioned before.  I did reduce

17   the roster from to 20 to 19 for the upcoming year based on

18   some of the conversations I had with coach.

19   Q.    I'm not sure we discussed competitive cheer.  If we

20   didn't --

21   A.    Competitive cheer, the coach requested an increase to

22   36 for reasons I stated before, with respect to it being a

23   high injury sport and that they do practice in groups of

24   six.  So any increase, if I increased it 32, 33, would not

25   have made sense or appropriately address the coach's

```
 1    concerns.  And she also indicated to me again what the
 2    average squad size was or the schools she was competing
 3    against and I did agree to increase that number to 36 as a
 4    result of her input and reasoning.
 5    Q.   Now, going back to Exhibit B Q, which was the roster
 6    chart that you prepared for this coming academic year?
 7    A.   Yes.
 8    Q.   There is a column for NCAA squad size.
 9    A.   Yes.
10    Q.   Where was that information derived?
11    A.   That comes from this communication from the NCAA.
12    Q.   What weight, if any, did you give to the NCAA squad
13    size information?
14    A.   Well, I think the coaches' input was more significant
15    but this certainly weighed heavily on this decision.  I
16    would question any request that was significantly below or
17    over what the NCAA average squad size is.
18    Q.   Now, I notice on the projected roster for 2010, 2011
19    if you include volleyball, with 14?
20    A.   Yes.
21    Q.   And is it the university's intention to eliminate
22    volleyball if the injunction in this case is lifted?
23    A.   Yes.
24    Q.   And did you look at what the resulting gender
25    distribution of athletes would be without the volleyball
```

1    team?

2    A.    Yes, I did.

3    Q.    And do you have those numbers handy?

4    A.    I'm sorry, I don't have the number.

5    Q.    Well, in general terms what did you find?

6    A.    In general terms, given that the team is a relatively

7    small team, does not make a substantial difference in

8    terms of where the number is, including the team, but it

9    does represent substantial proportionality and in

10   comparison with our full-time undergraduate population.

11   Q.    Now, I know you mentioned you granted a budget

12   increase in the track and field teams.  Did you give any

13   other teams budget increases for next year?

14   A.    I did, I increased the budget of the competitive

15   cheer team by $10,000.

16   Q.    Now, with respect to the budget of the competitive

17   cheer team, was the coach held to her budget for the first

18   year?

19   A.    No, she wasn't.  This, again, is as we alleged more

20   about travel schedule, the extensive recruiting and so

21   forth, we'll make adjustments as we go forward to support

22   team appropriately.  It's not unlike any team, once we

23   decide to do something, whether it's an academic program

24   or an athletic team, we're fully committed to insuring

25   there are appropriate resources to support it.

1    Q.   And have you let her know that for this coming year

2    that the same basic process would be in effect?

3    A.   I haven't spoken to her directly.  I believe that the

4    athletic director has though.

5            (Pause)

6    BY MR. BRILL:

7    Q.   I have just a few more questions, Dr. Thompson.

8        Did you participate in the head coaching and hiring

9    of the head coaches for the track or competitive cheer

10   teams?

11   A.   I did not participate in the hiring of the

12   competitive cheer head coach.  My role in the hiring

13   process for the track coach was Carolyn Martin was

14   identified as the candidate that was preferred by the

15   athletics department.  My only role in that was to offer

16   her the position and a salary for the job.

17   Q.   Did you know the background of either of those --

18   well, I'll say with respect to Carolyn Martin did you, did

19   you know that she'd been at the university for any length

20   of time?

21   A.   Yes, Carolyn Martin actually is an alumna of our

22   university.  She's been there a very long time and she

23   actually ran track while she was a student and also served

24   in an assistant coaching role, so she certainly had

25   significant experience not only in track but at Quinnipiac

University specifically.

Q.   Did you ever make any suggestion to any coach of any women's team that the coach increase their roster for this coming year?

A.   No.

Q.   So, any adjustments to the roster were based solely on the coach's input?

A.   All the adjustments to all rosters, decreases or increases, came as a result of the coaches and based on their experience of the previous year and in response to my questions in terms of budget facilities, support, so everything came from coaches.

Q.   The last question I have is you were asked the question on direct examination about whether you investigated or knew of the university investigating allegations of discrimination by Coach Sparks the plaintiff in this case?

A.   Yes.

Q.   Can you tell us why, why you did not investigate yourself or authorize anyone else to investigate such allegations?

A.   Because it was my personal decision not to engage in a conversation with the plaintiff given that we're in the middle of litigation.

          MR. BRILL:  That's all I have.  Thank you.

1          THE COURT:  All right, any redirect?

2          MR. HERNANDEZ:  Your Honor, I have some brief

3    cross on Mr. Brill's direct.

4          THE COURT:  Very well.

5    REDIRECT EXAMINATION

6    BY MR. HERNANDEZ:

7    Q.   Sir, as I understand your testimony, part of your

8    process in educating yourself about roster management at

9    Quinnipiac University included learning how the roster

10   management program had been run before you came on board,

11   is that correct?

12   A.   That is correct.

13   Q.   All right.  And so you wanted to know, among other

14   things I take it how roster management target numbers had

15   been set prior to 2009?

16   A.   Actually I didn't get into the determination of

17   roster numbers prior to -- my concern was more about how

18   it was being implemented.

19   Q.   Okay.

20          (Pause)

21          THE COURT:  I think it's the projector.

22   BY MR. HERNANDEZ:

23   Q.   Just so we're clear here, sir, is it your testimony

24   that your policy with respect to adjustments to the target

25   roster management numbers was applied evenly to the men's

```
1    teams and the women's teams?
2    A.   Was it my practice with respect to input?  Is that
3    what --
4    Q.   No, decisions to make changes to those numbers?
5    A.   Yes.
6    Q.   All right.  And you understand, sir, that the women
7    student athletes at Quinnipiac University were the under
8    represented sex at QU in terms of athletics?
9              MR. BRILL:  Object --
10   A.   What year?
11             MR. BRILL:  Yes, I object to the form of the
12   question.  It's not clear.
13             MR. HERNANDEZ:  All right.
14   BY MR. HERNANDEZ:
15   Q.   Sir, you had an opportunity to read Judge Underhill's
16   decision in this case?
17   A.   Yes, I did.
18   Q.   And do you understand that as part of that decision
19   there was a finding that the women's student athletes at
20   Quinnipiac University were under represented at QU as far
21   as athletic participation?
22   A.   Prior to 2009, '10, yes.
23   Q.   Okay.  And as part of your claimed remedial steps in
24   2009, 2010, it's your testimony that you applied the
25   roster management policies to the men's and women's teams
```

1    the same?

2    A.   When I took responsibility as effective July 1st,

3    2009, I treated both men's and women's coaches and teams

4    the same.

5    Q.   All right.  But you understand, however, that at

6    least according to the finding of Judge Underhill, the

7    women's -- the women were under represented at Quinnipiac

8    University?

9    A.   I'm looking forward.  I'm not sure what you mean by

10   looking back.  My personal feeling is that we have been in

11   compliance with Title IX all along.  The issue of prong

12   one came as a result of the decision to eliminate teams.

13   Q.   All right.  So it's your testimony that in your view

14   Quinnipiac University has always been in compliance with

15   Title IX?

16   A.   I believe that's the case as long as I've gone back

17   to look.

18   Q.   And that's based upon your understanding of Title IX?

19   A.   Yes, it's, my personal view was we were in compliance

20   but we were not in prong one prior to 2009, '10.

21   Q.   And it's your understanding, your belief anyway based

22   on what you've learned about gender equity at Quinnipiac

23   University, that in applying that to what you know about

24   Title IX you believe Quinnipiac University has always been

25   in compliance?

```
 1    A.    I don't know.  I can't speak going back to our

 2    history starting in 1929 and I know the law was initiated

 3    in the early 1970s, so I can't go back that far.

 4         In terms of my own review of things, my focus at this

 5    point is are we in compliance today and are we insuring

 6    that we're in compliance going forward.  That's my

 7    responsibility that I accepted when I took on the

 8    additional role effective last July.

 9    Q.   Give me a date, how far back do you think Quinnipiac

10    University has been in compliance with Title IX?

11              MR. BRILL:  Objection, Your Honor.  It's really

12    irrelevant.

13              THE COURT:  Yes, I'm not sure where we're going.

14              MR. HERNANDEZ:  I'll move on, Your Honor.

15    BY MR. HERNANDEZ:

16    Q.   Sir, you stated that you adjusted Coach Martin's

17    budget, is that correct?

18    A.    Correct.

19    Q.   She coaches four teams according to Quinnipiac

20    University, is that correct?

21    A.    Yes, correct.

22    Q.   And you adjusted her budget up ten thousand dollars?

23    A.    Yes, that's right.

24    Q.   The $10,000, which team was that for?

25    A.    Again, as I explained to you yesterday, the coach has
```

1    discretion over how that is allocated across teams and how

2    they utilize it for different purposes so there's no line

3    item budgets under the team budget with respect to certain

4    number as to recruiting, certain number has to go for

5    uniforms and so forth.

6         So in hiring people, as I mentioned before, it's a

7    matter of having faith in the coaches based on their

8    expertise and how they performed that they can

9    appropriately allocate their budget across the various

10   needs and in a way that supports the team effectively.

11   Q.   Did you take any steps to determine how Coach Martin

12   allocated that $10,000 across the four teams she has to

13   coach?

14   A.   She hasn't allocated it yet because she hasn't

15   received it yet.

16   Q.   Okay.  Did you put any conditions on how she was

17   going to allocate that $10,000 across these four teams?

18   A.   No.  As I said, it's my expectation that a coach will

19   take the responsibility of effectively utilizing the

20   resources across their various needs.

21   Q.   And as I understand it, one of the problems that you

22   found when you took over is that you thought that there

23   was insufficient oversight on the coaches, is that

24   correct?

25   A.   I did have a concern about a lack of oversight, yes.

1    Q.   Okay.

2    A.   Of course it's been corrected as a result of my

3    taking it over.  I take this very seriously.

4    Q.   Okay.  And as I understand it from your direct

5    testimony, you identified three issues with roster

6    management; one, insufficient oversight.  Two,

7    insufficient training of the coaches.  And, three, roster

8    manipulation, and by that I mean dropping and then adding

9    after the first date of competition, is that correct?

10   A.   Yes, I indicated I don't -- I think we're trying to

11   indicate there was wide spread manipulation.  I don't

12   believe that's the case.  I did see cases that the two

13   coaches, the men's baseball team and the men's lacrosse

14   coach did do some things as a result of their concern over

15   some players they had a personal relationship with.  But

16   it was not, I don't believe their intent was to not comply

17   we have Title IX.  It was more a personal issue in concern

18   for these individual students.

19        But those issues have been corrected and I feel very

20   strongly that, again as I said before, our house is in

21   order going forward.

22   Q.   I think with respect to the women's soccer coach, you

23   indicated that you felt that 27 was too high, is that

24   correct?

25   A.   For this upcoming year after a year of experience, he

1    felt that 27 was too high.

2    Q.   What did he want to get down to?

3    A.   He indicated in his email to me that he would like to

4    see a reduction of one to two players and I did reduce it

5    by two.

6    Q.   Okay, and he got 25, is that correct?

7    A.   That is his number for the upcoming year, yes.

8    Q.   And just showing you Plaintiff's 60 in evidence, does

9    that indicate that Coach Clark said if he had his choice

10   he would have a roster of 22 to 24 players?

11   A.   Yes, and then he goes onto say his hope was he could

12   reduce for the upcoming year from 27 by one to two

13   players.

14   Q.   Okay and he's now down to 25?

15   A.   Correct.

16   Q.   He's one over what he, the max of what he wanted,

17   correct?

18   A.   He's one, in terms of the beginning of the email,

19   yes.

20   Q.   Did you take any steps, sir, to learn what the

21   process was for setting roster management target numbers

22   prior to July of 2009?

