```
                  UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - X
                                 :
STEPHANIE BIEDIGER, ET AL        :
                                 : No. 3:09cv-621 (SRU)
                                 : 915 Lafayette Boulevard
             vs.                 : Bridgeport, Connecticut
                                 :
                                 : June 22, 2010
QUINNIPIAC UNIVERSITY            :
                                 :
- - - - - - - - - - - - - - - - X
```

                  BENCH TRIAL - AFTERNOON SESSION

B E F O R E:

    <u>THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.</u>


A P P E A R A N C E S:

    FOR THE PLAINTIFF:

        PULLMAN & COMLEY
            850 Main Street
            P.O. Box 7006
            Bridgeport, Connecticut  06601-7006
        BY:  JONATHAN B. ORLEANS, ESQ.
            ALEX V. HERNANDEZ, ESQ.

        KRISTEN GALLES, ESQ.
            Equity Legal
            10 Rosecrest Avenue
            Alexandria, Virginia  22301

    FOR THE DEFENDANT:

        WIGGIN AND DANA, LLP
            400 Atlantic Street
            P.O. Box 110325
            Stamford, Connecticut  06911-0325
        BY:  MARY A. GAMBARDELLA, ESQ.

                        (CONTINUED)

```
                    PROSKAUER ROSE
                         1585 Broadway
                         New York, New York,  10016
                    BY:  EDWARD A. BRILL, ESQ.
                         SUSAN D. FRIEDFEL, ESQ.
                         REBECCA BERKEBILE, ESQ.
```

```
                    Viktoria V. Stockmal, RMR, CRR
                       Court Reporting Services
                       119 Poverty Hollow Road
                         Newtown, CT 06470
                          (203) 470-0335
```

## <u>INDEX</u>

EXAMINATION

Witness Name                                                    Page

JEFFREY WEBB
    Cross By Ms. Friedfel................................. 451
    Re-Direct By Ms. Galles ............................. 456

JACK McDONALD
    Direct By Mr. Orleans................................ 458
    Cross By Mr. Brill .................................. 527
    Re-Direct By Mr. Orleans ............................ 544

MARY ANN POWERS
    Direct By Mr. Hernandez ............................. 550

```
1                    (RECONVENED AT 1:45 P.M.)
2              THE COURT:  My apologies for the delay.
3              MS. FRIEDFEL:  Your Honor, we decided to mark
4    the document that was disclosed to us earlier today, I
5    believe that's Exhibit GM?
6              THE COURT:  GM?
7              MS. FRIEDFEL:  I think so.  I'm just going to
8    show a copy to the witness.
9              MS. GALLES:  Your Honor, just for the record,
10   we renew our objection in case, you know -- that the
11   prior objection doesn't carry over, so --
12             THE COURT:  Your objection on privilege
13   grounds?
14             MS. GALLES:  Yes, yes.
15             THE COURT:  That's fine.  All right.  Do you
16   have another objection to the document?
17             MS. GALLES:  Well obviously, it's hearsay.
18   But she's welcome to try to overcome that.  I mean, it's
19   an e-mail.
20             THE COURT:  Okay.  Are you objecting on --
21             MS. GALLES:  Yes, we are objecting on the
22   privilege and the grounds of hearsay.
23             MS. FRIEDFEL:  May I proceed?
24             THE COURT:  Sure.
25
```

1    J E F F R E Y   W E B B,   called as a witness for

2    the Plaintiff, having been previously duly sworn by the

3    Court, testified futher as follows:

4    CROSS-EXAMINATION

5    BY MS. FRIEDFEL: (CONT'D.)

6    Q.   Mr. Webb, could you look at page 4 of the document I

7    just showed you, Exhibit GM?

8    A.   Page 4?

9    Q.   Yes, it says "4 of 5" at the top right corner.  I

10    don't know if it's actually the fourth page.  I think it

11    says -- it appears that the document is page -- paginated

12    2 of 5, 3 of 5, 4 of 5.

13    A.   Oh, okay.  All right.

14    Q.   I'm sorry.  I don't know --

15    A.   Not the actual fourth page, but the paginated

16    version.  Okay, got it.

17    Q.   If you look at that e-mail, it appears to be an

18    e-mail from Terry Lakowski (ph.) to yourself, Bill Boggs

19    (ph.), Greg Web, Bill Seeley, and Jonathan White; is that

20    right?

21    A.   Yes.

22    Q.   Terry Lakowski is an attorney that you retained

23    regarding Title IX and other issues; is that correct?

24    A.   That's correct.

25    Q.   And she says in this e-mail:  "I spoke to Karen

1   Morrison this morning" --

2             THE COURT:  Well, it's not in evidence yet

3   because there's an objection.

4             MS. FRIEDFEL:  Okay.

5             THE COURT:  So before we -- well, in general,

6   I would like to get the document in before it's contents

7   are put into the record.

8             MS. FRIEDFEL:  Okay.

9             THE COURT:  So are you offering the document

10  or --

11            MS. FRIEDFEL:  Yeah, I mean, I was offering

12  the document to show --

13            THE COURT:  Well, okay.  The objection is

14  hearsay.

15            MS. FRIEDFEL:  Correct.

16            THE COURT:  I already ruled on the privilege.

17  So how do you get around the hearsay objection.

18            MS. FRIEDFEL:  The hearsay objection?  I'm

19  not offering this for the truth of what the attorney told

20  them about her communications.  I'm not saying --

21  offering it for the truth of what Karen Morrison did or

22  did not say, but more just to the fact that Karen

23  Morrison -- I'm sorry, that Ms. Lakowski was having

24  communications with Karen Morrison on behalf of Varsity

25  Brands about the issues that are discussed in the

```
 1   document.
 2              THE COURT:  Okay.  Well okay, you got a
 3   couple things.  You have two levels of hearsay.  You got
 4   the document, itself, and you've got the statement in the
 5   document.
 6              MS. FRIEDFEL:  Okay.
 7              THE COURT:  It doesn't sound to me like you
 8   really want the document as much as you want the subject
 9   matter.  So maybe you don't need the document.
10              MS. FRIEDFEL:  I'm happy to question him for
11   that -- without mentioning the document, itself.
12              THE COURT:  All right.
13   BY MS. FRIEDFEL:
14   Q.   Mr. Webb, did Ms. Lakowski have communications with
15   Karen Morrison on behalf of Varsity Brands?
16              MS. GALLES:  Objection, foundation.
17              THE COURT:  If you know.
18   BY THE WITNESS:
19   A.   I don't know for sure.
20   Q.   Was Karen Morrison at the -- work at the NCAA?
21   A.   I don't know Karen Morrison.
22   Q.   You don't know her.  Do you know if she works at the
23   NCAA?
24   A.   I don't know that.
25   Q.   You received this e-mail from your attorney; right?
```

1    A.   Apparently so.

2    Q.   And you didn't ask her who Karen Morrison was?

3    A.   No, I did not.

4    Q.   It didn't concern you about who she was

5    communicating with on behalf of your company?

6    A.   No.  During most of this time I was traveling and

7    I'm primarily just copied on this.  This, primarily,

8    would have been to Bill Boggs, John White, you know, to

9    be honest with you, I don't --

10   Q.   Do you know whether or not Varsity Brands has had

11   communications with the NCAA about cheer becoming an

12   emerging sport?

13   A.   About six years ago.

14   Q.   About six years ago.  So you don't know, you were

15   completely unaware until right now, when I showed you

16   this e-mail --

17   A.   Yes, that's correct.  I don't recall seeing this

18   e-mail.

19   Q.   And you had no knowledge that your company was

20   communicating with the NCAA --

21   A.   No, I did not ask Ms. Lakowski to do that, no.  The

22   last time -- no.

23   Q.   Ms. Lakowski is here in the courtroom right now;

24   right?

25   A.   Yes.

```
 1   Q.   There's a dispute about this document whether or not
 2   it was privileged and whether or not it comes into
 3   evidence; is that right?  Or whether --
 4   A.   Yes.
 5   Q.   I'm sorry, whether or not it would be produced?
 6   A.   Yes.
 7   Q.   And you didn't talk to her at all about the contents
 8   of the document?
 9   A.   No, I asked her what was in the document and she
10   said it was about a conversation --
11              MS. GALLES:  No, you can't -- sorry.  Sorry.
12              MS. FRIEDFEL:  Withdrawn, your Honor.  I'm
13   finished with the witness.
14              THE COURT:  Okay.  Redirect?
15   REDIRECT EXAMINATION
16   BY MS. GALLES:
17   Q.   Mr. Webb, I just want to ask you about document FM,
18   which is the USA Cheer document that Ms. Friedfel
19   mentioned to you or showed you.
20   A.   FM.
21   Q.   F as in Frank, M as in Mary.  It's the USA Cheer
22   items.  I'm sorry, F as in Frank, N as in Nancy.
23   A.   Oh, okay, thank you.
24   Q.   I would like to direct you to the last page of that
25   document.
```

1    A.   Okay.

2    Q.   When was USA Cheer incorporated?

3    A.   I believe the actual incorporation was in January of

4    this year.

5    Q.   January of --

6    A.   2010.

7    Q.   So USA Cheer, Ms. Friedfel asked you several

8    question relating to the reference to sport within the

9    USA Cheer --

10   A.   Yes.

11   Q.   -- articles.  Are those references about Cheer as

12   sport, do they pertain to Cheer as it exists today or

13   Cheer as you hope or expect it may be in the future?

14   A.   The documents?  Are you -- I'm sorry, could you ask

15   the question again.

16        MS. FRIEDFEL:  I just object, before the

17   witness answers.  We object to the question as leading.

18        THE COURT:  She's going to ask it again.  I'm

19   sure --

20        MS. GALLES:  Rephrase it, because he didn't

21   even understand it.

22        MR. BRILL:  You didn't do very well.

23        MS. GALLES:  Yeah.

24   BY MS. GALLES:

25   Q.   Mr. Webb; and again, you previously testified that

1    you are the president of USA Cheer?

2    A.   Yes.

3    Q.   When -- so when the articles for USA Cheer were

4    filed, were the references to sport in the articles --

5    see now you flustered me.   Just joking.

6    A.   Okay.   Try again.

7    Q.   We'll try one more time.   Okay.

8         Mr. Webb, the USA Cheer articles of incorporation,

9    do they reflect cheer as it is today?

10   A.   It addresses side line cheerleading and its place

11   and the fact that it's important to keep it as it is, but

12   the actual -- the actual intent is to also provide it lot

13   of latitude based on where cheer develops in the future.

14   Q.   So it is an aspirational document about where you

15   think cheer might go?

16   A.   It is at least partially aspirational.   And again,

17   designed to give as much latitude as possible to include

18   not only what exists in cheerleading today, but where it

19   may go, in which direction it may develop.   From a

20   national standpoint and internationally.

21                   MS. GALLES:   I have no further questions.

22                   THE COURT:   Sir, you are excused.   Thank you.

23                   MR. ORLEANS:   Your Honor, as soon as Mr.

24   Webb --

25                   THE WITNESS:   Sorry.

```
1              MR. ORLEANS:  Take your time.  No problem.
2      Your Honor, the plaintiff's call Jack McDonald to the
3      stand.
4              THE COURT:  Please remain standing.
5      J A C K   M c D O N A L D,    called as a witness on
6      behalf of the Plaintiff, having been duly sworn by the
7      Court, testified as follows:
8      DIRECT EXAMINATION
9      BY MR. ORLEANS:
10     Q.   Good afternoon, Mr. McDonald.
11     A.   Good afternoon, John.
12     Q.   Do you mind if I call you Jack?
13     A.   Yes.
14     Q.   You do mind?
15     A.   O for 1.
16     Q.   I'm comforted to know I'm not the only nervous
17     person in this the room right now.
18          Jack, you are the athletic director for Quinnipiac
19     University?
20     A.   Yes.
21     Q.   How long have you been in that position?
22     A.   Just finishing 15 years.
23     Q.   You testified in the preliminary injunction hearing
24     thin case; didn't you?
25     A.   Yes, I did.
```

1    Q.   As athletic director, you are responsible for the

2    overall administration of Quinnipiac's intercollegiate

3    athletic program?

4        A.   Yes, and the recreation program.

5    Q.   And the recreation program as well?

6    A.   Yes.

7    Q.   And do your responsibilities include oversight of

8    compliance with NCAA rules?

9    A.   Yes.

10   Q.   And how about Title IX compliance as well?

11   A.   Yes.

12   Q.   Do your responsibilities include oversight of

13   financial matters within the athletic department?

14   A.   Yes.

15   Q.   And use of facilities?

16   A.   Yes.

17   Q.   And your responsibilities include general oversight

18   from the administrative perspective of the teams;

19   correct?

20   A.   Yes.

21   Q.   And of the coaches?

22   A.   That's correct.

23   Q.   And you report to Dr. Thompson who testified

24   earlier; correct?

25   A.   Yes.

1    Q.   You've been reporting to him since around the middle

2    of 2009?

3    A.   July of '09.

4    Q.   I'd like to start by talking with you about the

5    National Competitive Stunts and Tumbling Association.   Do

6    I have the name right?

7    A.   Yes.

8         Q.   And for convenience, I'll refer -- try to refer

9    to it as the NCSTA; all right?

10   A.   Yes.

11   Q.   What is that organization?

12   A.   It's a governing body that was started at

13   Quinnipiac, announced our intent to add competitive cheer

14   in the spring of '09; and we discovered that there was

15   five or six institutions that were also already offering

16   competitive cheer or intended to; so we got together as a

17   group in the summer of '09 to start planning to have a

18   national governing body.

19   Q.   Now you just referred to competitive cheer.   When

20   you -- in March of '09, when Quinnipiac announced that it

21   would eliminate certain sports, including women's

22   volleyball, you announced that you would elevate

23   cheerleading to varsity status, wasn't that the

24   announcement?

25   A.   I forget the exact terminology in the press release,

1    but there was clearly an intent to add competitive cheer.

2    Q.   And prior to this past year, the 2009-2010 year, the

3    cheerleaders at Quinnipiac were sideline cheerleaders;

4    correct?

5    A.   That's all we had, yes.

6    Q.   And they were not treated or held out as varsity

7    athletes before this past year; correct?

8    A.   No.

9    Q.   And at the time you made the announcement -- and

10   when I say you, I mean the university.  I don't

11   necessarily mean you, personally.  But at the time that

12   the announcement was made, Quinnipiac had had some

13   communication with the University of Maryland; right?

14   A.   Yes.

15   Q.   About -- specifically on the subject of competitive

16   cheer?

17   A.   That's correct.

18   Q.   But at that time, there was no organization of

19   schools offering cheer as a varsity athletic endeavor?

20   A.   No, there was not.

21   Q.   And at the time that you made the announcement in

22   March, there was no agreement among the schools to create

23   such an organization; was there?

24   A.   Not in March of '09.

25   Q.   In fact, it wasn't until after the preliminary

1    injunction hearing in this case that the group of schools

2    that are now in the NCSTA began to talk about forming a

3    governing body; is that correct?

4    A.   I'm not sure when that began, John, but it certainly

5    began right after the announcement of elevating the sport

6    to varsity.

7    Q.   Who are the members, currently, of the NCSTA?

8    A.   Well, clearly, Quinnipiac, University of Maryland,

9    Baylor University, Fairmont State, University of Oregon,

10   and we've recently added UMass Dartmouth.  I may be

11   missing one.

12   Q.   There are seven members now?

13   A.   Yes, I think so, yes.

14   Q.   Have there been other members who have dropped out

15   along the way?

16   A.   No.

17   Q.   And didn't the group meet -- Withdrawn.

18        You've been involved in the creation of this

19   organization from the very beginning; haven't you?

20   A.   Yes.

21   Q.   And by now I mean you, personally, you have

22   personally --

23   A.   Yes.

24   Q.   -- played a role, have you not?

25   A.   Yes.

1    Q.   And you serve on the governing board of the NCSTA?

2    A.   We haven't called ourself that yet, but there's

3    about five or six administrators that we've been talking

4    regularly.

5    Q.   So there is not formally a governing board at this

6    time?

7    A.   Not yet.  But we certainly have a group making a lot

8    of decisions.

9    Q.   And that's a group of administrators from the

10   various schools?

11   A.   Yes.

12   Q.   And the group met at the University of Maryland, was

13   it in November of 2009?

14   A.   Well, our first -- we had a few conversations

15   before -- that was September was we call it the summit.

16   Q.   The Cheer Summit?

17   A.   Correct.  But prior to that, to plan for that and

18   just literally schedule when, where and how much we're

19   going to talk about, we had a call or two in mid, late

20   summer of '09.

21   Q.   And then you had the summit in September; correct?

22   A.   That's correct.

23   Q.   And then there was an announcement that was made in

24   January of 2010; correct?

25   A.   There was an announcement made.  The exact date I'm

1    not familiar with.

2         MR. ORLEANS:  Let's see if I can make this

3    work.

4    BY MR. ORLEANS:

5    Q.   Calling your attention to Plaintiff's Exhibit No.

6    43.  Can you see it okay from there?

7    A.   Yes.

8    Q.   Because there's paper copy in the book?

9    A.   No, I can see it perfectly.

10   Q.   Okay.  Do you recognize this, Jack, as a print from

11   the Quinnipiac University web site?

12   A.   Yes.

13   Q.   And the head line is:  "University's announce

14   formation of National Competitive Stunts and Tumbling

15   Association," release date January 28, 2010; correct?

16   A.   That's correct.

17   Q.   And it lists the current members at that time.  Now

18   it lists Fort Valley State as a member.  Is Fort Valley

19   State still a member now?

20   A.   I don't think they're still a member now.

21   Q.   And the club team at Ohio State is not a member; is

22   it?

23   A.   I don't know if Ohio State was ever officially part

24   of this group.  At the time it might have been a

25   prospective member.

1    Q.   But it's not currently a member; is it?

2    A.   No.

3    Q.   And this press release issued by the Quinnipiac

4    Sports Information Department?

5    A.   Yes.

6    Q.   And it includes -- you see the highlighted line

7    there:  "The goal of the NCSTA is to usher stunts and

8    gymnastics into NCAA emerging sports status and

9    eventually a NCAA fully sanctioned varsity sport with a

10   NCAA sponsored national sponsorship"; is that accurate?

11   A.   Yes, it is.

12   Q.   Why is this organization called the National

13   Competitive Stunts and Tumbling Association rather than

14   the national competitive cheer association?

15   A.   I think there's been significant discussion since

16   our announcements about the actual name of our sport and

17   the name of our governing body so as not to confuse fans

18   and athletes and coaches with what has traditionally been

19   side line cheer.  So we had a lot of discussions and long

20   ones about what would be the name of our sport and what

21   would be the name of our governing body.  We had a

22   conference call with the athletic directors from many of

23   these institutions in November to talk about the name of

24   the sport and sort of as an agreement to begin the

25   governing of the sport, we come up with a national

1    governing body name of NCSTA, but the institutions were

2    allowed to call the sport competitive cheer.  But

3    basically, that's how we started at this point.

4    Q.   In fact, there was some disagreement among the

5    various institutions about what the sport should be

6    called; wasn't there?

7    A.   Yes.

8    Q.   And currently Quinnipiac calls the sport competitive

9    cheer?

10   A.   That's correct.

11   Q.   I think Oregon calls it competitive stunt and

12   tumbling?

13   A.   Something similar to the governing body name, yes.

14   Q.   And the various institutions are allowed to call it

15   what they want; is that correct?

16   A.   Certainly, obviously, what they want, but pretty

17   much it's competitive cheer or the name Oregon is using.

