```
                 UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

STEPHANIE BIEDIGER, ET AL       :  No. 3:09cv-621 (SRU)
                                :  915 Lafayette Boulevard
            vs.                 :  Bridgeport, Connecticut
                                :
                                :  June 23, 2010
QUINNIPIAC UNIVERSITY           :

- - - - - - - - - - - - - - - - x


                       BENCH TRIAL


B E F O R E:

      THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

      FOR THE PLAINTIFFS:

            PULLMAN & COMLEY
                  850 Main Street
                  P.O. Box 7006
                  Bridgeport, Connecticut 06601-7006
              BY:  JONATHAN B. ORLEANS, ESQ.
                  ALEX V. HERNANDEZ, ESQ.

            KRISTEN GALLES, ESQ.
                  Equity Legal
                  10 Rosecrest Avenue
                  Alexandria, Virginia  22301

      FOR THE DEFENDANT:

            WIGGIN AND DANA, LLP
                  400 Atlantic Street
                  P. O. Box 110325
                  Stamford, Connecticut  06911-0325
              BY:  MARY A. GAMBARDELLA, ESQ.


                                  (CONTINUED)
```

```
            PROSKAUER ROSE
                  1585 Broadway
                  New York, N. Y.  10016
            BY:   EDWARD A. BRILL, ESQ.
                  SUSAN D. FRIEDFEL, ESQ.
                  REBECCA BERKEBILE, ESQ.




                    Susan E. Catucci, RMR
                    Official Court Reporter
                    915 Lafayette Boulevard
                  Bridgeport, Connecticut  06604
                      Tel: (917)703-0761
```

I N D E X

WITNESSES:

MARY ANN POWERS

Continued Direct Examination by Mr. Hernandez......599
Redirect Examination.............................662
Cross Examination by Ms. Friedfel.................615
Recross Examination..............................675

ROBIN L. SPARKS

Direct Examination by Mr. Orleans.................682
Redirect Examination.............................722
Cross Examination by Mr. Brill...................710

-0-

```
1                    (9:10 O'CLOCK, A. M.)

2              THE COURT:  Good morning, everyone.  I apologize

3      for the delay.

4              MR. HERNANDEZ:  Good morning, Your Honor.

5              THE COURT:  Ready to go?

6              MR. HERNANDEZ:  Yes, Your Honor.

7              THE COURT:  Ma'am, you're still under oath.

8      M A R Y    A N N      P O W E R S,    called as a

9      witness on behalf of the Plaintiff, having been previously

10     duly sworn by the Court, testified as follows:

11     CONTINUED DIRECT EXAMINATION

12     BY MR. HERNANDEZ:

13     Q.   Coach Powers, the NCAA recruiting test that you

14     recently passed, that allows you or permits you to begin

15     recruiting off campus end of August, is that correct?

16     A.   I believe for juniors, on July 1st and in August,

17     yes.

18     Q.   So, in other words, it doesn't become effective it

19     doesn't kick in until July 1st as far as you know?

20     A.   Well, for the time you have made contact off campus.

21     Q.   I'm sorry?

22     A.   For the time that you have made contact off campus.

23     Q.   And, Coach, we talked about a number of competitions

24     that you did this competitive year just past, 2009, 2010.

25     I'd like to ask you about the availability of trainers on
```

1    those trips.  Did the university provide you with any

2    trainers to accompany the team?

3    A.    Our final trip, yes, they came with us.

4    Q.    Okay, so only on one trip?

5    A.    On one trip, yes.

6    Q.    Is that the Daytona trip?

7    A.    Yes, it is.

8    Q.    Okay.  We'll talk about that in a second.  Now, what

9    about during your practices, do you have trainers

10   available to you then?

11   A.    Yes, I do.

12   Q.    All right.  And are they physically present during

13   the practices?

14   A.    They are in and out.  We practice on court four in

15   our rec center which abutts the trainers' door.  So when

16   they bring in the water station, they have a

17   walkie-talkie.  But they are a step away so they come in

18   and out of practice, yes.

19   Q.    So physically they are close by during your

20   practices?

21   A.    Extremely close by.

22   Q.    Got you.  I think you sort of mentioned in passing

23   that your team competed under various different scoring

24   systems, including NCSTA scoring systems?

25   A.    Correct.

1    Q.   All right.  The nonNCSTA, nonNCSTA competitions, how

2    long are the routines that they compete in?

3    A.   They are anywhere from, depending on the company, two

4    minutes and 15 seconds and two minutes and 30 seconds.

5    Q.   Okay.  And the NCSTA competitions; how long were

6    those routines?

7    A.   If we were to go on a head on competition, for

8    instance, us against the University of Maryland, it would

9    probably be about a -- with a half time, about two hours.

10   Q.   Okay, and is that split evenly one hour for each

11   team?

12   A.   No.  There's a fence with heat, and so event number

13   one would be the compulsory round and then there would be

14   the partner stunt round and then I think it's the

15   compulsory basket and basket toss and there's a half time,

16   and we follow the other rounds, to conclude with the team

17   routine.

18   Q.   The team routine, is that two and-a-half or --

19   A.   Two minutes 30 seconds, correct.

20   Q.   That's the two minutes 30 second routines.  Is that

21   similar to the two minute 15 seconds to two minutes 30

22   second routines that are done in the nonNCSTA programs?

23   A.   They're significant.  The skill sets, skills being

24   evaluated are the same skill sets, however, we have

25   removed some of those subjective scores from the score

1    sheet.

2    Q.   All right.  I think you mentioned in passing that

3    that two and-a-half minute routine under NCSTA scoring is

4    a very popular part of the competition, is that correct?

5    A.   I think it's, I think it's an exciting part of the

6    competition.  It's when you see the whole, you know 24

7    members out there and there's a lot going on.

8    Q.   Okay, and that's the most entertaining part, you

9    think, of the competition?

10   A.   Actually I think it's, I don't know if I'd use the

11   word entertaining.  I think people enjoy watching it but I

12   don't know that anymore.  Once we've shown the components

13   being broken down by the different skill sets in each

14   sheet the appreciation of the positions of each athlete

15   has certainly changed, at least what fan bases have told

16   me, the way that they've looked at the sport.

17   Q.   Okay.  I just want to finish running through your

18   schedule from this year past.

19   A.   Okay.

20   Q.   And get an idea from you as to what these were like.

21   Was there a competition on March 6th known as the All New

22   England Open?

23   A.   Yes.

24   Q.   That was held in East Haven, Connecticut?

25   A.   East haven.

```
1    Q.   Where in East Haven?

2    A.   East Haven high school.

3    Q.   Did high school teams compete in that event?

4    A.   Yes, they did.

5    Q.   How many high school teams competed?

6    A.   I can only guess.  I wouldn't have an approximation

7    for you.

8    Q.   Fair enough.  And at this event were there any

9    All-Star teams competing?

10   A.   Not at this competition, no.

11   Q.   All right.  How many other colleges or university

12   teams competed?

13   A.   I think there were five or six in total.

14   Q.   Do you recall the names of those schools?

15   A.   I think Eastern Connecticut State University,

16   Western, I want to say Curry, another team from I think

17   the upper northeast.  I really don't recall.

18   Q.   Okay.  And of the other --

19   A.   And Central connecticut State University.

20   Q.   Central Connecticut.  And of the other college teams

21   that competed, how many of those were varsity teams?

22   A.   Just Quinnipiac University.

23   Q.   Just Quinnipiac?

24   A.   Yes.

25   Q.   Okay.  What status, what status, for lack of a better
```

1    word, did the other collegiate teams have?

2    A.    Sideline cheerleading teams that competed.

3    Q.    Were there any club teams that competed?

4    A.    Not at that competition, no.

5    Q.    Okay.  All right.  And what scoring format was used

6    at this All New England Open?

7    A.    The one, I believe, that models the NCA score sheet.

8    Q.    And again NCA is the National Cheerleading

9    Association?

10   A.    Yes, I think there's a big difference in there

11   because they don't have a crowd response on that score, so

12   there's no crowd.  Actually NCA and UCA score sheets are

13   the only ones that have a crowd response on it.  All the

14   others do not have crowd response scores.

15   Q.    Okay.

16   A.    It's Varsity Brands that holds the crowd responses to

17   that score sheet.

18   Q.    Now, was there an event on March 20th, the USA

19   Wildcat and dance challenge?

20   A.    Yes.

21   Q.    That was held at the New England Field House?

22   A.    Yes.

23   Q.    Is that -- where is the New England Field House?

24   A.    It's down, it's by Southern Connecticut State

25   University up Crescent Street.

1    Q.   And what kinds of teams competed at this March 20th

2    event?

3    A.   There was a small high school division but mainly

4    competitive All-Star programs.

5    Q.   Okay.  And again, competitive All-Star, those are

6    teams that come from private gyms, is that correct?

7    A.   Yes, there's no sideline cheer, they solely compete.

8    Q.   Okay.  And were there any college varsity competitive

9    cheer teams at this event?

10   A.   There was UConn's club program there.

11   Q.   Okay.  But that was a club program, not varsity?

12   A.   No.

13   Q.   So, I take it that Quinnipiac University was the only

14   varsity level collegiate team?

15   A.   Yes.

16   Q.   What scoring format was used at the USA Wildcat Dance

17   challenge?

18   A.   A scoring format that assessed skills only and had no

19   sideline elements on that score sheet.

20   Q.   Okay.  And the next event, Saturday, March 27, the

21   NECA championship, what does the NECA stand for?

22   A.   NECA, I believe it's New England Cheerleaders

23   Association.

24   Q.   What scoring system was used at the March 27th event?

25   A.   Again, one that only assesses skills, no sideline

1    components.

2    Q.   All right.  Was that held under the NCSTA scoring

3    system?

4    A.   No.

5    Q.   And do you recall which schools competed at the New

6    Hampshire event?

7    A.   The University of New Hampshire, again I think Curry,

8    and I think there was one more but I'm not sure.  UMass.

9    Dartmouth was supposed to but they scratched the night

10   prior.

11   Q.   So we're talking about four college teams?

12   A.   Yes.

13   Q.   And these are two and-a-half minute routines?

14   A.   Yes.  A lot of these competition companies do hold a

15   partner stunt round and, much like what is in our format

16   however, so they award scores to just a team in a singular

17   skill set so they do offer that as part of their

18   competition.

19   Q.   But otherwise we're talking two and-a-half minute

20   competition routines?

21   A.   Correct.

22   Q.   And what what sort of category were the other schools

23   in that competed?

24   A.   University of New Hampshire is a sideline cheer team

25   that competes.

1    Q.   Okay.

2    A.   Same with Curry and, as I said, I think I had four

3    teams, UMass -- Dartmouth would be because they are

4    varsity status at the school if they had been there.

5    Q.   But they scratched for this event?

6    A.   Yes, they did.

7    Q.   Then I think the next event is the NCA College

8    Nationals, it goes to the next page?

9    A.   Yes.

10   Q.   What is, again NCA is National Cheerleaders

11   Association?

12   A.   Correct.

13   Q.   And looks like there were two events, is that

14   correct?

15   A.   It's a 12 day event you have to qualify for finals.

16   Q.   Okay, and this is the Daytona Beach event that you

17   were referring to?

18   A.   Yes, it is.

19   Q.   All right.  How many people from Quinnipiac

20   University travel to Daytona for this event?

21   A.   Thirty-four.

22   Q.   Thirty-four?

23   A.   Yes.

24   Q.   How many days did you stay?

25   A.   Part of the package is for a, I want to say four

1    night, three day stay.

2    Q.    Okay.  Do you know offhand how much it costs

3    Quinnipiac University to send the competitive cheer team

4    for this four night, three day event?

5    A.    I'm going to say upwards of 30,000.

6    Q.    30,000?

7    A.    Yes.

8    Q.    All right.  Now, how much was your annual budget?

9    A.    I think it was established that a starting point was

10   50,000 but because we were a new sport they were going to

11   look to make sure that all of our needs were met as long

12   as I went to administration with what those needs would

13   be.

14   Q.    So Quinnipiac university is putting some financial

15   resources behind your team?

16   A.    My thought process is they put it behind every team.

17   Q.    Did the 30,000 come out of the 50,000?

18   A.    No, it came out of the tournament budget.

19   Q.    I'm sorry?

20   A.    The tournament budget.

21   Q.    Tournament budget.  Is that a separate budget from

22   the cheer budget?

23   A.    Yes, it is.

24   Q.    The first round -- well, let me just back up a bit.

25         What scoring system was used at the Daytona event?

1    A.   The scoring system that Varsity Brands employs where

2    they have a crowd response as part of its course is where

3    it's got an 110 percentage.  The score sheet comes to a

4    total of 110 points and ten points is for crowd response

5    and the other hundred points are for skill sets.

6    Q.   I see.  Just so we're clear, I know we heard from

7    Mr. Webb yesterday about Varsity Brands' theory and

8    philosophy of cheerleading.  Could you just explain for

9    the court what you mean by crowd response, a crowd

10   response element?

11   A.   You have to use poms and signs and props and

12   megaphones and actually try to engage the crowd to respond

13   back to you in a cheer.

14   Q.   Okay.  Did you say poms?

15   A.   Pompoms, shake your pompoms.

16   Q.   Okay.  Those are the paper things, different colors?

17   A.   Yes.

18   Q.   That shake around?  Now, did all of the Quinnipiac

19   university competitive cheer athletes have pompoms during

20   that event?

21   A.   Actually to participate in the event we don't use

22   pompoms because we're not in sideline cheer.  We had to

23   purchase a set of three.

24   Q.   Okay.  A set of three pompoms?

25   A.   Three sets of poms.

```
1    Q.   And how many are in a set?

2    A.   Well, there's two.  One --

3    Q.   Okay.  So there were three people with pompoms out,

4    during the routine?

5    A.   Yes.

6    Q.   Is there like a minimum number of athletes with

7    pompoms who have to be out on the floor?

8    A.   No, they just, they just award you more points for

9    the amount of programs you use to engage the crowd.

10   Q.   Okay.

11   A.   They sell pompoms and megaphones and so they put it

12   into the format, I think.

13   Q.   Just so I'm clear, if you had bought more sets of

14   pompoms would your score have been higher?

15   A.   It's the use of them and how you create that material

16   for the crowd.

17   Q.   Okay.  Now, you said that there were also signs.

18   What -- what do you mean by that?

19   A.   B-O-B-C-A-T-S, let's go Bobcats, you know, signs,

20   hold them up.

21   Q.   So we're talking big cardboard --

22   A.   Yes.

23   Q.   -- signs with letters on them, that sort of thing?

24   A.   Uh huh.  (Affirmative.)

25   Q.   All right.  And does Quinnipiac University have a set
```

1    of signs for its competitive cheer team?

2    A.   I've had signs left over from 12 years of having

3    signs.

4    Q.   And those signs would have been from your sideline

5    cheer days, is that correct?

6    A.   Actually I had purchased some new signs this year for

7    that event.

8    Q.   Got you.  Okay.  And you also said that part of the

9    competition also involves megaphones, is that correct?

10   A.   Well, you have the choice to use a megaphone.

11   Q.   Okay, but you're not required to use a megaphone?

12   A.   Well, if you want to make the score, you're

13   encouraged by Varsity Brands to use as many props as you

14   can to get the score in that category.

15   Q.   Okay.  And did your competitive cheer team do any

16   exhibition events in this past year?

17   A.   We did December 3rd, we exhibitioned.  It was an

18   inaugural event welcoming us to varsity status.  And we

19   exhibitioned on January 14th for the Walter Camp

20   Foundation for positive play.

21   Q.   What is the Walter Camp foundation?

22   A.   I believe athletes are brought into downtown New

23   Haven to work with the community.  They are receiving post

24   season honors in football at that point.  And they are

25   here for a few days to receive their post season honors

1    and they do positive play actually within the community.

2    Q.    Okay.  Now, when you say football players, are these

3    football players from the region --

4    A.    No, collegiate football players.

5    Q.    Excuse me?

6    A.    Collegiate football players from all, from all over

7    the country.

8    Q.    Collegiate football players from around the country.

9    A.    Yes.

10   Q.    And what is the Walter Camp Foundation dedicated to?

11   A.    You know, I'm not quite sure.

12   Q.    Where, where did you do this exhibition?

13   A.    At the New Haven Field House.

14   Q.    All right.  What time of day was that?

15   A.    I think we went out at around 11:00 o'clock in the

16   morning, I think.

17   Q.    Eleven a. m.?

18   A.    Yes.

19   Q.    What were some of the other events or entertainment

20   for the Walter Camp Foundation?

21   A.    Well, a lot of coaches and former athletes talk to

22   the inner city school kids about the importance of staying

23   in school and their experiences as collegiate athlete and,

24   you know, it was really to encourage those elements of

25   those kids that athletics could make a difference in their

1    lives.

2    Q.   Now, the college football players at this event, were

3    they from Connecticut, from the region, or --

4    A.   I think they were from across the nation.

5    Q.   All across the country?

6    A.   I do believe so, yes.

7    Q.   So basically in the Walter Camp Foundation you had

8    college football players from across the country come into

9    New Haven and your competitive cheer team put on an

10   exhibition at this event?

