```
                  UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

STEPHANIE BIEDIGER, ET AL        :  No. 3:09cv-621 (SRU)
                                 :  915 Lafayette Boulevard
             vs.                 :  Bridgeport, Connecticut
                                 :
                                 :  June 21, 2010
QUINNIPIAC UNIVERSITY            :

- - - - - - - - - - - - - - - - x


                        BENCH TRIAL


B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

    FOR THE PLAINTIFFS:

            PULLMAN & COMLEY
                850 Main Street
                P.O. Box 7006
                Bridgeport, Connecticut 06601-7006
            BY:  JONATHAN B. ORLEANS, ESQ.
                ALEX V. HERNANDEZ, ESQ.

            KRISTEN GALLES, ESQ.
                Equity Legal
                10 Rosecrest Avenue
                Alexandria, Virginia  22301

    FOR THE DEFENDANT:

            WIGGIN AND DANA, LLP
                400 Atlantic Street
                P. O. Box 110325
                Stamford, Connecticut  06911-0325
            BY:  MARY A. GAMBARDELLA, ESQ.


                              (CONTINUED)
```

```
PROSKAUER ROSE
      1585 Broadway
      New York, N. Y.  10016
BY:   EDWARD A. BRILL, ESQ.
      SUSAN D. FRIEDFEL, ESQ.
      REBECCA BERKEBILE, ESQ.




      Susan E. Catucci, RMR
      Official Court Reporter
      915 Lafayette Boulevard
   Bridgeport, Connecticut  06604
        Tel: (917)703-0761
```

I N D E X

WITNESSES:

RICK SEELEY

Direct Examination by Mr. Brill..................735
Redirect Examination............................768
Cross Examination by Mr. Orleans................764

TRACEY FLYNN

Direct Examination by Ms. Friedfel..............769
Redirect Examination............................835
Cross Examination by Mr. Hernandez..............812

-O-

```
 1                    (9:10 O'CLOCK, A. M.)

 2            THE COURT:  Good morning.  Sorry for the delay.

 3    This doesn't count as a forfeit, does it?

 4            MR. BRILL:  What's that?

 5            THE COURT:  Are there forfeiture rules when you

 6    start a contest late or --

 7            MR. BRILL:  You have two more minutes, Your --

 8    Honor.

 9            THE COURT:  Good.

10            MR. ORLEANS:  What was the tennis match we were

11    thinking of yesterday, 59 games without a result?

12            THE COURT:  No, 118 games without a result.

13            MR. ORLEANS:  59-59, right.

14            MR. BRILL:  Your Honor, just a few preliminaries

15    before we call our first witness this morning.

16            We are pleased to report that we have an

17    agreement with the plaintiffs with respect to the

18    Yiamouyiannis report and transcript.  So, for the record,

19    we've agreed to put into evidence paragraphs 18 through 27

20    of her report, which is Plaintiff's Exhibit 115.  That's

21    paragraphs 18 through 27.  This is largely on the subject

22    of emerging sports, Your Honor, and there's no question

23    she's an expert on those areas.

24            THE COURT:  Okay.

25            MR. BRILL:  Secondly, we also agreed to put in
```

1    pages 171 through 183 of her deposition -- and I'll hand

2    up that as an exhibit -- with the understanding,

3    stipulation and understanding, so the court understands,

4    that when the Committee on Women's Athletics first

5    designated number of sports as emerging sports in 1994,

6    that the rules for designating an emerging sport were not

7    the same as they are today.  So there's reference in here

8    to what happened in 1994.  The court should just

9    understand that was under a different set of rules.

10               THE COURT:  That's fine.

11               MR. ORLEANS:  I'll confirm that's our agreement.

12               THE COURT:  In terms of her deposition, let's

13   treat that as we did the other depositions.  I'll take it

14   as a transcript but not as an exhibit.

15               MR. BRILL:  All right.  I don't have the cover

16   page on it, if Your Honor wants us to recopy it with the

17   cover page.

18               THE COURT:  That's not necessary for me.  It

19   will be obvious what it is.

20               MR. BRILL:  You might have a little trouble

21   spelling her name but I think it's on her report.  So --

22               THE COURT:  Very good.  Thank you.

23               MR. BRILL:  I think I can actually spell it now

24   but I'm not going to try.

25               One other preliminary, Your Honor.  I think we

1    have an agreement on this.  On the Carolyn Martin

2    deposition she's the women's track coach, there were a

3    number of exhibits that were used at the deposition.

4              THE COURT:  Right.

5              MR. BRILL:  They were designated Exhibits A A

6    through B F and in those, those are the same as trial

7    Exhibits A A through B F and I believe -- I spoke to

8    Mr. Orleans this morning and it's my understanding that

9    the plaintiff does not object to the admission of any of

10   these exhibits.

11             MR. ORLEANS:  That's true, Your Honor.

12             THE COURT:  Very good, they are all full.

13             MR. BRILL:  If I could just add a couple other

14   things.

15             MR. ORLEANS:  Go ahead.

16             MR. BRILL:  I just wanted to advise the court

17   that we will be filing this afternoon the brief that I

18   mentioned in response to the government's amicus brief,

19   and we hope and plan on -- or I should say that we plan

20   and hope to file our findings of fact and conclusions of

21   law so the court has them in advance of the argument

22   tomorrow.

23             THE COURT:  Great.

24             MR. BRILL:  Thank you.

25             THE COURT:  Thank you.

1          MR. ORLEANS:  Your Honor, on our part, with

2     respect to the Samuel Seemes deposition that has been made

3     part of the record at the instance of the defendant, there

4     are two plaintiff's exhibits that are referenced in

5     Mr. Seemes' deposition transcript and they are already in

6     evidence but under different numbers, so I thought it

7     might be more convenient for the court and the clerk if I

8     handed up copies of those Seemes exhibits that could be

9     kept with the Seemes transcript so that the court would

10    have access to those with the exhibit stickers.

11         THE COURT:  That's fine.  Any problem with that?

12         MR. BRILL:  Oh, no, Your Honor.  You may want to

13    say for the record what the corresponding exhibit numbers

14    are.

15         MR. ORLEANS:  And I could do that probably at

16    the next break but I can't do it right this instant.

17         MR. BRILL:  I'm shocked.  Shocked.

18         MR. ORLEANS:  And, Your Honor, we also hope to

19    have filed by the end of the day today our trial brief and

20    our proposed findings of fact and conclusions of law.

21         THE COURT:  Very good.  Okay.

22         MR. BRILL:  I'd like to call --

23         THE COURT:  Just before you do that, let me

24    inquire whether plaintiff has had a chance to look over

25    the exhibits and determine whether there were any other

1    exhibits plaintiffs want to have admitted during their

2    case in chief.

3              MR. ORLEANS:  There are, Your Honor, a few but I

4    haven't had a chance to talk about them with defense

5    defense counsel yet.  Could we do that at the next break

6    and when we come back on the record after at the break, be

7    prepared to do that?

8              THE COURT:  That's fine.  I just didn't want to

9    overlook that.

10             MR. BRILL:  Good morning.  The defendant calls

11   Mr. Rick Seeley.

12             THE COURT:  Sir, please remain standing and

13   raise your right hand.

14   R I C K      S E E L E Y,     called as a witness on

15   behalf of the Defendant, having been duly sworn by the

16   Court, testified as follows:

17             THE COURT:  Please be seated, state your name

18   for the record and spell your last name, please?

19             THE WITNESS:  Rick Seeley, S-E-E-L-E-Y.

20             THE COURT:  Thank you.

21   DIRECT EXAMINATION

22   BY MR. BRILL:

23   Q.   Good morning, Mr. Seeley.

24   A.   Good morning.

25   Q.   Are you currently employed by Quinnipiac University?

1   A.   Yes, I am.

2   Q.   And what is your position?

3   A.   Head women's ice hockey coach.

4   Q.   How long have you been so employed?

5   A.   Two years.

6   Q.   And do you have an employment contract?

7   A.   Yes, I do.

8   Q.   For what period of time?  What's the period of time?

9   A.   Five years.

10   Q.   And can you tell us your prior work experience?

11   A.   Prior to Quinnipiac I was head coach for the woman's

12   ice hockey team at Clarkson University for five years.

13   And before that, the head coach for women's ice hockey at

14   Manhattanville College for four years.

15   Q.   Now, I want to take you to time last spring.  And do

16   you recall an occasion when Mark Thompson spoke to a group

17   of coaches?

18   A.   Yes, I do.

19   Q.   Can you tell us what you recall about that meeting?

20   A.   Well, I remember it was in the university club which

21   is the only time we've had a staff meeting there.  We --

22   it was basically our introduction to him as our superior.

23   And at that point the roster numbers that we were expected

24   to have were proposed to us.

25   Q.   Did you get them in writing?

1    A.    Yeah, there was a sheet that listed every team.

2    Q.    And do you recall anything else that Mr. Thompson

3    said about the roster numbers or the process of sending

4    roster numbers for the various teams?

5    A.    That they were based on the national average.  My

6    recollection of the meeting was more of an introduction of

7    him and just the general state, you know, of our

8    department that was good and basically moving forward.

9    Q.    Did he say anything, did he tell the coaches anything

10   about what they ought to do if they had any questions

11   about their roster, proposed roster numbers?

12   A.    He encouraged us all to set up a meeting with him.

13   Q.    Now, at the time that you -- by the way, what was the

14   roster number that you received at that meeting?

15   A.    At that meeting it was 27.

16   Q.    And at that time what was the status of your

17   recruiting for the coming year?

18   A.    I had 25 committed and I was in the process of

19   talking to a 26th.

20   Q.    Okay.  Now, did there come a time when you

21   communicated with the incoming players over, or with all

22   players that you expected to have on the team for the

23   2009, 2010 season?

24   A.    Yes, I have the same process every year and basically

25   mid June I contact the freshmen and tell incoming

1   freshmen, tell them what's expected and then a couple

2   weeks later I send an email to the entire team.

3           MR. BRILL:  Now, Your Honor, I'd like to mark a

4   document as an exhibit that Mr. Seeley gave to us this

5   morning but unfortunately there's some personal

6   information in here we need to redact before we can put it

7   in the court record, addresses and phone numbers and so

8   on.  May I mark the exhibit and show it to them and then

9   substitute the redacted version?

10          THE COURT:  Of course.

11          MR. BRILL:  Thank you.

12          MR. ORLEANS:  No objection.

13          MR. BRILL:  I've given a copy to plaintiff's

14   counsel and can I proceed a provide a copy of the

15   unredacted version to the court?

16          (Hands Court.)

17          THE CLERK:  G N.

18          MR. BRILL:  G N, right.  Let me show this --

19   BY MR. BRILL:

20   Q.   (Hand witness) -- to Mr. Seeley.  Can you identify

21   that document?

22   A.   Absolutely.  It's, this is, this the first email I

23   sent.

24   Q.   Could I show this to the judge?

25          (Hand Court)

1    A.   This is the email I sent to the incoming newcomers.

2    There's one transfer and I believe 12 or 13 freshmen,

3    so --

4    Q.   And what's the second page?

5    A.   The second page is the entire roster at that point.

6    Q.   How many players are on that roster?

7    A.   Twenty-six.

8    Q.   And are those the 26 that you ended up eventually

9    having on the team for the year?

10   A.   Yes.

11   Q.   Same 26?  And then I believe there's a letter -- I

12   don't have it in front of me but there's a letter?

13   A.   This is the letter I sent to the freshmen.

14   Q.   Okay.  I just call the court's attention to -- if I

15   can just see that for a minute, Mr. Seeley, there's a

16   paragraph -- I'd actually like to call the court's

17   attention to the second paragraph in the letter.

18        And, Mr. Seeley, when you say in this letter that

19   there's a mix of incoming players, some of whom may make

20   an immediate impact and others who might need a year or so

21   to develop into solid contributors, can you describe for

22   the court what you were referring to in terms of the

23   incoming players?

24   A.   Well, whether I bring in two or 13, there's going to

25   be a range of talent level.  And here I've got some of the

1    best players in Canada coming and so they are the ones,

2    from a coach's standpoint, you know, will contribute

3    right away.  There's others -- I mean you're recruiting

4    basically in three phases.  You have your top group, you

5    have your solid and what you consider your bottom group

6    and we're all competing for the same players.

7         So the bottom level recruits are the kids that we

8    think have potential if they come in, work hard and

9    understand their role and they could develop into players

10   that are going to contribute.  And that's basically what

11   I'm telling them, that they are, none of them should have

12   any expectations because there's a wide range where they

13   could end up in the program.

14   Q.   And what was your experience at the other two schools

15   where you had served as coach before in terms of, you

16   know, how the roster turned over when you first arrived?

17   A.   Well, it's pretty much my M O.  I started two

18   programs and had taken over a third, but there's a lot of

19   turnover in the first couple of years.

20   Q.   Why is that?

21   A.   I'm a real disciplinarian and I expect total

22   commitment and good attitude and good work ethic.  And

23   it's hard when you're starting or taking over a program

24   that traditionally didn't have that kind of discipline for

25   everyone to buy in.  So traditionally there's, I derive

1    about ten players a year for my first two or three years.

2    Q.   Did there come a time after this email to your 26

3    players that you had a conversation with Mr. Thompson

4    about the roster size?

5    A.   Yeah, I believe sometime in the next few weeks,

6    because I hadn't had my meeting with Mark yet, so I

7    believe I contacted either him or his secretary through an

8    email and Mark immediately got back to me and suggested we

9    talk on the phone later that day.

10   Q.   And what did you say and what did he say in that

11   conversation?

12   A.   Well, he wanted to make it clear that there's going

13   to be an open ongoing dialogue about our roster number and

14   he wanted to make sure it fit well for the program.  I

15   told him that at this point I did have 26 but it would be

16   impossible to recruit a 27th and 27 didn't make sense to

17   me.

18   Q.   Why?  Did you tell him why?

19   A.   Yeah, because with 26 I have a spare at each position

20   in terms of someone who can replace someone who's injured

21   or someone who could develop.

22   Q.   What do you mean by each position, Mr. Seeley, could

23   you explain?

24   A.   In ice hockey there are five skating positions and

25   goal defending positions.  So there's three floor

1    positions, left wing, right wing and center; two defensive

2    positions, right defense and left defense.  With five

3    nondressers it gives me the ability to have a great

4    practice that's not disrupted.  It gives me the

5    opportunity that if someone's not playing well or

6    someone's injured, the non dresser's just one player, you

7    know, one injury or one good week of practice away from

8    playing, but if you add a 27th player in there you're

9    spending all your time when you're planning practice

10   trying to fit that 27th player in there.

11       So after that conversation, which Mark was open to,

12   he contacted me the next day and said it makes sense and

13   he adjusted my number to 26.

14   Q.   Now, Mr. Seeley, you've talked about 21 dressers --

15   was that the term you used?

16   A.   Yes.

17   Q.   Can you explain that?

18   A.   The NCAA limits us to 21 dressing players for each

19   competition, so we have 18 skaters and three goalies that

20   are permitted to dress for a game.

21   Q.   And what happens to the other players on the team who

22   don't dress?

23   A.   This year we had them do video, we had them do game

24   breaker.  They are all involved in the competition one way

25   or another.

1    Q.   Okay.  Can I direct your attention to exhibit,

2    Defendant's Exhibit C B which should be in a book in front

3    of you -- C B?

4              THE COURT:  Just a quick follow up.  Are the

5    nondressers the same people throughout the year?

6              THE WITNESS:  When you have a team like I had

7    prior to last year, our team only won three games so we're

8    not recruiting the best players in the world yet, although

9    we did have some that would be considered close to that.

10   But the lowest players were pretty consistent.  There was

11   some movement but not a lot.  I anticipate a lot more

12   movement this year because it's a lot more competitive

13   roster.

14   BY MR. BRILL:

15   Q.   Could you look at Exhibit C B, Mr. Seeley, and tell

16   us if this is the email exchange you had with Mr. Thompson

17   that you just testified to?

18   A.   Yes.

19   Q.   Okay.  Now, did there come a time when you received a

20   letter from Jack McDonald concerning your roster for the

21   coming year?

