```
              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

STEPHANIE BIEDIGER, ET AL       :  No. 3:09cv-621 (SRU)
                                :  915 Lafayette Boulevard
           vs.                  :  Bridgeport, Connecticut
                                :
                                :  June 25, 2010
QUINNIPIAC UNIVERSITY           :

- - - - - - - - - - - - - - - - x


                     BENCH TRIAL


B E F O R E:

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

     FOR THE PLAINTIFFS:

             PULLMAN & COMLEY
                  850 Main Street
                  P.O. Box 7006
                  Bridgeport, Connecticut 06601-7006
             BY:  JONATHAN B. ORLEANS, ESQ.
                  ALEX V. HERNANDEZ, ESQ.

             KRISTEN GALLES, ESQ.
                  Equity Legal
                  10 Rosecrest Avenue
                  Alexandria, Virginia  22301

     FOR THE DEFENDANT:

             WIGGIN AND DANA, LLP
                  400 Atlantic Street
                  P. O. Box 110325
                  Stamford, Connecticut  06911-0325
             BY:  MARY A. GAMBARDELLA, ESQ.


                               (CONTINUED)
```

```
PROSKAUER ROSE
     1585 Broadway
     New York, N. Y.  10016
BY:  EDWARD A. BRILL, ESQ.
     SUSAN D. FRIEDFEL, ESQ.
     REBECCA BERKEBILE, ESQ.




      Susan E. Catucci, RMR
      Official Court Reporter
      915 Lafayette Boulevard
   Bridgeport, Connecticut  06604
        Tel: (917)703-0761
```

I N D E X


SUMMATIONS:

MR. ORLEANS..................................856

MR. BRILL....................................884

MR. ORLEANS (Rebuttal).......................930




-O-

1                    (9:10 O'CLOCK, A. M.)

2              THE COURT:  I get advantage of the fact that the

3    electricity was off a little while.  Although it's

4    actually after 9:00 o'clock it says before nine, so I'll

5    take that.  How is everyone this morning?

6              MR. BRILL:  We're fine.  I have a few

7    preliminaries I'd like to raise with the court before we

8    begin the arguments.

9              THE COURT:  Sure.  I want to make sure where we

10   are on the exhibits.

11             MR. BRILL:  Well, there was -- I think we're in

12   agreement except for one exhibit which was defendant's

13   Exhibit G C, there were no, there was no objection to it

14   when it was, when I questioned Dr. Lopiano about it.  This

15   is the book chapter that was authored by

16   Dr. Yiamouyiannis, and what happened was she never

17   testified but she did identify the book chapter at her

18   deposition.  So there's really no dispute that it's

19   authentic and we believe it should be placed in the record

20   as, just as we did other portions of her report.  That was

21   my first item.  Perhaps Mr. Orleans --

22             MR. ORLEANS:  I would like to be heard.  We

23   haven't been getting daily transcripts so I honestly don't

24   remember if there was an objection asserted when that

25   exhibit was shown to Dr. Lopiano, but it is hearsay.  At

the time if we didn't object it would have been because we
expected Dr. Yiamouyiannis to testify.  Since she did not
testify, it seems to us that the article authored by her
which Dr. Lopiano I think testified that she hadn't read
and disagreed with, we don't think that the article should
be part of the trial record.

MR. BRILL:  Well, we can cure the hearsay
objection by offering that portion of her deposition which
would be admissible under the federal rules.

THE COURT:  Let me figure out whether there's a
real problem here.  If it's not part of the trial record,
is there any dispute that I could look at an article like
this and glean from it whatever I wanted to glean from it?

MR. ORLEANS:  I suppose not, Your Honor.

THE COURT:  I mean, you know, I'm not sure it
matters whether it's in the trial record or out of the
trial order so I'm going go ahead and admit it.  It was
used, I don't recall an objection, so --

MR. BRILL:  The second issue, there's no
controversy, Your Honor.  There were a number of exhibits
that were put into evidence that it turns out contain
personal information regarding student athletes and we've
agreed with Your Honor's permission to seal those
documents rather than to attempt to redact them.

THE COURT:  Well, there's not really a need to

1    do that, I don't think.  Trial exhibits are not docketed

2    in any way.  They are --

3              MR. BRILL:  Okay.

4              THE COURT:  I mean they are here.  I suppose

5    somebody could ask to see one in which case we would want

6    to redact it before it was shown to anyone in the public,

7    but it's not obvious to me that the trial exhibits need to

8    be redacted at this point in time.  After a decision they

9    will be returned to the parties and would be available to

10   the Court of Appeals in the event that there's an appeal,

11   at which time it certainly is appropriate, I think, for

12   either side to redact any, you know, personal information.

13   I understand that to be an agreement of the party.

14              MR. ORLEANS:  Yes, Your Honor.

15              THE COURT:  Is that right?  Yes.

16              MR. BRILL:  Your Honor, I have one more issue.

17   This one is a bit more difficult and frankly it's a

18   situation I've never faced before and I'm not quite sure

19   what to do about it but I wanted to, I felt compelled to

20   bring it to the court's attention.

21              You may recall that Mr. Webb testified at the

22   very end of his direct testimony that in his opinion

23   cheerleading, including cheerleading competition, is not a

24   sport.  That's on page 415 of the transcript.  That

25   testimony was widely reported in the press and I

1  understand, of course, the fire storm of controversy, as a

2  result of which Mr. Webb has been issuing a series of

3  statements on his website and elsewhere which I regret to

4  say appear to directly contradict his court testimony, and

5  I felt it was necessary to bring this to the court's

6  attention.

7          I have his statements but, you know, I'm not --

8  the record the closed, I understand, but it seemed to me

9  the court needed to be aware of the fact in effect he's --

10  I'm not sure if I would say he's recanted his testimony

11  but he's put out public statements that I think I can

12  fairly say states the opposite of the testimony as it was

13  in court.  I've handed out copies of these statements to

14  plaintiff's counsel.

15          MR. ORLEANS:  Your Honor, I hadn't seen the

16  statements before this morning and I'm looking at them

17  myself.  I have to say that I don't think that they

18  contradict his testimony.  I think if you look at his

19  testimony in context and you read the entirety of his

20  public statements he's made, he's trying to walk a fine

21  line but I don't think he's contradicted himself in any

22  way.

23          What's more, the record is closed and I don't

24  think it's proper for the court to take notice of any

25  statements Mr. Webb made or may have made after he's off

1     the stand and no longer testifying in this case.

2              THE COURT:  I would agree with that.  I think

3     the record is the record.  I mean, to be perfectly frank,

4     I'm not going to take whole hog what Mr. Webb or anybody

5     has to say.  I'm going to evaluate it as I'm required to

6     do, and I don't think anybody's prejudiced by not opening

7     the record.

8              MR. BRILL:  Thank you.

9              THE COURT:  All right.

10             MR. ORLEANS:  Good morning, Your Honor.

11             THE COURT:  Good morning.

12             MR. ORLEANS:  I'd like reserve ten minutes for

13    rebuttal, if rebuttal is necessary.

14             THE COURT:  Sure.

15             MR. ORLEANS:  Your Honor, it's the plaintiff's

16    contention in this case, in this action that Quinnipiac

17    University discriminates against women in the operation of

18    its athletic program by failing to provide them with

19    genuine varsity participation opportunities in proportion

20    to their share of the undergraduate population.

21             Now, let me take just a moment to say what this

22    case is not about, in our view.  This case is not

23    volleyball players against cheerleaders.  We're not making

24    a claim that competitive cheer or a team stunt and tumble

25    team can never be a legitimate sport, although we do claim

1        that it is not currently recognizable as a varsity sport.

2                It is not volleyball players against runners.

3        We believe that Quinnipiac ought to be required to beef up

4        its running program for women.

5                And it certainly is not an attempt to reduce

6        opportunities for men.  We encourage Quinnipiac University

7        to increase the athletic participation opportunities for

8        all its student, both men and women, nor are we

9        criticizing the skills or the efforts of any athlete or

10       coach.

11               We are here because of Quinnipiac's failure to

12       take seriously its obligation of nondiscrimination against

13       its female student athletes.  We believe that Quinnipiac

14       has demonstrated by its behavior since the preliminary

15       injunction was entered in this case that it is focused on

16       the appearance but not on the reality of gender equity and

17       Title IX compliance.

18               I'm going to try in my remarks to briefly

19       explain the five ways in which we believe that Quinnipiac

20       discriminates.

21               First, Quinnipiac discriminates by putting

22       ceilings on the sizes of men's rosters and floors under

23       the women's rosters.

24               Now, Dr. Thompson testified that he manages to

25       the numbers and, in general, they have tried to cloke this

1    floor and ceiling policy in the language of management

2    consulting.  But, in fact, we believe that it was clear

3    from the evidence, both the documentary evidence and the

4    testimonial evidence, that for the men's teams the numbers

5    operate as ceilings and for the women's they operate as

6    floors.

7         Now, this chart -- this chart is derived from

8    Exhibit 142 which is the Quinnipiac's chart comparing the

9    sizes of its rosters for 2009, 2010, and for 2010, 2011

10   with the NCAA average squad sizes.  And also from Exhibit

11   eight, which was admitted at the preliminary injunction

12   hearing and included a, it was a -- it was part of

13   Dr. Lopiano's report at that point and it included a

14   column showing the northeast conference average squad

15   sizes.  So I took that column in order to show what I

16   would like to show now.

17        If you examine, if you compare the Quinnipiac

18   university squad sizes, both for the year just finished

19   and for the year to come, with the NCAA and NEC averages,

20   here's what we see.

21        Starting with the men, for basketball and for

22   hockey, for ice hockey, which are the favored sports at

23   Quinnipiac, the sport of emphasis, the sports with

24   prestige, the men get squad sizes that are larger than the

25   NCAA average, and in the case of basketball larger than

1    the NEC average.

2         For baseball, the squad size is smaller than

3    both NCAA and NEC.  For soccer, the same.  For tennis it's

4    equal to NCAA but smaller than NEC.  For lacrosse it's

5    smaller than both significantly.  For cross country, it's

6    smaller than both.  And so clearly there's a consistent

7    pattern of setting the men's roster sizes below the

8    relevant benchmarks.

9         On the other hand, for the women, even the

10   favored sport of basketball, the roster is larger than

11   both NCAA and NEC.  For field hockey, the same.  For

12   soccer, you know, it's close.  It's one smaller than

13   the -- in the year just finished it was larger, in the

14   year to come because the coach has been vocal, it's a

15   little smaller than the NCAA average, it's the same as the

16   NEC.  In tennis it's larger than both.  In lacrosse it's

17   larger than both.  In cross country it's significantly, in

18   the year to come projected to be significantly larger than

19   both.  In the year just finished in cross country, the

20   woman's squad was about the size of the NCAA but

21   significantly larger than the NEC.  And for ice hockey,

22   it's larger.

23        Now, the tracks, because Quinnipiac does not

24   enter so many events and does not have field athletes, the

25   comparisons really aren't relevant.  In softball, we're

1    close.  This year we were the same as the NCAA or a little

2    larger than the NEC.  For the coming year, again we have a

3    vocal coach in softball and the squad size is going to be

4    the same as the NEC.

5          In competitive cheer, there's no comparisons.

6    And in volleyball, for obvious reasons, it's a special

7    case but it's still projected in the coming year to be

8    just a little bit -- to be larger than the NEC average.

9          And we would submit, Your Honor, that it's quite

10   clear that these squad sizes in comparison to benchmarks

11   operate as ceilings for the men and floors for the women.

12          THE COURT:  Is there anything wrong with that?

13          MR. ORLEANS:  Yes.  Dr. Lopiano, as Dr. Lopiano

14   testified, if you're not going to discriminate between men

15   and women, you should have the same policy for both men

16   and women.  You can set, you could set a range, it seems

17   to me, for -- you could say that both men and women should

18   be within one or two of the average and give the coaches

19   some room to move within that.  And none of this would be

20   a problem if you had an established record of compliance

21   with Title IX, if you had been expanding women's sports,

22   if you had been meeting the needs and abilities and

23   interests of your population.  It's only when you get into

24   this situation where you're struggling desperately to

25   reach statistical proportionality that you start to misuse

 1    roster management in this way.

