**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

STEPHANIE BIEDIGER, KAYLA LAWLER,       :
ERIN OVERDEVEST, KRISTEN                 :   CIVIL ACTION NO:
CORINALDESI, and LOGAN RIKER,            :
individually and on behalf of all those  :   3:09-CV-00621 (SRU)
similarly situated; and                  :
ROBIN LAMOTT SPARKS, individually,       :

                Plaintiffs,   :   **NOTICE OF APPEAL**

    against                       :

QUINNIPIAC UNIVERSITY,                   :

          Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

        PLEASE TAKE NOTICE that Defendant Quinnipiac University hereby appeals to the United States Court of Appeals for the Second Circuit from the Memorandum of Decision and Order entered by this Court on July 21, 2010 (Docket No. 171, attached as Exhibit A), the Injunction Order entered by this Court on July 22, 2010 (Docket No. 180, attached as Exhibit B), and from all decisions and orders of the District Court encompassed within the above-referenced Memorandum of Decision and Order and Injunction Order.

Dated:  August 16, 2010

PROSKAUER ROSE LLP

By: _____
Edward A. Brill
Federal Bar No.
phv015747
Susan D. Friedfel
Federal Bar No.
phv03585
1585 Broadway
New York, NY  10036
Tel:  212.969.3000
Fax:  212.969.2900
ebrill@proskauer.com
sfriedfel@proskauer.com

WIGGIN AND DANA
Mary Gambardella, Esq.
Federal Bar No. ct05386
400 Atlantic Street
Stamford, CT  06911-0325
Tel:  (203) 363-7662
Fax: (203)363-7676
mgambardella@wiggin.com

*Attorneys for Defendant*

# Exhibit A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| STEPHANIE BIEDIGER, KAYLA LAWLER, ERIN OVERDEVEST, KRISTEN CORINALDESI, and LOGAN RIKER, individually and on behalf of all those similarly situated, and ROBIN LAMOTT SPARKS, individually, Plaintiffs, v. QUINNIPIAC UNIVERSITY, Defendant. | No. 3:09cv621 (SRU) |

<u>**MEMORANDUM OF DECISION**</u>

In March 2009, the defendant, Quinnipiac University ("Quinnipiac" or the "University"),

announced plans to cut three of its sports teams: the women's volleyball team, the men's golf

team, and the men's outdoor track team. Contemporaneously, the University pledged to create a

new varsity sport, competitive cheerleading, for the 2009-10 season. Those decisions form the

basis of this lawsuit. Plaintiffs Stephanie Biediger, Kayla Lawler, Erin Overdevest, Kristen

Corinaldesi, and Logan Riker are five current Quinnipiac women's varsity volleyball players, and

plaintiff Robin Lamott Sparks is their coach. Together, they allege that Quinnipiac's decision to

eliminate its volleyball team violates Title IX of the Education Amendments of 1972 (20 U.S.C.

§ 162, *et seq.*) and the regulations adopted pursuant thereto (34 C.F.R. Part 106) ("Title IX").

On May 22, 2009, I granted the plaintiffs' motion for a preliminary injunction, holding

that the manner in which Quinnipiac managed its varsity rosters – essentially, by setting artificial

ceilings for men's varsity teams and floors for women's varsity teams – deprived female athletes

of equal athletic participation opportunities. *See Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d

277 (D. Conn. 2009). On May 20, 2010, I certified the following class of plaintiffs seeking

injunctive relief, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure:

> All present, prospective, and future female students at Quinnipiac University
> who are harmed by and want to end Quinnipiac University's sex
> discrimination in: (1) the allocation of athletic participation opportunities; (2)
> the allocation of athletic financial assistance; and (3) the allocation of benefits
> provided to varsity athletes.

*Biediger v. Quinnipiac Univ.*, No. 09cv621 (SRU), 2010 WL 2017773 (D. Conn. May 20, 2010).

Although the plaintiffs allege several theories for relief under Title IX, the parties agreed
to sever and try independently the plaintiffs' first claim: that Quinnipiac discriminates on the
basis of sex in its allocation of athletic participation opportunities. The parties tried that claim in
a bench trial held from June 21 to June 25, 2010. My findings of fact and conclusions of law are
set forth herein.

I conclude, as a matter of law, that Quinnipiac discriminated on the basis of sex during
the 2009-10 academic year by failing to provide equal athletic participation opportunities for
women. Specifically, I hold that the University's competitive cheerleading team does not qualify
as a varsity sport for the purposes of Title IX and, therefore, its members may not be counted as
athletic participants under the statute. Competitive cheer may, some time in the future, qualify as
a sport under Title IX; today, however, the activity is still too underdeveloped and disorganized
to be treated as offering genuine varsity athletic participation opportunities for students.

Second, I hold that, although cross-country, indoor track, and outdoor track are usually
considered different sports, Quinnipiac may not count some runners who participate in each sport
three times. Quinnipiac's practice of requiring women cross-country runners to participate on the
indoor and outdoor track teams, and its treatment of the indoor and outdoor track teams as, in
essence, an adjunct of the cross-country team, are sufficient to show that some cross-country

-2-

runners who participate on the indoor and outdoor track teams should not be counted under Title IX. Specifically, cross-country runners who were injured or red-shirted during the 2009-10 indoor and outdoor track seasons cannot be counted because their activity does not amount to genuine athletic participation opportunities.

Finally, although I find, as a matter of fact, that Quinnipiac is no longer engaged in the same roster manipulation that was the basis for my preliminary injunction order, the University is still continuing to deflate the size of its men's rosters and inflate the size of its women's rosters. Although that roster management is insufficient to conclude that Quinnipiac violated Title IX as a matter of law, it supports the ultimate conclusion that the University is not offering equal participation opportunities for its female students.

## I.      Findings of Fact

Quinnipiac University is a private, coeducational institution located in Hamden, Connecticut. Quinnipiac is a member of the National Collegiate Athletic Association ("NCAA"), and is a Division I school, which means that it belongs to the NCAA's most competitive athletic division. The University competes in the Northeastern Conference ("NEC"), to which ten other Division I programs belong. Historically, men's and women's basketball and ice hockey have been the school's premier sports. Quinnipiac, however, sponsors seven varsity men's athletic teams and 12 varsity women's athletic teams, including, *inter alia*, women's volleyball, women's cross-country, women's indoor track and field, women's outdoor track and field, and women's competitive cheer.

During the 2009-10 academic year, 5,686 students were enrolled in the University's undergraduate program. That year, 2,168 students, or 38.13 percent of the student body, were

male, and 3,518 students, or 61.87 percent of the student body, were female. Based on the

varsity rosters for the first day of teams' competitions, 166 male athletes and 274 female athletes

participated during the academic year. Using those first day of competition figures, in 2009-10

male athletes made up 37.73 percent, and female athletes 62.27 percent, of the University's

varsity athletes. If Quinnipiac's numbers were accepted, the University would not be liable

under Title IX because the school would be offering athletic opportunities for women in numbers

proportional to the percentage of women in the school's undergraduate population.

 To succeed, the plaintiffs must undermine the way Quinnipiac counts its varsity athletes.

Plaintiffs seek to do so by raising three areas of factual disagreement. First, the plaintiffs claim

that Quinnipiac's roster numbers are inaccurate and the University's policy of setting varsity

roster targets leads to artificially undersized men's teams and oversized women's teams. Second,

the plaintiffs claim that Quinnipiac's female cross-country runners should not be counted

multiple times for their participation on the indoor and outdoor track teams because the indoor

and outdoor track teams are not true independent sports teams but serve, instead, as a more

structured nontraditional season for the University's female cross-country runners. Third and

finally, the plaintiffs claim that the Quinnipiac competitive cheerleaders should not be counted

because competitive cheer is not yet a legitimate intercollegiate varsity sport. I take up each of

those factual questions independently. I then conclude my findings of fact by discussing

Quinnipiac's plans for the 2010-11 academic year.

 A. Roster management

 Following the 2008-09 academic year, Quinnipiac changed its practice with respect to

setting roster targets for its teams – the practice that formed the basis of my preliminary

injunction order. Rather than establish ceilings for men's teams and floors for women's teams, and implicitly encourage coaches to manipulate their rosters before and after the first dates of competition – the dates on which the University collected its roster data to prove its Title IX compliance – Quinnipiac established a new policy of setting roster targets. That policy required coaches to meet roster numbers prescribed by the University after consultation with its coaches.

The roster target system was overseen by Dr. Mark Thompson, the senior vice president for student and academic affairs, and Jack McDonald, Quinnipiac's athletic director. Thompson inaugurated the new roster management system in the summer of 2009. After reviewing the relevant Title IX and NCAA regulations, Thompson developed a set of preliminary roster targets based on Quinnipiac's roster sizes in 2008-09, NCAA average squad sizes, and the teams' operating and scholarship budgets. Thompson testified that the purpose of setting the roster targets was to ensure that all athletes were given genuine participation opportunities. Those preliminary numbers were revealed to Quinnipiac's head coaches in a meeting held in July 2009, and were finalized on September 1, 2009, just before the beginning of the fall season. Issuing the initial roster target numbers in July 2009 meant that coaches were given their numbers after the recruiting season had ended and incoming Quinnipiac students had made their enrollment deposits. In other words, teams that had to find new players to meet their roster targets were likely forced to find those players on campus or among the small pool of graduating high school seniors and junior college players who had not already decided where to enroll for the 2009-10 academic year.

At the July 2009 head coaches meeting, some of the coaches audibly expressed frustration with their preliminary roster targets. In between the issuance and finalization of the preliminary

numbers, however, every coach met with Thompson to discuss whether the preliminary numbers were appropriate. For example, the women's basketball coach requested increases in the team's roster, Def. Exs. BZ & CA; the women's ice hockey coach requested a reduction of the team's roster, Def. Ex. CB; the women's softball coach requested an increase of one player to the team's roster; Def. Ex. CF; the men's basketball coach requested an increase of two players to the team's roster, Def. Ex. CK; and the men's ice hockey coach requested an increase of two players to the team's roster, Def. Ex. CN. Thompson agreed to all of those requests. Indeed, the only roster target change that Thompson appears to have denied was a requested increase of one women's volleyball player by Robin Sparks, for whom, Thompson testified, Sparks never proved the need. Ultimately, Thompson received the input of each Quinnipiac coach before finalizing the teams' roster target numbers. Every Quinnipiac coach, except for Germaine Fairchild, the women's softball coach, and Sparks, signed letters confirming their acceptance and approval of their roster targets. *See* Def. Ex. BO. During the academic year, Quinnipiac's coaches were permitted to make changes to their rosters. Any addition or deletion of a player, however, had to be approved in advance by Thompson.

The plaintiffs allege two potential ways in which Quinnipiac's practice of setting roster targets could result in a Title IX violation. First, the University may have manipulated its roster sizes by misidentifying student athletes, specifically, by erroneously discounting individual athletes from men's teams and adding individual athletes to women's teams. In other words, the plaintiffs claim that Quinnipiac's varsity teams were not actually complying with the roster targets the University assigned, and the actual number of athletes was not captured by the roster target totals. And, second, the University may have set artificially low roster numbers for its

-6-

men's teams and high numbers for its women's teams, thus creating de facto ceilings and floors

for squads on the basis of sex, which had the effect of denying genuine athletic participation

opportunities to some women athletes.

1.    *The total number of athletes competing at Quinnipiac*

The plaintiffs and Quinnipiac offered two competing theories for how the University's

2009-10 athletes should be counted.  Relying on a clarification letter issued in 1996 by the

Department of Education's Office of Civil Rights ("OCR"), Quinnipiac offered its squad lists for

teams' opening days of competition as evidence of the total number of athletes participating in

the 2009-10 academic year.  It did nothing more than put forward those opening day roster

numbers for the purpose of demonstrating its compliance with Title IX.

By contrast, the plaintiffs' expert witness, Dr. Donna Lopiano, scrutinized Quinnipiac's

2009-10 squad lists for which athletes were on teams' rosters on the opening days of competition

and/or were added to, or dropped from, rosters later in the season.  Lopiano analyzed those squad

lists to determine which students counted as athletic "participants" according to OCR's definition

of the term.  She accounted for all potential participants according to the following eight criteria:

> (1) Athletes who competed during the academic year, regardless whether such
> competition took place during the sport's traditional or nontraditional[1]

---

[1] A sport's "nontraditional" season is the season in which a sports team practices and
plays, but does not seek a championship.  *See* 2009-10 NCAA Division I Manual (Def. Ex. EP)
Figures 17-1 & 17-2, at 218-19 (showing dates for sports' traditional and nontraditional seasons).
For example, the Quinnipiac women's volleyball team's traditional season is the fall; the
conference and national championships take place at the end of that season.  Nonetheless, that
team may also participate in a nontraditional spring season.  During that nontraditional season,
the team continues to practice, albeit for fewer hours than during the traditional season, and may
play scrimmages and games against other schools' varsity teams.  Those competitions, however,
do not count towards the maximum and minimum number of contests set by the NCAA for the
team's championship season.

season;

(2) athletes who did not compete because of injury but received athletic financial aid, such as partial or full scholarships;

(3) athletes who were red-shirted[2] during the 2009-10 year;

(4) athletes who were listed on their team's squad list for the first day of competition in the traditional season and practiced with their teams, even if they never competed in a game;

(5) athletes who were on their team's squad list for the first day of competition in the nontraditional season and practiced with the team, even if they were not on their team's squad lists for the traditional season and did not compete;

(6) athletes who did not appear on a squad list for the first day of competition in the traditional or nontraditional season, but who practiced with their team for a majority of the season and received at least one semester's worth of athletic benefits;

(7) athletes who, in Lopiano's view, raised a "red flag" and either should not have been counted or, if not already included in the first six criteria, should have been added to the list of athletes; and

(8) athletes who exhausted their four years of NCAA eligibility but who, in a fifth year, continued to practice with their team and receive the same athletic benefits as any other varsity athlete.

Pl. Ex. 149 at 2-3.

In producing her figures for Quinnipiac's total number of athletic participants, Lopiano made several additional categorical choices about which women should be included. Lopiano did not include the women's competitive cheer team in her count of female athletes, on the

_____

[2] A "red-shirt" refers to an athlete taking advantage of the NCAA regulation permitting an athlete to remain on a team but not compete a year without losing a year of athletic eligibility. *See* 2009-10 NCAA Division I Manual (Def. Ex. EP) § 14.2.1 (requiring Division I athletes to complete four years of eligibility within five years). An athlete may red-shirt a year because of injury or in order to conserve a year's eligibility while practicing and improving his or her skills.

-8-

assumption that women's competitive cheer did not constitute a valid sport for Title IX purposes

and, therefore, the team's members were not "participants" to be tallied under the statute. In

addition, Lopiano offered four alternative totals for female athletes participating on the cross-

country and track teams. As I explain in more detail in the next section concerning Quinnipiac's

cross-country and track programs, there is substantial overlap between the women's cross-

country, indoor track, and outdoor track teams; indeed, every female cross-country runner was on

the indoor and outdoor track teams' 2009-10 rosters. Thus, those runners potentially may be

counted as three distinct athletic participants under Title IX. In order to account for the various

ways female runners can be counted, Lopiano made four calculations of the number of

Quinnipiac women athletes: (1) the total number of participants on each women's team,

regardless whether runners are counted three times for participating on the cross-country, indoor

track, and outdoor track teams; (2) the total number of participants on each women's team, but

counting participants competing on both the indoor and outdoor track teams only once for track

and field; (3) the total number of participants on each women's team, but counting cross-country

runners and exclusive track runners once, regardless whether they participated on multiple teams;

and (4) the total number of participants on all women's teams, but subtracting the indoor and

outdoor rosters completely. *Id.* at 4.

   Although each of those methods produces different totals for the number of female

varsity athletes during the 2009-2010 year, in none of those calculations did Lopiano detect

evidence of roster manipulation. Rather, she agreed that the athletes on the women's cross-

country, indoor track, and outdoor track squad lists were properly included as participants,

insofar as a single athlete competing on all three teams participates in separate sports.

Ultimately, Lopiano disagreed that individual runners who competed on more than one of those teams should be counted as more than one participant for the purpose of Quinnipiac's Title IX compliance because, in her view, it was a ruse for Quinnipiac to increase the statistical representation of its female athletes. But because Lopiano's disagreement centered on whether, categorically, female runners could be counted multiple times, and not on whether the runners actually participated on those teams, the distinctions between Lopiano's various tabulations of the University's female runners do not bear on Quinnipiac's purported roster manipulations. Rather, Lopiano observed potential evidence of Quinnipiac's inaccurate participant counting on other teams – namely, the men's basketball, ice hockey, lacrosse, soccer, and cross-country teams, as well as the women's field hockey, ice hockey, lacrosse, soccer, and softball teams.

For all of those teams, Lopiano performed three calculations based on her eight criteria for defining athletic "participants," as described above. First, in what she dubbed "Count A," she added each team's participants who met criteria (1) through (4). Next, in "Count B," she took the totals from Count A and included any other participants who met criteria (5) through (8). Finally, in "Count C," she subtracted any athletes whom she designated a "red flag" under criterion (7) and who, as far as she could tell, did not actually participate on their teams for Title IX purposes. She then compared those counts to Quinnipiac's opening day squad lists, the University's chosen method for establishing its numbers of male and female athletes. In relevant part, Lopiano calculated the following numbers of athletic participants on Quinnipiac's men's teams:

| MEN'S TEAM | COUNT A | COUNT B | COUNT C | QU COUNT |
|---|---|---|---|---|
| Basketball | 17 | 18 | 18 | 17 |
| Ice Hockey | 31 | 31 | 31 | 30 |
| Lacrosse | 43 | 43 | 43 | 41 |
| Soccer[3] | 24 | 27 | 27 | 24 |
| X-Country | 13 | 16 | 16 | 13 |
| . . . | | | | |
| Total[4] | 170 | 176 | 176 | 166 |

Pl. Ex. 151. When one takes all of the potential participants included in Count B, none of which are excluded in Count C, and compares them to Quinnipiac's count, the difference is ten male athletes. Thus, according to the plaintiffs, Quinnipiac undercounts its male athletic participants by up to ten students by relying on squad lists for the opening days of competition.

For the women's teams, on the other hand, the plaintiffs contend that Quinnipiac overstates the number of its female athletic participants. Lopiano calculated the following numbers of athletic participants on Quinnipiac's women's teams:

---

[3] Plaintiffs' Exhibit 151, Lopiano's summary of her counting and the basis for this excerpted chart, lists Count A for men's soccer as 27 players. Exhibit 150, however, shows that Count A should be 24, while Counts B and C should be 27. I have changed the chart to the correct Count A total of 24.

[4] The total numbers listed in this chart reflect *all* of Quinnipiac's male athletes for the 2009-10 academic year, including teams not specifically shown here. The excerpted chart does not include data for the men's baseball and tennis teams because the plaintiffs' and Quinnipiac's totals for those squads are consistent. The difference between the parties' counting is attributable to the five teams listed above.

