UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| STEPHANIE BIEDIGER, ET AL | : | No. 3:09CV-621 (SRU) |
| | : | 915 Lafayette Boulevard |
| vs. | : | Bridgeport, Connecticut |
| | : | |
| | : | June 11, 2010 |
| QUINNIPIAC UNIVERSITY | : | |

- - - - - - - - - - - - - - - - x

PRETRIAL HEARING


B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

    FOR THE PLAINTIFFS:

            PULLMAN & COMLEY
                    850 Main Street
                    P.O. Box 7006
                    Bridgeport, Connecticut 06601-7006
            BY:  JONATHAN B. ORLEANS, ESQ.
                    ALEX V. HERNANDEZ, ESQ.

    FOR THE DEFENDANT:

            WIGGIN AND DANA, LLP
                    400 Atlantic Street
                    P. O. Box 110325
                    Stamford, Connecticut  06911-0325
            BY:  MARY A. GAMBARDELLA, ESQ.

            PROSKAUER ROSE
                    1585 Broadway
                    New York, N. Y.  10016
            BY:  EDWARD A. BRILL, ESQ.
                    SUSAN D. FRIEDFEL, ESQ.
                    REBECCA BERKEBILE, ESQ.

```
Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917)703-0761
```

```
 1              (Whereupon the following session was held in

 2     chambers.)

 3                   (12:00 O'CLOCK, NOON.)

 4              THE COURT:  We're in chambers for the pretrial

 5     conference in Biediger v. Quinnipiac University.  Why

 6     don't we begin with appearances.

 7              MR. ORLEANS:  Jonathan Orleans from Pullman &

 8     Comley for the plaintiffs.

 9              MR. HERNANDEZ:  Alex Hernandez from Pullman &

10     Comley on behalf of the plaintiffs.

11              MR. BRILL:  It's Edward Brill, from Proskauer

12     Rose, for the defendant.  With me are two members of my

13     firm, Susan Friedfel and Rebecca Berkebile.

14              MS. GAMBARDELLA:  And Mary Gambardella from

15     Wiggin & Dana, also for the defendants.

16              THE COURT:  All right.  And also present is my

17     law clerk Ben Yaster, and an intern Paige Wilson.

18              MR. ORLEANS:  Your Honor, Kristen Galles, also

19     counsel for the plaintiffs, is not going to be able --

20              THE COURT:  We can put her on by phone if she

21     wants to be.

22              MR. ORLEANS:  She's otherwise engaged today if

23     that's all right.

24              THE COURT:  That's fine.

25              Let me start by throwing it out to you to try
```

1    and figure out what, if any, procedural agreements you may

2    have made about presentation of evidence.  Any luck there?

3         MR. ORLEANS:  Well, we've worked on it.  I guess

4    with respect to the plaintiff's expert witness Athena

5    Yiamouyiannis, who's expected to testify by deposition, we

6    have an agreement that her written report would be

7    admitted into evidence.  She would testify on direct to

8    explain and supplement the written report and that she

9    would be cross-examined and subject to redirect.

10        However, I should inform Mr. Brill and the court

11   that we have learned last night that she may be available

12   to testify live at trial.  Previously she was not going to

13   be available, she had a vacation planned, but that plan

14   has fallen through so we are considering whether we would

15   rather put her on live than by deposition.  And we will

16   let Mr. Brill and his colleagues know about that by

17   Monday.

18        THE COURT:  Okay.

19        MR. ORLEANS:  And in any event, they'll have an

20   opportunity to take her deposition if we are going to put

21   her on live at trial.

22        THE COURT:  Okay.

23        MR. BRILL:  I have no objection to her

24   testifying live except it raises a more serious issue

25   about whether we can complete the trial in five days, and

1    that's something we need to get to I think during the

2    conference today.  And the only thing I'd note with

3    respect to what Mr. Orleans stated is both sides agreed,

4    with respect to two particular experts, that we would put

5    in their reports in lieu of their direct testimony to be

6    supplemented perhaps by some short summary or explanation,

7    but each side reserves the right to object to any portions

8    of the report as if it were presented --

9            THE COURT:  Right.

10           MR. BRILL:  -- in court.  And with respect to, I

11   think it's Dr. Yiamouyiannis, I have a serious question --

12   I haven't deposed her yet but certainly from her report, I

13   don't understand how she can purport to be an expert on

14   track and field.  She is an expert on NCAA and other

15   issues, but at least according to her report, she's had no

16   experience in track and field.  She was a runner in

17   college and served six months as an assistant coach.  So,

18   that was one of the things I wanted to depose her about,

19   and I know we agreed to have Daubert motions and obviously

20   I couldn't even make a motion because I don't know the

21   basis of her expertise but there could be an issue there

22   about her -- the basis of her expertise.  It may be

23   something we can discuss, if you're aware of it, today.

24           MR. ORLEANS:  I'm happy to discuss it.  I may

25   not know enough about her substantively to respond to some

1        of your questions but -- we can talk about it.

2                We had made a similar agreement, I think, with

3        respect to the defendant's expert, Mr. Seemes, who also is

4        scheduled to testify by deposition.  We have a bit of an

5        issue here -- and I don't want Mr. Brill to feel

6        sandbagged in any way, he and I have not discussed this

7        directly -- but Mr. Seemes was disclosed a little bit late

8        for reasons that we concede were beyond the defendant's

9        control.  They had someone else named who got sick.  Mr.

10       Seemes has produced a written report but apparently he's

11       never published anything, never testified before.  It's

12       very difficult to find out anything about him, so we asked

13       for a CV.  Defense counsel didn't want to -- said he

14       doesn't have a CV and didn't want to have him create one.

15       So we asked whether he might respond to some questions

16       about his background so that we could be prepared.

17               And the thing I should add about this, Your

18       Honor, is that because Mr. Seemes apparently is only

19       available for one day, we're not going to have an

20       opportunity to depose him in advance of his deposition.

