```
              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

STEPHANIE BIEDIGER              :  No. 3:09CV-621 (SRU)
                               :  915 Lafayette Boulevard
            vs.                :  Bridgeport, Connecticut
                               :
                               :  April 24, 2012
QUINNIPIAC UNIVERSITY          :

- - - - - - - - - - - - - - - - x


                     MOTION HEARING


B E F O R E:

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

     FOR THE PLAINTIFF:

          PULLMAN & COMLEY
               850 Main Street
               P.O. Box 7006
               Bridgeport, Connecticut 06601-7006
          BY:  JONATHAN B. ORLEANS, ESQ.
               ALEX V. HERNANDEZ, ESQ.

     FOR THE DEFENDANT:

          PROSKAUER ROSE LLP
               Eleven Times Square
               New York, New York  10036-8299
          BY:  EDWARD A. BRILL, ESQ.
               SUSAN D. FRIEDFEL, ESQ.


              Susan E. Catucci, RMR
              Official Court Reporter
              915 Lafayette Boulevard
          Bridgeport, Connecticut  06604
                Tel: (917)703-0761
```

```
 1                    (3:00 O'CLOCK, P. M.)

 2               THE COURT:  Good afternoon.  We're here in

 3     Biediger v. Quinnipiac University.  Could I have

 4     appearances, please?

 5               MR. ORLEANS:  For the plaintiffs, Jonathan

 6     Orleans and Alex Hernandez from Pullman & Comley.

 7               MR. BRILL:  And for the defendant, Edward Brill

 8     and Susan Friedfel from Proskauer Rose.

 9               THE COURT:  Okay.  And we have two motions, I

10     think, pending.  One is a motion to compel.  Let's start

11     there.

12               I'll start by saying that I read the papers but

13     I'd be interested in an elaboration of the

14     need-slash-relevance of the scope of documents that are

15     being sought.

16               MR. ORLEANS:  Yes, Your Honor.  I had thought,

17     trying not to elaborate so much as to consolidate, but

18     essentially, Judge, we are not -- we certainly don't want

19     to involve the court in going through request by request.

20     I think once we have a clear decision on the temporal

21     scope of discovery, I would hope we would be able to work

22     things out with the defendant.

23               So the essential argument here, as I'm sure you

24     recognize, is whether the plaintiffs are entitled to

25     information that goes back prior to 2010 in connection
```

1       with the upcoming proceedings in this case.

2               And fundamentally, Judge, our view is that this

3       is an institutional reform litigation and ultimately the

4       court needs to balance the equities and make a decision

5       about the proper scope of relief.

6               It's true in connection with the hearing that's

7       coming up in June on the defendant's motion to lift the

8       injunction that's already been entered, it seems to us

9       that the court has to decide under all the circumstances

10      given the history, is it appropriate to lift the

11      injunction now, depending on what facts you find exist at

12      the time.  We recognize there's a factual snapshot that

13      gets taken but that's not the end of the story.

14              And, similarly, when we get to the proceeding in

15      or after November, whenever that gets scheduled, and the

16      court is determining the scope of a remedy on

17      discrimination in facilities and other benefits, assuming

18      that the court determines that the plaintiffs are entitled

19      to remedy, it's an equitable determination and it's, to us

20      it seems evident that in any institutional reform

21      litigation, history is significant.  And that no one would

22      say, for instance, if this were a case about race

23      discrimination in some other institution, I don't think

24      anybody would say that a lengthy history of discrimination

25      was irrelevant to shaping a remedy.

1          So that -- and we don't think that in a case

2     that's about discrimination in an educational institution,

3     we think that even though the court takes a snapshot of a

4     moment in time to determine whether at this moment there

5     is compliance with a set of regulations on proportionality

6     in athletic opportunities, it seems to us that in shaping

7     an appropriate remedy, determining whether to lift the

8     injunction that's been entered, the court has to consider

9     all the circumstances and that includes the history of the

10    university's conduct with respect to women's athletics.

11         So all the arguments we make in the brief get to

12    that point in one way or another.

13         THE COURT:  So here we are, let's assume that

14    the outcome -- well, there's two possible outcomes.

15    Either they are currently in compliance or they are not.

16    If they are currently in compliance, does the bad

17    history -- I'll assume there's a bad history here -- does

18    the bad history entitle plaintiffs to an injunction?

19         MR. ORLEANS:  I hesitate to use the word

20    "entitle," Your Honor, because I think it's obviously

21    discretionary with the court.  What I would say is that --

22         THE COURT:  Well, is it?  That's the point.  If

23    they are in current compliance, do I even have discretion?

24         MR. ORLEANS:  We think you do, yes.  If they are

25    currently in, if they are currently in statistical

1    compliance, we think that the court nonetheless has the

2    discretion to say I'm not going to lift the injunction

3    now.

4             THE COURT:  Well, fair enough.  But how does the

5    history bear on that?

6             MR. ORLEANS:  I think, I think the history bears

7    on that in that it would be something that I would think

8    Your Honor would weigh into the balance in determining am

9    I going to lift the junction now.

10            THE COURT:  We know, in terms of lifting we know

11   they weren't in compliance as of the date of the

12   injunction.

13            MR. ORLEANS:  Correct.

14            THE COURT:  So if they are now in compliance,

15   statistical compliance, you can argue they've only been in

16   statistical compliance for X months or whatever.  How does

17   the fact that in 1985 they were not in compliance help you

18   in the argument about whether it should be lifted or not?

19            MR. ORLEANS:  Well, I this, Judge, that there's

20   a difference between arguing on the part of the

21   plaintiffs, Your Honor, we know that they were out of

22   compliance from 2009 until 2010 and they are in compliance

23   now and, therefore, you shouldn't lift the injunction yet,

24   on the one hand, and being able to argue on the other

25   hand, Your Honor, we know and we've shown that the

1     university was not in compliance with Title IX at any

2     point since they joined Division I in 1998.

