UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

STEPHANIE BIEDIGER, ET AL    : No. 3:09CV-621 (SRU)
                             : 915 Lafayette Boulevard
         vs.           : Bridgeport, Connecticut
                             :
                             : June 11, 2012
QUINNIPIAC UNIVERSITY        :

- - - - - - - - - - - - - - - - x

BENCH TRIAL

B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

   FOR THE PLAINTIFF:

       PULLMAN & COMLEY
           850 Main Street
           P.O. Box 7006
           Bridgeport, Connecticut 06601-7006
         BY:  JONATHAN B. ORLEANS, ESQ.
           ALEX V. HERNANDEZ, ESQ.

       KRISTEN GALLES, ESQ.
           Equity Legal
           10 Rosecrest Avenue
           Alexandria, Virginia  22301

       SANDRA J. STAUB, ESQ.
           Legal Director, ACLU Foundation of CT
           330 Main Street
           Hartford, Connecticut  06106

   FOR THE DEFENDANT:

       PROSKAUER ROSE LLP
           Eleven Times Square
           New York, New York  10036-8299
         BY:  EDWARD A. BRILL, ESQ.
           SUSAN D. FRIEDFEL, ESQ.
                    (Continued)

REBECCA BERKEBILE, ESQ.
ANDREW RICE, ESQ.


Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917)703-0761

I N D E X

WITNESSES:

MARK THOMPSON

Direct Examination by Mr. Brill....................15
Redirect Examination.............................85
Cross Examination by Mr. Hernandez................46

LAMAR DANIEL

Direct Examination by Mr. Brill...................88
Redirect Examination............................184
Cross Examination by Mr. Orleans.................138
Recross Examination.............................217

JOHN BLAKE

Direct Examination by Ms. Friedfel.............. 221

−0−

```
 1                        (9:10 O'CLOCK, A. M.)

 2              THE COURT:  I apologize for the delay, although

 3      by that clock we're an hour early.

 4              Everybody set to go?

 5              MR. HERNANDEZ:  Yes, Your Honor.

 6              MR. BRILL:  Yes, Your Honor.  We have a few

 7      preliminaries before calling our first witness.

 8              THE COURT:  Okay.

 9              MR. BRILL:  First, we have some stipulations to

10      hand up that we had entered into with the plaintiffs.  I

11      think I have handed a copy to Mister -- to Jon.  They are

12      not many but --

13              THE COURT:  I'll take whatever I can get.

14              MR. BRILL:  Should I give a second copy to your

15      deputy?

16              THE COURT:  Sure.

17              MR. BRILL:  We also have proposed findings of

18      fact and conclusions of law that we would, we have

19      prepared.

20              Do you have a copy?

21              MS. FRIEDFEL:  Yes.

22              MR. BRILL:  We'll be e-filing these as well, so

23      this is a courtesy copy.

24              THE COURT:  Thank you.

25              (Hands Court.)
```

1              MR. BRILL:  We wanted to clarify a question we

2     had.  There was some discussion of law at the pretrial

3     conference, but obviously there was a 95-page decision in

4     July of 2010, which contained many findings and

5     conclusions.  And we are assuming that, absent some

6     evidence of changed circumstances, that we can rely on

7     those as still being applicable, to the extent that we'd

8     like to reprove things that were already decided by the

9     Court.

10             MR. HERNANDEZ:  I'm not sure what Attorney Brill

11    is referring to.

12             MR. BRILL:  I'll be specific.  For example,

13    there was a finding, there was litigation and finding last

14    time as to the track and field team, and the Court made

15    certain findings that, to the extent that student athletes

16    who actually participated, leaving aside the eleven that

17    the court found did not participate, that student athletes

18    that did participate in indoor track and field and outdoor

19    track and field were properly counted as genuine varsity

20    athletes and counted as participants.  And that was based

21    on certain findings as to the way in which the track team

22    is operated and the benefits that it received, et cetera.

23             Obviously, we recognize the plaintiffs would be

24    free to introduce evidence of changed circumstances that

25    would indicate that those findings should no longer

1     pertain.  But it seems to us that we shouldn't have to

2     re-litigate all of those same issues to come to the same

3     result, absent some proper showing that there's some

4     changed circumstances.

5              THE COURT:  I tend to agree with that.  What

6     we're dealing with here is the question of whether to lift

7     the injunction.  So what you need to show is that the

8     university is in compliance.  I think that there are

9     certain issues that are, once litigated, are not going to

10    be re-litigated here.  Therefore, I don't sense, unless

11    there's evidence presented, that either side needs to deal

12    with that.

13             MR. BRILL:  And we understand we have the burden

14    of proof, and we didn't want to be in a situation where,

15    at the end of the trial, we hadn't put in evidence as to

16    something we felt had already been decided in 2010.  And

17    we want to feel, as I said, on those issues that we can

18    rely on anything in that decision, absent some showing by

19    one side or the other of changed circumstances.

20             THE COURT:  Just so this record is clear, we

21    ought to have some indication on the record that, what

22    parts of the prior record, if any, you are seeking to have

23    me consider, what parts of the prior decision, if any,

24    that you are seeking to have me rely upon, so we don't get

25    in a situation afterward where you've made an assumption,

1    and I haven't made the same assumption.  So I mean -- and

2    that can be done, you know --

3            MR. BRILL:  That's fair.

4            THE COURT:  -- almost like you would do a

5    stipulation, we're relying on X, Y, and Z of the prior

6    decision.  And if there's an issue, there's some reason to

7    take that finding or conclusion up, then we can do that.

8    But I just want notice of that.

9            MR. BRILL:  We'll do that.

10           A couple of other small, more or less

11   housekeeping points, Your Honor.  With respect to the

12   expert reports, we had agreed that the parties would

13   submit their respective expert reports to the Court, and

14   we both have done so.  But our understanding, and I think

15   the plaintiffs' as well, is that we're not, we're

16   reserving any objections that we may have to portions of

17   those reports or to the exhibits of those reports that we

18   would otherwise have asserted had they been offered during

19   the course of the trial.

20           MR. ORLEANS:  I'm not sure that was exactly my

21   understanding, Your Honor, after the pretrial conference.

22   I thought that we had agreed that, as a way of shortening

23   the proceedings, submit the expert reports, let Your Honor

24   read them, that would enable, that would make the direct

25   testimony shorter, and we would focus on the cross with

1   the experts.  But I guess -- so I'm not sure that I

2   understood that we were reserving objections to particular

3   portions of the expert reports, but I suppose that the way

4   to deal with that is to take it up as it goes along.

5          THE COURT:  Let's take it up as it comes along.

6   It seems to me something that might otherwise not be

7   admissible could well be admissible if it's merely

8   something that the expert relied upon in preparing his or

9   her report.  So it's -- I think there's a narrower range

10  of appropriate evidentiary objections to matters that are

11  attached as exhibits or considered by the experts.

12         MR. BRILL:  And the Court had also made certain

13  rulings as to the motion in limine which would be

14  reflected, I think, in objection to portions of the expert

15  reports as well.  But I think we can take that up --

16         THE COURT:  Sure, let's do that as we go along.

17         MR. BRILL:  -- as the witness testifies.

18         My last question had to do with admission of

19  exhibits and how the Court wanted to deal with that.  My

20  recollection is, the last time the exhibits were sort of

21  automatically introduced when referred to by the witness.

22         THE COURT:  Well, the best way to do that would

23  be to have a list of exhibits that can be admitted by

24  stipulation.  Again, I don't want to get to the end of the

25  trial and there be some misunderstanding about whether an

```
 1    exhibit is in evidence or not in evidence.  So the best
 2    way to do it is for you two to come up with a list, you
 3    know, the following 17 exhibits are admitted, can be
 4    admitted by stipulation.  I'll, you know, bless that list,
 5    and those are in.  And then if there's others, we'll take
 6    them up in the order of course.  We offer this, we object
 7    to this, it's in or it's not.
 8              MR. BRILL:  Okay.
 9              MR. ORLEANS:  Your Honor, my understanding,
10    again based on how we did things last time, was similar to
11    Mr. Brill's, that the, unless objections were stated, and
12    I'm going to state one in a few minutes, that the only
13    issue with respect to exhibits was really relevance.  But
14    I'm sure that we can come up with a stipulated set, and
15    then we can deal with the rest.
16              And I think I also remember that last time Your
17    Honor ruled that, you know, when an exhibit came up and
18    was shown to a witness, it was admitted into evidence
19    unless an objection was stated at the time.
20              THE COURT:  Well, that's fine.  That's what
21    Mr. Brill was saying.
22              MR. BRILL:  That's my recollection as well.
23              MR. ORLEANS:  You'd like a list of stipulated
24    exhibits, and we'll provide that.  We can do that work to
25    make the record clear.
```

1          THE COURT:  Yes.  Again, I just don't want to

2    get to a post-hearing motion and one side thinks it's in

3    and one side thinks it's not in, and it's something we

4    could have dealt with at the time.

5          MR. BRILL:  Okay.

6          MR. ORLEANS:  Okay.

7          THE COURT:  If we're all on board that an

8    exhibit that's used with a witness will be admitted as a

9    full exhibit absent objection, I'm happy, as long as

10   everybody knows the rules and we can keep track of what

11   those exhibits are.

12         MR. ORLEANS:  That's acceptable.

13         MR. BRILL:  Sure.

14         THE COURT:  That's great.  All right.

15         MR. BRILL:  We'll also work on --

16         MR. ORLEANS:  What we did last time, we compared

17   lists on the last day of trial to make sure that we agreed

18   as to everything that had been in, and then we dealt with

19   it.

20         MR. BRILL:  And we'll also work on a

21   stipulation.

22         MR. ORLEANS:  Sure.

23         MR. BRILL:  I think those are my preliminaries.

24         MR. ORLEANS:  Okay.

25         THE COURT:  Fine.

1          MR. ORLEANS:  Your Honor, I had a couple of

2     preliminaries.  Number one, in our trial brief, which I

3     don't have in front of me --

4          THE COURT:  I have it.

5          MR. ORLEANS:  Do you remember the page?

6          MS. FRIEDFEL:  I want to say 32, but I'm not

7     certain.

8          MR. ORLEANS:  We think on page 32 --

9          THE COURT:  Okay.

10          MR. ORLEANS:  -- there is a reference to the

11     discharge of Coach Sparks.

12          THE COURT:  Okay.

13          MR. ORLEANS:  And we wanted to be clear on the

14     record that, in this proceeding, we are not challenging

15     the discharge of Coach Sparks.  We are not seeking any

16     inquiry into the reasons for that decision.

17          THE COURT:  No, no.  And when I read that, I

18     didn't take that you were.  I understood that you were

19     questioning the, whether the interim coach was a,

20     quote/unquote, real coach.

21          MR. ORLEANS:  And whether the university had

22     made adequate preparation for, to maintain coaching for

23     the team.

24          THE COURT:  Correct.

25          MR. ORLEANS:  Fine.  We wanted to make it clear

1    on the record that this is, we are not challenging Coach

2    Sparks' discharge in this proceeding.

3           THE COURT:  Right.  And you are in this case but

4    not in this proceeding.

5           MR. ORLEANS:  Yes.  That could become an issue

6    at the hearing in November, we'll see.

7           THE COURT:  All right.

8           MR. ORLEANS:  Secondly, Your Honor, we wanted to

9    note that, in connection with the expert report of Cecile

10   Reynaud, which is included in our exhibit book as Exhibit

11   Number 203 -- it hadn't been provided to you in advance

12   because we were still discussing it -- we have redacted

13   certain portions by agreement for purposes of this

14   hearing.  And so the copy that you have has those

15   redactions, and those redactions were done by agreement.

