1            THE COURT:  Sorry for the delay.  There's a lot

2   going on.

3            Let me give you one scheduling problem that I

4   have.  I've got unfortunately a video conference, court

5   video conference at 4:00 o'clock today that I cannot get

6   out of so we're going to end a little bit early today.  So

7   sorry about that.

8            Mr. Brill, your next witness.

9            MR. BRILL:  Is that for some specific period of

10  time or are we ending today?

11           THE COURT:  I don't know how long we're going to

12  go.

13           MR. BRILL:  Why don't we call the next witness

14  and see how we're going.

15           THE COURT:  See how we go.

16           MR. BRILL:  The defendant calls Mr. Lamar

17  Daniel.

18  L A M A R    D A N I E L,    called as a witness on

19  behalf of the Defendant, having been duly sworn by the

20  Court, testified as follows:

21           THE COURT:  Please be seated and state your name

22  for the record.

23           THE WITNESS:  Lamar Daniel, D-A-N-I-E-L.

24           MR. BRILL:  Your Honor, before beginning, we did

25  submit Mr. Daniel's report, rebuttal report, but with the

1   understanding with plaintiff's counsel, we would each go

2   briefly through the highlights --

3               THE COURT:  That's fine.

4               MR. BRILL:  -- of the testimony, if it's all

5   right.  If at any point the court wants us to skip

6   something or speed up, I'm happy to oblige.

7   DIRECT EXAMINATION

8   BY MR. BRILL:

9   Q.   Good morning, Mr. Daniel.

10  A.   Good morning.

11  Q.   What is your occupation?

12  A.   I'm a consultant, Title IX consultant.

13  Q.   Is that in the athletics area?

14  A.   Yes, it is.

15  Q.   What experience do you have in the Title IX area?

16  A.   I worked with the Office of Civil Rights for over 20

17  years, in April of 1974 through December of 1994, at which

18  time I became a consultant, and still am in that practice.

19  Q.   And what positions did you have with the Office of

20  Civil Rights?

21  A.   Well, I began as an equal opportunity specialist, GS

22  seven in the post secondary educational division and was

23  promoted up to GS 12 each year.  And in 1976, '77, I

24  believe it was, year, I was, I was reassigned to the

25  elementary and secondary education division because of

1    their heavy case load and at that time I primarily

2    investigated in scholastic athletic cases.  At the end of

3    the period of a year, I asked to go back to post secondary

4    education which I liked better, and at that time I was

5    assigned the University of Georgia at Luktell (ph), an

6    athletics case which was the oldest case in the office.

7    That was filed in 1972 originally.

8    Q.   What office were you in?

9    A.   Office -- Post Secondary Education, Office of Civil

10   Rights.

11   Q.   Was there a specific region; were you in the national

12   office?

13   A.   I was in region four which is Atlanta, covers eight

14   southern states.

15        And then I investigated that case at the University

16   of Georgia in 1978.  And in early '79, I was advised by my

17   division director that a policy interpretation was being

18   written and I was probably going to have to go back to

19   Georgia and reinvestigate them using their policy

20   interpretation.

21        So in that period of time, after that, somewhere in

22   the late Fall, I guess it was, November, wherever, I was

23   asked to go to the headquarters office in Washington to

24   work on a task force to prepare a manual and prepare a

25   training for investigators.

1          And as it turned out, I had, the experience I had in

2     interscholastic athletics and the only experience in

3     intercollegiate athletics cases in the country in OCR.

4     They called me up there to do that and I did, back and

5     forth on weekends to Washington D C and then later to

6     Denver where we delivered the training.  We had the

7     training center there.

8     Q.   Let me stop you there.  Was there an athletics

9     investigation manual produced as a result of the task

10    force work?

11    A.   We did produce an interim manual which was discarded

12    because it was simply unworkable and we were not able to

13    get it edited.  My last few visits to Washington was

14    trying to salvage that manual.  We could not salvage it.

15    It was just, it was written using only the policy

16    interpretation and the regs.  That's all primarily the

17    experience we had in intercollegiate athletics and what

18    experience that I had at the University of Georgia that I

19    could lend in certain areas, I wrote -- at one section

20    that I recall writing is the equipment and supplies and I

21    know I wrote another section or two but I really just

22    don't remember and I don't remember who wrote the

23    interests and abilities section which is absolutely

24    unfollowable.

25    Q.   Was that manual ever approved by the Office of Civil

1    Rights?

2    A.    It was not.

3    Q.    Was it ever publicly issued?

4    A.    It was not.

5    Q.    To your knowledge is it available today through the

6    Office of Civil Rights?

7    A.    Well, I went on line and I couldn't find it on line,

8    so I could have found the '90 manual, that was readily

9    available.  That was approved though.  But no, the '80

10   manual, no, it was not something that we even gave to our

11   investigators because they could not, they couldn't follow

12   it.

13   Q.    Now, you've reviewed Dr. Lopiano's expert report for

14   the plaintiffs?

15   A.    Yes, I have.

16   Q.    And have you seen that she attached a copy of the

17   1980 interim investigators manual to her report?

18   A.    I did.

19   Q.    Is that the report that you're referring to that was

20   never adopted?

21   A.    That's exactly right.

22   Q.    Now, were you involved -- after the 1980 experience,

23   were you involved personally in investigating Title IX

24   athletics cases?

25   A.    Yes, I was.  I investigated, that's all I was doing

1    that period of time which we, because we had a back log in

2    the office and the people that I worked with had a great

3    deal of difficulty in resolving those cases and they were

4    all placed under my supervision and I was made a

5    supervisory equal opportunity specialist promoted to GS 13

6    and we had a branch -- I had seven, eight people on my

7    staff and that's all we did was resolve those cases which

8    took about two years to -- and in a lot of instances,

9    reinvestigating the cases, revisiting the schools that we,

10   that others had visited before.  But we did resolve those

11   cases in two years.  I think that was the time we were

12   given by the assistant secretary of, or the deputy of the

13   director of office of civil rights, whatever they were

14   called.  Names change in federal bureaucracy.  But it was

15   an interesting time.  I was at OCR, the Title IX cases

16   were sent to my branch for investigation.

17   Q.   Mr. Daniel, did there come a time when you were

18   involved in the preparation of another investigators

19   manual?

20   A.   Yes, I coauthored the 1990 investigators manual.

21   Q.   And who did you coauthor that?

22   A.   With Valerie Bonnett.

23   Q.   Did anyone else work with on you that?

24   A.   Absolutely no one.

25   Q.   Is the 1990 manual the manual that is currently in

1    use?

2    A.    Yes, it is.   It was approved by the acting assistant

3    secretary for civil rights, William Smith, and we even had

4    some outside agencies write in and say, you know, thanks

5    for making the sentence, you know, doing the manual in

6    women's sport foundation was one, Catherine Wright, I

7    believe her name was, sent a letter thanking Val and I for

8    our work.

9    Q.    Did Dr. Lopiano have any involvement whatsoever in

10   drafting of the 1990 manual?

11   A.    No.

12   Q.    Was she involved at all in the task force that

13   produced the 1980 manual?

14   A.    No.

15   Q.    Overall, how many compliance reviews of Title IX

16   athletics issues did you complete or supervise while you

17   were on the OCR?

18   A.    I'm guessing around 50.

19   Q.    And since you left OCR, what have you been doing?

20   A.    I've been a consultant in Title IX athletics

21   exclusively and doing this continuation of what I was

22   doing at OCR except on a, not on an adversarial basis but

23   in order to assist schools that wanted to comply with

24   Title IX.

25   Q.    And without identifying your clients, can you

1    indicate the nature of the institutions?

2    A.   Well, they were primarily Division I, what we call

3    now the BCS schools, the FCS schools and nonfootball

4    schools, as well as some division two schools and I think

5    I had a couple of Division III schools and a few school

6    districts.

7    Q.   And have you continued to perform compliance reviews

8    in your role as a private consultant?

9    A.   Yes, I have.

10   Q.   And have those compliance reviews, both at the OCR

11   and as a private consultant included analysis of the

12   effective accommodation claims?

13   A.   Yes.

14   Q.   Now, you were retained as an expert in this case by

15   the defendant, is that correct?

16   A.   Yes.

17   Q.   And were you asked to conduct a review of the

18   Quinnipiac athletics program?

19   A.   Yes.

20   Q.   And as part of that review, did you look at the

21   question of the effective accommodation issue?

