```
                 UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

STEPHANIE BIEDIGER, ET AL        :  No. 3:09CV-621 (SRU)
                                 :  915 Lafayette Boulevard
            vs.                  :  Bridgeport, Connecticut
                                 :
                                 :  June 28, 2012
QUINNIPIAC UNIVERSITY            :

- - - - - - - - - - - - - - - - x

                     CLOSING ARGUMENTS

B E F O R E:

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

     FOR THE PLAINTIFF:

            PULLMAN & COMLEY
                 850 Main Street
                 P.O. Box 7006
                 Bridgeport, Connecticut 06601-7006
            BY:  JONATHAN B. ORLEANS, ESQ.
                 ALEX V. HERNANDEZ, ESQ.

            SANDRA J. STAUB, ESQ.
                 Legal Director, ACLU Foundation of CT
                 330 Main Street
                 Hartford, Connecticut  06106

     FOR THE DEFENDANT:

            PROSKAUER ROSE LLP
                 Eleven Times Square
                 New York, New York  10036-8299
            BY:  EDWARD A. BRILL, ESQ.
                 SUSAN D. FRIEDFEL, ESQ.
                 REBECCA BERKEBILE, ESQ.
                 ANDREW RICE, ESQ.
```

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917)703-0761

I N D E X

CLOSING ARGUMENTS:

MR. BRILL....................................4

MR. ORLEANS.................................63

MR. BRILL (Rebuttal)........................75

-0-

```
 1              (9:30 O'CLOCK, A. M.)

 2         THE COURT:  Good morning.  We're here in

 3    Biediger v. Quinnipiac.  Could I have appearances, please?

 4         MR. ORLEANS:  Jonathan Orleans, Alex Hernandez

 5    and Sandra Staub for the plaintiffs, Your Honor.

 6         THE COURT:  Thank you.

 7         MR. BRILL:  For the defendant, Edward Brill,

 8    Susan Friedfel, Rebecca Berkebile and Andrew Rice from

 9    Proskauer Rose.

10         THE COURT:  Thank you.

11         All right.  We're here for what amounts to

12    closing arguments.  Mr. Brill, it's your motion, your

13    burden.

14         MR. BRILL:  Thank you.  Will I be able to use

15    the Elmo during the course of the argument?  Is it on?

16         (Pause)

17         MR. BRILL:  Thank you.  Good morning, Your

18    Honor.

19         THE COURT:  Good morning.

20         MR. BRILL:  I'd like to just take a minute or

21    two with the beginning of my argument to go back to the

22    beginning of the case.  And just to set the framework for

23    the motion that's now before the Court, this Court found

24    in July of 2010 that Quinnipiac violated Title IX by

25    failing to provide athletic participation opportunities
```

1    for female students that were not substantially

2    proportionate to their percentage of the undergraduate

3    population.  And the differential, 3.62 percent, as the

4    court will recall --

5              THE COURT:  Or thereabouts.

6              MR. BRILL:  -- was said to be borderline but

7    nonetheless sufficient to support the issuance of a

8    permanent injunction.  That injunction enjoined Quinnipiac

9    from discriminating against female students on the basis

10   of sex by failing to provide them with adequate

11   participation opportunities.

12             And the Court at that time also enjoined

13   Quinnipiac from eliminating the women's volleyball team

14   and directed the University to submit a compliance plan

15   explaining how it intended to achieve compliance with the

16   obligation to provide substantially proportionate

17   participation opportunities in accordance with Title IX.

18             At the same time, the Court noted that

19   Quinnipiac was not obligated to continue sponsoring the

20   volleyball team beyond the 2010, '11 season as long as any

21   decision to eliminate volleyball was accompanied by

22   changes that brought the University into compliance with

23   Title IX.

24             Now, Quinnipiac submitted its proposed

25   compliance plan shortly thereafter in August of 2010

1    describing plans to create a women's rugby team in 2011,

2    2012, and a women's varsity golf team in 2010, 2011.

3            The Court at that time did not approve or

4    disapprove the compliance plan but stated that the plan on

5    its face appears to be a good faith effort that will

6    likely bring Quinnipiac into compliance with Title IX.

7    And, again, as the Court will recall, instead directed

8    that Quinnipiac at the appropriate time could make a

9    motion to lift the injunction so that there could be a

10   hearing on the full factual record as to the effect of

11   those changes.  And Quinnipiac thereafter proceeded, we

12   made the anticipated motion at the end of last year and

13   the hearing has now been held.  So here we are.

14           At the outset, one thing I think is clear.  The

15   injunction in this case was never intended to be of

16   indefinite duration, although it was denominated a

17   permanent injunction.  The Court contemplated at the time

18   of the 2010 decision that Quinnipiac could eliminate the

19   volleyball team when it came into compliance with Title

20   IX's requirement to provide substantially proportionate

21   participation opportunities for women.

22           The question of substantially proportionate

23   participation opportunities was the issue that was tried

24   in 2010.  That was the violation that was addressed by the

25   injunction and that was the deficiency that was remedied

1    by Quinnipiac's proposed compliance plan.

2            As we demonstrated in our post-trial brief that

3    we filed yesterday, and as I will address in more detail

4    this morning, there can be little doubt that Quinnipiac

5    now provides athletic participation opportunities for

6    women that are, in fact, not only proportional but, in

7    fact, overweighted toward women in comparison to their

8    undergraduate population.

9            First, there is no dispute that golf, which is a

10   NCAA championship sport, counts for purposes of

11   participation.

12           Second, rugby, which is an NCAA emerging support

13   is presumed to count as a sport for purposes of Title IX

14   under the 2008 OCR Dear Colleague letter, and I'll address

15   the arguments that plaintiffs make about rugby, but I do

16   not believe there's any serious challenge to the fact that

17   the rugby players count as participants.

18           And, third, acrobatics and tumbling now meets

19   all of the factors that the Court found were lacking under

20   the 2008 OCR Dear Colleague letter and its decision to

21   count as a sport.

22           So, we have three sports that we think clearly

23   count, and we've introduced a count of the participants in

24   those sports and all the sports.  And while plaintiffs

25   have raised some general questions about how Quinnipiac

1    counted the participants and the methodology employed by

2    Lamar Daniel, the short answer to their criticism is that

3    there was no evidence whatsoever of roster manipulation or

4    any other basis to doubt Quinnipiac's count of

5    participants except suspicion.  Suspicion is not evidence.

6            Mr. Daniel testified that he employed the same

7    methodology in counting participants at Quinnipiac that he

8    used for 20 years when he was at the OCR and did 50 or so

9    athletic investigations and in his 15 years as a private

10   consultant during which he continued to analyze

11   participants based on OCR criteria.

12           And I must say that it now turns out that

13   plaintiff's expert, Dr. Lopiano, in contrast, never

14   performed an analysis of participants before this case.

15   And not only that, she didn't even follow the same rules

16   this time around that she espoused at the 2010 trial, and

17   we'll go into some of that in detail later.

18           So, that should be the end of the inquiry.  You

19   have three new sports.  You have participants that are

20   counted in accordance with OCR's established methodology.

21   Women are represented in numbers that exceed their

22   percentage in undergraduate population.  That really ought

23   to be the end of this case, but --

24           THE COURT:  Well, actually, on that point, the

25   plaintiffs have raised in a number of places a number of

1    times the standard for lifting an injunction and the

2    equitable considerations that the court can or should

3    consider.  I haven't really seen a response by the

4    University.  The parties to a certain extent I think are

5    talking past each other.  You're talking technical

6    compliance with the numbers; they are talking equitable

7    considerations, and never the twain shall meet.

8         MR. BRILL:  Well, I think there are several

9    answers to that.  First of all, as I said, this was not an

10   injunction that was intended to be of indifferent and

11   permanent duration.  It was an injunction that from the

12   outset, in fact, was intended to result in a compliance

13   plan which we ended up going on a different track rather

14   than to a compliance plan, but as the Court said from the

15   outset, there was no requirement to keep volleyball for

16   even more than one year as long as Quinnipiac demonstrated

17   that it came into compliance with Title IX.

18         The cases that they've cited, and I could go

19   through them in detail, they all involve situations where

20   there was some, some violation, usually of a regulation or

21   statute, where there was a need for a permanent type of

22   solution monitoring of the defendant's conduct, and what

23   the Court said was that it's not enough to lift an

24   injunction under those circumstances unless there's some

25   showing that the changes that had been made are of some

```
 1        more permanent duration, not -- I think the language of

 2        the Supreme Court in the Horn case, which they cite, is

 3        "change of durable remedy."

 4              And I think we will show -- and I'm going to

 5        address the equities we didn't address in our post trial

 6        brief but I was going to address this morning -- that the

 7        equities here, I think it's appropriate for the Court to

 8        take into account the equitable considerations on both

 9        sides.  We do think the equities favor lifting the

10        injunction.

11              And one of the equities here, this is not just a

12        case where Quinnipiac has shifted around numbers and tried

13        to get some kind of a temporary compliance with prong one.

14        This is a case where Quinnipiac has spent millions of

15        dollars in resources establishing and supporting two brand

16        new teams and continuing to support acrobatics and

17        tumbling while it advanced to the status of a full fledged

18        varsity team in compliance with all of the criteria that

19        the Court had announced.

20              THE COURT:  On that point, one thing I've never

21        understood is why the University decided to eliminate the

22        volleyball team, and I'd love to hear an answer to that,

23        especially in light of the fact that the University has

24        spent, as you just said, millions of dollars in an

25        apparent effort to eliminate the volleyball team.  It
```

1    doesn't make sense to me frankly.

2         And if the issue was practice space and the Kahn

3    Auditorium, they could have built a stand-alone volleyball

4    facility for what they spent fighting for the right to

5    eliminate the volleyball team.  So it just does not make

6    any sense to me.  I'd be very interested in understanding

7    what the University's motivation was.

8         MR. BRILL:  I'm happy to explain it as best I

9    can.  I'll start by saying, it shouldn't be a factor in

10   the case because I don't think that -- I think the

11   plaintiff's own witnesses said the universities have the

12   right to select sports of their own choosing and for a

13   virtue of institutional reasons.

14        So, one reason which you touched on is the space

15   consideration.  I know the Court has been skeptical of

16   that before, but Dr. Thompson explained, I think as best

17   we can, that the volleyball team -- there is really only

18   two spaces in the University that can accommodate more

19   than a few hundred people.  One is the Burt Kahn Court and

20   the other is the Recreation Center.

21        The Recreation Center is highly used by, for

22   many, many reasons, by both intermurals and other varsity

23   teams.  It is not air conditioned and is not appropriate

24   for many of the gatherings that -- the only other space is

25   the Burt Kahn Court.

1            And the volleyball team, during the Fall in

2   particular, uses that space for two sets of their

3   practices five days a week, which means effectively it's

4   not available from 12 to 8, if you include the time for

5   setting up and breaking down and other activities.  So --

6            THE COURT:  But we've got a, we've got a

7   situation where other sports practice off campus.  We've

8   got track, golf.  Why not send volleyball to Cheshire High

9   School?  Why not send volleyball to Hamden High School?

10           MR. BRILL:  I can't answer that question except

11  to say that it assumes that -- I mean it's one thing about

12  a track, you know, a track team.  We don't have a golf

13  course so there's arrangements with local golf courses.  I

14  don't know whether -- the track team uses the track, which

15  is an outdoor facility, during an hour and-a-half period a

16  few days a week when it's not being used by the high

17  school.

18           I think that's very different from asking a high

19  school to have use of their gym for four hours every

20  afternoon during the full -- I mean high schools use their

21  gyms.  I don't know how easy it is to find a high school

22  where you could get that kind of access.  So --

23           THE COURT:  So it may not be possible but I

24  guess my point is I haven't heard that there was any

25  effort to consider alternatives with respect to the

1    volleyball team.  And if the space consideration is the

2    reason, it has been a very expensive approach to what

3    seems to be a relatively straightforward practical

4    problem.

5           MR. BRILL:  Well, I think the University, if

6    you're talking about the support of the other teams, the

7    answer is in part also -- I don't think the space is the

8    entire issue, but if you look at the sports other than

9    golf, which I think in some respects is viewed as a

10   substitute for volleyball because they are both

11   championship sports, they are both approximately the same

12   size squads.  If you look at the two other sports that

13   Quinnipiac chose to introduce, they are putting the

14   University on a national stage that it's not otherwise on

15   in athletics.

16          There's no other teams that compete against

17   Oregon Baylor in Maryland.  Those are the top tiered -- I

18   mean there was an article in Time Magazine this year --

19          THE COURT:  No, I understand, and that is a nice

20   point for why you chose those sports, but what I'm

21   focusing on is why eliminate volleyball?  That decision is

22   what has us here in the first place, so help me understand

23   why --

24          MR. BRILL:  So then we have to go back to 2009.

25          THE COURT:  Okay.

MR. BRILL:  Look, the University was involved in
a budget-cutting exercise then.  Obviously it's, for a
number of reasons, had to spend more money on athletics
since then, but at that time there was an university-wide
decision that we had to cut teams, and the volleyball team
was selected not just because of space, that was one
factor, but also because the University made the decision
looking at the success that it had with various teams and
kind of where those teams were going, that the volleyball
team was the one that was least serving the University's
interests.

