**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

STEPHANIE BIEDIGER, KAYLA
LAWLER, ERIN OVERDEVEST,
KRISTEN CORINALDESI, and LOGAN
RIKER, individually and on behalf of all
those similarly situated, and ROBIN
LAMOTT SPARKS, individually,
      Plaintiffs,

      v.

QUINNIPIAC UNIVERSITY,
      Defendant.

No. 3:09-cv-621 (SRU)

**RULING ON DEFENDANT'S MOTION TO LIFT INJUNCTION**

## TABLE OF CONTENTS

**I. Introduction**………………………………………………………………………1

**II. Findings of Fact**……………………………………………………............4

   A. Women's Golf……………………………………………………………..5

   B. Women's Acrobatics and Tumbling (Formerly Competitive Cheer)…………......5

   C. Women's Rugby………………………………………………………………14

   D. Women's Indoor and Outdoor Track…………………………………………19

   E. Quinnipiac's Counting of Athletic Participants……………………………22

**III. Standard of Review**………………………………………………………26

   A. Standard for Modifying or Dissolving Injunctions………………………………26

   B. Title IX:  Statutory and Regulatory Background………………………………30

     1. *The Statute*………………………………………………………………30

     2. *The Regulations*………………………………………………………………30

     3. *The Policy Interpretation*……………………………………………………33

       a. The Three-Part Test………………………………………………35

       b. The Levels-of-Competition Test………………………………………37

     4. *The Policy Clarifications*……………………………………………………38

       a. Substantial Proportionality (Prong One of the Three-Part Test)……………39

         i. *"Participants" Defined*……………………………………………40

         ii. *"Participation Opportunities" Defined*……………………………42

       b. Equivalent Competition (Prong One of the Levels-of-Competition Test)...48

       c. Summary………………………………………………………………57

**IV. Conclusions of Law**………………………………………………………60

   A. Substantial Proportionality (Prong One of the Three-Part Test)…………………61

     1. *Countable "Participation Opportunities"*……………………………………61

       a. Women's Golf………………………………………………………61

       b. Women's Acro………………………………………………………63

         i. *Recognition by the NCAA or Other Authorities*…………………64

         ii. *Intrinsic Factors*……………………………………………66

         iii. *Extrinsic Factors*………………………………………………67

         iv. *Conclusion*………………………………………………………69

       c. Women's Rugby………………………………………………………70

         i. *Recognition by the NCAA or Other Authorities*…………………70

         ii. *Intrinsic Factors*……………………………………………72

         iii. *Extrinsic Factors*………………………………………………72

         iv. *Conclusion*………………………………………………………76

       d. Women's Indoor and Outdoor Track……………………………………79

         i. *Runners Who Were Injured and Did Not Compete*………………80

         ii. *Runners Who Quit the Team and Did Not Compete*……………82

     2. *Calculating "Substantial Proportionality"*……………………………………84

   B. Equivalent Competition (Prong One of the Levels-of-Competition Test)………...86

   C. Equitable Considerations……………………………………………………91

**V. Conclusion**………………………………………………………………96

## I.  Introduction

The year 2012 marked the fortieth anniversary of the sex discrimination statute known as

Title IX.  *See* Education Amendments of 1972, Pub. L. No. 92-318, Title IX, §§ 901-907, 86

Stat. 235, 373-375 (codified at 20 U.S.C. § 1681, *et seq.*).  Born of congressional concerns about

"'massive, persistent patterns of discrimination against women in the academic world,'"

*McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004) (quoting 118 CONG.

REC. 5804 (1972) (statement of Sen. Bayh)), the law prohibits educational institutions that

receive federal funds from engaging in sex-based discrimination in the programs and activities

they sponsor, including athletics.  In the two score years since its enactment, Title IX has

marshaled significant change in public attitudes about, and opportunities for, women in sport.

Yet despite that progress, "Title IX has not ended the long history of discrimination against

females in sport programs; many educational institutions continue to place male sport programs

in a position of superiority."  *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 916 (7th

Cir. 2012).  Indeed, this case demonstrates that, even forty years later, Title IX still has promises

to keep.

In March 2009, defendant Quinnipiac University ("Quinnipiac" or the "University")

announced plans to trim its athletics budget for the 2009-10 academic year by, *inter alia*,

eliminating its women's volleyball team and creating a new varsity women's sport: competitive

cheerleading.[1]  Shortly thereafter, the plaintiffs, members of the Quinnipiac women's volleyball

team and their coach,[2] filed suit alleging that Quinnipiac's proposed actions violated Title IX and

---

[1] The University also decided to cut the men's golf and track teams, and employed an aggressive roster management program for its remaining teams.

[2] Plaintiffs Stephanie Biediger, Kayla Lawler, Erin Overdevest, Kristen Corinaldesi, and Logan Riker were varsity volleyball players, and plaintiff Robin Lamott Sparks was their coach.

the regulations promulgated to enforce it.[3]  Although the plaintiffs asserted multiple theories under Title IX, the case was bifurcated so that plaintiffs could proceed to trial on their primary claim first: that Quinnipiac discriminated on the basis of sex in its allocation of athletic participation opportunities.

Following a bench trial in June 2010, I concluded that Quinnipiac discriminated on the basis of sex during the 2009-10 academic year by failing to provide genuine athletic participation opportunities in numbers substantially proportionate to its female undergraduate population. *Biediger v. Quinnipiac Univ.*, 728 F. Supp. 2d 62, 64 (D. Conn. 2010).  That conclusion was principally based on two subsidiary determinations.  First, I determined that the University's competitive cheerleading team did not qualify as a varsity sport for purposes of Title IX and, therefore, its members could not be counted as athletic participants under the statute.  *Id.* at 99-101.  Although I indicated that "[c]ompetitive cheer may, some time in the future, qualify as a sport under Title IX," I ultimately concluded that the activity was, at present, "too underdeveloped and disorganized to be treated as offering genuine varsity athletic participation

---

The plaintiffs have since withdrawn all claims asserted on behalf of Sparks, individually.  *See* Stipulation of Dismissal of the Claims of Robin Lamott Sparks (doc. # 284).

[3] On May 22, 2009, I granted the plaintiffs' motion for a preliminary injunction, holding that the manner in which Quinnipiac managed its varsity rosters—by setting artificial ceilings for men's varsity teams and floors for women's varsity teams—deprived female athletes of equal athletic participation opportunities.  *See Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277 (D. Conn. 2009).  Thereafter, on May 20, 2010, I certified the following class of plaintiffs seeking injunctive relief, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure:

> All present, prospective, and future female students at Quinnipiac University who are harmed by and want to end Quinnipiac University's sex discrimination in: (1) the allocation of athletic participation opportunities; (2) the allocation of athletic financial assistance; and (3) the allocation of benefits provided to varsity athletes.

*Biediger v. Quinnipiac Univ.*, No. 09cv621 (SRU), 2010 WL 2017773, at *8 (D. Conn. May 20, 2010).

opportunities for students." *Id.* at 64.  Second, although cross-country, indoor track, and outdoor track are treated as separate sports, I determined that Quinnipiac could not count all female runners who participated in cross-country, indoor track, and outdoor track three separate times. Quinnipiac's practice of requiring female cross-country runners to participate on the indoor and outdoor track teams, and its treatment of track essentially as an adjunct of cross-country, demonstrated that certain cross-country runners who were injured or red-shirted during the indoor and outdoor track seasons should not be counted under Title IX because their experiences on the track teams did not amount to genuine athletic participation opportunities.[4]  *Id.* at 107-08.

Having found Quinnipiac in violation of Title IX, I permanently enjoined the University from continuing to discriminate against its female students by failing to provide equal athletic participation opportunities.  *Id.* at 114.  Because cutting then-current women's varsity teams would only exacerbate the problem, I also ordered that Quinnipiac not eliminate its women's volleyball team, at least until the University implemented changes sufficient to bring it into full compliance with Title IX.  *Id.*  That decision, and the legal framework it adopted, was later affirmed on appeal.  *See Biediger v. Quinnipiac Univ.*, 691 F.3d 85 (2d Cir. 2012).

Quinnipiac has now moved to lift the injunction pursuant to Federal Rule of Civil Procedure 60(b).  Quinnipiac claims that changes to its athletics program over the past two years have brought the school into statistical compliance with Title IX and, as a result, the injunction should no longer have prospective application.  A bench trial on Quinnipiac's motion was held in June 2012.  Based on the trial testimony, the parties' stipulations, and the admitted exhibits, the following constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule

---

[4] I also found that, based on the evidence produced at trial, Quinnipiac was no longer engaged in the same roster manipulation that spurred my preliminary injunction order.  *Biediger*, 728 F. Supp. 2d at 110.

of Civil Procedure 52(a).  For the reasons explained below, Quinnipiac's motion to lift the

injunction (doc. # 225) is DENIED.

## II.    Findings of Fact

Quinnipiac University is a private, coeducational institution located in Hamden,

Connecticut.  Quinnipiac is a member of the National Collegiate Athletic Association

("NCAA"[5]), and belongs to the NCAA's most competitive athletic division: Division I.[6]  The

University competes in the Northeastern Conference ("NEC"), a regional intercollegiate athletics

organization to which ten other Division I schools belong.  When this case commenced in 2009,

Quinnipiac sponsored seven men's varsity teams—baseball, basketball, cross-country, ice

hockey, lacrosse, soccer, and tennis—alongside twelve women's varsity teams—basketball,

competitive cheerleading, cross-country, field hockey, ice hockey, indoor track and field,

lacrosse, outdoor track and field, soccer, softball, tennis, and volleyball.

---

[5] Founded in 1906, the NCAA is the largest organization of intercollegiate athletic
programs in the nation, with more than 1,100 member schools.  *See* Expert Report of Judith
Sweet, at 3 (Pls.' Ex. 202) ("Sweet Report").  The NCAA establishes rules and policies that
govern most aspects of its members' varsity athletic programs, including recruitment,
scholarship allocation, and competitive scheduling.  The association currently sponsors national
championships in nineteen men's sports as well as twenty women's sports, and has adopted
official rules of play for each of those sports.  *See id.*

[6] Generally speaking, the NCAA's membership is divided into three separate competitive
divisions:  Division I, Division II, and Division III.  Division I represents the highest level of
varsity athletic competition, and schools must undergo a rigorous certification process in order to
join its ranks.  For example, Division I schools must meet the NCAA's minimum requirements
in the number of sports sponsored for men and women, the number of athletic scholarships
awarded, the process for recruiting athletes, and the amount of financial resources committed to
the school's overall athletics program.  *See* Sweet Report at 4.  Division II and III schools are
subject to fewer requirements and commit fewer resources to athletics.  Accordingly, Division II
and III teams compete at a lower level of competition.  *Id.*  Lastly, some smaller four-year
colleges that lack the resources for NCAA membership, but still wish to offer intercollegiate
athletics, join the National Association for Intercollegiate Athletics ("NAIA"), which functions
as a separate governing organization for approximately 350 institutions.  NAIA schools,
however, typically compete at a substantially lower level than NCAA Division I schools.  *Id.*

In response to this court's July 21, 2010 decision, Quinnipiac implemented the following changes to its athletic program:  (1) the addition of a varsity women's golf team; (2) the further cultivation of competitive cheer as a developing sport, having renamed the activity "acrobatics and tumbling"; (3) the addition of a varsity women's rugby team; and (4) the adoption of a written policy that no student athlete would be required to join additional teams in order to participate in her sport of choice—or more specifically, that women's cross-country athletes would no longer be required to participate in women's indoor and outdoor track.  The scope and effect of those changes are examined in some detail below.

A.   Women's Golf

Quinnipiac created a varsity women's golf team in the 2010-11 academic year.  The plaintiffs do not seriously challenge the quality of athletic participation opportunities that women's golf provides—and for good reason.  Golf is a full-fledged NCAA-championship sport, and is universally recognized as providing a legitimate intercollegiate varsity experience. Moreover, as established at trial, Quinnipiac's golf team appears to enjoy all the trappings of a varsity sport:  the team is led by an experienced coach who receives an operating budget from the University; the coach conducts off-campus recruiting; the University provides scholarships to aid in recruiting athletes; the team competes against other collegiate varsity teams; the team practices for competitions; and the University provides athletes on the team with myriad other benefits that come with being a varsity athlete, such as academic support, medical assistance, training, and opportunities for community service.

B.   Women's Acrobatics and Tumbling (Formerly Competitive Cheer)

Throughout the 2010-11 and 2011-12 academic years, the University has continued to develop its competitive cheerleading program, which, as noted above, has now been

denominated "acrobatics and tumbling" ("acro").  To fully understand and evaluate what acro

has become, discussion of its background and origin will be helpful.

In years past, Quinnipiac sponsored a women's sideline cheerleading team that performed

at men's basketball games and occasionally entered competitions against other schools.

Following the 2008-09 academic year, however, Quinnipiac decided to transform its traditional

cheerleading team into a new women's varsity sport for the exclusive purpose of competition, a

sport it aptly named: "competitive cheer."  As I explained in a previous ruling:

> Competitive cheer is an outgrowth of traditional sideline cheerleading.
> Competitive cheer teams use many of the moves and techniques that sideline
> cheer squads have developed over the decades, and their routines look like more
> athletic and aerobatic sideline cheer orchestrations. But whereas sideline
> cheerleaders primarily work to entertain audiences or solicit crowd reaction at
> other teams' games or school functions, competitive cheer teams strictly engage
> in sport.  Participants do not perform for a crowd's approval or involvement –
> they compete to win.

*Biediger*, 728 F. Supp. 2d at 78.  Thus, in contrast to traditional sideline cheerleading,

competitive cheer "emphasize[s] the more gymnastic elements of sideline cheerleading, such as

aerial maneuvers, floor tumbling, and balancing exercises, to the exclusion of those activities

intended to rally the watching audience."  *Id.*

To encourage the development of competitive cheer, Quinnipiac helped create a nascent

intercollegiate organization, the National Competitive Stunt and Tumbling Association

("NCSTA"), with seven other schools: the University of Maryland, Fairmont State University,

the University of Oregon, Azusa Pacific University, Baylor University, Fort Valley State

University, and Ohio State University.  Five of these schools—Quinnipiac, Maryland, Fairmont

State, Oregon, and Azusa Pacific—sponsored varsity competitive cheer squads for the 2009-10

academic year; the other three were planning to sponsor a varsity team in the near future.  The

NCSTA was formed independent of the NEC or any other athletic conference.

- 6 -

Following a series of organizational meetings, the NCSTA eventually defined the sport's four positions: flyers, who are thrown in the air and perform various spins and flips; back spots, who provide support and are responsible for directing groups on a team; and main and support bases, who are responsible for supporting and lifting flyers.  In addition, the NCSTA developed an initial set of rules for its competitions.  A team's score is a composite of six discrete events: the stunt, tumble, pyramid, basket toss, partner stunt, and team events.  The scoring system is based on pre-determined start difficulty values, a system akin to gymnastics.  Teams select the routine that their players will perform in each event, and whether the teams meet that score depends on the quality and accuracy of their execution.  Final scores are determined by a panel of judges.

Despite its athletic elements and embryonic organizational structure, competitive cheer/acro is not recognized as a sport by the NCAA.  Nor does the NCAA recognize competitive cheer/acro as an "emerging sport," a provisional designation that allows a university to count the activity toward NCAA revenue distribution and minimum sports sponsorship requirements.  NCAA Manual §§ 20.02.4-.02.5 (Def.'s Ex. JX).[7]  Furthermore, the Department of Education has not recognized competitive cheerleading/acro to be a sport, and schools reporting their athletic participation data under the Equity in Athletics Disclosure Act

---

[7] The NCAA adopted the "emerging-sport" designation in the early 1990s to encourage the growth and development of new intercollegiate sports for women.  A school's sponsorship of an emerging sport counts toward membership minimums and revenue distribution requirements.  Although the NCAA does not sponsor a national championship for emerging sports, teams must still abide by many of the same NCAA regulations that apply to full-fledged NCAA-championship sports.  Moreover, once an emerging sport has shown sufficient growth, the sport may be upgraded to NCAA-championship status.  But, on the other hand, if an emerging sport fails to add enough varsity teams over the course a ten-year provisional period, it may lose its emerging-sport status altogether.  *See* Sweet Report at 10-12.

("EADA")[8] are instructed not to report their cheerleading rosters unless they have received a letter from the Department of Education's Office of Civil Rights determining that their cheer squads are legitimately engaged in sport.  *See* Dep't of Educ., Office of Postsecondary Educ., The User's Guide for the Equity in Athletics Act Web-Based Data Collection (2009), at 19, 21, attached as Ex. L to Expert Report of Donna Lopiano (Pls.' Ex. 201).  To date, the agency has never issued a letter counting cheerleading or acro as a varsity sport.

Following a bench trial in June 2010, this court joined that near-uniform consensus, concluding that Quinnipiac's competitive cheerleading program was not—at least not yet—an intercollegiate varsity sport for purposes of Title IX.  Apart from the lack of recognition by the NCAA and other authorities, my determination was based on the structure, administration, team preparation, and competitive schedule of the cheer program.  Specifically, I identified three pivotal shortcomings that distinguished cheer from every other Division I varsity team sponsored by the University: (1) the head coach's inability to engage in off-campus recruiting; (2) the team's erratic regular season, which was marred by inconsistency in terms of the rules of play and the quality of opponents, including events against club and even high-school teams; and (3) the team's perfunctory post-season competition, which consisted of an open invitational tournament that did not rank, seed, or exclude teams on the basis of their regular season record, and imposed new rules of competition not followed during the regular season.  *Biediger*, 728 F. Supp. 2d at 99-100.  As I stated in that decision, "[a]lthough I have *only identified three areas* where the University falls short, those areas are highly important, if not essential, to the experience of participating on an intercollegiate varsity team."  *Id.* at 100 (emphasis added).

---

[8] The EADA is a law separate from Title IX that requires an educational institution receiving federal funding and participating in intercollegiate athletics to report its athletic participation data for men and women to the Department of Education.  20 U.S.C. § 1092(g).

Unfortunately, Quinnipiac mistook my narrow ruling for a three-point blueprint for turning its budding competitive cheer team into a fully-blossomed intercollegiate varsity sport. The University spent the last two years tweaking its cheer—now "acro"—program to remedy each of the specific elements I previously identified as deficient.  As a result of recent changes, which I will examine below, Quinnipiac now argues that the team not only has a new name, but new prospects for recognition as an intercollegiate sport as well.

To Quinnipiac's credit, a number of its efforts over the past two years have been successful.[9]  First, the acro team's head coach, Mary Ann Powers, began off-campus recruiting for the first time in June 2010 and continued to do so throughout the 2010-11 and 2011-12 seasons.  Trial Tr. at 315-30.  Although the NCAA does not recognize acro as a varsity sport, Coach Powers nevertheless tailored her recruitment efforts to NCAA standards.  Those efforts paid off, and the talents of several recruited athletes were added to the ranks of Quinnipiac's team.  *Id.*

Second, the acro team's regular season benefited from more consistency in the rules of play and the quality of opponents.  Since July 2010, the NCSTA has changed its name to the National Collegiate Acrobatics and Tumbling Association ("NCATA"[10]), and has developed

---

[9] Consistent with factual findings from my previous decision, the evidence at trial generally showed that Quinnipiac continues to provide the acro team with benefits similar to those provided to other varsity teams, including: (1) an operating budget and coaching staff roughly equivalent to other varsity teams; (2) eligibility for awards and recognition; (3) equipment, medical treatment, strength and conditioning training, academic support, community service, and publicity on par with other varsity teams; and (4) regular practice regimens consistent with other teams' schedules.  Moreover, despite the fact that the NCAA does not recognize acro as a varsity sport, the team still followed applicable NCAA rules, such as requiring all participants to be cleared by Quinnipiac's medical staff before competing and following practice time restrictions.  For example, team practice was limited to eight hours in the off-season and twenty hours during the regular season, including competitions.

[10] It was the governing body's decision to change its name to the NCATA that prompted

into a more cohesive governing body with its own set of bylaws, rules, and policies. *See* NCATA Bylaws Code and Conduct (Def.'s Ex. IA); NCATA Rules and Policies (Def.'s Ex. IB); NCATA Code of Points (Def.'s Ex. IC). The NCATA has also partnered with USA Gymnastics, which now sanctions all NCATA competitive events. As a result of this improved structure, for the 2010-11 and 2011-12 seasons, all of acro's meets were governed by a consistent set of rules under the NCATA format.[11] Further, during both seasons, acro competed solely against college-level varsity opponents.[12] *See* Trial Tr. at 339-42.

Third, the opportunity for a genuine post-season championship improved in the past two years. During the 2010-11 and 2011-12 academic years, Quinnipiac's acro team participated in a progressive-style championship under the same NCATA rules that governed regular season play. Although the NCATA championship remains an open invitational in which every acro team in the country participates, teams are now seeded according to their regular season records. *See id.* at 249-51.

But despite these incremental improvements in structure, administration, and scheduling, crucial elements of Quinnipiac's acro program remain unchanged and continue to distinguish the

_____

Quinnipiac to retitle its cheer program "acrobatics and tumbling."

[11] Under the NCATA's revised rules, two to four teams compete in each meet, which consists of six discrete events: (1) compulsories; (2) acro; (3) pyramid; (4) toss; (5) tumbling; and (6) the team event. Teams submit their skill sequences a week prior to the meet. For each heat, the maximum score is ten, and the combination of heat scores will result in the overall score for the event. The combination of event scores results in the meet totals. *See* NCATA Code of Points (Def.'s Ex. IC); Trial Tr. at 230-34.

