IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHANIE BIEDIGER, KAYLA LAWLER, ERIN OVERDEVEST, KRISTEN CORINALDESI, and LOGAN RIKER, individually and on behalf of all those similarly situated; | ) ) ) ) ) | Case No. 3:09-CV-621(SRU) |
| Plaintiffs, | ) | June 17, 2013 |
| v. | ) ) | |
| QUINNIPIAC UNIVERSITY, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
FOR A FINAL ORDER APPROVING THE PROPOSED CONSENT DECREE**

Jonathan B. Orleans (ct05440)
Alex V. Hernandez (ct08345)
Pullman & Comley, LLC
850 Main St., P.O. Box 7006
Bridgeport, CT  06601-7006
Telephone:  (203) 330-2000
Facsimile:  (203) 576-8888
Email:  jorleans@pullcom.com
Email:  ahernandez@pullcom.com

Kristen Galles (pro hac vice)
Equity Legal
10 Rosecrest Avenue
Alexandria, VA  22301
Telephone:  (703) 722-1071
E-Mail:  kgalles@comcast.net

Sandra Staub (ct28408)
American Civil Liberties Union
 Foundation  of Connecticut
330 Main Street
Hartford, CT  06106
Telephone:  (860) 523-9146
Email:  sstaub@acluct.org

## I.     INTRODUCTION

The parties to this class action – Plaintiffs Stephanie Biediger, Kayla Lawler, Erin Overdevest, Kristen Corinaldesi, and Logan Riker, individually and on behalf of a certified class of similarly situated female student-athletes ("Plaintiffs"), and Defendant Quinnipiac University ("Defendant," "Quinnipiac," or the "University") – have reached a settlement agreement resolving all of Plaintiffs' claims.  The settlement has been embodied in a proposed Consent Decree, which was filed with the Court when the parties moved jointly for preliminary approval (doc. #307).  The Court granted preliminary approval on April 29, 2013 (doc. #308).   Pursuant to Fed.R.Civ.P. 23(e), Plaintiffs now request a final order approving the Consent Decree.

## II.    COMPLIANCE WITH PRELIMINARY APPROVAL ORDER

The Court is thoroughly familiar with the history of this case, and this Memorandum assumes such familiarity on the part of the reader.  Pursuant to the Preliminary Approval Order, Quinnipiac emailed the form of notice approved by the Court to the members of the class on May 3, 2013.  (Declaration of Mark Thompson, filed herewith.)  No objections to the proposed Consent Decree have been filed with the Court or received by counsel.  The coach of Quinnipiac's women's rugby team and a member of the team jointly transmitted a comment and a request to appear and be heard at the Fairness Hearing.

## III.   THE CONSENT DECREE

The following are the principal terms of the proposed Consent Decree:

### A.     Title IX Policy

- Quinnipiac will promptly develop and disseminate a Title IX nondiscrimination and grievance policy.

- Quinnipiac will ensure that its Title IX coordinator is trained concerning gender

equity in athletics and that he/she will participate in ensuring gender equity in the athletics department.

   a.  **Participation Claims**

- Quinnipiac will not eliminate its women's volleyball team during the term of the Consent Decree.

- Quinnipiac will not eliminate any other women's varsity athletic team during the term of the Consent Decree unless it replaces the team with a varsity team in an NCAA championship sport that provides a comparable number of athletic participation opportunities.

- Quinnipiac will enhance the women's track and field programs by, among other things:  authorizing additional scholarships for athletes who focus on non-distance events; providing the maximum number of paid full-time coaches allowed by NCAA rules; making good faith efforts to expand the number of events in which women's track and field athletes compete; and providing regular access and transportation to an adequate facility for outdoor track and field practices.

- Quinnipiac will enhance the women's rugby team by, among other things: authorizing additional scholarships; engaging a full-time assistant coach; upgrading the quality and condition of the field which will be dedicated to exclusive use of the women's rugby team; scheduling most matches against varsity or upper-level club teams; and making good faith efforts to promote rugby as a varsity sport with the goal of establishing a Division I varsity women's rugby athletic conference.

- Quinnipiac will not add any new men's teams during the term of the Consent Decree unless it also adds additional women's teams with a comparable number of

opportunities.

b. **Scholarship Claims**

Quinnipiac will authorize additional athletic scholarships for several of its women's teams.  More specifically:

- Quinnipiac will authorize the maximum number of scholarships permitted by NCAA rules for all of its women's "tier one" teams, and will authorize at least 50% of the maximum number of scholarships permitted by NCAA rules for all of its other women's varsity teams.

