```
                  UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

STEPHANIE BIEDIGER, ET AL      :  No. 3:09CV-621 (SRU)
                               :  915 Lafayette Boulevard
             vs.               :  Bridgeport, Connecticut
                               :
                               :  June 20, 2013
QUINNIPIAC UNIVERSITY          :

- - - - - - - - - - - - - - - x

                       FAIRNESS HEARING

B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

   FOR THE PLAINTIFF:

          PULLMAN & COMLEY
                850 Main Street
                P.O. Box 7006
                Bridgeport, Connecticut 06601-7006
             BY: JONATHAN B. ORLEANS, ESQ.
                 ALEX V. HERNANDEZ, ESQ.

          KRISTEN GALLES, ESQ.
                Equity Legal
                10 Rosecrest Avenue
                Alexandria, Virginia  22301

          AMERICAN CIVIL LIBERTIES UNION
                2074 Park Street
                Hartford, Connecticut  06106
             BY: SANDRA J. STAUB, ESQ.

   FOR THE DEFENDANT:

          PROSKAUER ROSE LLP
                Eleven Times Square
                New York, New York  10036-8299
             BY: EDWARD A. BRILL, ESQ.
                 SUSAN D. FRIEDFEL, ESQ.
```

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut   06604
Tel: (917)703-0761

1                   (10:10 O'CLOCK, A. M.)

2                   THE COURT:  Good morning.  We're here in the

3       matter of Stephanie Biediger and others v. Quinnipiac

4       University.  Could I have appearances please?

5                   MR. ORLEANS:  For the plaintiffs, Your Honor,

6       Jonathan Orleans, Alex Hernandez, from Pullman & Comley;

7       Kristen Galles from Equity Legal; and Sandra Staub from

8       the ACLU Foundation of Connecticut.

9                   THE COURT:  Thank you.

10                  MR. BRILL:  Good morning.  For the defendant,

11      Quinnipiac University, Edward Brill and Susan Friedfel

12      from Proskauer Rose.

13                  THE COURT:  Very good.  Thank you.  We're here

14      obviously for consideration of final approval of a

15      proposed consent decree.

16                  I want to first inquire whether there's anyone

17      here who wishes to be heard today.  I got an indication

18      that Rebecca Carlson might be interested in speaking?

19                  Do you wish to be heard beyond what you've

20      submitted in writing?

21                  MS. CARLSON:  I was going to read it, but --

22                  THE COURT:  Yes, why don't you do that.  Come on

23      up.

24                  MS. CARLSON:  Sure.

25                  (Pause)

1              MR. BRILL:  Your Honor, we have no objection to

2    Ms. Carlson speaking, even though she's not a class

3    member, but I just would want to be clear, the

4    university --

5              THE COURT:  I understand.

6              MR. BRILL:  She's not speaking on behalf of the

7    university and we have nothing to do with her --

8              THE COURT:  I understand completely.  I

9    appreciated her testimony and I, I think she has a stake

10   in this litigation, at least indirectly, and I'm happy to

11   hear from her.

12             MS. CARLSON:  Here?

13             THE COURT:  Sure.

14             MS. CARLSON:  Thank you, Your Honor.  Thank you

15   for the opportunity to speak today.

16             Again, my name is Rebecca Carlson and I'm

17   currently the head coach at Quinnipiac University for

18   women's rugby.

19             First and foremost, I want to say that the past

20   two years of being a varsity program at Quinnipiac has

21   been very eye-opening, rich with experience.  When the

22   program first began in the Spring of 2011, compared to our

23   current fellow women's programs, our start-up seemed

24   foreign and unusual.

25             We began with 60 candidates for less than 30

spots.  Over the last two years the program has changed from a group of walk-on players and recruits to a family of hard working varsity student athletes that deserve nothing more than that title they've earned.

I would like to remind the Court today that not so long ago sports like woman's basketball allowed for only half court play and a maximum of two dribbles.  Aside from the obvious modifications to the playing rules of this sport was another process that seems long forgotten, yet despite increasing female participation in sports.