23   A.   Well, I started to get an understanding of things

24   knowing that I was taking on responsibility and in

25   response to what's happening with respect to the lawsuit

```
 1    and so forth.  So I did start to think about and plan for

 2    what I knew was going come become of my role effective

 3    July 1st.

 4    Q.   Is that a yes?

 5    A.   Yes.

 6    Q.   All right.  Sir, drawing your attention to your

 7    testimony from May 14th, 2010.  Copy for you.  (Hands

 8    witness)  And referring counsel to page 15.  Lines 19

 9    through 25.  Were you asked these questions and did you

10    give these answers?

11         Did you take any steps to learn about how the roster

12    management targets were set before July of 2009?

13         Answer:  No.

14         Question:  Did anyone tell you what the process had

15    been for setting roster management in target numbers prior

16    to July of 2009?

17         Answer:  No.

18         Was that your testimony?

19    A.   Yes, that's a different question than what you just

20    asked me a moment ago.  The question you asked me was

21    whether I preparing for setting roster targets going

22    forward.  This question, you asked me earlier --

23         MR. BRILL:  Your Honor, I believe in all

24    fairness, he needs to show the witness the continuation of

25    that question and answer on the next page.  It can't be
```

```
 1    read aloud.

 2             MR. HERNANDEZ:  He has a copy of the transcript

 3    in front of him.

 4             MR. BRILL:  Excuse me?

 5             MR. HERNANDEZ:  He has a copy of the transcript

 6    in front of him.

 7             MR. BRILL:  I'll ask that the witness be allowed

 8    to read the questions and the answers if he's intending to

 9    impeach the witness with inconsistent testimony.

10             THE COURT:  One, I don't have a transcript so I

11    can't decide.  The witness already said his answer wasn't

12    inconsistent so I don't feel out of fairness it needs to

13    go further.

14             MR. BRILL:  All right.

15    BY MR. HERNANDEZ:

16    Q.   Coach Martin, you were relying on her, is that

17    correct?

18    A.   Yes.

19    Q.   All right.  And do you know if she had ever been a

20    head coach before she took on the task of managing four

21    teams?

22    A.   No, I don't believe she was.

23    Q.   All right.  Do you know if she had had any experience

24    in recruiting before she took on the task of coaching four

25    teams?
```

1    A.    I don't know what role she played in recruiting as an

2    assistant coach.

3    Q.    Do you know what sort of administrative support Coach

4    Martin was receiving?

5    A.    In terms of clerical or secretarial support?

6    Q.    Yes, sir.

7    A.    There's a shared secretarial resource within the

8    athletics department for all of the head coaches.

9    Q.    And did she have anyone -- did she have any increased

10   access to administrative staff as a result of her increase

11   in the women's track team?

12   A.    No.

13   Q.    I just want to make sure I understand this.  Now,

14   compared to Coach Sparks, how many years has Coach Sparks

15   been a head coach at Quinnipiac?

16   A.    Not sure.  I believe it may be four years or so.

17   Q.    Okay.  And she would have also had five years

18   actively recruiting, is that correct?

19   A.    That's one of her duties as head coach would be

20   recruiting, yes.

21   Q.    And you understand that recruiting is a significant

22   aspect in Division I athletics?

23   A.    In terms of fielding a competitive team, yes.

24   Q.    Can you tell the court what Coach Powers' experience

25   is as a head coach in a Division I school?

1    A.   I don't think she was a head coach in a Division I

2    school prior to taking on this.  I believe that's the same

3    situation as Coach Sparks when she joined us.

4    Q.   And she has no experience in actively recruiting for

5    a Division I school, is that correct?

6    A.   That I can't tell you, I don't know.

7    Q.   Well --

8    A.   Other than her experience with Quinnipiac.

9    Q.   You have no idea what her experience is as far as

10   recruiting?

11   A.   No, I -- again, if I could give you an analogy.  The

12   breadth of my responsibility is such that this would be

13   like me getting into minutiae with, micro management with

14   a department chairperson.  The expectation is when you

15   hire somebody, they have the skills, capabilities and so

16   forth to carry out their duties effectively.  I have that

17   confidence in my department chairs, my deans, all the

18   student affairs staff, all services staff, essential life

19   staff, the head coaches.  If there's an issue or problem

20   brought to my attention, I address it; otherwise my

21   expectation is that they'll carry out their duties and

22   responsibilities as expected.

23   Q.   Okay.  And what about qualifications?  You understand

24   now that Coach Powers is not NCAA certified for

25   recruiting?

1   A.   Actually she is.  After your question yesterday, I

2   questioned our athletic director about it.  She did pass

3   her test in May.

4   Q.   That would be May of this year?

5   A.   Correct.

6   Q.   All right.  And I believe I asked you yesterday when

7   deposits were due.  Did you take any steps to -- I believe

8   you said June 1st?

9   A.   That is correct.

10  Q.   Did you take any steps to verify that?

11  A.   No, I believe it was June 1st.

12  Q.   Would you be surprised to learn that it's May 1st?

13  A.   I'm sorry, you're right.  It is May 1st.

14  Q.   All right.  So she passed her recruiting test after

15  deposits were due?

16  A.   Yes, she did.  It was sometime in May.

17  Q.   So she had no opportunity to recruit off campus for

18  2009, 2010?

19  A.   Not that I'm aware of.

20  Q.   And are there any men on the competitive cheer team?

21  A.   No, there are none.

22  Q.   All right.  So the 36 competitive cheer athletes,

23  we're talking about women, correct?

24  A.   Yes.

25  Q.   All right.  None of the male athletes are

```
 1   participating -- well, withdrawn.
 2              MR. HERNANDEZ:  If I could just have a moment,
 3   Your Honor?
 4              THE COURT:  Sure.
 5              (Pause)
 6              MR. BRILL:  I have nothing on redirect, Your
 7   Honor.
 8              THE COURT:  He's not done.
 9              MR. BRILL:  I'm sorry.
10              THE COURT:  But that's good to know.
11              MR. BRILL:  Up to this point.
12   BY MR. HERNANDEZ:
13   Q.   Sir, I believe part of your answer was that when
14   Quinnipiac University decides to do something, you commit
15   the necessary resources; was that your testimony did I
16   hear?
17   A.   That is correct.
18   Q.   Is that correct?  And did Quinnipiac University make
19   a commitment to restart its women's volleyball team?
20   A.   Yes, we did, as a result of the temporary injunction,
21   the injunction hearing.
22   Q.   I'm talking about a few years ago.  A few years ago
23   Quinnipiac University actively recruited Coach Sparks,
24   actively recruited student athletes, made promises and got
25   them to come to the campus to play volleyball for
```

1    Quinnipiac University, is that correct?

2    A.   The volleyball team has been sufficiently supported

3    by a budget, coaching staff, facilities, and the same

4    levels of support that are provided to every one of our

5    athletic teams.

6    Q.   And in March of last year, that support was pulled

7    out from underneath their feet, correct?

8    A.   We did make a budget decision last year with regard

9    to two men's teams as well as the women's volleyball team,

10   that we needed to eliminate those for budgetary reasons.

11   Q.   So Quinnipiac University withdrew its commitment to

12   the necessary resources to support volleyball, correct?

13   A.   Again, it was a budget decision with respect to three

14   teams.  It was not limited to women's volleyball.

15   Q.   Okay, I'm not talking about budget.  I'm talking

16   about people.  Living, breathing people.  Quinnipiac

17   University withdrew the resources to support the women's

18   student athletes and Coach Sparks.  Fair?

19           MR. BRILL:  This is just argumentative.  There's

20   no factual dispute here about this decision.

21           THE COURT:  Well, it's cross.  That goes to

22   prior testimony.  I'm allow it.

23   BY THE WITNESS:

24   A.   I don't feel good about telling any teams.  My

25   primarily concern, my role in particular is with regard to

1    student well being and student welfare.  So I wouldn't say

2    that -- I mean there are 40 employees as well and either

3    their positions were cut or were not refilled.  So this is

4    a very tough decision process throughout the economic

5    crisis.  This was not something that was done lightly.  It

6    was one difficult consideration for well being.  So it's

7    not something that I feel good about but it was a

8    necessary decision given our economic condition and our

9    budgetary situation at the time.

10   Q.   And, sir, drawing your attention to your earlier

11   testimony, you said that after Coach Fairchild expressed

12   her concerns, you had meeting with her, is that correct?

13   A.   Yes, I had several meetings with Coach Fairchild.

14   Q.   And you discussed her concerns about the target

15   number?

16   A.   Are you referring to last year or this upcoming year?

17   Q.   All right.  For 2009, 2010?

18   A.   Yes, I did meet with her.

19   Q.   All right.  And what about with respect to an email

20   that she sent regarding the target roster number for 2010,

21   2011?

22   A.   I did not speak to her directly.  I offered to.  Her

23   response was she was going to be out of town I think in

24   Texas for a period of time and she indicated to me she

25   would be getting back to me to have that personal meeting.

```
 1      She's not done so yet.
 2              MR. HERNANDEZ:  I have no further questions,
 3      Your Honor.
 4              THE COURT:  All right.
 5              MR. BRILL:  Nothing on redirect.
 6              THE COURT:  Very good.  Sir, you're excused.
 7      Thank you.
 8              THE WITNESS:  Thank you.
 9              (Witness excused.)
10              MR. ORLEANS:  Your Honor, before Mr. Webb takes
11      the stand, with respect to your ruling this morning on the
12      privilege question, defense counsel has quite reasonably
13      asked for a copy of the unredacted document that you ruled
14      was not privileged, and unfortunately we didn't bring it
15      with us.  I wonder if it might be possible for your staff
16      to make a couple copies of -- one for each lawyer.
17              THE COURT:  Tell you what, we can do that.
18              MR. ORLEANS:  Of that one?
19              THE COURT:  I was going to say I can return --
20      the unredacteds were given to me for use in camera.  I
21      don't intend to docket them in any way, even under seal
22      unless anybody thinks that's necessary for further review.
23      So I'll have my clerk during the next break make two
24      copies of the portion that were disclosed.
25              MR. ORLEANS:  That would be useful.  And then we
```

```
 1     could have one and disclose one to the other side.

 2               THE COURT:  All right.

 3               MR. ORLEANS:  Thank you.

 4               THE COURT:  Sure.  And you're calling Mr. Webb?

 5               MS. GALLES:  He's in the restroom.

 6               THE COURT:  This counts toward your time.

 7               MR. BRILL:  Can we have a two minute restroom

 8     break?

 9               THE COURT:  You know what --

10               MS. GALLES:  There he is.

11               THE COURT:  We'll take our morning break.  Why

12     don't we take 15 minutes, come back at one until 11.

13               MR. ORLEANS:  May we strike Mr. Webb's location

14     from the record?  It's a little more personal than we

15     expected.

16               (Whereupon a recess was taken from 10:25

17          o'clock, a. m. to 10:40 o'clock, a. m.)

18               MS. GALLES:  Your Honor, plaintiffs would like

19     to call Jeff Webb who's the next witness.  We do have one

20     housekeeping matter related to Mr. Webb though.  It's

21     Exhibit Three of Mr. Webb's report which is Trial Exhibit

22     135, was supplemented before his deposition and

23     unfortunately the supplement which is just basically the

24     most recent list of teams was not included, and we've

25     provided a copy and showed it to the defense counsel.
```

```
 1              I understand that when the point comes to admit

 2     it, they may object, but at least for purposes of making

 3     sure that all of the books and everything have the right

 4     exhibit, maybe submit that to the books or however --

 5              THE COURT:  Sure.

 6              (Hands Court)

 7              MS. GALLES:  -- it needs to be done.  I made a

 8     bunch of copies.

 9              MS. FRIEDFEL:  I've got it.  Thank you.

10              THE CLERK:  Actually I could use two more

11     copies.

12              MS. GALLES:  All right, there you go.

13              THE COURT:  This is replacing or supplementing?

14              MS. GALLES:  Supplementing, because what's in

15     there is for 2009 and that was for 2010.

16              THE COURT:  Very good.

17              Sir, please stand and raise your right hand

18     J E F F     W E B B ,     called as a witness on behalf

19     of the Plaintiff, having been duly sworn by the Clerk,

20     testified as follows:

21              THE COURT:  Please be seated, state your name.

22     Spell your last name for the record.

23              THE WITNESS:  Jeff Webb.  W-E-B-B.

24

25
```

```
1    DIRECT EXAMINATION

2    BY MS. GALLES:

3    Q.    Mr. Webb, what is your current position?

4    A.    I'm the Chairman and chief executive officer of

5    Varsity Brands Incorporated.

6    Q.    And what is Varsity Brands?

7    A.    Varsity Brands is a company that provides products

8    and services for all ages of cheerleaders and cheer

9    service.

10   Q.    What is the Universal Cheer Association?

11   A.    The Universal Cheerleaders Association is a division

12   of Varsity Brands and its primary purpose is to provide

13   training and competition opportunities for cheerleaders.

14   Q.    So, as head of Varsity Brands you are the head of the

15   Universal Cheerleaders Association?

16   A.    I am.

17   Q.    And what is the National Cheerleader Association, or

18   NCA?

19   A.    NCA is similar to the Universal Cheerleaders

20   Association, provides educational services for

21   cheerleaders.  It's just a different brand with a slightly

22   different curb aluminum.

23   Q.    And is it affiliated in any way with Varsity Brands?

24   A.    Yes, it's also a division of Varsity Brands.

25   Q.    So, as head of Varsity Brands are you also the head
```

1    of the National Cheerleader Association?

2    A.    Yes, ultimately.

3    Q.    Okay.  What is the United Spirit Association?

4    A.    United Spirit Association is also a division of

5    Varsity Brands.  It is, it's a regional provider, West

6    Coast primarily, provider of educational services to

7    cheerleaders.