18   Q.   I'm sorry if I asked you this already, but back in

19   March 2009, there was not a plan to organize a group like

20   NCSTA; was there?

21   A.   In my mind, there was.  I've been experienced for

22   many years in our Division I status, we actually formed

23   leagues before for some other sports at Quinnipiac.  I've

24   been very actively involved in NCAA governance on sport

25   committees, championship cabinets, knowing full well that

```
 1    for our sport to be recognized, these things needed to
 2    happen.
 3    Q.   But you hadn't started working on it at that point,
 4    I guess would be --
 5    A.   We started working on it the day we announced the
 6    sport.
 7    Q.   At that time, you -- Withdrawn.
 8         Let me rephrase.
 9         In March of 2009, when you announced the elimination
10    of volleyball and other sports, you did not anticipate
11    that the varsity cheerleaders at Quinnipiac would have to
12    stop cheering at basketball games; did you?
13    A.   I'm pretty sure by that point we knew that the
14    student athletes beyond competitive cheer would no longer
15    be on sideline cheer -- cheerleading.
16    Q.   You had not, in March of 2009, developed a
17    competition format for competitive cheer; had you?
18    A.   No.
19    Q.   And you hadn't developed a scoring system for
20    competitive cheer?
21    A.   The scoring system was coming with the formation of
22    the group.
23    Q.   So the scoring system is something that's been
24    worked on through the NCSTA?
25    A.   Yes.
```

1    Q.   And I presume the competitive format as well?

2    A.   Yes.

3    Q.   In March of 2009, did you know about the process at

4    the NCAA for becoming an emerging sport?

5    A.   Through the rise of other sports to the emerging

6    sport program, I was aware of how it happens and the

7    committees and the people involved.

8    Q.   So did you know what -- and again, I'm talking about

9    March of 2009 now, did you know what NCAA committee you

10   had to be in touch with in order to begin that process?

11   A.   I probably couldn't tell you the name of it, but I

12   knew there was a process that exist.

13   Q.   You knew there was a process that existed?

14   A.   Yes.

15   Q.   To become -- to be recognized as an emerging sport?

16   A.   Yes.

17   Q.   Were you aware at that time that there was a process

18   for seeking a determination letter from the Office of

19   Civil Rights?

20   A.   Yes.

21   Q.   Now would it be fair -- Withdrawn.

22        The NCSTA, as we stand here today, is not

23   incorporated; is it?

24   A.   No.

25   Q.   And it has no staff, no employees of its own;

1 correct?

2 A. That's correct.

3 Q. It receives staff support from the various

4 organizations --

5 A. That's correct --

6 Q. -- from various institutions?

7  A. It's is very common in a lot of our sports.

8 Q. And it doesn't have -- I think you said it doesn't

9 after formal board of directors; correct?

10 A. We certainly have a group of people making

11 decisions.

12 Q. But the question was does it have a formal board of

13 directors?

14 A. No.

15 Q. It doesn't have a set of bylaws; does it?

16 A. Bylaws are being worked on.

17 Q. So they are in process now?

18 A. Yes.

19 Q. And does it have a committee structure?

20 A. Again, five or six of us, we are the decision makers

21 and --

22 Q. Are there sub committees to your group?

23 A. Not quite yet.

24 Q. So would you disagree with me if I referred to it as

25 still a work in process in many ways?

1    A.   Almost -- yes, yes.

2    Q.   You would disagree?

3    A.   I would say the work in progress is almost done.

4    Q.   Do you have a web site yet?

5    A.   No.

6    Q.   You are planning to have one, though, right?

7    A.   Yes.

8    Q.   And within the last month, the group agreed on the

9    roster sizes -- the maximum roster size and the travel

10   roster size for the coming year; correct?

11   A.   Yes.

12   Q.   There are no schools in the Northeast Conference,

13   other than Quinnipiac, that are part of NCSTA; is that

14   right?

15   A.   That is correct.

16   Q.   In fact, other than Quinnipiac, there are no schools

17   in Connecticut that are part of NCSTA?

18   A.   At this point, correct.

19   Q.   And there is only one other school in New England,

20   that being UMass Dartmouth, that is part of the NCSTA?

21   A.   That is correct, at this point.

22   Q.   Other than UMass Dartmouth, the closest NCSTA member

23   is the University of Maryland in College Park; is that

24   right?

25   A.   That's correct.

1    Q.   Let me show you Plaintiff's Exhibit 41.

2              MR. ORLEANS:  How do you work the up and

3    down?  I'm trying to make it a little smaller so we can

4    get a little more of it.

5    BY MR. ORLEANS:

6        Q.   Can you read it that the size, Jack, or is that

7    too small now?

8    A.   Yes.  A little larger would help,  --

9    Q.   Let me see if I can do better.

10   A.   That's fine.

11   Q.   You can't just quite get the whole document in.

12       Do you recognize this document as the 2009 and '10

13   schedule and results for the Quinnipiac competitive cheer

14   team?

15   A.   Yes.

16   Q.   And you'll see that I've highlighted a couple of the

17   events.  The All Girl Collegiate Competitive Cheer event

18   Friday, February 5th at Kennesaw State University in

19   Georgia.  That was the first competition ever held uses

20   the NCSTA meet format; correct?

21   A.   That's correct.

22   Q.   And also use the NCSTA scoring system; right?

23   A.   That's correct.

24   Q.   That was in February of this year?

25   A.   Yes.

1    Q.   And also in February of this year, on February 28th,

2    at Quinnipiac, you had a meet with Quinnipiac, Maryland,

3    UConn, Western Connecticut and Babson; correct?

4    A.   That's correct.

5    Q.   And that one also used the NCSTA meet format; am I

6    right?

7    A.   Yes.

8    Q.   And of all the competitions that the Quinnipiac

9    University competitive cheer squad was in, in 2010, those

10   are the only two that used the NCSTA meet format; am I

11   right?

12   A.   Yes, you are.

13   Q.   Now the meet format that was used this past spring

14   in 2010 is being revised somewhat for the 2010-2011

15   season; is it not?

16   A.   That's correct.

17   Q.   And the NCSTA is planning its first -- its first

18   national championship to be held next spring in 2011;

19   right?

20   A.   That's correct.

21   Q.   And all of the NCSTA schools will participate in

22   that meet; will they not?

23   A.   Yes.

24   Q.   So there's -- the regular season doesn't result in

25   anybody being eliminated from post season competition,

1    this year at least?

2    A.    That's correct.

3    Q.    In -- when I say "this year," I mean the coming year

4    2010-2011.

5         Not much suspense about who's going to qualify for

6    the championship, I guess this time?

7    A.    There are other sports that have regional

8    championships and in a similar format.  The suspense will

9    be significant once the student athletes get there.

10              MR. ORLEANS:  I want to take just a minute

11   and, your Honor, I'm conscious of time and will try not

12   to spend too much time on this.  But I would like to go

13   through Plaintiff's Exhibit 98.  For this one, it might

14   be helpful actually if you took out the paper, because

15   it's -- it's this notebook right here.  The one on the

16   bottom.

17   BY MR. ORLEANS:

18        Q.    Can we make that work?

19   A.    We're making it.  Yep.

20   Q.    This is a collection of e-mails that -- and minutes

21   that relate to the NCSTA.  And I would just like to go

22   through it and have you identify for the record so that

23   the judge knows what we've got here.

24        The first couple of pages feature an e-mail chain

25   among you, Kelly Cunningham, Nancy Post and Renee

1    Baumgartner.  Can you just say who those people are?

2            MR. BRILL:  Can you give the Bates numbers

3    for each of those.

4            MR. ORLEANS:  It starts D 15458, Exhibit 98.

5            MR. BRILL:  I have it.

6    BY MR. BRILL:

7    Q.   Can you just explain to Judge Underhill who those

8    three --

9    A.   Starting to the top this was from me on Monday,

10   April 12th, which was a few days after we met in Daytona.

11   Kelly Cunningham is the assistant athletic director for

12   compliance in Maryland.  Nancy Post is the associate

13   athletic director, and Sieman (ph.) was administrator at

14   Baylor who just -- they are adding competitive this

15   years.  Renee Baumgartner is the senior administrator and

16   associate athletic director at Oregon.  And this really

17   was to set up -- setting up a meeting with Karen Morrison

18   at the NCAA.

19   Q.   And this is April 12th, 2010 and you're suggesting

20   to Kelly, Renee and Nancy that there be a conference call

21   with Karen Morrison of the NCAA; correct?

22   A.   That's correct.

23   Q.   And the acronym CWA there refers to the Committee on

24   Women's Athletics?

25   A.   That's correct.

```
 1          Q.   And that's the committee with the primary
 2    jurisdiction over emerging sport status at the NCAA; am I
 3    right?
 4    A.   That's correct.
 5    Q.   Now if we can go to the next e-mail in the chain.
 6    This starts at 15522.
 7          Do you see that one?
 8    A.   I think -- my number at the bottom doesn't seem to
 9    coordinate with what you just said.  15459?
10                   MR. ORLEANS:  Oh, no.
11                   THE WITNESS:  Is that right?
12                   MR. ORLEANS:  No, that is not right.  Oh,
13    I -- it's separated by a yellow sheet.  Here we go.
14                   THE WITNESS:  Oh, it's separate e-mail.
15                   MR. ORLEANS:  The first one is a three page
16    chain, but I'm done with that one and now I'm on to the
17    next chain.
18                   THE WITNESS:  Okay.
19    BY MR. ORLEANS:
20    Q.   15522, still part of Exhibit 98, is dated April
21    27th, 2010 and it's an e-mail from you to Renee
22    Baumgartner; right?
23    A.   That's correct.
24          Q.   It says, "Notes from meeting in Dayton," but I
25    think you meant Daytona.
```

1          A.   That's correct.

2     Q.   That's a reference to an NCSTA meeting you had in

3     Daytona Beach, Florida?

4          A.   Yes.

5     Q.   When members of the NCSTA were at the NCAA college

6     nationals; right?

7     A.   That's correct.

8     Q.   And you say:  "Renee, here you go, I would consider

9     these drafts and not final."

10         And what's the "these"?  Is that minutes of the

11    meeting?

12    A.   That's probably the notes on the next page.

13    Q.   Your notes.

14    A.   Trying to he -- you know, again, there were four or

15    five of us at the meeting and we reviewed, again

16    re-reviewed our, you know, bylaws, procedures, policies.

17    Q.   And you say:  "I also sent along what Nancy sent us

18    today."

19         If you look at the list of attachments,

20    Mr. McDonald, one of the attachments is NCSTA outline of

21    competitive cheer.docx and another attachment is NCSTA

22    meeting April 2010.  Do you see those two attachments?

23    A.   I'm looking at them.

24    Q.   If you go one page, the next page that we see is

25    headed:  "National Competitive Stunts and Tumbling

 1    Association, Outline of competitive cheer"; is this the

 2    document from Nancy Post?

 3    A.   John, I'm not familiar with which one of these is

 4    from whom.

 5    Q.   Let me just suggest that you go through one, two,

 6    three pages and you'll see one that's headed, NCSTA

 7    meeting.

 8    A.   Yes.

 9    Q.   So let me ask you now, having seen that, does that

10    refresh your recollection at all, Mr. McDonald as --

11        A.   I'm going to be not sure, but I think the

12    second one headed, NCSTA meeting, was from me.

13    Q.   Okay.  So that would be your notes of the meeting

14    in --

15    A.   Right.

16    Q.   -- Daytona in April?

17    A.   That's correct.

18    Q.   It appears that at that meeting you discussed a

19    number of matters relating to the plans for the NCSTA;

20    would that be --

21    A.   Yeah, --

22    Q.   -- a generalization?

23    A.   Regarding the organization of the sport.

24    Q.   If you go to the last page of your notes, it's Bates

25    number D 15528.  You see the heading there, "Roman 4,

1    NCAA emerging sport status"?

2    A.   Right.

3         Q.   And it says, "Timeline for submission, spring

4    2011"?

5    A.   That's correct.

6    Q.   Is that still the plan, that you will submit an

7    application --

8    A.   Some time between now and then, yes.

9    Q.   Now backing up just a sec to the Nancy Post

10   document, the Outline of competitive cheer, what was the

11   purpose of that document?

12   A.   I think in the -- both Nancy and I were probably

13   coordinating taking notes together.  I had asked her to

14   make sure that, you know, what I wrote is similar to what

15   was discussed and approved and voted on.

16   Q.   Let me just ask you then about the section entitled,

17   "Minimum competitions."  It says, "Teams will compete

18   annually in a minimum of six competitions"; is that still

19   the expectation for NCSTA members?

20   A.   I believe we revised that to six to eight is -- but

21   that's what we discussed in April.

22   Q.   In April.  And in April, you discussed that half of

23   those would have to use the NCSTA format?

24   A.   Yes.

25   Q.   And also, that any competition must include at least

1    one collegiate opponent?

2    A.   Yes.

3    Q.   I don't have anything further on that collection.

4    So if you go to the next separator page.

5    A.   Okay.

6    Q.   The next e-mail is dated April 29, 2010 from you to

7    the add -- a group of NCSTA administrators; correct?

8    A.   I think I might have missed something, John.

9    Q.   Are we getting there?

10   A.   I'm looking at an e-mail dated May 10th.

11   Q.   Let's see if we missed one.

12   A.   Sorry.

13   Q.   Or if there's a problem with -- here you go.

14   A.   Oh.  Okay, thanks.

15   Q.   Sure.

16        So 15547 is an e-mail dated April 29th from you to

17   Baumgartner, Cunningham, Post, Kristi Kiefer at Fairmont

18   State; is she an athletic administrator at Fairmont

19   State?

20   A.   Yes.

21   Q.   And the subject is "Today's Minutes" and the first

22   attachment listed is:  "NCSTA conference call April 28th,

23   2010"; do you see that?

24   A.   Yep, yes.

25   Q.   And your message is:  "First draft, good call today,

1      we're inching closer."

2            So are you the author, then, of the notes that

3      follow?

4      A.   Again, yes, I was the author usually subject to

5      approval by the group.

6      Q.   Now this is -- these notes appear to be notes of a

7      conference call with Karen Morrison -- with a number of

8      the NCSTA administrators and with Karen Morrison from the

9      NCAA; correct?

10     A.   That's correct.

11     Q.   And in that call you discussed the required contents

12     of an emerging sport proposal to the Committee on Women's

13     Athletics; is that right?

14     A.   That's correct.

15     Q.   And in the middle of the page there is a listing of

16     the things that Ms. Morrison told you should be included?

17     A.   That's correct.

18     Q.   And one of the items in that list is an

19     interpretation from OCR; correct?

20     A.   That's correct.

21     Q.   And that's not something that the NCSTA has yet;

22     correct?

23     A.   That's correct.

24     Q.   And that's -- Withdrawn.

25           Do you have a letter of support from each NCAA

1    division at this point?

2    A.    I don't know what you mean by --

3    Q.    I'm just reading from the list of items that ought

4    to be included that you got from Ms. Morrison, right

5    under interpretation from OCR it says, "one letter of

6    support from each NCAA division"?

7    A.    You know, John with all the talk, I'm not familiar

8    with that term, nor do I know what it means.

9    Q.    Okay.  Fine.

10    But Ms. Morrison did tell you that that

11    interpretation from OCR was an important point; didn't

12    she?

13    A.    Yes, she did.  And we certainly have put that as

14    priority one and there's a significant effort undergoing

15    now regarding a national inter because of the national

16    nature of the sport.

17    Q.    If you could move to the next e-mail chain after the

18    yellow separator page, you should see page D 15565?

19    A.    Correct.

20    Q.    May 10th, 2010, e-mail from you to Kelly Cunningham

21    and others?

22    A.    Correct.

23    Q.    Is everybody on this list associated with an NCSTA

24    school?

25    A.    Yes.

1    Q.   And you say:  "I have attached what I think we

2    talked about today"; and the attachment is agenda and

3    minutes from a conference call on May 10; correct?

4    A.   Yes.

5    Q.   And you authored this document; didn't you?

6    A.   Yes.  Again -- again, the authoring and then it gets

7    edited if there's comments.

8    Q.   I understand.  But this is not an edited version; is

9    it?  This is the version that you first sent to everyone?

10   A.   John, I --

11   Q.   Since it came from your e-mail?

12   A.   Yeah, it probably is.  If it came from my e-mail,

13   then this is not edited yet.

14   Q.   And looking then at the first page of the agenda and

15   minutes, it indicates in Roman I, discussion of a

16   national championship.  There were some concerns -- I'm

17   paraphrasing -- but there were some concerns among the

18   coaches about having the NCSTA national championship the

19   same weekend as the NCA in Daytona?

20   A.   Yes.

21   Q.   But ultimately, I know that you -- that the group

22   did decide to hold its national championship in Oregon on

23   the same weekend as the NCA championship in the spring of

24   2011; correct?

25   A.   That's correct.

1    Q.   Also, at this call on May 10th, it appears that

2    there was discussion about holding a coaches meeting at

3    the University of Maryland on May 18th and 19th; is that

4    right?

5    A.   Yes.

6                MR. ORLEANS:  And let me just interrupt for

7    one second here.

8                Excuse me, your Honor.  This doesn't have a

9    sticker on it, but this is a copy of FG; is it not?  Just

10   trying to save a little time.

11   BY MR. ORLEANS:

12   Q.   Mr. McDonald, showing you a document that I will

13   represent to you is a copy of Defendant's Exhibit FG, I'm

14   trying to save you the trouble of plowing through those

15   books.

16   A.   That's fine.

17   Q.   Do you agree that this is the cover page, at least,

18   of the recommendations that came out of that coaches

19   meeting at the University of Maryland?

20   A.   Yes.

21   Q.   So the coaches did meet and came up with a set of

22   recommendations that they made to the administrators?

23   A.   Yes.

24   Q.   And that was on May 18th and 19th?

25   A.   Yes.

1   Q.   Returning now to the agenda and minutes of May 10th.

2   At Roman V there's a reference to you having asked about

3   getting some is approval from OCR.  Is that accurate?  Is

4   that a subject that you raised on this call?

5   A.   Yes, I did.

6   Q.   And it appears that the decision was that Oregon

7   would take the lead on that; is that right?

8   A.   Yes, as I said earlier, we wanted a national inter

9   because of the national nature of the sport.

10       Q.   There was also an issue about coaches who own

11   or work for cheer clubs; correct?

12   A.   That's correct.

13   Q.   And that was a subject that had come up with our

14   deposition of Coach Powers; right?

15   A.   I'm not sure I was there for your deposition, but --

16   Q.   It's an -- let me -- let me ask the question a

17   little differently.  At Quinnipiac, one of the assistant

18   coaches has an interest in a private cheer club; correct?

19   A.   Correct.  As an NCAA compliance overseer of, you

20   know, all coaches we have to be watch -- careful as to

21   where they have other employment, vis-a-vis, being a high

22   school coach, running a golf club and coaching a team, so

23   very similar to those kinds of question that is we need

24   to be aware of.

25   Q.   It would be a violation of NCAA recruiting rules for

1    a college coach who had not passed the recruiting exam to

2    be using the position at another entity to recruit;

3    wouldn't it?

4    A.   It really has nothing to do with the recruiting

5    exam.  It's more other employment, are you involved with

6    prospective student athletes.  So the recruiting exam has

7    nothing to do with this agenda item.

8    Q.   Apart from the recruiting exam, it would be a

9    violation of NCAA rules, would it not, if a college coach

10   were using a position at a high school or a club, a

11   sports club to talk to and recruit student athletes?

12   A.   I'm not saying what's unusual -- is it a violation,

13   but it's important that we knew what the policies were.

14   And our cheer coaches knew what they were so that they

15   could stay in line with NCAA policies.