11   A.   Yeah, our cheer team put on an exhibition.  I know

12   they felt strongly that for all the females coming from

13   the grammar school, it would encourage them to stay

14   involved in athletics because they could someday be a part

15   of the sport.

16   Q.   Okay.  The competition, was that -- I'm sorry, I said

17   competition.  That exhibition, how long was the exhibition

18   that you put on?

19   A.   Probably about seven or eight minutes.

20   Q.   Okay.  Was that similar to the crowd response routine

21   that you did?

22   A.   No, we did no crowd response for that.  We wanted to

23   exhibit the skill set and strength needed in our sport for

24   young ladies and their guidance.

25   Q.   One of the events that you sponsored, did that

1    involve a dance off among the coaches?

2    A.    Yes.

3    Q.    Which event is that?

4    A.    That was the February 26 and -7 event.

5    Q.    Was that the one that was hosted by Quinnipiac?

6    A.    Yes.

7    Q.    Okay.  And what was the dance off, what was involved

8    there?

9    A.    The dance off was for Make a Wish.  I had conceived a

10   concept on the part of positive play for any athletes to

11   engage the coaches to have a dance off with our mascot.

12   We received a dollar a vote.  Each coach -- each team

13   could nominate their coach and pay a dollar a vote to have

14   their coach come down and dance with Boomer and all the

15   proceeds went to Make a Wish Foundation.

16   Q.    And who is Boomer?

17   A.    Boomer is our mascot.

18   Q.    Boomer the Bobcat?

19   A.    Boomer the Bobcat.

20   Q.    That's a guy basically in a big Bobcat uniform?

21   A.    Yes.

22   Q.    One of these big sports hats?

23   A.    Yes.

24   Q.    And the -- which, which coach won?

25   A.    I believe in the high school division -- gosh, the

1    coach from Branford.  They had brought in a significant

2    amount of -- I think they brought over 2,000-dollars for

3    the coach, the kids collected over 2,000-dollars across

4    the Branford community to have that coach win that for

5    Make a Wish.

6         And I couldn't tell you at the All-Star event who

7    won.  I believe his name was Ryan Spevich (ph)?

8    Q.   And I've just got to know:  Who won, the coach or

9    Boomer the Bobcat?

10   A.   I think the coach won in one and Boomer won in the

11   other.

12   Q.   Go Boomer.

13   A.   Yes.

14   Q.   Thank you, Coach.

15   A.   You're welcome.

16            THE COURT:  Redirect?  Or cross, whatever you're

17   doing.

18   CROSS EXAMINATION

19   BY MS. FRIEDFEL:

20   Q.   Good morning, Coach Powers?

21   A.   Good morning, Susan.

22   Q.   Now, you testified yesterday you're the head coach of

23   the varsity competitive cheer team, right?

24   A.   Correct.

25   Q.   To whom do you report?

1    A.   I report to Jack McDonald and Bill Mecca.

2    Q.   And Jack McDonald is the athletic director?

3    A.   He is the athletic director, correct.

4    Q.   And Bill Meccas is?

5    A.   He is the associate athletic director.

6    Q.   And you're coaching position is a full-time position,

7    is that correct?

8    A.   Yes.

9    Q.   I'm going to ask you a couple questions about how

10   your team worked this year.  How many athletes did you

11   have on the team?

12   A.   Thirty.

13   Q.   Thirty, okay.  I'm going to direct you to Exhibit E M

14   in the binder.  It's in the third defendant binder.

15   A.   (Pause)

16   Q.   E as in Ellen, M as in Marianne.

17           MR. ORLEANS:  Just want you to move the

18   microphone over a bit so we can hear you better.

19   A.   E M?

20   Q.   Yes, E M.  And if you turn to the page that's marked

21   at the bottom corner, D 15100 to 15102?

22   A.   I can't possibly find my place here.  Okay.

23   Q.   What is that document?

24   A.   This document is the amount of scholarships that are

25   award to my team.

1    Q.    Okay.  This is your squad list?

2    A.    It's my squad list as well, yes.

3    Q.    What was your first date of competition this year?

4    A.    This year was December 5th.

5    Q.    And how many athletes were on your roster the first

6    date of competition?

7    A.    Thirty.

8    Q.    Thirty.  And were Katrina Lennon and Nicole Manzo on

9    the roster on the first date of competition?

10   A.    No.

11   Q.    Was Alissa Pacheco on your roster the first date of

12   competition?

13   A.    Yes

14   Q.    And were there any changes to your roster between the

15   first date of competition and the end of the year?

16   A.    No.

17   Q.    I'm also going to show you Plaintiff's Exhibit 42.

18   This is going to be in a different binder.

19   A.    Okay.

20   Q.    What's that document?

21   A.    This is the roster I believe that appears on the

22   website.

23   Q.    Now, I just want to point out, if you look at the

24   squad list, you'll see that indicates that Caitlyn

25   Armstrong is listed as enrolling in the fall of 2009.  But

1  if you look at this document here, Exhibit 42, it lists

2  her as a junior.  Could you just tell the court which one

3  is the right --

4  A.   Caitlyn will be a senior this year so she was a

5  junior last year.

6  Q.   All right.  And the same question about Marina

7  Polcara and Kimberly Severino?

8  A.   Okay.

9  Q.   It lists them as enrolled in 2009 on the squad list

10 but here it lists them as sophomores; which one is

11 correct?

12 A.   Kim Severino and Marina Polcara are sophomores this

13 year.

14 Q.   I just want to make it clear because there was an

15 inconsistency, looks like.  So it appears -- is there a

16 mistake on the squad list?

17 A.   Yes.

18 Q.   Where it says --

19 A.   Yes, clerical error.

20 Q.   Now, did the athletes on your team play particular

21 positions?

22 A.   Every athlete has their own position, yes.

23 Q.   What are those positions?

24 A.   Main base, a support base, a back spot and a flyer.

25 Q.   And what do those different positions do?

1    A.   The flyer is the girl you would typically see in

2    pyramid and in the partner stunts up in the air.  The back

3    spot is the back of the stunt.  I tell the kids in that

4    position they are the steering wheel of the stunt.  They

5    have to be extremely tall for that position and extremely

6    strong.  And the main and the support base.

7        When we put them together we have to use a height

8    inclusionary method so that when they are in an extended

9    stunt they are able to hold it when they meet together to

10   unify that flyer up the air, so we base that on their

11   height and on their strength.

12   Q.   And on Plaintiff's Exhibit 42, that indicates their

13   different positions?

14   A.   Yes.

15   Q.   Is that right?

16   A.   It does.

17   Q.   You've had lot of questions about your recruiting

18   tests and I want to talk a little bit about recruiting

19   during the 2008, 2009 year; that would be last year before

20   the team became varsity.  Did you have prospective

21   students contact you regarding their interest in

22   participating in cheer?

23   A.   Every year I had over 100 asking me about the

24   competitive aspect of the program, yes.

25   Q.   And how did you respond to those inquiries?

1    A.    I would ask them to send me a videotape of their

2    skill sets.  I would talk to their coaches.  When they

3    came for visits on campus they would meet with me.  I had

4    developed a bio sheet that I would send out to them.

5    Q.    And did you identify which of those 100 kids who

6    contacted you were those with the greatest skills through

7    what you're discussing?

8    A.    Yes, most certainly.

9    Q.    And did you make any efforts to get those kids with

10   the best skills to come to Quinnipiac?

11   A.    Yes.

12   Q.    What did you do?

13   A.    I told them that first of all academics are primary

14   and it was a wonderful school to be at and that they could

15   have the best of both worlds; they could be competing in

16   something they loved and going to a great institution

17   academically.

18   Q.    And you testified yesterday that several members of

19   the competitive cheer team for 2009, '10 had been members

20   of the '08-'09 sideline cheer that competed, correct?

21   A.    Yes.

22   Q.    How many of those?

23   A.    I would say 15 or 16.

24   Q.    And how did you decide which members of the sideline

25   team were going to be members of the competitive cheer

1    team in '09, '10?

2    A.    Even on the onset of being on the support, I mean

3    being on the traditional cheerleading sideline team, their

4    goal had always been to come later to Quinnipiac to

5    compete.  We had gone down to NCA nationals for five years

6    and had been a powerhouse, in the top five and six every

7    single year, and the word had spread about this program.

8    You know, that had, you know, I have a lot of kids that

9    are P T and O T and we have the major that they want but

10   also a sport that they want.  So it wasn't, it was --

11   Q.    So I guess my question is, you had a squad of I

12   think -- I don't know, how many was on the sideline squad

13   in '08-'09 approximately?

14   A.    How many?  I think we started about 28.

15   Q.    Okay, and then -- so but did you make a decision as

16   to how many of those kids were going to be able to be on

17   your competitive squad in '09, '10?

18   A.    The coaches sat down and formulated a grid on their

19   skill sets, weaknesses they had about recruiting in the

20   foreseeable future.  So, yes, we based it on their skill

21   sets, cheerleader skill sets.

22   Q.    And did Quinnipiac have a sideline cheerleading squad

23   this year, 2010?

24   A.    Yes, it did.

25   Q.    Did you coach that squad?

1    A.   No, I did not.

2    Q.   Did you run the try outs for that squad?

3    A.   No, I did not.

4    Q.   Were any members of the '09-'10 varsity competitive

5    cheer squad on the sideline squad?

6    A.   No, they were not.

7    Q.   Did the '09-'10 varsity competitive cheer team do any

8    sideline cheerleading?

9    A.   Only at the Varsity Brands event where we had to

10   compete for a crowd response score.

11   Q.   Just that 45 seconds?

12   A.   Just that 45 seconds, yes.

13   Q.   And there was, there were no other teams there, you

14   weren't cheering for another team, right?  You were

15   clearing for a score, is that correct?

16   A.   Correct.

17   Q.   Now, were your athletes subject to certain

18   requirements based on their status as a varsity team?

19   A.   They were subject to both, they are subject to the

20   benefits, yes, so therefore the requirements as well for

21   being a student athlete.

22   Q.   Were they subject to the same requirements as all the

23   other varsity athletes at Quinnipiac?

24   A.   Yes, they were.

25   Q.   And what were those requirements?

1    A.   Compliance, following compliance rules, compliance --

2    we decided to that they would follow these same guidelines

3    for, you know, their schedule for the week.  How much they

4    could practice, post seasonal -- I mean pre-season

5    workouts, determine schedule by that.  They had to be drug

6    tested.  They had to have an academic, they had to

7    participate in power hours for academics as they come in

8    as freshmen or, if they fell below the mark, as upper

9    classmen.

10   Q.   And what are power hours?

11   A.   It's what our student athletes have to do.  We try to

12   keep them academically in good standing and like to see

13   them come in with a 3.0.  So you don't know how your

14   freshmen are going to fare with that, so they come in

15   knowing they have to dedicate six hours until the end of

16   the first semester when they prove they can get the 3.0

17   GPA.

18   Q.   So six hours of sort of mandatory study time?

19   A.   Mandatory study, yes.

20   Q.   And Mr. Hernandez questioned you a little bit about

21   your exhibition at the Walter Camp Foundation and you said

22   that was part of your positive play?

23   A.   Positive play, yes.

24   Q.   Are all the varsity teams required to participate in

25   some sort of varsity -- positive play?

1    A.    Yes, I believe Jack McDonald developed that.  We

2    believe that student athletes are privileged and they

3    should give back to the community.

4    Q.    So your positive play is your community service?

5    A.    It's our community service, yes.

6    Q.    And you also did your event -- at your event you did

7    the fundraiser for the Make a Wish Foundation, is that

8    right?

9    A.    Yes.

10   Q.    And Mr. Hernandez asked you some questions about your

11   dance off with Boomer the Bobcat?

12   A.    Uh huh.

13   Q.    At basketball games, does Boomer the Bobcat appear at

14   half time?

15   A.    Yes, he does.

16   Q.    Yeah?  Okay.  And with respect to your athletes were

17   they required to have any clearance from the sports

18   medicine staff?

19   A.    Yes, they were.

20   Q.    And that's the same as all other varsity athletes?

21   A.    As all the rest of the athletes, correct.

22   Q.    Now, with respect to your practice time, you said

23   that you were -- your team was subject to the same roles

24   rules as all the OPM teams with respect to how much time

25   you can practice.  And what are those rules?

1  A.   Well, during your pre-season, we're allowed only

2  eight hours, until we reach that mark where we're going to

3  declare the date of the onset of our season.  So in

4  pre-season, we, they are allowed to not train as a team.

5  I can work with them individually on skills and they have

6  to strengthen and condition.

7       We had talked about, because of our sport, that we

8  have to always think about safety employed.  We dedicated

9  our eight hour week to four hours dedicated to separate

10  skill instruction and two hours to strength on the floor

11  and -- four, I think we divide it four and four, strength

12  and conditioning and floor stunts.

13  Q.   And at some point did your limitation from the eight

14  hour practices change?

15  A.   I think it was in October 9th that we were allowed,

16  we entered the onset of our declared season and then we

17  were allowed up to a 20 hour week, but that's to include

18  competition -- date of competition is a three hour

19  immediate assessed to the 20 hour week.  Strength and

20  conditioning hours are formulated to that team meeting,

21  individual instruction and practice time.  They have to

22  have a dedicated day off which could be a travel day but

23  on that travel day you're not allowed to engage them in

24  any aspect of the sport at all, not even showing a video.

25  Q.   And you said that that change happens at the

1    beginning of your defined season?

2    A.    Yes.

3    Q.    Your championship season?

4    A.    Yes, it does.

5    Q.    And how long is your championship season?

6    A.    We had 132 days this year.

7    Q.    And that was counted back from where?

8    A.    I believe from the October 9th date.

9    Q.    So it went forward from October 9?

10   A.    We had considered the Daytona trip our post season.

11   You know, that was our final.  That was our final, so we

12   counted back up to that date.

13   Q.    And who made the designation as to what the defined

14   season was going to be?

15   A.    We wanted to see how Maryland could operate with

16   that.  They had already set a standard in place.  Oregon

17   had been working with their team for I think several

18   months before I had that opportunity.  And we established

19   it by having some phone conferences together.

20   Q.    So when you say "we," it wasn't a decision that just

21   Quinnipiac made, you made that?

22   A.    No, I made it in conjunction with Maryland, Oregon,

23   the administration at Baylor.  We had decided that the

24   formulation of the time of the season would be, you know,

25   it was going to be formulated with, the same as

1    basketball.

2    Q.   You modeled it after the basketball season?

3    A.   Yes, we did.

4    Q.   Now, were there any rulings that pertained to varsity

5    teams at Quinnipiac that the university did not require

6    the competitive cheer to comply with?

7    A.   No, we had to follow the rules of all the other

8    teams.

9    Q.   Now, did your athletes receive the benefits that

10   other varsity athletes at Quinnipiac received?

11   A.   Yes, they did.

12   Q.   And you're smiling?

13   A.   They just -- it was an incredible experience for them

14   this year.

15   Q.   And what are those benefits?

16   A.   Like trainers, strength and conditioning coach,

17   scholarships.  Dedicated set time for their practice.

18   Funny, they didn't see the power hours as anything but

19   good for them.  They really managed their time management,

20   anytime they had the opportunity to be involved in

21   positive play.

22        So all of those things collectively, and not have to

23   do double duty as sideline cheer and the ability to

24   compete, this was truly their love, they could focus on

25   that and have such a great positive experience on their

```
 1    own, in their sport.

 2    Q.    And did your athletes get uniforms?

 3    A.    Yes, they did.

 4    Q.    Were those uniforms numbered?

 5    A.    Yes, they were.

 6    Q.    And so each athlete got their own number and it was

 7    their number for the season?

 8    A.    Early in our conference calls with -- Oregon's coach

 9    had worked with Nike an developing a new uniform for the

10    sport and we felt it was very -- it was going to bring us

11    into NCAA status.  We wanted to give these kids post

12    season honors and All-American status, and by team

13    position we assessed their numbers so that we could

14    develop in various events we talked about the scoring

15    system, we were able to give those kids post season

16    honors.

17    Q.    Did they get practice gear?

18    A.    Yes, they did.

19    Q.    And did they get travel bags?

20    A.    Yes, they did.

21    Q.    And did they get their shoes provided?

22    A.    Yes, they did.

23    Q.    And those were all provided by the university?

24    A.    All provided, yes.

25    Q.    What is the Student Athlete Advisory Council?
```

```
 1    A.    SAAC, that's part of the NCAA.  It's where the
 2    student athletes have a voice in how rules and regulations
 3    possibly affect them in their membered institutions.
 4    Q.    Does Quinnipiac have a Student Advisory Council?
 5    A.    Yes.
 6    Q.    And who are the members of that?
 7    A.    Each team picks two members from their sport to be on
 8    SAAC.
 9    Q.    And did your athletes have representatives on SAAC?
10    A.    Yes, I picked two amazing young ladies for us.
11    Q.    And did the team get coverage from the Sports
12    Information Department?
13    A.    Yes, we did.
14    Q.    If you'll look at Exhibit F F in the defendant's
15    binder?
16    A.    Where are we?
17          THE COURT:  The next book, book three binder.
18          THE WITNESS:  Okay.
19          MR. HERNANDEZ:  No objection, Your Honor.
20    BY THE WITNESS:
21    A.    F?
22    Q.    F F?
23    A.    Okay.
24    Q.    What are these documents?
25    A.    These are releases.
```

1    Q.    And these --

2    A.    Releases to our website.

3    Q.    Okay.  This is, what, some, just some examples of

4    what sport information provided for your team, is that

5    right?