22   A.   Yes, I did.

23   Q.   And I'm going to direct your attention to Exhibit

24   B O.  Let's see if that's in front of you as well.  It's

25   probably in a different book.  I think that's a

1    plaintiff's book --

2         (Pause)

3         Looking at Exhibit B O, can you tell us if that's a

4    copy of the letter that you got from Mr. McDonald in July?

5    A.    No, this is Dan --

6    Q.    I'm sorry, turn to -- all the letters are together in

7    one exhibit.  Is there, look at page D 94.  Or 94 --

8    actually the bates number is cut off but why don't you

9    look through and see if you can find the letter that was

10   sent to you.

11   A.    Yes.

12   Q.    What's the bates number on that, the bottom right

13   corner?

14   A.    D 94.

15   Q.    D 94?

16            THE COURT:  Yes, it's cut off.  I think it's 94

17   something.

18            MR. BRILL:  Okay.

19            THE COURT:  I see it.

20   BY MR. BRILL:

21   Q.    But this is the letter you received from

22   Mr. McDonald?

23   A.    Yes.

24   Q.    And you signed it on July 30th?

25   A.    Correct.

```
1    Q.    Did you -- now this letter is dated prior to your

2    conversation that you testified to with Mr. Thompson, but

3    do you recall either getting, do you recall whether you

4    got a letter after your conversation with Mr. Thompson?

5    A.    I believe I did.

6    Q.    Okay, and you signed it on July 30th?

7    A.    Yes.

8    Q.    And how soon after you got the letter did you sign

9    it, if you recall?

10   A.    I honestly can't remember.

11   Q.    Can you recall how you received the letter?

12   A.    Through campus mail.

13   Q.    Through campus mail?

14   A.    Yes.

15   Q.    In your office?

16   A.    Yes.

17   Q.    Now, let me call your attention to Exhibit E L.

18   Again that's in probably the first book that we were

19   looking at.  I ask you to look through the pages of E L

20   and see if you can find a copy of the roster for the

21   women's ice hockey team.  And I direct your attention to

22   bate number D 9130.  I'm sorry, D 9135 and 37?

23   A.    Yes.

24   Q.    Is that your signature on 9137?

25   A.    Yes, it is.
```

1    Q.   And was this the -- this is the roster for the

2    women's ice hockey team as of the first date of

3    competition for the 2009, 2010 season?

4    A.   Yes, it is.

5    Q.   Okay.  Okay.  Next I'd like to direct your attention

6    to Exhibit E W.

7    A.   I don't believe it's in this book.

8    Q.   Do you have the book there?  And, again, this exhibit

9    includes documents relating to a number of teams but if I

10   can direct your attention to page D 0859 and ask you if

11   you recognize that as the end of season statistics for the

12   women's ice hockey team?

13   A.   Yes, it is.

14   Q.   And I guess it doesn't give your final won/loss

15   record here but what was your record for the year?

16   A.   Nineteen, ten and eight.  Actually that is at the

17   top.

18   Q.   Okay.  Now, if you look at the list of players and it

19   says G P, that I assume stands for Games Played?

20   A.   Yes.

21   Q.   And there's a handful of players, Kelsey Britton,

22   Kate Colucci and Jessica Puig.  Is that how you pronounce

23   her name?

24   A.   Yes.

25   Q.   Who are only in a handful of games.  Are these the

1    additional players who didn't dress for the most part that

2    you were mentioning before?

3    A.   Yes, generally.

4    Q.   And how would you describe their contributions to the

5    team in comparison to the other players?

6    A.   Well, Kelsey Britton is one of our favorite players,

7    even though she doesn't dress.  She was our team captain

8    this spring and will probably be one of our captains next

9    year and she probably won't dress a game.  Her

10   contributions, she was the coaches award winner because

11   her contributions are endless.  She the first there, the

12   last to leave.  She promotes the team in every way and has

13   one of the best attitudes I've ever coached.

14   Q.   Even though she doesn't dress for games for the most

15   part?

16   A.   Right.

17   Q.   Had you considered cutting her from the team to make

18   room for a more skilled player?

19   A.   Never, never.  She brings too much to the program.

20   For my program the attitude is just as important as the

21   skill.

22   Q.   And what about Colucci and Puig?

23   A.   They were brought in and when I recruit, I'm totally

24   upfront about, you know, obviously it was stated in that

25   letter there was a wide range, but when I recruit I tell

1    everyone they have to earn everything they get and these

2    two, they were the ones I was referring to.  If you put in

3    the effort for a good year, you might be able to work your

4    way into the program if your attitude is great and your

5    work ethic is great.  Kate Colucci started out that way

6    and we, we patted her on the back a lot in front of the

7    team and give her a promise but I think she interpreted

8    that as she should be playing now and so her attitude

9    changed pretty quickly.

10        Jessica Puig tried to stick it out and tried to

11   maintain a positive attitude but it just wasn't there at

12   the end of the year.  So --

13   Q.   Did anybody tell you you couldn't cut players from

14   the team during the season?

15   A.   Absolutely not.

16   Q.   Did you have any understanding about what the

17   procedure was if you wanted to either add a player or

18   delete a player from the squad?

19   A.   My understanding was we had, we should run that

20   through Mark Thompson's office.

21   Q.   And did you ever request during the season to cut

22   anybody and get any response?

23   A.   Nope.

24   Q.   You didn't.  Okay.  Did Puig and Colucci continue to

25   practice -- well, let me start did they ever practice with

1    the team?

2    A.   They practiced everyday.

3    Q.   And did there come a point when they stopped, either

4    one of them stopped practicing?

5    A.   Jessica Puig, maybe with about two weeks left in the

6    season, we had probably about four weeks, we said,

7    Jessica, you're going to have to really improve your

8    effort.  The team's outgrowing you and you're starting to

9    get in the way in practice.  We thought she had the

10   ability to keep up.  We just thought she was losing

11   interest and I think she loved the Quinnipiac experience

12   and was being drawn away from the hockey team.  So we

13   basically said it's got to change in the next week or two

14   or we're going to go into the play-offs without you.  Kate

15   Colucci was on the roster right to the end; practiced the

16   last day of practice.

17   Q.   And incidentally, for the walk-ons or the

18   nonrecruited players on the team that you mentioned, did

19   they play hockey in high school or on an amateur basis

20   before you recruited them?

21   A.   At this level every player is going to have a pretty

22   solid hockey background but they are varied.  You know,

23   Kate Colucci comes from Rhode Island which isn't a hockey

24   hot bed but she was an all-state hockey player in Rhode

25   Island.

1          Same with Jessica Puig in Illinois, she was all-state

2     in Illinois.  That doesn't translate to being a great

3     player but it translates to having the potential to

4     contribute.

5     Q.   I'd like to turn your attention to Plaintiff's

6     Exhibit 150 for a minute.  I think it might be in one of

7     the other notebooks that's to your --

8     Q.   Do you have Exhibit 150?  This is headed Supplemental

9     Report of Donna Lopiano.  Actually it's -- let me see.

10          MR. BRILL:  Your Honor, I'm just trying to help

11     with the exhibits.

12     BY MR. BRILL:

13     Q.   You'll see 150 is a series of charts that were

14     prepared by the plaintiff's expert witness, Dr. Donna

15     Lopiano.  And I'd ask you just to, these pages are not

16     numbered unfortunately, but if you could find a page

17     referring to women's ice hockey, it may be a little hard

18     to see.  The teams are labeled right at the bottom of

19     the -- right, these are the names of the various teams?

20     A.   Yes.

21     Q.   Okay.  And you see that Dr. Lopiano under the column

22     Red Flag notes has, entered a note about six players here.

23     Now, you've already talked about Catherine Colucci?

24     A.   Yes.

25     Q.   And I believe you've already testified that it was

```
 1    not correct that you were not allowed to cut until the end
 2    of the season?
 3    A.   Right.
 4    Q.   Did you ever send an email that suggested that?
 5    A.   No.
 6    Q.   I don't think you talked about Christina Finoia.
 7    A.   No.
 8    Q.   Can you tell us about Christina Finoia's
 9    participation at the time?
10    A.   Sure.  Christina was -- earlier I mentioned when I
11    talked to Mark Thompson I had 25 committed and I was
12    working on the 26th player.  That was Christina Finoia.
13         She was an interesting case because I had, when I
14    arrived at Quinnipiac her father was the first person who
15    e-mailed me, welcomed me.  He was involved with local
16    girls hockey and was trying to bring me up to date.
17    Q.   You said when you first arrived several years ago as
18    the coach?
19    A.   Yes.  And basically wanted to know if we could work
20    together and how we're going to fix women's ice -- girls
21    ice hockey in Connecticut and so on.  So we developed a
22    relationship and he coached the local team.  On that team
23    was a goalie we were recruiting as our third string
24    goalie.  So we went to one of the games.
25         So I was really impressed with the work ethic of one
```

1    of his players and when I talked him after he said "She's

2    my daughter and she's going to Quinnipiac," and I said,

3    "Oh.  Does she always work this hard?"  He said, "Yes,

4    it's a great characteristic of her."

5         So as a start we were deciding who, should we have

6    this player who potentially would only last a year but we

7    were having this debate because we did like the idea of

8    finishing out the roster at 26 so we had five lines --

9    Q.   Why do you say that she would potentially only last a

10   year?

11   A.   Because she was one of those, the program was going

12   to be growing pretty quickly.  She was one who would have

13   to work really hard just to contribute in practice, but if

14   she could handle that role and I met with her and

15   basically told her that that might be the case, it might

16   be a one year thing and you might never play a game, but

17   the potential is you maybe by the end of the year you're

18   playing ten games and you'll have an experience you never

19   even considered.  And she seemed really excited about this

20   possibility and so she was the 26th player.  We rounded

21   things out.

22   Q.   And these conversations were before you had any

23   discussions with Dr. Thompson or Jack McDonald about your

24   roster number for next year?

25   A.   Right.  I scouted their team in January, maybe early

 1    February.  But, you know, we were in that process and when

 2    the roster number came up we went okay, well, then as long

 3    as she's excited about the opportunity and understands

 4    that it can go both ways, let's go with it.

 5        Pretty soon after, playing time was an issue which

 6    caught us off guard so all of sudden her attitude was

 7    swaying and we went on a road trip and she was partying at

 8    home breaking team rules.  And we had a talk with her and

 9    basically we had a couple more talks as we tried to work

10    through it and she made the statement, she basically

11    admitted she was not mature enough to handle the

12    responsibility for this kind of opportunity.  Her grades

13    were suffering at that point in time which is important in

14    our program.

15        So I suggested to her that we, let's stop practicing,

16    let's get our head on straight, let's adjust to college

17    life, let's get your grades up.  I said I'd like to keep

18    you on the roster so if we run into injury problems like

19    we did the year before, we have someone who understands

20    the program a little bit already and has been here and

21    would that appeal to you?  And she said yes and I said

22    "You understand that you're still, you have to still live

23    by our rules.  You're still representing the hockey

24    program and the institution and the local community."

25        And she accepted that responsibility, her grades went

1    from failing grades to 3.4 or 3.5 and she was a model

2    citizen.  We ended up not having injury problems, we

3    didn't have to call her back but, you know, that was

4    realistic compared to the year before.

5    Q.   And Coach Seeley, how long into the season did she

6    stop practicing?

7    A.   Well, if I consider the first day that we're allowed

8    to work out together, probably two and-a-half months

9    maybe, two months, two and-a-half months?

10   Q.   And --

11            THE COURT:  She didn't play in a game.

12            THE WITNESS:  No.

13            THE COURT:  She's not on your sheet of people

14   who played in a game?

15            THE WITNESS:  No.

16            THE COURT:  But you have 26 people listed as

17   people played in a game, 23 players and three goalies, so

18   who is it --

19            THE WITNESS:  Could I just check that?

20            (Pause)

21            MR. BRILL:  Well, one of the goalies is a woman

22   named Empty Net.

23            THE COURT:  Oh, very good.  I wasn't looking at

24   it, I just saw the name.

25            MR. BRILL:  Empty Net did not do very well.

```
1              (Laughter)

2              THE WITNESS:  She was actually my starter the

3   year before.

4              THE COURT:  That's when they put me in.  All

5   right, got it.  Okay.  But Empty Net played ten games.

6              MR. ORLEANS:  Maybe that says something about

7   the reliability of this result sheet.

8              THE WITNESS:  Those were her numbers?  Not bad.

9              (Laughter)

10  BY MR. BRILL:

11  Q.   Okay, the next player down on the red flag list,

12  Coach Seeley, is Stacy Kmill?

13  A.   Yes.

14  Q.   Can you tell us the situation with Stacy Kmill?

15  A.   Stacy was one of the, she was a sophomore this year

16  so she was one of the players I recruited when I first got

17  here in May of '08.  So clearly it's after the recruiting

18  process, so anyone we recruited at that point was a bit of

19  a risk in terms of really understanding what they were

20  going to bring to the table.

21     Again, everything in my recruiting process is put on

22  the table in terms of potential opportunity and where

23  things can go.  And Stacy has questioned us from day one

24  and felt that she wasn't being treated fairly and so her

25  attitude has progressively gotten worse over two years.
```

```
 1      So by the end of this year the three coaches just said it
 2      looked like she wasn't going to be -- even though she was
 3      a scholarship athlete, it looked like she was on the fifth
 4      line in our depth chart which is a nondressing player.
 5      And our opinion was she was a negative influence on a
 6      dressing player.  We talked to her captains and they
 7      thought there was no way she could be a positive
 8      contributing member as a nondresser.  So we decided to
 9      remove her from the program.
10      Q.   She was a scholarship player?
11      A.   Yes, full scholarship.
12      Q.   She played 34 games if I'm reading this directly?
13      A.   Yes, each year she was suspended for a game or two
14      for indiscretions, but other than that she dressed every
15      game.
16      Q.   And what about the next red flag.  Polci?
17      A.   I'm not sure -- I don't have my glasses -- but why is
18      she referred to as red flag?
19      Q.   What was the situation with --
20      A.   Bree is just a great kid who worked hard, and her and
21      her family were more about status in terms of where they
22      worked in the program and at the end of the year we meet
23      with all our players and tell them what we thought of
24      their season, where we see them in the years to come, and
25      her and her family weren't happy with her position in the
```

1    program, even though we thought it was positive, and they

2    requested a release.

3    Q.   She was on a scholarship?

4    A.   Yes.

5    Q.   And the family requested a release?

6    A.   Yeah, we didn't cut her; she decided to leave.

7    Q.   And let's look at the next red flag.  We talked about

8    Jessica Puig, is that correct?

9    A.   Yes.

10   Q.   And I guess the last one is a woman named Carrie

11   Wilson?

12   A.   Yes.  Carrie, you know, we'll take responsibility as

13   coaches of not evaluating properly but, again, she was in

14   the program, full scholarship athlete, who just didn't

15   work hard, didn't live up to her advanced billing and her

16   playing time dwindled.  I think you see she probably only

17   dressed a third to a half of the games and it was the same

18   situation.  We explained where she fit in the program and

19   her and her family weren't happy with it and she requested

20   a release, I believe it was in December or January but she

21   still dressed for games after that.

22   Q.   Through the end of the season?

23   A.   Not through the end of the season.  Because the last

24   game she dressed, Princeton, she got a concussion so she

25   wasn't eligible to play.

1    Q.   She was injured at that point?

2    A.   Yes, she was still showing up for practice and

3    sitting in the stands but she couldn't participate.

4    Q.   The players who did not dress for the team, the last

5    group of five or so, you mentioned that during the games

6    they had certain functions they would perform during the

7    practices; did they participate with the other players?

8    A.   Everyone participated in their practices equally.

9    They were all expected to do the same things.

10    Q.   Did they get the same access to medical facilities

11    and trainers?

12    A.   Oh, absolutely.

13    Q.   Did they have uniforms?

14    A.   Everything was the same for -- because the

15    nondressers could change.  It wasn't like we were treating

16    them differently.  They all had to be ready to play at any

17    point and they were all treated the same.  I chose at

18    times not to bring people on the road based on either

19    discipline or they didn't work hard enough during the week

20    of practice but we could travel with the whole roster.