 2         THE COURT:  Let me understand, is roster

 3    management in and of itself a problem or is it a problem

 4    only to the extent that it implies that the opportunities

 5    for some of them, the women on an over sized roster, are

 6    not genuine participation opportunities?  In other words,

 7    is it direct evidence of a problem or is it only an

 8    indirect evidence of a problem?

 9         MR. ORLEANS:  Our contention is that the way

10    roster management is implemented at Quinnipiac is

11    discriminatory on its face.  But to answer your question a

12    little more directly, it's certainly necessary for schools

13    to manage their rosters.  We can't really contest that.

14    No school's in a position to simply say, you know, go out

15    and get as many athletes as you want and let the chips

16    fall where they may.  They have to set some targets but

17    they have to set those targets and implement those targets

18    in a nondiscriminatory way that is accountable to the

19    needs of the sport, the needs of the coach, the needs of

20    the athletes, and the comparison to relevant benchmarks.

21         We do, we do contend that the quality of the

22    women's experience versus -- is less than the quality of

23    men's experience because the women's teams are inflated in

24    size and the men's teams are not.  The men's experience is

25    compromised also because of the ceilings, but in

1    particular, as Your Honor observed at the preliminary

2    injunction stage, you know, we think it's imposition of

3    floors under the women's teams that operates the

4    disadvantage the women have in Title IX.

5         Is that in answer to your question?

6         THE COURT:  Yes.

7         MR. BRILL:  Jon, could I ask you to speak into

8    the mic?  It's hard to hear you.

9         MR. ORLEANS:  Yes.

10        MR. BRILL:  Thank you.

11        MR. ORLEANS:  So there was also evidence, Your

12   Honor, we would submit, that the coaches and the

13   administrators perceived the men's targets as ceilings and

14   the women's targets as floors.  The coaches of the men's

15   teams were frustrated that their numbers were low, coaches

16   of the women's teams found it difficult to meet the

17   targets that were too high.

18        And as Dr. Lopiano testified and I just said

19   treating the men's teams and women's teams differently is

20   discriminatory on its face and we don't think the court

21   really has to go any farther than that in order to find in

22   favor of the plaintiffs.

23        Second, Your Honor, Quinnipiac discriminates in

24   the way take it counts runners in order to comply, in

25   order to appear -- again it's the appearance versus the

1    reality -- in order to appear to comply with Title IX

2    without actually doing so.

3          This is the multiple, the multiple count issue

4    and I want to say that the court doesn't need to find that

5    all running sports are one sport or that indoor and

6    outdoor are really the same sport, although that is a

7    contention that I'll address in a few minutes.  The court

8    doesn't need to find, although we do contend it and I'll

9    address it in a few minutes, that there's anything less

10   than legitimate or genuine about the indoor and outdoor

11   track program for women.  In order to see that the way

12   that Quinnipiac counts its male and female runners is

13   discriminatory, you don't really need to reach those

14   issues, I think.

15         What Quinnipiac is doing is exploiting counting

16   rules.  And, you know, we know that the NCAA says you

17   count a kid as an athlete in each sport and that, that

18   cross country, indoor and outdoor track are different

19   sports for NCAA purposes.  And we know that for EADA

20   purposes, the Office of Civil Rights says you count kids

21   multiple times if they are in different sports and

22   certainly in that sense if you've got a kid who plays say

23   soccer in the fall and softball in the spring.

24         But you have to interpret these rules and

25   regulations for Title IX purposes in light of the purpose

1    of Title IX, which is expanding genuine participation

2    opportunities for women and insuring that women get equal

3    participation opportunities as men.  And it is simply, we

4    submit, obviously unfair, illegitimate, discriminatory to,

5    to multiple count female runners and single count male

6    runners.  It's taking advantage of loopholes in the system

7    for purposes for which they were, for which those rules

8    were never intended.

9          Quinnipiac had -- let me put the chart back up

10   just so we have the numbers.

11         THE COURT:  It will come.  I think it's auto

12   focus.

13         MR. ORLEANS:  There it is.  In the current year,

14   2009, 2010, the year just finished, Quinnipiac had 13 male

15   cross country runners.  Now, we should observe and I'm

16   sure Your Honor recalls the evidence, Quinnipiac before

17   this past year had indoor and outdoor track for men and

18   when Quinnipiac had indoor and outdoor track and cross

19   country for both men and women, it counted them the same,

20   and even if there were some differences in the sizes of

21   those rosters, you know, for statistical purposes there

22   was something of a wash, not a perfect statistical wash

23   but at least they were all being treated the same.

24         Now, in the current year, in the year just

25   finished, we have 13 men who counted as 13 men.  We have

18 women who run cross country.  They're required by their
coach to also run indoor and outdoor track which, not
coincidentally puts floors under the size of the indoor
and outdoor track squad.  And so these 18 women count as
54.  Then we have 12 more women who run track only.  They
run both indoor and outdoor, so they count as 24.  So we
end up with 30 women who count as 78.

For next year, we're going to, the proposal is
to increase the cross country squad, beyond any obvious
reasonable need, so that the 24 women running cross
country will count as 72 and the 11 additional women who
will run track only will count as 22 and we'll have 35
women who count as 94.

It's not -- it's not right.  It's not fair.
It's not consistent with Title IX.  It's an exploitation
of the rules.  It's facially discriminatory because of the
way, the difference that it establishes between how men
are counted and women are counted, and it violates Title
IX.

Third, Quinnipiac discriminates by failing to
count its participants properly.  Here we're relying on
the testimony of Dr. Lopiano and her, particularly her
supplemental report.  There was a lot of testimony about
that, Your Honor is familiar with the exhibits, and her
conclusions, her conclusion page will be attached as an

1    exhibit to our trial brief which will be filed today.  I

2    apologize for that, Your Honor.  We had a bit of a glitch.

3    I think our proposed findings and conclusions are --

4    probably will be filed before we're done this morning,

5    emailed from the office.  And when we get back to the

6    office, we have to finish fixing the trial brief and we

7    will promptly file it.

8         Dr. Lopiano in her supplemental report explained

9    in detail her approach to counting, and I think it's

10   appropriate here to point out, I think, a real difference

11   in the approach of the plaintiffs and the defendant.  It

12   seemed to us that the defendant focused almost exclusively

13   on counting student athletes on the roster as of the first

14   day of competition, which is the standard for the EADA.

15   The EADA equaled -- the EADA takes a snapshot on the first

16   day of competition and asks that that information be

17   reported to the government.  But Title IX is counting

18   participants across an entire season or an entire academic

19   year.  And so Dr. Lopiano, who as the court knows is not

20   only recognized as an expert in Title IX but also was

21   herself an athletic director, looked at more than just the

22   first date of competition squad lists.  She conducted an

23   exhaustive analysis of each team and each athlete.  And,

24   as you'll recall, she laid out her reasons from the

25   perspective of an athletic director for counting or not

1    counting each athlete.

2          And there was a lot of attention paid during the

3    trial to the group of athletes that she described as red

4    flags.  And frankly I think eight little bit of a red

5    herring.  Those were athletes about whom Dr. Lopiano

6    concluded that she didn't have sufficient information to

7    be sure of her judgment whether this was someone who

8    should count or shouldn't count.

9          And she explained what her concerns were and

10   it's indicated on the carts.  And the testimony that's

11   been presented, I think we would concede, resolved those

12   concerns about some of these athletes and showed that

13   Quinnipiac probably would be justified in counting them or

14   not counting them, whichever preferred to do with respect

15   to some of them and perhaps not with respect to others.

16         But even if the court were to decide that all of

17   the judgment calls that Dr. Lopiano made with respect to

18   the, quote/unquote, "red flagged athletes" were incorrect,

19   her column B would still be the best and most solid basis

20   for counting participants, and her column A would be an

21   even more conservative approach.

22         So I'm not going to spend the time here in the

23   oral argument putting those charts back up on the board.

24   The court has them and is familiar with them.  But

25   Dr. Lopiano showed that even if Quinnipiac is permitted to

1   triple count its runners and even if it is permitted to

2   count competitive cheer, that absent volleyball in the

3   year just finished, there would have been -- and this is

4   column B I'm referring to -- there would be an equity gap

5   of 18 which was necessary, which clearly was sufficient to

6   support the volleyball team.

7           And under column A, even if Quinnipiac were

8   allowed to triple count its runners and even if it were

9   allowed to count competitive cheer without volleyball, the

10  equity gap would have been 11, again, enough to support

11  the volleyball team.

12          THE COURT:  Is that the standard?  The defendant

13  cites cases suggesting that it's not enough to show that

14  there are, there would be a gap large enough to support a

15  small team but, rather, there has to be a gap large enough

16  to support the average team for there to be a Title IX

17  violation.

18          MR. ORLEANS:  Your Honor, our contention is that

19  the 1996 interpretation is pretty clear about this, that

20  where the gap is large enough to support a team, then the

21  university is obligated to offer that team.  And in this

22  case, certainly we know what teams are at issue, so that

23  even if in some hypothetical set of circumstances the

24  university, a university could claim, well, you know, the

25  gap is very small and we shouldn't be required to invest

1      all those resources to establish a five person golf team

2      or something like that.  That's not this case.  This case,

3      we have a volleyball team, we have a coach, we have

4      scholarships, we have a schedule.  So I don't think it's a

5      case, these circumstances are circumstances where the

6      defendant should be heard to say we're not obligated to

7      offer volleyball because it's a smaller team than the

8      average team.

9           I know that the defendant also makes some

10     contentions about what is substantial proportionality and

11     whether 2 percent is close enough or whether it has to be

12     farther apart, and our contention with respect to that

13     will be, look, if you are -- if you comply with Title IX

14     and you slide out of compliance because things do

15     fluctuate, you know, the gender proportion of the student

16     body may change, the team may have a bad recruiting year

17     or a good recruiting year, a school is entitled to be cut

18     some slack if it has shown in one way or another that it's

19     serious about nondiscrimination and needs some time to

20     adjust.  But a school with an established record of

21     discrimination is not, we submit, entitled to be cut much

22     slack.

23          Now, on the counting issue for the coming year,

24     Quinnipiac wants to close its gap by adding six cheer team

25     members and six runners.  We've already talked about how

1     the six runners would be counted as 16, and Quinnipiac

2     claims it will close its gap that way and will be entitled

3     to eliminate volleyball.  For the reasons we've already

4     discussed that's completely improper, but we also contend,

5     as we have contended throughout the litigation, that it's

6     not enough to promise we'll be good in the future if

7     Quinnipiac is currently not in compliance.  And plaintiffs

8     are entitled to an injunction to assure compliance in the

9     future, they are not entitled to cut an existing team and

10    make a promise they'll fix it some other way.

11          Now, fourth major contention.  Let me address

12    competitive cheer.  Just one moment, please.

13          (Pause)

14          Now, it's our contention that the new sport, new

15    activity, endeavor, whatever you want to call it, offered

16    by Quinnipiac, whether you call it cheerleading, whether

17    you call it competitive cheer, whether you call it

18    competitive stunt and tumble, it's a terrific opportunity

19    for a bunch of kids who want to do that, but it's not yet

20    a varsity sport for Title IX purposes.

21          The brief, the amicus brief of the United States

22    I think lays out very thoroughly the standards that the

23    government, that the OCR uses to address this question of

24    what's a sport for Title IX.  And we suggest that it is

25    extraordinarily significant, Your Honor, that neither

1    Quinnipiac nor its new organization, the National

2    Competitive Stunt and Tumble Association, has gone to OCR

3    to request a determination letter.  Here is the agency

4    that is primarily responsible for enforcing Title IX.

5    Here is an agency that has an established track record of

6    saying cheerleading does not qualify as a varsity sport.

7         And there's obviously, certainly since last

8    spring when we were here on the preliminary injunction,

9    there's controversy and question as to whether this new

10   activity counts as a varsity sport.  But they haven't gone

11   there.  They don't want to ask the government for an

12   opinion because they are afraid of the result.  And, you

13   know, it would be appropriate we think, for this court not

14   necessarily to defer to the government, but certainly to

15   weigh heavily into the balance in Your Honor's

16   consideration the fact that Quinnipiac has not done the

17   very logical thing and gone to the OCR and asked for a

18   determination of whether this new endeavor is a sport.