-11-

| WOMEN'S TEAM | COUNT A | COUNT B | COUNT C | QU COUNT |
|---|---|---|---|---|
| Field Hockey | 26 | 26 | 25 | 24 |
| Ice Hockey | 26 | 26 | 20 | 26 |
| Lacrosse | 28 | 30 | 30 | 29 |
| Soccer | 29 | 29 | 28 | 27 |
| Softball | 21 | 21 | 21 | 20 |
| . . . | | | | |
| Total[5] | 170 | 172 | 164 | 166 |

*Id.* According to the plaintiffs, then, Quinnipiac overstates its female participants (excluding the cross-country, outdoor track, and indoor track runners) by two.

During trial, however, Quinnipiac demonstrated that the University engaged in minimal undercounting of male athletes and no overcounting of female athletes, and that the discrepancies between the plaintiffs' and defendant's calculations were attributable to facts about individual athletes of which Lopiano was unaware. Take, for instance, the six women's ice hockey players whom Lopiano discounted and who are responsible for the net overstatement of Quinnipiac's female athletic participants.[6] Lopiano identified those six players as "red flags" and subtracted

---

[5] As in the previous chart, the total number reflects the totals for *all* female athletic participants during the 2009-10 academic year. The excerpted chart excludes the women's basketball, tennis, and volleyball teams because the parties' totals for them were consistent. The chart also does not account for the women's cross-country, indoor track, and outdoor track teams because the plaintiffs are not challenging the numbers on those teams as inaccurate. Rather, they allege that participants on more than one of those teams should not be counted as multiple participants under Title IX.

[6] If the six women's ice hockey players identified by Lopiano are not removed from the team's squad list, then, by the plaintiffs' calculation, Quinnipiac will have actually *undercounted* its female athletic participants by four students, assuming that the plaintiffs' tallying of the

them from her "Count C" because she believed they were not legitimate players and were cut

after their season ended due to a Quinnipiac policy prohibiting women's coaches from cutting

players mid-season in order to maintain the appearance of Title IX compliance. *See* Pl. Ex. 147

(email to Jack McDonald explaining why six cuts were made after end of women's ice hockey

season). Rick Seeley, the Quinnipiac women's ice hockey coach, gave uncontradicted testimony

that Lopiano's belief was false. Seeley was never informed by Quinnipiac's administration that

he could not cut players during the season; at most, he was instructed to contact Mark Thompson

before cutting any of his players. Furthermore, the 2009-10 women's ice hockey team roster

shows that five of the six players Lopiano identified as "red flags" competed in games during the

season, Def. Ex. EW, at D 0859, and Seeley confirmed that the remaining "red flag" was the last

player on the bench and the only team member, other than a red-shirted player, not to play in a

game that season. Nonetheless, Seeley gave undisputed testimony that even the last player on the

bench, like all of the women ice hockey players Lopiano identified as "red flags," was on the

team's squad list on the first day of competition, practiced with the team, and received athletic

benefits like any other varsity athlete. Moreover, Seeley said that all of the six players at issue

quit on their own accord, or were cut for disciplinary and/or other legitimate, team-based reasons.

Quinnipiac's and Lopiano's counts were further reconciled by the testimony of Tracey

Flynn, the University's Title IX compliance officer. The one-player difference between

Quinnipiac's and Lopiano's counts for the men's basketball team was explained by a student

who transferred to the University mid-year; under NCAA regulations, he was not allowed to join

women's field hockey, lacrosse, soccer, and softball teams is accurate. That runs contrary to
their theory that Quinnipiac was inflating its women's rosters.

-13-

the team immediately and, therefore, was not counted by Quinnipiac on the basketball team's roster. The one-player difference between Quinnipiac's and Lopiano's counts for the men's ice hockey team stems from a player who was cut before the first day of competition, but rejoined the team in January 2010; although, according to the team's season statistics, that player did not play in any games, he did practice with the team and arguably should have been included in Quinnipiac's tally. Quinnipiac's counting should therefore be increased by one male athlete.

The men's lacrosse team's two-player difference appears to represent a genuine disagreement between the plaintiffs and defendant about how to count the athletes. Records of Quinnipiac's internal change-in-status log show that two additional players joined the team in January 2010, before the first day of official competition; those same records also indicate that two different lacrosse players quit at approximately the same time, before the first game of the traditional season. Def. Ex. EN. As email correspondence shows, the two players added to the men's lacrosse team were substitutes for the two players cut. Def. Exs. CR-CS, CU-CV. Quinnipiac's opening date of competition data is therefore accurate insofar as it includes the correct number of players on the men's lacrosse roster. Unlike Lopiano, however, Quinnipiac does not account for the players swapped; instead, the University counts only the roster spots filled on, and not before, the first day of competition.

A similar player swap explains the three-player difference between Quinnipiac's and Lopiano's counts of the men's soccer and cross-country squads. Three players were added to the men's soccer team roster in spring 2010, after the traditional season had closed, which is why they appear in Lopiano's Counts B and C. Lopiano did not note, however, that three players left the team between January and March 2010, and it appears that the three who were added were

-14-

supposed to fill the places of those who left during the nontraditional season. The same

exchange appears to have occurred on the men's cross-country team: three players were added to

the team's spring, nontraditional roster to make up for three outgoing seniors. Because all of

those player swaps happened before the commencement, or after the conclusion, of the teams'

championship seasons, I will accept Quinnipiac's count of its male athletes, with the exception of

the one men's hockey player who must be added to the University's tally.

In sum, the facts show that Quinnipiac's count of female athletes – without considering

the participants on the University's women's cross-country, indoor track, and outdoor track

squads, or the members of the competitive cheer team – is not overstated. Rather, the evidence

shows that the women's ice hockey team, the only team that the plaintiffs put forward as

artificially keeping more players on its team than was necessary or desirable, provided

participation opportunities to all of the players on its roster. The women's ice hockey players

who left the team did so after the season and for legitimate reasons; indeed, the plaintiffs put on

no evidence that any women ice hockey players were forced off because of the University's

roster management. The facts suggest that the men's teams were arguably slightly undercounted.

But eight of the ten identified players who were purportedly undercounted were athletes who

joined teams to replace players who were cut or quit. Thus, there is no evidence, other than the

one player added to the men's ice hockey team mid-season, that Quinnipiac men's coaches felt

pressure to add more players to their teams following the first date of official competition.

Rather, the evidence shows that the men's coaches, like the women's coaches, followed the

direction of the University's athletics department and maintained their rosters at the prescribed

sizes. That conclusion was confirmed by Flynn, who testified that the suspicious trend of men's

-15-

teams adding players, and women's teams dropping players, after the first date of competition –

the trend that she had observed and testified about at the preliminary injunction hearing – did not

take place during the 2009-10 academic year.  Indeed, when pressed by opposing counsel on

cross-examination, Lopiano could not identify any examples of the University adding or cutting

players after the first date of competition in order to manipulate the school's roster numbers.

### 2.  *The sizes of Quinnipiac's men's and women's teams relative to national and conference averages*

Even if Quinnipiac's men's and women's teams complied with the University's revised

roster management program, and ceased their former respective practices of adding and cutting

players after the first date of official competition, the question still remains whether Quinnipiac's

mandatory roster numbers are appropriately set and afford athletes genuine varsity participation

opportunities.  At trial, the plaintiffs introduced data showing that the Quinnipiac men's rosters

were slightly smaller than national and conference averages, while women's rosters were slightly

larger than those averages.  The plaintiffs introduced the following chart representing the

difference between the size of Quinnipiac's men's teams and the size of average NCAA Division

I and NEC teams:

| MEN'S TEAM | QU COUNT | NCAA AVG. | NEC AVG. |
|---|---|---|---|
| Baseball | 31 | 33.3 | 35.88 |
| Basketball | 17 | 15.4 | 14.09 |
| Ice Hockey | 30 | 27.7 | 28 |
| Lacrosse | 41 | 45.6 | 51.4 |
| Soccer | 24 | 28.5 | 25.6 |

-16-

| | | | |
|---|---|---|---|
| Tennis | 10 | 10.2 | 11.22 |
| X-Country | 13 | 15.4 | 16.45 |

Pl. Ex. 151.[7]  Those data reveal that four of the seven men's teams – the baseball, lacrosse,

soccer, and cross-country teams – had rosters that were smaller by approximately two to four

players than the national average, and that five men's teams were smaller than the average

Northeastern Conference squad.  By contrast, only the men's basketball and ice hockey teams –

the University's premier programs – had teams larger than the national and conference averages.

The plaintiffs also introduced evidence showing that Quinnipiac's women's teams were

larger than the national and conference averages.  They introduced the following chart showing

the disparity between women's teams and the national and conference averages:[8]

| WOMEN'S TEAM | QU COUNT | NCCA AVG. | NEC AVG. |
|---|---|---|---|
| Basketball | 18 | 14.5 | 13.82 |
| Field Hockey | 24 | 22.7 | 22.2 |
| Ice Hockey | 26 | 23.3 | 27.5 |
| Lacrosse | 29 | 27.2 | 23.44 |
| Soccer | 27 | 26.2 | 24.8 |
| Softball | 20 | 19.6 | 19.2 |
| Tennis | 10 | 9.4 | 8.8 |

---

[7]  The Quinnipiac team roster numbers reflect the athletes participating in 2009-10.  The NCAA Division I and NEC averages were taken from the 2008-09 academic year.

[8]  The chart does not include a comparison of the competitive cheer team because neither the NCAA nor the NEC recognizes competitive cheer as a varsity sport and, therefore, NCAA and NEC data do not exist for that activity.

| | | | |
|---|---|---|---|
| Volleyball | 12 | 14.8 | 12.56 |
| X-Country | 18 | 16.9 | 13 |
| Indoor Track | 30 | 37.9 | 29.91 |
| Outdoor Track | 30 | 37.2 | 30.55 |

*Id.* Those figures show that, with the exception of women's volleyball, indoor track, and outdoor track, every Quinnipiac varsity women's team was larger than the national average Division I women's team. Quinnipiac's teams were larger than the national average by approximately one to four players. The chart also shows that the University's indoor and outdoor track squads were comparatively much smaller than the typical women's track and field team; both had seven to eight fewer players than the average Division I team.[9] The Quinnipiac track rosters were consistent in size with the NEC averages for those sports, however. But other Quinnipiac women's teams, such as basketball, cross-country, and lacrosse, were bigger than the average NEC squad by four to five players, a larger disparity than between those squads and average NCAA Division I rosters. Indeed, except for the track teams, volleyball, and ice hockey, every University women's team was bigger than the average conference team.

Quinnipiac challenged the evidence that its men's teams were smaller than average, and its women's teams larger than average, by introducing data of the variation between the size of NEC teams. For example, NEC women's indoor and outdoor track teams ranged from 18 to 56 athletes, and the conference's roster numbers reveal that the Quinnipiac women's indoor and outdoor track teams were not only consistent with the mean size of their rivals, but that the

---

[9] As I explain in the following section, Quinnipiac's relative shortage in players is likely attributable to its lack of athletes competing in "field" competitions, such as jumps and throws.

University's teams were near the median of the conference's indoor and outdoor track team sizes. *See* Pl. Ex. 103 (setting forth 2008-09 roster sizes of NEC teams, and showing that, of the twelve teams in the conference, Quinnipiac had the sixth-largest women's indoor track team and the fifth-largest women's outdoor track team).

But other Quinnipiac women's teams are demonstrably bigger than their conference competition when the 2009-10 Quinnipiac rosters are compared to the conference's 2008-09 rosters, as set forth in Plaintiffs' Exhibit 103. The University's 2009-10 women's basketball team had 18 members; that was three more members than the next biggest NEC team in the preceding season. *Id.* Similarly, the Quinnipiac women's cross-country, lacrosse, and soccer teams would all have been the third-largest NEC team for their respective sports. *Id.* That stands in contrast to the men's teams, which, with the exception of the cross-country and basketball teams, all had relatively small rosters when the University's 2009-10 roster numbers are compared to the NEC's 2008-09 tallies.[10] That comparison shows that, of ten competing schools, the men's tennis team would have been smaller than five other NEC teams; that, of eleven competing schools, the men's soccer team would have been smaller than six other NEC teams; that, of nine competing schools, the men's baseball team would have been the second-smallest team in the NEC; and that, of six competing schools, the men's lacrosse team would have been

---

[10] Although the men's cross-country team was smaller than the NEC average, *see* Pl. Ex. 151, the team was actually only smaller than four, or one-third of, the NEC's teams, *see* Pl. Ex. 103. That is explained by the fact that several of the larger teams were enormous in comparison to the Quinnipiac men's cross-country team and drove up the conference's overall average. *See id.* (showing that the four largest men's cross-country teams had rosters of 17, 24, 31, and 39 runners).

-19-

the smallest team in the conference.[11] *Id.*

Altogether, the evidence indicates that Quinnipiac's men's rosters tended to be smaller than the national and conference averages and its women's rosters tended to be larger. That general finding does not hold true for all sports. If the University's 2009-10 roster count is compared to the NEC's data for the 2008-09 season, the men's cross-country team would have been bigger than seven other competing teams, and the men's basketball team would have been the biggest in the conference; meanwhile, the women's volleyball, indoor track, and outdoor track teams would have been near the NEC's median size. But, aside from those exceptions, the plaintiffs are correct that the University appears to set its men's rosters at relatively small numbers and its women's rosters at relatively high numbers. The disparity between the University's rosters and the national and conference averages may not be great – with the exception of women's indoor and outdoor track, no Quinnipiac team is more than four players above or below the national average. Nonetheless, the plaintiffs have proven that some disparity exists.

B.    Indoor and outdoor women's track and field

In the 2009-10 season, Quinnipiac fielded four running teams: a men's cross-country team, a women's cross-country team, a women's indoor track team, and a women's outdoor track team. All four of those teams are coached by Carolyn Martin, who was promoted to the head coaching position at the end of the 2008-09 academic year; previously, Martin had served as an

––––––––––––––––––

[11] I am omitting the men's and women's ice hockey teams from this part of the discussion. Only three teams in the NEC have men's and/or women's hockey teams; because of the small pool of competing schools, I do not find the size of Quinnipiac's ice hockey squads relative to the rest of the conference to be especially meaningful.

assistant coach to the women's cross-country, indoor track, and outdoor track teams, and was a former student and varsity athlete at Quinnipiac.[12]  As head coach, Martin has two paid assistant coaches and two unpaid, volunteer coaches.  Martin is the only Quinnipiac coach responsible for overseeing four separate teams.  In fact, only one other University coach – Mike Quitko, who coaches the men's and women's tennis teams – coaches multiple teams, and he only oversees two squads.  As head coach for the men's cross-country, women's cross-country, indoor track, and outdoor track teams, Martin is responsible for, among other duties, training her athletes, preparing them for meets, managing the teams' budgets and operations, and recruiting players.  McDonald testified that it was common for schools to appoint one coach for all of their running teams, and then have those coaches delegate responsibilities for specific teams to assistant coaches.  In other words, the coaching and management of Quinnipiac's varsity running teams was a standard practice among NCAA schools.

The NCAA recognizes cross-country, indoor track and field, and outdoor track and field as different sports for purposes of athletic eligibility.  2009-10 NCAA Division I Manual (Def. Ex. EP) § 14.2.3.3, at 138.  Furthermore, those sports have different rules of competition and their own championships.  Women's cross-country races are five or six kilometers long.  Races can be run on all kinds of surfaces and can be either flat or hilly; in a single race, a course is likely to take runners across a variety of terrains.  Track and field, by contrast, offers races of various lengths, ranging from short sprints, to middle-distance contests, to long-distance races of

---

[12] Martin did not testify at trial.  In place of her live testimony, the parties stipulated to using her deposition of May 18, 2010.  The parties also agreed to submit the deposition testimony of Samuel Seemes, the defendant's expert on cross-country and track and field, in lieu of live testimony.

a mile or more.  And, although it is true that tracks can differ in some ways, such as in their lengths, their surface material, whether they are indoors or outdoors, and the degree to which they are banked, most tracks are similarly constructed as an unbroken oblong loop.[13]  In addition to the track races are the field events, which can be distilled into two types:  jumping events, such as horizontal contests like the long jump or vertical contests like the high jump; and throwing events, such as the shot-put, discus, and javelin.  Cross-country offers no field events; a cross-country meet, rather, is a single race that all of the competitors run at the same time.

In a cross-country race, a team generally may enter as many runners as it wishes, although only its top five finishers will score.  A team's final score is the sum of those five runners' places, and the winning team is the squad with the lowest total score.  Teams may, as a matter of strategy, enter more than five runners in a single meet.  Entering more runners hedges against the risk that an individual entrant might have a bad race or injure herself on the course and finish in a slower time.  A team may also enter a large number of runners with the hope of "displacing" their opponents' runners.  Because a team's score is determined by adding the places of its top-five finishers, having a sixth runner finish before an opponent's fifth runner will increase, or "displace," the opponent's final score by one more point.  That will result in a higher opponent's total score, and a greater likelihood that the team will beat that opponent.

The cross-country scoring system is markedly different than the scoring system used at a track meet.  At a track meet, a school enters athletes in a variety of events, and a team's total score reflects the cumulative scores of its individual members.  Many track meets are not scored

---

[13] An exception to this is the course for the steeple chase, an outdoor track event that involves obstacles such as water troughs and barriers that runners must overcome.

at the team level, but only provide individual competitors the chance to excel in their respective events. At those meets, there is less incentive to enter many entrants in the same competition. Martin did testify, however, that a track team may include more distance runners than sprinters for events in which a team score is compiled. A sprinter, according to Martin, is able to compete in multiple races at a track meet because a short race is less physically taxing than a distance competition; for instance, a sprinter could compete in both the 100 and 200 meter dashes, but a distance runner is unlikely to run both the 5,000 and 10,000 meter races. Therefore, a track team may elect to carry fewer sprinters than distance runners in order to be as efficiently competitive as possible.

Quinnipiac cross-country meets and practices are run on campus, but the University has neither an indoor nor an outdoor track for competition. Instead, indoor and outdoor track athletes must compete off campus at a local high school. The University's indoor track team practices on a track in the school's recreation center, but the outdoor track team practices off campus. According to Samuel Seemes, Quinnipiac's track and field expert witness, it is not rare for a university to have a track team without also having a track on campus, and several other college and university track teams practice off campus and are unable to host home meets. Quinnipiac also does not enter any athletes in field events because it lacks the coaching and facilities for athletes to train for those events.[14] According to Martin and Seemes, it is not uncommon for schools to enter athletes only in track events; both witnesses recalled other universities that enter their track-and-field participants in races only, to the exclusion of field events. Neither Martin

---

[14] Quinnipiac did enter one woman in the triple jump at three outdoor track events in the 2009-10 season. Martin said, however, that the athlete was a triple-jumper in high school, and it does not appear that the athlete ever trained to triple-jump during the team's practices.

nor Seemes, however, was able to state whether the sizes of Quinnipiac's track-only track and field teams were similar to the rosters of other universities whose track and field teams only competed in races.