21       We have an agreement we'll get an hour with him first

22       thing in the morning and then we'll move into the de bene

23       esse deposition.

24               So we are working at somewhat of a disadvantage

25       in terms of being able to cross examine this expert.  And

1     most recently we've been told that Mr. Seemes is not

2     returning phone calls so we don't, we don't have a CV, we

3     don't have answers to our questions that were sort of in

4     the nature of what's your background, the kind of

5     information you would find on a CV, and we're not going to

6     get any time between a discovery deposition and the de

7     bene esse deposition.  I'm troubled by this and I want to

8     reserve the right, depending how this goes, to seek to

9     exclude the testimony on that basis.  I'm not making the

10    motion but I wanted to alert the court and Mr. Brill to

11    any concern.

12            MR. BRILL:  First of all, I did speak to Mr.

13    Seemes yesterday.  He's at the U. S. Track and Field

14    Championships in Eugene and virtually unreachable, but he

15    took a few minutes out to call me.  And he said he had

16    seen -- I sent an email and he was going to do his best to

17    respond to it yesterday, which he didn't do, but they are

18    very simple questions and I don't think it would take more

19    than five minutes to answer them at his deposition.  It's

20    like where did you go to school.

21            We supplied all the information that Rule 26

22    requires, what was the basis of his expertise.  And his

23    whole report was like ten double spaced pages, so they

24    could take a full discovery deposition in the morning,

25    take a few hours' break and take their de bene esse

```
1    deposition in the afternoon.  It's not very complicated.

2    His testimony is in response to the report of

3    Dr. Yiamouyiannis and really addresses a handful of issues

4    about, you know, track and field and why it's properly

5    considered as three separate sports, and why Quinnipiac's

6    team is really no different than many other teams in the

7    United States in terms of the way it conducts the three

8    sports.

9              We had no choice, and as Jon said, we had

10   another witness who notified us at the last minute she had

11   some very, very bad medical news and was not able to come

12   to the trial.  And we had spoken to Mr. Seemes earlier as

13   a potential witness and he was willing to step in at the

14   last minute but --

15             THE COURT:  As I hear the request, it's

16   essentially to have educational and employment background

17   of this witness.

18             MR. ORLEANS:  Those were essentially the

19   questions we asked, with a little bit of detail, more than

20   just --

21             MR. BRILL:  Because you have the employment

22   background.

23             MR. ORLEANS:  Well, I don't know that it's the

24   complete employment background.

25             MR. BRILL:  It is, it is.
```

1          MR. ORLEANS:  But it doesn't include any

2     information as to what the duties of the positions that he

3     held were, and there's no educational information there,

4     as I recall.  I didn't bring the report with me, so --

5          I guess all I can say, Judge, is I understand

6     they have cell phones in Eugene, or wherever the track and

7     field championships are going on, and they have internet

8     service at the hotel, and if he needed to sit down for

9     half an hour and create a rough CV and email it to you so

10    you could email it to me, I don't think that's too much to

11    ask.

12         MR. BRILL:  I spoke to him yesterday.  I asked

13    him to try and answer the questions and he said he would

14    try.  You know, I have no control over him, but --

15         THE COURT:  I think that would be a good idea.

16    It's just going to eliminate a potential problem.

17         MR. BRILL:  I'll try and call him again this

18    afternoon.

19         THE COURT:  Okay.  All right, any other thoughts

20    about ways to make the trial more efficient?

21         MR. BRILL:  Well, one of the issues we had

22    raised early on, obviously one thing we could do, we could

23    eliminate Dr. Yiamouyiannis' testimony as non-qualified,

24    but I think we have to see what she says at her

25    deposition.

1              I'll put on the table we also have a serious

2    question about the testimony of their expert Jeff Webb on

3    competitive cheer because he was deposed this week in

4    Memphis all afternoon.  Although he's listed on the

5    pretrial order as being an expert on what's a varsity

6    sport, he basically said he has no basis to opine on

7    what's a varsity sport.  He doesn't know anything about

8    the NCAA or Title IX or what constitutes a sport.  He

9    could testify about cheerleading and describe cheerleading

10   and the history of cheerleading but he cannot opine on

11   what's a sport for purposes of Title IX or any other

12   purpose.  So at least some of his testimony we think would

13   be, based on his own admission, excluded based on his own

14   admission in his deposition.

15             And the other thing I've asked plaintiffs

16   repeatedly since we got their expert reports about a month

17   ago, is that there's enormous overlap between Donna

18   Lopiano and Dr. Yiamouyiannis.  And you can see by the

19   color coding that we did here on the two reports, there's

20   at least four topics where they both purport to give

21   opinions and I'm not, I wouldn't even mind so much if it

22   was just that they would get up and give those opinions on

23   direct, but for example, this is one that really to me is

24   an example of how it can't work, is that both of them talk

25   about how, in their view, Quinnipiac University doesn't

1    have a bona fide track and field team because we have,

2    quote unquote, sub varsity athletes on the team, with a

3    concept that I haven't seen anywhere else in any other

4    case or material in Title IX, but they both say this.

5         Now, I probably have two hours of -- and

6    Dr. Yiamouyiannis goes on about this for several pages in

7    her report.  Dr. Lopiano just more briefly.  I probably

8    have a good two hours of cross on this topic, which is

9    really central to their attempt to knock out our track and

10   field teams.  I shouldn't have to do that with both

11   witnesses and they shouldn't both be allowed to testify to

12   the same thing.