3            THE COURT:  Okay, so why is it not enough, if

4     that's the purpose, to give them an interrogatory that

5     says give us the percentage male, percentage female

6     student body enrollment at Quinnipiac from 1990 forward

7     and give us the numbers of, that you claim were Division I

8     athletes, male, female, each of these years?

9            MR. ORLEANS:  Well, I think we could do that and

10    we have some of that, some of that information from the

11    EADA reports that are available through the government

12    website going back that far.  We don't have the squad

13    lists and we learned there are differences between what's

14    shown on the squad list and what's shown in the EADA

15    reports.

16           THE COURT:  We're not going to get to that level

17    of detail with respect to past years.  I mean there's no

18    value in spending weeks trying to figure out whether the

19    squad lists for the last 15 years have been accurate or

20    not.

21           MR. ORLEANS:  I would concede, I think, Your

22    Honor, that we wouldn't want to ask the court to spend

23    weeks going through that.  We might want to have an expert

24    look at it and make some summary statement about it, but

25    in addition, Your Honor, I think, I have reason to

1   believe, and maybe Mr. Brill will correct me if I'm wrong,

2   but I think that if we, the plaintiffs, based on the

3   information that we have or could have from EADA reports

4   going back to say 1998, the Division I year that

5   Quinnipiac moved up to Division I, if we say Quinnipiac

6   has not been in compliance since that time, the response

7   is going to be, yes, we were because we were in compliance

8   with prong two.  And there's the can of warms that is

9   opened.

10          And that's why we also want some information

11  about, you know, when teams were added and when teams were

12  cut, because we have want to show -- we think that it is

13  relevant to the equities whether there is a history of

14  noncompliance, a history of discrimination that goes back

15  some distance.

16          If you want to say you're not interested in what

17  went on from 1972 to 1998, that's the court's prerogative

18  and discretion and I understand that view.  But certainly

19  back, we think that the consideration of the history

20  predating 2010 or 2009 is relevant to the equities in the

21  case and certainly is discoverable.

22          THE COURT:  Well, you know, there's history and

23  then there's history.  These have got to be the most

24  extensive document requests I've seen as a judge.  I

25  understand I have an affidavit from Ms. Galles saying this

1    is standard and no courts have ever refused to require

2    production of all of this.  This is -- I mean it's

3    unbelievably extensive.

4           MR. ORLEANS:  Your Honor, the one thing I would

5    say about that -- I don't want to interrupt the court.

6    Just, it is extensive.  To a large degree it's extensive

7    because it's detailed and rather than asking broad

8    questions at least in some cases, I'm not going to make

9    this claim with respect to every request but some of the

10   requests are fairly narrowly focused and they do track the

11   OCR investigator's manual.  We have a declaration from

12   defendant's expert Lamar Daniels who used to work at OCR

13   and was one of the authors or the editors of OCR.

14           THE COURT:  I'm not saying they are in bad

15   faith.  I'm just saying they are unbelievable for the

16   limited purpose you're suggesting they might be valuable;

17   i.e., weighing equities.

18           What I need is a sense of, you know, here in 20

19   minutes is our case why they've never been in compliance

20   since 1998, and here in 20 minutes is our case why we have

21   been.  That's --

22           MR. ORLEANS:  What you're looking for.

23           THE COURT:  I think otherwise it's, you know,

24   it's not even a tail wagging the dog, it's the flea on the

25   tail that's kicking the dog around.  I just don't think

 1    having an extensive detailed history, other than trying to

 2    make the university look bad, I don't see that it really

 3    serves any great purpose in terms of weighing equities

 4    here.

 5            If they are in compliance, the argument has to

 6    be that they've been out of compliance for a long time and

 7    one year is just one year so don't lift it yet.  And if

 8    they are out of compliance, you don't need all that

 9    history.

10            MR. ORLEANS:  Just to be clear, Your Honor,

11    obviously we're not conceding they are in compliance

12    currently but, yes, if I understand your -- you're

13    correctly predicting a significant part of the argument we

14    will make.  We will argue if the court finds the

15    university to be in compliance now, the court nonetheless

16    should not lift the injunction, and we'll explain -- it

17    will be based on equitable considerations and we'll

18    explain what they are.

19            THE COURT:  Right.  But there's a limited amount

20    of information, I think, that you reasonably need to

21    support that and I just think what we're presented with

22    here is just really over the top.

23            So, let me hear why they shouldn't get

24    anything -- I take it that they shouldn't get anything

25    past 2010 is I guess the defense position.

1          MR. BRILL:  Yes, I'm having trouble hearing you,

2     Your Honor, I'm very sorry.

3          THE COURT:  I'm sorry.  All right, go ahead.

4          MR. BRILL:  You were asking me obviously why we

5     disagree with Mr. Orleans' request or is there a narrower

6     question?

7          THE COURT:  Your position seems to be that the

8     plaintiffs are not entitled to anything prior to 2010.

9     Why is that the case?

10          MR. BRILL:  Number of reasons, Your Honor.

11     First of all, this case arises in the context of a motion

12     to lift the permanent injunction.  Many of --

13          THE COURT:  Well, the Motion to Compel relates,

14     as I understand it, both to that motion and to the merits.

15          MR. BRILL:  So could I address them separately,

16     Your Honor, because I think the issues are actually

17     different with respect to the two prongs of the motion.

18          THE COURT:  You can address them however you

19     want, but it seems to me the question of compelling

20     discovery, if it should be compelled for either purpose,

21     then it should be compelled.

22          So if you have a great argument why it

23     shouldn't be compelled in connection with the motion to

24     lift the injunction, it doesn't really help you unless --

25     so you ought to lead with your strength, if you will.

1          MR. BRILL:  I think there are very strong

2  arguments but they are slightly different arguments for

3  both.

4          THE COURT:  Fine.

5          MR. BRILL:  Much of what Mr. Orleans argued

6  might have been relevant to the original trial in terms of

7  exploring the history of Quinnipiac and whether that

8  affected the Court's basis for issuing a permanent

9  injunction but, in fact, the Court ruled twice actually

10  that discovery prior to 2007, 2008 would not be required

11  and would not be relevant to the hearing on the merits.