16          THE COURT:  All right.  And speaking of

17   exhibits --

18          MS. FRIEDFEL:  Would you like them?

19          THE COURT:  Yes, that would be helpful.

20          MR. ORLEANS:  Would you like to do that now?

21          THE COURT:  Talking about exhibits and I don't

22   have them, I feel a little naked, so --

23          MR. ORLEANS:  Okay, so --

24          MR. BRILL:  Your Honor, we have four books, but

25   probably only two will be in frequent use.  The other two

```
 1    have some large specific documents, so it's not quite as
 2    bad as it looks.
 3              THE COURT:  Okay.
 4              MS. STAUB:  Okay.
 5              MR. ORLEANS:  You guys all set?
 6              MR. BRILL:  Yes.
 7              MR. ORLEANS:  Your Honor, here's a copy of the
 8    plaintiffs' exhibits for the Court's use.  Some of our
 9    copies have stickers on them, but that was because we
10    copied before we put stickers on.
11              THE COURT:  That's fine.
12              MR. ORLEANS:  Not to worry.
13              All right.  And then we need the original set
14    for the witnesses' use, correct?
15              THE COURT:  All right.  In terms of
16    sequestration of witnesses, we have only experts and party
17    representatives present, is that correct?
18              MR. ORLEANS:  That is correct.
19              MR. BRILL:  And our first witness is here.
20              THE COURT:  That's fine.
21              MR. ORLEANS:  Now, we should have one more copy
22    of our book for the Clerk.
23              Mr. Carter, do you want for your use copies of
24    our expert reports, as well as the rest of the trial
25    exhibits?
```

1          THE CLERK:  I believe I already have copies of

2     the expert.

3          MR. ORLEANS:  You already have those?  Did we

4     deliver two when we delivered them the other day, one for

5     the judge and one for you?  Very good.  We were thinking

6     ahead.

7          (Pause.)

8          MR. ORLEANS:  Your Honor, just to alert you,

9     there will be, we will have one objection, that we're

10    aware of, to an exhibit offered by the defendant.  It's

11    Exhibit JW.  And when that comes up we can assert that.

12         THE COURT:  Okay.

13         MR. ORLEANS:  The last thing that I wanted, two

14    more things that I wanted to note, Your Honor.  You may

15    have taken this up with Mr. Brill; I'm sorry, I was in the

16    conference room.

17         Exhibits to the expert reports, we didn't mark

18    those separately this time.  We just supplied them along

19    with the expert reports.  I understand Mr. Brill may have

20    some objections.  We can mark those separately --

21         THE COURT:  As we go.

22         MR. ORLEANS:  -- as necessary, deal with that as

23    we go.

24         And, finally, Your Honor, we did not, this time

25    around, mark as exhibits legal reference materials like

1    the 1979 policy interpretation, the Title IX regulations,

2    the 1996 clarification of the "Dear Colleague" letters

3    that, with which Your Honor is thoroughly familiar and to

4    which you've referred to your prior decisions.

5            We can mark those if you like, but I thought it

6    probably wasn't necessary to clutter up the exhibit list

7    with that stuff this time.

8            THE COURT:  No, I don't need that.  It might be

9    helpful to have, just for convenience, to have a set if

10   you guys have copies.

11           MR. ORLEANS:  We can provide a set of these

12   reference materials probably by tomorrow.  I think they

13   are all exhibits to our amended complaint, and I can pull

14   that from the file and make some extra copies.

15           THE COURT:  That's fine.

16           MR. ORLEANS:  I'll make copies for defense as

17   well.

18           MR. BRILL:  Great.

19           THE COURT:  All right, fine.

20           MR. BRILL:  Your Honor, the defendant calls

21   Dr. Mark Thompson.

22   M A R K     T H O M P S O N,   called as a witness on

23   behalf of the Defendant, having been duly sworn by the

24   Court, testified as follows:

25           THE COURT:  Please be seated, state your name

1    for the record and spell your last name, please.

2              THE WITNESS:  Mark A. Thompson, T-H-O-M-P-S-O-N.

3              MR. BRILL:  Your Honor, do you want me to stand

4    while I'm questioning the witness?  There's no lecturn.

5    The only problem is, it's hard for me to read my book.

6              THE COURT:  No, I'm very relaxed, so --

7              MR. BRILL:  Is it okay if I sit while I

8    question?

9              THE COURT:  That's fine.

10             MR. BRILL:  Thank you.

11             THE COURT:  Stand if you're going to object,

12   either side.

13             MR. BRILL:  I just realized I can't see the

14   book.

15             MR. ORLEANS:  While we're being informal, may we

16   remove our jackets?

17             THE COURT:  Yes, of course.

18             MR. ORLEANS:  Thank you.  It's hot in here.

19             THE COURT:  Yes.  The facilities folks came in

20   and adjusted.  Hopefully it will cool off.

21   DIRECT EXAMINATION

22   BY MR. BRILL:

23   Q.   Good morning, Dr. Thompson.

24   A.   Good morning.

25   Q.   What is your current position with Quinnipiac

1    University?

2    A.   Senior Vice President for Academic and Student

3    Affairs.

4    Q.   And could you just state again for the record what

5    your responsibilities are in that position?

6    A.   Sure.  The broad areas of responsibility are every

7    aspect of academics offered by the university, student

8    affairs, which includes residential life, and student

9    affairs programming, as well as athletics and recreation.

10   Q.   And specifically do you have responsibility with

11   respect to the athletics program at Quinnipiac?

12   A.   I do.

13   Q.   Could you describe that responsibility?

14   A.   I'm responsible for the broad oversight of the

15   programs we have.  And Jack McDonald, our athletics

16   director, reports to me on day-to-day operations as a

17   result of that reporting line.

18   Q.   Who do you report to?

19   A.   I report to John Lahey, the president of the

20   university.

21   Q.   Now, did you review the decision of this court that

22   was issued in July 2010?

23   A.   I did.

24   Q.   And as a result of that decision, did you take any

25   action or direct any action with respect to the athletics

1    program?

2    A.    Yes, I did.   As a result of the Court's finding that

3    we were not in compliance on the participation claims, we

4    immediately sought to give consideration to additional

5    women's opportunities to be offered at the university.

6    Q.    And specifically what did you decide at that time?

7    A.    We added women's rugby and women's golf to the mix of

8    the teams at the university.

9    Q.    And who made the decision to add those two teams?

10    A.    I did, in consultation with Jack McDonald.

11    Q.    And can you explain briefly why you selected each of

12    those sports to add to the athletics program?

13    A.    The golf program was relatively easy in terms of the

14    decision on our part.   We had men's golf up until a recent

15    time, so we decided that, given we had experience with

16    that, we would add women's golf.

17        With respect to women's rugby, we had been looking

18    into the possibility of adding rugby as far back as 2006.

19    Jack had been in touch with USA Rugby in 2006, and we were

20    giving consideration to it as a potential addition over

21    the course of that period of time.   Given that we were

22    familiar with what it would take to add it, as a result of

23    Jack's correspondence, we decided it was a good option.

24    Q.    And what actions did you take, if any, to implement

25    the decision to add those two sports?

1    A.   It's a relatively standard process.  As with any new

2    program, the first thing you would do is to seek someone

3    who would be responsible for the development of the

4    program.  So the first thing we did was provide budget

5    approval for the hiring of head coaches for both of the

6    sports.  And then that person is responsible then for

7    making contact with me with respect to their budget needs

8    and so forth, in terms of what they need to do to develop

9    the program.

10   Q.   Were coaches hired for each of those sports?

11   A.   Coaches were hired for both, yes.

12   Q.   Who was hired for each sport and when?

13   A.   Becky Carlson was hired as the rugby coach.  I don't

14   remember the specific date.  And John O'Connor was hired

15   as the woman's golf coach.  And, again, I don't remember

16   the specific date.

17   Q.   When approximately was it?

18   A.   I would say it's, my best recollection was within six

19   to eight months after the finding of the Court in 2010.

20   Q.   Then did you allocate any resources for these two

21   teams?

22   A.   We did.  Based on the coaches' input in terms of what

23   they thought was necessary to appropriately operate both

24   teams, we provided operating budgets to both.

25   Q.   And did you allocate any scholarships for the coaches

1    recruiting?

2    A.    Yes, to both teams.  I believe it was three

3    equivalent full scholarships for the golf team and six

4    full scholarships for the rugby team.

5    Q.    And how much is each scholarship worth,

6    approximately?

7    A.    It's approximately $50,000 for each scholarship.

8    Q.    That's each year?

9    A.    Each year.

10   Q.    So a four-year scholarship is $200,000?

11   A.    Correct.

12   Q.    How did you set the budgets for the teams?

13   A.    In consultation with each of the coaches.

14   Q.    Was that different from the process that you would

15   use normally with the other athletic teams?

16   A.    No.  No, it's same process for all teams, in terms of

17   having understanding from the coach's perspective what

18   they need to appropriately carry out their

19   responsibilities and support the team.

20   Q.    What would the budget typically cover?

21   A.    A budget would cover all the needs including

22   recruiting expenses, travel expenses, uniforms, equipment,

23   all of the things that would be necessary to support the

24   team in a way that's equivalent to the rest.

25   Q.    Did you do anything with respect to facilities for

1   the two teams?

2   A.   The golf team is relatively easy.  You don't have to

3   provide a field on campus and so forth, so the

4   arrangements we had for the men's team were carried over

5   to the women's team.  I don't know specifically what they

6   are, but we made the appropriate arrangements for the team

7   to practice and participate.

8        With respect to the rugby team, we developed a new

9   field on campus, just on the fringe of the campus, next to

10   the venue where both lacrosse teams and field hockey play.

11   Q.   Can you tell us approximately the amount of financial

12   commitment that was involved in supporting each of those

13   teams?

14   A.   I can tell you that the development of the rugby

15   field, capital improvements to the rugby field were

16   approximately $50,000.  And the best information I have

17   with respect to the support of the teams was last year's

18   budget numbers, if you take into account the scholarships

19   at which there are three for golf and six for rugby,

20   that's nearly half a million dollars in ongoing annual

21   support for both of these teams.

22        Last year the approximate expenditure for salaries,

23   as well as the operations of the team, for rugby was

24   approximately $200,000, and for golf was approximately

25   $100,000.

1    Q.   Incidentally, did you authorize the hiring of any

2    assistant coaches for those teams?

3    A.   Yes, I did, for both.

4    Q.   And when did each team begin competition, if you

5    know?

6    A.   I'm sorry.  I don't know for sure.  I believe it was

7    about the 2011 year.

8    Q.   If you don't know we'll bring that out through

9    another witness.

10    Did you take any action in response to the finding in

11    the Court's decision that there had been a requirement for

12    women on the cross-country team to also join the track

13    teams?

14    A.   Yes, I did.  I was concerned that there was a

15    misperception with regard to that.  And we put out a -- I

16    asked Jack McDonald to put out a statement clarifying that

17    there was no requirement that any athlete participate on

18    more than one team, and we also included that in our

19    operating manual for athletics, to make sure there was

20    clarity around that issue.

21           MR. BRILL:  Could you show the witness

22    Exhibit HK.  I guess the witness can find it in the book.

23    BY MR. BRILL:

24    Q.   Is this the notification sent to all the student

25    athletes?