22   A.   Yes, I did.

23   Q.   And how did you go about making that assessment?

24   A.   I went about it as we did from the very beginning.  I

25   first used the NCAA squad list because that is the basic

1    document to determine a participant.  I go through it and

2    I removed those people who are not participants, those who

3    are the medical exemptions, those with eligibility

4    exhausted, those who are clearly cut or quit prior to the

5    first competitive event.

6         And I take these, I remove these from the squad lists

7    and just make a mark to indicate that.  And then when I

8    interview the head coaches, I will ask them to verify

9    those that I have, that I have taken off and I also ask

10   them, I define what constitutes a participant, the

11   criteria for a participant which is in the policy

12   interpretation, A through C, and --

13   Q.   Could I just interrupt you for one second?

14   A.   All right.

15   Q.   Did you, in fact, meet with all of the head coaches

16   of the Quinnipiac teams?

17   A.   I did.  I met with everyone, or half of them.  Helen

18   Grant, who assisted me in this and who is now, I have sold

19   my clientele to primarily.  She's -- I'm sort of semi

20   retired but I'm still active to some degree but she

21   assisted me in this and in that particular investigation,

22   as I still assist her in some of the ones that she's taken

23   over from me.

24   Q.   I'm sorry to interrupt.  I just wanted to clarify

25   that.

1    A.    Okay.

2    Q.    So, can you go through the process again,

3    beginning --

4    A.    Okay.  Once I finish my initial review, I interview

5    the coaches, I go over the ones that I have and ask them

6    to verify that these people were truly, were medical

7    exemptions and were truly eligibility had expired and they

8    were no longer participants, they were no longer on the

9    team, and that these people who in these squad lists

10   indicated that were cut or quit prior to the first

11   competitive event of the championship season was, had been

12   taken off.  I mean that, that those were, that was true,

13   and I also asked them is there anyone else here who is,

14   you know, that is not a participant, that does not, you

15   know, is not on the team, receiving the benefits of a

16   student athlete, which is training, medical training,

17   weight training, the whole 9-yards of being a participant

18   in a Division I.

19        And if they make any, before they make any marks or

20   tried to exclude anyone, they have to justify to me why

21   they are excluding this individual or, and that the list

22   is complete.  And once I have finished with the coach, at

23   the end of, and Helen Grant is finished with hers -- and

24   of course I go over hers, she gives me the squad list, and

25   I go over her squad list and any questions that I have

1     about anybody on there, I will call her and say what is,

2     what is, and we resolve the situation.

3          And then, finally, I meet with the compliance officer

4     whose responsibility it is to maintain those squad lists

5     and go over any questions that we may have with her.  If

6     there's any conflicts between the coaches and the

7     compliance officer, I go with the compliance officer's

8     records because that's their responsibility to maintain

9     those records for the NCAA, and they also help me with

10    making the final determination of what is a participant

11    under Title 9.

12    Q.   And who is the compliance officer that you --

13    A.   Tracey Flynn.

14    Q.   Is this, how does this process differ, if at all,

15    from the process that you followed in other Title IX

16    investigations?

17    A.   This is the way we did it from the very beginning.

18    It's the way it's done today.

19    Q.   You follow the same procedure?

20    A.   Absolutely right.

21    Q.   Did you prepare a written report summarizing your

22    analysis?

23    A.   Yes, I did.

24    Q.   I'd like you to look at Exhibit H Y which should be

25    in the binder.  The other binder, I think.

1    A.   This one?

2    Q.   The second one, the one closest to the court

3    reporter.

4    A.   They are both about the same distance.

5         (Pause)

6         What do you want me to look at?

7    Q.   Exhibit H Y.

8    A.   Okay.

9              THE COURT:  Let me just clarify, do we have

10   agreement that all the experts identified by each side

11   should be treated as experts; we don't need to have a

12   formal offer and qualification and so forth?

13             MR. ORLEANS:  Yes, we do.

14             MR. BRILL:  Yes, within the area of their

15   respective expertise.

16             THE COURT:  Of course.

17             MR. ORLEANS:  Yes.

18             THE COURT:  All right.  Thank you.

19   BY MR. BRILL:

20   Q.   Is Exhibit H Y the report that you prepared?

21   A.   Yes, it is.

22   Q.   And the, if you turn to page two, the chart?

23             MR. BRILL:  And again, I apologize for leading

24   questions, Your Honor, but I think these are just

25   undisputed issues.

1    BY MR. BRILL:

2    Q.   This is the chart summarizing the count of

3    participants on the men's and women's teams?

4    A.   Yes.

5    Q.   Were you asked to make certain assumptions in

6    preparing these charts?

7    A.   Yes.

8    Q.   What were those assumptions?

9    A.   That rugby and acrobatics and tumbling was a sport

10   for purposes of this determination.

11   Q.   Now, on pages three and four, this sets forth your

12   definition of who you counted and who you didn't count?

13   A.   That is correct.

14   Q.   And I don't intend to go into detail unless the Court

15   needs that.

16         THE COURT:  No, that's fine.

17   Q.   And as a result, you reached the conclusions that are

18   stated on pages four and five?

19   A.   Yes.

20   Q.   And you found that Quinnipiac was, in fact, complying

21   with its obligation to effectively accommodate the

22   interests and abilities of the plaintiff class of female

23   athletes?

24   A.   Yes.

25   Q.   And which prong did you analyze for that purpose?

1    A.    Prong I.

2    Q.    Now, attached to your report is a detailed

3    participation count on each team?

4    A.    Yes.

5    Q.    What is included on that?

6    A.    I looked at every single athlete individually and

7    made a determination whether they were a participant or

8    not, and I indicated the reason why they were included and

9    why they were excluded.

10   Q.    Did you also subsequently do a participation count

11   for the participants in the 2010, '11 season?

12   A.    Yes, I did.

13   Q.    What did you base that count on?

14   A.    That was based primarily on squad list and the roster

15   management forms and, and went through and the

16   conversation, the question I had was relayed I believe to

17   Rebecca Berkebile to further relate to Tracey Flynn.   I

18   had some questions on some of the participants.

19   Q.    And incidentally, did you have the roster management

20   change forms for 2011, '12 also?

21   A.    Yes.

22   Q.    Did you prepare a detailed list of, athlete by

23   athlete list for 2010, 2011?

24   A.    No, I did not.

25   Q.    Just a summary?

1    A.   Just, right, a summary.

2    Q.   I'd like you to look at the document that we have

3    marked as Exhibit H J.

4    A.   Yes.

5    Q.   And the first page is the -- this is the summary for

6    2010, 2011?

7    A.   That is correct.

8    Q.   Did you use the same criteria in 2010, 2011 as you

9    used for 2011, 2012?

10   A.   Yes, but I did not interview the coaches for 2010,

11   '11.

12   Q.   But the definition of who was a participant --

13   A.   Right, absolutely, that's stays the same.

14   Q.   This was not based on first day of competition

15   numbers?

16   A.   It was based on first day of regular season count.

17   Q.   No, I mean you didn't simply reflect the first day of

18   competition numbers on those charts; this is, you used the

19   same definition as you had for the 2011, 2012 numbers?

20   A.   Yes.

21   Q.   Do you ever rely on EADA numbers?

22   A.   Never.

23   Q.   Why is that?

24   A.   Because EADA report is not, in most cases is not even

25   provided by the athletic departments.  The business

1    department, a number of schools do this, and the

2    information I guess they get from the athletic department

3    but is secondary information.  It's not primary

4    information.  That's only the NCAA squad list is primary

5    information.

6         OCR does not use that today because the information

7    is erroneous.  The EADA reports is, are for recipients of

8    Title IV funds, report to Congress on gender equity which

9    gender equity is not even, it's not even a Title IX legal

10   term.  It's something the NCAA formulated back in

11   whenever.

12        But the EADA report has erroneous definitions for

13   participants.  They require you to count the medically

14   exempt, the eligibility exhausted, and up until a certain

15   point, they were requiring -- I don't know if they still

16   do this or not but they are requiring that you count male

17   practice squad players on female teams as females.

18   Q.   Okay.  So going back to Exhibit H Z, the first page

19   is your summary for 2010, 2011, is that right?