It was perennially a losing team.  They were
having trouble getting to the correct level of
competitiveness.  It was not attracting fans.  It was not
advancing the University's brand in the athletic market
place.  And, you know, they eliminated three men's teams
at the same time.  Those were hard decisions, but they
couldn't just eliminate the men's teams in their view.
That didn't get them far enough and they weren't willing
to cut into other men's teams and the one women's team
that seemed like the one that was most logical to cut at
that time was volleyball.

Sure, after the court issued the injunction,
somebody might have said in retrospect, hey, why are we
going to spend all this time and money and effort

1    litigating this if, you know, we could just reinstate the

2    volleyball team.  But the University felt that this was

3    the decision they made and was prepared to defend the

4    decision.

5         I think it was made in good faith and for

6    correct reasons at that time.  And if you're asking me if

7    somebody were to look back three years ago and say we knew

8    that we going to have three years of litigation before

9    Judge Underhill and we'd have to spend millions of dollars

10   on other sports, would we have made the same decision,

11   anybody can second guess the decision that was made at

12   that time.  But once they made that decision, then they

13   were prepared to go in another direction.  I don't think

14   anybody looked back and said, well, maybe we should just

15   keep the volleyball team and find some other place to

16   compete or practice or exist.

17        I mean, I'm not sure if that's a completely

18   satisfactory answer but it's an honest answer and I think

19   it's as much as I can tell you about the decision.

20        THE COURT:  Okay.

21        MR. BRILL:  And in all fairness, people's, you

22   know, people's -- look, people's positions get hardened

23   when they are in litigation, okay?  And there's been some

24   very vicious things being said here in this litigation and

25   attacks on the University in a way that I think have been

1    over the top and uncalled for.  And, you know, the

2    University feels it was within its rights and it intended

3    to exercise those rights and it was going to comply with

4    Title IX in a way that it felt was appropriate for it to

5    do that didn't involve continuing volleyball.

6           At some point, and in part because I think the

7    message from this Court was, certainly in the 2010

8    injunction, okay, you can continue volleyball for at least

9    one more year but if you come into compliance then you do

10   have the right to eliminate volleyball.

11          THE COURT:  I don't think anybody's challenging

12   the right to eliminate volleyball, provided Title IX is

13   complied with.  It's just in trying to understand what's

14   going on with the University.  It's a question that has

15   been bugging me for a long time.

16          MR. BRILL:  Yes.

17          THE COURT:  And when I'm thinking about

18   equitable considerations, it's helpful to have some sense

19   of why the University's reacting the way it is.

20          MR. BRILL:  I think I can say that -- and

21   Dr. Thompson was certainly involved in making this

22   decision -- that they believed that they were acting in

23   good faith, that they had the right to decide which sports

24   to offer and they preferred to offer these other sports

25   and they were prepared to defend that in court.  That's

1    the best that I can say.

2              THE COURT:  Okay.  That's fine.

3              MR. BRILL:  Believe me, as their lawyer I've

4    explained to them over and over again this is a very

5    expensive decision for you, not just because of the money

6    you're spending on the sports but also on legal fees that

7    we've obviously engendered in this case.

8              And, you know, I mean I could -- it's not really

9    appropriate to talk about all the efforts we've made to

10   settle this case because those are not before the court.

11             THE COURT:  No, right.

12             MR. BRILL:  But there's been -- believe me, it's

13   been something that's been on everybody's mind all along

14   and I think the problem has been that, you know, the issue

15   of volleyball has always been if you're, you know, if

16   you're going to go back and continue volleyball, you

17   really have to reinstate it and continue it on some

18   indefinite longterm basis and that just wasn't something

19   the University has been willing to do.

20             THE COURT:  Okay.  As long as I've already

21   interrupted you, let me --

22             MR. BRILL:  That's what we're here for.

23             THE COURT:  Yes, let me throw out a couple other

24   interruptions.

25             You mentioned the counting of participants and

```
1    one thing that I wanted to have both counsel sort out for

2    me is the counting of participants for Title IX versus the

3    counting of participants for other purposes, including

4    NCAA purposes.

5             MR. BRILL:  Okay.  I'm just going to get my

6    water.

7             (Pause)

8             MR. BRILL:  There are three different sets of

9    rules for counting participants.  The OCR rules as you

10   know are set forth in the 1979 policy interpretation.  The

11   NCAA rules, which are slightly different, we put into

12   evidence, I can't give you the exhibit number now, and one

13   of the differences, at least until recently, has been, for

14   example, male practice players counted on women's teams,

15   counted as partnerships in those teams for NCAA purposes.

16   I think they finally changed that rule.

17            There's also a rule about, I think Mr. Daniel

18   explained that the NCAA, for example, if you were

19   currently medically disqualified, you have a career ending

20   injury but you were on scholarship, you would count as a

21   participant for the NCAA and not for OCR.

22            THE COURT:  Right.

23            MR. BRILL:  And finally, NCAA only counts for

24   first date of competition.  I think it's first day of

25   traditional season competition whereas the OCR looks to
```

1       the first day of any competition but that's not the

2       exclusive test as the Court held in 2010 and as Mr. Daniel

3       explained in his testimony.  The EADA has a different set

4       of rules, was slightly different and I can't go into them,

5       but I think for these purposes, the OCR count obviously is

6       the one that's significant.

7               THE COURT:  Right, right.  I mean it seems to me

8       that the NCAA is counting in a way that is intended to

9       make sure that there's fairness among schools.  You can't

10      give the left guard a shotput scholarship.

11              MR. BRILL:  Oh, that's --

12              THE COURT:  And say we now have extra, in effect

13      we have more people on our football team with scholarships

14      than our competition does.  And so their concern, as I see

15      it, is how do we count people in a way that's fair in

16      terms of making sure that these schools don't get an

17      advantage.  And that's why, if you have a career ending

18      injury but you're on a scholarship, you count for NCAA

19      purposes because what they care about is making sure that,

20      you know, School A doesn't get more scholarships than

21      School B.

22              MR. BRILL:  Right, and actually, the rule you're

23      talking about, which Dr. Lopiano referred to as not even a

24      capping of participant rule, that's an allocation of

25      scholarship rule.

1           THE COURT:  Right.

2           MR. BRILL:  For example, I'm an alumnus of

3   Michigan State; yesterday they got a commitment from the

4   number one athlete in the State of Michigan who plays

5   basketball and football, who plays both sports, and his

6   scholarship had to be allocated to the football team

7   because that's the way the NCAA rules work.

8           THE COURT:  Sure, sure.

9           MR. BRILL:  That's what that multi sport rule

10  refers to, but they'll both be counted as participants on

11  the teams when you report the number of participants, both

12  for NCAA or OCR purposes.

13          THE COURT:  But, again, the counting of

14  participants for NCAA purposes, I think -- correct me if

15  I'm wrong -- is intended to make sure that Michigan State

16  doesn't get an advantage over Michigan.

17          So, in your example, they have to count them him

18  on the football team, even though he's got a basketball

19  scholarship, because he's a football player and he's

20  practicing and doing all these things and he's available

21  to play and they can't come out with 86 players and

22  Michigan only gets 85 players.

23          MR. BRILL:  Right, but actually that's for

24  counting scholarships, so you count them as a scholarship

25  athlete, you can only have 85 in each sport, but the

1    participant count, you count in any sport you participate

2    in.  That was the difference that Dr. Lopiano really

3    didn't get.

4              THE COURT:  Well, I got it.

5              MR. BRILL:  So there's no --

6              THE COURT:  The point I'm trying to make is the

7    NCAA doesn't care if you're a man or a woman; Title IX

8    does.

9              MR. BRILL:  Right.

10             THE COURT:  And so counting of participants,

11   there's a different purpose to it.

12             MR. BRILL:  Exactly.

13             THE COURT:  NCAA versus Title IX.

14             MR. BRILL:  Right.

15             THE COURT:  And what I'm worried about here is

16   Title IX.

17             MR. BRILL:  Okay.

18             THE COURT:  Yes.

19             MR. BRILL:  Well, I think we're on the same page

20   on that.

21             THE COURT:  Okay.  One last interruption, I

22   hope.

23             MR. BRILL:  I hope it's not the last one.

24             THE COURT:  Who knows.  This is the other issue

25   that I really would like some help with, is the

1    Investigators Manual.  Here's my sense of the

2    Investigators Manual:  It is to guide investigators, this

3    is how you investigate whether someone's in compliance

4    with Title IX.

5         I don't have a sense that it is an interpretive

6    aid to a court in the same way that other sources from OCR

7    might be.  And the reason for that is if I'm telling my

8    law clerk, here's a manual for how you go about

9    researching a case, that's a process piece.  And if I say,

10   you know, don't give me any cases over 1980, that's a

11   guide.  It's not a rule that I can't rely upon Brown v.

12   Board of Education.

13        And so, I just don't think the guidance given to

14   an investigator is especially helpful in an adjudicator's

15   determination of whether there's been compliance with

16   Title IX, so I'll throw that out there.

17        MR. BRILL:  Let me respond to that, that the --

18   I assume that the reference is to the competition test

19   because that's what's been at issue here.  The, the

20   competition test was --

21        THE COURT:  Well, there's other things as well.

22   As I recall, the Investigators Manual had, you know,

23   5 percent --

24        MR. BRILL:  No, well, that wasn't in the

25   Investigators Manual.

1          THE COURT:  It wasn't, all right.

2          MR. BRILL:  That was -- the testimony of the two

3     people who wrote them were the testimony, or the

4     explanation.

5          THE COURT:  All right.

6          MR. BRILL:  The competition test itself is

7     something that's in a policy interpretation that was

8     issued by OCR in 1979 of the regulation.  The

9     Investigators Manual is the instruction of the OCR to its

10    investigators about, in part, how we apply and interpret

11    the policy interpretation.  So --

12         THE COURT:  How "we."

13         MR. BRILL:  How "we," OCR.

14         THE COURT:  We, investigators.

15         MR. BRILL:  How we, OCR, officially adopts this

16    as our standard for purposes of telling our investigators

17    how to investigate and how to interpret --

18         THE COURT:  Exactly.

19         MR. BRILL:  -- the policy interpretation so it's

20    not -- and I know during the trial, the Court was troubled

21    by what appeared to be the plain language of the policy

22    interpretation versus the application in the policy, in

23    the Investigators Manual, and all I can say is that if the

24    competition test were set forth in a statute and the

25    agency were departing from the plain language of the

1    statute, that's kind of a common situation that we know

2    how to deal with.  Or even if it was in a regulation and

3    the agency later adopted some interpretation that was

4    contrary to the plain language of the regulation.

5         But here you have an agency that publishes an

6    interpretation of the regulation and then interprets the

7    interpretation for their own investigators, and so -- it

8    seems to me that is entitled to some deference.

9         THE COURT:  The investigators interpret it for

10   themselves and then got it approved, their interpretation

11   approved by OCR.  OCR, I mean the OCR investigators, as we

12   heard, wrote the manual.  This is how you do it.

13        MR. BRILL:  I don't think you heard -- I think

14   this came out in deposition, maybe Mr. Daniel wasn't

15   asked -- they were tasked with the assignment from the

16   senior leadership of OCR to prepare this manual.

17        THE COURT:  Right, right.

18        MR. BRILL:  So it wasn't something that was like

19   a, you know, some sideline effort by the investigators.

20        THE COURT:  Well, let me put it this way.  If I

21   write a published decision that appears in FSupp 2d,

22   that's got one level of authority to it.  If I have an

23   internal statement from my law clerks, this is how you

24   research a case, that's got a different -- even though I

25   approved it, "Yep, you're right, that's the way to go

1    about researching," it's just a different order of

2    authority and, frankly, it's not clear to me that it's an

3    official interpretation of an interpretation.  The

4    interpretation is there.  What the Investigators Manual is

5    is directions how to investigate whether the

6    interpretation is being complied with.

7         MR. BRILL:  All I can say is every court that's

8    looked at this, looked at this has --

9         THE COURT:  Has dropped a footnote and said this

10   is also supportive.

11        MR. BRILL:  In some cases it's more than a

12   footnote because there have been substantive issues that

13   have been discussed and the courts have taken guidance,

14   strong guidance from the Investigators Manual,

15   particularly with respect to the three part test which has

16   not been much of an issue at this phase of the case.

17        And OCR, I think, had looked -- this Court in

18   fact in the 2010 decision indicated that it would defer to

19   not just the Dear Colleague letter but to a letter that

20   was written by somebody at, by an official of OCR to the

21   Minnesota High School Association and said that letter

22   deserved the Court's deference.

23        Well, the OCR Investigators Manual, which is not

24   only, was not only intended for the investigators, it's

25   public -- it was put out there for the public and --

1          THE COURT:  Right.

2          MR. BRILL:  -- it does indicate the thinking of

3    the OCR and it seems to me an agency has the right to say,

4    look, we have, we have published an interpretation of this

5    regulation.  It's not exactly clear how this is supposed

6    to be tested but we've decided to do it this way and we've

7    told our investigators this is how to do it, and the

8    public, we're telling the public that this is how we are

9    interpreting and applying this part of our interpretation

10   of the regulation.

11          So, I don't think this is a situation where,

12   even if the Court felt that, you know, I wouldn't do it

13   that way and it seems to me that what OCR said in the

14   Investigators Manual really doesn't track the exact

15   language of the policy interpretation, you may be right in

16   terms of reading the language but the agency -- this is

17   the agency that's living and breathing and dealing with

18   these issues and they've decided that this is how they are

19   going to investigate these cases and this is the approach

20   they are going to take.