[12] In 2010-11, the team participated in five discrete regular-season events, which were scored as six different competitions, as well as a national championship sponsored by the NCATA. Trial Tr. at 343-44. In the 2011-12 season, the team participated in six regular-season events, which were scored as ten competitions, prior to heading to the national championship. *Id.* at 344; A&T Competition Schedule – 2011-12 (Def.'s Ex. IG). Quinnipiac's acro program scored no overall wins this past season, but the team did take home the top score in the pyramid

team from other Division I varsity sports.

First and foremost, the NCAA still has not recognized acro—or any other cheer-derivation—as an intercollegiate varsity sport. And without that recognition, acro lacks what every other varsity men's team sponsored by Quinnipiac enjoys: the chance to participate in an NCAA-sponsored championship. *Id.* at 397. Judith Sweet, the plaintiffs' sports administration expert, testified credibly that the experience NCAA championships provide is considered "the top of the mountain" by student athletes, and championships sponsored "by other organizations don't have the same financial resources, and the quality of experience is not the same." *Id.* at 438; *see also* Expert Report of Judith Sweet, at 11 (Pls.' Ex. 202) ("Sweet Report").

Second, the NCATA's recent efforts to win NCAA recognition for acro as an emerging sport have proved fruitless. In December 2010, the NCATA submitted its first emerging-sport proposal to the NCAA's Committee for Women's Athletics ("CWA"), the organization responsible for determining whether a newly-developed sport receives provisional recognition as an emerging sport. *See* Trial Tr. at 267-68; NCATA Emerging Sport Submission (Def.'s Ex. IE). But the NCATA's proposed format ignited a schism of sorts within the competitive cheer community, which has since splintered into two competing factions with two very different visions of the sport. One faction, led by the NCATA and its membership, has rallied behind the acro format, which emphasizes the gymnastic elements of cheer. The other faction, led by a for-profit entity known as USA Cheer, has put forward a rival format called "STUNT," which places greater emphasis on the performance-based aspects of traditional cheerleading competitions. *See* Trial Tr. at 259-60, 275-76; 293-95. Tensions mounted, and in a direct challenge to acro's viability, STUNT submitted its own emerging-sport proposal to the CWA using its preferred

event final. Trial Tr. at 390.

format.[13]

Confronted with competing proposals for cheer-based sports, the CWA held both proposals in abeyance and instructed the NCATA and STUNT to resolve their differences and resubmit a joint proposal. *See id.* at 283, 293-95. Unfortunately, the two sides failed to reach an agreement, and in 2011, both the NCATA and STUNT once again submitted competing emerging-sport proposals. *Id.* at 295; NCATA Emerging Sport Supplemental Submission (Def.'s Ex. ID).

As a result of that discord, acro's prospects of qualifying as an NCAA emerging sport in the foreseeable future have dimmed considerably since 2010. The ongoing rivalry between the NCATA and STUNT means that the structure of this nascent sport will remain in flux, as some schools adopt one format while others adopt the competing format. Moreover, under NCAA rules, before a putative sport can be recognized as an emerging sport, there must be at least twenty collegiate-level varsity or competitive club teams in existence. *See* Criteria for Emerging Sports, attached as Ex. 6 to Sweet Report.[14] But due, in part, to competition from STUNT, there are currently too few teams operating under the NCATA's format to support acro as an emerging sport. During the 2011-12 academic year, only six universities sponsored acro teams: Azusa Pacific University, Baylor University, Fairmont State University, the University of Maryland, the University of Oregon, and Quinnipiac. *See* Trial Tr. at 227. One of those schools—Maryland— has decided to cancel its acro program at the end of the season. *Id.* In 2012-13, the five

---

[13] STUNT also sponsors its own national championship, separate from acro. *See* Trial Tr. at 941.

[14] Moreover, before the CWA will even consider an emerging-sport proposal, at least ten NCAA-member schools must submit letters of commitment, signed by the president and athletic director, stating that the school already sponsors or intends to sponsor a team in that sport. *See* Criteria for Emerging Sports, attached as Ex. 6 to Sweet Report.

remaining schools as well as two others—the University of Massachusetts Dartmouth and

Plymouth State University—are expected to sponsor acro programs, bringing the total to seven.

*Id.* at 228.  Even looking ahead to 2013-14 and beyond, only three additional schools—

Alderson-Broaddus College, Kennesaw State University and Shorter University—have provided

letters of commitment, bringing the total to ten.[15]  *Id.* at 228, 287-88.  With so few programs in

existence, there is uncertainty whether acro will be recognized as an emerging sport any time

soon.

Third, although Quinnipiac's acro team competed exclusively against collegiate varsity

opponents over the past two seasons, there was significant variation in the declared division level

among those opponents.  In the 2011-12 academic year, for example, Quinnipiac competed

against five different teams (i.e., every other acro team in existence).  Of those teams, three

belonged to NCAA Division I (Baylor, Maryland, and Oregon); one belonged to NCAA Division

II (Fairmont State); and one belonged to the NAIA (Azusa Pacific).  *See* A&T Competition

Schedule – 2011-12 (Def.'s Ex. IG); Trial Tr. at 346-47.  Of Quinnipiac's ten regular-season

competitions, only six were against fellow NCAA Division I opponents.  Put differently, forty

percent of Quinnipiac's regular-season meets were against teams below their declared division

level.  By comparison, one-hundred percent of Quinnipiac's men's teams competed one-hundred

percent of the time against fellow Division I teams; not one men's varsity team played a single

regular-season game against below-division opponents.  *See* Lamar Daniel Rebuttal Report, at 6-

7 (Def.'s Ex. HZ).

Lastly, although Coach Powers recruited some athletes off campus, recruitment strategies

for a developing sport like acro differ from recruitment strategies for established varsity sports.

---

[15] According to Quinnipiac, there are no acro club teams in existence at the present time.

Because no high school in the country—or indeed the world—currently sponsors an acro program, *see* Trial Tr. at 278, 367, Coach Powers' recruiting efforts were limited to seeking out student-athletes with a patchwork of skill sets derived from diverse athletic backgrounds, including cheerleading, gymnastics, acrobatics and other sports. *Id.* at 315, 323-25, 327-29. None of these athletes, however, had any experience competing under the acro format. Thus, unlike every men's sport at Quinnipiac, Coach Powers was unable to recruit athletes for acro based on their mastery of the specific sport for which they were being recruited. Rather, the coach could only infer whether a recruited athlete's training in other sports prepared her to compete effectively in acro.

    C.   <u>Women's Rugby</u>

In the 2011-12 academic year, Quinnipiac began sponsoring a new varsity women's rugby team. Although Quinnipiac's team is new, the sport of rugby has been played for about 175 years. Rugby combines elements of football, track, and soccer into a high-intensity sport in which players attempt to move the ball forward, but—somewhat counter-intuitively—are only permitted to pass the ball backwards or sideways. *See* Trial Tr. at 571.

Rebecca Carlson was hired as Quinnipiac's head coach for rugby in October 2010, and immediately went to work recruiting athletes and preparing the program for its first competitive season, scheduled to commence in less than a year. *Id.* at 572. Carlson testified that one of the most attractive elements of rugby is the large roster size a single team can support, making the sport much cheaper for a university to sponsor. *Id.* at 673. Thus, part of her preparations included sending campus-wide emails and hosting a series of informational meetings to spread the word about women's rugby. Over the course of the year, Carlson met with approximately

---

*See* Tr. of Closing Arg. (June 28, 2012) at 54.

sixty female students who expressed interest in playing varsity rugby.  *See id.* at 573-76.  But after putting these students' athletic abilities to the test in a series of open tryouts, Carlson eventually whittled down the number of participants by more than half.  *Id.* at 576-577; *see also* First Date of Competition Squad Lists 2011-12 (Def.'s Ex. HO).

Carlson became NCAA-certified to recruit off campus in February 2011, and conducted some off-campus recruiting in the months that followed.  To that end, she traveled to observe top-ranked high school rugby club teams, and contacted high school coaches for information about various athletes in other sports with skills transferable to rugby.  Trial Tr. at 580.  Those efforts yielded moderate success:  Carlson recruited three rugby players for the 2011-12 academic year, two of whom ultimately joined Quinnipiac's team.  *Id.* at 581-82.  Quinnipiac also allocated a total of six scholarships to the team, though less than one-third of those funds were actually awarded to rugby athletes in 2011-12.  *Id.* at 584.  The remainder was reserved for future recruits.

Apart from Quinnipiac, only four other colleges in the country sponsor varsity women's rugby:  Bowdoin College, Eastern Illinois University, Norwich University, and West Chester University.  *Id.* at 572.  Just one of those institutions—Eastern Illinois—is designated as Division I.[16]  As a result, the rugby team spent most of its inaugural season playing club teams, rather than varsity opponents.  Generally speaking, club teams operate at a lower level of competition and receive less institutional support than do varsity teams.  *See* Sweet Report at 4.  Club teams typically receive little or no funding from a school's athletic program, and must seek out alternative sources of support from student government or recreation departments to supply

---

[16] The other colleges are designated as follows:  Bowdoin College (Division III), Norwich University (Division III), and West Chester University (Division II).  Trial Tr. at 572.

coaching, equipment, and training.  *Id.*  During the 2011-12 regular season, Quinnipiac's rugby

team competed in a total of ten matches.  *See* Rugby 2011-12 Competition Schedule (Def.'s Ex.

JP).  Six of those matches were against collegiate club teams.  Only four were played against

varsity teams.  *Id.*

Women's rugby is currently recognized by the NCAA as an "emerging sport," which

means that the NCAA does not sponsor any post-season competition, but the sport is otherwise

subject to many of the same structural and administrative requirements as full-fledged NCAA-

championship sports.  *See* Sweet Report at 10.  Moreover, schools sponsoring women's rugby

may count their teams toward membership minimums and revenue distribution under NCAA

regulations.  *Id.*

But women's rugby's future within the NCAA is, at best, uncertain.  Under NCAA rules,

emerging-sport status is merely a provisional designation, and an emerging sport can lose that

status if it fails to garner enough support from member institutions.  Specifically, an emerging

sport risks removal from the list if, after a period of ten years, it fails to add enough varsity teams

to make adequate progress toward promotion to NCAA-championship status.  *Id.* at 12; *see also*

NCAA Manual § 20.02.4.2 (Def.'s Ex. JX) ("A sport shall no longer be considered an emerging

sport once the sport has been established as a championship sport.  Further, an emerging sport is

limited to a 10-year time period to become a championship sport unless it can be demonstrated

that steady growth has occurred during that time.").  The NCAA's initial list of emerging sports,

released in the early 1990s, originally included nine sports: crew, ice hockey, team handball,

water polo, synchronized swimming, archery, badminton, bowling, and squash.  Of those sports,

more than half have been removed from the list due to lack of growth, including team handball,

synchronized swimming, archery, badminton and squash.[17]  *See* Sweet Report at 10.

Rugby was added to the emerging-sports list in 2002, and has therefore reached the sunset of its ten-year provisional period.  Yet despite ten years on the list, a meager five schools—including Quinnipiac—currently sponsor rugby as a varsity women's sport. Quinnipiac, moreover, is the only Division I school that has added varsity women's rugby since the sport was added to the list.  *Id.* at 13.  By way of comparison, women's squash was stripped of its emerging-sport status when it reached the ten-year mark in 2011, even though forty-eight schools sponsored varsity teams.  *Id.*  Similarly, synchronized swimming was removed when, after ten-years, eleven schools sponsored teams.[18]  With only five varsity teams in existence, rugby appears to be in serious danger of losing its emerging-sport status in the very near future. *Id.*

Moreover, no school in the NEC—the regional conference in which every other Quinnipiac team, except acro, competes—sponsors women's rugby.  *See* Trial Tr. at 625-27. Therefore, Quinnipiac's team competes in a separate regional league known as the Metropolitan New York Rugby Football Union ("Metro NY"), which operates under the auspices of USA Rugby, the sport's national governing body.[19]  *Id.* at 587-89.  Although Quinnipiac's women's

---

[17] Women's crew, ice hockey, water polo, and bowling have since been promoted to NCAA-championship sports after meeting minimum sponsorship requirements.  *See* Sweet Report at 10.

[18] Badminton was removed from the list despite sponsorship by fifteen schools, and archery was removed with eight schools participating.  After adding no new varsity teams over ten years, team handball was removed as well.  *See* Sweet Report at 13.

[19] Coach Carlson testified, however, that USA Rugby has since divided its former territorial units into what it now calls conferences.  Thus, beginning in the 2012-13 academic year, Quinnipiac's rugby team will compete in a conference known as the "Tri-State Conference."  Trial Tr. at 588.

rugby team is designated a varsity team, every other team competing in Metro NY is a collegiate

club team.  Indeed, not one other varsity team participates in Quinnipiac's competitive region.

*Id.* at 590.

Although the NCAA does not sponsor any post-season contests in women's rugby, USA

Rugby sponsors its own national collegiate championship.  *Id.* at 567, 663-64.  To qualify, teams

must first win their regional playoffs, such as the Metro NY regional.  From there, a team must

win the conference championship—here, USA Rugby's Northeast Conference—to qualify for

the national tournament.  *Id.* at 604.  Although Quinnipiac qualified for the playoffs this past

season, the rugby team did not compete, apparently for two reasons.  First, as a result of an ice

storm, Metro NY decided to cancel the playoffs for the 2011-12 season, and instead sent the

highest ranking team—which was not Quinnipiac—to the conference tournament.  *Id.* at 605.

But even in the absence of ice, Quinnipiac's team had already decided to skip the regional

playoffs—and, as a result, to forgo any chance at competing for USA Rugby's national

championship.  Due to Quinnipiac's competition schedule, participating in the Metro NY

regional playoff would have precluded the team from competing in matches against two of the

four other varsity rugby teams currently in existence:  Eastern Illinois and West Chester.  *Id.* at

605.  Carlson testified that her team could not give up those crucial varsity games.  *Id.*

Quinnipiac has since altered its schedule for future seasons to avoid similar conflicts, but

it remains to be seen whether Quinnipiac's rugby team will ever compete in the regional

playoffs, even in years to come.  According to Coach Carlson, the current format of the regional

and conference tournaments—a format in which teams play a series of matches over three

consecutive days—is simply too unsafe for her players.  *Id.* at 606, 663-65.  Carlson testified

that, for safety reasons, she will not allow her players to compete in any regional or conference

post-season tournaments so long as those tournaments are structured as back-to-back competitions in a single weekend.  *Id.* at 606, 666.

    D.    <u>Women's Indoor and Outdoor Track</u>

During the 2010-11 and 2011-12 seasons, Quinnipiac continued to field four running teams: men's cross-country, women's cross-country, women's indoor track, and women's outdoor track.  All four teams are coached by Carolyn Martin, who was promoted to the head-coaching position in 2009.  As head coach, Martin is responsible for, *inter alia*, training her athletes, preparing them for meets, managing the teams' budgets and operations, and recruiting team members.

Historically, Quinnipiac has emphasized cross-country over its other running sports, and this past year, the University's women's cross-country team won its seventh NEC title.  *See id.* at 517.  Quinnipiac cross-country meets and practices are conducted on campus, but the University has neither an indoor nor an outdoor track for competition.  Instead, indoor and outdoor track athletes must compete off campus at a local high school.  The University's indoor track team practices on a track in the school's recreation center, but the outdoor track team practices off campus.

The NCAA recognizes cross-country, indoor track, and outdoor track as three different sports for purposes of athletic eligibility.  NCAA Manual § 14.2.3.3 (Def.'s Ex. JX).  Each sport imposes its own set of rules and each competes for its own separate championship.  Furthermore, the sports have distinct competitive seasons; cross-country competes in the fall, indoor track in the winter, and outdoor track in the spring.  Coach Martin, however, has traditionally required her female cross-country athletes—even those who suffered injuries during prior seasons—to join the ranks of the indoor and outdoor track teams as well.  On that basis, I previously

concluded that Quinnipiac could not double or triple count, for purposes of Title IX, injured or red-shirted cross-country athletes who were forced to sign up for indoor and outdoor track but did not—and physically could not—compete in any track events.  *Biediger*, 728 F. Supp. 2d at 106-07.  Quinnipiac's compulsory participation policy smacked of roster manipulation, and "raise[d] questions as to whether simultaneous participation on the women's cross-country, indoor track, and outdoor track teams at Quinnipiac represented three genuine athletic opportunities, or whether cross-country runners' mandated participation on the indoor and outdoor track teams was simply a form of alternative off-season training for the cross-country runners, one that allowed Quinnipiac to inflate the rosters of its women's indoor and outdoor track teams."  *Biediger*, 691 F.3d at 99.

In the 2010-11 academic year, however, Quinnipiac implemented a new policy: "No student is required to participate in one sport in order to participate in a different sport."  Notice to Athletes Re: Requirement (Email from J. MacDonald), at 2 (Def.'s Ex. HK).  Thus, in accordance with that policy, Coach Martin no longer mandates that her cross-country athletes participate in track, too.  *See* Trial Tr. at 511, 793.

Although Martin no longer *requires* that her cross-country runners join track, many of her athletes continue to do so, even when pre-season injuries might preclude those athletes from actually competing in track meets.  According to Martin, running sports have the highest rate of injury among all intercollegiate sports.  *Id.* at 532.  Therefore, if an athlete is injured in one running sport (such as cross-country), it is not Martin's practice to cut that athlete from other teams (such as indoor or outdoor track) if the athlete still wishes to participate.  *Id.*

According to Quinnipiac's roster count, during the 2011-12 seasons, thirty-two female athletes participated in indoor track and twenty-nine participated in outdoor track.  *See* Lamar

Daniel Expert Report, at 28-31 (Def.'s Ex. HY).  Of those runners, approximately seven indoor

track athletes and eight outdoor track athletes did not compete during the regular season due to

injury.  Moreover, a total of three indoor track players quit the team shortly after the start of the

team's regular competitive season, without participating in a single track event.  *Id.* at 28-29.

 Martin testified that, during the indoor and outdoor track seasons, all of the athletes listed

on the team rosters practiced, even if they were not scheduled to compete in an upcoming meet.

Trial Tr. at 529-30.  Injured players were responsible for participating during practice—although,

depending on the severity of injury, their practice time often consisted of physical therapy,

strength training, conditioning, and other rehabilitative exercises, rather than running.  *Id.* at 530-

33.  All of the athletes, however, were expected to attend team meetings and competitive events.

All track team participants were also entitled to coaching, equipment, and other athletic benefits,

such as travel and per diem costs for away meets, as well as scholarship aid.

 According to Martin's recollections, all of the injured track team members regularly

practiced with the team, even though they did not compete.  *See id.* at 536-54.  Quinnipiac's

athletic department, however, failed to keep any written record of attendance at team practices,

despite an NCAA requirement to maintain such records.  *See id.* at 840; 905-07.  Therefore, there

is no documentary evidence whatsoever to corroborate Martin's testimony concerning her

memory of individual participation rates.[20]

 Martin also testified that injured runners regularly attended track competitions.  That

testimony was corroborated—at least to some degree—by Martin's score sheets for each track

---

[20] There is reason to doubt Martin's memory.  During trial, Martin testified that it was
"hard for [her] to recall all the athletes" and that "it's hard to keep track of everything" related to
coaching four different running teams over the course of the academic year.  Trial Tr. at 778.
Indeed, without some written record, I think it unlikely that anyone could recall with accuracy
individual players' practice-participation rates over the course of an entire season.

event, which indicated whether individual runners were injured or redshirted during the meet.
*See* Martin Spreadsheets (Def.'s Ex. JL).

      E.    Quinnipiac's Counting of Athletic Participants

      The University currently sponsors seven men's varsity athletic teams and fourteen
women's varsity athletic teams, including, *inter alia*, women's volleyball, women's cross-
country, women's indoor track, women's outdoor track, women's golf, women's rugby, and
women's acro. Dr. Mark Thompson, Quinnipiac's Senior Vice President for Academic and
Student Affairs, is responsible for the operation of the athletics department and supervises the
University's roster management program. Since 2009, Thompson has maintained oversight for
setting roster targets for Quinnipiac's varsity teams and ensured that coaches adhere to those
targets. Coaches seeking to add or remove athletes from their teams for any reason must first
seek approval from Thompson.

      Lamar Daniel, the defendant's Title IX expert, submitted a report in which he analyzed
the total number of "participants" in Quinnipiac's athletic program in 2011-12. Purporting to
rely on agency interpretations and practices under Title IX, Daniel defined "participants" as:

      (1) those individuals whose names appear on the NCAA official eligibility
      lists at the time of the first competition;

      (2) those individuals whose names are added to the NCAA official
      eligibility lists after the first competition during the season;

      (3) those individuals who practice and/or compete during the regular
      season;

      (4) those individuals who receive athletic financial assistance who are
      red-shirted[21] for medical or other reasons but have eligibility remaining;

---

[21] A "red-shirt" refers to an athlete taking advantage of the NCAA regulation permitting
an athlete to remain on a team but not compete for a year without losing a year of athletic
eligibility. *See* NCAA Manual § 14.2.1 (Def.'s Ex. JX) (requiring Division I athletes to
complete four years of eligibility within five years). An athlete may red-shirt a year because of

(5)  those individuals who left the team for disciplinary or other reasons
but continue to receive athletic financial assistance and are eligible to compete
under NCAA rules; [and]

(6)  those individuals who enroll and/or practice during the nontraditional
seasons[22] only if they receive athletic financial assistance.