- Quinnipiac will not decrease the number of scholarships authorized for any women's varsity team.

- Quinnipiac will also authorize additional scholarships for the track and field and rugby teams, and for the women's volleyball team.  By the 2015-16 academic year the volleyball team will have 8 scholarships.

- Quinnipiac will not add more athletic scholarships for its men's teams unless it also adds a comparable number of athletic scholarships for its women's teams.

c. **Treatment and Benefits Claims**

i. *Facilities*

- Quinnipiac will make a number of major improvements to athletics facilities. It is expected that the facility improvements and new construction will take about five years to complete.

- Quinnipiac will spend at least $5 million to improve the permanent athletic facilities used by its women's varsity sports teams, including the renovation and/or construction of locker rooms, exercise and weight training facilities,

3

and other facilities, so that they are comparable to the facilities provided to men's varsity teams in the same tier.

- Quinnipiac will construct an indoor track and field facility that meets NCAA standards for practice and competition.

- Quinnipiac will provide its track athletes with access to an outdoor track & field facility and will provide transportation to and from that facility.

- Quinnipiac will build a superior practice and competition facility dedicated to women's field hockey.

- Quinnipiac will increase the dimensions of the varsity rugby pitch to the maximum dimensions allowed by the International Rugby Board.

ii.    *Tiering*

- Quinnipiac will elevate women's field hockey to "tier one" status by the beginning of the 2013-14 academic year, and will elevate a fourth women's sport to tier one status within six months of the Court's approval of the Consent Decree.  All tier one teams will have the maximum number of scholarships, will have the maximum number of paid coaches, and will schedule the maximum number of competitions allowed by NCAA rules. They will also practice and compete at facilities of superior quality.

- Quinnipiac will not add more men's teams to tier one during the term of the Consent Decree unless it also adds a proportionate number of women's teams or female athletes to tier one.

iii. *Other Benefits*

- Quinnipiac will spend approximately $450,000 to improve benefits for female athletes by the 2013-14 academic year including:

  − providing the maximum number of competitive opportunities permitted by NCAA rules during both traditional and nontraditional seasons;

  − allowing all teams to begin practice at the earliest date permitted by NCAA rules;

  − providing athletic training coverage for all sports during both traditional and non-traditional seasons;

  − increasing academic support; and

  − increasing the salaries of women's coaches.

- Quinnipiac will spend up to an additional $175,000 annually for benefits to female athletes in accordance with the recommendations of the Referee designated under the Consent Decree.

d. **General Provisions**

- The Court will appoint a "Referee" to oversee the implementation of the decree and to monitor compliance. Quinnipiac will provide information and reports to plaintiffs' counsel and the Referee on a regular basis. The Referee will have authority to receive and investigate complaints concerning Quinnipiac's compliance with Title IX and the Consent Decree. The parties have jointly proposed that Jeffrey H. Orleans, former Commissioner of the Ivy League, be appointed as the Referee.

- The Court will retain jurisdiction over the lawsuit for the duration of the Consent Decree.

- Most provisions of the Consent Decree will be in effect for three years.

- The terms of the Consent Decree do not apply to the Acrobatics and Tumbling Team.

  ### e.  **Payment of Attorney Fees and Expenses**

- Quinnipiac will pay class counsel $1,900,000 for attorneys' fees and costs of litigation, and in addition will contribute $50,000 to the Emanuel Margolis Fellowship Fund at the Quinnipiac University School of Law.  (The Margolis Fellowship supports a Quinnipiac law student to work at the ACLU of Connecticut.)

  ### f.  **Payments to Named Plaintiffs**

- Quinnipiac will pay each named Plaintiff $15,000 in satisfaction of her individual claims under Title IX.