As I'm sure you're aware, not soon after Title IX was passed in 1972, many programs for female student athletes and coaching jobs emerged.  How did they come to create teams where none existed prior?  The answer is they put up fliers, sign-up sheets on campus rec centers and took any and all participants regardless of skills.  If you were to ask some of the most prominent female figures in athletics who were former coaches from that era, they will confirm this.

In references to this, I would like to simply state that during the course of this case there was an attempt to discredit that very same process that was solicited years ago when new sports for women began to surface.

That being said, I would like to say that my

1    coaching staff and I were 100 percent committed to keep

2    only those who were truly varsity athlete caliber,

3    regardless of numbers.

4              I grew up playing only sports with males on a

5    military base where very few female opportunities existed.

6    Therefore, in my experience, I had no choice but to be

7    better than the boys or I didn't make it.  I'm a former

8    dual sport scholarship athlete of the NCAA and

9    participation that is earned is the only method I've ever

10   been familiar with.

11             Over the course of this case, our status has

12   come into question and the legitimacy of our sport

13   challenged based off of the treatment received or not

14   received by the institution.  I am here today to lament to

15   the Court that this program deserves its status 100

16   percent, but we are not able to achieve this alone.

17             The efforts of the student athletes and the

18   coaching staff must be consistently and effectively

19   coupled with strong support from the institution for that

20   varsity title to sustain itself.

21             As a result, the following decree points are the

22   most urgent to our development as a varsity sport, both at

23   Quinnipiac and within the NCAA.  First, rugby is a full

24   contact sport that needs a full-time staff.  A full-time

25   assistant teaching coaching position is a priority for our

program.  My assistant coach is here today.  Our assistant

coach is a vital part of our development in its full

contact sport and is an issue of safety.  Therefore, I

urge the Court to support this.

Second, rugby is played on a field 130 by 75.

Our program must be supplied that field that is a

regulation size in order to be permitted any home games

this fall, as mandated by our local conferences.  I urge

the Court to support this as well.

Third, we are confident that our program will

thrive with the right resources and treatment as we

develop.  We believe we are capable of playing the highest

level of rugby available in the country for competition.

We support the decree of mixed varsity and top tiered club

program schedule including the following:

NCAA Eastern Illinois, two games; NCAA Harvard,

one game; NCAA Westchester, one game; NCAA Norwich, one

game.  Top tier club programs are Army, two games; Navy,

one game; and Stanford with one game.  Also to establish

an in-state rivalry is UConn and Yale.

Fourth, as a former NCAA rugby student athlete,

our program at Eastern Illinois was the only sport on

campus that was forced to be the catch-all facility for

both intermurals, physical education classes, band

practice, and currently is the practice football field at

1    the coach's discretion.

2          Without a dedicated facility it was difficult

3    for recruits, the community and the fellow student

4    athletes, administration and opponents to take the program

5    seriously in the same manner as its fellow varsity sports.

6          At Quinnipiac -- excuse me.  As the Quinnipiac

7    rugby program is considered to be in its infant stages of

8    development, it is imperative that the university is

9    judicious in designating field usage solely for the

10   women's rugby program.  Consistent recreational usage of

11   entities outside the women's rugby program creates unsafe

12   playing services and increased opportunity for injury.

13         Furthermore, the university must be committed

14   and clear in its representation of our program as a

15   varsity sport, which is identical treatment and

16   experience.  Field designation to our sport is a vital

17   vehicle in developing that message.

18         Fifth, we believe rugby to be a viable option

19   for athletic directors and are fully confident that

20   Quinnipiac and its athletic representatives can assist in

21   the marketing and expansion of the game in the NCAA to

22   fellow athletic directors.

23         As a former emerging sports initiative leader

24   for three years at AUSA Rugby, I have seen several

25   institutions interested in our full contact emerging sport

strictly for its roster supply.  Universities adding
roster spots without consideration to increasing financial
and resource obligations are doing a disservice to the
sport.