8    Q.    Okay.  And are you the -- is it affiliated in any way

9    with Varsity Brands?

10   A.    Yes, it is.  It's a division, a division of Varsity

11   Brands.

12   Q.    Okay, and as head of Varsity Brands, are you

13   ultimately head of the United Spirit Association?

14   A.    Yes.

15   Q.    Why are there three separate organizations there as

16   opposed to one; is that historical or how did that happen?

17   A.    Yes, these -- into these grew up separately.  In

18   fact, the National Cheerleaders Association and United

19   Spirit Association at one time were part of separate

20   companies that were acquired by Varsity.

21   Q.    How did you first get involved in cheerleading?

22   A.    I was a cheerleader in my senior year in high school,

23   Dallas, Texas, and following that, I was a cheerleader at

24   the University of Oklahoma.  And during the summers my job

25   was, my summer job was as an instructor for the National

```
 1   Cheerleader Association at training camps throughout the
 2   southeast and midwest.
 3   Q.   And what was your first job out of college?
 4   A.   I went to work as a director of external programs for
 5   the National Cheerleader Association based in Dallas.
 6   Q.   And what were your responsibilities in that position?
 7   A.   I was responsible for developing the educational
 8   curriculum for the high school and collegiate programs,
 9   primarily in camp.  I was also responsible for directing
10   the larger camps in the country.
11   Q.   Why did you decide to take a job with a cheerleading
12   group outside of -- when you got out of college?
13   A.   Well, throughout my -- again, my summer job was as an
14   instructor and I developed a real passion for teaching
15   cheerleading and training cheerleading and the NCA job
16   gave me a chance to do that, and also gave me a pretty
17   good living.
18   Q.   How long did you work at the NCA?
19   A.   I was there two and-a-half years.
20   Q.   And what did you do after leaving NCA?
21   A.   I started my own organization, Universal Cheerleaders
22   Association.
23   Q.   And why did you start a new organization?
24   A.   Well, I began -- I'd begun to develop a different
25   concept, nuance approach to cheerleading that was really
```

1    different than what NCA's historical approach had been,

2    and that approach included adding more athleticism,

3    entertainment to the traditional role of cheerleading.

4    And I felt that within the NCA confines, because it had

5    been there for 20 years and had its own, you know, format

6    and traditions, I didn't feel like I'd had the opportunity

7    to actually, to do that.

8    Q.   All right.  At some point in your -- well, what kinds

9    of things did you add to cheerleading as part of your

10   development of UCA?

11   A.   Well, we added, you know -- well, what I most recall

12   now, we added a real athletic component and also

13   contained.  And the idea that the concept that I really

14   came up with was that the sport was changing and becoming

15   more of an entertainment venue really, that cheerleading

16   was part of that.  And a promoter of that can also change,

17   and we felt like it would be more effective for

18   cheerleaders to be more athletic, to provide entertainment

19   during the, kind of the dead spots, if you do --

20   Q.   Excuse me, what do you mean by dead spots?

21   A.   The boring parts of the game which we all are

22   familiar with.  I think except for volleyball, of course.

23   Q.   You mean basically half time, time outs?

24   A.   Yes, half time, time outs, just pre-game, so on.

25   Q.   And when did you start the UCA?

1    A.    Our first games were the summer of 1975.

2    Q.    I should ask when did you start working at the NCA?

3    A.    That would have been January of 1972.

4    Q.    Okay.  And, again, what did you say for --

5    A.    UCA started in the Fall of 1974 and our camps were,

6    the first camps were the Summer of 1975.

7    Q.    Okay.  For UCA?

8    A.    For UCA.

9    Q.    Now, at some point with the UCA, did you start

10   creating any kind of competitions for cheerleaders?

11   A.    Yes, yes.

12   Q.    Would you please explain the circumstances for doing

13   so?

14   A.    Yes.  We wanted to get more, have visability for our

15   concept and style of cheerleading and we were too small to

16   have kind of national footprint in conducting our camps

17   and we believed that the best way to get exposure for what

18   we were doing was to get cheerleading on television, our

19   type of cheerleading.  And we, through a contact with a

20   new shoe company I was introduced to some television

21   production people and they came to one of our camps and

22   looked at what was happening, thought it was very visual

23   and said, well, we can -- we think this has television

24   opportunities but we need a format that gives us some

25   drama.  And so we indicated why don't we create a

1    competition between cheerleading groups?  And that's what

2    we did.

3    Q.   Okay.  And so when you added that competition format

4    for television, did you think you were changing

5    cheerleading or creating a new sport?

6    A.   No, absolutely not.  We were trying to, again, get,

7    you know, visibility and promotion of our style of

8    cheerleading.

9    Q.   Okay.  And when you startrd working with these

10   television folks, about what time was that?

11   A.   1980.

12   Q.   Okay.  And eventually did any colleges participate in

13   these competitions?

14   A.   Yes, several years later.

15   Q.   Okay, and were these like the football cheerleaders

16   or what we might in this trial call sideline cheerleaders?

17   A.   Yes, these were the classical, the only cheerleading

18   squads that the schools had.

19   Q.   How many competitions a year were offered for these

20   college teams?

21   A.   One.

22   Q.   Is that -- so how many competitions a year -- like if

23   you're the, you know, the University of Florida or

24   whatever, how many competitions a year did they have to

25   compete in?

```
1              MS. FRIEDFEL:  Objection.  Could we get a
2    clarification of the time period?
3              MS. GALLES:  He just said in the 1980's.
4              MS. FRIEDFEL:  Okay so we're still in the
5    eighties.  Thank you.
6    BY THE WITNESS:
7    A.   One.
8    Q.   Now, do you still conduct and provide the competition
9    opportunities for the college groups?
10   A.   Yes.
11   Q.   And do colleges still attend your events?
12   A.   Yes.
13   Q.   Okay.  How many events does the Universal Cheer
14   Association put on for colleges each year?
15   A.   One.
16   Q.   And the National Cheerleading Association, how many
17   events does it put on for colleges each year?
18   A.   One.
19   Q.   And is that called the NCA Nationals?
20   A.   Yes.
21   Q.   Okay.  How long have you been -- the Universal Spirit
22   Association, does that still run any competitions for
23   cheerleaders?
24   A.   The United Spirit Association?
25   Q.   Thank you for correcting me.
```

1   A.   Yes, it does have competitions for cheerleaders.

2   They have one for colleges.

3   Q.   Okay.  And is that still the case through the -- as

4   we stand here in court today in 2010?

5   A.   Yes.

6   Q.   So, have UCA, NCA and United Spirit Association --

7   did I get it right that time?

8   A.   Yes.

9   Q.   Thank you.  So they have been running one competition

10   a year since, ever since the 1980s?  College competition?

11   A.   NCA, UCA started their college competitions about

12   1990.

13   Q.   Okay.  And you're still running those competitions?

14   A.   Yes.

15   Q.   Okay.  And at any time during running any of those

16   competitions, United Cheerleaders Association, National

17   Cheerleaders Association or United Spirit Association, did

18   you think that you were running a sports competition?

19   A.   No.

20   Q.   Over the years from when you first started the

21   competitions in the 1980's through this school year, have

22   you changed the way you conduct or run these competitions

23   at all?

24   A.   The competitions are essentially the same.  Rules

25   may, may vary slightly but they are essentially the same.

1    Q.    Could you please describe for us -- let's take the

2    Universal Cheerleader Association, their college

3    competition, could you please describe for us what is

4    involved?

5    A.    Each team that enters -- and it's open to anybody.

6    Each team that enters submits a videotape during the fall

7    of their cheerleading team in action leading a crowd.

8    They have classical responsibility; that can be everything

9    from being on the sideline at football games, it can be

10   pep rallies, it can be alumni functions where they really

11   are demonstrating their spirit leading competitions and

12   they get a score for that.

13        Then when the teams sign up to enter the actual

14   physical competition which takes place in the middle of

15   January, that crowd score goes with them, and then they,

16   in Orlando they perform a two minutes, two and-a-half

17   minutes, two minutes and 15 second routine that includes,

18   again, a cheer or chant, some type of crowd leading

19   component, and then also a minute and-a-half of dance,

20   routine with dance moves and acrobatics.

21   Q.    So, is there any other component of the competition

22   for any given time?

23   A.    No.

24   Q.    Okay.  Now, the National Cheerleaders Association,

25   okay, do you run that national event?

1    A.    Yes.

2    Q.    And where does that take place?

3    A.    Daytona Beach, Florida.

4    Q.    And could you please describe what that competition

5    or what that event looks like?

6    A.    Again, the teams sign up.  It's open to anybody.

7    They come to Daytona and the first day they present with,

8    again, a portion of the routine that precedes the dance

9    routine separately.  It goes with the first.  That

10   includes kind of a spirit leading traditional performance

11   where they meet the crowd, they do signs and flags and

12   megaphones and solicit a crowd response for their score.

13   Q.    How long is that?

14   A.    That is approximately a minute long.

15   Q.    Okay.

16   A.    And then that's followed by an approximately two

17   minute routine that is the dance routine with acrobatics.

18   Q.    So is that the entire performance of the cheerleading

19   squad at nationals?

20   A.    Yes.

21   Q.    So is the entire performance three minutes or less?

22   A.    Yes.

23   Q.    And just to clarify, when you say that, you mention

24   that anyone can enter; does this mean any college

25   cheerleading team anywhere in the country can enter the

1    event?

2    A.    Yes.

3    Q.    Do they have --

4    A.    I'm sorry, speaking of the NCA?

5    Q.    Yes, NCA.

6    A.    Yes.

7    Q.    Do they have to go through any kind of qualifying

8    rounds to earn a right to go or just anybody, all-comers?

9    A.    Anybody.

10   Q.    Now, let's back up to the Universal Cheer

11   Association.  Is that the same for the Universal Cheer

12   Association?

13   A.    Yes.

14   Q.    Okay.  Now, at the Daytona event, are there different

15   divisions or just everybody who shows up?

16   A.    There are different divisions.

17   Q.    And could you please explain what the different

18   divisions are for all the events that take place at

19   Daytona?

20   A.    In general the divisions are divided into size of the

21   school, and then also whether it's coed or all female.

22   And then there's also division based on ability level

23   which would be like intermediate or advanced so you have

24   this matrix of divisions.

25   Q.    And is there also a dance competition that goes along

1    at the same time as the cheer competition?

2    A.    Yes, there is.

3    Q.    Is there also a mascot competition that goes along

4    with --

5    A.    Yes.

6    Q.    And could you please describe for us the basis of the

7    dance competition that goes along the same lines?

8    A.    The dance competition is for separate dance or pompom

9    teams.  That's what they are referred to.  Approximately

10   two minute routine.  All dance with no acrobatics allowed.

11   Q.    Okay.  And what about the mascot routine?  What does

12   that involve?

13   A.    The mascot routines are generally, you know, team or

14   a routine for a couple minutes and it's more of a skit.

15   Q.    Now, next year are you going to be adding a division

16   for -- let me back up.

17        Do you know what the NAIA, at National Association of

18   Intercollegiate Athletics is?

19   A.    Yes.

20   Q.    Do you know what the NCAA is, the National Collegiate

21   Athletic Association?

22   A.    I do.

23   Q.    And so next year are you going to be starting a

24   division for NAIA schools?

25   A.    Yes, we're discussing it and it looks like we're

1    going to do that.

2    Q.   Is that something that's going to start next year?

3    A.   Next year.

4    Q.   Is that going to be for the traditional sideline

5    cheerleader, the NAIA schools?

6    A.   Yes.  To the best of my knowledge all the schools

7    that participate have the classical cheerleading function,

8    spirit.

9    Q.   And these NCA Nationals in Daytona, has Quinnipiac

10   ever participated?

11   A.   Yes, they have, yes.

12   Q.   Before this year, to your knowledge, before this year

13   had Quinnipiac ever entered NCA as a varsity or sport

14   cheer team?

15   A.   No.

16   Q.   Now, who is the -- do you have a Director of College

17   Programs for the Universal Cheerleader Association?

18   A.   Yes.

19   Q.   And who is that?

20   A.   John White.

21   Q.   Do you have a director of college programs for the

22   National Cheerleaders Association?

23   A.   Yes.

24   Q.   Who is that?

25   A.   Bill Boggs.

1    Q.   And do they report to you?

2    A.   Yes.

3    Q.   Now, over the years of running these competitions,

4    UCA, NCA, have you and your staff, meaning your directors

5    of college programs, developed a relationships with the

6    teams and their coaches?

7    A.   Yes.

8    Q.   Okay.  So do either you or those two gentlemen that

9    you mentioned have familiarity with the types of teams and

10   the coaches who coach them?

11   A.   Yes, with every single one of them.

12   Q.   Okay.  Mr. Webb, I would like to -- well, as part of

13   running those competitions, do you or your directors of

14   college programs keep track of the types of teams that

15   enter, for example, whether they call themselves --

16   whether they are classical cheerleading teams or whether

17   they call themselves a varsity sport cheer team?