16   Q.   And at this time in May, Coach Powers, the head

17   competitive cheer coach at Quinnipiac, had not yet passed

18   the NCAA recruiting exam; am I correct?

19   A.   I know she's passed it, John.  The actual timeline

20   of when these events occurred, I'm not familiar with.

21   Q.   Do you know whether she had passed it before May 1st

22   of this year?

23   A.   I think it was in May.

24   Q.   You think it was in May of this year?

25   A.   Yeah.  And I think, just so you know, the exam is

1    for off campus recruiting, not for on campus recruiting.

2    Q.   Understood.

3         If we could move to the next set of pages.  It's

4    actually a single page.  It's an e-mail from Coach Powers

5    to you, dated May 19, 2010; correct?

6    A.   15422?

7    Q.   15422.  This is Coach Powers' reporting in to you on

8    returning from the meeting at the University of Maryland

9    we talked about a moment ago; isn't it?

10   A.   Yes.

11   Q.   Move on to the next one.

12        This is a document pertaining to the NCSTA

13   conference call on May 25th, 2010.

14             MR. BRILL:  What's the Bates number on that,

15   please.

16             MR. ORLEANS:  D 15859.  I'm sorry.  Does the

17   copy that we gave you not correspond to what I'm doing?

18             MS. FRIEDFEL:  No, it doesn't.

19             MR. BRILL:  You skipped one, I think.

20             MR. ORLEANS:  Because I was going to

21   apologize if --

22             MS. FRIEDFEL:  No, no need.

23             MR. ORLEANS:  -- if we messed up the books.

24   BY MR. ORLEANS:

25   Q.   All right.  Jack, looking at the May 25th, 2010

1    document, there's no cover e-mail for this one which is

2    either an oversight on my part or it may be that there

3    wasn't one; but do you recognize this as the notes from

4    the NCSTA conference call on May 25th?

5    A.   Yes, I do.

6    Q.   And you participated in that call?

7    A.   Yes, I did.

8    Q.   Are you the author of these notes or was it someone

9    else?

10   A.   No, I was not.  Kelly Cunningham -- I think this

11   meeting or one of the previous meetings I was cut short,

12   so I asked someone else to take the notes.

13   Q.   But you were a participant?

14   A.   Yes.

15   Q.   And did you review these?

16   A.   Yes.

17   Q.   And are they accurate, as far as you know?

18   A.   Yes, as far as I know.  They are accurate and pretty

19   good and show good progress.

20   Q.   If you look at the second page under Roman Numeral

21   II, it looks as though you -- the group has increased --

22   decided to increase the minimum number of NCSTA meets

23   from three to four for each participating school; is that

24   correct?

25   A.   That's correct.

```
1    Q.   And if you would go to page five of those minutes.
2    And Roman V, updates.  It appears that Oregon is not or
3    as of May 25th, a month ago, was not in a position to
4    seek OCR review immediately and advised the group that
5    that review by OCR would be sought at some later date; is
6    that right?
7    A.   Yes.  That's accurate what it says.  I'm not sure --
8    this is clearly an important process, but --
9    Q.   I beg your pardon?
10   A.   This is clearly an important item, so --
11   Q.   Yeah.  Was that an accurate statement of what
12   occurred?
13   A.   Yes.  Yes.
14   Q.   And as we sit here today, a month -- not quite a
15   month after the May 25th call, has anyone from NCSTA
16   taken a step to seek OCR review?
17   A.   This is still at the University of Oregon.
18   Q.   Okay, all right.  If the University of Oregon had
19   taken a significant step to seek OCR review, you would
20   expect to know about it; wouldn't you?
21   A.   Oh, absolutely.
22   Q.   Then do you have D 15867 there?  It would be a
23   couple pages past where we are.
24   A.   E-mail?  Yes.
25   Q.   Yes.  It starts with, "Begin forwarded message"?
```

```
 1     A.   Yes.
 2               MR. ORLEANS:  Is that also part of what
 3     defense counsel has?
 4               MR. BRILL:  Yes, thank you.
 5     BY MR. ORLEANS:
 6     Q.   This is an e-mail from Kelly Cunningham to a group
 7     of NCSTA affiliated administrators and coaches; correct?
 8     A.   That's correct.
 9     Q.   And it says:  "Attached are the minutes and update
10     of recommendations from our call."
11          And if you then move two pages to D 15869 there is a
12     document headed NCSTA conference call, June 10, 2010; are
13     you there?
14     A.   15869?
15     Q.   Yes.
16     A.   Yes.
17     Q.   I'll ask you, are these the notes or minutes from an
18     NCSTA conference call that occurred on June 10th, 2010?
19     A.   Yes, they are.
20     Q.   And you participated in that call?
21     A.   Yes, I did.
22     Q.   And you reviewed these notes and they are accurate;
23     are they not?
24     A.   Yes.
25     Q.   Now attached to the notes is a document that is
```

1    headed, "Report of the NCSTA," and it appears to be a

2    list of what are called action items.  They are actually

3    also referenced in the minutes of the meeting; right?

4    A.   That's correct.

5    Q.   I just want to make sure I'm characterizing it

6    accurately.

7         So among the decisions that were made on June 10th,

8    was the decision to limit the regular season travel squad

9    to 28 student athletes; correct?

10   A.   That's correct.

11   Q.   And moving down that page to item 4, there's a

12   decision to limit the post season team competition squad

13   to 24 athletes plus four alternates; correct?

14   A.   That's correct.

15   Q.   And on the next page, Bates number D 15872, there

16   was a decision to seek to establish competitive cheer as

17   an individual sport rather than a team sport; correct?

18   A.   That's correct.

19   Q.   And that's within the NCAA differentiation between

20   team and individual sport?

21   A.   Effective length of the playing season, things like

22   that.

23              MR. ORLEANS:  Your Honor, I hope I didn't

24   take too much time with those.  I just wanted to make

25   sure you were aware of the contents of that set of

1    documents.

2              THE COURT:  Okay.

3    BY MR. ORLEANS:

4    Q.   Now in this past season, Jack, the spring 2010

5    season I'll call it -- well, do you recall when the

6    Quinnipiac cheer team had its first competition in the

7    academic year just finished?

8    A.   Yes, we had an inaugural event in the first week of

9    December.

10   Q.   The first week of December?

11   A.   Yes.

12   Q.   Was that a competition or --

13   A.   Sort of an exhibition program, get the campus aware

14   of our new sport and it was a very good opportunity for

15   us to see competitive cheer for the first time.

16   Q.   So I think I probably then should refer to it as the

17   2009-2010 season.  In the 2009-2010 season, the

18   Quinnipiac team competed against sideline squads; did it

19   not?

20   A.   A variety of different teams, yes.

21   Q.   And competed against -- we know you competed against

22   Maryland which bills itself as a varsity squad, right?

23   A.   Yes.

24   Q.   And that's a competition only team?

25   A.   Yes.

```
1    Q.   But you also competed against sideline teams and
2    club teams; did you not?
3    A.   That's correct.
4    Q.   And that will also be true in the coming year; will
5    it not?
6    A.   That's correct.
7    Q.   And it's also the case that in the 2010-2011 year,
8    not all of Quinnipiac's competitions will be in the NCSTA
9    format?
10   A.   That's correct.  If I could add that --
11   Q.   There's no question.  I'm sorry, Jack.
12   A.   That's fine.
13   Q.   I'm sure your lawyers are going to ask you some
14   questions?
15   A.   No, that's fine.
16   Q.   If you will just confine yourself to answering my
17   questions, I would appreciate it.
18        With respect to the plan by NCSTA to submit a
19   proposal to the Committee on Women's Athletics for
20   emerging sport status, you need ten schools to sign on to
21   a proposal; correct?
22   A.   That's correct.
23   Q.   And you don't have ten yet; do you?
24   A.   Not yet.
25   Q.   Changing the subject a little bit, now talking about
```

1    the EADA reports.  You are involved in the submission of

2    Quinnipiac's EADA reports; aren't you?

3    A.   Yes.

4    Q.   And in fact, you're listed on the reports as the

5    responsible officer, I think?

6    A.   Yes.

7    Q.   And you're aware that OCR doesn't allow schools to

8    count cheerleading as a varsity sport when submitting

9    their EADA data, right?

10   A.   We don't have cheerleading.  It's competitive cheer,

11   I mean, so --

12   Q.   This is what I wanted to get clear?

13   A.   Yes.

14   Q.   You were here in court yesterday, right?

15   A.   Yes.

16   Q.   And you saw and heard the testimony --

17   A.   Right.

18   Q.   -- about the EADA instructions?

19   A.   Correct.

20   Q.   Which include an instruction that in order to count

21   cheerleading for EADA purposes, a school must have

22   obtained a determination letter from OCR; right?

23   A.   Yes.

24   Q.   And you're aware of that instruction in the --

25   A.   As it relates to cheerleading, yes.

```
 1    Q.   And so I take it then that it is Quinnipiac's
 2    position that it's offering something different and
 3    therefore that rule doesn't affect you?
 4    A.   I think that's something we need to answer -- get
 5    answered.
 6    Q.   Have you sought an OCR determination letter for
 7    Quinnipiac?
 8    A.   Again, the national group, NCSTA is certainly
 9    working on that as a group.
10    Q.   So NCSTA is working on it but hasn't sought it yet;
11    correct?  It's a yes or no.
12    A.   No.
13    Q.   I'm not correct?
14    A.   No, we haven't sought it yet.
15    Q.   Thank you.
16    A.   Sorry.
17    Q.   And Quinnipiac has not sought an OCR determination
18    on its own; has it?
19    A.   No.
20    Q.   To your knowledge, has any school in the NCSTA
21    sought a determination letter from OCR?
22    A.   I know Maryland has sought an answer and their
23    answer has been it's up to the institution to define and
24    support the event -- the sport as a sport; but that's not
25    something that Quinnipiac or the national body could use.
```

```
 1     Q.   I'm going to go to Exhibit 145.  I'm anticipating an

 2     objection.

 3          MS. FRIEDFEL:  Very clairvoyant.

 4     BY MR. ORLEANS:

 5     Q.   I would like to show you, Jack, a document that's

 6     been marked as Plaintiff's Exhibit 145.  Do you recognize

 7     this as an EADA report from the University of Maryland?

 8          MR. BRILL:  Objection, your Honor.  This

 9     document is hearsay.  The part that's not showing --

10          MR. ORLEANS:  I'll be glad to show it.

11          MR. BRILL:  -- contains a statement by

12     Maryland with respect to alleged advice to them by the

13     Office of Civil Rights.  We don't know the circumstances

14     under which that legend was put on there, what advice was

15     given to them by the Office of Civil Rights; and this

16     document was just added to the exhibit list a day or two

17     ago.  I can say that I, personally, have spoken to the

18     attorney at length, director of University of Maryland

19     about this and there is a long story here which we were

20     prepared to take their depositions in Maryland to get on

21     the record had this been raised as an issue.  But the

22     document --

23          We have no objection to this going in for the

24     top portion of the document; but it -- it's clear hearsay

25     to say that the Office of Civil Rights requested
```

1      something from them.  Because we don't know the

2      conversations that were had, we don't know what

3      representations were made to the OCR or exactly what OCR

4      said to them or why.  And frankly, if it comes in for the

5      truth of that, then we would ask for leave to continue

6      the file to take depositions of the Maryland --

7      responsible Maryland officials; because -- and I'm

8      representing this to the Court, what I can say is that it

9      was not what Mr. Orleans is presenting it to be.

10                 MR. ORLEANS:  Well, your Honor, with respect

11     to the hearsay objection --

12                 MR. BRILL:  I'm sorry, I left out there's

13     also a bunch of other EDEA reports.  I don't know if they

14     are going to be offered.  But there was no -- at least

15     this is last year's report.  Before the NCSTA was formed.

16     What we got was a package of EADA reports for a group of

17     the NCSTA schools, most of which, the vast majority of

18     which didn't even compete in varsity competitive cheer

19     last year.  And whatever was said last year under the

20     circumstances that existed last year really don't have

21     relevance -- I mean, even if this were not hearsay, it

22     doesn't reflect conversations that OCR has been having or

23     decision that is it might make based on the new format

24     and the new organization.

25                 MR. ORLEANS:  Your Honor --

```
 1              MR. BRILL:  Any slight relevance is far

 2    outweighed by the prejudicial suggestion that OCR has

 3    given an opinion to Maryland which frankly is simply not

 4    the case.

 5              MR. ORLEANS:  Your Honor, with respect to the

 6    hearsay objection, the entire collection of documents are

 7    government records.  I will represent to the Court that I

 8    downloaded these reports from the Office of Civil Rights

 9    web site where they are available to the public.  These

10    are reports that are required to be submitted by

11    institutions that receive federal funds.  They are filed

12    with the Department of education Office of Civil Rights

13    and they are available to the public on the web site.

14              MR. BRILL:  And --

15              MR. ORLEANS:  Insofar --

16              MR. BRILL:  I don't dispute that.

17              MR. ORLEANS:  Can I finish?  I waited for

18    you.

19              MR. BRILL:  I'm sorry.

20              MR. ORLEANS:  Insofar the objection is a

21    hearsay objection, I think that the government records

22    exception disposes of that argument.

23              Insofar as what it's being offered for, the

24    documents are being offered to show that Maryland has not

25    received a determination that competitive cheer may be
```

 1     counted.  I'm not trying to offer any evidence about any

 2     other conversations Maryland may or may not have had with

 3     the Office of Civil Rights.  I don't know about those.

 4          And the documents -- the remainder of the EADA

 5     reports which are contained in the exhibit are being

 6     offered to show that in -- and it's all limited to

 7     2008-2009 because these reports are filed in October of

 8     2009 and we don't have reports yet for the current year.

 9     But I would offer the document simply to show that none

10     of the schools now in the NCSTA at that time, for

11     whatever probative value that has, listed cheerleading or

12     competitive cheer as varsity sports on their EADA

13     reports.

14          MR. BRILL:  Your Honor, I don't object to

15     that document for that limited purposes as long as

16     there's no suggestion that the statements about what was

17     requested by the OCR are accepted for the truth.  We

18     would -- in fact, we don't dispute that as of October

19     15th, 2009 or indeed through today that Maryland has not

20     received a letter from the Office of Civil Rights

21     advising it that it can count competitive cheer as a

22     sport.  That's not disputed here.  What I do dispute is

23     admitting a document to show that there was advice or

24     request from the Office of Civil Rights not to include

25     it.

```
 1              And as far as the rest of the NCSTA membership,

 2       all those documents are completely irrelevant to the

 3       extent the schools weren't even claiming to be

 4       participating in competitive cheer during that period of

 5       time.

 6              THE COURT:  Mr. Orleans, we seem to have

 7       double hearsay.  The report is a government report, but

 8       the statements in the notes appear to be hearsay

 9       statements.

10              MR. ORLEANS:  I see the point, your Honor.

11       Wouldn't that be true of most government records?  The

12       information has to be reported to the government from

13       somewhere.  And the exception doesn't go that far?

14              THE COURT:  Well, this is --

15              MR. ORLEANS:  Cover the second layer?

16              THE COURT:  I think it's different because --

17       for two reasons:  One, presumably the data is data that

18       the participants are required to provide to the

19       government so there's a duty to collect it.  Which gives

20       it some credence.  Whereas, the statement in the note

21       is -- doesn't fall, doesn't appear to fall within that --

22       the scope of that duty.  What's more, the fact that it

23       mentions a request suggests that it's repeating an out of

24       court statement as opposed to merely pulling the data

25       required from the report.
```

```
 1              MR. ORLEANS:  Your Honor, I see where you're

 2    going and with that in mind, I will withdraw the offer of

 3    the document and accept Mr. Brill's proposed stipulation

 4    that Maryland, that the University of Maryland has not

 5    received a determination letter from OCR.

 6              MR. BRILL:  Yes, we would agree to that.

 7              THE COURT:  Very well.

 8    BY MR. ORLEANS:

 9    Q.   I'm sorry if I asked you this already, Jack, but it

10    is the case, isn't it, that Quinnipiac has never in the

11    past reported competitive cheer as a varsity sport on its

12    EADA submission?

13    A.   No.

14    Q.   No, it has not?

15    A.   No, it has not.  I'm sorry.

16    Q.   I keep asking the questions in an awkward way.  I

17    apologize.

18         I think you heard Mr. Thompson testify earlier that

19    the cheer squad was not held to its expense budget in its

20    first year of varsity operation?

21    A.   Having had many other sports start and evolve in

22    Division I, its -- there's no question that it's an

23    evolving process.  But there are certain policies that

24    are adhered to, but frankly, coaches and our financial

25    people did a great job supporting them in the first year.
```

```
1    Q.   So you did hear that testimony?

2    A.   Yes, I did.

3    Q.   And that would explain how that squad was able to

4    fly to competitions in Georgia and Florida on a $50,000

5    travel -- on a $50,000 expense budget; right?

6    A.   That's correct.

7    Q.   Now you would agree, wouldn't you, that for a

8    Division I coach, recruiting is very important?

9    A.   Yes.

10   Q.   And you heard Dr. Lopiano say yesterday that

11   arguably it's the most important thing that a head coach

12   does, at least after instruction?

13   A.   Yes.

14   Q.   And with respect to competitive cheer, even though

15   it's not an NCAA sport, you are following NCAA rules; is

16   that right?

17   A.   Yes.

18   Q.   So certainly, for the year that is coming, the

19   2010-2011 academic year, recruiting is by and large over;

20   is it not?

21   A.   I wouldn't say that's done at all until they the

22   first day of classes in September.

23   Q.   You are saying recruiting continues right through

24   the summer?

25   A.   It sure does, in terms of people and -- this is I
```

1   would say, definitely in competitive cheer, but certainly

2   in all sports.

3   Q.   Accepted students' deposits were due to be paid to

4   Quinnipiac by May 1st, correct?

5   A.   There's no question.

6   Q.   So some coaches with holes in their rosters may

7   continue to recruit through the summer to try to fill

8   some holes; right?

9   A.   It's very possible.

10   Q.   I want to talk a little bit about the roster

11   management process, implementation at Quinnipiac.

12        That's something that Dr. Thompson is in charge of;

13   right?

14   A.   That's correct.

15   Q.   But you're also involved?

16   A.   Yes.

17   Q.   You work closely with him on that?

18   A.   Yes, I do.

19   Q.   And Dr. Thompson testified that he took that very

20   seriously?

21   A.   Yes, he did.

22   Q.   And that he expected the coaches to hit their

23   numbers; correct?

24   A.   Yes, he did.

25   Q.   So did you expected the coaches to hit their

1   numbers?

2   A.   Yes.

3   Q.   And that is at least in part because QU wants to

4   maintain Title IX compliance on the proportionality test;

5   correct?

6   A.   That's correct.

7   Q.   So -- and in order to do that, you really can't let

8   the men's squads get any larger than their targets or let

9   the women's squads get smaller than their targets; is

10  that right?

11  A.   Basically, yes.

12  Q.   And I take it that after the evidence that was

13  presented at the preliminary injunction hearing which

14  suggested that there might have been some manipulations,

15  the name of the game was, you know, was no more games

16  with drops and adds, get to the target number and stay

17  there, is that a fair characterization?

18  A.   Yes.

19  Q.   In the summer of 2009, last summer, did any of the

20  coaches express concerns to you about the fact that they

21  didn't get their targets until after the recruiting

22  season was essentially done?

23  A.   No.

24  Q.   No?

25  A.   They had been aware about roster numbers in general

1   anyway, so they knew their -- the numbers with important.

2   It wasn't like a roster management just happened.  They

3   were very close all the time.

4   Q.   Didn't any of the coaches tell that you they were

5   taken by surprise by their roster numbers?