6    A.    For every, for every time we competed they wrote for

7    there a sport, yes.

8    Q.    So they wrote a release before the game?

9    A.    I would call them after the cessation of the contest

10   and let them report in our scores.

11   Q.    So they would report after you competed?

12   A.    I would report to my SID.

13   Q.    And do they also sometimes report in advance --

14   A.    Yes, they do.

15   Q.    -- of a meet?  Now, are there any types of

16   recognition that the university gives to varsity athletes?

17   A.    At year's end we, the team select MVPs and scholar

18   athletes of the year.

19   Q.    Are there also athletes of the month?

20   A.    Yes, there are.

21   Q.    Were your athletes eligible to receive those awards?

22   A.    Yes, they were.

23   Q.    And did your athletes receive any?

24   A.    Student athlete of the month?

25   Q.    Well, just in general, any of the awards.

```
1    A.   One of my juniors received the junior scholar athlete
2    of the year award, 3.96 in her major.
3    Q.   So the scholar --
4    A.   Of the year was a competitive cheer candidate, yes.
5    Q.   But that award is for student athletes who receive a
6    certain GPA?
7    A.   Yes.
8    Q.   And you testified you had an operating budget from
9    the university for 2009, 2010, right?
10   A.   Yes.
11   Q.   And what is a team operating budget supposed to
12   cover?
13   A.   Team equipment, travel, team lodging.  Team travel,
14   team lodging, their meal stipends, equipment.
15   Q.   Okay.
16   A.   Everything we need to make the sport work.
17   Q.   Does it include scholarships?
18   A.   Yes, it does.
19   Q.   Your operating budget?
20   A.   Not our operating budget, no.
21   Q.   Does it include coaching salaries?
22   A.   No.
23   Q.   And was your operating budget administered by the
24   Athletics Department?
25   A.   As far as I believe, yes.
```

1    Q.   And how much was -- you testified I think your

2    operating budget was initially set at 50,000?

3    A.   Correct.

4    Q.   And were all of your expenditures expected to come of

5    that; were you limited to that 50,000?

6    A.   No, I was told ahead of time that because we were a

7    new sport that if we needed to, we had to develop a new

8    logo, we needed all new equipment, that we would be able

9    to exceed that and they would -- with permission I could

10   see to what they needed.

11   Q.   And how much did you end up spending this year if you

12   recall?

13   A.   I think -- there was a, there was some clerical

14   errors in the report, some were charged to the wrong

15   account, but do I include the tournament play --

16   tournament play is shown back to our budget, so I don't

17   know if that effectively reflects in our budget.

18   Q.   Let's just say all together how much did you spend on

19   operating expenses for the team this year?

20   A.   130.

21   Q.   130,000?

22   A.   Uh huh.  (Affirmative.)

23   Q.   Thank you.  And did the university provide you with

24   scholarships to use in recruiting?

25   A.   Yes.

1    Q.    And how many of those scholarships were you provided?

2    A.    I started with six.

3    Q.    Six.  And did you award scholarships to any of your

4    athletes in the 2009-2010 academic year?

5    A.    Yes, I did.

6    Q.    And how many did you choose to award in '09, '10?

7    How many athletes did you choose to give athletic

8    scholarships to?

9    A.    I believe I gave ten.

10   Q.    And would it help you to refer to the squad lists

11   that I think you said has your scholarship information?

12   A.    Probably.

13   Q.    That was in Exhibit E M?

14   A.    So it's not in this book -- E?

15   Q.    E as in egg.  And it was D 15100 to 15102.

16   A.    I don't know if I have the right place here.  Got

17   you.

18   Q.    So how many of your athletes received scholarship

19   funds this year?

20   A.    We're talking '09, '10?

21   Q.    Yes, during the academic year that just concluded.

22   A.    Thirteen.

23   Q.    Thirteen.  Okay.  Now, it looks on the squad list

24   like there were 14 athletes who got scholarship dollars,

25   is that --

1    A.    Well --

2    Q.    -- correct?

3    A.    I must be clear, Katrina Lennon did not accept the

4    award and did not come out on the squad.

5    Q.    You offered her the award?

6    A.    Yes.

7    Q.    And when did she respond to your offer?

8    A.    She responded in the summer, late summer, when she

9    found out that she was not going to return and join the

10   team.

11   Q.    So she was not going to join the team.  And it seems

12   to indicate that the change in status is Q, August 25, is

13   that about -- does that indicate she was not part of the

14   team, that she had decided not to join that team as of

15   that date?

16   A.    Yes.

17   Q.    And how did you determine to whom you were going to

18   award scholarships for this year?

19   A.    I based it on skill sets with the hope of obviously

20   as a coach seeing them not be, you know, be kids who are

21   off my bench and would be in good academic standing and,

22   as I said, I based it on skill sets.

23   Q.    So you awarded it to the strongest athletes that you

24   had coming in?

25   A.    Yes, I did.  Yes, I did.

1   Q.   And did you renew the scholarships for those athletes

2   who were going to continue to be on the team next year?

3   A.   Yes, I did.

4   Q.   And did you award any scholarship money to any

5   athletes who were on the team this year, who are going to

6   be on the team next year but who didn't have the

7   scholarship money this year?

8   A.   Yes, I did.

9   Q.   And about how many of those?

10  A.   I awarded five of my freshmen, my freshmen from last

11  season.

12  Q.   So the kids who were freshmen this year but didn't

13  have scholarship money who going to have some next year?

14  A.   Correct.

15  Q.   And how many athletes from the '09, '10 team are

16  guaranteed a spot for the '10, '11 team?

17  A.   I have to count.

18       (Pause)

19       Eighteen.

20  Q.   Eighteen.  And how many spots are you going to have

21  for the '10, '11 team?

22  A.   I'm told 36.

23  Q.   Thirty-six.  So that leaves 18 spots.  So did you do

24  any recruiting this year?

25  A.   Yes, I have.

1    Q.   For athletes for next year?

2    A.   Yes.

3    Q.   How did you go about doing that recruiting?

4    A.   Actually I didn't have to go off campus.  I just,

5    being one of six varsity programs in the country I was

6    flooded with females, and so I asked them to send me

7    videos or, you know, that's -- my evaluation was by seeing

8    the video that they send to me.

9    Q.   About how many kids contacted you this year about

10   being on the team next year?

11   A.   Next year?  Well over 150.

12   Q.   And you contacted them and you communicated with

13   them?

14   A.    I sent them a bio sheet which listed the skill sets

15   for me to determine.  It asked a lot of information, asked

16   for coaches' contact number, asked for --

17   Q.   I think I can help you with that.  If you look at

18   Exhibit F H.

19   A.   Same book?

20   A.   Different book.

21            THE COURT:  Should be the same book.

22            THE WITNESS:  Am I just not good at this or

23   what?

24            THE COURT:  No, actually it's in that --

25            THE WITNESS:  Okay, yes.

```
1    BY MS. FRIEDFEL:

2    Q.   What's that document?

3    A.   That is the document that when a prospective student

4    athlete emails me, I send it to them.  You get that many

5    emails, you just can't spend -- I could spend my whole

6    time doing this.  So I would ask them for their skill sets

7    on this bio sheet, their GPAs, their SAT scores, their

8    team position.

9    Q.   And you said you'd get a video and you would review

10   that?

11   A.   Well, I would review this first and if they did not

12   have the skill sets that I would entertain recruiting for,

13   I would let them know that.  I would just thank them for

14   thinking of Quinnipiac University competitive cheer, and

15   then ones who had the skill sets I would request a video.

16   Q.   And did you do anything else to follow up apart from

17   requesting a video?

18   A.   Our sport shows up on YouTube a lot, especially when

19   the All-Star rolls around.  I could literally track them

20   through this and I could follow them through the year.

21   Q.   So you track some kids you had an particular interest

22   in?

23   A.   Yes, you can follow them in a routine.  You can see

24   how strong their tumbling is, how strong an athlete they

25   were in their position.  I didn't have to go off campus;
```

```
1    they came to me.

2    Q.   And did you make efforts to get the kids you thought

3    had the best skills skills to come to Quinnipiac?

4    A.   Yes, I did.

5    Q.   Are you going be awarding scholarships to any of the

6    kids that are coming in next year?

7    A.   Yes, I am.

8    Q.   How many scholarship offers did you put out?

9    A.   I offered 13 and I believe I'm getting 10 of the 13

10   that I offered.

11   Q.   And approximately how many dollars in scholarships,

12   or -- you can either put it in dollars or put it in terms

13   of total full scholarships, are you going to be dispensing

14   next year?

15   A.   I awarded up to five.

16   Q.   Five.  Now, you said that you think you're getting

17   back ten -- ten of the scholarship kids have committed?

18   A.   Yes.

19   Q.   Is that right?  So, that comes, if my math is right,

20   you said you had 18 returning students plus ten new

21   scholarship athletes, that gets you to 28 and then there

22   are eight spots left?

23   A.   But I also rostered, I believe -- three athletes

24   without scholarships.  I roster them through a skill set.

25   Q.   So you guaranteed spots to three incoming students?
```

1    A.   Yes.

2    Q.   So 31, so you've got five left?

3    A.   Yes.

4    Q.   And how do you plan to fill those five spots?

5    A.   I'm going to offer walk-on try outs.

6    Q.   And who do you anticipate is going to participate in

7    those walk ons?

8    A.   I had 35 to 40 requests from the incoming students

9    that want to try out for those walk-on positions.

10   Q.   And how many -- are any of the members of your

11   '08-'09 team going to have to participate in that try-out

12   next year?

13   A.   Yes, they are.

14   Q.   How many?

15   A.   Eight.

16   Q.   Eight.  And that's -- why is that?

17   A.   The skill set of the Freshmen coming in, you know,

18   especially in standing, running, tumbling, which is huge

19   in our sport, they are not quite there unfortunately.

20   Q.   So the athletes you have coming in are just that

21   strong that they --

22   A.   Yes.

23   Q.   -- that they potentially are greater strength than

24   the athletes, some of the athlete on the current team?

25   A.   Yes.

1   Q.   And so in total, you said you had about I think, I

2   believe you said you had 35 that you -- walk-ons that are

3   going to try out next year from the beginning, from the

4   incoming class, is that right?

5   A.   For four to five positions, yes.

6   Q.   And how many -- do you have a sense of how many of

7   these kids have the skills that might be necessary to be

8   considered?

9   A.   Too many of the skills to be considered.  It's going

10  to be tough.

11  Q.   So it's going to be a very competitive try-out?

12  A.   Yeah, I'm going to have to really think about my

13  positions, first and foremost.

14  Q.   And is it your intent to do off campus recruiting in

15  the coming year for 2010, 2011?

16  A.   Yes.

17  Q.   I'm sorry, to do recruiting during '10, '11 for '11,

18  '12?

19  A.   Yes, I don't know how much I have to do, honestly.

20  They just start hitting me hard on the emails and their

21  coaches are too, so --

22  Q.   Okay.  Their coaches, meaning the kids?

23  A.   The coaches from their, either their All-Star compete

24  gyms that they are in or from their high school coaches.

25  The participation numbers in this sport are at the high

1    school level and at the All-Star compete only level.  They

2    are not cheerleaders.  It's huge numbers.

3    Q.   Now, Mr. Hernandez took you through your competition

4    schedule in pretty significant detail so we don't need to

5    go through all that, but you talked a little bit about --

6    I do want to show you -- excuse me.  I do want to show you

7    some of your score sheets, so if we can look at Exhibit

8    F B?

9    A.   Okay.

10   Q.   Before we get to that, all of the teams against whom

11   you competed were teams from colleges, is that right?

12   A.   Correct.

13   Q.   Now, if you'll look through Exhibit F B, can you tell

14   us what these documents are?

15   A.   This is the first competition we entered at the

16   Hartford Center.

17   Q.   Just flip through them.  I just want a general

18   description of what this set is.

19   A.   We have our first -- this looks like the NCSTA form.

20   Q.   You don't hae to identify each one.  Just these are

21   your score sheets from your meets?

22   A.   Yes, these are our score sheets from our meets.

23   Q.   Now, other than the NCSTA meet which we're going to

24   talk about separately, what were the general categories on

25   which your team was judged in these non NCSTA meets?

1    A.   They are generally judged on both standing tumbling,

2    running tumbling, partner stunts, pyramids, basket tosses,

3    jumps and dance.

4    Q.   And if you turn to Exhibit 12311 -- not exhibit, I'm

5    sorry, page 12311 of Exhibit F B.  It's toward the back.

6    They are not actually -- I put them in chronological order

7    so it's a little bit hard --

8    A.   Okay.

9    Q.   It's about 3-quarters of the way through.

10   A.   (Pause)

11   Q.   And can you identify this score sheet?

12   A.   Yes, this is the National Cheerleader Association

13   score sheet.

14   Q.   Is this, where it says 45 second crowd cheer, is that

15   the crowd response portion you were talking about earlier?

16   A.   Yes, it is.

17   Q.   And this shows that that has a maximum value of

18   eleven points on the score sheet?

19   A.   Yes.

20   Q.   And the total number, if I have my math right, is

21   110, right?

22   A.   Correct.

23   Q.   And this is the only competition -- is this the only

24   competition in which you were judged on that criteria?

25   A.   As far as the grants competition, yes.

1    Q.   But the only varsity grant competition you competed

2    in was the NCA College Nationals, correct?

3    A.   Correct.

4    Q.   Now, who were your competitors at that event?

5    A.   Well, it changed two weeks before the season, before

6    we went down there, but our competitors ended up being

7    University of New Hampshire, Kennesaw, Townsend, UMass,

8    Amhurst and Providence College.

9    Q.   And who did you anticipate your competitors were

10   going to be when you scheduled to go to that event?

11   A.   The teams that had typically been in All-Girl B 1 for

12   the history of this championship.

13   Q.   And who were those teams?

14   A.   Maryland, Louisville, N C State, Providence, UMass,

15   Michigan, Illinois, Florida, a lot.  Kennesaw.  All the

16   ones that were broken down into the division they created

17   two weeks prior.

18   Q.   So if you look at F J, Exhibit F J?

19   A.   Uh huh.

20   Q.   What are these documents?  Are these the --

21   A.   These are the day two finals of the final standings.

22   Q.   From the NCA?

23   A.   Right.

24   Q.   And the documents indicate, the first page is

25   All-Girl 1 and that's the division you competed in?

1    A.    The brand new division they developed, yes.

2    Q.    And the next one is All-Girl 1 A?

3    A.    Yes.

4    Q.    So when you planned to go to this competition, was it

5    your understanding that these things that are now 1 and

6    1 A were going to be combined and it was going to be one

7    division?

8    A.    I actually asked that question last year.  If they --

9    Q.    When --

10   A.    It was my understanding we would all be part of it.

11   Q.    Right, that was going to be one division?

12   A.    One division.

13   Q.    All right.  And when did you find out that that was

14   going to change?

15   A.    Two weeks prior to the competition.

16   Q.    So when you scheduled this event, your plan was to be

17   competing against University of Maryland and University of

18   Oregon, is that right?

19   A.    All of these teams, correct.

20   Q.    And Maryland and Oregon are varsity teams, is that

21   right?

22   A.    Correct.

23   Q.    And the NCA college national championship is run by

24   Varsity Brands, right?

25   A.    Yes, it is.

1    Q.   And that's Jeff Webb's company?

2    A.   Yes, it is.

3    Q.   All right.  Let's talk about something near and dear

4    to your heart now.  The NCSTA meet format.

5    A.   Okay.

6    Q.   What does a -- let's turn to Exhibit 44 in the

7    plaintiff's exhibit binder.

8    A.   Am I going to need this one again?

9    Q.   I don't think so.  Forty-four?

10   A.   Okay.

11   Q.   What's that document?

12   A.   This is a document about how we're developing the

13   NCSTA extension meet format.

14   Q.   Approximately when was this document finalized?

15   A.   I think this document was -- we just recently had an

16   additional meeting down in Maryland so I don't know if

17   this is the newest one, to tell you the truth.  We've been

18   working on scoring system and a meet format all year long,

19   so I believe this is probably before we were at Kennesaw

20   meet finalized.  Sometime in January.

21   Q.   So this was the -- was this the format that you

22   competed in in Kennesaw in --

23   A.   Yes.

24   Q.   -- in February?  So this document describes that

25   format?