21    Q.   Did you advise the Athletic Department about your

22    decision to delete the number of women from the roster

23    after the end of the season?

24    A.   Yes, I did.

25    Q.   And what was the response -- who did you communicate

1  with?

2  A.   Well, the first person that I let know is, and the

3  reason I did is a letter went out, an email went out

4  either from Tracey Flynn or Lyneene Richardson for the

5  entire roster and I emailed them saying this six won't be

6  on the team next year so other than having to get things

7  back from them, could you not include them on our roster

8  or in any correspondence.

9  Q.   And was there further communication?

10  A.   I believe they both accepted, told me they got the

11  email.  Tracey said I would probably want to make Mark

12  Thompson aware of this group immediately.

13  Q.   And did anyone ask you for an explanation?

14  A.   Jack sent me an email, something along the line --

15  Jack McDonald, my A D -- saying we have to talk about

16  this.  I emailed him back and said whenever you like.  And

17  he asked if I could just pull an explanation together

18  because a few people in the department were concerned.  My

19  interpretation was not because of roster numbers but

20  that's our Athletic Department, they want to make sure

21  that all, in my experience, all the athletes were taken

22  care of and I'm treating them properly.  So I basically

23  just wrote a quick email to Jack explaining each of the

24  six individual's specific case.

25  Q.   Now, let me just direct your attention to Plaintiff's

```
 1    Exhibit 147.  And I'm sorry for all the notebooks that are

 2    arrayed around you but it should be here.  147, do you see

 3    that?  We can close some of these up.

 4         (Pause)

 5         And what is Exhibit 147, Mr. Seeley?

 6    A.   This is Jack's response to the email I sent.

 7    Q.   And then the next page, is that --

 8    A.   That's the email.

 9    Q.   And did you have a meeting to discuss the subject of

10    the six women who were removed from the team?

11    A.   I ended up having a conversation with each of the

12    people Jack wanted to set up a meeting with, some on the

13    phone, some in person.

14    Q.   And who was that?

15    A.   Tracey Flynn, Lyneene Richardson and Sean Duffy, our

16    academic rep.

17    Q.   And who is Lyneene Richardson?

18    A.   She's the Assistant Athletic Director, oversees the

19    academics of student athletes.

20    Q.   Now, I want to call your particular attention to the

21    second paragraph in your email in which you say, "In

22    general last printing we were caught off guard after the

23    recruiting season with an imposed roster number.  While I

24    have no problem with it and will do whatever is in the

25    best interests of the department and institution, it left
```

1     us scrambling for bodies to fill the roster."

2     A.    Well --

3     Q.    I'm sorry, were you going to explain that statement?

4     A.    Obviously based on the email I found in terms of my

5     correspondence with my team, that wasn't entirely

6     accurate.  To say we were caught off guard, yeah, after

7     recruiting process if someone says here's the number and

8     that's not the exact number you have, you say how am I

9     going to change that, especially in any opinion in ice

10    hockey where it's hard to find people who can skate.

11    So --

12    Q.    So the 27 caught you off guard; is that what you're

13    saying?

14    A.    Right.

15    Q.    But you, ultimately you ended up with 26?

16    A.    Yeah, I was in a strong position at the time and, as

17    I said, it was just that initial feeling, but I didn't

18    check back -- this email to Jack was just in response to

19    his, so I wasn't checking facts and time and everything

20    else.  I just was trying to give an explanation that

21    would, and I thought were fair explanations that would

22    make the other people in the office understand what I'm

23    trying to do with this program.

24    Q.    I'm sorry, I didn't hear.  Did you say at the time

25    you wrote this email to Jack you did or you did not check

1   back on the status of recruiting when you got the original

2   roster number?

3   A.   I didn't.  I just started writing the email.

4   Q.   Okay.  And did there come a time when you had to set

5   the roster for the upcoming year, 2010, 2011?

6   A.   I don't understand the question.

7   Q.   In other words, did there come a time in last spring

8   or at some point when you were, you had to start

9   assembling your roster for the upcoming year?

10   A.   Right.  I mean we're already working on our roster

11   for 2011, 2012 now, so it's an ongoing process.  I went

12   into the process understanding that 26 was going to be my

13   number from now on.

14   Q.   Did -- actually, and if you look back to the email

15   and I'm not sure that you have it in front of me (sic)

16   but -- in Exhibit C B, which is your July 24th email

17   correspondence with Mark Thompson, you say "We can easily

18   work with 26 as our roster number this season.  We have an

19   exceptional recruiting class.  We'll have 14 new student

20   athletes on campus this fall, bringing our roster total to

21   26."

22       And then you say, and this this is what I want to ask

23   you about:  "I look forward with our experience with this

24   group and feel secure that we can discuss the pros and

25   cons of a roster this size again during the upcoming

1    season."  Can you explain to the court what you meant by

2    discussing the pros and cons of a roster that size?

3    A.   Well, Mark had, Mark Thompson in our conversation had

4    said that is an ongoing process and he wants to get

5    feedback from each of us and our experience with the

6    numbers that we were told to use.  I hadn't had a roster

7    of 26 before and I made that clear to him, so I was

8    basically saying I'm not sure how this will be.  But what

9    I realized, it's more about the character of the

10   individuals than the actual number at 26.  And my

11   experience was 26 was great and that's what I want to keep

12   it at.  So we didn't, we didn't talk -- I think we had a

13   general meeting at some point during the year but that was

14   maybe one question at a meeting and I just said the

15   number's great, let's keep it here.

16   Q.   And do you have a roster now for the upcoming --

17   A.   Yes, I do.

18   Q.   -- season?  And how many players do you have?

19   A.   Twenty-six.

20   Q.   And they are already recruited?

21   A.   They've already got their first letter and they are

22   working on their summer program.

23   Q.   Just a few more questions, Mr. Seeley.

24        Did you ever hear Jack McDonald make any comment to

25   the coaches that they would get in trouble if they didn't

1    sign the roster letters for this year?

2    A.   Absolutely not.

3    Q.   And do you recall a conversation last week with some

4    of the lawyers for the plaintiffs in this case?

5    A.   Yes, I do.

6    Q.   And did you say to them anything different than

7    you've just testified to?

8    A.   No.

9              MR. BRILL:  Nothing further.

10             THE COURT:  All right.  Cross?

11   CROSS EXAMINATION

12   BY MR. ORLEANS:

13   Q.   Good morning, Coach Seeley.

14   A.   Good morning.

15   Q.   How are you?

16   A.   Very well, thank you.

17   Q.   I'm John Orleans.  We met by telephone a couple weeks

18   ago, didn't we?

19   A.   Uh huh.  (Affirmative.)

20   Q.   And counsel for Quinnipiac were also on that call,

21   weren't they?

22   A.   Yes.

23   Q.   Could I -- you testified a moment ago, I wanted to

24   make sure that I heard it, you had never carried a roster

25   of 26 before?

1    A.    No, I hadn't.

2    Q.    Your roster's previously been smaller than 26?

3    A.    Twenty-four -- 23, 24.

4    Q.    So always smaller than 26?

5    A.    Yes.

6    Q.    Okay.  Could you look at Exhibit Number 148?  You got

7    that --

8    A.    Yes.

9    Q.    -- handy?  This is your, an email from you to Mark

10   Thompson on May 3rd, 2010, isn't it?

11   A.    Yes, it is.

12   Q.    Okay.  And in this email you say that Mr., or

13   Dr. Thompson, "I'm pretty sure we can maintain our

14   assigned roster number, 26, for the next couple of

15   seasons," right?

16   A.    Yes.

17   Q.    Okay.  Did you have a conversation with Robin Sparks

18   at some point in May about the size of the women's ice

19   hockey roster?

20   A.    I don't remember specifically but she was in my

21   office, we had a conversation.

22   Q.    Specifically on May 26th, do you recall having a

23   conversation with her?

24   A.    I remember having a conversation.  I don't remember

25   the date.

1    Q.   Okay.  Do you remember in the conversation that you

2    had with her telling her that your roster target of 26 is

3    really too high?

4    A.   I don't remember that.

5    Q.   Do you remember telling her in your conversation with

6    her that the last three players on your team are really

7    bottom of the barrel D 3 players?

8    A.   I'm not sure I used that terminology but this year

9    that turned out to be the case.  I wouldn't say bottom of

10   the barrel Division III players; I would say bottom of the

11   barely Division I players.

12   Q.   But you might have said three when you were talking

13   to Coach Sparks, you're not sure?

14   A.   It's pretty consistent through any program not in the

15   top of the ten of the country that your bottom players

16   would be top level Division III players.

17   Q.   Did you tell Coach Sparks although you plan for -- in

18   words or substance, I'm not trying to give you exact

19   words -- did you tell her in words or substance that

20   although you've planned for a roster of 26, for the next

21   few years you really expect 19 to be your number in the

22   long run?

23   A.   Absolutely not.  I can dress 21.

24   Q.   And this year did you always dress 21?

25   A.   No.

1   Q.   Sometimes you dressed fewer than 21?

2   A.   Sure.

3   Q.   Was it your understanding once you got your roster

4   number of 26 that you couldn't go below that?

5   A.   For that year.

6   Q.   For the year?

7        And if we could look, please, at Exhibit 147.  You

8   wrote this and I'm looking specifically at the second

9   page, your message to Jack McDonald on April 6th?

10  A.   Yes.

11  Q.   You wrote this before you had any involvement in this

12  lawsuit, correct?

13  A.   Correct.

14  Q.   And Jack -- was it your understanding that Jack

15  McDonald asked you to write this because there was some

16  concern over the news that you had provided that you were

17  cutting six people from the roster?

18  A.   Yes.

19  Q.   And so at that time you wrote that the imposed roster

20  number had left you scrambling for bodies to fill the

21  roster?

22  A.   I did write that.

23            MR. ORLEANS:  Nothing further, Your Honor.

24            THE COURT:  All right.  Any redirect?

25            MR. BRILL:  Just a few questions.

```
1    REDIRECT EXAMINATION

2    BY MR. BRILL:

3    Q.   Just to clarify, I believe, Mr. Seeley, you said that

4    you were told that you could not go below the number of

5    26?

6    A.   No, I wasn't told that and I did want to expand on

7    that.  We were told we'd have to go through Mark if we

8    wanted to add or drop anyone.  So the number was imposed,

9    meaning we were told we want you to have 26 but it was

10   still left open there would be flexibility.

11   Q.   And if there had been reason for you to cut somebody

12   from the team -- what would be a reason to cut somebody

13   from a team during the season?

14   A.   Just, you know, breaking teams rules excessively.

15   Q.   If somebody had seriously violated team rules and you

16   felt they shouldn't be on a team anymore, was it your

17   understanding that you could take that issue to

18   Mr. Thompson?

19   A.   Absolutely.

20   Q.   Now, under what circumstances would you dress less

21   than 21 for a game?

22   A.   People weren't working hard enough.  I mean generally

23   what I said the last half of the season, if I can't use

24   you in a game based on your work ethic during the week,

25   I'm not going to bother dressing you.  Nothing to do with
```

```
 1   skill level.

 2              MR. BRILL:  I don't have anything further, Your

 3   Honor.  Thank you.

 4              THE COURT:  Thank you, sir.  You're excused.

 5              THE WITNESS:  Thank you.

 6              (Witness excused.)

 7              MR. BRILL:  Your Honor, we'll substitute the

 8   redacted version of those exhibits.

 9              THE COURT:  Yes, thank you.

10              MS. FRIEDFEL:  We'd like to call Tracey Flynn.

11              THE COURT:  Good morning.  Please remain

12   standing and raise your right hand.

13   T R A C E Y      F L Y N N,     called as a witness on

14   behalf of the Defendant, having been duly sworn by the

15   Court, testified as follows:.

16              THE COURT:  Please be seated, state your name

17   and spell your last name for the record.

18              THE WITNESS:  My name is Tracey Flynn, F, as in

19   France, L-Y-N-N.

20              THE COURT:  Could you just pull that mic around

21   a little?  There you go.  Thanks.

22   DIRECT EXAMINATION

23   BY MS. FRIEDFEL:

24   Q.   Good morning, Tracey.

25   A.   Good morning.
```

1   Q.   Are you employed by Quinnipiac University?

2   A.   Yes, I am.

3   Q.   What is your position?

4   A.   My title is Associate Director of Athletics and

5   Senior Woman's Administrator.

6   Q.   What are your responsibilities?

7   A.   My general, my comprehensive responsibility is to

8   coordinate the NCAA rules compliance effort by our

9   university.  And as a Senior Women's Administrator

10   designation that the NCAA requests from Division I

11   schools, and in that regard I mostly represent the

12   university at meetings at the conference level or perhaps

13   the national level that has to be ways that are requested

14   and asked to attend.

15   Q.   How many years of experience do you have in

16   compliance?

17   A.   I started in the early '90s, like 1991, '92.  So 18

18   years or so, only it feels like 30 but it's been 18.

19   Q.   I'm going to direct your attention to Exhibit E L

20   which should be in one of those binders there.

21       (Pause)

22       Could you tell us what these documents are?

23   A.   Exhibit E L, the first page that I'm looking at is

24   what I recognize as NCAA squad list for women's basketball

25   dated October 26, 2009.

1    Q.   Okay.  You just flip through the rest of the exhibit;

2    do these also appear to be NCAA squad lists for the other

3    teams?

4    A.   Yes, they do.

5    Q.   Do you prepare those documents?

6    A.   I am one of the primary contributors to the

7    preparation and completion of this document, these

8    documents.

9    Q.   And at what point in the year did you and your staff

10   start preparing these squad lists?

11   A.   We start preparing these squad lists at about this

12   time right now.  It's currently a work in progress on my

13   desk.  So late -- early June, late June for the upcoming

14   year.

15   Q.   Okay.  And now is every name that's listed here a

16   person who is on the team as of the first date of

17   competition?

18   A.   As I previously stated, this list has a first date of

19   competition, so yes.  Everybody that we are aware of and

20   have been told that is on the team is included on this

21   list and tracked for all their information.

22   Q.   Okay, but is every person that's on the list on the

23   team on the first date of competition?

24   A.   No, not necessarily.

25   Q.   Okay, and why would that be?

1   A.   You may have somebody that was expected to be the

2   team and pre-season starts for men's soccer and they quit

3   during the pre-season period and they started practice so

4   they were on the list.  We would be notified that they

5   quit during pre-season and we would so indicate that.  We

6   didn't simply delete someone's name never to be seen again

7   on a roster.  So there's a process in, associated with the

8   software to monitor those types of changes.

9   Q.   Okay.  So what would indicate to someone reading this

10  document whether or not the person was on the team as of

11  the first date of competition?  You can pick a different

12  example of a squad list if this woman's basketball is not

13  helpful.

14  A.   Would you repeat your question, please?

15  Q.   I just would like you to explain to the court how, in

16  looking at a squad list, you would determine whether

17  somebody was on the team as of the first date of

18  competition.

19  A.   I would keep my eyes on that change in status column.

20  So I would go down line by line.  If I was looking at

21  another school's roster, squad lists similar to this, and

22  I would look at that change of status column, keeping in

23  mind that the words basketball case 10/26 was on or just

24  before the first date of competition.  And I would look

25  and see what the change of status codes read and what the

1    dates were.

2    Q.   Okay.  So if you looked -- let's look at the field

3    hockey team which is actually the next list in the

4    exhibit.

5    A.   I'm there.

6    Q.   If we look at Veronica Clark in the change in status

7    column under the reason it says C R.  Can you explain what

8    that stands for?

9    A.   C stands for cut.  R stands for the fact that she did

10   not participate in any contest.  She did not play.

11   Q.   So R is short for red shirt, is that right?

12   A.   It's represents red shirt slash did not compete, so

13   if you were to look at the software where you're checking

14   that box, it does say red shirt/did not compete.

15   Q.   And then it has a date there.  Is that the date on

16   which the person was cut?

17   A.   That's the date that the coach would have given me on

18   their change -- the change of status form she submitted

19   regarding Veronica Clark.