19        Now, let me just say briefly why we think that

20   at this time competitive stunt and tumbling is not ready.

21   First of all, it's not recognized by the NCAA.  There's a

22   well established process, you heard testimony about the

23   process for recognizing emerging sports at the NCAA.

24   Quinnipiac recognizes the emerging sport status is

25   desirable.  The National Competitive Stunt and Tumbling

1    Association recognizes this an emerging sport status is

2    desirable but they haven't submitted a proposal yet.  They

3    don't have the ten schools on board they need in order to

4    submit that proposal.  They've engaged in conversation

5    with the NCAA, they are making a plan but they haven't

6    done it yet, they don't plan to do it until next spring

7    sometime and it's purely speculation to wonder when that

8    proposal might be acted on and when the NCAA eventually

9    will make a decision.

10            But since competitive cheer is not yet

11   recognized, the participants in the activity are deprived

12   of all of the benefits that come with competing in a NCAA

13   sport.  Now, obviously Quinnipiac voluntarily follows some

14   of the NCAA rulings for those participants, but merely

15   following the rules does not encompass all of the benefits

16   that come from being part, as an athlete, from being part

17   of the NCAA and that's not true of any other athletes at

18   Quinnipiac.

19            THE COURT:  Let me follow up a little bit.  The

20   status as a NCAA sport or a NCAA emerging sport might

21   provide a presumption that a sport counts for Title IX

22   purposes.  Is the converse necessarily true?  Is the

23   absence of NCAA recognition conclusive or largely

24   conclusive of the Title IX inquiry or is the inquiry

25   independent of what the NCAA has or might do?

1          MR. ORLEANS:  Judge, I don't think we have any

2     basis to say that the absence of emerging sport, of the

3     emerging sport designation is itself conclusive.  I can't

4     point to a rule or regulation or a case that says an

5     activity will never be treated as a sport unless the NCAA

6     has recognized it.  But it certainly should weigh very,

7     very heavily in the balance, especially at this early

8     stage when there are only half a dozen schools that are

9     engaged in the activity, when they haven't decided what to

10    name the activity yet, when they haven't had a

11    championship yet.

12          With all of the other indicia, the lack -- the

13    failure to even apply for emerging sport status yet should

14    weigh heavily in your determination.

15          THE COURT:  Is there anywhere in the record an

16    indication of other sports or activities that are not

17    counted for Title IX purposes that one might consider a

18    sport?  I recall seeing an exhibit that listed, for

19    example, NCAA championship sports and then some sports

20    that were not championship sports.  Is there any

21    indication -- let's take, and this is completely out of

22    the blue, I have no idea what the status is, but let's

23    take bowling, okay?  Now, bowling it seems to me is a

24    sport potentially, it's potentially an intercollegiate

25    sport.  Are there colleges that offer --

```
 1              MS. GALLES:  That is a recognized NCAA sport,

 2    Your Honor.

 3              THE COURT:  Okay.

 4              MS. GALLES:  It has been for a few years.

 5              THE COURT:  All right.  There is an example of

 6    Ultimate Frisbee, very popular on college campuses, teams

 7    travel around the country -- some call it a sport.  Is

 8    there any indication one way or the other whether, first,

 9    it's recognized by the NCAA and, second, whether it's

10    counted for Title IX purposes?

11              MR. ORLEANS:  I'm not, certainly not aware of

12    any school counting Ultimate Frisbee as a NCAA sport, but

13    my awareness or nonawareness is not really conclusive of

14    anything.  I'm smiling because I think that a painting of

15    NCAA recognition would be contrary to the culture of

16    Ultimate Frisbee.

17              (Laughter)

18              THE COURT:  Fair enough.

19              MR. ORLEANS:  There's an anti-authoritarian cast

20    to that activity.

21              But I can't cite you a place in the record that

22    identifies other non-NCAA recognized activities that are

23    counted for Title IX purposes, if that's the question.

24              THE COURT:  That's what I was looking for, yes.

25    Okay.
```

1          MR. ORLEANS:  In any event, just to get back

2     then to the -- and do you have further questions along

3     that line?

4          To get back then to the reasons that we think

5     that competitive cheer is not ready for prime time yet,

6     obviously it's not the case that any other sports at

7     Quinnipiac University are not NCAA or NEC.  I've already

8     made the point it's not recognized by OCR and that

9     Quinnipiac hasn't asked for that recognition, for that

10    recognition yet or that determination.

11         You heard some testimony on recruiting, and even

12    accepting Coach Powers' testimony that she gets a lot of

13    inquiries from kids who want to participate in this new

14    endeavor, obviously the inability up until this coming

15    August to go off campus to recruit is going to affect the

16    quality of the team and that in turn is going to affect

17    the quality of the experience for the athletes.

18         The lack of Northeast Conference recognition or

19    competition is going to affect the quality of that

20    experience.  The team can't form rivalries.  They can't

21    build a fan base.  They don't have people traveling with

22    them to nearby schools.

23         The quality of the competition is inconsistent.

24    There are a few varsity teams nationwide, teams that treat

25    themselves as varsity.  The competition that the

 1   Quinnipiac squad faces includes sideline cheerleaders whom

 2   compete occasionally.  It includes club teams.  There's no

 3   other varsity sport at Quinnipiac University that faces

 4   such an uneven quality of competition.

 5        The rules of the competitions are inconsistent,

 6   from event to event.  In this past year, Quinnipiac had

 7   only two meets in the new NCSTA format.  That format has

 8   since been changed and there are plans to have more meets

 9   in that format next year, but those are only plans.  And

10   in the meantime, there will be some number of meets in the

11   coming year that are under different rules.  Some of those

12   contests include the traditional sideline crowd response

13   aspect; some of them don't.

14        Some of them include, are based purely on the

15   two and-a-half minute team routine which is similar to

16   what a sideline squad does.  Some of them include the

17   individual event heats that are part of the NCSTA format.

18   But there's no consistency to it.

19        And as I believe Your Honor observed during the

20   trial, I may be incorrect about that, but I remember there

21   was some testimony about the size of the squad for the

22   team event and the NCSTA I think has recently established

23   the maximum at 24, but there is no minimum.  Now, compare

24   that to other -- can you imagine a soccer team showing up

25   with seven or a basketball team showing with no out field?

1     This is -- it's evolving.  It may get there some day but

2     it's not there yet.

3           The governing body, the NCSTA which you heard

4     testimony about is still in the process of being

5     organized.  It's not incorporated.  It has no staff.  It

6     has no bylaws.  Its committees are still being organized

7     and it's not recognized by anyone except the institutions

8     that are involved in it.

9           And it has yet to hold its first championship

10    event that is scheduled for next year.

11          Now, we would submit, Your Honor, that based on

12    all of these factors -- and you can run, you can compare

13    the list of factors that I've just run through with the

14    2008 OCR letter which is quoted heavily in the United

15    States' brief, and we think it's clear that the quality of

16    the experience of the competitive cheer athlete at

17    Quinnipiac just is not the same as the experience of other

18    athletes.

19          It's certainly not the experience of, similar to

20    the experience of the male athletes.  And it's not fair to

21    the competitive cheer athletes or to the other women at

22    Quinnipiac to count this activity yet as a varsity sport

23    for Title IX purposes and allow Quinnipiac thereby to

24    escape its obligations to provide other sports for women.

25          Now, of course, if the court were to say that

1   competitive cheer doesn't count yet, that's not saying to

2   Quinnipiac don't pursue this.  Quinnipiac ought to pursue

3   it.  It's simply saying that, for present, it doesn't

4   count toward your Title IX obligations.

5           Now, finally, Your Honor, the fifth -- how am I

6   doing on time?  What time did we start?

7           THE COURT:  We started at nine, the clock on the

8   wall.

9           MR. ORLEANS:  So, with my ten minute rebuttal I

10  have ten minutes left.  This is taking my longer than I

11  expect and I apologize if I'm rambling on.

12          The fifth major contention that we wanted to

13  advance is that Quinnipiac discriminates by failing to

14  operate a genuine varsity women's track and field program.

15  Now, this is, again, not a, not a criticism of the coach,

16  not a criticism of the athletes, and it is not a statement

17  that in every case cross country track and field are one

18  sport.  But if you read Coach Martin's deposition, you

19  know that she conceded during her testimony that the track

20  and field program is essentially operated as an adjunct to

21  cross country.  It's a way to keep the cross country

22  runners in training throughout the year.  It's not

23  necessary since the cross country runners could compete in

24  at least a limited number of track and field events in the

25  winter and spring, even if they weren't designated as a

1    separate team.

2            But in a variety of ways Quinnipiac shows that

3    it's not serious about operating a competitive track and

4    field program for its women.  It has a barely adequate

5    practice facility for indoor.  It has no practice

6    facilities for outdoor.  It can't ever host an event

7    either indoors or outdoors.  It doesn't recruit for any

8    events other than the distance events.  All of the

9    scholarships available to runners go to the cross country

10   athletes.  So all of the, all of the participants who run

11   only track are walk-ons.

12           Because the coach is responsible for four teams,

13   unlike any other coach at Quinnipiac, the female runners

14   don't get the same access to coaching that other varsity

15   athletes get.  They don't ever have a realistic chance as

16   a track team to win a meet.  Now, I know it's an

17   individual sport but there are team scores and part of the

18   experience, I would think, of being a varsity athlete is

19   having a chance to win.  The girls who run track at

20   Quinnipiac never have a chance to win as a team.

21           The track teams at Quinnipiac compete only in

22   the minimum number of meets permitted by the NCAA rules if

23   you want to have it count as a team for Division I

24   purposes.  There's no other team at Quinnipiac in any

25   sport that competes in only the minimum number of events.

1           There's no other sport at Quinnipiac where,

2     where the student athletes are required as a condition of

3     participating in sport A to also participate in sport B

4     and/or sport C.  It's only the female cross country

5     runners who are required as a condition of being on the

6     cross country team to also participate in indoor and

7     outdoor track.

8           Based on all these factors, Your Honor, it seems

9     to us that the female track athletes at Quinnipiac do not

10    enjoy a varsity experience that is of the same quality as

11    other varsity athletes at Quinnipiac, including all of the

12    men.  And we submit, we are cognizant of the fact that the

13    class was certified in this case and we represent a class

14    of current and prospective female athletes.  We submit

15    that Quinnipiac ought to be required to invest in its

16    women's track program and to expand those opportunities

17    for women if it wants to count women's indoor and outdoor

18    track separately from cross country.

19          So, let me just say a word about remedy.

20          THE COURT:  Before you get there, let me ask you

21    a question.

22          MR. ORLEANS:  Sure, yes, Your Honor.

23          THE COURT:  What it takes for plaintiffs to win

24    this case.  There seems to be some difference of opinion

25    about whether it's a statistical exercise or a qualitative

1     determination, whether it's based upon a percentage

2     calculation, deviation from undergraduate enrollment

3     percentage or, as you suggested, that if the gap is large

4     enough to support another team.  Give me some sense of the

5     plaintiff's position with respect to what it takes to win

6     and how you get there.