In 2009-10, the Quinnipiac women's cross-country team had 18 members, and its indoor and outdoor track teams had 30 members; the men's cross-country team had 13 members. All of the women's cross-country runners participated on the indoor and outdoor track teams. In other words, 60 percent of the indoor and outdoor track teams consisted of athletes who ran cross-country in the preceding fall season. The remaining 12 members on the women's indoor track team also participated on the outdoor track team. Thus, every participant on the women's cross-country, indoor track, and outdoor track team competed on at least one other squad. It is not unusual for cross-country runners to participate on track teams, and for track participants to run in the indoor and outdoor seasons, however. Both Martin and Seemes testified that runners often participate in more than one season. In fact, Martin said that many runners expect to compete across seasons. She testified that she was having difficulty recruiting male cross-country participants because the University did not offer them track opportunities in the winter and spring seasons and would not sponsor those runners to compete individually in any winter or spring track meets.

Under NCAA regulations, a Division I cross-country team must compete in at least six contests over the course of a year, with at least five athletes in each contest. NCAA Division I Manual (Def. Ex. EP) § 20.9.4.3, at 311. Indoor and outdoor track teams must compete in at least six meets in each season with a minimum of 14 participants, *id.*, and may not compete in more than 18 meets combined, *id.* § 17.24.5.1, at 271. The women's cross-country team ran

-24-

eight races in the 2009-10 season, including the NEC championship and the NCAA regional finals; the women's indoor track team entered runners in eight meets, but only met the minimum 14 participants to compete as a team in six contests; and the women's outdoor track team entered runners in seven meets, but only met the minimum 14 participants in six of them.

Martin testified that, during the indoor and outdoor track season, all of the athletes listed on team rosters practiced, even if they were not competing in an upcoming meet. Injured players were responsible for participating during practice, too, although their practice time consisted of physical therapy, strength training, conditioning, and other rehabilitative exercises. All of the athletes were expected to attend team meetings and each roster member received coaching, equipment, warmup gear, and shoes; only athletes who were competing, however, received racing uniforms. Track team participants were also entitled to athletic benefits, such as travel and per diem costs for away meets, as well as scholarship aid. There are four full-tuition scholarships available for all of the women's cross-country, indoor track, and outdoor track runners. Those scholarships may be divided among participants on the teams. In 2009-10, the four scholarships were distributed among women who participated on all three of the women's running teams. Martin did not extend any scholarship funds to athletes who ran only on the indoor and outdoor track squads.

Historically, Quinnipiac's running program has prioritized distance running over sprinting. Thus, the women's cross-country team has been the predominant squad relative to the indoor and outdoor track teams, and the distance track events have been emphasized more than sprinting contests. Spreadsheets prepared by Martin illustrating the races Quinnipiac track runners entered during the 2009-10 seasons reveal the dominant role that distance running played

in the University's women's running program.  *See* Def. Exs. AJ & AR.  The following chart was compiled using those exhibits.  It shows the number of track events that participants entered in the women's indoor and outdoor track seasons, and identifies those events as sprint, middle-distance, or distance competitions.  A sprint is defined as any race equal to or shorter than 400 meters; a middle-distance race is defined as any race greater than 400 meters but shorter than 1,500 meters; a distance race is defined as any race greater than or equal to 1,500 meters.[15]  If an athlete ran an event more than once at a meet – e.g., if an athlete ran in a qualifying heat and then ran in the finals for the event – participation in that event for that meet is counted only once.

| TEAM | SPRINT EVENTS | MIDDLE-DISTANCE EVENTS | DISTANCE EVENTS | TOTAL EVENTS |
|---|---|---|---|---|
| Indoor track | 26 | 48 | 62 | 136 |
| Outdoor track | 24 | 31 | 81 | 136 |
| Combined track | 50 | 79 | 143 | 272 |

The chart shows the teams' heavy emphasis on distance running.  In the indoor track season, 45.6 percent of all races entered by Quinnipiac runners were distance events.  At the

---

[15] That delineation of events in terms of sprint, middle-distance, and distance races is consistent with the categorization suggested by Seemes at his deposition.  Martin also identified distance events as races of 1,500 meters and up.  I note, too, that I counted each entrant's participation in a relay as a separate race.  Likely, however, that will not account for the actual total number of sprint and middle-distance events entered.  (Most of the relays were either sprint or middle-distance lengths, although in the indoor season Quinnipiac competed in the distance medley relay race, too.)  Martin only marked relay participation for those athletes who did not compete in any other races at a given meet.  Thus, if a runner ran the 800-meter and the 4x800-meter races, Martin's spreadsheets would only account for the individual 800-meter performance, and the relay participation would not be noted.  Even with this caveat, however, it is plain that distance events make up a substantial portion – indeed a majority as counted by Martin – of the races Quinnipiac entered during the indoor and outdoor track seasons.

-26-

typical indoor meet, however, only about one-third of track races – not including field contests – are distance events.[16]  In the outdoor track season, distance events ballooned to 59.6 percent of races entered by Quinnipiac runners, even though distance competitions continued to constitute only about one-third of outdoor track events.[17]  When the two seasons are taken together, 52.6 percent, or slightly more than half, of all the track events Quinnipiac's women runners entered qualified as distance contests, in comparison to 18.4 percent sprint events and 29.0 percent middle-distance events.  In addition to the number of distance races entered, it is also clear that the cross-country runners are major contributors to the indoor and outdoor track teams.  Using Martin's spreadsheets, Def. Exs. AJ & AR, and isolating the runners who participated on the cross-country team, *see* Def. Ex. AB (women's cross country squad list), reveals that cross-country participants ran in 74 races in the indoor season, which constituted 54.4 percent of all of Quinnipiac's events, and in 68 total races in the outdoor season, which constituted 50 percent of the school's events.  When the seasons are combined, the cross-country runners accounted for 52.2 percent of the teams' total races entered.

The statistical evidence of the teams' emphasis on distance running is consistent with Martin's description of the operation of the indoor and outdoor track programs.  Martin testified

---

[16]  Based on the records of Quinnipiac's 2009-10 indoor meets, *see* Def. Ex. AI, there are 13 running events usually offered at indoor track meets.  Five are sprints (55 or 60 meter dash, 55 or 50 meter hurdles, 200 meter dash, 400 meter dash, 4x400 meter relay), four are middle-distance (500 meter run, 800 meter run, 4x800 meter relay, 1,000 meter run), and four are distance (1 mile run, 3,000 meter run, 5,000 meter run, distance medley).

[17]  Based on the records of Quinnipiac's 2009-10 outdoor meets, *see* Def. Ex. AP, there are 13 running events usually offered at outdoor track meets.  Seven are sprints (100 meter dash, 100 meter hurdles, 4 x 100 relay, 200 meter dash, 400 meter dash, 400 meter hurdles, 4x400 relay), two are middle-distance (800 meter run, 4x800 relay), and four are distance (1,500 meter run, 3,000 meter steeplechase, 5,00 meter run, 10,000 meter run).

that there is a self-reinforcing effect to focusing on distance running. Quinnipiac has

traditionally been a strong school for distance running; the University has won the last five NEC

women's cross-country titles. But Martin said that, even with improved distance runners, her

indoor and outdoor women's teams would be unlikely to finish better than third in their current

makeup; moreover, she admitted that the teams would be unlikely to ever win a conference title

without competitors in field events. According to Martin, it therefore makes sense for her to

continue emphasizing cross-country in order to maintain the University's success, rather than

commit to competing in field events for which she currently lacks infrastructure, coaching, and

funding.

Female runners at Quinnipiac are unique in their competition for different teams across

seasons. McDonald confirmed that, except for women's runners, very few, if any, University

athletes participate in multiple varsity sports. Lopiano agreed that such competition across sports

was rare in college athletics except for runners; she said, however, that at most schools women's

participation in cross-country, indoor track and field, and outdoor track and field presents no

Title IX problem because schools offer the same opportunities for male distance runners. But

that is not the case at Quinnipiac, where neither indoor nor outdoor track is offered for men, and

where male cross-country runners are not permitted to represent Quinnipiac as individual entrants

at indoor and outdoor track meets.

Finally, at her deposition, Martin described the track teams as adjuncts of the cross-

country team, and further noted that cross-country runners were required to participate in the

indoor and outdoor seasons. In other words, as a condition of competing on the cross-country

team, runners also had to participate on the indoor and outdoor track teams. That was true even

-28-

for cross-country athletes who were injured or red-shirting a season; they, too, had to join the indoor and outdoor track teams, even though they had little to no hope of competing during the season. During the 2009-10 indoor track season, three cross-country runners did not compete at all because of injury; one runner only competed in one meet because of injury; and one runner did not compete because she was red-shirted. *See* Def. Ex. AB (2009-10 cross-country squad list); Def. Ex. AJ (indoor track competition spreadsheet prepared by Martin). And during the 2009-10 outdoor track season, five cross-country runners did not compete at all because of injury, and one runner did not compete because she was red-shirted. *See* Def. Ex. AB (2009-10 cross-country squad list); Def. Ex. AR (outdoor track competition spreadsheet prepared by Martin). The evidence showed that such a requirement was unique to cross-country runners, and no other Quinnipiac varsity athlete was expected to participate on a second team in order to compete in his or her favored sport. Furthermore, no evidence was introduced showing that such a requirement was common among other Division I cross-country programs.

C.    Competitive cheer

Following the 2008-09 academic year, Quinnipiac decided to create a new women's varsity sport: competitive cheer. Competitive cheer is an outgrowth of traditional sideline cheerleading. Competitive cheer teams use many of the moves and techniques that sideline cheer squads have developed over the decades, and their routines look like more athletic and aerobatic sideline cheer orchestrations. But whereas sideline cheerleaders primarily work to entertain audiences or solicit crowd reaction at other teams' games or school functions, competitive cheer teams strictly engage in sport. Participants do not perform for a crowd's approval or involvement – they compete to win. In order to distinguish their activity from their sideline roots, cheer teams

do not attempt to elicit crowd response; generally do not use pom-poms, megaphones, signs, or other props associated with traditional cheerleading teams; do not wear skirts and sleeveless or cropped tops, but wear uniforms consisting of shorts and jerseys, much like what women's volleyball players don; and emphasize the more gymnastic elements of sideline cheerleading, such as aerial maneuvers, floor tumbling, and balancing exercises, to the exclusion of those activities intended to rally the watching audience. As I noted in my preliminary injunction ruling, competitive cheer is an athletic endeavor that "could be easily described as 'group floor gymnastics.'" *Biediger*, 616 F. Supp. 2d at 295.

Despite its athletic elements, however, competitive cheer is not recognized as a sport by the NCAA. Nor does the NCAA recognize competitive cheer as an "emerging sport," a provisional designation that allows a university to count the activity toward NCAA revenue distribution and minimum sports sponsorship requirements. 2009-10 NCAA Division I Manual (Def. Ex. EP) § 20.02.25.1, at 298. Furthermore, the Department of Education has not recognized competitive cheerleading to be a sport. Indeed, schools reporting their athletic participation data to the Department of Education under the Equity in Athletics Disclosure Act ("EADA") are instructed to report their cheerleading team rosters only if they have received a letter from OCR determining that their cheerleading squads are legitimately engaged in sport.[18] U.S. Dep't of Educ., Office of Postsecondary Educ., *The User's Guide for the Equity in Athletics Act Web-Based Data Collection* (2009) (Pl. Ex. 110), at 19, 21.

Jeff Webb, who testified at trial, is at the center of competitive cheer's history and

---

[18] The EADA is a law separate from Title IX that requires an educational institution receiving federal funding and participating in intercollegiate athletics to report its athletic participation data for men and women to the Department of Education. 20 U.S.C. § 1092(g).

maturation.  Webb is the president of Varsity Brands, Inc., an athletic equipment manufacturer

that caters to cheerleading teams.  Through its subsidiary organizations the National

Cheerleading Association ("NCA"), Universal Cheerleaders Association ("UCA"), and the

United Spirit Association, Varsity Brands also holds competitions among scholastic cheerleading

teams and private, "all-star" cheerleading teams.[19]  Webb's involvement with the sport of

cheerleading began in the early 1970s, when he was a student cheerleader at the University of

Oklahoma.  Shortly after graduating, he started UCA, which would eventually turn into Varsity

Brands, with the intent of creating a business that would sell cheerleading equipment and offer

training camps for cheerleaders.  To help promote his business, Webb began holding

competitions for cheerleaders, the first of which took place in 1980.  Soon, those competitions

began to be televised, and cheerleading began to be recognized as a form of competition.  Webb

testified, however, that he never imagined that his competitions would establish a new sport;

rather, he understood his competitions as a publicity vehicle for his startup business.

　　　　After forming UCA, Webb formed the NCA as a new competition format for colleges

and universities; the NCA held its first competition in 1990, and holds a national championship

in Daytona Beach, Florida, every year.  That Daytona Beach championship is, today, the marquee

competitive event for cheerleaders.  Webb said that, although technically different than the UCA,

the NCA competition rules were essentially identical to those of the UCA.  Today, the two

organizations mainly differ in terms of the teams that compete in their competitions: UCA events

are reserved for sideline cheerleading teams, while both sideline and competitive cheerleading

---

[19]  All-star teams are private, non-scholastic teams similar to privately organized travel
baseball teams or Amateur Athletic Union squads.  All-star teams vary in terms of the age and
skill-level of their participants.

teams may compete in the NCA format. In the NCA college competition, teams compete in two segments: a minute-long "spirit" exercise judged by the enthusiasm the team generates in the crowd, followed by a two- to two-and-a-half-minute team performance to showcase the team's athleticism and gymnastic skill. The NCA welcomes all college and university teams to participate in its competitions, and has divisions to distinguish schools based on their size and ability; the organization, however, does not have a progressive or playoff system to winnow a final champion. Besides hosting competitions among cheerleading teams, NCA events also feature competitions among school dance teams and mascots.

As was true with the UCA's competitive events, Webb did not believe that his NCA competitions would eventually establish a sport that would, some day, be recognized by athletics organizations such as the NCAA. Instead, he envisioned NCA competitions as a further promotion of his cheerleading supply business.[20] Indeed, testimony at trial revealed that the NCA's scoring system was intertwined with the promotion of Varsity Brands. During the "spirit" portion of the competition, cheerleading teams are awarded points for using props, such as pom poms, sold by Varsity Brands; the more props a team uses, the more points that team receives. Webb testified that he was not averse to competitive cheerleading eventually becoming

---

[20] Although Webb did not think that he was establishing a sport, his involvement in the creation of the USA Federation for Sport and Cheer ("USA Cheer"), a putative governing body for American sideline cheer, shows that he is open to the possibility of sideline cheerleading being recognized as a sport at some point. *See* Def. Ex. FN (bylaws of USA Cheer). Webb testified that USA Cheer was designed to give him flexibility to have a hand in sideline cheerleading should it, in the future, become recognized as a sport. Despite his involvement in USA Cheer, his testimony was consistent that he did not believe cheerleading was a competitive sport yet. Furthermore, in his testimony he distinguished competitive cheer, which is more likely to be recognized as a sport, from the traditional sideline cheer he supports through the NCA and UCA competitions and which USA Cheer is intended to regulate.

an independent sport.  Still, as a sideline cheerleading purist, Webb wants competitive cheer to be distinguished from traditional sideline cheer out of concern that competitive cheer will threaten his competitions – for instance, competitive cheer might annex certain moves and routines from sideline cheer – and lead to confusion about the difference between the two forms of cheerleading.  Webb did not think that the rise of competitive cheer would hurt his business, however.  On the contrary, he welcomed its emergence, believing that the creation of new competitive cheer teams at high schools, colleges, and universities would increase demand for Varsity Brands' products and services.

Previously, Quinnipiac had a women's sideline cheerleading unit that performed at men's basketball games and, once or twice a year, entered competitions against other schools.  Those competitions included participating in the NCA championship in Daytona Beach.  For the 2009-10 academic year, however, a new cheerleading team was created for the exclusive purpose of competition.  Mary Ann Powers, the coach of Quinnipiac's sideline cheer unit, was asked by the athletics department to head the new competitive cheer program in March 2009.  She accepted the offer and assumed her coaching role in the summer of 2009.  In addition to Powers, two paid assistant coaches and one unpaid volunteer coach help manage the team.  Before Powers was hired, Quinnipiac released an advertisement for the position of competitive cheer coach.  Among other prerequisites, applicants were supposed to have experience recruiting athletes and familiarity with NCAA and NEC rules and regulations.  When Powers accepted Quinnipiac's offer, she was not qualified to recruit and was not familiar with the NCAA or NEC rules.  Indeed, she was not cleared to recruit any athletes off-campus until the spring of 2010, when she passed the NCAA's recruitment examination for coaches.

-33-

The competitive cheer team was assigned an initial roster target of 30 players, a number that initially disappointed Powers, who had hoped to have 32 or 36 athletes. At the very least, she hoped to have a roster number that was a multiple of four, which represents the number of competitive cheer positions and the number of players necessary to perform certain cheer routines. Thompson told her that she would have to make do with 30 athletes for the 2009-10 season, but said that he would consider requests for more players in the future.

Although Powers was unable to recruit players off campus for the 2009-10 season, she said that her on-campus recruiting was sufficient to field a competitive team. Powers testified that there was very strong interest in the competitive cheer team among undergraduates, and that incoming and prospective Quinnipiac students contacted her to express their desire to participate. New students who were interested in joining the competitive cheer team were sent a questionnaire about their cheerleading and/or gymnastics experience. Powers also requested that interested students submit videos demonstrating their cheerleading skills. For the first season of the competitive cheer team, Powers elevated 16 students from her former sideline cheer unit. According to Powers, those students had participated on the sideline cheer team with an eye towards eventually competing exclusively; she testified that those members relished the opportunity to travel to the NCA championship in the spring and wanted to compete like other varsity athletes. After adding the veteran sideline cheer participants, there were 14 spots to be filled. Thirteen were freshmen, and the remaining player was a graduate student and former gymnast who still had a year of NCAA eligibility.

Quinnipiac allotted six full-time scholarships, worth $47,500 each, to the competitive cheer team. In the team's first year, Powers only extended one and one-half scholarships, and

distributed them among ten members in amounts ranging from $3,000 to $9,000 a year. Powers

testified that she was cautious in how she assigned her initial scholarships because she wanted

funds to be available for players in future classes. The competitive cheer team had an initial

budget of $50,000, which covered the costs of travel, lodging, equipment, and other operational

expenses. Ultimately, however, the team spent $130,000 during its inaugural season. That

increase in costs is attributable, in part, to team trips to compete in Georgia and Florida.