13        And there's, as I say, there's four, four

14   precise topics that they just duplicate each other on, on

15   track and field.  And I pointed this out from the outset

16   when I first got the reports and I've urged the plaintiffs

17   to modify the reported or tell us who's going to testify

18   as to what, but so far they haven't done it.  So I think

19   that it's going to be an enormous waste of time if they

20   present testimony, particularly if Dr. Yiamouyiannis

21   testifies in open court.  But, frankly, even if she

22   doesn't, because I'm going to have to cross examine

23   Lopiano on exactly the same topics.

24        THE COURT:  Well, okay.  Let me suggest that

25   perhaps the way to deal with that is to consider time

```
 1        limits, give each side a certain amount of hours.  If you
 2        want to spend two hours on cross on that issue, that's two
 3        hours of your time.  If they want to spend some of their
 4        time duplicating expert testimony, that's use of their
 5        time.  It seems to me that time limits are a way of making
 6        sure that we have an equal amount of time for each side,
 7        and also making sure we get the case done in five days and
 8        making sure, frankly, everybody pares the case down to
 9        what's essential.  It seems to me we have seven hours,
10        approximately seven hours a day to hear testimony.  We
11        have five days and everybody can do the math and figure
12        out how much time everybody has.  Anybody strongly opposed
13        to that approach?
14                MR. BRILL:  No, I think that makes sense,
15        although I would say probably we shouldn't get to the full
16        35 hours because there probably would be some time spent,
17        you know, on arguments or -- I'm not sure we get a full
18        seven hours a day.  If you think we will, then that's
19        fine.
20                THE COURT:  Well --
21                MR. BRILL:  That would be 17 and-a-half hours, I
22        guess, for each of us.
23                MR. ORLEANS:  Your Honor, I'm not -- I'm only
24        opposed to it if it turns out to deprive the plaintiffs of
25        the opportunity to present their case.  You know,
```

1    Mr. Brill -- with respect to the specific issue of

2    duplicative testimony between Dr. Yiamouyiannis and

3    Dr. Lopiano, although Mr. Brill has expressed that concern

4    on a number of occasions, he's never specified

5    specifically what subjects he thinks are, are duplicative.

6    Maybe with some conversation between us next week, we can

7    refine that a little bit.

8            MR. BRILL:  I'd be happy to.

9            MR. ORLEANS:  And that would enable us to reduce

10   that, but it's certainly within the court's discretion, I

11   think, to set time limits for both sides.  Other courts

12   have done it and if it turns out to -- if we foresee it as

13   being a real problem in terms of the opportunity to

14   present our case, we will let the court know that at the

15   appropriate time.

16           THE COURT:  All right.  I think it's worth a

17   try.  The other, I guess, related aspect is a motion in

18   limine and specifically whether the whole preliminary

19   injunction record will be part of the trial record.  I

20   haven't seen any written opposition to the motion in

21   limine.

22           MR. ORLEANS:  We only saw the motion in limine

23   yesterday.

24           THE COURT:  Fair enough.  Here's my thought, my

25   initial thought on that.  The preliminary injunction

1    record I think ought to be part of the trial record.  And

2    then portions that are irrelevant -- this is a bench

3    trial.  I can figure out what's irrelevant and, you know,

4    there's no sense in spending a lot of time figuring out

5    which portions of the preliminary injunction record are

6    pertinent and which portions are not pertinent.  I think

7    we save a lot of time because we had fairly lengthy

8    testimony from the named plaintiffs at the preliminary

9    injunction hearing that would not have to be repeated.  We

10   can focus on the issues that really matter, specifically

11   what's going on this academic year and whether these teams

12   are properly counted or not, or are the athletes on those

13   teams properly counted or not.

14        So I understand the motion in limine, it

15   probably has some merit, but in terms of the approach I'd

16   like to take, I'd rather not spend a whole lot of our

17   limited time sorting out whether some aspect of the

18   preliminary injunction record comes in or not.  I can do

19   that, I can go back and read it and I do think -- I heard

20   it the first time.  I mean it's in my head.  I know what

21   was said, in effect.  The idea that anybody's going to be

22   prejudiced by the fact that it becomes a part of the,

23   quote unquote, official trial record of this trial, you

24   know, this is not a jury trial.  So it can't really unring

25   the bell, that I think everybody has to assume, as I do,

1    that I'm going to be able to focus in on what matters at

2    the trial and decide this trial.  So that's my initial

3    thought.

4              MR. BRILL:  And that's fair enough, Your Honor,

5    but there was a second aspect to the motion also with

6    respect to evidence of alleged lack of compliance prior to

7    this year and, for example, in Ms. Lopiano's report she's

8    in the sections analyzing our EADA numbers back to 1992

9    and has a whole section about historical noncompliance and

10   it's really just not relevant to anything.  And that was

11   not in evidence at the preliminary injunction hearing, by

12   the way.

13             THE COURT:  Okay, fair enough.  We can take that

14   up.  But I think the point I'm making is, at least with

15   respect to the preliminary injunction record, I think we

16   waste a whole lot of time for what would be in the end not

17   a really helpful result.  We ought to decide whether

18   there's any relevance to historical data, historical

19   treatment, historical experience, or not.

20             MR. ORLEANS:  Your Honor, we certainly -- do you

21   want to hear our response to the motion in limine at this

22   point on that issue, on the issue of the analysis of

23   prior --

24             THE COURT:  Yes.  If you're prepared, I think

25   that's probably a good idea.

1          MR. HERNANDEZ:  Well, we did choose to try the

2    case in front of the court.  If this were a jury trial I

3    think we'd have to be more careful about what came out in

4    front of the jury.  As Your Honor said, we can't unring

5    the bell and, in fact, Your Honor has found as part of its

6    ruling that the defendant engaged in manipulation of the

7    roster management process.

8          The defendants are basically claiming that they

9    promised that they are going to be good in the future,

10   that the roster management process that they have in place

11   now is going to bring them into compliance of prong one.

12         In our view, Your Honor, the fact is it's the

13   same, substantially the same coaches who are involved

14   throughout, and to the extent that the university had a

15   policy, practice and procedure of manipulating the roster

16   management system, that's relevant to decide whether their

17   promises going forward are meaningful or not.  And while

18   it's not dispositive of the question, it in our view

19   certainly helps the court assess the testimony that the

20   defendants are going to offer in support of their claim

21   that they are presently and in the future going to be in

22   compliance.