12  Notwithstanding that, the court did issue a permanent

13  injunction based on the inquiry as to one specific

14  hearing.

15          Now, the court ordered that we submit a

16  compliance plan, if you recall.  That was the original

17  direction.

18          THE COURT:  I recall.

19          MR. BRILL:  And obviously when we get to that

20  compliance plan, the compliance plan expressed the sports

21  and the squad sizes that Quinnipiac would be planning to

22  have in the future several years.  If the court had gone

23  forward with the notion of simply approving a compliance

24  plan, there's no issue of past history or anything else.

25  It was just does this compliance plan satisfy Title IX.

```
 1              Instead, the court said, in effect, rather than
 2       prove or disprove the compliance plan, I'll give
 3       Quinnipiac an opportunity to move to lift the injunction,
 4       to show what changes have been made, what changes have
 5       occurred since the time and date of the permanent
 6       injunction and to show what the situation is in the
 7       current academic year.  So the history is even less
 8       relevant now than it was at the time of the permanent
 9       injunction.
10              THE COURT:  It may be more relevant.  Let's
11       assume you're in compliance, you're in statistical
12       compliance and you say, Judge, lift the injunction, we're
13       in statistical compliance.  And they come back and say
14       wait a minute, wait a minute, wait a minute, they barely
15       made it, you know, statistical compliance and, by the way,
16       they've not been in compliance ever.  This is the first
17       year in history they've ever been in compliance and if you
18       lift the injunction, you know, things are going to slide
19       right back the way they were.
20              MR. BRILL:  Right, and I was going to address
21       that, Your Honor.  If that were the case, that would be a
22       legitimate argument, we barely squeaked by by adjusting
23       squad sizes.  But we intend to show we are way
24       over-weighted toward women now.
25              THE COURT:  I've read your papers.
```

1                    MR. BRILL:  We didn't just adjust squad sizes,

2        we've added two brand new women's sports and we intend to

3        to show that acrobatics and tumbling counts, so that the

4        court can have assurance that this isn't a case where

5        somebody manipulated a few numbers and there's a risk of

6        going back.

7                    And let me say one other thing about history.

8        It's even, it's frankly almost impossible, impractical to

9        do that here because, as Mr. Orleans recognized,

10       Quinnipiac didn't contend that it was in compliance with

11       prong one until 2009, 2010.  So that the history that the

12       court would have to address would be a complete history

13       under prong two, which has not been litigated, which would

14       involve discovery back to the, you know, according to the

15       case law, back to the date that Title IX was passed.

16                   And it wouldn't -- there's no way to do that

17       without extensive discovery, a hearing that frankly would

18       be much, much longer than the hearing we would have likely

19       on the hearing on the merits, and I'm not sure what it

20       would show.  I mean if we weren't in compliance with prong

21       two for 20 years but we now can demonstrate that we're in

22       good faith compliance with prong one and there's no reason

23       to believe that we won't continue to be, then it seems to

24       me that's enough for the court to act on.

25                   And if the court finds that there's still some

1    doubt as to whether Quinnipiac is in good faith not only

2    moving towards but exceeding the requirements of Title IX

3    with respect to prong one, then that ought to be

4    sufficient to lift the injunction.

5           Even if -- let's assume we have a trial for a

6    week or more on prong two, and the court says, well, you

7    know what, you really, you really didn't have a history of

8    satisfactory under prong two.  There's not a lot of case

9    law on prong two.  There's a few cases but you didn't -- I

10   find that Quinnipiac would not have qualified under prong

11   two.  I don't think that -- it would be a tremendous

12   burden to have discovery and a trial.  I don't know that

13   it really advances the ball very much on the issue.

14           THE COURT:  Okay.

15           MR. BRILL:  I'd like to address, if I could, the

16   second part of it.  And there, the issue is much clearer

17   because the only request, the only relief that they are,

18   the class is requesting is injunctive relief, and there is

19   no doubt that injunctive relief is based on present

20   circumstances.  And even if Quinnipiac --

21           THE COURT:  Well, it's based on all the

22   circumstances, isn't it?  Don't I have to consider all the

23   circumstances when deciding whether to grant the equitable

24   relief?

25           MR. BRILL:  Yes, but I would suggest if

```
1    Quinnipiac 20 years ago or ten years ago had a deficient
2    situation with respect to the baseball field, for example,
3    but that was remedied, I don't see how that's relevant to
4    the scope of the injunctive relief that would be issued
5    now.
6              And that would be confirmed by the declaration
7    that I think you said you read by Lamar Daniel, who
8    practically wrote the book on the OCR regulation.  He was
9    the co-author of the investigators' manual that the
10   plaintiffs themselves cite.  And not only his declaration
11   but the document shows it is standard to go back one year
12   or at most two years, which is exactly what we've done.
13             And even if there were some small additional
14   benefit that could be gained in some areas by going back
15   further, I think the court needs to weigh the burden of
16   that versus the potential probative value and they haven't
17   come forward and said, look, on this one area, you know --
18   I can't even think of an area where that would be true.
19             But they've taken now the depositions, by the
20   way, of all 17 coaches.  We've given them close to 30,000
21   documents, and they haven't come forward with anything
22   specific to say that in this specific area it would be
23   useful or necessary to go back.  They've just put before
24   the court these hundreds and hundreds of document requests
25   and said Quinnipiac needs to go back much further than
```

they have.  And, you know, it's costing -- I won't even put on the record but it's obviously taking hundreds and hundreds of hours and costing many thousands of dollars to comply with these requests.  And, you know, we're doing it with respect to the current two years but I don't think that there's any warrant to go back further with respect to the benefit in scholarships.

Let's look at the scholarship claim for one, to give you an example.  So the court has to examine the allocation of scholarships between men and women athletes and whether those are proportional in the same way that the court is in the proportionality of participation obligations.  If the scholarships are not proportional now, then relief will have to be given.  It doesn't really matter what the history of scholarships was.