1    A.    Yes, it is.

2    Q.    Did you say this policy was also included in the

3    staff handbook?

4    A.    Yes.

5    Q.    Now --

6              THE COURT:  Let me just jump in.

7              What did you mean by the third paragraph did not

8    affect the obligation of the student?

9              THE WITNESS:  Your Honor, I didn't write the

10   email so, I'm sorry, I don't know how to answer your

11   question.

12             THE COURT:  Okay.

13             THE WITNESS:  I was more concerned in the second

14   sentence, that no student is required to participate.

15             MR. BRILL:  I think that was a technical point,

16   and we can clarify that later.

17             THE COURT:  Okay.  It's not important, I just

18   was trying to figure it out.

19   BY MR. BRILL:

20   Q.    The Court's decision found that the competitive cheer

21   team didn't count as a sport for 2009, 2010.  We

22   understood that from reading the Court's decision.

23   A.    Correct.

24   Q.    Did you make a decision as to whether the university

25   would nonetheless continue to support that sport?

1    A.    We decided to continue to support it.

2    Q.    Why was that?

3    A.    We had -- basically, we'd made a heavy investment

4    already in the team, and the Court's decision in 2010

5    indicated that there was a, it was close to a sport, my

6    interpretation of the Court's decision.  And a couple of

7    the concerns on the part of the Court with respect to

8    things like having a national governing body or a

9    championship season, I thought from my perspective, they

10   were about to be satisfied and have since been satisfied.

11   So we didn't want to abandon something we had invested so

12   heavily in.  And it looked like the direction of things

13   was, all the concerns would be addressed over the coming

14   months.

15   Q.    Incidentally, has the -- was the name of the sport

16   changed since the 2009-2010 season?

17   A.    Yes.  It's currently referred to as acrobatics and

18   tumbling.

19   Q.    And was it just Quinnipiac that made that change, or

20   was that made by the national organization you're

21   referring to?

22   A.    The decision to change it to that was made by the

23   national organization.

24   Q.    Did you supply any additional support, financial

25   support or scholarship support to the acrobatics and

1    tumbling team?

2    A.   The thing that comes to mind immediately was the, at

3    the suggestion of the national governing board, their

4    suggestion was 12 full scholarships.  We agreed to a

5    multiyear increase.  This past year it was 9 scholarships,

6    next year that will increase to 12 full scholarships, as a

7    result of the import of the governing body.

8    Q.   Did you -- in your position as senior vice president,

9    did you retain responsibility for the ongoing roster

10   management plan at the university?

11   A.   Yes, I did.  And I still do.

12   Q.   I'd like to have you look first at the Exhibits HA

13   and HB, and ask if you can identify those documents.

14   A.   HA was our roster plan going into the 2010-'11

15   academic year.  And Exhibit HB was the roster plan going

16   into the 2011-'12 academic year.

17   Q.   There are actually two roster plans.  One is dated

18   November 16, and one is dated August 15.

19   A.   Sorry.

20   Q.   Can you explain what those two are?

21   A.   So the second one, one for August 15th, was the plan

22   going into the academic year.  And then the one that's

23   dated November 16th were, includes some adjustments on the

24   basis of input received from the coaches.

25   Q.   With respect to the roster plan, first for the

1    2010-2011 season, when were those roster targets

2    determined?

3    A.    Those were determined in August of 2010.

4    Q.    And it seems like, if you look at Exhibit HA, there

5    was a significant change in the size of the indoor and

6    outdoor track teams from the prior year.  I think you

7    testified to this at the prior trial, but could you just

8    review why you had authorized an increase of 30 to 35?

9    A.    Sure.  My recollection on this was the coach had

10   requested an increase in the rosters for both the indoor

11   and outdoor track teams.

12   Q.    Now, the next set of rosters, which is Exhibit HB,

13   how did you go about setting the rosters for 2011-2012?

14   A.    It's the same process every year.  I request input

15   from the coaches themselves so I have an understanding as

16   to what they think the appropriate roster number is, given

17   their resources available to them and so forth.  So I rely

18   heavily on coaches' input with respect to making a

19   determination about what the roster should reasonably be.

20   Q.    Do you set minimum roster sizes for the women's teams

21   and maximums for the men's teams?

22   A.    No.

23   Q.    Is there any difference in how you view the target

24   roster numbers for men and women?

25   A.    No.

1    Q.    And what is the process for approving changes in

2    roster numbers for a team once you've set the approved

3    target?

4    A.    The process requires that each of the coaches contact

5    me directly.  I want to make sure we're doing this

6    appropriately, and that I understand why changes are being

7    requested and to ensure that roster management is being

8    handled in the most appropriate way.  So the coaches

9    contact me directly, and I'll respond to them.

10   Q.    If you could look at Exhibits HC through HI, in front

11   of you, these are a series of emails regarding roster

12   changes.  And if you could just briefly describe to the

13   Court which team was involved and whether you were

14   increasing or decreasing.  HC is the first --

15   A.    HC is from the women's basketball coach with,

16   notifying me that a student had decided not to return, and

17   she requested that her roster be reduced.  And I approved

18   that request.

19   Q.    And HD?

20   A.    HD is a request from the head coach for men's and

21   women's cross country, and women's indoor and outdoor

22   track, and she had a concern that led me to believe it was

23   appropriate to reduce her roster from what was originally

24   planned.

25   Q.    For the track team?

1    A.    The track team, sorry.

2    Q.    What about HE?

3    A.    HE, this was correspondence with respect to a request

4    from Tom Moore, on the men's basketball team, which there

5    was a reduction in the number.  It came as a result of a

6    decision with respect to a player and --

7    Q.    Well, just to read it more carefully, the email says:

8    "Tom would like to add an additional player for both

9    practice and games"?

10   A.    I'm sorry.  I just read the first part of it.

11   Correct.

12   Q.    So it was actually an increase to the men's roster.

13   A.    Yes, increase.  I apologize.  I read the first part

14   but not the second part.

15   Q.    And HF is an email from Robin Sparks, the volleyball

16   coach; is that correct?

17   A.    Correct.

18   Q.    And she's -- what is she -- looks like she's

19   requesting an increase to carry a 15th player?

20   A.    That is correct.  And I approved her request.

21   Q.    And HG is, this is the women's softball coach.  And

22   if I'm reading this correctly --

23            MR. BRILL:  And I know this is leading, Your

24   Honor, I apologize --

25

1  BY MR. BRILL:

2  Q.    -- but she's asking to go from 19 to 16?

3  A.    Correct.

4  Q.    And did you approve that?

5  A.    I did.

6  Q.    Now, the rugby coach here, on September 2nd,

7  indicated that she was going to have an initial roster of

8  less than 34.

9       Did you have an understanding of approximately what

10 number she was going to be able to have by the first day

11 of competition?

12 A.    My recollection was, in discussion with her, that

13 because it was her first year of fielding a team, and

14 based on my instructions to her with regard to how to

15 appropriately handle the roster, I think her initial

16 target from her perspective, in terms of how things are

17 going at this point, was 20.

18 Q.    Did you approve that?

19 A.    I did.

20 Q.    And finally HI --

21       THE COURT:  Let me just go back to HH.  In that

22 you wrote that the decided roster was four.  What did you

23 mean by that?

24       THE WITNESS:  There's an initial roster target

25 set consistent with the policy and procedures I described

1    in four, in which I had a conversation with the coach, she

2    originally thought that 34 was the appropriate number but

3    then found, going into the inaugural season, she didn't

4    think that was appropriate given the experience as she got

5    closer to her first date of competition.

6              THE COURT:  All right.  So the coach picked 34.

7              THE WITNESS:  Yes.

8              THE COURT:  All right.

9    BY MR. BRILL:

10   Q.   And finally, HI, this is with a men's baseball team?

11   A.   Yes.

12   Q.   And can you tell us, take a look at this email and

13   explain this email?

14   A.    It's a request to add one additional player.  And I

15   approved that.

16   Q.   Was there any coach who -- withdraw the question.

17        Was there a situation in the fall of 2011, with

18   respect to any team having less than the target roster

19   without obtaining your advance approval?

20   A.   There was the golf team.

21   Q.   And can you just explain to the Court what happened

22   under those circumstances?

23   A.   The golf team was getting ready to go to an

24   invitational match or something in the nontraditional

25   season.  I received an email the day prior to when they

1     were to leave with the team.  And I don't remember exactly

2     what the email said, but the email caused me some concern

3     about the practices of the coach in terms of how he went

4     about filling a roster of ten, which was the agreed-upon

5     number in consultation with him.

6          But I wanted to make sure that my concerns were met

7     in terms of, I got the impression that the last couple he

8     was simply adding to get to the number, which is

9     unacceptable.  I wanted to make sure that the process he

10    underwent in terms of recruiting were appropriate and he

11    understood this is not, you know, simply about numbers,

12    it's about appropriately doing things, and make sure he

13    was following my directives with respect to how to

14    effectively recruit and manage a team.

15    Q.   Did you approve him taking the team to this

16    invitational event with less than the target roster?

17    A.    Initially I denied it.  I did not want him going

18    until I understood.  Because it was an invitational, it

19    was in a nontraditional season, I wanted to make sure that

20    things were appropriate.  So given that I couldn't have

21    that conversation, it came at the last minute prior to the

22    men going, I wanted to make sure I had a conversation

23    before approving anything.

24    Q.   I want to turn your attention to Exhibit KV.

25               THE COURT:  My guess is that the -- it's

1    working.

2             MR. BRILL:  This is a summary chart, Your Honor,

3    that we had prepared.

4    BY MR. BRILL:

5    Q.   So if you look at this chart, Dr. Thompson, the first

6    column are the roster sizes in 2009, 2010, as found by the

7    Court in its decision.

8         The second column are the roster sizes you approved

9    on August 15th, as reflected in the exhibit that we have

10   just looked at.  I think it was HB.

11        And the third column, which we'll come to, Lamar

12   Daniel's expert report of the roster sizes that he

13   actually found for 2011-2012.

14        And if you could just point out to the Court, or I

15   guess note that that your approved size, how did your

16   approved sizes for 2011-'12 for men's teams compare to the

17   roster sizes found by the Court?

18   A.   In total or team by team?

19   Q.   Well, I don't think we need to go team by team but --

20   so it was exactly the same, was it not?

21   A.   Right, for men.

22   Q.   Lamar Daniel found there was, in fact, two more

23   participants this past year than there were two years ago.

24   A.   Correct.

25   Q.   And for the women's teams, excluding the acrobatics

1    and tumbling, golf, and rugby teams because, of course,

2    they weren't counted by the Court and didn't exist in

3    2009-2010, your group roster sizes were ten more; is that

4    correct?

5    A.   That is correct.

6    Q.   And that was largely, was it not, because of the ten

7    additional, the track athletes that you had approved?

8    A.   That is correct.

9    Q.   But, in fact, you ended up being just two larger,

10   according to Lamar Daniel's report; is that correct?

11   A.   That is correct.

12   Q.   So in sum, the rosters in this year were two higher

13   on the men and two higher on the women based on the

14   team-by-team total comparison of the same teams that

15   existed today as two years ago.

16   A.   Based on Lamar's, yes, input.

17   Q.   Now, there's been some testimony and argument in this

18   case over the course of the last three years about the

19   Burt Kahn Court and why the university would like to use

20   the Burt Kahn Court for purposes other than volleyball.

21        And I wanted to see if you could explain, first of

22   all, how many facilities are there currently on the campus

23   that can accommodate a large group gathering?