20             MR. ORLEANS:  H Z?

21             THE COURT:  H J.

22             MR. BRILL:  H J, I'm sorry.  I skipped ahead.

23   BY THE WITNESS:

24   A.   Yes, that's right.

25   Q.   And the second page is the summary of the same

1     numbers that you had in your report summarizing 2011,

2     2012?

3     A.   Yes.

4     Q.   Now, did you review the report that was submitted by

5     Dr. Lopiano for the plaintiffs?

6     A.   Yes.

7     Q.   And did you prepare a report in response to that?

8     A.   Yes, I did.

9     Q.   And now I get to H Z; is that a copy of your rebuttal

10    report?

11    A.   Yes, it is.

12    Q.   Okay.  With respect to the participation count issue,

13    Dr. Lopiano raised a number of criticisms.  What is your

14    practice with respect to having student athletes who do

15    not actually compete in a given sport?

16    A.   The policy clarification of December, I believe it's

17    December, 1996 anyway, makes it very, very clear that

18    those people who do not compete who are on the team

19    receive a number of benefits and services and

20    opportunities and should be counted.

21         If that were -- if we had football here, the question

22    would not even be raised because there are a lot of them

23    who don't get to compete.

24    Q.   And are there, can you give an example of reasons

25    that athletes may not compete and may still be counted as

1    a participant?

2    A.   They can, especially in a sport like track, which is

3    the injuries they have are nagging injuries, over-use

4    injuries, stress injuries, they could -- you know, you can

5    overcome that in a short period of time.  I overcame a

6    stress fracture in four weeks last year from worn out

7    shoes and had the tread mill up too high, so you

8    understood an athlete could -- you don't know how long it

9    takes a person to heal so a coach may not compete them for

10   that reason.  They may not compete them because they have

11   a bad attitude.  They might not compete them for -- there

12   are various reasons that I suggested that an individual

13   may not be placed in competition.

14   Q.   Now, would the rule about having athletes who

15   practice with a team and participate in other respects but

16   don't compete, is that rule different for track and field

17   versus other sports?

18   A.   No, it's not.  It's for all sports.

19   Q.   Are there any separate rules for counting athletes of

20   multiple teams as participants on each team?

21   A.   No.

22   Q.   And what are the, what are the things that you would

23   look to -- if an athlete doesn't actually compete, what

24   are the things you would look to to see whether an athlete

25   is actually a participant?

1    A.    Well, if the athlete is on a team at the time of the

2    first competition and receives all the benefits of a

3    participant, they are a participant under Title IX's

4    criteria, A through C.

5    Q.    What would those benefits be?

6    A.    Medical training, weight training, equipment, travel,

7    if they sometimes travel, may not get to play, whatever.

8    The same things that everybody else on the team is

9    provided, and every other athlete is provided.

10         THE COURT:  Do those benefits have to be

11   received or merely made available?  In other words, you

12   know, you often see injured athletes in street clothes on

13   the bench at a basketball ball game.  Now, that athlete

14   obviously is traveling with the team, is presumably

15   present at practices where new plays are being practiced.

16   So does -- to count, does somebody have to actually

17   receive these other benefits or merely have them

18   available?  If they want to come, they can come.

19         THE WITNESS:  If they have the opportunity to

20   receive them -- I mean just because you, you know, if

21   you're injured, obviously you're going into the training

22   room and receive some degree of therapy.  You still have

23   weight training, you still have locker room, you still,

24   you know, you're still with the team and taking part with

25   the team.

1            Now, an athlete may not receive, let's say -- I

2     worked with two schools, to give you an example of that,

3     two schools that had 22 men on the basketball team.  This

4     was a few years ago, I saw this for the first time, and I

5     asked the first head coach, what is this, 22 on a

6     basketball team?  And he said, well, they're just practice

7     players.  And he said they don't even dress out.  I said

8     how many you don't dress out?  He said seven of them don't

9     dress out.  He only dresses out his 13 he gives

10    scholarships to and two walk-ons, but they are there

11    everyday practicing and they are there everyday.  I count

12    those people.  They have the opportunity to practice, they

13    have been certified as eligible to be -- to receive, you

14    know, to play.

15            So they are countable participants just like the

16    football players who, you know, under NCAA rules you can't

17    have, in Division I you can't have 105 football players up

18    to the time of the first game.  Well, after that first

19    game, here come another 50 football players, walk ons, and

20    those people get equipment, they practice, they receive

21    coaching and they are participants and I count those

22    people.

23            THE COURT:  What about the converse where, let's

24    say you have a track athlete who breaks his leg before the

25    start of the season, and everybody knows you can't

1    practice, you can't compete, you can't lift weights, you

2    can't do anything, they are in a cast for the entire

3    season, but they are on the squad list.

4            THE WITNESS:  Well, you know, a coach has his or

5    her reasons for keeping someone on the squad list.  The

6    coach is making a professional decision on why a person is

7    there.  And I've really not seen anyone with broken

8    legs -- I mean, ostensibly it could be, but the 1996

9    Hossey (ph) clarification indicates these people receive a

10   great deal of benefits and I'm not saying the one with the

11   broken leg in the cast does and that is a very gray area,

12   there's no question about that, but I do, I think that

13   some of the others, they receive sufficient benefits to be

14   counted as a participant.

15           THE COURT:  All right.

16   BY MR. BRILL:

17   Q.   And I was going to ask you actually about paragraph B

18   of the policy interpretation that you quote on page three

19   of your rebuttal report.  I believe you were referring to

20   paragraph eight first which is those athletes who receive

21   the institutionally sponsored support normally provided to

22   athletes?

23   A.   Right.

24   Q.   Coaching, equipment, medical training, services, et

25   cetera.

1          What about the requirement that athletes participate

2     in organized practice sessions and other team meetings and

3     activities.  Would that, would that apply to someone who's

4     injured and can't compete?

5     A.    Well, the question is -- I mean it's kind of a

6     rarity.  It depends on the degree of the injury obviously.

7     If the person is injured to a sufficient degree, the coach

8     will probably red shirt them, if they have not had a red

9     shirt before.  That's one of the reasons why track is such

10    a difficult sport to track, because they can be, you know,

11    you've got a -- somehow you get injured toward the end, if

12    you're a distance person, at the end of the cross country

13    season, it delays your getting, to getting into the indoor

14    to do distance.  And a coach, depending on the degree of

15    that injury, may decide to red shirt that individual.

16    Then again, they may not, just depending on what the, you

17    know, the coach's consultation with the trainer or when do

18    you think this person is going to be back?

19         There's a lot of things involved in this and -- but

20    it's the professional decision of the coach to keep them

21    out there and if they are there, they are attending

22    practice, then they are a participant.

23         They may not get to do everything in a practice but

24    they can to the extent their injury allows them to do it,

25    and this is the same way with males.  You know, there's

1    been more arguments with males than I've -- this is the

2    first argument not counting females but I understand the

3    circumstances for that, but mostly my experience has been

4    with the coach, male coaches say, well, this guy counts,

5    he was there, he's doing this.  And as I said, it depends,

6    it just depends the degree to which this occurs.

7    Q.   Mr. Daniel, there's been an issue raised also in

8    Dr. Lopiano's report about two rugby players that you

9    counted?

10   A.   Yes.

11   Q.   Can you comment on the reason for counting those two

12   rugby players?

13   A.   They were on the team and practicing and received

14   full benefits.  They did not get to play.

15       I also counted somebody in another sport, a male, I

16   believe, for the same way, he was only there for about 30

17   something days.  It was a case where the clearing, the

18   NCAA clearing house sometimes drag their feet in

19   determining eligibility.  Those people are on those teams

20   and practicing and, as I said, I counted one of them, the

21   male, I believe, in some -- I forget what sport it was --

22   soccer I want to say.  It was in soccer.  He was 30

23   something days into the season but he was there practicing

24   and everyday because he was there at the time of the first

25   competitive event.  I counted him and I counted those two

1   rugby players for the very same reason.  They were there

2   almost the entire season.

3   Q.   Can I direct your attention to Exhibit J X.  That may

4   be in the next book, I'm not sure.

5   A.   I think it is.

6         MR. BRILL:  I'm sorry, that's one of our reserve

7   books, Your Honor.  Actually to make it easy, Your Honor,

8   I'm going to project this on the Elmo so that the witness

9   doesn't have to go through.

10        Now, it's page 211 of the exhibit, Your Honor,

11   for the record.