21          THE COURT:  Exactly, this is how they are going

22   to investigate those cases.  That's precisely my point.

23   If the SEC is going to look at a hedge fund, there's a

24   couple of sources.  They've got their own regulations

25   about what's lawful and what isn't, and then they've got

1    perhaps a manual for their people who are going in there.

2    Look at these files, look at those files.  If you find

3    this, that's a red flag.  That is, if you find that it's a

4    red flag, give us a report about this.  How they do their

5    investigation, whether the standards that they set for

6    looking at whether there's a been compliance can't be the

7    same as the actual standards for compliance.  It's a

8    different purpose.  One is a standard, one is a process

9    piece.  And --

10          MR. BRILL:  I can't speak to the SEC.  I don't

11   know how the SEC works, and I don't know whether the

12   manual that you're talking about is an internal manual or

13   whether it's been published for the public to see.

14          THE COURT:  It's got -- any governmental

15   document pretty much is a public document.

16          MR. BRILL:  Yeah.

17          THE COURT:  So, the fact it's a public document

18   doesn't add a lot in my mind because anything the

19   government does is public.  So the question is really what

20   is the purpose and does something that tells an

21   investigator how to investigate help a adjudicator decide

22   how to decide.  That's the fundamental problem I'm having

23   with the Investigators Manual.

24          MR. BRILL:  With the Investigators Manual.

25          THE COURT:  Right.  And how to use it in this

1    case.

2              MR. BRILL:  Well, so I'll talk about that and I

3    can talk about -- I mean I can move right in and talk

4    about the competition test.

5              THE COURT:  Whatever.  I don't want to interrupt

6    you too much.

7              MR. BRILL:  Let me start with the competition

8    test because to some extent that's really, I think that's

9    really the only issue, frankly, the only significant issue

10   that's been raised about the rugby team and the acrobatics

11   and tumbling teams.  I mean I can come back to this later

12   but I think it's clear they both count for purposes of the

13   participation count.

14             And I think that when you're looking at the

15   competition test, you really have to understand the

16   historical context, that it was developed at a time when

17   there was intentional discrimination going on against

18   women.  Schools were sponsoring men's teams playing up

19   here and they were relegating women's teams, at one point

20   Ms. Bonnett said they were put at intermural levels and

21   that wasn't right and that was intentional discrimination

22   and there had to be some way to stop that.

23             THE COURT:  Yes.  Let me just, let me comment

24   briefly.  That's in your briefs and I understand

25   historically how it came about.  You know, 42 USC Section

 1    1983 which, you know, which precludes various types of, or

 2    gives rise to a cause of action for various types of

 3    unconstitutional conduct by various officials, and it was

 4    passed right after the Civil War, but I interpret it

 5    everyday.  It's still good law.  And the fact this came in

 6    in 1979 is interesting historically but it doesn't mean

 7    that I overlook it.  I think it's still there.  It's

 8    still -- are you saying it's not there?

 9              MR. BRILL:  We're not asking you to overlook it.

10              THE COURT:  Okay.

11              MR. BRILL:  We're saying -- and, first of all,

12    it's not a statute, okay?  It's part of a policy

13    interpretation.

14              THE COURT:  I understand.

15              MR. BRILL:  And it was addressed to one problem,

16    which has largely been ameliorated, and the question is

17    how do you reasonably read and interpret that policy

18    interpretation today, particularly in light of -- forget

19    about the NCAA for a minute.  OCR itself has said in 2008

20    that we, in a 2008 letter, we are encouraging new sports

21    and we are encouraging the development of new and

22    different sports, and here's how you tell if something's a

23    sport, and they have this multi-factor test.  And one

24    whole aspect of that test is competition, the competition

25    that a team engages in.

1              So let's look at the acrobatics and tumbling
2    team for a minute, for example.  And the Court addressed
3    at great length the multi-factor test in the 2010 decision
4    and identified four factors that were lacking, off campus
5    recruiting and so on, so --
6              THE COURT:  Focus on rugby.
7              MR. BRILL:  Focus on what?
8              THE COURT:  Rugby.  I'll be completely frank, I
9    think you have, notwithstanding that you've touched all
10   the bases at least in a minimal sense, I think acrobatics
11   and tumbling has a ways to go and you have a stronger case
12   with rugby, so I'd be interested in hearing how you apply
13   that to rugby.
14             MR. BRILL:  All right, I'm surprised frankly to
15   hear the Court say that -- and I'll get back to acrobatics
16   and tumbling -- because it seemed to me that was the
17   stronger case in a sense because we followed, you know, we
18   touched every base --
19             THE COURT:  You touched my bases.  I identified
20   some things, you touched those bases, but it's not an NCAA
21   recognized or emerging sport so there's no presumption, so
22   I think there's a harder look at what's going on.  You
23   have very few teams who are actually doing this yet.
24   Although there is now a structure, everybody gets into the
25   national championship, there's problems.  It's such a

1    young sport, there's -- correct me if I'm wrong, there's

2    five teams in America that do this at the college level.

3              MR. BRILL:  There were six last year and seven

4    next year, Your Honor.

5              THE COURT:  All right, six.

6              MR. BRILL:  I really feel like the, you know,

7    the bar is shifting on us because we -- the Court

8    indicated these are the things you have to meet and we did

9    it, and there's nothing, there's nothing in the OCR rule

10   that says you have to have ten teams or twelve teams or

11   nine teams.  There has to be sufficient competition.

12             THE COURT:  Let me -- I like analogies, let me

13   give you an analogy.  I'm applying for a mortgage and the

14   bank says we'll only give you a mortgage if you have a

15   good credit rating over, whatever, 600.  So, for years and

16   years and years I've had 450 and I diligently work and I

17   pay my bills on time and so forth, and I get to 601 and I

18   quickly call the bank and say, okay, I did it, I got to

19   600, quick, loan me the money.  There's technical

20   compliance with the requirement that's been set.  Does the

21   bank have any confidence that I'm going to be at over 600

22   next month?

23             You know, I don't want to cut you off on

24   acrobatics and tumbling.  What I'm telling you is your

25   stronger argument is rugby and I'd be more interested in

1    hearing about rugby and, you know, you can argue whatever

2    you want to argue.  So I'm just --

3           MR. BRILL:  Right, well, I would like to come

4    back to acrobatics and tumbling.

5           And with respect to rugby, obviously there is a

6    presumption that rugby counts for purposes of Title IX and

7    the argument that the plaintiffs have made with respect to

8    rugby is that the competition is not sufficient, but that

9    argument, as I understand it, doesn't really go to the

10   question of the participant count, okay?  It really goes

11   to the question of whether the University as a whole

12   passes the competition test.

13          And so what I was saying before is that the --

14   OCR has established this multi-factor test and one of the

15   criteria in that test is the competition.  And the way

16   it's phrased is not a division level of competition; it

17   talks about competition which is equal to the abilities of

18   the athletes on the team, which is basically the same test

19   that the OCR used in connection with the original

20   competition test.

21          The preface to the two part competition test

22   says that the purposes of this is to provide athletes, men

23   and women athletes with competition that are equal to

24   their abilities, and so I want to make several points.

25          First is that it really would create a dichotomy

1    and could not be consistent with the intention of OCR if

2    you had a sport, whether it's acrobatics and tumbling or

3    rugby or some other sport that met the criteria of the

4    2008 letter so that it's a sport for purposes of Title IX,

5    and the competition is sufficient under the criteria of

6    that letter to be a sport, that the university could

7    nonetheless fail the levels of competition test because

8    it's sponsoring this new sport that OCR is trying to

9    encourage and the problem is that -- here's the dichotomy

10    under the competition test and why I think it has to be

11    read reasonably and flexibly in light of the OCR policy:

12              Everybody agreed, from Dr. Lopiano to

13    Dr. Yiamouyiannis in the last trial to Mr. Daniel,

14    everybody agreed that emerging sports often necessarily

15    compete against club teams until you get to the point

16    where there's enough of a critical mass of varsity teams

17    that you can achieve just varsity competition and then

18    ultimately maybe you get to a championship sport level.

19    But the idea of the emerging sports program, and I think

20    this is implicitly in the OCR letter as well, is to

21    nurture those sports while they grow, nurture the varsity

22    sports.

23              It doesn't make any sense to say everybody has

24    to stay at club level until all of a sudden there's enough

25    varsity teams.  That's not how it works.

1          And, therefore, if you said that rugby, for

2     example, by competing against six club teams in 2011 and

3     four varsity teams -- and putting acrobatics and tumbling

4     aside for the moment, let's just talk about rugby -- that

5     that was enough to bring Quinnipiac below the level of

6     competition as a whole necessary for the competition test,

7     then you're creating a, I think, enormous barrier to any

8     school starting new and emerging sports, because -- and

9     think of it this way.  Think of a school -- and putting

10    aside volleyball for a minute because I think volleyball

11    in a sense is irrelevant to this analysis.  If this

12    Court's going to make a ruling that applies, I think more

13    broadly -- and as I said, in any event, you can view rugby

14    and I think you can view golf and volleyball as

15    interchangeable for each other -- so you have a school

16    that has the full slate of Division I men's competitions

17    and a full slate of Division I women's teams, and it wants

18    to start a new team.  It wants to support rugby or some

19    other emerging sport.  But by definition there's no NCAA

20    championship, by definition and necessity, at least for

21    some period of time, rugby is going to be competing

22    against club teams.

23          So how could it be the intent of OCR to say,

24    well, yes, you're a sport and, yes, we're encouraging new

25    sports and, yes, we're encouraging emerging sports but you

1    know what?  If you add rugby, you fail the competition

2    test; you're in violation of Title IX.  It's not a

3    sensible way to harmonize, I think, the competition test.

4           So I think the way to look at that test is as

5    follows, and this goes back to -- this is not the 1860's

6    but it was 40 years ago or whatever, but what OCR was --

7    Title IX is an anti-discrimination statute and the

8    competition test is part of the mechanism to root out

9    discrimination against women in sports.

10          And if you had a rugby team that, as Your Honor

11   suggested, if you were out playing the Bridgeport women's

12   over 45, you know, Y league or playing the worst crummy

13   teams in the country while men were not doing that, I

14   think that would be discriminatory if there were other

15   opportunities available.  But in rugby, the testimony is

16   that in rugby this is a highly developed sport at the club

17   level, that the competition is -- more than meets the

18   abilities of the athletes.

19          In fact, you heard Jacqueline MacLearie cringe

20   when she thought about the Rutgers club team and how scary

21   those athletes were and that was the toughest team they

22   played all year for rugby.

23          And I would say for acrobatics and tumbling

24   also, are the women on those teams getting the competition

25   that's equal to their abilities?  Do they feel they are

being discriminated against compared to the men?  And if the school, if Quinnipiac is prepared to put in the resources to support this team as a varsity team, and provide these women with competition that's fully equal to their abilities and challenges them in a way that's equal to the challenges of other varsity teams, whether their competition is entirely varsity for some period of time or whether it's mixed varsity and club teams, that's not discriminating against them.  In fact, just the opposite; it's supporting the women.

And when you think of -- when you think about the class here, okay, the class is not -- this is not an action by volleyball players who happen to be the class representatives.  This is a class action of women, students who are interested in being -- who, I think the phrase is "were being denied athletic participation opportunities."

So, who is it that's being denied participation opportunities here?  I think the comparison would be to bowling because that's the sport that we keep hearing about.  Why didn't Quinnipiac just start a bowling team? After all, that's an NCAA championship sport.

By the way, there's only two NCAA sports, championship sports for women we don't sponsor, and that's bowling and swimming and diving.  And swimming and diving,

1    I think the Court can understand.  We don't have a

2    swimming pool and that would be an enormous expense.

3         But with respect to bowling, okay, it's competed

4    in the conference at a multi-divisional level.  There are

5    Division II and III teams, including Cookstown in

6    Pennsylvania, Jersey City in New Jersey and Adelphi on

7    Long Island.

8         How that is competition significantly -- how

9    does the opportunity to have a bowling team that's

10   competing against Division II and Division III teams like

11   that offer better opportunities for women athletes than

12   rugby does, which is competing against the other varsity

13   teams in the country and the highest level of club

14   competition?

15        It seems to me if the athletes are saying that,

16   you know, this is an enormous opportunity for us.  As

17   Jacqueline McLearie said, this is -- you know, I mean her

18   testimony could have been videotaped really and used as an

19   inspirational video for Title IX.  It changed her life,

20   and she made history.  She was featured on the front page

21   of her home town sports section.

22        You know, I mean the idea that somehow these

23   students are being deprived of the opportunity to have

24   fans come to their games?  I mean we don't even have a

25   bowling alley at Quinnipiac.  How many fans are going to

1    be traipsing to some bowling alley somewhere or going down

2    to Cookstown to watch the women's bowling team?

3            The evidence was that the rugby team had

4    enormous turnout at its games at the campus and, again,

5    acrobatics and tumbling is the most, the most attended

6    women's sport of any, beyond even basketball and ice

7    hockey.  It's attracting the biggest crowds on campus.  So

8    there's enormous student and fan backing for these sports.