Lamar Daniel Expert Report, at 4 (Def.'s Ex. HY).  Conversely, Daniel explained that

"participants" are not:

(1)  those who are fifth-year students whose eligibility has expired but still receive
athletic financial assistance;

(2)  those who are medically exempt, i.e., who receive athletic financial assistance
but cannot participate because of career-ending injuries;

(3)  those who enroll and/or practice during the nontraditional season unless they
receive athletic financial assistance for the period; [and]

(4)  those who try out and quit or are cut prior to the first contest of the regular
season.

Id.  Applying this definition, Daniel examined Quinnipiac's squad lists for 2011-12 and verified

the participant count through interviews with the head coaches of each varsity team sponsored by

the University.  Id.  Daniel's results are summarized in the following table.

| SPORT | MALE PARTICIPANTS | FEMALE PARTICIPANTS |
|---|---|---|
| Acro | NA | 36 |
| Baseball | 31 | NA |
| Basketball | 16 | 15 |
| Field Hockey | NA | 22 |
| Golf | NA | 11 |
| Ice Hockey | 28 | 27 |
| Lacrosse | 44 | 30 |
| Rugby | NA | 28 |

injury or in order to conserve a year's eligibility while practicing and improving his or her skills.

[22] A sport's "nontraditional" season is the season in which a sports team practices and
plays, but in which no championship competition is held in the sport.  See Lamar Daniel Expert
Report, at 4 n.3 (Def.'s Ex. HY).

| | | |
|---|---|---|
| Softball | NA | 16 |
| Soccer | 25 | 26 |
| Tennis | 11 | 11 |
| Cross-country | 13 | 24 |
| Indoor Track | NA | 32 |
| Outdoor Track | NA | 29 |
| Volleyball | NA | 14 |
| **TOTALS** | **168** | **321** |

*Id.* at 2.

According to Quinnipiac, in the 2011-12 academic year, the University had an undergraduate enrollment of 5,988 students, of which 2,253 (or 37.6%) were male, and 3,735 (or 62.4%) were female. Comparing those enrollment statistics with the calculations summarized above reveals that Quinnipiac's total number of athletic participants included 168 male athletes (or 34.4%) and 321 female athletes (or 65.6%). The University's counting, if accurate, demonstrates that Quinnipiac's athletic participation rates for 2011-12 were not only proportional to the University's female undergraduate enrollment, but were in fact over-weighted in favor of women by approximately three percentage points.[23]  *Id.* at 4-5.

---

[23] Quinnipiac also submitted raw numerical data regarding its enrollment for the 2010-11 academic year, without any accompanying expert analysis. According to those estimates, 5,869 students were enrolled in the University's undergraduate program in 2010-11, of which 2,159 (or 36.85%) were male, and 3,700 (or 63.15%) were female. Based on the varsity rosters for the first day of teams' competitions, 161 male athletes and 303 female athletes participated during the academic year. Using those first-day-of-competition figures, in 2010-11 male athletes made up 34.7%, and female athletes 65.3%, of the University's varsity athletes.

Although I have taken these additional statistics into consideration, I base my decision on the participation count from the 2011-12 academic year, partly because experts on both sides focused their analysis on the 2011-12 numbers, and because "[n]umbers from the current or most recent, complete competitive season provide the most representative quantification of participation opportunities presently offered." *Cohen v. Brown Univ.*, 879 F. Supp. 185, 203-04 (D.R.I. 1995), *rev'd in part on other grounds*, 101 F.3d 155 (1st Cir. 1996).

Daniel also analyzed the competitive schedules within Quinnipiac's varsity athletics program for 2011-12.  The charts below provide the total number of competitive events and the division level of opponents for men's and women's teams.

## Men's Teams

| MEN'S TEAMS | NCAA DIVISION I | NCAA DIVISION II | NCAA DIVISION III | NAIA | CLUB | TOTAL EVENTS |
|---|---|---|---|---|---|---|
| Baseball | 52 | 0 | 0 | 0 | 0 | 52 |
| Basketball | 29 | 0 | 0 | 0 | 0 | 29 |
| Cross-country | 7 | 0 | 0 | 0 | 0 | 7 |
| Ice Hockey | 34 | 0 | 0 | 0 | 0 | 34 |
| Lacrosse | 17 | 0 | 0 | 0 | 0 | 17 |
| Soccer | 17 | 0 | 0 | 0 | 0 | 17 |
| Tennis | 22 | 0 | 0 | 0 | 0 | 22 |
| **TOTALS** | **178** | **0** | **0** | **0** | **0** | **178** |

## Women's Teams

| WOMEN'S TEAMS | NCAA DIVISION I | NCAA DIVISION II | NCAA DIVISION III | NAIA | CLUB | TOTAL EVENTS |
|---|---|---|---|---|---|---|
| Acro | 6 | 2 | 0 | 2 | 0 | 10 |
| Basketball | 29 | 0 | 0 | 0 | 0 | 29 |
| Cross-country | 7 | 0 | 0 | 0 | 0 | 7 |
| Field Hockey | 18 | 0 | 0 | 0 | 0 | 18 |
| Golf | 10 | 0 | 0 | 0 | 0 | 10 |
| Ice Hockey | 33 | 0 | 0 | 0 | 0 | 33 |
| Lacrosse | 15 | 0 | 0 | 0 | 0 | 15 |
| Rugby | 3 | 1 | 0 | 0 | 6 | 10 |
| Soccer | 17 | 0 | 0 | 0 | 0 | 17 |
| Softball | 53 | 0 | 0 | 0 | 0 | 53 |
| Tennis | 24 | 0 | 0 | 0 | 0 | 24 |
| Indoor Track | 7 | 0 | 0 | 0 | 0 | 7 |
| Outdoor Track | 7 | 0 | 0 | 0 | 0 | 7 |
| Volleyball | 25 | 0 | 0 | 0 | 0 | 25 |
| **TOTALS** | **254** | **3** | **0** | **2** | **6** | **265** |

*See* Lamar Daniel Rebuttal Report, at 6-7 (Def.'s Ex. HZ).  As can be seen above, Quinnipiac's

men's teams played all of their regular season contests against Division I opponents.  Only

women's teams—specifically, acro and rugby—played against teams ranked below Quinnipiac's

declared division level.  Nonetheless, on the basis of these statistics, Daniel opined that the

University is now in compliance with Title IX.

The plaintiffs' competing Title IX expert, Dr. Donna Lopiano, submitted a report of her

own in which she challenged Daniel's calculations.  *See* Expert Report of Donna Lopiano (Pls.'

Ex. 201).  Lopiano argues that Daniel's methodology for counting "participants" under Title IX

conflicts with agency regulations.  Specifically, Lopiano contends, *inter alia*, that:  (1) acro

athletes should not be counted as participants because the acro program still does not qualify as

an intercollegiate-level varsity sport under the statute; (2) rugby athletes similarly should not be

counted because the rugby team, though clearly engaged in "sport," is currently operating at a

club, rather than varsity, level of competition; and (3) two- and three-sport runners—i.e., athletes

who participated in cross-country, as well as indoor track and/or outdoor track—who did not

actually compete in multiple sports should not be double- or triple-counted.[24]  Moreover,

Lopiano argues that Daniel failed to appropriately assess the levels of competition that

Quinnipiac offers its male and female athletes program-wide.  In Lopiano's view, if the proper

methodology is applied, Quinnipiac's 2011-12 athletic program still fails to meet Title IX's

gender-equity requirements.

### III.  Standard of Review

A.  Standard for Modifying or Dissolving Injunctions

I begin with a brief overview of the law of injunctive remedies, and the standards

---

[24] Lopiano also challenges Daniel's counting of two rugby athletes, since neither was
cleared to compete under NCAA rules until the last competition of the season.  *See* Trial Tr. at

governing their modification.  Generally speaking, "[a]n injunction is an equitable remedy issued

under established principles which guide courts of equity."  *Sierra Club v. U.S. Army Corps of*

*Eng'rs*, 732 F.2d 253, 256 (2d Cir. 1984).  Injunctions come in two basic varieties:  preliminary

and permanent.  A preliminary injunction (including a temporary restraining order), as the name

suggests, is issued to preserve the status quo while the parties await a final determination on the

merits.  *Id.*  A permanent injunction, in contrast, is issued only after a merits hearing, and

generally "may not be changed in the interest of the defendants if the purposes of the litigation as

incorporated in the decree have not been fully achieved."  *Id*. (citing *United States v. United*

*Shoe Machinery Corp.*, 391 U.S. 244, 248 (1968)).

Injunctive decrees are creatures of equity, and equity governs their dissolution.  *See*

*United States v. Eastman Kodak Co.*, 63 F.3d 95, 101 (2d Cir. 1995) ("[T]he power of a court to

modify or terminate a consent decree is, at bottom, guided by equitable considerations.").  For

preliminary injunctions, the decision whether to modify or dissolve the order "involves an

exercise of the same discretion that a court employs in an initial decision to grant or deny a

preliminary injunction," *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 141 (2d Cir.

2005), and that "discretion is measured by whether the requested modification effectuates or

thwarts the purpose behind the injunction."  *Sierra Club*, 732 F.2d at 257 (citing *Chrysler Corp.*

*v. United States*, 316 U.S. 556, 562 (1942)).  For permanent injunctions, however, Federal Rule

of Civil Procedure 60(b)(5) provides that the final order may be vacated or modified on "just

terms" when "applying [the order] prospectively is no longer equitable."  Fed. R. Civ. P.

60(b)(5).  The Rule supplies "a means by which a party can ask a court to modify or vacate a

judgment or order if 'a significant change either in factual conditions or in law' renders

---

909.

continued enforcement 'detrimental to the public interest.'"  *Horne v. Flores*, 557 U.S. 433, 447

(2009) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)); *see also In re*

*Joint E. & S. Dists. Asbestos Litig.*, 237 F. Supp. 2d 297, 316 (E.D.N.Y. 2002) (Rule 60(b)(5) is

"based on the historic equitable power of the court to modify its decree in light of changed

circumstances").  The burden to prove such "significant change" rests with the party requesting

relief.  *See Rufo*, 502 U.S. at 383 ("[A] party seeking modification . . . bears the burden of

establishing that a significant change in circumstances warrants revision of the decree.").  In

addition, the moving party generally must show that there has been good-faith compliance with

the order and that it is "unlikely that the [enjoined party] would return to its former ways" if the

order is dissolved.  *Bd. of Educ. of Oklahoma City Pub. Schs. v. Dowell*, 498 U.S. 237, 247

(1991).  However, once "a durable remedy has been implemented, continued enforcement of the

order is not only unnecessary, but improper."  *Horne*, 557 U.S. at 450.

The injunction at issue in this case is a *permanent* injunction, though not necessarily one

intended to remain effective in perpetuity.[25]  Thus, in order to obtain relief from the injunction

---

[25] The injunction order had two main components: (1) "Quinnipiac University and its officers, agents, servants, and employees are permanently enjoined from discriminating against female students on the basis of sex by failing to provide equal athletic participation opportunities"; and (2) "Quinnipiac University shall not eliminate its women's volleyball team." Injunction Order (doc. # 180), at 1.  The order stated that "[t]his injunction shall remain in force pending further court order."  *Id.*  In the accompanying memorandum of decision, however, I indicated that, although Quinnipiac "must commit to sponsoring the women's volleyball team during the 2010-11 season," the University "is not obligated to continue sponsoring the team beyond that point . . . so long as any decision to eliminate women's volleyball is accompanied by other changes that will bring the University into compliance with Title IX."  *Biediger*, 728 F. Supp. 2d at 114.

Thus, although the injunction in this case was issued after a trial on the merits, the component of that order enjoining elimination of the volleyball team was arguably more provisional than it was permanent.  That, in turn, raises the question whether the standard for modifying preliminary, rather than permanent, injunctions should apply.  *Cf. Sierra Club*, 732 F.2d at 257 ("[T]he fact that a hearing was held does not transform [the injunction's] provisional status from one designed to maintain the status quo into a permanent edict. . . . The injunction

order, Quinnipiac must demonstrate the inequity of the order's continued enforcement in light of significantly-changed circumstances.  *See* Fed. R. Civ. P. 60(b)(5); *Horne*, 557 U.S. at 447; *see also Sierra Club*, 732 F.2d at 256 ("[A] court may modify a final or permanent injunction only where conditions have so changed as to make such relief equitable, i.e., a significant change in the law or facts.").

Here, "significant change"—change sufficient to implement a "durable remedy" and justify dissolution of the injunction—means achieving genuine compliance with Title IX, both now and for the foreseeable future.  *See Horne*, 557 U.S. at 447, 450; *Dowell*, 498 U.S. at 247*; see also Evans v. Fenty*, 701 F. Supp. 2d 126, 171 (D.D.C. 2010) ("[A]t a minimum, a 'durable' remedy means a remedy that gives the Court confidence that defendants will not resume their violations of plaintiffs' constitutional rights once judicial oversight ends.").  Thus, before analyzing Quinnipiac's current athletic program, I pause to review the statutory and regulatory framework governing Title IX athletics cases.  Much of the relevant law was fully discussed in

---

was issued as a temporary 'hold' in activity . . . [and, t]herefore, the district court need only have applied the same discretion as it had originally, and not require proof of a significant change in circumstances.").

In my view, however, under the circumstances presented here, there is no meaningful difference between these standards.  Under either standard, the heart of this case is whether Quinnipiac's recent changes to its athletic program are enough to bring the University into full and lasting compliance with Title IX.  Thus, even assuming, *arguendo*, that the order enjoining elimination of the volleyball team was, as a technical matter, more like a preliminary—rather than a permanent—injunction, the discretionary determination whether to dissolve that order would still be guided by the same fundamental inquiry:  Has Quinnipiac demonstrated a "significant change" in the manner in which it allocates genuine varsity athletic participation opportunities to women so that the injunction is no longer warranted?  *See, e.g.*, *Favia v. Indiana Univ. of Pennsylvania*, 7 F.3d 332, 344 (3d Cir. 1993) (addressing motion to modify a preliminary injunction in a Title IX case by analyzing whether the defendant-university had "me[t] its burden of demonstrating a *'significant' change in facts*") (emphasis added).  For this reason, I will apply the "significant-change-in-circumstances" standard to Quinnipiac's motion, despite the fact that—at least with respect to volleyball—the injunction in this case, although "permanent," was never expected to be of indefinite duration.

my previous decision, *see Biediger*, 728 F. Supp. 2d at 87-94, which the Second Circuit has since

affirmed, *see Biediger*, 691 F.3d at 96-108.  I apply that same analysis here.  But Quinnipiac's

motion also raises several novel questions under Title IX—questions for which prior decisions

supply few, if any, answers.  In those instances, I turn to agency regulations, and the canon of

administrative law, for appropriate guidance.

B.   Title IX:  Statutory and Regulatory Background

1.   *The Statute*

Title IX provides, in relevant part: "No person in the United States shall, on the basis of

sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial assistance."

20 U.S.C. § 1681(a).[26]  The statutory language is bold and aspirational, but Title IX's particulars

have mostly been defined by subsequent agency regulations and interpretations.  *See Cohen v.

Brown Univ.*, 991 F.2d 888, 893 (1st Cir. 1993) (stating that Title IX "sketches wide policy lines,

leaving the details to regulating agencies").  Thus, it is to those regulations that I now turn.

2.   *The Regulations*

The Department of Education ("DOE"), the agency tasked with enforcing Title IX, has

established a bipartite regulatory framework for intercollegiate athletics,[27] which requires

---

[26] The term "program or activity" is defined as "all of the operations of . . . a college,
university or other postsecondary institution."  20 U.S.C. § 1687(2)(A).  It is undisputed that
Quinnipiac is such a "program or activity" that receives federal funding and, therefore, is subject
to Title IX's prohibitions.

[27] The Department of Health, Education, and Welfare ("HEW") first promulgated
regulations pursuant to Title IX.  *See generally Cohen*, 991 F.2d at 895 (describing history of
federal regulation of athletics programs under Title IX).  HEW was later separated into the
Department of Health and Human Services ("HHS") and the Department of Education ("DOE"),
and DOE simply replicated those same regulations when it took over enforcement authority for
Title IX.  *Id.*

funding recipients to provide members of both sexes (1) equal athletic financial assistance (scholarships), *see* 34 C.F.R. § 106.37(c)[28]; and (2) equal athletic opportunity, *see* 34 C.F.R. § 106.41(c).[29]

The equal-athletic-opportunity requirement under section 106.41(c) is further subdivided into two component parts: "effective accommodation" and "equal treatment."  *Biediger*, 691 F.3d at 92.  The effective-accommodation component bases Title IX compliance, in part, on

---

[28] Section 106.37(c) provides, in relevant part:

(1) To the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.

(2) Separate athletic scholarships or grants-in-aid for members of each sex may be provided as part of separate athletic teams for members of each sex to the extent consistent with this paragraph and § 106.41.

34 C.F.R. § 106.37(c).

[29] Section 106.41(c) provides, in relevant part:

Equal Opportunity. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
(2) The provision of equipment and supplies;
(3) Scheduling of games and practice time;
(4) Travel and per diem allowance;
(5) Opportunity to receive coaching and academic tutoring;
(6) Assignment and compensation of coaches and tutors;
(7) Provision of locker rooms, practice and competitive facilities;
(8) Provision of medical and training facilities and services;
(9) Provision of housing and dining facilities and services;
(10) Publicity.

34 C.F.R. § 106.41(c).

whether "the selection of sports and levels of competition effectively accommodate the interests

and abilities of members of both sexes." 34 C.F.R. § 106.41(c)(1).  In contrast, the equal-

treatment component, derived from 34 C.F.R. § 106.41(c)(2)-(10), requires "equivalence in the

availability, quality and kinds of other athletic benefits and opportunities provided male and

female athletes."  *Mansourian v. Regents of Univ. of California*, 602 F.3d 957, 964-65 (9th Cir.

2010) (internal quotation omitted).  "Effective accommodation claims thus concern the

opportunity to participate in athletics, while equal treatment claims allege sex-based differences

in the schedules, equipment, coaching, and other factors affecting participants in athletics."  *Id.*

at 965; *see also Boucher v. Syracuse Univ.*, 164 F.3d 113, 115 n.1-2 (2d Cir. 1999)

(distinguishing effective-accommodation claims from equal-treatment claims).  Notably, "'an

institution may violate Title IX solely by failing to accommodate effectively the interests and

abilities of student athletes of both sexes'" even if athletic benefits are provided on an equal

basis, and vice versa.  *Mansourian*, 602 F.3d at 965 (quoting *Kelley v. Bd. of Trs.*, 35 F.3d 265,

268 (7th Cir. 1994)).

Thus, as applied to intercollegiate athletics, the DOE's Title IX regulations provide for a

triumvirate of compliance-related claims:  (1) "scholarship" claims; (2) "effective-

accommodation" claims; and (3) "equal-treatment" claims.  With respect to the instant motion,

however, we are concerned only with effective accommodation under section 106.41(c)(1).  The

plaintiffs' equal-treatment and scholarship claims will be tried separately at a later date.

The regulations set forth above were promulgated according to specific congressional

delegation, *see Cohen*, 991 F.2d at 895 (citing Education Amendments of 1974, Pub. L. No. 93-

380, § 844, 88 Stat. 612 (1974)), and therefore the "'degree of deference is particularly high.'"

*McCormick*, 370 F.3d at 288 (quoting *Cohen*, 991 F.2d at 895).  Moreover, the requirement of

section 106.41(c)(1), that courts consider whether the "selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes" when assessing gender equity in athletics, is a reasonable interpretation of Title IX, to which I must defer. *See Biediger*, 691 F.3d at 96-97.

### 3. The Policy Interpretation

In 1979, the DOE published a policy interpretation, which the department's Office of Civil Rights ("OCR") continues to enforce. *See* Policy Interpretation; Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71,413 (Dec. 11, 1979) (the "1979 Policy Interpretation"). Reflecting the agency's tripartite approach to Title IX compliance issues, the policy interpretation is divided into three separate sections: (1) Athletic Financial Assistance (Scholarships); (2) Equivalence in Other Athletic Benefits and Opportunities; and (3) Effective Accommodation of Student Interests and Abilities. 44 Fed. Reg. at 71,414-71,418.