## IV.  ARGUMENT

### A.  Legal Standard

While the decision to grant or deny approval of a settlement lies within the broad discretion of the trial court, settlement is a highly favored means of resolving disputes.  *Bano v. Union Carbide Corp.*, 273 F.3d 120, 129–30 (2d Cir. 2001); *see also Anita Foundations, Inc. v. ILGWU Nat. Ret. Fund*, 902 F.2d 185, 190 (2d Cir. 1990) ("Courts are wary of disturbing settlements, because they represent compromise and conservation of judicial resources, two concepts highly regarded in American jurisprudence.").   The judicial policy in favor of settlements is particularly strong in the class action context, where the cases "readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006); *see also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 805 (3d Cir. 1995), *quoted in Bano*, 273 F.3d at 130 (noting  "the urgency of

[the public] policy [favoring settlements] in complex [class] actions that consume substantial judicial resources and present unusually large risks for the litigants"); *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) (settlement of complex class action litigations is clearly favored by the courts because "[t]here are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation").

A court may approve a class settlement if it is "fair, adequate, and reasonable, and not a product of collusion." *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000) (citing Fed. R. Civ. P. 23(e)(2)). This evaluation requires the court to consider "both the settlement's terms and the negotiating process leading to settlement." *Wal-Mart Stores, Inc. v. VISA U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005). Moreover, courts in the Second Circuit recognize "a presumption of fairness, reasonableness, and adequacy as to the settlement where 'a class settlement [is] reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803 (2d Cir. 2009) (quoting *Wal-Mart Stores*, 396 F.3d at 116); *see also In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y), *aff'd*, 117 F.3d 721 (2d Cir. 1997) ("So long as the integrity of the arm's length negotiation process is preserved . . . a strong initial presumption of fairness attaches to the proposed settlement.").

Recognizing that a settlement represents an exercise of judgment by the negotiating parties, the Second Circuit has cautioned that while a court should not give "rubber stamp" approval to a proposed settlement, it must "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir.2000). In assessing a settlement, the court should neither substitute its

7

judgment for that of the parties who negotiated the settlement, nor conduct a mini-trial on the action's merits.  *See Weinberger*, 698 F.2d at 74; *see also In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 455 (S.D.N.Y. 2004) (court should not substitute its "business judgment for that of counsel, absent evidence of fraud or overreaching") (citations omitted; internal quotation marks omitted).

The factors to be considered by a court in making a Rule 23(e) fairness determination are as follows:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendant to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463 (citations omitted).  In applying these factors, "not every factor must weigh in favor of the settlement, but rather the court should consider the totality of these factors in light of the particular circumstances."  *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008) (citations omitted; internal quotation marks omitted); *see also Int'l Union of Elec., Elect., Salaried Mach. & Furniture Workers v. Unisys Corp.*, 858 F. Supp. 1243, 1265 (E.D.N.Y. 1994) (the court need not apply any "single, inflexible test") (citations omitted; internal quotation marks omitted).

The Consent Decree now before this Court was reached through arm's-length negotiations by experienced counsel, imparting to it a presumption of fairness.  That presumption is bolstered by the factual and legal complexity of the case, the extensive exchange of information in discovery, the advanced stage of the proceedings, the myriad risks attendant to

any litigation, and Plaintiffs' counsel's knowledge that continued litigation might not produce a more favorable result than that which could be obtained by settlement.  The proposed Settlement is fair, reasonable, and adequate, and warrants this Court's final approval.

      **B.**      **The Proposed Consent Decree Is Entitled to a Presumption of Fairness Because It Was Negotiated at Arm's Length by Experienced and Informed Counsel**

The proposed Consent Decree is presumptively fair, reasonable, and adequate because it was reached by experienced, fully-informed counsel after extensive arm's-length negotiations, with the assistance of a professional mediator with experience resolving Title IX cases.

"A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."  *Wal-Mart Stores*, 396 F.3d at 116 (citations omitted; internal quotation marks omitted); *see also In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009), *aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010) ("Where a settlement is the 'product of arm's length negotiations conducted by experienced counsel knowledgeable in complex class litigation,' the negotiation enjoys a 'presumption of fairness.'") (citations omitted).  In this vein, the opinions of experienced and informed counsel supporting settlement are entitled to considerable weight.  *See Currency Conversion Fee*, 263 F.R.D. at 122 (noting that experienced class counsel, like experienced mediators, can lend fairness to a settlement).

In this case, experienced and capable counsel explored settlement possibilities periodically over four years of litigation, enlisting the assistance of judicial and non-judicial mediators.  Attorney Galles has represented class plaintiffs in numerous Title IX cases.  Other counsel on both sides have many years of experience representing plaintiffs and defendants in

complex litigation, including both class and individual cases in which plaintiffs have alleged that they were victims of discrimination in violation of federal statutes.