NCAA rugby, when supported in the same fashion
as other varsity sports, will be a thriving entity in the
future and I hope to be a big part of that.  However, in
order for rugby to thrive, there must be action by
institutions currently housing the sport at the varsity
level.  Quinnipiac must be a leader in this arena.

Individual schools in various regions of the
country adding will not create immediate beneficial
platforms for our sport.  Elevation must come at the
conference level where collective efforts by athlete
directors must be made in order for institutions like
Quinnipiac and eventually achieve in -- excuse me,
eventually achieve an NCAA championship.

In reference to conferences, with Harvard's
recent ad, the Ivy League now possesses an ideal solution
to its compliance issues in terms of women's
participation.  Competing in an all-varsity competition
schedule is desired by Quinnipiac rugby and its coaching
staff, and must be achieved.

The University and Quinnipiac Athletics must
actively pursue and encourage Ivy League administrators in

1    creating this opportunity at the conference level.  If

2    applied in the same manner as demonstrated in their active

3    support of acrobatics and tumbling, QU has unlimited

4    potential to be a positive and vital spokesman for NCAA

5    rugby.  We believe that they are capable of this.

6           We are in full support and would like QU to

7    commit to a consistent campaign on rugby's behalf to the

8    Ivy League and beyond.  Given each of the Ivy League's

9    compliance circumstances, rugby would be an ideal fit and

10   all willing, QU must be an encouraging leader in this

11   arena.

12          Finally, please let it be known that although

13   the lawsuit was brought on by volleyball and there was an

14   attempt to discredit the sport of rugby at Quinnipiac, we

15   support volleyball 100 percent.  Please let it be known

16   that while acrobatics and tumbling was called into

17   question in this case as well, we support these athletes

18   100 percent as well.  These women are the friends, the

19   roommates of my student athletes, and part of our QU and

20   professional future professionals.

21          Because of this case, we're hoping that the

22   country and its leader in athletics will pay attention.

23   We do not wish to see rugby used solely as a compliance

24   solution.  We do not wish to see universities attempt to

25   add women's rugby at the cost of eliminating others.

1    Rather, we strive for rugby to be a successful full

2    contact sport with viable competition and ultimately a

3    NCAA championship.

4                Thank you so much for your attention.

5                THE COURT:  Thank you.

6                MR. BRILL:  Your Honor, I'm sorry, did you have

7    another --

8                THE COURT:  Well, Melissa Condo signed onto the

9    statement as well.  Are you here?  Do you wish to be

10   heard?

11               MS. CONDO:  I am here.

12               THE COURT:  Do you want to say anything today?

13               MS. CONDO:  Yeah, I would like to.

14               THE COURT:  Sure, come on up.

15               (Pause)

16               MS. CONDO:  Hello.

17               THE COURT:  Good morning.

18               MS. CONDO:  Good morning.  I'm a little

19   disheveled this morning, so -- pardon me.

20               My name is Melissa Condo.  I'm a senior on the

21   women's rugby team.  I'm here to represent the team.  You

22   heard my coach speak on behalf of us as well.

23               I'm actually one of the first members of the

24   team and I have seen quite the transformation from 60

25   girls down to the very smaller group that we have left.

1          I went through my athletic career all through

2    high school and younger knowing about Title IX without

3    really knowing about Title IX because it didn't really

4    play that much into my life.  And now I am sort of smack

5    dab in the middle of it in a way I would never have

6    expected.  This has been one of the most challenging

7    experiences of my life.

8          I'm beyond grateful for the opportunities that

9    Quinnipiac has given me, both academically and

10   athletically, but I do see problems with the way that our

11   team and others teams on this campus have been treated,

12   and this is coming from my experience as a female athlete

13   and collegiate athletic.  I see the need for us to have a

14   full-time coaching staff, because when you have a full

15   contact sport, you would never see other full contact

16   sports have only one full-time coach.  So that's one

17   thing.