18   A.   Yes.

19   Q.   Okay.  Mr. Webb, and do you and your directors of

20   college programs, is that something that you keep in the

21   ordinary course of your business?

22   A.   Yes.

23   Q.   And why do you keep track of that information?

24   A.   Well, beginning about six years ago, the University

25   of Maryland declared that it was attempting to develop

1    this cheerleading squad to be considered a sport and was

2    especially, as I say, working a fine line and we felt that

3    that was potentially a new direction, something we should

4    be aware of and we should follow to see what the effect

5    might be.

6    Q.   Okay.  And before the last year or two, had any

7    school that entered any of your competitions ever called

8    itself a varsity sport besides Maryland?

9    A.   Until a couple years, only Maryland.

10   Q.   Okay.

11   A.   Couple years ago.

12   Q.   Okay, I'd like you to turn to Exhibit Three in your

13   report, which is Exhibit 135.

14              MS. FRIEDFEL:  Your Honor, we object to the use

15   of this exhibit.  When Mr. Webb was deposed about this

16   document he testified that he did not know how it was

17   prepared, he didn't know what arrangement was used to

18   prepare it.  The designations as to whether something was

19   sideline, competitive or club was not made by him.  They

20   were made by his employees and his employees aren't here

21   and I can't cross examine them to find out what the basis

22   of their knowledge is.

23              MS. GALLES:  Your Honor, I do believe that she's

24   slightly mischaracterizing the deposition but what

25   Mr. Webb said was he personally did not create these

1   charts but that his directors of college programs created

2   them and they have personal knowledge of every single team

3   on here, they were created in the ordinary course of

4   business, he has personal knowledge of many of these

5   teams.  But otherwise we would have -- there are several

6   hundred or thousand, you know, Varsity employees but they

7   ultimately report to Mr. Webb and I really don't think

8   there's any dispute regarding the content of which teams

9   are sideline cheer.  These are business records of Mr.

10  Webb's organization.

11          THE COURT:  Let me make sure I understand the

12  objection.  What's the objection?

13          MS. FRIEDFEL:  The objection is, well, for one,

14  I wasn't able to thoroughly question him about the

15  document in the course of his expert disclosure because

16  when I asked him if he created the document or if he knew

17  what information was used, he testified that I believe

18  this was created by John White and Bill Boggs.

19          And I said did they rely on any documents in

20  preparing this?

21          I'm sure -- they have knowledge, I'm sure they

22  just went to the actual registration list.  That's what

23  they do.  Yes, they would have knowledge of this.

24          And I said, my question was would they rely on

25  documents.

1          And you said they relied on their registration

2     list.  And he said that's what I assume, I didn't ask them

3     how they got it, this is what they do, they work with this

4     all the time.  And I'm sure they just went, I would assume

5     they just went to the registration documents and I'm sure

6     that's accurate.

7          So he didn't know.  He's assuming that they went

8     to registration documents, he didn't know for sure.

9          And when I followed up with Ms. Galles she

10    emailed me and told me that they looked up registration

11    documents for the identities of the teams that competed at

12    their competition.

13         If that's what they want to put it in for,

14    that's fine, I have no objection.  They have a business

15    record of who competed in their competition.  But she also

16    told me that the basis of the categorization, whether it

17    was sideline or competitive, it was based just on their

18    knowledge and what they happen to know from their

19    communications and their knowledge of the coaches.  But I

20    can't ask him questions about that because they are not

21    here.

22         MS. GALLES:  She certainly could have chosen to

23    depose any of those gentlemen, that this is their boss and

24    this information was provided or created in the normal

25    course of business for him, for their Varsity Brands, and

1    he ultimately is the head of Varsity Brands.

2            THE COURT:  All right, I take it the objection

3    is a hearsay objection?

4            MS. FRIEDFEL:  Yes, Your Honor.

5            THE COURT:  Sir, was this document created --

6    why was it created?

7            THE WITNESS:  It was created because we had --

8    I'd asked in our meetings with our collegiate directors,

9    and there are only three, I asked them to track the teams

10   that participate and the way they are categorized so we

11   can watch how things develop.  This is based originally

12   beginning five or six years ago in Maryland, saying

13   they're trying to move to a sport.

14           This was done exactly the way that I would ask

15   for a report.  There's no way I would sit there and

16   develop this report myself.  These are vice presidents of

17   our company who in the typical course of business provide

18   me this exact format, this exact report.  I'm highly

19   confident it's accurate.

20           THE COURT:  So it was prepared for your

21   business, not for your expert report.

22           THE WITNESS:  Were certainly both.

23           MS. GALLES:  Well --

24           THE COURT:  Well, okay.

25

1    BY MS. GALLES:

2    Q.   Let me back up.  The first part of these deal --

3    these are for 2009, are they not?

4    A.   Yes.

5    Q.   Okay, and you weren't asked to provide some kind of

6    expert report before winter or spring of this year, were

7    you?

8    A.   That is correct.

9    Q.   So those were prepared long before you were ever

10   asked to participate in this case, were they not?

11   A.   Yes.

12          MS. FRIEDFEL:  Your Honor, I'd also like to

13   point out with respect to the supplement that Ms. Galles

14   identified earlier as the 2010 nationals, when I

15   questioned him about this document at his deposition it

16   includes a bunch of columns before the school names that

17   say classical and group, and when I asked him what some of

18   these meant he couldn't tell me.  I asked him what CD

19   meant, he didn't know.  I asked him what MA meant, he

20   didn't know.

21          THE COURT:  Well, okay, but that's a different

22   problem.  You know, a witness isn't always expected to

23   know everything about every business record.  The question

24   for admissibility is not --

25          MS. FRIEDFEL:  Fair enough.

1          THE COURT:  It's is this a business record, so

2     that's what I'm trying to sort out.

3          Sir, give me a better sense who prepares this,

4     when and why.

5          THE WITNESS:  Yes.  These lists are prepared

6     again by the directors of our collegiate programs and

7     again we have one for the three separate collegiate

8     programs.  These are developed for the Universal Spirit

9     Association, National Cheerleader Association.  These are

10    the primary national competitions.  And these, again, are

11    executives in the company.  They are charged with knowing

12    everything about every one of their accounts, the colleges

13    they work with.

14         So, for instance, from the National Cheerleaders

15    Association report, Mr. Boggs would be responsible for

16    knowing every coach, knowing the type of team it is,

17    knowing what their environment is at their school, knowing

18    how they classify themselves.  That's his responsibility.

19    It's his only responsibility.  All he has is college.  So

20    for college he only has the college competition and then

21    the four to five camps that are run.  So he is charged

22    with having a -- just a very, very deep knowledge of each

23    one of these programs.

24         THE COURT:  Okay.  Is the information

25    classifying sideline, club or sport taken from an

```
 1    application or a registration document submitted by the

 2    team or is that an evaluation made by someone who works --

 3              THE WITNESS:  That would be taking the actual

 4    registration and Mr. Boggs and Mr. White would clarify

 5    with the team what they are.  But, but again, again, Your

 6    Honor, these directors know every -- there aren't that

 7    many teams, 150 teams or 200 teams.  They knew every

 8    single team.  They know every coach.  They know the

 9    purpose of their program.  They can tell you all kinds of

10    detail.

11              THE COURT:  I understand.

12              MS. GALLES:  And I can clarify one other point,

13    Your Honor.

14    BY MS. GALLES:

15    Q.   What the UCA -- are only sideline teams even allowed

16    to participate by rule of the UCA?

17    A.   Yes.

18              MS. GALLES:  So it's another reason why we know

19    the accuracy of that.

20              MS. FRIEDFEL:  As to the UCA but not NCA.

21              MS. GALLES:  Right.

22              THE COURT:  Okay.

23              MS. GALLES:  Again we say if they wanted to

24    depose Mr. Boggs, they certainly could have.

25              MS. FRIEDFEL:  It's not our obligation to depose
```

1    every employee.

2              THE COURT:  All right, all right.  We're trying

3    to figure out if it comes in or not.  Let's figure out if

4    it comes in.

5              I'm still uncertain whether this information of

6    the sideline sport club clarification that the team

7    indicates on a registration form or whether it's simply

8    your employee understands that Armstrong State College is

9    a sideline squad.

10             THE WITNESS:  On the actual NCA registration I'm

11   not sure.  It's not the kind of detail that I would be

12   involved with, and what I would do is rely on my directors

13   for the accurate information which, Your Honor, we take

14   from the registration.  And, again, I can't emphasize

15   enough they are, they are in constant contact all year

16   long with these different programs and these different

17   coaches.  Not only are they responsible for getting, for

18   promoting their participation in our programs, these

19   directors also serve as a resource for those colleges.

20   They come to us any with any particular problems they may

21   have or to help them, you know, to help them with issues

22   with their team and their administrations.

23             THE COURT:  Does the NCA group competitors,

24   according to this sideline, club or sport classification,

25   do you have a sport --

1          MS. GALLES:  There's more background to that

2    that if you'd like me to lay it, Your Honor --

3          THE COURT:  All right.

4    BY MS. GALLES:

5    Q.   Okay.  Before last year, did any team besides

6    Maryland even represent itself to be a varsity sport to

7    your team?

8    A.   It was Maryland and possibly Fairmont State and

9    that's it.

10   Q.   So is this the first year, last year or this year,

11   the first year, the first time that any of these teams

12   even represented themselves as something other than a

13   sideline or a club team?

14   A.   Beyond Maryland and Fairmont State, yes.

15   Q.   Okay, so it's really all about what they are doing

16   this year?

17          MS. FRIEDFEL:  Further, Your Honor, when I

18   inquired about the documents that were used to prepare

19   this, Ms. Galles represented to me that the registration

20   forms did not contain any information about these

21   classifications and so I didn't pursue getting them

22   because if they didn't have the information, it wasn't

23   necessary.

24          THE COURT:  Okay.

25          MS. GALLES:  I believe Mr. Webb said he's

```
1    relying on his director of college programs who in the
2    course of his day to day activities it's his
3    responsibility to have intimate knowledge of each and
4    every one of these teams and, therefore, has personal
5    knowledge of what these teams are and has provided and
6    collected that information every year since Maryland and
7    provides it to Mr. Webb every year since Maryland, and --
8             THE WITNESS:  This is our business to know this.
9    This is what we do.
10            MS. GALLES:  It is their, we would represent it
11   is their business record.  And also, despite their
12   objections to it, I really didn't think there's any
13   dispute as to who's a varsity team and who's not a varsity
14   team or purporting to be a varsity team in the litigation.
15            MS. FRIEDFEL:  I don't know there's a dispute as
16   to the varsity teams, Your Honor, except with respect to
17   Oregon.  The only other -- the question that really is
18   about club teams, I don't know about all the club teams in
19   the country.  I only know about the teams that Quinnipiac
20   competes with.
21            THE WITNESS:  We do.
22            THE COURT:  The supplement we got today, NCA
23   2010, how did your business use that document?
24            THE WITNESS:  We used it primarily again to
25   track the trends in cheerleading, where it is and what
```

1   it's becoming, so that we can be on top of that and
2   participate in it.
3           And, for instance, on the, on the club teams, we
4   have situations -- again I talked about this as being a
5   resource.  We have situations, for instance, where you
6   have the actual cheerleading squad for Ohio State, for
7   instance, who cheers for football games and does all the
8   alumni functions, is under the athletic department as a
9   support group.  They also participate in the UCA
10  competition.  Well, we required at the UCA competition
11  only the teams that have run the full gamut.  Full
12  cheerleaders, leadership, so on, participate.
13          NCA you have the Ohio State Club Team.  Well,
14  there are some times during the year there are disputes
15  between these two teams and actually the Ohio State
16  cheerleaders may come to us and say these people are
17  misrepresenting themselves in the community and we have a
18  problem with that.  Well, they look to us to help try to
19  solve that.  So we have to know the dynamics, what's
20  taking place at every single one of these institutions.
21  And how they mesh together and what their role is.  People
22  depend on us to do that.
23          So we track the type of team that this is at
24  each institution that we work with.  So we use it for that
25  purpose and then, of course, again, as I said, we also use

1    it to track the trends on what is developing in

2    cheerleading for this very purpose.

3           MS. GALLES:  So I guess in addition to our

4    believing this is a business record, obviously there was

5    at residual hearsay rule where Mr. Webb has, you know,

6    gone over in great detail about how this information is

7    collected and, you know, the degree to which he relies on

8    it in his business and his directors of college programs,

9    particularly Mr. Boggs, relies on it.