6   A.   There was some concern by an athlete or two.  But I

7   immediately let them know they needed to make a request

8   to Mark.

9          THE COURT:  You said by "an athlete or two,"

10  did you mean "a coach or two" or --

11  BY THE WITNESS:

12  A.   No, a coach about an athlete or two.

13         THE COURT:  Oh, I see.

14  BY MR. ORLEANS:

15  Q.   Excuse me just a moment, your Honor.  Sorry.

16       Coaches who get roster targets that are higher than

17  the number of athletes they've recruited have to hold

18  tryouts or take walk-on's; correct?

19  A.   Could you repeat that question again.

20  Q.   Coaches who get roster targets that are bigger,

21  bigger numbers, higher, than the number of athletes that

22  they've recruited for their squads have to have tryouts

23  or walk-on's or some way to fill those slots; right?

24  A.   Yes.

25  Q.   And at Quinnipiac, is it more often the case that

```
1    women's teams have to fill out their rosters by holding

2    tryouts or allowing walk-on's?

3    A.   I don't know if it's more men or women.

4    Q.   This is Plaintiff's 86.  Let me try to get this so

5    you can see all of it.

6         I don't remember if this one is already in evidence.

7    86?

8              THE CLERK:  It's in.

9              MR. ORLEANS:  That's in already?  Okay.

10   BY MR. ORLEANS:

11   Q.   Jack, this is a document -- the cover page actually

12   is an e-mail to you from Dr. Thompson.  It's dated

13   September 1, 2009.  And this is the attachment.  It

14   appears to be to show the roster sizes for this year that

15   we've just completed, 2009-2010.  Let's start with men.

16   There's a column for the final plan, there's a column for

17   the preliminary plan.  I guess that was an earlier

18   version?

19        You need to answer verbally.  Sorry.

20   A.   Yes.

21   Q.   And then you got a column showing the difference and

22   a column showing the NCAA average squad size.  And then

23   the final column for the men that's highlighted shows the

24   comparison to the NCAA average squad size.  Correct?

25   A.   That's correct.
```

1    Q.   And I see that the Quinnipiac men's -- Quinnipiac

2    baseball is four -- the target is four less than the NCAA

3    average squad size; correct?

4    A.   That's correct.

5    Q.   Soccer is three smaller; correct?

6    A.   Yes.

7    Q.   Lacrosse is three smaller?

8    A.   Yes.

9    Q.   Cross country is two smaller?

10   A.   Yes.

11   Q.   And ice hockey is two larger?

12   A.   Correct.

13   Q.   Did it cause you any concern that so many of your

14   men's -- your targets for men's teams were just a little

15   smaller than the NCAA averages?

16   A.   I think Dr. Thompson mentioned this morning that

17   each one of those decisions on a number was after lengthy

18   discussion with each of the coaches.

19   Q.   And he also mentioned that the NCAA average squad

20   sizes were taken into account; didn't he?

21   A.   Yes.

22   Q.   My question you to is, did it cause you any concern

23   that most of your men's squad sizes were a little bit

24   lower than the NCAA averages?

25   A.   No.

```
1    Q.   Okay.  And now let's look at the women's.  I can't

2    move it because we have to be able to see what the sports

3    are.  You got the same basic setup for the women;

4    correct?

5    A.   Yes.

6    Q.   And we can see that for women's basketball, the team

7    is three larger than the NCAA average; right?

8    A.   Correct.

9    Q.   For field hockey it's two larger.  For soccer it's

10   one larger.  For tennis it's one larger.  For lacrosse

11   it's two.  For cross country it's two.  For ice hockey

12   it's one.  And for softball it's one.  Was I -- I did

13   read all those correctly?

14   A.   Yes, you did.

15   Q.   And let's just talk about indoor track and outdoor

16   track briefly.  For indoor track, the squad size is seven

17   smaller than the NCAA average; correct?

18   A.   Correct.

19   Q.   But the NCAA average includes teams that enter field

20   events which Quinnipiac doesn't do?

21   A.   That's right.

22   Q.   And the same for the outdoor track?

23   A.   Correct.

24   Q.   My question is, did it cause you any concern that

25   the Quinnipiac women's teams targets were consistently
```

```
 1    just a little bigger than the NCAA average squad size?

 2    A.   For the same reason as the men, no.

 3    Q.   And now let me show you Exhibit 142.  Now the left

 4    column is under men and under women, the left column is

 5    the target for the upcoming year; correct?

 6    A.   That's correct.

 7    Q.   Do you recognize the document as the targets for the

 8    coming year?

 9    A.   Yes.

10    Q.   And we can see that your basketball team is slated

11    to be -- your men's basketball team is slated to be

12    larger than the NCAA squad -- average squad size and the

13    same for the women's team; correct?

14    A.   Yes.

15    Q.   And your men's ice hockey team is scheduled to be

16    larger than the NCAA average squad size; correct?

17    A.   That's correct.

18    Q.   And those are basketball and ice hockey are your

19    sports of emphasis?

20    A.   Yes.

21    Q.   Men's baseball is going to be two smaller than the

22    NCAA average; right?

23    A.   Yes.

24    Q.   Soccer is going to be five smaller?

25    A.   Yes.
```

```
 1     Q.   Tennis is right at the average.  Lacrosse is going

 2     to be four smaller than the NCAA average?

 3     A.   Correct.

 4     Q.   Cross country is going to be two smaller than the

 5     NCAA average?

 6     A.   Correct.

 7     Q.   Did it cause you any concern that your men's teams

 8     are consistently set up just a little bit smaller than

 9     the NCAA average?

10               MR. BRILL:  Objection, your Honor.

11     Misstating the evidence.

12               THE COURT:  Lacrosse is --

13               MR. BRILL:  Two of the teams are larger and

14     one is the same.

15               MR. ORLEANS:  I'll amend the question.  I

16     think he's answered it, but I'll amend the question to

17     say many of your men's teams are smaller the NCAA

18     average?  And the answer is.

19     BY THE WITNESS:

20     A.   Am I concerned, is that the question.

21     Q.   Yeah, that's the question?

22     A.   For the reasons already stated, no.

23     Q.   And then on the women's side, the basketball team is

24     three larger than the average, the field hockey team is

25     one larger?
```

1    A.   Yes.

2    Q.   The soccer team is one smaller than the average.

3    Tennis is one larger, lacrosse is three larger, cross

4    country is seven larger than the national average.  Ice

5    hockey is three larger than the national average.

6    Softball is one smaller than the national average.  And

7    volleyball is one smaller than the national average.

8         Now with respect to the women's squad sizes,

9    obviously, some are larger and some are smaller.  With

10   respect to the ones that are larger, slated to be larger

11   than the national average, did it cause you concern that

12   they were slated to be larger than the national

13   average?

14   A.   No.

15   Q.   You've increased the prospective size of indoor and

16   outdoor track from 30 to 35 as against NCAA average squad

17   sizes of 38 and 37 for indoor and outdoor respectively;

18   right?

19   A.   Yes.

20   Q.   But you're still not entering field events, are you?

21   A.   No.

22   Q.   You heard Dr. Thompson's testimony about his

23   interaction with Dave Clark the coach of the women's

24   soccer team?

25   A.   Yes, I did.

1    Q.   Did Dr. Thompson discuss that issue with you before

2    he gave -- before he made a decision?

3    A.   Most all the time, it's I think Dr. Thompson, myself

4    and the coaches involved are part of the same e-mail

5    chain.  Many times I will -- coach will request it to me,

6    I will send it to Mark to say that, you know, I support

7    this or I don't.  And Mark ultimately makes the final

8    decision, but I'm always aware of both the request and

9    the decision.

10   Q.   So you knew that Coach Clark thought that 27 was not

11   a manageable number for his soccer squad?

12   A.   Yes.

13   Q.   And that he wanted a roster of 22 to 24?

14   A.   Correct.

15   Q.   And -- but that he said he would work with what the

16   school needed; correct?

17   A.   That's correct.

18   Q.   Let me show you -- I will move these e-mails as

19   quickly as I can.  This is an e-mail, this is Plaintiff's

20   Exhibit 88.  And it's an e-mail back and forth between

21   you and Carolyn Robin who is the same person as Carolyn

22   Martin; correct?

23   A.   Correct.

24   Q.   And on February 15th, 2010, Coach Martin wrote to

25   you about her desire to drop some -- drop three athletes

1    from her cross country roster and add three athletes to

2    train with the team for the spring; correct?

3    A.   This is men's cross country or --

4    Q.   This is men's cross country.  Right.  I'm trying to

5    move quickly, but what she says is she lost Rich Klauber,

6    he transferred?

7    A.   Correct.

8    Q.   And her two graduating seniors Dan Martin and Tyler

9    Dinnan, she would like to be able to replace with two

10   other athletes to train with us; right?

11   A.   That's correct.

12   Q.   So she asked you whether it would be possible to add

13   three athletes so that we can better prepare next year's

14   team; right?

15   A.   That's correct.

16   Q.   And your response was, "I'm assuming that your

17   numbers will stay the same if Mark approves this"; right?

18   A.   Yes.

19   Q.   So you thought, you believed when you sent that,

20   that the three athletes added to practice for the spring

21   after the competitive season wouldn't count as

22   participants for Title IX purposes; right?

23   A.   I'm assuming that if all was cleared, that they

24   would not -- they would be part of the add or drop

25   process that gets approved by Tracey Flynn and ultimately

```
 1    Mark.

 2    Q.   And was it your assumption that if you dropped

 3    someone and added someone, that with a net gain of zero,

 4    that that wouldn't increase the number of participants

 5    who had to be counted?

 6    A.   Well again, because this is a sport that ended and

 7    cross country now had a non-traditional season in the

 8    spring, so that -- so it's a tad different than just

 9    dropping and adding in the middle of a season.  But

10    ultimately, what that e-mail showed was the communication

11    in support of the roster policies.

12    Q.   But I take it then that the answer to -- my question

13    was whether you thought that dropping three and adding

14    three would increase the number of participants that had

15    to be reported and I take it that the answer is you

16    thought that it would not increase that number?

17    A.   That's correct.

18    Q.   And similarly, since this is a multi-page, can you

19    get your hands on Plaintiff's Exhibit 90?

20    A.   Is this the same one?

21    Q.   If it's got numbers, is 90 in here?

22    A.   Yes.

23    Q.   Great.

24         Okay?

25    A.   Yes.
```

1    Q.   Exhibit 90 is an e-mail chain between you and is it

2    pronounced "Danny"?

3    A.   Yes.

4    Q.   And Danie Caro?

5    A.   Yes.

6    Q.   And Danie Caro is the coach of the women's lacrosse

7    team; right?

8    A.   That's correct.

9    Q.   So go to the back, the last page first and we'll

10   work our way up.  Do you recall the exchange that's

11   reflected in these e-mails?

12   A.   Yes.

13   Q.   If I can paraphrase, it appears that Coach Caro is

14   asking you about a student who was studying abroad in the

15   fall, this is in September that coach writes to you:

16   "I've got a student that's studying abroad.  I would like

17   to add her to the roster when she gets back.  Am I going

18   to have to drop someone in order to stay at my number?"

19   Right?

20   A.   Yes.

21   Q.   And you wrote back that you were in Maryland and you

22   wanted to know if the student coming back from your --

23   was on scholarship?

24   A.   That's correct.

25   Q.   And you said that if she's on scholarship she's

1      going to count.  But if she's not on scholarship, she's

2      not going to count, right?  Well, let me withdraw that.

3      I want to be fair.

4          You said, you think if she's on scholarship, she'll

5      count?

6      A.   That's right.

7      Q.   And so I take it that what you thought was that if

8      she was not on scholarship, she wouldn't count?

9      A.   I'm not sure what I meant at the time.  But it

10     clearly was sort of looking for more information to help

11     both Tracey and Mark make a decision for this question.

12     Q.   If you go then to the first page -- she wrote back

13     you to on September 14th, Coach Caro wrote back:  "She's

14     a non-scholarship player"; right?

15     A.   That's correct.

16     Q.   And then if you go to the first page of the exhibit,

17     you then said:  "My hunch is that if she was not on the

18     roster for the first date of competition, and she was not

19     on athletic aide, she wouldn't count"; right?

20     A.   That's what I said, yes.

21     Q.   So that was your belief at that time?

22     A.   That was my hunch.

23     Q.   Do you recall whether you ever had that confirmed or

24     not?

25     A.   I don't.  This clearly, again, went to the same

1    review process.

2    Q.    Showing you Exhibit 91.  This is an e-mail from

3    Coach Clark on September 17th of 2009 about player who

4    wanted to quit the team asking if he had to replace her

5    to keep his roster at 27 or could he continue without a

6    27th player.  Right?

7    A.    Yes.

8    Q.    And the e-mail was sent to Tracey Flynn and to you?

9    A.    Yes.

10   Q.    Right?  And Ms. Flynn then responds later that day,

11   if you can't stop someone from quitting, "You hit your

12   target number as of the first day of competition.  You

13   met your obligation"; see that?

14   A.    Yes.

15   Q.    Is that an accurate statement of the policy of the

16   athletic department at that time?

17   A.    It's an interpretation from Tracey, yes.

18   Q.    Let me talk just a minute about how you count and

19   report runners.  Prior to this year, Quinnipiac had

20   women's cross country, indoor and outdoor track and also

21   had men's cross country, indoor and outdoor track; right?

22   A.    That's correct.

23   Q.    And when you did your EADA reports, you treat -- for

24   purposes of whether you were going to use duplicated or

25   unduplicated counts -- do you understand what I mean by

1    duplicated and unduplicated counts?

2    A.   Yes.

3    Q.   For purposes of your EADA reports, you would treat

4    the men's and women's cross country and track programs

5    the same; wouldn't you?

6    A.   That's correct.

7    Q.   So even -- your reporting may had varied from year

8    to year whether it was duplicated or unduplicated, but it

9    was always the same for the men's and women's teams; is

10   that right?

11   A.   That's correct.

12   Q.   But now that you have a men's cross country program

13   but no men's track, but you have women's cross country,

14   indoor and outdoor track, you are going to multiple count

15   some of the women but you're not going to multiple count

16   any of the men; am I right?

17   A.   That's correct.

18   Q.   So if I can go back for a min -- you haven't filed

19   the 2009-2010 EADA report yet; have you?

20   A.   No.

21   Q.   And that will be filed in October?

22   A.   That's correct.

23   Q.   So if we can just look at the women's -- the female

24   runners for the year just ended.  There are 18 cross

25   country runners; right?

1    A.    Yes.

2    Q.    And they are all required by their coach to run

3    indoor and outdoor track; are they not?

4    A.    I don't know the answer to that.

5    Q.    Do you know that they all do run indoor and outdoor

6    track?

7    A.    I couldn't say for sure.

8    Q.    You couldn't say for sure.  Okay.  Let's just -- I'm

9    going ask you to accept, I just want to do a quick little

10   math exercise with you.  I'm going to represent to you

11   that all of the cross country runners run indoor and

12   outdoor track.  Those 18 girls are going to count for 54

13   participation slots; right?

14   A.    18 times 3?

15   Q.    18 times 3, that's right.  And if you similarly

16   assume that of the 30 indoor and outdoor track athletes,

17   18 on each squad are cross country runners and the other

18   12 run only indoor and outdoor track, and that's 12 more

19   girls who are going to count for 24; right?

20   A.    Again, there are many athletes that might go

21   overseas, student teaching, nursing.  I would say that

22   you're -- I'm not sure that's exactly true, not all the

23   same people.  You might not have all 18 running indoor

24   and outdoor track.

25   Q.    That information is part of the record as to who

```
1    actually ran and who actually -- in fact, you could have
2    a girl who, due to -- who was on the roster for cross
3    country, indoor and outdoor track and receiving a
4    scholarship, say, so that she counts.  And if she were
5    injured, but receiving aide, she might never run at all
6    and she would still count three times; right?
7    A.   I'm not sure.  Again, I'll defer to Tracey in terms
8    of the exact how these -- that special occurrence counts.
9    But to say that all same 18 in cross country
10   automatically run indoor and outdoor track, I don't know
11   if that's true.
12   Q.   Am I correct that at Quinnipiac there are no
13   multiple sport athletes, other than the female runners?
14   A.   There may be one or two athletes that may try a
15   second sport, but --
16   Q.   There was one girl who was on the ice hockey team
17   for most of the year and then went to field hockey,
18   right?
19   A.   Right, right.
20   Q.   Are there any others you are aware of?
21   A.   There's none I'm aware of.  But I'm not going to say
22   it doesn't happen.
23   Q.   You are not aware of somebody who plays soccer in
24   the fall and softball in the spring?
25   A.   I'm not aware, but I wouldn't say it doesn't happen.
```

1    Q.   And you'd agree with me, wouldn't you, that there's

2    more difference between, for example, playing soccer in

3    the fall and softball in the spring on the one hand than

4    there is between running the 800 meters indoors and the

5    800 meter outdoors?

6    A.   That's a matter of opinion.

7    Q.   And Quinnipiac doesn't have an outdoor track;

8    correct?

9    A.   No.

10   Q.   And the Quinnipiac indoor track is not suitable for

11   competition?

12   A.   No.

13   Q.   No, it is not or no --

14   A.   No, it isn't.  Sorry.  Tricked me again.

15   Q.   That's because I asked the questions in the

16   negative.

17        Does Quinnipiac have plans to construct an outdoor

18   facility?

19   A.   Not at this time.

20   Q.   Does Quinnipiac have plans to improve its indoor

21   facility?

22   A.   Not at this time.

23   Q.   So there's no plan at this time to make the indoor

24   facility suitable to host competitions?

25   A.   No.

```
 1                    MR. ORLEANS:  May I just have a moment, your

 2       Honor.  I'm almost finished.

 3                    THE COURT:  Fine.

 4       BY MR. ORLEANS:

 5       Q.   Jack, let me just show you a copy of Plaintiff's

 6       Exhibit 147.  This is an e-mail from you to Rick Seeley;

 7       correct?

 8       A.   Yes, it is.

 9       Q.   And it's dated April 7th of this year.  It says:

10       "This is helpful.  It might be good we meet with all to

11       review this so all are aware."

12                    And the attachment --

13                    MR. BRILL:  Your Honor, I'm not sure when I'm

14       supposed to jump in to object.  I'll make my objection

15       now.  This is hearsay.  It's being offered for the truth

16       of the contents.  It's a letter sent by Mr. Seeley making

17       out-of-court statements; and in fact, the plaintiffs had

18       Mr. Seeley on their witness list.  They asked to speak to

19       him.  And after speaking to him they took him off the

20       witness list.  They can't now put in the statements by an

21       out-of-court declaration.  It's rank hearsay.

22                    THE COURT:  Well --

23                    MR. ORLEANS:  May I respond?

24                    THE COURT:  Sure.

25                    MR. ORLEANS:  Your Honor, defense counsel
```

1    represented not three and a half hours ago that the

2    defense is going to be calling Mr. Seeley in any event.

3    But it's not hearsay.  It's an admission.  Mr. Seeley is

4    a coach.  We've been told he's an administrator.  He's an

5    employee of the university.  He is speaking here in

6    connection with his function for the university.  And the

7    statement by Mr. Seeley, therefore, is not hearsay.

8            MR. BRILL:  Your Honor, he is not -- he does

9    not represent the university for purposes of binding the

10    university.  In fact, the plaintiff's took the position

11    when they asked to speak to the coaches, they told us

12    that their position was that coaches were not -- that

13    they didn't have to get our permission to speak to the

14    coaches as officials of the university, but they, as a

15    courtesy, asked us if we objected.  In fact, they,

16    themselves, approached a coach, Coach Fairchild, and

17    spoke to her and called her as a witness in this very

18    case without permission of the university.  Coaches not

19    sufficiently lie in the organization to be somebody that

20    binds university.  They are an employee of the university

21    three, four, five levels down from the top of the

22    university.