1   A.   Yes, it does.

2   Q.   Okay.  And can you tell the court what a NCSTA meet

3   consists of?

4   A.   An NCSTA meet consists of six different events.  One

5   would be the team routine -- one would be the team routine

6   and then there would be five additional events to that,

7   all with separate heats.  There would be a compulsory

8   event, there would be partner stunt event, there would be

9   a tumbling event, a basket toss event and the team routine

10  event.

11  Q.   And are there different heats or rounds within each

12  of those events?

13  A.   There's different heats in each of those events, yes.

14  In the compulsory event, for instance, there's 40 points

15  accessed in the compulsory round and there is a partner

16  stunt event, a tumble event, a basket event and a pyramid

17  event.

18  Q.   So, within the compulsory round, there is a component

19  for each of these events?

20  A.   Yes, there is.

21  Q.   Then you said there's also a sort of separate round

22  for each of these events, is that right?

23  A.   Yes.

24  Q.   And that's an optional round?

25  A.   Yes.

1    Q.   And how does the -- what are the requirements for the
2    compulsory round?  Let's start there.
3    A.   The requirement in the compulsory round, every team
4    is basically, it's apples to apples.  We decide to use the
5    compulsory round to use progression in our sport but we
6    all exhibit the same skill.  For instance, in the basket
7    round, we all do a basket as our skill.  It compares
8    apples to apples.
9         We all do a four two one pyramid round.  We all do
10   the same pyramid using the same amount of athletes on the
11   floor.  In the tumbling round we do basic standing
12   tumbling which is eight athletes the floor doing standing
13   tucks to hand spring tucks to toe backs to hand spring
14   layouts.
15   Q.   And does the whole team compete in each one of these
16   rounds and events?
17   A.   No, you pick your best athletes by their position and
18   their skill set and you'll put them in your heats.
19             THE COURT:  How many athletes compete?
20             THE WITNESS:  Well, every heat has a different
21   amount of athletes but we travel with 28.
22             THE COURT:  Okay.  I'm looking at the rules,
23   Exhibit 44, and it says the pyramid event up to 20
24   athletes, tumbling event --
25             THE WITNESS:  We've had revisions.

```
 1              THE COURT:  -- requires eight.  Time event, up
 2    to 36.  I'm trying to get a sense how many Quinnipiac
 3    cheer team members actually compete in that particular
 4    meet.
 5              THE WITNESS:  Between 24 and 28.
 6              THE COURT:  Okay.
 7    BY MS. FRIEDFEL:
 8    Q.   Mary Ann, let's just clarify.  You said there were
 9    revisions; the 24 to 28 rule, when does that come into
10    play?
11    A.   The 24 rule, after our meeting down in Maryland in
12    May we had to vote whether the team routinely would be 24
13    athletes in the team or 28 and it was voted 24.
14    Q.   Okay.
15    A.   So --
16    Q.   So for this year though was there a limitation on the
17    number of athletes who could compete?
18    A.   No.
19    Q.   On the team?
20    A.   No.
21    Q.   Okay.  We're going to show, with the court's
22    permission, a little -- this is some excerpts that we took
23    out of a video of the Kennesaw meet that we've been
24    talking about.  So --
25              THE COURT:  How do you want to mark that?
```

1          MS. FRIEDFEL:  It's marked, I have a DVD I can

2     give you but it's marked as Exhibit F E.

3          THE COURT:  F E.

4          MS. FRIEDFEL:  Yes.

5          (Pause)

6          THE WITNESS:  I don't know if you can make that

7     any bigger because that's far for me.

8          MS. FRIEDFEL:  No, no, no, it's going to be

9     bigger.  Don't worry about it.

10          (Video played)

11     BY MS. FRIEDFEL:

12     Q.   Now, what is this?

13     A.   The introduction of the athletes.  They do their warm

14     up in our meet in front of the crowd.

15     Q.   (Pause)

16          Which round is this?

17     A.   This is the compulsory round, the compulsory partner

18     stunts round.

19     Q.   Is that Quinnipiac?

20     A.   Quinnipiac is in the far left, correct.

21     Q.   (Pause)

22          Which round was that?

23     A.   That is the compulsory basket.

24     Q.   (Pause)

25          How about this one?

1    A.    The option the pyramid.

2    Q.    That's Quinnipiac?

3    A.    That's Quinnipiac, yes.

4    Q.    (Pause)

5          What was that one?

6    A.    The compulsory basket.

7    Q.    (Pause)

8          Which round was that?

9    A.    That was the compulsory tumble.  It's not over yet.

10   There's more to it than that.

11   Q.    (Pause)

12         Now, all the different teams seem to be doing the

13   same things?

14   A.    It's the compulsory round in tumbling.

15   Q.    So each team does the same?

16   A.    Each team does the same thing in the compulsory

17   round, yes.

18   Q.    (Pause)

19         Which round is this?

20   A.    This is the optional tumble.  This -- you can't beat

21   that one.

22   Q.    (Pause)

23         Which event is this?

24   A.    This the team routine.

25              (Video ends)

1            MR. HERNANDEZ:  Your Honor, could we have an

2    indication from counsel as to what was excerpted?  I think

3    she mentioned it was an excerpted video.  Just let us know

4    what has been taken out.

5            MS. FRIEDFEL:  The full meet took several hours

6    and we didn't think the court wanted to watch several

7    hours.  We just took samples.  You have, you have the full

8    video because we produced it so you should know what the

9    excerpts are.  There should be no question about what we

10   put in and took out.

11   BY MS. FRIEDFEL:

12   Q.   And these events, this event is scored, is that

13   right?

14   A.   Yes.

15   Q.   The NCSTA meet?

16   A.   Yes.

17   Q.   How many judges are there?

18   A.   There will be five officials in the meet format.

19   Q.   And what are their roles?

20   A.   The head judge is in charge of any discrepancies in

21   the score and for execution.  We have two execution

22   officials, one production official and one value official.

23   Q.   And are there certain difficulties applied to the

24   different skills?

25   A.   Well, what we do is we have a predetermined value

1    which is based on difficulty.  So, our software's being

2    developed right now but even issued manually, we enter our

3    skill set ahead of time and each had a difficulty value

4    assessed to them.  So when you're watching a different

5    round in a different heat in a different event, those --

6    it's real time scoring.  The scoring is up as much like in

7    gymnastics and in figure skating.  There will be a score

8    that's based on difficulty that is immediately attached

9    and predetermined and goes up on the board.

10   Q.   And then what is the secondary part of the --

11   A.   The official can, the other officials judge the

12   execution and every single heat has a different skill set

13   so they would be -- their execution, their judging would

14   be things like, in the basket round they might be judging

15   the height of the basket, the aerial maneuvers done in the

16   basket.  In the partner stunt round it may be flexibility,

17   looking at the strength of the bases, looking at was there

18   a miss on it, a bobble on it.  Was there stability in the

19   stunt.  Flyer's body position; flyers have to be

20   completely flexible in the sport.

21        So those judges are only judging the execution of the

22   stunt because the difficulty value has already been

23   awarded to that.

24   Q.   And just to draw your attention in Exhibit 44, just

25   want to draw your attention to page 0875 -- something.

1    Unfortunately the bate numbers were cut off?

2              THE COURT:  Yes, 0875.

3              MS. FRIEDFEL:  Is that it?  Okay.

4    BY MS. FRIEDFEL:

5    Q.   Does that page go through all of the -- or tell me

6    what this describes?

7    A.   This describes the various events and rounds.  So we

8    have the stunt, the basket tosses, the pyramid and the

9    tumbling, where execution is scored and how you assess,

10   how the judge would look and base that score based on the

11   skill executed.

12   Q.   And the next page where it says stability, what is

13   that?

14   A.   Stability is making sure that the flyer holds good

15   body position, that it stays in the air, that there's no

16   falls to the ground, there's no miss.  How the base

17   players match up to each other to hold that skill steady.

18   Q.   And the next category is height?

19   A.   Uh huh.  On this you see that average, so this was

20   usually probably applied to baskets or a transition in a

21   pyramid or in a partner stunt.  If there's little

22   clearance over the base's head they are going to get an

23   average score in there which would fall in the five to six

24   range because the bases quite frankly weren't doing their

25   job.  They weren't using their arms to load that flyer

1    through and give her what she needs to get, make full

2    extension on that.

3    Q.    The next page goes through a few more categories?

4    A.    Yep.  There's elements in the meets that some -- in

5    the team routine, for instance, synchronization is key, to

6    have all these five partners stunt groups hitting those

7    things at the exact same time.

8         Technique.  Technique situation in a basket toss, for

9    instance, would be does the flyer remains set when the

10   bases dip.  Does she not dip -- does she dip when they

11   dip?  She should not.  If she does, she's going to take

12   several feet off that basket.

13        The flexibility.  The flexibility would be on their

14   body positions.  We have certain, the flyers and partner

15   stunts have certain body positions up in the air, much

16   modeled after ice skating and gymnastics.

17   Q.    And if you look at the next few pages, does that

18   illustrate the flexibility positions?

19   A.    Yes, it does, on each skill, on all varied skill sets

20   of the flyer.

21   Q.    And were these materials distributed to the judges in

22   advance of your competition?

23   A.    We had officials training prior to the Kennesaw meet

24   and prior to every meet there was skill training, judging

25   training of the officials involved.

```
 1    Q.    Now, if we go -- I'm sorry to flip you back but in
 2    F B?
 3    A.    Again it's not this book.  Okay.
 4    Q.    It's bate stamp 1692 to, I think you said earlier you
 5    saw the score sheets from Kennesaw?
 6    A.    What was the page on that?
 7    Q.    I think it's 621932.
 8          THE COURT:  It's toward the front.  It's about
 9    eight pages in.  There you go.
10          THE WITNESS:  Okay.
11    BY MS. FRIEDFEL:
12    Q.    What is that?
13    A.    This is the scoring sheet for, these are Quinnipiac
14    scores as reflected, and I believe this would be the
15    Kennesaw meet.
16    Q.    And that goes through each team and each event?
17    A.    Yes, it does.  The team event scores of each team
18    that we competed against, yes.
19    Q.    All right.  And if you continue the other page, does
20    that include the scores of each of the events for each of
21    the teams?
22    A.    Yes, it does.
23    Q.    All right.  Now, we're going to go to Exhibit F G, as
24    in George.
25    A.    Okay.
```

1   Q.   What's this document?

2   A.   This is the document upon our final meet, our last

3   meeting down in Maryland.

4   Q.   This is a report of the coaches meeting or somebody

5   else?

6   A.   It's a report of -- we've made, where as we -- as we

7   propel this sport forward, we realized there are things we

8   can do better, and we have a road ahead of us to work on,

9   so that was a meeting that reflected, these are the notes

10  of everything we worked on prior to going there and when

11  we got back, Maryland's coach put together what we had

12  worked on and done in Maryland.

13  Q.   I just want to highlight a few things in here.  Well,

14  first of all, I should say the document is titled

15  Recommendations.  Were the coaches' recommendations that

16  are contained in the document adopted or --

17  A.   Well, we had our, we each had different duties that

18  were assigned to us, and we went down there to discuss

19  things and to, to table things, to vote on them, things we

20  know we can vote on as coaches that applied to scoring,

21  and then there are certain things that our administration

22  votes on.

23       So there's a conference call preceding our meeting

24  with our administrators on certain things that had to be

25  voted on; for instance, travel team size for the next

1    coming season.

2    Q.   That was something that the administrators need to

3    decide?

4    A.   It had to be recommended what we were going to do.

5    We had to make a decision on what was the best amount of

6    kids to put in a team routine, and we had to know it was

7    would between 24 and 28.  The final number decided for

8    budget travel was 24.

9    Q.   That was the number for the team routine?

10   A.   That's the number for team routine.

11   Q.   Okay.  And are there any -- is there anything in this

12   document that you're aware of that has not been adopted?

13   A.   I know there's still some things that have been

14   tabled, like injury during a routine, how -- we attempted

15   to take a vote on that.  If there was an injury during the

16   team routine, would there be time assessed to that squad.

17   And I think it pretty much won, there was a four to two

18   vote on it, but we're still working on the challenges of

19   that.

20   Q.   But pretty much everything else in here has been

21   adopted for the '10, '11 year?

22   A.   For the most part.

23   Q.   Okay.  I just want to highlight a few things.  You

24   mention the software program; you don't have a software

25   program for your statistics this year?

A.   We had a scoring system but not a software program.

A software program is going to help us in many ways with

our statistics for the season and with our realtime

scoring.  So on the night before, 48 hours before my team

competes, I can get into that software and to my athletes

competing in the Sanction format and then in every event,

in every heat of every event, enter their skills and it

computes those predetermined values on the skills, are in

the system.

So it's just going to make realtime scoring that much

easier and then it's going to be able to determine stats

during the year.  I can track my athletes for

determination of -- for all -- we're going to name --

4 percent kids in the sport are going to be named to

All-American status.

Q.   So you're going to maintain statistics on each

individual athlete?

A.   Yes, I am.

Q.   How is that going to work?

A.   Well, for instance, if one of my players was involved

in 17 events, in varied heats, and she had 15 hits, she

had the opportunity to have 17 hits but she only had 15,

if she scores in the top 4 percent against the another

universities employed in the meet format, she might be

eligible for All-American status.

1  Q.   And that software, is that going to be ready for the

2  '10, '11 season?

3  A.   I think it's ready right now.  I think our

4  administrators probably have had a phone call on the

5  shared cost of that.

6  Q.   Have you developed your schedule for 2010, '11 yet?

7  A.   Yes, I have.

8  Q.   And is this page 15831, does this reflect your

9  schedule for next year?

10  A.   This reflects the schedule of the meet formats.

11  Q.   The NCSTA?

12  A.   The NCSTA for meets, yes, the varsity programs.

13  Q.   Looks to to me like you have five regular season

14  meets scheduled, is that right?

15  A.   We actually are adding one more onto that, a home

16  meet on that.

17  Q.   What is home meet?

18  A.   We have been approached by both the University of New

19  Hampshire and Rutgers to compete in meet format with us.

20  Q.   So you're going to host a NCSTA meet?

21  A.   We believe that for the growth of the sport it's

22  necessary, and so many teams from various universities

23  want to compete in this format.  So Rutgers University and

24  New Hampshire have approached me, I've talked to Central

25  Connecticut's coach too, as well, so we're talking about

```
 1    putting together a meet in January to add to the schedule.

 2    Q.   So you'll have six NCSTA regular season meets?

 3    A.   Six regular NCSTA regulars meets and then the post

 4    season, national championship at Oregon.

 5    Q.   And so there's going to be a national championship

 6    for the NCSTA?

 7    A.   At the University of Oregon.

 8    Q.   At the University of Oregon.

 9    Q.   What's the format of that going to take?

10    A.   How is that formulated to the girls or --

11    Q.   Well, how is it going to be structured?

12    A.   In the NCSTA meet format.

13    Q.   And is that going to be a tournament?

14    A.   It's going to be -- the travel day would be

15    Wednesday.  Thursday would be the practice and the display

16    round.  Friday, there will be two heats to get by and then

17    five supported by three, the winners of that will move on.

18    On Saturday and Sunday will be finals.  But we're also

19    going to have an event final on the morning --

20    Q.   Slow down.

21    A.   I'm sorry.

22    Q.   At the end of the teams -- poor Susan can't type that

23    fast.  At the end of the tournament for the brackets you

24    were talking about, those were going to the whole team

25    competing in the meet format, is that right?
```

1    A.   Yes.

2    Q.   Okay.  And at the end of that, the winner of that

3    would be -- well, they would be the national champion, is

4    that right?

5    A.   Yes.

6    Q.   That would be the whole team.

7    A.   Yes.

8    Q.   And is there a way for individuals to have --

9    A.   Yes.  On the morning of finals for the national

10   championship, there will be an event final with all the

11   various heats and the four top scores in every single heat

12   can move on into the event finals.

13   Q.   And so that there will be an event final for each --

14   A.   There will be a national championship for a partner

15   stunt group, there will be a national championship for a

16   tumbling pass, there will be a national championship for

17   basket toss group.

18   Q.   And who's going to be eligible to compete in those

19   individual stunt championships?

20   A.   For this season, only NCSTA teams and in the

21   foreseeable future, it will allow other teams.  We're

22   hoping as we -- obviously we gained other teams, they

23   might not qualify for the national championship but they

24   can qualify for an individual round.

25   Q.   So, the intent -- I just want to make sure I

1    understand.  The intent is to allow, even if in the

2    future, if a team may not be nationally ranked, an

3    individual athlete or an individual small group of

4    athletes could become nationally ranked?

5    A.   Correct.

6         MS. FRIEDFEL:  I don't think I have anything

7    else, Your Honor.

8         THE COURT:  Okay.  Redirect?

9    REDIRECT EXAMINATION

10   BY MR. HERNANDEZ:

11   Q.   Ms. Powers, where does the competitive cheer team

12   practice?