20   Q.   So if the first date of -- do you know what the first

21   date of competition was for field hockey?

22   A.   I'd have to look at their schedule.  The change, the

23   squad list, we try to get everything accurate and

24   complete -- well, we have to have everything accurate and

25   complete by the first date of competition.  And sometimes

1    if we're waiting for the eligibility of a student to be

2    determined we'll wait right up until the first date of

3    competition.   Sometimes we can get it completed because

4    all the information has come together the day or two

5    before the actual competition.   But we certify that

6    everybody is ready to go and this is the first date of

7    competition.

8        I'd like to note that if we got the, if we had the

9    squad list two days, completed and all signed two days

10   before a competition and put this label and there was a

11   change, we'd go back and redo the squad list, reflect that

12   change and discard this first date -- that first, the

13   original first date of competition with a more recent

14   updated competition.

15   Q.   So is it your understanding that Veronica Clark then

16   would not have been on the team on the first date of the

17   competition, is that right?

18   A.   Correct.   She was not going to have the opportunity

19   to play or be considered part of the team, yes.

20   Q.   And we talked about the R for red shirt; under what

21   circumstances would you indicate an R in a change of

22   status column?

23   A.   If a student has not competed prior to them leaving a

24   team, can be cut or quit or withdraw from the school, they

25   would get an R.

1        An R would also, can also appear at the conclusion of

2   the season for our fall sports.  At the conclusion of a

3   fall season, sometime thereafter, we'll take the entire

4   team roster and we'll submit it to the sport information

5   and say, according to your records, did this student

6   athlete compete, yes or no.  Then we take that same roster

7   with that information and ask the coaching staff, did this

8   athlete compete, yes or no.  When we get their feedback,

9   then the assistant compliance coordinator -- Bob Tipson

10  currently is assigned that responsibility -- he will go

11  through the sport information and coaching staff and say,

12  no, didn't compete.  We check that box and then in

13  subsequent printings that student would be listed as a R.

14  Q.   So an R could apply to a student who was on the team

15  for the whole season?

16  A.   Correct.

17  Q.   Is that right?  And could also apply to a student who

18  was cut from the team before the season ever started, is

19  that right?

20  A.   Correct.

21          THE COURT:  Let me follow up a little bit.  The

22  dates there for field hockey, there are four changes.

23  There were two adds two days before the report date, there

24  was a cut on the report date and there was a cut maybe two

25  weeks before the report date.  Do those dates reflect the

1   date that you or someone in the athletic administration is

2   notified of a cut or does it reflect the date that the

3   coach actually cut the player?

4          THE WITNESS:  I would have to look at the

5   individual change of status form.  The coach typically

6   will tell us that that was the date, that as of that date

7   they were cut but to verify the accuracy because it's a

8   question involving quite -- potentially a number of

9   athletes.  But it's -- typically the coach will, the form

10  says, you know, sport, student athlete, date of the add or

11  delete, reason for this change.  Then they will say --

12  these are the columns on this form.  Did they compete this

13  year, did --

14         MS. FRIEDFEL:  I can help you out with this.  We

15  have the forms.

16         THE WITNESS:  There's only two columns left.

17         MS. FRIEDFEL:  If you go to Exhibit E O, we can

18  show the court the forms.

19         THE WITNESS:  Would you like me to find on

20  Exhibit E O a particular student athlete?

21         THE COURT:  Well, maybe in just a moment.  Let

22  me ask this.

23         THE WITNESS:  Okay.

24         THE COURT:  If the information that you had

25  showed that there were too many field hockey players as

1    compared to the roster management number, would you, for

2    example, with the two adds on 9/2/2009, if that having --

3    after only one cut prior to that.  If you're now, if this

4    team is now one over its roster management number, would

5    someone contact the coach and say you're over, you need to

6    cut one and, therefore, Veronica Clark gets cut the day of

7    the report, or is that just a coincidence?

8              THE WITNESS:  It could be either.

9              THE COURT:  Okay.

10             THE WITNESS:  Particularly in field hockey,

11   because it's a fall sport and they are getting ready for

12   their competition right around the time school starts,

13   they have a very, she'll have a very small window where

14   she'll hold a try-out and so that's why she may be looking

15   at a couple different players and deciding who she's going

16   to have on her team in that very -- finalizing the team,

17   including considering a try-out.

18             THE COURT:  Okay.

19             THE WITNESS:  Such as like if you look at

20   Frederica Mucci on that team, she wasn't recruited and by

21   just looking at this document I would say, and knowing

22   it's field hockey and it's at the very start of the school

23   year, she's getting close to the try-out and she's

24   decided that Frederica is someone she'd like to have on

25   the team and see how she might be able to contribute to

1    the team.

2              THE COURT:  Okay.  And with respect to her, she

3    seems to be the only player on the team that has N N after

4    her name.  What do the Y and N's in those two columns

5    suggest?

6              THE WITNESS:  The two N Ns?  Frederica would

7    have been added to the team on the try-out process.  As of

8    the first date of competition, she was still, she had just

9    joined the team and she was actually coming from, she was

10   coming from an international high school without knowledge

11   of the NCAA initial eligibility rules or to the degree she

12   needed.  So she would have been applying for, to the

13   eligibility center to have her academic status verified.

14             So, on the first date of competition she's on

15   the team, she's practicing, but she has not met NCAA

16   regional eligibility standards yet, so we could put, no,

17   not eligible on this day for the fall semester.

18             THE COURT:  So the eligibility, the two columns,

19   what does the F and S stand for?

20             THE WITNESS:  Fall and Spring.

21             THE COURT:  Got you, okay.

22   BY MS. FRIEDFEL:

23   Q.   Now, on Exhibit E O, could you just explain quickly,

24   you described the report already, this is the document

25   that you asked the coached about?

A.   Yes, it's a communication, it's meant to be a
communication tool and we've had it in place for a number
of years and it is a way, as I say, for coaches to let us
know that there's been a change on their team.  Let us
know, meaning the compliance office.

Q.   Now, on the top of the field hockey report there's a
sticker that says or appears to be a sticker that says for
2010 EADA report.  What does that mean?

A.   The squad list is done for NCAA purposes all school
year.  My office looks very much like the witness stand
right now with all these notebooks because of all the
documentation that we do to support our compliance with
the variety of rules.

     So something that I started recently, for years I've
been putting first date of competition labels, so if I'm
looking at a whole pile of white papers, for some reason
the notebook breaks when I drop it or something, I'll be
able to easily find again the first date of competition.

     We have EADA reports that we use these documents to
refer to in completing part of the EADA report.  We use
these documents, the first date of competition documents
that we use to complete an NCAA gender equity report.  So
I actually, at sometime in the past fall, started to make
photocopy of the -- the first date of competition, the
official squad list.  We made a copy and then put a

1      different label on it, so now I know these are the ones

2      I'm going to use for the 2010 EADA report.

3           And there's a third copy that has since been labeled

4      that says "To be used for the 2011 NCAA gender equity."

5      So it's just a way to easily identify what the document is

6      and the ones I'm going to be referring to and using to

7      support future reports.

8      Q.   Okay.  And are you responsible for gathering the

9      information as to who is participating on the teams for

10     the first date of competition in connection with the

11     university's EADA reporting?

12     A.   Yes.

13     Q.   And would you need any information other than what's

14     on these first date of competition squad lists to

15     determine who should be reported for the EADA purposes?

16     A.   No.

17     Q.   These are the documents you refer to --

18     A.   Yes.

19     Q.   -- when you're putting that information together?

20     A.   Yes.  In fact, for when preparing the EADA report and

21     NCAA gender equity report we have to follow revenue

22     distribution reports, sports sponsorship reports, et

23     cetera, et cetera.  I actually converted a few years ago

24     to file folders that have brass tabs on either side, I

25     think I picked up from our health science department.

1    That way if you drop the folder, hoping nothing will fall

2    out because now it's been hole punched into the file

3    folder.  And I want to be able to, when I'm doing a

4    report, have somebody else, if they wanted to look at how

5    I came to the numbers or the number of games played or the

6    number of total grants given, I take the source document

7    that I used and, as you can see, I've labeled this one

8    2010 and that is kept as part of the working folder and

9    then the final report is in there.

10       And it kind of just goes back to probably something I

11   learned in seventh or eighth grade science, that when you

12   prove something scientifically, the scientific world

13   doesn't necessarily believe it until other people can

14   replicate it, so it's kind of the same thing.  I want to

15   be able to demonstrate -- anybody else will be able to

16   come to the same numbers, additions, subtraction, that I

17   did through the use of the documents that I used as source

18   documents.

19   Q.   Okay.  If an athlete is unable to play for medical

20   reasons but they receive an athlete scholarship, would

21   they count for your EADA reporting?

22   A.   Yes, as long as they have been on the team as of the

23   first date of competition but with that assumption that

24   they started off the year medically able to compete and

25   also had an athletic scholarship.

```
 1    Q.   Okay, thanks.  Now, we talked a little bit about the
 2    add/delete forms a moment ago.  Is there a procedure now
 3    with respect -- for when a coach wants to make a change in
 4    their roster?
 5    A.   Yes.  The process has expanded, and that started this
 6    past academic year and the form is still in use but an
 7    additional step has been put in and that is to inform the
 8    coach to inform Mark Thompson or discuss with Mark
 9    Thompson about the addition or deletion of a student from
10    the team.
11    Q.   And do you make any changes to the roster before you
12    get Dr. Thompson's approval of those changes?
13    A.   I am fairly certain I have fully adopted that process
14    and complied with the request and -- am very supportive of
15    that.  I mean there's times when coaches have sent me
16    change of status and I said have you sent this to Mark
17    Thompson or Vice President Thompson?  And they'll go,
18    well, I like to be informal and I don't make the change
19    until I get the email, the written confirmation.  I've had
20    coaches come in about concerns about an athlete maybe
21    hasn't been feeling well, has talked about quitting a
22    team, what should I do, you know, and how will that
23    maybe affect anything.  I said I think, you know, what it
24    sounds like, for example, that sounds like a legitimate
25    concern, things happen in student's lives, but you really
```

1      should have a discussion with Vice President Thompson.

2      Q.    If you look at Exhibit E N.

3      A.    I have E N.

4      Q.    What is that?

5      A.    It's a change in status log.  When a coach submits to

6      me a change in status form, it might have one athlete on

7      it, it might have several athletes on it, depending the

8      time of the year.  Maybe during the fall when spring

9      sports are doing their tryouts, I may get a couple from

10     different coaches.

11           In addition to taking that change of status form and

12     going to the software and noting changes and updating, et

13     cetera, I also keep a running list of what the changes

14     are, and that's to support, so this document further

15     supports the communication process.

16           There are about 12 people that I will communicate

17     with or communicate a change in status, from our academic

18     person to the assistant compliance coordinator who are

19     just across the hall from me, but to let our registrar

20     know, let the athletic training staff know, let the two

21     full time staff members in sport and information.

22           There's also someone on that list from the, that

23     works with athletic association and development, and so I

24     would add their name to this change of status and then I

25     will either attach this to an email that there's a change

1    of status, subject roster change, please see the attached.

2    Or I might cut and paste that particular update or the

3    newest changes and make them aware of those changes.

4        And if you were to look the change of status forms in

5    E O, there's an electronic distribution box at the bottom.

6    It's like an Office Use Only portion and electronic

7    distribution is supported.  It would be creating this log

8    and maintaining this log.

9    Q.   So it's a log that you keep just to keep track of

10   things?

11   A.   Right.

12   Q.   Now, we talked about the EADA report a little bit and

13   you mention when I asked you about the scholarship

14   athletes, you said assuming they were on the team as of

15   the date, first date of competition?

16   A.   Yes.

17   Q.   You used the first date of competition as a guideline

18   for determining your numbers for EADA reporting?

19   A.   Yes, I actually refer to it as a line in the sand.

20   Q.   And why do you use that date?

21   A.   When I look at the definition of a participant, which

22   is what the EADA is requesting, the EADA has a glossary of

23   terms and it says a participant is, and it lists three

24   reasons.  And that's why I, to answer your question -- I

25   think I lost my train of thought.

1   Q.   So your understanding and with your years of

2   compliance experience, that the requirement for reporting

3   for the EADA is as of the first date of competition?

4   A.   Yes, first date of competition in that definition.

5   Q.   Okay.  And have you ever calculated participation

6   numbers based on the first date of competition and then

7   nontraditional season for a sport whose championship

8   season is in the fall, for reporting purposes?

9   A.   No.

10  Q.   And have you ever heard of anybody doing that in the

11  compliance world?

12  A.   No.

13  Q.   And have you ever calculated participation numbers

14  based on whether an athlete was on a team for a full

15  semester?

16  A.   No, it goes back to that, my line in the sand, that

17  first date of competition.  So if your name is on there

18  and you're on the list and you're not a cut or a quit, if

19  it meets, if you meet one of these three definitions as of

20  the first date of competition, that's what I have used to

21  complete the numbers for the EADA report.

22  Q.   When is the EADA report filed?

23  A.   The EADA report is filed by the federal government

24  October 30th of the year after the completion, the

25  following academic year.

1    Q.   So for the '09-'10 year you'll file your report in

2    October of '10?

3    A.   That is correct.

4    Q.   So if you were asked to or if you needed to, you

5    could report all of the athletes who were on the team at

6    any point in the year, right?  You'd have that information

7    available to you?

8    A.   Yes.

9    Q.   But it's not requested by any reporting agency, is

10   it?

11   A.   No, it's -- again the first date of competition is

12   the benchmark from that glossary of terms, so that's,

13   that's what we do.

14   Q.   Okay.  Now, do you do a separate count of

15   participants for each of the sports that the university

16   sponsors?

17   A.   Yes.

18   Q.   And if an athlete is on more than one sport, how do

19   you count them?

20   A.   Since I use the squad list for the first date of

21   competition for each sport, if their name appeared on two

22   sports, I would be counting them on the, from the first

23   squad list or the squad list from sport A, and if their

24   name was on the second squad list, squad number B sport, I

25   would count that as another participation opportunity.

1   Q.   And do you maintain that first date of competition

2   squad list for the women's cross country team?

3   A.   Yes.

4   Q.   Do you maintain a separate squad list for the women's

5   indoor track team?

6   A.   Yes.

7   Q.   And do you maintain a separate squad list for the

8   woman's outdoor track team?

9   A.   Yes.

10  Q.   Because those are three separate sports.

11  A.   The NCAA has them as three different sports with

12  three different championships, three different schedules,

13  yes.

14  Q.   Now, I want to show you Plaintiff's Exhibit --

15          THE COURT:  Before we move from there, let me

16  follow up with some questions from Exhibit E N and E L.

17  E N, well -- about four pages in which is D 9073.

18          THE WITNESS:  I'm there.

19          THE COURT:  All right, there are three women's

20  field hockey players listed on 8/19.  Two deletes and an

21  add.

22          THE WITNESS:  Okay.

23          THE COURT:  Now, it looks to me like the add

24  shows up on E L without any add indication, she's simply

25  on the list.  The two deletes are simply not on the list.

1    And the player listed as being cut effective 8/21 on E L

2    does not appear, at least I can't find her on E N.  I'm

3    just trying to figure out how these two documents relate

4    to each other.

5              THE WITNESS:  Okay.  There is a question or do

6    you want me just to give my thoughts?

7              THE COURT:  If you could just maybe explain why

8    the two folks deleted 8/19 don't show up as cuts or

9    deletes, where somebody effective 8/21 did, why the person

10   listed as cut 8/21 doesn't show up on the change of status

11   log and why the two deleted 8/19 -- well, I guess I just

12   asked that.  Why the person added 8/19, doesn't show up as

13   an add.  I'm just trying to understand, you know, how this

14   is working.

15             THE WITNESS:  Okay.  I don't have it in front of

16   me but as I'm looking at this, as I'm looking at this

17   change in status log, I'm thinking that perhaps that their

18   first day of practice for pre-season was 8/20.  So if you

19   look at --

20             THE COURT:  So that would be the first date in

21   effect that you would see who was on the roster?