7              MR. ORLEANS:  It's both a statistical and a

8     qualitative exercise.  In order to -- you can't do the

9     statistical exercise, which is the counting, the

10    calculation of percentage without deciding who you count

11    and which sports count.  And in order to do that, you have

12    to engage in the qualitative consideration of what's the

13    experience of the athletes like.  So, although we did

14    think that particularly the first argument that I made,

15    Your Honor, the argument about floors and ceilings and the

16    roster management policy, that that is fasically

17    discriminatory and that if you find for us on that, we

18    think we win without having to go much further.  But once

19    you get past that argument, I think that in order to do

20    the calculation you have to look at some of the

21    qualitative considerations.  Is that --

22             THE COURT:  All right.

23             MR. ORLEANS:  Is that answering your question?

24             THE COURT:  The way you sought to do that,

25    principally, not entirely but principally, is with what

```
 1    I'll call more generalized arguments.  You're not saying
 2    that Jane Smith, who was the sixth fastest 800 runner on
 3    the indoor track team and finished last in every event and
 4    never got the coach's attention and whatever, whatever,
 5    you're not saying that she shouldn't be counted; you're
 6    really going on a more generalized approach and saying it
 7    isn't, it can't be a real opportunity, a genuine
 8    participation opportunity for at least some of the women
 9    on the track teams.
10              MR. ORLEANS:  One of our arguments, based on
11    Dr. Lopiano's searching --
12              THE COURT:  Right.
13              MR. ORLEANS:  -- gets to that level of
14    individual.  But the arguments that I've made here today
15    are more generalized, yes.
16              THE COURT:  I understand her red flags, there's
17    some evidence about individuals.
18              MR. ORLEANS:  Right.
19              THE COURT:  But principally you're arguing these
20    broader --
21              MR. ORLEANS:  Yes, Your Honor.
22              THE COURT:  -- items.  All right, okay.  So in
23    your view, as I understand it, if you win on ceilings,
24    floors, you think you win.  And then if you, through any
25    of the other arguments, can demonstrate a gap large enough
```

```
1    to support the volleyball team, you believe you've won.

2              MR. ORLEANS:  Yes, Your Honor.

3              THE COURT:  All right.  Remedy.

4              MR. ORLEANS:  What I want to say about remedies

5    is simply the following.  The defendant has suggested that

6    before the court enters any order, if the court is going

7    to find for the plaintiffs, that the defendant should be

8    allowed to submit a compliance plan and we don't think so.

9    We think that it's appropriate for the court immediately

10   to enter an order that puts Quinnipiac under supervision.

11             They've had a lot of time to comply.  They've

12   had all of this year to get into compliance.  Before the

13   preliminary injunction hearing in 1996 when they conducted

14   their NCAA certification self study, they identified

15   gender equity as a problem, and I believe that there was

16   testimony about that from Mr. McDonald at the preliminary

17   injunction hearing, although the study itself was never

18   admitted into evidence.

19             So they've had a long time to figure out how to

20   comply and they've failed to do that.  We think that the

21   appropriate thing for the court to do by way of remedy is

22   to put Quinnipiac under the supervision of a magistrate

23   judge or special master, order them to maintain the

24   volleyball program for the foreseeable future and we can

25   work out the details from there.
```

1          THE COURT:  Okay.  Thank you.

2          MR. ORLEANS:  Thank you very much, Your Honor.

3          MR. BRILL:  May I have a short recess, Your

4     Honor, to use the restroom facilities?

5          THE COURT:  Sure.

6          (Pause)

7          THE COURT:  We've lost opposing counsel.

8          MR. BRILL:  Oh well, if they don't want to

9     listen --

10          (Laughter.)

11          (Pause)

12          MR. BRILL:  Thank you, Your Honor.  Good

13     morning.  If I could just begin argument with a few

14     personal words, Quinnipiac University appreciates the

15     dedication of the volleyball players, the plaintiffs in

16     this case, and understands their deep disappointment over

17     the decision last year to eliminate their team.

18          And it also regrets having to cut three men's

19     teams at the same time, affecting almost 30 male athletes.

20          But the other personal side to this story, Your

21     Honor, is the 30, soon to be 36, Quinnipiac athletes who

22     participate in competitive cheer.  Coach Powers described

23     the feelings of those athletes, of those students being

24     treated as varsity athletes this year for the first time.

25     The tangible benefits that they received, the

scholarships, the training, of access to the weight room,
of uniforms, of academic support.  And also the intangible
benefits that they felt.  The respect that they had as
they walked across the campus as members of the varsity
team, the feeling of being members of that team, and the
feeling of having crowds cheering for them instead of
leading crowds and cheering for others.  There could not
have been a more eloquent description of what Title IX is
all about than what that experience means for the
athletes.

I will address plaintiff's claims about roster
management issues, the proper counting, cross country and
track track and field in a few moments.  But really, Your
Honor, there is only one issue in this case and it really
is this sport of competitive cheer that's on trial here,
notwithstanding what Mr. Orleans said.  In fact, there
probably would be no trial at all or at least no serious
issue in my view if Quinnipiac and others had called this
sport something else.

The court's suggestion in its preliminary
injunction decision of group floor gymnastics, for
example, would have been one good possibility, but
cheerleading or even cheer seems to strike a raw nerve for
many people.  It seems to conjure up images of classical
sideline cheerleaders with short skirts waving pompoms, as

1    Jeff Webb described them, an imagine that plaintiffs

2    actually sought to play upon in their questioning of Coach

3    Powers.  You may recall about how the team used some

4    pompoms in the one 45-second portion of one performance

5    during the year in which they were actually required by

6    Jeff Webb's company to use those pompoms, which by the way

7    he also sold to the participants.

8         But no one in this courtroom who saw the video

9    of that NCSTA meet and no one who has witnessed the team

10   in a NCSTA competition I don't think could ever confuse

11   competitive cheer, however titled, with sideline

12   cheerleading.

13        Unfortunately those people do not include

14   Dr. Lopiano, who expressed her unwaivering opinion that

15   competitive cheer is not a sport, even though she had

16   never seen a meet and she didn't think it was necessary to

17   do so during the entire year that she's been an expert in

18   this case.

19        Your Honor, I applaud Dr. Lopiano for her work

20   on behalf of women's athletics and I have no intention

21   whatsoever of belittling her accomplishments in any way.

22   She helped open the door to millions of young girls and

23   women to taste the thrill of victory and the agony of

24   defeat.  But I say to this court, I implore this court,

25   don't close that door now to thousands of women, tens of

1    thousands of women of a new generation who aspire to

2    compete in a new sport -- and it is a new sport.  The

3    sport of competitive cheer, however titled, clearly meets

4    any reasonable application of the OCR multi factor test

5    for determining what activities are a sport as expressed

6    both in the April 2000 seed letter and the 2008 Dear

7    Colleague letter.  Indeed --

8                THE COURT:  Let me jump in right there.

9                MR. BRILL:  Yes.

10               THE COURT:  Aren't there two levels of inquiry

11   that I have to go through?  One, is this activity a sport

12   that qualifies for Title IX purposes and, two, if so, does

13   the Quinnipiac team qualify as a varsity squad, given its

14   organization activities, et cetera, et cetera?

15               In other words, I can imagine -- take any sport

16   you want, football, basketball, you know, tennis, you name

17   it, a sport that's clearly recognized by the NCAA, at a

18   particular university it wouldn't quite be there yet for

19   whatever reason, so it seems to me that logically I've got

20   to figure out maybe it's really three steps.

21               One, is it a sport per se.  We've heard about

22   chess.  It seems to me chess is not a sport.  Two, is it a

23   sport for Title IX purposes.  And three, is it a countable

24   sport at Quinnipiac given what Quinnipiac's status is.

25               MR. BRILL:  Well, I think that's right although

1    I think the second and third question merge here because

2    Quinnipiac participates in this activity or sport no

3    different than the other organizations, the other schools

4    that are at this point also sponsoring varsity competitive

5    cheer teams.  So it's not as if there would be some level

6    out there of competitive cheer that exists that Quinnipiac

7    is not meeting or is doing things differently.  So in

8    effect I think it's the same analysis here.

9         THE COURT:  Well, okay, but it seems to me that

10   that three step analysis applies not just to competitive

11   cheer but to women's outdoor track.  And --

12        MR. BRILL:  Well, yes, except with respect to a

13   sport that's governed by the NCAA, women's outdoor track,

14   for example, you have established rules that tell you

15   whether you have a track team or you don't have a track

16   team.  And if you comply with those rules and you compete

17   the same way other NCAA teams compete, then --

18        THE COURT:  Then there's a presumption --

19        MR. BRILL:  There's a presumption you have a

20   team.

21        THE COURT:  Right.

22        MR. BRILL:  If I could -- I'm happy to answer

23   any of your questions Your Honor has as I go along.  But

24   only two things have changed since Your Honor ruled in its

25   preliminary injunction decision and found that

1    Quinnipiac's cheer team would likely have all of the

2    necessary characteristics of a valid competitive sport.

3    Only two things really have changed since then.

4         First, the sport has progressed to a new level

5    with the formation last fall of the national competitive

6    cheer tumbling association, the NCSTA, by six schools that

7    sponsor or soon will sponsor varsity teams.

8         This NCSTA governing body has already adopted

9    many rules that govern competition this year, including

10   length of season, playing surphase, size of squads, et

11   cetera, and I refer Your Honor to Exhibit F T and transfer

12   pages 538 through 540 for discussion of these issues.

13   There are many more rules that have been adopted and will

14   be in place next year.

15        The NCSTA members will have to have a minimum of

16   half their competitions against other collegiate teams in

17   the NCSTA format, and Quinnipiac already has six NCSTA

18   competitions scheduled for next year, which frankly is

19   more than -- many varsity sports recognized by the NCAA or

20   otherwise only require six, sometimes five competitions to

21   constitute a legitimate season.  We already have six for

22   next year scheduled under the NCSTA format.  And there's a

23   national championship that's now scheduled for next spring

24   at Oregon.

25        Mr. Orleans, you know, makes an issue about the

1    NCSTA still not being incorporated and it doesn't have a

2    formal board of governors.  These things are typical for a

3    sport that's starting up.  Competitive cheer and the NCSTA

4    are far along, much farther than many other sports I think

5    would be at this point in terms of formality of the

6    governing organization.  And it's clear that certainly the

7    schools that have adopted the sport as a varsity sport are

8    looking to the NCSTA as the governing body and that body

9    has actually been functioning and these schools are

10   following the rules and accepting them as the governing

11   organization.

12          THE COURT:  Are you aware of any sport not

13   recognized as an emerging sport -- let he put it this way.

14   Any up and coming sport or any nation sport not recognized

15   as an emerging sport by the NCAA that has been counted for

16   Title IX purposes?

17          MR. BRILL:  Well, certainly there are many

18   sports that are not recognized by the NCAA that are

19   counted for Title IX purposes.  And I'm going to get to

20   that, Your Honor.  But if you look at -- this is -- this

21   is Exhibit 105, page 66.

22          These, these are men's latest statistics on

23   men's participation and the non-championship sports,

24   archery, badminton, equestrian, rowing, rugby, sailing and

25   squash are not NCAA recognized championship sports,

1    there's no emerging sports category for men, but schools

2    self report their participation in these sports to the

3    NCAA.  And, of course, they are free to count them for the

4    Title IX purposes.

5         Now, Dr. Lopiano in fact testified here

6    confirming her testimony in the U C Davis case.  In that

7    case the school had three varsity, three varsity women

8    wrestlers, and wrestling is not a woman's emerging sport

9    or championship sport.

10        THE COURT:  Right.  Okay, but, all right, let's

11   get back to the chart you just showed.  That distinguishes

12   between championship sports and non-championship sports.

13   So there isn't, for example, a national NCAA championship

14   in rowing but there is, as I recall the figures, thousands

15   of men in the country who row competitively at the varsity

16   level.  That's not really what I'm talking about.  What

17   I'm trying to figure out is, is there, is there a sport

18   that has not traditionally been recognized by the NCAA as

19   a sport and you can look at the alumnus for especially the

20   Winter Olympics, you know, moguls.  Now maybe there's a

21   NCAA mogul competition that I'm not aware of, you know, et

22   cetera, just -- the question really is are there sports,

23   men or women's sports that you're aware of that have not

24   been recognized by the NCAA in some way, championship,

25   nonchampionship, emerging, that are nonetheless counted

1    for Title IX purposes.

2             MR. BRILL:  Well, certainly the OCR letter

3    itself makes clear that the multifactor test only applies

4    to sports that are not recognized by the NCAA as an

5    emerging sport or championship sport.

6             THE COURT:  Okay, but --

7             MR. BRILL:  I can't, the only sport I can think

8    of off the top of my head would be, for example, women's

9    wrestling, as Dr. Lopiano testified, and those wrestlers

10   didn't even compete against other college teams, they

11   competed in open competitions.  And her testimony in Davis

12   which she confirmed here is that that was a recognizable

13   sport.  And if you read the Mansurian decision you'll see

14   that the, you know, Dr. Lopiano's position and the

15   plaintiff's position was that that counted for Title IX

16   participation purposes.