Although the NCAA does not recognize competitive cheer as a varsity sport, the

Quinnipiac competitive cheer team still followed applicable NCAA rules, such as requiring all

participants to be cleared by Quinnipiac's medical staff before competing and following practice

time restrictions. Team practice, which focused on strength conditioning, skill development, and

improving the team's coordination and timing, was limited to eight hours in the off-season and

20 hours during the season, competitions included. Per NCAA rules, team members were also

allowed to engage in individual practices not mandated by the team. Powers testified that her

athletes received benefits on par with those received by other varsity teams, such as equipment;

access to facilities, trainers, and strength and conditioning coaches; the opportunities to

participate in "power hour" study halls and in the University's "positive play" community service

program; and publicity about the team's news and successes. The competitive cheer team also

acknowledged its own best athletes with team awards, and one participant won a university-wide

scholar-athlete recognition. The competitive cheer team, however, did not receive locker room

space, which the University extended to other varsity teams. The Quinnipiac competitive cheer

team also had to buy separate catastrophic insurance coverage because, as a non-recognized

sport, it was not covered by the NCAA's insurance program.

In addition to forming a new competitive cheer team, Quinnipiac joined and helped

establish a nascent intercollegiate competitive cheer organization, the National Competitive Stunt

and Tumbling Association ("NCSTA"), with seven other schools: the University of Maryland,

Fairmont State University, the University of Oregon, Azusa Pacific University, Baylor

University, Fort Valley State University, and Ohio State University.  Five of the NCSTA schools

– Quinnipiac, Maryland, Fairmont State, Oregon, and Azusa Pacific – fielded varsity competitive

cheer squads for the 2009-10 academic year; the other three schools either were planning to

sponsor a varsity competitive cheer team soon or had club teams that, eventually, could be

elevated to varsity status.  The NCSTA was independent of the NEC or any other athletic

conference.  McDonald testified, however, that there was a precedent for Quinnipiac and other

college teams to compete outside the NEC: when the men's lacrosse and women's ice hockey

teams began there were not enough NEC teams for them to compete in conference.  Like those

sports, competitive cheer could not be expected to play in the conference when other NEC

schools did not field rival teams to compete against.

The NCSTA held its first organizational meeting, dubbed the "Cheer Summit," in

September 2009 at the University of Maryland.  McDonald and Powers attended that meeting on

Quinnipiac's behalf.  At the Cheer Summit, the member NCSTA schools discussed a number of

foundational issues for organizing the sport of competitve cheer, including what to call the sport

itself: Quinnipiac referred to the sport as "competitive cheer," while the University of Oregon

christened its squad a "competitive stunt and tumbling" team.[21]  Mainly, the NCSTA members

---

[21]  Because Quinnipiac refers to its team as "competitive cheer," so too do I in this
memorandum of decision.  I note, however, that the chosen nomenclature – specifically, its
incorporation of the word "cheer" – has no bearing on my decision whether competitive cheer is

-36-

conferred about the rules of competition for the sport and developing a set of governing bylaws. Although the schools held some basic common beliefs about the sport – for example, the members were unanimous that competitive cheer teams should only engage in competition, and not support other varsity teams in a sideline capacity – there was no consensus on finer questions, such as how many players should compete, how the sport should be scored, and how the regular and post-seasons should be structured. Indeed, even the organization of the NCSTA still had to be determined; at the time of the meeting, and to this day, the NCSTA is a loosely defined, unincorporated association with no board of directors, subcommittees, voting or petition systems for its members, or other hallmarks of a governing national athletics organization.

By the end of the Cheer Summit, the NCSTA agreed to the following rules for the 2009-10 season: (1) the competitive cheer season would last 132 days, counting back from the final championship event, which, in 2009-10, would be the April 2010 NCA Daytona Beach national championship; (2) each competitive cheer team could have up to three paid coaches, and could have one additional volunteer coach; (3) each team must compete in at least eight contests, including the championship, over the course of the season; (4) no team could have more than 12 scholarship spots; (5) teams could have approximately 35 players, although the number was never decided definitively; (6) competitions must be played on cushioned mats; and (7) a certified trainer must be present at all practices and competitions. *See* Def. Ex. FT, at D13367 (McDonald's notes from the Cheer Summit). The NCSTA defined the sport's four positions: flyers, who are thrown in the air and perform various spins and flips while in flight; back spots, who provide support and are responsible for directing groups on a team; and main and support

---

a sport that offers genuine athletic participation opportunities for women under Title IX.

bases, who are responsible for supporting and lifting flyers. Finally, the NCSTA developed an initial set of rules for its competitions during the 2009-10 season. A team's score is a composite of six discrete events: the stunt, tumble, pyramid, basket toss, partner stunt, and team events. The scoring system is akin to gymnastics and figure skating. Teams select the routine that their players will perform in each event, and each routine has a predetermined score value; whether the teams meet that score depends on the quality and accuracy of their execution. Scores are determined by panels of five judges.

Despite the establishment of the NCSTA and a single, uniform set of rules to govern intercollegiate competitive cheer, the 2009-10 Quinnipiac competitive cheer season was marked by inconsistency in terms of whom the University competed against and what scoring system was applied. The first date of competition for the Quinnipiac competitive cheer team was December 5, 2009; that meet was against sideline cheerleading teams from SUNY Stony Brook and Babson College at the Hartford Civic Center. Before that, the team held an exhibition on campus to showcase the new competitive cheer program; that exhibition, however, was not a competition against another team. On February 5, 2010, the competitive cheer team competed at Kennesaw State University, in Georgia, against Fairmont State, Maryland, Oregon, and the University of Georgia, according to the NCSTA competition format. All of those teams were exclusively competitive and did not provide sideline entertainment for other sports teams. The next day, Quinnipiac competed in Atlanta at an event sponsored by Cheer Sport, an independent cheerleading organization. That event was scored according to Cheer Sport's rules, and Quinnipiac competed against two sideline cheer teams from the University of Louisville and Coastal Carolina University, and three competitive cheer teams from North Carolina State

-38-

University, Georgia, and Ohio State.  On February 28, 2010, Quinnipiac held a home meet at its

campus in Hamden, Connecticut.  That event featured competitions among middle school, high

school, all-star, and college sideline cheer teams, in addition to contests among college

competitive teams; Quinnipiac, however, competed only against the University of Maryland,

another varsity competitive cheer squad, Babson College's sideline team, and the University of

Connecticut club team.  That meet was scored according to the NCSTA's rules.

On March 6, 2010, at a meet in East Haven, Connecticut, the Quinnipiac competitive

cheer team competed against collegiate sideline and high school teams according to the NCA

scoring system.  Later in the season, on March 20, 2010, Quinnipiac competed against "all-star

teams" that featured high school-aged players.  On March 27, 2010, Quinnipiac participated in an

event hosted by the New England Cheering Association ("NECA"), in which the University

competed against four collegiate sideline cheer teams.  At the final event of the season, the NCA

championship held in April 2010, Quinnipiac competed against other collegiate competitive

cheer teams.  But, as part of its competition, Quinnipiac was awarded points for using pom poms

and other props associated with sideline cheer and produced by Varsity Brands, NCA's corporate

parent.  Furthermore, the team was judged on its ability to solicit a crowd response, which is an

element of sideline cheerleading, and not competitive cheer.  Powers testified, however, that the

crowd response segment of the NCA championship lasted no more than 45 seconds, and that her

team's efforts at Daytona Beach were the only time that the Quinnipiac competitive cheer squad

engaged in such "spirit" activity during the 2009-10 season.

The following chart summarizes the Quinnipiac competitive cheer season.  It shows the

dates on which Quinnipiac's competitive cheer team played, the site of each competition, the

-39-

type of opponent, and the scoring system employed.  The types of opponents are divided into four

groups: (1) "competitive" college teams dedicated specifically to competitive cheer, regardless of

whether the team is sponsored as a varsity or club sport; (2) "sideline" college teams whose

primary purpose is to perform at other teams' games and events; (3) "high school" cheer teams

sponsored by their schools, regardless of whether they are primarily competitive or sideline

squads; and (4) "all-star" teams from private gyms or organizations that are unaffiliated with any

school.  The scoring systems are designated by their governing bodies.  The chart notes when no

scoring system was used or if the scoring system was not described at trial.

| DATE | LOCATION | OPPONENT TYPE | SCORING SYSTEM |
|---|---|---|---|
| 12/03/2009 | Hamden, CT | None: no opponents | None |
| 12/05/2009 | Hartford, CT | Sideline | Spirit Unlimited |
| 01/16/2010 | Fairfield, CT | None: both opponents scratched | None |
| 02/05/2010 | Kennesaw, GA | Competitive | NCSTA |
| 02/06/2010, 02/07/2010 | Atlanta, GA | Competitive, Sideline | Cheersport |
| 02/13/2010 | Woodbury, CT | Sideline | NCA |
| 02/28/2010 | Hamden, CT | Competitive, Sideline | NCSTA |
| 03/06/2010 | East Haven, CT | Sideline, High School | NCA |
| 03/20/2010 | New Haven, CT | Competitive, Sideline, All-star | Unknown – but not NCSTA |
| 03/27/2010 | Kingstown, RI | Sideline | NECA |
| 04/08/2010, 04/09/2010 | Daytona Beach, FL | Competitive | NCA |

As the chart shows, over the course of its season, the competitive cheer team competed

against a variety of opponents and according to scoring systems promulgated by a host of organizations. Quinnipiac competed against other collegiate competitive cheer teams, including varsity and club teams; collegiate sideline cheer teams that competed occasionally; private all-star teams with players of varying ages; and even, at one event, high school teams. Only two of its meets were scored according to the NCSTA scoring rules. The rest of the events were subject to different scoring systems, although Powers testified that every form of competitive cheer scoring emphasized the same skill sets as those graded by the NCSTA scoring conventions.

Representatives of the NCSTA schools met again to refine the association's rules following the 2009-10 season. After conferring, the NCSTA instituted the following changes for the 2010-11 season: (1) the NCSTA would hold its own championship independent of the NCA, although every NCSTA team would qualify to compete, assuming that each team met the organization's scheduling and roster requirements for the season; (2) NCSTA schools must compete in six competitions exclusive of the NCSTA championship, (3) at least half of the competitions scheduled must follow the NCSTA's rules and format, and each competition must be against at least one other collegiate team; (4) competitive cheer teams can practice no more than eight hours a week during the off-season and 20 hours a week while in season; (5) there is no maximum squad size, although only 28 athletes can travel to competitions; and (6) NCSTA membership would be available to all competitive cheer teams sponsored as varsity teams by their schools' department of athletics, as well as any club teams, provided that they are formally sponsored as club teams and their schools are committed to sponsoring them as varsity programs eventually. *See* Def. Ex. FT. Although the NCSTA instituted those changes for the 2010-11 season, the organization did not, and to this day has not, created a permanent set of bylaws to

govern competitive cheer. Instead, as one might expect of a still-developing sport, the NCSTA rules remain somewhat in flux.

At the April 2010 meeting, the NCSTA also discussed developing a website, logo, and a single marketing plan for the sport of competitive cheer. In particular, the NCSTA members discussed creating a more athletic branding image to counter the stereotype that cheerleading is necessarily sideline entertainment, and not a sport in its own right. The NCSTA also agreed that the association would apply to the NCAA for competitive cheer to be recognized as an emerging sport. McDonald testified, however, that qualifying as an NCAA emerging sport would not be feasible until the end of the 2010-11 season because there were not enough teams to support competitive cheer as an emerging sport. To qualify, a putative emerging sport must have ten schools that either are already sponsoring varsity teams or will commit to sponsoring a team in the near future.

Besides seeking recognition from the NCAA, NCSTA representatives discussed whether and how to obtain approval from OCR for competitive cheer to count as a sport under Title IX. For the 2009-10 season, Quinnipiac never sought a letter from OCR determining that its competitive cheer members were athletic participants for the purpose of Title IX. The University did not seek the letter despite a requirement set forth on the EADA reporting forms, which states that a school may not count cheerleading as a varsity sport without an OCR determination letter; instead of requesting the letter, Quinnipiac chose not to include its competitive cheer data on its EADA disclosure. According to McDonald, Quinnipiac did not seek a letter from OCR because the University of Maryland had tried previously and unsuccessfully to get OCR approval for its varsity competitive cheer team; as McDonald understood Maryland's experience, OCR told

Maryland that it would not render a ruling and, instead, Maryland should use its own discretion

to decide whether a varsity competitive cheer team met Title IX's mandate. Quinnpiac has no

plans to seek a determination letter from OCR in advance of the 2010-11 season.

Currently, the Quinnipiac competitive cheer team has committed to participating in five

NCSTA-sanctioned competitions in 2010-11. It is planning to add a sixth NCSTA event. In

either case, it will have enough NCSTA events to qualify for the organization's championship.

Quinnipiac is not planning on participating in next year's NCA Daytona Beach championship.

D.  Changes for 2010-11

Thompson released the new roster targets to Quinnipiac's head coaches in June 2010,

again after the recruiting season had ended and incoming students had paid their enrollment

deposits, but in time for the University to calculate the percentages of men and women enrolling

as undergraduates for the coming academic year. Thompson met with all coaches in May 2010,

however, to discuss the 2009-10 experience and what size roster they anticipated needing for the

following year. According to Thompson, during those meetings no head coach complained about

the size of his or her 2009-10 roster target.

Quinnipiac's new roster targets differed from the targets for the 2009-10 year. Of note,

the women's cross-country team was expanded from 18 to 24 runners, while the men's cross-

country team continued to have 13 roster slots. That increase was in response to a request made

by Martin for more female runners. The additional six cross-country runners translated to a near

parallel increase in the number of indoor and outdoor track participants. Those teams' rosters are

set to expand from 30 to 35 runners. With those roster increases, the Quinnipiac women's cross-

country team would have seven more runners than the average NCAA team and 11 more runners

than the average NEC team; and the University women's indoor and outdoor track teams would have three fewer participants than the NCAA average but five more participants than the average conference squad, despite having no field participants.

The women's competitive cheer roster was also increased by six athletes, bringing the total roster size to 36 participants for the 2010-11 season. Powers testified that she has 24 students who intend to return for the coming season, but only 18 were guaranteed spots. There are 10 incoming freshmen who have already been guaranteed scholarship money, and another three incoming students who will participate without financial aid. Powers reported that interest to compete on the 2010-11 team was strong among prospective students; because Quinnipiac is one of a handful of schools nationally to offer competitive cheer as a varsity sport, there was great demand among graduating high school seniors who wanted to continue their cheerleading or gymnastics careers in college. That leaves five roster spots for walk-ons. Powers anticipates the competition for those remaining spots to be intense: she expects 30 to 35 students to try out for those positions.

The University plans to cancel the women's volleyball program, thus eliminating the team's 12 roster spots. Those positions will be made up for – and, in fact, exceeded, should the new indoor and outdoor track positions count under Title IX – by the new roster spots on the women's cross-country and competitive cheer teams. If, however, the University does not cut the women's volleyball program, it has set a roster target of 14 players for the team.[22] But, as

---

[22] Besides the changes to the women's cross-country, indoor track, outdoor track, and volleyball teams, the University also plans on increasing the men's basketball team by two spots, decreasing the women's soccer team by two spots, increasing the women's lacrosse team by one spot, and decreasing the women's softball team by one spot. Def. Ex. BQ.

-44-

Thompson testified, because of the relatively small size of the women's volleyball team,

maintaining or eliminating the women's volleyball team will have little effect on Quinnipiac's

compliance with Title IX. With or without women's volleyball, the University believes it will

offer athletic participation opportunities for women that are substantially proportional to

Quinnipiac's female undergraduate enrollment.

Quinnipiac anticipates that, in 2010-11, women will make up 61.9 percent of the

undergraduate population and fill 63.79 percent of the school's athletic participation

opportunities. Those figures assume that the 14 women will play volleyball. In the event that the

volleyball program is cancelled, Quinnipiac anticipates there will be 282 female athletes and 450

athletes overall. That results in 62.67 percent of the school's athletic participation opportunities

being assigned to women, which, as Thompson predicted, is proportional to the percentage of

women in Quinnipiac's undergraduate program.

**II.      Standard of Review**

Title IX prohibits discrimination on the basis of sex in education programs and activities.

The statute provides: "No person in the United States shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any education

program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The words

"program or activity" are defined as "all of the operations of . . . a college, university or other

postsecondary institution." 20 U.S.C. § 1687(2)(A). It is undisputed that Quinnipiac is such a

"program or activity" that receives federal funding and, therefore, is subject to Title IX's

prohibition of sex discrimination.

The statutory language of Title IX is silent with respect to universities' athletics

departments, and the scope and mechanics of its application have been defined by subsequent

agency regulations and interpretations. In 1975, what was then the Department of Health,

Education, and Welfare (HEW) – which was later separated into the Department of Health and

Human Services (HHS) and the Department of Education (ED) – promulgated regulations

pursuant to Title IX that required universities to provide equal opportunity for men and women in

their athletics programs. *See generally Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993)

(describing history of federal regulation of post-secondary athletics programs under Title IX ).

Those regulations, which survive today, list ten factors to be considered when determining

whether a school has provided such equal athletic opportunity. The first factor, and the one

relevant to the decision of this case, is "[w]hether the selection of sports and levels of

competition effectively accommodate the interests and abilities of members of both sexes." 34

C.F.R. § 106.41(c)(1).

In 1979, HEW published a policy interpretation in the Federal Register defining the

phrase "effectively accommodate the interests and abilities of members of both sexes" in 34

C.F.R. § 106.41(c)(1). That policy interpretation states that whether a university meets its

obligation to "effectively accommodate the interests and abilities of members of both sexes" will

be determined in one of the following three ways:

> (1) Whether intercollegiate level participation opportunities for male and
> female students are provided in numbers substantially proportionate to their
> respective enrollments; or
>
> (2) Where the members of one sex have been and are underrepresented
> among intercollegiate athletes, whether the institution can show a history and
> continuing practice of program expansion which is demonstrably responsive
> to the developing interest[s] and abilities of the members of that sex; or

-46-

> (3) Where the members of one sex are underrepresented among
> intercollegiate athletes, and the institution cannot show a continuing practice
> of program expansion such as that cited above, whether it can be
> demonstrated that the interests and abilities of the members of that sex have
> been fully and effectively accommodated by the present program.