23         In their motion in limine, they state basically

24   that everything has changed now because they changed one

25   person and they also assert that the court can now

1    determine whether Quinnipiac is in compliance with prong

2    one based on the evidence as to what, quote, actually

3    happened in 2009, '10.  That's really the question.

4    That's one of the ultimate issues in front of the court,

5    what actually happened.  And to the extent that there's

6    still vestiges of their prior policies and procedures and

7    the way they implemented roster management this past year,

8    it's all relevant in our view.

9            Finally, with respect to Rule 403, they are

10   moving to exclude the evidence on the grounds that it's

11   unduly prejudicial.  They claim it's prejudicial.  Pretty

12   much any evidence offered by a party tends to have some

13   prejudice, but the standard I would simply remind everyone

14   is whether the -- it reads as follows:  "Although relevant

15   evidence may be excluded if its probative value is

16   substantially outweighed by the danger of unfair

17   prejudice," et cetera.  So, in our view there is

18   prejudicial -- strike that.  There is probative value to

19   the evidence and it's not substantially outweighed by the

20   danger of unfair prejudice or confusion.  We trust the

21   court to be able to figure out what's relevant and not

22   relevant in the case.

23           MR. BRILL:  I think the court already ruled on

24   that aspect of the motion so I'm not sure I have to

25   respond to Mr. Hernandez.  You said you were not going to

1    grant the motion, at least that was your indication, as to

2    the evidence that was already in at the preliminary

3    injunction hearing.

4            THE COURT:  I think his argument is broader.  I

5    think he's arguing they should be -- in response to your

6    argument about the expert report, I think he's arguing

7    that they should be permitted to introduce at this hearing

8    additional evidence about past practices.  Isn't that --

9            MR. BRILL:  But there's no roster management

10   prior to 2007, 2008.  The past practice, there was no

11   attempt to comply under prong one and there was no roster

12   management.  We were claiming compliance under prong two.

13   So, anything prior to 2007, 2008 would have literally

14   nothing to do with the argument that Mr. Hernandez just

15   made because there was no effort, there could be no

16   manipulation.  Even if you assume that's relevant now,

17   there couldn't be any evidence of manipulation of rosters

18   because there was no roster management plan.

19           And the court took all the evidence on the

20   roster management plan which began to be applied in 2007,

21   2008.  All of that is in evidence at the preliminary

22   injunction hearing.  What we are saying, the other prong

23   of our argument was Dr. Lopiano's got charts going back,

24   you know, 15 or 20 years about what the percentage of

25   people were and prong one.  There's no relevance to

1    whether we -- we would stipulate that the university was

2    not complying with prong one prior to 2009, 2010.  So

3    what's -- so you can't -- there's nothing to try as to

4    prong one and why should we have a trial about prong two

5    compliance in the past when it couldn't -- even if we were

6    out of compliance with prong two in the past, it doesn't

7    affect the present compliance, lack of compliance with

8    prong one.  It's just not a relevant issue.

9           There is, I can see the argument that the

10   plaintiffs are making about the connection between roster

11   manipulation that the court found in 2007, 2008 and 2008,

12   2009, that they can argue, well, you did it then so how

13   can we know you're not doing it now?  We argue that's not

14   a good argument because of reasons that will be shown at

15   trial, but that argument has nothing to do with what

16   happened prior to 2007, 2008.

17          So we think that, if anything, the trial really

18   has to be limited to the preliminary injunction record as

19   to 2007, 2008 forward and evidence as to what's happening

20   now.

21          MS. GAMBARDELLA:  Your Honor, could I jump in

22   very, very quickly?  Because you tried, we tried at THE

23   preliminary injunction, we sat in this very room during

24   our pretrial then and this very issue came up, and the

25   reason that anything prior is not in the record is because

```
1    Your Honor excluded it.
2              THE COURT:  I remember.
3              MS. GAMBARDELLA:  So I just want to throw that
4    in.
5              THE COURT:  All right.  I think to a certain
6    extent maybe the parties are talking past each other a
7    little bit.  As I understand the plaintiff's argument,
8    correct me if I'm wrong, the argument is they should be
9    permitted to supplement the preliminary injunction record,
10   at least with expert testimony concerning roster
11   management from 2007 to the present.
12             MR. HERNANDEZ:  Yes, Your Honor, to the extent
13   it was part of the record at the PI hearing.
14             THE COURT:  Right.  Okay.
15             MR. HERNANDEZ:  To the extent it was an issue.
16             MR. ORLEANS:  It is a little broader that,
17   because Mr. Brill has brought up the chart, that is the
18   part of Dr. Lopiano's reports which takes --
19             THE COURT:  Right.
20             MR. ORLEANS:  -- takes the University's data
21   submitted to the Department of EADA and the EADA reports
22   back to --
23             MR. BRILL:  Whatever the first year was.
24             MR. ORLEANS:  -- '92, '93, '95, goes back a long
25   way and looks in each of these years and it analyzes
```

1    whether there is prong one compliance.

2           I think our argument is that that, that that

3    does have some relevance.  I understand the arguments that

4    Mr. Brill has made but this is the analogy that I've been

5    able to come up with.  You wouldn't buy a mutual fund if

6    the managers of the mutual fund said to you, well, last

7    year we earned ten percent.  You'd want to know something

8    about the -- something more than just the short term

9    results of that fund.  You'd want some historical

10   information, so we'd like to have the opportunity to

11   have -- and we're happy to take the stipulation that there

12   was no compliance with prong one before 2007, 2008.  We

13   would strongly contest that there was ever compliance with

14   prong two but I agree with you we don't have to try that

15   issue, but we would like to have Dr. Lopiano be able to

16   put into evidence or to testify about just -- it won't be

17   lengthy testimony but to say from 1995 up until the

18   present, there's never been compliance with prong one.