If scholarships were proportional ten years ago but they are not proportional now, I think -- I'm not going to deny the plaintiffs would be entitled to equitable relief to compel that scholarships be given out in a proportional way.

And if you go down every one of the benefits, the locker rooms, the facilities and so on, everything will have changed over the course of time, and it just seems to us that what's really relevant in the claim for injunctive relief is what are the conditions now, what

1    were they most recently, last year, and what is the

2    current need for injunctive relief to remedy deficiencies

3    that the Court would find with respect to those benefits.

4              THE COURT:  All right.  Mr. Orleans?

5              MR. ORLEANS:  Just briefly, Your Honor.

6    Mr. Brill discussed the University's claim that it was in

7    compliance with Title IX's participation requirements

8    under prong two before 2009.  Without getting into a

9    lengthy discussion of the merits of that claim, we don't

10   think so.  Prong two requires a demonstrated history of

11   having a sports with an under-represented sex and I would

12   say I don't think there's been a team with an

13   under-represented sex since 2003.

14             So, but that's a little bit -- that's some of

15   what we're trying to explore in order to make even the

16   brief presentation that Your Honor referenced in

17   connection with our argument, or potential argument, that

18   even if the university is in compliance now, nonetheless

19   the injunction should not be lifted because of the history

20   of discrimination.

21             THE COURT:  But to satisfy that, why do you need

22   anything more than the statistical information that you

23   already have and the dates when teams were added, which it

24   sounds like you already have?

25             MR. ORLEANS:  I think we have some of that

1    information.  I think, you know, it might be useful to

2    have, for example, communications among the administrators

3    and athletic directors about that situation to determine

4    whether they were knowingly violating the statute or

5    whether they were simply not paying attention.  That might

6    be relevant to the Court's consideration of the equities

7    in terms of the remedies, what was the state of mind of

8    the defendant concerning its compliance or noncompliance.

9         As I said, Your Honor, I didn't come prepared to

10   parse the individual requests in detail.  I was more

11   looking for a line in the sand that we could then deal

12   with this as far as time.  But I take your point, I

13   wouldn't stand here and claim that we need -- that in

14   order to explore the prong two issue prior to 2009, that

15   we need a complete response to every single request going

16   back to 1998 when Quinnipiac went Division I.

17        THE COURT:  We did discovery through backwards

18   until 2007 in connection --

19        MR. ORLEANS:  I believe that we did, Your Honor,

20   yes.

21        THE COURT:  Is that right?  And so if you had,

22   if you had the prong one information and the prong two

23   information from 2007 forward, why isn't that enough?

24   That's five years back, and the equitable value diminishes

25   rapidly as you go back in time.  You know, Quinnipiac is

1   not the same place in very many ways that it was 20 years

2   ago.

3            MR. ORLEANS:  Well, it has the same president,

4   Your Honor.

5            THE COURT:  Well, that's possible but --

6            MR. ORLEANS:  And the same athletic director

7   that it had when it went to Division I in 1998.

8            THE COURT:  Well, fine.

9            MR. ORLEANS:  And let me just very briefly

10  address two other points that Mr. Brill made.

11           With respect to Lamar Daniel, he did work at OCR

12  until 1994.  He does claim credit for authoring the

13  investigators' manual.  We haven't taken his deposition

14  yet.  I will say that I am, I am not sure that he is as

15  much of an authority on OCR investigations as he thinks he

16  is but, you know, we'll find out.  I just, I don't want my

17  silence to be construed as conceding any level of

18  expertise for him.

19           THE COURT:  I understand.

20           MR. ORLEANS:  Finally, Mr. Brill made a point

21  about using scholarships as an example on the benefits

22  claim.  I believe, Your Honor, that there are damages

23  claims asserted in connection with the disparate treatment

24  claims that are to be tried in November, and if we have

25  all overlooked something in that regard, maybe, perhaps --

1   this is dawning on me as I sit here -- perhaps when we

2   move for class certification, we didn't seek certification

3   of a damages class or perhaps we did but the court only

4   certified injunctive relief class.

5          THE COURT:  I don't think you sought it and

6   probably didn't seek it because you wanted to have an easy

7   (b)(2) certification, but --

8          MR. ORLEANS:  On Count One.  But we are, and I

9   think we've been consistent in stating this, we are

10  seeking damages on behalf of the class, and that argument

11  is advanced in the briefing on the Motion to Compel as a

12  reason why we need some information going back to the

13  beginning of the statute of limitations, which I think is

14  2006.  So --

15         MR. BRILL:  Your Honor, may I respond?  I'm

16  sorry.

17         MR. ORLEANS:  I'm sorry too.  If there's an

18  issue as to whether we are entitled to seek damages, we'll

19  try to clean that up promptly.

20         THE COURT:  Well, I think it's accurate -- I

21  think the defense has accurately pointed out that the

22  class certification order did not certify any damages

23  claims, so I don't recall frankly rejecting a class

24  certification motion in part, so I don't believe that the

25  class certification motion sought certification of damages

1   claims.  I could be mistaken.

2         MR. ORLEANS:  I think you're right, Your Honor.

3         (Pause)

4         MR. ORLEANS:  Your Honor, may I raise one

5   additional issue with respect to discovery?

6         THE COURT:  Sure.

7         MR. ORLEANS:  This is not asserted in the

8   motion.  It's mentioned in the declaration of Ms. Galles

9   which was filed today, so the defendant has not had a

10  chance to respond to it but I think they are aware of it

11  because this is something that's come up in the

12  depositions that have been going on over the last week or

13  ten days.

14        In our document requests to the University, we

15  asked the University to inquire of the coaches whether

16  they had in their possession documents responsive to the

17  requests, apart from the University's records, whether the

18  individual coaches have records.

19        We also when we noticed the depositions and

20  served the notices on the University, we again included

21  document requests directed to the individual coaches.

22        Apparently when the depositions were taken and

23  coaches were asked whether they had seen the document

24  requests or whether they had been asked to turn over

25  documents to the University for review, we were told that

1    they had, the coaches had not seen the requests and that

2    the University had not asked the coaches for any documents

3    that might be in their individual possession.