24   A.   On the Mount Carmel campus, which is where the Burt

25   Kahn Court is located, as well as freshmen and sophomores

1    are housed, resident hall, as well as it's the heart of

2    the undergraduate programs.

3    Q.   If could you speak into the microphone.

4    A.   On the Mount Carmel campus we have all of our

5    freshmen and sophomore students who are residents on the

6    campus, plus all of the undergraduate programs essentially

7    take place on the campus as well.

8         The, the only large gathering space that holds

9    anything above 300 people is Burt Kahn Court, as well as

10   the recreation center.  Burt Kahn Court is climate

11   controlled so it has air conditioning.  The recreation

12   center does not, so it's not an appropriate venue in terms

13   of having large formal gatherings.  In particular, we

14   invite --

15             THE WITNESS:  Sorry I'm not looking at you.  I'm

16   trying to handle the microphone at the same time.

17             THE COURT:  I can hear you.

18             THE WITNESS:  Okay.

19   BY THE WITNESS:

20   A.   So when you have distinguished speakers and so forth,

21   you run the risk of it being an uncomfortable environment,

22   and it's not appropriate, given the acoustics and so

23   forth, to have events in the recreation center.  We try to

24   avoid it unless it's a group who, where we would expect

25   more than a thousand people to come.  But the Burt Kahn

1    Court is the only venue on the campus that holds, can

2    comfortably hold 300 to a thousand participants.

3    Q.   And what types of events would the university

4    normally seek to hold in the Burt Kahn Court?

5    A.   It's used very heavily by a lot of the student

6    organizations for a variety of, for fraternities and

7    sororities and so forth, either for their own programming

8    or they bring in outside speakers.

9         We use it considerably for a distinguished speaker

10   series where we'll bring in folks like Spike Lee, who'd

11   speak to the community, or David Gregory, who would speak

12   to the community as part of the learning process.  We

13   have, oftentimes we have a common freshman experience

14   where we have an expectation that students attend these

15   types of lectures.  So it's, again, the only place where

16   people can go comfortably.

17        We're also increasing substantially because of

18   increase in student population as well as the enhancement

19   of academic programs.  We're doing things such as

20   increased undergraduate research programs, where you might

21   want to have poster sessions and those kinds of things.

22   We can set up posters for folks to come and see what the

23   students are doing in undergraduate research in

24   cooperation with faculty.

25   Q.   And what limitations, if any, resulted from the use

1    of that space by the volleyball team this past year?

2    A.    The volleyball team's practice time is prime time,

3    it's right in the heart of the afternoon.  It's usually

4    reserved for a period of, I think my best recollection is

5    about two to six in the afternoon during the weekdays,

6    which is a time where it's for prime use.  We've tried to

7    make sure we've accommodated the volleyball team in terms

8    of that time slot because that's what they've

9    traditionally used that facility for over that timeframe.

10        The other thing to remember though is that in terms

11   of setup times and breakdown times around events, usually

12   requires anywhere from an hour to two hours depending upon

13   the event.  So if you have an event in the morning,

14   effectively you're done by noon, in order to make sure

15   it's broken down by 2:00 o'clock for the volleyball team

16   to be able to use it without having to worry about being

17   late for their start time for their practice.  And the

18   same thing on the other end of things, practice ends at

19   five or six o'clock.  That means that you can't really

20   have a large event given the time it takes to set up to

21   set up for an evening event.  So it's not just the period

22   of time for practice, it tends to be on either end it

23   causes some problems.

24   Q.    And as a result of the limitations on use of the Burt

25   Kahn Court during those times, how has the university

1    dealt with scheduling these events?

2    A.   We've either made the decision to hold, either not

3    hold an event, or to do it at a time that's not

4    necessarily conducive to the larger community in terms of

5    convenience or expectation and participation.  Or in some

6    cases we've taken a chance and tried to do it in the

7    recreation center, which has not worked well in some

8    cases.  You can't predict the weather, and we've had

9    situations where people have been very uncomfortable in

10   there.

11   Q.   Now, I want to turn your attention to the volleyball

12   team.

13        Has the university continued in any respect to

14   support the volleyball team during last three years?

15   A.   There's been no change in the support to the

16   volleyball team, so we've continued to support it at the

17   level that we have all along.

18   Q.   Does that include the budget?

19   A.   Yes.

20   Q.   Scholarships?

21   A.   Yes.

22   Q.   Have you treated it any differently than other teams?

23   A.   No.

24   Q.   Have you made a decision what to do with the

25   scholarships for players on the current team should the

1    Court lift this injunction and should the volleyball team

2    be eliminated?

3    A.    We did.  We thought the fairest thing to do would be

4    to honor the scholarships for students who are currently

5    on the roster for their full experience or eligibility

6    period while they are at the university.

7    Q.    Has that decision been communicated to the players?

8    A.    It's been communicated directly from me, in writing

9    to the players, that that was the decision of the

10   university.

11   Q.    Now, the university made a decision to terminate

12   Coach Sparks during this past year; is that correct?

13   A.    That is correct.

14   Q.    What action, if any, did you take to ensure the, at

15   least to ensure replacement of Coach Sparks?

16   A.    We immediately sought to hire an interim head coach

17   to make sure there was no disruption of the team, and

18   we're currently conducting a search for a permanent head

19   coach for the team.

20   Q.    Was there any -- how did the time period, if you

21   know, in hiring the interim coach compare to similar

22   situations in the past?

23   A.    Had to characterize it as probably the quickest we've

24   ever hired somebody once someone has left, to bring

25   someone on board.  So it was, I would say, within a two-

1    to three-week period.

2    Q.   Did you personally interview the interim coach?

3    A.   I did not, no.

4    Q.   Did you know anything about his background?

5    A.   I did.  I knew -- I don't remember specifically the

6    experience but I do remember having a conversation with

7    Jack about his experience and felt at the time that it was

8    appropriate.

9    Q.   Now, I want to turn your attention to the track team

10   for a minute.  Since the time of the 2010 trial, have you

11   taken any action with respect to the benefits for the

12   track team one way or the other -- track teams, I should

13   say.

14   A.   We made several changes.  We added three full

15   equivalent scholarships for the track team.  We also added

16   a part-time coach.  We've subsequently added, given

17   authorization for a full-time coach, which is effective

18   for the next fiscal year on July 1st of 2012.  And we've

19   also increased our operating budget, I believe the amount

20   was $10,000.

21   Q.   Was there any instructions with respect to the three

22   additional scholarships, that those be targeted for any

23   particular type of athlete?

24   A.   We wanted them primarily focused on field events.

25   Q.   Would that include sprints and distance, also?

1    A.    Yes.  I'm sorry.  Yes, all of those things.

2    Q.    So in other words, anything other than just distance

3    events?

4    A.    Yes.

5    Q.    So what is the, do you know what the total number of

6    scholarships for the track and field and cross-country

7    teams would be now?

8    A.    I believe it's -- I don't know.  I'd be guessing if I

9    tried to tell you off the top of my head.  I do know what

10   we sought to do by adding the three was to bring it to the

11   NEC average to make sure we were there.  But, I'm sorry, I

12   don't know what the net addition brought us up to.

13   Q.    To make sure that the total number of scholarships

14   for the cross-country and track teams was equal to the

15   average number of scholarships offered by other NEC for

16   the same sports?

17   A.    That is correct, that was the goal.  I'm sorry, I

18   don't recollect what the total is.  I'd have to add it.

19   Q.    And do you believe that you achieved that goal?

20   A.    Yes, I know we did.

21   Q.    Now, turning to the acrobatics and tumbling and rugby

22   teams for a minute.  First of all, does Quinnipiac operate

23   with what some people called a tiered sports program?

24   A.    We have sports of emphasis.

25   Q.    You call it "sports of emphasis"?

1    A.   Yes.

2    Q.   Could you describe what you mean by "sports of

3    emphasis"?

4    A.   Sure.  Sports of emphasis are men's and women's ice

5    hockey teams, and men's and women's basketball teams, and

6    then men's and women's lacrosse, and women's field hockey.

7    Q.   And in what respects are those, are any of these

8    teams treated differently than the other teams?

9    A.   The primary benefit or difference is that they

10   receive the full support allowable under any rules in

11   terms of things like travel budgets, scheduling --

12   Q.   Coaching?

13   A.   Coaching.

14   Q.   Scholarships?

15   A.   Scholarships.

16   Q.   What about facilities?

17   A.   Facilities, yes.  The TD Bank Center houses the

18   basketball and hockey teams, as an example.

19   Q.   Now, the lacrosse and field hockey teams don't have

20   facilities at this point that are comparable?

21   A.   No.  But it's part of our planning process to bring

22   them up to where they should be.

23   Q.   Now, with respect to the sports that are not sports

24   of emphasis, do you make any distinctions among those

25   sports?

1    A.    No.  They are treated all the same with all respects,

2    so there's no distinction across any of the, those teams

3    in terms of any budgeting preference or any other

4    preferences.

5    Q.    Now, specifically with respect to acrobatics and

6    tumbling and rugby, are those treated differently in any

7    of those respects than the other non-sports of emphasis?

8    A.    No.  They are treated precisely the same as all the

9    other non-sports of emphasis.

10   Q.    Now, one area that not all sports are treated the

11   same is locker rooms; is that correct?

12   A.    That is correct.

13   Q.    Are there certain teams that even don't have a locker

14   room or share locker rooms?

15   A.    The tennis teams don't have locker rooms.

16   Q.    That's men's and women's?

17   A.    Men's and women's.  The indoor and outdoor track team

18   women's does not have a locker room.  Rugby shares a

19   locker room.  Most of the others -- I think I may be

20   missing one, but all of the others have either a locker

21   dedicated or shared.

22   Q.    In fact, you said the indoor and outdoor track team

23   don't have a locker room.

24         In fact, do they share with the rugby team also?

25   A.    Yes.  I'm sorry.

1    Q.   And what about acrobatics and tumbling, do they have
2    a locker room at this point?
3    A.   No, they don't.
4    Q.   Is there anything that -- and what about men's
5    cross-country, does it have a locker room?
6    A.   I don't believe so.
7    Q.   Is there any plan that the university is currently
8    considering to improve facilities, including locker-room
9    space?
10   A.   Currently going through a master planning process
11   that encompasses the entire campus, but a large proportion
12   of that is dedicated to taking a look to see what we need
13   to do to improve the athletics and recreation facilities
14   appropriately, and one of the major goals is to
15   appropriately house all of the athletic teams.
16   Q.   And where does that process stand now, Dr. Thompson?
17   A.   This is several stages to it, and we're at the
18   beginning of it, which is a program analysis to get input
19   from the coaches and others involved in athletics, in
20   terms of what their programmatic needs are.  There's a
21   followup meeting coming up within the next couple of weeks
22   with our facilities folks, and eventually there will be an
23   engagement with the architects we traditionally use to
24   take a look at what we need to do to appropriately house
25   all of the teams.

1    Q.    I'd like you to turn your attention to Exhibit KU.

2          Could you identify Exhibit KU?

3    A.    This was the roster plan effective most -- this is

4    the most recent plan going into the 2012-'13 academic

5    year.

6    Q.    I don't have a comparison up to the present plan, but

7    by looking at this can you point out to the Court if there

8    are any teams where there are changes one way or the

9    other?