12   BY MR. BRILL:

13   Q.   Now, the plaintiffs actually referred to this section

14   of the NCAA manual in their trial briefs.  This was not

15   included in Dr. Lopiano's expert report, and they argued,

16   just to explain, in their trial brief that this section of

17   the NCAA rules relates to how you count, how you count a

18   participant who is a multi sport athlete.

19        Are you familiar with this section, 15.5.10.7.1?

20   A.   Yes, I am.

21   Q.   And what does this relate to?

22   A.   This relates to where you count them in terms of

23   financial aid.  There's like an excellent chart toward the

24   end that kind of summarizes a lot of this, saying if you

25   play football and something else, you are counted in

1   football.  If you play basketball and not football but in

2   something else, you're counted in basketball.  And I

3   believe the next one down is ice hockey, and I think

4   volleyball is on the list and then you get on down to some

5   other sports, you count them, whichever one you want to

6   count them.

7   Q.   This has to do in terms of how you count the

8   scholarships for purpose of maximum scholarships --

9   A.   That's exactly right, you count them in terms of --

10            THE COURT:  Guys, guys.  My court reporter, I

11   can see by her face, is going crazy.  You are

12   over-anticipating each other and it's not going to work.

13   We're not going to have a record of what either of you

14   says.  So --

15            THE WITNESS:  I'm sorry about that.

16            (Pause)

17            MR. BRILL:  Now neither of us wants to go.

18            THE COURT:  Start with a question, and then

19   we'll get an answer.

20   BY MR. BRILL:

21   Q.   Does this section have any relationship whatsoever to

22   counting of participants for purposes of the OCR Prong I

23   test?

24   A.   No, it does not.  It's about how to count financial

25   aid.  The NCAA has no -- the only thing that they do is

1    certify eligibility in terms of participation.  They don't

2    really limit participants or otherwise define

3    participants.  That's Title IX that does that.

4    Q.    Does this section even apply to Quinnipiac?  It says

5    requirement to qualify as multi sport athlete, bracket,

6    FBS/FCS.  What is FBS/FCS?

7    A.    That's the football bowls, series in the football

8    championship series we use used to call one A and one

9    double A.

10   Q.    Well, Quinnipiac doesn't have a football team, so far

11   as you know, does it?

12   A.    No, but they do have -- their basketball players

13   don't play in another sport so that doesn't apply, I don't

14   believe.  Their ice hockey, I can't remember about ice

15   hockey where they play, one might have played another

16   sport, which that person would have been counted in ice

17   hockey.

18   Q.    But this particular operation that's cited by the

19   plaintiffs, does this apply to any schools other than

20   schools that have football times?

21   A.    Yes, that could apply to schools with just basketball

22   or it could apply to other schools.

23   Q.    Okay.

24   A.    That particular shaded section just dealt with

25   football.

1    Q.    That dealt with football?

2    A.    That whole area applies to other sports.

3    Q.    Now, in the next section of your report you discuss

4    the effective accommodation requirement.  Could you put

5    that exhibit back in front of you, please?

6              THE COURT:  We're back to the principal report?

7              MR. BRILL:  I'm sorry, the rebuttal report.

8    That's H Z, I believe.

9              MR. ORLEANS:  H Z.

10             THE WITNESS:  Okay.

11   BY MR. BRILL:

12   Q.    What is, what is the effective accommodation

13   requirement, Mr. Daniel?

14   A.    Effective accommodation is actually mentioned three

15   times in the policy interpretation, one under not

16   responsibility for the school under contact sports, one

17   under noncontact sports which is irrelevant to what we're

18   dealing with here, and the other deals with levels of

19   competition.

20        And that's what the effective accommodation deals

21   with, the levels of competition being the division levels,

22   the Division I, II, III, NAIA.  I don't remember whether I

23   had junior colleges in there or not.

24   Q.    Well, I'm -- are you finished with your answer?

25   A.    Yes.

1    Q.    Before we get to the competition test, I want to know

2    just generally are you familiar with a regulation that

3    requires that selection of sports and levels of

4    competition effectively accommodate the interests and

5    abilities of members of both sexes?

6    A.    Yes.

7    Q.    Is that what's typically referred to as the effective

8    accommodation requirement?

9    A.    Yes.

10   Q.    And how is compliance, overall compliance, measured

11   with the effective accommodation requirement?

12   A.    There is a three part test, and in terms of the

13   number of participants on a particular, in a particular

14   program, if after you meet Prong I, which is the simplest

15   prong in terms of being able to determine whether or not

16   you meet the prong, you meet that prong because it's a

17   comparison of participation, the rates of participation

18   with the rates of full-time undergraduate enrollment is

19   simplest to determine.  It was designed that way for

20   schools, non-football schools initially, because we at OCR

21   felt there were no football schools could ever meet Prong

22   I.  They could meet II or III but not Prong I so schools

23   with non-football, that was the purpose of Prong I, to

24   have some sort of test that would eliminate them from

25   further consideration.

1           Prong II and III is much more complicated and much

2     more involved in terms of the things that you have to

3     consider.  Under Prong I you do not consider anything else

4     other than a comparison of participants to full-time

5     undergraduate student body.

6     Q.   Is there a second test with respect to the effective

7     accommodation requirement?

8     A.   There is a test of the levels of competition.

9     Q.   Is that sometimes referred to as the two part test?

10    A.   Yes.

11    Q.   Before I get to that specific test, is there a

12    separate requirement to determine why a school offers

13    specific sports?

14    A.   No, there's not, and if enough of the schools have

15    proportionality, there would not be a separate

16    requirement, not even an issue.

17    Q.   In under which prongs of the three part test would

18    the question of assessing interests and abilities be

19    relevant?

20    A.   Primarily the third test would be where you would

21    need to assess interests and abilities.

22    Q.   And why is that; what does the third test look at?

23    A.   Well, the third test, there's a 2010, I believe, Dear

24    Colleague letter that to schools that, you know, it was,

25    it was designed when -- to overrule a 2004, where there

1    was an interests and abilities survey that was very

2    controversial.  And then in 2010 they came out with, the

3    Office of Civil Rights came out with further directions on

4    how to really, this is how you would determine interest.

5    There were suggestions of many various ways in how you

6    determine interest before you add a sport.

7    Q.   And that letter applies to which prongs?

8    A.   The third prong.

9    Q.   How do most Division I schools go about starting a

10   new sport?  Do they first do a survey of interests and

11   abilities, in your experience?

12   A.   Well, the interests and abilities survey could be as

13   simple as you're looking -- I mean, the fact that all the

14   time I look at the National Federation of High School

15   Association and see what sports are offered there, I did

16   that for acrobatics and tumbling, and there have --

17   there's competitive, what they call spirit squads which is

18   in the evolution of this sport which it has evolved from

19   spirit squads, from sideline cheering to --

20              MR. ORLEANS:  Excuse me, Your Honor.  At this

21   point I'm going to object to the answer as nonresponsive.

22   Mr. Daniel isn't offered as an expert on competitive cheer

23   or acrobatics and tumbling, and now he's testifying about

24   competitive cheer and acrobatics and tumbling and the

25   question was about how schools go about assessing

1    interest.

2            THE COURT:  We'll just get another question.

3            MR. BRILL:  All right.

4    BY MR. BRILL:

5    Q.   What considerations in your experience have been

6    relevant to schools deciding to start sports?  What types

7    of things would they look at?

8    A.   Well, you know, athletic directors and various people

9    at an institution know what's available in their area.

10   For instance, and I think Dr. Thompson testified to this a

11   while ago, that they're well aware of USA rugby in the

12   Northeast, you know, it is prominent there.

13       To have that awareness and to be aware also that

14   club, sometimes if you look at the clubs in your area,

15   club sports for high school, at the high school level, is

16   more important than the high school sports.  Most coaches

17   that I've talked to in various sports indicate that they

18   don't recruit high schools in several sports.  They

19   recruit clubs, and that's true in soccer, the top of the

20   elite clubs, softball and baseball.  There are traveling

21   teams that are elite players at the high school level that

22   receive more recruitment than high school kids, and they

23   are aware of these things.

24       To be aware of these things, to me, is a legitimate

25   survey of interest.  You don't have to look at everything

1   in a 2010 letter.  You don't have to -- I mean, it's not

2   necessarily a science.  You know, you're -- you offer what

3   is best for your particular school and in the best

4   judgment of the people at that particular school.  And a

5   varsity sport is whatever the president or the chancellor

6   or whatever committee at that school says it is.  They

7   make the determination of what constitutes a varsity

8   sport.