9    I don't know what else Title IX intends.

10           These are genuine varsity sports, these are

11   genuine varsity athletes.  And in the case of rugby, it

12   seems to me that, whatever the competition test is looking

13   for, it's not looking for -- it's not saying, okay, this

14   is Division I and this is below Division I and, therefore,

15   as a matter of mechanical application, the women are being

16   discriminated against.

17           Look, I'll accept your view that the OCR

18   Investigators Manual shouldn't be determinative and, you

19   know, whatever methodology Mr. Daniel and Ms. Bonnett have

20   been using all these years, and the OCR has been using, we

21   don't need to rely on that.  But let's look at the purpose

22   of what that policy interpretation says.

23           It says are women and men being given

24   opportunities that are equal to their athletic abilities?

25   And it seems to me the answer has to be yes here in terms

1    of what the actual experience was of the rugby

2    competition.  I think that's the fair way to read the

3    test.

4              And to read it -- look, if you, if you took a

5    strict little reading of the competition test, and I

6    thought about this also, and you said that, okay, these

7    women are not competing on a Division I level and,

8    therefore, they are -- on a proportional basis the women's

9    teams are having less competitive opportunities than men,

10   and you say that, therefore, an emerging sport is going to

11   cause a violation of the competition test, there's only

12   three ways, therefore, to deal with that, okay?

13             One is a school could only add NCAA championship

14   sports for women.  And I don't think -- that's clearly not

15   the intent of OCR because OCR says we want you to add new

16   sports and develop new opportunities.

17             The other thing Quinnipiac could have done is

18   eliminated men's sports.  Right?  I mean rather than

19   adding three new women's sport, or two, if you want to

20   again look at golf as a trade for volleyball, rather than

21   add, in order to achieve proportionality, rather than add

22   two new sports for women, we could have cut another men's

23   sport.  We could do that under NCAA rules and allow six --

24   we could stay Division I with six men's teams and eight

25   women's teams.  We could cut a large men's sport and maybe

```
1    trim the rosters on some other men's sports.  I don't
2    think that's fulfilling the purposes of Title IX either
3    particularly.
4            The only other way that Quinnipiac could achieve
5    adding an emerging sport is if it said, okay, we're adding
6    rugby for women but at the same time we're going to add
7    some non-championship sports for men that also competes
8    against club teams.
9            Now, putting aside the problem that has with
10   respect to proportionality, that's tying a weight around
11   the legs of any school that wants to add an emerging sport
12   for women.  What you're saying is, okay, you can add
13   emerging sports for women but then at the same time you
14   have to add some non-championship sport for men so you
15   don't come out of balance with the competition test.  None
16   of these three paths are, I don't think make any sense
17   and --
18           THE COURT:  What about a fourth path which is
19   for rugby playing the best available competition?
20           MR. BRILL:  It is.
21           THE COURT:  Well --
22           MR. BRILL:  Well, Your Honor, if you start --
23           THE COURT:  I understand that the rugby team
24   thought they were playing better teams and their record
25   supports that view, but I think the evidence is
```

1    uncontradicted they were playing the lower tiered club

2    teams.  No?  Am I wrong about that?

3              MR. BRILL:  The coach said the tier one teams

4    are not here in this region.  She said there were other

5    tier one teams elsewhere in the country, but think about

6    it for a minute.  First of all, if you were starting a

7    women's basketball team, would you schedule UConn, Baylor,

8    Notre Dame and Duke as your competition the first year?

9    That's not fair to the student athletes.

10             The question is competition equal to their

11   abilities.  They got beaten 54 to nothing by Rutgers.  If

12   they had played, I think it was Penn State, the perennial

13   national champion in rugby, it would have been a

14   slaughter.

15             And, yes, this is the whole point of the

16   competition test, it's a fluid test.  So this year was her

17   first year of recruiting and I think she had two or three

18   recruited athletes plus many talented multi-sport high

19   school varsity athletes that she found on campus who could

20   survive her boot camp.  But next year she has, what, eight

21   or ten athletes coming in and the year after that, more,

22   and the level of this team is going to go up.  And, as she

23   said, when we get to that next level, then we'll look to

24   another level of competition, but the level of competition

25   now is the level that's appropriate for the team.

1           And I think that it's not fair to second-guess

2     that as attorneys or as the Court to say, well, we think

3     you should have been playing at tier one because somebody

4     happened to mention that there were two tiers in USA Rugby

5     throughout the country.

6           The evidence is what did the coach think and

7     what do the athletes think about their competition.  And

8     if an athlete came in and said -- I mean the coach was

9     deposed, you know, they represent -- by the way, I think

10    it bears mentioning that the plaintiffs represent the

11    class, okay?  They have the ability to bring in any

12    athlete or any prospective student athlete and say, you

13    know, I was a member of this team or I would have gone out

14    for the rugby team but they were playing crappy, second

15    class competition and that wasn't of interest to me.

16           That wasn't the evidence here.  There's

17    something called evidence and lot of their argument is

18    suspicion and conjecture and accusations, but when you

19    look at the evidence, the evidence is that the competition

20    was fully equal, if not more than equal.  I mean the rugby

21    team had a losing record and I think the testimony was

22    there was only one team -- they were quite honest.  I mean

23    this wasn't -- and the coach and the athlete actually said

24    the same thing.  This wasn't some Pollyanna saying, oh

25    well, all the competition was just great and it was like

1    the best we could possibly have.  No, they both were

2    honest.  They said, look, Hofstra wasn't so good.  We beat

3    Hofstra pretty badly, that was the only team on our

4    schedule that wasn't so good.

5            But, look, the UConn basketball team probably

6    has some games where it blows out -- I don't know, I'm not

7    going to say Quinnipiac because Jack would be mad at me,

8    and I don't know they played UConn, but I'm sure they have

9    some cupcakes on their schedule, every team does.

10           But they had a losing record.  They had, you

11   know, I think they had three or four or five really close

12   competitive matches, and maybe six, and they lost pretty

13   badly in three or four matches.  That's exactly the kind

14   of schedule most -- if you asked a coach who was starting

15   a new team what would you like your first year to be?

16   Well, they might want a few more cupcakes than Quinnipiac

17   had but I think they'd like to have mostly competitive,

18   close matches and maybe one or two that cause them to

19   stretch.

20           THE COURT:  Right.  Well, you know, this is a

21   difficult problem for universities and for courts,

22   frankly, you know, how and when do you count something as

23   a varsity sport when -- well, if we look back at

24   competitive cheer, I don't want to over simplify it but

25   the University took a sideline cheer squad, added some

1    people and called it a varsity sport.  I can imagine a

2    situation where the University would take a very good

3    intermural team and call it a varsity sport.  And if they

4    play very good intermural teams --

5            MR. BRILL:  Right.

6            THE COURT:  -- they are playing at a level that

7    is appropriate for the competition.  They get a locker

8    room, they get a bus, they get a coach, but they are a

9    very good intermural team that now has a varsity label on

10   it.  Do they count?

11           MR. BRILL:  Well, there's another test for that

12   obviously.  To be a varsity team, you have to get the

13   benefits of the other varsity teams.  You can't just call

14   an intermural team a varsity team.  It has to get --

15           THE COURT:  That's what I'm saying.

16           MR. BRILL:  It has to have coaches --

17           THE COURT:  You give it the bus, you give it the

18   coaches, you give it the scholarships, you give it the

19   uniforms and you tell the fans when to show up.

20           MR. BRILL:  Right.

21           THE COURT:  But if what you've done -- I'm not

22   saying this is what you've done, but if what the

23   University did was "We need to get in compliance with

24   Title IX.  Hey, you know what?  The ladies croquet team is

25   a pretty good intermural team.  Why don't we -- you know,

1    the Pi Phi House has a pretty good croquet team.  Let's

2    call it a varsity team.  They're right there.  We'll give

3    two of them scholarships and we'll give them a coach and a

4    bus and we're now in compliance under Title IX."

5             I don't think that counts and obviously that's

6    not what we're dealing with here.

7             MR. BRILL:  Right.

8             THE COURT:  But you see the problem with when

9    you count a team as a varsity team, notwithstanding that

10   they have the bus and the scholarships and the coach and

11   so forth, if it's an open call to the student body, come

12   become a Division I varsity athlete, is that -- have you

13   really done it?  That's the hard question in this case, I

14   think.

15            MR. BRILL:  So, with respect to rugby, I think

16   there's several answers to that.  First of all, we know

17   it's a sport.  Because it's an emerging sport --

18            THE COURT:  It's a sport.  You have a

19   presumption; the question is whether the plaintiff has

20   overcome that presumption with its evidence.  That's the

21   question.  I'm not giving you a hard time; I'm just

22   expressing that that's the hard question.

23            MR. BRILL:  That is not the question that they

24   raise.  I mean obviously the Court can view it that way.

25   They have not attacked the presumption in my reading of

1    their papers or the evidence at trial.

2         What they've said is that, in fact, their expert

3    witness -- I mean I think they are bound by the testimony

4    of their expert, Donna Lopiano, said I am not contesting

5    that rugby counts as a sport for purposes of the 2008 OCR

6    letter.  What they said was the competition by the rugby

7    team -- and I asked her this very specifically -- are you

8    saying that -- they are saying as a whole --

9         THE COURT:  You're missing my point.  You're

10   missing my point.  Rugby is an emerging sport, if a

11   University says we now have a women's rugby team, there's

12   a presumption.

13        MR. BRILL:  Right.

14        THE COURT:  You count those participants.  But

15   if the participants are the Pi Phi House women's rugby

16   intermural team that they slapped a varsity label on and

17   they gave them everything that they give varsity teams,

18   but if it's not a real sport, can you count it in your

19   year one or year two?  Can you count it before it becomes

20   a full fledged varsity sport at the particular University?

21        That's the difficult question, frankly, because

22   what we've got here, as I understood the testimony, was an

23   open call.  Were there a lot of women who wanted to play

24   Division I varsity rugby?  Absolutely.  I would, too.  If

25   I were in school and they had a Division I open season,

1    brand new team, no scholarship athletes, you too have a

2    chance to be on a varsity team?  Absolutely, I'd be there,

3    whether I'd ever played the sport before or not.  It would

4    be a lot of fun.  But that begs the question, doesn't it?

5              MR. BRILL:  No, I --

6              THE COURT:  Whether this is real.  That's the

7    question.

8              MR. BRILL:  Well, it's certainly real.  I mean

9    anybody who heard the coach and the athlete would know

10   this is real.

11             THE COURT:  The coach is very real.  The

12   athletes are trying very hard.  They are very interested,

13   no question.

14             MR. BRILL:  I'm sorry, they are very --

15             THE COURT:  They are very interested.  They are

16   very determined.  They are trying very hard.  They are

17   working very hard.

18             MR. BRILL:  Right.  This is not the local

19   sorority house.  This coach cut you from the team if you

20   couldn't do your sprints and weightlifting and didn't show

21   up exactly on time.  So I think there is a --

22             THE COURT:  I understand.

23             MR. BRILL:  There could be a case where it is a

24   superficial effort to say you have a team when you don't

25   have a team, but there are tests within Title IX to look

1    for that.

2          And, in addition, what did Dr. Lopiano testify

3    last time when she was criticizing the competitive cheer

4    team, she said, oh, they didn't even take any time to

5    create that team.  On day one they said we're going to

6    turn the sideline cheer team into a competitive cheer team

7    and that's not the way you do it.

8          The way you do it, she said, was you start a

9    year in advance.  You hire a coach, she starts recruiting.

10   All the things that Dr. Lopiano said you had to do, that's

11   what Quinnipiac did.  Obviously every team, whenever a

12   university starts a new sport, whether it's an emerging

13   sport like rugby, when we started ice hockey, when we

14   started any sport you can think of.

15         If Quinnipiac wanted to start a -- I don't know,

16   a bowling team, for example.  I mean bowling is the sport

17   that everybody says.  Once you -- for purposes of Title

18   IX, once you give that sport the support, you treat it as

19   a varsity sport and give those athletes the support that

20   Title IX says, they are receiving those benefits, they are

21   varsity athletes and they are participants.

22         And there are tests to see, in a case of an

23   emerging sport or otherwise, whether this is a phoney

24   situation or it's not.  But there's no -- it's not like

25   there's a continuum and you say, okay, well, when the

1    team -- in the third year it becomes a varsity sport or in

2    the second year -- these athletes have all the

3    accouterments of being varsity athletes.  And the only

4    question is -- two questions you've raised.  One is the

5    level of recruiting and obviously a team begins recruiting

6    from day one and that takes place over a period of time,

7    but there's nothing wrong with getting athletes from on

8    campus.

9              Rowing.  You heard the testimony about how

10   rowing -- this is how rowing works.

11             THE COURT:  I'm not saying there's anything

12   wrong with it.  I'm saying this is the issue in the case,

13   is, you know, whether these are real teams.  And I think

14   you probably, you know, you come in with the advantage on

15   rugby.  You've got the presumption that they clearly have

16   done the things that they need to do, and what I'm trying

17   to get you to address is what I understand plaintiff's

18   principal argument in attacking rugby is, yeah, but here's

19   who they are playing, here's where they got their

20   athletes, you know, and is this a genuine participation

21   opportunity comparable to that offered men.

22             When we talk about the competition test, I think

23   what they are really saying is would the men athletes at

24   Quinnipiac happily trade places with the women athletes at

25   Quinnipiac.  That's fundamentally I think what the

1    question is.