With respect to the effective-accommodation requirement under section 106.41(c)(1), the policy interpretation provides, in relevant part: "[i]n effectively accommodating the interests and abilities of male and female athletes, institutions must provide *both* the opportunity for individuals of each sex to participate in intercollegiate competition, *and* for athletes of each sex to have competitive team schedules which equally reflect their abilities." 44 Fed. Reg. at 71,418 (emphasis added). Thus, the OCR measures effective accommodation by reference to two separate gender-equity benchmarks:  (1) equity in athletic opportunities; and (2) equity in levels of competition. *Id.* Whether a university meets these dual obligations is determined under two distinct tests, which have come to be known as (1) the "three-part" test; and (2) the "levels-of-competition" test. *Id.* Funding recipients must satisfy both tests to comply with Title IX's mandates. *See McCormick*, 370 F.3d at 301 ("[T]he three-part test relates to participation

opportunities, and a second, two-part test relates to the competitive schedules and opportunities for men's and women's teams."); *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 829 (10th Cir. 1993) ("In addition to assessing whether individuals of both sexes have the opportunity to compete in intercollegiate athletics, the OCR also examines whether the quality of competition provided to male and female athletes equally reflects their abilities."), *cert. denied*, 510 U.S. 1004 (1993); *Cohen v. Brown Univ.*, 809 F. Supp. 978, 991 (D.R.I. 1992) ("Thus, in determining compliance under § 106.41(c)(1), a court must conduct a two step analysis. First, it should apply the three-part test, and second, it should apply the two questions on competitive opportunities. A violation of § 106.41(c)(1) can occur in either one of these two steps, or in both."), *aff'd*, 991 F.2d 888 (1st Cir. 1993).[30]

The first test—the "three-part test"—was the subject of my prior decision, *see Biediger*, 728 F. Supp. 2d at 87-88, and "most Title IX litigation has centered around application of this test." *McCormick*, 370 F.3d at 300. Because I previously concluded that Quinnipiac failed this first test, there was never any need to address the second test. *See Biediger*, 728 F. Supp. 2d at 111-14. Here, however, the plaintiffs contend that, even if Quinnipiac can demonstrate compliance under the "three-part" test, the University's current athletic program, assessed as a

---

[30] The 1979 Policy Interpretation also provides a host of other factors that the OCR will consider when determining overall compliance with Title IX's effective-accommodation requirement. For example, the interpretation states that the OCR will consider how an institution determines the athletic interests and abilities of its students, how it selects the sports it offers, and will make an ultimate determination of compliance based, in part, on whether "disparities in individual segments of the program with respect to benefits, treatment, services or opportunities are substantial enough in and of themselves to deny equality of athletic opportunity." 1979 Policy Interpretation, 44 Fed. Reg. at 71,418. Because I conclude that Quinnipiac has failed to prove compliance with Title IX on the basis of the three-part and/or levels-of-competition tests— or, at the very least, failed to demonstrate a "significant change" in the manner in which it allocates athletic participation opportunities among its male and female students—I need not pass on whether an alleged failure to satisfy these other factors constitutes an independent violation of Title IX.

whole, independently fails under the "levels-of-competition" test.  Therefore, the resolution of

this motion requires that I interpret and apply both tests.

a.   The Three-Part Test

The three-part test assesses whether a university has met its obligation to "effectively

accommodate the interests and abilities of members of both sexes" in one of three ways:

> (1) Whether intercollegiate level participation opportunities for male and
> female students are provided in numbers substantially proportionate to their
> respective enrollments; or
>
> (2) Where the members of one sex have been and are underrepresented
> among intercollegiate athletes, whether the institution can show a history and
> continuing practice of program expansion which is demonstrably responsive
> to the developing interest[s] and abilities of the members of that sex; or
>
> (3) Where the members of one sex are underrepresented among
> intercollegiate athletes, and the institution cannot show a continuing practice
> of program expansion such as that cited above, whether it can be
> demonstrated that the interests and abilities of the members of that sex have
> been fully and effectively accommodated by the present program.

1979 Policy Interpretation, 44 Fed. Reg. at 71,418.  These three "prongs" establish three separate

safe harbors; a school complies with this facet of the effective-accommodation requirement if it

succeeds in meeting any one of them.  *Biediger*, 691 F.3d at 93; *Cohen*, 991 F.2d at 897.  In this

case, Quinnipiac relies *solely* on the first prong, contending that, because it provides athletic

participation opportunities for women in numbers substantially proportionate to its

undergraduate female enrollment, the interests and abilities of its female athletes are effectively

accommodated.  The University does not argue, and has never argued, that it meets this aspect of

Title IX's mandate by satisfying the second or third prongs of the three-part test.[31]

---

[31] In fact, Quinnipiac has vigorously opposed any discovery concerning its pre-2009
practices with respect to women's sports—discovery that would be essential to litigate one or
both of the latter two prongs.  *See* Def.'s Mem. of Law in Opp'n to Pls.' Mot. to Compel, at 2-9

From a defendant's perspective, relying exclusively on prong one—and forgoing proof under prongs two and three—has certain advantages. Compliance under prongs two and three typically requires an extensive evidentiary record concerning a school's past gender-equity practices, history of program expansion for women, and assessment of athletic interests over time. Prong one, in contrast, permits a university to demonstrate gender equity arithmetically, based on its *current* athletic program alone. As one court put it, "a university which does not wish to engage in extensive compliance analysis may stay on the sunny side of Title IX simply by maintaining gender parity between its student body and its athletic lineup." *Cohen*, 991 F.2d at 897-98. Thus, as a matter of litigation strategy, singular reliance on prong one allows a defendant-university concerned about its prior gender-equity record to avoid intrusive discovery on—and public testimony about—the school's history of sex discrimination in athletics.[32]

But putting all your eggs in prong one's basket is also a risky strategy. Under prongs two and three, for example, heightened scrutiny of a school's history of program expansion and accommodation of athletic interest is counterbalanced, to some degree, by increased flexibility in the type and quantity of athletic activities that schools may count toward Title IX compliance. *See Mansourian v. Regents of Univ. of California*, 816 F. Supp. 2d 869, 921 (E.D. Cal. 2011) (noting that prong two "provides institutions flexibility in choosing which teams they add")

---

(doc. # 244).

[32] Indeed, when it comes to histories of gender discrimination in athletics, it is safe to assume that most colleges have skeletons in their closets, because few if any institutions provided female students athletic opportunities on par with their male counterparts at the time of Title IX's enactment. *See* 1979 Policy Interpretation, 44 Fed. Reg. at 71,419 ("Participation in intercollegiate sports has historically been emphasized for men but not women. Partially as a consequence of this, participation rates of women are far below those of men. During the 1977-78 academic year women students accounted for 48 percent of the national undergraduate enrollment (5,496,000 of 11,267,000 students). Yet, only 30 percent of the intercollegiate athletes are women.").

(quotation omitted); *Cohen*, 991 F.2d at 898 (prongs two and three "recognize that there are circumstances under which, as a practical matter, something short of . . . proportionality is a satisfactory proxy for gender balance").  In this regard, however, prong one is much less forgiving.  Pursuant to OCR rules, as explained more fully *infra*, when calculating "substantial proportionality" under prong one, not every purported athletic activity counts as an "intercollegiate level[33] participation opportunity" and not every purported athlete necessarily counts as a "participant."  *See* 44 Fed. Reg. at 71,418 (emphasis added).  Thus, although compliance with prong one typically involves a less-extensive analysis, the requirement that each claimed "participation opportunity" provide a *genuine* intercollegiate-level experience is no less stringent.  *See Biediger*, 691 F.3d at 105 (counting only "the number of *genuine* varsity athletic participation opportunities" when assessing substantial proportionality under prong one) (emphasis added); *Cohen*, 879 F. Supp. at 201-02 ("Because a positive showing on prong one terminates the inquiry, providing a 'safe harbor' for the institution, . . . logic suggests that 'substantially proportionate' must be a standard stringent enough to effectuate the purposes of the statute."); *see also Beasley v. Alabama State Univ.*, 966 F. Supp. 1117, 1124 (M.D. Ala. 1997) ("The test of such substantial proportionality is, however, stringent.").

### b.  The Levels-of-Competition Test

After providing the three-part test for effective accommodation, the 1979 Policy Interpretation goes on to state that:

---

[33] The Policy Interpretation expressly differentiates between so-called "club" teams and intercollegiate "varsity" teams, stating that, "under this Policy Interpretation, club teams will not be considered to be intercollegiate teams except in those instances where they regularly participate in varsity competition."  44 Fed. Reg. at 71,413 n.1.  However, application of the Policy Interpretation is not limited to intercollegiate athletics alone, because "its general principles will often apply to club, intramural, and interscholastic athletic programs, which are also covered by the regulation."  *Id.* at 71,413.

Compliance with this provision of the regulation will also be assessed by examining the following:

(1) Whether the competitive schedules for men's and women's teams, on a program-wide basis, afford proportionally similar numbers of male and female athletes equivalently advanced competitive opportunities; or

(2) Whether the institution can demonstrate a history and continuing practice of upgrading the competitive opportunities available to the historically disadvantaged sex as warranted by developing abilities among the athletes of that sex.

44 Fed. Reg. at 71,418.[34]   In this case, however, Quinnipiac's decision to forgo evidence on its historical allocation of athletic opportunities means that the first prong again provides the only avenue through which the University may claim compliance with Title IX's levels-of-competition requirement.  Quinnipiac does not—and cannot—claim compliance with the second prong.

The Second Circuit has held that courts owe the 1979 Policy Interpretation—and the two-step effective-accommodation analysis described above—a high degree of deference.  *See Biediger*, 691 F.3d at 96 ("[T]he 1979 Policy Interpretation of § 106.41(c) is entitled to a particularly high degree of judicial deference[.]") (internal quotation omitted); *see also McCormick*, 370 F.3d at 300 (applying the 1979 Policy Interpretation's three-part test for determining whether high school districts provided female students with equal athletic opportunities).  I will apply that level of deference here.

### 4. The Policy Clarifications

Over the past two decades, the OCR has published multiple letters clarifying the scope and effect of the three-part test, and the "substantial-proportionality" prong in particular.

---

[34] The interpretation also provides that "[i]f comparisons of program components reveal that treatment, benefits, or opportunities are not equivalent in kind, quality or availability, a finding of compliance may still be justified if the differences are the result of nondiscriminatory

Unfortunately, the same cannot be said of the levels-of-competition test. What follows summarizes the relevant OCR guidance on both the three-part and levels-of-competition tests, with the caveat that the OCR's guiding light shines mostly on the former, and not the latter.

a. Substantial Proportionality (Prong One of the Three-Part Test)

In 1996, the OCR published a letter clarifying the meaning of the first prong of the three-part test: "[w]hether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments." Dep't of Educ., Office for Civil Rights, Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test, at 1 (Jan. 16, 1996) (the "1996 Clarification"). The OCR explained that it analyzes "substantial proportionality" in two steps. First, the agency determines "the number of participation opportunities afforded to male and female athletes in the intercollegiate athletic program." *Id.* at 2-3. Once all athletes (or "participants") engaged in countable intercollegiate-level varsity sports (i.e., "participation opportunities") are tallied, the second step involves calculating whether the number of participation opportunities is substantially proportionate to the gender demographics of the university. 1996 Clarification at 4. Substantial proportionality does not require exact proportionality. Rather, whether a school satisfies prong one is determined on a case-by-case basis, which involves assessing the percentage of female athletic participants relative to female enrollment, taking into account "the institution's specific circumstances and the size of its athletic program." *Id.* One proxy for gauging whether an athletic program is "substantially" proportionate is to calculate whether the number of additional women needed to achieve exact proportionality would be insufficient to form a viable varsity team. *Id.* So, for example, if a school has five fewer female athletes than needed to reach exact proportionality,

---

factors." 1979 Policy Interpretation, 44 Fed. Reg. at 71,415.

the OCR would find the athletic program to be substantially proportional because no varsity team can be sustained with so few participants.

The OCR's stated methodology under prong one raises two definitional questions:  (1) who counts as a "participant"?; and (2) what activities qualify as "participation opportunities"? Over the years, the OCR has offered the following additional guidance.

### i.  "Participants" Defined

The 1996 Clarification defines "participants" as student-athletes:

> a.  Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and
>
> b.  Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and
>
> c.  Who are listed on the eligibility or squad lists maintained for each sport; or
>
> d.   Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

*Id.* at 3 (quoting 44 Fed. Reg. at 71,415).[35]  Generally speaking, "all athletes who are listed on a team's squad or eligibility list and are on the team as of the team's first competitive event are

---

[35] The 1996 Clarification states that this four-part definition of "participant"—which the OCR uses for purposes of determining the total number of "participation opportunities" under prong one—is taken directly from the 1979 Policy Interpretation.  That statement, while technically accurate, is somewhat misleading.  The policy interpretation does provide this definition, but not in the context that the OCR suggests.

As noted above, the 1979 Policy Interpretation is divided into three separate sections, tracking three different areas of regulatory compliance: (1) "Athletic Financial Assistance (Scholarships)" (Part A), *see* 34 C.F.R. § 106.37(c); "Equivalence in Other Athletic Benefits and Opportunities" (Part B), *see* 34 C.F.R. § 106.41(c)(2)-(10); and "Effective Accommodation of Student Interests and Abilities" (Part C), *see* 34 C.F.R. § 106.41(c)(1).  The three-part test—of which the substantial-proportionality requirement is a part—appears under the "Effective Accommodation" section (Part C).  *See* 44 Fed. Reg. at 71,417-71,418.  But that section—which

counted as participants." *Id.*  Moreover, "an athlete who participates in more than one sport will

be counted as a participant in each sport in which he or she participates." *Id.*  Lastly, participants

include "athletes who do not receive scholarships (e.g., walk-ons), those athletes who compete

on teams sponsored by the institution even though the team may be required to raise some or all

of its operating funds, and those athletes who *practice but may not compete*." *Id.* (emphasis

added).  According to the OCR,

> investigations reveal that these athletes receive numerous benefits and
> services, such as training and practice time, coaching, tutoring services,
> locker room facilities, and equipment, as well as important non-tangible
> benefits derived from being a member of an intercollegiate athletic team.

is meant to interpret the regulation codified at section 106.41(c)(1)—never defines the terms
"participation opportunities" or "participant."  *See id.*  Instead, the definition of "participant" that
the OCR references in the 1996 Clarification is lifted from an entirely *different* section of the
policy interpretation—the section addressing "Athletic Financial Assistance (Scholarships)"
(Part A), which, in turn, is meant to interpret an entirely different regulation codified at section
106.37(c).  *See id.* at 71,415.  Curiously, the OCR adopted that definition for use outside of its
intended context and without any explanation for doing so.

  But an explanation is sorely needed, because this seemingly mismatched definition of
"participant," when applied to prong one, can sometimes produce anomalous results.  Of
particular concern is the inclusion of subpart "d" in the OCR's four-part definition.  *See* 1996
Clarification at 3.  Take, for example, an injured athlete who was never listed on the squad list,
never practices—let alone competes—with her team, and never receives any other benefits of
varsity participation, but who nevertheless receives some amount of financial aid for athletic
ability.  Under subpart "d" of the OCR's definition, this individual apparently counts as a
"participant" for purposes of substantial proportionality, despite the fact that she gets nothing
close to a "genuine" varsity experience.

  This peculiar outcome calls into question the persuasiveness of the OCR's attempt to
transplant the definition of "participant" from one distinct compliance area to another.  Indeed, it
might make perfect sense to count our hypothetical athlete as a "participant" for purposes of
assessing allocation of *scholarships* (notably, the purpose for which this definition was originally
supplied), but it makes little sense, in my view, to do the same when assessing allocation of
*participation opportunities*.  Quite simply, a "participant" for one purpose is not necessarily a
"participant" for another.

  Despite my reservations, however, for purposes of this case I will continue to defer to the
OCR's definition of "participant."  The Second Circuit has specifically endorsed the OCR's
definition of "participant" for purposes of prong one, *see Biediger*, 691 F.3d at 93, albeit without
addressing the curious mixing of definitional sources.  I urge the OCR to clarify the definition of
"participant" or explain its inclusion of language from the scholarship section of the regulations.

> Because these are significant benefits, and because receipt of these benefits does not depend on their cost to the institution or whether the athlete competes, it is necessary to count all athletes who receive such benefits when determining the number of athletic opportunities provided to men and women.

*Id.*

In a letter accompanying the 1996 Clarification, however, the OCR emphasized that, for an athlete to be counted as a "participant," he or she must be afforded a participation opportunity that is "real, not illusory"; that is, an athletic experience that offers benefits equivalent to those provided other bona fide varsity athletes. *See* Letter from Norma V. Cantú, Assistant Secretary for Civil Rights, Dep't of Education, at 4 (Jan. 16, 1996) (the "1996 OCR Letter").

### ii. "Participation Opportunities" Defined

In 2008, the OCR published another letter describing what it considers to be countable "participation opportunities." The OCR explained that, for an athletic activity to be counted in the substantial-proportionality analysis, the activity must take place in the context of an authentic varsity "sport." Letter from Stephanie Monroe, Assistant Secretary for Civil Rights, Dep't of Education, at 1-2 (Sept. 17, 2008) ("2008 OCR Letter").

To determine whether an athletic activity qualifies as a varsity "sport" for Title IX purposes, the OCR "considers several factors related to an activity's structure, administration, team preparation, and competition." *Id.* First, the OCR considers whether the sport is recognized by an intercollegiate athletic organization, such as the NCAA or the NAIA, and whether the activity is subject to the "organizational requirements" promulgated by that organization. *Id.* at 2. If so, then the OCR will presume that the sport can be counted as a genuine "participation opportunity" under Title IX. *Id.* If that presumption does not apply, or if the presumption has been effectively rebutted "by evidence demonstrating that the institution is

not offering the activity in a manner that satisfies" those organizational requirements, the OCR

will then consider a multitude of factors that bear on whether an activity amounts to a varsity

"sport." *Id.* Those factors include the following:

> I. Program Structure and Administration: . . . .
>
> (A) Whether the operating budget, support services (including academic, sports medicine and strength and conditioning support) and coaching staff are administered by the athletics department or another entity, and are provided in a manner consistent with established varsity sports; and
>
> (B) Whether the participants in the activity are eligible to receive athletic scholarships and athletic awards (e.g., varsity awards) if available to athletes in established varsity sports; to the extent that an institution recruits participants in its athletics program, whether participants in the activity are recruited in a manner consistent with established varsity sports.
>
> II. Team Preparation and Competition: . . . .
>
> (A) Whether the practice opportunities (e.g., number, length and quality) are available in a manner consistent with established varsity sports in the institution's athletics program; and
>
> (B) Whether the regular season competitive opportunities differ quantitatively and/or qualitatively from established varsity sports; whether the team competes against intercollegiate or interscholastic varsity opponents in a manner consistent with established varsity sports;
>
> When analyzing this factor, the following may be taken into consideration:
>
> 1. Whether the number of competitions and length of play are predetermined by a governing athletics organization, an athletic conference, or a consortium of institutions;
>
> 2. Whether the competitive schedule reflects the abilities of the team; and
>
> 3. Whether the activity has a defined season; whether the season is determined by a governing athletics organization, an athletic conference, or a consortium.

(C) If pre-season and/or post-season competition exists for the activity, whether the activity provides an opportunity for student athletes to engage in the pre-season and/or post-season competition in a manner consistent with established varsity sports; for example, whether state, national and/or conference championships exist for the activity; and

(D) Whether the primary purpose of the activity is to provide athletic competition at the intercollegiate or interscholastic varsity levels rather than to support or promote other athletic activities.

When analyzing this factor, the following may be taken into consideration:

1. Whether the activity is governed by a specific set of rules of play adopted by a state, national, or conference organization and/or consistent with established varsity sports, which include objective, standardized criteria by which competition must be judged;

2. Whether resources for the activity (e.g., practice and competition schedules, coaching staff) are based on the competitive needs of the team;

3. If post-season competition opportunities are available, whether participation in post-season competition is dependent on or related to regular season results in a manner consistent with established varsity sports; and

4. Whether the selection of teams/participants is based on factors related primarily to athletic ability.

*Id.* at 2-4 (footnote omitted).

Whether an activity is a "sport" will depend on the facts specific to the institution and will be decided based on the totality of those factors. *Id.* at 2, 4. Moreover, the OCR has emphasized that schools retain flexibility in choosing their path toward compliance:

It is OCR's policy to encourage compliance with the Title IX athletics regulations in a flexible manner that expands, rather than limits, student athletic opportunities. . . . Expanding interscholastic and intercollegiate competitive athletic opportunities through new sports can benefit students by creating and stimulating student interest in athletics, taking advantage of athletic opportunities specific to a particular competitive region, and providing the opportunity for access to a wide array of competitive athletic activities.

- 44 -

*Id.* at 4.  But, as I stated in my previous decision, "permitting universities space to cultivate new athletic opportunities for women does not do away with the fundamental requirement that, for an athletic opportunity to count under Title IX, it must be genuine, meaning that it must take place in the course of playing an actual 'sport' *and* it must allow an athlete to receive the same benefits and experience that she would receive if she played on another established varsity squad." *Biediger*, 728 F. Supp. 2d at 91 (emphasis added).

All of this can be distilled into the following rule.  Under prong one, the term "participation opportunities" means the total number of "participants"—as defined in the 1996 Clarification—engaged in genuine intercollegiate-level varsity "sports."   Whether a particular athletic activity qualifies as a "sport" (so that "participants" in that activity may count for purposes of prong one) depends on both intrinsic and extrinsic factors, as outlined in the 2008 OCR Letter.  Intrinsic factors concern the inherent sport-like qualities of the activity, such as (1) whether the purpose of the activity is athletic competition; (2) whether competition is judged by a set of rules and objective criteria; (3) whether participants are selected on the basis of athletic ability; (4) whether the number of competitions and length of play are determined by a governing athletics organization; (5) whether the activity has a defined season; and (6) whether post-season competition, if available, is dependent on regular season results.  Extrinsic factors, in contrast, concern how the putative sport is administered by the university, including (1) whether the budget, support services, and coaching are provided in a manner consistent with established varsity sports; (2) whether participants are eligible for scholarships and awards; (3) whether participants are recruited in a manner consistent with other varsity sports; (4) whether practice opportunities are consistent with other varsity sports; (5) whether competitive opportunities differ quantitatively or qualitatively from established varsity sports, including competition

against other varsity opponents; (6) whether the competitive schedule reflects the abilities of the

team; (7) whether the team participates in pre-season or post-season competition in a manner

consistent with other varsity sports; and (8) whether resources for the activity are based on the

competitive needs of the team.  Intrinsic factors bear on whether an activity is *capable* of

providing athletes a genuine varsity participation opportunity, while extrinsic factors bear on

whether a particular school's program is organized and administered in a way that *actually*

provides athletes a genuine varsity participation opportunity.  Accordingly, even if an athletic

activity possesses, in the abstract, all of the intrinsic attributes of an authentic "sport," it may

nonetheless be offered in such a manner that its participants do not receive a genuine varsity

experience on par with other bona fide varsity athletes; that is, the activity, as administered, lacks

the extrinsic attributes of an intercollegiate varsity sport.[36]

Prior to the 2008 Dear Colleague Letter, the OCR issued two missives concerning the

agency's standards for distinguishing "sports" from "extracurricular activities" for purposes of

Title IX.  The first, dated April 11, 2000, included the following passage:

> Certain school activities in which students are engaged may be activities that
> require a considerable amount of athleticism, but not every athletic activity
> qualifies as a sport.  Consistent with earlier policy statements, there is a
> presumption by OCR that *drill teams, cheerleading and other like activities
> are extracurricular activities and are not considered sports* or part of an
> institution's athletic program within the meaning of the Title IX regulation.