In addition to exploring settlement over the course of the litigation, the parties entered into more focused negotiations in December 2012. Having reached an impasse, the parties enlisted the services of Michael Dickstein, Esq., a professional mediator with specific experience in the resolution of Title IX cases. It took three months of intense, hard-fought, and sometimes contentious negotiations before the parties were able to agree to the terms now before this Court. Under these circumstances – and particularly in the absence of any indicia of fraud or collusion – this Court should begin its analysis of the *Grinnell* factors with the presumption that the Consent Decree is fair, reasonable, and adequate.

### a. Evaluation of the Consent Decree under the *Grinnell* Factors Confirms That It More Than Satisfies the Fair, Reasonable, and Adequate Standard

Building upon the presumption of fairness that attaches to the proposed Consent Decree, each and every one of the nine *Grinnell* factors weighs manifestly in favor of final approval.

### 1. *Complexity, Expense, and Likely Duration of Litigation*

"Avoiding wasteful litigation and expense are factors which lay behind the Congressional infusion of a power to compromise." *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997), *aff'd sub nom. In re PaineWebber Inc. Ltd. Partnerships Litig.*, 117 F.3d 721 (2d Cir. 1997) (citations omitted; internal quotation marks omitted). Consequently, courts in the Second Circuit place heavy emphasis on the first *Grinnell* factor. *Id.* Where, as here, difficult questions of law and fact predominate, and "litigation[ ] through trials and appeals would be burdensome, perhaps needlessly expensive, and possibly could substantially reduce the

amounts now available for settlement," fairness is well-served by settlement.  *In re Milken &*
*Associates Sec. Litig.*, 150 F.R.D. 46, 55 (S.D.N.Y. 1993).

This case has presented numerous complex factual and legal issues under Title IX.  Yet
although the litigation has continued for over four years, only one of Plaintiffs' claims – their
equal athletic participation claim – has been tried, and only as to equitable relief.[1]  Plaintiffs'
counsel have collectively invested well over $2 million worth of attorney time and $150,000 in
out-of-pocket expenses in the case.  Defendant has undoubtedly incurred similar amounts for
counsel's services and litigation expenses.   There can be no doubt that litigation of the
outstanding damages claim under Count One and of Plaintiffs' three remaining claims (for
discrimination in the allocation of athletic financial assistance, discrimination in the allocation of
athletic benefits, and retaliation) would be protracted and costly, and would continue to present
complex and difficult factual and legal issues.  Nor can there be any doubt that a trial on those
remaining claims likely would not conclude the action – time-consuming post-trial motions and
appeals would be inevitable.  The case could go on for many more years.

     i.    ***Favorable Reaction of Class***

The only *Grinnell* factor to outweigh the first is the reaction of the class.  *See In re Am.*
*Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001) ("[T]he reaction of the
class to the settlement is perhaps the most significant factor to be weighed in considering its
adequacy.") (citations omitted; internal quotation marks omitted).   "Lack of objection," – as in

---

[1] In their Amended Complaint, Plaintiffs sought both damages and equitable relief on their Title
IX claims.  Although the class was certified as to injunctive relief only, if the case were to
continue Plaintiffs would seek certification of a damages class and would attempt to prove
damages on a classwide basis.

this case – "is strong evidence of the settlement's fairness." *In re Luxottica Grp.*, 233 F.R.D. at 311.

The proposed Consent Decree has been well-received by the class. Pursuant to this Court's order, Quinnipiac emailed notice to class members on May 3, 2013. The deadline to file objections, comments, and/or requests to be heard at the Fairness Hearing was June 5, 2013. Through the date of this memorandum, not a single objection to the settlement described in the notice has been received.

ii.   *Stage of Proceedings and Amount of Discovery Completed*

"A court will consider the extent of discovery completed by counsel in order to ensure that plaintiffs have had access to sufficient material to evaluate their case and to assess the adequacy of the settlement proposal in light of the strengths and weaknesses of their position." *In re Luxottica Grp.*, 233 F.R.D. at 312. Where, as here, extensive discovery has been conducted and the litigation is at an advanced stage, it is apparent that Plaintiffs' counsel "has had sufficient information to act intelligently on behalf of the class." *In re PaineWebber*, 171 F.R.D. at 126.

A very large amount of information was exchanged in the discovery process. The parties conducted extensive written discovery, exchanging thousands of pages of documents, and deposed over twenty witnesses. Experts on both sides prepared multiple reports. The Court also conducted three separate evidentiary hearings, each of which lasted several days.