18          A full size field is definitely necessary for us

19   to be even valid as a Division I NCAA team.  It's just

20   not -- it doesn't make sense for us to not have the actual

21   size field to play on.  And we need more challenging teams

22   to play.  If we ever want to see rugby become more

23   successful as an NCAA sport, we can't just keep playing

24   teams that aren't challenging us and aren't pushing us to

25   be better and pushing more people that want to play rugby

and want to get this started all over the country.

And like other sports at Quinnipiac, we deserve to have our own field and we deserve not to have noncollegiate sports play on our field.  It's just not, it's not something that Quinnipiac should have as a D-1 sport and as a respectable university.

Though I'm disappointed today not to see leadership from some of the other female athletic teams for Quinnipiac, I believe I'm speaking on behalf of all female student athletes today when I say that we all deserve consistent equal treatment and support from Quinnipiac.  And I hope that as a result of this, it will happen not only at Quinnipiac but other colleges nationwide.  Thank you.

THE COURT:  Thank you.

(Pause)

THE COURT:  There are -- you'll get a chance Mr. Brill.  Let me just figure out if there's anyone else who wants to be heard.  I see some of the original plaintiffs in court.  Do any of you wish to be heard concerning the proposed consent decree?

MR. ORLEANS:  Your Honor, perhaps it's appropriate for me to say that the original named plaintiffs are not here in the courtroom.  They all have jobs.

```
1              THE COURT:  Well, one original plaintiff.

2              MR. ORLEANS:  Right, the coach -- Coach Sparks

3        is here.

4              THE COURT:  Yes.

5              MR. ORLEANS:  I apologize.

6              THE COURT:  Do any of the other members of the

7        audience wish to be heard today?

8              (No response.)

9              No?  Okay, very good.  Mr. Brill?

10             MR. BRILL:  Thank you, Your Honor.  I thought --

11       first of all, I want to thank Coach Carlson and Melissa

12       Condo for their remarks to the Court, and I thought it was

13       worth noting particularly in view of the Court's concerns

14       expressed in its most recent decision, that in fact, and

15       Coach Carlson was perhaps too modest to say that rugby

16       teams this past year won the conference championship and

17       advanced to the National Championship Final Four in

18       Stanford University in California, so the team did have a

19       successful here and did compete in postseason

20       championship, both here in the conference and on the

21       national level.

22             THE COURT:  That's great.  I was going to make

23       predictions about the future but I guess some of them have

24       already come true.

25             MR. BRILL:  And I also want to simply point out,
```

```
 1    I think perhaps the Court's aware of this, that the

 2    concerns that the Coach addressed and also that Ms. Condo

 3    addressed with respect to the full-time coaching staff,

 4    the size of the field, the condition of the field and the

 5    exclusive use of the field, are all addressed in the

 6    consent decree.

 7              THE COURT:  I was going to mention that I'm not

 8    sure if they've had the chance to read in full the consent

 9    decree, but it does provide for a full-time assistant

10    rugby coach, it does provide that the university will

11    provide the largest authorized rugby field that will be

12    used exclusively for the women's rugby team.

13              So, I think there's going to be dramatic

14    improvements in rugby at Quinnipiac, women's rugby at

15    Quinnipiac, and it's really my hope that Quinnipiac will

16    become a national leader and that this sport will become a

17    full NCAA championship sport.

18              I have always been surprised frankly that it

19    hasn't.  It's a sport with great appeal.  It's a sport

20    that is -- calls upon a real variety of athletic

21    abilities.  And I remember back in my college days having

22    watched some wonderful club, women's rugby club team

23    competitions and just assumed by now they'd be an NCAA

24    sport.  So hopefully this litigation may in fact spark a

25    renewal of interest in that sport.  I hope that it does.
```

1          Mr. Orleans, did you or any other plaintiffs'

2     counsel wish to be heard?