10          THE WITNESS:  There's also been discussion over

11   the year about, it's again a trend that we are continuing

12   to track about whether the club cheerleaders should have

13   their own separate division and not be competing against

14   the classal cheerleaders as well.  So it's incumbent upon

15   us to track how many club teams there are, if that's a

16   trend that's growing, that it's getting smaller.  If it's

17   creating problems for the classical teams, if it's

18   creating internal problems at the universities.  So we

19   track this information to have a handle, a very accurate

20   handle on whether, what the dynamic is at each

21   institution.  It's part of our business.

22          THE COURT:  Okay.  Who prepared it?

23          THE WITNESS:  Sir?

24          THE COURT:  Who prepared these documents?

25          THE WITNESS:  The National Cheerleaders

1    Association document was prepared by Mr. Boggs who's the

2    director of that program.  And the UCA document was

3    prepared by Mr. White, who's the director of that program.

4             THE COURT:  And when were they prepared?

5             THE WITNESS:  I can't give you an exact date,

6    Your Honor.

7             THE COURT:  Well, for example, the first one

8    says UCA College Nationals.  Was that document prepared at

9    or about the time of the UCA College Nationals?

10            THE WITNESS:  Yes, it would typically be.  I

11   would assume it would be this type of report I would get

12   after the event takes place.

13            THE COURT:  That was my next question.  How was

14   the document used within the company?

15            THE WITNESS:  Again it's used --

16            THE COURT:  Circulated, I mean.  Who gets it?

17            THE WITNESS:  How is it circulated?  If -- let's

18   take Mr. White.  Mr. White would circulate it to Mr. Boggs

19   and to me, and that's probably it.  Again, it's a small

20   group that deals with colleges because we also have high

21   school camps and high school competitions, so this is a

22   smaller program for us.  There are only a limited number

23   of us that are actually engaged or involved directly in

24   the college program.

25            MS. GALLES:  And I would say these are prepared

1    every year right after the competitions and have been done

2    long before this lawsuit, as I recall.

3                  THE WITNESS:  That's right.

4                  THE COURT:  Do you wish to voir dire anymore?

5                  MS. FRIEDFEL:  I do have one question, Your

6    Honor.

7    VOIR DIRE EXAMINATION

8    BY MS. FRIEDFEL:

9    Q.   Mr. Webb, if you look at the UCA National colleges

10   speech, you testified a few minutes ago that under the

11   rules of the UCA college nationals, only sideline

12   cheerleading teams can participate, is that right?

13   A.   Only -- only traditional cheerleading teams that,

14   that you know, are on the sideline but also deal with

15   school spirit.  They are the classical cheerleading team,

16   that is right.

17   Q.   But not competitive club teams?

18   A.   Correct.

19   Q.   And not competitive varsity sport teams?

20   A.   Correct.

21   Q.   Could you explain to me then why there's a column on

22   this page that says competitive team only, unless it was

23   prepared for purposes of this lawsuit?

24   A.   I would imagine that this is the form that Mr. White

25   and Mr. Boggs would use and it's the same form.

1    Q.   But it's not the same form.  The next form has three

2    columns:  Sideline, club and competitive?

3    A.   I'm having a little trouble finding it.  Give me a

4    second.

5         (Pause)

6         Yes, I'm not sure why.  Competitive team is all

7    there.

8              MS. FRIEDFEL:  That was my only question, Your

9    Honor.

10             THE COURT:  All right.  I'm going to admit these

11   documents as business records.

12             MS. GALLES:  All right.

13             THE COURT:  So 135 is full.

14             (Whereupon Plaintiff's Exhibit 135 was marked

15        full.)

16   BY MS. GALLES:

17   Q.   Now, this particular year in 2009, 2010, I believe

18   you said that just because we had the long break there,

19   just want to make sure that before, before last year or

20   this year, that only Maryland and possibly Fairmont State

21   represented themselves as a varsity cheer team; is that

22   accurate?

23   A.   Yes, that's my understanding.

24   Q.   Now, this year -- for this year's 2009, 2010

25   competition, okay, was this the first year that any other

1    schools beside Maryland and possibly Fairmont State held

2    themselves out to be a varsity cheer sport team?

3    A.    To the best of my knowledge, yes.

4    Q.    At some point during this past year, did you become

5    aware that some schools, some additional schools were

6    calling themselves varsity sport cheer teams?

7    A.    Yes.

8    Q.    Okay.  And did you take any action in response to

9    learning that, hey, there's these additional schools --

10   were these schools that had participated in NCA

11   Nationals before?

12   A.    Yes.

13   Q.    Okay.  Did you take any action in response to

14   learning that?

15   A.    The only action was to tell Mr. Boggs to continue to

16   follow the, you know, what was happening, get as much

17   information as he could from the schools, find out what

18   was the driving factor at their institutions so that we

19   could consider it at a later date.

20   Q.    And at the NCA Nationals in Daytona, did -- did

21   Mr. Boggs or any other of your employees conduct any

22   meetings with these schools to talk about what they were

23   intending to do?

24   A.    Yes.  There was a, there was a meeting with these

25   particular schools.

1    Q.    Okay.  And as a result of that meeting, meeting with

2    those schools, have you been considering whether you're

3    going to, whether you're going to allow them to

4    participate against the other teams that have

5    traditionally been in your competition?

6    A.    Yes, we have had discussions.

7    Q.    Okay.  And why have there been such discussions.  Or

8    let me back up.

9         Did you think it would be fair -- have you received

10   any complaints from any of your usual participants, usual

11   teams about whether they should be competing against

12   schools that claim to be varsity sport teams?

13   A.    Yes, according to Mr. Boggs there have been several

14   complaints.

15   Q.    Okay.  And did that trigger at all as to whether you

16   should allow these new sport cheer teams to continue to

17   participate?

18   A.    Well, the complaints would have been one part of that

19   consideration.  The fact that there would now be more than

20   just one or two would lead us to believe that at some

21   point a different division should be created to level the

22   playing field.

23   Q.    Okay.  So do you think it would be fair to have these

24   sport teams or the schools that purport to be sport teams

25   compete against the regular sideline teams?

1    A.    I don't think so.

2    Q.    Okay.  Now, when schools like Maryland or Quinnipiac,

3    when they come and they show up at your event, at your

4    nationals, do they compete with your, the rules of your

5    organization?

6    A.    Yes, they do.

7    Q.    Are those sideline rules?

8    A.    Those are rules that are primarily designed by the

9    classical sideline, so-called sideline cheerleaders, yes.

10   Q.    And do they compete in the same format that you

11   talked about earlier, providing the cheer component and

12   the two and-a-half minute routine component?

13   A.    Yes.

14   Q.    Okay.  Now, are you aware at all or have you become

15   aware at all of the organization known as the National

16   Competitive Stunt and Tumbling Association?

17   A.    Yes.

18   Q.    Okay, is that something that was just created this

19   year?

20   A.    That's what I understand, yes.

21   Q.    Okay.  Do you have any understanding of what the

22   format is for those competitions?

23   A.    Well, it's my understanding and our records confirm

24   that, that the teams or the schools who are part of that

25   organization first has to have competed in the traditional

1    or against classical cheerleading teams and sideline

2    teams.

3    Q.    And using the sideline format?

4    A.    Yes.

5    Q.    Okay.

6    A.    They also have created a different format that I

7    think is still in development, it's my understanding, that

8    they use in meets with each other.

9    Q.    Okay.  Now, this new format, do you know of any high

10   schools or amateur or club teams that use or have ever

11   used this new NCSTA format?

12   A.    No.

13   Q.    As far as you know, has anyone in the history of

14   cheerleading ever used that format before this year?

15   A.    No.

16   Q.    Do you know what USA Cheer is?

17   A.    Yes.

18   Q.    Okay.  What is USA Cheer?

19   A.    USA Cheer IS the generally accepted national

20   governing body or authority for cheerleading in the United

21   States.

22   Q.    Were you involved in setting up that organization?

23   A.    Yes.

24   Q.    Okay.  And as it currently is constituted, does it

25   govern sideline, sport or what does it govern?

A.   It governs sideline, collegiate and high school

levels and it also, it IS also governing is what's called

allstar club cheerleading.

Q.   Okay.  At this point in time, is there any part of

USA Cheer that has anything to do with -- well, let me

back up.

I'd like to point out is USA Cheer the same thing as

USA Federation for Sport Cheering?

A.   Yes.

Q.   Okay.  It's the same entity?

A.   Yes, USA Cheer is the shorter --

Q.   Version?

A.   -- name.

Q.   Okay.  So do you know why the word sport is in the,

in the official name?

A.   Yes.  When we had decided that it was important to

create this governing entity for purposes of structure and

safety and so on, you know, we wanted to at least have the

flexibility so that if cheerleading developed some type of

outgrowth that it became a sport, it would be included as

well.

Q.   Okay.  Now, was part of that in order to present it

to Sport Accord?

A.   I can't -- I can't remember if that was the full

intention but we wanted more flexibility to have this

1    organization part of the other types of international

2    federations.

3    Q.    And what is the sport --

4    A.    Like Sport Accord?

5    Q.    What is Sport Accord?

6    A.    Sport Accord, it's actually a private company.  Its

7    main function is to provide a forum for communication

8    between many different types of international federations.

9    Q.    All right.  Is chess part of Sport Accord?

10   A.    Yes.

11   Q.    Is billiards part of Sport Accord?

12   A.    I believe so, yes.

13   Q.    Are there any other games or activities that you

14   would not ordinarily characterize as a sport that are part

15   of Sport Accord?

16   A.    Sport accord takes the very broad general description

17   of sport.  And I give you chess.  It not only includes

18   your classical sports like international track and field,

19   the original sport, but again, very broad things like

20   chess.

21   Q.    Okay.  Now, when -- does Varsity Brands, does it have

22   anything to do with providing insurance for cheerleaders?

23   A.    Yes.

24   Q.    Okay, could you please --

25          MS. FRIEDFEL:  Your Honor, I fail to understand

1   the relevance of the insurance issue.  What's the

2   difference whether there's insurance required or not?

3   That has nothing to do with the case.

4          MS. GALLES:  Well, we haven't been able to

5   examine him yet to demonstrate the relevance.  Or would

6   you like me to just describe it?

7          THE COURT:  Well, I'll allow a little of this.

8   We'll see where we're going to go.

9   BY MS. GALLES:

10  Q.   Mr. Webb, does the NCAA provide catastrophic injury

11  for sport teams?

12  A.   Yes, for on the field athletes.

13  Q.   Okay.  Does the NCAA provide catastrophic insurance

14  for cheerleading teams?

15  A.   Yes.

16  Q.   Okay.  What kinds of cheerleading teams does it

17  provide insurance for?

18  A.   The classical holistic cheerleading squad that,

19  again, involves all the school spirit activities as well

20  as compete.

21  Q.   So when a cheerleading team comes and participates at

22  your events, at your competitions --

23  A.   Yes.

24  Q.   -- is the covered by the NCAA's insurance policy?

25  A.   No.

1    Q.   So, do these cheerleading squads as part of -- do

2    they have to obtain separate independent insurance to

3    participate in these competitions?

4    A.   Varsity Brands provides that insurance for the

5    participating competitions.

6    Q.   And, is that insurance only for during those events?

7    A.   Travel to and from those events and at these events,

8    competitions or camps.

9    Q.   And have you looked into how expensive that insurance

10   is if it were, if a school had to go out and get that

11   insurance for its competitive team?

12   A.   If it was a separate team that wasn't, again,

13   classical cheerleading team which is covered by the NCAA

14   insurance, and it was not, you know, then, we have looked

15   just to compare the insurance rates that we're getting and

16   we can't even find where you can get it.  So I assume it

17   would be very expensive but I'm not sure.

18   Q.   But you looked into --

19   A.   Yes.

20   Q.   -- whether you can find arrange to find a way for

21   the teams to get it and thus far have not been able to do

22   such?

23   A.   That is correct.

24   Q.   What was the American Association of Cheer Coaches

25   and Administrators?

1    A.   It's a nonprofit entity comprised of several thousand

2    cheerleading coaches across the United States and their

3    mission is to help promote cheerleading, to represent

4    cheerleading coaches and to create a safe environment for

5    cheerleaders to participate in.

6    Q.   Okay.  Do you have any role in the American

7    Association of Cheer Coaches and Administrators?

8    A.   I'm the President.

9    Q.   Okay, I would like you to look at what's Exhibit Six

10   in your report, please.  I believe it's Exhibit 138 over

11   all.

12   A.   Okay.

13   Q.   This is entitled, it's a position paper of the

14   American Association and Cheerleading Coaches and

15   Administrators.  Do you recognize this document?

16   A.   Yes.

17   Q.   And I'd like to direct you to the second page where

18   it says the best category for cheerleading?

19   A.   I'm trying to find that.

20   Q.   The second page of the --

21   A.   Uh huh.  (Affirmative.)

22   Q.   It says the best category toward the end of the

23   article in position.

24        MS. FRIEDFEL:  I'd just like to note my

25   objection because they're introducing this document.