23            In any event, Mr. Seeley will be here and if

24    there's -- if he could be cross examined at that time

25    about statement that is he may have made in the e-mail,

```
 1      that's appropriate.  But he can't be -- I don't --

 2      obviously, your Honor has to make a ruling, but it seems

 3      to me there's no basis for admitting it on the grounds

 4      that its an admission against its interest by the

 5      university.

 6                  THE COURT:  It seems to me it's hearsay, but

 7      as a practical matter, if he's coming and he's going to

 8      be available for him to be examined on at that time, I

 9      wonder why it can't be used now.  In other words, do you

10      want to have plaintiff recall Mr. McDonald at that point

11      to ask him about the document after it comes in?

12                  MR. ORLEANS:  I only have a couple questions,

13      your Honor.  I -- we, certainly, admit it conditionally

14      to it being linked up, assuming Mr. Seeley will admit

15      it's his statement, then I think the problem will be

16      solved.

17                  MR. BRILL:  I guess we will proceed on that

18      base.  I'm not sure that cures the hearsay problem, but I

19      agree with the practicalities of recalling

20      Mr. McDonald.

21                  THE COURT:  I'm going to allow this

22      examination and if it turns out that the document doesn't

23      come in for some reason, then I'll strike it.  So it's

24      not admitted, but you can use it.

25                  MR. ORLEANS:  Okay.
```

 1    BY MR. ORLEANS:

 2    Q.   Mr. McDonald, really I just want to ask you if you

 3    received this communication from Mr. Seeley?

 4    A.   Yes, I did.

 5    Q.   And this was prompted by his request to -- or

 6    withdrawn.

 7         This was prompted by his notification to you and

 8    Tracey Flynn that he would -- that there were six girls

 9    who would not be returning to play hockey next year;

10    correct?

11    A.   That's correct.  And I -- any time there is a

12    student athlete that's been asked -- the scholarship

13    won't be renewed or they're quitting, it's really

14    important that I and Tracey know who they are and why

15    it's happening.

16    Q.   And did you ask him to provide some kind of detailed

17    explanation --

18    A.   That's what the e-mail said.

19    Q.   This is his explanation?

20    A.   This is the response to that.

21    Q.   You were here yesterday.  Do you recall Mr.  --

22    Dr. Thompson being shown a letter to Robin Sparks from

23    you -- excuse me, with an envelope?

24    A.   The campus envelope.

25    Q.   Yeah, the campus envelope?

1    A.   Yes.

2    Q.   Did you send out the roster target letters to the

3    coaches on or about June 9th?

4    A.   Yes.

5    Q.   And the exhibit that we saw was a copy of the letter

6    that went to Coach Sparks; correct?

7    A.   Correct.

8    Q.   It is true, isn't it, that there is currently a

9    schedule of volleyball competitions set for the fall?

10   A.   Yes.

11   Q.   And you have returning students by which I mean

12   students who have already -- who were coming as

13   sophomores or juniors or seniors who are on the

14   volleyball team; correct?

15   A.   Yes.

16   Q.   And who are receiving athletic scholarships?

17   A.   Yes.

18   Q.   And the school is committed to maintaining the

19   scholarships for those kids regardless of what happens;

20   isn't it?

21   A.   Yes.

22   Q.   That's how you've treated other athletes on other

23   teams that were eliminated?

24   A.   Yes.

25   Q.   And you also have freshmen coming to Quinnipiac in

1     the fall who were recruited by Coach Sparks and are

2     coming with athletic scholarships to play volleyball;

3     correct?

4     A.    Yes.

5     Q.    But I think that you told me previously that you

6     weren't -- you don't know what the university's policy is

7     going to be as far as honoring scholarships of those

8     kids?

9     A.    We have made sure Coach Sparks informs the

10    prospective student athletes with exactly what's

11    happening with volleyball.

12    Q.    As far as you know, Coach Sparks has informed anyone

13    that she recruited to come to enter as a freshmen in the

14    fall that the future of the volleyball team is uncertain,

15    right?

16    A.    Yes.

17    Q.    You didn't tell her she needed to tell the students

18    that their scholarships might be withdrawn; did you?

19    A.    I forget exactly what was said about that, but we

20    wanted to have her and the prospective student athletes

21    and the families be aware of what's happening.

22    Q.    And by be aware of what's happening, you mean be

23    aware that the program might be eliminated; correct?

24    A.    That's correct.

25              MR. ORLEANS:  Nothing further for this

```
 1    witness, your Honor.

 2               THE COURT:  All right.  Why don't we take a

 3    ten minute recess and come back for cross.  We will be

 4    doing any direct through this witness?

 5               MR. BRILL:  Yes.  Although not much of one.

 6               THE COURT:  All right.  Fair enough.  We will

 7    stand in recess until 3:45.

 8                    (RECESS At 3:35 P.M.)

 9                    (RECONVENED AT 3:47 P.M.)

10               MR. BRILL:  Jack, I'm going to try to make

11    this as quick and painless as possible, but there's a few

12    things I want to go over.

13    CROSS-EXAMINATION

14    BY MR. BRILL:

15    Q.   You were shown Exhibit 1 during your direct

16    examination.  I put part of it on the screen here and

17    call your attention to the highlighted portion.  Were you

18    aware at the time Coach Martin was requesting an increase

19    in the roster for next year that she was planning to

20    expand the number of atheletes that included sprinters as

21    well as a high jumper?

22    A.   She has talked about that possibility.  I'm not

23    aware of this specific e-mail.  But --

24    Q.   I see.

25    A.   But...
```

1    Q.   Now when the decision was made to eliminate the

2    volleyball team last spring, what, if any, was the budget

3    concern that the University had with respect to the

4    volleyball team?

5    A.   The major reason as we testified last time was that

6    we were hoping to have a new facility built for

7    volleyball and some intermural basketball and volleyball

8    activities.  The current Burt Kahn Court is going to be

9    used more by student activities and campus events and

10   special events that the campus wants to hold because our

11   current special events facility is being turned into a

12   student center.  So it's a little bit of a domino effect.

13   The University was planning to build a third field house

14   gymnasium for volleyball and the economy just brought

15   that to a halt.

16   Q.   There was no suggestion that the operating budget

17   for the competitive cheer team was less than the

18   operating budget would have been for the volleyball team;

19   was it?

20   A.   No.

21   Q.   And just skipping over to a few topics, you were

22   asked about some rules changes that were being made with

23   respect to the NCAA -- NCSTA competition format for next

24   year?

25   A.   Yes.

1    Q.   Is that unusual for sports to be changing rules from

2    one season to another?

3    A.   As athletic administrator, we probably get no less

4    than maybe five to ten rule award policy changes per

5    sport of our 18 sports.  It's very common for the coaches

6    to change things like the three point line in basketball.

7    It's very common.  We just changed no icing in ice hockey

8    during a penalty a month ago.  So it's very common for --

9    as an athletic administrator to see and approve or argue

10   with policy changes.

11   Q.   You were also asked about the championship format

12   for the NCSTA.  For the NEC conference championships, are

13   there any sports in which every team in the conference is

14   eligible to participate --

15   A.   There's many.  All of the six track and fields for

16   men and women.  Men's and women's golf.  I might be

17   missing some others, but there are many of them that all

18   of the conference members are eligible to participate.

19   Q.   And I'm not sure you testified to this, but in

20   addition to the meeting of the administrators of the

21   NCSTA, did the coaches also meet throughout the year?

22   A.   They did meet at the summit in September of '09 with

23   us administrators; but frankly, since then, they've

24   either been on a conference call with the administrators

25   or they have met on their own.  They have been very

1   diligent and they have been meeting weekly as coaches and

2   then they would then formulate a list of proposals and

3   discussion points that the administrators would then have

4   a call to approve, discuss and move forward.

5   Q.   And were those recommendations, for the most part,

6   reflected in the exhibits that --

7   A.   Most everything we've seen today is as a result of

8   proposals by the coaches to the administrators.

9   Q.   Have you been involved in the formation of

10  conferences with respect to other sports in the course of

11  your career?

12  A.   A few times.  As everybody knows, Quinnipiac was

13  Division II until 1995.  For example, when we went

14  Division I in 1998, we didn't have a conference for our

15  ice hockey program.  And nor did we have a women's ice

16  hockey program.  So in 1998, I was deeply involved in the

17  formation of a men's ice hockey conference, UConn,

18  Fairfield, Army, Holy Cross, so that we could have a

19  conference for men's ice hockey at Quinnipiac.  And all

20  of the discussions that we just had regarding the NCSTA,

21  I used my experience both with that as well as my NCAA

22  committee experience to help the NCSTA get going.

23          So women's ice hockey team, which we added in

24  1998, also came on as a sport without a conference and we

25  had to find it a conference.  We had to find it a

1    schedule.  And very similar to the schedule we see here

2    today for competitive cheer, so that was a two year

3    process to get women's ice hockey up and running.

4            Men's lacrosse was a sport without a conference

5    for probably my whole ten years in Division I.  We've

6    recently found a conference for it.  But that, too,

7    needed leadership, committee conference affiliation.  So

8    I was also deeply involved with that.

9    Q.   And then some of those sports that you mentioned you

10   compete against schools that are outside of the New

11   England area?

12   A.   Yes.  We find that the men's lacrosse, particularly

13   men's lacrosse and men's, women's ice hockey take us

14   into, shall we say, markets that the northeast conference

15   does not.  Ice hockey traditionally is a, you know, New

16   York to Boston kind of markets, because the ECAC would

17   play Harvard and Dartmouth and Brown and Princeton.  So

18   we kind of got the northeast covered pretty well.  Men's

19   lacrosse and women's lacrosse, particularly men's

20   lacrosse as an independent in the early days, that brings

21   us to the New York to Washington, D.C. market so we can

22   play schools look Loyola and Maryland and like that.

23           So my experience with all of these other sports

24   that we sort of elevated or started at Quinnipiac, really

25   helped in the formation of the competitive cheer NCSTA.

```
 1      Q.    Now as Mr. Orleans pointed out, some of the teams

 2      that are other members of the NCSTA are located quite a

 3      distance from Quinnipiac.  Has the University considered

 4      whether that could be an advantage or disadvantage in

 5      terms of entering into this sport?

 6      A.    I think as I just said, our experience with ice

 7      hockey, but particularly our past league in men's

 8      lacrosse we played Ohio State, we played Notre Dame,

 9      University of Denver, we played Air Force Academy, that

10      got Quinnipiac into a whole new world of demographics and

11      markets not only for the athletic department it but for

12      the entire University.  Now with the success of that,

13      having the opportunity to go to Maryland and go to Oregon

14      and go to Bailor, is only going to help Quinnipiac

15      tremendously in terms of our being seen all over the

16      country.

17      Q.    I would say you're playing with the big boys, except

18      I guess it's the big girls?

19      A.    Big boys and girls, yes.

20      Q.    Now you were asked a question about men's -- about

21      men's squads being larger and women's squads being, I may

22      have this backwards, but any efforts to keep men's squads

23      smaller and women's squads larger during the roster

24      management process.  Do you recall that?

25      A.    Yes.
```

1    Q.   Did the same principals apply in the opposite

2    direction, in other words, men's squads couldn't be

3    smaller than the target numbers and women's squads

4    couldn't be larger?

5    A.   I think we -- through the discussions with Mark and

6    through the policies and vetting with the coaches, we

7    just picked and all agreed -- I mean all, meaning the

8    coaches, myself and Mark Thompson on what the number

9    would be.  There was no sort of blanket attempt to make

10   all the men's smaller or all the women higher.

11   Q.   You were asked questions about tryouts and walk-ons.

12   In your experience in college athletics, is it common for

13   teams, even with teams with many recruited athletes, to

14   have tryouts and walk-ons?

15   A.   Yes.  Men's ice hockey holds an open and fair

16   tryout.  Clearly our numbers might sometimes prohibit

17   that.  But when possible, we like to give tuition paying

18   parents and their student athletes a fair and open tryout

19   for as many sports as possible.

20   Q.   I would like to direct your attention to Exhibit 88

21   that you were questioned about by Mr. Orleans.

22        I believe this is an e-mail about adding three men

23   to the --

24   A.   Oh, yes.

25   Q.   -- cross country team during the spring.

```
 1    A.   Yes.

 2    Q.   It's -- incidentally, Did the men's cross country

 3    team compete at all during the spring of 2010?

 4    A.   No.

 5    Q.   You were asked about whether you felt you had to

 6    report these three athletes when they were added to the

 7    team.  Do you recall that question?

 8    A.   Yes.

 9    Q.   Is it your understanding that there's any reporting

10    required to either the EADA or to -- under the EADA or to

11    the NCAA of any athletes other than those that are on the

12    roster as of the first day of competition?

13    A.   No.

14    Q.   And could you look at Exhibit 91, please, that you

15    were asked about by Mr. Orleans.  And looking at that

16    document, this was the one where the coach, I think it

17    was the women's --

18    A.   Soccer.

19    Q.   -- soccer coach asked if she had to maintain the

20    roster at 27?

21    A.   Yes.

22    Q.   But wasn't she, in fact, asking to add a player to

23    the team?

24    A.   He --

25    Q.   He, yeah.
```

1    A.    Ask that question again?  I'm --

2    Q.    Well, there was a portion of the e-mail that Mr.

3    Orleans didn't point out to you and what was it that the

4    coach was asking for?

5    A.    "I would like to add another keeper, if possible,

6    but need clarification what I can and cannot do in this."

7    Q.    Another keeper being a goal keeper?

8    A.    Yes.

9    Q.    Can you take a look at Exhibit EW, please, this is

10   one that we haven't looked at before.  it's a Defendant's

11   Exhibit, so I'm not sure if you have one of the books

12   next to you.

13   A.    Schedules or statistics?

14   Q.    Yes.  Can you identify those documents?

15   A.    I'm looking on this top page is field hockey

16   statistics.

17   Q.    Just in general, you don't have to go through them

18   one by one, do these represent the final season

19   statistics for various sports at Quinnipiac?

20   A.    Without looking at each one individually, it looks

21   like most of them are the final season, yes.

22   Q.    And who maintains that information?

23   A.    These are maintained by the sports information staff

24   who take stats at each game and the software sort of

25   accumulates, statistics, names, bats, hits, home runs,

1       saves, goals, whatever that sport keeps as a record.

2       Q.   And would these records indicate any athlete that

3       participated in any one of those sports during the

4       season?

5       A.   Yes.

6       Q.   Now you were asked about a lot of documents relating

7       to the NCSTA, I'm not going to go through all of that

8       again with you, but I would like you to look at Exhibit

9       ET because there's one or two e-mails that Mr. Orleans

10      did not ask you about.

11                  THE COURT:  Same book.  ET.

12                  MR. BRILL:  ET.

13                  THE WITNESS:  I start at EQ.

14                  THE COURT:  keep --

15                  THE WITNESS:  There we go.  Okay.  "Season of

16      competition."

17                  MR. BRILL:  I'm sorry, it's FT.  It's either

18      a typographical error or my eyesight is going back.  FT.

19      BY MR. BRILL:

20      Q.   If you would look at the beginning of that document,

21      I think starts with Bates number 13358 through 3360.

22      A.   Yes.

23      Q.   And does this reflect the discussion that took place

24      at the administrators meeting in September?

25                  THE COURT:  All right, wait a minute.  I'm --

```
 1    FT is 13365.

 2              MS. FRIEDFEL:  I think they are in a

 3    different order.

 4              MR. BRILL:  133 --

 5              MS. FRIEDFEL:  Here.  This is strange.  Okay.

 6    The document must have been replaced, your Honor.  It

 7    didn't get replaced in mine.

 8              THE WITNESS:  It looks like this was an

 9    e-mail I sent that I pasted with the minutes of the

10    September meeting at the bottom of it.  If this is the

11    one to Colleen Morgan.

12              MR. BRILL:  13365 through 13367.

13              THE WITNESS:  Oh, okay.

14              MR. BRILL:  Is that correct?

15              THE COURT:  That's what I have.

16              MR. BRILL:  I have an old version of it in my

17    notebook.  I apologize, your Honor.

18    BY MR. BRILL:

19    Q.   And -- are your notes an accurate summary of what

20    took place in that September --

21    A.   I am not looking at 13365, but I do see the same

22    meeting minutes.

23              THE COURT:  Just leave -- where's the first

24    page?  You have the old one.

25              MR. BRILL:  Oh.
```

```
1              THE WITNESS:  This is what you're referring
2    to.
3              MR. BRILL:  Yes.  Okay, we will change the
4    Bates number in the original -- we can.  But it's the
5    same document.  For some reason, there's two different
6    versions of it.
7    BY MR. BRILL:
8    Q.   You are looking at a document, Mr. McDonald, that
9    is -- that has an e-mail dated November 17th, 2009 from
10   you to a number of individuals?
11   A.   Yes.
12   Q.   And this attaches the unofficial minutes of a
13   meeting that was held at University of Maryland in
14   September?
15   A.   Yes.
16   Q.   Was that the so-called cheer summit?
17   A.   Yes.
18   Q.   And on the next page, can you just go through very
19   briefly the items that are listed and tell us whether
20   decisions were made on those --
21   A.   Under the term; "competitive cheer policies"?
22   Q.   Yes.
23   A.   Yes.  To the development of any sport at NCAA sport
24   or really any sport, the things listed here, like, length
25   of season, maximum number of coaches, number of contests,
```

1    equivalencies, roster size, the floor surface, the

2    recruiting season, these are basically the components of

3    how you build a sport.  So we at the cheer summit a

4    discussion of what are we going going to do, are we going

5    to be fall or spring or fall and spring.  So we, as a

6    group of administrators and the coaches were there, had

7    very good discussions regarding, okay, this is sort of

8    the very beginnings of the components of a competitive

9    cheer program.

10   Q.   And the decisions that were made at that meeting

11   with respect to those items, did those decisions apply

12   during the 2009-2010 season?

13   A.   Some of them did.  Yes.  There was some refinement

14   as you've seen in some of the discussions today, some of

15   these things may have changed a bit.  But this was the

16   beginning of -- really the beginning of the competitive

17   cheer as a varsity sport.

18   Q.   In particular, did the length of season apply?

19   A.   Yes.

20   Q.   Did the number of contests apply?

21   A.   It did.

22   Q.   Why don't you go through the test and tell us

23   quickly of those items applied during the '09-10 season?

24   A.   Most of these were designed after -- I know the

25   length of the season was to mirror the basketball season

1    which was usually the NCAA we use 122 or 132 days, so

2    that's sort of where we started from.  I'm pretty sure we

3    were within that number.  Most sports are.  Maximum of

4    coaches, three paid, one volunteer.  Most of us weren't

5    there.  But number of contests, we had eight.

6                   THE COURT:  That's the minimum number.

7    BY THE WITNESS:

8    A.   Minimum number of -- I'm sorry.  The other line.  I

9    have number of contest, Monday after Thanksgiving.

10   Q.   It says, "Minimum number of contests, eight"?

11   A.   Right.

12   Q.   "First day of competition, Monday after

13   Thanksgiving"?

14   A.   12 euqivalencies was the scholarship number; roster

15   size, 35; competition surface, normal cheer mats;

16   certified trainer, all practices and competitions.  So

17   these -- this, again, is our very, very first meeting.

18   But we then as a group agreed that this would be our

19   starting benchmark.