13   A.   Where do we practice?  We practice this year at

14   three, dependent upon what is going on at the university,

15   at three different places but mainly court four of the Rec

16   Center.

17   Q.   Is that the same as the Burt Kahn court?

18   A.   No -- well, it's in the same building but Burt Kahn

19   is the old gymnasium and the Rec Center is adjunct to

20   that.

21   Q.   Okay.  And do you do any work in the Burt Kahn

22   courts?

23   A.   We have practiced in Burt Kahn.

24   Q.   How many times did you practice there?

25   A.   I don't even know that I can give you a -- maybe this

1    season, maybe ten or 12 times.

2    Q.   Ten or 12 times.  Is there a new sound system in the

3    Burt Kahn court?

4    A.   I don't know.

5    Q.   You don't know.  I think you mentioned earlier that

6    one of the goals of the NCSTA is to get recognition by the

7    NCAA, is that correct?

8    A.   That's our mission statement, yes.

9    Q.   Okay.  And are you also seeking recognition by the

10   NEC, the Northeast Conference?

11   A.   We have got to garner more performance in the area

12   for that.

13   Q.   But is that something that you would like to have

14   happen?

15   A.   I would love for that to happen.  I would love for

16   everybody to pick this sport up.

17   Q.   Okay.  And so I take it that you think that

18   recognition by the NCAA is important for your sport?

19   A.   Most certainly.

20   Q.   Okay.  And if your proposed sport were accepted by

21   the NCAA, that would enhance the status of competitive

22   cheer, would you agree?

23   A.   I would think so.

24   Q.   All right.  And would you agree that would also

25   enhance the status of your competitive cheer athletes?

 1   They could say, hey, we're NCAA recognized now?

 2   A.   Maybe that's a question for them.  I think it's been

 3   a hope for them for a long time to be recognized just as

 4   athletes, period, in this sport.  I mean this week I got

 5   phone calls from my kids upset that the media has

 6   portrayed the Dallas Cowboy cheerleaders in the media and

 7   that's not what they are and not what they do.

 8        So, to be recognized as an NCAA athlete but, more

 9   importantly, on our campus the recognition that they've

10   gotten, the pride they feel to be on this team and honored

11   by their university and being student athletes, it's been

12   an incredible experience for each and every single one of

13   them.

14   Q.   And the same would be true about NEC status; that

15   would enhance the --

16   A.   I've never even thought about that.  It's never

17   been -- I've never even entertained that.

18   Q.   Okay.  The NCSTA rules as I understand it, in

19   different events, and putting up a copy of Exhibit 44,

20   bate stamp number 869, that's the second page of the

21   exhibit.

22        Do you understand that in the pyramid event you can

23   have up to 20 athletes?

24   A.   We can have up to 24 athletes in the pyramid event.

25   Q.   Up to 24 now, so that's changed?

1    A.   That's changed, yes.

2    Q.   What's the fewest number of athletes you can have for

3    that event?

4    A.   What would be the fewest number?

5    Q.   Uh huh.

6    A.   Guess that's up to the coach on every single team.  I

7    don't know why they'd use fewer.

8    Q.   Okay, so -- and is that event a necessary part of the

9    presentation or competition?

10   A.   The pyramid?

11   Q.   Yes.

12   A.   Exceptionally, yes.

13   Q.   Okay, and so what I'm hearing is at least for the

14   pyramid event, under NCSTA rules a school can field up to

15   24 athletes but as few as -- how many can you --

16   A.   You really can't build the structures you saw on that

17   tape without having the athletes on the floor with --

18   including the spotting.

19   Q.   But it's, ultimately it's up to the coach to decide

20   how many athletes?

21   A.   Because we have to hit three body structures.  We

22   have to do three body structures for the 30 points in that

23   round.  I can't imagine us using less than 24 now and

24   getting a good -- when we talk about that predetermined

25   difficulty score, you're just not going to get the

1    difficulty score without those kind of athletes engaged in
2    that.
3    Q.   I'm referring to the rules right now; as far as the
4    rules are concerned, you could go with fewer than 24?
5    A.   You know, I don't know that.  That's a good question.
6    I will certainly have to go return to my colleagues and
7    ask that.
8    Q.   Okay.  So you'd agree that that's -- no pun
9    intended -- it's up in the air at this point?
10   A.   No, I wouldn't agree with that.  I might not know
11   that, I left Maryland's conference early, but I would
12   never understand why another coach would use less than 24
13   athletes in that event.
14   Q.   You'd agree the rules don't say you have to have no
15   fewer than X number of athletes?
16   A.   I'm saying I don't know that.
17   Q.   Okay.  The tumbling event -- all right, sorry.
18        Team event, optional, says teams may use up to 36
19   athletes.
20   A.   Correct.
21   Q.   Can you use fewer than 36 athletes?
22   A.   The team event has changed for this year.  The team
23   event is 24 athletes.
24   Q.   Okay.  And do you know if the rule says that they can
25   use up to 24 athletes?

1   A.   The rule says that we can use 24 athletes in team

2   events, yes.

3   Q.   Up to 24?

4   A.   Yes.

5   Q.   Okay.  So you can show up with fewer than 24?

6   A.   Nobody would.  I'm trying to -- again, possibly if

7   things are reestablished, but there are 24 in the event.

8   Q.   I'm trying to understand a little bit more about

9   money that was paid out in '09, '10.  And I think at your

10   deposition you referred to them as stipends, these

11   payments?

12   A.   Yes, I did.

13   Q.   You refer to them as stipends?

14   A.   I did.

15   Q.   What do you mean by stipends?

16   A.   I didn't mean that.  I think I established that

17   yesterday I didn't mean that.  It was the award.  My

18   roster size is large and the first year of scholarships I

19   only awarded one and-a-half, so that in future I could

20   recruit strategically so that was also with the thought

21   process of every single year if I, for instance, gave an

22   athlete an award that was maybe five or 6,000-dollars, by

23   the time she was a senior that would be elevated upon her

24   progress in the sport.

25   Q.   Are any of the competitive cheer athletes required to

```
 1    compete in any other sports as a condition of being
 2    competitive cheer athletes?
 3    A.   I'm not sure I understand your question.
 4    Q.   All right.  For example, do you require competitive
 5    cheer athletes to compete in any other sports?
 6    A.   Do I?
 7    Q.   Yes.
 8    A.   They can't.
 9    Q.   The answer is no?
10    A.   The answer is no.
11    Q.   I think you mentioned that you've been doing some
12    recruiting via email and videos, correct?
13    A.   Correct.
14    Q.   And you're recruiting high school students?
15    A.   I'm recruiting -- well, they are all coming from high
16    school but you mean from high school programs?  Is that
17    what you're asking?
18    Q.   Correct.
19    A.   I'm recruiting both.  The high school numbers in the
20    sport I think are reported at 200,000 kids participating
21    in high school cheer.  But in the All-Star program there
22    are a lot more training in those programs because they
23    don't know what sideline cheer is, so they have gymnastic
24    instructors, and also those gyms are opening up their gyms
25    to teaching gymnastic instruction for the sport of cheer
```

```
 1    to high school students.  So we are seeing a good balance
 2    there.  But I'm recruiting from both, All-Star and high
 3    school.
 4    Q.   Okay.  As I understand it, the NCSTA sponsors only
 5    collegiate competitive cheer events, is that correct?
 6    A.   Yes.
 7    Q.   So, in other words, the NCSTA does not have any high
 8    school level competition?
 9    A.   No.
10    Q.   All right.  What does --
11    A.   I'm sorry, there has been, there's been professed
12    interest.  Michigan high schools have been using a format
13    of this since in the State of Michigan they are a varsity
14    sport.  High schools have approached Oregon's coach
15    because they want to pick up this format for head on
16    competition.  And I was approached by New Hampshire asking
17    us if we'd speak to them about picking this form of
18    competition up.  So we know that there's talk about high
19    schools looking to the format.
20    Q.   Okay.  And of the high school students who are
21    sending you emails, how many of them have competed under
22    the NCSTA format?
23    A.   The high schools?
24    Q.   Yes, the high school students who are sending you
25    emails of interest?
```

1    A.   They've competed in skill sets that are off the
2    format.
3    Q.   And what does NCSTA propose to name this new sport
4    activity?
5    A.   Currently it's competitive cheer.
6    Q.   Okay.  And is there some dispute over whether NCSTA
7    should use the word cheer?
8    A.   There is, there is.
9    Q.   There is?
10   A.   Yes.
11   Q.   And what's that all about?
12   A.   I would say even media on it this week would prove
13   that, that there's a stereotype that just won't go away.
14   You know, there's -- that stereotype exists in this sport.
15   I think Mr. Webb called it classical cheerleading.  It
16   hasn't been classical cheerleading for decades.  These
17   sideline teams, that's not classical if you're doing it on
18   the sidelines.  There's nothing classical about it.
19   Q.   And just so we're clear, you use the term competitive
20   cheer, correct?
21   A.   We use the term competitive cheer, correct.
22   Q.   Does NCSTA, has it settled on competitive cheer as
23   the name of its sport --
24   A.   We have a vote that it currently has been competitive
25   cheer but we still have not resolved the issue of whether

1    the name needs to change.

2    Q.   Okay.  So now, as I understand it, you're recruiting

3    high school student athletes to compete in, in a sport

4    that they have not competed in previously.

5    A.   No.  We're, we're not asking that.

6    Q.   Okay.

7    A.   The high school athletes are members of All-Star gyms

8    and there are 300,000 kids in this country competing those

9    skills.  I don't think the format changes the skill set or

10   what they are trained for.  They are trained in floor

11   gymnastics, they are trained in those stunts.  So I don't

12   think the format changes the skill set.

13        And even when you go to different companies, for

14   instance, if you were to go to a cheer sport event, they

15   would do a tumbling round down there.  Sean Johnson from

16   the, our Olympic medalist Sean Johnson is the spokesperson

17   for the sport.  I mean I don't think that the skill set

18   changes because of the meet format.

19        I think the meet format, we developed it to speak to

20   an intercollegiate contest in a head-on between two

21   schools at the same time.  But the team routine is a

22   favorite part of this sport and it's one that's highly

23   recognized and it has all the components of the team

24   routine in it broken down so you could see it better and

25   value it better.

1    Q.    And how many schools compete in the NCSTA format

2    within the Northeast Conference?  Within the area covered?

3    A.    We've been talking about that, we don't have that

4    answer since the varsity sports don't know whether they

5    are going to do that yet.  And Maryland will be a bus trip

6    for us; they are the next closest.

7    Q.    Is Maryland within the NEC, do you know?

8    A.    No, Maryland's not within the NEC.

9    Q.    They are not?

10   A.    No.

11   Q.    All right.  So Maryland would be the closest school

12   where QU would compete in the NCSTA format?

13   A.    You mean when we travel?

14   Q.    Correct.

15   A.    Unless, again, unless Dartmouth makes the decision

16   whether to compete in this format.

17   Q.    Okay, but as of right now --

18   A.    As of right now it's Maryland.

19   Q.    -- Maryland is the closest?

20   A.    Yes.

21   Q.    What is the next closest?

22   A.    Probably Fairmont.

23   Q.    And where is Fairmont?

24   A.    I think it's in West Virginia.

25   Q.    West Virginia?

A.   Yes.

Q.   I don't think anything is close in West Virginia.

A.   You asked me what would be the next closest; I just
answered.

Q.   It was a joke.

A.   Okay.

Q.   What about after West Virginia?  I didn't say it was
a good joke.

A.   Okay.

Q.   What's the next closest after West Virginia?

A.   I'm trying to think about --

Q.   If you had the schedule, would that help?

A.   Probably Oregon.

        THE COURT:  Georgia.

A.   No, no.  Pardon me.  Baylor.

Q.   Baylor, and that's in Texas?

A.   Yes.

Q.   Okay.  All right, and what about Georgia?

A.   Georgia is a club team.  They are not a part of the
NCSTA.

Q.   So they are not NCSTA?

A.   No.

Q.   So, in order of closest, it would be Maryland, West
Virginia and then Texas?

A.   Correct.

1          MR. HERNANDEZ:  I have no other questions, Your

2    Honor.

3          THE COURT:  All right.

4          MS. FRIEDFEL:  Your Honor, may I ask a few more

5    questions?  She's our witness but he called her first so

6    if I could have just a few redirect questions?

7          THE COURT:  Sure, let me ask one first.

8          MS. FRIEDFEL:  Sure, by all means.

9          THE COURT:  Thank you.

10         You were describing the NCSTA championship

11   format and the tournament and so forth and it was unclear

12   to me whether teams other than NCSTA or college varsity

13   teams were going to be permitted into that championship,

14   either as a team or for individual or small group events.

15         THE WITNESS:  Okay.  I have had that, our

16   administrators -- that was an administrative vote.  I

17   don't believe for the championship it is but I don't know

18   about the events.  Are you talking for this coming season?

19         THE COURT:  Right.

20         THE WITNESS:  I don't -- they just had a

21   conference call last week and I don't know the answer on

22   the event, the event preceding the national championship.

23         THE COURT:  Okay, so you talked about having

24   both, the possibility of individual or small group

25   rankings and so forth?

```
 1                    THE WITNESS:  Uh huh.  (Affirmative.)

 2                    THE COURT:  Would those folks proceed to the

 3       NCSTA tournament in some way or is that --

 4                    THE WITNESS:  That's what I think that the vote

 5       was on.

 6                    THE COURT:  So that's unclear.

 7                    THE WITNESS:  I've not been made aware yet.

 8                    THE COURT:  All right.  But in terms of the

 9       college teams actually participating in that championship,

10       it's only going to be --

11                    THE WITNESS:  This year, yes.

12                    THE COURT:  It's only going to be NCSTA --

13                    THE WITNESS:  This year, yes.

14                    THE COURT:  -- teams.  Okay.  Thank you.

15       RECROSS EXAMINATION

16       BY MS. FRIEDFEL:

17       Q.   Earlier Mr. Hernandez asked you about your trainers

18       and whether you traveled with the trainers?

19       A.   Yes.

20       Q.   Were those trainers available at the meets that you

21       competed at?

22       A.   Yes.

23       Q.   So the meet provider provides trainers?

24       A.   Oh absolutely.

25       Q.   Okay.  And in terms -- he asked you some questions
```

```
 1    about where you practice and where you play.  What do you
 2    need in order to practice in terms of a facility?
 3    A.   What do we need?  We need nine mats.  We need nine
 4    mats that roll up into cylinders.  So, for instance, if
 5    we're scheduled in the Rec Center and something's coming
 6    in and the gym is available on that day, we can roll them
 7    up -- they are attached with velcro, we can roll them up
 8    and bring them down the hall, roll them down the hall,
 9    bring them down the hall.
10    Q.   So you can practice in the Rec Center and you can --
11    and you practice sometimes in Burt Kahn, is that right?
12    A.   Yes, we do.
13    Q.   And you're -- the competition that you held in
14    February, the big event, where was that held?
15    A.   That was held day one down in Burt Kahn, and then day
16    two up at T D Bank.
17    Q.   So you can compete at the T D Bank north center, the
18    way it's currently configured?
19    A.   Yes, you just bring in nine mats.
20    Q.   Okay, now --
21    A.   You'll -- excuse me, you need a mat for the warm up
22    center as well.  You have a warm up floor and then your
23    separated floor.
24    Q.   But you don't have to do anything to the T D North
25    Center to reconfigure it in any way physically so you can
```

1    --

2    A.    No, you put the mats down.

3    Q.    And with respect to the number of athletes that

4    compete, you said that the new rule for the NCSTA is that

5    you travel with 28?

6    A.    Uh huh.  (Affirmative.)

7    Q.    And you have 24 as the max on the team, right?

8    A.    Right.

9    Q.    Those other four athletes, do those four athletes get

10   to compete?

11   A.    Actually yes, and I'm hoping to recruit for that a

12   little more strategically because in our tumbling round,

13   we have, for instance, an aerial, an aerial pass which is

14   going to really require a tumbler with really great front

15   tumbling skills, do arabians, punch runs.  She might be in

16   some of the tumbling heat but might not be in the team

17   routine.  There can be two of them in that position that

18   out of the 28, 26 -- it could be all 28 of them, I don't

19   know.  They might all compete.

20   Q.    So you can have specialist athletes who would compete

21   in the individuals versus others who would compete in the

22   teams?

23   A.    Absolutely.

24   Q.    Can you swap in some of the specialists into the team

25   if you need to?

1    A.    Absolutely.

2              MS. FRIEDFEL:  I don't have any other questions.

3              THE COURT:  Thank you, you're excused.

4              THE WITNESS:  Thank you.

5              (Witness excused)

6              THE COURT:  Why don't we take our morning break

7    until -- why don't we say until quarter after.

8              MR. ORLEANS:  Your Honor, before we take the

9    break, let me just give the court some information on the

10   schedule that I hope will be welcome.  The plaintiffs have

11   elected not to call Dr. Yiamouyiannis who was scheduled to

12   be our next expert.  We advised defense counsel of that

13   last evening.  So which means that after the break we'll

14   be calling Coach Sparks, and then the plaintiffs will be

15   through.