22             THE WITNESS:  Right.

23             THE COURT:  So if they are cut before the first

24   date of practice, they are just not going to show up on

25   the roster?

```
 1                    THE WITNESS:  I believe so.

 2                    THE COURT:  And if they are added before the

 3       first date of practice they are just going to show up on

 4       the roster as if they are on the roster.

 5                    THE WITNESS:  Correct.

 6                    THE COURT:  All right.  And then -- but what

 7       about the woman who's cut 8/21?

 8                    THE WITNESS:  It looks like it could be an

 9       oversight on this particular page.

10                    THE COURT:  Okay.  So she normally would be

11       listed on the change in status log?

12                    THE WITNESS:  Yes.

13                    THE COURT:  Okay.  Okay, that's helpful.  Thank

14       you.  That's all I had.

15       BY MS. FRIEDFEL:

16       Q.   Okay.  Do you have Exhibit 150 there?  It's going to

17       be at the very end of the plaintiff's last binder.

18                    MR. HERNANDEZ:  I'm sorry, which one are you on?

19                    MS. FRIEDFEL:  150.

20                    MR. HERNANDEZ:  150, thanks.

21       BY MS. FRIEDFEL:

22       Q.   If you take a look at that, these are some spread

23       sheets that were provided by the plaintiff's expert, and I

24       want to turn your attention to the second page which is

25       men's basketball.
```

A.   I'm there.

Q.   Okay, and you see where it says Kevin Baskin?

A.   Yes.

Q.   Under the reasons Ms. Lopiano stated, athletic aid, practiced and received varsity benefits during entire second semester.  Is that an accurate statement to your knowledge?

A.   It is not an accurate statement.

Q.   Why not?

A.   Kevin Baskin was an early enrollee.  He started his collegiate career as a freshmen, not in September or August semester, he started in January.  He was, when he came in he was not meeting NCAA initial eligibility standards or when he was preparing to come in, and my office had to file an initial eligibility waiver with the NCAA staff.

     In determining the totality of his circumstances, they decided, as is their right, that he could in fact receive athletic aid.  He was precluded from practicing or competing with the team.  And he would have to, the phraseology is sit a year or two semesters.  So based on that information and knowing that Kevin was going to get an athletic scholarship, he did in fact start school with us and continues to this day in summer school.  But he was never allowed to practice, never allowed to compete, can't

1    be in team meetings.  There's a whole list of things in

2    the NCAA manual that qualifiers and non qualifiers can and

3    cannot do.  Isn't allowed to travel with the team.  He can

4    receive tutoring benefits which, in fact, he did.  He can

5    not weight train or do conditioning with a team.  He can

6    in fact lift on his own separate from the team.

7        But the intent of the waiver decision was to allow

8    him to start college and give him the financial aid in

9    order to do that, but for him to focus on his academics

10   for two semesters before he'll be loud to step on the

11   court with the team and practice.

12   Q.   Okay.  Thank you.  If you look at the men's soccer

13   page?  A few after that?

14   A.   Yes, I'm there.

15   Q.   Do you see that?  If you'll look at the line for

16   Peter --

17   A.   Karahalios.

18   Q.   Thank you.  If you see, you see the column there for

19   him that says red flag notes?

20   A.   Yes.

21   Q.   And Ms. Lopiano wrote "Played and received aid three

22   prior years but cut as senior, roster limit, question

23   mark."  Did Mr. Karahalios receive aid at Quinnipiac?

24   A.   He did not receive any athletic scholarship while

25   attending Quinnipiac.

1    Q.    Okay.  And if you look at Plaintiff's Exhibit 11,

2    it's a separate binder, the first binder.  You want to

3    turn to page D 320?

4    A.    I'm there.

5    Q.    And does that document show that whether Peter

6    Karahalios received athletic aid?

7    A.    The NCAA squad list in fact shows that he does not

8    receive any athletic aid and the athletic grant column is

9    zero.

10   Q.    What year is that for?

11   A.    This is for 2007, 2008.

12   Q.    Okay.  And if you flip to the next exhibit which is

13   Exhibit 12 at page D 271?

14   A.    Would you like me to find men's soccer?

15   Q.    Yes.  D 271 should be, if I have my numbers right,

16   should be men's soccer.

17   A.    Yes.

18   Q.    And is that the, what's that document?

19   A.    It's the NCAA squad list for first date of

20   competition, 2008, 2009.

21   Q.    And does that show whether Peter Karahalios received

22   aid in that year?

23   A.    It shows that he did not receive athletic aid --

24   Q.    Okay.  Thank you.

25   A.    -- that year.

1    Q.   And if we look back at Ms. Lopiano's chart in Exhibit

2    150, if you look down to -- we're going to the men's

3    tennis team, which is the next page.

4    A.   Yes.

5    Q.   You see under Vincent Corvari, there's a similar note

6    that says "Senior cut despite playing three previous years

7    on aid"?

8    A.   I see that.

9    Q.   And to your knowledge, did Vincent Corvari ever

10   receive athletic aid from Quinnipiac?

11   A.   No, he did not receive athletic aid.

12   Q.   Now, we can go to Exhibits 11 and 12 again and look

13   at those, the squad lists for tennis, just to confirm

14   that.  It's in 11, it should be D 323.

15   A.   In the 2007, 2008 school for the first date of

16   competition, Vincent Corvari was listed as having no

17   athletic aid, allowed on the squad list.

18   Q.   If you look at Exhibit 12, D 274 -- wait.  Before you

19   change that one, let's, if we look down -- trying to be

20   more efficient here -- on the men's tennis sheet, on

21   Ms. Lopiano's chart she also listed Zackary Tuckman as

22   playing prior years on aid.

23       Now, can you look in Exhibit 11, D 323, does that

24   show whether Zackary Tuckman -- Zackary Tuckman wasn't

25   actually on the team, was he?

1    A.    Zak was a senior in high school that year.

2    Q.    Let's see.  Go to Exhibit 12.

3            THE COURT:  I see it in '08.

4    BY MS. FRIEDFEL:

5    Q.    You see it.  Now, the judge asked you a question

6    about Frederica Mucci earlier on the field hockey team,

7    and if we look at Ms. Lopiano's chart on the next page, in

8    women's field hockey, she indicates under Frederica Mucci,

9    red flag, did not play, no aid, could have been cut before

10   first contest.

11           Now, Frederica Mucci was cut on October 15th, 2009,

12   is that right?

13   A.    That's what the records say, yes.

14   Q.    And is that -- do you believe that to be true?

15   A.    I do know that to be true.

16   Q.    And do you know why Frederica Mucci was cut

17   on October 15?

18   A.    As I testified earlier, she joined the team as a

19   nonrecruited student athlete through the try-out process.

20   She's coming in as a freshman.  I knew her to be, knew of

21   her as an international student, she had graduated from an

22   international high school.  I mentioned earlier as well

23   that she, as of the first date of competition, was on the

24   team but had not yet been certified initially eligible by

25   the NCAA eligibility center, based on her status as a

nonrecruited athlete and the NCAA rules which give
non-recruited student athletes a period of 45 days in
which they can practice but not compete or a for a team,
it's a grace period while the NCAA determines their NCAA
eligibility, initial eligibility status.  And during that
time it's often the non-recruited athlete who's been
registering with the eligibility clearing house,
contacting their high school or high schools to make sure
that their transcripts from these high schools are sent to
the eligibility center.  And once all the documents are in
place, during that time there's a very long cue of people
waiting for final certification.

So Frederica was on the team, was practicing, doing
everything else I would expect a team member, power hours,
training room, if necessary.  But her temporary
certification period ended on 10/15, and a couple days
before that, we already knew she hadn't yet been
certified, and her and the coach knew that as of 10/15,
she could have to cease all team activities, including
practicing until such time that she ultimately would be
certified eligible.  10/15 came, the grace period ended,
she needed to be cut from the team or cease practice so
she was cut, she was cut from the team.  And as it turned
out, she never did complete or never did receive a final
certification.

1    Q.   So, she never received the certification so she

2    couldn't participate after the 15th of October?

3    A.   Yes, any athletic related activities, and she did

4    not.

5              THE COURT:  Could I ask about another field

6    hockey player?  Veronica Clark.  Veronica Clark, according

7    to Exhibit E N, page D 89270, was added to the field

8    hockey team 9/1/09.  And according to D 8919, she's

9    deleted from the team, 9/4/09.  So it looks like she was

10   on the team for three days.  How was she treated, do you

11   know, in terms of whether she's counted a player?

12             THE WITNESS:  I haven't done, I'm now in the

13   process for the EADA report for 2010.  I haven't

14   officially done all that yet.

15             THE COURT:  So this would be --

16             THE WITNESS:  I would project that's a not

17   counting.

18             THE COURT:  Oh, I see.  This would be for the

19   year that you haven't reported yet.

20             THE WITNESS:  Yes.

21             THE COURT:  Got it.

22             THE WITNESS:  But projecting that she would not

23   be a counter.

24             THE COURT:  Okay.

25

1   BY MS. FRIEDFEL:

2   Q.   So you don't plan to count Veronica Clark for totals

3   in participation of field hockey for the '09, '10 EADA

4   report?

5   A.   I don't expect to.

6   Q.   Okay.  Just looking at Amanda Radwell who's also on

7   the field hockey list?

8   A.   Yes.

9   Q.   Stating that she quit January 26, 2010, is that

10  accurate?

11  A.   It is not accurate.  It's a clerical error by the

12  compliance office.  I've looked into this, because if you

13  look at the first date of competition, squad list, it says

14  she quit on 8/21.  And if you look at the squad list, the

15  set of squad lists that were produced on or printed on

16  5/26/2010.

17  Q.   Is that Exhibit E M that you're referring to, those

18  squad lists from 5/26?

19  A.   I actually don't know what the exhibit number is, I

20  just know the history.

21  Q.   If you want to turn to Exhibit E M, you can -- I can

22  direct you to it.

23  A.   So, E M is a set of squad lists that were run on

24  5/26.  Let's find the field hockey.

25  Q.   It's D 5105.

1    A.   Oh, if you were look at D 15096, which is where

2    Amanda Radwell's name appears on the 5/26/2010 squad list,

3    it says quit.  Well, the codes are quit, red shirt,

4    1/26/2010.  I had, since this happening, I had gone back

5    to look to see why she was a cut and a red shirt on the

6    initial squad list but yet a quit and a red shirt.  And

7    she was, she quit the team during pre-season.  Apparently

8    I put it as a cut on the squad list and at some point over

9    Christmas break, early second semester or, you know, early

10   January, the coach informed me that she wasn't a cut, she

11   in fact was a quit.  So I went back to reflect that more

12   accurately, that she was still not on the team but that

13   she was a quit.  So that was a software adjustment.  The

14   software can and will automatically populate the date when

15   you put a code in and I did not pick up on the fact that

16   it switched the date from 8/21 to one -- January 26, 2010

17   which is the date I was going in and making the

18   adjustment.  So that's why there's that discrepancy.

19   Q.   So Amanda Radwell was not on the field hockey team?

20   A.   No, she did in fact quit, left the team and did not

21   play in 2009, 2010.

22   Q.   Okay.  Now, if you want to look at Exhibit E V.

23   A.   E Z?

24   Q.   E V as in Victor.

25   A.   I have E V.

1    Q.   And is that email correspondence that you had with

2    Rene Tersey (ph)?

3    A.   Yes.

4    Q.   And that confirms there that -- well, I guess it says

5    on the email, on August 21st, you wrote to Ms. Tersey,

6    referring to Amanda Radwell on the subject, "I did,

7    however, receive an email per our usual process notifying

8    me that Amanda had quit the team."

9    A.   Can you refer to the -- document page?

10   Q.   Yes, it should be D 15238, the first page of Exhibit

11   E V.

12            THE COURT:  I see it.

13   A.   I see it, okay, yes, I do see that.

14   Q.   Okay.  Now, looking back at Exhibit 150, the charts

15   from Ms. Lopiano's report, I just wanted to look at

16   women's soccer.

17   A.   I'm there.

18   Q.   And under Jannell Lopez (ph) she red flags her as a

19   fifth year senior at mid semester, who was added.  Had

20   Jannell Lopez ever played soccer for Quinnipiac before?

21   A.   Yes, she did.

22   Q.   When did she play?

23   A.   She was a member of the team her freshmen year in

24   college and she was also a member of the women's lacrosse

25   team her freshmen year, so she was on the fall women's

1   soccer team and her spring freshmen year, women's

2   lacrosse.

3   Q.   Do you know the circumstances under which Jannell was

4   added to the women's soccer team?

5   A.   In this given case, Jannell had, after her freshmen

6   year had continued with only one sport which was women's

7   lacrosse.  And so in the '08, '09, Spring '09 women's

8   lacrosse season, she exhausted her eligibility.

9   Q.   You can only play a single sport for four years?

10  A.   Four years during a five year period.  She was coming

11  back for the fall, she came back in the fall to complete

12  her degree.  I think he's an occupational therapy major

13  and they need like 142 or so credits to graduate.

14       During the early part of the soccer season, the team

15  started to get beset with severe injuries and, in fact, I

16  think they lost three students to season ending knee

17  injuries.  And at one point one of the injuries, I believe

18  the goalie lost, lost -- one of the goalies on the team

19  was lost to a knee injury which left Coach Hart with only

20  one goalie, and so that's not a good idea to go into any

21  given game with one goalie, and so he inquired if because

22  of the circumstances of the rash of injuries and no longer

23  having personnel, if he could add another player.  And he

24  conferred with Mark Thompson and the answer apparently was

25  yes because then Jannell agreed to come back out and be

1  part of the team in the event that there was a need for

2  her to step in a game.

3  Q.   Thank you.  We're done with Dr. Lopez's charts.  I do

4  want to ask you some more questions.

5       Do some sports have a championship season and

6  nontraditional season?

7  A.   Yes.

8  Q.   And which of Quinnipiac's sports fall into that

9  category?

10  A.   That have a traditional and nontraditional?

11  Q.   Yes.

12  A.   It would be easiest if I said there are a few sports

13  that don't have.

14  Q.   Okay.  Which are the sports that don't have a

15  nontraditional season?

16  A.   Men's and women's ice hockey, men's and women's

17  basketball.  And then women's cross country doesn't have a

18  nontraditional season.  Women's indoor track doesn't have

19  a nontraditional season.  They just have the one season.

20  And women's outdoor track doesn't have a nontraditional

21  season.

22  Q.   Okay.  What about competitive cheer; do they have a

23  nontraditional?

24  A.   Oh, competitive cheer, they are considered the

25  nonsegmented.  We call them, refer to them as the winter

1    sport.

2    Q.   That runs throughout two semesters?

3    A.   Yes, it spans two semesters.

4    Q.   Okay, and do you -- hold on, let's switch to E T,

5    actually.

6    A.   E T.

7    Q.   E T, phone home.  You can take some of those off,

8    Tracey.

9    A.   It looks like my desk.  I have E T.

10                  THE COURT:  Go ahead.

11                  SPEAKER-P:

12   BY MS. FRIEDFEL:

13   Q.   What is this document?

14   A.   I'm sorry, I didn't hear that.

15   Q.   What is the document; what is E T?

16   A.   Okay, it is called, as the label says, competition

17   used for the academic year 2009, '10.  It's a document

18   that's generated by the NCAA compliance assisted software,

19   and it is a list of the athletes in the software, and of

20   particular note is the far right hand column where it

21   refers to participated flag.

22   Q.   What does that participated flag mean?

23   A.   I had made reference earlier in my testimony to the

24   fact that we solicit from both our sports information and

25   our head coaches the status of every player on their team

1      whether they competed in a contest or not during their

2      seasons.  And when we gather that information we go back

3      to the software and there is a place to check yes,

4      participated in a varsity contest, red shirt, did not

5      participate.  When you run this report it takes that

6      information and puts it in this format.  So if you see

7      yes's, they competed in at least one contest.  If you see

8      blanks, means they did not compete in a contest that year.

9      Q.    And do you count a season of competition used if an

10     athlete -- or, I'm sorry, a participation flag if an

11     athlete competes in a competition in the nontraditional

12     season?