17            And there may be others but the point is that

18   NCAA recognition is not a sine qua non of a new sport.  In

19   fact, logically it couldn't be, Your Honor, because when a

20   sport -- there's a period of time between the existence,

21   development of a sport and its recognition as an emerging

22   sport.  And once it gets to being recognized as an

23   emerging sport then the multi factor test doesn't apply.

24            THE COURT:  Here's what I'm trying to get at.

25   Mansurian was a fairly unique case.

1          MR. BRILL:  Fairly what?

2          THE COURT:  Unique case.

3          MR. BRILL:  Yes.

4          THE COURT:  Correct me if I'm wrong, it didn't

5     involve the same kind of counting that we're worried about

6     here.  It was more of a discrimination claim by individual

7     athletes who had been kicked off the wrestling team after

8     participating as wrestlers.  And the question was had they

9     been discriminated against on the basis of their gender or

10    not, whereas here we're trying to figure out whether a

11    university's overall athletic program is in or out of

12    compliance with Title IX.  And so I understand Mansurian.

13         Really, what I'm trying to get at is there

14    guidance out there, are there cases out there that you can

15    point to that are similar to this situation where a

16    university is claiming we're in compliance with Title IX

17    because we're counting these athletes as varsity athletes,

18    notwithstanding that their sport is very new, not yet

19    established, et cetera.

20         MR. BRILL:  I'm not aware of any cases like that

21    and I'm not aware of any court cases frankly applying the

22    OCR standards at all in determining what's a sport.

23         THE COURT:  I was afraid of that.

24         (Laughter)

25         MR. BRILL:  Your Honor, if -- competitive cheer

1    so easily meets so many of the factors in the eight part

2    test, even if I can't come up with another example,

3    competitive cheer so easily meets so many of the factors

4    in the multi part test that I think there would be little

5    question, frankly, about the outcome here except for the

6    second new thing which is the amicus brief that was filed

7    by the government.

8              THE COURT:  Well, that raises the question Mr.

9    Orleans brought up which is if it's so clear, why did the

10   university not seek OCR's blessing?

11             MR. BRILL:  Your Honor --

12             THE COURT:  And I'm not looking for strategy.

13   I'm just trying to get a sense of whether this is

14   important --

15             MR. BRILL:  Well, there's a lot of confusion

16   here and if I can say this, until the government's brief

17   was filed -- let me back up a bit.

18             Certainly the general understanding of the

19   university community was that OCR would not give a

20   declaratory judgment in effect as to whether something was

21   a sport.  The University of Maryland had tried repeatedly

22   to get a ruling and they kept getting back letters saying

23   you have to decide on your own if you meet the

24   multi-factor test.

25             They, since 2003 there's been -- this isn't on

the record but you're asking me what happened, this is

what happened.  Dr. Lopiano at the time of the preliminary

injunction hearing testified that there's no requirement

to go to OCR first and so the general understanding was

that you did your best to interpret the rules, and if you

were comfortable that you complied with the test, then

went ahead and treated something as a sport.

For the first time for this coming year, OCR

added this instruction for the EADA report for the coming,

for the 2009-2010 year which is not to be filed until

October, but frankly on its face it was ambiguous.  First

sentence said the sport has to be, the activity has to be

primarily devoted to competition.  And the second sentence

said don't count cheerleading or dance unless we tell you

in advance you can.  And people shrugged and said we don't

know what this means.

And the OCR has now said as of Monday in their

amicus brief that, yes, the letter is required if you're

going to count cheerleading, and that includes competitive

cheer, and that, that report is due in October.

And Mr. McDonald testified that the NCSTA, even

several months ago, had decided that the best approach

would be to make a national approach to OCR rather than

having each school go to the regional office and, in fact,

in the NCAA gender equity guide there's a discussion about

1    competitive cheer and it indicates that there's some

2    uncertainty now about whether competitive cheer is a sport

3    or isn't, and that there's no set answer and that

4    different regional offices might have different views.

5    And, therefore, the decision of the NCSTA was to raise

6    this on a national level and take it to OCR.

7              But frankly, OCR has now, I believe, punted the

8    issue back to this court because it has said we have no

9    firm position on competitive cheer, it's up to the court

10   to make a decision based on the evidence and you should

11   apply the multi factor test that we've set out in our

12   letters.  In fact, they've repeatedly emphasized in their

13   brief that an overall determination requires consideration

14   of all of the factors.

15             Now, to the extent that the government's brief

16   suggested that one or two or three of those factors

17   deserve extra weight, special emphasis, we believe for the

18   reasons stated in our brief that the government's brief

19   does not deserve deference from the court.

20             THE COURT:  I reviewed your response.

21             MR. BRILL:  I won't review what's in the brief

22   but I will just say that I would like to respond to a few

23   specific points.

24             New sports are not been fully formed.  They do

25   not arrive with a full slate of varsity teams, post season

competition and NCAA conference governance, and OCR has

never said those are all required before you can count

something as a sport.  In fact, as I said, the multi

factor test doesn't even apply once you have all those

things.

Dr. Yiamouyiannis, we put in a few pages from

her deposition, Your Honor, and if you read it, you've

seen that she was deeply involved with emerging sports

during her ten years at the NCAA, and she agreed in her

deposition that any rule that limited varsity teams to

competing against other varsity teams when a sport is

starting up would obviously make it much more difficult to

expand opportunities for women in college athletics, and

to the extent that the government is saying that's a

requirement, it's completely contrary to every

understanding of a new sport or even an emerging sport.

You know, it only takes, to apply for an

emerging sport, you need 20 schools that have either

varsity teams or club teams.  Now, competitive cheer,

there's already six schools that have varsity teams and,

according to Mr. Webb's document, there's something like

12 compete only in clubs that participate in his

competitions and that doesn't include all the sideline

cheer teams that actually OCR itself has described as club

compeitions.

1              If you look, if I can show, just put up on the

2       board for a minute the list of emerging sports that are

3       now recognized by the NCAA, and you can see that the right

4       hand column has the total number of schools for all

5       divisions.   Archery, badminton, rugby and synchronized

6       swimming have less than ten teams total in all divisions.

7       And so obviously, as Dr. Lopiano and Dr. Yiamouyiannis

8       conceded, they are competing largely against club teams,

9       not against other varsity teams, even when they get

10      recognized as an emerging sport.  It makes no sense to put

11      more of an obligation on competitive cheer or some other

12      sport that hasn't yet been recognized as an emerging

13      sport.

14              THE COURT:  Help me understand that.  My

15      understanding of the testimony in the case was that, or

16      the record in the case was that to be an emerging sport,

17      there had to be ten varsity --

18              MR. BRILL:  No.

19              THE COURT:  No?

20              MR. BRILL:  No.  The requirement is you have to

21      have 20 teams actually competing intercollegiately either

22      at the varsity or club level.  They could actually, all 20

23      could be club teams.  Dr. Yiamouyiannis testified to that.

24      But in order to -- the other essential is you have to have

25      ten letters of intent from the presidents of the

1    institutions that they are intending to sponsor the sport

2    as a varsity sport.

3            THE COURT:  All right.  So what you just showed

4    me where there are less than ten, there are at least ten

5    schools who have said you may not be varsity today but

6    we're going there.

7            MR. BRILL:  Exactly.

8            THE COURT:  I got you.

9            MR. BRILL:  The other -- and actually bowling is

10   another example.  I think Your Honor mentioned bowling

11   earlier.  Bowling was one of the first emerging sports

12   recognized for women in 1994, and for many years there

13   were two, three, four, less than five schools that had

14   varsity bowling teams.  They were competing against club

15   teams.  Now bowling has become a championship sport.

16           But if someone had said from the outset you

17   can't count this sport unless you're only competing

18   against varsity teams, bowling wouldn't be where it is

19   today.

20           THE COURT:  I'm not sure that's true.  I think

21   there's two issues here.  Issue one is are we going to

22   support the team, are we going to give it scholarships and

23   coaching status and so forth in hopes that we bring the

24   sport along.  The other is do we today count it for Title

25   IX purposes.  And so I think those are distinct inquiries

1   and they may be related but I think they are distinct, and

2   so to say that, you know, you're never going to be able to

3   count for Title IX if you don't count it early, I'm not

4   sure that's right.

5        MR. BRILL:  No, my point was a slightly

6   different one, Your Honor.  My point was in response to

7   the government's argument that you can't satisfy the

8   multifactor test unless you're only competing against

9   other varsity teams, and I'm saying that has never been

10  the case.

11       THE COURT:  Fair enough.

12       MR. BRILL:  And I understand your point but as a

13  practical matter here, if Your Honor says that

14  Quinnipiac -- competitive cheer in general or Quinnipiac

15  is not a sport for purposes of Title IX, as a practical

16  matter that's, I think it's going to put an end to it

17  because if you consider the resources that are required

18  for this sport, coach testified that the budget for last

19  year was 130 or 140,000-dollars, the operating budget, you

20  have six scholarships that are approximately, you know,

21  costs the school about 200,000-dollars each over the

22  course of four years, and so on.  You can't expect a

23  school to put these resources and to continue this as a

24  club team, nonvarsity team and then try to comply with

25  Title IX by supporting another team of 30 women athletes.

1          THE COURT:  Well, okay --

2          MR. BRILL:  We have to allocate our resources in

3    a way that makes sense to the university and complies with

4    Title IX.  Now --

5          THE COURT:  Right.  But the principal purpose of

6    committing those resources presumably is not to comply

7    with Title IX.  Presumably the purpose is to provide this

8    opportunity for women and/or to bring the sport along and

9    be a pioneer in the sport, et cetera, et cetera.  You

10   know, Title IX isn't the ultimate goal.  It may be the

11   focus of this litigation but it shouldn't be the ultimate

12   goal in how a university allocates its athletic resources.

13   I hope it isn't.

14         MR. BRILL:  Well, obviously we have to allocate

15   our resources in light of the requirements of Title IX,

16   but the university here has made a decision for many

17   reasons that in a time when there were limited pledge of

18   resources that we wanted to be a pioneer in this sport

19   which seemed to comply with all of the attributes of a

20   sport under OCR guidelines, to enable the university to do

21   really several things.

22             One was that Quinnipiac had an opportunity to be

23   a major national player in a new sport compared to

24   continuing or putting resources in other sports where they

25   would never get to that level.  And it's a regional school

 1    that doesn't usually compete with schools from Oregon,

 2    Maryland, Baylor and so on, and this is a major

 3    opportunity for the university in that respect.

 4            THE COURT:  But my point is, I really have two

 5    points -- one, that major opportunity exists whether the

 6    sport is counted for Title IX purposes or not.  You'll be

 7    out there as a pioneer whether these athletes count toward

 8    Title IX or not.  That's point one.

 9            Point two is in terms of the resources, the

10    university committed a lot of resources, I'm sure, I

11    haven't seen the numbers, to its sideline cheer.  If those

12    athletes, if those cheerleaders traveled to an away game,

13    they bought uniforms, et cetera, it wouldn't the same

14    commitment, I understand, but the point is no one ever

15    thought sideline cheerleaders were going to count toward

16    Title IX and yet there was some commitment of resources to

17    support sideline cheer while Quinnipiac had it.  So,

18    again --

19            MR. BRILL:  Well, the marginal, the marginal

20    cost -- you have a sideline cheer team, the marginal cost

21    would be fairly negligible, just the travel expenses for

22    the two or three competitions that they engaged in, they

23    had a part-time coach, no scholarships, they didn't have

24    access to facilities, weight room and so on.

25            I don't want to belabor this point, but if the

1     university had infinite resources as Robin Sparks

2     suggests, well, you're putting up a medical school so why

3     don't have you continue volleyball and so on, in the ideal

4     world Quinnipiac would sponsor every sport that we could

5     think of, but we have to make choices and this is the

6     choice that was made, Your Honor.  And I don't think it's

7     realistic to think that if we're wrong, that we're

8     nevertheless going to be continue to be able to devote

9     resources into continuing this sport as some kind of club

10    sport while, you know, while waiting for it to be

11    recognized as a sport under the OCR guidelines.