Policy Interpretation; Title IX and Intercollegiate Athletics ("1979 Policy Interpretation"), 44

Fed. Reg. 71,413, 71,418 (Dec. 11, 1979). Those three means of assessing Title IX compliance

establish safe harbors for universities; a school has complied with its requirement to

accommodate the interests and abilities of male and female students if its succeeds in meeting

any of the prongs set forth in the 1979 Policy Interpretation. *Cohen*, 991 F.2d at 897. In this

case, Quinnipiac defends against the plaintiffs' allegations of sex discrimination by relying on the

first prong, contending that, because it provides athletic participation opportunities for women in

numbers substantially proportionate to its undergraduate female enrollment, the University is in

compliance with Title IX. The University does not argue that it meets Title IX's mandate by

satisfying the second or third prongs of the 1979 Policy Interpretation.

On December 16, 1996, OCR, the body responsible for enforcing Title IX, published a

letter that clarified, *inter alia*, the meaning of the first prong: "[w]hether intercollegiate level

participation opportunities for male and female students are provided in numbers substantially

proportionate to their respective enrollments." OCR stated that, in determining whether a

university provides substantially proportionate participation opportunities for its male and female

students, its "analysis begins with a determination of the number of participation opportunities

afforded to male and female athletes in the intercollegiate athletic program." Jan. 16, 1996

Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test ("1996

Clarification") at 2-3. The 1979 Policy Interpretation defines "athletes" as students:

a. Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and

b. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and

c. Who are listed on the eligibility or squad lists maintained for each sport; and

d. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

*Id.* at 3 (quoting 44 Fed. Reg. at 71,415). OCR stated that "[a]s a general rule, all athletes who are listed on a team's squad or eligibility list and are on the team as of the team's first competitive event are counted as participants" and "an athlete who participates in more than one sport will be counted as a participant in each sport in which he or she participates." *Id.* Finally, OCR clarified that a participant on a team need not meet minimum criteria of playing time or athletic ability to count for Title IX purposes.

> OCR includes, among others, those athletes who do not receive scholarships (e.g., walk-ons), those athletes who compete on teams sponsored by the institution even though the team may be required to raise some or all of its operating funds, and those athletes who practice but may not compete. OCR's investigations reveal that these athletes receive numerous benefits and services, such as training and practice time, coaching, tutoring services, locker room facilities, and equipment, as well as important non-tangible benefits derived from being a member of an intercollegiate athletic team. Because these are significant benefits, and because receipt of these benefits does not depend on their cost to the institution or whether the athlete competes, it is necessary to count all athletes who receive such benefits when determining the number of athletic opportunities provided to men and women.

*Id.* Although the scope of who counts as an athlete is broader than scholarship athletes who receive playing time, OCR was careful to emphasize, in a letter accompanying the 1996

Clarification, that for an athlete to be counted, he or she must be afforded a participation

opportunity that is "real, not illusory," and offers the same benefits as would be provided to other

bona fide athletes. Letter from Norma V. Cantú, Assistant Secretary for Civil Rights of the

Department of Education (Jan. 16, 1996) ("1996 OCR Letter") at 4.

Once all athletes – or, stated differently, all genuine participation opportunities – are

counted, the second and final part of analyzing a university's compliance under the first prong is

deciding whether the numbers of genuine participation opportunities are substantially

proportionate for men and women. 1996 Clarification at 4. OCR was clear that substantial

proportionality does not require exact proportionality. Rather, whether a school meets the first

prong is determined on a case-by-case basis, and involves assessing the percentage of female

athletes relative to female enrollment and taking into account "the institution's specific

circumstances and the size of its athletic program." *Id.* To provide a baseline, OCR said that a

university would fail to satisfy the substantial proportionality test if, assuming the school lacked

perfect proportionality, the number of additional women to achieve such proportionality would

be insufficient to constitute a varsity team. *Id.* So, for example, if a school has five fewer female

athletes than needed to reach exact proportionality, OCR would find the athletic program to be

substantially proportional because no varsity team can be sustained with so few participants.

Finally, in the letter that accompanied the 1996 Clarification, OCR stated that, although

universities will be subject to the agency's counting methodology, schools retained "flexibility

and choice regarding how they will provide nondiscriminatory participation opportunities." 1996

OCR Letter at 4. That flexibility includes eliminating teams or placing caps on their rosters in

order to achieve substantial proportionality. *Id.* Nonetheless, regardless of the means it chooses

-49-

to comply with the 1979 Policy Interpretation's first prong, a university will not meet the

substantial proportionality threshold if the participation opportunities it provides to women are

not genuine.

In a letter published on September 17, 2008, OCR went further in describing what it

considers to be a genuine athletic participation opportunity. In that letter, the agency clarified a

basic point: for an athletic participation opportunity to be counted in the substantial

proportionality analysis, that participation opportunity must take place in the context of an

intercollegiate varsity "sport." To ascertain whether a team is engaging in a varsity "sport," OCR

"considers several factors related to an activity's structure, administration, team preparation, and

competition." Letter from Stephanie Monroe, Assistant Secretary for Civil Rights of the

Department of Education (Sept. 17, 2008) ("2008 OCR Letter") 1. First, OCR considers whether

the university is a member of a recognized intercollegiate athletic organization, such as the

NCAA or National Association of Intercollegiate Athletics, and whether the sport in question is

subject to the "organizational requirements" promulgated by that organization. If the school

belongs to such an organization and its varsity sports are governed by the organization's rules,

then "OCR will presume that such an institution's established sports can be counted under Title

IX." *Id.* at 2. If that presumption does not apply, or if the presumption has been effectively

rebutted, OCR will then consider a bevy of factors that bear on whether an activity amounts to a

varsity "sport." Those factors include the following:

> I. Program Structure and Administration: . . . .
>
> (A) Whether the operating budget, support services (including academic, sports medicine and strength and conditioning support) and coaching staff are administered by the athletics department or another entity, and are provided

in a manner consistent with established varsity sports; and

(B) Whether the participants in the activity are eligible to receive athletic scholarships and athletic awards (e.g., varsity awards) if available to athletes in established varsity sports; to the extent that an institution recruits participants in its athletics program, whether participants in the activity are recruited in a manner consistent with established varsity sports.

II. Team Preparation and Competition: . . . .

(A) Whether the practice opportunities (e.g., number, length and quality) are available in a manner consistent with established varsity sports in the institution's athletics program; and

(B) Whether the regular season competitive opportunities differ quantitatively and/or qualitatively from established varsity sports; whether the team competes against intercollegiate or interscholastic varsity opponents in a manner consistent with established varsity sports;

When analyzing this factor, the following may be taken into consideration:

1. Whether the number of competitions and length of play are predetermined by a governing athletics organization, an athletic conference, or a consortium of institutions;

2. Whether the competitive schedule reflects the abilities of the team; and

3. Whether the activity has a defined season; whether the season is determined by a governing athletics organization, an athletic conference, or a consortium.

(C) If pre-season and/or post-season competition exists for the activity, whether the activity provides an opportunity for student athletes to engage in the pre-season and/or post-season competition in a manner consistent with established varsity sports; for example, whether state, national and/or conference championships exist for the activity; and

(D) Whether the primary purpose of the activity is to provide athletic competition at the intercollegiate or interscholastic varsity levels rather than to support or promote other athletic activities.

When analyzing this factor, the following may be taken into consideration:

1. Whether the activity is governed by a specific set of rules of play adopted by a state, national, or conference organization and/or consistent with established varsity sports, which include objective, standardized criteria by which competition must be judged;

2. Whether resources for the activity (e.g., practice and competition schedules, coaching staff) are based on the competitive needs of the team;

3. If post-season competition opportunities are available, whether participation in post-season competition is dependent on or related to regular season results in a manner consistent with established varsity sports; and

4. Whether the selection of teams/participants is based on factors related primarily to athletic ability.

*Id.* at 2-4 (footnote omitted).

Whether an activity is a sport will depend on the facts specific to the institution and will be decided based on the totality of those factors. *Id.* at 2, 4. In the 2008 OCR Letter, however, OCR reiterated its position that institutions must be permitted to retain flexibility in meeting the requirements of Title IX.

It is OCR's policy to encourage compliance with the Title IX athletics regulations in a flexible manner that expands, rather than limits, student athletic opportunities. . . . Expanding interscholastic and intercollegiate competitive athletic opportunities through new sports can benefit students by creating and stimulating student interest in athletics, taking advantage of athletic opportunities specific to a particular competitive region, and providing the opportunity for access to a wide array of competitive athletic activities.

*Id.* at 4. Still, permitting universities space to cultivate new athletic opportunities for women does not do away with the fundamental requirement that, for an athletic opportunity to count under Title IX, it must be genuine, meaning that it must take place in the course of playing an actual "sport" and it must allow an athlete to receive the same benefits and experience that she would receive if she played on another established varsity squad.

-52-

Finally, in 2000, eight years before its 2008 Dear Colleague Letter, OCR issued two

letters to the Minnesota State High School League ("MSHSL") concerning the agency's then-

existing standards for what constituted a "sport" under Title IX.  In the first letter, dated April 11,

2000, OCR informed the MSHSL of the factors that it considered with respect to whether an

activity is a sport.  That letter closed with following passage:

> Certain school activities in which students are engaged may be activities that
> require a considerable amount of athleticism, but not every athletic activity
> qualifies as a sport.  Consistent with earlier policy statements, there is a
> presumption by OCR that drill teams, cheerleading and other like activities
> are extracurricular activities and are not considered sports or part of an
> institution's athletic program within the meaning of the Title IX regulation.

Letter from Mary Frances O'Shea, National Coordinator for Title IX Athletics, Office of Civil

Rights, United States Department of Education, to David V. Stead, Executive Director,

Minnesota State High School League (Apr. 11, 2000) ("April 2000 OCR Letter") at 3.[23]  OCR

added that, although cheerleading is presumed not to be a sport, any decision about a particular

school or program's cheerleading team would be made on a case-by-case basis.  *Id.*

In a second later dated May 24, 2000, OCR told MSHSL that, with respect to its April 11,

2000 letter, "the term cheerleading . . . includes both competitive and sideline cheer; other like

activities would include all extracurricular activities similar to drill teams and cheerleading, such

as danceline, skateline, and pep squads."  Letter from Mary Frances O'Shea, National

---

[23]  OCR's position in 2000 that cheerleading is presumptively not a sport is consistent
with a policy first announced by HEW in 1975, in which HEW ruled cheerleading to be an
extracurricular activity, and not a varsity sport, for purposes of Title IX.  *See* Letter from Peter E.
Holmes, OCR, to Chief State School Officers, Superintendents of Local Educational Agencies
and College and University Presidents (Nov. 11, 1975) at 3 ("However, drill teams, cheerleaders
and the like, which are covered more generally as extracurricular activities . . . , are not a part of
the institution's 'athletic program' within the meaning of the regulation.").

Coordinator for Title IX Athletics, Office of Civil Rights, United States Department of

Education, to David V. Stead, Executive Director, Minnesota State High School League (May

24, 2000) ("May 2000 OCR Letter"). It added that in every case where OCR has evaluated

whether a cheerleading or drill team constitutes participation in a sport, the agency concluded

that the team was not a sport and that team members could not be counted as athletes under Title

IX. The parties to this lawsuit have stipulated that, since 2000, OCR has never held an

intercollegiate varsity cheerleading program to be a sport for Title IX purposes. The United

States, in its amicus brief, has confirmed that as well. Br. of the United States as Amicus Curiae

at 13.

Both sides in this case agree that OCR's regulations, policy interpretation and

clarification, and letters should be followed in deciding whether Quinnipiac has violated Title IX.

Furthermore, I am bound to defer to OCR's interpretation of Title IX. First, the regulation set

forth at 34 C.F.R. § 106.41(c)(1), which makes the question whether the "selection of sports and

levels of competition effectively accommodate the interests and abilities of members of both

sexes" a factor to consider when determining whether a university provides equal,

nondiscriminatory athletic opportunities to both sexes, is a reasonable interpretation of Title IX

promulgated by HEW (and, today, enforced by OCR) according to specific congressional

delegation. *McCormick ex rel. McCormick v. School Dist. of Mamaroneck*, 370 F.3d 275, 288

(2d Cir. 2004); *Cohen*, 991 F.2d at 895 (citing Education Amendments of 1974, Pub. L. No. 93-

380, § 844, 88 Stat. 612 (1974)). For that reason, the regulation is owed "'particularly high

deference'" under the doctrine of *Chevron U.S.A. Inc. v. Natural Resources Defense Council,*

*Inc.*, 467 U.S. 837 (1984). *McCormick*, 370 F.3d at 288 (quoting *Cohen*, 991 F.2d at 895).

The remaining administrative interpretations of that regulation – the 1979 Policy

Interpretation, the 1996 Clarification and accompanying letter, the April and May 2000 OCR

Letters, and the 2008 OCR Letter – are also owed deference.  The Second Circuit has previously

held that courts owe the 1979 Policy Interpretation deference because "it is both persuasive and

not unreasonable," and would therefore receive deference under either the standards of *Chevron*

or *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  *McCormick*, 370 F.3d at 290; *see also id.* at

300 (applying three-part test of 1979 Policy Interpretation for determining whether high school

districts effectively accommodated female students by providing equal athletic participation

opportunities).  The Second Circuit has not ruled on the deference due the 1996 Clarification, but

its sister courts have held that the OCR 1996 Clarification, like the 1979 Policy Interpretation, is

deserving of deference.  *E.g.*, *Mansourian v. Regents of the Univ. of Cal.*, 602 F.3d 957, 965 n.9

(9th Cir. 2010) (noting that the Ninth Circuit and other circuits "have held that both the [1979]

Policy Interpretation and the [1996] Clarification are entitled to deference," and citing cases in

support); *see also McCormick*, 370 F.3d at 300 (citing, without relying upon, the 1996

Clarification).

Lastly, although no federal court appears to have been presented with the question

whether the 2000 and 2008 OCR letters also deserve deference, there seems to be little question

that this court should defer to them insofar as they represent OCR's interpretation of its own

regulations.  As a general proposition, courts are to defer to an agency's interpretation of its own

regulations.  "It is well established that an agency's construction of its own regulations is entitled

to substantial deference. . . . Because applying an agency's regulation to complex or changing

circumstances calls upon the agency's unique expertise and policymaking prerogatives, we

presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers." *Martin v. Occupational Safety & Health Review Comm'n*, 449 U.S. 144, 150-51 (1991) (internal quotations omitted); *see also Kelly v. Bd. of Trs.*, 35 F.3d 265, 271 (7th Cir. 1994) (holding that OCR's Title IX policy interpretation is owed deference provided that the interpretation is reasonable). Neither party has challenged the reasonableness or persuasiveness of OCR's interpretations of the Title IX regulations in its 2000 and 2008 letters. That is true despite the letters containing presumptions that are likely detrimental to each party: in the April and May 2000 OCR Letters, Quinnipiac is subject to a presumption against treating competitive cheerleading as a sport, while in the 2008 OCR Letter, the plaintiffs are subject to a presumption in favor of treating NCAA-governed activities, such as Quinnipiac's indoor and outdoor track and field teams, as sports.

Those letters are ultimately entitled to deference because they create a reasonable and persuasive method – best captured by the 2008 OCR Letter, which builds upon the list of factors first proposed in the April 2000 OCR Letter – for determining which activities count as sports for Title IX purposes. The 2008 OCR Letter correctly recognizes that an intercollegiate sport is defined not only by the activity's athletic elements, but also by its structure, administration, and the competition it fosters. Put differently, the OCR factors appropriately weigh not only the physical nature of the activity itself, but also how the experience of participating in that activity compares to the experience of participating on other varsity sports teams. That inquiry is reasonable, persuasive, and entirely consistent with OCR's goal of ensuring not only that female students are offered equal athletic participation opportunities, but that those participation opportunities are real, and not illusory. For those reasons, I will defer to the 2000 and 2008 OCR

Letters interpreting OCR's regulations and will use the method they prescribe for determining

whether an activity may be treated as a sport under Title IX.

Having concluded that I must defer to the various sources of OCR Title IX regulations, I

now synthesize the agency's Title IX analysis to provide the standard of review that I will apply

in this case. Whether Quinnipiac has complied with Title IX by providing substantially

proportionate athletic participation opportunities for its female students is determined by a two-

part test. The first step involves determining which of the University's putative varsity athletic

participation opportunities should be counted for Title IX purposes. Whether an athletic

participation opportunity will be counted depends on whether it affords an athlete a *genuine*

opportunity to participate in a varsity sport. To be a genuine participation opportunity, an athlete

must participate in a legitimate "sport," which is assessed by considering the set of factors set

forth in the 2008 OCR Letter. That includes the presumption in favor of NCAA sports being

recognized as sports, as well as the presumption against cheerleading being considered a sport,

for the purpose of determining whether Quinnipiac provides equal athletic participation

opportunities to its female students. And even if an athlete participates on a varsity team in a

bona fide "sport," that athlete's participation will be counted under Title IX only if the quality of

his or her experience is on par with the experience of other varsity athletes. Thus, whether an

athlete counts will hinge not only on whether he or she is on a roster list, practiced with a team,

or competed in games over the course of the academic year; it will also be decided by examining

the totality of the circumstances surrounding his or her participation.

Once all of the genuine athletic participation opportunities are counted, the second step of

the test is to compare the percentage of athletic participation opportunities provided to women to

the percentage of women enrolled as undergraduates. Whether there is a substantial proportionality between Quinnipiacs's female athletes and female students will depend not just on a statistical figure but also on other facts specific to Quinnipiac, such as whether any shortage in female athletes is large enough to sustain an independent women's varsity team that the University is not presently sponsoring.

Before applying that standard of review to the facts of Quinnipiac's athletics program, I note two additional points. First, the central issues presented in this case lack much prior case law. It appears that no federal court has yet applied OCR's test for whether a sponsored varsity activity can be treated as a sport for purposes of Title IX. Similarly, there is little precedent on judging whether an athlete's experience on a varsity team qualifies as a genuine participation opportunity – i.e., whether his or her participation opportunity is real, and not illusory. In its amicus brief, the government urges the court to "'look behind [the] numbers' and examine the quality of opportunities being offered" by Quinnipiac in determining which of University's proffered participation opportunities are genuine, just as I did in the preliminary injunction ruling. Br. of the United States as Amicus Curiae (doc. # 154) at 11 (quoting *Biediger*, 616 F. Supp. 2d at 297). I will apply that same standard here in determining which athletic participation opportunities may be counted in the first part of OCR's test for substantial proportionality.

The second point is briefer. When discussing athletic participation opportunities in this decision, I mean *varsity* athletic participation opportunities. Quinnipiac provides its students opportunities to participate on club and intramural teams that, no doubt, are meaningful and genuine. The issue in this case, however, is only whether the University's varsity program offers equal opportunity to its male and female students.