19   I've looked at the numbers and there's consistently been a

20   gap.

21           MR. BRILL:  But I don't understand what the

22   relevance -- a mutual fund manager is trying to make money

23   every year so there's some relevance to past partners, but

24   Quinnipiac wasn't trying to comply with prong one.  They

25   were relying on a different prong.  So what's the

1    relevance of Mr. Dr. Lopiano saying aha, see, they weren't

2    in proportion all of these years.  And the case law is

3    very clear, the Colorado State case we cite says even if

4    you were out of compliance for 20 years, you can change

5    your prong.

6        THE COURT:  I'm going to stick with the rule we

7    had at the preliminary injunction hearing, which is 2007

8    forward.  Because the problem is the further away you get

9    from the present, the more factors that could have

10   changed -- personnel, budgets, you know, enrollment, you

11   name it -- and the less probative it is about the issue in

12   this case, which is 2009, 2010.  What happened in 1999 to

13   2000 -- it is just a long time, it's a long time before

14   where we are now.  And even if it came in, I mean I'll

15   tell you it just wouldn't be very persuasive to me because

16   there'd be a whole host of reasons why those numbers,

17   putting aside the fact, the argument that we weren't even

18   trying to comply, there would be a whole host of reasons

19   those numbers would not necessarily have any bearing on

20   what's happening today.

21       MR. ORLEANS:  Accepting your ruling Your Honor,

22   may we put on the record the stipulation that Mr. Brill

23   offered a moment ago?

24       THE COURT:  Yes.

25       MR. BRILL:  Sure.

```
 1              THE COURT:  Sure, that's fine.
 2              MR. ORLEANS:  We were going to work on some
 3    stipulations.
 4              MR. BRILL:  We'll reach a stipulation,.
 5              THE COURT:  Let me go back to the question of
 6    timing.  I'm going to grant each side 16 hours, and I will
 7    be frank, I've never done this before.  When the clock
 8    gets turned on and turned off is going to be something
 9    that you can complain about, I'm sure, after the fact, but
10    I'm going to do my best.
11              MR. BRILL:  Do we have instant replay, Your
12    Honor?
13              MR. ORLEANS:  We can bring chess clocks.
14              MS. GAMBARDELLA:  Are these real hours or
15    lawyers hours?
16              MR. BRILL:  Billable hours.
17              THE COURT:  Those are clock hours, you know.
18              MS. GAMBARDELLA:  Just trying to get it clear.
19              THE COURT:  The clock will start, I take the
20    bench and whoever is on, starting with the plaintiff,
21    obviously your clock is started.  I'll turn on the defense
22    clock when cross begins and so forth, so -- but 16 hours
23    apiece I think gives us plenty of time for you to put on
24    the essential evidence in this case, much of which I think
25    is going to be, ought to be factual undisputed.  I think
```

1    the issue is what's the legal significance of various

2    pieces of evidence.

3              MR. BRILL:  We have a few other issues I'd like

4    to throw on the table.

5              THE COURT:  Sure.

6              MR. BRILL:  Just a question.  Do you want

7    opening statements on the first day of trial?

8              THE COURT:  I do not want opening statements,

9    no.

10             MR. BRILL:  We're going to give you a trial

11   brief.

12             MR. ORLEANS:  That was on my list too.

13             MS. GAMBARDELLA:  We didn't have them --

14             MR. ORLEANS:  I don't think so.  What about

15   closings, Your Honor?  Do you want us to plan to close on

16   the last day or would you prefer -- I know you're going

17   away, would you prefer to have us come in and close after

18   you've had a week to digest?

19             THE COURT:  My view is the sooner the better.

20   If you can do a closing right at the end, I think that

21   would be great.  I think both of you probably know what

22   your closing is right now.

23             MR. ORLEANS:  I wish that were true.  I know

24   it's supposed to be.

25             THE COURT:  And you mentioned trial briefs.

```
 1      Again, any trial briefs I'd like -- let me put it this

 2      way -- before the end of trial, and the earlier --

 3              MR. BRILL:  You had indicated that on the phone

 4      call and we're working to get you something at the outset

 5      of the trial, hopefully by the first day.  I think we

 6      ought to have it, as well as proposed findings and

 7      conclusions.

 8              THE COURT:  That would be great.  And if you

 9      could give us some sort of disk on that, that would be

10      helpful as well, I'm sure.

11              MR. BRILL:  Actually, I have a new case that was

12      decided, I think is very pertinent.  If Your Honor wants a

13      citation, I could give it now.

14              THE COURT:  Sure.

15              MR. BRILL:  Just, it was a very -- I think

16      interesting, well reasoned decision in the case.  It's

17      called Equity in Athletics against Department of

18      Education, 675 FSupp 2d 660, which was decided December 30

19      of last year by the District Court in Virginia.  And it

20      goes at length into what substantial proportionate means,

21      and basically says that there's never been any case

22      that -- it holds that the gap of 2 percent is

23      substantially proportional, that there's never been any

24      case that's found anything less than that not to be

25      proportional, and it talks about the need for flexibility
```

1    in a situation like this where there's a change in teams,

2    and it's only about three or four pages of decision that's

3    relevant, but if you want some reading on the trip --

4         MS. GAMBARDELLA:  Just what he was talking about

5    earlier he would like, more reading in this case.

6         MR. BRILL:  The other thing we want to talk

7    about a little bit is the question of identifying which

8    teams or rosters may be in dispute.  And Mr. Orleans

9    called and told me that Dr. Lopiano is working on a

10   supplemental report.  I had raised an issue about the fact

11   that she hadn't gone into that in her report and we agreed

12   she would produce a supplemental report, and I just wonder

13   if we could have some deadline when we're going to get

14   that so we can be prepared to respond to it.