4            And we're troubled by that.  You know, we think

5    that, for example, it would not be surprising if coaches

6    used their personal email or cell phone text messaging

7    capabilities to gripe to each other about the University's

8    roster management targets rather than putting that

9    information on the University's email system.  If that's

10   the case, that might be relevant for an exploration of

11   what's really going on with roster management.

12           So we think that certainly having the coaches

13   turn over anything that they have in their possession

14   that's relevant, that's responsive to these document

15   requests, is a reasonable thing and that that information

16   is discoverable.

17           And so we raise that.  It's not raised formally

18   in the Motion to Compel but it's an issue that's out there

19   now and we certainly would like to see the defendant

20   directed to obtain that information from the coaches.

21           MR. BRILL:  Your Honor, this issue is not ripe

22   for adjudication and it has not been discussed between

23   counsel.

24           MR. ORLEANS:  That's true.  I don't contest

25   that.

1            MR. BRILL:   In seeking to respond in a

2    comprehensive way to these 379 document requests, we

3    notified plaintiff's counsel at the very outset what we

4    going to do and what email accounts we were going to

5    review.   There are 17 separate coaches and we said we are

6    not searching coaches' email accounts because any relevant

7    email relating certainly to participation claims, to

8    roster sizes and so on, would all have to go to somebody

9    in the athletic administration department or to Mark

10   Thompson.

11           We searched the emails of I don't know how many

12   athletic department administrators but at least a dozen,

13   anybody who would have had any substantive responsibility

14   for any of the areas that Mr. Orleans is taking about, but

15   we haven't discussed this among ourselves.   We raised this

16   with them probably a month ago when we indicated the scope

17   of the undertaking we were going to do.   And the coaches

18   were asked in a very general way, do you use your text

19   messages to communicate with recruits, do you use email to

20   communicate with your players, and of course the answer is

21   yes.   But is it really necessary for us to have to go

22   through tens or hundreds of thousands of text messages and

23   emails telling the players, you know, the bus is leaving

24   at 8:00 a. m. tomorrow morning or practice today is going

25   to be at such-and-such a place.   Or the thousands, tens of

1   thousands of emails the coaches send in text messages to

2   recruits, which they testified to.

3        They were questioned about, in many cases

4   student by student, athlete by athlete, everything the

5   coach did to recruit a particular athlete.  So, you know,

6   if there were some marginal relevance to the text messages

7   between the coach and the athlete, I don't see what it

8   would be but it certainly is far outweighed by the burden

9   of us having to collect all that and review it.

10        And in the one or two instances where they

11  questioned a coach about a specific document that had not

12  been produced or we didn't otherwise know about it, we

13  immediately obtained that document.

14        And the other example is some of the coaches

15  were asked, well, do you keep records of the competitions

16  that your athletes compete in yourself.  They said yes but

17  we produced all of the official results of every single

18  competitive event for the last two years.

19        So what does it add -- except to put a burden on

20  us and on the coaches, I think it doesn't add anything to

21  the record here, certainly not to the participation claim.

22        The notion that they want to undergo -- and they

23  didn't ask a single coach did you gripe to anybody else,

24  did you send a text message, did you send an email.  There

25  were 17 coaches deposed.  That question, as far as I know,

1    wasn't asked of a single one of them.  And, therefore,

2    they can't come into court and say, well, now we just want

3    to undergo a fishing expedition to find a needle in a

4    haystack to find out if some coach somewhere complained.

5         And even if they did, how would that advance the

6    ball?  Because what they did ask the coaches was who

7    participated; who was on your roster; how did you recruit

8    each one of these athletes; what events did they

9    participate in; when they left the roster, what was the

10   reason; did get they financial aid.  All the issues that

11   are relevant to this hearing have been thoroughly explored

12   now by written discovery among the people who would have

13   99.9 percent of the relevant correspondence and by

14   depositions of the coaches.

15        If there's some particular document that they

16   feel they don't have that they need to get from the

17   coaches other than the notion of, well, maybe the coaches

18   were complaining to each other, then we'd be happy to talk

19   to them about it, but there is no motion to compel pending

20   on that.

21        As I said, we were upfront at least a month ago

22   in telling them what the scope of our discovery was and I

23   don't think it's appropriate now to stand up at the last

24   minute based on a declaration that Ms. Galles submitted a

25   half hour before the hearing and try and put this issue

1    before the court.

2         MR. ORLEANS:  Judge, I appreciate this wasn't

3    something that had been discussed in advance and I'm

4    perfectly happy to defer it until we've had a chance to

5    discuss it.

6         I think that the, you know, the burden of

7    searching the electronic database is a little bit of a red

8    herring because you run a keyboard search and even if you

9    have a hundred thousand emails in the database, you may

10   only turn up 50 that actually have to be looked at.

11        But, as I say, I'm happy to discuss this with

12   defense counsel and then if we need to present something

13   to the court, we'll do it in an appropriate way.

14        THE COURT:  Okay.  Thank you.

15        I think it's not fully ripe but I'd like to take

16   up the motion to postpone the hearing, and I'm principally

17   interested in hearing a justification for postponing --

18   which has been set for some time.  What, if anything,

19   about the manner in which discovery has been complied with

20   has prevented plaintiffs from being apparently ready to go

21   forward?

22        MR. ORLEANS:  Well --

23        THE COURT:  And I just, I need more support.  I

24   mean you mention --

25        MR. ORLEANS:  Judge, I don't want to accuse the

1    defendant of any bad faith.  It's just, you know, the

2    document requests were extensive and it has taken time for

3    the defense to produce.  They are continuing to produce.

4    There's been a lot of depositions to be taken.  They are

5    ongoing and not yet complete.

6           And I guess my -- we've obviously been at odds

7    over some of the discovery issues.  We've heard about some

8    of that this morning.  If this is going to result in the

9    plaintiffs obtaining anymore discovery, then we're going

10   to need -- obviously that's going to be an additional

11   burden to review whatever else we obtain and whether that

12   results in our requesting additional deposition time with

13   any of the witnesses.  I don't know.