10   A.    I don't know what you mean by "significant."

11   Q.    Ice hockey seems to be down from 26 or 27 to 22?

12   A.    Correct.  On the --

13   Q.    Why is that?

14   A.    The coach came to me.  We had a -- during his annual

15   review.  He came approximately four, six weeks ago, and

16   explained to me his experience with the higher roster,

17   which I believe was 26, that he thought it was appropriate

18   to bring the roster down to 22, to ensure that, in fact,

19   all of the athletes were offered a genuine experience

20   consistent with the expectations of Title IX.

21   Q.    And obviously you agreed to that change?

22   A.    Right, based on his input.

23   Q.    And rugby now is at 26, and there's been a 30 -- your

24   target was 35 last year?

25   A.    I think it was 34 originally.  And, again, I think

1    Becky came in with good intentions in terms of what she

2    thought was appropriate, but her experience after a year,

3    and listening to her in terms of what she thought was

4    better, given her experience, I decided to set it at 26

5    based on her input.

6    Q.   Now, I see track is back up at 35, and what does that

7    reflect?

8    A.   Again, Carolyn Martin, who is the coach, feels that

9    35 is the number she would like to have to field a

10   competitive team in each of the sports.

11   Q.   So, and your gender distribution at the bottom, those

12   numbers are, I assume, 2011-2012 undergraduate percentage

13   numbers?

14   A.   That is correct.

15   Q.   Is there any preliminary estimate on what that gender

16   distribution will be for the forthcoming year?

17   A.   My best estimate of how it's going to turn out is the

18   proportion of women in the undergraduate population will

19   come down slightly in proportion, and men will go up

20   slightly, based on the early numbers of the freshman class

21   coming in, but nothing of great significance in terms of

22   major swing.

23   Q.   And obviously this chart includes volleyball.

24   A.   Correct.  I'll just mention golf as well.  That's a

25   change in consultation with the coach, where originally

1   that was set at a target of ten, but in consultation with

2   the coach, I made a decision to reduce that number as

3   well, based on his input for the coming year.

4   Q.    Okay.  Thank you.

5          MR. BRILL:  I have nothing further.

6   CROSS EXAMINATION

7   BY MR. HERNANDEZ:

8   Q.    Good morning, Dr. Thompson.

9   A.    Good morning.

10  Q.    I believe you mentioned that you consider women's

11  field hockey to be a sport of emphasis at Quinnipiac

12  University?

13  A.    That is correct.

14  Q.    And who's the coach of the women's field hockey team?

15  A.    The coach is Becca Kohli.

16  Q.    And have you represented to her that women's field

17  hockey is a sport of emphasis?

18  A.    Yes.

19  Q.    When did you do that?

20  A.    Approximately a year and-a-half ago.

21  Q.    Year and-a-half ago.

22        And what did you -- how did you tell her that women's

23  field hockey was going to be a sport of emphasis?

24  A.    In person.

25  Q.    All right.  And did you tell her what that means?

1    A.    Yes.

2    Q.    What did you tell her that means?

3    A.    I told her that I wanted to be in consultation with

4    her with respect to her needs around coaching, that would

5    be taking a look at the facilities, taking a look at the

6    scholarship level and so forth.  So it was treated on an

7    equivalent basis with teams such as ice hockey and

8    basketball teams.

9    Q.    Do you believe that she considers women's field

10   hockey to be a, quote/unquote, sport of emphasis?

11   A.    I believe she does.

12   Q.    All right.  You actually monitor the roster

13   management at Quinnipiac University; is that correct?

14   A.    Yes, I oversee it.

15   Q.    All right.  And do you rely on the coaches to provide

16   you accurate information in setting those roster

17   management numbers?

18   A.    In terms of achieving them?

19   Q.    Yes.

20   A.    In terms of achieving them, I rely on both the

21   coaches as well as our compliance office, which the person

22   I primarily rely on in the compliance office is Tracy

23   Flynn.

24   Q.    What sort of information does Tracy Flynn track?

25   A.    Tracy is ultimately responsible for monitoring the

1      additions or deletions to the rosters, over the course of

2      time that you're referring to, as the roster management

3      portion of her responsibilities.

4      Q.    And do you take any steps to monitor whether people

5      who are listed on the roster are actually reporting for

6      practice?

7      A.    Myself personally?

8      Q.    Yes.

9      A.    No.

10     Q.    And does -- do you have a process for monitoring

11     whether people are reporting for practice?

12     A.    I have to rely on the coaches.  That's part of their

13     responsibility, to make sure that that's happening.

14     Q.    And how do they ensure that that's happening?

15     A.    I have would assume it's akin to, just to give you an

16     analogy, a professor, faculty member who's managing a

17     classroom, has an expectation that their students are

18     there.  Many times it's a similar process in terms of what

19     the coaches would communicate to their players and

20     expectations around their participation.

21     Q.    Have you ever had a discussion with any of the

22     coaches that you expected them to keep track of who

23     appears for practice?

24     A.    No, I haven't, not myself specifically.

25     Q.    All right.  Do you take any steps to monitor whether

1    people on the roster are participating fully in the
2    organized practice for the teams?
3    A.   Again, given my level in the university, I don't get
4    into the details of things.  I place expectations on the
5    people who are responsible for doing these things.  So,
6    no, I don't do it personally, but I have an expectation
7    it's being done.
8    Q.   Do you know if Ms. Flynn periodically audits whether
9    people on the roster are actually practicing?
10   A.   I don't know that.
11   Q.   All right.  And do you know if Ms. Flynn has a
12   process for periodically auditing whether people on the
13   roster are participating fully in the practice sessions?
14   A.   No, I don't know that.
15   Q.   Does Quinnipiac University have an employee to
16   coordinate compliance with Title IX?
17   A.   We do.
18   Q.   All right.  And do you have a gender equity officer
19   at Quinnipiac University?
20   A.   I would assume that would be the same person,
21   Title IX.
22   Q.   Who is that?
23   A.   Sarah Steel.
24   Q.   And how long has Sarah Steel been the gender equity
25   officer?

A.   It was near, it was right after the Court's decision
in 2010 that I appointed Sarah.  And rationale behind
Sarah was that she reports directly to me, so she's an
associate vice president for academic affairs.

Q.   How was she chosen?

A.   I chose her.

Q.   Does she have any experience in the field of gender
equity?

A.   She had -- the reason I chose her was both twofold.
One is because she's someone I worked with on a daily
basis.  And secondarily, she had significant human
resources experience, which I thought was applicable to
the type of experience we would expect in someone who is
responsible for Title IX compliance for the university.

     I subsequently sent her for training as soon as I
appointed her, to make sure she was comfortable and
brought up to speed with respect to what her duties and
responsibilities are.

Q.   What type of training did she receive?

A.   I don't remember.  I know she went to it a, it was a
national program.  I don't remember specifically what it
was, but I funded her.  She -- wherever it was, she had to
fly to it, and we fully supported her needs.

Q.   Do you know who was sponsoring the program?

A.   I don't.

1    Q.   How did you pick the program?

2    A.   It was, I asked Sarah to do her best analysis in

3    terms of what she thought was the appropriate program, and

4    she came to me with the suggestion that I send her to this

5    particular training program.

6    Q.   Did she present you with a number of different

7    training programs that she could attend?

8    A.   I don't remember.  I think she presented it as being

9    among the options she looked at.  I think she presented

10   this one as being the best.

11   Q.   Did you review the option with her?

12   A.   No.  I rely very heavily on Sarah.  I have a lot of

13   confidence in her ability.  She's very capable of making a

14   determination such as that.

15   Q.   All right.  So you didn't review who would be on the

16   faculty at this presentation?

17   A.   No.

18   Q.   All right.  And you understand that there are some

19   organizations that are antagonistic in this case toward

20   Title IX; are you aware of that?

21   A.   I don't know of any off the top of my head.

22   Q.   Okay.  And did you -- all right.

23        How long was this program that she attended?

24   A.   I don't know.

25   Q.   And did you have a chance to talk with her about the

1    program when she came back?

2    A.    Nothing other than asking her if she thought it was

3    of the quality she thought it was going to be.

4          And she confirmed that she felt that it was.

5    Q.    Did she receive any materials at this program?

6    A.    I don't know.

7    Q.    So obviously then, if she did, you didn't see any

8    materials that she received?

9    A.    That is correct.

10   Q.    All right.  Did she have to -- did this program offer

11   a certification in gender equity?

12   A.    I don't know.

13   Q.    Did you ask Ms. Steel to review the Court's decision

14   granting the plaintiff's motion for class certification in

15   this case?

16   A.    I don't know that I asked her, but I know she has

17   reviewed it.

18   Q.    How do you know that?

19   A.    I had conversation with her.

20   Q.    All right.  Did you discuss the decisions with her?

21   A.    I don't believe so.  No, not that I can recall.

22   Q.    All right.  Did you take steps to notify coaches that

23   she was the new gender equity person on campus?

24   A.    Yes, I did.

25   Q.    And what steps did you take?

1    A.   I was a communication to the coaches that she had

2    been appointed, and also to our compliance folks, Tracy

3    Flynn and Bob Tipson (ph).

4    Q.   How did you communicate that?

5    A.   I don't remember if it was by an email, or if it

6    was -- I'd go to coaches' meetings on occasion.  So I

7    don't remember if it was verbally or in writing.

8    Q.   Did you take any steps to confirm that coaches were

9    aware of the new gender equity person?

10   A.   As in a followup question?

11   Q.   Correct.

12   A.   No.

13   Q.   Do you know at this time whether any coaches are

14   unaware of Ms. Steel's position?

15   A.   I'm not sure that if you -- I mean, I can't guarantee

16   that every coach would have the name on the tip of their

17   tongues.  It's on our internet, and I think appropriately

18   posted there for folks who need assistance.

19   Q.   Do you know if Quinnipiac University has a

20   nondiscrimination policy?

21   A.   Yes, we do.

22   Q.   When was that added?

23   A.   It's longstanding.  It's been revised over the course

24   of time, but I'm not sure when it was initiated.  But it's

25   been periodically revised over the course of time and

1    covers everything with respect to our hiring practices and
2    personnel policies and so forth.
3    Q.    Did you participant in preparing the
4    nondiscrimination policy?
5    A.    No.
6    Q.    Who did?
7    A.    I don't know.  As I say, it's a longstanding policy.
8    Q.    Have there been any changes in the nondiscrimination
9    policy recently?
10   A.    I don't know.
11   Q.    All right.  And do you know if the nondiscrimination
12   policy first appeared in the 2011-'12 athletic handbook?
13   A.    That I don't know.
14   Q.    You're not aware of that?
15   A.    No.
16   Q.    Does Quinnipiac University have a Title IX grievance
17   procedure in place?
18   A.    We do.  It's the procedure that's overseen by Sarah
19   Steel.
20   Q.    All right.  And how was the Title IX grievance
21   procedure devised?
22   A.    It was designed -- I'm sorry.  It was designed by
23   Sarah.
24   Q.    And was there a Title IX grievance procedure in place
25   at Quinnipiac University before Ms. Steel came onboard?

1    A.   I believe there was, but I can't tell you for sure.

2    But those types of issues generally continued to be

3    directed towards Human Resources, if there was one.   I

4    don't remember there ever being a Title IX grievance in

5    the 14 years I've been there, other than the one related

6    to this case.

7    Q.   Now, when exactly did Quinnipiac University decide to

8    add women's golf?

9    A.   That was within a month after the Court's decision

10   in 2010.

11   Q.   All right.   And so would that have been in or about

12   late summer of 2010?