9   Q.   For a Division I school, if they are starting up a

10  team, don't they have to find out if there are students

11  that are able to fill the new team?

12  A.   Well, I'm sure that that's part of the process that

13  goes, that there is availability of participants.  If

14  there's, as much let's say prominence -- this is just an

15  example of USA rugby, they are coming from somewhere but

16  you can use cross-over athletes.  I know a rowing coach

17  who recruits volleyball players who aren't good enough to

18  play varsity volleyball because they are usually tall and

19  good at the sweeps.

20       And you know, you have some basketball players who

21  have really good hands and they get maybe recruited as

22  wide receivers or tight ends.  You know, there's all kinds

23  of cross-overs in sports.

24  Q.   Would it be appropriate for an athletic director at a

25  school to start a team and rely on recruiting to find

1    athletes rather than looking to the present student body?

2    A.   That would certainly be, in Division I you're going

3    to rely on recruiting primarily, except with some

4    exception to that.  Rowing began at schools with, from

5    recruiting in the student body and there's still a lot of

6    rowing teams, they advertise that, you know, this is the

7    one sport that you can never have played before until you

8    come to college and then you can become an Olympian, which

9    I think that has happened.

10        But, you know, so you begin to recruit at some point

11   in time, you know, especially in Division I.

12   Q.   Would be an appropriate consideration in your view

13   for a school to consider the impact of a new sport on the

14   gender equity of the school, the proportionality?  In

15   other words, the number of participants, male or female

16   participants?

17   Q.   Well, yes, that's how rowing and equestrian got

18   started throughout the country, because of the number of

19   participants involved in those sports.  It was something

20   that offset football.

21   Q.   As sports for women, you're saying?

22   A.   Right.

23   Q.   Could I just draw your attention to Exhibit I J.

24        Do you see that exhibit?

25   A.   Yes.

1   Q.   Is this the high school athletic survey that you made

2   reference to earlier?

3   A.   Yes.

4   Q.   Now, going on to the next section of your report, you

5   talk about the levels of competition test?

6   A.   Yes.

7   Q.   And what, can you explain what that test is?

8   A.   Well, that test is a, it's a chart that I broke down

9   in the 1990 manual for a division, list a division level

10  of competition.  And, you know, you know the division

11  level of the school you're looking at and you have

12  Division I, Division II, Division III, NAIA and other on

13  there as, in some instances you may have put junior

14  colleges because there's some schools that would compete

15  some against junior colleges in certain times simply for

16  recruitment purposes.

17       I know of a school in the ACC that had a junior

18  varsity football.  They no longer have it but they played

19  two of the private schools in Virginia.  They had real

20  football teams that was just for recruiting, but all these

21  J V participants counted because they played varsity and

22  J V, I counted them twice.

23  Q.   Is the chart that you're referring to attached to

24  your chart as Exhibit A to your rebuttal report?

25  A.   Yes, it is.

1    Q.   And what is the methodology that you, the

2    investigators manual directed to follow with respect to

3    computing levels of competition?

4    A.   This is -- I listed the total competition during the

5    championship season for every sport Quinnipiac offers and

6    I looked at division level, their competition.

7    Q.   And then the results are shown on pages six and seven

8    of your rebuttal report?

9    A.   Yes.

10   Q.   And you find that the men's teams competed 100

11   percent of their competition at Division I and the women's

12   teams were 95.85 in Division I?

13   A.   That is correct.

14   Q.   Would that be considered a significant variance by

15   OCR standards?

16   A.   It would not.

17   Q.   Incidentally, is this test in regular use today to

18   your knowledge?

19   A.   No, it's not.

20   Q.   Why is that?

21   A.   Because the sports committees have limited the amount

22   of competition below division level for just about every

23   sport, and they just simply don't -- if you compete

24   against someone below division level, it just won't count

25   there so what's the point of having that kind of

competition.

I think men's basketball may be allowed one or two.
Some you see do it, others don't.  One -- FCS football is
allowed one or two, and sometimes they do that, sometimes
they don't.

Q.   But at the time that you were at OCR, was this test
in more frequent use?

A.   Very much so, especially in 1980 when we did all the
investigations because women's sports were all over the
place.

Q.   Did you have occasion to apply this test yourself?

A.   I did.

Q.   On how many occasions?

A.   Well, I have no idea.  That was 32 years ago, 32
years ago when we started doing it, but we had to do it
then.  Like I said, there was -- women's sports were in
Division I, II and III at various institutions that were
Division I in all men's, on the men's side.

Q.   And what was your conclusion with respect to
Quinnipiac's passing or failing the level of competition
test?

A.   Well, there were so few overall, on an overall basis
and all of Title IX looked at overall and not any sport,
single out any sport or sport-by-sport comparison.  On an
overall basis, Quinnipiac passes the test.

1        And the reason -- there are reasons for the

2    differences between the 100 percent and the, what --

3    95.85 percent, and again, it has to do with the

4    development of, where acrobatics and tumbling is now and

5    rugby is now, there is not available, enough available

6    competition for them to compete 100 percent.

7        But if you did not go ahead and add these teams

8    there, then women's sports would never develop.  Rowing

9    started out in the Southeast.  The schools that would add

10   it as varsity, they would have to compete against some

11   clubs because there simply wasn't enough people to compete

12   against.  They would maybe, they would go all the way to,

13   I think it's Boston to the Dad Vail (ph), I believe it was

14   called.  It would be their one, they made sure that they

15   competed in that because that was mostly all varsity

16   rowing.

17       But otherwise it was club and it was out of necessity

18   cause the rowing team was very large and it cost a lot to

19   transport them from one place to another.

20   Q.   Now, you attach as Exhibit B to your rebuttal report

21   a section from a book by Val Bonnett?

22   A.   Yes.

23   Q.   That's the same person who was the co-author of the

24   1990 manual?

25   A.   Yes, that is correct.

1    Q.   And what, does she have a treatise on Title IX?

2    A.   She has written on a couple of occasions, I think,

3    having to do with Title IX.

4    Q.   And did your methodology follow the same methodology

5    that Val Bonnett recommended in her treatise?

6    A.   Yes, that's what we decided on back in the 1990's,

7    not much different.

8    Q.   In other words, she is reflecting the same

9    methodology today?

10   A.   Yes, she is, that is correct.

11   Q.   I'd like to call your attention also to Exhibit

12   K B.

13            MR. BRILL:  What I'm showing the witness, Your

14   Honor, is Exhibit 10 of Exhibit K B which is the original

15   NCAA gender equity guide published in 1994.  There will be

16   testimony by a later witness that identifies the document.

17   I actually don't think there's any dispute about it.

18   BY MR. BRILL:

19   Q.   And there's a section here on measuring equivalently

20   advanced competitive opportunities, Mr. Daniel?

21   A.   (Pause)

22   Q.   Do you have that?  You can look up, just look up.  Do

23   you see that?

24   A.   All right.  Yes.

25   Q.   I don't know if you can read it.  I can make it a

1    little bigger.

2        You see according to this statement in the NCAA

3    gender equity guide that "While no percentage point

4    difference defines compliance, differences of five

5    percentage points or more should be avoided, and

6    differences up to five percentage points and sometimes

7    more may be justified if coaches and athletes indicate

8    satisfaction with the level of competition"?

9    A.   That is correct.

10   Q.   Was that consistent with your understanding of the

11   way OCR applied the level of competition --

12   A.   Yes.

13   Q.   -- test?

14       Now, in Dr. Lopiano's report, she says that the level

15   of competition test looks at such things as recruiting,

16   scholarships, coaching, facilities, in order to create a

17   tiering of teams.

18       Is that, is that a proper application of the

19   competition test in your experience?

20   A.   No, it's not.  It's never been done.

21   Q.   Have you ever seen anyone that ever applied

22   competition test that way?

23   A.   Never.

24   Q.   Was it ever applied that way at OCR?

25   A.   No, it was not.

1    Q.   Have you ever seen any, any publication or authority

2    about Title IX that ever described the competition test

3    that way?

4    A.   No, neither in writing nor implied, stated or

5    implied.

6    Q.   And how is the tiering test generally understood to

7    work?