2           And what I'm saying is to the extent that a team

3    like rugby is made up of people who are determined,

4    dedicated volunteers from the student body, maybe the men

5    would be a little less interested in trading places.  And

6    that, I understand it's difficult because with an emerging

7    sport there's always going to be a transition.  I

8    understand all of that.  I'm just saying that's the

9    question, I think.  That may be the hardest question in

10   this proceeding.

11          MR. BRILL:  I think that the only way I can

12   answer that is to say I don't think the issue is trading

13   because, you know, you have this program of emerging

14   sports for women and you have the OCR encouraging new

15   sports for women, and men may be very happy to be content

16   with their existing championship sports and they may not

17   be interested -- the men on those teams may not be

18   interested in starting and joining -- some of them might

19   but we don't know, but I think the test is is Quinnipiac

20   discriminating against the women by starting those sports

21   rather than the alternatives which, the three alternatives

22   I gave you which is to say, okay, Quinnipiac, we give up,

23   okay?  We give up.  We're only going to start a bowling

24   team and we'll find some pool nearby and we'll start a

25   swimming team.

1          If the Court tells us now that's what Title IX

2     requires then we will skulk away and we're not going to

3     support these new sports and OCR be damned and the NCAA be

4     damned and, you know, we're trying to fulfill the goal --

5     the goal of Title IX is to expand opportunities for women

6     and --

7               THE COURT:  Right.

8               MR. BRILL:  And --

9               THE COURT:  And on that point, why is it that if

10    the University's making great progress, why is it onerous,

11    burdensome, inequitable, to keep the injunction in place

12    some limited period of time longer while rugby gets those

13    athletes, while acrobatics and tumbling expands in

14    America.

15          In other words, the way the University's going

16    about it is they have chosen, as they have to right to, to

17    meet Title IX through adding golf, an emerging sport and a

18    yet unrecognized sport.  Having made that choice, why is

19    it appropriate today to lift the injunction now rather

20    than waiting a year or two to see how those things

21    develop?

22               MR. BRILL:  Well, let me say I'm perplexed, Your

23    Honor, because when we -- you know, I think there's a

24    question of fairness here, and the original --

25               THE COURT:  That's exactly what I'm talking

1    about.  Why is it fair?  Give me your argument why it's

2    fair.

3            MR. BRILL:  Because we were directed to submit a

4    compliance plan and we did.

5            THE COURT:  Right.

6            MR. BRILL:  And the Court said on its face it

7    looks fair and complies with Title IX.  And nobody said --

8            THE COURT:  It's a good plan.

9            MR. BRILL:  It's a good plan.  If you succeed in

10   this plan, it looks to me like on its face you're okay.

11           THE COURT:  Have you yet succeeded on the plan?

12           MR. BRILL:  Excuse me?

13           THE COURT:  Have you yet succeeded on the plan?

14   That's the question we're here about today.

15           MR. BRILL:  Well, we did everything that anybody

16   said was required for acrobatics and tumbling, and I'm

17   sorry that you view that as the weaker of the two sports.

18   To my mind it's stronger, and I'll tell you why.

19   Because --

20           THE COURT:  Let me just comment here.  There are

21   not enough teams doing acrobatics and tumbling in America

22   to qualify as an emerging sport under the NCAA.

23           MR. BRILL:  Who says that?  Who has said that?

24           THE COURT:  That is my recollection of the

25   testimony.

```
 1              MR. BRILL:  No.

 2              THE COURT:  If I'm wrong, correct me then.

 3    Correct me if I'm wrong.

 4              MR. BRILL:  There's no -- somebody --

 5              THE COURT:  How many teams --

 6              MR. BRILL:  That's an argument they made in

 7    their brief.  So here's the issue, because if you read the

 8    emerging sport proposal which is in evidence, here's the

 9    problem, Your Honor --

10              THE COURT:  Okay.

11              MR. BRILL:  -- there is a competitor out there

12    which is a for profit entity, and they have said to their

13    teams, if you ever compete in acrobatics and tumbling, you

14    are barred forever from anything run by USA Cheer, which

15    has scared people away.

16              THE COURT:  Okay.

17              MR. BRILL:  And the NCAA was not ruled on this

18    because it's a unique situation.  But the presentation to

19    the NCAA has said, look, we have six teams or seven next

20    year that are actively competing on a varsity level in A

21    and T.  You need 20 teams total that are competing in some

22    format.  And, for that purpose, you can look to the teams

23    that are competing in a similar version of the same

24    athletic endeavor, whether it's stunt or competitive cheer

25    because that really fulfills the mission and the purpose
```

```
 1        of the NCAA in seeing that there's a widespread interest

 2        in this activity, whether the, whether the NCAA ultimately

 3        says we accept it or we don't accept it, there's been no

 4        ruling that there's not enough teams competing.  That's

 5        something that plaintiffs argue in their brief without

 6        support.

 7                THE COURT:  I understand there's no ruling.  You

 8        just quoted the numbers that were the numbers I was

 9        relying on.  You've got six or seven teams; you need 20.

10                MR. BRILL:  But you don't need 20 varsity teams.

11        To be an emerging sport you could have --

12                THE COURT:  How many club teams are there that

13        do A and T?

14                MR. BRILL:  None, because --

15                THE COURT:  Thank you.  Seven is less than 20,

16        isn't it?

17                MR. BRILL:  Yes, but -- I mean, Your Honor,

18        you're not here to rule on the emerging sport application.

19                THE COURT:  I'm here to decide -- look, we got

20        into this because of my comment that A and T is less

21        likely to be counted.

22                MR. BRILL:  Right.

23                THE COURT:  And the reason it's less likely to

24        be counted is because it doesn't even qualify as an

25        emerging sport under NCAA.  You don't have the benefit of
```

1    the presumption.  Without the benefit of the presumption,

2    I don't see how you can meet --

3            MR. BRILL:  Well, I'm very confused because the

4    last time we went through this, at the last trial there

5    was not even an emerging sport's application, and there

6    were the same number of members in the NCATA as there are

7    today, and no one argued that --

8            THE COURT:  We're here on this application,

9    okay?

10           MR. BRILL:  Well, I know, but --

11           THE COURT:  Last time the question was is cheer

12   leading a sport.  That's what I answered.  Now the

13   question is does acrobatics and tumbling count, do you

14   count the participants?  And I'm suggesting to you it's

15   not impossible to count them, some courts would count

16   them.  That's your weaker argument?  Why?  In part because

17   it doesn't even qualify as an emerging sport with the

18   NCAA.  There are six or seven teams in the country at the

19   college level, counting clubs, junior varsity, varsity,

20   whatever you want to count.  There's six or seven teams.

21           MR. BRILL:  But the view, the view of the

22   Acrobatics and Tumbling Association, which has been

23   presented to the NCAA --

24           THE COURT:  And if they win, and if they win,

25   they get a presumption and we're in a different situation

1    a year from now when they win, if they win, in two years,

2    three years, than we are today.  Today --

3            MR. BRILL:  But we don't -- we went through --

4    the purpose of the 2008 letter was to assess whether an

5    activity is a sport if it's not an emerging sport.  If

6    you --

7            THE COURT:  I agree.

8            MR. BRILL:  If you meet those criteria, and I

9    don't see anywhere in that letter, I don't see anywhere in

10   this Court's ruling, I don't see anywhere in the OCR

11   brief, that said, you know what, you don't have enough

12   teams -- even if you do these -- see, this is the

13   fundamental unfairness, Your Honor, because --

14           THE COURT:  Mr. Brill, look, you've been going

15   well over an hour.  You can talk about this as much as you

16   want.  This is your weak argument.  I keep telling you

17   that.  This is your week argument.  Talk about it as much

18   as you want.  I'm going to give the other side equal time.

19           MR. BRILL:  Right.

20           THE COURT:  When I was a lawyer I used to always

21   try and focus on my stronger arguments and I think this is

22   a loser for you.

23           Look, I haven't made up my mind yet.  If you

24   want to use your time on this, that's great.  I think

25   you're stronger on rugby than you are on A and T.

1          MR. BRILL:  Well, we'll take either one.  I

2     think we win with either one, Your Honor.

3          THE COURT:  I think you have numbers with either

4     one.

5          MR. BRILL:  And obviously, you know, I'm not

6     going to spend a lot of time on something you're telling

7     me that's my weaker argument.  But I just want to make a

8     fairness point because it does -- I think it is unfair.

9          Last time around, we had -- the OCR came into

10    this court and they came into the Court of Appeals and

11    they made a very specific statement of here are the things

12    that are lacking for this activity to be a sport.  And

13    this is not applying to the bank for a mortgage, okay?

14    This is taking guidance from this Court's decision and

15    from OCR.  And, frankly, where is OCR now?  You know?

16    They are not here to challenge this.

17         THE COURT:  That argument doesn't work for me.

18    I mean I don't care if they are here or not here.  I've

19    got to decide this --

20         MR. BRILL:  Well, whether they're here or not

21    here --

22         THE COURT:  Let's talk one at a time, okay?  My

23    poor court reporter had enough problems with the

24    witnesses.  I don't know care if they are here or not

25    here.

1          MR. BRILL:  Well, I think the fact that they

2     were here certainly did make a difference the last time

3     and I think whether they are here or not here, there were

4     factors that were laid out by OCR on behalf of the United

5     States Government, there were factors that were laid out

6     by this Court instructing Quinnipiac as to what it needed

7     to do with respect to acrobatics and tumbling.

8          I'm not going to say more except to say in all

9     fairness as a matter of equity, I believe that Quinnipiac

10     had a right to rely on the fact that if it could satisfy

11     those factors that -- one of which was not the number of

12     teams, that it counted as a sport.

13          THE COURT:  I think we started this whole

14     argument with my request to you to talk about the

15     arguments that plaintiffs had made about why it's

16     appropriate now to lift an injunction.

17          MR. BRILL:  Right.

18          THE COURT:  And so let's assume that you're

19     right and that you touched all the bases.  This is the

20     question I asked long ago.  Assuming you've touched all

21     the bases, why should I be confident that it's time to

22     lift the injunction?  That's what I'm getting at.

23          MR. BRILL:  We waited a year more than the Court

24     said was necessary with respect to continuing volleyball

25     to ensure all these sports were fully in place.  This is

1    not a question of shifting numbers around, it is not a

2    question of, you know, some temporary fix.  As I started

3    to say before I was sidetracked, Quinnipiac has devoted

4    resources and commitment to these sports.  To rugby, for

5    example.  And we've committed scholarships, we've hired a

6    coach, we've established facilities and the team is there.

7    The team is not going away tomorrow if the Court lifts the

8    injunction, and same thing with respect to golf.

9            And let me just say this also.  As I started to

10   say, the case is not about volleyball.  The case is about

11   discrimination against women athletes.  And whether or not

12   the Court feels there was a good reason for Quinnipiac to

13   terminate volleyball in the first place, or whether they

14   made a sensible educational business decision to continue

15   with that decision, the fact is that it's continued

16   volleyball for three years beyond the time that it

17   eliminated three men's sports.

18           And Dr. Reynaud testified -- there wasn't much

19   of substance to her testimony but I think one thing

20   resonated, and that is it is extraordinarily difficult, it

21   is extraordinarily difficult to continue a team under

22   these circumstances.

23           Quinnipiac has struggled, and I'm sure the coach

24   has struggled and the new coach is struggling, to recruit

25   athletes to treat this team as equitably as it can under

1   circumstances when no nobody knows when it's going to

2   disappear.

3           And so assuming that there's no obligation to

4   continue this team legally on a permanent basis, which the

5   Court has said repeatedly, then what is the equitable

6   thing to do?  If Quinnipiac is otherwise complying with

7   the participation test, and even if -- I think the rugby

8   athletes count.  Whatever you say about the competition

9   under the competition test, I don't think there can be any

10  question that the rugby athletes count for the purposes of

11  the participation test, and we're in compliance with prong

12  one.

13          And that being the case, even if there's some

14  question about the level of competition, what is the fair

15  thing to do here?  Is it to continue the volleyball team

16  in this state of limbo and to put the University in a

17  continuing situation where we're struggling to maintain a

18  team that we want to eliminate and that it's being

19  continued only by virtue of some indefinite injunction, or

20  let the University go ahead and terminate the volleyball

21  team, which it wants to do, and if there is some issue

22  about the competition of the rugby team, which I don't

23  think exists, but if there is some issue, then craft a

24  remedy that's addressed to that.  The volleyball team has

25  nothing to do with that.  It has nothing to do with that.

1           And I mean, if the Court said to us, look, I

2    think you need to have a majority of your matches against

3    varsity teams, and we know that that's the instruction,

4    when we'll go out and we'll recraft the schedule.  But in

5    all fairness, if the Court says, you know, what I find is

6    lacking is you don't have a majority of your matches

7    against varsity teams, and we go out and do that and a

8    year later again the rule is, well, I know you have a

9    majority of matches against varsity teams but I didn't

10   tell you that you also have to do X, you know, we just

11   need to know what the rules are and we'll comply with the

12   rules.

13           There are ways to address the competition issue,

14   if that is the Court's concern.  But I must say the rugby

15   players, the only issue about the rugby players,

16   Dr. Lopiano testified that the issue in her mind was the

17   competition.  She said they get everything else that every

18   varsity team gets.  They are a varsity team in every

19   respect except the competition.  They have the presumption

20   under the 2008 letter.  So they count, they count as

21   participants.  And we meet Prong I.  Forget about the A

22   and T team.  I'm not going to talk about that anymore for

23   the moment.