Letter from Mary Frances O'Shea, National Coordinator for Title IX Athletics, Office for Civil

Rights, Dep't of Education, to David V. Stead, Executive Director, Minnesota State High School

---

[36] That, in effect, is what the OCR means when it says that the presumption in favor of counting NCAA-recognized sports "can be rebutted by evidence demonstrating that the institution is *not offering the activity in a manner* that satisfies the factors [listed]."  2008 OCR Letter at 2 (emphasis added).

League, at 3 (Apr. 11, 2000) ("April 2000 OCR Letter") (emphasis added).[37]  The OCR added

that, although cheerleading and cheer-like activities are presumed not to be countable

intercollegiate-level sports, any decision about a particular school's program would be made on a

case-by-case basis.  *Id.*

     In a second later, dated May 24, 2000, the OCR clarified that "the term cheerleading . . .

includes both competitive and sideline cheer; other like activities would include all

extracurricular activities similar to drill teams and cheerleading, such as danceline, skateline, and

pep squads."  Letter from Mary Frances O'Shea, National Coordinator for Title IX Athletics,

Office for Civil Rights, Dep't of Education, to David V. Stead, Executive Director, Minnesota

State High School League (May 24, 2000) ("May 2000 OCR Letter").  It added that in every

case where the OCR had evaluated whether a cheerleading or drill team constituted participation

in a sport, the agency concluded it was not and that team members could not be counted as

"participants" under Title IX.  *Id.*  To date, the OCR has never held a varsity cheerleading—or

cheer-derivative—program to be a sport for Title IX purposes.

     The interpretive guidance described above, including the 1996 Clarification and

accompanying letter, the April and May 2000 OCR Letters, and the 2008 OCR Letter, are owed

substantial deference.  *See Biediger*, 691 F.3d at 96-97 ("We here conclude that the 1996

Clarification, the accompanying 1996 OCR Letter, and the 2000 and 2008 OCR Letters are

---

[37] The OCR's position in 2000 that cheerleading is presumptively not a sport is consistent
with a policy first announced by HEW in 1975, in which HEW ruled cheerleading to be an
extracurricular activity, and not a varsity sport, for purposes of Title IX.  *See* Letter from Peter E.
Holmes, Office for Civil Rights, to Chief State School Officers, Superintendents of Local
Educational Agencies and College and University Presidents, at 3 (Nov. 11, 1975) ("However,
drill teams, cheerleaders and the like, which are covered more generally as extracurricular
activities . . . , are not a part of the institution's 'athletic program' within the meaning of the
regulation.").

likewise entitled to substantial deference under *Auer v. Robbins*, 519 U.S. 452, 461 (1997),

because they reflect reasonable agency interpretations of ambiguities in its own regulation, and

there is no reason to think that the agency's interpretations do not reflect its 'fair and considered

judgment on the matter in question.'") (quoting *Mullins v. City of New York*, 653 F.3d 104, 113-

14 (2d Cir. 2011)); *see also Mansourian*, 602 F.3d at 965 n.9 (noting that other circuits "have

held that both the [1979] Policy Interpretation and the [1996] Clarification are entitled to

deference," and citing cases in support).  As I noted in my previous decision:

> The 2008 OCR Letter correctly recognizes that an intercollegiate sport is defined
> not only by the activity's athletic elements, but also by its structure,
> administration, and the competition it fosters.  Put differently, the OCR factors
> appropriately weigh not only the physical nature of the activity itself, but also
> how the experience of participating in that activity compares to the experience of
> participating on other varsity sports teams.  That inquiry is reasonable, persuasive,
> and entirely consistent with OCR's goal of ensuring not only that female students
> are offered equal athletic participation opportunities, but that those participation
> opportunities are real, and not illusory.

*Biediger*, 728 F. Supp. 2d at 93.  I will continue to defer to the OCR's interpretations, and will

use their methodology for determining whether an activity may be treated as an intercollegiate-

level sport under Title IX.

> b.  Equivalent Competition (Prong One of the Levels-of-Competition Test)

Under prong one of the levels-of-competition test,[38] a university has effectively

accommodated women's athletic interests and abilities when "the competitive schedules for

men's and women's teams, on a program-wide basis, afford proportionally similar numbers of

male and female athletes equivalently advanced competitive opportunities."  44 Fed. Reg. at

71,418.  For ease of reference, I call this prong the "equivalent-competition" requirement.

---

[38] As noted above, Quinnipiac has chosen, as a matter of litigation strategy, to rely solely
on the first prong of the levels-of-competition test to demonstrate its compliance with this aspect
of Title IX.

Although the OCR has published considerable guidance on the meaning and purpose of the three-part test, the agency has offered almost no additional direction on the levels-of-competition test. Indeed, in the thirty-three years since the Policy Interpretation was promulgated, the OCR has never, to my knowledge, issued any official policy clarifying the significance of this test or how it should be applied. But the dearth of published guidance does not mean that the OCR has abandoned the equivalent-competition requirement. On the contrary, the OCR has reiterated time and again that effective accommodation is assessed under *both* the three-part *and* levels-of-competition tests. *See* 1996 Clarification at 2 (stating that, in addition to the three-part test, the "OCR also considers the quality of competition offered to members of both sexes in order to determine whether an institution effectively accommodates the interests and abilities of its students"); Russlynn Ali, Assistant Secretary for the Office for Civil Rights, Dep't of Education, Dear Colleague Letter, at 2 n.9 (Apr. 20, 2010); Brief of the United States as Amicus Curiae, at 7 n.4, *Biediger v. Quinnipiac Univ.*, 728 F. Supp. 2d 62 (D. Conn. 2010) (No. 09-cv-621).

Still, from all accounts, the levels-of-competition test is seldom used today and rarely if ever litigated. The test's dormancy in recent years is attributed not to regulatory inertia, but to evolving NCAA standards on competitive scheduling among member schools. In the late 1970s and early 1980s, before the NCAA standardized the process, women's athletics programs competed at disparate division levels among various athletic conferences. *See* Lamar Daniel Rebuttal Report, at 5 (Def.'s Ex. HZ). During that period, the levels-of-competition test was an essential and frequently-invoked component of the OCR's regulatory arsenal. Today, however, the NCAA imposes strict procedures governing the competitive schedules of men's and women's NCAA-championship sports, permitting only limited competition below declared division levels.

- 49 -

*Id.* As a result, modern NCAA rules have all but eliminated the problem that the levels-of-competition test was designed to address—at least among schools that offer both sexes the full panoply of NCAA-championship sports.

But where, as here, a sizable percentage of a school's athletics program includes non-NCAA-championship sports, the levels-of-competition test is once again in play—and I must determine the proper way to apply it.  In the absence of official sources clarifying the scope of this test, I must turn to the only interpretive compass at my disposal: the OCR's internal investigator's manual. *See* Valerie Bonnette & Lamar Daniel, Office for Civil Rights, Title IX Athletics Investigator's Manual (1990), attached as Ex. H to Expert Report of Donna Lopiano (Pls.' Ex. 201) (the "Investigator's Manual" or "Manual").

The Investigator's Manual, which was issued in 1990 to replace an earlier 1980 version, is an internal agency document that was not subject to public notice and comment and was never formally published.  It is not an official interpretation of either Title IX or the 1979 Policy Interpretation; rather, the Investigator's Manual was designed merely to assist OCR personnel in conducting investigations and compliance reviews in the field.  *See, e.g.*, *McCormick*, 370 F.3d at 293 n.14 ("The Investigator's Manual is an internal agency document designed to aid in agency investigations of intercollegiate and interscholastic athletics programs.").  As a result, the Investigator's Manual is not entitled to the same level of deference accorded the regulations, the 1979 Policy Interpretation, or even the OCR policy letters, but instead is merely "entitled to respect" to the extent that it has "the power to persuade."  *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (stating that "[i]nterpretations contained in policy statements, agency manuals, and enforcement guidelines . . . lack the force of law" and do not warrant *Chevron* deference); *see also Oregon v. Gonzales*, 546 U.S. 243, 268 (2006) (stating that, under so-called *Skidmore*

deference, an agency's interpretation merits deference depending on the "'thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control'") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001) (stating that a non-binding agency interpretation "may therefore at least seek a respect proportional to its power to persuade . . . [and] may surely claim the merit of its writer's thoroughness, logic, and expertise, its fit with prior interpretations, and any other sources of weight") (internal quotation omitted).  Indeed, the Second Circuit has previously indicated that the value of the Investigator's Manual is limited to its persuasive power.  *See McCormick*, 370 F.3d at 293 n.14 ("We rely on [the Investigator's Manual] here to the extent that it provides a *persuasive* explanation of the Policy Interpretation.") (emphasis added); *see also Cohen*, 809 F. Supp. at 988 (recognizing that the Investigator's Manual does "not carry the force of law or establish controlling standards," but concluding that it is, to some extent, an important guide "in unraveling the requirements of the athletic regulation"); *Beasley v. Alabama State Univ.*, 3 F. Supp. 2d 1325, 1335 n.8 (M.D. Ala. 1998) (stating that "some measure of deference should be accorded to the Investigator's Manual, which reflects OCR's interpretation of its own regulations"); *but see Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093, 1110 (S.D. Cal. 2012) (recognizing that the "Policy interpretation by the OCR is entitled to deference by the Court," but merely taking "judicial notice" of the Investigator's Manual). However, insofar as there are inconsistencies between the Manual and the Policy Interpretation, the Policy Interpretation must control.  *See Roberts v. Colorado State Univ.*, 814 F. Supp. 1507, 1511 (D. Colo. 1993) (noting "minor inconsistencies do exist between the Policy Interpretation and the Investigator's Manual"), *rev'd in part on other grounds*, 998 F.2d 824 (10th Cir.

1993)).[39]  With this guidance in mind, I turn to address the Manual's description and explanation of the levels-of-competition test.

As noted above, prong one of the levels-of-competition test assesses "[w]hether the competitive schedules for men's and women's teams, on a program-wide basis, afford proportionally similar numbers of male and female *athletes* equivalently advanced competitive opportunities."  44 Fed. Reg. at 71,418 (emphasis added).  The Investigator's Manual provides the following methodology for assessing compliance with this requirement:

> COMPARE the number of competitive *events* for each team at the institution's declared competitive level.  USE the attached chart for this comparison.  DETERMINE the overall percentage of men's and women's *events* below the declared division level or classification.  If this analysis results in relative equivalence, then the second factor [prong two], as discussed below, need not be considered.  If there is a *significant difference* in the number of competitive events for men and women at the institution's declared competitive level, ASK the appropriate institution for an explanation.  If there is any concern that the explanation is not satisfactory, consider the second factor.

Investigator's Manual at 26 (emphasis added).[40]

In the broadest sense, I find persuasive—and will defer to—the Manual's general methodology for measuring the competitiveness of a team's schedule based on the declared division level of opponents at each competitive event.  Given the inevitable disparities that exist

---

[39] It bears mentioning that, in other contexts, some of the Manual's directives have been expressly rejected by subsequent OCR "Dear Colleague" Letters.  *See* Mary Frances O'Shea, Assistant Secretary for the Office for Civil Rights, Dear Colleague Letter: Bowling Green State University (July 23, 1998), *available at* http://www2.ed.gov/about/offices/list/ocr/docs/bowlgrn.html (addressing rules governing athletic scholarships and noting "the confusion caused by the manual's inclusion of a statistical test" that was irrelevant in determining compliance standards for scholarship allocation).

[40] The Manual does not define what constitutes a "significant difference," but goes on to caution that, because the "Policy Interpretation permits nondiscriminatory differences in men's and women's athletics programs," investigators should "[a]sk the appropriate institution representative for an explanation of any disparities found" before issuing any violation findings.  Investigator's Manual at 26.

from year to year, relying on an opponent-team's division level as a proxy for its competitive prowess is a reasonable interpretation of the regulation.

But I am otherwise unpersuaded by the Manual's approach to determining proportional similarity under the levels-of-competition test—an approach that, in my view, directly conflicts with the plain language of the 1979 Policy Interpretation. Indeed, even a cursory comparison of the text of the equivalent-competition prong and the Manual's stated methodology reveals significant inconsistency. Although the test itself expressly calls for a proportional comparison of *athletes* to competition level, the Manual calls for a proportional comparison of *events* to competition level. In this respect, the Manual's approach cannot be squared with the controlling language of the Policy Interpretation.[41] *Cf. Cohen*, 809 F. Supp. at 994 (noting that the levels-of-competition test assesses whether "the competitive opportunities in th[e] program are proportionate to the number of men and women *athletes* currently participating") (emphasis added). The Manual's approach may provide a reasonable shorthand for *investigators* in the field, but it is ultimately unpersuasive as the appropriate legal analysis for the *court*.

Thus, although I will defer to the Manual's general methodology, in order to give effect to the plain language of the Policy Interpretation, the analysis must also take into account the proportionate number female *athletes* afforded equivalently-advanced competitive opportunities. To that end, I must modify slightly the Manual's approach. Rather than compare the percentage of *events* below the declared division level among men's and women's teams, I will compare the

---

[41] The testimony of the plaintiffs' sports-management expert, Dr. Donna Lopiano, reinforces my position. Lopiano expressly disagreed with the Manual's approach, and testified that, with respect to the levels-of-competition test, "it's the number of athletes that experience that competition, not the number of competitions that count." Trial Tr. at 861-62.

percentage of "competitive opportunities" afforded to male and female *athletes* below their declared division level.[42]

This modified analysis proceeds in four steps.[43]  First, I will calculate the total number of "competitive opportunities" afforded to the members of each team at their declared division level.  To do so, I will simply multiply the number of team "events" against division-level opponents by the number of participants on each team involved.  Second, I will calculate the number of "competitive opportunities" *below* the declared division level.  That similarly requires multiplying the number of team "events" against non-division-level opponents by the number of participants on each team involved.  For example, assume a Division I women's volleyball team has ten participants and plays in a total of ten events.  Seven events are against Division I opponents and three events are against Division II opponents.  That yields a total of seventy competitive opportunities at the declared division level, and thirty competitive opportunities at the non-division level.

Next, I will add up the total number of division-level and non-division-level competitive opportunities across all teams for each sex, and determine what percentage of overall competitive opportunities were played against opponents below the school's declared division level.  The final step involves comparing the overall percentage of below-division-level competitive

---

[42] Alternatively, Lopiano has also suggested an entirely different and somewhat more qualitative approach to assessing levels of competition that she developed independently.  *See* Expert Report of Donna Lopiano, at 28-35 (Pls.' Ex. 201).  That alternative methodology, however, has no basis in any published OCR guidance of which I am aware, and therefore I decline to adopt it on the current record.

[43] This modified approach to assessing equivalent competition was suggested by defendant's own expert, Lamar Daniel, in response to the concerns I raised at trial regarding the apparent inconsistencies between the Manual and the Policy Interpretation.  *See* Competition Test – Alternative Application, attached as Ex. B to Def.'s Post-Trial Brief (doc. #  275).

opportunities for male athletes versus the percentage of below-division-level competitive

opportunities for female athletes on a program-wide basis.

For example, assume a school sponsors four teams at the Division 1 level:  (1) women's

softball; (2) women's volleyball; (3) men's soccer; and (4) men's baseball.  Assume further that

the number of participants on each team and the number of competitive events among division

levels are as follows:

| Women's Teams | # of participants | Division I competitions | Division I competitive opportunities | Non-Division I competitions | Non-Division I competitive opportunities |
|---|---|---|---|---|---|
| Softball | 30 | 10 | 300 | 0 | 0 |
| Volleyball | 10 | 7 | 70 | 3 | 30 |
| **Totals** | | | 370 (92.5%) | | 30 (**7.5%**) |

| Men's Teams | # of participants | Division I competitions | Division I competitive opportunities | Non-Division I competitions | Non-Division I competitive opportunities |
|---|---|---|---|---|---|
| Soccer | 20 | 15 | 300 | 0 | 0 |
| Baseball | 25 | 49 | 1,225 | 1 | 25 |
| **Totals** | | | 1,525 (98.4%) | | 25 (**1.6%**) |

Given these hypothetical statistics, a total of 7.5 percent of women's competitive opportunities

were below the school's declared division level.  Compare that with men, for whom only 1.6

percent of competitive opportunities were below division level.  On a proportional basis, that

amounts to a difference of approximately 6 percent.

Neither the 1979 Policy Interpretation nor the Investigator's Manual specify a threshold

percentage that will constitute a violation of the equivalent-competition requirement; that is,

when a school fails to provide "proportionally similar numbers of male and female athletes

equivalently advanced competitive opportunities." 44 Fed. Reg. at 71,418. According to Quinnipiac, a disparity of less than 5 percent does not raise serious compliance concerns, particularly if the school can point to nondiscriminatory reasons for the disparity. The University finds support for that proposition not in any official OCR guidance, but in an unauthorized treatise published by one of the original co-authors of the Investigator's Manual. *See* VALERIE BONNETTE, TITLE IX AND INTERCOLLEGIATE ATHLETICS, at 57-58, excerpt attached as Ex. B to Lamar Daniel Rebuttal Report (Def.'s Ex. HZ) ("Bonnette Treatise"). But that treatise—which the OCR has never endorsed and which does not even purport to represent the views of the agency—is not entitled to deference.[44]

In my view, in the absence of specific OCR guidance on point, the phrase "proportionally similar," as used in the first prong of the levels-of-competition test, should be given a construction roughly analogous to the phrase "substantial proportionality," as used in the first prong of the three-part test. According to the OCR, "substantial proportionality" does not require exact proportionality; rather, determinations are made on a case-by-case basis, taking into account "the institution's specific circumstances and the size of its athletic program." 1996

_____

[44] Although not entitled to deference, the Bonnette Treatise does lend support to my position that the Manual's methodology for assessing compliance with the levels-of-competition test conflicts with the plain language of the Policy Interpretation. The treatise states, in relevant part:

> The analysis for percentages of *events* at the same competitive level does *not* identify specifically whether "proportionally similar numbers" of male and female *participants* are provided equivalent competitive opportunities, *per the language of the Policy Interpretation*. However, this analysis is sufficiently accurate for compliance determinations. The numbers of female and male participants may be calculated where the analysis suggested here indicates significant differences.

Bonnette Treatise at 58 (emphasis added). Thus, even Bonnette acknowledges that the Manual's approach—the purpose of which was merely to guide investigators in making surface-level compliance determinations in the field—differs from what the Policy Interpretation expressly

Clarification at 4.  That same basic standard should apply here as well.  Thus, in keeping with

OCR guidance in other areas, I conclude that whether a university's program-wide competitive

schedule violates the equivalent-competition prong of the levels-of-competition test should be

determined on a case-by-case basis, taking into account the totality of the circumstances.  Like

the OCR, I will not endeavor to specify a numeric threshold at which a violation occurs.

However, for purposes of this case, I will accept Quinnipiac's own suggestion that, at the very

least, an unjustified disparity of over 5 percent constitutes a violation.

> c.   Summary

To summarize, compliance with Title IX's "effective-accommodation" requirement is

determined by two separate tests:  (1) the three-part test; and (2) the levels-of-competition test.

In the case at bar, Quinnipiac relies exclusively on the first prong of both tests.

Prong one of the three-part test assesses whether Quinnipiac provides substantially

proportionate athletic participation opportunities for its female students.  Substantial

proportionality is determined in two steps.  The first step involves determining which of the

University's putative varsity athletic participation opportunities should be counted for Title IX

purposes.  Whether an athletic participation opportunity will be counted depends on whether it

affords an athlete a *genuine* opportunity to participate in a varsity sport.  To be a genuine

participation opportunity, an athlete must participate in a legitimate "sport," which is assessed by

considering the set of factors set forth in the 2008 OCR Letter.  That includes the presumption in

favor of NCAA sports being recognized as intercollegiate sports, as well as the presumption

against recognizing cheerleading and its derivatives as sports for Title IX purposes.  Moreover,

even if an athlete participates on a varsity team in a bona fide "sport," that athlete's participation

requires.

will be counted under Title IX only if the quality of his or her experience is on par with the experience of other varsity athletes.  Thus, whether an athlete counts will hinge not only on whether he or she is on a roster list, practiced with a team, or competed in games over the course of the academic year; it will also be decided by examining the totality of the circumstances surrounding his or her participation.  Once all of the genuine athletic participation opportunities are counted, the second step of the test is to compare the percentage of athletic participation opportunities provided to women to the percentage of women enrolled as undergraduates. Whether there is a substantial proportionality between Quinnipiac's female athletes and female students will depend not just on a statistical figure but also on other facts specific to Quinnipiac, such as whether any shortage in female athletes is large enough to sustain an independent women's varsity team that the University is not presently sponsoring.