The mediation with Attorney Dickstein began after the Court of Appeals affirmed this Court's decision granting a permanent injunction, as the parties prepared for potential trial on the remaining three claims in the case. Although discovery had not been entirely completed on those claims, enough information had been disclosed to allow for the preparation and exchange of preliminary expert reports.

At this stage of the case, the parties are in a superior position to evaluate the benefits of the proposed Consent Decree against the risks of proceeding through resolution of the remaining three claims. *See Wal-Mart Stores*, 396 F.3d at 118 (where several years of discovery, summary judgment and mediation occurred prior to settlement, plaintiffs had "a thorough understanding of their case"). The Consent Decree captures, in its terms, the thorough analysis of the case performed by both Plaintiffs' counsel and Defendant's counsel.

    iii.  ***Risks of Establishing Liability***

At each stage of the case, Defendant has vigorously challenged Plaintiffs' factual and legal contentions. Although Plaintiffs are confident that they can establish Defendant's liability on each of the remaining claims, there is no doubt that Defendant will continue to mount a vigorous defense, and there is always risk that Defendant may prevail at trial or on appeal.

    iv.  ***Risks of Establishing Damages***

Even if Plaintiffs were to succeed on the remaining three claims, they would still face risks in proving their damages at trial. "In class actions, the 'complexities of calculating damages increase geometrically.'" *Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 214 (S.D.N.Y. 1992) (citations omitted). Moreover, in view of the broad equitable relief to which Defendant has agreed in the Consent Decree, there is a possibility that further litigation, even if successful, would result in no greater improvements in Quinnipiac's women's athletics program than the Decree provides.

    v.  ***Risks of Maintaining the Class Action Through Trial***

Although Plaintiffs see little risk that the class might be decertified, it is a risk nonetheless. As one court examining the potential for later, unexpected class decertification

noted, "Post-trial motions and appeals – even dubious ones – are a potential risk in any litigation." *In re Luxottica Grp.*, 233 F.R.D. at 314.

vi.     ***Ability of the Defendant to Withstand a Greater Judgment***

"[T]he fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate." *In re PaineWebber*, 171 F.R.D. at 129. Particularly where, as here, the injunctive component of damages is arguably more critical than the monetary relief, the significance of the defendant's financial wherewithal is diminished.

vii.    ***Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery***

The proposed Consent Decree provides myriad benefits to class members and secures promises of significant investment by Quinnipiac in its women's varsity athletics program. Quinnipiac has agreed to retain the varsity women's volleyball program and either has expanded or will expand women's athletic participation opportunities by adding varsity golf and rugby, and by enhancing the women's track and field program. Female athletes will benefit from a substantial investment by Quinnipiac (estimated to be at least $5 million) in new or improved facilities (including locker rooms, exercise and weight training facilities, practice and competition facilities, and office space for coaches), and from further investment by Quinnipiac in additional athletic scholarships for women (including in volleyball), more coaching, additional academic support, the promotion of two women's teams to "tier one" status, higher levels of competition, more practice time, more competitive events, and additional expenditures on such things as uniforms, equipment, and travel. The Referee to be appointed pursuant to the Consent Decree will review Quinnipiac's compliance with the treatment and benefits requirements of

Title IX, and will make recommendations which will be entitled to substantial deference.  The Referee will also supervise the expenditure of $175,000 annually to ensure equality in the treatment of women and men in the University's athletics program.

The benefits the Consent Decree provides to the class equal or exceed in many respects those that could be obtained through trial, satisfying the eighth *Grinnell* factor.

        viii.    ***Range of Reasonableness of the Settlement Fund to a Possible Recovery in Light of All the Attendant Risks of Litigation***

For all of the reasons set forth above, Plaintiffs' counsel believe that the Consent Decree provides Plaintiffs with a very favorable result, and one that is well within the range of reasonableness in light of the risks attendant to continued litigation of the case.  And even if some more favorable result were theoretically possible, certainly such a result would come only after many more years of protracted and costly litigation.

## V.    PLAINTIFFS' ADDITIONAL COMMENTS

Plaintiffs believe it is important also to point out to the Court what is *not* finally determined by the Consent Decree, preserving the rights of the class to challenge any failure of Quinnipiac to comply with Title IX after the Decree expires.