3          MR. ORLEANS:  Very briefly, Your Honor.  Thank

4     you.

5          With respect to rugby in particular, I'd also

6     like to on behalf of the plaintiff class, thank Coach

7     Carlson and Ms. Condo for coming and speaking to the

8     Court.

9          I suppose it's not necessary for me to read into

10    the record the provisions of the consent decree that

11    specifically address women's rugby, but I would echo Your

12    Honor's comments in saying that in negotiating this

13    consent decree the plaintiff class sought to create a

14    situation in which Quinnipiac would be able to address the

15    concerns expressed by the plaintiffs and by the Court in

16    its most recent decision about the status of rugby.  And

17    it's certainly our hope and expectation that over the term

18    of the consent decree, Quinnipiac will be able to create a

19    first class varsity rugby program that will be able to

20    advocate for that sport with other schools and will be

21    able to encourage the development of woman's rugby as a

22    varsity sport nationwide.

23         Having said that, Your Honor, there were only

24    two other points that I wanted to make.  The first is

25    that, as we've stated in our papers, we believe that this

1    proposed consent decree is fair, adequate and reasonable.

2    It's in the best interests of the class.  We think that

3    we've achieved remarkable benefit for female student

4    athletes at Quinnipiac with this consent decree in terms

5    of treatment, in terms of scholarships, in terms of

6    participation opportunities.  And we are grateful to

7    Quinnipiac for coming to the table and negotiating this

8    agreement with us and committing itself to significant

9    improvements in the quality of the women's athletic

10   program at the university.

11          I did want to mention that upon the announcement

12   of the proposed consent decree in the media, there were

13   some articles that suggested essentially that this decree

14   meant that volleyball at Quinnipiac would last only three

15   more years and would then end, and we've included in our

16   submission to the Court a statement from Mark Thompson,

17   the Vice President at Quinnipiac who is in charge of the

18   athletic programs, continuing that there is no plan at

19   Quinnipiac to eliminate volleyball and we thought it was

20   important to get that on the record.

21          Our other concerns have been addressed in our

22   papers, Your Honor, and with that said, we would request

23   that the Court approve the consent decree.  Thank you.

24          THE COURT:  All right.  Mr. Brill, do you wish

25   to be heard further?

1           MR. BRILL:  As we've said in our memorandum, the

2     University also supports approval of the consent decree,

3     Your Honor.

4           THE COURT:  Very good.  And I am going to

5     approve the proposed consent decree and enter this is an

6     order of the Court.  Having considered all the Grunnell

7     factors, I think this settlement, this consent decree

8     easily wins an approval.

9           And I think what I'd like to note is I approve

10    it -- not only approve it but I applaud it, and I think

11    this has been a very significant and well litigated case.

12    I think both sides had a very high level of competition,

13    if I can use a sports analogy.  I think the abilities were

14    quite good on both sides and the outcome, I'm happy to

15    say, is the very rare circumstance of a win-win.

16          It seems to me that the plaintiffs secured for

17    female athletes and women's sports teams at Quinnipiac

18    really remarkable results.  The sports teams really across

19    the board, I think, at Quinnipiac for women are going to

20    be dramatically stronger in the future.  The facilities

21    are going to be better and the coaching is going to be

22    better, there's going to be more scholarships.  It's going

23    to be -- I think it's going to lead to a real renaissance

24    of women's sports at Quinnipiac.

25          I have already commented on rugby.  It would not

1    at all surprise me that the women's rugby team at

2    Quinnipiac will have a successful in the near future not

3    unlike the men's hockey team at Quinnipiac.  I think it

4    will be a sport that rallies the student body and,

5    frankly, improves the university's image with prospective

6    students, not just athletes but all prospective students

7    who frankly all enjoy going to a place where there is a

8    high level of athletic competition available.