1    Mr. Hernandez earlier represented this witness was not

2    going to be presenting any testimony about what is termed

3    a proper sport, and this whole article is about the

4    definition of a sport under OCR rules.

5              MS. GALLES:  He's not representing himself as an

6    expert in Title IX, he's representing himself as an expert

7    in cheer.  We haven't even tried to introduce it yet.

8              MS. FRIEDFEL:  I'm just trying to follow the

9    judge's rule.

10             THE COURT:  So, what's the objection?

11             MS. FRIEDFEL:  The objection is to the extent

12   they are trying to use this position paper to present

13   Mr. Webb and his organize as experts on cheer and they're

14   saying that cheer is not a sport, that they earlier

15   represented that they were not going to be doing that.

16             MS. GALLES:  Well, Your Honor, he's entitled to

17   represent what he believes and what his organization

18   believes and, indeed, the OCR guidelines, which he's not

19   going to be discussing the OCR guidelines.  The OCR, ones

20   of those OCR guidelines is what do authorities in the

21   activity think and what do the organizations representing

22   the activity think, and so obviously what does the

23   American Association of leading coaches and administrators

24   think is relevant and important to that guideline.

25   Mr. Webb is certainly not going to be talking about these

```
1    OCR guidelines but the only way to find out what do these

2    organizations and what do the people who are experts in

3    cheer want or think, is to ask them.

4              THE COURT:  Well, okay.  I'm going to, I'm going

5    to sustain the objection.

6              MS. GALLES:  Okay.

7              MS. FRIEDFEL:  Thank you, Your Honor.

8              MS. GALLES:  Obviously we would ask -- we

9    disagree just for the record.

10             THE COURT:  Yes, you don't have to do that.  By

11   offering it --

12             MS. GALLES:  Okay.  Let me take one moment, Your

13   Honor, make sure I covered everything.

14             THE COURT:  Sure.

15             (Pause)

16   BY MS. GALLES:

17   Q.   Mr. Webb, why is cheerleading so important to you?

18   A.   Well, cheerleading is something I have had a passion

19   for since I was very young man.  And you know, I've been

20   able been fortunate enough over the past 30, 35 years to

21   take sort of a concept that I created and to be able to

22   transform this athletic activity into something that

23   millions of kids can participate in and I honestly believe

24   that as cheerleading exists today which is what we

25   originally envisioned when we started UCA, we began that
```

1    transforming process, we envisioned that the traditional

2    role of cheerleading with leadership, with spirit race,

3    combined with what we do on the field, entertainment and

4    an element of competition, we believe that the result

5    speaks for itself.

6        Most people tell you that cheerleading has grown

7    three to four times over the past 25 years and it involves

8    millions and millions of kids, and we know from the

9    feedback we get the impact it's had on so many lives and

10   it's because of the total experience, not just one.  So

11   that's why it's important.

12   Q.   And during any of these 30 years or whatever that you

13   have been running cheerleading camps, running clinics,

14   running cheerleading competitions, have you at any time

15   thought or considered that you were running varsity sport

16   competitions?

17   A.   No.

18   Q.   Okay.  Now, do you have, do you have anything

19   against, you know, in the future something evolving out of

20   cheer that becomes a sport?

21   A.   No, absolutely not.  I mean if there is some type of

22   legitimate outgrowth of what has been classical

23   cheerleading and it provides a format for more kids to

24   participate, we're all about that.  We totally support it.

25   Our issue is it has to be different enough that it's not

1    confused with cheerleading so it doesn't threaten

2    classical cheerleading because we know what it is, we know

3    how valuable it is.  We get to participate.

4        So it has to be a different now.  Maybe use some of

5    the disciplines or styles of cheerleading so there's no

6    confusion and that particularly means the name.  You know,

7    we don't think there should be any way that cheer or

8    leader is used in any type of entity that is not

9    cheerleading because we think it creates confusion and we

10   think it risks classical cheerleading which we think is

11   very valuable.

12   Q.   So most of the schools that are representing

13   themselves as competitive teams, are they skill just doing

14   classical cheerleading?

15   A.   To which teams are you referring?  I'm sorry.

16   Q.   Whether you're participating in events or events just

17   like yours, are they still just doing what are considered

18   traditional cheerleading?

19   A.   You're not --

20   Q.   I'm not talking about NCSTA.

21   A.   Okay, yes, yes.  They may have a competitive element

22   which we support as recognition.  It's not the main thing

23   but they are the classical teams.  They may compete once

24   or device a year, but what they primarily do are the

25   traditional school spirit.

1    Q.   Do you think it would be fair for schools that may

2    eventually evolve into something different to compete

3    against classical sideline cheerleading?

4    A.   No.  Different resources, different function.  No, I

5    don't think it's fair.

6    Q.   Okay.  And do you have any financial reason to be,

7    for wanting to stop a school from evolving a new sport out

8    of cheerleading?

9    A.   Absolutely not.  The fact of the matter is we know

10   from our year long contacts.  We conduct coach's meetings

11   at all of our camps and our events.  We get feedback about

12   what's happening.  We know those coaches want cheerleading

13   to continue like it is today.  So we don't, and because,

14   again, the things I said, kids get out there.  The fact is

15   that at the college level, they want to be at the games,

16   they want to be at the ball games, they want to be at the

17   tournaments.

18            MS. FRIEDFEL:  Objection, Your Honor --

19   BY MS. GALLES:

20   Q.   Stop when there's an objection.  You have to --

21            MS. FRIEDFEL:  I'm sorry to interrupt but he

22   can't testify what students want or don't want.

23            THE COURT:  Let's get back to the question.  It

24   was about whether you have a financial reason.

25            MS. GALLES:  Yes.

1    A.    And that's the whole context I bring that up.  So we

2    know that, we -- based on that information, it is our

3    strong feeling that the kids who participate in classical

4    cheerleading now, you're not going to take an existing

5    team and take a competition.  It would be adding another

6    team.  Okay?  If you add another team, then from a

7    business standpoint, that means we have more potential

8    customers to sell products and services to.  So from a

9    business standpoint, you know, it's counterintuitive to

10   think we would be against it.

11   Q.    So, but as you sit here today with your 30 some years

12   of experience in cheerleading, including cheerleading

13   competition, do you believe that those competitions are

14   sport?

15   A.    No.

16   Q.    Do you believe that they are varsity sport?

17   A.    No.

18         MS. FRIEDFEL:  Objection, Your Honor.  This is

19   exactly what they said they were not going to use this

20   witness for.

21         MS. GALLES:  He is allowed to talk about what

22   his 35 years, whether he believes his own activity is a

23   sport.  He is not --

24         THE COURT:  Well, you got that answer but then

25   he went on.  So I'll sustain the objection.

1           MS. GALLES:  Okay.  Again, we would just

2    register for the record, Your Honor, the OCR factors and

3    indeed, asking that very question of the people most

4    knowledgeable is somehow you have to be able to represent

5    that factor and that's why we are offering that evidence,

6    so it's on there.

7           THE COURT:  Okay.

8           MS. GALLES:  May I have one moment to confer

9    with co-counsel to see if there's anything else?

10          (Pause)

11   BY MS. GALLES:

12   Q.   I believe just one more question, Mr. Webb.

13   A.   Okay.

14   Q.   You've been involved in cheerleading for 35 years.

15   Is there, do you know if there's any kind of a consensus

16   or -- amongst various organizations knowledgeable about

17   cheer, including yours, about whether cheer is or should

18   become a sport?

19   A.   Yes.

20   Q.   And what is that consensus?

21   A.   Well, our organization has a strategic partnership

22   with the NCAA and the National High School Federation and

23   both of the -- this is with the branding people of the

24   NCAA and, you know, the position with regard to classical

25   cheerleaders is they should remain that, they should

1    remain in their current role.

2            MS. GALLES:  I have no more questions at this

3    time.

4            THE COURT:  All right, let's take a five minute

5    recess and pick up with cross.

6            (Whereupon a recess was taken from 11:45

7        o'clock, a. m. to 11:50 o'clock, a. m.)

8            MS. GALLES:  Your Honor, I'd like to take care

9    of one more duty I'm sorry I forgot to do before the

10   break.

11   BY MS. GALLES:

12   Q.   Mr. Webb could you please turn to what's been marked

13   as -- I just had it out.  The exhibit number 132, which is

14   what you have in front of you.

15   A.   Number --

16   Q.   No, it's Exhibit 132 in the bigger picture but it's

17   what you have in front of you?

18   A.   Oh, the entire, yes.

19   Q.   It's marked report of Jeff Webb?

20   A.   Yes.

21   Q.   Okay.  Is that the expert report that you prepared

22   for this particular case?

23   A.   Yes.

24   Q.   Okay, and does it accurately reflect your views and

25   opinions relating to this case?

1   A.   Yes.

2   Q.   And one mention in there, since preparing this

3   report, have you learned that Oregon this semester moved

4   from, moved from sideline into competitive cheer?

5           MS. FRIEDFEL:  Objection, Your Honor.  That's a

6   question, Your Honor.  I have a further objection to the

7   introduction of the report but I assume we're going to get

8   to that.

9           THE COURT:  Yes, it is leading, so let's

10   rephrase it.

11           MS. GALLES:  I'm sorry.

12   BY MS. GALLES:

13   Q.   Is there any correction that you want to make in the

14   report relating to the University of Oregon?

15   A.   Yes, I've learned that the University of Oregon is

16   attempting to or is part of the NCSTA and attempted to

17   create a separate type of cheerleading team.

18   Q.   Okay.

19   A.   Strictly competition.

20   Q.   And again, I'm sorry, and this accurately reflects

21   your opinions relating to the issues in this case?

22   A.   Yes, it does.

23   Q.   Okay.

24           MS. GALLES:  Your Honor, we would move to admit

25   Mr. Webb's report except for Exhibit six which you have

 1    excluded as just a way of cutting short the testimony in

 2    the case.

 3              THE COURT:  All right.  Just to be clear, that

 4    would be Exhibits 132?

 5              MS. GALLES:  Yes, sir, Exhibit 132 through 137.

 6              THE COURT:  137.

 7              MS. GALLES:  Would not include 138 because you

 8    already ruled on that.

 9              THE COURT:  Any objection?

10              MS. FRIEDFEL:  Yes, we object to the

11    introduction of the report for a couple of reasons.  One

12    is it includes some of the representations with respect to

13    what is or is not a varsity sport which the plaintiffs

14    earlier represented they were not going to try to

15    introduce evidence of.

16              And second, the report is filled with hearsay

17    and I'm not referring to the facts that the report in and

18    of itself is hearsay, which I understand you ruled with

19    respect to the Lopiano report yesterday.  But it includes

20    statements that would not be admissible even if he were to

21    make them here in court today.

22              He talks about, in the report he talks about the

23    fact that the NCSTA meet format doesn't work.  When I

24    asked him at his deposition, he testified he's never been

25    at a NCSTA meet.  He never reviewed materials provided by

1    the NCSTA about their meet.  And his opinion was solely

2    based on what his employee Bill Boggs told him based on

3    what Bill Boggs saw and what Bill Boggs was told by

4    parents at the NCSTA meet.

5            THE WITNESS:  Bill Boggs was at the meet.

6            MS. GALLES:  The judge has to --

7            THE WITNESS:  I'm sorry, I'm sorry.

8            MS. GALLES:  The judge has to --

9            THE WITNESS:  I'm sorry.

10           MS. FRIEDFEL:  And there are further objections

11   to some of the exhibits if you would like, Your Honor.

12           THE COURT:  All right, well, I'm going admit

13   132.  It seems to me that to the extent it contains

14   hearsay, an expert is permitted to rely on hearsay if he

15   or she would rely upon it in the ordinary course of their

16   activities.  Here it seems to me that this witness fits

17   that bill.  He's in the business of cheerleading and to

18   the extent that the example you just gave is something

19   that he's relying on in the ordinary course of his

20   business, it seems to me he can rely upon it in his expert

21   report as well.  It seems to me you can also cross him on

22   that and I think it goes more to the weight than to the

23   admissibility.

24           MS. FRIEDFEL:  We further object to Exhibit 134

25   which is the, regarding the insurance as completely

1    irrelevant.  The types of insurance that are available for

2    sideline cheerleaders have nothing to do with competitive

3    cheer as a varsity sport.

4          MS. GALLES:  I would address two points.  Number

5    one, that information is directly off of Varsity's

6    website.  It's the information that Varsity provides to

7    the schools that enter its competitions in order to notify

8    them that they are going to compete, they need to go out

9    and get insurance.  And that was just one of the factors

10   that were established in terms of why cheer has presently

11   constituted as not a sport and also Quinnipiac's

12   representation that cheer is going to be so much less

13   expensive than volleyball.  That, you know, that that's

14   not true and insurance is either very expensive or

15   impossible to get.