20   Q.   Now Jack, there were some questions about off-campus

21   recruiting and Coach Martin -- I'm sorry, Coach Powers'

22   certification.  Was she able to do any recruiting during

23   the '09-10 year without an off-campus recruiting

24   certification?

25   A.   Coach Powers did a significant amount of recruiting

1    on campus.  As we all know cheer, cheer leading, dancing

2    is a very, very popular item throughout everywhere around

3    the country, every time a university had an admissions

4    open house, sophomore, junior open house, the amount of

5    student athletes that she dealt with during those events,

6    because of the public awareness of Quinnipiac's new

7    varsity sport, she did quite a bit -- not to mention

8    visits by families to see her specifically, so she did

9    quite a bit of recruiting this past year on campus.

10   Q.   Did you make the decision to promote coach powers to

11   a head competitive cheer coach?

12   A.   Yes.

13   Q.   And on what did you base that decision?

14   A.   Well, 10 to 12 years of success as an athletic

15   department employee.  She was part time sideline cheer

16   coach helping coordinating the spirit groups, helped us

17   with midnight madness.  There was no better person to

18   take us to the next level of her competitive cheer.

19   Q.   And did you make the decision to promote Caroline

20   Martin to head cross country and track and field coach

21   last summer?

22   A.   Yes, I did.  As I mentioned earlier, she was all New

23   England runner.  Phenomenal success as an assistant coach

24   to both -- both the men's and women's teams, won eight or

25   nine conference championships.  So when Shawn Green left,

1    the search, in my mind, was done.

2    Q.   How does her salary compare to the salary of the

3    other coaches of the other teams?

4    A.   Caroline's salary, two answers to that question:

5    One is it was the same as what Coach Green had, the

6    former cross country and track and field coach; it's a

7    also a little more than the other coaches because she's

8    coaching four sports for as many as nine or ten months.

9    Q.   It's -- when you say a little bit more, can you give

10   us a range like 10 percent, 50 percent --

11   A.   It's probably 30 or 40 percent more.

12   Q.   And when coach Green was here, how many coaches --

13   first of all, was he the head coach also for all six

14   teems?

15   A.   He was the head coach of five of the six track and

16   cross country sports.  We had another person named Ed

17   O'Connor who was the head coach of men's cross country

18   and he was here as long as I was here.  He has since

19   moved on to another role on campus.  So we had a pooling

20   of six part time assistant coaches, but Shawn Green was

21   technically the head coach of five of the six track and

22   cross country sports.  But in reality, for me, as

23   administrator, he managed the entire program.

24   Q.   And what is the general practice, if there is one,

25   among Division I schools as to how many coaches there are

1    for men's and women's cross country and track and field

2    when a school has six teems?

3    A.   Many, if not all, have a director of men's and

4    women's track and field and cross country.  It's very,

5    very common, then they may have assistant coaches for

6    sprints and jumps and throws and distances.  But it is

7    very, very common to have one person that manages your

8    track and field, cross country athletes.

9              MR. BRILL:  I don't have anything further on

10   either cross or direct of this witness.

11             THE COURT:  All right.  Redirect?

12             MR. BRILL:  I'm sorry, your Honor, I

13   forgot -- there was one exhibit I didn't get to.  I

14   apologize.

15             THE COURT:  That's all right.

16             MR. BRILL:  I didn't get to the end of my

17   notebook.  The most important exhibit.

18   BY MR. BRILL:

19   Q.   Can you look at Exhibit FW, please.  Can you

20   identify that?

21   A.   Yes, this is -- is this the graphics page, the

22   branding page?

23   Q.   Yes.

24   A.   This is part of a conference call that was held last

25   Monday, I think the 14th.  Actually, it was pretty

1    exciting to get this and see this.  This really shows the

2    work of a branding company to help the NCSTA in our

3    branding, logos, potential uniforms, graphics, web pages.

4    It was pretty exciting to see, you know, almost a year's

5    worth of work come in to see --

6    Q.   How did this come about?  Did the --

7    A.   One of the previous conference calls, May-June, we

8    all agreed that we would invest, I think, $8,000 into

9    having a company design this branding image for the

10   NCSTA.

11            MR. BRILL:  Thank you.

12   REDIRECT EXAMINATION

13   BY MR. ORLEANS:

14   Q.   Jack, do you still have the page with the notes from

15   the September meeting?

16   A.   Do we have -- is that --

17            MR. HERNANDEZ:  I'm a little confused because

18   you don't have the same page number that we do.  We have

19   it as FT.  It's the notes from the September cheer summit

20   that you were asking him about.  But --

21            MR. BRILL:  I think it's the same notes, but

22   for some reason the Bates number is different.

23            MR. ORLEANS:  Okay.

24            THE WITNESS:  FT, right?

25            MR. ORLEANS:  It's the one you were looking

1     at that has your notes from the --

2               THE WITNESS:  We were referring to some

3     pasted minutes from the cheer summit.  Yeah.

4               MR. ORLEANS:  Okay.  Right.

5     BY MR. ORLEANS:

6     Q.   I just wanted to ask you, at the time of the Cheer

7     Summit in September at the University of Maryland, when

8     you were talking about the length of the season, you were

9     counting 132 days back from the final championship event,

10    parens, NCA.  So at that point, you were planning that

11    the NCA event in Daytona would be your championship

12    event?

13    A.   That was for this past year.

14    Q.   Okay.  Well, at that time, -- there's nothing in

15    these notes about a plan for any other championship

16    format; is there?  That's a yes or no?

17    A.   Nothing that -- no, no.

18    Q.   Nothing in the notes?

19    A.   No.

20    Q.   Can you go to EW, please, which Mr. Brill asked you

21    about.  And you testified that these show the -- these

22    are end of season results and statistics for the various

23    Quinnipiac sports teams; right?

24    A.   Yes.

25    Q.   And I think that what you said was they show

1    everyone who participated.  Do you remember that?

2    A.   Yes.

3    Q.   And by participated, you mean got in a game; right?

4    A.   Correct.

5    Q.   So we're not arguing about the definition of

6    participant under EADA or Title IX.  All you meant by

7    your testimony was this is going to show every athlete

8    that got in a game or a competition?

9    A.   That's correct.

10   Q.   Now you testified with respect to a number of sports

11   that Quinnipiac competes outside the immediate geographic

12   area; right?

13   A.   Yes.

14   Q.   And that's good because it helps you to market the

15   school outside the local area?

16   A.   Yes.

17   Q.   You mentioned, I think, lacrosse and hockey?

18   A.   Particularly lacrosse, but hockey, yes, a little

19   bit.  They are outside the northeast conference.

20   Q.   But you do have lacrosse rivals that are within

21   Connecticut; do you not?

22   A.   Yes.

23   Q.   And you do have hockey rivals that are within

24   Connecticut?

25   A.   Yes.

```
 1    Q.   And you also testified that there are a number of

 2    NEC sports in which all the members of the conference get

 3    to participate in the championship tournament?

 4    A.   Yes.

 5    Q.   Name those sports again, please?

 6    A.   Let's say all the six track and cross Country, three

 7    for men, three for women, the two golf championships, I

 8    think their bowling championship we don't sponsor it

 9    but --

10    Q.   I just wanted an example.  If the Quinnipiac women

11    win the NEC cross country, they qualify to move on to

12    some sort of regional or national event; do they not?

13    A.   Cross country is a tad different.  You could use

14    golf or tennis is a better example.

15    Q.   Okay.

16    A.   That's not a function of the NEC or Quinnipiac, it's

17    the way NCAA runs their regionals.  But let's just say in

18    golf or tennis they all participate in the tennis

19    championships, all 12 schools, in the winter, advance to

20    the NCAs.

21    Q.   And the winner advances to an NCAA regional or

22    national championship?

23    A.   Regional, usually.

24              MR. ORLEANS:  Thank you, nothing further.

25              THE COURT:  I have three quick questions.
```

```
 1              Looking at FT, the minimum number of
 2    contests, eight, what was the number of contests that
 3    Quinnipiac competitive cheer participated in during its
 4    last year?  That is 9-10.  It was less than eight.
 5              THE WITNESS:  I'm not sure.  I don't want to
 6    say without knowing for sure.  I would -- I don't know.
 7    It's near that number.
 8              THE COURT:  I vaguely recall another document
 9    where we --
10              THE WITNESS:  I know there's a refinement of
11    that policy in a most recent meeting we had that said six
12    to eight.  Somewhere -- we had that in part of the
13    coach's recommendations from not too long ago.
14              THE COURT:  I thought --
15              MR. BRILL:  The coach will be testifying
16    next.  He can clarify this for the Court rather than
17    taxing the memory of this witness.
18              THE COURT:  All right.
19              THE WITNESS:  Thank you, Ed.
20              THE COURT:  With respect to the running
21    sports, you mentioned that it's common for a single
22    person to manage all of the teams?  Do you --
23              THE WITNESS:  Yes.
24              THE COURT:  Do you mean coach all the
25    teams.
```

```
 1                    THE WITNESS:  Coach, manage, direct with a

 2        series of assistant coaches on the staff.

 3                    THE COURT:  And it's common at Quinnipiac or

 4        common in the NEC or common across the country.

 5                    THE WITNESS:  It's common across the country

 6        to be a director men's, women's, cross country, track and

 7        field with assistant coaches to assist you in the

 8        different --

 9                    THE COURT:  Subdivisions.

10                    THE WITNESS:  Disciplines, yeah.

11                    THE COURT:  And looking at FW, who -- what's

12        the company that prepared that?  Was that Nike?

13                    THE WITNESS:  I think it might have been.

14        Well, it's from a company out of Oregon; so everything in

15        Oregon has a swish on it.

16                    THE COURT:  Swishes on all the upper

17        right-hand corners.

18                    THE WITNESS:  Yeah, I'm not exactly sure of

19        the name of the company, but it was done and coordinated

20        with the Oregon administration.

21                    THE COURT:  Okay.

22                    MR. BRILL:  Can I ask one clarifying

23        question, your Honor?

24                    THE COURT:  Sure.

25                    MR. BRILL:  With respect to the minimum
```

1    number of competitions as eight, was that eight NCSTA

2    competitions or eight total.

3             THE WITNESS:  No, I think we talked somewhere

4    there was eight total, and again, excuse me for being a

5    little bit foggy, and there was a statement in one of our

6    minutes that maybe half of them needed to be NCSTA.

7             MR. BRILL:  Thank you.

8             THE COURT:  Okay.

9             MR. ORLEANS:  Thank you, your Honor.

10            THE COURT:  Sir, you're excused.  Thank you.

11            THE WITNESS:  Thank you.

12            MR. HERNANDEZ:  Plaintiffs call coach Mary

13   Ann powers.

14            THE COURT:  Ma'am, please remain standing.

15   M A R Y   A N N     P O W E R S,   called as a

16   witness on behalf of the Plaintiff, having been duly

17   sworn by the Court, testified as follows:

18   DIRECT EXAMINATION

19   BY MR. HERNANDEZ:

20   Q.   Coach Powers, good afternoon.

21   A.   Good afternoon.

22   Q.   I would like to start by asking you about Quinnipiac

23   University's competitive cheer program.

24   A.   Okay.

25   Q.   As I understand it, as of March 2nd, 2009, there was

1      no competitive cheer program; is that correct?

2      A.   That's correct, but we were a sideline team that did

3      compete.

4      Q.   And how long have you been a cheer coach at

5      Quinnipiac University?

6      A.   This is my 12th year.

7      Q.   Did you first begin as a sideline cheer coach in

8      1999 at Quinnipiac?

9      A.   1998.

10     Q.   I'm sorry, 1998.

11     A.   Correct.

12     Q.   And when did the sideline cheer team begin competing

13     against other schools?

14     A.   Almost within that first year.

15     Q.   And then, of course, we'll jump to March of 2009.

16     A.   Okay.

17     Q.   On March 3rd, 2009, were you told that Quinnipiac

18     University was now going to treat competitive cheer as a

19     varsity sport?

20     A.   They told me that they were making competitive cheer

21     a varsity sport, Yes.

22     Q.   Can you tell Judge Underhill about how you were

23     notified that you were going to be the competitive -- the

24     head competitive cheer coach?

25     A.    I wasn't notified that I was going to be the head

```
1    competitive cheer coach.  I was notified that competitive
2    cheer program had been elevated to varsity status.
3    Q.   Now before -- who told you that they were going to
4    do that?
5    A.   I received a phone call and I was on my way into
6    work, because Quinnipiac is my part time job and they
7    asked me if I could come down to the university.  I was
8    called by Bill Mecca.
9    Q.   Did you go down to the university?
10   A.   I could not.
11   Q.   Because you were on your way to your other job?
12   A.   Yes, I was.  I was on my way to my full-time job.
13   Q.   Did they eventually notify you that cheer was going
14   to be made a varsity sport?
15   A.   They asked me if -- I couldn't come down, they would
16   be calling me back again.  Then I was called back by
17   Billy Jack and Tracey Flynn, I believe.
18   Q.   Did they have you on speakerphone or something like
19   that?
20   A.   I wasn't sure of that, but at one point I pretty
21   much knew that I was.  I didn't know while I was talking.
22   Q.   Were you driving at the time?
23   A.   No, I hadn't quite left for work.
24   Q.   What were you told?
25   A.   I was told by Jack that he had something very
```

1    important to tell me, that he had had a very hard day, a

2    day that nobody really wants to quite go through, that he

3    had had three coaches in his office and that he had to

4    cut -- he had to tell three coaches that the programs

5    were being let go.  And I asked what's that have to do

6    with me; and he said, well, the final call of the day, at

7    least I get to make one good one.  And he said we're

8    making competitive cheer a varsity sport.

9    Q.   Now before they notified you that they were going to

10   make competitive cheer a varsity sport, did anyone in the

11   athletic department consult with you about the prospect

12   of making competitive cheer a varsity sport?

13   A.   I believe in 2003, Maryland had sent a packet, they

14   were doing press release kits when they made competitive

15   cheer a varsity sport in Maryland.  They had spent press

16   kits out to everyone and we did receive one.  And Jack

17   had reviewed it with me.

18   Q.   And were any decisions made in 2003, after you

19   received the University of Maryland package?

20   A.   No.  He just said that he would like to think at

21   some point this might happen.  He was going to keep a

22   close eye on it.  I'm trying to remember what he said.  I

23   think he might have called the university.

24   Q.   And between that meeting with Jack in 2003 and March

25   3rd of 2009, were you consulted again about making

1    competitive cheer a varsity sport?

2    A.   It was mentioned here and there that, you know, it

3    would be hopeful in the future.  We're just going to keep

4    on looking at it and seeing where it's going.  But it

5    wasn't -- there were brief conversations, at best.

6    Q.   And were any plans about making competitive cheer a

7    varsity sport discussed in the fall of 2008?

8    A.   No.  Not -- with me?

9    Q.   With you.

10   A.   No.

11   Q.   And then how about January-February of 2009.  Were

12   there any discussions with you about the prospect of

13   making competitive cheer a varsity sport?

14   A.   No, no conversations, no.

15   Q.   And then on March 3rd, 2009, you get the big news?

16   A.   Yes.

17   Q.   So I take it that there were no discussions with you

18   about practice facilities for competitive cheer before

19   they announced it would become a varsity sport?

20   A.   I don't understand the question.

21   Q.   Well, you said there were no discussions with you

22   before cheer became a varsity sport?

23   A.   I didn't say there was none.  I think I said there

24   were few but they were brief.  Basically, they were

25   looking at it, hang on, we're watching where this is

 1   going.

 2   Q.   Okay.  Let's break it down to January-February of

 3   2009.  Were there any discussions with you about where a

 4   competitive cheer team would hold practices?

 5   A.   No.

 6   Q.   Were there any discussions in January-February of

 7   2009 about what competitive cheer uniforms might look

 8   like?

 9   A.   No.

10   Q.   And in March of 2009, when you were told that you

11   would be the competitive cheer coach, varsity competitive

12   cheer coach, was there any discussion about whether you

13   had passed the NCAA recruiting test?

14   A.   In what --

15            MS. FRIEDFEL:  Objection, your Honor.  I

16   think he's mischaracterizing her testimony.  I don't

17   think she said that she was made the varsity coach in

18   March of 2009.

19            MR. HERNANDEZ:  I'll rephrase the question.

20   MR. HERNANDEZ:

21   Q.   In March of 2009, they told you competitive cheer

22   would become a varsity sport; correct?

23   A.   Correct.

24   Q.   Did you have any discussions with members of the

25   athletic staff about your status as far as whether you

1   had taken or passed the NCAA recruiting exam?

2   A.   In March?

3   Q.   Yes.

4   A.   No.

5   Q.   Did there come a time when you learned that

6   Quinnipiac University was going to hire a head coach for

7   competitive cheer?

8   A.   There came a time several weeks later where they

9   told me that they were, quite frankly, looking for me for

10  the job.  They felt confidently that I was the person

11  that belonged in that position.

12  Q.   At the meeting where they told you that they were

13  going to make competitive cheer a varsity sport, at that

14  time, did they give you any indication that they were

15  looking at you to be the head coach?

16  A.   No.  You know, that meeting was just I think it was

17  probably -- it's my guess that it was an emotional day

18  for everybody.  It was day's end.  I had to be at work

19  and I had to be there quickly.  I was emotional because

20  I -- it was a total surprise to me and to think that my

21  sport possibly could have reached this point.  They

22  didn't -- they had emotions going because three sports

23  were cut, not just one.

24  Q.   Now between March 3rd of 2009, when you learned the

25  competitive cheer would become a varsity sport and when

```
1    they told you that they wanted you to be the head coach
2    for varsity competitive cheer, had there been any
3    discussions with you about making that happen?  About
4    making you the head coach?
5    A.   From what date are you asking me?
6    Q.   From March 3rd, 2009, when they told you it's going
7    to become a varsity sport, all right, and two weeks later
8    when they asked you to be the head coach, was there any
9    discussion in those two weeks about your becoming the
10   head coach for varsity competitive cheer?
11   A.   As I think I just stated, they said they felt I was
12   a natural fit for them.
13   Q.   Okay.
14   A.   But it wasn't announced to me on the date that they
15   made the announcement that the sport was chosen.
16   Q.   Okay.  Do you know if the University solicited
17   applications for a head coach for competitive cheer?
18   A.   I don't know that, no.
19   Q.   Let me show you what's been received as Plaintiff's
20   Exhibit 82.  Do you recognize this?
21   A.   It looks like that is my employee contract.
22   Q.   Well, I see you don't have your glasses on.
23   A.   No, I don't.  I'm like this.  I'm sorry.
24             THE COURT:  It's --
25             THE WITNESS:  Oh, competitive --
```

```
1              THE COURT:  Take that book and look at 82.
2              THE WITNESS:  I'm glad I gave you all a good
3    laugh.
4    BY THE WITNESS:
5    A.    Okay.
6    Q.    Do you recognize Plaintiff's Exhibit 82?
7    A.    It's a position announcement for a head coach --
8    head coach for competitive cheer.
9    Q.    Okay.  And do you recall if the position
10   announcement for head coach competitive cheerleading was
11   posted anywhere in the university?
12   A.    I don't know.
13   Q.    Were you given a copy of Plaintiff's Exhibit 82?
14   A.    No.
15   Q.    Let me just go over some of these things.  It
16   appears that Quinnipiac University was looking for a head
17   coach of competitive cheerleading who had successful
18   cheerleading coaching experience, college level
19   preferred.  And you had that; correct?
20   A.    I believe so.
21   Q.    And he were also looking for experience in
22   recruiting; correct?
23   A.    It looks like that's what they're looking for, yes.
24   Q.    Now had you had any experience in recruiting student
25   athletes for a Division I athletic program?
```

1    A.    Well, I couldn't have had experience recruiting

2    athletes in a Division I program as pertains to sport

3    because we had never been declared that, but certainly,

4    over my years as a coach what had happened as this

5    program grew and became a competitive force to be

6    reckoned with at the national level, the kids that we

7    were getting hundreds of requests a year about our

8    program and I started having to ask for skill set videos

9    to be sent to me and whatnot.  So a lot of the kids who

10   came were looking for their academics most certainly

11   first, but they were hoping for the opportunity to be on

12   a cheerleading team and compete on the team.