16             I've been informed, advised by defense counsel

17   that they would prefer then -- and we have no objection to

18   this because of the late notice -- they would prefer to

19   then to break for the day in order to call their witnesses

20   tomorrow.  But I thought the court might like to know that

21   in terms of planning your own time.

22             THE COURT:  That's great.  I can get something

23   done.

24             MR. ORLEANS:  This counts as getting something

25   done, Your Honor, doesn't it?

1          THE COURT:  I guess so.  Who are your witnesses?

2          MR. BRILL:  Tomorrow it will be Tracy Flynn who

3    is the compliance officer.  And Rick Seely will be very

4    short.  He's the woman's ice hockey coach.

5          THE COURT:  Okay.  Let me ask whether either

6    side might want to call the track coach.

7          MR. BRILL:  The track coach.  You have her

8    deposition, Your Honor, because she gave birth just a

9    couple weeks ago.

10         THE COURT:  Oh, that's right.  All right.

11         MR. BRILL:  Unfortunately she can't leave a

12   newborn just like a week and-a-half, two weeks old.

13         MS. FRIEDFEL:  That wouldn't be nice at all.

14         MR. BRILL:  Could I mention one other thing,

15   Your Honor?

16         THE COURT:  Where do I find her deposition?

17   That's what you want handed up.

18         MR. BRILL:  Yes.

19         THE COURT:  All right, I have it right here.

20   Thank you.  I haven't read it yet obviously.

21         MR. BRILL:  May I mention one other thing, Your

22   Honor?  I told Mr. Orleans this morning that in light of

23   their decision not to call Dr. Yiamouyiannis, that there's

24   about ten page excerpt from her deposition and three

25   questions from her report that we'd like to offer.  They

1    are not really, it's really not the expert opinion

2    portion.  It's the testimony as to the facts with respect

3    to the NCAA rules on emerging sports.  Actually responsive

4    to the question that Your Honor had asked the other day

5    about whether a men's squash team counts and so on.  They

6    had designated her as an expert on this, she submitted a

7    report on this, we relied on that testimony being in the

8    record.  And, in fact, I think the law is very clear that

9    once she gives her report and is deposed, it's just like

10   any other witness.  Since she apparently is unavailable,

11   it's pretty clearly admissible and we just handed those

12   short excerpts to the plaintiffs so they can see what

13   we're talking about.

14           THE COURT:  Well, is the plaintiff offering her

15   report?

16           MR. ORLEANS:  I had not believed, Your Honor,

17   that we could offer her report without making her

18   available to testify.

19           THE COURT:  Well, is there any objection to

20   doing that?

21           MR. BRILL:  Absolutely.

22           MR. ORLEANS:  I anticipated that.

23           THE COURT:  Okay.

24           MR. ORLEANS:  And I have not yet had an

25   opportunity to review the segment of her report or the

```
1    segment of her deposition transcript that defense counsel
2    would like to introduce so I'd like to respond to that a
3    little later on after I've had a chance to look at it.
4              THE COURT:  Okay.
5              MR. ORLEANS:  We may or may not object to the
6    defense proposal on that.
7              THE COURT:  All right.  Well --
8              MR. ORLEANS:  Okay.
9              THE COURT:  Well, good.  All right, we'll see
10   you at 11:15.
11             MR. ORLEANS:  Thank you, Your Honor.
12             (Whereupon a recess was taken from 11:00
13        o'clock, a. m. to 11:20 o'clock, a. m.)
14             THE COURT:  Quick question on the schedule.  Is
15   it counsel's anticipation that the defense case will
16   finish early enough tomorrow to do your arguments at the
17   end of the day tomorrow?
18             MR. BRILL:  Well, yes and no.  Finishing early,
19   yes.  Being prepared for the argument, I think I'd rather
20   have until Friday morning but -- we'll do whatever the
21   court would like.  I think it would be a better argument,
22   Your Honor, if we had another day to go through the
23   transcript and get prepared for it.
24             THE COURT:  Okay.
25             MR. ORLEANS:  Whatever the court wants is fine
```

1    with us, Your Honor.

2              MR. BRILL:  But -- I'll be flexible also, Your

3    Honor.

4              THE COURT:  All right.  I'm happy to do it on

5    Friday.  That's fine.

6              MR. ORLEANS:  Thank you.

7              THE COURT:  Okay.

8              MR. ORLEANS:  Ready to go, Your Honor?

9              Plaintiff calls Robin Sparks.

10   R O B I N     L.     S P A R K S,     called as a

11   witness, one of the Plaintiffs, having been duly sworn by

12   the Clerk, testified as follows:

13             THE COURT:  State your name, spell your last

14   name please.

15             THE WITNESS:  Hi.  It's Robin Sparks,

16   S-P-A-R-K-S.

17   DIRECT EXAMINATION

18   BY MR. ORLEANS:

19   Q.   Ms. Sparks, you are the coach for the Quinnipiac

20   University volleyball team?

21   A.   I am.

22   Q.   And other than the fact that you're back on the stand

23   in Judge Underhill's courtroom this morning, are you aware

24   of anything else special about today?

25   A.   Today is the anniversary of Title IX, the 38th

1    anniversary.

2    Q.   How did your volleyball team do this year?

3    A.   We won four more matches than we probably should have

4    given everything we went through last year, but I was

5    really proud of them, for what we went through.

6    Q.   How many competitions did you engage in?

7    A.   You know, I'm not going to say I remember what our

8    loss record was to tell you exactly how many competitions,

9    but around 30.

10   Q.   And when you refer to "everything that you went

11   through this year," aside from the, whatever stress and

12   trauma there may have been associated with the lawsuit,

13   what other things did you go through that affected the

14   team's performance?

15   A.   Well, we lost most of our recruiting class last year

16   so I did my very best to find athletes really late last

17   summer and that was a problem.  We also ended up facing

18   injuries and illness and the like.  We had to compete with

19   seven people a couple of times this year because of that.

20   Q.   Now, I'll come back to some of the issues about

21   recruiting in the summertime but what's your outlook for

22   2010, 2011?

23   A.   We're going to have most athletic team that

24   Quinnipiac has probably ever seen.  I'm really excited

25   about the athletes who committed to come in thus far.

1   Q.   And since you testified at the preliminary injunction

2   last year, have you received any recognition or awards?

3   A.   I have.

4   Q.   Would you describe that briefly for the court,

5   please?

6   A.   I attended the NCAA Women Coaches Academy which the

7   NCAA does in conjunction with a foundation.  I can't

8   remember the name of the foundaton, but it's three days

9   with coaches of every level and every sport and it's just

10  for women.  We get training in legal issues, ethical

11  issues, how to deal with press, just lot of coaching

12  issues.  And I was awarded the Judy Sweet and most

13  inspirational award by the fellow coaches who were there.

14  Q.   Who's Judy Sweet?

15  A.   She's the first woman president of the NCAA.

16  Q.   Now, at the time that you testified last year, in May

17  of 2009, did you have a written employment contract with

18  Quinnipiac?

19  A.   I did.

20  Q.   And what were the essential terms of that contract?

21  A.   It was from July 1 --

22          MR. BRILL:  Objection, Your Honor.  This is a

23  document that should be put in evidence.  I don't know

24  where this is going but --

25          MR. ORLEANS:  I just wanted to get into the

1    record the fact it was a one year contract.  I think that

2    was established.

3              MR. BRILL:  I didn't know where you were going

4    but if there's some issue about the conference --

5              MR. ORLEANS:  No, no no.

6    BY MR. ORLEANS:

7    Q.   And would you have accepted your position at

8    Quinnipiac University as volleyball coach back when you

9    first took the job if you didn't have a written contract?

10             MR. BRILL:  Same objection, Your Honor.  She

11   can't say what she would have done in a hypothetical

12   circumstance.

13             THE COURT:  Well, I'll allow it.  It's not

14   necessarily a hypothetical.  I'll allow it.

15   BY THE WITNESS:

16   A.   Absolutely not.

17   Q.   Do you have an understanding of whether other

18   volleyball coaches in the northeast conference generally

19   have written employment contracts?

20   A.   Yes, they do.

21   Q.   Let me call your attention -- and I'm correct that

22   you no longer have a written employment contract with

23   Quinnipiac?

24   A.   Correct.

25   Q.   Let me call your attention to the month of June 2009,

1    if I could.  In June 2009, did you attend a meeting with

2    Dr. Thompson?

3    A.   There was an all staff meeting where he was

4    introduced as being the new person in charge of athletics.

5    Q.   Okay.  And what was the purpose of that meeting?

6    A.   I think it was for Mr. Thompson to introduce himself

7    to everybody.  We had to go around the room and introduce

8    ourselves to him.  It was really the first time many of us

9    had seen him.

10   Q.   And did Dr. Thompson speak at all to the -- well,

11   withdrawn.

12        Who else attended besides you and Dr. Thompson?

13   A.   Every coach, every trainer.  It was the entire

14   athletics and recreation department.

15   Q.   Okay.  And did Dr. Thompson address at all the

16   general subject of the Title IX lawsuit and the

17   preliminary injunction?

18   A.   Yes.

19   Q.   He did.  And did he say anything in particular that

20   has stuck with you?

21   A.   Yes.  He started off by saying he knew that no one

22   had done anything wrong at Quinnipiac, even though it may

23   not look kosher to the outside world.

24   Q.   And from the time of that meeting -- well, withdrawn.

25        Did he say anything about roster management?

1    A.    That there would be roster targets developed and he

2    would be in contact with coaches I think for their input.

3    Q.    Okay.  And from the time of that meeting until the

4    end of July, did you have any communications with -- any

5    conversations, excuse me, with Dr. Thompson about your own

6    roster target?

7    A.    No.

8    Q.    In that same period of time, from around the

9    beginning of June until the end of July, did you have

10   communications with Jack McDonald about your roster

11   target?

12   A.    Yes.

13   Q.    Okay.  And would you describe the communications that

14   you had with Mr. McDonald concerning your own roster

15   target for volleyball?

16   A.    Well, Jack and I met to do my review for the year, my

17   employment review.  It was actually a really nice meeting,

18   I have to admit.  And we talked about, you know, not about

19   the case by any means.  I think we both like each other

20   and expressed that.  But we did talk about how difficult

21   it was going to be, you know, what number would be

22   reasonable for me.  And he and I had agreed that ten would

23   be -- and I told him I would continue to work because I

24   would like to get to at least 12 because you need six on

25   the side, but that ten at that time, I was confident I

1    could have ten kids by that time.

2    Q.    Okay.  And since you're talking about the efforts

3    that you were making to recruit in July, in order to get

4    to 12 athletes at that point, how does a coach go about

5    recruiting at that time of the year?

6    A.    Well, as soon as we received the preliminary

7    injunction, I started almost immediately.  I had to -- I

8    sent emails to every club director that I knew in the

9    country and many that I didn't know.  I sent emails to the

10   junior college conferences that were most talented, I

11   guess the best way, the most competitive junior college

12   conferences to say do you have any athletes who are still

13   not committed to Quinnipiac.  I also contacted people who

14   I knew were very involved in the community, in the

15   junior's community, who also were very helpful and, you

16   know, saying I don't know anybody but let me use my

17   network.  It was really kind of amazing how many people

18   were trying to help me identify anybody available.

19   Q.    At that point in the summer, haven't most kids who

20   have graduated from high school and are planning to attend

21   college in the fall already decided where they are going

22   to go?

23   A.    Yes.

24   Q.    And in particular, haven't most athletes at that

25   point, Division I athletes, already made a commitment to a

1    school?

2    A.    Yes.

3    Q.    So you're looking -- well, so what are you looking

4    for?

5    A.    I started with just trying to find some names to find

6    athletes who might still be available.  Once I did

7    identify somebody, then I had to find out what were their

8    grades like, you know, were they capable of being admitted

9    at Quinnipiac University.  I also had to find out could

10   they afford it.  That's, you know, it's too late to get

11   financial aid at that point.  You can get some but, you

12   know, financial aid deadlines are much earlier, so it made

13   it incredibly challenging to try to find anybody.

14   Q.    As a varsity coach, if you could find someone who was

15   athletically capable and academically capable and could

16   pay, were you confident, even though all admission

17   deadlines were long past, that the admissions office would

18   let the person in?

19   A.    Yes, I was.

20   Q.    And were you successful in finding anybody last

21   summer, in the summer of 2009?

22   A.    I ended up finding one athlete who I was able to

23   attract in Florida.  Other than that, I found a local

24   athlete who was going to go play Division III but was

25   happy to come in and help us out.  And then the other

1    athletes I found were on campus.  They just happened to be

2    kids at Quinnipiac.

3    Q.   The two -- you mentioned two that you found who were

4    on campus that you were able to recruit.  Did either of

5    those two stick with the team through the year?

6    A.   One finished the year but has since transferred out.

7    And one did not.

8    Q.   Did she -- was she cut or did she quit?

9    A.   She quit.

10   Q.   Okay.  And did you then in the fall hold tryouts or

11   try to recruit on campus?

12   A.   In the fall, yes.

13   Q.   And did any, did you find any kids at that point who

14   you put on the roster?

15   A.   One athlete I tried to add in.  She was, she had the

16   build, she didn't really have the skill yet but I thought

17   we could register her a year, work with her and maybe get

18   her up to speed but she, after a few weeks, decided it

19   wasn't for her.

20   Q.   Okay.  Now, you've passed the NCAA recruiting test,

21   haven't you?

22   A.   For the current year, yes.

23   Q.   Is it something you have to take every year?

24   A.   You have to take it every year to start recruiting on

25   August 1st.

1   Q.   So each time you pass it, it's good from August 1st
2   to July 31st?
3   A.   Correct.
4   Q.   Is that right?  Okay.  So that if you were to take
5   the test, you need take the test sometime between now and
6   July 31st, is that correct?  Take and pass it?
7   A.   I can -- I can recruit off campus through July July
8   31st.  If I'm going to recruit off campus starting in
9   August I will have to have passed the test.  So if I don't
10  take it until, I don't know, for some reason September, I
11  wouldn't be able to recruit off campus for August until I
12  passed it.
13  Q.   But you can recruit off campus until July 31st
14  because you already passed it for the current year, right?
15  A.   Correct.
16  Q.   And, again, while we're talking about recruiting, do
17  you get email inquiries from students about playing
18  volleyball for Quinnipiac?
19  A.   Yes.
20  Q.   What kind of quantity are we talking about?
21  A.   Hundreds.  I actually, I actually pay for a database
22  to help me with it so that I can just send questionnaires
23  to the athletes, they can key in the information
24  themselves so that I don't have to spend the time.  But
25  per year, to quantify it, you know, at least 500.

1    Q.   And do they send you videotapes?

2    A.   Yes, some.

3    Q.   And do you still find it valuable to go off campus to

4    recruit?

5    A.   Invaluable, yes.

6    Q.   And why?  What's the value of going off campus?

7    A.   Videotapes only show the very best.  You know, I

8    actually joke sometimes with athletes that if I ever see

9    them make a mistake, they should be on the national team

10   because they are perfect.  I need to see them actually in

11   a game situation.  To see their skills is great, but to

12   see how they react to their teammate when they make a

13   mistake, how they treat their coach, I actually like to

14   see how they treat their parents.  Because that synergy

15   and how they act in stressful situations is really

16   important to a team because it's really neat to toss a

17   ball and watch somebody hit a ball a lot of time when

18   there's no one around them or in front of them, but in

19   stress how do they react?  But nobody is going to send you

20   a tape that shows you their worst side.

21   Q.   Now, I got off track a little bit.  We were talking

22   about your -- you described your communications with

23   Mr. McDonald concerning your roster target last summer.

24   And I think you said that you had discussed ten as a

25   target and you had said you would try to get to 12, is

1    that correct?

2    A.    Yes.

3    Q.    All right.  Did there come a time in July of 2009

4    when Mr. McDonald distributed roster letters to the

5    coaches at a staff meeting?

6    A.    Correct.

7    Q.    And were all the coaches present at that meeting?

8    A.    I'm going to say probably not because it's very rare

9    that all the coaches are present at meetings, but quite a

10   few.

11   Q.    And did people actually open the letters and see what

12   their targets were?

13   A.    Yes.

14   Q.    At that meeting?

15   A.    Yes.

16   Q.    And what was your target?

17   A.    Fourteen.

18   Q.    And have you had any warning that your target would

19   not be ten and not be 12 but would be 14?

20   A.    No.

21   Q.    Do you recall the reactions of any of the other

22   coaches --

23   A.    Yes.

24   Q.    -- when they opened their letters?  What do you

25   recall?

1          MR. BRILL:  Objection, Your Honor.  She's going

2     to testify about what other coaches said about their

3     roster targets.  It's hearsay.

4          MR. ORLEANS:  I think I would rely on excited

5     utterance exception, Your Honor.