13     A.    It depends on the sport that they are involved in.

14     Q.    Okay, and what -- what's the difference?

15     A.    The NCAA regulations say that any time a student

16     competes in a contest, they are charged with a season of

17     competition used.  There is an exception to that bylaw

18     that says in the sports of men's soccer, women's soccer,

19     field hockey, women's volleyball and men's water polo,

20     that any play during their nontraditional season, if a

21     student didn't compete in the fall season but did compete

22     in a nontraditional season, in the spring, they do not get

23     charged with a season of competition.

24     Q.    So, all of those sports that you just mentioned that

25     are exceptions to this rule with respect to nontraditional

1   season play, are those sports, are their championship

2   seasons in the fall semester?

3   A.   Yes.

4   Q.   And do the coaches of those teams sometimes use the

5   spring semester to look at different players?

6   A.   I think each coach probably has their own set of

7   reasons what they are doing with the spring.  The one that

8   you offer is most likely one of them.  The way I'd thought

9   of it in my career is those sports that I mentioned, with

10   the exception of water polo because I never worked with

11   the water polo program, those coaches are using the spring

12   nontraditional season to prepare for next year.  So you

13   typically do not have seniors that have exhausted their

14   eligibility, played their last game, had a senior day in

15   the fall.  They typically do not play in the spring.

16   Q.   So the seniors wouldn't play in the spring?

17   A.   They typically do not.

18   Q.   And do the coaches of those teams ever sometimes add

19   athletes for that nontraditional season?

20   A.   Yes.

21   Q.   And do you have an understanding of why they add

22   those athletes?

23   A.   As I referred earlier in my testimony, using field

24   hockey as an example, having a try-out in the fall for

25   fall sports can sometimes be difficult given just working

1    with pre-season in your first official game, that's going

2    to count, is coming up and some sports will then take the

3    opportunity, such as a women's soccer, and I have had

4    these discussions over the years, he's given students that

5    came in and they didn't even know to try-out yet, he gives

6    them that opportunity to try out maybe in like February,

7    and if he thinks he's got some potential, he would keep

8    those young women on the team through the spring and give

9    them perhaps some game opportunity and then make a

10   decision as to whether he thinks that he would like to

11   continue to help them develop and bring them back next

12   year to be part of the championship segment or decides

13   that maybe it's not in their best interest, they are

14   really not going to be able to contribute in whatever

15   fashion.  And so he may have discussions and ask them not

16   to come back or they may recognize that the level of

17   competition or the commitment is not something that they

18   feel they want to continue with and they may decide

19   themselves not to continue.

20   Q.   So, for those sports would it be accurate to say

21   sometimes the coach uses that nontraditional season as an

22   extended try-out for the following year?

23   A.   I think that would be fair.

24   Q.   Just on this participation flag, I just wanted to ask

25   you on -- if you look down to page 15056.

1    A.    I'm there.

2    Q.    If you look at Katrina Lennon and Nicole Manzo?

3    A.    Katrina Lennon -- I see them.

4    Q.    They both have quits next to their name in October

5    and August.  Do you know when the competitive cheer's

6    first date of competition was?

7    A.    Not exactly, but it was in early December, the first

8    week or so.

9    Q.    So it was after these date these --

10   A.    Correct.

11   Q.    -- athletes had quit?  And do you know why there's a

12   participation flag next to those?

13   A.    Yes, I do.  When the information was solicited from

14   sports information and the coaching staff, it appears that

15   coach wrote a yes.

16   Q.    So it was a mistake is that --

17   A.    It was clerical error.

18   Q.    Okay.  Now, I want to show you Exhibit B M.

19              THE COURT:  How much longer do you think you

20   have with this witness?  We ought to take a break at some

21   point.

22              MS. FRIEDFEL:  Maybe 15, 20 minutes.

23              THE COURT:  Why don't we break now.  The court

24   reporter's been going for a couple hours, and I know

25   counsel wanted to spend sometime talking about exhibits

1     Why don't we take 20 minutes and come back at 11:30.

2     Stand in recess.

3              (Whereupon a recess was taken from 11:10

4         o'clock, a. m. to 11:35 o'clock, a. m.)

5     BY MS. FRIEDFEL:

6     Q.   Tracey, could you look at Exhibit B M, B as in boy?

7              (Binders fall)

8              THE COURT:  I knew it was going to happen sooner

9     or later.  Tracey, luckily these are clipped so --

10             THE WITNESS:  Yes.

11             (Laughter)

12    BY THE WITNESS:

13    A.   I'm there.

14    Q.   Okay.  Can you tell us what this document is?

15    A.   It's a list of, it's the Quinnipiac University roster

16    numbers 2009, 2010.  It lists all of our varsity sports,

17    our intercollegiate sports by sex and it indicates the

18    athletes that are on the squad lists as of the first date

19    of competition.  And then the number of athletes as of the

20    last date of competition in their championship season.

21    Q.   And where was the information for these columns with

22    respect to the name of athletes on the first date of

23    competition and on the last date of competition and the

24    championship season derived from?

25    A.   They would come from the NCAA squad lists that were

1  maintained during the 2009, 2010 academic year.

2  Q.   And did you go through each of those squad lists and

3  confirm these numbers are accurate?

4  A.   Yes, I did.

5        MS. FRIEDFEL:  And the other information there,

6  just for the record, Your Honor, with respect to the

7  projected enrollment, I spoken with plaintiffs counsel and

8  they agree we don't have any dispute about that

9  information, so we wanted to enter this part.

10  BY MS. FRIEDFEL:

11  Q.   During the '09-'10 academic year, were you aware of

12  any coach taking any steps to manipulate his or her roster

13  and the first date of competition?

14  A.   No, on the contrary.

15  Q.   On the contrary how?

16  A.   I really have felt that throughout the course of

17  starting last summer through the course of the academic

18  year that our coaches have really taken strides to

19  understand and understand better the squad list process,

20  the change of status process, have had an opportunity to

21  confer with our vice president, Vice President Thompson on

22  roster sizes and have discussions and really feel our

23  coaches have been very conscientious of working within the

24  NCAA rules and the rules established by the university.

25  Q.   Are you aware of any coach of a men's team cutting a

```
 1    player before the first date of competition with the

 2    intent of adding that player back to the team soon

 3    thereafter?

 4    A.   During this past academic year, no, I have not seen

 5    any of that.

 6    Q.   And are you aware of any coach of women's team adding

 7    players before the first date of competition with the

 8    expectation of them quitting soon thereafter?

 9    A.   No.

10    Q.   And are you aware of any coach of a women's team

11    adding players before the first date of competition with

12    the intent of cutting them soon thereafter?

13    A.   No.

14    Q.   And have you ever heard Jack McDonald say that the

15    coaches would get in trouble if they didn't sign their

16    roster letters?

17    A.   No.

18    Q.   Just one last question.  If I look at Exhibit E L --

19    I should have asked you this probably earlier, sorry.  If

20    you would turn to page D 12233?

21    A.   Would you repeat that exhibit number?

22    Q.   Sure, it's Exhibit E L, page D 12233.  I think I got

23    it right.

24    A.   Could you tell me what the title of the document is?

25    Q.   Sure.  What I'm looking for is the competitive cheer
```

```
 1    squad list.
 2              MR. HERNANDEZ:  It's the third from the back.
 3    BY THE WITNESS:
 4    A.    Thank you.  I have found it, thank you.
 5    Q.    And in the upper right hand corner, it says women's
 6    cheerleading, is that right?
 7    A.    It does.
 8    Q.    Why does it say that?
 9    A.    There's a, when you're working with the sport in the
10    NCAA software there's a drop down menu and competitive
11    cheer wasn't a choice from the list and I used something
12    that somewhat referred to our competitive cheer team such
13    as women's cheer.  I could have used men's polo or women's
14    rowing, but I chose that with full knowledge this would
15    probably be a question about ten minutes later.
16    Q.    And this squad list doesn't refer to a cheerleading
17    team, does it?
18    A.    It refers to a competitive cheer team.
19    Q.    The varsity competitive cheer team at Quinnipiac?
20    A.    That is correct.
21              MS. FRIEDFEL:  Thank you.  I don't have any
22    further questions.
23              THE COURT:  Let me ask a couple before cross.
24    Could you turn please to Plaintiff's Exhibit 123.  Trade
25    you --
```

 1                    THE WITNESS:  Thank you.

 2                    THE COURT:  If you go to the third page, top of

 3      the page, it says QU indoor track.  Maybe it's the second

 4      page.

 5                    THE WITNESS:  Yes.

 6                    THE COURT:  And then there are names of athletes

 7      and it looks like all the different competitions.

 8                    THE WITNESS:  Yes.

 9                    THE COURT:  There are several athletes starting

10      with Holly Banaian.

11                    THE WITNESS:  Banaian.

12                    THE COURT:  B-A-N-A-I-A-N.  Who did not compete?

13                    THE WITNESS:  That is correct, from this

14      document.

15                    THE COURT:  Christine Donnelly, Caitlyn Kelly,

16      so forth.  Were these athletes counted for purposes of the

17      numbers in Defendant's Exhibit B M we just looked at?

18                    MR. BRILL:  Your Honor, could I clarify

19      something before the witness answers?

20                    THE COURT:  Sure.

21                    MR. BRILL:  First of all, this is an exhibit to

22      Dr. Yiamouyiannis' report so it's not in evidence and

23      there is a similar exhibit attached to the deposition of

24      the track coach.

25                    THE COURT:  Okay.

 1           MR. BRILL:  And she goes through each of these

 2    athletes and explains the circumstances.  I have no

 3    objection to asking Ms. Flynn what she knows but it is

 4    explained in great detail.

 5           THE COURT:  That's great.  I have that

 6    deposition but I have not read the testimony yet.

 7           MR. BRILL:  She goes through each athlete, if

 8    they competed, if they didn't, what the circumstances

 9    were, et cetera.

10           THE COURT:  Excellent, thank you.  Okay, that's

11    all I had.

12    CROSS EXAMINATION

13    BY MR. HERNANDEZ:

14    Q.   Good morning, Ms. Flynn.

15    A.   Good morning.

16    Q.   Ms. Friedfel asked you about suspicious drops from

17    the roster right before the first date of competition and

18    then adds after the first date of competition for the

19    men's teams.  And as I understand your testimony, you're

20    not aware of any of that happening in '09, '10, correct?

21    A.   Correct.

22    Q.   All right.  And last year when you testified in this

23    courtroom, I believe you said that you found that

24    practice, to the extent that it happened, to be something

25    that you felt uncomfortable with, correct, when you

1    learned about it?

2    A.   I can't precisely recall my testimony from last year.

3    Q.   Okay.

4    A.   I do recall at some point perhaps in my deposition

5    where you inquired into last year's court proceedings that

6    I had indicated that I felt I recognized something

7    happening with some rosters in '07, '08 -- '07, '08 that

8    were of concern to me.

9    Q.   And did that include the dropping of male student

10   athletes before the first date of competition and then

11   adding them on after the first date of competition?

12   A.   That's what I would have stated, yes.

13   Q.   Okay.  Now, you understand that the decision of the

14   court in this case found a problem with that practice as

15   well, correct?

16   A.   (Pause)

17        Yes.

18   Q.   Okay.  And that's one of the things that Dr. Thompson

19   was brought in to make sure didn't happen, correct?

20   A.   Yes.

21   Q.   All right.  As I understand your testimony, he's

22   been -- he's made it clear he's not going to put up with

23   that sort of thing, right?

24   A.   I don't believe I said that precise -- that he made

25   that statement.  I don't think I was asked about any

1    statements.

2    Q.   I'm not asking you to quote him.

3    A.   Okay.

4    Q.   Has he cracked down to make sure that that sort of

5    thing doesn't happen?

6    A.   I don't think I would characterize it as crack down.

7    I believe I've testified earlier today indicating that we

8    had expanded our change of status process to include Vice

9    President Thompson and that he was open to discussing and

10   wanted to know if a coach felt that there needed to be a

11   change in the roster, somebody was -- that he felt needed

12   to be cut or there was a circumstance that they wanted to

13   add somebody, or somebody was going to be quitting the

14   team, so he, this was an added element to that process and

15   I would say overseer.

16   Q.   So there's added supervision to make sure that was

17   not happening, correct?

18   A.   Yes.

19   Q.   All right.  And were -- let's talk about women's

20   running sports for a second, if we could.  All right?  Do

21   you know -- or running sports generally.  Where do the

22   men's cross country athletes train, where do they

23   practice?

24   A.   Men's cross country team practices on and around the

25   Quinnipiac University property.

1    Q.    And what about the women's cross country team; where

2    do they train and practice?

3    A.    On and around the university property.

4    Q.    So we're talking roads and trails and -- whatever's

5    available?

6    A.    Well, I'll never see them on a trail because I'll

7    never be there, but I have been around town and will see

8    them out on the roads.

9    Q.    Fair enough.  Now, what about the women's indoor

10   track team, where do they train, where do they practice?

11   A.    I don't keep up on practice venues per se, I believe

12   they practice at Yale University's track.

13   Q.    Okay.  And do you know how they get there?

14   A.    I do not.

15   Q.    All right.  You don't know if the women indoor or

16   outdoor track athletes have to drive themselves to Yale to

17   practice?

18   A.    I don't know for a fact, as a fact how they get

19   there.

20   Q.    Okay.  Now, again, Vice President Thompson, his focus

21   was on the add/drop practice at Quinnipiac University, is

22   that correct?

23   A.    His focus was on the changing of rosters.

24   Q.    Change of status forms?

25   A.    Change -- any -- any change to a roster.

1   Q.   Okay.  Did he ask you to assist him in keeping track

2   of the change in status forms?

3   A.   I would not -- if someone asked me what his role was,

4   I would not answer it the way you've just asked that

5   question.  I would not say he's asked me to help him keep

6   track of adds and deletes because, or change of status

7   because that's something I've already done or I already

8   did.

9   Q.   Have you had these conversations with Vice President

10  Thompson about what role he expected you to play in his

11  new role monitoring the add/delete list?

12  A.   There was at some point, and I can't recall when, but

13  there was expectation that the coaches were going to now

14  ask to confer with Vice President Thompson before a change

15  to be made or should be made and, you know, there have

16  been times when some coach would in fact give me a change

17  of status form and I'd ask if they had run it by and

18  discussed this with Vice President Thompson.

19  Q.   My question was have you and Vice President Thompson

20  had any conversations about what role you were going to

21  play in his new administration of this process?

22  A.   What stands out in my mind mostly is an email that he

23  sent me confirming or reiterating that coaches needed to

24  confer with him so I can't remember a specific

25  conversation, but I do remember an email message and I

```
1    think I was one of several people included on that email.
2    Q.   Okay.  Now, the, the add/delete process, that was, as
3    you understood it, the problem and the reason Vice
4    President Thompson was coming in to take over this role,
5    is that correct?
6    A.   Yes, that would be correct.
7    Q.   All right.  And as far as making the target roster
8    management numbers that the coaches were required to make,
9    is it your understanding that the first date of
10   competition was the time that controlled when someone,
11   when a coach was considered to have made their number?
12   A.   Could you repeat the question?
13   Q.   Yes.  The first date of competition.
14   A.   Yes.
15   Q.   That's an important date, correct?
16   A.   Yes.
17   Q.   All right.  And it's an important date because you
18   consider the first date of competition to be the date on
19   which the coach either made or didn't make their target
20   roster management number, is that correct?
21   A.   Yes.
22   Q.   All right.  Because that was the focus.  The first
23   date of competition, correct?
24   A.   That first date of competition is a big date for a
25   variety of reasons.  And the first date, to answer your
```

1    question, is the reference that I'm familiar with with

2    EADA purposes and it is also the -- you know, for NCAA

3    purposes, who's academically and athletely eligible to

4    compete, so that first date of competition seems to be an

5    important benchmark for several different things that I do

6    in my job.

7    Q.   Okay.

8    A.   But it's not the only time that the vice president

9    wanted to know about any changes in the roster.

10   Q.   Right.  He's monitoring add/deletes and after the

11   first date of competition, too, correct?