12          In the real world, Your Honor, schools will

13    devote resources to the sports that will count for

14    purposes of Title IX because they don't have unlimited

15    resources.  It's not that they are -- it's nothing

16    nefarious but it's just as if, in any other aspect of the

17    university there may be, you know, a program that's

18    accredited or not accredited and so on and you have to

19    decide, you can't have every program for every purpose and

20    every possible student.  You have to decide where to put

21    your resources.

22          THE COURT:  Well, fair enough.  But there's --

23    we can get off this but it seems to me at the time the

24    university committed resources to the competitive cheer

25    team, there was and today there still is substantial doubt

1      whether that team is going to count for Title IX purposes.

2      So a decision was made by somebody, not knowing that it

3      was going to count for Title IX purposes, to commit these

4      resources, and either that was something they intended to

5      do regardless of Title IX or until Title IX or whatever,

6      but the point is there was no guarantee when those

7      resources were committed that this was going to count.

8              MR. BRILL:  I accept that, although Your Honor

9      did say in the preliminary injunction certainly that it

10     was likely it would be found to comply.

11             Let me just say one word about post season

12     competition.  Again, it makes no sense to suggest, as the

13     government does, that the school can't have a sport, a new

14     sport, unless and until there's an NCAA championship, when

15     even the sports that rise to the level of emerging sports

16     don't have NCAA championships until many years after they

17     become emerging sports.  It just, it doesn't work.

18             Let me go on to -- I may want to come back to

19     competitive cheer, Your Honor, but let me make sure I

20     touch on some of the other issues.

21             First of all, on track and field, there's really

22     been nothing new put before the court other than what was

23     presented at the preliminary injunction hearing and

24     there's been nothing presented to change the court's

25     opinion that -- in fact, I think, that decision has now

1    been confirmed by the government's brief because the

2    government has been scrutinizing this case for months.

3    They've been in touch with counsel, they've reviewed

4    the -- obviously reviewed the preliminary injunction

5    decision which is cited in their brief.  They reviewed the

6    record in the case.  They know full well that plaintiffs

7    have argued that track and field is improperly counted and

8    I mean it's impossible to believe that if the OCR had any

9    question about that whatsoever, they would not have raised

10   it in their amicus brief as an issue for the court.

11          THE COURT:  Let me press you on the requirement

12   that cross country runners run indoor and outdoor track.

13          MR. BRILL:  You know, I can't recall Coach

14   Martin's exact testimony but I know that she said that it

15   was a nonissue for her because every cross country runner

16   that she's ever recruited wanted to run indoor and outdoor

17   track, and that's what she expected, but there's no one

18   ever that didn't want to run indoor and outdoor track.

19   They come here with the expectation that they'll be able

20   to run cross country and indoor and outdoor track.

21          THE COURT:  Well, if that's true then you

22   wouldn't need to require it.

23          MR. BRILL:  It's not as if there's a formal

24   requirement.  I think she was asked about it at her

25   deposition and she explained that, I think she may have

1   said it's something that I require but not in any formal

2   way.

3           She was responding to the intention that these,

4   you know, the athletes that she's recruiting in her view

5   always wanted to do this and it was something she expected

6   of them as well.  It's never been a case where someone

7   said, well, I want to run cross country but not indoor

8   outdoor track.

9           THE COURT:  Well, let's assume for a minute that

10  the coach of one of the women's fall sports required her

11  athletes to run outdoor track in the spring to get in

12  shape.  And there's a high school, Central High School in

13  Bridgeport, Connecticut, won a state basketball

14  championship and the coach requires all the team members

15  to run cross country.  But why?  Because they are on the

16  basketball team, to get in shape.  Now they are not what I

17  would call real cross country runners, they are certainly

18  the tallest team out there but they are not the fastest.

19          You know, obviously that's not the situation we

20  have here but you can understand the concern that is

21  raised if a coach is requiring participation on outdoor

22  track as a form of conditioning as opposed to a form of

23  true participation.

24          MR. BRILL:  And I agree with that 100 percent,

25  Your Honor.  If there was a basketball team who was being

1       required to run cross country, that's a completely

2       different situation.  If you read Dr. Seemes, I don't know

3       if you read Mr. Seemes' report.  He is the head of USA

4       Coaches Association and coached track for many years.  It

5       is standard virtually in every school that cross country

6       runners run track and field, indoor, outdoor.

7                    THE COURT:  I understand.

8                    MR. BRILL:  And I think to get hung up on the

9       word "requirement" that she may have used in her

10      deposition doesn't really change the fact that there's

11      nothing unusual about this.  It's the common practice.

12                   What they are running, you know, they are taking

13      the opportunity to run distance races and some of the, you

14      know, some of these women may, they may be champion ten

15      thousand meter runs.  Many of them are.  I think

16      Quinnipiac had several 5,000 meter, 10,000 meter runners

17      who went to, I think some of them went to the NCAA

18      regionals or certainly went to the New England Regional

19      Tournament and they are legitimately participating in the

20      track season as talented athletes just as in the cross

21      country season.

22                   THE COURT:  No doubt about it.  But the

23      combination of a requirement to participate and a roster

24      number significantly higher than average raises a concern

25      about whether all of those athletes are getting a genuine

1    participation opportunity.  Are they receiving sufficient

2    coaching or the same level of coaching?  And is this

3    simply cross country continued?  Is the coach focusing on

4    the cross country runners to the exclusion or the

5    detriment of the other runners?  Now, we don't have a lot

6    of evidence on that but --

7              MR. BRILL:  Well, I would say --

8              THE COURT:  -- that's the concern.

9              MR. BRILL:  So I would say this, Your Honor.

10    Plaintiffs withdrew the testimony of Dr. Yiamouyiannis.

11              THE COURT:  Right.

12              MR. BRILL:  So it's not before you but there's a

13    reason they, I would state there's a reason they withdrew

14    it and they can't substitute suspicion and speculation for

15    evidence.  The evidence before you in Coach Martin's

16    deposition, when you read it, and she has the results from

17    everything, is that each of these women received

18    individual coaching, they each received training, they are

19    part -- they are assistant coaches and voluntary coaches,

20    they were separated out for the different events in

21    training between the distance runners and the shorter

22    distance runners and into three or four groups during the

23    indoor outdoor seasons, and every single woman on that

24    team participated fully in the track programs.

25              There's nothing unusual about the size

1    incidentally of the cross country team which was not at

2    all the largest in the conference.  And, in fact -- and

3    the track team was only 30.  It's hard to compare because

4    Quinnipiac did not compete in most field events and it

5    didn't have very short distance sprinters.

6          But the evidence is it was Coach Martin and

7    you'll read this in her deposition as well as Mark

8    Thompson's testimony, it was Coach Martin who wanted more

9    runners on their team for next year.  This was not

10   something that the university foisted upon her.  And

11   Dr. Thompson went back to her and said are you sure that

12   you -- you know, how are you going to give these women

13   genuine opportunities, and she explained to him her plans,

14   who she had recruited.  She had now a sprinter, she had a

15   high jumper.  She had, she said if we want to get up to

16   the next level of competition, the schools we're aspiring

17   to compete against have more cross country runners than we

18   do.  More runners means more competition for the team.

19   And he accepted her explanation and, in fact, gave

20   additional resources to her.

21          So, you know, the cross country teams in the

22   Northeast Conference range from something like seven to 30

23   in size, and the track teams from 14 or 15 up to the 50s.

24   There's no -- to say something is above average is

25   meaningless.  You can't draw any conclusions from that.

1    Dr. Lopiano admitted that.

2         And, you know, putting aside the issue of this

3    requirement, there's nothing unusual -- in fact, let me

4    put it differently.  The NCAA clearly counts track as

5    three sports.  It has forever.  The EADA form requires you

6    to, you know, to count them separately.  It gives up the

7    option of combining one box but the athletes are counted

8    multiple times.

9         The book chapter from Dr. Yiamouyiannis that we

10   just put into evidence instructs that -- who's an expert

11   on Title IX -- instructs that athletes for cross country,

12   indoor track and field and outdoor track and field be

13   counted separately, and there's no evidence that any

14   single woman athlete was ever compelled or required to,

15   you know, to run in -- cross country athlete was somehow

16   required to run track against the desire of that athlete

17   to participate in those sports.  So I think that that

18   distinction is really meaningless.

19        And the comparisons that they made to other

20   sports like swimming or tennis that have different seasons

21   and different surfaces, may have some logical weight but

22   the truth is that it's the governing bodies that have

23   recognized track and field and cross country as separate

24   sports and they haven't done this with respect to these

25   other sports and there's -- the OCR, you know, the OCR has

1    never said that you only count these sports separately as

2    long as you have men's and women's teams.

3         And I recognize -- obviously Mr. Orleans says

4    it's unfair because you're getting, you're counting these

5    women two or three times, but that's the way the rules are

6    set up.  And they work both ways.  If we had a school that

7    had a, if the school had men's and women's track teams and

8    had more men than women count -- you know, couldn't not

9    count the men because it would give an advantage to the

10   men athletes or, to put it another way, they couldn't take

11   less of a count on the men in order to reduce the

12   proportionality obligation with respect to the women.  If

13   they had more men track and field athletes and they had to

14   count them three times, that would increase the need for

15   more women athletes in other sports.  And so it works both

16   ways and that's the rule.

17        THE COURT:  Yes, the testimony was that it's

18   extremely rare to have a two sport athlete except in this

19   context.  Would it be a sensible thing for the court to

20   do, to count the number of men athletes and the number of

21   women athletes by name rather than by roster position as a

22   check on whether there has been compliance with Title IX?

23        MR. BRILL:  No, that would be completely

24   contrary to OCR's guidance, as Dr. Yiamouyiannis explains

25   in her report.  There's both a duplicated count and an

1    unduplicated count that's contained in the EADA forms.

2    The so called unduplicated count, which Your Honor is

3    referring to, is used for certain purposes such as

4    determining whether scholarships are proportionally

5    awarded and for other purposes.

6            The duplicated counts specifically is used for

7    determining proportionality in participation for prong

8    one.  It would be revolutionary to now say, and contrary

9    to OCR guidance to say you use an unduplicated count of

10   athletes for purposes of proportionality.  It would --

11   frankly, as Coach Seemes, Mr. Seemes testified in his

12   deposition, it would have profound effects on the track

13   and field programs throughout the United States, for the

14   same reason -- I mean let's be blunt -- for the same

15   reason that we're talking about the effect on competitive

16   cheer.

17           Because if schools are only going to count, if

18   the rules are changed, then there's going to be a real

19   world impact on that and resources that are devoted to

20   track and field, both indoor and outdoor, if they don't

21   count the same way, then schools have to decide how they

22   are going to allocate their resources.  If OCR wants to

23   change the rules then, you know, they have the opportunity

24   to change the rules, but everybody's playing by the rules

25   that are in place.

1          I want to talk for a minute about roster

2     management.  And Mr. Orleans said first of all that

3     there's something nefarious about roster management the

4     way it's used at Quinnipiac.

5          First of all, we don't have caps and we don't

6     have minimums.  That's clear from Dr. Thompson's

7     testimony.  Even when -- there are a number of instances

8     where women's, the coaches of women's teams wanted to add

9     athletes and he wouldn't let them, either at all or

10    without justification.  The volleyball team, the women's

11    softball team and for the next year, the lacrosse coach,

12    all wanted more athletes and he turned that down.

13          THE COURT:  Well, I understand that argument.

14    On the other hand, if you have a mandatory number, then

15    doesn't that number serve as both a floor and a ceiling?

16          MR. BRILL:  Yes, it's a number but it's the same

17    for men and for woman.  Your Honor --

18          THE COURT:  It's the same except if the, if the,

19    if the target number is consistently higher than squad

20    averages for women and consistently lower than squad

21    averages for men, then the practical effect of having that

22    number is that it's a floor for women and ceiling for men,

23    isn't it?