-58-

### III.   Conclusions of Law

#### A.   Competitive cheer

Competitive cheerleading is not a sport recognized by the NCAA, and the members of the

NCSTA have yet to apply to the NCAA for designation of competitive cheer as an emerging

sport.  Thus, competitive cheer is not entitled to any presumption in favor of it being considered a

sport under Title IX.  On the contrary, in its 2000 letters to the MSHSL, OCR explicitly stated

that cheerleading is presumptively not a Title IX sport, although the agency reserved the

possibility that, in certain cases, a school's cheerleading program could be counted.  Consistent

with OCR's policy, I turn to the set of factors that the agency uses to determine whether an

activity is a sport – specifically, the factors listed in the 2008 OCR Letter – and examine whether,

on the facts of the 2009-10 season, Quinnipiac's competitive cheerleading team was a team

whose members may be counted as athletes for purposes of Title IX.

#### 1.   *Program structure and administration*

The competitive cheer team's operating budget, benefits and services, and coaching staff

are administered by the athletics department in a manner consistent with the administration of

Quinnipiac's other varsity teams.  The team receives its operating budget and scholarship funding

through the athletics department's normal channels.  In 2009-10, the cheerleading team was

assigned an initial budget of $50,000 that was increased over the course of the year with approval

of the athletics department; the team was also given six full-time scholarships to distribute

among team members.  Furthermore, team members are eligible to receive awards and

recognition for their participation: competitive cheer has its own team awards, such as the year's

most valuable player award, and members are eligible for, and have received, University-wide

-59-

recognitions, such as scholar-athlete honors.  The competitive cheer team received benefits and

services – such as equipment, medical treatment, strength and conditioning coaching, study halls,

community service opportunities, and publicity – that were on par with other varsity teams.

Finally, the competitive cheer coaching staff was administered like the coaching staff of other

Quinnipiac varsity squads.  Coach Powers answers to Jack McDonald, the athletic director, and

Mark Thompson, the senior vice president for athletics and recreation, and is responsible for

coaching and training her players, recruiting new athletes, distributing scholarships, and

overseeing her team's budget.  Those responsibilities are the same duties for which other

Quinnipiac varsity coaches are responsible.

But some factors relating to the team members' participation do diverge from the typical

varsity program.  For instance, the competitive cheer team does not receive locker space,

although the evidence at trial was not clear whether other varsity teams also lacked that benefit.

In addition, unlike other varsity teams, the competitive cheer team did not receive NCAA

catastrophic insurance, but had to obtain insurance from a separate provider.  The most important

difference in the team's structure and administration, however, is its recruitment system.  In

2009-10, no member of the Quinnipiac competitive cheer team was recruited off campus.

Instead, all members of the competitive cheer team were selected from the pool of current

Quinnipiac students, including women who were formerly members of the University's sideline

cheerleading team and incoming students who individually contacted Powers.  According to

Lopiano, the plaintiffs' expert, off-campus recruiting is essential for Division I athletics

programs.  Although not every player on a team need be recruited by a coach – Title IX

regulations recognize that a walk-on receives a genuine participation opportunity even though he

-60-

or she was not recruited – a serious Division I team usually must engage in some off-campus recruiting in order to field a competitive squad.

Powers was unable to recruit off campus for at least two reasons. First, she was ineligible to conduct off-campus recruiting because, unlike the other Quinnipiac head coaches, she had not passed the NCAA's recruiting examination for the 2009-10 season. In addition, Powers was unable to recruit off campus because Quinnipiac established the competitive cheer team in March 2009, which is relatively late in the college recruiting cycle. Lopiano testified that a Division I team usually must begin planning its recruitment at least one year in advance, and that the typical Division I head coach knows who the vast majority of her incoming players will be well before the beginning of the school year. Indeed, in some sports it is not uncommon for elite athletes to be recruited as early as tenth grade, more than two years before they will matriculate at a college or university. By inaugurating the competitive cheer team less than six months before the beginning of the 2009-10 academic year, Quinnipiac did not give Powers much lead time to find participants off campus, even if Powers had been permitted to engage in that kind of recruiting.

Powers testified that her inability to recruit team members off campus did not significantly hamper her team's performance or ability to attract talented athletes. According to her, there was great interest among the undergraduate student body and incoming class in participating on the competitive cheer team, and the pool from which Powers was able to select was strong enough to field a solid squad. But the fact that the cheer team was, in fact, talented does not alter the conclusion that the team's process of recruiting players was different than the process used by Quinnipiac's other varsity teams and, for that matter, the process used by the typical NCAA Division I program. Although Powers is now eligible to recruit off campus – she

-61-

passed the NCAA recruiting examination in June 2010, in time to recruit players for the 2011-12

season – the team's recruitment for 2009-10 (and 2010-11) was nonetheless inconsistent with the

manner in which the University's other teams filled their rosters.  That is a significant difference

in program structure and administration, as compared to other varsity teams.

2.    *Team preparation and competition*

The 2008 OCR Letter puts forward four criteria in which a team's preparation and

competition can be examined: (1) the quality of the team's practice opportunities; (2) whether the

regular season differs quantitatively or qualitatively from the regular seasons of other varsity

sports; (3) whether the pre- and post-seasons are consistent with other varsity sports; and (4)

whether the team is organized primarily for the purpose of engaging in athletic competition.  I

take up each criterion one at a time.

Most of the evidence submitted at trial concerning the 2009-10 Quinnipiac competitive

cheer season dealt with the team's regular and post-season schedules; little was introduced

concerning the team's practice regimen.  Based on the evidence that was submitted, however, the

team's practices appear to be similar to the practice regimen for other varsity squads.  First, the

competitive cheer team submitted to NCAA restrictions on practice time, which limited the team

to eight hours of practice in the off-season and 20 hours of practice, including competitions,

during the regular season.  Therefore, the number of hours in which the competitive cheer team

practiced is consistent with the time other varsity athletes practiced during the 2009-10 school

year.  Powers also described her practices as being structured and focused on developing team

members' skill sets, strength and conditioning, and the team's overall performance.  That, too, is

consistent with practices for other varsity teams.  Finally, competitive cheer practices took place

-62-

on campus, just like other varsity teams.

Although there is little to no difference between the practice schedule and regimen of the competitive cheer team and other Quinnipiac varsity teams, there are major and, ultimately, dispositive distinctions between the competitive cheer regular and post-season schedules and the schedules for other varsity squads. The 2008 OCR Letter instructs that, in deciding whether a team's season and competition is quantitatively or qualitatively different from established varsity sports, the following factors should be considered: whether the number of competitions and length of play are predetermined by a governing athletics organization, conference, or consortium of institutions; whether the competitive schedule reflects the team's abilities; and whether the activity's season is defined by a governing athletics organization, conference, or consortium. Quinnipiac partially satisfies the first and third factors. Before the 2009-10 season began, the member schools of the NCSTA conferred and agreed that each school would participate in no fewer than eight competitive cheer competitions, and that the competitive cheer season would last 132 days, counting backwards from the NCA championship in Daytona Beach. The NCSTA, however, did not establish a maximum number of competitive cheer competitions; rules for what kind of teams its member schools could play against; or what kinds of scoring systems would be permissible at non-NCSTA competitive cheer competitions. It also does not appear that the NCSTA's rules for the minimum number of meets or the length of a season were enforceable: nothing in evidence shows that the NCSTA could penalize member teams for violating the organization's agreement. Indeed, the NCSTA could not even threaten to exclude violators from participating in the post-season – a stick that the NCAA uses to deter and punish its member schools for violating its rules – because the 2009-10 post-season was administered by

-63-

NCA, a third-party organization over which the NCSTA had no authority.

When comparing the competitive cheer 2009-10 season with the seasons of the University's other varsity teams, the competitive cheer team's shortcomings come into even greater clarity. During the Quinnipiac competitive cheer regular season, the team participated in ten competitions.[24] Those events were conducted according to at least five different scoring rules – specifically, the NCSTA, NCA, NECA, Spirit Unlimited, and Cheer Sport scoring systems. Although Powers may have been correct when she stated that all of the formats focused on the same skill sets and employed similar methods for judging teams' performances, the competitive cheer season was still not governed by a single overseeing body, such as the NEC or the NCAA, and, as a result, the rules of competition shifted from competition to competition. No other varsity sport was subject to multiple sets of governing bodies, and every other Quinnipiac varsity team could prepare for games knowing that the rules of competition would remain constant.

Furthermore, and perhaps most damaging to Quinnipiac's position, the Quinnipiac competitive cheer team fails to meet the OCR's benchmark that a sports team should play a schedule that reflects its participants' abilities. The competitive cheer team competed against a variety of different opponents over the course of its season, including other collegiate varsity competitive cheer squads, collegiate club competitive cheer squads, collegiate sideline cheer teams, all-star squads, and even high school cheerleaders. In reviewing the other Quinnipiac teams' schedules, no other University varsity team played against non-varsity competition – and,

---

[24] The competitive cheer team also held one exhibition before the beginning of the season in which the team put on a demonstration for the Quinnipiac community. Because there was no competition at that event, I am not counting it as part of the team's season for purposes of this analysis.

certainly, no other University varsity team played against non-collegiate competition, such as private all-star or high school teams. The Quinnipiac competitive cheer team plays collegiate club opponents who do not receive varsity benefits, such as scholarships, equipment, and training, and are not held to the same rules and regulations as a varsity program; collegiate sideline opponents who play their "sport" not primarily to compete but to entertain audiences at other sporting and campus events; all-star opponents who have no scholastic affiliations; and high school opponents who are younger, less experienced, and less physically mature than college athletes. No other Quinnipiac varsity team is forced to play such a motley assortment of competitors, and it cannot be doubted that the quality of competition is more variant across the competitive cheer season than across the seasons of the University's other varsity teams. If Quinnipiac is serious that its competitive cheer team is a legitimate varsity sport, then it should not tolerate its team playing against non-varsity collegiate teams, non-scholastic all-star teams, and, especially, athletes who are still in high school.

That leads to the competitive cheer post-season. In 2009-10, the Quinnipiac competitive cheer post-season consisted of competing in the NCA national championship. That championship was open to all schools' cheerleading teams; there was no progressive playoff system or entrance qualification, such as a ranking system or minimum win tally over the course of the season. In fact, being a competitive cheerleading team was not a prerequisite to participating in the NCA event. Teams that engaged exclusively in sideline cheer not only participated, but, according to the NCA's records, formed the overwhelming majority of teams that competed in the NCA championship. Although Quinnipiac competed solely against other collegiate competitive cheerleading teams at the NCA championship, Quinnipiac and its

-65-

opponents were not ranked, seeded, or winnowed in any way. Instead, they were pitted against

each other in a single championship round in which the team with the highest score won.[25] How

those schools fared in their regular seasons was irrelevant to their success.

Besides not offering a progressive championship, the NCA championship failed to

provide a form of competition in keeping with Quinnipiac's season. Powers testified that at the

NCA event, her team was forced to participate in a 45-second to one-minute "spirit" segment in

which her team's success was judged by the intensity of the elicited crowd response and the

number of Varsity Brands props it used. According to Powers, at no point in the 2009-10 season

– even during the events that were judged using NCA's scoring system – was her team's score

ever determined by the ability to coax a reaction from the audience; furthermore, she testified

that raising the crowd's spirit is a hallmark of sideline, not competitive, cheer, and was an

activity that the NCSTA explicitly rejected from its format. And at no point during the regular

season did her team members use pom poms or other props. No other varsity sport at Quinnipiac

introduces a new scoring system or element of competition in its championship that was not

present during the regular season. Nor would a varsity sport introduce such a novelty: the whole

---

[25] Even if the NCA had wanted to create a progressive playoff, it is hard to imagine how the organization would have been able to rank or seed Quinnipiac, given the inconsistency of the competitive cheer team's regular season. Because Quinnipiac cheerleading competitions were conducted according to different rules and against teams of varying ages, ability, and institutional support, there was no easy way to compare the University's entire season against another's. That is one more way that Quinnipiac's regular season distinguishes it from other varsity sports. When sports teams compete under the same governing rules and against the same types of opponents, athletics organizations can distinguish among teams based on their overall records. But when a sports team competes under a diversity of rules and against a diversity of types of opponents – in other words, when there is not a common system for measuring a team's success across an entire season – an athletics organization such as the NCA cannot sensibly distinguish the top teams from the bottom. That makes creating a progressive playoff system difficult, if not impossible.

point of a championship is to prove who is the best under the rules that each team has had to follow, and learn to excel within, over the course of the preceding year. Yet the Quinnipiac competitive cheer team was subject to precisely that kind of abrupt switch in the rules – a switch for which the squad had not prepared, that was at odds with the skills its members honed over the season, and that clashed with the athletic image the team sought to project. That experience is inconsistent with the post-season of any other varsity team.

Despite its regular and post-seasons being qualitatively different than other established varsity sports, Quinnipiac is correct that it satisfies OCR's fourth criterion for team preparation and competition: that a team's primary purpose be to compete athletically at the intercollegiate varsity level. There is no doubt that the purpose of the competitive cheer team is to compete, and not to cheer others. That conclusion is bolstered by the fact that the competitive cheer team engages in no sideline cheer activity (with the exception of the "spirit" segment in the NCA championship); the competitive cheer team holds tryouts to determine who may participate on the team and Powers selects players based on their athletic abilities; the team engages in regular workouts, practices, and team meetings in order to polish their routines in advance of competition; and the University provides resources to the team for the sole purpose of facilitating competition. Finally, I credit Powers' description of her athletes as being driven to compete; moreover, I take seriously that the competitive cheer members consider themselves to be athletes, and not entertainers.

The plaintiffs do not challenge the competitiveness of the Quinnipiac cheer squad, and neither will I. In the end, however, other factors relating to the structure, administration, team preparation, and competition lead me to conclude that, at this point in time, the University's

competitive cheer team cannot count as a sport under Title IX.

### 3.    *Summary and conclusion*

There are several factors concerning the Quinnipiac competitive cheer team compelling

the decision that, for the 2009-10 season, it cannot be counted as a varsity sport for purposes of

Title IX. First, the fact that the team did not – and could not – engage in any off-campus

recruitment during the season marks a significant departure from what would be expected of any

other competitive Division I varsity team. Although the women on the Quinnipiac competitive

cheer team were athletically able, they would have been all the more talented had Powers been

able to seek out the best competitive cheerleaders around the country, as any other varsity coach

would have been able to do.

Second, the Quinnipiac regular season was inconsistent in terms of the rules governing

the team's competitions and the types and quality of its opponents. Two basic features of any

other collegiate varsity program are the application of a uniform set of rules for competition and

the restriction of competition to contests against other varsity opponents. Those features ensure

that play is fair in each game, that teams' performances can be compared across a season, and

that teams can be distinguished in terms of quality. Those touchstones of a varsity program are

absent from the University's competitive cheer 2009-10 regular season.

Third, the Quinnipiac post-season fell short of what would be expected of any other

varsity team. Quinnipiac participated in an open invitational that made no distinctions among the

relative strengths of the entrants and required the teams to engage in forms of competition

associated with sideline, and not competitive, cheerleading. Most other varsity sports would

have used some system to separate teams and competitors in terms of quality, and would have

-68-

ranked, seeded, or excluded teams on the basis of their performances during the regular season.

Moreover, any other varsity sport would not have imposed new rules of competition in the post-season that teams did not follow during the regular season.

Finally, I note that, although the competitive cheer team received many benefits and services associated with a typical varsity sport, there were some items that Quinnipiac did not offer, such as locker space, and the NCAA refused to insure the team members. These are relatively minor differences between the competitive cheer and other Quinnipiac varsity teams, however, and they do not weigh heavily in my analysis.

The 2008 OCR Letter does not say how it would balance its factors for determining whether an activity is a sport. Nor does it appear that OCR intended for there to be a mechanical or mathematical process for weighing those factors. Instead, OCR was clear that how those factors are balanced will depend on the circumstances of each case, and that balancing should always be performed with an eye towards whether the participants in a putative sport are receiving genuine athletic participation opportunities equivalent to the opportunities provided to athletes in other established varsity sports. On the facts of the 2009-10 season, I find the Quinnipiac competitive cheer team's inability to recruit off campus, its inconsistent regular season, and its aberrant post-season sufficient to conclude that the women's competitive cheer team was not a varsity sport under Title IX. Although I have only identified three areas where the University falls short, those areas are highly important, if not essential, to the experience of participating on an intercollegiate varsity team. Without proper recruiting, team participants can never feel secure that they are surrounded by the best available talent, or at least the quality of talent that would be typical of other Division I varsity teams. Without a consistent schedule,

-69-

athletes can never know just how good their team is and whether they have distinguished themselves from their opponents over the course of the season. And without a legitimate post-season, it can never be confirmed who deserves to be crowned a champion.

In its amicus brief, OCR asks the court to pay particular attention and give weight to the factors concerning the 2009-10 competitive cheer regular season and post-season scheduling, which I have done. *See* Br. of the United States as Amicus Curiae (doc. # 154) at 19-20. An agency's amicus brief is entitled to deference to the extent that it is persuasive. *N.Y. State Restaurant Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 130 (2d Cir. 2009). Quinnipiac argues that OCR's emphasis on those factors is owed no deference because it is inconsistent with the agency's previous policy statements and is not otherwise justified, both of which sap the brief's persuasive value. The University's argument is not compelling. First, I do not find any conflict between OCR's suggested approach and the agency's previous interpretations of its regulations. OCR has never announced how its factors must be balanced, but has only said that the factors for whether a sponsored activity is a Title IX sport will be assessed on a case-by-case basis. The agency has certainly never proposed the interpretation that Quinnipiac advocates, that each factor be given equal weight such that an activity meeting a majority of the OCR factors will be considered a Title IX sport.

Next, to the extent that the OCR factors are supposed to inform whether the participation opportunities in a putative sport are real, and not illusory, I find the government's position to be persuasive. Whom a team plays against, how often the team plays, under what conditions competitions are held, and how a champion is eventually selected are all essential to the varsity experience; a team's regular and post-season scheduling defines the quantitative and qualitative

scope of competition and creates the reason for which team members practice and train during

the year.  In other words, scheduling strongly affects the terms of an athlete's varsity

participation.  It is therefore reasonable to place significant weight on those factors.  Finally, I do

not think that OCR's emphasis on regular and post-season scheduling robs educational

institutions of the flexibility that Title IX and its regulations are intended to provide.  Schools

still retain flexibility in accommodating the athletic interests of their students under OCR's

current position.  All that the government's brief clarifies is that a university's flexibility under

Title IX does not permit it to treat an activity as a sport when, in fact, that activity offers

participation opportunities quantitatively and qualitatively different than other varsity teams.

In deciding that competitive cheer is not presently a Title IX sport, I do not mean to

minimize the experience shared by the Quinnipiac competitive cheer team.  It is unquestionable

that the Quinnipiac competitive cheer members engaged in meaningful efforts and activities

during the 2009-10 season – efforts and activities that this decision cannot diminish or take away.