15        MR. ORLEANS:  Well, you don't need to file

16   anything in response to it.  You just need to prepare a

17   cross examination in response to it.  Right?

18        MR. BRILL:  Yes, and possibly have witnesses.  I

19   mean if she's going to say, for example, that the ice

20   hockey team had five too many women, we have to make sure

21   the ice hockey coach would be available to testify to

22   that.

23        MR. ORLEANS:  I think we've already -- we've

24   agreed to talk with Tracy Flynn on Monday and I need to

25   convey some of the information I get from Ms. Flynn to

1    Dr. Lopiano and then, as promptly as possible after that,

2    would give you a supplemental report.  But I can tell you

3    now that the women's cross country, indoor track and

4    outdoor track teams are at issue and the counting of

5    athletes on those teams, and the women's ice hockey team

6    is an issue of not counting of athletes on that team.  I

7    can't tell you right now for sure one way or the other

8    what other teams we may have issues about.

9            MR. BRILL:  Could we say by Wednesday we could

10   get the supplemental?  Would that be reasonable?

11           MR. ORLEANS:  Yes, sure.

12           THE COURT:  On the competitive cheer, I know

13   there's an issue, big issue about whether competitive

14   cheer counts.  Are there also issues with respect to

15   whether all of the participants in competitive cheer

16   should be counted?

17           MR. ORLEANS:  I don't think that we have any

18   challenge.  My understanding is that that team, as far as

19   we know, started with 30.  I think maybe one dropped off

20   and was replaced, so I don't think that we have any

21   claim --

22           THE COURT:  Okay.

23           MR. ORLEANS:  -- that there were more or fewer

24   than 30 girls who participated on that team.

25           THE COURT:  All right.

```
1              MR. ORLEANS:  I think the issue with cheer is

2       whether it counts an a sport for Title IX purposes at the

3       present time.

4              THE COURT:  Okay.

5              MR. BRILL:  And talking about cheer for one

6       minute, there was a technical issue at the deposition of

7       the two cheer witnesses in Memphis earlier this week.

8       They were both asked about -- there's another organization

9       in addition to the NCAA called the NAIA which basically

10      has the smaller schools around the country and they were

11      asked about the fact that the NAIA last year has declared

12      competitive cheer to be an emerging sport for its members,

13      and in fact has entered into some relationship with this

14      organization called Varsity Brands that sponsors -- it's a

15      for profit organization that runs a lot of the cheerleader

16      competitions and there's several documents that they were

17      shown during the deposition from the NAIA website, of

18      which shows a quarterly press release in May that quoted

19      some of the Varsity Brand executives about this

20      relationship, and we just wanted to know -- there was

21      objection by Ms. Galles at the deposition to the

22      authenticity of the documents, and I've spoken to the NAIA

23      and they are prepared to authenticate the documents, they

24      are on their websites, and I just wonder if we need to do

25      that or if we can just get a stipulation just as to the
```

1    authenticity.  I understand you may have other objections

2    but we think that the two witnesses testified enough to

3    make the documents admissible and they can be

4    authenticated.

5          MR. ORLEANS:  As far as authenticity, this is

6    something we can discuss.  We haven't discussed this in

7    any detail.

8          MR. BRILL:  Right.

9          MR. ORLEANS:  You said, you emailed to me a copy

10   of a press release.  To me, the press release is hearsay,

11   and even assuming that it's authentic, there are a whole

12   host of issues relating to this.  The, quote unquote,

13   sport that NAIA is recognizing as competitive cheer is not

14   very similar to the sport that -- to the sport that

15   Quinnipiac is engaged in.  It's sideline teams and, you

16   know, the NAIA lists on its website a bunch of schools

17   that it says are now recognizing cheerleader as a varsity

18   sport, but if you go to the websites of those schools, as

19   I did, to see whether they in fact list cheerleading as a

20   varsity sport, the great majority of them do not.

21         So -- and it's just, it's a huge can of worms

22   and even if we can agree that certain documents are

23   authentic, I'm not going to waive any hearsay objections

24   to this.

25         MR. BRILL:  And I'm not suggesting that you

```
1    would.  I think that witness testimony is all that I need

2    as long as I can get some agreement as to the

3    authenticity.  And I recognize everything you say, those

4    are positions you could take -- and we don't contend any

5    different, by the way, but it is what it is and I just

6    think it has some relevance to the case.  It may not be a

7    lot but there's some relevance.

8              THE COURT:  This was --

9              MR. ORLEANS:  Let's discuss the authenticity.

10             THE COURT:  This was an issue I was going to

11   raise.  I rarely have had an authenticity objection at

12   trial.  When you have lawyers who have seen documents in

13   advance and have had an opportunity to figure out if this

14   is something that somebody made up, there usually isn't a

15   problem.  So I'm going to strongly urge you to stipulate

16   to the authenticity of everybody's documents, whosoever

17   they might be, unless there are some unique circumstances

18   and if the fight is going to be admissibility --

19             MR. ORLEANS:  Judge, I'm not eager to be the

20   first to object to authenticity in your courtroom and

21   we'll discuss this and see if we can't work something out.

22             THE COURT:  Okay.  I wanted in general to figure

23   out both with respect to witnesses and exhibits if there

24   are objections that we ought to either know about or even

25   take up today.  Let's put aside the experts.  I think I've
```

1    put out a little already about concerns with experts and

2    maybe we haven't exhausted that topic, but it sounds like

3    those are largely resolved or in the process of being

4    resolved.  Does anybody have any complaints about anybody

5    else's witness list that we need to take up?

6              MR. ORLEANS:  I don't believe so.

7              THE COURT:  I don't believe so.

8              MR. BRILL:  Let me just take a look at their

9    list.  Obviously, you know, given the time constraints of

10   each party, I would have said I'm not sure we need all the

11   plaintiffs but that's up to -- now that's up to them how

12   they want to spend their time.