14          But I guess what I would say on the discovery

15   issue particularly is that the period of time that was

16   allotted to pursue discovery in preparation for this

17   hearing has flown by in a big hurry, and although it

18   looked at the outset like it ought to be enough time,

19   we've found it quite a struggle to adequately review all

20   of the information that we've gotten and to be prepared we

21   think for a hearing in June.

22          And then there are the other factors that are

23   mentioned in the motion as well.

24          THE COURT:  Well, I mean I'll be completely

25   frank, I'm very reluctant to postpone the hearing.  It's

1    been scheduled for quite some time.  I know it was

2    scheduled over the opposition of the plaintiff but I think

3    to give the defense a chance to convince me to lift the

4    injunction before the coming academic year is important.

5         And, you know, most of the matters mentioned, I

6    think are ones that can be worked around.  You know, high

7    school graduations are very, very important but they are

8    not very long.  And, you know, even a luncheon in San

9    Francisco three days before the start is not something

10   that I would sense would be at risk if we started on the

11   11th.

12        MR. ORLEANS:  Your Honor, those factors, you

13   know, were not being advanced as the primary reasons to

14   ask for a postponement.

15        THE COURT:  All right, but I guess I don't yet

16   have a sense that the, for example, the manner in which

17   you receive documents or had witnesses made available for

18   deposition has in any way prejudiced your preparation of

19   the case.  And so, if that is your argument, I would need

20   to hear more about that.

21        It's a lot of documents.  I understand it's an

22   important case and I understand you've taken a lot of

23   depositions but, you know, unless you got dumped a lot of

24   documents very recently, unless the depositions have been

25   unreasonably postponed, that sort of thing, it seems to

1    me --

2              MR. ORLEANS:  Your Honor, I certainly can't

3    claim that the depositions having unreasonably postponed.

4    In fact, the defendant has been accommodating of

5    plaintiffs' side in postponing some depositions.

6    Documents -- I don't know, we certainly haven't received

7    in the last couple of days an enormous amount of

8    documents.  We received, as I think we mentioned in the

9    motion, in total some 30,000 documents, about half of them

10   within the last month or so.

11             So, yes, it's a burden but I'm not accusing the

12   defendant of bad faith.  I'm just saying that reviewing

13   that volume of material is burdensome and we don't have

14   the -- it's a strain on the resources we have.

15             THE COURT:  All right.  Mr. Brill, how would

16   postponing the hearing until November prejudice the

17   defendant?  The suggestion's been made that in effect it

18   would be one more season for volleyball.

19             MR. BRILL:  I'm sorry --

20             THE COURT:  The suggestion has been made that it

21   would mean one more season for volleyball.

22             MR. BRILL:  Your Honor, obviously this was

23   discussed at length when we had the initial scheduling

24   conference and the court recognized that the defendant's

25   entitled to and should be entitled to an opportunity to

1    show that it's in compliance and to lift the injunction

2    before the upcoming academic year or, in effect, let the

3    injunction continue for a year by default.  And it's not

4    just continuing volleyball.

5          The problem, we explained repeatedly, this

6    facility that the team practices in and competes in is the

7    only multi-use facility in the University now.  In fact,

8    when I was up there this week there were posters all over

9    it.  Such and such a meeting is going to be in the Burt

10   Kahn gymnasium.  Such and such election is going to be in

11   the Burt Kahn gymnasium.  And they can do that now because

12   the volleyball team is only in there for a limited amount

13   of time.

14         But you're basically depriving the University

15   by -- if the injunction is continued by default, then the

16   University has to operate with its hands tied behind its

17   back to the detriment of its academic programs by not

18   having this facility available.

19         THE COURT:  Let's not overstate it.  I assume

20   the volleyball team is not practicing 24/7.

21         MR. BRILL:  No, but they practice twenty hours a

22   week in season, and it's been very difficult not only --

23   every time, every time there's an event and the chairs

24   have to be set up and the whole room has to be reassembled

25   and disassembled for volleyball practice, it's not only

1    led to difficulty in scheduling events there but it's led

2    to have constant friction with the team because the floor

3    isn't cleaned up properly or somebody didn't put the

4    chairs away properly.

5           And this is a facility that the University has

6    said for three years we wanted it to go to academic

7    purposes, in addition to which, the university has said

8    over and over again we do want to discontinue the

9    volleyball team.  We've continued it for three years now.

10   Only one of the original plaintiffs is still left.  She

11   was a high school senior when the case began.

12          And I will say that -- I'd like to respond to

13   the merits of the motion as well, because it seems to me

14   they haven't given any reason for changing the Court's

15   premise which is that Quinnipiac is entitled to an

16   opportunity to show, in the three or four day hearing,

17   that we have complied with the law and with the Court's

18   injunction and we should be free of the injunction.

19          With respect to the discovery issue, I just want

20   to make a few points.  Number one, we made a very

21   concerted effort to produce early on the documents that

22   related to the participation claim and to the hearing.  So

23   that, yes, there are thousands of documents that are

24   continually being produced and it is not a easy task, by

25   the way, despite electronic searches, to review these.

1          But these largely now relate to the

2    participation claim which is scheduled for trial in the

3    fall and has a later -- what's that?  To the benefits

4    claim, which is scheduled for trial in the Fall and has a

5    later discovery cut-off.

6          In addition to which, I think it's significant

7    to note that the plaintiffs now have all of the

8    information, plus more, than they had at the time of the

9    hearing which was sufficient for the court to issue a

10    permanent injunction.  They have the squad lists for two

11    years.  They have the records of competition in every

12    sport.  They have all the records of additions and

13    deletions to the team.  They have email, all the email

14    correspondence about every sport, how the roster was set,

15    what the coach wanted, when Mr. Thompson approved an

16    addition or approved a deletion.  All that's been

17    produced.