13   A.   That is correct.

14   Q.   All right.   And who decided to add it?

15   A.   I ultimately decided to add it.

16   Q.   And did you discuss that with Jack McDonald?

17   A.   I did.

18   Q.   And when was the coach hired for golf?

19   A.   I think the coach -- again, my best recollection --

20   I'm sorry, I'm fuzzy on some of these things.   We do a lot

21   of hiring, but my best recollection was we hired someone

22   that fall.

23   Q.   All right.   And was that position posted?

24   A.   Yes, it was.

25   Q.   Did you conduct a national search for the new women's

1    golf coach?

2    A.    I'm not sure how broad the pool was.

3    Q.    All right.  And, in fact, Quinnipiac University ended

4    up hiring the old men's golf coach; is that correct?

5    A.    That is correct.

6    Q.    And does he live in the area?

7    A.    I believe he does.

8    Q.    All right.  And he's friends with Billy Mecca; is

9    that correct?

10   A.    I don't know that.

11   Q.    You don't know that?

12   A.    No.

13   Q.    When did you set the roster management number for

14   golf?

15   A.    It was probably shortly after the coach arrived.  I

16   don't know exactly what the date was.

17   Q.    Okay.  And you believe the coach arrived in the fall?

18   A.    I believe so.  I'm not -- could have been.  As I

19   said, we've hired 80 new full-time faculty, a host of

20   administrators.  We're opening a new medical school.  I've

21   hired 18 basic science faculty, an entire administrative

22   staff for the medical school, so I can't keep track of the

23   hire date of every one of the new employees coming to

24   Quinnipiac.  So, I'm sorry, I can't tell you precisely

25   when it was.

1    Q.   I'd ask you to turn your attention to Plaintiffs'

2    Exhibit 239, in front of you there.

3         Do you have Plaintiffs' 239 in front of you?

4    A.   I do.

5    Q.   And do you recognize Plaintiffs' 239?

6    A.   This is, looks like it's a comparison of either --

7    well, it's from August of 2011, and it has roster plans

8    for 2011-'12.  I'm assuming that the other numbers are the

9    actual numbers for '10-'11 and '9-'10.

10   Q.   All right.  And does -- drawing your attention to

11   golf, does that indicate that Quinnipiac University had a

12   roster plan number of 10 --

13   A.   Yes.

14   Q.   -- for the '11-'12, academic year?

15   A.   Yes.

16   Q.   And this was prepared in August of 2011?

17   A.   Correct.

18   Q.   All right.  And when Coach O'Connor came on, was he a

19   full-time coach or part-time coach?

20   A.   No.  He's a part-time coach.

21   Q.   Is he still a part-time coach?

22   A.   Yes, he is.

23   Q.   Is there any plans to make him a full-time coach?

24   A.   Yes, there are.

25   Q.   All right.  And --

1    A.   I'm sorry, maybe not.  There's plans to approve the

2    position as a full-time coach.  He would have to apply for

3    it like anyone else would.

4    Q.   All right.  Drawing your attention to Plaintiffs'

5    Exhibit 240 -- and specifically drawing your attention to

6    page 5, Exhibit A -- is Plaintiffs' Exhibit 240 and

7    Exhibit A, a statement that you prepared for the Court in

8    connection with this litigation?

9    A.   It was prepared by Proskauer but reviewed by me for

10   accuracy.

11   Q.   All right.  And drawing your attention to Exhibit A,

12   under golf, does that represent that there would be 11

13   female participants in '11-'12?

14   A.   Effective that date, 12/15, apparently by this there

15   was 11 participants on the roster.

16   Q.   And was 11 the number that you projected for '11-'12?

17   A.   No.

18   Q.   What was the number you projected for '11-'12?

19   A.   From the August date it was ten.

20   Q.   All right.  And has the actual number of golf

21   participants been reduced?

22   A.   I don't know.  I know for the roster target for next

23   year, it's been reduced to eight.

24   Q.   When was it reduced to eight?

25   A.   I would say probably within the last couple months.

1    As a result of a conversation with Coach O'Connor, I made

2    the decision to reduce it to eight.

3    Q.   Okay.  And did you take any steps to notify the Court

4    of the change in the projected number of female

5    participants?

6           MR. BRILL:  Objection, Your Honor.  There's

7    no -- this witness doesn't have any responsibility for

8    advising the Court of anything.

9           THE COURT:  Well, okay, it's a court trial.  I

10   mean so -- the answer then would, presumably is no.

11   BY MR. HERNANDEZ:

12   Q.   Would that be your answer, sir, no?

13   A.   The answer is no.

14   Q.   Okay.  And it's a mistake?

15   A.   No, it's not a mistake.

16   Q.   You would not consider that a mistake?

17   A.   No.

18   Q.   All right.

19   A.   It's not, I don't consider it a mistake.  This is a

20   truthful statement effective December 15.  And you're

21   referring to a change that occurred in the planned roster

22   that happened a couple months ago, so -- I don't think the

23   Court expects me to let them know whenever a roster change

24   is made across the teams.  So I don't consider it a

25   mistake.  It's a truthful statement effective 12/15.

1    Q.    And the target roster management number now is eight;

2    is that correct?

3    A.    That is correct.

4    Q.    All right.  Was there an exchange of ideas over what

5    the roster management number should be with Coach O'Connor

6    in the fall of 2011?

7    A.    There was.

8    Q.    And what was the substance of that exchange?

9    A.    Again, the early decision for golf was to have the

10   roster set at ten.  We had a discussion about, given the

11   budget we were allocating and so forth, as to whether or

12   not that was an appropriate number for him.  He indicated

13   that it was, and that's what we set the target at.

14   Q.    And was the target at ten in the fall of 2011?

15   A.    Yes.

16   Q.    And he was unable to meet that number; is that

17   correct?

18   A.    He ultimately did.

19   Q.    All right.  Early on, he had a problem meeting that

20   number; is that correct?

21   A.    That's what I referred to before, where I had a

22   concern that I didn't have enough information to be sure

23   that he was appropriately following my directives.

24   Q.    All right.  And did he indicate to you that he could

25   only field eight participants?

1    A.    For this past year?

2    Q.    In the fall of 2011?

3    A.    Again, at some point along the way, I indicated that

4    he had, essentially the message was he had eight that he

5    felt were solid athletes to play, he was coming up to this

6    invitational, added two more, and the information I got at

7    the time did not convince me that he appropriately

8    recruited those athletes, so I wanted to have a

9    conversation with him.  It ultimately end up at 11, and

10   I'd have to look back to see what happened during that

11   period of time on December 15.  I don't remember off the

12   top of my head.

13   Q.    Do you know where he got these additional women

14   golfers?

15   A.    I don't remember precisely where he got them.  But,

16   again, I was concerned enough that I thought we ought to

17   have a conversation and make it clear as to what my

18   expectations were to appropriately handle his recruiting

19   of athletes.

20   Q.    Drawing your attention to Plaintiffs' Exhibit 243.

21         Have you had a chance to read 243?

22   A.    Yes, I have.

23   Q.    Was that an email from the women's golf coach to you,

24   indicating that he would have a problem making the target

25   roster management number of ten?

1    A.   Again, I don't want to characterize this as the ends

2    justify the means.  That's not the process.  The

3    process -- this was the email that prompted my concern,

4    and I wanted to make sure that Coach O'Connor understood

5    that you don't just go out and you try to meet a roster at

6    all costs just by, you know, potentially dragging people

7    in.  So this was, caused me sufficient concern that I

8    sought to have a conversation with him.  The invitational

9    was the next day, on that Saturday, and I felt very

10   uncomfortable with what he had indicated here and wanted

11   to have a conversation with him about his recruitment

12   processes to make sure he understood what the expectations

13   of the university were.

14   Q.   I understand that you have a statement you'd like to

15   make to the Court.

16        My question to you was:  Is this the email that Coach

17   O'Connor sent to you, notifying you that he had a problem

18   making the number ten?

19            MR. BRILL:  I object to the gratuitous comment

20   by Plaintiffs' counsel, Your Honor.

21            MR. HERNANDEZ:  The answer was nonresponsive.

22            MR. BRILL:  Well -- I'm sorry.

23            THE COURT:  It's all right.  Look, again,

24   there's no jury here.  So it's all right.

25

1    BY MR. HERNANDEZ:

2    Q.   Was that the email he used to bring this problem to

3    your attention?

4    A.   Yes.

5    Q.   And drawing your attention to Plaintiffs' 244.

6         Do you recognize Plaintiffs' 244?

7    A.   Yes, I do.

8    Q.   All right.  And is that an email from Jack McDonald

9    on which you are copied?

10   A.   Yes, it is.

11   Q.   And is that an email addressed to the women's golf

12   coach, telling him that Jack would not be able to sign his

13   squad list?

14   A.   That is correct.

15   Q.   All right.  And also threatening to cancel future

16   matches until he reaches his target roster management

17   number of ten; is that correct?

18           MR. BRILL:  Objection, misstates the document,

19   Your Honor.  It says "Or gets permission from mark seven."

20   The document speaks for itself.

21           THE COURT:  Yes, I've got it.  Okay.

22           THE WITNESS:  I was going to answer your

23   question the same way.  You're reading half the sentence.

24           So one of the options was to get the roster to

25   ten using appropriate recruitment methods, or give me an

1   explanation as to why the roster should be set at lower

2   number.

3   BY MR. HERNANDEZ:

4   Q.   All right.  And he would have to get your permission,

5   correct?

6   A.   That is correct.

7   Q.   And without your permission the match would be

8   canceled; is that correct?

9   A.   In this particular case, where he wanted to go to,

10   the invitational match was canceled.

11   Q.   All right.  Drawing your attention to Plaintiffs'

12   Exhibit 247, is that an email from the women's golf coach,

13   dated September 13, 2011, to you?

14   A.   Yes, it is.

15   Q.   All right.  And in that, does that reflect that he

16   reached out to members of the student body to try to round

17   out the golf roster?

18   A.   Indicates that he did reach out to the student body

19   to see if there were qualified athletes to add to the

20   roster, yes.

21   Q.   And would you consider these to be recruited student

22   athletes?

23   A.   I would.  I believe recruitment takes place on and

24   off campus.

25   Q.   And did you have any discussions with him on the

1    qualifications of the students that he was proposing to

2    add?

3    A.   I don't remember a specific conversation about that.

4    Q.   Did you eventually approve those proposed student

5    athletes to be added to the women's roster?

6    A.   I don't remember.  I don't know if this is the same

7    eleven that appeared in the December 15th calculation or

8    not.

9    Q.   And are you aware that golf does not have a

10   nontraditional season?

11   A.   It's my loose term.  This is again where you know

12   enough to be dangerous on some of these things, given the

13   breadth of my responsibilities.  So when I refer to an

14   invitational as being nontraditional, I mean it's

15   optional, you don't have to participate in it.

16            THE COURT:  You're not talking about the indoor

17   golf season.

18            THE WITNESS:  No.

19   BY MR. HERNANDEZ:

20   Q.   And drawing your attention to Plaintiffs' Exhibit

21   250, in front of you there, and specifically the beginning

22   at the bottom, is that an email from the women's golf

23   coach, dated February 8, 2012, to you, indicating that he

24   had been approached by two women interested in joining the

25   golf team?

1    A.    Yes.

2    Q.    And did you have any discussions with Coach O'Connor

3    about the qualifications of those proposed two student

4    athletes?