8    A.   Tiering, to me, is a method of administration of an

9    athletic program where you have your premier searches,

10   major sports, minor sports, whatever you want to call it.

11   Various people call it different things.  Most schools

12   that tried the tiering fail because they would have

13   football in the top tier.  They didn't want to bring up

14   enough women's sports to, to -- and you know, just if you

15   have football and men's basketball in that top tier, it's

16   going to take several women's teams, at least initially,

17   to bring up that to the same level.

18        So I've never seen any situation where I accepted

19   tiering, but I advised all schools that, you know, you can

20   call it whatever you want, I'm going to look at your

21   overall program and whatever, the chips will fall where

22   they may, and I don't recognize tiering as anything other

23   than the way you're administering your athletic program,

24   which may be in violation of Title IX.

25   Q.   But to the extent that tiering is recognized, does it

1    apply to the effective accommodation --

2    A.    No, those benefits --

3    Q.    You have to wait until I'm finished with the

4    question, I'm sorry.  We're driving the court reporter

5    crazy.

6         Does it apply to the effective accommodation section

7    or to some other section of the regulation?

8    A.    It applies to the laundry list section.  That's where

9    you look at that kind of thing.  Treatment, benefits and

10   services provided to student athletes.

11   Q.    Just a few more questions long those lines.

12   Dr. Lopiano in her analysis included the track and field

13   teams as competing below Division I because they were in

14   meets that included teams from Divisions I, II and III.

15   Do you recall that?

16   A.    I recall that.

17   Q.    Do you believe that's an appropriate way to classify

18   the track team competitions?

19   A.    No, that is the nature of track competition.  Schools

20   of various division levels, you're not competing against

21   them, you're competing with them.  And at some of the

22   track competitions, there's -- certain times have to have

23   been met in other previous meets in order to even qualify

24   for that meet.  But anybody at any division level could

25   have qualified for that particular meet.  Coaches decide

1    which are the best meets to try to get into to develop

2    their team.  The whole thing with track is trying to move

3    to the championship, to make it to the championships.

4         So, you know, if you can compete against someone in

5    Division III, ostensibly could have a better time than

6    anybody in Division I, could be an Olympian.  Just chose

7    to go to a school that did not offer a major program and

8    this person could be on academic scholarship.  You see

9    that more often in track than other sports.

10   Q.   How did you classify the track and field competition?

11   A.   It was all Division I, because that's what their

12   results is all going into Division I, let's say hopper,

13   for consideration for the championship season.

14   Q.   Now, in several places in Dr. Lopiano's report, she

15   makes the statement to the effect that the rugby team

16   fails the competition test, or the track and field team

17   fails the competition test.  Can the competition test be

18   passed or failed by a single team?

19   A.   No.  It's an overall, and that's what the policy

20   interpretation makes clear, and it's also, it's what in

21   the 1990 manual makes clear, it's based on overall

22   program.

23   Q.   You were -- while you were at Quinnipiac, you were

24   also asked to look at the level of benefits provided to

25   the teams as well as the effective accommodation issue?

1   A.   Yes, I was.

2   Q.   And can you -- did you draw any conclusion as to

3   whether the benefits provided to the acrobatics and

4   tumbling and rugby teams are comparable to the benefits

5   provided to the other varsity teams?

6   A.   They are absolutely no different from any other

7   varsity team.  They are provided the same types of

8   benefits and services and treatments, and as a matter of

9   fact, the coaches for both sports and both sports said

10  their competition was, I mean everything about them was

11  same as the other sports.

12  Q.   Do you know whether OCR offers opinions about whether

13  an activity is a sport?

14  A.   No, they will not under any circumstances.  They'll

15  give you the criteria for what constitutes a sport but

16  they will never come out and say this is a, is or is not a

17  sport.

18       Now, they may have, and this is the intercollegiate

19  level I'm speaking of, interscholastically they may have

20  told some school districts that sideline cheer did not

21  count for a participation.  That's possible.  As a matter

22  of fact, it's probable.

23  Q.   Is there any requirement under Title IX that a school

24  adopt a gender equity plan?

25  A.   Not unless they've been found in violation of Title

```
1   IX.
2   Q.    Then it would be a remedial issue?
3   A.    It would be a remedial plan, yes.
4   Q.    But other than that, there's now such requirement?
5   A.    No.
6   Q.    All right.  I just have a few more questions about
7   Dr. Lopiano's report and then I will be finished.
8         In Dr. Lopiano's report --
9             MR. BRILL:  And I want to say at the outset,
10  Your Honor, that it's a little -- I'm not waiving my
11  objection to these areas being relevant, but because
12  Mr. Daniel is here as both a primary and rebuttal witness,
13  I feel I have to ask him these questions.  It's also
14  possible he may have to leave because of a family
15  emergency so I'd like to ask him just a few questions that
16  go into certain areas in Dr. Lopiano's report on the
17  possibility they may be ruled relevant.  Is that
18  permissible?
19            THE COURT:  Sure.
20  BY MR. BRILL:
21  Q.    Now, Dr. Lopiano assessed the teams based on four or
22  five different criteria, and one of them was recruiting.
23  She looked to the dollars per athlete and she looked to
24  the percentage of recruited athletes.
25        Now, I want to ask you whether you believe that those
```

1   are appropriate factors for assessing recruiting with

2   respect to the, that aspect of Title IX.

3   A.   Recruiting is not a proper aspect of looking at

4   participation.

5   Q.   No, I'm sorry, I'm not asking about participation

6   now.  I'm saying if you're looking at recruiting as a

7   benefits issue --

8   A.   Yes.

9   Q.   -- would you look at the budget recruiting per

10  athlete or are there some other things you would look at?

11  A.   You would look at it but you would have to ask, you

12  know, you'd have to ask the coach are you provided with

13  sufficient funds to recruit.  Because you can't look at a

14  budget and know the availability of student athletes

15  unless you're an expert on the area you're in,

16  geographically too, and the availability of athletes in

17  the next town or all around you, or are you going to have

18  to go a range further there.  The money alone won't tell

19  you anything.  It needed -- every team has different needs

20  and needs fluctuate annually.  That's why there's no pat

21  formula for determining compliance in recruitment.

22  Q.   And what do you look to as an investigator at OCR

23  and as a private consultant for assessing how teams are

24  supported for recruiting?

25  A.   I look at the -- I ask the coach, number one, do you

1   and all your assistants recruit.  Some of them are only

2   allowed out two at a time but I'm not interested in that,

3   I just want to make sure they are all recruiting and

4   virtually all do regardless of how big or how well known

5   the coach is, they go after somebody if he's good enough.

6       I ask that, I ask is the funding sufficient.  I ask

7   them to define their recruitment area, where they range,

8   they actually go and look at recruits, look for

9   recruits.

10  Q.   I don't know whether you have anything else but I

11  wanted to ask you, when you spoke to the coaches of all of

12  the 21 teams, were there any teams where the coaches said

13  that they were, that they did feel there were adequate,

14  there was adequate support for recruiting?

15  A.   Yes, there were.  There were two men's and four

16  women's.

17  Q.   What were these teams?

18  A.   The two men's were basketball and ice hockey.  The

19  women's were ice hockey, acrobatics and tumbling, rugby

20  and field hockey.

21  Q.   So, if Dr. Lopiano ranked rugby in her lowest tier on

22  recruiting, would you agree with that designation?

23  A.   No.

24  Q.   Now, on scholarships, is there a -- is scholarships

25  included in the laundry list of benefits?

1    A.    Scholarships is a separate issue altogether on

2    another part of the regulation, 106.37c, and a separate

3    finding is made in scholarships in all cases.

4    Q.    And what does that section require?

5    A.    It requires that there be the participation rates but

6    using a head count, and the rates of the actual

7    expenditures and the rates of the participation using a

8    head count is within 1 percent.

9    Q.    Now --

10   A.    Or non discriminatory reason be provided in excess of

11   1 percent.

12   Q.    The regulation actually provides for substantially

13   proportional, is that correct?

14   A.    That's what the regulation says, yes.

15   Q.    Where -- and where a sport is in a first or second

16   year and it hasn't allocated all of the scholarships,

17   would you take that into account in evaluating the

18   scholarships that were available for that sport?

19   A.    Yes, as prescribed by the policy interpretation,

20   you're allowed up to a generation of athletes, which is

21   four years, to award all the aid.