24           So if the problem is the Court's concerned with

25   maybe the rugby team isn't quite there and maybe they need

```
 1          to have a little bit more varsity competition or maybe

 2          there should be a higher level of club competition, look,

 3          I think that we're not discriminating.  I think we have

 4          fully met the purpose and the intent of Title IX, and the

 5          purpose and the intent of the policy interpretation.  But

 6          if the Court disagrees, then that has -- in my view that

 7          has nothing to do with continuing the volleyball team.

 8                  That's just a -- you know, the plaintiffs

 9          actually in their post-trial brief talked about it as a

10          punitive measure.  This is a remedial issue, it's not a

11          punitive issue.  And to know remediate any violation of

12          the competition test, if there is one, then there could be

13          some remedy that's addressed to that.

14                  And, you know, that's something that could be

15          either further addressed or, you know, the Court can

16          address it in its decision, but the volleyball team -- you

17          know, continuing the volleyball team in the state of

18          lingering uncertainty is not doing anybody a favor.  It's

19          not doing the school a favor; it's not doing the

20          volleyball athletes a favor; it's not doing the class

21          members a favor.  And I think the time has to come to say

22          okay, three years is three years, and Quinnipiac meets

23          Prong I.  I have some problems with the level of

24          competition of the rugby team but I'll deal with that

25          separately.
```

1             To the extent I have time left, I know I've been

2     talking for quite a while, but I'd like to reserve some

3     time.  Thank you.

4             THE COURT:  Mr. Orleans?

5             MR. ORLEANS:  Good morning, Your Honor.

6             THE COURT:  Good morning.

7             MR. ORLEANS:  Your Honor, I've been at this game

8     too long to think that questions from the bench

9     necessarily reveal what the Court is thinking.  But I do

10    have to say that I think that Your Honor's questions,

11    number one, show that you thoroughly understand the

12    arguments that we're making and, number two, have

13    articulated many of them better than I can myself, and as

14    a result, I hope to be brief.  And I'll gladly yield some

15    of my time to Mr. Brill if he feels that he has more to

16    say.

17            I'm struck, I think, by the irony of Quinnipiac

18    invoking the language and rhetoric about expanding

19    athletic opportunities for women when the whole point of

20    this proceeding is to allow Quinnipiac to eliminate an

21    existing women's team.  And although Mr. Brill started by

22    saying let's go back to the beginning, and referring to

23    the 2010 trial that we had, if we're going to go back to

24    the beginning, we have to go back to the beginning which

25    is Quinnipiac's decision to eliminate an existing team at

1    the time when it clearly was out of compliance with Title

2    IX and had not been in compliance with Title IX for a good

3    deal of time.  And that context, I think, informs

4    everything and informs the equitable considerations and it

5    informs how the Court ought to deal with this case, ought

6    to view this case.

7         Essentially Quinnipiac's arguments about rugby

8    and acrobatics and tumbling is an argument that if you

9    don't endorse the rugby and acrobatics and tumbling

10   program in these circumstances, no school will ever be

11   able to add emerging sports or add new sports, and that's

12   just not true.  There are lots of circumstances in which

13   schools will have incentives to add new sports, and no one

14   would challenge or certainly we would not suggest to a

15   court that it ought to bar Quinnipiac or any school from

16   adding those new sports.

17        The issue is what do you do with your existing

18   sports, and as we argued in our post hearing brief, you

19   know, it's one thing when you're trying to expand

20   opportunities for women, you want to add a new sport and

21   you need some time to bring that sport up to speed up to

22   compare it with your other sports, and it's part of an

23   ongoing program.  It's another thing when you start out by

24   eliminating an existing women's team, you engage in roster

25   manipulation and then, under the compulsion of the Court,

1    you start adding new activities.  Those are different

2    contexts and call for different considerations in our

3    view.

4             Let me talk briefly about rugby.  And I think

5    I'd like to talk become rugby by reading to the Court from

6    your decision of 2010, and this was a discussion of

7    competitive cheer.  You said "Furthermore, and perhaps

8    most damaging to Quinnipiac's position, Quinnipiac

9    competitive cheer team fails to meet the OCR's benchmark

10   that a sports team should play a schedule that reflects

11   its participants' abilities.  The competitive cheer team

12   competed against a variety of different opponents during

13   the course of its season" -- I'm going to edit just a

14   little bit -- "including other collegiate varsity cheer

15   squads, collegiate club quadrants, collegiate sideline

16   cheer teams, all star squads and even high school

17   cheerleaders."  And of course we don't contend that with

18   respect to rugby.

19            "In reviewing the other Quinnipiac teams'

20   schedules, no other University varsity team played against

21   non-varsity competition.  No other Quinnipiac varsity team

22   is forced to play such a motley assortment of

23   competitors."

24            All those statements that Your Honor made with

25   respect to what was then competitive cheer in 2010 apply

1   to rugby now, and it's not as if we are suggesting that

2   rugby is not a sport -- rugby is clearly a sport -- nor

3   are we suggesting that the Court should tell Quinnipiac

4   drop your rugby program.  We don't think Quinnipiac should

5   drop its rugby program.  As Mr. Brill pointed out, we

6   represent a class of female athletes and I'm fully aware

7   of that, so we welcome the expansion of opportunities for

8   athletes.

9           The question is whether the rugby program is far

10  enough advanced at this time, given the lack of a

11  significant number of recruited athletes; the newness of

12  the team; the club competition as opposed to varsity

13  competition; the lack of a championship in which the team

14  participates; whether that program is far enough advanced

15  at this point in time that it can be said to provide equal

16  opportunities for Quinnipiac's female athletes.  That's

17  the question.

18          And we think it's obvious we think it's not

19  there yet.  Close maybe, but not there yet.  So what's

20  fair under these under those circumstances?

21          THE COURT:  Well, if it's not there yet and if A

22  and T is not there yet, then there's not technical

23  compliance with --

24          MR. ORLEANS:  Correct.

25          THE COURT:  -- the proportionate representation

1    requirement.  But if rugby is counted, do you acknowledge

2    that University has come into compliance with the

3    proportionate participation?

4         MR. ORLEANS:  I think it's -- I'm sorry, Your

5    Honor, but I didn't review my math before I came over here

6    and I should have.  I think it may end up depending on how

7    you deal with multiple counting of the track athletes, and

8    whether that creates enough of a discrepancy.  In other

9    words --

10        THE COURT:  Well, the ones, I think we've run

11   through the numbers and the ones that I am aware that

12   you're challenging, I think, aren't sufficient to get you

13   there without winning rugby, the rugby argument.

14        So I think what I'd like to hear from you in

15   your argument is really two different things.  One, why

16   shouldn't rugby count, given that it's got a presumption

17   as the numbers are explored.  And, two, assuming it does

18   count, are there equitable reasons, as you hint in your

19   papers, that -- or suggest in your papers that,

20   nonetheless, the injunction should not be lifted at this

21   time.

22        MR. ORLEANS:  All right.  Let me take those two

23   points in that order, Your Honor.  Why shouldn't rugby

24   count?  I think we've addressed that to some degree in our

25   papers but it does go essentially to, well, it goes to our

view of the competition test which is a view that looks at

the quality of the competitive opportunity which is

provided.  It's more than just -- in our view, it's more

than just, you know, did the team compete against club or

varsity, although that's obviously a part of it.

I do think it's interesting that what we hear

from Quinnipiac today is an argument that because the team

lost a significant number of its matches, we should figure

that club competition is adequate for this team.

Mr. Daniel, of course, testified that you really can't get

into these subjective measures within the categories

Division I, Division II, Division III, club.  We're going

to end up applying power ratings to the competition in

each division in trying to determine who's competing at

their level, at their appropriate level of ability.

Rugby's the only team at Quinnipiac that plays a

significant number of its matches against club

competition.  Rugby doesn't participate -- there is no

varsity collegiate championship.  The only championship

that's available is the one that's sponsored by USA Rugby

which is primarily a club championship, and Quinnipiac

doesn't participant in it because the coach feels that

it's not safe and, of course, we applaud her for being

concerned about the safety of her athletes but it does,

the absence of the opportunity to participate in a

1   championship is something that affects the quality of the

2   opportunity that the athletes receive.

3           It's early in the program.  She hasn't yet

4   allocated all of her scholarships.  The result is that a

5   relatively small percentage of the athletes on the team

6   are recruited.  That's not a criticism, but it is a factor

7   that should be taken into account, as Your Honor has in

8   other contexts, in judging whether the rugby athletes are

9   receiving a fully equal participation opportunity to the

10  participation opportunities that are afforded to men.

11          There is no comparable men's team.  This is not

12  to suggest that Quinnipiac shouldn't add an emerging sport

13  for women.  It is to suggest that there may be some

14  interim period of time between when you add the emerging

15  sport and when the existence of that sport may justify you

16  in eliminating some other existing championship sport.

17          So that's essentially my argument with respect

18  to rugby, that it's close, it's not there yet.  It does

19  not possess all of the indicia that one would expect of a

20  genuine varsity participation opportunity for the athletes

21  who participate in it.  That's partly the competition test

22  and partly the other factors.

23          With respect to the equitable issues, I want to

24  comment first, or once more about our representation of a

25  class of athletes and the fact that this is not just about

1    volleyball.  I think that my representative plaintiff

2    clients ought to be very proud of what we have achieved in

3    this litigation.  I think it's a shame that we had to

4    litigate in order to achieve it, but I doubt that

5    Quinnipiac would have made the progress that it's made had

6    we not challenged the University's action in eliminating

7    the volleyball team.

8              And what we have achieved goes far beyond simply

9    maintaining the volleyball program up until today.  It's

10   resulted in improvements for the track program.  It's

11   resulted in scholarships and sports opportunities for

12   women in new activities, and I think we will see, you

13   know, we've got a trial on the benefits claims coming up

14   in November but based on the evidence that I'm aware of so

15   far from discovery, you know, I think we'll see that we

16   also instigated improvements to facilities for athletes

17   generally and particularly for women's athletics, that I

18   don't think would have been achieved had we not litigated

19   this matter.

20             But, so with that parenthetical, assuming for

21   the sake of the argument that Your Honor were to conclude

22   that Quinnipiac has achieved statistical compliance, we

23   think that, number one, it would be unfair specifically to

24   the volleyball team to permit the elimination of that

25   program now because, Your Honor's heard this before, it's

1    July, the young women on that team who are expecting to

2    play this year don't have any realistic opportunity at

3    this late date to transfer to another school where they

4    might be able to play.  Scholarships are not available.

5    They've been allocated in other schools.  There's no time

6    before the season in the Fall.

7            And I know that we'll hear from Quinnipiac that,

8    you know, they assumed the risk to some degree.  But

9    although they were informed of the possibility that the

10   program might be eliminated, that does not mean that it's

11   fair or equitable to eliminate the program at a time when

12   they are unable to take appropriate measures to continue

13   their athletic careers.

14           So in the sense of the volleyball program only,

15   it would be unfair to those people to eliminate the

16   program now.

17           In the larger sense of equity to the class

18   generally, as we've said in our papers, we do not believe

19   that the University has established, has shown that there

20   is in place a durable remedy and it's not punitive but

21   this is not, you know, this is not a damages case.  There

22   have been years of discrimination.  It seems to us that it

23   would be appropriate under these circumstances to continue

24   the injunction for some period of time and let's wait and

25   see.  Let's see Quinnipiac implement the remainder of its

1    compliance plan.  Let's see how it operates its program.

2    We would argue that the volleyball team ought to have some

3    substantial period of time to operate without the sword

4    hanging over its head, that that would be a fair remedy in

5    view of the discrimination that's occurred, to give,

6    provide some assurance that the volleyball players and

7    other women athletes will have genuine equality of

8    athletic opportunity at Quinnipiac.

9            THE COURT:  All right.

10           MR. ORLEANS:  If I could just have a minute to

11   go over my notes, Your Honor?

12           THE COURT:  Yes.  I asked Mr. Brill several

13   questions about the Investigators Manual, who counts, NCAA

14   versus Title IX.  I don't know if you want to comment on

15   any of that.

16           MR. ORLEANS:  Well, the Investigators Manual,

17   Your Honor, we agree with the thrust of your questions.

18   We think that both Investigators Manuals, the 1980 and the

19   1990, you know, were created to guide nonlawyer

20   investigators in the discovery of appropriate information

21   and the development of recommendation that would then be

22   reviewed at higher levels before final determinations were

23   issued.

24           They are informative.  We don't deny that they

25   are informative, but they are not authoritative, they are

1    not written by policy officials of OCR and they weren't

2    intended to be policy interpretive documents.  So we

3    essentially agree with you.

4         I would just comment in passing that we don't

5    agree with the defendant that Val Bennett's treatise is an

6    authoritative treatise.  You know, she was, like Lamar

7    Daniel, you know, neither of them was a policy making

8    official, they left OCR and they went into business and

9    publishing that book was part of her effort to promote her

10   business, we think.  That 5 percent, in terms of the

11   competition test, that notion that 5 percent is close

12   enough on that particular way of measuring things, that

13   may have made more sense in 1980 something -- was a number

14   that was plucked out of the air.  It's not anywhere in the

15   regulations.  There's no authoritative source for it, so I

16   think we share your view on the Investigators Manuals.