Prong one of the levels-of-competition test examines, on a program-wide basis, whether the competitive schedules for men's and women's teams provide "proportionally similar" numbers of male and female participants equivalent competitive opportunities.  Proportional similarity is determined in four steps.  The first step involves calculating the total number of "competitive opportunities" at the declared division level.  That calculation, in turn, requires multiplying the number of competitive events against division-level opponents by the number of participants on each team competing in those events.  The second step involves a similar calculation of the number of "competitive opportunities" below the declared division level, which requires multiplying the number of competitive events against non-division-level opponents by the number of participants on each team competing in those events.  The third step is computing the total number of division-level competitive opportunities and the total number of non-division level competitive opportunities across all teams for each sex, and determining what

percentage of those opportunities were played against non-division-level opponents.  The final

step is a comparison of the overall percentage of below-division-level competitive opportunities

among the men's teams versus the women's teams.

A few other general points bear brief mention.

First, it is worth repeating that, apart from my previous decision—and the appeal before

the Second Circuit—no other court has addressed the OCR's test for assessing genuine varsity

participation opportunities, and precious few have interpreted Title IX's effective-

accommodation requirement more generally.  Moreover, the unique procedural circumstances of

Quinnipiac's motion make application of that small universe of Title IX cases all the more

challenging.  Most—if not all—prior cases have involved a plaintiff seeking to prove a *violation*

of Title IX.  Here, however, we encounter a defendant, previously found in violation of Title IX,

seeking to prove *compliance*.  That shift in burden of proof—and the equitable lens through

which I must view that proof—alters the analysis in significant ways, because evidence sufficient

to prove a *violation* is sometimes qualitatively different from evidence sufficient to prove

*compliance*.  *See Neal v. Bd. of Trustees of California State Univ.*, No. Cv-F-97-5009, 1997 WL

1524813, at *13 (E.D. Cal. Dec. 26, 1997) ("The Policy Interpretation presents ways in which

plaintiffs may show that a school has violated Title IX; it does not speak to ways by which an

institution can show compliance with Title IX.").  In the usual case, if the plaintiff's proof falls

short in certain particulars, the defendant-university wins through operation of the burden of

proof.  That no longer holds true here.  Quinnipiac must now show affirmatively that its athletic

program offers genuine varsity participation opportunities, and equivalent athletic competition,

for its female population.

Second, I note from the outset that frequent reference will be made throughout this opinion to NCAA rules and bylaws. This is so because the OCR has often relied, as a practical matter, on the self-regulating forces of NCAA guidelines in shaping its approach to Title IX's mandates in the context of intercollegiate athletics. Over the past two decades in particular, a certain symbiosis has developed between NCAA directives and OCR enforcement measures. But I must emphasize that NCAA regulations and Title IX ultimately serve very different purposes. The NCAA is principally concerned with fairness *among institutions*, while Title IX is concerned with fairness *between the sexes*. Therefore, compliance with NCAA regulations is not compliance with Title IX—and vice versa. Nothing in this opinion should be interpreted as suggesting otherwise.

## IV.    Conclusions of Law

Quinnipiac moves to lift the July 2010 permanent injunction, claiming the injunction is no longer warranted because the changes outlined above have brought the University into compliance with Title IX's effective-accommodation requirement. First, Quinnipiac argues that women's golf, acro, rugby, and track provide female athletes with genuine varsity participation opportunities, and that the University allocates those and other athletic opportunities in numbers substantially proportionate to its undergraduate population, in compliance prong one of the three-part test. Second, Quinnipiac argues that the competitive schedules provided for female athletes are proportionally similar to those provided for male athletes, in compliance with the first prong of the levels-of-competition test. I address each of those arguments below. After assessing the University's current status under Title IX, I turn to address the crucial—and ultimately dispositive—inquiry under Rule 60(b)(5): whether Quinnipiac has demonstrated "significant change" in its allocation of athletic opportunities for women so that continued enforcement of the injunctive order is no longer equitable.

A.    Substantial Proportionality (Prong One of the Three-Part Test)

Prong one of the three-part test assesses whether Quinnipiac provides substantially proportionate athletic participation opportunities for its female students. As noted above, substantial proportionality is determined in two steps. First, I must determine whether the University's proffered varsity athletic opportunities may be counted under Title IX. For present purposes, that determination turns on whether the University's three newly-sponsored sports—golf, acro, and rugby—and its revised policies concerning indoor and outdoor track offer the women on those teams genuine athletic opportunities on par with other Division I varsity sports. Second, once all varsity participation opportunities are tallied, I must compare the percentage of athletic opportunities provided to women to the percentage of women enrolled as undergraduates. I structure my analysis along those lines.

*1.    Countable "Participation Opportunities"*

In the 2011-12 academic year, Quinnipiac sponsored the following sports: men's baseball, basketball, cross-country, ice hockey, lacrosse, soccer, and tennis; and women's acro, basketball, cross-country, field hockey, golf, ice hockey, indoor track, lacrosse, outdoor track, rugby, soccer, softball, tennis, and volleyball. For purposes of this motion, there is no dispute that the following sports provide countable participation opportunities: baseball, basketball, cross-country, ice hockey, lacrosse, soccer, softball, tennis, and volleyball. Thus, my analysis will focus on whether the following sports "count" for purposes of Title IX: (1) women's golf; (2) women's acro; and (3) women's rugby. Further, I must also determine whether certain multi-sport runners on the women's indoor and outdoor track teams should be counted as participants under the statute.

a.    Women's Golf

Women's golf is recognized as a full-fledged NCAA-championship sport, and is therefore subject to the presumption that the activity provides genuine varsity participation opportunities countable for purposes of Title IX.  Moreover, the plaintiffs do not seriously challenge whether Quinnipiac's golf program provides the eleven female athletes listed on the team's roster genuine varsity opportunities.  Thus, I will count the golf team's eleven student-athletes as "participants" under the statute.

But before turning to consider the other proffered changes to Quinnipiac's athletic program, one additional point must be made with respect to golf.  Quinnipiac has argued that, by adding golf, it is entitled to replace the fourteen participation opportunities provided by women's volleyball with the eleven participation opportunities that golf now supplies.  In Quinnipiac's view, the elimination of volleyball is justified regardless of whether acro, rugby, or any other putative varsity opportunity counts for purposes of Title IX.  That argument, however, fails to persuade.

Under the terms of the permanent injunction, Quinnipiac may not eliminate volleyball— or *any* women's team for that matter—unless it has otherwise reached full compliance with Title IX.  In 2010, this court found that Quinnipiac's participation count missed the mark on proportionality by 3.62 percent—a deficit of thirty-eight participation slots.  *See Biediger*, 728 F. Supp. 2d at 111-12.  By adding golf to its varsity lineup, Quinnipiac narrowed that gap by less than a third.

Further, substantial proportionality is measured on a program-wide basis, not sport by sport.  Thus, the fact that golf was added to *narrow* the participation gap does not mean that golf can "*replace*" volleyball.  *Cf. Barrett v. West Chester Univ. of Pennsylvania State Sys. of Higher Educ.*, No. 03-cv-4978, 2003 WL 22803477, at *9 (E.D. Pa. Nov. 12, 2003) (rejecting the

argument that defendants "simply replaced the participation opportunities in gymnastics with those of the future women's golf team" by stating "even if the golf team were to provide as many female participation opportunities as did the gymnastics team, there is still a significant disparity in proportionality").  Indeed, the issue in this case is not whether Quinnipiac may swap golf for volleyball, but rather whether Quinnipiac has made sufficient changes to its athletic program as a whole to justify, as an equitable matter, lifting the injunction to permit the University to eliminate an existing women's NCAA-championship sport.  The addition of golf, therefore, does not, by itself, justify the elimination of volleyball.

        b.      Women's Acro

Acro (formerly competitive cheer) is not recognized by the NCAA as either a championship sport or an emerging sport.  Thus, unlike golf, acro is not entitled to any presumption in favor of it being considered a sport under Title IX.  Instead, Quinnipiac bears the burden of proving, by a preponderance of the evidence, that its acro program satisfies the factors listed in the 2008 OCR Letter.  But that burden is even weightier than it may at first appear.  Not only must Quinnipiac prove that acro possesses the intrinsic and extrinsic attributes of an intercollegiate-level varsity sport, the University must also overcome the OCR's presumption *against* treating cheer-based activities as "sports" under Title IX.  And it must do so in the shadow of this court's previous decision, rendered only two years ago and more recently affirmed by the Second Circuit, that this very same athletic activity—though, then, called by a different name—did not (yet) qualify as a varsity sport for purposes of Title IX.

Nevertheless, consistent with the OCR's policy, I turn to the set of factors that the agency uses to determine whether an activity is a sport, and examine whether, on the facts of the 2011-12 season, Quinnipiac's acro team was a team whose members may be counted as athletic

participants under Title IX.  For purposes of this opinion, I will assume that Quinnipiac's acro

program for the 2011-12 season continued to satisfy all of the factors that I previously

determined its predecessor—competitive cheer—satisfied in the 2009-10 season.  That is a safe

assumption, because the evidence at trial generally indicated that the acro team's budget, benefits

and services, coaching staff, scholarships and awards, and practice opportunities were all

provided in a manner consistent with established varsity sports.  Further, I have no doubt that the

acro team's purpose is to compete athletically at the intercollegiate level, and that its members

were selected for—and remain dedicated to—that purpose.  Indeed, I continue to be impressed

and inspired by the athleticism, skill, and commitment to excellence that these student-athletes

demonstrate.

As explained below, however, the incremental changes Quinnipiac has made to its

cheer—now acro—program over the past two years are not enough to qualify the activity as an

authentic varsity "sport" for purposes of Title IX.  Quinnipiac has not overcome the presumption

against treating this activity as a countable athletic participation opportunity under prong one.

### i.      Recognition by the NCAA or Other Authorities

To determine whether a putative sport qualifies as an intercollegiate-level participation

opportunity for purposes of Title IX, the OCR first considers whether knowledgeable athletic

organizations and authorities recognize the activity to be a legitimate varsity sport.  *See* 2008

OCR Letter at 2; April 2000 OCR Letter at 2; *see also* Brief of the United States as Amicus

Curiae at 16 ("OCR focuses not on the national availability and popularity of the activity, but

rather on the recognition of the activity as a sport by those knowledgeable organizations and

associations.  As such, the court's first inquiry should be whether [the activity] has been

recognized as part of an intercollegiate athletic organization.").  As indicated at trial, however,

neither the NCAA nor the OCR currently recognizes acro as a sport.

In my view, lack of recognition is sufficient to tip the balance against treating an athletic endeavor as an authentic varsity "sport" for purposes of prong one.  True, recognition by the NCAA is not, in itself, a requirement of Title IX.[45]  But where, as here, a school chooses to sponsor an athletics program at the highest level of competition (NCAA Division I), and offers *all* of its male athletes the opportunity to participate in NCAA-championship sports, the lack of NCAA recognition for a single women's sport within that program raises a significant gender-equity issue if the school hopes to count that unrecognized sport toward compliance with Title IX.  So long as Quinnipiac chooses to hold itself out as a Division I institution, providing a full slate of NCAA-recognized sports for men, equity demands that it do the same for women.

The circumstances of acro's failure to win recognition as an emerging sport are also significant.  This is not a case in which a putative sport simply has yet to be considered by the NCAA or other officials with expertise in college athletics.  On the contrary, the NCAA's CWA—the undisputed authority on intercollegiate sports for women, and the source from which the OCR's presumption in favor of recognized emerging sports arises—has specifically reviewed the NCATA's emerging-sport proposal and determined that, due to its ongoing rivalry with STUNT, the competing factions within cheer-based sports must first compromise their differences before recognition can be awarded.  Accordingly, the CWA has, in effect, determined that neither acro nor STUNT is ready to be recognized on its own as an emerging sport, at least

---

[45] Indeed, under the statute, universities are not "required" to offer intercollegiate athletics at all.  The only requirement imposed by Title IX is that, *if* a school chooses to offer athletics, it must do so on a nondiscriminatory basis.  *See Cohen*, 991 F.2d at 906 ("Title IX does not require institutions to fund any particular number or type of athletic opportunities—only that they provide those opportunities in a nondiscriminatory fashion if they wish to receive federal funds.").

until the internal divisions within the former competitive-cheer community are resolved.  Under

the circumstances, I see no reason for this court to interfere with the CWA's judgment on matters

squarely within its realm of expertise.  So long as acknowledged authorities in intercollegiate

athletics decline to recognize acro as an authentic varsity sport, courts should hesitate before

doing otherwise.[46]  For this reason alone, I conclude that Quinnipiac has failed to overcome the

presumption against treating acro as a varsity "sport" for purposes of Title IX.[47]

>           ii.      *Intrinsic Factors*

Even putting aside the lack of recognition by the NCAA, Quinnipiac has failed to prove

that acro satisfies certain "intrinsic" factors that the OCR has identified as fundamental to

intercollegiate varsity sports, such as: whether competition is judged by a consistent set of rules;

whether the number of competitions and length of play are determined by a governing athletics

organization; whether the activity has a defined season; and whether post-season competition is

dependent on regular season results.

The evidence showed that the NCATA has indeed become better organized over the past

two years, and has adopted a consistent format for regular season competitions.  But the ongoing

rift between the NCATA and STUNT means that, at least for now, the rules, competitive format,

and structure of cheer-based sports will remain in flux, as some teams gravitate toward one

---

[46] Indeed, plaintiffs' Title IX expert, Donna Lopiano, testified that, until the NCAA recognizes acro as a sport, and until Quinnipiac asks for and receives a determination letter from the OCR stating that its acro program qualifies as an intercollegiate varsity sport, the University should not be permitted to count acro as a varsity sport for Title IX purposes.  Trial Tr. at 855. Quinnipiac, in contrast, proffered no expert testimony concerning acro's status as a varsity sport.

[47] In reaching this conclusion, I do not mean to disparage or discourage *non-varsity* athletic opportunities for women.  The experience of participating on a club or intramural team— particularly in the context of a new and innovative sport—is undoubtedly a challenging and meaningful one.  The issue in this case, however, is only whether Quinnipiac's *varsity* athletics program offers equal opportunity to women.

iteration of the sport while others gravitate toward competing iterations. Until some reconciliation is reached or one of the alternatives becomes widely adopted, acro's format will be subject to modification. No other varsity team sponsored by Quinnipiac risks training under a competitive format that is subject to change as rival factions battle over how the sport ultimately will be defined.

The NCATA has also introduced a post-season competition format that ranks teams based on regular season results. But, due to the extraordinarily small number of schools sponsoring acro, the NCATA's national championship remains open to each and every acro team in the country. There is currently no progressive playoff system or entrance qualification, such as a minimum win tally over the course of the season. Nor, as a practical matter, is a playoff system feasible at this early stage in acro's development. With so few teams in existence, the NCATA's growth strategy requires that it extend invitations to its national tournament to every acro team in existence. This, too, differentiates acro from other varsity sports sponsored by Quinnipiac. No other team receives an automatic bid to nationals; a free pass that dilutes the experience compared to legitimate post-season competition.

      *iii.*    *Extrinsic Factors*

With respect to the "extrinsic" factors identified in the 2008 OCR Letter, Quinnipiac has come closer to meeting its burden of proof. By "extrinsic" factors, I mean those factors that bear on whether an athletic activity is administered by the university in manner consistent with bona fide varsity sports, including: whether participants are recruited in a manner consistent with other varsity sports; whether competitive opportunities differ quantitatively or qualitatively from established varsity sports; whether the competitive schedule reflects the abilities of the team; and whether the team participates in pre-season or post-season competition in a manner consistent

with other varsity sports.

Over the past two years, Quinnipiac's acro program has seen discernible improvements with respect to each of these factors. But Quinnipiac's program still falls short in certain particulars. I address the most significant shortcomings below.

First, although Coach Powers conducted some off-campus recruiting during the 2011-12 academic year, her recruitment strategies for acro differed from established varsity sports. Unlike the coaches of every other varsity team sponsored by the University, Powers could not recruit athletes based on their mastery of acro's specific competitive format, because no high school in the country currently sponsors an acro program of its own. Instead, Powers was forced to scout athletes from the ranks of myriad other sports, hoping that skills honed in those sports would be transferable to acro. And while coaches in established varsity sports may, from time to time, recruit athletes from disparate athletic backgrounds, for Powers this exception became the rule. Powers had no choice but to draw her recruits from a pool of student-athletes who had never before competed in the sport of acro. As a result, Powers could only know by inference and guesswork what other coaches knew for sure: whether a particular athlete competes effectively in the sport for which she is being recruited. For these reasons, recruitment for acro differed both quantitatively and qualitatively from every other varsity sport in the University's athletics program.

Second, despite a newly-implemented competitive schedule that consisted solely of collegiate varsity opponents, there are still far too few acro programs in existence to provide genuine intercollegiate competition on the varsity level. In 2011-12, for example, there were only *six* teams—including Quinnipiac—nationwide. No men's varsity team plays such a tiny universe of opponents. And although Quinnipiac competed against each and every extant acro

team during the 2011-12 season, there was significant variation in the declared division level among those opponents.  Out of Quinnipiac's ten regular-season competitions, only six involved fellow NCAA Division I competitors; the remaining events were contested against NCAA Division II teams, or even NAIA teams.  That fact further distinguishes acro from every men's team sponsored by the University; not one men's team played a single regular-season game against non-Division I opponents.

       *iv.*   *Conclusion*

In its 2008 Letter, the OCR made clear that the inquiry into whether an athletic activity qualifies as an intercollegiate varsity "sport" is based on the totality of the circumstances and should be analyzed on a case-by-case basis.  Furthermore, the balancing of factors identified in that letter must be performed with an eye towards whether the participants in a putative sport are receiving genuine athletic participation opportunities equivalent to the opportunities provided to athletes in other established varsity sports.  Based on the 2011-12 season, I find that acro still lacks the organizational structure that distinguishes extracurricular athletic activities from intercollegiate varsity sports for purposes of Title IX.  In particular, I find the lack of recognition by the NCAA, the ongoing rivalry with STUNT, the sport's unconventional recruiting difficulties, and the team's inadequate regular-season and post-season competition sufficient to conclude that Quinnipiac's acro program cannot be considered—at least not at this stage in its development—an intercollegiate-level varsity "sport" under Title IX.

One final note.  It bears repeating that Quinnipiac has chosen, as a matter of litigation strategy, to rely *exclusively* on prong one of the three-part test to establish its conformity with Title IX's effective-accommodation requirement.  Accordingly, my conclusion that Quinnipiac may not count its acro program toward compliance with Title IX is confined to the analysis

under prong one—the only prong in which an assessment of substantial proportionality in

"intercollegiate level participation opportunities" is required.  44 Fed. Reg. at 71,418.  I need

not—and do not—decide today whether, under different circumstances, a university's

sponsorship of a varsity-level acro program could count toward compliance under prongs two or

three.[48]

   c. Women's Rugby

  The status of Quinnipiac's women's rugby team presents a closer question.  Rugby is

recognized by the NCAA, and is therefore subject to the presumption that participants on the

rugby team count for purposes of Title IX.  The issue here is whether that presumption has been

effectively rebutted by the evidence presented at trial.  To make that determination, I must return

to the set of extrinsic and intrinsic factors identified in the 2008 OCR Letter.

   i. *Recognition by the NCAA or Other Authorities*

---

[48] As a practical matter, Quinnipiac's decision to rely exclusively on prong one was most likely motivated by necessity, rather than strategy.  Generally speaking, a defendant-university is unlikely to satisfy prong two's requirement of demonstrating a "history and continuing practice of program expansion" for women where, as here, the university recently sought to eliminate an existing varsity women's sport.  *See* 1996 Clarification at 7 ("In the event that an institution eliminated any team for the underrepresented sex, OCR would evaluate the circumstances surrounding this action in assessing whether the institution could satisfy part two of the test."). For similar reasons, it is unlikely that a defendant-university could demonstrate, for purposes of prong three, that the interests and abilities of female students have been "fully and effectively accommodated by the present program" where, as here, the university has sought to eliminate, over its athletes' objections, an existing varsity women's sport.  *See* Russlynn Ali, Assistant Secretary for the Office for Civil Rights, Dep't of Education, Dear Colleague Letter, at 5 (Apr. 20, 2010) ("[I]f an institution recently has eliminated a viable team for the underrepresented sex from the intercollegiate athletics program, OCR will find that there is sufficient interest, ability, and available competition to sustain an intercollegiate team in that sport and thus there would be a presumption that the institution is not in compliance with Part Three."); *see also Ollier v. Sweetwater Union High Sch. Dist.*, 604 F. Supp. 2d 1264, 1274 (S.D. Cal. 2009) ("[W]hen a viable team is eliminated, unmet interest is strongly suggested.").  Thus, under the circumstances, Quinnipiac probably had little choice but to rely solely on prong one to demonstrate compliance.

The OCR's threshold inquiry is whether the activity under consideration has been recognized as an authentic varsity sport by intercollegiate athletic organizations, such as the NCAA. As noted above, the NCAA currently recognizes rugby as an emerging sport, and as a result of that recognition, the OCR will presume that Quinnipiac's rugby program provides female athletes the opportunity to participate in an intercollegiate varsity "sport" for Title IX purposes. But in the context of this case, that presumption has lost much of its force, because rugby has reached the outer limit of its ten-year provisional period as an emerging sport without adding a sufficient number of varsity programs nationwide to qualify for advancement to NCAA-championship status. Only five schools in the country, including Quinnipiac, currently sponsor varsity women's rugby—far fewer than the number of sponsoring-schools previous emerging sports enjoyed when they were nevertheless stripped of their status for lack of growth. Having failed to rally enough support among NCAA-member institutions, rugby risks losing recognition as an emerging sport in the very near future.