First, the Consent Decree explicitly states (in Section I.A.) that "provided that Quinnipiac complies with the terms of this Consent Decree and binding recommendations of the Referee … Plaintiffs will not seek further relief against Quinnipiac for alleged violations of Title IX during the term of the decree."  Thus, the agreement between the parties embodied in the Consent Decree gives the University time to come into compliance with Title IX.  During this period the University's resources and attention will not be diverted by litigation, provided the University implements the measures to which it has agreed.  During the Decree's term, any claim by

Plaintiffs that Quinnipiac has failed to live up to its promises must be brought to the Referee in the first instance; but once the Decree expires Plaintiffs will have the unrestricted right to challenge in court any violations of Title IX.

Second, the Consent Decree does not finally determine that Quinnipiac's women's rugby team will be countable for Title IX purposes after the Decree expires.  The Court ruled on March 4, 2013 that (*inter alia*) the rugby participants could not be counted in determining Quinnipiac's compliance with Title IX's participation requirements for 2011-12.  In the Decree, Quinnipiac has agreed to significantly raise its level of support for the rugby program by providing an improved dedicated field,  providing at least two full time coaches, scheduling the maximum number of games allowed by NCAA rules, scheduling the best available competition (either varsity or top level club teams), offering nine (9) athletic scholarships, and pledging to promote the sport with the goal of developing a rugby athletic conference of varsity teams.   In view of Quinnipiac's agreement to make this level of commitment to rugby, Plaintiffs agreed as part of the settlement to forego any further challenge to the program for the duration of the Decree.

Plaintiffs hope that Quinnipiac will vigorously promote the growth of women's varsity rugby so that it will provide participants with a competitive experience equal to  Quinnipiac's men's sports by the Decree's termination.  But if rugby does not develop as a varsity sport for women sufficiently to achieve this objective by that time, Plaintiffs have reserved the right again to challenge the counting of rugby for purposes of Title IX.  Defendant has also reserved its rights regarding rugby's status after termination of the Decree.  In the meantime, the parties agree that it is appropriate to give Quinnipiac the time and opportunity to further develop its women's rugby program.

Third, as the Court is aware, Plaintiffs have challenged Quinnipiac's treatment of its track

& field program throughout this litigation.  During the litigation Quinnipiac has enhanced the program, and under the Consent Decree Quinnipiac will implement additional improvements by expanding the number of events in which athletes participate, recruiting athletes with the skills to enter the additional events, providing the maximum number of paid coaches, allowing the track & field teams to enter the maximum number of competitions permitted by NCAA rules, building an indoor track & field facility that meets NCAA standards, providing access and transportation to an offsite outdoor track & field facility, and offering at least 4 cross-country and 6 track & field scholarships.  Plaintiffs applaud the University's increased level of commitment to women's track & field, but reserve their rights to challenge whether Quinnipiac's approach to counting multisport athletes comports with Title IX, whether Quinnipiac provides its track & field athletes with levels of competitive opportunities comparable to those it provides to male athletes, and whether Quinnipiac provides track & field athletes with sufficient benefits sufficient to count its track & field program as a varsity program, after the termination of the Consent Decree.

Plaintiffs hope and expect that when the Consent Decree expires the University will be fully compliant with Title IX, and look forward to working with the Referee and the University to achieve that goal through the procedures established by the Decree.  But in support of final approval of the Decree, we note that Plaintiffs retain the right to challenge noncompliance after the Decree terminates.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for final approval of the proposed Consent Decree.

Respectfully Submitted,


By:   /s/  Jonathan B. Orleans
Jonathan B. Orleans (ct05440)
Alex V. Hernandez (ct08345)
Pullman & Comley, LLC
850 Main St., P.O. Box 7006
Bridgeport, CT  06601-7006
Telephone:  (203) 330-2000
Facsimile:  (203) 576-8888
Email:  jorleans@pullcom.com
Email:  ahernandez@pullcom.com

Kristen Galles (*pro hac vice*)
Equity Legal
10 Rosecrest Avenue
Alexandria, VA  22301
Telephone:  (703) 722-1071
E-Mail:  kgalles@comcast.net

Sandra Staub (ct28408)
American Civil Liberties Union
 Foundation  of Connecticut
330 Main Street
Hartford, CT  06106
Telephone:  (860) 523-9146
Email:  sstaub@acluct.org


*Attorneys for Plaintiffs*

18