9              So, I think also the women's volleyball team is

10   going to be stronger than it's been in a long time.  It's

11   obviously been on shaky ground for a while and I think the

12   fact there's going to be greater scholarships awarded and

13   presumably a greater commitment to that sport is extremely

14   important.  The university is going to have a beautiful,

15   I'm sure it's going to be beautiful, indoor track

16   facility, which I think can only lead to good things for

17   the women's track athletes, who can I think really take

18   the success that their cross country team has had

19   traditionally and expand that into other track and field

20   events.  So, it's clear the plaintiff class has won a

21   really good outcome here.

22             I think the university is a winner as well.  The

23   university has committed to making dramatic investments in

24   itself and in its student body basically, which can only

25   inure to the university's benefit in the long run.  The

1    fact that the facilities are going to be improved, that

2    teams are going to be more competitive, that there will be

3    athletic successes by the women's teams at Quinnipiac and

4    that Quinnipiac becomes potentially a national leader for

5    women's athletics in a number of areas, I think will all

6    inure to the university's benefit in the wrong run.  These

7    are true investments in the university's future and I

8    think they will bear good fruit, in terms of reputation

9    and in terms of making the university a place that anyone

10   would want to attend.

11        So I think this is the very rare case in which

12   the resolution of the case is a win-win.  Usually it's a

13   situation where each side is walking away relatively

14   disappointed with the outcome because the settlement is a

15   true compromise in which nobody wins, and I commend

16   everyone here for their efforts to bring about what is I

17   think a fantastic result of this difficult and challenging

18   litigation.

19        I would also comment that the, the fact that the

20   parties have agreed to -- I'm forgetting now what we're

21   calling them -- this special master or referee.

22        MR. ORLEANS:  Referee, Your Honor.

23        THE COURT:  Referee, thank you.  That they have

24   found a remarkably competent and experienced referee to

25   work with both sides going forward, I think is very

1    encouraging.  I think that --

2              (Fire alarm sounds.)

3              (Whereupon a recess was taken from 10:35

4         o'clock, a. m. to 10:45 o'clock, a. m.)

5              THE COURT:  So, as I was saying, the only thing

6    I wanted to say is I think the ultimate result in this

7    case is better for both sides than could have been

8    achieved through a completion of the litigation, and

9    that's really a testament to the ability of both sides'

10   counsel and ultimately the good faith of everybody

11   involved, and I hope that this litigation in fact proves

12   to be a net win for everybody in the long run.  I hope

13   that the university comes to a realization that these

14   investments are important and valuable and and ultimately

15   will return to the university great rewards.

16              And I certainly wish everyone involved with this

17   case, directly or indirectly, great, good luck in the

18   future.

19              I intend to enter the proposed order and attach

20   the consent decree.  Is there anything else we need to do

21   to complete this portion of the case?

22              MR. ORLEANS:  Just mechanically, Your Honor,

23   does the Court want, want the original with everyone's

24   signatures for the Court's records?  How do you want to

25   handle that?  I've got today with me an original with

1   signatures on behalf of all of the plaintiffs.  I think

2   the defendant needs a day or to two to get an original

3   signature page.

4           THE COURT:  Well, I think we can enter the

5   order.

6           MR. ORLEANS:  I think so, too.

7           THE COURT:  You can file at some convenient time

8   a fully executed copy.

9           MR. ORLEANS:  That's fine.

10          THE COURT:  I have no doubt that both sides are

11  intending to sign, if they haven't yet done it, and I

12  don't think we should hold things up for that.

13          Any concerns there?

14          MR. ORLEANS:  I agree.

15          MR. BRILL:  No.

16          THE COURT:  All right.  Well, thank you all for

17  a very interesting and challenging piece of litigation

18  and, as I said, best of luck to everybody.

19          We'll stand in recess.

20          MR. ORLEANS:  Thank you, Your Honor.

21          (Whereupon the above matter was adjourned at

22  10:50 o'clock, a. m.)

23

24

25

C E R T I F I C A T E


      I, Susan E. Catucci, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.



/S/ Susan E. Catucci
_____

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917) 703-0761