16         And so we would say, number one, it's irrelevant

17   because of that and it's admissible as part of the

18   business records that Quinnipiac -- or excuse me.  That

19   Mr. Webb's company provides to the entrants in its

20   tournaments every year.

21         MS. FRIEDFEL:  Just for the record, Your Honor,

22   the position taken is not that the competitive cheer team

23   would be less expensive than the volleyball team.

24         THE COURT:  Okay.  I'm going to sustain the

25   objection to 134.  It does not appear to me to be

```
 1     especially relevant.

 2              MS. GALLES:  Okay.

 3              THE COURT:  And I don't believe it's a business

 4     record.  The fact it's on the website doesn't make it a

 5     business record.

 6              MS. GALLES:  I would say it becomes a business

 7     record because it's what they provide in the course of

 8     their business to the teams that enter their tournament so

 9     that the teams can be aware of, hey, you don't have

10     insurance and we've arranged a way for you to get

11     insurance and this is the information so --

12              THE COURT:  Okay, I understand.

13              MS. GALLES:  Just so it's clear.

14              THE COURT:  Any other objections?

15              MS. FRIEDFEL:  Yes.  As to the Exhibit 136, Your

16     Honor.

17              MS. GALLES:  Actually we're going to withdraw

18     that exhibit.  It's going to be dealt with with another

19     witness.

20              THE COURT:  All right.

21              MS. FRIEDFEL:  The only objection I have, Your

22     Honor to 137 is the extent it contains hearsay statements

23     about what was motivating other schools when they chose to

24     present, create competitive cheer teams.  I assume it's

25     being offered for its truth.
```

```
 1              MS. GALLES:  137 is sort of a guest editorial

 2    that Mr. Webb wrote for the NCAA news which is sort of the

 3    newspaper, or it used to be a newspaper put out by the

 4    NCAA for its members.  It's now all on line.

 5              THE COURT:  Well, the motivations for creating

 6    competitive cheer team don't seem especially relevant to

 7    me, so there's no harm in allowing it in is what I'm

 8    saying.

 9              MS. FRIEDFEL:  If it comes in as his opinion on

10    these issues I don't have any particular objection so long

11    as it's not offered for the truth.

12              MS. GALLES:  We basically wanted to offer it,

13    Your Honor --

14              THE COURT:  Okay, it's in.

15              MS. GALLES:  Okay, thank you.

16              (Whereupon Plaintiff's Exhibit 137 was marked

17         full.)

18              THE COURT:  Cross?

19    CROSS EXAMINATION

20    BY MS. FRIEDFEL:

21    Q.   Good morning, Mr. Webb.

22    A.   Hi.

23    Q.   Now, Quinnipiac University's varsity competitive

24    cheer team is not engaged in cheerleading, is that --

25    A.   It's not what?
```

1    Q.    Engaged in cheerleading.

2    A.    I don't think so.

3    Q.    Now, you testified earlier that your organization was

4    in discussions about whether or not the schools in the

5    NCSTA are permitted, were going to be permitted to compete

6    in your NCA competition, is that right?

7    A.    No, asked to compete against the sideline teams.

8    Q.    Against the sideline times teams, okay.

9          Now, isn't it true that the teams that are part of

10   the NCSTA have already told your organization that they

11   are not going to compete in the NCA championship next

12   year?

13   A.    Most recently, yes.  Before that they were going to

14   compete so at this point they've said they are not going

15   to.

16   Q.    Right, so -- you are no longer in discussions about

17   whether or not, who they are going to compete against,

18   right?  Because they've --

19   A.    That is correct.

20   Q.    Okay.  Now, you also testified that you were not

21   aware of any team that had -- any club team, excuse me,

22   that had competed in the NCSTA format, is that right?

23   A.    Correct.

24   Q.    Well, isn't it true that Michigan State and Ohio

25   State's have both not only competed in the NCSTA meet

1    format but they have hosted competitions in that format?

2    A.    I'm not sure about that.

3    Q.    You don't know?

4    A.    I don't know.

5    Q.    And you've never been to a NCSTA meet, is that

6    correct?

7    A.    Correct.

8    Q.    And you've never reviewed the format of that meet?

9    A.    I've been briefed on it by our collegiate director

10   Mr. Boggs who, one of his responsibilities was to go and

11   audit it and provide me with a brief of its content and

12   how it was conducted.

13   Q.    All right.  So, in your report where you say that the

14   NCSTA meet format didn't work, what is the basis of this

15   statement?

16   A.    That was primarily from Mr. Boggs.

17   Q.    And at your deposition, you testified that he, what

18   he told you was that he felt like it didn't really work,

19   that it wasn't that interesting, there weren't many crowds

20   and that didn't really provide the kind of venue in the

21   event they were hoping for, right?

22   A.    That is correct.

23   Q.    So he didn't tell you about any technical issue with

24   respect to how the competition worked, did he?

25   A.    He did.

1    Q.   He did?

2    A.   Yes, he did.

3    Q.   What did he tell you?

4    A.   He told me that the format included individual

5    competition and tumbling, individual competition and

6    partner stunts, routine members and then an actual team at

7    the end that was identical to what the classical

8    cheerleaders do.

9    Q.   Right, but that's not anything about why in any way,

10   shape or form the format didn't work, is it?

11   A.   He felt like it didn't work from a, the way it was

12   perceived by the audience.  He didn't feel like it was

13   very exciting.  He didn't feel like it worked from a lens

14   that we would primarily look at on an event working which

15   would include not only the legitimacy of the competition

16   but crowd reaction, environment and so on.  That's the way

17   we would look at it.

18   Q.   Right.  And you run your competitions for

19   entertainment purposes, is that what you testified

20   earlier?

21   A.   That's one of the reasons, yes.

22   Q.   One of the reasons, right.  And the NCSTA is being

23   run as a varsity sport, is that right?  That's what they

24   are, that's their claimed purpose?

25              MS. GALLES:  Objection, foundation.

1          THE COURT:  I'll allow it.

2     A.   From what I've seen, they are attempting to develop a

3     format that would be considered a varsity sport.

4     Q.   And the primary purpose of a varsity sport is

5     competition, isn't it?  It's not entertainment.

6     A.   Yes, I would think so, yes.

7     Q.   Okay.  Now, you testified earlier that you're the

8     president of the USA Cheer, is that right?

9     A.   Correct.

10    Q.   Now, I'd like you to take a look at Defendant's

11    Exhibit F N.  It's in the binders that are next to you.  I

12    believe it should be in Exhibit Binder three of three.

13         (Pause)

14    BY MS. FRIEDFEL:

15    Q.   Now, one of the purposes of USA Cheer is to be

16    recognized by the U. S. Olympic Committee as the governing

17    body for sport cheering, is that right?

18    A.   Yes.

19    Q.   Okay.  And the Olympic Committee is responsible for

20    the Olympic games, right?

21    A.   That is one of their responsibilities.

22    Q.   Right, and is there any dispute that the Olympic

23    committee is made up of sports?

24    A.   No.

25    Q.   Thank you.  Now, if you look at, on page 3?

1    A.    Page what?

2    Q.    I'm sorry, on page four of the bylaws?

3    A.    Okay.

4    Q.    Paragraph F.  One of the purposes of USA Cheer is to

5    coordinate athletic -- I'm sorry.  I may have a wrong

6    paragraph here -- is to sanction and coordinate athletic

7    participation in competition, is that right?

8    A.    Yes.

9    Q.    And another purpose is to coordinate and provide for

10   a participation by athletics in national athletic

11   competition in cheer, is that right?

12   A.    By athletes.

13   Q.    By athletes, okay.  And let's go then to page two of

14   the report where it says at 1.3 and -- right?

15   A.    Page two?

16   Q.    Page two of the report, article one definitions?  And

17   it defines an athlete as one who's eligible under ICU

18   rules to compete in international athletic competition

19   sanctioned by the ICU?

20   A.    Right.

21   Q.    And that's the International Cheer Union?

22   A.    Correct.

23   Q.    And are you the president of the International Cheer

24   Union?

25   A.    Yes.

1    Q.    The athletes, they participate, in those competitions

2    they participate in a two and-a-half minute cheer routine

3    competition, is that right?

4    A.    Yes.

5    Q.    Okay.

6    A.    And -- go ahead.

7    Q.    And you further define an active athlete for purposes

8    of the USA Cheer bylaws --

9    A.    Which, what are you referring to?

10   Q.    Right preceding paragraph 1.2.  I'm sorry.

11   A.    Okay.

12   Q.    As one who has within the last ten years competed at

13   an official national championship which was either

14   sanctioned or under the jurisdiction of the USACF, the NCA

15   or the UCA, correct?

16   A.    Correct.

17   Q.    And those organizations also sponsor competition in

18   that two and-a-half minute format, is that right?

19   A.    Yes.

20   Q.    Now, let's go to page five, paragraph 2.2, the bylaws

21   further state that USA Cheer supports the competitive

22   aspects and activities of cheer which function more as a

23   sport, is that right?

24   A.    Uh huh.  (Affirmative.)  Yes.

25   Q.    Now, if you could look at Exhibit F Q?

```
1    A.   Okay.

2    Q.   This is a letter that you wrote?

3    A.   Uh huh.  (Affirmative.)

4    Q.   I'm just going to put this up on the Elmo so that

5    everybody can see it.  One second.

6         Now, in this letter you wrote that the ICU has had

7    remarkable success in building its membership and

8    addressing its primary concerns which are to assist and to

9    support global development of cheer and to be an effective

10   voice in representing the athletes, coaches and officials

11   who make up our sport.  Is that right?

12   A.   Yes.

13   Q.   And you refer to cheer as a sport eight times in this

14   document, didn't you?

15   A.   Yes, in the general sense is how I meant it, which is

16   a very loose definition that would be used in terms of a

17   Sport Accord where you include even chess.

18   Q.   So when you were testifying earlier that you didn't

19   think that cheer is a sport, you were using a different

20   definition of sport than you used in all these documents?

21            MS. GALLES:  Objection, Your Honor.  They

22   repeatedly said they did not want him testifying about a

23   definition of sport and now she's soliciting from him

24   exactly what she would not allow me to solicit from him.

25            THE COURT:  Well, no, I think there's a
```

1   distinction between sport and varsity sport, and that's

2   why I drew the line in your examination, so I'll allow

3   this.

4   BY THE WITNESS:

5   A.   Would you ask the question again, please?

6   Q.   You were using a different definition a few minutes

7   ago when you testified that you don't think cheer is a

8   sport that you use in all these other documents where you

9   refer to cheer as a sport?

10   A.   I'm not trying to be difficult.  Please tell me

11   exactly what you refer to, what I said, when did I say it.

12   Q.   A few moments ago when Ms. Galles questioned you she

13   asked you if you considered cheer a sport and you said no.

14   A.   Yes, that is correct.

15   Q.   Right, but in all these documents that relate to

16   cheer competition, you referred to cheer as a sport?

17   A.   Yes, in the broad athletic activity sense, not in the

18   form of like a varsity sport.

19   Q.   Right, but your testimony earlier was not a varsity

20   sport because the court didn't allow you to answer that

21   question, did it?

22   A.   I don't understand what you mean by that.

23   Q.   Withdrawn.

24      Now, let me see here.  Okay.  You testified earlier

25   that your, that the NCA is planning to or is in

1    discussions about sponsoring a separate division from the

2    the NAIA, is that correct?

3    A.   Yes.

4    Q.   And I'd like to direct your attention to Exhibit F O.

5         MS. GALLES:  Your Honor, we object to F O and if

6    she proceeds to F P which apparently are press materials

7    from the NAIA, obviously there's no one here from the NAIA

8    or anyone competent to testify about the NAIA, so they of

9    course are hearsay, they are not relevant to any extent.

10   If she cares to characterize what the NAIA is doing, we

11   believe it would be a misrepresentation of that.

12        So basically hearsay and relevance.  If they

13   want to talk about the NAIA is doing they can bring

14   somebody from the NAIA in.

15        MS. FRIEDFEL:  Your Honor, I'm not offering it

16   for the truth.  If you give me a little latitude --

17        THE COURT:  What's the purpose of it?

18        MS. FRIEDFEL:  The purpose of it is to show Mr.

19   Webb was aware that the NAIA was representing that their

20   competition in the NCA's competition is for their varsity

21   cheerleading teams, that he was aware of that.  That's

22   all.

23        MS. GALLES:  And again, Your Honor, we would say

24   that is irrelevant because whether a school wants to claim

25   that something is a sport and then call it that, who knows

1   why they may or may not be calling it, and of course as we

2   know and as we believe that schools are calling it a sport

3   simply to count it for Title IX purposes, not because it

4   legitimately is a sport, so if they want to get into a

5   side trial about what NAIA is or is not doing, that's

6   fine.

7           THE COURT:  Why don't you ask him what he's

8   aware of and see whether we even need this document.