13   Q.    Okay.  Now before March of 2009, had you had any

14   experience in doing off-campus recruiting?

15   A.    Had I had -- before March 2009?  No.

16   Q.    Now it appears they were also looking for, under

17   responsibilities, someone with experience in team

18   management including NEC and NCAA rules and regulations.

19   A.    Okay.

20   Q.    Now before you were made head competitive

21   cheerleading coach, had you had any experience in team

22   management including NEC and NCAA rules and regulations?

23   A.    Not adhering NEC and NCAA ruling regulations, no.

24   But I think to management of the team and of all the

25   other spirit groups at the same time, most certainly.

1    Q.   Okay.

2         Now then, did there come a time when you learned how

3    many athletes would be on your first year's competitive

4    cheer team?  And by first year, I mean 2009-10 academic

5    year?

6    A.   I learned of my roster size right after the -- right

7    after the case last year.

8    Q.   When you say right after the case last year, does

9    that mean right after the --

10   A.   Well, it means, first of all, I don't believe the

11   contract came forth in my employment -- my official

12   employment as head coach until the middle of June -- I

13   mean the middle of July.  However, it was that the point

14   meetings started coming fast and furious, I can't give

15   you an exact date, but I know it was predicated on what

16   had been set forth, the roster size had been set forth by

17   what the Court, I believe, had decided which was a team

18   size of 30.

19   Q.   Okay.  And what is your understanding as to what

20   role, if any, the Court played in setting the roster size

21   of 30?

22   A.   I don't -- I didn't know why they had -- I had

23   thought the other universities that were sponsoring

24   competitive cheer, they were at 36.  But I think they

25   were -- I -- I think they named it, they thought that was

1    a significant amount.

2    Q.   You wanted 36; is that correct?

3    A.   I didn't ask for 36.  I asked for 32, so that I

4    wouldn't leave two athletes out of team position.

5    Q.   Okay.

6    A.   However, I did believe in the future to -- to

7    certainly have a level playing field up against Oregon

8    and Maryland and Bailor, knowing they would have 36, I

9    was hoping it would be allowed for me to have those

10   numbers, yes.

11   Q.   Did you ask Mr. Thompson or Dr. Thompson, rather, if

12   you could have 32?

13   A.   Yes, I did.

14   Q.   Going forward?

15   A.   Yes, I did.

16   Q.   And what did Dr. Thompson tell you?

17   A.   He told me that the roster size was set at 30 for

18   right now and we would revisit the situation in the

19   future.

20   Q.   And did Dr. Thompson tell you why the roster number

21   was set at 30?

22   A.   I didn't question him.  I just accepted what he

23   said.

24   Q.   Did he mention something about the Court ruling in

25   this case setting the roster number at 30?

1    A.    I -- you know, I'm not sure that he said that.  I

2    just --

3    Q.    Okay.

4    A.    When he said 30, I just went with what he said.

5    Maybe I assumed it was by the Court ruling, but that's

6     -- how I thought a roster size -- that was our roster

7    size had been reported to the papers at 40; and when I

8    received my roster size at 30, that came from, I think

9    Jack first and then I went to Mark and questioned could I

10   have 32 so two teammates wouldn't be out of position.

11   What Mark said, if I think I'm answering your question

12   correctly, is that the roster size was set at 30 and

13   it -- I don't know that he mentioned the Court ruling.  I

14   think he possibly did.  I'm not -- I'm not quite sure.

15   Q.    Now I guess what I'm trying to figure out is why

16   earlier you mentioned that you believed that the roster

17   size for varsity competitive cheer was set at 30 by Court

18   ruling or Court order.  If I understood you correctly.

19   Where did you get that idea from?

20   A.    That the roster size -- that's maybe just maybe an

21   assumption on my part.

22   Q.    Okay.

23        Did there come a time when you were presented with a

24   letter that you were asked to sign which certified that

25   30 student athletes for competitive cheer was a

1    reasonable roster number?

2    A.   Yes.

3    Q.   And I took this out of order.

4              MR. HERNANDEZ:  Do you know the exhibit

5    number for the whole thing just so I can refer to it.

6              MR. ORLEANS:  For the roster size letters?

7              MR. HERNANDEZ:  For the record I'm --

8    BY MR. HERNANDEZ:

9    Q.   Coach Powers, I'm putting up on the screen an

10   exhibit number which number we will determine shortly.

11   Do you recognize that letter?

12   A.   I do.  But I really need to get closer because I

13   don't have my distance glasses on.

14             MR. ORLEANS:  For the record, your Honor, it

15   should be Exhibit BO, roster sizes for 2009-2010.

16             THE WITNESS:  BO?  Okay, yep.

17   BY MR. HERNANDEZ:

18   Q.   Do you have BO roster target letter dated July 22nd,

19   2009 to you from Jack McDonald in front of you there?

20   A.   Yes, I do.

21   Q.   And you recognize this letter?

22   A.   Yes, I do.

23   Q.   Now did you have any input into the roster target

24   number of 30 that's reflected in Exhibit BO?

25   A.   No, I did not.

1    Q.   So you were told what your roster number was going

2    to be for that team; correct?

3    A.   That's correct.

4    Q.   And again, you thought it maybe should be a little

5    bit higher?

6    A.   I felt that at least it should be at 32 because two

7    females were not going to have the opportunity to

8    participate the way as a coach I hoped that they could.

9    Q.   When you were presented with Exhibit BO, had you

10   been told what your budget was going to be for '09-10?

11   A.   I was told that my budget was going to be around

12   $50,000; but because we were a new sport, I needed to

13   speak to administrators when I needed something and they

14   were going to see to it that the needs of the team were

15   filled.

16   Q.   Now had you had any experience in budgeting funds

17   for a competitive team before?

18   A.   My team was never competitive before, so no, I would

19   not have had any experience.

20   Q.   And when you were a sideline cheer team that

21   competed, how often would you travel?

22   A.   Again, the mission statement for sideline cheer at

23   the time was to be -- to support the athletic -- the

24   men's and women's basketball teams primarily first.  So

25   the ability to travel, do you mean locally, regionally?

1    We were allowed to -- we were allowed to compete as long

2    as it did not interfere with the men's and women's

3    basketball program schedules.

4    Q.   It would cost money to travel; correct?  If you were

5    competing?

6    A.   They were usually a bus trip, one or two towns over.

7    We didn't do much travel outside of that except for the

8    Daytona trip in 2005 down in Florida.

9    Q.   And money for traveling by bus, did you have a

10   budget set aside for that?  When you were a sideline

11   team.

12   A.   It didn't happen often, maybe once or twice a year.

13   I'm sure they wanted to ensure the team's safety, so yes,

14   once or twice a year.  And around 2007-8 we travelled a

15   little more by bus.

16   Q.   My question is were you given a budget for that

17   travel?

18   A.   My sideline team had a budget, Yes.

19   Q.   Where did that money come from?

20   A.   We had a budget.  And I had to adhere to what was in

21   that budget and so I was allowed to use budget money for

22   the bus.

23   Q.   Okay.  Well, all right.  You received the money from

24   the University; correct?

25   A.   Correct.

1    Q.   And there were some instances where you would raise
2    money through the sideline cheer team for travel; is that
3    fair to say?
4    A.   There was times I would raise money?
5    Q.   Yeah, did you ever sponsor events to raise money for
6    travel?
7    A.   I sponsored an event for -- since 2004, at the
8    university.
9    Q.   Okay.  So there have been occasions where you raised
10   money for a team.  Aside and apart from what the
11   University gave you?
12   A.   I -- as I said, from 2004 until recently, I've held
13   an event yearly that's brought in over 110 competing
14   teams.
15   Q.   Now then, you signed Plaintiff's Exhibit BO on
16   August the 3rd 2009; is that correct?
17   A.   Correct.
18   Q.   And at that time you were agreeing that as head
19   coach of the competitive cheer team you confirmed that
20   "30 student athletes on the competitive cheer team is a
21   reasonable roster number that represents a genuine
22   opportunity for Division I experience for each team
23   member and that I have a sufficient budgetary allocation
24   to support this number"; correct?
25   A.   I was agreeing I -- I kind of am a stubborn person.

1    I did express interest in two more athletes, but I

2    agreed.

3    Q.   Now then, do you know if the NCAA recognizes

4    competitive cheer as a varsity sport?

5    A.   No, it does not.

6    Q.   Was the University able to purchase insurance for

7    the competitive cheer team for its competitions?

8    A.   Do you mean starting this year or do you mean --

9    Q.   Correct --

10   A.   -- when we were sideline cheer.

11   Q.   For 2009-2010?

12   A.   We had to purchase insurance for the competitive

13   team, yes.

14   Q.   Were you able to obtain that insurance through the

15   NCAA?

16   A.   No.   The NCAA only insures sideline cheer.   But only

17   for sideline material, not competitive material.

18   Q.   And were you able to secure insurance for the

19   varsity competitive cheer team for the calendar year

20   2009-10?

21   A.   Yes.

22   Q.   And where did that insurance come from?

23   A.   That came out of my budget, as far as I understand.

24   If you want the name of the company, I don't quite

25   remember it.

1    Q.   Do you remember how much that insurance cost?

2    A.   I think it was around 3,000-and some-odd dollars.

3    Q.   Did competitive cheer have an assigned locker room

4    in its first year, 2009-10?

5    A.   No.

6    Q.   Were you given any assistant coaches to help you

7    out?

8    A.   I was given -- I have two assistants and volunteer

9    coach.

10    Q.   Who were the two assistant coaches?

11    A.   My two assistant coaches were Marie Kashuba and

12    Cheryl Thomes.

13    Q.   I suspect the court reporter will ask you to spell

14    Ms. Kashuba's name?

15    A.   K-A-S-H-U-B-A.

16    Q.   And may as well go ahead and spell the other name as

17    well?

18    A.   T-H-O-M-E-S.

19    Q.   And who was your volunteer coach?

20    A.   Toni Corvi.

21    Q.   And just for the record, Toni, is that a male or --

22    A.   No, it's a female.  T-O-N-I.  I'm sorry.

23    Q.   That's all right.  And Corvi, is that spelled

24    C-O-R-V-I?

25    A.   Correct.

1    Q.   Do you know if Ms. Kashuba, Ms. Thomes or Ms. Corvi

2    have taken the NCAA recruiting exam?

3    A.   No, I'm the only coach on staff that has taken the

4    NCAA test.

5    Q.   And you passed that recently?

6    A.   Yes, I have.

7    Q.   Congratulations?

8    A.   Thank you, very much.

9    Q.   When did you take the test?

10    A.   June 10th.

11    Q.   That was just a couple weeks ago?

12    A.   Yes, it was.

13    Q.   So you are now able to recruit off campus; correct?

14    A.   Correct.  I don't think I'm going to have to do a

15    lot of it, though.

16    Q.   And for the very first year of competitive cheer,

17    2009-10, other than the freshmen, other than the incoming

18    freshmen, were the members of the competitive cheer team

19    former sideline cheer members?

20    A.   Some of them were, yes.

21    Q.   How many of them were former sideline cheer people?

22    A.   How many of them?

23    Q.   Yeah.

24    A.   For 09-10?

25    Q.   Correct.

1    A.   I think around 16.

2    Q.   And how many were incoming freshmen?

3    A.   I believe 13.

4    Q.   That comes out to 29; correct?

5    A.   I had a graduate student on the team.

6    Q.   Would that be Ms. Pacheco?

7    A.   Yes, it would.

8    Q.   When did Ms. Pacheco join the team?

9    A.   Somewhere in early November.

10   Q.   Early November?

11   A.   Yeah, I think so.  I think it was late October,

12   early November.

13   Q.   Did you hold tryouts for this new varsity team?

14   A.   I did.

15   Q.   When were those held?

16   A.   The first -- well, I didn't actually end up holding

17   the tryout, I'm sorry to renege on that, I held a clinic

18   to look at skill sets.  But after two days it was pretty

19   clear amongst the pool of young ladies who had come to

20   the tryout who would fit position needed for the athletes

21   and who had the skill sets in tumbling.

22   Q.   And when was this clinic held?

23   A.   I want to say the very first week of September.

24   Q.   And so as of early September, you pretty much knew

25   who was going to be on your squad; is that correct?

1    A.   Correct.

2    Q.   Except for Ms. Pacheco, she came in in November?

3    A.   Well, we -- one of our athletes did leave the team

4    on October 9 -- October 11th.  And so I did need to find

5    another athlete before our first contest report date.

6    Q.   That turned out to be Ms. Pacheco?

7    A.   Yes.

8    Q.   Ms. Pacheco, she was a graduate student; is that

9    correct?

10   A.   Yes, she was.

11   Q.   Ms. Pacheco had previously been a sideline

12   cheerleader; correct?

13   A.   I guess you could say that, yes.

14   Q.   Well, that's my understanding.  You're smiling.

15   A.   No, no I'm just thinking it through.  You know she

16   was a sideline cheerleader, but we were competing and she

17   was a gymnast that had nowhere to go like many of the

18   girls in our sport, so the reason she had joined the team

19   a few years back was because as a former gymnast with a

20   specialty in floor, she was hoping to compete.  So she

21   did sideline cheer so that she could have the competitive

22   part of it.

23   Q.   Okay.  And so in October you lost somebody from your

24   30 person roster, correct?

25   A.   Correct.

1    Q.   And you were aware that Ms. Pacheco was a graduate

2    student on campus?

3    A.   I was aware because she came to me and asked me if

4    there was any positions left when we had 30.  And I told

5    her no, we had 30.  And she said if anything ever

6    happens, I would really love the opportunity to compete.

7    Q.   And was she given some financial assistance?

8    A.   She was given a $5,000 scholarship.

9    Q.   This woman who quit, had she received any

10   scholarship money?

11   A.   No, she did not.

12   Q.   So the woman who quit, you did not consider to be a

13   scholarship-worthy athlete?

14   A.   I guess I did not.

15   Q.   Okay.

16   A.   That's fair to say.

17   Q.   But after you lost this non-scholarship-worthy

18   athlete, she was replaced by MS. pacheco --

19   A.   Mm-hm.

20   Q.   -- to fill your 30th slot; correct?

21   A.   Correct.

22   Q.   And you understood that you were expected to reach

23   that 30 person target roster management number; correct?

24   A.   Correct.

25   Q.   And in connection with securing Ms. Pacheco as a

1    member of your new team, you decided to award her a

2    partial $5,000 scholarship?

3    A.   Correct.

4    Q.   Is there an intramural competitive cheer activity at

5    Quinnipiac?

6    A.   No.

7    Q.   Do you have scholarship funds available to you as

8    the head coach?

9    A.   Yes.

10   Q.   In 2009-10, how many full-time scholarships were

11   available to you?

12   A.   Six.

13   Q.   And did you use all six of those scholarships?

14   A.   For 2009-10?

15   Q.   Yes.

16   A.   No, I did not.

17   Q.   Did you consider payments that you made out of the

18   scholarship funds to be stipendize?

19   A.   I do believe I couched it that way.  I gave

20   scholarships that I felt reflected a lot of things; and

21   that I had to look to strategically recruiting in the

22   future without having had the ability to recruit before.

23   So we tried to put skill sets on a grid and we're hoping

24   to have the athletes pick up their skills just a little

25   bit more, especially in some of their tumbling skills;

```
1    but the other goal was to every single year raise the bar
2    and get those kids up so that we were giving them more
3    money.
4    Q.   As I understand it, a Fulbright Scholarship is
5    around $47,000, correct?
6    A.   Correct.
7    Q.   47,500, correct?
8    A.   Correct.
9    Q.   But who's counting.  And you had six of those to
10   give out?
11   A.   Not six.  It was not recommended that I use six that
12   year, not at all.
13   Q.   My question was you had six available you to,
14   correct?
15   A.   I had six available, correct.
16   Q.   How many people actually received these stipendize
17   as you referred to them?
18   A.   I think you just said it was a stipend.  I think you
19   just said it was a stipend.  I said my goal was to have
20   the kids reach a certain level and keep on seeing that
21   they were elevated to a little bit more money every
22   single year.
23   Q.   Okay.
24        And how many people received --
25   A.   Ten.
```

1    Q.    -- payments?

2    A.    Ten for 2010.

3    Q.    How big were these payments?

4    A.    Some were as high as 9,000 and some were as low as

5    3,000.

6    Q.    Do you know, in total, how much money was paid out

7    to those ten female student athletes?

8    A.    I would really have to have the sheet of paper in

9    front of me and look through It.

10   Q.    Did the payments amount to a full scholarship?

11   A.    Above a full scholarship.

12   Q.    Did it amount to two full scholarships?

13   A.    Just a little under, I believe, or maybe about one

14   and a half, actually.

15   Q.    So 47,500 times one and a half is about what you

16   paid out; is that --

17   A.    I think around 65,000.

18   Q.    Fair enough.  Okay.

19         I would like to talk to you about the schedule for

20   2009-10.

21   A.    Sure.

22   Q.    I think you mentioned that you held a clinic in

23   September of 2009; correct?

24   A.    I held a two day clinic and was supposed to hold a

25   tryout on the day after the final clinic, but we made our

1    final cuts on the Thursday prior to the Friday -- tryout.

2    Q.    And you began training, fair to say?

3    A.    We were ready to enter our pre-season.  We had

4    declared a 132 day season that year as our season length

5    for the sport.  So we were already in the midst of

6    pre-season and when he -- the NCSTA was working on how to

7    determine how we were going to use those eight hours

8    while we were in pre-season.

9    Q.    As I understand it, the NCSTA first held its very

10    first cheer summit in September of 2009; is that correct?

11    A.    Correct.

12    Q.    Did you attend that summit?

13    A.    Yes, I did.

14    Q.    Who else attended that summit on the part of

15    Quinnipiac University?

16    A.    Cheryl Thompson and Jack McDonald.

17    Q.    When you were training in the fall of 2009, had the

18    NCSTA made a determinations to how many practice hours

19    were appropriate?

20    A.    No, the -- we were making our practice hour choice

21    based on the rules by the NCAA not by the NCSTA.  We were

22    trying to follow compliance rules as any sport on campus

23    would.

24    Q.    Did there come a time when you had your first date

25    of competition?

```
1    A.    Yes, we did.

2    Q.    When was that?

3    A.    Our first date of competition was December 5th.  But

4    two days prior to that there was inaugural event held at

5    the university.

6    Q.    What was the inaugural event?

7    A.    The inaugural event was something Jack has done when

8    he, for instance, he brought women's hockey on to campus,

9    he holds a ribbon cutting ceremony and it's basically to

10   have the school community, their parents, people involved

11   and want to see the kids, we actually did a little mini

12   exhibition, come and watch and see the team and welcome

13   them to varsity status.

14   Q.    How long did this -- did you call it an exhibit

15   or --

16   A.    I said, the team exhibited their skills.

17   Q.    Exhibited their skills.  How long did this

18   exhibition last?

19   A.    I think it started around 6:30 and it was over by 8.

20   Q.    And by exhibition, I take it there was no

21   competition?

22   A.    No, no competition on December 3rd.

23   Q.    When was the first date of competition?

24   A.    December 5th.

25   Q.    Who did you compete against?
```

1    A.   I believe Stony Brook and Babson College.

2    Q.   And where was that competition held?

3    A.   At the Hartford Convention Center.

4    Q.   And you have a ring binder upo -- your Honor, would

5    this be a good time to break for the day?