6          MR. BRILL:  If she says Coach A said my roster

7     target is ridiculously high -- they've had access to all

8     these coaches for over a year and they chose not to depose

9     any of the coaches.  They cannot get this in through --

10    I'm sorry, Your Honor, but it's upsetting to me to think

11    they are going to now try to get this evidence in through

12    the back door.

13         THE COURT:  The question is what do you recall.

14    That doesn't call for any out-of-court statement.  A sigh,

15    a rolling of the eyes, a you know, whatever.  In other

16    words, she hasn't been asked what did Coach Smith say.  So

17    let's find out whether the answer's going to be a

18    statement or the answer's going to be something other than

19    a statement.  What do you recall, is the question.

20         MR. BRILL:  And I'm sorry, can we just clarify

21    when this meeting was because I lost track of that.

22         MR. ORLEANS:  July of 2009, and the roster

23    targets were handed out.

24         Your Honor, to be honest I am asking her to

25    report what other coaches said when they opened their

1    letters.

2              THE COURT:  All right.

3              MR. ORLEANS:  I don't want to be -- I'm not

4    trying to hide the ball here.

5              THE COURT:  So you're saying it's excited

6    utterance.

7              MR. ORLEANS:  You open a letter, you see your

8    target and the first thing that comes out of your mouth I

9    think is an excited utterance or a statement of existing

10   mental or emotional condition.

11             THE COURT:  That's a bit of stretch but --

12             MR. ORLEANS:  Well --

13             THE COURT:  You know, lay a foundation.

14             MR. ORLEANS:  State of mind.

15             THE COURT:  Lay a foundation.

16   BY MR. ORLEANS:

17   Q.   Now let's take it a bit at a time.

18   A.   Okay.

19   Q.   Do you recall that some of the coaches made comments

20   when they opened their roster letters?

21   A.   Yes.

22   Q.   And specifically which coaches do you recall?

23   A.   Men's soccer coach.

24   Q.   Okay, let's start with him, men's soccer coach.  Was

25   he agitated?

1    A.   Yes.

2            MR. BRILL:  Your Honor, that's a leading

3    question.  Come on.

4            THE COURT:  Yes, it is.  Rephrase it.

5            MR. ORLEANS:  Let me see if I can rephrase.

6    BY MR. ORLEANS:

7    Q.   What was his --

8            THE COURT:  Demeanor.

9            MR. ORLEANS:  Thank you.

10   BY MR. ORLEANS:

11   Q.   What was his demeanor?

12   A.   He was angry.

13   Q.   And did he raise his voice at all?

14   A.   Yes.

15   Q.   I withdraw the question, I don't mean to lead.

16        What was his tone of voice?

17   A.   I think disgust would be the best -- I mean he was

18   disgusted by this situation.

19   Q.   And did he make a statement?

20   A.   Yes.

21   Q.   What was that statement?

22           MR. BRILL:  Objection, Your Honor.

23           THE COURT:  Yes, I'm going to allow it.  Go

24   ahead.

25   BY THE WITNESS:

```
1    A.    He said, "I am not signing this letter."

2    Q.    That's the women's soccer coach?

3    A.    Men's soccer coach.

4    Q.    Men's soccer coach.  Did any of the other coaches

5    make comments when they opened their letters?

6    A.    Yes.

7    Q.    What other coach made a comment?

8    A.    Women's soccer coach.

9    Q.    And that would be Mr. Clark?

10   A.    Yes.

11   Q.    What was his demeanor?

12   A.    I would say he was frustrated.

13   Q.    How did you -- what indicated to you that he was

14   frustrated?

15   A.    I remember looking at him and he kept looking and

16   just shaking his head when he was looking at the letter.

17   And then he started talking to some other people but --

18   Q.    What was his tone of voice when he started speaking?

19   A.    He's not someone who screams and yells so -- I think

20   frustrated.  I think frustrated is probably, may be

21   different than demeanor or tone of voice but I would mean

22   this to just encompass it.

23   Q.    What statement did he make that you heard?

24         MR. BRILL:  Your Honor, I'm going object to this

25   and similar questions of every person.
```

1          THE COURT:  Fair enough, but it's not obvious to

2    me that these statements are being offered for their

3    truth.  They are being offered to express state of mind.

4          MR. ORLEANS:  Correct.

5          THE COURT:  In other words, I'm not going to

6    sign this letter, well, it has no relevance if it's

7    offered for its truth.  It does have a lot of relevance if

8    it's offered to show attitude, mental state, frustration,

9    whatever.  So I don't think these are hearsay statements.

10         If they are -- in other words, if there comes

11   out a statement that is being offered for its truth, renew

12   your objection and we'll take it up.  But it sounds to me

13   like this is not, it's just not hearsay because it's not

14   being offered for its truth.  And to the extent that it

15   is, it seems to me so far we've had a foundation that

16   would support it, an excited utterance exception.

17   BY THE WITNESS:

18   A.   I'm sorry, could you read the question?

19   Q.   The question is what Mr. Clark said that you heard.

20   A.   He said his number, this number doesn't work because

21   of the sub rules in soccer.

22   Q.   The sub rules?

23   A.   The substitution rules.  I don't know --

24         MR. BRILL:  I'm sorry, could I ask the court

25   reporter to read back the last question and answer?  I was

1    distracted.

2            THE COURT:  The "Question:  The question is what

3    Mr. Clark said that you heard.

4            Answer:  He said his number, this number doesn't

5    work because of the sub rules in soccer.

6            Question:  The sub rules?

7            Answer:  The substitution rules.  I don't

8    know --"

9            MR. BRILL:  Well, that is objectionable hearsay,

10   Your Honor.  That's a statement about what he felt about

11   his number and frankly if this is coming in through this

12   witness I withdraw my prediction that the case is going to

13   finish tomorrow because I'm now going to call Mr. Clark

14   about what he really said and what he felt about his

15   roster.

16           THE COURT:  Well, okay.  I mean that's a

17   different issue.  That doesn't change my ruling on

18   hearsay.  The statement, this number doesn't work, does

19   not sound to me like it's being offered for the truth as

20   much as it's been offered to demonstrate an expression of

21   frustration.  The number, the number is the number.

22           MR. BRILL:  But are they going to argue that

23   means the soccer coach had a number that didn't work for

24   him because she testified that he said this number doesn't

25   work for me?

1          THE COURT:  He has a number that he doesn't
2     like.  It's an indication of his state of mind.  It's not
3     an indication of whether -- how does a number work or not
4     work?  What's true or false about that statement?
5          MR. ORLEANS:  Just for the record, he's the
6     women's soccer coach.
7          THE COURT:  I'm sorry, whatever.
8          MR. ORLEANS:  No, that's okay.
9          MR. BRILL:  How does it work or not work?
10          THE COURT:  What is true or false about the
11     statement this number doesn't work for me.
12          MR. BRILL:  What's true or false about it is
13     his, is the effort to show that he was saying that he had
14     a number that didn't work for him.  Right?
15          THE COURT:  What does that mean?  How is that
16     true or false?  It's true or false only in the sense that
17     it's an indication of his state of mind.  The statement
18     itself, if I say "holy cow" that's not true or false.  The
19     cow isn't either holy or unholy.  It's an expression of my
20     reaction to something.
21          MR. BRILL:  Right but --
22          THE COURT:  This is in the nature of a reaction.
23     It's not, he's not saying, because he can't say that a
24     number either works or doesn't work.
25          MR. BRILL:  Well, that's where I'm losing --

1        THE COURT:  He's either happy or unhappy with

2    his number.  It's like holy cow.  I don't think it's

3    hearsay.  I'm going to overrule the objection.

4        MR. ORLEANS:  Thank you, Your Honor.

5    BY MR. ORLEANS:

6    Q.   Let me call your attention to the following month,

7    August 2009.  During August 2009, did you have a

8    conversation with Carolyn Martin about her roster target?

9    A.   Yes.

10   Q.   Could you just describe the circumstances under which

11   you had this conversation?

12   A.   She and I were walking down the hall, she had

13   recently very recently, I believe, been named the head

14   coach.  We were talking about balancing coaching and

15   family and then we started, she started talking a little

16   bit about just the responsibilities and what you need to

17   do when you're coaching and it led into the situation she

18   was in at the moment.

19   Q.   Okay.  And did she say anything that indicated to you

20   what her state of mind was concerning her roster target?

21        MR. BRILL:  Your Honor, this is not a state of

22   mind statement.  We know what she testified to in her

23   deposition.  This is not --

24        THE COURT:  It's a yes or no.  It's a yes or no

25   question.  You can answer that question.  Did she or did

1    she not say something to you indicating her state of mind?

2           THE WITNESS:  Yes.

3    BY MR. ORLEANS:

4    Q.   And what did she say?

5           THE COURT:  Now it's time for your objection.

6           MR. BRILL:  I object to this as hearsay.

7           THE COURT:  Okay, all right.

8           MR. ORLEANS:  I think it's a -- the statement --

9    I would make as an offer, Your Honor, that the statement

10   that Coach Sparks is about to relate begins with the words

11   "I don't know."  And I'm offering it as a statement of

12   Coach Martin's mental condition or her state of mind, her

13   then existing state of mind.  So to the extent that it's

14   hearsay I think that it comes in under that exception.

15          It's also in the same sense that Your Honor just

16   described, I think it's not offered for the truth of any

17   fact within it.  It's offered as an indication of what

18   Coach Martin was thinking and feeling at that time and

19   what her, how she felt about the roster target that she

20   had been assigned.

21          THE COURT:  Well, it's a bench trial.  Let me

22   hear what the statement is.  I'll either strike it or I

23   won't.

24          MR. BRILL:  I only know what she testified to in

25   her deposition and it doesn't correspond how she's

1    describing it now.

2              THE COURT:  Well, you're a step ahead of me; I

3    haven't seen the deposition.

4              MR. ORLEANS:  Again, to be honest, I do not

5    recall whether I asked her at her deposition what she said

6    to Coach Sparks.

7              THE COURT:  Okay, let's hear it and then we'll

8    take up a motion to strike.

9              MR. ORLEANS:  Just so that's clear.

10             MR. BRILL:  I wasn't talking about what Coach

11   Martin testified to, I'm talking about what Coach Sparks

12   testified to in her deposition.

13             THE COURT:  All right, let's get the answer,

14   what did she say to you?

15             THE WITNESS:  She said she didn't know how she

16   was going to get to 30 and has been joking she's going to

17   go to the cafeteria and put up a sign to find those

18   athletes.

19             MR. ORLEANS:  I would offer the portion of the

20   statement "I don't know how I'm going to get to 30."

21             THE COURT:  All right, and is there a motion to

22   strike?

23             MR. BRILL:  Yes, Your Honor.

24             THE COURT:  Okay.  And why is that not a

25   statement of mental condition, her present sense, mental

1    condition?

2          MR. BRILL:  I accept your ruling on that.  That

3    was not what -- it was not what I expected the answer to

4    be so -- it's different from what she testified to in her

5    deposition.

6          THE COURT:  All right, so we'll strike the

7    remainder and we'll permit the portion that's been

8    offered.

9          MR. ORLEANS:  Okay.

10          MR. ORLEANS:  May I have just a moment Your

11    Honor?

12          THE COURT:  Sure.

13          (Pause)

14    BY MR. ORLEANS:

15    Q.   Now, Coach Sparks, you never actually signed your

16    2009 roster letter, did you?

17    A.   No.

18    Q.   And if you could just briefly explain to the court

19    why you didn't sign it?

20    A.   I believe they are manufacturing evidence for the

21    case and I refused to sign it.

22          MR. BRILL:  Objection, Your Honor, move to

23    strike.

24          THE COURT:  What's the objection?

25          MR. BRILL:  Her belief that we're manufacturing

```
 1    evidence?

 2              THE COURT:  Well, why -- okay.

 3              MR. BRILL:  I mean what is that evidence of?

 4              THE COURT:  It's evidence of why she didn't sign

 5    the letter.  There wasn't an objection to the question.  I

 6    don't understand why there's an objection to the answer.

 7    In other words, she's answered why.  Am I missing

 8    something?  Is the answer scandalous, 403?  What is it

 9    that you have a problem with the answer that you didn't

10    have a problem to the question?

11              MR. BRILL:  Just the suggestion that there was,

12    that the university was manufacturing -- I'm sorry, the

13    university was not manufacturing evidence, Your Honor.

14              THE COURT:  Okay, it's her view.

15              MR. BRILL:  It's her belief, okay, I accept

16    that.

17    BY MR. ORLEANS:

18    Q.   And do you recall a staff meeting in August or --

19    withdrawn.

20         Do you recall a staff meeting in August or September

21    of 2009 when Mr. McDonald made a comment about the

22    importance of signing the roster letter?

23    A.   Yes.

24    Q.   And what did he say?

25    A.   He said we'd be in more trouble for not signing the
```

1    letters -- for not signing the letters than not meeting

2    our targets.

3    Q.   Did you attend the Title IX training that

4    Dr. Thompson testified about that was conducted by

5    Quinnipiac for its coaches?

6    A.   Yes.

7    Q.   Who conducted that training for Quinnipiac?

8    A.   Janet Judge.

9    Q.   Is that the same Attorney Janet Judge who was in

10   court at the defense table during the preliminary

11   injunction hearing?

12   A.   Yes.

13   Q.   Did she say anything during the training about

14   whether or not Quinnipiac had done anything wrong?

15   A.   Yes.

16   Q.   Okay, and what did she say?

17   A.   She said that cutting and dropping players around the

18   first day of competition was not proper, you cannot do

19   that.

20   Q.   Now, let me draw your attention to April of this

21   year, April 2010.  In April of 2010, did you attend a

22   staff meeting at which Dr. Thompson spoke about budget

23   issues and the Athletic Department?

24   A.   Yes.

25   Q.   Could you tell his Honor what Dr. Thompson said about

1    budget issues in the Athletic Department at Quinnipiac?

2    A.   He came in and talked about how well he thought the

3    year had gone and the transition, he said the university

4    had one more tough year budget rise because there's like a

5    5 million-dollar debt payment and then there would be a

6    level amount of dollars and it was -- I don't understand

7    all the the details, but things would open up budgetarily

8    for the university.  He said that the staff raises would

9    be back this year but everybody's budgets would be flat.

10       He also talked about the fact that the university had

11   put emphasis in different parts of it for excellence.  I

12   don't know that he used that word but had spent a lot of

13   time talking about academics and doing a lot of work

14   there.  They'd spent a lot of time on student services,

15   doing a lot of work there, and they were going to start

16   putting investment back into athletics so they were going

17   to start investing in facilities again, hopefully having

18   more looker room space, start upgrading facilities

19   outside, et cetera, et cetera.  The plan, it was things

20   that Jack had talked about prior to everything getting

21   tight economically.

22   Q.   Did he say anything about the status of the

23   university's endowment?

24   A.   I'm not sure if he talked about the endowment then or

25   not.

1    Q.   Did -- was there some other occasion when he spoke

2    about the endowment?

3    A.   The president spoke about the endowment at the Bill

4    Mecca golf tournament in front of everybody.

5    Q.   Were you there?

6    A.   Yes.

7    Q.   What did the president say about the endowment at the

8    Mecca golf tournament?

9    A.   The endowment is higher than it's ever been in the

10   history of the university right now.

11   Q.   Are you aware whether or not the university has made

12   plans to establish a medical school?

13   A.   Yes.

14   Q.   Are you aware of any statements that have been made

15   by the president of the university about how the medical

16   school will be paid for?

17   A.   Yes.

18   Q.   What has he said about that?

19   A.   They won't have to go into debt to do that.

20   Q.   Okay.  At that April meeting with Dr. Thompson, did

21   he make any statements about the rosters for 2010, 2011?

22   A.   He talked about the process, yes.

23   Q.   And what did he say about, at that point about

24   whether roster targets were known?

25   A.   They were not known at that point.

1    Q.    So this is -- and this is in April?

2    A.    Correct.

3    Q.    Okay.  And without relating anybody's specific

4    remark, what was the reaction among the coaches to the

5    news that the roster targets were not yet known?

6    A.    I think frustration.  You're recruiting.  It's very

7    difficult to recruit when you don't know how many you're

8    supposed to have in the fall.

9    Q.    And how did Dr. Thompson respond to any expressions

10   that the coaches may have made about that?

11   A.    I think he was understanding and listened to that.  I

12   think in general as coaches, we like to know two or three

13   years in advance what our numbers are going to be because

14   recruiting cycles are such that athletes are committing so

15   young now, you really need to know as you're doing

16   planning for your future.  But he explained that we would

17   only ever know one year in advance but he thought he could

18   get it to us in like October of the year instead of

19   further, or as late as this year.

20   Q.    Did Dr. Thompson say anything about the trend in

21   undergraduate admissions of men and women at Quinnipiac?

22   A.    Yes.

23   Q.    What did he say about that?

24   A.    Coming up into the fall, that deposits were up in

25   health sciences and greatly reduced in business and --

1    Q.   What was the significance of that?

2    A.   The health science is predominantly women and that

3    businesses were more where men tend to go.