12   A.   Throughout the academic year, correct.

13   Q.   But as far as the coaches are concerned, for a coach

14   to either make their number or not make their number, the

15   first date of competition, that's the important date,

16   right?

17   A.   It appears to be a significant date for many of us,

18   yes.  All of us.

19   Q.   Okay.  And that was communicated to the coaches,

20   right, that was the important date, first date of

21   competition?

22   A.   (Pause)

23   Q.   You understood the --

24   A.   First, I think the coaches all understand the first

25   date of competition for the academic year is an important

1   date.

2   Q.   All right.  And that was communicated to the coaches

3   by Jack McDonald and by Vice President Thompson, correct?

4   A.   I would -- I would agree with that.

5   Q.   All right.  The -- who is the Title IX coordinator at

6   Quinnipiac University?

7   A.   Title IX coordinator is Sarah Steele.  I don't know

8   her exact title but she is, I believe, at the assistant or

9   associate vice presidential level and I believe she works

10  under the Department or within the Department of Academic

11  Affairs.

12  Q.   Okay.  And what is your understanding of the role of

13  the Title IX coordinator, what is she supposed to do?

14  A.   I have not seen her job description relative to that

15  role so I don't have an answer for you.

16  Q.   Okay.  As I understand it, you are the Senior Women's

17  Administrator, correct?

18  A.   Senior Woman's Administrator.

19  Q.   Thank you.

20  A.   Yes.

21  Q.   And also within the Athletic Department it's your

22  job, among other things, to keep track of the add/delete

23  list, correct?

24  A.   It's my job to keep track of the status of our

25  student athletes and one of the mechanisms that I use to

1    do that and maintain the NCAA squad list is to keep a list

2    of the student athletes that are leaving or joining the

3    team.

4    Q.   Perfect, thanks.  And that also includes making sure

5    that students are academically eligible under the NCAA,

6    correct?

7    A.   The add/delete list that you're referring to does not

8    take into consideration yet academic or athletic

9    eligibility of an athlete.  Again, that's a supporting

10   document for the NCAA squad list.  It's the NCAA squad

11   list and all the work done on the different parts of the

12   software, that is where we refer, maintain, monitor

13   academic and athletic eligibility.

14   Q.   Right, that was my point.  It's not just the

15   add/deletes, you have to keep track of a number of

16   different things, including the NCAA academic eligibility

17   and seasons used, correct?

18   A.   Myself, and I have several assistant AD's that also

19   do -- contribute to that information.

20   Q.   Okay.  And as I understand the flow of information,

21   it comes from the coaches to you and then from you to,

22   it's shared with Vice President Thompson, correct?

23   A.   What do you mean by flow -- what information are you

24   talking about --

25   Q.   Add/deletes?

1    A.   Add/deletes, yes, it is initiated by a coach.

2    Q.   And after Mark Thompson became the vice president in

3    charge of monitoring this, as I understand it he sent you

4    an email about what he expected from you, correct?

5    A.   Sometime after he became supervisor of the Athletic

6    Department, yes.

7    Q.   How long after he became supervisor of athletics and

8    recreation did he send you this email?

9    A.   I have no recollection of that.  I know that the

10   email exists.  I would say it's in the fall semester but I

11   do not have an exact recall.

12   Q.   Fair enough.  Fair enough.  Take a deep breath, I

13   don't want you to get nervous.

14   A.   I'm actually not nervous.

15   Q.   All right.  Now, then, is Vice President Thompson's

16   office in the Athletic Department?

17   A.   No, it is not.

18   Q.   Where is his office?

19   A.   School of business.

20   Q.   Okay.  Did he ever pay a visit to you as the senior

21   woman's administrator and explain to you what he expected

22   from you in connection with his new monitoring of the, of

23   this process?

24   A.   I don't recall Vice President Thompson ever visiting

25   my office to discuss anything such -- to discuss anything.

1    Q.    Okay.  Ms. Steele, the Title IX coordinator at

2    Quinnipiac University -- by the way, did you know that

3    that, that Quinnipiac University by law is required to

4    have a Title IX coordinator?

5    A.    I know that by law all colleges and universities are

6    expected to have someone designated as Title IX

7    coordinator.

8    Q.    Okay.  Now, after the court entered decision in May

9    of last year -- right?

10   A.    Correct.

11   Q.    Did you have any conversations with Ms. Steele about

12   how the university was going to handle Title IX compliance

13   going forward?

14   A.    No.

15   Q.    And did she ever send you any emails about what she

16   expected to you as the gatekeeper of this information, the

17   add/delete information?

18   A.    No.

19   Q.    And I take it obviously that if Vice President

20   Thompson didn't meet with you and she didn't meet with

21   you, that the three of you didn't get together and discuss

22   what was expected of you?

23   A.    Correct.

24   Q.    All right.  So, again, the focus for the coaches is

25   the first date of competition, correct, for whether they

1    make their roster management number or not?

2    A.   Yes.

3    Q.   All right.  Now then, I take it then that -- do you

4    know if Vice President Thompson, Ms. Steele, Mr. McDonald

5    or anyone associated with athletics at Quinnipiac

6    University undertook an examination, men's athletic

7    program, women's athletic program, to determine whether

8    equipment for the women's program and the men's program

9    was equal or close to being equal?

10             MS. FRIEDFEL:  Objection, Your Honor.  This is

11   going beyond the scope of my direct examination.  We

12   didn't talk anything about equipment or resources for any

13   of the teams.

14             MR. HERNANDEZ:  It's one of the proportionality

15   factors, Your Honor.

16             MS. FRIEDFEL:  I don't believe it is actually.

17             THE COURT:  Well, I'll allow it, at least some

18   of this.  See where we go.

19   BY MR. HERNANDEZ:

20   Q.   Was any study like that ever undertaken?

21   A.   Not to my knowledge.

22   Q.   All right.  Can I take it that the same is true about

23   the scheduling of competitions?

24   A.   I don't work directly with schedules -- I'm thinking

25   through my answer out loud.

1        (Pause)

2        I don't know the answer to your question.

3    Q.   All right.  Do you know if any such examination or

4    comparison was made, men's program, women's program, with

5    respect to access to coaching, to coaches?

6    A.   I don't know that that took place.

7    Q.   Okay.  And certainly no one consulted you about that?

8    A.   No.

9    Q.   All right.  The coaches who had been dropping before

10   the first date, I'm talking about '07, '08, who had been

11   dropping before the first date of competition and then

12   adding athletes after the first date of competition, these

13   are the same coaches that you continued to rely on for the

14   first date of competition roster list, is that correct?

15   A.   Correct.  As I stated, we, the coach, head coach or

16   the coach, initiates.  Presumably it's the head coach.

17   Q.   Okay, and do you know if any procedures for

18   accountability were put in for any of the coaches, any of

19   the programs, to determine if there were athletes who were

20   practicing with the team showing up for practices, working

21   out, but who were not on the roster?

22   A.   The one thing that comes to my mind is a few years

23   ago I wrote a program that the -- some software allows

24   that flexibility, so on any given day a coach anywhere

25   because it's a web based program, can pull up and see who

```
 1    is on his or her team and whether they are eligible to be
 2    at practice or not or competition or not.
 3    Q.   All right.
 4    A.   So all our coaches have that opportunity to know
 5    who's eligible for practice and competition.  It's
 6    particularly of importance in the first few weeks of the
 7    school year when sometimes people are medically waiting
 8    for their insurance so we won't allow them to practice.
 9    So that comes to my mind when you asked that question.
10    Q.   And, again, it's up to the coach to do the checking;
11    no one's checking on the coach under that situation?
12    A.   Correct.
13    Q.   Okay.  As I understand it, Coach Martin coaches four
14    teams, is that correct?  Men's cross country, women's
15    cross country, women's indoor track, women's outdoor
16    track?
17    A.   Yes.
18    Q.   Are there any other coaches at Quinnipiac University
19    who have responsibility for four different teams?
20    A.   No.
21    Q.   The women's indoor and outdoor track teams, do they
22    have access to track and field facilities at Quinnipiac
23    University?
24              MS. FRIEDFEL:  Your Honor, this is also -- we
25    didn't, this witness is not the track coach.  She's not
```

1    here to testify about --

2              MR. HERNANDEZ:  I'll withdraw the question, Your

3    Honor.  Withdrawn.

4    BY MR. HERNANDEZ:

5    Q.   The NCAA eligibility, academic and year of

6    competition used, that's information that you track

7    carefully, correct?

8    A.   Yes.

9    Q.   Is that information important to you in the role that

10   you play at Quinnipiac University?

11   A.   Yes.

12   Q.   Could you tell the court why it's important to have

13   that NCAA academic eligibility and year of competition

14   used?  Why is that important for you to have that

15   information?

16   A.   Academic eligibility, there's a variety of rules

17   based on year in college, et cetera, and a student athlete

18   has to meet those standards, be it university or NCAA, in

19   order to be eligible to compete.  Participation is -- to

20   track participation is important because a student

21   athlete, every student athlete in Division I has five

22   years in which to complete or use four seasons of

23   competition.  So it's good to keep a running total just to

24   make sure you know that they haven't exhausted their

25   eligibility and are getting ready to get on a bus for the

1    next year to go to a game.

2    Q.   All right.  And do student athletes have to submit

3    their names to the NCAA to do a check to make sure that

4    they are academically eligible and that they haven't used

5    up the five, more than five years of eligibility?

6    A.   The NCAA, the student athletes do not to have submit

7    that they played or not played to the NCAA.  The

8    monitoring of academic eligibility credits earned, credits

9    enrolled, percentage of degree requirement, grade point

10   average, is done inhouse on everyone's campus.  And what I

11   mean by in house, it's campus based, and depending on what

12   school or variety of different people may be involved in

13   the process.

14       The only time that I can think of that students are

15   working with the NCAA on any kind of eligibility on a

16   regular and routine basis is when students are coming into

17   college and need to, to prove or need to have assessed

18   their initial eligibility standards.

19   Q.   And under those circumstances they do go through the

20   NCAA?

21   A.   They go through the NCAA eligibility much if --

22   eligibility -- eligibility center.

23   Q.   Okay.  And these NCAA requirements, would you agree

24   that in part they make sure that the different schools are

25   not cheating, they are not bringing in a ringer, for

1    example, with a grade point average of 1.1?

2    A.   The initial eligibility center, formerly known as the

3    NCAA clearing house, was established so that if a student

4    was interested in going to some schools, that those six,

5    seven, three, twelve schools did not have to do an

6    assessment and perhaps interpret transcripts differently.

7         So the clearing house, now eligibility center, was

8    created to have standard practices, same set of eyes

9    looking at transcripts provided by a student.

10        I think certainly in the beginning of the NCAA

11   clearing house, there may have been times when one school

12   was able to say, hey, you can come here and meet the

13   eligibility standards and another school's assessment was

14   you can't.  And that did -- that was a discrepancy and

15   certainly could be a competitive advantage.

16   Q.   So you want to make sure that schools are on the same

17   level playing field?

18   A.   With regards to initial eligibility standards, yes.

19   Q.   And as far as the years of competition used, that

20   protects the student athletes as well, would you agree?

21   A.   I don't know what you mean by protects.

22   Q.   Well, it prevents a university, for example, from

23   having a student compete for seven years in a row?  In

24   other words, they can't exploit an All-Star like an O. J.

25   Simpson or whatever for seven years.

1    A.    I'm sorry, I really don't know how to respond to that
2    question or statement.
3    Q.    All right.  Would you agree that the NCAA rules and
4    guidelines in part are there to protect the student
5    athletes?
6    A.    In general, the NCAA manual is there to protect all
7    people associated with athletics, coaches, student
8    athletes, and support a competitive experience filled with
9    integrity, et cetera.
10   Q.    So the NCAA rules, guidelines are important to make
11   sure that the schools are on the same level playing field?
12   A.    Are given the same opportunities.
13   Q.    Same opportunities.  And the NCAA rules, guidelines,
14   they are there to make sure that the student athletes are
15   protected, correct?
16   A.    Yeah, I guess you could characterize it as there's
17   rules there to protect them.
18   Q.    Okay.  Before 2009, 2010, did any of the members of
19   the women's competitive cheer team submit their names to
20   determine whether they were academically eligible under
21   the NCAA guidelines?
22   A.    The competitive cheer members would not submit their
23   names to see if they were academically eligible.  Student
24   athletes submit their names to the NCAA to determine if
25   they meet initial eligibility standards.  In my world of

1    the NCAA, initial eligibility and academic eligibility are

2    two different things.

3    Q.   Did any of the freshmen members of the 2009, 2010

4    competitive cheer team submit their names to determine by

5    the NCAA if they were academically eligible?

6    A.   The NCAA does not have a mechanism for students who

7    are in competitive cheer to submit their names.

8    Q.   Okay.  Were any of the --

9    A.   So the answer is no.

10    Q.   No.  Thank you.

11        Were any of the other members of the competitive

12    cheer team, that is non-freshmen, were any checks made

13    through the NCAA to determine whether they had used up

14    their years of eligibility?

15    A.   As I previously stated, that the NCAA does not

16    check -- does not review seasons of competition in the way

17    that I think you're asking.

18    Q.   Fair enough.  Did you take any steps to determine

19    whether members of the women's competitive cheer team for

20    2009, 2010 have used up the years of their competitive

21    eligibility?

22    A.   State the question one more time?

23    Q.   Right.

24    A.   Not rephrase, just restate it, if you would, please.

25    Q.   If I can.  I don't know if I can.  Maybe we can have

1    it read back, how's that?

2              THE COURT:  "Did you take any steps to determine

3    whether members of the women's competitive cheer team for

4    2009, 2010 had used up the years of their competitive

5    eligibility?"

6              THE WITNESS:  I didn't have to take -- I took

7    mental steps.  And there have not previously been a

8    competitive cheerleader, cheer team member, at any school

9    so they had not used any competitive season at the start

10   of the year.  The only concern I would have on the seasons

11   used as a first year program would be had they been, are

12   they within their five year eligibility clock, and I did

13   check on that.

14   BY MR. HERNANDEZ:

15   Q.   Okay.  Do you know if the members of any other sports

16   team are required to practice off campus other than the

17   women's indoor and outdoor track team?

18              MS. FRIEDFEL:  Objection, Your Honor.  This is

19   again outside the scope of my direct.  This witness

20   already testified that she doesn't keep track of the

21   venues of where teams are practicing.

22              THE COURT:  Do you know the answer to that

23   question?

24              THE WITNESS:  Going through the teams right

25   now --

1               (Pause)

2               I think I have an educated guess.

3               THE COURT:  Well, I'll sustain the objection.

4               I have an educated guess too.  Probably less

5       educated than yours.

6               (Laughter)

7       BY MR. HERNANDEZ:

8       Q.   Now, I'd like to chat with you a bit about some of

9       the entries you made about red shirt, quit, that sort of

10      thing.

11              Correct me if I'm wrong but as I understand it, red

12      shirt, red shirting, means that you're not going to

13      compete but under the NCAA you can still practice, go to

14      the training rooms and work out, get medical facilities,

15      tutoring, all that sort of thing.  You just defer, you're

16      going to use that fifth year.  Is that what red shirting

17      means?

18      A.   I don't know that red shirt automatically means

19      you're going to use that fifth year.  It's -- I'm not

20      even -- I'm not even sure if the word red shirt is

21      actually in the NCAA manual.  It could be.

22              But to answer your question, if someone does not play

23      and they are referred to as a red shirt, they in fact can

24      practice, travel with the team, stand on the sidelines in

25      their uniform at games, but never get called into a game.

1    They have access to power hours, the training room,

2    visiting with our academic support monitor, et cetera.

3    Q.   And presumably somebody who quits is not doing any of

4    those things, correct?  They've walked away.

5    A.   Typically someone, once they quit, are cut from a

6    team, they would no longer avail themselves of those

7    things, those services.  Sometimes you may see somebody

8    that's quit a team but has an ongoing injury, may still be

9    working with the athletic training room, or if you no

10   longer have a sport, we may still give support

11   academically to an athlete.