24          MR. BRILL:  No, I don't think so.  I think that,

25    as Dr. Lopiano said in her report, it is, it is acceptable

1    to add women to existing teams for purposes of roster

2    management as long as the additional women have the same

3    quality participation opportunity as men and women.  And

4    that roster management can satisfy prong one as long as

5    the men's teams are not depressed to the point where

6    there's no real participation opportunity and women's

7    teams are not increased to the point where the women on

8    those teams don't have a viable participation opportunity

9    which she says means coaching, competition and uniforms,

10   et cetera.

11          There's nothing wrong with saying if the NCAA

12   average for a certain team is, let's say 20, roster

13   management -- if a school is going to actually comply with

14   proportionality, there has to be a control over the

15   rosters.  Otherwise you could never be sure if each coach

16   could have more or less.

17          Now, I just want to say something about the

18   women's teams though.  If that, if that NCAA average is

19   20, if we had 40, the numbers might suggest that there's

20   some padding or inflation going on, but if the coach -- if

21   Dr. Thompson says, you know, I'd like you to carry two

22   more, as long as you confirm to me that you can really

23   provide an opportunity for those two more women and you

24   have the resources for them and they'll have a

25   participation opportunity, then the numbers mean nothing

1    because averages are only averages.

2           And in the NEC conference, as we saw, some

3    schools -- the range of an average may be 15.6 but the

4    people on the schools can range from five to 35 and the

5    question is go behind those numbers.  You can't stop at

6    the averages.  And look at the -- I mean look at what they

7    are complaining about.

8           I mean frankly it's almost at the point where

9    it's -- it's almost to the point where it's silly, Your

10   Honor, because no school could ever have effective roster

11   management to comply with prong one if you can't have some

12   deviation from the averages and that can be a little

13   deviation up for the women and deviation down for the men,

14   as long as the men's teams are not diluted of the

15   participation to participate and the women's teams have

16   the ability to provide participation opportunities.

17          I think Coach Seeley's testimony was the best

18   example because he said I don't want 27 but I've already

19   recruited 25 athletes and I have a 26th that I've been

20   talking to, and okay, I'll do 26.  And it turned out, he

21   found that to be a perfect number for him.  Now, without,

22   without roster management maybe he would have had 24 or

23   25, but he took that 26th athlete and everybody on that

24   team had a fair opportunity to participate during the year

25   and he's having 26 next year.  He says it's a terrific

1    number and he's got even higher quality of recruits.

2           So I don't know what a school's supposed to do

3    if you can't have some flexibility in the averages that

4    what he's basically saying is, you know, every, every team

5    has to be either at the exact average at the conference of

6    the NCAA or has to be up or down by same amount.  If you

7    look at this chart, you know, this is the final chart,

8    roster comparison primarily against average.

9           There are three -- I think seven or eight men's

10   teams were either at or above the NCAA average.  And on

11   the women's teams -- sorry.  The difference, in one case

12   the difference was three athletes, that was the women's

13   basketball coach, who asked, pleaded for more members of

14   the team.

15          THE COURT:  Yes, I understand the numbers.  We

16   got off on this because I was taking a little bit of issue

17   with your suggestion that we don't have floors and

18   ceilings.  I think as a practical matter we do and that's

19   the only point I'm making.  If you have a mandatory

20   number --

21          MR. BRILL:  It's not a floor or ceiling, Your

22   Honor.  Here's the difference.  A floor means your number

23   is 15 but have as many as you want above the floor.  And a

24   ceiling means, you know, your number is X and you can go

25   below that.  But Dr. Thompson didn't allow men to go lower

1    or women to go higher without some justification.  He had

2    to find that that number --

3              THE COURT:  Right.

4              MR. BRILL:  -- was a genuine number.

5              THE COURT:  Right.  But let's face it, when the

6    men's numbers are consistently low and it's a hard number,

7    as a practical matter it's a ceiling.  And when the

8    woman's numbers are high, as a practical matter it's a

9    floor.  Because the coaches, a woman's coach who's been

10   told take on more athletes than ideal, isn't going to want

11   to take on more athletes than the mandatory number.  It's

12   just not going to happen.  They are already at a number --

13             MR. BRILL:  But it did happen, Your Honor.  It

14   happened in three cases that we know of and Dr. -- I mean

15   we had the lacrosse coach who wanted 36 athletes instead

16   of 30 on the women's team and he said no.  And you have

17   the softball coach that wanted 21 instead of 20 and he

18   said not unless you can justify it.  So there is a

19   difference.

20             And the difference is that we're not just saying

21   have a number because it's a number, but this number was

22   established after a three month process in which he had to

23   assure himself that each number represented a genuine

24   opportunity for the athletes on the team.  In fact, Coach

25   Sparks said he kept saying that over and over again and he

1    sent email after email.

2            THE COURT:  I understand the evidence.

3            MR. BRILL:  Now, Your Honor asked about the are

4    we looking at specific athletes here or -- what time did I

5    begin?

6            THE COURT:  You've got like ten minutes left.

7            MR. BRILL:  Okay.  About what level of inquiry

8    is appropriate here.  And they had the year to pore over

9    in the minutest detail every athlete on every team at

10   Quinnipiac University.  Week by week throughout the

11   season, we sent the plaintiffs at the court's request

12   weekly results of every competition.  They had the squad

13   lists at the beginning of the season, they had the final

14   squad list.  They had the opportunity to depose coaches.

15   They had the opportunity to speak to the compliance

16   officer and the coaches.

17            And at the end of the day, what they came up

18   with is where they start, which is ceilings and caps.

19   It's all about ceilings and caps.  There's no knowing --

20   certainly there's not a single piece of evidence, as

21   frankly there was at the preliminary injunction hearing,

22   of any roster number that was manipulated to produce a

23   false number by adding and then deleting athletes.

24            And when I asked Dr. Lopiano repeatedly what

25   evidence she had, what evidence she could point to about

anything that she disagreed with in the numbers, her only
response was, well, you have floors for women's teams and
caps for men's teams.  And that's inherently unfair,
although her own report as well as the NCAA gender equity
guide both say there's floors for men's teams, floors for
women's teams and caps for men's teams are okay.  That is
a permissible way to manage rosters as long as the result
is a fair opportunity to both the men and the women.

So you can't stop the inquiry, question of
whether they are -- even if you view our process as caps
and floors, which I don't think is fair, that's not the
end of the inquiry.  You have to show some actual
deprivation of participation opportunities which there's
been no evidence of whatsoever, notwithstanding the waving
of the red flags and so on.  No evidence.

And when I asked Dr. Lopiano is that the best
answer that you can give to my question, she admitted that
was, that was all she had.  Which was nothing.  And
there's simply no evidence of that kind of roster
manipulation.  And the plaintiffs have the burden here.
You know, we are not -- it's not up to us to come and put
on evidence from 20 coaches or 400 athletes to parade to
the stand and say yes, I had a genuine opportunity.  The
plaintiffs have the burden of showing there were athletes
that didn't have participation opportunities, that because

1   the women's basketball team has 18 or because the track

2   team has 30, that somehow there were athletes on that team

3   that didn't practice or didn't participate or didn't in

4   some way receive the full benefits of being on those

5   teams.

6          And there's no evidence in the record of that,

7   Your Honor.  They failed, totally failed in carrying their

8   burden of proof, unless somehow the roster process itself

9   is going to be held to be improper, and frankly, I have to

10  say that it's hard to imagine what more Quinnipiac could

11  have done in response to the findings that came out in the

12  preliminary injunction hearing, what more Quinnipiac could

13  have done to set up a roster management process that could

14  would be genuine, fair, compliant with the law, and

15  produce a result that did provide genuine opportunities

16  for the athletes in every team while insuring

17  proportionality.

18          If someone could suggest to me a way to suggest

19  proportionality without some control over the rosters, I'd

20  like to hear it because it doesn't work.  And the answer

21  is not that Quinnipiac has to keep adding teams and keep

22  adding teams and keep adding teams.  You know, Title IX

23  works both ways also, and unless you have some control

24  over the roster, if you're talking about prong one

25  compliance, if you have too many women's teams, then the

1    men are going to be complaining.  So you have to maintain

2    that proportionality on both sides.

3              I just want to answer quickly a few of the

4    points that Mr. Orleans made.  And there's never been a

5    finding, contrary to what he said, there's no established

6    record of discrimination here.  None.  This court did not

7    find discrimination in this preliminary injunction

8    decision.

9              The court did not inquire into practices prior

10   to 2008, 2009.  What the court said was on the record

11   reviewing the practices roster management that you didn't

12   have confidence that Quinnipiac would be complying with

13   prong one in 2009, 2010, but Quinnipiac was not, was not

14   relying on prong one prior to this past year and there's

15   been no finding that it did not comply or it did comply or

16   did not comply with any other prongs prior to this year,

17   so there's no issue of any established record of

18   discrimination here at all.

19             With respect to competitive cheer, if I can come

20   back to that for a minute, the fact is that -- the fact,

21   as I said, if it's not recognized by the NCAA which was

22   Mr. Orleans' first point, is a nonissue.  If we were

23   recognized by the NCAA then the multi-factor test would

24   not apply.

25             Recruiting to me is a complete red herring.  The

suggestion that somehow the team isn't able to obtain the
athletes that it needs, you heard the coach, you saw the
videos, you saw the quality of athletes that are on this
team.  Recruiting takes place.  It doesn't necessarily --
was not off campus recruiting last year but athletes were
recruited and women on this team were not picked up in the
cafeteria, as Dr. Lopiano may have suggested in her report
would be the case.

These are highly skilled gymnasts who, in fact,
Coach testified when she needed another athlete on the
team for this year, there was a, I think a graduate
student who had been an elite gymnast who wanted to
participate on the team.  So there is no shortage of
trained and skilled athletes.

You know, the fact that the NEC conference
doesn't recognize the sport, again, this is going to be
the case in every sport.  The athletic director, Jack
McDonald, testified he developed women's ice hockey and
lacrosse here without any conference sponsorships and he
put together schools in order to start participating in
those sports with Quinnipiac.

So, these are all, you know -- look, if
competitive cheer met every single factor on the check
list, and the NEC conference recognized it and the NCAA
sponsored a championship, then we wouldn't be here.

1    Obviously it doesn't, but the question is what's a fair

2    overall view of all these factors?  And what are the most

3    important factors and why are those factors the most

4    important?  And we think it's the athleticism, the

5    competitive nature, the fact that the -- internally,

6    administratively, this sport is treated as a varsity

7    sport, these athletes are treated as varsity athletes,

8    just like all other athletes at the university, and that

9    it furthers the purpose, most importantly, of Title IX.

10            It furthers the purpose of Title IX to expand

11   opportunities for women, to expand opportunities by

12   developing new sports, which if Your Honor takes a look at

13   the OCR 2008 letter, the OCR says this is the intent of

14   these factors.  When we're looking at a sport that's not

15   recognized by the NCAA and we have to decide if it's a

16   sport for purposes of Title IX, we want to take a flexible

17   approach.  We want to expand opportunities for women.

18            Now, you heard testimony that I think there's

19   something like 150,000 women, girls and women, just in the

20   last six months who participated in All-Star cheer

21   competitions.  So we know that there's an enormous

22   interest in this sport.  Coach Powers testified that she's

23   received calls from three, four, five, high school

24   federations already wanting to adopt the NCSTA meet

25   format.

1          This sport is taking off in an enormous way, and

2     a decision by this court that fails to recognize it is, I

3     think, is going to, if not a death knell, a substantial

4     obstacle to what would otherwise be an extraordinary new

5     opportunity for athletic participation for tens of

6     thousands of women.  And it's not volleyball against

7     competitive cheer, I agree with you.  But the issue before

8     Your Honor frankly is, you know, is competitive cheer

9     going to be recognized as a sport.

10          As we said in our brief, even if, frankly even

11     if it's not, the issue is compliance this year and

12     Dr. Lopiano with all of her calculations and permutations

13     and columns, at the end of the day, whether you look at

14     column A or column B, if you include cheer and if you

15     include track as the NCAA looks at it and as the EADA

16     looks at it, she says you're right there.  She had no

17     dispute.  So we really don't have to quarrel over her

18     methods of accounting.  You're right there.