But what those students experienced was not the genuine opportunity to participate on a varsity

team, which is the standard for counting athletes under Title IX.   In reaching my conclusion, I

also do not mean to belittle competitive cheer as an athletic endeavor.  Competitive cheerleading

is a difficult, physical task that requires strength, agility, and grace.  I have little doubt that at

some point in the near future – once competitive cheer is better organized and defined, and surely

in the event that the NCAA recognizes the activity as an emerging sport – competitive cheer will

be acknowledged as a bona fide sporting activity by academic institutions, the public, and the

law.  As the evidence in this case demonstrates, however, that time has not yet arrived.  For that

reason, Quinnipiac may not yet count the members of its competitive cheer team in order to

-71-

prove its compliance with Title IX.

B.     Indoor and outdoor track and field

Unlike competitive cheer, which is not recognized as a sport by the NCAA and which

OCR presumes not to be a sport under Title IX, cross-country, indoor track and field, and

outdoor track and field are presumptively sports under the statute.  Each is recognized as a

distinct sport by the NCAA, each team plays for separate conference and national championships,

and, as I noted in my preliminary injunction ruling, the activities "are, at their heart, different

sports." *Biediger*, 616 F. Supp. 2d at 295.  The plaintiffs do not challenge that cross-country,

indoor track, and outdoor track are separate sports, however, and do not assert that the analysis

that I applied with respect to competitive cheer should be applied here, too.  Rather, the plaintiffs

make a different contention: according to them, it is wrong for Quinnipiac to "triple-count"

athletes who compete in cross-country, indoor track, and outdoor track as three separate athletes

– that is, once for each season that she competes in – because the indoor and outdoor track

seasons do not provide cross-country runners with genuine athletic participation opportunities.

The plaintiffs characterize the indoor and outdoor track seasons as, essentially, the cross-

country team's nontraditional season.  Every other Quinnipiac fall sport continues to practice and

play in the spring, and the NCAA regulates those off-season practices and games.  Yet, as the

plaintiffs note, athletes who compete in fall sports are counted only once under Title IX –

specifically, only for their participation during their traditional fall championship seasons.  Their

participation in the spring, nontraditional season is not tallied for Title IX purposes.

Of course, there are reasons why nontraditional seasons are not counted under the statute.

If the test for counting an athlete is whether he or she is provided a genuine varsity athletic

-72-

opportunity, then the nontraditional season will necessarily fall short. As a matter of NCAA regulation, athletes practice for fewer hours with their teams during the nontraditional season. They also do not prepare for or compete in sanctioned games. Rather, they play in scrimmages and other friendly matches that do not bear on their overall win/loss records and do not build towards a final conference or national championship. Thus, quantitatively, in terms of the number of hours and games played, and qualitatively, in terms of the experience of preparing for and competing in games, a player's involvement during the nontraditional season does not rise to the genuine varsity athletic participation opportunity that would be provided during the traditional season.

The women's cross-country runners all participate in the indoor and outdoor track seasons. Because they are team members during the indoor and outdoor track championship seasons, their experience on those teams exceeds that of other fall athletes participating in their teams' nontraditional seasons. Quinnipiac's female cross-country runners practice with their track teams to the full extent permissible under NCAA rules during their competition seasons; compete in NCAA sanctioned contests over the course of each season; and participate in conference and national championship rounds at each season's conclusion. In other words, they appear to engage in athletic participation opportunities similar to other varsity athletes during their competition seasons. Thus, it does not appear that the University's three-sport female runners can be analogized to other single-sport athletes who also participate in nontraditional seasons.

The plaintiffs next challenge the triple-counting of female cross-country runners by undermining the experiences of being members of the indoor and outdoor track teams. It is true

that the indoor and outdoor track teams offer an experience that is arguably quantitatively and

qualitatively deficient relative to the experience of other Quinnipiac varsity athletes.  First, the

indoor and outdoor track teams participated in the bare minimum number of meets – six apiece –

during their respective seasons, while all other Quinnipiac varsity teams' schedules approached

the NCAA maximum for contests during a season.

Second, although cross-country runners are eligible for athletic financial aid, Martin does

not extend scholarships to runners who only compete during the track seasons; therefore, unlike

any other team where any member is theoretically eligible for financial aid, on the indoor and

outdoor track teams only certain teammates – namely, distance runners also on the cross-country

team – may receive it.

Third, the indoor and outdoor track teams are unable to host home meets and the outdoor

track team cannot practice on campus, but every other Quinnipiac varsity team (including the

competitive cheer team) was able to host at least one home competition.

Fourth, Coach Martin and her two assistant coaches are spread among four teams, which,

in the context of Quinnipiac's athletics department, is a setup unique to the University's running

teams.  But although the coaching structure for the Quinnipiac women's running reams is

exceptional, it is important to highlight that Martin and her assistants are not responsible for four

rosters of completely different players.  Rather, they coach 43 runners total: 13 male cross-

country runners, 18 female cross-country runners who also participate in the track seasons, and

12 runners who only participate in track.  A single head coach and two assistants may be a lean

coaching staff, but it is not that much smaller than the coaching staff available for other large

Quinnipiac varsity teams.  The men's varsity lacrosse team, for instance, had 41 players in 2009-

10 and a coaching staff similar in size to the University's running program. Nonetheless, the coaching structure for women's running is different than other Quinnipiac varsity teams.

Finally, the indoor and outdoor track teams are arguably not as competitive as other varsity teams because they do not recruit for, or enter competitors in, field events. Thus, unlike other varsity squads, the Quinnipiac indoor and outdoor track teams are structured in a way that prevents them from winning as a team. At most, individual participants can work to win individual events and improve their times over the course of the season.

For all of those reasons, the plaintiffs argue, runners on the women's indoor and outdoor track teams do not receive athletic participation opportunities equivalent to the participation opportunities enjoyed by Quinnipiac's other varsity athletes. Even assuming that the plaintiffs are correct that the experience of female runners is different than the experience of the University's other varsity athletes, however, it is not clear that Quinnipiac's runners receive participation opportunities that are different in quantity or quality than the members of other college and university varsity indoor and outdoor track teams. The OCR regulations are ambiguous with respect to whether the genuineness of an athletic participation opportunity is judged by comparing the experiences of one team's members to: (1) athletes competing on different teams at the same institution, and/or (2) athletes competing on the same team at different institutions. Likely, both comparisons are valid. The former analyzes whether a school is providing equal athletic opportunity to its male and female athletes, which is the touchstone of Title IX. *See* 34 C.F.R. § 106.41(c) ("A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes."). The latter comparison helps clarify whether apparent differences between

-75-

athletes' experiences on two different teams at the same school amount to a deprivation of genuine participation opportunities. In other words, comparing the same teams at different schools demonstrates whether disparities between different teams at the same school matter.

To illustrate, consider a hypothetical example of a school whose men's tennis team has one coach for ten players and whose women's lacrosse team that has two coaches for 30 players. Whether that disparity in coaching resources – the men's team has one coach for ten athletes, while the women's team has one coach for 15 – results in disparate participation opportunities may depend on whether it is abnormal for lacrosse teams to have that kind of coach-to-athlete ratio. Because a school may allocate resources differently to its teams based on legitimate reasons relating to the nature of the sports – i.e., in the hypothetical, features unique to tennis training or tennis competition may require hiring more coaches than would be necessary for other squads – and not to the players' sexes. Whether such legitimate differences exist can be determined, in part, by looking at similar teams at other schools and how their programs are administered. In this case, whether there are legitimate reasons for the differences between the Quinnipiac track programs and the University's other varsity teams may be determined by comparing the University's indoor and outdoor track teams to indoor and outdoor track teams at other Division I schools.

Some features of Quinnipiac's track teams that seem exceptional are, in fact, ordinary for Division I track and field programs. Martin and Seemes both testified that it is not uncommon for other Division I programs to sponsor varsity track teams even though they lack facilities to host home meets or even on-campus practices. They also said that assigning one head coach and several assistants for all of a school's running teams was a common management structure

-76-

among Division I varsity programs.  Furthermore, Martin and Seemes claimed that other schools also elect to focus on certain types of events – such as, in Quinnipiac's case, distance running – to the exclusion of others, and that other schools besides Quinnipiac choose to enter track events only, even though that puts their teams at a significant disadvantage to other squads that enter players in both track and field events.

But some features of Quinnipiac's indoor and outdoor track teams do appear to be unusual.  The University introduced no evidence about whether other schools reserve scholarships specifically for athletes who compete in certain events or who compete across three seasons.  It also remains unclear whether teams that only enter track events, and only emphasize certain races, tend to have rosters as large as Quinnipiac's.  And there was no showing made that other Division I track programs compete in the minimum, as opposed to the maximum, number of meets allowed by the NCAA.  That said, however, Quinnipiac has succeeded, at least somewhat, in rebutting the plaintiffs' claim that the indoor and outdoor track participants are not provided genuine athletic opportunities, insofar as the University has shown its teams to be similar to other Division I varsity track and field programs.

The most convincing reason for not "triple-counting" the women who run on the cross-country, indoor track, and outdoor track teams concerns not the quantitative and qualitative experience of indoor and outdoor track members, but, instead, the intertwined relationship between the cross-country and track programs.  Martin testified that her cross-country runners are required to participate on the indoor and outdoor track teams.  Thus, those runners do not participate in the indoor and outdoor track seasons only because they want to; rather, as a condition of their membership on the cross-country team, they are bound to continue running in

-77-

the winter and spring on the Quinnipiac track teams. Conditioning participation in one sport on

participation in another is unique to the women's cross-country team. On no other Quinnipiac

squad are players ordered to compete in additional seasons in order to maintain their team

membership or scholarship support. Not even the men's cross-country team, which is

fundamentally identical in structure and administration to the women's cross-country team, is

mandated to compete in the off-season for different teams. Nor could the men's cross-country

team condition participation that way: there is no varsity men's indoor or outdoor track team for

them to join, and the University has barred male cross-country runners from individually

representing the school in winter and spring intercollegiate track meets.

     Requiring students to participate on the indoor and outdoor track teams in order to run in

the fall cross-country season bears significantly on the quality of an athlete's experience as a

track team member. Indeed, it goes to the heart of student amateur athletics: by requiring female

cross-country runners to run on teams in the winter and spring, Quinnipiac deprives those

students of the discretion to choose which teams they want to join. No other team includes

members who participate for the purpose of maintaining their membership with another squad.

For sure, some varsity athletes may join or stay on a team for reasons other than the desire to

compete: scholarship athletes, for example, may continue playing with a team in order to

continue receiving financial aid needed to fund their education. But there is no squad other than

women's cross-country where a Quinnipiac athlete must join a second team in order to achieve

the goal of competing in his or her favored varsity sport and receiving scholarship aid.

Participation on the indoor and outdoor track teams is an additional chore, an added sacrifice of

time and energy, for Quinnipiac's female cross-country runners that no other University athletes

are asked to make for the right to continue playing on their primary teams. Cross-country is not a sport that inherently requires its players to participate in multiple seasons. If that were true, then the men's cross-country team would also require its players to compete on indoor and outdoor track teams, either on a sponsored varsity team or, at the very least, in their own individual capacities representing Quinnipiac. The University, however, does not permit its male cross-country runners to represent Quinnipiac at winter and spring track meets.

It is because indoor and outdoor track participation is mandatory for the University's cross-country runners that Martin testified that the women's track teams were mere adjuncts to the school's cross-country program – a description whose truth is borne out by the fact that more than half of all the races the indoor and outdoor teams entered were distance events. The women's indoor and outdoor cross-country teams are the only squads that can fairly be described as appendages of another principal varsity team. That sense of inferiority is heightened by the fact that the women's indoor and outdoor track teams can never win a team championship. Unlike the cross-country team, which has won repeated conference championships, the women's track teams can expect to come in no better than third place, according to their coach. Winning a championship is not a prerequisite to providing genuine athletic participation opportunities. But structuring a team to make that goal impossible – here, by minimizing sprint and middle-distance participation, and avoiding field events entirely – does suggest that the participation opportunity is deficient when compared to the experience of other varsity athletes, especially when the track teams' structure is coupled with the requirement that runners participate in track in order to maintain their membership on the cross-country team and receive scholarship aid.

There was no evidence introduced showing that it was common for other cross-country

-79-

teams to require their athletes to participate in the indoor and outdoor seasons.  Although Martin

testified that it was common for cross-country athletes to run in all three seasons, she was

speaking in terms of what cross-country athletes chose to do on their own volition, and not what

they were forced to do by their coaches.  I therefore cannot say that Quinnipiac's treatment of its

indoor and outdoor track teams as adjuncts to its women's cross-country team – i.e., by forcing

cross-country runners to run indoor and outdoor track and structuring those sqauds so they cannot

possibly win as a team – is an accepted method for administering Division I varsity track and

field teams.

The Quinnipiac women's cross-country team's requirement that its members participate

in the indoor and outdoor track seasons recalls roster manipulations similar to those I identified

as depriving athletes of participation opportunities in my preliminary injunction ruling.  In

granting the preliminary injunction, I held that Quinnipiac's practice of setting floors for

women's teams rosters artificially inflated the University's number of female athletes and led to

an over-counting of Title IX participation opportunities.  *Biediger*, 616 F. Supp. 2d at 296-97.

Specifically, the University's requirement that women's team rosters be bigger than necessary led

women's teams to keep players on their rosters who would never have genuine participation

opportunities over the course of the season, as evidenced by their quitting or being cut shortly

after the first day of competition, when the school's EADA reporting data was collected.  *Id.* at

297.  In the case of the University's women's indoor and outdoor track and field teams, there is

an analogous artificial increase in its rosters: there are more athletes participating on the team

than there would have been but for the requirement that cross-country athletes run indoor and

outdoor track.

For example, the indoor track team had four cross-country runners who ran no races –
three because of injury and one who was red-shirted – and another cross-country runner who ran
in only one meet, while the outdoor track team had six runners who did not compete at all
because of injury and red-shirting.  Had those runners competed only on the cross-country team,
their winter and spring would have been an off-season in which, as varsity athletes, they would
have had access to trainers and coaches in order to rehabilitate and practice individually.  As
cross-country runners, their membership on the indoor and outdoor track teams should not have
been necessary for them to be recognized as varsity athletes and receive attendant benefits, such
as financial aid, training, and physical therapy.  Rather, it appears that those injured players
remained on the indoor and outdoor track teams because of a rule imposed by their coach and in
order for the indoor and outdoor track teams to meet the roster target numbers imposed by the
athletics department.  That suggests the same kind of roster inflation I previously held to violate
Title IX.  It may not be as insidious – no female athletes are being booted from their teams after
the first day of competition – but it raises the same problem of Quinnipiac counting female
athletes who, in effect, are not partaking in genuine athletic participation opportunities but whose
"principal role is to provide a gender statistic."  *Id.* at 296.

Unfortunately, the plaintiffs did not establish how many cross-country runners would
likely not join either the indoor or outdoor track team if they had the choice.  At most, it is
certain that the 11 roster spots detailed above – the five non-competitors during the indoor
season, and the six non-competitors during the outdoor season – should not have been tallied
under Title IX because they did not compete and did not receive any benefits in addition to what

-81-

they were already obtaining through their cross-country participation.[26]  Although the other cross-country runners were obliged to run indoor and outdoor track, it appears that they all were genuine members of the team.  In the indoor season, 12 cross-country runners ran between five and seven meets, while another cross-country runner ran four meets; and in the outdoor season, nine cross-country runners ran between five and seven meets, while another three cross-country runners ran three or four meets.  The cross-country members accounted for 54.4 percent of the indoor team's races, and 50 percent of the outdoor team's races.  When both teams are considered together, the cross-country runners ran 52.2 percent of Quinnipiac's total track events.  That is a substantial contribution, and Quinnipiac's Title IX calculation should account for it.

In sum, there are reasons to doubt that all cross-country runners who participate in the winter indoor track season and in the spring outdoor track season receive genuine participation

---

[26]  To demonstrate how the participation opportunities of those injured and red-shirted cross-country runners are truly illusory, consider the following hypothetical situation: Imagine that Quinnipiac required every injured or red-shirt female athlete who competes in the fall season to join the women's indoor and outdoor track teams.  Those athletes would not be expected to compete in any track meets – rather, they would remain on the injured or red-shirt lists – but, at least nominally, they would be members of the team on the first day of competition.  By Quinnipiac's logic in defending its "triple counting" of female cross-country runners, the University should also count my hypothetical injured and red-shirted participants as athletes for Title IX purposes.

Surely, though, it would be unacceptable for Quinnipiac to pump up its women's track team rosters with injured field hockey, soccer, and volleyball players who would never actually compete in the indoor and outdoor track seasons and, for that matter, would never want to enter a race.  But that is essentially what Quinnipiac is doing with its injured cross-country runners.  The University is requiring women who will not race and who are already receiving varsity benefits to join second and third teams unnecessarily.  The only differences between my hypothetical example and what Quinnipiac is actually doing is that cross-country is a running sport somewhat like track, it is not uncommon for varsity running team rosters to overlap at other Division I programs, and the Quinnipiac cross-country and track teams share a coaching staff.  Those differences, however, warrant no distinction in the outcome; they do not overcome the central problem of the University padding its rosters with athletes who have no hope of competing or otherwise participating meaningfully during the indoor and outdoor track seasons.

opportunities.  The principal reason is the requirement that cross-country runners compete on the indoor and outdoor track teams.  That requirement is unlike any condition of participation for other Quinnipiac varsity teams, and, in the case of injured and red-shirted cross-country athletes, it causes the indoor and outdoor rosters to bulge with players who are already receiving varsity resources and benefits, who will not compete or otherwise practice with the indoor and outdoor teams, and who may have no interest in being on those teams' rosters.  Although most cross-country athletes may expect to continue running in the winter and spring, it is not necessarily the case that *every* cross-country runner wants to participate in each competitive season.  Lastly, other factors relating to the experience of running indoor and outdoor track – such as the reservation of scholarship funds for certain kinds of athletes, the relatively large rosters sizes for teams that specialize in a small number of events, the minimal number of meets entered in both seasons, and the teams' structural inability to place better than third in the NEC – indicate that the indoor and outdoor track teams are anomalous, and the experience of participating on those squads is different than other Quinnipiac varsity participation opportunities.  Those factors, by themselves, are not enough to justify discounting all of the cross-country runners' participation on the indoor and outdoor track teams.  But they do further militate in favor of discounting some of the cross-country runners' participation.

Despite raising all of those issues, however, the plaintiffs only succeeded in proving that the injured and red-shirted cross-country runners, who amount to 11 of the 60 roster spots for the combined indoor and outdoor track seasons, should not be counted under Title IX.  That number probably should be bigger to reflect the cross-country runners who would not choose to run indoor and outdoor track but who must do so in order to maintain membership on the cross-

-83-

country team. But the plaintiffs have not demonstrated how much bigger that number should be.