13             THE COURT:  Right.

14             MR. BRILL:  And otherwise, no.

15             THE COURT:  Okay.  And with respect to exhibits,

16   I'm going to urge you to come up with a list of exhibits

17   for each side as to which there is no objection so that we

18   can begin the trial -- I think we did this --

19             MR. ORLEANS:  Yes.

20             MS. GAMBARDELLA:  We did.

21             THE COURT:  We can begin the trial with

22   hopefully all of the exhibits and then we can focus on the

23   onces that matter in terms of objections.  It will save

24   you both time, frankly, if you can do that because if you

25   spend five minutes trying to get a document in when

1    there's realistically no objection to it, you just wasted

2    five minutes.

3         MR. BRILL:  Well, we've given our preliminary

4    and almost final witness/exhibit list.

5         MR. ORLEANS:  We are little behind schedule.

6         MR. BRILL:  Maybe we can have a schedule

7    established because I really don't want to be doing this

8    the day before the trial.

9         MR. ORLEANS:  I'm going to be in the office all

10   weekend, Ed.  I expect to have you some kind of list on

11   Monday.  It may be subject to a little bit of

12   supplementation, but actually we need to go through yours

13   because some of it is going to be the same.

14        MR. BRILL:  Okay.

15        MR. ORLEANS:  I don't anticipate we're going to

16   have much trouble.  There are going to be some relevance

17   issues because we have some different views of what's

18   relevant and what's not, but a lot of the stuff we're

19   going to be able to stipulate to.

20        MR. BRILL:  We did include a lot of emails about

21   people's eligibility issues because we didn't know who was

22   going to be challenged, so out of an excess of caution

23   some of this stuff -- I mean they could be technically

24   admitted without objection but it may not really be

25   material to anything as to why, you know, Sam Smith had to

1    be deleted from a roster because he withdrew from

2    something or something, or -- and there's a lot of emails

3    like that.

4              THE COURT:  Okay.  Well, to the extent that, for

5    example, there's agreement that there's no real issue on

6    the men's baseball team numbers and you've got 15 emails

7    about that, I'd encourage you to take that off your final

8    list of exhibits and not offer those because I'm going to

9    feel some obligation to go through the exhibits and,

10   frankly, don't look forward to wasting my time on stuff

11   like that.

12             MR. BRILL:  And we don't want you to.  There's

13   some we're putting in not entirely for the substance of

14   the decision but to show the process --

15             THE COURT:  That's fine.

16             MR. BRILL:  -- however, to show how Dr. Johnson

17   carefully has looked at every decision he made.  But we'll

18   pick out examples of that.

19             THE COURT:  It's probably worth me saying this,

20   which I think I probably said before the preliminary

21   injunction.  I think I do in virtually every bench trial.

22   I think the rules of evidence are most necessary in jury

23   trials and they are much less necessary in bench trials.

24   I don't want to get carried away with that proposition.

25   Hearsay, obviously a hearsay document shouldn't be

 1   admitted in either type of trial, but when you talk about

 2   marginal relevance, if there's a good argument that a

 3   document isn't relevant, it's unlikely that it's going to

 4   bear on my decision, I mean because relevance and value

 5   are correlated.  And so if there's a strong argument that

 6   it's not relevant, chances are it's not going to have any

 7   impact, so don't waste your breath, time and energy coming

 8   up with arguments why a document isn't relevant.  Make an

 9   argument that -- or even if you make the objection it's

10   not relevant for this reason, you know, that's going to

11   help me understand you don't think it deserves much

12   weight.  But in a bench trial, in the same way I can

13   ignore the portions of the preliminary injunction trial

14   that aren't going to matter, I can ignore either documents

15   or portions of documents that aren't relevant to the

16   issues.

17          MR. BRILL:  Just a couple very technical

18   questions, Your Honor?

19          THE COURT:  Yes.

20          MR. BRILL:  I gather from the way things were

21   done at the P I hearing, you prefer numbers for plaintiffs

22   and letters for the defendants.  We proceeded that way.

23          THE COURT:  You can do it however you want so

24   long as we don't have duplicative identifications.  I

25   don't want to have two Exhibit Threes or two Exhibit D's,

1    you see when I'm saying?

2              MR. BRILL:  Yes.

3              THE COURT:  You can do it one through 100 and

4    200 through 300.  You can do it numbers and letters.  You

5    can do it however you want.  I just don't want to have

6    confusion when someone says I'm showing you Exhibit 34,

7    there shouldn't be any question in my mind or in the Court

8    of Appeals' mind what it is we're all looking at.

9              MR. BRILL:  And we've already kind of started to

10   go through the double letter alphabet.

11             THE COURT:  Oh no.

12             MR. BRILL:  Is that going to be confusing to you

13   to have Exhibit CCB or whatever?

14             THE COURT:  I've had quadruples.  It's not a

15   problem.  I mean it gets --

16             MR. BRILL:  It's a little --

17             THE COURT:  You have to be careful to say I'm

18   giving you Exhibit AAAAA, that the court reporter hears

19   all the As, but it doesn't bother me.  I don't want to

20   have, like I say, I don't want to have two exhibits with

21   the same --

22             MR. BRILL:  We do have a couple double As or

23   double Bs but we'll figure it out.

24             MR. ORLEANS:  We'll fix that.

25             MR. BRILL:  We didn't realize that the PI

1    exhibits got quite as far as they did, but we'll figure

2    that out.

3             THE COURT:  Fair enough.

4             MR. ORLEANS:  Judge, do you want -- just to be

5    clear on the exhibit logistics, you want a notebook for

6    yourself, a notebook for --

7             THE COURT:  My law clerk.

8             MR. ORLEANS:  And a notebook and originals for

9    the witnesses?