18          And, in addition, which they didn't have the

19    last time and they complained about, they now deposed all

20    of the coaches.  The last coach was deposed this morning

21    and while some of those depositions, they may have to be

22    continued, at least the plaintiffs said they may want to

23    continue some of them on the benefits issues, the

24    participation issues have now been thoroughly explored.

25          So there's really, there's no deficiency in the

1    discovery that they've identified.

2             I can't, and as Your Honor pointed out, much of

3    the rest of the motion is simply repeating what was argued

4    the first time but I don't think it's fair or appropriate

5    to say that Quinnipiac, well, it's no big deal to just

6    have the injunction continue by default for another year,

7    and/or let's see what the Second Circuit does, because the

8    Second Circuit may not rule for a long time or the Second

9    Circuit may uphold Your Honor's ruling.  And --

10            THE COURT:  Let's hope so.

11            MR. BRILL:  I know you hope so and they hope so

12   and we hope it doesn't.  But the point is that while we're

13   all waiting for the Second Circuit to do something at some

14   time, we don't know when, in the meantime Quinnipiac has

15   made major changes and we'd like the opportunity to come

16   to the court and show that it's no longer appropriate to

17   keep the injunction in effect.  And for the reasons of

18   being able to direct the budget funds and athletic support

19   to the sports that Quinnipiac does want to continue

20   sponsoring, as well as a very important issue of tying up

21   this very important facility for another year, we urge the

22   court to stick with its original thought which was that

23   it's only fair to Quinnipiac to give it a full opportunity

24   to have this hearing to show that we are in compliance

25   before the injunction continues by default.

```
 1              MR. ORLEANS:  May I just comment very briefly on

 2      that, Your Honor?

 3              THE COURT:  Sure.

 4              MR. ORLEANS:  We don't dispute the University's

 5      right to have a hearing at which it should argue, at which

 6      it will argue that the injunction should be lifted, but

 7      the issue is when that hearing should take place.  We just

 8      find this repeated assertion that it's a facilities issue,

 9      an issue of the Burt Kahn court, not at all credible.

10              THE COURT:  I don't find that especially

11      convincing.  It seems to me that there ought to be other

12      places.  There are gyms --

13              MR. ORLEANS:  There are other places, Your Honor

14      --

15              THE COURT:  -- and you can rent a facility,

16      whatever.

17              MR. ORLEANS:  And frankly, Judge, I find it

18      difficult to facility that if this court were to lift the

19      injunction sometime toward the end of June, that given the

20      fact that they've got a team, a schedule, they presumably

21      face some disappointment from the Northeast Conference if

22      they were to cancel the volleyball schedule at the last

23      possible minute.  They've got scholarships to which they

24      are committed.  They would take an enormous PR hit, I

25      believe, if they were to cancel the season for that team
```

1   at the last minute.

2        I just find it very difficult to believe that

3   even if this court lifts the injunction in June, that the

4   University isn't going to continue volleyball for that one

5   more year.  And we just don't see that there's any

6   significant impact on the university if it were required

7   by circumstances to play one more season of volleyball,

8   even if the court were then to -- and if the court then in

9   November lifted the injunction and then the kids obviously

10  would have the opportunity to make transfer arrangements.

11       So, and I recognize some of this was argued

12  before when we scheduled the hearing in the first place,

13  but time hasn't changed those facts as we see them.

14            THE COURT:  All right.  Let me raise one other

15  issue.  The damages claims on the individual claim

16  presumably are jury issues, or the injunctive relief

17  claims are court issues.  Is that everybody's

18  understanding?

19            MR. ORLEANS:  Yes, Your Honor.

20            THE COURT:  So wouldn't it make sense to sever

21  the damages on the individual claims from the claims for

22  injunctive relief for purposes of the benefits and the

23  scholarships?

24            MR. ORLEANS:  We haven't thought about that,

25  Your Honor, but we would be glad if Your Honor would allow

1    us a little bit of time to think about it and confer, we'd

2    be glad to address that with defense counsel and perhaps

3    we can write a joint letter to the court indicating where

4    we are on that issue.

5           THE COURT:  Sure.  Because I'd like to schedule

6    the trial on the benefits and scholarships issues.

7           MR. ORLEANS:  You had told us after November

8    1st --

9           THE COURT:  Well, I was looking at November 5th.

10   Right now November is still open.  November 2nd would be

11   the jury selection date, if we have a jury selection,

12   although that frankly might be the 1st because of a

13   conflict but --

14          (Pause)

15          MR. BRILL:  Are you talking about the trial on

16   the class claims on November 5th?

17          THE COURT:  Right.

18          MR. BRILL:  Well, I would just say, again, we

19   haven't conferred about this, Your Honor.  It's true that

20   the plaintiffs and the defendant actually both have a

21   right to a jury trial on the damages claims, but of course

22   they can waive that if they want to.  We haven't discussed

23   it, and it also seems to me that, with the exception of

24   Coach Sparks -- and there's a whole other issue with Coach

25   Sparks now which we haven't brought to the Court's

1    attention -- but with with respect to the five named class

2    representative, this may be something we could, that could

3    be stipulated after ruling on the benefits.

4            THE COURT:  Well, that's another reason to

5    sever.

6            MR. BRILL:  Because they acknowledged, I mean

7    they've been deposed about their damages and they are

8    basically small incidental damage claims, and it may be

9    something that we can work out, either to consolidate it

10   and have the court -- either have the Court try those

11   claims as well or else to sever it, and we could work

12   something out afterward.  I think it would probably be --

13   my opinion is it would make more sense to do that than to

14   have a separate jury trial.

15           MR. ORLEANS:  As I said, Your Honor, I'd like a

16   chance to confer with co-counsel and confer with defense

17   counsel on that, and we'll do that.