5    A.    The conversation -- I don't remember.  I've had

6    conversations with him about ensuring -- I don't have

7    conversations with respect to qualifications of specific

8    athletes.  Again, it may have been a restatement of my

9    expectations about that, but I don't get down to the

10   minutia of each individual player.

11   Q.    Let's talk about acrobatics and tumbling.

12         When did Quinnipiac University decide that it was

13   going to make competitive cheer a varsity sport, or

14   designated a varsity sport?

15   A.    I don't know the specific date.  It predated my

16   responsibility for athletics.  I'm sorry, I don't know the

17   specific date.

18   Q.    And when did the -- and before picking competitive

19   cheer, do you know if Quinnipiac University conducted a

20   survey of the women student athletes about their interest

21   in the activity?

22   A.    I don't.  Given that it again predated my

23   responsibility for athletics, I have no knowledge.

24   Q.    Have you ever seen any such surveys?

25   A.    No.

```
1    Q.    Before settling on competitive cheer, do you know if
2    Quinnipiac University determined there was sufficient
3    interest to begin this activity?
4    A.    I'm sorry.  Again, it predates my taking over that
5    area of responsibility.
6    Q.    Did you have any conversations with anybody who
7    preceded you about the level of interest in competitive
8    cheer?
9    A.    No.
10   Q.    At some point you decided to transform competitive
11   cheer into acrobatics and tumbling; is that correct?
12   A.    That is correct.
13   Q.    And before transforming competitive cheer into
14   acrobatics and tumbling, was there any discussion about
15   the level of interest in this new activity?
16             MR. BRILL:  Objection, Your Honor.  There's no
17   evidence it's a new activity.  The witness testified the
18   name was changed.  You can ask him if it's a new activity
19   but -- the question assumes contrary to the evidence.
20             THE COURT:  Rephrase it.
21             MR. HERNANDEZ:  All right.
22   BY MR. HERNANDEZ:
23   Q.    Sir, was there any discussion about the level of
24   interest in acrobatics and tumbling before Quinnipiac
25   University decided to change the name of competitive
```

1  cheer?

2  A.   No, there was no discussions.

3  Q.   Before changing the name of competitive cheer to

4  acrobatics and tumbling, did the university take any steps

5  to evaluate the type of competition that acrobatics and

6  tumbling would be going up against?

7  A.   Not aware.  Again, this is an ongoing sport, so I

8  don't remember any changes being discussed.  I knew that

9  the name change came as a result of the discussion that

10  occurred at the governing body in terms of what it should

11  be appropriately referred to.

12  Q.   Do you know which schools acrobatics and tumbling is

13  proposing to compete against?

14  A.   No, I don't.

15  Q.   All right.  Do you know if any of these schools

16  recognize acrobatics and tumbling as a varsity sport?

17  A.   I don't have that information.

18  Q.   All right.  Do you know if Quinnipiac University

19  conducted a survey of the proposed competitors in

20  acrobatics and tumbling to determine which, if any, of

21  these schools were treating acrobatics and tumbling as a

22  varsity sport?

23  A.   No, I don't.

24  Q.   All right.  Did Quinnipiac University take any steps

25  to determine whether the potential competitors for

1    acrobatics and tumbling were club teams?

2    A.    I'm not aware of that, no.

3    Q.    All right.  Do you know now whether any of the

4    proposed competitors for acrobatics and tumbling are club

5    teams?

6            MR. BRILL:  Can we just clarify what counsel's

7    referring to when he says "proposed competitors"?

8            Is he referring to 2011-2012, or proposed

9    competitors for the future at some point?

10   BY MR. HERNANDEZ:

11   Q.    Did you understand my question?

12   A.    Not really.

13   Q.    All right.

14   A.    Sorry.

15   Q.    Acrobatics and tumbling is going, is proposing to

16   compete in 1213, correct?

17   A.    That's correct.

18   Q.    And presumably acrobatics and tumbling has a

19   competitive schedule lined up; is that correct?

20   A.    That's my assumption, yes.

21   Q.    Have you seen that schedule?

22   A.    No, I haven't.

23   Q.    So you don't know which schools are on that schedule,

24   correct?

25   A.    No.  Again, I'm sorry.  The breadth of the

1   responsibilities I have don't allow me necessarily to get

2   into the details of these things, so the answer no.

3   Q.   As far as roster management goes, I believe it's your

4   testimony that it's your responsibility to make sure that

5   the student athletes are receiving a genuine competitive

6   opportunity; is that correct?

7   A.   That is correct.

8   Q.   And that's part of your job when you monitor roster

9   management, correct?

10  A.   That is correct.

11  Q.   All right.  My question, sir, is:  To the extent that

12  you are in charge of ensuring the students receive a

13  quality competitive opportunity, have you reviewed

14  acrobatics and tumbling's '12-'13 competitive schedule?

15           MR. BRILL:  Objection.  There is no evidence

16  there is a schedule, Your Honor.

17           And further objection is, the trial is about

18  2011-2012, and whether Quinnipiac was in compliance for

19  2011-2012.  So there's no -- I don't understand the

20  relevance of asking whether he reviewed a schedule for

21  next year, as to which there's no evidence that there is

22  such a schedule even at this point.

23           MR. HERNANDEZ:  I intend to cover both academic

24  years, and I respectfully submit my question stands.

25           THE COURT:  I'll going to allow a certain amount

1    of this.

2              THE WITNESS:  The best way to answer your

3    question is, I haven't reviewed the upcoming year's

4    schedule or current schedule of any team.

5    BY MR. HERNANDEZ:

6    Q.   But it was your decision, in consultation with

7    Mr. McDonald, to make, to rename competitive cheer

8    "acrobatics and tumbling," and offer it as a sport; is

9    that correct?

10   A.   Jack came to me with advice of the governing board,

11   and yes.  So on the basis of that information, yes.

12   Q.   Okay.  And did you take any steps to review the teams

13   that acrobatics and tumbling was going to compete against

14   in '11-'12, this year past?

15   A.   No.

16   Q.   All right.  Do you know, as you sit there today,

17   whether acrobatics and tumbling competed against any club

18   teams in '11-'12?

19   A.   I don't know.

20   Q.   Do you know, as you sit there today, whether

21   acrobatics and tumbling competed against any non-varsity

22   acrobatics and tumbling teams in '11-'12?

23   A.   No, I don't know.

24   Q.   And the same would be true for the coming year; is

25   that correct?

1    A.    That's true.

2    Q.    Before undertaking to change the name of competitive

3    cheer and rename it acrobatics and tumbling, did

4    Quinnipiac University take any steps to find out whether

5    the NCAA recognizes it as a sport?

6    A.    I don't know.

7    Q.    You don't know if you did, or you don't know --

8    A.    I don't know.

9    Q.    All right.  Do you know if the NCAA recognized the

10   re-branded activity of acrobatics and tumbling as a sport?

11   A.    It does not.

12   Q.    Before undertaking to add acrobatics and tumbling,

13   did Quinnipiac University undertake a study of the level

14   of competition afforded by other schools with acrobatics

15   and tumbling programs?

16   A.    I don't know whether or not that occurred.

17   Q.    Did you ever ask if it occurred?

18   A.    No.

19   Q.    Before undertaking to add acrobatics and tumbling,

20   did Quinnipiac University take any steps to find out

21   whether the Northeast Conference recognizes it as a sport?

22   A.    I don't know.

23   Q.    And just so that we're clear, Quinnipiac University

24   does belong to the Northeast Conference, correct?

25   A.    That is correct.

1    Q.   Commonly referred to as the NEC?

2    A.   Correct.

3    Q.   And before undertaking to add acrobatics and

4    tumbling, did Quinnipiac University assess how far members

5    of the team would have to travel to compete with other

6    schools in acrobatics and tumbling?

7    A.   I don't know.

8    Q.   And before undertaking to add acrobatics and

9    tumbling, did Quinnipiac University assess how far

10   supporters of acrobatics and tumbling would have to travel

11   to watch their team compete?

12   A.   I don't know.

13   Q.   Do you know if, in '11-'12, the acrobatics and

14   tumbling team competed against any NCAA Division II

15   schools?

16   A.   I don't know.

17   Q.   All right.  And do you know if acrobatics and

18   tumbling, in academic year '11-'12, competed against any

19   NCAA Division III teams?

20   A.   I don't know.

21   Q.   Let's talk about volleyball a little bit.

22        Who is the interim volleyball coach?

23   A.   It's Kris, I have trouble pronouncing his last name,

24   I think it's Czaplinski.

25   Q.   And when did Mr. Czaplinski come to your attention?

A.    It was around the end of February, beginning of March

of this year.

Q.    And when was Coach Sparks let go from Quinnipiac?

A.    I don't remember the exact date, but it was in

February of this year.

Q.    Did Quinnipiac University have a replacement coach

lined up?

A.    No.

Q.    Just so my question and the answer is complete, did

you have a coach lined up before Coach Sparks left?

A.    No.

Q.    When Coach Czaplinski was hired as the interim coach,

did you take any steps to verify whether he was NCAA

qualified to recruit?

A.    No.  I relied on Jack in the hiring process for those

types of details.

Q.    And are you aware when he was first hired he was not

NCAA qualified to recruit?

A.    No.

Q.    You were not aware of that?

A.    No.

Q.    Let's talk about the women's rugby team at this

point.

      Before deciding to add rugby, did Quinnipiac

University have a women's club rugby team?

1    A.    No.

2    Q.    So there was nobody at Quinnipiac University playing

3    women's rugby when the university decided to add it as a

4    varsity sport; is that correct?

5    A.    I don't believe -- you're correct.

6    Q.    And do you know if Quinnipiac University has a men's

7    rugby club team?

8    A.    It's not officially sponsored -- there is a men's

9    rugby team that affiliates with the university but it is

10   not officially recognized by the university.

11   Q.    It's a club sport, correct?

12   A.    It's a group of men who have come together, and they

13   play without sponsorship by the university.

14   Q.    You understand that to be a club sport?

15   A.    Not officially recognized by Quinnipiac University,

16   yes.

17   Q.    All right.  And have members of this unofficial group

18   of men playing rugby requested that they be upgraded to a

19   university-recognized team?

20   A.    They have.

21   Q.    And they've been doing that for a number of years,

22   correct?

23   A.    I don't know how many, but it's been a significant

24   number of years.

25   Q.    Approximately how many years?

A.    I don't know.  I just know it goes back several.

Q.    Okay.  And since there was no women's rugby players,

presumably there was nobody, no women rugby players asking

to become a club team, correct?

A.    I'm not aware of any.

Q.    All right.  Before undertaking to add women's rugby,

did the university undertake any steps to determine the

level of interest in women's rugby at the university?

A.    Not aware of any -- among women students?

Q.    Correct.

A.    No, I'm not aware of any.

Q.    And before undertaking to add rugby, did the

university take any steps to assess the student body to

determine their athletic abilities for this new sport?

A.    Not that I'm aware of.

Q.    All right.  And just so that I'm clear, the men's

rugby players have asked to be made a sport, correct?

A.    They've asked to be recognized by the university as a

club sport.

Q.    And has the university declined that?

A.    We've had several requests for club sports, and every

one of them has been denied at this point.

            THE COURT:  Let me just clarify that answer.

            So the men's rugby group has requested

university recognition as a club sport or as varsity --

1           THE WITNESS:  As a club sport.  Had a similar

2    request from a group of men's ice hockey players who would

3    like to establish a club team.  But we've denied all

4    requests for club teams at this point.