22   Q.    So, do you think it's appropriate for Dr. Lopiano to

23   have ranked rugby at the lowest tier because they have not

24   expended all of their six scholarships?

25   A.    Absolutely not.

1    Q.   Now on facilities, did you look at the fields at

2    Quinnipiac?

3    A.   Yes, I did.

4    Q.   How would you rank their rugby field compared to the

5    other fields?

6    A.   The rugby was just basically, just met the minimum

7    requirements for, for the sport.  I think it's a problem

8    with the width of the field.

9    Q.   And how did it compare to the other fields that you

10   saw?

11   A.   Well, the other fields, soccer was about as -- men's

12   and women's soccer was pretty bad.  Baseball, softball

13   were equally bad for the outdoor sports.  Lacrosse, field

14   hockey stadium was much better.  I believe it had a turf

15   field.  And then, of course, the T D Bank Sports Center

16   was an outstanding facility.

17   Q.   Would you think it would be appropriate to rank the

18   rugby facilities below baseball, softball and soccer?

19   A.   No, baseball and softball was pretty bad.  Softball

20   had -- no, it was baseball, I believe, had an uphill track

21   and softball's fencing was not high enough.

22   Q.   And on track, did Quinnipiac have a track, outdoor

23   track facility?

24   A.   Not on campus.

25   Q.   Did you visit the track facility?

A.    I certainly did.

Q.    And how would you characterize the facility?

A.    It's as good as several Division I facilities,
although it belongs to a high school it has everything you
would have or would want on a facility and it's only like
five minutes away.

Q.    Are there other sports that are typically, that have
facilities typically off campus?

A.    For competition there's a lot of them.  Football,
basketball, baseball, tennis.  I've seen numerous sports
compete off campus at various institutions.

Q.    What about golf and bowling?

A.    Golf, there's very few -- only the biggest schools,
top schools in the country in golf have their own
facilities.  The rest use country clubs or public courses.

Q.    Do you think it was appropriate to rank the track and
field team with the lowest tier because the facility was
located a few minutes away at a high school?

A.    No, I don't.  It's not ideal but it's an excellent
facility.

Q.    Now, Dr. Lopiano also ranked the track and field team
at the bottom in coaching because she said the coach was
part time.  How would you understand the track coach to
be, a full-time or part time coach?

A.    I know her well.

1        I know Pat Henry LSU personally.  He's won the last

2    three national championships in men's and women's indoor

3    and outdoor track.  He's the head coach of cross-country

4    track at Texas A and M University.

5        I've had the honor of meeting John McDonald at the

6    University of Arkansas.  He's the head of cross-country

7    track coach at the University of the men's team at the

8    University of Arkansas.

9        That's just standard operating procedure for track,

10   because there's no sport like cross-country track.  They

11   are three separate sports with three separate

12   championships that are very similar.

13   Q.   Do you think it was appropriate to rank the track and

14   field team with the lowest category on the basis of having

15   a part time coach?

16   A.   No, she's not a part time coach.  She's a full-time

17   coach.

18   Q.   And just finally, all these benefits that we've

19   talked about, coaching, facilities, scholarships and

20   recruiting, do these have anything whatsoever to do with

21   the assessment of interests and abilities test?

22   A.   No, the assessment of interests and abilities, the

23   fact those student athletes receive those things make them

24   a participant.  The quality of those things is what comes

25   into the laundry list investigation, the full list.

1    That's where you assess the quality of benefits,

2    treatments and services.  The mere fact they receive those

3    is as far as you need to go in terms of determining

4    participation.

5              MR. BRILL:  I have nothing further with this

6    witness on direct.

7              THE COURT:  Cross?

8              MR. ORLEANS:  Your Honor, do you want me to

9    start now?  I'm certainly not going to finish by lunch.

10             THE COURT:  No, you won't finish by lunch, but I

11   have a -- I have a 1:30 criminal matter, so if you could

12   go until about 1:00 o'clock, that may make sense.

13             MR. ORLEANS:  Sure.

14   CROSS EXAMINATION

15   BY MR. ORLEANS:

16   Q.   Good afternoon, Mr. Daniel.

17   A.   Good afternoon.

18   Q.   I'm going to start out standing up.  You may see me

19   sit down after a bit.

20        Just to pick up where we ended there, your view is

21   that the assessment of benefits provided to the men and to

22   the male and female athletes and the assessment of

23   participation opportunities are two totally separate

24   inquiries, is that correct?

25   A.   Yes.

1   Q.   Okay.  But they are both part of a Title IX

2   compliance review, isn't that correct?

3   A.   Yes.

4   Q.   You can't say that an institution complies with Title

5   IX if it meets the standard on one part of that and

6   doesn't meet the standards on the other part of that, can

7   you?

8   A.   Yes, you can.  Because there are three separate

9   findings in Title IX.  You make a finding for

10  participation under 106.41c, you can make a finding for

11  athletic financial assistance under 106.37c, and you make

12  a finding on the laundry list under 106.41c -- C one, I'm

13  sorry, C one on interests and abilities, and C on the

14  others.  So there are three separate findings made from --

15  and that's the way it's always been.

16  Q.   Okay, and if you found that institution to be in

17  compliance with two, in two of those areas but not in the

18  third, you wouldn't say that the university was in

19  compliance with Title IX, would you?

20  A.   Probably, probably not.  Depends on --

21  Q.   Unless the -- I'm sorry.  I apologize, Susan.

22       Unless the violations were minimal; would that be

23  fair?

24  A.   That would be fair.

25  Q.   I wonder if we could go back to talk about your

```
 1    background for just a minute.  You said you started at OCR
 2    in 1974?
 3    A.    Right.
 4    Q.    As an equal opportunity specialist, I think you said?
 5    A.    Right.
 6    Q.    At the GS 7 level?
 7    A.    Right.
 8    Q.    And you had a college degree at that time, correct?
 9    A.    Yes.
10    Q.    You were not then a lawyer?
11    A.    No.
12    Q.    Is that correct?  And you never went to law school?
13    A.    I did not.
14    Q.    Okay.  And did you ever complete any kind of advanced
15    degree?
16    A.    I was working on a masters degree when I was -- like,
17    my second daughter was born and I had to go to work.
18    Q.    That was a masters in English, wasn't it?
19    A.    Yes, it was.
20    Q.    Do you think you have a novel in you based on the
21    experiences you've had at OCR?
22    A.    I'm asked that an awful lot, but absolutely not.  I
23    don't --
24              MR. BRILL:  Maybe from this case though.
25              MR. ORLEANS:  Maybe after this case.  There you
```

1    go.

2    BY MR. ORLEANS:

3    Q.   And you left OCR then in 1994; you put in your 20

4    years, correct?

5    A.   Yes.

6    Q.   And you haven't worked at OCR since then?

7    A.   I have not.

8    Q.   And at OCR, your case load included athletics and

9    other Title IX matters, correct?

10   A.   Yes.

11   Q.   And there was one point in your testimony when -- if

12   I can find it -- I think you testified Dr. Lopiano's

13   tiering approach to the analyses of levels of competition

14   was never used at OCR.  Do you remember that testimony?

15   A.   Yes.

16   Q.   Okay.  And that would, you would be referring to the

17   Atlanta office of OCR where you worked, correct?  You

18   wouldn't know necessarily what went on in the other

19   regions?

20   A.   I've seen letters from other regions.

21   Q.   Okay.

22   A.   And I know what I trained initially the investigators

23   from all regions.

24   Q.   Okay.  And you left 18 years ago?

25   A.   Yes.

1    Q.    Okay.  You've never been a collegiate athletics

2    coach, is that correct?

3    A.    I have not.

4    Q.    And you've never been a collegiate or university

5    athletic director?

6    A.    No, I have not.  I've had an opportunity to be an

7    associate athletic director and I declined.

8    Q.    And you declined, all right.

9          And you said that you've been semi retired since you

10   sold your clientele to Helen Grant?

11   A.    That is correct.

12   Q.    And when was that?

13   A.    2009, I think.

14   Q.    When you left OCR in 1994, you were a supervisory EO

15   specialist was your title?

16   A.    Yes.

17   Q.    How many supervisory EO specialists were there in the

18   division of post secondary education in the Atlanta

19   office?

20   A.    Three.

21   Q.    And how many -- now that's in the one division, the

22   post secondary education?