17        THE COURT:  Okay.

18        MR. ORLEANS:  What was your other --

19        THE COURT:  The other one was who counts for

20   purposes of Title IX, whether there's any distinction

21   between who counts for NCAA purposes and Title IX

22   purposes.

23        MR. ORLEANS:  Well, Your Honor observed that,

24   you know, one of the things that NCAA is very concerned

25   about is to make sure that there's not game playing when

1    it comes to scholarships.  So if, for example, a football

2    team gets 85 scholarships, a school shouldn't be able to

3    manipulate its numbers so that it's covertly fielding 86

4    or 87 or 88 scholarship players in order to obtain

5    advantage on the field.  And so, yeah, the NCAA approach

6    to defining participants is a little different.

7              But you know, we think -- I think that this is

8    borne out in Dr. Lopiano's report.  We think that the

9    definition of participant that's in the 1979 policy and

10   interpretation applied with some common sense is the best

11   definition to be used for purposes of Title IX counting.

12   But, you know, you do have to, particularly when it comes

13   to the multi sport athletes, we think you do have to use

14   some common sense and, you know, we think that the Court's

15   approach in the 2010 decision was an example of applying

16   common sense to that definition of participant.

17              THE COURT:  Okay.

18              MR. ORLEANS:  If I could just have a moment to

19   review my notes and I'll see if I have anything more to

20   say.

21              (Pause)

22              MR. ORLEANS:  Your Honor, I think the last thing

23   I would have to say, we think that it, it bears

24   remembering that ultimately the obligation here that the

25   University has is an obligation not to discriminate, and

1      although we bifurcated our claims and tried the equal

2      participation claim first, and the Court entered an

3      injunction that required Quinnipiac to comply with the

4      proportionality requirement of prong one, that, you know,

5      ultimately the University's obligation is to comply with

6      Title IX in all its particulars.

7              And we don't -- I would suggest that there is in

8      the record now evidence that supports a claim that the

9      University is not in compliance on benefits, particularly

10     with respect to competitive facilities and the locker

11     rooms and so forth.

12             But in terms of equitable considerations, we

13     would suggest that it makes sense before letting the

14     University off the hook and allowing it to eliminate the

15     volleyball program, it makes sense to see the result of

16     that second part of the case, because remedial

17     considerations there may react with remedial

18     considerations here.

19             THE COURT:  All right, thank you.

20             MR. ORLEANS:  Thank you, Your Honor.

21             THE COURT:  Mr. Brill?

22             MR. BRILL:  Thank you, Your Honor.  We obviously

23     have the burden of proof and I appreciate the time that

24     Your Honor is devoting to hear this argument.  I don't

25     want to indulge on your time.  I understand you have

 1   around three hours total and I have some things that I
 2   would like to address, including some of the points
 3   Mr. Orleans just made.
 4        THE COURT:  Let me just say, if you expect a
 5   lengthy rebuttal let me just check in with the court
 6   reporter, see if she needs a break.
 7        (Pause)
 8        MR. BRILL:  I think there are some general
 9   principles here and the Court has alluded to them to some
10   extent in the questioning this morning, but some of them
11   have implications far beyond this case and far beyond the
12   question of women's teams.
13        So, for example, the question about when you
14   count the team for purposes of Title IX based on the
15   competition, as both Dr. Lopiano and Ms. Sweet explained,
16   there are many schools that sponsor non-NCAA varsity
17   sports.  For example, U. C. San Diego, their school
18   sponsors a men's rowing team, and the University of
19   California Berkley had a men's varsity rugby team.  It was
20   the only one in the country until recently, and competed
21   against entirely club competition.
22        Now, is the rule going to be that those men's
23   teams don't count for purposes of Title IX?  You would
24   have every women's rights organization in the country
25   jumping up and down saying that's not fair, how can that

1    be that they are sponsoring, they are giving all the

2    support of a varsity team to these 60 rugby players for

3    these 50 rowing players and you're telling them that

4    doesn't count for purposes of Title IX?

5            So, there are implications, not just for on the

6    women's side but for what does it mean to be a varsity

7    athlete or a varsity team that counts for purposes of

8    Title IX?

9            And the question of when you get to that point

10   in counting, what if Quinnipiac had started a bowling team

11   in the same way it started the rugby team and we hired a

12   coach in year one, we recruited people on campus and

13   started off campus recruiting, and the next year there

14   were, we managed to get one new recruit and we had nine

15   varsity athletes who had either bowled previously or had

16   some varsity athletic experience.  Is that different

17   because it's a championship sport?  Or is your rule, the

18   proposed rule that, well, it doesn't count until there's a

19   certain percentage of recruited athletes and then it

20   counts for purposes of Title IX?

21           What about rowing?  Okay, rowing is a NCAA

22   championship sport for women, and the testimony is -- and

23   I think actually Tracey Flynn explained that the NCAA

24   adopted special legislation for rowing because, in truth,

25   virtually all collegiate women rowers never have rowed

1   before they got to college.  And, you know, the vast

2   majority of them are recruited on campus and trained to

3   row.  So could a school say, okay, well, we have this

4   rowing team but it doesn't really count as a varsity team

5   now or until we have 25 percent recruited or 50 percent

6   recruited or the third year?

7          I mean the rules here are somewhat specific to

8   this case but they are also general principles, and I

9   think the clearest principal and the only one that makes

10  sense is to say, look, rugby's an emerging sport, it

11  myself the overall -- there's been no rebuttal of that

12  showing, it meets the overall criteria of the 2008 letter

13  and the participants count.  If it's a varsity sport, the

14  participants count.

15         You have the separate tests.  There's two tests.

16  There's a three part test, there's a two part test.  With

17  respect to the two part test, the assumption is, the

18  assumption is that you don't even have a two part test

19  unless there were some sports that were below the level of

20  the men's teams, right?  The test doesn't say all women's

21  teams must be competing at exactly the same levels as

22  men's teams.  It says there must be substantially similar

23  proportion of women's teams that have similarly advanced

24  competitive opportunity.

25         If you're only talking about the rugby team,

okay, I mean again A and T -- the Court has apparently

reached at least a tentative decision that's not counting

so A and T doesn't count for purposes of the competition

test.  Then what do you have?  You have seven men's teams

that are all Division I, and you have 13, I think, women's

teams, 12 of which are entirely Division I and one of

which is an emerging sport which has three competitions at

Division I, one at Division II and six in one year, the

first year, six club competitions.

And putting aside everything else and the OCR

calculation or our alternative calculation or the Court's

calculation, I think you could look at that and say, you

know what?  This is substantially similar, because if I

don't think this is substantially similar, then I have

to -- you know, what's the rule going to be?

And, look, Dr. -- Ms. Sweet was, I think, very

frank in saying a couple things.  Number one, schools --

yes, the NCAA wanted to encourage schools to start

emerging sports but, frankly, they don't want to start the

sports unless they count for purposes of Title IX because

schools don't have unlimited resources and they want to

put their money into supporting their legal obligations

and so it doesn't make a lot of sense to be supporting

varsity sports that don't get you anywhere for Title IX.

That's number one.

1        Number two, if you had a rule, she said very

2   explicitly if you have a rule that, that you could only

3   compete against other NCAA championship teams, or -- I'm

4   sorry, against other varsity teams in order to count, that

5   would strongly discourage anybody from starting any of the

6   emerging sports.

7        None of that has anything to do with volleyball.

8   These are rules that have to do with, for the OCR purpose

9   and the NCAA, which it has its own rules but it also has

10  to be seen as reflective of hundreds and hundreds and

11  hundreds of institutions throughout the United States that

12  sponsor athletic teams that have gotten together and

13  decided this is how we want to promote women's sports, and

14  the OCR has come on board on that.

15       And I think that if the rule in this case is

16  that rugby doesn't count yet because you don't have enough

17  of a varsity schedule, then you have created a Catch 22

18  because other schools, you know, other schools are going

19  to say, well, we really -- why should we start rugby if it

20  doesn't count yet.  We don't quite know when it's going to

21  count but there's not a lot of varsity teams out there and

22  we're not going to be the next ones that get sued so we'll

23  start bowling, okay, or we'll start something else.

24       And you don't take the safe course.  Quinnipiac

25  didn't take the safe course.  We took a risk.  We didn't

```
 1    take the safe course.

 2              But, the safe course is everybody will just

 3    stick to the existing championship sports, or there may be

 4    some emerging sports that there's enough varsity

 5    competition that, you know, you can have a complete

 6    varsity schedule from day one but that's not the standard

 7    situation.

 8              Look at bowling.  We keep talking about bowling.

 9    For the first five years, there were no more than five

10    schools that sponsored varsity bowling teams.  They were

11    all competing against club teams.  And then it gradually

12    got more and more varsity support and it became a

13    championship sport.  But if the rule is that it doesn't

14    count for purposes of Title IX, for participation

15    purposes, or that, yes, maybe it counts for participation

16    purposes but we'll get you under the competition test,

17    then why would, why would schools take that risk?  Why

18    would they start these emerging sports, especially if the

19    rules are so fuzzy that, well, it may not count the first

20    year but we'll have to see how you do over the next two or

21    three years, or you have only had two recruited athletes

22    the first year and we know that rowing has the vast

23    majority of non-recruited athletes but for rugby, the

24    first year was only two recruited athletes and that's not

25    enough and maybe a year or two from now.
```

1           None of these rules fulfill the purposes of

2    Title IX.  And I'm sorry that Mr. Orleans finds it ironic

3    that we are espousing the goals of Title IX, but I really

4    feel genuinely and sincerely that if you took the

5    testimony of Jacqueline McLearie and even Erin Trotter in

6    acrobatics and tumbling, that these are the types of

7    opportunities that Title IX is supposed to be promoting

8    and they are genuine, they are real sports, they are real

9    varsity teams, they are real athletes.  You know, these

10   are not kids that were dragged out of a sorority house,

11   and to the extent they were, they were kicked off the team

12   in five minutes.

13          So, and even if you look at the biographies of

14   the rugby players, yes, it's true that I think only two of

15   them had played rugby before, but some of them were all

16   state athletes in multi-sports, you know, track champions,

17   basketball, all stars, state high school all stars players

18   in basketball.  Maybe we weren't quite good enough to be

19   on the University Division I basketball team, okay?  But

20   isn't that what Title IX is about, to say you know what?

21   These are real women athletes.  We're going to give you a

22   new sport, new opportunity to express your athletic

23   skills.

24          And I think that's what Quinnipiac has done.  I

25   think it's done it for both acrobatics and tumbling and

1    rugby.  Perhaps it's not there yet for acrobatics and

2    tumbling but it certainly is there for rugby.

3         And I want to talk specifically about the club

4    competition a little bit first.  Their own experts, there

5    was a lot of testimony about club competition, if you

6    recall.  And again, Ms. Sweet was, even Dr. Lopiano to

7    some extent, but Ms. Sweet was very expansive about this,

8    and she said there's nothing wrong with club competition

9    for varsity teams.  The NCAA allows it.  You can't use it

10   to fulfill your minimum number of competition requirements

11   but it's in accordance with NCAA rules, and she said if I

12   was going to evaluate whether a club competition was

13   equivalent to a varsity competition, I'd evaluate it by

14   looking at the factors.  Is there an organized conference?

15   Are there eligibility requirements for the players?  Is

16   there some kind of a post season championship opportunity?

17   Is there -- you know, what about the coaching?

18        Well, in rugby you have a very formal, you know,

19   U. S. organization.  You have organized conference

20   competition.  You have strict liability eligibility rules

21   set by us USA Rugby.  The coaches have to be certified,

22   and there is a championship available.

23        Now, it's true that the coach and the players

24   decided this year not to participant in the metro New York

25   post season play off because they chose rather to have

1    additional varsity competition, but that's -- under the

2    2008 letter, that's not even a factor.  I mean the letter

3    says if the team participates in post season competition,

4    is it consistent with other post season competition in

5    terms of having progressive championships in the regional

6    and state and national level and so on.  So the absence of

7    the championship really can't be the deciding issue here.

8    In fact -- well, I mean certainly not in the absence of a

9    NCAA championship, because by definition emerging sports

10   don't have that.

11            I don't know whether the Court wants me to

12   address the issue of track participant counting because we

13   attached a chart to our brief which I think made clear

14   that these were bona fide track athletes who happened to

15   be injured, 10 of the 13, and the other three left the

16   team.  They were on the team on the first date of

17   competition and they legitimately left for personal

18   reasons in two cases and one because she was declared

19   ineligible.

20            But I do want to call the Court's attention to

21   Exhibit Two -- not Exhibit Two, I'm sorry, Exhibit J W

22   which is the OCR guidance which the Court may recall we

23   put into evidence on the last day of the trial after --

24   over objection.

25            First of all, there was some contention by the

1    plaintiffs that these were some low level functionaries at

2    the OCR.  Well, in fact I looked it up on the website, and

3    it's available to the Court.  Mr. Katski (ph), who's the

4    Chief Legal Officer of OCR; Ms. Michaels is head of the

5    unit which I believe is the unit that deals with athletic

6    issues, and they are the two people that are on this

7    email.  She reports to Mr. Katski.  So this is not just

8    some functionary sending out an informal letter.