In light of rugby's precarious position within the NCAA, the usual presumption based on NCAA recognition is weakened in this case; rugby may be recognized today, but not tomorrow. Moreover, because the equitable inquiry under Rule 60(b)(5) is forward-looking, *see* Fed. R. Civ. P. 60(b)(5) ("[T]he court may relieve a party or its legal representative from a final judgment, order, or proceeding [if] . . . applying it *prospectively* is no longer equitable.") (emphasis added), the fact that rugby has little prospect of retaining NCAA recognition going forward is particularly relevant here. Accordingly, I conclude that, under the unique circumstances of this case, the presumption in favor of counting Quinnipiac's rugby program for Title IX purposes is entitled to considerably less weight. With that in mind, I turn my attention to the remaining factors under the 2008 OCR Letter.

### ii.     Intrinsic Factors

Rugby, which has been played in its current form for more than a century, plainly possesses the intrinsic qualities of an authentic sport.  Without a doubt, rugby's purpose is athletic competition, its contests are governed by a uniform set of rules, its players are selected for their ruthless athleticism, and its competitive season and length of play are all well settled. Moreover, USA Rugby—the sport's national governing body—sponsors an annual post-season tournament in which member teams compete based on their regular-season results.  Indeed, the plaintiffs concede that rugby is unquestionably a "sport," and that collegiate rugby is, at the very least, capable of providing genuine athletic participation opportunities.[49]  At issue is whether Quinnipiac administers its rugby program as an *intercollegiate-level* sport on par with other varsity sports offered by the University.  *See* 1979 Policy Interpretation, 44 Fed. Reg. at 71,418 (assessing proportionality of "*intercollegiate level* participation opportunities" for purposes of prong one) (emphasis added).  In other words, whether Quinnipiac may count its rugby athletes for Title IX purposes depends on whether the school's rugby program is conducted in a manner that satisfies the various extrinsic factors outlined in the 2008 OCR Letter.

### iii.     Extrinsic Factors

Quinnipiac's rugby program, at least as it was organized and administered in the 2011-12 season, lacked the extrinsic qualities required to provide its female athletes with participation opportunities on par with other Division I varsity sports.

True, Quinnipiac afforded its newly-minted rugby team many of the same benefits that established varsity teams receive, such as professional coaching, support services, practice

---

[49] Indeed, Lopiano testified: "[R]ugby absolutely is a sport.  The question is whether it's being conducted as a Division I varsity level program."  Trial Tr. at 859.

opportunities, scholarships and awards, and an annual budget tailored to the needs of the team. Those benefits are no doubt integral to the development, support, and maintenance of a successful intercollegiate varsity team, and they certainly represent a significant investment on behalf of the University.[50]

But varsity sports, at their core, are all about competition.  For this reason, when assessing varsity programs under Title IX, the OCR places considerable emphasis on factors related to team competition, such as:  (1) whether competitive opportunities differ quantitatively or qualitatively from established varsity sports, including "whether the team competes against intercollegiate or interscholastic *varsity opponents* in a manner consistent with established varsity sports"; and (2) whether the activity provides an opportunity for athletes to participate in pre-season or post-season competition in a manner consistent with other varsity sports, including "whether state, national and/or conference championships exist for the activity."  2008 OCR Letter at 3 (emphasis added); *Biediger*, 728 F. Supp. 2d at 100-01 (citing Brief of the United States as Amicus Curiae at 19-20).  As I stated in my previous decision, "[w]hom a team plays against, how often the team plays, under what conditions competitions are held, and how a champion is eventually selected are all essential to the varsity experience; a team's regular and post-season scheduling defines the quantitative and qualitative scope of competition and creates the reason for which team members practice and train during the year."  *Biediger*, 728 F. Supp.

---

[50] Coach Carlson also recruited athletes for rugby in a manner that was generally consistent with other varsity sports, but only two recruits actually joined the team as a result. The vast majority of rugby's participants were culled directly from the student body after a series of meetings and open tryouts.  Although I am somewhat skeptical that a fully-competitive Division I varsity team can be created in a single season based on an open call and a pair of recruits, this factor does not weigh heavily in my analysis.  Quinnipiac has, at the very least, demonstrated that Coach Carlson's *methods* of recruitment for rugby—for example, off-campus scouting of high school rugby athletes—were generally equivalent in kind to the recruitment strategies of established varsity sports.

2d at 101.  During the 2011-12 season, however, Quinnipiac's women's rugby program fell short on each of those crucial elements.

First, rugby's competitive schedule differed both quantitatively and qualitatively from other varsity sports.  Every other Quinnipiac varsity team—including acro—played a full schedule of varsity competitors.  The rugby team, in contrast, played not only some, but a *majority* of its regular season against non-varsity club teams.[51]  Such diminished competitive opportunity is inconsistent with a varsity program at an NCAA Division I institution.  As I stated before, the "[t]wo basic features of any other collegiate varsity program are the application of a uniform set of rules for competition *and the restriction of competition to contests against other varsity opponents*."  *Id.* at 99-100 (emphasis added).   Rugby may have satisfied the former requirement, but it has not satisfied the latter.[52]

In my view, for purposes of prong one, Quinnipiac's rugby team does not presently provide female athletes with genuine "*intercollegiate level* participation opportunities," 44 Fed. Reg. at 71,418 (emphasis added), equivalent to other Division I varsity teams.  That will not change until, at the very minimum, a majority of its competitions are scheduled against varsity-level opponents.  *See id.* at 71,413 n.1 (distinguishing "intercollegiate" teams from club or intramural teams); *see also Cohen v. Brown Univ.*, 101 F.3d 155, 173 (1st Cir. 1996) (endorsing

---

[51] Moreover, of the four other varsity women's rugby teams at the college level, only one is designated Division I: Eastern Illinois.  Thus, even if Quinnipiac provided its rugby team with a full varsity schedule, the team would have but a single competitor in the entire country at the University's declared division level.

[52] The University argues that, despite spending most of its regular season competing against non-varsity club teams, rugby's competitive schedule still "reflect[ed] the abilities of the team,"  2008 OCR Letter at 3, because Quinnipiac's team ended the 2011-12 season with a relatively mediocre win-loss record.  In my view, however, win-loss records make poor proxies for measuring competitive opportunity under Title IX.  A team's win-loss record is a function not only of the strength of competition, but innumerable other factors, such as injuries, scheduling

the view that "intercollegiate" teams, for purposes of prong one, are those that "regularly participated in *varsity competition*") (emphasis added).  So long as the University offers every other varsity team a full array of varsity competitors, it must do substantially the same for rugby—at least if it hopes to count its rugby program toward compliance with prong one. Anything less violates not only the spirit but the letter of the Policy Interpretation.

Second, the rugby team lacked the opportunity to participate in *any* post-season competition in 2011-12, let alone participate "in a manner consistent with established varsity sports."  2008 OCR Letter at 3.  Neither the NCAA nor the NEC—the regional athletic conference to which every other established varsity team at Quinnipiac belongs—sponsors post-season contests in women's rugby.  As a result, the rugby team was consigned to a separate regional division sponsored by USA Rugby: Metro NY.  But even within that division, Quinnipiac's team could not avail itself of post-season opportunities.  An ice storm forced the cancelation of last year's Metro NY regional play-offs and, for reasons that were not addressed at trial, the regional tournament was never rescheduled.  Coach Carlson, however, testified that, even if the playoffs had gone forward as planned, and even if the team's schedule did not pose any additional conflicts, due to the tournament's grueling consecutive-game-day schedule, she would not—and will not—permit her players to participate in the Metro NY regional for fear of their safety.  That decision effectively forecloses any chance of the team competing for USA Rugby's national championship, at least until Metro NY modifies the tournament's format.

Although I commend Carlson for protecting her athletes' welfare, the very fact that the Metro NY regional is structured in a way that invites such safety hazards demonstrates that USA Rugby—or women's rugby in general—is not yet sufficiently organized within Quinnipiac's

conflicts, and even luck.  Therefore, this factor receives little weight in my analysis.

competitive region to offer post-season opportunities on par with the NEC or NCAA-sponsored regional or conference tournaments that other teams enjoy.  It is difficult to imagine the men's hockey team, for example, declining to participate in post-season tournament play because the NEC or NCAA failed to structure its contests in compliance with basic player-safety standards.  If Quinnipiac is serious about sponsoring women's rugby as a Division I varsity sport, it should not tolerate its team competing in a region in which post-season championships are, in the Coach's estimation, too dangerous to win.

Moreover, even if Quinnipiac's rugby team were permitted to participate in post-season tournaments, the team's regional and conference post-season competition would consist entirely of club teams.  No other school in the Metro NY region sponsors a varsity team.  Nor do any schools in USA Rugby's Northeast Conference.  Indeed, the only point at which Quinnipiac would encounter varsity opponents during the post-season is at the national championship itself—assuming one of the four other varsity teams in existence wins their conference tournament and therefore qualifies for nationals.  On that basis, rugby is unlike any other established varsity team at Quinnipiac: all other teams—with the exception of acro—compete in NEC and NCAA-sponsored tournaments against a full slate of varsity competitors.

### iv.   Conclusion

As noted above, the determination whether an athletic activity qualifies as an intercollegiate varsity sport for purposes of Title IX is based on the totality of the circumstances and should be analyzed on a case-by-case basis.  This case, however, involves procedural—as well as factual—circumstances that are somewhat unique.  Although rugby is currently recognized by the NCAA as an emerging sport, I have concluded that the rebuttable presumption that normally arises from that recognition does not carry the usual force in this case, given the

uncertainty surrounding rugby's future within the NCAA.  Accordingly, I must weigh the various factors under the 2008 OCR Letter to determine whether, on balance, the plaintiffs have successfully rebutted that less-forceful-than-usual presumption.  And although plaintiffs generally bear the burden of proof on that issue, I am mindful that, to succeed on its motion to lift the injunction, Quinnipiac bears the ultimate burden of proving its compliance with Title IX.

Considering the totality of the circumstances, I conclude that, on the basis of the 2011-12 season, Quinnipiac should not be permitted to count its nascent rugby program among the University's intercollegiate-level varsity sports for purposes of prong one.  Although rugby is unquestionably a "sport" (that is, it has all of the intrinsic qualities of a sport), the manner in which Quinnipiac's rugby program was administered in its inaugural season ultimately deprived female participants of the competitive opportunities essential to a genuine varsity experience. Specifically, I find that the rugby team's majority club competition in the regular reason, the absence of any potential varsity competition in the regional and/or conference post-season, and the team's inability to compete for a regional, conference, or national championship due to safety concerns with the regional tournament's current format are sufficient, in the aggregate, to overcome the presumption in favor of counting rugby's participants for Title IX purposes.[53]

I also find unpersuasive Quinnipiac's argument that, by declining to count participants in an emerging sport—like rugby—for prong-one purposes based on the lack of available varsity competition, my decision today conflicts with OCR policies in favor of expanding athletic opportunities for women.  I recognize that emerging sports, by definition, require an incubation period in which to grow and develop, and that during that period first-generation varsity teams

---

[53] Because I have concluded that the rugby team as a whole cannot be counted toward compliance with prong one, I need not decide whether the two individual rugby athletes challenged by the plaintiffs qualify as "participants" under the statute.

will inevitably spend a portion of their regular seasons competing against club teams to round

out their schedules.  But even assuming that, under those circumstances, participants in emerging

sports can never be counted for purposes of prong one—a conclusion I do not reach today—it

does not follow that emerging sports count for nothing under Title IX.  On the contrary, it seems

all but certain that sponsorship of emerging sports could count toward compliance under prongs

two or three.

Under prong two, for example, the OCR has explained that "an institution has flexibility

in choosing which teams it adds for the underrepresented sex, as long as it can show overall a

history and continuing practice of program expansion for members of that sex."  1996

Clarification at 6 n.3.  Schools that sponsor emerging sports—even those for which a majority

varsity schedule is lacking—are no doubt expanding opportunities for female athletes for prong-

two purposes.[54]  Alternatively, under prong three, schools comply with Title IX's mandate when

"the interests and abilities of [the female] sex have been fully and effectively accommodated by

the present program."  44 Fed. Reg. at 71,418.  So long as sponsorship of emerging sports

contributes to full and effective accommodation of athletic interests and abilities, emerging

sports will count toward compliance with prong three as well.  Thus, although I conclude that

participants in Quinnipiac's rugby program may not be counted for purposes of prong one—the

only prong under which Quinnipiac claims to be compliant—my decision by no means precludes

---

[54] Indeed, among the hypothetical examples provided in the 1996 Clarification, the agency's only mention of emerging sports comes in the context of prong two.  *See* 1996 Clarification at 7 ("Institution C is currently implementing a plan to add a varsity women's team in the spring of 1996 that has been identified by a regional study as an *emerging women's sport* in the region. The addition of these teams resulted in an increased percentage of women participating in varsity athletics at the institution. Based on these facts, OCR would find Institution C in compliance with *part two* because it has a history of program expansion and is continuing to expand its program for women in response to their developing interests and abilities.") (emphasis added).

the possibility that, under different procedural circumstances, a school's sponsorship of women's rugby would count for purposes of prongs two or three.

           d.      Women's Indoor and Outdoor Track

Cross-country, indoor track, and outdoor track are recognized by the NCAA as separate championship sports, and athletes in each of those sports are therefore presumptively countable as participants under Title IX.  Moreover, as demonstrated at trial, the fundamental problem that precipitated my previous decision to deduct certain multisport runners from Quinnipiac's counting of indoor and outdoor track participants has apparently been resolved.  As a result of the University's newly-implemented policy on multisport athletes, Coach Martin no longer requires female cross-country athletes to participate in track as well.  Accordingly, because "an athlete who participates in more than one sport will be counted as a participant in each sport in which he or she participates," 1996 Clarification at 3, multisport athletes on Quinnipiac's three separate women's running teams can now be duly counted three separate times, so long as those athletes meet the definition of "participant" in each of those sports.

In light of the above, the plaintiffs' arguments with respect to track have become more nuanced at this stage in the litigation.  The plaintiffs no longer assert that the University's cross-country, indoor track, and outdoor track programs should not be considered separate sports.  Rather, they challenge Quinnipiac's method of counting specific track athletes as "participants" for Title IX purposes.  The plaintiffs target two categories of runners in particular.  First, they contend that certain injured or red-shirted multisport runners who did not actually compete in track should not be double- or triple-counted under the statute.  Second, they argue that a number of multisport athletes who quit the track team less than half-way through the regular season without competing in a single track event similarly should not be counted.  I address each of

those contentions separately.

              i.       *Runners Who Were Injured and Did Not Compete*

First, the plaintiffs argue that approximately a dozen multisport runners who were injured during the indoor or outdoor track season and did not compete in any track events should not be counted as track participants.  The OCR defines "participants" as athletes who are (1) receiving "'institutionally-sponsored support'" (i.e., coaching, equipment, medical and training room services) on a regular basis; *and* (2) "'participating in organized practice sessions and other team meetings and activities on a regular basis'"; *and* (3) "'listed on the eligibility or squad lists maintained for each sport.'"  1996 Clarification at 3 (quoting 44 Fed. Reg. 71,415).  Moreover, an athlete who, "'*because of injury*,'" cannot meet the above criteria will still be counted as a participant if she "'continue[s] to receive financial aid on the basis of athletic ability.'"  *Id.* (quoting 44 Fed. Reg. 71,415) (emphasis added).

Notably, the definition of participant makes no mention of competition, and official OCR guidance provides that the agency will, in fact, count as participants "those athletes who practice but may not compete."  *Id.*  In my view, that narrow expansion of the participant-universe is reasonable and necessary so that so-called "benchwarmers"—athletes who practice and train just as hard as starters, yet unfortunately never get to play—are properly counted.  But where, as here, a school seeks to count an injured runner as a participant in a sport like track—a sport in which there are effectively no benchwarmers,[55] and for which common injuries preclude athletes from competing or even running at all—a more searching inquiry may be needed to ensure that the athlete's varsity experience is "real, not illusory."  1996 OCR Letter at 4.

---

[55] Coach Carlson testified that track meets are usually structured as open invitationals in which virtually any runner—including coaches or other unaffiliated athletes—may compete.  *See* Trial Tr. at 546-47; 554-57.

In the case at bar, there is no dispute that the non-competing injured runners in question were listed on the squad lists for indoor and/or outdoor track and received institutionally-sponsored support.  Therefore, Quinnipiac may overcome the plaintiffs' challenge by demonstrating that those athletes either (1) regularly "participat[ed] in organized practice sessions and other team meetings and activities"; or (2) "receive[d] financial aid on the basis of athletic ability."  1996 Clarification at 3 (internal quotation marks omitted).  Because only one of the challenged runners received a scholarship for track,[56] the remaining runners may only be counted as track participants if the University can show, by a preponderance of the evidence, that those runners practiced and attended team activities on a regular basis.

Determining whether individual runners with disparate injuries of varying severity participated regularly and meaningfully in organized practice sessions and other activities over the course of the season is necessarily a fact-intensive inquiry.  Here, however, I lack a sufficient factual record to make that determination.  For reasons left unexplained at trial, during the 2011-12 season, Quinnipiac failed to keep any record whatsoever of attendance at track team practices, despite an NCAA requirement to do so.[57]  As a result, the only evidence presented by either party on athlete-specific practice-participation rates was the testimony of Coach Martin, who

---

[56] Approximately four of the challenged track athletes received athletic aid for *cross-country*, but did not receive aid for indoor or outdoor track.  To the extent Quinnipiac seeks to count these athletes as participants in track based solely on their scholarships in cross-country, I disagree.  In my view, a multisport athlete must independently meet the definition of "participant" in each sport for which the University seeks to count her.  Athletes are not automatically countable in one sport merely because they receive athletic aid in a different sport.

[57] Obviously, keeping practice records is not, in itself, a requirement of Title IX.  But it is no less obvious that keeping practice records during the 2011-12 season was going to be a requirement for proving compliance with Title IX at the trial in this case.

struggled—quite understandably—to recall the athletes' individual circumstances.[58]  Moreover,

neither party came forward with any corroborative evidence—such as medical records or

testimony from the athletes themselves—concerning the nature or severity of each runner's

injuries, or the physical limitations they suffered as a result.  Based on my review of this limited

record, it appears that some, though not all, injured runners were able to meaningfully participate

in practice sessions and other activities on a regular basis.  But without more information,

drawing distinctions between individual athletes to determine which runners should or should not

count as track participants is simply impracticable.

Although Quinnipiac bore the burden of proof—and ultimately should bear the risk—on

this issue, because the number of challenged athletes is relatively small and including them in the

participation count does not affect the outcome of this case, for purposes of this motion, I will

assume without deciding that injured runners who did not actually compete nonetheless regularly

participated in practice sessions and other team activities.  Based solely on that assumption, and

only for this limited purpose, I will count those athletes as participants for Title IX purposes.

### ii.    *Runners Who Quit the Team and Did Not Compete*

The plaintiffs' second challenge involves a far less complex factual determination.  The

plaintiffs argue that Quinnipiac should not be permitted to count three indoor track athletes who

quit the team before having a chance to compete in any track events.  As explained below, I

agree with that assessment.

---

[58] Although Quinnipiac failed to submit any written record of individual practice-participation rates, with respect to attendance at track competitions and events, the University did submit Coach Martin's score sheets, which indicated whether individual runners were injured or red-shirted during each meet.  Therefore, there is at least some—albeit minimal—evidence to corroborate Coach Martin's testimony that injured runners attended track meets on a regular basis.

Under the plain language of the 1996 Clarification, to qualify as a "participant" for purposes of Title IX, a student-athlete must, *inter alia*, "participat[e] in organized practice sessions and other team meetings and activities *on a regular basis* during a sport's season." 1996 Clarification at 3 (emphasis added).  Moreover, at least one court has held that, to be included in the participant count, an athlete must participate on the team for a majority of the season.  *See Cohen*, 879 F. Supp. at 192 ("A team member who participated for the *majority of the season* should be acknowledged as a participant.") (emphasis added).

Here, indoor track's competitive season began with the team's first event on December 3, 2011 and continued through the final event on March 5, 2012.  *See* Trial Tr. at 523-26.  One athlete, however, quit the team by December 9, 2011; two others followed suit by January 11, 2012.  None of those runners competed in a single track event.  Although Coach Martin testified that, according to her recollection, all three participated in practice sessions in the weeks leading up to the semester break, no practice records exist to verify her memory.

In my view, in the absence of records documenting individual participation at practices, Quinnipiac has failed to demonstrate that these athletes, who quit the team less than half-way through the regular season without competing in a single track event, participated in track "on a regular basis."  1996 Clarification at 3.  Therefore, I conclude that these three athletes cannot be counted as participations under the statute.[59]

---

[59] That result is unchanged by the fact that one of those three runners received financial aid based on athletic ability.  First, the athlete in question received aid not for indoor track, but for cross-country.  As explained *supra* note 56, athletes do not automatically count as participants in one sport merely because they receive athletic aid in a different sport.  Second, even if that runner did receive financial aid for indoor track, she still would not count as a track participant on that basis alone.  Under the OCR's four-part definition of participant, only athletes who, "*because of injury*," fail to meet the other three criteria will be counted as a participant based on the athletic scholarship they receive.  1996 Clarification at 3 (emphasis added).  The runner at issue here, however, failed to meet the other criteria not because of injury, but because

### 2. Calculating "Substantial Proportionality"

Having analyzed which women's teams sponsored by the University count for purposes of prong one, I will now apply the formal, two-step process that the OCR uses to determine whether a school provides substantially proportional athletic participation opportunities. First, I will count the total number of participants; second, I will determine whether that total is substantially proportional to the University's undergraduate female population.