9           MS. FRIEDFEL:  I'll back up a little bit.

10  BY MS. FRIEDFEL:

11  Q.   In your Exhibit 5 to your report, it was entered into

12  evidence a few minutes ago?

13          THE COURT:  137.

14          MS. FRIEDFEL:  Thank you, 137.

15  A.   Okay.

16  Q.   You indicate that one of your objections to varsity

17  competitive cheer teams is they cause confusion, is that

18  right?

19  A.   Correct.

20  Q.   And you think that they make some schools think they

21  can just count their sideline teams, is that right?

22  A.   Yes.

23  Q.   Now, as I -- if you look at Exhibit F O, you're aware

24  that the NAIA is representing that their teams are varsity

25  sports, is that right?

1           MS. GALLES:  Same objection, Your Honor.

2           THE COURT:  Well, why don't you just ask him if

3    he's aware without looking at them?

4    BY MS. FRIEDFEL:

5    Q.   Fair enough.  Are you aware that NAIA is representing

6    that the teams that will be competing in your, in the

7    competition that your organization is going to conduct are

8    varsity teams?

9    A.   I believe from talking to, especially Mr. Boggs, that

10   the teams that are competing are their classical

11   cheerleading teams who also do all the sideline material.

12   Q.   All right, but you understand that I'm not asking you

13   to make a judgment as to whether or not they should or

14   should not be characterizing them as varsity teams.  I'm

15   just asking you are you aware of the fact that the NAIA is

16   representing that they are varsity teams?

17   A.   Yes.

18   Q.   Yes.  And your company contracted with them to run a

19   competition for them, is that right?

20   A.   Right.

21   Q.   And you weren't concerned that that was going to

22   create confusion?

23   A.   Yes, we have, we have registered that concern.

24   Q.   Yeah, but you were still willing to take their money

25   and run that competition?

1  A.   We're still talking about it.  And there's that

2  amount of money, by the way.

3  Q.   Now, sideline cheerleaders attend your company's

4  camps and clinics, correct?

5  A.   Correct.

6  Q.   And you train them in new skills and help them in

7  their learning how to be better cheerleaders, is that

8  right?

9  A.   Yes.

10  Q.   Okay, and you testified you run competitions that

11  those sideline cheerleaders attend?

12  A.   Yes.

13  Q.   And they buy your company's uniforms, right?

14  A.   Some do.

15  Q.   And I believe you testified at your deposition that

16  your uniform division is actually the most profitable?

17  A.   That is correct.

18  Q.   And you're concerned that if competitive cheer is

19  recognized as a varsity sport that competitive cheer teams

20  may try to prevent sideline teams from learning certain

21  skills in their routines, correct?

22  A.   Yes.

23  Q.   And you view varsity competitive cheer as a threat to

24  sideline cheerleading, is that correct?

25  A.   What do you mean varsity competitive cheer?  Are you

1    talking -- define that for me, please.

2    Q.    What Maryland has been doing and Quinnipiac --

3    A.    I view it as what, as a threat?

4    Q.    As a threat to classical cheerleading.

5    A.    It continues to call itself cheer which they don't

6    cheer and they don't lead, which creates confusion with

7    the classical cheerleader team.  And if they perform the

8    same type of routine that classical cheerleaders have

9    provided as part of their entertainment component for 25

10   years, which further confuses things.  Yes, I think it's a

11   threat because I think that what the sideline cheerleaders

12   do and the skills they use help them be more effective.

13   And, again, I think the fact that it's run three or four

14   times over the past 20 years validates that.

15   Q.    And you think that if the schools have competitive

16   cheer teams, that the cheer teams may try to prevent the

17   athletic -- I'm sorry.  May try to prevent the sideline

18   cheer groups from using some of those athletic elements

19   that you've introduced to clear, is that right?

20   A.    I think it's a possibility.

21   Q.    Right.  And if sideline cheer teams weren't able to

22   participate or to use those athletic skills, they wouldn't

23   have as great a need to attend your camps and clinics to

24   learn how to execute those skills, would they?

25   A.    That's not necessarily true.  In the state of Ohio at

```
1    the high school level they can't do any stunts and our
2    enrollment is as large as it's ever been.
3    Q.   Now, if you'll look at Exhibit F K.
4    A.   Okay.
5    Q.   Now, your NCA championship, you considered that to be
6    a pretty prestigious event in the cheerleading world,
7    correct?
8    A.   Yes.
9    Q.   And it's important for you to maintain that prestige,
10   right?
11   A.   Sure.
12   Q.   And, in fact, your rules prohibit any team from
13   competing in another national championship?
14   A.   Yes.
15   Q.   If they want to compete in your championship, right?
16   A.   Yes.
17   Q.   Now, if competitive cheer were to become an NCAA
18   champion sport, your national collegiate probably wouldn't
19   be that prestigious anymore, would it?
20   A.   I think it would still contain the great majority of
21   the teams it does now because it's primarily classical
22   cheerleaders.  I don't think it hurts prestige at all.
23   Q.   Now, you testified earlier that you felt that it
24   would be unfair for sideline teams to compete against the
25   varsity competitive teams, is that right?
```

1    A.    Yes.

2    Q.    And was that because you think that they, the

3    competition would be uneven, because they wouldn't --

4    A.    I think that the competition only teams have only one

5    focus, generally or probably going to have more resources,

6    and a lot more time to focus on that one aspect of

7    cheerleading.  And the classical cheerleading teams have a

8    lot of other responsibilities and so it's only a matter of

9    time.  And they are probably only going to compete once

10   during the year when these other teams are going to be

11   competing many times, probably, or a number of times.  So,

12   yes, I don't think it provides a level playing field.

13   Q.    If you'll look at Exhibit F J?

14   A.    Okay.

15   Q.    Now, these are results from your 2010 NCA college

16   national championship, correct?

17   A.    Right.

18   Q.    Now, if you'll look at the first page, it shows that

19   Quinnipiac University came in third, is that right?

20   A.    Correct.

21   Q.    And Quinnipiac's team is a varsity team, is that

22   right?

23          MS. GALLES:   Objection.

24   BY MS. FRIEDFEL:

25   Q.    They consider themselves a varsity team, is that

1    right?

2    A.    I guess so.

3    Q.    On your Exhibit 3 to your report you classify them as

4    a sport team, is that right?

5    A.    Thank you.

6    Q.    The University of New Hampshire, what kind of team is

7    that?

8    A.    That's a classical cheerleading team.

9    Q.    Right.  And University of New Hampshire beat

10   Quinnipiac, right?

11   A.    Yes.

12   Q.    So they were formidable competitors, right?

13   A.    Yes.

14   Q.    And also if you look at the next page which is the

15   results from your all girl one A division, the University

16   of Maryland won that competition, right?

17   A.    They did.

18   Q.    And they consider themselves to be a varsity team, is

19   that right?

20   A.    Okay.

21   Q.    Is that correct?

22   A.    The same as Quinnipiac, yes.

23   Q.    Okay, and what about the University of Louisville;

24   what kind of team is Louisville?

25   A.    They are a classical cheerleading team.

```
 1    Q.    They are.  And what was the difference in the score
 2    between Maryland and Louisville?
 3    A.    A couple of, you know, what, 20/100ths or whatever.
 4    Q.    So they were clearly formidable competition for the
 5    University of Maryland, is that right?
 6    A.    Yes, and the only one.
 7    Q.    I'm sorry, what?
 8    A.    They were the only one that was really formidable
 9    competition.  That was a classical cheerleading team.
10    Q.    Right, well --
11    A.    In fact, the teams that you're describing have two of
12    the top three spots.
13    Q.    Yes, Oregon and Maryland do have two of the top three
14    spots.  And N C State has what kind of team?
15    A.    N C State is, in this case I believe it's a club
16    team.  I'm not sure if this is club or their sideline
17    team.  They have both in competition.
18    Q.    And the University of South Carolina?
19    A.    It's a classical team.
20    Q.    And Georgia?
21    A.    Is a club team.
22    Q.    And Michigan State?
23    A.    I believe that's their club, they have both.
24    Q.    Okay.  So only two of the teams on this were actually
25    sideline teams?
```

1   A.   Yes.

2   Q.   Right?

3   A.   Correct.

4   Q.   Now, your NCA competition, you said divides the teams

5   into divisions, right?  And that's based on the NCAA

6   division rules, right?

7   A.   Generally speaking, the classification, that's one,

8   right.  Second one is, it can be how the teams

9   classified themselves as whether they are advanced or

10  intermediate teams and also reference coed or all girl.

11  Q.   So the people, the teams competing in the all girl

12  Division I that Quinnipiac competed against, those are all

13  NCAA Division I schools?

14  A.    I do believe Kennisaw (ph) division is so I'm not

15  sure.  And again, the divisions classically for NCA and

16  UCA, while they have some relevance to how NCAA classes,

17  we also have, they are really our own division so we can,

18  we can move teams back and forth.  I don't believe

19  Kennisaw is a Division I team.  I could be wrong.

20  Q.   Okay.  Now if we go to Plaintiff's Exhibit 135 which

21  is Exhibit Three to your report?

22          MS. GALLES:  I'm sorry, could you please say

23  that again?

24          MS. FRIEDFEL:  135, his Exhibit 3.

25          MS. GALLES:  Okay.

BY MS. FRIEDFEL:

Q.   This document includes the teams that will compete at

your UCA nationals and your NCA nationals, is that right?

A.   Yes.

Q.   But it does not include every team that competes in

cheer, does it?

A.   I'm not sure about that, it's the great majority.

There could be a few that participate at USA.

Q.   Right, but are you aware that Quinnipiac University's

competed against Batsin (ph), Stoney Brook, Penn State

Club Team, Fairfield University, UConn Club and in this

case also college?

        MS. GALLES:  Objection, foundation.  And in

terms of how she's characterizing that.

        THE COURT:  I'll allow it.  He can answer it.

BY THE WITNESS:

A.   I'll have to go to -- let me look.

     (Pause)

     Could you name the schools again, please?

Q.   I'll withdraw that question.

A.   Okay.

Q.   Are you willing to admit there are schools in the

country that compete, competitive cheer or cheerleading,

participate in cheerleading competitions who do not attend

your competition?

1    A.    I'm talking about classical cheerleaders.  Is that

2    what you're talking about?

3    Q.    We'll take them one at time.  They are sideline

4    classical cheerleading teams that compete but that do not

5    attend your companies, NCA and UCA competitions.

6    A.    There could be.

7    Q.    Right, and there could also be club teams that

8    compete but they do not attend your company's

9    competitions, is that right?

10   A.    There could be but I'm not aware of any.  There could

11   be.

12   Q.    Well, do you know that UConn has a club team?

13   A.    No.

14   Q.    No?  Now, allstar cheer teams don't do any sideline

15   cheerleading, do they?

16   A.    That is correct.

17   Q.    And all they do is compete and train to compete?

18   A.    That is correct.  And perform, entertain, as well as

19   they put on exhibitions sometimes too.

20   Q.    Okay, and your company sponsors allstar competitions,

21   is that right?

22   A.    Yes.

23   Q.    About what percentage of the allstar competitions

24   that are out there do you sponsor?

25   A.    50 percent.

1    Q.   50 percent, okay.  Now if we look at Exhibit F V?

2              MS. GALLES:   What?

3              MS. FRIEDFEL:  As in Victor.

4              THE COURT:  Just for planning purposes, let me

5    let you know, I have a commitment at 12:30 for one hour.

6              MS. FRIEDFEL:  I'll finish this document and

7    then we can break.

8              MS. GALLES:  B as in boy or V as in Victor?

9              MS. FRIEDFEL:  V as in Victor.

10             MS. GALLES:  Okay.

11   BY MS. FRIEDFEL:

12   Q.   This was a document produced by you made in response

13   to a request, is that right?

14   A.   Yes.

15   Q.   And what is this document?

16   A.   This is participants in the various Varsity Brands

17   divisions in the, primarily in the allstar space for the

18   past year.

19   Q.   Well, the document says participants by division for

20   spring 2010, so that would be from January to date?

21   A.   Yes.

22   Q.   And it shows that you had 130,678 people participate

23   in allstar competitions in your company, is that right?

24   A.   That is right.

25   Q.   And more than 56,000 of those participants were

1    between the ages of 12 and 18, is that right?

2    A.    Yes.

3    Q.    So you'll agree with me that there is substantial

4    interest in cheer competition, is that right?

5    A.    There is substantial interest in allstar competition,

6    yes.

7    Q.    All right.

8              MS. FRIEDFEL:  Do you want to break now, Your

9    Honor?  I'm done with that document.

10             THE COURT:  All right, sure.

11             All right, we'll take our lunch break until

12   1:30.  We'll continue with the cross then.  Stand in

13   recess.

14             (Whereupon the luncheon recess was taken at 12:30

15   o'clock, p. m.)

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Susan E. Catucci, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ Susan E. Catucci
_____

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917) 703-0761