6              THE COURT:  Well, I can go another 15 minutes

7    or so.

8              MR. HERNANDEZ:  Okay.  That's fine.

9              THE COURT:  I think it would be useful to

10   finish the witness if we can.

11   BY MR. HERNANDEZ:

12   Q.   If you can go to Plaintiff's Exhibit 41.  It's in

13   one of your ring binders there.  Do you recognize

14   Plaintiff's Exhibit 41?

15   A.   Yes, I do.

16   Q.   What is Plaintiff's Exhibit 41?

17   A.   This looks to be our season schedule.

18   Q.   And I believe you mentioned that your first date of

19   competition was Saturday, December 5th at the Hartford

20   Civic Center; is that correct?

21   A.   Correct.

22   Q.   And are there different meet and competition formats

23   for competitive cheer?

24   A.   There are different -- for competitive cheer?

25   Q.   Okay.  Let me rephrase the question.  In 2009-10

1    competitive season for varsity competitive cheer --

2    A.   Okay.

3    Q.   -- did you compete under different meet formats?

4    A.   Every -- we competed under different score sheets

5    and different scoring systems.

6    Q.   And are there different organizations that run

7    competitive cheer events?

8    A.   Different organizations?  There's many different

9    organizations, yes, in our sport.

10   Q.   And is Spirit Unlimited one of those organizations?

11   A.   Yes, they are one of those organizations.

12   Q.   And what types of competitive cheer organizations

13   competed at the Spirit Unlimited event?

14   A.   I think the event was mainly all star, which is

15   competitive cheer.  I think the bulk of that was all star

16   teams; and then they had a collegiate division and I

17   honestly can't tell you if they had a high school,

18   because I honestly don't know.  We were scheduled to go

19   in the afternoon and I didn't pay attention to what the

20   morning schedule was.

21   Q.   And what are all star teams?

22   A.   All star teams are teams that compete only there is

23   no cheerleading, yet they are called cheerleaders, nobody

24   seems to know why.

25   Q.   What age groups do those cover?

1    A.   Those cover the age groups of I want to say two and

2    a half to level six teams are 18 and over.  There's no

3    age limit.

4    Q.   Okay.  And this event at the Hartford Civic Center

5    on December 5th, what time did that start?

6    A.   I don't know what time it started.  I just know that

7    we competed I want to say around the eleven o'clock -- if

8    I remember correctly, it was anywhere between 11 and 1.

9    I can't remember by bus or by the time we arrived warmed

10   up, had our warm-up area and then competed.

11   Q.   Were there non-collegiate organizations competing at

12   that event?

13   A.   Not collegiate?

14   Q.   Yeah.  The all star --

15   A.   It was mainly competitive -- it was mainly

16   competitive cheer teams there.  Except -- there was a

17   collegiate division, though.

18   Q.   And were there any young kids, I think you said they

19   start around two and a half years old.  What were the

20   youngest ages there?

21   A.   Well, when these competition companies hold

22   sessions, sometimes as you're arriving, the earlier

23   session is clearing out.  So there's thousands of

24   competitive kids going in and out the door and their

25   parents.  So I just am walking into a warm-up area and

```
 1    I'm not focusing on, you know -- I'm focusing on my team,

 2    getting them warmed up, getting them ready to compete.  I

 3    don't know.  But I'm sure there's many, many, many teams

 4    there.

 5    Q.   The Spirit Unlimited competition, what is Exiter

 6    Unlimited?

 7    A.   Exiter Unlimited is a competition company.

 8    Q.   It's -- all right.  And does Spirit Unlimited follow

 9    the NCSTA scoring format?

10    A.   Probably in the team routine, which is very

11    important -- well, you know, a good amount of the skill

12    sets in the team routine I'm sure are quite similar.  But

13    not the -- the meet format and the scoring system the way

14    you assess skills and the points awarded to that are two

15    different things.

16    Q.   Okay.

17         Does Spirit Unlimited follow the same scoring

18    systems as the NCSTA?

19    A.   No.

20    Q.   Different way of scoring?

21    A.   Different way of scoring.

22    Q.   Babson, is Babson a member of the NCSTA?

23    A.   No.

24    Q.   Stony Brook, are they a member of the NCSTA?

25    A.   No.
```

1    Q.   Were either Babson or Stony Brook varsity collegiate

2    competitive cheer teams?

3    A.   No.

4    Q.   What sorts of teams were they if they --

5    A.   They are collegiate teams that are much like

6    Quinnipiac was in years prior, A sideline team that are

7    just becoming teams that are competing quite a bit; and

8    they compete a lot of the same skill sets in stunting and

9    tumbling that we do.  On that score sheet, we are scored

10   on the same skill sets.

11   Q.   So they are both sideline teams that compete, is

12   that fair to say?

13   A.   They are sideline teams that compete the same skill

14   sets.

15   Q.   And drawing your attention to the January 16th

16   competition, was there a competition held at Sacred Heart

17   University in Fairfield, Connecticut?

18   A.   There was supposed to be one and we arrived.

19   Q.   Did you compete at that event?

20   A.   I can't say that we did.  We were there as we were

21   supposed to be.  The bus was ordered.  We were on the

22   docket to compete against two other teams and they both

23   scratched the night prior.

24   Q.   Who were the other teams?

25   A.   I don't know.  They didn't list them on a web site.

```
1     I don't know who the other teams were to be there.
2     Q.   And do you know if those schools were varsity
3     collegiate competitive cheer teams?
4     A.   No, they were not.  They were sideline cheer teams
5     that compete.
6     Q.   The Sacred Heart Pioneer Cheer and Dance Challenge,
7     what organization sponsored that event?
8     A.   Sacred Heart University Cheerleading.
9     Q.   Did they use the NCSTA scoring system?
10    A.   No, they did not.  But they were supposed to and
11    this wanted to compete against us last year at Quinnapiac
12    on January 30th.
13    Q.   My question was on January 16th, Did they use the
14    NCSTA format?
15    A.   Oh, I'm sorry, no.  I misunderstood.
16    Q.   So your answer was --
17    A.   No, they did not use the NCSTA.
18    Q.   Drawing your attention to the next competition,
19    February 5th, 2010, was that an all-girl, collegiate
20    competitive cheer held at Kennesaw State University,
21    Kennesaw, Georgia?
22    A.   Yes, it was.
23    Q.   How did you get Kennesaw, Georgia?
24    A.   We flew.
25    Q.   How many people did you fly?
```

1    A.   We flew 34 people.

2    Q.   34?

3    A.   Mm-hm.

4    Q.   That sounds expensive.  How much did that cost?

5    A.   I think about $18,000 for our hotel and airfare.

6    Q.   $18,000 for a single competition in Georgia?

7    A.   No, it was a three-day competition.  We were -- we

8    competed on Friday, on Saturday and on Sunday.

9    Q.   Okay, so that was $18,000 for one trip for 34

10   people?

11   A.   Yes, it was.

12   Q.   Now, who did you compete against at the Kennesaw

13   State University competition?

14   A.   The University of Maryland, the University of Oregon

15   and Georgia.

16   Q.   As I understand it, University of Maryland,

17   University of Oregon are members of the NCSTA?

18   A.   Yes, they are.

19   Q.   Were they members of the NCSTA in February of 2010?

20   A.   In February of 2010?  Yes.

21   Q.   And what about Georgia?

22   A.   Georgia's coach had been on some conference calls in

23   the late summer as he had heard of the governing body

24   being formed for us for competitive cheer and he was

25   hoping to have his administrators pick up the sport and

1    they had expressed interest.  So we did come on a few

2    conference calls.  But then later on -- and he -- the

3    reason he's on the schedule is because he had professed

4    an interest in competing in the NCSTA format and with our

5    teams.

6    Q.   And do you know if Maryland, Oregon or Georgia

7    considered their competitive cheer squads varsity teams?

8    A.   Georgia considers them an all-girl compete club team

9    and Maryland and Oregon consider themselves varsity

10   program.

11   Q.   What is an all-girl compete team?

12   A.   That's all they do is compete.  That's what all

13   stars is.  There's over 300 -- 300,000 kids in the United

14   States doing competitive cheer.

15   Q.   And was the all-girl collegiate competitive cheer at

16   Kennesaw State, was that held under NCSTA scoring?

17   A.   Yes, it was.

18   Q.   Drawing your attention to Cheer Sport Nationals,

19   February 6th, in Atlanta, Georgia --

20   A.   Okay.

21   Q.   What is Cheer Sport?

22   A.   Cheer Sport is, again, a competition company that I

23   believe they said that over 856 teams competed with over

24   750 of them being compete only teams that has varied

25   divisions.  One includes special needs teams.  One

```
 1    includes -- the majority are all star compete kids.  And
 2    they do hold a collegiate division.
 3    Q.   These are -- these events are basically one day
 4    apart; right?
 5    A.   Yes.
 6    Q.   The Ken saw and the Cheer Sport?
 7    A.   Yes.
 8    Q.   Did you score -- did you get a score at the all-girl
 9    collegiate competitive cheer competition?
10    A.   You mean, Cheer Sport?  Do you mean --
11    Q.   You competed on February 5th --
12    A.   I know but you are calling it the all-girl
13    competitive -- are you talking about Kennesaw, the day
14    prior?
15    Q.   Correct.
16    A.   The Kennesaw -- the NCSTA meet format, did they have
17    a score?
18    Q.   Yes.
19    A.   Yes.
20    Q.   Did that -- you competed against some of the same
21    schools the next day on February 6th; correct?
22    A.   We did.
23    Q.   And that would include Maryland and Oregon; correct?
24    A.   Correct.
25    Q.   Was there a ranking on the February 6th competition?
```

1   When you came in?

2   A.   The February -- that would be the Cheer Sport

3   competition, which the cessation of that was February

4   7th.

5   Q.   Yes.

6   A.   Yes, I believe we came in sixth.

7   Q.   My question to you was was your position, did you

8   advance -- were you seeded in any way as a result of how

9   you sport on February 5th when you competed on February

10   6th?

11   A.   They are two separate companies.  I mean -- they are

12   two different formats.

13   Q.   Okay.  So can I take it that the Cheer Sport

14   Nationals was not held under NCSTA scoring policies?

15   A.   No, different scoring policy.

16   Q.   And so irregardless of how you did at Kennesaw

17   State, you didn't actually advance vis-a-vis the other

18   schools when you competed the next day?

19   A.   No, they are two separate competitive -- they were

20   two separate competitions.

21   Q.   I think I understand.

22       Now then you proceeded to compete on February 7th;

23   correct?

24   A.   That was the second day part of the cheer

25   sport event.

1    Q.   And the schools that competed that the event, how

2    many of them were non-NCSTA schools?

3    A.   Oregon, Maryland, Fairmont, Quinnipiac were the

4    NCSTA schools at the Cheer Sport.  And then the majority

5    of the rest were all-girl competitive only club teams.  I

6    think there were only two sideline cheer leagued teams

7    that compete competitive skills.

8    Q.   And the sideline cheer teams, Did they compete

9    against you at either of these events?

10   A.   The sideline cheer teams competed the same skills

11   that we competed against us, yes.

12   Q.   Now then, your next competition, February 13th, at

13   Nonnewag High School, what competitive format was used

14   for that?

15   A.   It was a -- it was based on two and a half minute

16   routine.  I can't tell you whether they used an NCA score

17   sheet or -- probably An NCA score sheet.

18   Q.   And NCA stands for what?

19   A.   National Cheerleader Association.

20   Q.   And that is different from the NCSTA organization;

21   correct?

22   A.   Yes, it is.

23   Q.   Were there any varsity competitive cheer teams,

24   other than Quinnipiac, that competed on February the

25   13th?

1    A.   No, there were not.

2    Q.   Yours was the only one?

3    A.   Ours was the only one.

4    Q.   What kinds of teams were the other organizations

5    that you competed against?

6    A.   Well, Central Connecticut State University is a

7    sideline team that competes -- we met up against them

8    several times this year, so they compete quite often.

9    Eastern Connecticut State University is a sideline

10   cheerleading team that competes quite often.  Western

11   Connecticut State University, I think we saw them almost

12   everywhere we competed this year in a lot of places; and

13   Westfield State is a CO-ED competitive only team under

14   varsity status at Westfield state.

15   Q.   By co-Ed you mean boys and girls were on their team?

16   A.   Men and women, yes.

17   Q.   WCSU, Western Connecticut State University, you said

18   you saw them everywhere, but do you know what kind of

19   organization they are?

20   A.   WCSU?

21   Q.   Yeah.

22   A.   They are a sideline cheerleading team that competes

23   quite often.

24   Q.   Fair enough.  Drawing your attention to the next

25   event, February the 28th, was that a Quinnipiac all star

```
 1     competitive cheer challenge?

 2     A.    Okay.

 3     Q.    Was that hosted by Quinnipiac University?

 4     A.    Yes, it was.

 5     Q.    And was this a competition?

 6     A.    It was a two-day competition.

 7     Q.    And what are the schools that competed that the

 8     competition?

 9     A.    On Saturday I ran an reason event down at Burt Kahn

10     gymnasium with high schools.  We partner with Make-a-wish

11     for part of our positive play and I think we had 60 high

12     schools competing on day one, on Saturday.  Connecticut

13     high schools are allowed to compete six times during

14     their season.  They can pick four events -- they can pick

15     four schools they to have do their league and then their

16     state championships.  So all the high schools in

17     Connecticut are allowed to compete at least six times.

18     So we host a tournament and we had tremendous response to

19     that tournament every single year.  And on Sunday, we

20     hosted a all star event with a collegiate division.  So

21     the second day was a collegiate division and all star --

22     which are compete-only teams.

23     Q.    And what were the all star teams that competed at

24     that event on February the 28th?

25     A.    What were they?
```

1    Q.   Yeah.  What were their names.  Where did they come

2    from?

3    A.   That day we had Connecticut Spirit All Stars, we had

4    Extreme All Stars, we had Northeast Tropics, we had

5    Liberty, we had Cheer Extreme, we had USA Wild Cats, we

6    had -- they were from a lot of places.  I don't remember

7    all the programs that were there.  Quite a bit.

8    Q.   Were there any -- other than Quinnipiac University,

9    were there any collegiate varsity competitive cheer teams

10   that the event?

11   A.   Yes, we had a collegiate division, but we divide it

12   had two ways.  We did compete in meet format in our home

13   court against the University of Maryland; and the other

14   collegiate teams, I believe Babson competed against UConn

15   in the two and a half minute routine.

16   Q.   And how long was the routine that you competed in

17   against University of Maryland?

18   A.   Well, it's the new meet format, so it's a little bit

19   different.  It's got the two and a half minute routine

20   that everybody loves and then we have chosen to bring new

21   elements into that meet format that take all the skills

22   that are involved in the two and a half minute routine

23   and allow -- the ran we have chosen to do this is to give

24   statistics for post season honors to our athletes in the

25   future; and because when you're watching a two and a half

1    minute routine, it's an amazing thing to see, the

2    athleticism, but when you break down the skill sets and

3    you look at the athletes and what they do best as in a

4    basket toss around, you can really see the strength and

5    reflexes of each and every player.  So it's just really

6    different.  We have a compulsory round where you are

7    looking at apples to apples.  Maryland has to execute a

8    pyramid and we execute the same one.  And the fans get it

9    because there's realtime scoring.  Okay, so we have

10   different events with different heats; and it's more than

11   just two and a half minutes, although the two and a half

12   minute part is amazing and fun, but the skill set in the

13   two and a half minutes are all broken down so that we can

14   add a little bit more to the athletes and their team

15   position; and to the fan experience.

16   Q.   February the 28th, was that held under NCSTA scoring

17   rules?

18   A.   Yes, it was.

19                THE COURT:  Mr. Hernandez, why don't we break

20   here.

21                MR. ORLEANS:  Okay.

22                THE COURT:  For the day.  I want to spend a

23   moment discussing with counsel kind of where we are.

24                MS. FRIEDFEL:  Can the witness be excused?

25                THE COURT:  The witness can be excused.

```
 1              MR. ORLEANS:  I would expect tomorrow morning
 2    we will finish with Coach Powers and then the defendant
 3    will examine Coach Powers and we've been told that that
 4    may take some time.
 5              MS. FRIEDFEL:  It may take less.  I didn't
 6    know they would go through this in as much detail.
 7              MR. ORLEANS:  It will be our intention to
 8    call Dr. Amanies, our last expert.  I don't actually
 9    think she'll be terribly lengthy.  I don't know about the
10    cross.  But -- and after Dr. Amanies our final witness
11    will be Coach Sparks.  And at that point, the plaintiffs
12    will be done.  It's my understanding that the defendant
13    intends to call, after Coach Sparks -- after they have
14    cross-examined Coach Sparks, intends to call Tracey Flynn
15    the compliance officer and Coach Seeley.  I'm confident
16    that we'll be finished by the end of the day on Thursday,
17    actually, the way things are going.
18              THE COURT:  Okay.  I can't remember if I
19    warned everybody about a break at three o'clock on
20    Wednesday.
21              MR. ORLEANS:  No.  You did not.
22              THE COURT:  Okay.
23              MR. ORLEANS:  How long will that break be?
24              Are we finishing early on Wednesday or does
25    that mean a break and come back on Wednesday, your Honor?
```

```
1                    THE COURT:  Ordinarily, I would say done for
2         the day.  If we need to come back, I can probably be back
3         by 4:30 or 4:35.  I apologize, it's a continuing
4         obligation I have every Wednesday; and I meant to mention
5         that to counsel and I apologize if I hadn't.
6                    MR. BRILL:  If we finish with Coach Powers,
7         Coach Sparks should not be a very lengthy witness, I
8         don't think.
9                    MR. ORLEANS:  I don't anticipate.
10                    MR. BRILL:  And Dr. Amanies, in view of this
11         morning's ruling, will certainly be less than two hours
12         if you -- possibly considerably less.  There's no reason
13         why we shouldn't finish all three witnesses tomorrow and
14         assuming Thursday is a full day, then there should be no
15         problem finishing testimony on Thursday.
16                    THE COURT:  Good.
17                    MR. BRILL:  The question we talked about is
18         closing argument.  I don't know.  My suggestion at that
19         point, if we can finish the evidence on Thursday, then
20         let's come in from 9 to 11 on Friday and you'll each have
21         an hour.
22                    MR. ORLEANS:  That will be more than enough
23         time for me, your Honor.  I don't anticipate taking an
24         hour.
25                    THE COURT:  I would be surprised if either of
```

1     you did, but I would have up to an hour.

2                 MR. BRILL:  Any time he doesn't use, I'll be

3     happy to.

4                 THE COURT:  So that sounds like it's going to

5     work.

6                 MR. ORLEANS:  I think we'll be okay.

7                 THE COURT:  Okay.  I'm going to take a very

8     brief recess and take up the Made Stone matter when --

9     thank you.

10                      (CONCLUDED AT 5:21 P.M.)

11                  C E R T I F I C A T I O N

12            I hereby certify that the above and foregoing

13    is a true and correct of the transcript of the

14    stenographic notes of the proceedings, at the trial in

15    the above-entitled cause, heard before THE HONORABLE

16    STEFAN R. UNDERHILL, U.S.D.J., held at Bridgeport,

17    Connecticut, on the 22nd day of June, 2010.

18            Dated this 23rd day of June, 2010.

19

20    _____

21    VIKTORIA V. STOCKMAL
      CRR, RMR
22

23

24

25