4    Q.   And from your observation as a member of the

5    Quinnipiac community and a member of the faculty at

6    Quinnipiac, is Quinnipiac emphasizing health sciences?

7    A.   Yes.

8         MR. ORLEANS:  Just a moment, if your Honor

9    please?

10        (Pause)

11        MR. ORLEANS:  I have nothing further at this

12   time, Your Honor.  Thank you.

13        THE COURT:  All right, cross?

14   CROSS EXAMINATION

15   BY MR. BRILL:

16   Q.   Coach Sparks, you remember giving a deposition in

17   this matter on April 12th, 2010?

18   A.   Yes.

19   Q.   I'm going to hand the witness a copy of her

20   deposition transcript, Your Honor.

21        (Hands witness.)

22        Thank you.  You remember I asked you about the -- to

23   testify to everything you remembered about that June,

24   early June meeting with Dr. Thompson at your deposition?

25   A.   The June meeting?

```
 1    Q.   Yes, the meeting in which you just said that
 2    Dr. Thompson -- didn't you just testify that Dr. Thompson
 3    told the coaches at that meeting June of 2009, that
 4    Dr. Thompson told the coaches that Quinnipiac had done
 5    nothing wrong?
 6    A.   Yes.
 7    Q.   You didn't testify to that in your deposition, did
 8    you?
 9    A.   I don't remember you asking me specifically about the
10    June meeting.
11    Q.   Well, let's look at your testimony.
12              MR. ORLEANS:  Could we have a page reference,
13    please?
14              MR. BRILL:  Yes, if I can get it.  It's page
15    ten.
16    BY MR. BRILL:
17    Q.   You attended just a -- is this a little out of focus
18    or just my eyes?  Can you see that, Your Honor?
19              THE COURT:  I can see it.
20    Q.   You attended the June 3rd -- do you remember giving
21    this, do you have that in front of you?
22    A.   Yes.
23    Q.   "You attended the June 3rd, 2009, Athletic Department
24    meeting which is referred to in the email?
25              I believe so.
```

1        And Dr. Thompson spoke at that meeting, is that

2    correct?

3        If he says he did, he must have.  I mean I don't

4    remember dates specifically.

5        Well, do you remember a meeting in which Dr. Thompson

6    explained the new procedure for roster management to the

7    coaches?

8        Yes, I do.

9        And what did he say?

10       He just handed us numbers individually and said that

11   if we had problems to let us know.

12       Do you recall anything else that he said?

13       Oh geez, he would be following up with us to have

14   meetings and I don't recall anything else right now."

15       So you didn't remember this comment by Dr. Thomas in

16   April of your deposition, did you?

17   A.   It looks like I confused two different meetings when

18   we were talking but we were talking, I mean you didn't --

19   it just didn't come up, no.  I mean I know that he, you

20   know -- I was an incredibly nervous wreck, this is the

21   beginning of it and I know that as I sat back that we got

22   the numbers later.  We didn't get the numbers at the

23   June 3rd meeting and -- so that's what it says.

24   Q.   You don't remember getting your roster number at the

25   June 3rd meeting?

1    A.    No.

2    Q.    Well, let's turn to page 11 of your deposition.

3    Actually before I put that up, Coach Sparks, you testified

4    that you told Jack McDonald that you wanted a roster

5    number of ten?

6    A.    The way Jack and I had our meeting, Jack suggested

7    ten and I told him that I thought it was reasonable for me

8    to try to get to 12.  I wasn't sure I could get there but

9    I was going to do my best.

10   Q.    And was that before you got -- before the university

11   assigned any roster number to you?

12   A.    Yes.

13   Q.    Well, that's not what you testified to, was it?

14        "Didn't you testify that -- what was the initial

15   roster number that you were assigned?

16        I believe it was 15 or 14.  It was a large number.

17        And did you object to the number or respond to it?

18        I had a meeting with Jack about it, yes."

19        This was after you got the roster number that you had

20   the meeting with Jack, right, that's what you testified

21   to?

22             MR. ORLEANS:  Your Honor, I don't think this

23   contradicts her testimony.  I think -- he's trying to

24   impeach with inconsistent testimony, I object.

25             MR. BRILL:  She just testified that the meeting

1    with Jack about the roster number was before any roster

2    number was assigned.

3           Let's finish reading.  The court can decide.

4    BY MR. BRILL:

5    Q.   "What was said in that meeting?

6           He understood that it was going to be difficult for

7    me to achieve at that late a date.  We agreed to -- I

8    thought it was reasonable for me to try to get to 12 and

9    he agreed."

10          Does that refresh your recollection that you were

11   assigned the roster number of 14 or 15 before your meeting

12   with Jack in which --

13   A.   There were two meetings with Jack.  The first time I

14   met with Jack is my staff review and we talked generally

15   about, you know, Jack brought it up and that was -- I

16   don't know, it was the end of the year, it was my staff

17   evaluation.  The initial roster number was the letter I

18   got and that said 14.

19   Q.   The initial roster number was the letter that you

20   got?

21   A.   That's the way I took that to be is when, because

22   that was when we were told and they said you need to sign

23   something to say that that's what you've going to have.

24   Q.   And you don't -- in any event, you didn't feel that

25   12 was an unreasonably large number, did you?

1    A.   But -- I was would love to have been able to tell you

2    I could get to 14.  That would be great.  The

3    circumstances we were in, when Jack first said ten I

4    thought at that time, look, I think I can get to 12, and

5    so that was my goal was to try to get to 12.

6    Q.   And you did not think this was an unreasonably large

7    number, did you?

8    A.   No.

9    Q.   Now, with respect to your conversation with the track

10   coach, Coach Martin?

11   A.   Uh huh.  Yes, sorry.

12   Q.   You don't know whether -- in fact, you suggested to

13   her that she talk to Jack if she had a problem with the

14   number that was assigned to her, didn't you?

15   A.   Yes.

16   Q.   And you don't know whether she had any conversation

17   with Jack about the roster number, do you?

18   A.   She -- during the course of the conversation --

19   Q.   No, after your meeting with her, you don't know

20   whether she had any conversation with Jack McDonald?

21   A.   She told me during that meeting, like when we talked,

22   she had talked to Jack.

23   Q.   Well, didn't you testify at your deposition on page

24   30, Coach Sparks, that "You don't know what if anything

25   she said to Jack McDonald or anybody else in the Athletic

1    Department about the roster size?

2         No.

3         Did you have any other conversations with the track

4    coach about the roster size?

5         Not that I recall."

6    A.   Well, when we were talking, she was -- her

7    conversation was about how to get to the roster size, I'm

8    not sure she had a conversation about, I don't know what

9    they talked about in terms of the number part.  She was

10   saying that she would like to add jumpers.  And --

11   Q.   This is what she told you?

12   A.   Yeah, because she could get them to go practice at

13   the high school.

14   Q.   But you suggested to her if she had problem, she

15   should go back to Jack or somebody else in the Athletic

16   Department, right?

17   A.   I told her that she should stick with her integrity,

18   that we had to -- I hadn't gone through all this to have

19   coaches not be able to do, to stay within their integrity

20   for the program, their own program.

21   Q.   But didn't you tell her to go back and talk to Jack?

22   A.   Absolutely.

23   Q.   And you don't know whether she did or she didn't?

24   A.   I do not know after that.

25   Q.   And at the meeting in June when Dr. Thompson spoke to

1   the coaches, he did tell the coaches, did he not, that it

2   was the university's intention for each team to have a

3   roster number that was a reasonable number that

4   represented genuine Division I experience for each member

5   of the team?

6   A.   I'm not sure if that's exactly what he said but I'm

7   sure he said that the university intended for us to have

8   set roster numbers.

9   Q.   That were genuine and reflected genuine Division I

10   experience?

11   A.   He may have said that.  I don't recall that part

12   specifically.

13   Q.   Well, you did recall that in your deposition, right?

14      At the bottom --

15         THE COURT:  If you're refreshing recollection

16   why don't we do that the right way.

17         MR. BRILL:  Excuse me?

18         THE COURT:  Are you refreshing recollection?

19   She says she doesn't recall.

20         MR. BRILL:  Yes.

21         THE COURT:  So show her the page, ask her if

22   that refreshes her recollection.

23   BY MR. BRILL:

24   Q.   Does that refresh your recollection --

25         MR. ORLEANS:  What page is it?

1    A.    "When do you remember him telling you that --"

2          THE COURT:  No, you don't put it on the record,

3    you refresh her recollection.

4          MR. BRILL:  Got it, Your Honor, I'm sorry.

5    BY MR. BRILL:

6    Q.    Would you look at page ten at the bottom, page 11 at

7    the top, page eleven, and see if that refreshes your

8    recollection?

9    A.    (Pause)

10         I said that -- you know, he says that a lot so he

11   probably did say that then.

12   Q.    And that's what you testified to at your deposition?

13   A.    Yes.

14   Q.    Now, you testified that the men's -- checking my

15   notes -- the men's soccer coach made a comment, an

16   expression of unhappiness of some kind or frustration when

17   he opened his envelope?

18   A.    Yes.

19   Q.    Were all of the coaches in a room together when they

20   got these roster, these letters?

21   A.    Yes.

22   Q.    And you don't know whether the men's soccer coach was

23   frustrated because he had too many players or too few

24   players or for any other reason, correct?

25   A.    I believe what he told me after that --

1    Q.   No, I'm asking about at the time when he made this

2    utterance.

3    A.   Well, he was frustrated because he said "I asked for

4    29 and it's only 23, I have injured players on

5    scholarship, they're going to count.  I thought I was

6    going to get 29."

7    Q.   And this is what he said during the meeting?

8    A.   He was sitting next to me so he had asked for 29, he

9    expected his number to be 29.

10   Q.   What experience as a Division I coach did you have

11   when you were hired?

12   A.   I had not been a Division I coach.

13   Q.   And when were you advised that you would no longer be

14   a, on an employment contract?

15   A.   When was I advised?  I actually e-mailed, I think, or

16   did I call -- Jack because I was out recruiting and I was

17   at the national championships and I didn't want to use my

18   Visa if I wasn't, I was no longer under contract, I didn't

19   want to break a rule, so I got in touch with Jack because

20   I had no contract and it was June 29th or 30th, and he

21   told me that no one was getting contracts, that I could

22   could use my Visa, that we would be getting NCAA

23   contracts.

24   Q.   Now, at your deposition, Coach Sparks, I asked you a

25   series of questions about what you knew about any other

1    teams where you felt that, that a coach was, had an

2    inappropriate number, do you remember that?

3    A.   Yes.

4    Q.   And you didn't say anything at that time about a

5    conversation you had with a men's soccer coach, did you?

6    A.   We didn't really have a long conversation.  It was in

7    a staff meeting, but I remember we talked a lot about --

8    can you -- we talked a lot about the women's teams, I

9    recall that.  If I didn't mention the men's soccer, then I

10   didn't mention but I know you asked me a lot if I had

11   conversations with coaches and --

12   Q.   Well, that was a conversation with a coach, wasn't

13   it?

14   A.   Well, he was announcing that to everybody so -- there

15   was a lot of talk going on at that time.

16   Q.   Well, after -- do you remember that I asked you after

17   going through all, all the evidence you could recall

18   about --

19          MR. ORLEANS:  Excuse me, page please?

20          MR. BRILL:  Thirty-eight.

21   BY MR. BRILL:

22   Q.   Do you remember I asked you on page 38, "With respect

23   to the men's teams do you have any reasons to question

24   whether these numbers of any cases are lower than they

25   should be," and you said, "Not at this moment"?

1    A.    I didn't remember it then.

2    Q.    You did not remember the conversation at that time?

3          And do you recall you testified -- I'm sorry, do you

4    recall -- with respect to the woman's soccer coach, do you

5    recall coach asking in a meeting whether he could lower

6    his, the squad number for the women's soccer team and have

7    some other team pick up an extra woman?

8    A.    There was a discussion, yes, I recall that.

9    Q.    And then Mark Thompson said in response that he would

10   not allow any horse trading between teams?

11   A.    Yes.

12   Q.    And that each team had to justify its own roster

13   number?

14   A.    Yes.

15   Q.    And he said if anyone had a problem to come and

16   discuss it with him, right?

17   A.    I think that's what the email said.

18   Q.    You think --

19   A.    I think that's what the email said.

20   Q.    So you don't know whether the soccer coach went to

21   talk to Dr. Thompson after that, do you?

22   A.    No.

23   Q.    And you have no reason to believe that the woman's

24   soccer roster number was too high other than that one

25   comment by the coach at the meeting you just testified to,

1    correct?

2    A.    Correct.

3    Q.    In terms of recruiting, how many volleyball, college

4    volleyball programs are there in the United States?

5    A.    Division I or II or III or --

6    Q.    Division I?

7    A.    336 -35?  There's teams in transition from D II to D

8    I so I'm not sure they are classified.  But 330-ish.

9    Q.    How does Quinnipiac rank nationally?

10   A.    This past year we were down, you know, with the

11   entire Northeast Conference, is one of the weakest

12   conferences in the country, so we were down in the bottom.

13   Q.    So you're recruiting against all of these other

14   programs in the United States?

15   A.    Absolutely.

16            MR. BRILL:  I don't think I have anything else

17   for this witness, Your Honor.

18            THE COURT:  All right.  Any redirect?

19            MR. ORLEANS:  Just very brief, Your Honor

20   REDIRECT EXAMINATION

21   BY MR. ORLEANS:

22   Q.    Coach Sparks, you testified just a minute ago on

23   cross that you were told by Mr. McDonald that you would

24   receive a NCAA contract?

25   A.    Yes.

```
 1    Q.    And did you ever receive a NCAA contract?

 2    A.    No.

 3    Q.    To your knowledge is there such a thing as a NCAA

 4    contract?

 5    A.    No, but I wasn't sure if, like if there's something I

 6    didn't know about.

 7    Q.    But your employment did continue?

 8    A.    Yes.

 9    Q.    And Mr. Brill asked you about your conversation with

10    Coach Martin.  And I think you testified on cross

11    examination that you had said to Coach Martin, I didn't do

12    this so that -- and I missed your answer to that question.

13    What was it that you said to Coach Martin?

14    A.    She was --

15    Q.    What did you say to her?

16    A.    I told her that I didn't go through all of this,

17    meaning this.

18    Q.    Meaning this lawsuit?

19    A.    Bringing this lawsuit, to have to have coaches do

20    things that were against the integrity and the best for

21    their team.

22    Q.    And how did she respond?

23    A.    What she said or how --

24    Q.    What did she say?

25    A.    She said she understood but she was really excited to
```

 1    get a head coaching job and she believed she had to do

 2    what the university wanted her to do.

 3                MR. ORLEANS:  Nothing further, Your Honor.

 4                THE COURT:  All right.  Thank you, you're

 5    excused

 6                (Whereupon the witness was excused.)

 7                MS. FRIEDFEL:  Your Honor, I just have a small

 8    housekeeping matter.  I have a copy of the DVD for the

 9    court.

10                THE COURT:  Very good.

11                MS. FRIEDFEL:  Exhibit F E.

12                THE COURT:  It's the DVD that corresponds to

13    F E?

14                MS. FRIEDFEL:  Yes.

15                THE COURT:  Very good.  Thank you.

16                MR. ORLEANS:  Your Honor, subject to some

17    housekeeping, the plaintiffs would rest at this time.

18                Mr. Brill and I have talked, we want to make

19    sure that we were all in agreement as to what exhibits

20    have been admitted and go through the list and make sure

21    that we offer up the ones that we haven't used if we

22    really would need them.

23                We want to make sure that the deposition

24    exhibits have been submitted with the depositions so that

25    Your Honor will know what the witnesses are talking about.

1          We have this offer by the defendants of a

2    portion of Yiamouyiannis' report and deposition that I

3    need to review.  So I would think tomorrow we'll be able

4    to address those things but we have no more witnesses to

5    call.

6          THE COURT:  I was going to recommend that you go

7    over the exhibits because it's not unusual, especially in

8    this format, to realize -- I think Mr. Brill had a bad

9    experience yesterday -- to realize that an exhibit you

10   need to get in you haven't quite moved in yet.

11         Okay, so where are we in terms of defense

12   witnesses?  You suggested the possibility of calling

13   another witness?

14         MR. BRILL:  We have Tracy Flynn, we have Rick

15   Seely.

16         THE COURT:  Right.

17         MR. BRILL:  And I want to evaluate the testimony

18   this afternoon to see if I need to respond to any of her

19   testimony.  If so, if it's only in for state of mind

20   evidence, I'm not sure it's necessary to respond to that,

21   but if there's anything more we think the court needs to

22   hear, we'll evaluate that this afternoon.

23         THE COURT:  All right.  Very good.  So we'll see

24   you back here tomorrow at 9:00 o'clock.  We'll stand in

25   recess.

1          MR. ORLEANS:  Thank you, Your Honor.

2          (Whereupon the above matter was adjourned at

3     12:20 o'clock, p. m.)

C E R T I F I C A T E

I, Susan E. Catucci, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ Susan E. Catucci
_____

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917) 703-0761