12   Q.   Okay.

13        MR. HERNANDEZ:  If I could just have a moment,

14   Your Honor?

15        (Pause)

16   BY MR. HERNANDEZ:

17   Q.   If you could look at the ring binders, Plaintiff's

18   Exhibits 89?

19        (Pause)

20   I have it here.  This may help speed things up a

21   little bit.  Do you have Plaintiff's Exhibit 89 there in

22   front of you?

23   A.   Yes, I do.

24   Q.   Do you recognize Plaintiff's Exhibit 89?

25   A.   Can I take a moment?

```
1    Q.   Sure.

2    A.   (pause)

3         I recognize this.

4    Q.   Is Plaintiff's Exhibit 89 an email chain that you

5    participated in?

6    A.   Yes, it is.

7    Q.   Okay.  Drawing your attention to Plaintiff's Exhibit

8    92.

9              MS. FRIEDFEL:  I'm sorry, what was the exhibit?

10             MR. HERNANDEZ:  Ninety-two.  Nine, two.

11             MS. FRIEDFEL:  Thank you.

12   BY THE WITNESS:

13   A.   Yes, I recognize this.

14   Q.   Okay.  And is that an email chain that you were also

15   party to?

16   A.   Well, it looks like -- yes, it is a part of a

17   chain -- or I am the chain, yes, yes.

18   Q.   And drawing your attention to Plaintiff's Exhibit 94,

19   nine, four.

20   A.   Yes, I recognize this.

21   Q.   Is Plaintiff's Exhibit 94 an email that you were

22   involved in?

23   A.   I was part of this email chain.

24   Q.   Okay.  Thanks.

25             MR. HERNANDEZ:  And we offer those as exhibits
```

1   obviously.

2            And I have no other questions.

3            THE COURT:  All right.  Redirect?

4   REDIRECT EXAMINATION

5   BY MS. FRIEDFEL:

6   Q.   Can we take a look at the -- I want to compare B M

7   with A M, which is I think we may need to clarify

8   something.

9            MR. HERNANDEZ:  Since I didn't refer to these

10  exhibits, I think Your Honor can anticipate my objection

11  as being beyond the scope of my examination.

12           MS. FRIEDFEL:  You raised a question earlier

13  about some of the numbers so I just realized something

14  might need to be clarified.

15           THE COURT:  I think -- let's see where it goes

16  but I'm inclined to allow it.

17           MS. FRIEDFEL:  Thank you.

18  BY THE WITNESS:

19  A.   So I'm at B M as well as A M.

20  Q.   So they are going to be in two different binders --

21           THE COURT:  Well, it's the same binder actually.

22           THE WITNESS:  Luckily for us.

23  BY MS. FRIEDFEL:

24  Q.   If you look at B M or women's indoor track, listed on

25  the chart for the first date of competition with a number

1    30?

2    A.    Yes.

3    Q.    Is that right?  Now, if you look at A M could you go

4    through and count up and see how many people are on this

5    list as of the first date of competition?  I seem to count

6    31 but could you check that?

7    A.    This is a test, right?

8    Q.    It's not a test.  I mean I can short circuit this --

9    if anyone has objection --

10    A.    I'm fine to do this.

11    Q.    Okay.

12           (Pause)

13           THE COURT:  I count 32 but I'm counting Empty

14    Net.

15           (Laughter)

16           (Pause)

17           THE WITNESS:  Usually I do this with pencil or

18    pen in hand.

19           THE COURT:  Here you go.

20           THE WITNESS:  Oh, I'll be fine actually.  Thank

21    you, though.  I'd like to try it again.

22    BY MS. FRIEDFEL:

23    Q.    Well, if we count up all the names on the list there,

24    I think Your Honor said there are 32, right?

25    A.    Correct.

1   Q.   And the only person who's listed as having a

2   connection of a quit or quit is Jordan Smith, is that

3   correct?

4   A.   That is correct.

5   Q.   So, ordinarily if you were counting the first date of

6   competition, squad number, roster number, what would you

7   come up with based on this?

8   A.   Thirty-one.

9   Q.   Thirty-one.  Now, do you know what the circumstances

10  are, were with Brittany Bower (ph) this year for the

11  indoor track?

12  A.   Yes, well, actually it, it spanned the entire year.

13  She was diagnosed with a medical condition.  She was on

14  the team last year, was coming back this year.  She was

15  diagnosed with a medical condition, life altering medical

16  condition, and so she was on the team, she could travel

17  with the team, she could practice with the team when she

18  felt well enough to do so.  And that's what I remember

19  about Brittany.

20  Q.   So do you know whether she ever did practice with the

21  team in the indoor practice season?

22  A.   I don't believe she did.

23  Q.   Okay.

24        MS. FRIEDFEL:  It might be better, Your Honor,

25  you'll read in the transcript of Carolyn Martin's

1    testimony that this athlete, she anticipated she would be,

2    might be better enough to be on the team, it turned out

3    she wasn't.  But the change wasn't processed in time to

4    get her off the squad list and that's why we only counted

5    her as 30 because she wasn't actually on the team.  I just

6    wanted to qualify that on the record.

7              THE COURT:  Okay.

8    BY MS. FRIEDFEL:

9    Q.   Mr. Hernandez asked you a couple questions about

10   whether you knew if an analysis had been done about the

11   equipment, the coaching and the scheduling for men versus

12   women.  Do you know that any of those analyses have not

13   been done?

14   A.   I don't know that any have, have or have not been

15   done.

16   Q.   You just don't know one way or the other?

17   A.   Correct.

18   Q.   Okay.  Do you have any reason to believe that any of

19   the coaches at Quinnipiac were practicing athletes were

20   not properly on their rosters at the time?

21   A.   I have no reason to believe that.  We work very hard,

22   in fact, to insure that that does not happen.

23   Q.   And did the university take steps to insure that the

24   competitive cheer athletes were meeting academic

25   eligibility requirements?

1    A.   Academic eligibility requirements, yes.  They went

2    through the process that we have in place for all our

3    athletes to determine their academic eligibility, like are

4    they enrolled full-time.  If yes, they can practice.  If

5    they are going -- we applied all applicable NCAA rules to

6    our student athletes on the competitive cheer team.

7         One of the NCAA rules is to go from the fall

8    semester -- to go from competing in the fall semester to

9    competing in the spring semester, you have to have passed

10   a minimum of six credits so we do six credit check

11   mid-year and they were subjected to that rule.

12        Another rule is freshmen have to earn a minimum of 18

13   credits between the fall and the spring semester and

14   ultimately have to earn between -- 24 credits going into

15   the next school year.  So our academic, our system AD for

16   academic support would go through the entire list of

17   freshmen to insure that all the freshmen had earned at

18   least 18 credits, because if they haven't earned 18

19   credits, there's nothing to do to remedy that situation

20   unless there's a mitigating circumstance which would

21   require us to file a waiver request.

22        If any student athlete in the freshmen year as of the

23   end of the spring semester, so two academic semesters, has

24   not earned 24 credits, she will begin alerting those

25   student athletes that you will need to go to summer school

1    because you are shy of your 24 credits.  Competitive cheer

2    freshmen would be subjected to that.

3    Q.   Okay, let me just ask a question.  Apart from

4    actually submitting their names to the NCAA --

5    A.   Eligibility Center.

6    Q.   -- to the Eligibility Officer, were the competitive

7    cheer athletes required to comply with all of the other

8    regulations that are applied to the varsity athletes at

9    Quinnipiac?

10   A.   Yes.

11   Q.   And with respect to the seasons of competition and

12   use that Mr. Hernandez was asking you about, that's

13   tracked by sport, is that correct?

14   A.   That is correct.

15   Q.   So -- and the competitive cheer athletes would only

16   become ineligible to play if they had competed in

17   competitive cheer for more than four years or for four

18   years already?

19   A.   Three years previous -- yes, yes.

20   Q.   Right.  So if they had competed in soccer, they would

21   still have, as long as they were within the five year

22   clock, they would still have eligibility to compete in

23   competitive cheer?

24   A.   Yes.  I think that the Jannell Lopez, women's soccer,

25   women's lacrosse example that we discussed earlier in my

1    testimony is a perfect example of that.  She started

2    college five years ago, played women's soccer, or was on

3    the women's soccer team her freshmen year, was on the

4    women's lacrosse team and used eligibility for the, for

5    four years.  She was still within her five year clock.

6    There was an emergency situation with soccer, she was able

7    to come back to the women's soccer team.

8    Q.   Okay, thank you.

9    A.   And be eligible to practice and compete.

10            MS. FRIEDFEL:  Let me just confer for a moment,

11   Your Honor.

12            (Pause)

13   BY MS. FRIEDFEL:

14   Q.   I just want to show you an exhibit -- actually maybe

15   I can do it without the exhibit.  You were shown some

16   correspondence earlier with Dani Caro -- well, who's Dani

17   Caro?

18   A.   Dani Caro was our women's lacrosse coach.

19   Q.   And that correspondence was about her roster number

20   and the -- a student that was going to be studying abroad?

21   A.   Correct.

22   Q.   Do you know how her roster was handled in terms of

23   what her number was and how things were counted?  Actually

24   let me ask you a more specific question.

25   A.   Thank you.

1   Q.   Do you know if the student who was going to study

2   abroad was counted for the first date of competition

3   roster total?

4   A.   As I mentioned earlier, we have not yet done the

5   official counting for EADA but if I had to do the report

6   this afternoon, I would not count her.

7   Q.   Okay.  And do you know if a student was cut because

8   she returned from study abroad for the spring?

9   A.   I do not know that.

10  Q.   Okay.  Do you believe that to be the case, that there

11  was a specific swap?

12  A.   I believe there was no such swap.

13  Q.   Okay.

14         MS. FRIEDFEL:  I don't think I have any other

15  questions, Your Honor.

16         THE COURT:  All right.  Thank you, you're

17  excused.

18         THE WITNESS:  Thank you.

19         (Witness excused.)

20         MR. ORLEANS:  Are you done?

21         MS. FRIEDFEL:  I believe we are.

22         THE COURT:  The defense is resting?

23         MS. FRIEDFEL:  Yes, we're resting.  We'll have

24  the discussion about exhibits but with respect to

25  witnesses we would rest.

1            THE COURT:  Okay.

2            MR. ORLEANS:  Your Honor, on the housekeeping

3     side of things for the exhibits, this morning I had

4     mentioned the two exhibits to the deposition of Samuel

5     Seemes.  I had given copies of those deposition exhibits

6     to your clerk.  And I can report that deposition exhibit

7     Plaintiff's One either is or is contained within trial

8     Exhibit E M for cross referencing purposes.

9            Deposition Exhibit, Plaintiff's Two is contained

10    within Trial Exhibit E P.

11           The only other thing that I think would be

12    useful to do, and I don't know if you want to do this on

13    the record, Judge, is to go through both the plaintiff's

14    and the defense trial exhibit list and make sure that we

15    all agree what's in and what's not in.

16           THE COURT:  Well, I definitely want to do that

17    and the only question is how to do it.  I was just

18    conferring with my clerk to confirm our list and we can do

19    it a number of ways.  My first thought was to have that

20    list typed up and emailed to both of you so that if you

21    think something's in that isn't on that list, then you can

22    bring it up.  If you think something was not in that is on

23    that list, you can bring that up.  And hopefully then by

24    return email you can tell us if you have any problems.

25    And that will be the list once we've figured out any adds

1      or deletes.

2              MR. BRILL:  And you have authority over the adds

3      and deletes, Your Honor.

4              MR. ORLEANS:  That's fine.

5              THE COURT:  This will be as of the last day of

6      competition.

7              (Laughter)

8              MR. ORLEANS:  That would be fine, Your Honor,

9      but before then we close the last day of competition,

10     there are a few exhibits on the plaintiff's list that I

11     don't think have been admitted yet but I've spoken with

12     defense counsel, I don't believe we have any disagreement

13     about them, so let me just get on the record that they are

14     going in.

15             THE COURT:  Let's get those out of there.

16             MR. ORLEANS:  Okay.  Exhibit 25, the gender

17     equity manual, the NCAA gender equity manual, should be in

18     if it's not already in.

19             Exhibit 48, the users guide for the EADA website

20     data collection, if that's not already in, should be in.

21             THE COURT:  All right, and there's agreement,

22     there's agreement to those?

23             MS. FRIEDFEL:  Yes, I think 48 actually is

24     already in.

25             THE COURT:  They might both be in.

1          MR. ORLEANS:  They may be.  I'm working from the

2     list we've been keeping, Your Honor, so I don't know

3     whether they correspond to your list.

4          THE COURT:  Sure.

5          MR. ORLEANS:  Exhibit 52, the criteria for, the

6     NCAA criteria for emerging sports should be in.

7          THE COURT:  Okay.

8          MR. ORLEANS:  And there are a few at the end

9     that I think we agree are in.  Numbers -- number 139, the

10    defendant's responses and objections to request for

11    admission.

12         140, set of amended responses and objections to

13    requests for admission.

14         And 141, an interrogatory response, should be

15    in.  I honestly don't know whether the version of the

16    interrogatory response that we submitted has been verified

17    by someone for the defendant but I think we're in

18    agreement that it's truthful and accurate.

19         MS. FRIEDFEL:  Yes, it's been verified.  It was

20    just a question whether the verified copy is what is in

21    the exhibit.

22         THE COURT:  Yes, my copy is not verified but,

23    you know, I'm not sure that that matters.  It's submitted

24    by counsel as a judicial admission.

25         MR. ORLEANS:  Yes and it's stipulated in.

```
 1              That's all I have, Your Honor.

 2              THE COURT:  Okay.  All right.

 3              MS. FRIEDFEL:  We don't have any specific

 4    exhibits at this moment that when we can list.  I don't

 5    anticipate having any but we'll doublecheck that.

 6              THE COURT:  And we'll email, as I said, our

 7    list.  Who wants from each side?

 8                   (Mr. Orleans and Ms. Friedfel raising hand)

 9              THE COURT:  We'll get it to the two of you.  And

10    again, if you check it as quickly as possible and let us

11    know if there's no issue, let each other know if there's

12    any issues as well.

13              MR. ORLEANS:  We will.

14              THE COURT:  It may well be you two can

15    stipulate, we don't agree whether it was in but there's no

16    problem being in, that's fine.  And so the record will

17    remain open for that purpose until tomorrow.

18              MR. ORLEANS:  That's fine.

19              MS. FRIEDFEL:  Thank you, Your Honor.

20              THE COURT:  All right.  Let's talk briefly about

21    closings.  We'll be here at nine.  I'm basically going to

22    give each side an hour.  If plaintiff wants to reserve

23    some time for what amounts to rebuttal, that's fine.  Just

24    let me know.  I'm likely to have some questions which

25    hopefully you'll save a little time for.  It's going to be
```

```
 1    helpful to me to focus in precisely on how you believe the
 2    evidence supports your position.  And so it's be going to
 3    be helpful, frankly, to see the plaintiff's trial brief to
 4    understand your view --
 5              MR. ORLEANS:  Yes, appreciate that.
 6              THE COURT:  -- your view of the case, and I will
 7    have read both trial briefs.  And if I get it soon enough
 8    I will read the response to the amicus prior to the
 9    argument.  And hopefully, having carried it around for a
10    couple days I will read Carolyn Martin's deposition so I
11    don't keep asking those same questions.  Any question or
12    concerns about tomorrow?
13              MR. ORLEANS:  Can I let you know tomorrow
14    morning about whether we want to reserve time for
15    rebuttal?
16              THE COURT:  Sure, that's fine.  I do need to
17    leave pretty much at 11, so let's try and start right at
18    nine.  I know I've been the hold-up lately but let's try
19    and start at nine and finish by 11 if we can.
20              MR. ORLEANS:  I don't anticipate a problem with
21    that, Your Honor.
22              THE COURT:  Okay, great.  Thank you all.  Unless
23    there's anything further, we'll stand in recess.
24              (Whereupon the above matter was adjourned at
25    12:40 o'clock, p. m.)
```

C E R T I F I C A T E

        I, Susan E. Catucci, RMR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.

        /S/ Susan E. Catucci
        _____

            Susan E. Catucci, RMR
            Official Court Reporter
            915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
             Tel: (917) 703-0761