19          Now, frankly I don't understand how you could

20     not look at volleyball for this year because we had a

21     volleyball team and the issue is current compliance.  For

22     next year, Your Honor has the projections for next year

23     and the numbers show that Quinnipiac will be in compliance

24     without the volleyball team for next year.  And that's the

25     relevant inquiry, not whether you subtract out the

1    volleyball team for this year.  But no court, as we say in

2    our brief, has ever held that a gap of 2 percent or less

3    has not satisfied -- not a gap but a differential of

4    2 percent or less, has failed to satisfy the prong one

5    requirements.  And if you, even if Your Honor were to hold

6    that competitive cheer does not count for this year, the

7    difference is about two and-a-half percent which, again,

8    no court has ever been as low as two and-a-half percent.

9    And I would suggest to Your Honor that with these

10   circumstances that -- if you feel that competitive cheer

11   isn't there yet, we're not there yet, there's no question

12   we're going to be there next year, just as you said last

13   year at the preliminary injunction hearing, you had to

14   predict what would be likely for the coming year, last

15   year we didn't have the NCSTA, we didn't have the six

16   other varsity teams.  We didn't have the majority of our

17   competitions for this year in the NCSTA format.

18          We will next year.  There's going to be a

19   national championship.  I mean every factor, every factor

20   next year, there is off campus recruiting, every single

21   factor, even if you viewed it as a check list of the OCR

22   letter, will be met.  And I would suggest to you that even

23   if you find that we're not quite there now, that you

24   should take into account the fact that, based on, based on

25   the evidence, there is every reason to believe that, that

1    competitive cheer will certainly meet the criteria for

2    next year, and given that and this a two and-a-half

3    percent differential for this year is, you know, is less

4    than any court has ever found to be a violation that we

5    ought to be, that Your Honor should find that Quinnipiac

6    has substantiallily proportionally teams for this year and

7    that there's no reason -- therefore, we're not in

8    violation for this year and that there's no reason to

9    believe that we're going to be in violation next year

10   because, even without volleyball, competitive cheer will

11   most assuredly be a sport.  Thank you, Your Honor.

12             THE COURT:  Thank you.

13             Before you go, let me quickly follow up.  Using

14   a percentage method, what percentage is substantial?

15             MR. BRILL:  No court has ever found anything

16   less than 5 percent to be not substantial.  I think it

17   does depend on the size of the school.  I would think

18   something around between three and five percent would be

19   the borderline.  But I don't think two or two and-a-half

20   percent -- I think two, two and-a-half percent is clearly

21   substantial compliance.

22             THE COURT:  And is that true even if the gap in

23   athletes is -- would be sufficient to support the

24   volleyball team?

25             MR. BRILL:  Yes.  This notion came out of

1    nowhere.  I mean have there's no court that looks at this

2    from the gap standpoint that I'm aware of.  And, secondly,

3    it's a complete misinterpretation of the OCR guidance.  As

4    the court in -- I forget the name of the case -- in

5    Virginia said, what the OCR said in the 1996 guidance was

6    that if you, if the gap was small enough that it would not

7    support a team, then that was a basis for finding that a

8    school was in compliance but they didn't say the converse.

9    And when they, when they defined what they meant by the

10   gap, they said you look to the average size of the women's

11   team in that school.  At Quinnipiac, the average size of

12   the team, just eye balling the squad size, would be 20, in

13   the low 20s probably.  So the OCR never said, well, you

14   can't eliminate a team because automatically that's going

15   to result in a gap the size of the team that's being

16   eliminated.

17        THE COURT:  Okay.  And did you want to comment

18   on the plaintiff's view about remedy?  You mentioned

19   compliance --

20        MR. BRILL:  Well, it's a class action, Your

21   Honor, and I believe that the case law is it doesn't -- I

22   mean this case has been going on one year.  That's not

23   very long compared to the Brown case, for example, and it

24   is up to -- every court has said if you bring a class

25   action, it's up to the university to decide how it intends

1    to comply and reach proportionality.

2          The court doesn't say -- it's not up to the

3    court say, well, I want you to have a volleyball team with

4    12 people and you want to put some sprinters on your track

5    team and maybe you've got a few too many people on this

6    team and that team and while you're at it, why don't you

7    add a women's rugby team.

8          What these cases say is, okay, Quinnipiac, or

9    okay, Brown, we're sorry, you're not in compliance with

10   prong one.  We want you to come back with a plan, the

11   plaintiffs will have an opportunity to comment on the

12   plan, the class members who are going to be affected

13   should have an opportunity to comment on the plan and then

14   the court has to decide if the plan is adequate or the

15   plan isn't adequate.

16          But out of the blue, there's no basis now for

17   specific remedy other than to say, you know, make sure

18   you're in compliance with Title IX.  I mean, frankly, if

19   the only reason, putting aside track and field for a

20   minute and I talked just about competitive cheer, if the

21   court says that competitive cheer is not a team for

22   purposes of Title IX, then -- and it says that two

23   and-a-half percent gap puts us out of compliance for this

24   year, then we have to decide how we're going to get back

25   into compliance.

It's not obvious, you know.  It may require
either putting, cutting another men's team or adding
another women's team.  Simply putting the volleyball team
back in place doesn't necessarily -- when I add up the
numbers I don't think that would necessarily result in
compliance.

So it's a complicated, it's a complicated issue
that involves balancing of -- question of teams being
eliminated, teams being added, rosters being adjusted and
so on, and there are many other people who are affected
other than the main plaintiffs.  I mean the track athletes
have a, have an interest here in what happens.  So, yes I
think there would need to be an opportunity for
compliance.

Could I make one final comment.  And that is in
the Colorado State case, I don't recall the sport that was
involved, it may have been women's softball, the court
said there that -- there was a permanent injunction
requiring the school to maintain that particular team but
at the same time it said but once you get into, once you
get into compliance with Title IX, that obligation
evaporates because its always going to be the decision of
the school to decide how it complies.

So Your Honor can say, okay, we're not in
compliance now and I want you to maintain the volleyball

1      team at least for another year, but get once we get into

2      compliance, then we don't have to maintain the volleyball

3      team or any other team.

4                    THE COURT:  I understand.

5                    MR. BRILL:  Thank you very much.

6                    THE COURT:  Thank you.  Mr. Orleans?

7                    MR. ORLEANS:  Before I begin, I'm going try to

8      be as brief as I can.  Were there particular questions

9      that the court wanted to ask of me?  Or do you want to

10     just react as I go?

11                   THE COURT:  Let me react.

12                   MR. ORLEANS:  All right, I'm going to try.  I'm

13     going start with working from the end.

14                   THE COURT:  I was going to say that's what's

15     fresh in my mind and I'd be interested in your response to

16     that.

17                   MR. ORLEANS:  With respect to the remedy, Your

18     Honor, as far as I know, in every case, every class action

19     case where the plaintiffs were members of a team that was

20     dropped, the court has started by ordering the

21     reinstatement of that team and whatever else needs to

22     happen in terms of shaping a remedy and having a hearing

23     for the class or giving the class an opportunity to weigh

24     in and giving the university an opportunity to devise a

25     compliance plan, I believe that every court that has faced

that situation has started by ordering the reinstatement

of the team from which the plaintiffs were drawn.

         And there was a second point I wanted to make

about the remedy and it has slipped my mind.  If it comes

back to me, I'll come back to it.

         With respect to the issue of points of

substantial compliance percentage gap, I think the thing

that you have to keep in mind is that, you know, a gap of

2 percent at Ohio State where there might be thousands of

athletes is a different number of athletes that would

support the different team than a gap of 2 percent in a

small school where there are only a couple of hundred

athletes.  So, and that's why the 1996 clarification

focuses, contrary I think to what defense counsel

suggested, focuses not on percentages but on whether,

whether the gap between actual and required number of

women would be enough to support a team.

         THE COURT:  Yes, although I think that argument

cuts both ways.  At a small school, you know, the

fluctuation is going to have a more dramatic impact.

         MR. ORLEANS:  True.

         THE COURT:  So --

         MR. ORLEANS:  Okay.

         THE COURT:  I understand.  I understand.

         MR. ORLEANS:  So, Your Honor asked about why

Quinnipiac had not gone to OCR and I think that in his

response defense counsel made a comment about OCR not

giving advisory opinions.  I want to read to the court

from Exhibit 109 which is the 2008 Dear Colleague letter,

the penultimate paragraph.

          "OCR remains available to provide technical

assistance on this issue to recipients on a case by case

basis.  If you have further questions regarding the

application of Title IX to athletics programs or seek

technical assistance, please contact the OCR enforcement

office serving your state or territory."

          So there is of course no actual evidence in the

record about what happened at Maryland five or six years

ago but certainly two years ago in 2008, OCR was inviting

schools with questions about this to seek assistance.

          And further on that point, it just is not true,

I don't think, that the brief of the United States somehow

pushes off on the court the responsibility to make this

decision.  I think the brief assumes that the issue is

before the court and that the court will decide, but I

don't think there's any statement in the United States

brief that, you know, we don't want it, the court must

decide this for us, and if it were presented to us we

would punt.  That's not the way I read the U. S. brief.

And, as I said earlier, I think it is appropriate to weigh

1   heavily and balance the fact that the Quinnipiac and NCSTA

2   have not gone to OCR.

3           The theme of defense counsel's argument was that

4   it's really competitive cheer that's on trial and we just

5   dispute that very strongly, Your Honor.  It's a false

6   choice.  There's certainly no reason that Quinnipiac could

7   not honor its commitment to the competitive cheer squad

8   members and continue its effort to build this new activity

9   into a legitimate varsity sport.

10          It is a resource allocation issue.  And you know

11  what?  There's a cost to being a NCAA Division I athletic

12  program.  If you want the prestige and the status and the

13  marketing opportunities and the recruiting opportunities

14  that come with being Division I, I think as an

15  institution, you have to be prepared to devote the

16  resources do that and you can't necessarily do it on the

17  cheap.

18          There was sort of an implicit threat there at

19  the end of Mr. Brill's remarks that, gosh, if the court

20  were to find they are not in compliance with Title IX, we

21  might have to cut more men's teams, they can't cut more

22  men's teams, not if they are going to stay in Division I.

23          So, they may have to reexamine their, some of

24  their resource allocation decisions.  We think that they

25  ought to honor their commitment to competitive cheer and I

1    mentioned along those lines, there are a lot of schools in

2    the country that offer scholarships to their sideline

3    cheerleaders.

4         So there's certainly plenty of room for

5    Quinnipiac, as Your Honor suggested in some of your

6    questioning, to serve the needs and interests and

7    abilities of its students for legitimate athletic and

8    educational reasons, quite apart from the issue of Title

9    IX compliance.  And if it does that, if it focuses on

10   that, it will find itself in Title IX compliance because

11   it will be providing the opportunities for women that it

12   is required to provide.  Thank you.

13        THE COURT:  All right, thank you all.

14        (Pause)

15        THE COURT:  I have a lot of work to do.  And as

16   I've told counsel I'm not going to even be here for some

17   period of time, so I want give you a good estimate of when

18   I can have a decision.  It will be a matter of weeks not

19   days, but weeks not months.  And I understand the time

20   pressures that are involved with the upcoming academic

21   year and it's my intention to get a decision to you as

22   quickly as I can consistent with an obligation, I think a

23   very heavy obligation, to carefully review the record and

24   consider these issues carefully.

25        So I will tell you it's my hope to have a

1      decision to you by the middle of July.  Whether that is

2      possible, frankly I don't know, but that is my hope and my

3      goal.

4              And I want to thank both sides for a very

5      efficient presentation of the case.  I had concerns

6      obviously that we could hear this matter in the time

7      available and I very much appreciate the efforts you've

8      gone to to cooperate with each other and to present the

9      case, as I said, efficiently.

10             What's important to me, I think, is to get the

11     record established and now to have some time to carefully

12     review it.

13             And, as I say in every case, best of luck to

14     everyone.

15             And we're going to stand in recess.

16             (Whereupon the above matter was adjourned at

17     11:25 o'clock, p. m.)

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Susan E. Catucci, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ Susan E. Catucci
_____

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917) 703-0761