Similarly, the plaintiffs have not succeeded in proving that their identified deficiencies in the indoor and outdoor track programs warrant not counting any cross-country runner for her participation in those seasons. Some triple-counting is warranted because the evidence shows that Quinnipiac's cross-country runners do, in fact, compete in the indoor and outdoor track seasons and appear to be enjoying genuine athletic participation opportunities. Because the plaintiffs have not proven which others athletes who ran in all three seasons should not be triple-counted, I will only subtract the 11 identified non-participants from the roster. In other words, I will count 49 of Quinnipiac's proffered 60 indoor and outdoor track roster spots as genuine participation opportunities.

C.      Roster Management

The plaintiffs allege that Quinnipiac is still engaged in the kind of roster manipulation that I held to violate Title IX in my preliminary injunction ruling. They marshal two claims: that the University's roster target numbers do not represent the number of actual participation opportunities, and that the University's system of setting roster targets for its varsity teams creates artificial ceilings for men's squads and floor's for women's squads that deprives women of genuine participation opportunities. The plaintiffs' evidence on the first claim does not establish a Title IX violation. Quinnipiac had no policy in place requiring coaches to hit their roster targets only on the first day of competition. On the contrary, coaches were expected to maintain their roster sizes for the duration of the season and could only deviate from their roster targets with the approval of Thompson, the chief administrator for the University's athletics department. For almost all of the examples that the plaintiffs introduced of alleged roster

-84-

manipulation, Quinnipiac provided legitimate justifications unconnected to coaches hitting their roster targets. For example, Seeley, the women's hockey coach, gave valid reasons why six players on his roster quit or were cut following the 2009-10 season, and Flynn, the athletics department compliance officer, was able to explain why certain men's teams dropped players following the traditional season and brought on new athletes to take their places in the nontraditional season. Altogether, I find that the evidence does not sustain the plaintiffs' contention that Quinnipiac was engaging in roster manipulation whereby the University's teams cut and added players inappropriately in order to create the appearance of Title IX compliance.

On the other hand, the evidence does support the plaintiffs' argument that Quinnipiac set roster targets that, relative to NCAA and NEC averages, were small for men's teams and large for women's teams. In 2009-10, four of the University's seven men's teams were smaller than the national average by two to four players, and five teams were smaller than the conference average. The only men's teams that were bigger than both averages were the basketball and hockey squads, which are Quinnipiac's premier programs and, therefore, are likely to receive more funding and support from the University. By contrast, eight of the 11 women's teams – that is, every team except the volleyball, indoor track, and outdoor track squads – were bigger than the national average by one to four athletes.  The indoor and outdoor track teams' relative paucity in size can be attributed to the teams' failure to carry any athletes participating in field events. Relative to the NEC, seven of Quinnipiac's women's teams – every team except volleyball, ice hockey, and the track squads – were bigger than the conference average.

Those statistics reveal a trend in Quinnipiac's athletics department to field relatively smaller men's teams and relatively larger women's teams. It is true that the differences between

-85-

the University's rosters and the national averages are, for each team, marginal: no team diverges

from the NCAA average by more than four players.  Those marginal differences for each team,

however, amount to arguably more substantial differences in the aggregate.  The following chart,

culled from the data in Plaintiff's Exhibit 151, shows the differences between the total roster

numbers for Quinnipiac's men's and women's teams (without counting the competitive cheer

squad) and the NCAA and NEC averages.  In addition, the chart shows the difference between

the total roster targets for Quinnipiac's women's teams and the NCAA and NEC averages when

indoor and outdoor track and field are not counted.

|  | QU TOTAL | NCAA AVG TOTAL | NEC AVG TOTAL |
|---|---|---|---|
| All male athletes | 166 | 176.1 (+10.1) | 182.64 (+16.64) |
| All female athletes | 244 | 249.7 (+5.7) | 225.78 (-18.22) |
| W/out women's track | 184 | 174.6 (-9.4) | 165.78 (-18.22) |

That chart reveals that the average NCAA Division I school offering the same varsity

teams as Quinnipiac would have approximately ten more male athletes, or slightly more than one

athlete per team.  If the track and field teams are counted, then Quinnipiac would have an above-

average number of female athletes, but if the indoor and outdoor track squads are excluded, then

Quinnipiac has approximately nine fewer female athletes than the national average, or about one

fewer athlete per team.  The comparison to the NEC makes the same point more dramatically.

An average NEC school offering the same teams as Quinnipiac would have approximately 17

more male athletes, or two more participants per team, and 18 fewer female athletes, which is

approximately two fewer participants per team.

Quinnipiac is correct that a policy of imposing roster targets does not, by itself, violate

Title IX. *See* 1996 OCR Letter ("An institution can choose to eliminate or cap teams as a way of complying with part one of the three-part test."). And the plaintiffs have also not proven how the discrepancies between the sizes of Quinnipiac's teams and average national and conference teams – discrepancies that result in approximately one to two fewer male athletes, and one to two more female athletes, per team – result in the deprivation of genuine participation opportunities for women. At most, the plaintiffs have demonstrated that Quinnipiac has deliberately set its roster targets to achieve Title IX compliance, which OCR permits the University to do.

Even if the Quinnipiac policy of setting roster targets does not provide the plaintiffs a basis for relief, however, it does suggest that any lack of proportionality between the University's athletics program and its undergraduate population is not due to "natural fluctuations in [the] institution's enrollment and/or participation rates." 1996 Clarification at 4. Quinnipiac, rather, has deliberately structured its athletics department to increase women's participation relative to men's, and if the University does not succeed in achieving proportionality, it will not be because of factors external to the administration of its varsity program. In addition, the University's habit of stacking its women's teams lends credence to the plaintiffs' contention that certain members of the indoor and outdoor track teams – namely, the cross-country runners compelled to participate – are not being provided genuine athletic participation opportunities but are counted as team members in order to prop up Quinnipiac's statistics for Title IX purposes.

I conclude, therefore, that the plaintiffs' proof with respect to the University's system of roster management does not entitle them to relief. There is no indication that Quinnipiac is continuing to engage in the manipulation that was the basis for my preliminary injunction ruling. But there is evidence that the University sets below-average roster targets for men's teams and

-87-

above-average roster targets for women's teams. That roster management technique has not been shown to deprive students of genuine athletic participation opportunities, but only demonstrates that men's teams are marginally smaller, and women's teams are marginally bigger, than national and conference averages. It also shows, however, the purposefulness of Quinnipiac's roster targets. The University set its roster targets with the intent of producing statistics showing that it provides substantially proportional athletic participation opportunities for women. Although that is not necessarily wrong, it does corroborate the plaintiffs' other argument that Quinnipiac was inflating its women's indoor and outdoor track teams with cross-country runners in order to comply with Title IX. More significantly, it supports the plaintiffs' theory that any disparity between Quinnipiac's athletics department and its undergraduate enrollment cannot be attributed to causes such as natural fluctuations in the yearly makeup of the undergraduate population. Rather, the evidence shows that the University's roster targets were carefully chosen and managed, and any shortfall in the number of Quinnipiac's female athletes is attributable to University decision-making and not other external factors.

D.    Conclusion

Having analyzed the plaintiffs' three general arguments for why Quinnipiac is not in compliance, I now apply the formal, two-part test that the OCR has promulgated for whether a school provides substantially proportional athletic participation opportunities. First, I will count the total number of athletes; and, second, I will then determine whether that total is substantially proportional to the University's undergraduate female population.

Based on the analysis above, I conclude that at least 41 women must be removed from Quinnipiac's tally of female athletes during 2009-10. Those 41 represent the 30 competitive

cheerleaders and the 11 cross-country runners who were injured and/or red-shirted during the indoor and outdoor track seasons.  I say that "at least" 41 women must be subtracted because that number likely should be greater in light of Quinnipiac's practice of requiring its female cross-country runners to run indoor and outdoor track.  Had that practice not been in place, it is probable that one or more other cross-country runners would have sat out the winter and/or spring track seasons.  Because the plaintiffs have not proven who those other runners are, however, I only eliminate 41 female athletes in applying the OCR test.  Nevertheless, it is important to note that 41 is likely a conservative estimate of the female athletes who should not be counted.

Quinnipiac's roster count shows that 274 female athletes and 166 male athletes were on their teams on the first day of competition.  Forty-one female athletes must be removed from Quinnipiac's count, which leaves 233 female athletes; the total male athletes must be increased by one, to 167, due to the men's ice hockey addition identified by Flynn.  That completes the first step of the OCR analysis.

The second and final step is to compare the proportion of women in Quinnipiac's varsity athletics program to the proportion of women in the University's undergraduate population.  The University's enrollment data show that in 2009-10, 61.87 percent of Quinnipiac's undergraduates were women.  Under the Title IX count, however, 58.25 percent – 233 female athletes out of 400 total athletes – of Quinnipiac's varsity athletes were female.  That results in a 3.62 percent disparity.

A 3.62 percent difference represents, in strictly numerical terms, a borderline case of disproportionate athletic opportunities for women.  OCR has not established a threshold

statistical figure for determining whether a school offers participation opportunities substantially proportional to its enrollment, but instead examines each school on a case-by-case basis. 1996 Clarification at 4. Courts, however, have held that a disparity within two percentage points is proof that an educational institution falls within the substantial proportionality safe harbor. *See Equity in Athletics, Inc. v. Dep't of Educ.*, 675 F. Supp.2d 660, 682-83 (W.D. Va. 2009) (finding no case in which a disparity of two percentage points was held to constitute a lack of substantial proportionality). In light of those holdings, a 3.62 percent difference is, by itself, a relatively thin basis for finding that Quinnipiac was out of compliance during the 2009-10 academic year.

OCR was clear in its 1996 Clarification, however, that raw numbers are only part of the analysis for whether the participation of women in a school's varsity program is proportional to enrollment. In addition to calculating the disparity, OCR considers other factors designed to give context and meaning to a school's shortfall of athletic opportunities for students of a specific sex. Specifically, OCR considers whether natural fluctuations in enrollment contributed to the lack of proportionality, and whether the absolute number of athletic participation opportunities that need to be created to achieve exact proportionality would be sufficient to sustain a viable athletic team. 1996 Clarification at 4.

When those two factors are considered, the 3.62 percent difference indicates that Quinnipiac was not in compliance with Title IX. First, there is no indication that the disparity is attributable to a surge of women enrolling at Quinnipiac. Rather, the 2009-10 undergraduate enrollment was consistent with the University's expectations. Furthermore, the disparity cannot be attributed to any unanticipated drop in female athletic participation or spike in male athletic participation. Quinnipiac carefully selected its teams' roster targets, and the evidence showed

-90-

that the University took meticulous steps to ensure that its roster targets were met over the course

of the year.  There were, therefore, no natural fluctuations in Quinnipiac's enrollment or varsity

program that would explain the disparity.

Next, the 3.62 percent disparity represents a shortfall of approximately 38 female

athletes.[27]  Thirty-eight additional athletes would almost certainly be enough to sustain a new,

independent varsity team.  There are at least three bases for reaching that conclusion.  First, in

2009-10, the biggest Quinnipiac women's teams were the indoor and outdoor track teams, which

each listed 30 runners on their rosters – a total that, as explained above, is inflated, but which I

will treat as valid for the purpose of conducting this part of the analysis.  Based on Quinnipiac's

2009-10 roster targets, the mean size for Quinnipiac's women's teams was 22 members, and the

median team size was 24 members.  Therefore, it would appear that the additional 38 athletes

would certainly be enough to support an additional varsity team, especially when one considers

that Quinnipiac's women's rosters tended to be bigger than the national and conference averages.

The second reason it can be assured that the 3.62 percent disparity represents enough

players to sustain an independent team can be found in the (unsuccessful) actions Quinnipiac

took to comply with Title IX.  Quinnipiac attempted to meet its Title IX obligations by creating a

new sports team, competitive cheer, with 30 participants (which will be increased to 36

participants for the 2010-11 season).  Thus, the University's own conduct shows that another

viable sports team could be created with the 38 potential athletes who are currently not being

---

[27] That number was reached as follows.  In order for the 167 male athletes to represent
38.13 percent of the University's varsity athletes, there would have to be 438 total athletes, or
271 female athletes.  The difference between the exactly proportional 271 female athletes and the
233 female athletes currently countable under Title IX is 38.

offered athletic participation opportunities.

Finally, the University's plans for the 2010-11 year show that 38 female athletes would be sufficient to sustain an independent varsity squad. For this coming year, Quinnipiac plans to eliminate the women's volleyball team and thus subtract its 12 players from 2009-10; add six players to its competitive cheer team; add six cross-country runners; and add five runners to its indoor and outdoor track teams. Assuming that the six competitive cheer players will not be counted because competitive cheer is not a Title IX sport and that, at a minimum, the 16 newly added roster spots for female runners will produce 12 athletes countable under Title IX – in other words, assuming that there remains a disparity of 38 female athletes in 2010-11 – it is certain that an independent sports team could be created from the shortfall of participation opportunities. That independent sports team would be the eliminated women's volleyball squad, a team that, based on Quinnipiac's 2010-11 roster target, requires a mere 14 players to compete.

Application of OCR's 1996 Clarification shows that the 3.62 percent disparity is enough to prove that Quinnipiac has not achieved substantial proportionality and does not fall within the 1979 Policy Interpretation's first safe harbor for Title IX compliance. Although a 3.62 percent is not an overwhelming disparity, it is sufficient to show an absence of substantial proportionality on the facts of this case. The disparity reflects Quinnipiac's deliberate planning and not other external events beyond the University's control, and the number of potential female athletes reflected by that disparity would be more than enough to sustain an additional varsity athletic team. I therefore conclude that, during the 2009-10 school year, Quinnipiac did not offer athletic participation opportunities for women that were substantially proportional to the University's female enrollment. The University was close to achieving that degree of proportionality. Its

-92-

decision to gamble on its competitive cheer team being found to be a Title IX sport, and on all of

its indoor and outdoor track runners countable under Title IX, however, deprived Quinnipiac of

just enough female athletes to meet OCR's first prong for Title IX compliance. I therefore hold,

as a matter of law, that Quinnipiac violated Title IX during the 2009-10 academic year by failing

to offer equal athletic participation opportunities to its female students.

My ruling would not change to the extent the University argues that, even if it was out of

compliance last year, it will be in compliance in 2010-11. I am not convinced that the proffered

facts of the upcoming competitive cheer season – namely, an increase in the number and

proportion of competitions played according to NCSTA rules, and the creation of an NCSTA

championship – are adequate to conclude that, next season, competitive cheerleading will count

as a sport under Title IX. Nor am I convinced that all of the additional cross-country, indoor

track, and outdoor track runners should be counted as genuine athletic participation

opportunities. Those determinations can only be made with a factual record documenting what

actually occurred during those teams' seasons. In other words, Quinnipiac's Title IX compliance

can only be judged after the completion of the 2010-11 academic year, and not at present, more

than six weeks before the year's commencement. Thus, the facts introduced about what

Quinnipiac will do in the future do not change my ruling that Quinnipiac violated Title IX and,

currently, is not in compliance with the law and its regulations.

## IV.   Remedy

The plaintiffs have proved that Quinnipiac failed to provide equal athletic participation

opportunities to its female students. I now turn to the remedy to which they are entitled. Both

parties are in agreement that if I conclude that Quinnipiac violated Title IX then injunctive relief

is appropriate.  The parties disagree, however, what kind of injunctive relief should be entered.

The plaintiffs have requested an injunction that the women's volleyball team continue during the

2010-11 season.  But Quinnipiac has requested the right to develop its own compliance plan to

be submitted to the court for approval.

Both parties can and should be accommodated.  Quinnipiac shall submit a compliance

plan describing how it will bring itself into Title IX compliance for 2010-11 and thereafter.  *Cf.*

*McCormick*, 370 F.3d at 301-02 (holding that district court properly entered injunctive relief and

ordered the defendants to submit compliance plans for court review).  The University is entitled

to determine its own method for achieving statutory compliance; the OCR regulations are clear

that, although educational institutions must offer equal athletic participation opportunities to both

sexes, Title IX gives schools flexibility in deciding for themselves how to best meet that legal

obligation.  *See, e.g.*, 1996 OCR Letter at 4 ("Ultimately, Title IX provides institutions with

flexibility and choice regarding how they will provide nondiscriminatory participation

opportunities.").  On the other hand, the plaintiffs have proved that the University is currently

violating Title IX; cutting the women's volleyball team would only exacerbate that violation.

Therefore, any compliance plan that Quinnipiac submits must commit to sponsoring the

women's volleyball team during the 2010-11 season.  Quinnipiac is not obligated to continue

sponsoring the team beyond that point, however, so long as any decision to eliminate women's

volleyball is accompanied by other changes that will bring the University into compliance with

Title IX.

**V.      Conclusion**

I find in favor of the plaintiffs on their first claim for relief in their first amended complaint (doc. # 101).  A declaratory judgment shall issue that the defendant, Quinnipiac University, has violated Title IX and the regulations promulgated pursuant thereto by failing to provide equal athletic participation opportunities to its female students.

Furthermore, Quinnipiac is hereby enjoined from continuing to discriminate against its female students on the basis of sex by failing to provide equal athletic participation opportunities. Therefore:

**IT IS HEREBY ORDERED** that, within 60 days, Quinnipiac University shall submit to the court a compliance plan detailing how it will achieve compliance with Title IX and its regulations.  That compliance plan shall provide for the continuation of the women's volleyball team during the 2010-11 season.

It is so ordered.

Dated at Bridgeport, Connecticut, this 21st day of July 2010.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge

# Exhibit B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

STEPHANIE BIEDIGER, KAYLA
LAWLER, ERIN OVERDEVEST,
KRISTEN CORINALDESI, and LOGAN
RIKER, individually and on behalf of all
those similarly situated, and ROBIN
LAMOTT SPARKS, individually,
     Plaintiffs,

     v.

QUINNIPIAC UNIVERSITY,
     Defendant.

No. 3:09cv621 (SRU)

## INJUNCTION ORDER

The defendant, Quinnipiac University, has violated Title IX of the Education

Amendments of 1972 (20 U.S.C. § 162, *et seq.*), and the regulations adopted pursuant thereto (34

C.F.R. Part 106).  *See* Mem. of Decision (July 21, 2010) (doc. # 171).  Accordingly, pursuant to

Rule 65 of the Federal Rules of Civil Procedure, it is hereby ordered that:

(1) Quinnipiac University and its officers, agents, servants, and employees are

permanently enjoined from discriminating against female students on the basis of sex by failing

to provide equal athletic participation opportunities;

(2) Quinnipiac University shall not eliminate its women's volleyball team; and

(3) By September 21, 2010, the defendant shall submit to the court a compliance plan

detailing how it will achieve compliance with Title IX and its regulations.

This injunction shall remain in force pending further court order.

It is so ordered.

Dated at Bridgeport, Connecticut, this 22d day of July 2010.

                                        /s/ Stefan R. Underhill
                                        Stefan R. Underhill
                                        United States District Judge