10            THE COURT:  Correct.  Well, right.  Originals, I

11   would say just to the clerk.  You don't have to take the

12   original out of the notebook with the deputy and pull it

13   out and walk it over.  If you want to give the witness

14   here's the six exhibits I'm going to talk to you about and

15   they are copies, as long as the other side isn't

16   complaining that's highlighted or that's different than

17   what's the original or --

18            MS. GAMBARDELLA:  I thought what we did, we put

19   each of our binders on the witness stand and just said

20   look at 2800, if you will.

21            MR. ORLEANS:  To the extent that all of the

22   exhibits get admitted in advance.

23            MS. GAMBARDELLA:  Saves a lot of time.

24            THE COURT:  That's perfect.

25            MR. ORLEANS:  Judge, what about -- do you want a

1    set on disk for the court?

2              THE COURT:  I don't need the exhibits on disk as

3    much.

4              MR. ORLEANS:  I was imagining you with your

5    laptop on the airplane to Latin America.

6              THE COURT:  I'm not taking my laptop.

7              MR. ORLEANS:  Good for you.  I'll banish that

8    fantasy.

9              THE COURT:  I don't think we need exhibits on

10   disk if we have our copies.

11             MR. ORLEANS:  Okay.

12             THE COURT:  The trial briefs and the proposed

13   findings especially is very helpful to have on disk

14   because we may cut and paste or whatever.

15             MR. ORLEANS:  Is the court's technology able to

16   deal with CDs as opposed to three and-a-half inch

17   floppies?

18             THE COURT:  Oh, yes.

19             MR. ORLEANS:  Because the instructions still say

20   three and-a-half inch floppies.

21             THE COURT:  I'll have to change that.  It should

22   just say disk.

23             THE CLERK:  Or we can use Memory 6.

24             MR. ORLEANS:  Oh, very advanced.

25             THE COURT:  Actually we have pretty decent

```
 1    technology right now.

 2           MR. ORLEANS:  Just a few last logistical

 3    questions.  Are there a couple jury rooms or conference

 4    rooms close to the courtroom such that each side can

 5    commandeer one for the week of the trial?  I know we tried

 6    a case in the fall in front of Judge Thompson, he made a

 7    room available to each side.  It was very, very useful.

 8           THE COURT:  Let me say this.  There probably

 9    are.  There's a couple of rooms over near Judge Garfinkel,

10    I think they are adjacent to each other.  They are not

11    especially sound proof so you need to be careful about

12    that.  They are pretty small.  We can look into whether

13    they can be used.

14           MR. ORLEANS:  I don't need to bother you and/or

15    chambers about this, if there's somebody else in the

16    clerk's office I should talk to.

17           THE COURT:  Well, it's probably better if we do

18    it because we'll find a way to make it happen, but I think

19    we can get that done.

20           I think the question I was going to ask you, are

21    either of you going to want to have any kind of display

22    other than --

23           MR. BRILL:  Well, the Elmo we're planning to

24    use.

25           THE COURT:  Fine.
```

```
1              MR. BRILL:  We had talked to I think somebody
2    here about using it and trying to look at it after we're
3    finished with the pretrial conference.
4              THE COURT:  It's there.  I just finished a jury
5    trial so they are deliberating.  It's up and it's very
6    easy to use.
7              MR. BRILL:  That's the only thing we would plan
8    on using.
9              MR. ORLEANS:  And we want to use it.
10             MR. BRILL:  Yes, we have, we do have a DVD that
11   we need to play.
12             THE COURT:  You can connect a laptop to the
13   projector that we use with the Elmo and then play it --
14             MS. GAMBARDELLA:  This is just a silly thing but
15   can you make sure we have approval to bring up a
16   Blackberry?  Because we sometimes don't have our bar
17   numbers and they may start taking away our Blackberrys.
18   Today, they let us today.
19             THE COURT:  That's a good point.
20             MS. GAMBARDELLA:  But later on they may not.
21             MR. BRILL:  And what time do you start court in
22   the morning?
23             THE COURT:  Well, my thought is to start at nine
24   to get our seven hours in, and have a lunch break when
25   sometimes we are likely going to have to take up other
```

1    matters.  I'm notoriously bad at getting here by nine so I

2    will make a special effort not to use up anybody's

3    precious minutes.

4                MS. GAMBARDELLA:  Can Kessel sit at our counsel

5    table?

6                MR. ORLEANS:  No way.  We want Kessel at our

7    table.

8                MR. BRILL:  When we bring our stuff, is the

9    courtroom open before then?

10                THE COURT:  Oh, yes.  You can bring it in the

11    Friday before, if you want.  You can bring it in probably

12    starting about 8:00 o'clock is my guess, certainly by

13    8:30.  The front door I believe is open at eight.

14    Certainly will be if we tell them.

15                All right.  So bottom line is you have some

16    issues you're still working out.  Exhibit lists, expert

17    reports, supplemental reports.  We're going to look for

18    trial briefs from you.  We're going to get our exhibits

19    from you whenever you want to drop them off, and we'll try

20    the timing for the trial.  That should allow us, you know,

21    an hour or so each for whatever closing argument you want

22    to make.

23                MR. ORLEANS:  Fine.

24                MR. BRILL:  Great.

25                THE COURT:  If other issues come up, just give a

```
1    call and we'll find a way to get them resolved.  Okay?

2            MR. BRILL:  Okay.  Thank you, Your Honor.  Have

3    a good trip.

4            THE COURT:  Appreciate it.

5            (Whereupon the above matter was adjourned at

6    1:00 o'clock, p. m.)
```

C E R T I F I C A T E

I, Susan E. Catucci, RMR, Official Court
Reporter for the United States District Court for the
District of Connecticut, do hereby certify that the
foregoing pages are a true and accurate transcription of
my shorthand notes taken in the aforementioned matter to
the best of my skill and ability.

/S/ Susan E. Catucci
_____

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917) 703-0761