18           THE COURT:  Why don't we plan you'll come back

19   on November 5th and try the benefits and scholarships

20   claims.  I can tell you now that the 12th and the 19th are

21   likely to be off days and we have, if we get that far, the

22   Thanksgiving holiday toward the end of the month, but --

23           MR. ORLEANS:  Hopefully we won't get that far.

24           THE COURT:  Hopefully we won't get that far, but

25   let's just all plan that we're going to start evidence on

November 5th and we can figure out what claims those might

be some time soon.  I'll tell you my inclination is to

sever the damages and the coach's individual claim from

the injunctive relief sought by the class, but we can talk

about that.

All right.  I'm going to -- with that in mind,

I'm going to deny the motion for the continuance of the

hearing.  I recognize the significant burden that the

plaintiff's counsel will be under to get ready for this

case.

I will note that the initial burden in my view

falls to the defense, so they are going to start the

evidence and the plaintiff in effect is going to be in a

reactive position, which, one, means it's I think a little

easier and, two, their case, their witnesses or whatever,

their evidence will start a little later, so I think we

should hold the June 11th date and go from there.

In terms of discovery, it's my intention to deny

in substantial part the Motion to Compel.  I do think that

the plaintiff, plaintiffs, are entitled to some focused

and easily produced information, probably ideally by way

of requests to admit or interrogatories, perhaps frankly

simply by negotiation and stipulation, of the, some

history, I would say 2007, 2008 academic year forward is

probably the reasonable period in terms of balancing the

1  need for the information against the burdensomeness of

2  producing it.

3          But from 2007 forward, you know, what was the

4  status in terms of prong one compliance, and to the extent

5  the university wants to argue prong two applied, what are

6  the facts that they would rely upon; i.e., we found it or

7  we started X Y Z women's sports or we made these other

8  efforts with respect to improving opportunities for women.

9          This discovery should not be, in my mind,

10  difficult to request or to produce, and I think it's going

11  to have some, but really only minimal, impact on the

12  outcome of the hearing.

13          So, I'm not sure I've given you enough guidance

14  but let me find out if you think you can work with that or

15  whether you want more.

16          MR. ORLEANS:  Your Honor, I think I'd rather

17  take what you've just given us and attempt to work things

18  out with defense counsel, and if we run into any

19  obstacles, we'll seek your guidance.

20          THE COURT:  All right, that's fine.  I'm not

21  formally ruling on the Motion to Compel but it seems to me

22  what's being sought is dramatically more burdensome than

23  it's worth and it goes way further back in time than is

24  reasonable.

25          Mr. Brill, can you work with that?

1          MR. BRILL:  Of course, Your Honor, we will.

2          THE COURT:  All right.  And I'll leave you two

3     in the first instance also to work out questions

4     concerning the coaches.  To the extent that plaintiff

5     wishes to pursue that further, why don't you try to work

6     it out and, if need be, I'll take that up as well.

7          Anything else we can usefully do today?

8          MR. ORLEANS:  Your Honor, with respect to the

9     hearing in June, do we have the one week?  Monday through

10    Friday?  Do you have --

11         THE COURT:  Fridays are always tricky because I

12    have lots of other things to do and Friday is when things

13    seem to get scheduled.

14         (Pause)

15         THE COURT:  As things now stand, I do have a

16    pretty full Friday on the 15th.

17         MR. ORLEANS:  So we're looking at Monday through

18    Thursday?

19         THE COURT:  Monday through Thursday.  And if we

20    need to pick up, we would probably pick up on the 21st or

21    finish up on the 21st.  If -- the other complication on

22    the 15th is presently I have jury selection down for the

23    15th for a couple of other cases, so that's always

24    difficult to postpone, but we'll see.  We'll see if we can

25    do it in the four days.  Anybody think that's completely

1    unrealistic?

2              MR. BRILL:  No, I think we should be able to,

3    Your Honor.  Did you say if we didn't finish on the 14th,

4    what date --

5              THE COURT:  Well, I think I might be able to

6    squeeze you in the 15th but more likely the 21st.  The

7    18th through the 20th I'll be at a conference.

8              MR. BRILL:  Your Honor, could I simply raise

9    some procedural issues in terms of, obviously when we had

10   the trial on the merits, Your Honor, I asked for a formal

11   pretrial order and I didn't know if you wanted that again

12   for this hearing.

13             THE COURT:  I will want to do that, and I'll

14   want to have a pretrial conference where we talk through

15   exhibits and witnesses.

16             MR. BRILL:  So you'll schedule that or do you

17   want to do that now?

18             THE COURT:  We can try and do that now if you

19   want.

20             (Pause)

21             THE COURT:  How does May 31st look for

22   everybody?

23             MR. BRILL:  Your Honor, I also have a high

24   school graduation.  Mine is in Illinois on June 1st so I

25   will be out of town on the 31st and the 1st.

1          THE COURT:  Okay.

2          MR. BRILL:  I could do it maybe the week before

3    the hearing would be convenient, unless you need to have

4    it prior to that.  And I was -- Mr. Orleans and I had had

5    some preliminary discussion about expert discovery and so

6    on.  I was suggesting that that be concluded by May 28 so

7    that we ought to have at least a little time after that

8    to -- I guess that's Memorial Day -- by May 29.  We'd need

9    a little time after that to finalize the pretrial papers.

10          THE COURT:  What about 9:00 o'clock on June 4th?

11          MR. BRILL:  That's fine for me.

12          MR. ORLEANS:  We can do that.

13          THE COURT:  Let's plan on that.  We'll get a

14    pretrial order out.  That would probably be due the 31st

15    and the 1st.

16          MR. BRILL:  Excuse me?

17          THE COURT:  We'll get a pretrial order out and

18    the pretrial memo would be due either the 31st of May or

19    the 1st of June, okay?

20          MR. BRILL:  Thank you.

21          THE COURT:  Anything else?

22          MR. ORLEANS:  I don't think so.

23          THE COURT:  All right.  Thank you all.  We'll

24    stand in recess.

25

1          (Whereupon the above matter was adjourned at 4:05

2    o'clock, p. m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Susan E. Catucci, RMR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.



        /S/ Susan E. Catucci
        _____

            Susan E. Catucci, RMR
            Official Court Reporter
            915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
             Tel: (917) 703-0761