5    BY MR. HERNANDEZ:

6    Q.   Sir, do you know if, in 2008 --

7           THE COURT:  Just one second.

8           So Quinnipiac has no club teams?

9           THE WITNESS:  That is correct.

10          THE COURT:  All right.  And, just curious, why?

11          THE WITNESS:  I don't know the historical reason

12   for not having it.  We are considering establishing club

13   teams going forward because we think it adds to the

14   experience, it helps with attracting students to the

15   university.  We think it will add to retention and so

16   forth.

17          Part of the reason -- there is a proposal being

18   formed right now, but the part of the reason for not doing

19   it right at the moment is waiting to see the outcome of

20   the Title IX issues, so we have an understanding of the

21   resources that we need to commit to, anything that we need

22   to do with respect to the varsity athletics before using

23   resources for the club sports.  But we are planning for

24   the future, I can't tell you specifically when.

25

BY MR. HERNANDEZ:

Q.   In 2008, when the university decided to eliminate the volleyball team, did finances play a part in that decision?

          MR. BRILL:  Objection, Your Honor.  I believe it was 2009, according to --

          MR. HERNANDEZ:  I'm sorry, 2009.

BY MR. HERNANDEZ:

Q.   When volleyball was eliminated, was part of the reason financial?

A.   It was among several budget cuts we were considering, yes.

Q.   And did the university, to your knowledge, ever consider cutting, for example, the men's hockey team and making the men's rugby players a varsity sport in their stead?

A.   No.

Q.   Did the university, in order to save money, to the extent that the decision to cut volleyball was financial, did it ever consider cutting any of the established recognized NCAA/NEC sponsored men's varsity sports in favor of elevating the men's rugby team to varsity status?

          MR. BRILL:  Your Honor, I'm objecting to this line of questioning on the grounds that it's irrelevant to this proceeding.  It might have been relevant to the last

1    proceeding about decisions made to eliminate volleyball,

2    but the reasons for the decision at that time, it seems to

3    me, can't be relevant to the question of whether the

4    injunction is lifted now, whether we should have cut a

5    men's sport at that time instead of volleyball?

6            THE COURT:  I don't think it's "should have," I

7    think it's "did you consider it," but -- what's the

8    relevance?

9            MR. HERNANDEZ:  Well, at the end of the day,

10   Your Honor, whether Quinnipiac is in compliance with Prong

11   I or not, and whether the Court decides to lift the

12   injunction are not, is ultimately going to be an equitable

13   decision.  We believe that by the steps that the

14   university took toward women's volleyball and elevating a

15   group of people who had never played rugby before to the

16   extent that it was a financial reason, and they didn't

17   make the same consideration with respect to an expensive

18   men's team, which is operating at a particular level, in

19   favor of a demonstrated interest and ability by male

20   athletes, shows they are treating the men and women

21   athletes differently.  It's all about discrimination, Your

22   Honor.

23           THE COURT:  Well, I'll allow it.

24   BY MR. HERNANDEZ:

25   Q.   Sir, do you recall my question?

A.   I'm sorry, could you repeat it?

Q.   All right.  In 2008, to the extent that the university -- sorry, 2009, when the university cut women's volleyball, to the extent that it was looking to save money, to the extent that it was a financial decision, did the university ever consider dropping an expensive established men's sport recognized by the NCAA or NEC, in favor of something like the men's rugby players who wanted to be made a club team?

        MR. BRILL:  Your Honor, I have an additional objection.  This witness testified he was not in charge of athletics at that time, and he has very limited knowledge about all the reasons that went into dropping volleyball.

        THE COURT:  Okay, but he can say that, if that's his answer.

        MR. BRILL:  I know, but the problem is, it's going to require me to go into a lot of testimony potentially with other witnesses that have almost no relevance here, in order to refute the suggestion that somehow we have to go back to 2009 and examine why volleyball was eliminated on some equitable theory that it's hard to understand.

        THE COURT:  Well, if he gets the anticipated answer that you've suggested, we won't have any evidence yet about all those issues, and so the door hasn't been

1    opened yet.

2         You can answer.

3         THE WITNESS:  Thank you.  Just as a reminder, we

4    cut three men's teams at the same time we sought to cut

5    the one women's team, as part of a decision process.  But

6    I'm not aware of any analysis or decision-making process

7    that considered eliminating a men's ice hockey team.

8    Again, it was before I was responsible for that area.

9    BY MR. HERNANDEZ:

10   Q.   All right.  So -- and presumably there was no --

11   well, I'll leave it at that.

12        Have you had a chance to review the rugby schedule

13   from 20011-2012?

14   A.   No.

15   Q.   All right.  Do you know which schools the women's

16   rugby team competed against last year?

17   A.   No.

18   Q.   Do you know if any of these teams that the women's

19   rugby team competed against were club teams?

20   A.   I don't know.

21   Q.   Do you know if any of their, of the women's rugby

22   competitors were Division II schools?

23   A.   I don't know.

24   Q.   Do you know if any of them were Division III schools?

25   A.   I don't.

 1    Q.   And are you aware that the NCAA does not recognize

 2    competitions against club teams as actual competitions?

 3              MR. BRILL:  Objection to the form of the

 4    question, Your Honor.  Assumes a fact not in evidence.

 5              THE COURT:  Overruled.

 6              MR. BRILL:  He can ask him whether that is the

 7    case, but he's saying is he aware that is the case, and

 8    there's no such evidence.

 9              THE COURT:  Well, okay.

10              MR. BRILL:  And we dispute that that is true.

11              THE COURT:  Fair enough.  So he can answer it

12    yes or no, and we'll see what the next question is.

13              MR. HERNANDEZ:  And to the extent that Attorney

14    Brill is suggesting answers to the witness, I'd request

15    that he stop.

16              THE COURT:  All right.  Let's -- I don't need --

17    I've told you before, I don't need a whole lot of

18    objections.  It's a court proceeding.  But let's just go

19    ahead and ask the question.

20    BY MR. HERNANDEZ:

21    Q.   Sir, are you aware that games against club teams are

22    not recognized as official competitions by the NCAA?

23    A.   No.  Again, my expectation is that the day-to-day

24    operations and those kind of things would be known by our

25    athletic director and coaches.  Similar to accreditation

1    standards around a particular academic program, I wouldn't

2    know each standard that would be met by expectations as we

3    hire people whose responsibility it is, and it's their

4    responsibility.  So the answer is no.

5    Q.    And do you know if Quinnipiac University took any

6    steps to compare the level of competition afforded to the

7    women's rugby team against the level of competition being

8    afforded to all the other men's teams at the university?

9    A.    I don't know.

10   Q.    Are you aware that rugby does not have a championship

11   tournament?

12   A.    No, I'm not.

13   Q.    Before undertaking to add rugby, did Quinnipiac

14   assess the number of schools within the NEC that offer

15   women's rugby?

16   A.    I don't know what analysis took place.

17   Q.    Before undertaking to add rugby, do you know if

18   Quinnipiac University did an assessment of the number of

19   high schools in Connecticut that offer women's rugby?

20   A.    I don't know.

21   Q.    And before undertaking to add rugby, did the

22   university assess the number of high schools within New

23   England that offer women's rugby?

24   A.    I don't know.

25   Q.    Before adding rugby, did the university assess the

1    impact which the number of high schools within New England

2    compete in rugby would have on the rugby coach's ability

3    to recruit athletes?

4    A.   It could have happened, but I'm not aware of it.

5    Q.   Do you have any idea how far the women's rugby

6    coaches, coach has to travel to recruit athletes?

7    A.   No.

8    Q.   All right.  And I take it then that the distance that

9    they may have to travel did not factor into the budget for

10   women's rugby; is that correct?

11   A.   The budget is sufficient to meet the coach's needs

12   based on her input, so I take very seriously whatever they

13   share with me is their needs, which includes the operating

14   budget, their travel requirements, both in competition and

15   recruiting.

16   Q.   To the extent there was a discussion about that,

17   there was not a discussion about how far she would have to

18   travel to recruit athletes; is that fair to say?

19   A.   No.  Her presentation to me would be that she needs X

20   number of dollars to satisfy her recruiting and travel

21   needs.  And I would take her input as essentially part of

22   the decision-making.

23   Q.   So if I understand you correctly, there was no

24   particular kicking of the tires as far as that part of

25   budget; is that correct?

1    A.    There was no need to because I had full faith and
2    confidence in the person that we hired.
3    Q.    Before undertaking to add rugby, did the university
4    make an assessment of how far the team would have to
5    travel to compete?
6    A.    Again, it's possible but I'm not aware of it.
7    Q.    All right.  And before you and Mr. McDonald made the
8    decision to add rugby, was there any discussion about how
9    far the rugby supporters would have to travel to watch
10   their team play?
11   A.    I didn't have any discussion with Jack about it, and
12   I don't know if those discussions took place.
13          MR. HERNANDEZ:  If I could just have a moment,
14   Your Honor.
15          No more questions at this time.
16          THE COURT:  Redirect?
17          MR. BRILL:  I just have a few questions, Your
18   Honor.
19   REDIRECT EXAMINATION
20   BY MR. BRILL:
21   Q.    If I could turn the witness' attention back to
22   Exhibit 240, and specifically Exhibit A.
23          Dr. Thompson, you were asked about the golf roster
24   being shown as 11, for 2011-2012?
25   A.    Correct.

1   Q.   You testified you had approved the roster as eight.

2        Was that for '11-'12, or was that for '12-'13?

3   A.   The approval of the roster at eight was for the

4   upcoming year, '12-'13.

5   Q.   And that was the chart you just showed to the Court.

6   A.   That's correct.

7   Q.   So there's no mistake on Exhibit A; is that correct?

8   A.   I don't believe so, no.

9   Q.   Now, Sarah Steel is the Title IX coordinator?

10  A.   Yes.

11  Q.   Do her responsibilities include anything outside of

12  athletics?

13  A.   She currently has responsibility for the entire

14  campus, Title IX issues, in coordination with the Human

15  Resources office.

16  Q.   Which include much more than athletics; is that the

17  case?

18  A.   Yes.

19  Q.   Does she have any direct responsibility for the

20  athletics program?

21  A.   No, she doesn't.

22  Q.   Do you know whether Coach Czaplinski, the interim

23  volleyball coach, had any employment or role at Quinnipiac

24  before you hired him as the interim volleyball coach?

25  A.   I believe, my best recollection was he was an

1    assistant coach at one time for the program.

2    Q.   And you were asked whether you took any action to

3    line up a replacement before Coach Sparks was terminated.

4         Was there any reason you didn't do that?

5    A.   I think it would have been inappropriate to start a

6    search before the person who is in the position was no

7    longer there.

8    Q.   And was there any delay between the time that you

9    made the decision to terminate Coach Sparks and to notify

10   her of the termination?

11   A.   No.  I mean, it may have been the next day but, no,

12   nothing material.

13   Q.   Would it be your normal practice to start looking for

14   a replacement employee before a decision is made to

15   terminate the current employee?

16   A.   No.

17            MR. BRILL:  I don't have anything further.

18            THE COURT:  All right, sir, you're excused.

19   Thank you.

20            THE WITNESS:  Thank you, Your Honor.

21            (Whereupon the witness was excused.)

22            THE COURT:  Why don't we take our morning break.

23   We'll take about 20 minutes.  You should be ready to come

24   back at 11:25.  That would be great.

25            We'll stand in recess.

1          (Whereupon a recess was taken from 11:05

2     o'clock, a. m. to 11:30 o'clock, a. m.)