23   A.    Yes.

24   Q.    And so how many supervisory EO specialists were there

25   in the OCR region four office as a whole, including all

1    divisions?

2    A.   I have no idea.  We were one of the larger offices

3    but I would guess -- there was around 200 staff, how many

4    were equal opportunity specialists who held other jobs?

5    We had a large attorney group there also.

6    Q.   And then there were how many regions?

7    A.   There were ten regions.  There are 11 now.

8    Q.   All right.  And as far as your authority as a

9    supervisory EO specialist, you were supervising

10   investigators who were out investigating complaints and

11   doing compliance reviews, is that right?

12   A.   Yes.

13   Q.   And you also undertook some yourself, even when you

14   had the supervisory title?

15   A.   I went with them to the extent that I could.

16   Q.   Okay.  And you had the -- you or you and your

17   investigator then would prepare draft findings of some

18   kind?

19   A.   Yes.

20   Q.   But before those findings could be issued, you had to

21   get those approved up the ladder, right?

22   A.   Yes.

23   Q.   So how -- who had to approve it initially?

24   A.   Well, initially I had to approve what the

25   investigators did and either I had to take on the

1    rewriting of it myself and then pass it to my division

2    director, my division director to the legal staff where it

3    was assigned, an attorney would look at it and then

4    usually an attorney that was, had been involved in

5    athletics previously, almost exclusively, that was the

6    case in Atlanta.  And then the chief attorney.

7         And then it went, once approved it would come back to

8    the division, or it would be sent to the regional director

9    for his signature, or if it was a controversial issue, it

10   would go to Washington to make sure they were in agreement

11   with everything.

12   Q.   To be approved up there before it could be issued out

13   of the --

14   A.   Yes.

15   Q.   -- Atlanta office?

16   A.   Yes.

17   Q.   All right.  Now, so, it would be fair to say,

18   wouldn't it, that your, your authority to interpret the

19   Title IX regulations was highly constrained, wasn't it, by

20   all these levels of bureaucracy above you?

21   A.   It would be for most people but not for me because of

22   my experience.

23   Q.   Despite your experience, you still had to get that

24   approval up the chain of authority before your recommended

25   findings --

1    A.   Absolutely, that's the way bureaucracy works.

2    Q.   Yes.  And since you left OCR, you've been working as

3    a consultant for colleges and universities, correct?

4    A.   Yes.

5    Q.   And those are often schools with football programs,

6    are they not?

7    A.   A lot of them were.

8    Q.   You've never acted as a consultant to a Title IX

9    plaintiff or a group of plaintiffs, is that correct?

10   A.   That is correct.

11   Q.   And do you recall publishing an article in the Extra

12   Point Magazine or Newsletter published by the American

13   Football Coaches Association in 1995?

14   A.   Yes, I did.

15   Q.   And in that article you wrote that "The

16   proportionality test for compliance with Title IX in the

17   1979 policy interpretation is a monster," correct?

18   A.   Yes.

19   Q.   And you indicated in that article that you do not

20   approve of the proportionality test under Prong I?

21   A.   I was writing to a football coaching group.  They

22   were very concerned about complying with Title IX.  They

23   did not think they could do it and I told them it was, you

24   know, it was a big issue.  This was what kind -- this was

25   '95 I believe it was, I'd just become a consultant.  They

1    were frightened by Title IX and I did a lot of work for

2    them in trying to show them that they could meet it.

3    There were three tests and it was not all proportionality,

4    as some people were preaching then.  There were two other

5    tests they could possibly meet, and I did a lot of work

6    with those people in getting around to that, but the

7    proportionality was tough on them.

8         That was -- at one time there was a group who wanted

9    to say this should be the only standard and lot of people

10   felt that was the case.  And so that was -- you write to

11   your audience.

12   Q.   Title IX, proportionality is a problem for football

13   schools because there are so many student athletes on the

14   football teams, correct?

15   A.   That is correct, it was a problem.

16   Q.   So were you writing for that audience and calling

17   proportionality, the proportionality test a, quote,

18   monster?

19   A.   Yes.

20   Q.   Okay.  And Mr. Daniel, this is the first time that

21   you've ever testified as an expert witness in court, is

22   that correct?

23   A.   Yes.

24   Q.   And that's despite the fact that your CV that's

25   attached to your initial report, Exhibit H Y, states at

1    the end of the second paragraph "Lamar also testifies as

2    an expert witness."

3    A.    Well, I'm available --

4    Q.    That's a yes or no, Mr. Daniel.

5    A.    It says that, yes.

6    Q.    Now, you testified about being involved in preparing

7    the 1990 investigators manual, which you wrote with Val

8    Bonnett?

9    A.    Yes.

10   Q.    And were there any -- did anyone other than you and

11   Ms. Bonnett have any input into that manual?

12   A.    No.

13   Q.    So there were no, no consultants from outside who

14   provided suggestions or anything of that sort?

15   A.    Absolutely none.  That was a culmination of our

16   experience with ten years of investigations.

17   Q.    And was Ms. Bonnett also at that time in 1990, was

18   she an OCR employee?

19   A.    Yes, she was.

20   Q.    And that manual was adopted by OCR?

21   A.    Yes, it was.

22   Q.    And it was still in use when you left in 1994?

23   A.    Yes, it was.

24   Q.    Now, it's never been issued by the OCR as any kind of

25   official guidance, has it?  There's no Dear Colleague

1    letter that says here's our manual, this is, this is our

2    official interpretation?

3    A.   That manual was, was issued when Michael Williams was

4    the Assistant Secretary of Civil Rights.  The first Dear

5    Colleague letter came from Norma Cantue (ph) who succeeded

6    him.

7    Q.   And is that, is the -- you mentioned that the 1990

8    manual is available.  Is it available on the OCR website

9    to members of the public?

10   A.   I have no idea.

11   Q.   Okay.  And that manual is essentially a document

12   that's designed to provide investigators with procedures,

13   isn't that right?

14   A.   Yes.

15   Q.   And of necessity, it provides the investigators with

16   procedures that are going to fit most situations, is that

17   right?

18   A.   Yes.

19   Q.   They are not going to fit every situation?

20   A.   That is right.

21   Q.   And so in some situations an investigator's going to

22   need to use some discretion?

23   A.   Yes.

24   Q.   And they may need to be creative or inventive to come

25   up with an appropriate way to evaluate a program?

1   A.   Yes, they do know how to follow up.

2   Q.   Okay.  And it's a hallmark of the OCR's approach to

3   Title IX compliance reviews, is it not, that OCR evaluates

4   every case on its own facts?

5   A.   Yes.

6   Q.   Now, in general -- withdrawn.

7        You described the, in your testimony as well as in

8   your report, you described the process that you use in

9   doing an athletics compliance review; you said you start,

10  at least on the participation side, you start with the

11  squad list, correct?

12  A.   Yes.

13  Q.   And you interview the head coaches?

14  A.   Yes.

15  Q.   Do you generally interview assistant coaches as well?

16  A.   No.

17  Q.   Okay.  Do you generally interview athletes?

18  A.   Yes.

19  Q.   Did you interview athletes in this case?

20  A.   No.

21  Q.   And I understand -- am I correct that you didn't

22  interview -- well, withdrawn.

23       Would you have liked to interview athletes in this

24  case?

25  A.   Yes.

```
 1   Q.   And am I correct that you didn't interview them

 2   because you believed that permission of the plaintiffs'

 3   counsel had to be obtained?

 4   A.   I was advised not to interview.  We could not

 5   interview them because they had been designated as a

 6   protected class and that's the reason why I did not.

 7   Q.   Do you know whether anyone ever sought the permission

 8   of plaintiffs' counsel to interview any athletes in

 9   this --

10   A.   I do not.

11   Q.   And just to confirm, I think this was your testimony

12   but you did assume that rugby and acrobatics and tumbling

13   should be treated as sports for the purpose of this

14   review?

15   A.   Yes.

16            MR. ORLEANS:  Your Honor, that's a good time for

17   me to stop.  If I know continue, I'm going to -- it's

18   going to be a little tough to break.

19            THE COURT:  All right, we'll come back in about

20   an hour, hopefully about 2:00 o'clock.

21            MR. ORLEANS:  Thank you.

22            THE COURT:  Stand in recess.  Have a nice lunch.

23            (Whereupon the luncheon recess was taken at 1:00

24   o'clock, p. m.)

25
```