9            And if you look at pages three and four of the

10   letter, and I think since I asked for the Elmo to be

11   turned on, maybe this would be a good opportunity to use

12   it.  The question is provided student athletes are given

13   true participation opportunities on cross country, indoor

14   and outdoor track teams, does OCR stand by the 1996

15   clarification and count participants on each of these

16   teams separately for purposes of participation?  And I've

17   highlighted the key sentences.

18           First, OCR considers each student athlete who

19   was given true participation opportunities on cross

20   country, indoor track and outdoor track teams as being

21   afforded three distinct participation opportunities for

22   purposes of Title IX.

23           And, lastly, OCR counts the number of genuine

24   participants in each sport utilizing the definition of

25   participants outlined in the 1979 policy interpretation

1    and the 1996 clarification.

2            So, there's no, there's no separate rule about

3    multi-sport athletes in track and field, and to the extent

4    that Dr. Lopiano said there was, I think as the Court

5    recognized, it was based on this completely inapplicable

6    NCAA rule about scholarships that frankly, frankly wasn't

7    in her expert report this time; she didn't even apply that

8    rule the last time.  If you go back and look at her

9    counting and her testimony in the last trial, she didn't

10   say anything about any different rule for multi sport

11   athletes.  She counted everybody on those teams whether

12   they competed or not.  It was the Court's ruling that

13   excluded the 11 or track -- I think it was 11 cross

14   country athletes on the track and field teams because of a

15   requirement that the Court found existed and which there's

16   no evidence that requirement exists anymore.  I mean the

17   plaintiffs have said we have don't really believe it but,

18   again, evidence is evidence and just to say you don't

19   believe that the requirement is gone is not the basis for

20   making a finding, or especially for continuing an

21   injunction.

22            THE COURT:  Let me just make sure I understand

23   the University's position.  If an athlete is -- a cross

24   country athlete breaks her leg during a cross country

25   season, she's listed on the indoor track roster but is

1    unable to do anything, she's literally on crutches, does

2    she count?

3         MR. BRILL:  Well, I would say, of course there

4    was no indication of anybody in that circumstance, but I

5    would say yes, under these circumstances.  As the coach

6    said two or three days a week they do lifting which is

7    upper body work, and somebody who has a broken leg can

8    participate in that aspect of the practices.

9         And, more importantly, if somebody has a broken

10   leg but is a member of the team in every other respect,

11   who comes to the practices, there's coaching that goes on

12   at the practice.  Let's say this person is a 400-meter

13   runner and the coaches, and as Coach Martin said, if

14   someone's injured, I take that time to talk to them and

15   say, you know, let's look at the film how you did in such

16   and such a race and you made your move here, you should

17   have waited another 50-yards to make your move, or this is

18   the program I want you to be working on over the next two

19   weeks while you continue your rehabilitation.

20        They travel with the team to the meets.  They

21   attend all the team meetings.  They participate in all

22   team activities.  Yes, I think that person counts.  And

23   they couldn't do those things if they were not actually a

24   member of the indoor track team.  It's different than

25   other sports.  I mean it is different.  That's why OCR

1     kind of renewed its guidance just earlier this year.

2              So that's the hypothetical, but the fact is

3     that, Coach Martin testified that in most of these

4     circumstances, these weren't women that were completely

5     debilitated from participating even in the physical

6     activities of practice.  And the fact that they in some

7     cases -- why does it make sense to say that someone who is

8     injured during the indoor reason season but is working and

9     starting to run, rehabilitating and competes in the

10    outdoor season and competed in all previous years as a

11    track athlete doesn't count?  Either they are on the

12    roster or they are not.  And it's never been the rule in

13    any sport that an injured athlete has to be removed from

14    the roster.  That's just not the way, that's not way it

15    works.

16             So my answer is yes, if they are getting the

17    intangible benefits of being on the team, they count, and

18    they don't have to compete and if they are physically, if

19    they are permanently physically disabled and they can no

20    longer participate in the sport, that's one thing.  But if

21    they have an injury, they are rehabilitating while they

22    participate on the team, I think there's no question they

23    count as participants.  They count.  They would in any

24    other sport.

25             The issue is Dr. Lopiano has said I'm applying

1    different rules to track and field, but talk about

2    plucking something out of the thin air, I mean that comes

3    from nowhere and certainly is not what OCR's position is.

4         I want to talk a little bit about some of the

5    equitable factors that Mr. Orleans mentioned.  He said it

6    was unfair to the present members of the team, it was too

7    late.  Well, I can say two things about that.  We tried to

8    have a hearing earlier, and this was the time that the

9    plaintiffs said everybody was available and it was

10   scheduled with the, I think with the explicit, not even

11   implicit, understanding that the purpose of the hearing

12   now was to enable the Court to make a decision in time for

13   the University to eliminate the sport before the coming

14   academic year if that were to be permissible under the

15   Court decision.

16        And in addition, I believe the evidence is in

17   the record that Mr., Dr. Thompson testified that we have

18   agreed to continue the scholarships for all of the women

19   who are currently on the volleyball team.  There's going

20   to be no negative impact on them whatsoever with respect

21   to their scholarships, and anyone who chooses to transfer,

22   you know, they would have the opportunity to transfer, but

23   as long as they are at the University, they have their

24   scholarships protected.

25        In addition, there's hardly a brief that's filed

1    here or an argument that's made when we don't hear about

2    years of discrimination, and I'm sorry, the Court's -- the

3    Court's 2009 decision on the preliminary injunction did

4    not find, did not find discrimination had occurred for

5    prior years or even for the 2008, 2009 year that was being

6    looked at.

7          What the Court said was I'm not confident that

8    Quinnipiac will be able to meet its roster numbers as

9    projected for 2009, 2010 because of the manipulation that,

10   the incorrect counting that it had found.  And, therefore,

11   since I don't trust those numbers for next year I'm going

12   to enter a preliminary injunction.  There was no finding

13   of discrimination in the past.  There was no finding of

14   discrimination in the past in the 2010 trial.

15         What the 2010 trial found was in that single

16   year, in the one year that was at issue, there was a

17   discrepancy of 3.62 percent, a number that I will never

18   forget, 3.62 percent.  That is hardly massive

19   discrimination, okay?  I mean it was enough to justify

20   this Court in issuing an injunction, but for the

21   plaintiffs to continue to talk about a history of

22   discrimination, it just -- you know, it's one of those

23   things where sometimes you think if somebody repeats it

24   enough, it has the air of accepted truth?  It's not --

25         THE COURT:  You're not asserting, are you, that

1    the roster management regime that I had trouble with in my

2    earlier rulings appeared out of whole cloth that year?

3            MR. BRILL:  Yes, because the testimony was that

4    the University in 2007, 2008 introduced roster management

5    for the first time.  First time ever.  And it had not

6    relied on proportionality before, it hadn't had a roster

7    management plan before, and there were some coaches that

8    didn't get it.  Okay?  And whether you think they were

9    nefarious or, as Dr. Thompson said, they did it because

10   they didn't have the heart, some of the men's coaches

11   didn't have the heart to cut the players from the team,

12   whatever.

13           It wasn't -- there's no evidence that that was

14   some kind of -- it couldn't have been historical practice

15   because they didn't even have roster targets prior to that

16   point.  So yes, it appeared, it appeared not out of whole

17   cloth but it appeared out of the introduction of a new

18   system that the coaches didn't get.  And whatever

19   happened, but more importantly --

20           THE COURT:  It happened because there were

21   problems otherwise there would be problems with the

22   numbers.

23           MR. BRILL:  Well, I mean I don't want to go back

24   and reargue that, okay?  But whatever happened then, the

25   truth is that the University then changed the system, they

 1    put Dr. Thompson in charge, he took personal control of

 2    the rosters.  This Court found in 2010 there was no more

 3    evidence of that roster manipulation.

 4            THE COURT:  I understand.

 5            MR. BRILL:  And so the issue is how much longer

 6    do we have to bare the burdens of, you know, that issue

 7    that occurred four or five years ago now and is that

 8    really a grounds for equitably continuing an injunction?

 9            And particularly let me say this:  When they

10    talk now about it would be fair to have some long term

11    extension of the volleyball team, we had trial on the

12    merits and what the Court said was you have to continue

13    the volleyball team for at least one year.  So, there

14    wasn't any, you know, there wasn't a finding then based on

15    that 3.62 percent disparity, which we think is now gone,

16    that the volleyball team was entitled to five years, ten

17    years or any particular length of time more than one year.

18            And I just, I want to say one more thing about

19    rugby and the passage of the 2010 decision that Mr.

20    Orleans read because I think that rugby does meet, that

21    rugby does come within that passage.  It is in every sense

22    a team that has a schedule that meets the participant's

23    abilities.  It's not competing against high school

24    athletes.  It's not competing against, as the Court found,

25    against sideline cheer teams that come and compete for two

1    and-a-half minutes once each year.

2            And the Court did say, and this, I think, this

3    is maybe even the nub of the entire problem, okay?  The

4    Court did say no other university team played against

5    varsity, against non-varsity competition.  That was

6    something that was pointed out with respect to -- by the

7    way, A and T does now compete against all varsity

8    competition.  I couldn't restrain myself from something

9    something more about A and T.

10           THE COURT:  Not just all varsity, all of the

11   varsity competition.

12           MR. BRILL:  Yes.

13           THE COURT:  Right.

14           MR. BRILL:  Right.  And the rugby team obviously

15   is the only team that has some non-varsity competition,

16   but I come back again to what Ms. Sweet said and what to

17   me is self evident, that if the rule has to be that you

18   compete only against varsity teams, then you make it

19   almost impossible for any school to add emerging sports

20   under these circumstances.

21           And to say that Quinnipiac is different because

22   we eliminated the volleyball team, I mean to use one of

23   Dr. Lopiano's favorite phrases, that's like mixing up

24   apples and oranges because the question of the volleyball

25   team really went to the participation issue and whether we

were meeting Prong I and how many participation

opportunities we had for women, and the rugby team, if the

rugby team counts and we think it does, then the issue is

how does that affect the overall competition level for

women?  The competition test is a program-wide test.  You

can't flunk the competition test based on a single team.

You just can't do it.  You look at the entire program.

        And so rugby, the rugby participants count, the

question is whether the fact that rugby has 60 percent,

six of ten competitions, below varsity level, whether that

brings the entire University out of compliance with the

competition test.  And I just conclude by saying I don't

think that's a sensible way to apply the competition test.

I think that any such ruling would have very pernicious

consequences for emerging sports and would, I think,

result in, you know, quite apart from Quinnipiac, I think

would result in a situation where no schools in the future

would be, would have the encouragement to start these new

emerging sports for the fear that, you know, that they are

going to be held out of compliance with Title IX.

        Because let's face it, it's not, this is not a

situation of schools adding sports over and above their

proportionality requirement, or schools -- there were some

suggestion in the trial brief of the plaintiffs about how,

well, you could count emerging sport for Prong II instead

1    of Prong I.  That's doesn't make sense.  It's either a

2    sport for purposes of Title IX or it's not a sport.  And

3    whether a school is relying on Prong I or Prong II, it

4    needs to know it can rely on that sport for purposes of

5    counting.

6            Whether these plaintiffs say, you know, other

7    schools don't have to worry because we're not going to be

8    out there suing, well, who's to say that some other school

9    is going to be so confident that if they add an emerging

10   sport in order to achieve proportionality and in order to

11   comply with Prong II, that they wouldn't be vulnerable to

12   some other group of plaintiffs and I think it's important

13   to have certainty here.  It's important to have certainty

14   and it's important to -- it's important not just for

15   Quinnipiac, it's important for -- it's important for the

16   whole concept of encouraging and supporting these new

17   sports.

18           And as I said, the question -- this is my final

19   comment, I'll assure the court reporter -- the question of

20   volleyball is really a different issue, and just think of

21   it this way.  If we had, if putting apart any issue of the

22   injunction and this lawsuit, if Quinnipiac had in 2009, if

23   it had substituted golf or volleyball and eliminated the

24   men's sports that it eliminated, maybe it eliminated

25   another men's sport, maybe -- and two years later we added

1    an emerging sport, two years later we added rugby, the

2    same issue, the same issue of competition test would

3    apply.  Right?

4            I mean, as I said earlier, the question of the

5    level of competition is really not related to the issue of

6    the elimination of the volleyball team except in the most

7    broad sense that, well, we're violating Title IX in some

8    way and maybe the volleyball team should be continued.

9            And we think as a matter of equity and fairness

10   that Quinnipiac has sought in good faith to implement its

11   compliance plan, which had at least some small blessing by

12   the Court, and it went about it in a way that adopted an

13   NCAA emerging sport which had the imprimatur of not just

14   the NCAA but the OCR as counting.  And we think it does

15   count for purposes of Prong I and we think we should not

16   be held to be in compliance -- out of compliance with

17   Title IX because of the competition test, which would

18   really thwart that whole effort.  Thank you, Your Honor.

19           THE COURT:  All right, thank you both.

20           MR. ORLEANS:  Thank you, Your Honor.

21           THE COURT:  This is going to take me a while to

22   get this written but I'll get it to you as quickly as I

23   can.  Thank you.  We'll stand in recess.

24           (Whereupon the above matter was adjourned at

25   11:55 o'clock, p. m.)

C E R T I F I C A T E


        I, Susan E. Catucci, RMR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.



        /S/ Susan E. Catucci
        _____

            Susan E. Catucci, RMR
            Official Court Reporter
            915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
              Tel: (917) 703-0761