Based on the analysis above, I conclude that a total of sixty-seven women must be removed from Quinnipiac's tally of female athletes during 2011-12. Those sixty-seven women represent the thirty-six athletes in acro, twenty-eight athletes in rugby, and three indoor track runners who quit the team less than half-way through the regular season and did not compete in a single track event.

Quinnipiac's roster count shows that 321 female athletes and 168 male athletes participated on varsity teams during the 2011-12 academic year. As noted above, sixty-seven female athletes must be removed from Quinnipiac's count, which leaves 254 female athletes. That completes the first step of the analysis.

The second step is to compare the proportion of women properly counted as Quinnipiac's varsity athletes to the proportion of women in the University's undergraduate population. The University's enrollment data showed that, in the 2011-12 academic year, 62.4 percent of Quinnipiac's undergraduates were women. Under the Title IX count, however, only 60.2 percent—254 female athletes out of 422 total athletes—of Quinnipiac's varsity athletes were female. That results in a 2.2 percent disparity.

The OCR has not established a threshold statistical figure for determining whether a

she quit the team prematurely.

school offers participation opportunities substantially proportional to its enrollment, but instead examines each school on a case-by-case basis.  1996 Clarification at 4.  Some courts, however, have indicated that a disparity below two percentage points is proof that an educational institution falls within the substantial proportionality safe harbor.  *See Equity in Athletics, Inc. v. Dep't of Educ.*, 675 F. Supp. 2d 660, 682-83 (W.D. Va. 2009) (finding no case in which a disparity of two percentage points was held to constitute a lack of substantial proportionality). Thus, a 2.2 percent disparity represents, at least in numerical terms, a very close case indeed.[60]

The OCR was clear in its 1996 Clarification, however, that raw numbers are only part of the analysis for whether the participation of women in a school's varsity program is proportional to enrollment.  In addition to calculating statistical disparity, the OCR also considers whether natural fluctuations in enrollment contributed to the lack of proportionality, and whether the number of athletic participation opportunities needed to achieve exact proportionality would be sufficient to sustain a viable athletic team.  1996 Clarification at 4.

Quinnipiac, however, introduced no evidence at trial to suggest that natural fluctuations in enrollment—or unanticipated drops in female athletic participation—were to blame for any disparity in athletic opportunities.  On the contrary, Quinnipiac carefully selected its teams' roster targets, and the evidence showed that the University continued to take steps to ensure that its roster targets were met over the course of the year.

Moreover, the 2.2 percent disparity represents a shortfall of approximately twenty-five

---

[60] Although the calculations above reveal a disparity of only 2.2 percent, it must be remembered that I have already given Quinnipiac the benefit of the doubt by assuming that, for purposes of this motion, the dozen or so injured track athletes challenged by the plaintiffs participated regularly and meaningfully in organized practice sessions, and therefore count as "participants" under the statute.  Accordingly, the 2.2 percent figure is a particularly generous one, because gaps in the evidence have been resolved in Quinnipiac's favor.

- 85 -

female athletes.[61]  Twenty-five additional athletes would almost certainly be enough to sustain a

new, independent varsity team.  In 2011-12, the average women's squad size was approximately

twenty-three players.  Moreover, if the injunction is lifted, Quinnipiac plans to eliminate the

women's volleyball team and thus subtract those players from its athletics program.  Because

women's volleyball required a mere fourteen players to compete this past season, the shortfall of

twenty-five participation opportunities is clearly enough to support an independent varsity squad;

namely, a restored women's volleyball team for the upcoming season.  On this basis, I conclude

that the 2.2 percent disparity demonstrates that, in the 2011-12 academic year, Quinnipiac failed

to allocate athletic participation opportunities in numbers substantially proportionate to its

undergraduate female population.  Accordingly, the University has not yet brought itself into

compliance with Title IX's effective-accommodation mandate.

> B.    Equivalent Competition (Prong One of the Levels-of-Competition Test)

Having determined that Quinnipiac failed to satisfy prong one of the three-part test for

effective accommodation, I now turn to consider whether Quinnipiac independently fails the

levels-of-competition test.  Put differently, even assuming, *arguendo*, that the analysis above is

in error—and all of Quinnipiac's acro, rugby and track participants should count toward

compliance with Title IX—I must nevertheless determine whether Quinnipiac violated the

effective-accommodation mandate by failing to provide equivalently-advanced competition for

its female athletes.

Prong one of the levels-of-competition test examines, on a program-wide basis, whether

---

[61] The total number of additional female athletes needed to achieve exact proportionality
was calculated in the following manner.  In order for the 168 male athletes to represent 37.6
percent of the University's varsity athletes, there would have to be 447 total athletes, or 279
female athletes.  The difference between the exactly proportional 279 female athletes and the 254
female athletes currently countable under Title IX is 25.

the competitive schedules for men's and women's teams provide "proportionally similar" numbers of male and female athletes equivalent competitive opportunities.  That determination turns on the four-step analysis I outlined above—an analysis that is summarized by the tables that follow.

**Men's Teams**

| Men's Teams | # of Participants | Division I competitions | Division I competitive opportunities | Non-Division I competitions | Non-Division I competitive opportunities | % below declared division level |
|---|---|---|---|---|---|---|
| Baseball | 31 | 52 | 1612 | 0 | 0 | 0% |
| Basketball | 16 | 29 | 464 | 0 | 0 | 0% |
| Cross-country | 13 | 7 | 91 | 0 | 0 | 0% |
| Ice Hockey | 28 | 34 | 952 | 0 | 0 | 0% |
| Lacrosse | 44 | 17 | 748 | 0 | 0 | 0% |
| Soccer | 25 | 17 | 425 | 0 | 0 | 0% |
| Tennis | 11 | 22 | 242 | 0 | 0 | 0% |
| **TOTALS** | | 178 | 4534 | 0 | 0 | **0%** |

**Women's Teams**

| Women's Teams | # of Participants | Division I competitions | Division I competitive opportunities | Non-Division I competitions | Non-Division I competitive opportunities | % below declared division level |
|---|---|---|---|---|---|---|
| Acro | 36 | 6 | 216 | 4 | 144 | 40% |
| Basketball | 15 | 29 | 435 | 0 | 0 | 0% |
| Cross-country | 24 | 7 | 168 | 0 | 0 | 0% |
| Field Hockey | 22 | 18 | 396 | 0 | 0 | 0% |
| Golf | 11 | 10 | 110 | 0 | 0 | 0% |
| Ice Hockey | 27 | 33 | 891 | 0 | 0 | 0% |
| Lacrosse | 30 | 15 | 450 | 0 | 0 | 0% |

| | | | | | |
|---|---|---|---|---|---|
| **Rugby** | 28 | 3 | 84 | 7 | 196 | 70% |
| **Soccer** | 26 | 17 | 442 | 0 | 0 | 0% |
| **Softball** | 16 | 53 | 848 | 0 | 0 | 0% |
| **Tennis** | 11 | 24 | 264 | 0 | 0 | 0% |
| **Indoor Track** | 32 | 7 | 224 | 0 | 0 | 0% |
| **Outdoor Track** | 29 | 7 | 203 | 0 | 0 | 0% |
| **Volleyball** | 14 | 25 | 350 | 0 | 0 | 0% |
| **TOTALS** | | 254 | 5081 | 11 | 340 | **6.3%** |

As shown in the first table above, during the 2011-12 academic year, zero percent of the competitive opportunities Quinnipiac provided to male athletes were against non-Division I opponents. Or, put differently, 100 percent of Quinnipiac's male varsity athletes played 100 percent of their competitive schedule against Division I varsity opponents.

Compare that calculation with the women's over-all program. As shown in the second table above, a total of 6.3 percent of the competitive opportunities Quinnipiac provided to female athletes were against non-Division I or non-varsity opponents. Because male athletes did not play a single regular-season contest against opponents ranked below the University's declared division level, that results in a 6.3 percent overall disparity in equivalently-advanced competitive opportunities for female athletes.

That disparity is a direct consequence of the irregular competitive schedule of the women's acro and rugby teams during the 2011-12 season. Acro, for example, played four out of ten regular-season contests against below-division-level teams, two against NCAA Division II teams, and two against non-NCAA teams sponsored by the NAIA. Rugby's schedule, by comparison, was even more anomalous. Out of ten regular season matches, the women's rugby team played only three against Division I varsity opposition, and all three were against the same—and, indeed, the only—Division I varsity competitor: Eastern Illinois. Only one other

- 88 -

match was played against a varsity opponent, but that team was ranked Division II.  The majority of rugby's competitions—a total of six matches—were played against non-varsity club teams.

The OCR has not specified a threshold percentage that will constitute a violation of the equivalent-competition requirement.  Nevertheless, a disparity of 6.3 percent is above the 5 percent threshold that Quinnipiac's own expert suggested would result in a finding of non-compliance.  Moreover, the significance of the 6.3 percent disparity comes into greater clarity when two additional facts are considered.  First, rugby's competitive schedule not only contained discrepancies in division levels among opponents, but discrepancies in their varsity status as well.  Thus, while a 6.3 percent disparity may appear to be—in strictly quantitative terms—a relatively modest difference, the fact that Quinnipiac offered female rugby athletes a majority *club* schedule while offering its male athletes a full *varsity* schedule at the highest division level demonstrates—in qualitative terms—a particularly egregious disparity in opportunity.  Second, it bears mention that acro and rugby—the only teams competing against below-division-level opponents—represent two of the four largest rosters among all women's teams sponsored by the University.[62]  As a result, an exceptionally large percentage of female athletes were affected by Quinnipiac's inequitable allocation of competitive opportunities: during the 2011-12 academic year, 20 percent of all female athletes had team schedules in which 40 percent or more of their regular-season competitions were against non-Division I or non-varsity opponents.  On that basis, I have little trouble concluding that Quinnipiac's athletic program, viewed program-wide, failed to provide proportionally-similar numbers of male and female athletes equivalently-advanced competitive opportunities in the 2011-12 academic year.

---

[62] Based on Quinnipiac's calculations, acro boasts the largest number of participants of any women's sport (thirty-six), followed only by indoor track (thirty-two), outdoor track (twenty-nine), and rugby (twenty-eight).

To refute that conclusion, Quinnipiac puts forward two arguments—neither of which is convincing.

First, Quinnipiac contends that there are legitimate, nondiscriminatory reasons for the 6.3 percent discrepancy in competitive opportunities between the sexes. In Quinnipiac's view, acro and rugby, by virtue of their status as new and emerging sports, have yet to develop a sufficient number of varsity teams nationwide to provide a full array of Division I varsity competition. Building on that premise, the University argues that the acro and rugby teams' irregular competitive schedule should be excused.

That argument, however, proves too much. The very fact that Quinnipiac chose to add women's acro and rugby to its athletic lineup when it knew or should have known that those sports lacked—at least at this stage in their development—Division I and/or varsity competition on par with men's varsity sports demonstrates that the University continues to treat its female athletes differently. Rather than add an established NCAA-championship sport—or recommit to sponsoring volleyball, an existing NCAA-championship sport—Quinnipiac took a risk on its women's athletics program and chose to sponsor acro, an unrecognized sport, and rugby, an emerging sport. That gamble does not insulate the University from the equivalent-competition requirement, nor does it excuse the 6.3 percent disparity in competitive opportunities for female athletes.[63]

The University's second argument is even less convincing. According to Quinnipiac, the levels-of-competition test must be applied flexibly to sports like acro and rugby to give effect to

---

[63] A different conclusion might result if Quinnipiac had added acro or rugby in response to requests or petitions by its student body to add those sports to the University's varsity lineup. But that is not the case at bar. On the contrary, the evidence showed that Quinnipiac did nothing to survey the athletic interests among current or prospective students, but instead chose to sponsor acro and rugby for economic or strategic reasons, including the sizeable rosters of

the OCR's policy of encouraging new athletic opportunities for women.  In Quinnipiac's view, a literal application of the equivalent-competition requirement would have a chilling effect on new and emerging sports, as schools will refuse to sponsor them for fear of falling out of compliance with Title IX.

Again, I am not persuaded.  The fact that Quinnipiac's athletic program fails the levels-of-competition test does not mean that other athletic programs sponsoring new or emerging sports will fail that test.  Due to Quinnipiac's carefully-selected squad sizes under its current roster management plan, one-fifth of the University's female athletes participate in unrecognized or emerging sports.  It is unlikely that other universities would attempt to sponsor Division I athletics programs with such a large percentage of new and developing sports.  Moreover, Quinnipiac has chosen to rely, as a matter of litigation strategy, solely on prong one of the levels-of-competition test.  Although I need not decide the issue today, it would appear that, under different circumstances, a defendant-university offering new and/or emerging sports in its athletic program could satisfy the levels-of-competition test by relying on prong two and demonstrating a history and continuing practice of upgrading competitive opportunities for the underrepresented sex.

Accordingly, I conclude that, on the basis of prong one of the levels-of-competition test, Quinnipiac has failed to bring itself into compliance with Title IX's effective-accommodation mandate for the 2011-12 academic year.

C.   Equitable Considerations

Having examined Quinnipiac's current athletic program in some detail, and having determined that the University failed to comply with Title IX by providing women with

female athletes that both teams could support.

nondiscriminatory athletic opportunities, I turn to address the fundamental inquiry under Rule 60(b)(5): whether Quinnipiac has demonstrated a "significant change" in its treatment of female athletes so that continued enforcement of the injunction is no longer equitable.  *See* Fed. R. Civ. P. 60(b)(5); *Sierra Club*, 732 F.2d at 256 ("[A] court may modify a final or permanent injunction only where conditions have so changed as to make such relief equitable, i.e., a significant change in the law or facts.").

To place the matter in perspective, it helps to reiterate what Quinnipiac is seeking to achieve through this motion.  This is not a case in which a defendant is seeking merely a declaration of compliance with Title IX so that it may escape judicial oversight.  Rather, Quinnipiac has made no secret of the fact that it seeks to lift the injunction so that it can move forward with its plans to eliminate an existing women's NCAA-championship sport: women's volleyball.  Thus, in weighing the equities, I am mindful that, as a practical matter, a decision to lift the injunction is a decision to permit a defendant, which was recently adjudged in violation of Title IX, to eliminate varsity participation opportunities for women.

That being said, Quinnipiac has generally made a good faith, if at times misguided, attempt to comply with the injunction and bring itself into statistical compliance with Title IX.  A prime example of that good-faith effort is the addition of varsity women's golf—a full-fledged NCAA-championship sport that clearly offers its participants a genuine varsity experience.  Yet rather than simply recommit to women's volleyball or bring other NCAA-championship sports to campus, the University doubled down on its plan to eliminate volleyball, and staked its compliance with Title IX on an as-yet unrecognized sport as well as an emerging sport in imminent danger of losing that recognition.  Throughout this litigation, Quinnipiac has proclaimed itself a "pioneer" in women's sports by choosing to cultivate acro and rugby as new

and emerging sports for women.  But by relying today on sports that do not yet provide genuine varsity participation opportunities, Quinnipiac has taken a prong-two approach to solving a prong-one problem.

As noted above, in order to obtain relief from a permanent injunctive order, the defendant must demonstrate the inequity of enforcing that order prospectively in light of significantly-changed circumstances.  Here, however, Quinnipiac has shown neither a *significant* change in its allocation of athletic opportunities, nor that inequity would result from continued enforcement of the injunction.[64]  At most, the University has shown that it has made *some* progress toward the goal of effective accommodation, but those modest adjustments over the past two years have brought only incremental improvements in gender equity, not full and lasting compliance with Title IX.  By the measure of both the three-part and levels-of-competition tests, Quinnipiac remained in violation of the statute's effective-accommodation mandate during the 2011-12 academic year.  And although disparities of 2.2 percent and 6.3 percent, respectively, under those two tests appear to be—at least in strictly statistical terms—relatively modest differences, the fact that the University plans to eliminate the volleyball team altogether means that those disparities would only increase if the injunction were lifted.  Accordingly, Quinnipiac's proffered changes to its athletics program are insufficient to warrant dissolution of the permanent injunction.  The equities weigh in favor of keeping the injunction in force for the foreseeable future.

---

[64] Indeed, Quinnipiac has not made any credible showing that continued sponsorship of the volleyball team poses an unfair or unusually onerous burden.  The principal reason Quinnipiac has given for wanting to eliminate the volleyball team is a need to free the volleyball practice space for other activities.  *See* Tr. of Closing Arg. (June 28, 2012) at 11-15.  That goal could be achieved by finding practice space for volleyball off campus, as the University does with the track and golf teams.

Moreover, it bears mentioning that, at this juncture, two-thirds of the plaintiffs' Title IX claims against Quinnipiac have yet to be litigated; the plaintiffs' scholarship and equal-treatment claims are scheduled for trial later this year.  Although the injunction was issued specifically to remedy Quinnipiac's failure to comply with the effective-accommodation requirement, it is beyond cavil that a defendant may violate Title IX by failing to comply with *any* of the core regulatory requirements under the statute.  *See Mansourian*, 602 F.3d at 965; *Kelley*, 35 F.3d at 268.  Indeed, the plaintiffs' still-pending equal-treatment claim arises out of the very same regulatory provision as the effective-accommodation claim at issue here.  *See* 34 C.F.R. § 106.41(c).  An effective-accommodation claim is but one side of the equal-athletic-opportunity coin under section 106.41(c).  *See Biediger*, 691 F.3d at 92 ("Title IX claims of sex discrimination in athletics fall into two categories based on the § 106.41(c) factors to which the claims are addressed: effective accommodation claims focus on § 106.41(c)(1), and equal treatment claims focus on § 106.41(c)(2)-(10).").  Thus, it would be premature to lift the injunction at this stage and permit Quinnipiac to eliminate the volleyball team before full compliance with Title IX has been demonstrated.  For this reason, too, the equities favor keeping the injunction in place, at least until the University's overall compliance with Title IX can be fully assessed at trial.  *Cf. Cohen*, 991 F.2d at 906 ("[T]he district court has broad discretionary power to take provisional steps restoring the status quo pending the conclusion of a trial.").

That raises the question of remedies going forward.  As Quinnipiac is undoubtedly aware, district courts are empowered to order specific relief—such as the addition of women's teams, or the elimination of men's teams, as determined by the court—in Title IX cases, particularly where, as here, a defendant's own remedial efforts have proven insufficient.  *See Cohen*, 991 F.2d at 906-07 (noting that "the district court has the power to order specific relief if the

institution wishes to continue receiving federal funds," and stating that "specific relief [is] most useful in situations where the institution, after a judicial determination of noncompliance, demonstrates an unwillingness or inability to exercise its discretion in a way that brings it into compliance with Title IX") (citing *Franklin v. Gwinnett Cnty. Public Schs.*, 503 U.S. 60, 70-73 (1992)); *Roberts*, 998 F.2d at 833 (noting, in dicta, that in a Title IX class action, an "appropriate remedy for violation might be to enjoin [the university's] conduct of men's varsity competition until defendant presented a plan that would bring [the university] into compliance with Title IX"). Here, however, I do not believe such drastic measures are warranted. Although Quinnipiac still has a ways to go, I am confident that the University is making substantial progress toward Title IX compliance. The inquiry, therefore, is whether it is onerous or inequitable to keep the injunction—and the volleyball team—in place while Quinnipiac's newly-sponsored acro and rugby programs develop.

"Ultimately, Title IX provides institutions with flexibility and choice regarding how they will provide nondiscriminatory participation opportunities." 1996 OCR Letter at 4. Quinnipiac has chosen to meet its statutory obligation by adding, *inter alia*, an emerging sport and an as-yet unrecognized sport. I applaud Quinnipiac for breaking new ground in women's sports, and investing so heavily in new opportunities for female athletes. But having made that choice, Quinnipiac must now follow through with it. As demonstrated at trial, the acro and rugby teams still need to grow and mature before those teams can offer female students athletic opportunities on par with the opportunities Quinnipiac already offers its male students. Determining when and whether those two new teams have ripened into authentic Division I varsity programs—thereby bringing the University into full compliance with Title IX—will require assessment over time, at least more time than two short years. *Cf. Frew v. Suehs*, 775 F. Supp. 2d 930, 936 (noting that,

even where a defendant has recently achieved compliance with a decree, "assessment over time is the most reliable way in which to judge whether the Decree's objectives have been achieved"); *Evans*, 701 F. Supp. 2d at 172 (denying motion to lift injunction, stating "it is simply too soon to tell whether [structural changes] will result in improved outcomes for the plaintiffs, and, if so, whether the improvements will be sustained absent judicial involvement"). As the developmental process for acro and rugby unfolds—a process of Quinnipiac's own choosing—the University should not be permitted to eliminate existing NCAA-championship sports for women.

For the above reasons, I conclude that it is neither inequitable nor unduly burdensome for Quinnipiac to continue to sponsor the volleyball team while its newly-formed acro and rugby teams evolve toward genuine Division I varsity status. Because achieving Title IX compliance will require additional progress over a period of years, Quinnipiac's motion to lift the injunction must be denied. Once acro and rugby reach parity with other Division I varsity teams—or, in the interim, if Quinnipiac supplements its current athletic program with other full-fledged NCAA-championship sports for women—the University may renew its motion to lift the injunction.

## V.   Conclusion

In sum, Quinnipiac has failed to demonstrate a significant change in the quantity and/or quality of athletic participation opportunities provided to its female students. Accordingly, Quinnipiac's motion to lift the injunction (doc. # 225) is DENIED.

It is so ordered.

Dated at Bridgeport, Connecticut, this 4th day of March 2013.

 /s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge

- 96 -