**Biedeger v. Quinnipiac University**

| | |
|---|---|
| DATE: | July 7, 2016 |
| TO: | Hon. Stefan J. Underhill, USDJ |
| CC: | Counsel for the Parties<br>Mark Thompson, Exececutive Vice President and Provost, Quinnipiac<br>Gregory Amodio, Director of Athletics, Quinnipiac |
| FROM: | Jeffrey Orleans, Referee |
| SUBJECT: | **Referee's Third Annual Report** |

Pursuant to Section V-D-7 of the Consent Decree, I am pleased to submit to the Court and to counsel this third Referee's Annual Report, which is the final Report required under the Decree.  The parties and I understand that, as with prior Referee's Reports, this document will become part of the public record; because the parties have not yet seen this document, however, I would ask the Court not to place it on the record until they have been able to review it.

As in the past, this document is based on a variety of material submitted by Quinnipiac and provided to class counsel, including comprehensive reports in October 2015 and April 2016 and a supplemental report and extensive student-athlete survey results in late June 2016, as well as campus visits and meetings with counsel.  I again want to note the ongoing cooperation of both Quinnipiac and plaintiffs' counsel and of course I will be pleased to discuss any portion of this Report with the Court at any time.

| **Section** | | **Page** |
|---|---|---|
| **A.** | **Preface** | **2** |
| **B.** | **Leadership** | **3** |
| | 1. **Leadership responsibility** | 3 |
| | 2. **Title IX policy and officers** | 4 |
| | 3. **Communicating about Title IX** | 4 |
| **C.** | **Facilities** | **5** |
| | 1. **New facilities** | 5 |
| | 2. **Field hockey, soccer and lacrosse, rugby** | 6 |
| | 3. **Volleyball** | 6 |
| | 4. **Indoor track and field** | 7 |
| | 5. **Strength and conditioning** | 7 |
| | 6. **Locker-rooms** | 7 |
| | 7. **Planning** | 7 |
| **D.** | **Tiering** | **8** |
| | 1. **"Proportionality"** | 8 |

|     |                                                              |     |
| --- | ------------------------------------------------------------ | --- |
|     | 2. Support                                                   | 9   |
|     | 3. Soccer                                                    | 10  |
| E.  | Team budgets, resources and benefits                         | 11  |
|     | 1. Resources generally                                       | 11  |
|     | 2. "Template" resources                                      | 12  |
|     | 3. "Judgment" resources                                      | 14  |
| F.  | Sports information, communication and promotion              | 16  |

**A.   Preface**

This is the final Annual Report specified in the Decree, and the Decree's scope and Referee's responsibilities both became more limited on July. I thus have tried in this Report to provide an overall summary of both progress in major compliance areas and work that still must be finished, including the institutional knowledge, structure and commitment needed to comply with Title IX and specific actions that are important for Quinnipiac to achieve that compliance. The Report thus does not address all specific issues that I may have discussed with either or both parties since the July 2015 Referee's Report, especially when compliance has been addressed earlier[1]. Within the framework set out in the Decree, I intend my recommendations to apply directly to Title IX compliance, and not to be "administrative" considerations.

As I have reported before, I believe that Quinnipiac has made substantial compliance progress during the course of the Decree. Quinnipiac's women's teams also have a number of recent competitive achievements, including in 2015-16 winning the inaugural NCVWRA varsity collegiate rugby championship; NCAA championship participation in women's ice hockey (national quarter-finals), cross-country, golf and tennis; regular-season MAAC championships in field hockey and basketball; and second-place finishes in the Indoor and Outdoor MAAC Track and Field Championships.

At the same time, changes and additions to the senior administrative staff, and development of that staff's advertent focus on Title IX, still are in progress; a number of programmatic changes cannot be complete until the new stadiums are finished, as discussed in Section **C** below; and for a number of unavoidable reasons, the "resources review" required by the Decree (Section **E** below) could not be completed until this spring, which is later than the parties expected initially.

Notwithstanding the substantial steps that Quinnipiac has taken, therefore, Quinnipiac has not yet completed all the work and changes that it intends and that I think are needed. I thus have tried here to be clear about what I think needs to be done to sustain

---

[1] To provide three varied examples, prior Reports have noted Quinnipiac's compliance in: (a) providing salary comparisons with the NEC and the MAAC, and meeting substantive standards based on those comparisons; (b) developing an effective mechanism to monitor the award of athletic financial aid generally, assure that all such aid is awarded if there are changes in student-athlete status during the year, and award aid in specific women's sports as the Decree requires; and (c) promoting the growth of women's rugby as a Division I varsity sport.

and extend Quinnipiac's progress, and to finish assuring that its athletics program is not only academically and athletically successful, but also fully gender equitable[2]. Other than certain facilities issues (as noted), I believe that all matters addressed here can and should be resolved before the end of the 2016-17 academic year, and that any necessary additional funding should be provided by adjusting 2016-17 budget lines or, if more appropriate, in the 2017-18 budget which will be developed next winter and spring.

**B.     Leadership**

    **1.** The **active leadership responsibility** taken in the last three years by Executive Vice President and Provost Mark Thompson and Vice President Annalisa Zinn have provided a clear focus for Title IX leadership, oversight, budgeting and overall compliance. Director of Athletics Gregory Amodio, a widely experienced administrator who was appointed in July 2015, has stated a commitment to Title IX compliance and has involved himself directly in Title IX changes and issues.

Quinnipiac hired an experienced and well-qualified Deputy Director of Athletics this spring, who began work on June 1; among other duties, she will fill the NCAA-mandated position of "Senior Woman Administrator" and will have significant operational responsibilities, generally and for Title IX compliance specifically. Athletics also now has an internal budget officer, who began work in the campus finance office and how has moved to Athletics, and this summer will add an Assistant AD for finances.

Quinnipiac now intends to move substantial responsibility for Title IX athletics compliance (including the continuing analyses needed to identify compliance issues) from Vice President Zinn to Athletics directly, subject to continuing oversight from the Provost. The changes just noted, together with the new institutional and Athletics budgeting approaches described in earlier reports and summarized below in Section **E**, should enable Athletics to make appropriate programmatic, budget and other decisions.

Especially in light of this change, it is important to remember that real and long-term gender equity requires not only good individual decisions, but a foundation of systematic commitment to gender equity and to success for all teams. The Director's personal leadership and continuing oversight – subject to regular review by senior non-athletics administrators who understand and will support Quinnipiac's Title IX responsibilities – will be essential for this new approach to fulfill its promise, especially in regard to coaching evaluation and development.

The success of the women's Indoor and Outdoor track and field teams is illustrative. Leadership, funding, consideration of input from me and from plaintiffs, openness to change – and hard work by coaches and student-athletes -- have brought these teams to the forefront of MAAC competition across the range of running and field events. Sustained institutional commitment now should be able to continue that success, so that these teams will be able to benefit fully from the new Indoor facility to which Quinnipiac is committed under the Decree.

---

[2] Quinnipiac's most recent NCAA Academic Progress Rate team figures (2014-15) may be accessed at http://web1.ncaa.org/maps/aprRelease.jsp.

**2.** As detailed in earlier Reports, Quinnipiac has a revised **Title IX policy** and has appointed and provided training for an institutional **Title IX Officer** and Deputy Title IX Officers (including a senior Athletics administrator). On its own initiative, Quinnipiac also appointed an Athletics Title IX Committee, including administrators, coaches and student-athletes, which has considered various policy and budget issues.

Title IX Officers must of course continue to be in place and to be adequately and currently trained, and their identities, roles and availability must be known to the student body and to faculty and staff. Quinnipiac has reported that new efforts are under way this summer to inform student-athletes about Title IX officers and resources, and these should be in effect this fall. Whether the Title IX Committee continues is a matter of institutional discretion; if so, it should have a clear charge and role that incorporate its work into regular Athletics Department decision-making.

**3.** As I have discussed with Quinnipiac, there is a major leadership opportunity is formulating **an explicit approach for communication about Title IX issues and decisions** between the Athletic Director and student-athletes, coaches and staff, and the overall campus. Every institution does this in its own way, but I believe it matters especially when an institution has experienced Title IX litigation, in order to look forward to changes that are being implemented rather than backward toward that litigation's original causes, and to develop credibility with women athletes and their coaches.

A communications approach thus should:

* Establish the Director's philosophy and commitment and convey information in common to female and male athletes, so as to minimize uncertainty and rumor about Quinnipiac's actual policies and actions and the reasons for them[3];

* Make clear that progress is occurring, and how changes benefit athletes of both genders – especially where specific required actions still must be completed[4];

* Provide regular "non-complaint" avenues for student-athletes to ask questions and voice concerns, and encourage them to use those avenues; and,

* Develop understanding and support from the campus community.

Provost Thompson and Vice President Zinn have taken positive steps in this regard in the past two years, including department-wide meetings in the fall and effective outreach to specific teams. Changes that have begun in overall sport information, communication and promotion (Section **F** below) also can be helpful, as can effective use of the re-

---

[3] For example, to assure that student-athletes and coaches can understand the reasons for changes in the anticipated stadium construction schedules, or to resolving questions about tiering resources and other "benefits" areas noted Section **E-2** below. Similarly, Quinnipiac has reported that an institution-wide committee is reviewing meal plans and dining services generally, in part in response to student concerns; this also is an area in which clear communication from the Director, and from the institution generally, can be important in answering any student-athlete concerns.

[4] For example, with regard to the locker-room changes and sports information oversight discussed later in this Report.

designed, end-of-year student-athlete surveys, which are to be part of a redesigned overall institutional self-assessment procedure in anticipation of a re-accreditation visit in 2019.  I also would urge development of an annual public report about Title IX athletics steps and progress.  Whatever specific steps are adopted, a clear communications approach is a significant part of the capacity for long-term compliance.

### C. Facilities

    **1.**  The Consent Decree requires the following **construction of facilities**:

    \*  "A superior practice and competition facility dedicated to women's field hockey that meets NCAA Division I standards for the sport;"

    \*  "A superior practice and competition facility based on NCAA Division I standards" for women's soccer and lacrosse, based on their elevation to Tier 1;

    \*  "Increas[ing] the dimensions of the women's varsity rugby pitch to the maximum dimensions allowed by the International Rugby Board;" and,

    \*  "An indoor track & field facility for practice and competition [that] will meet NCAA standards for hosting indoor meets."

    The Decree also provides that:

> [ . . . a construction schedule] shall project that all of the facilities improvements will be **completed by no later than June 30, 2018**.  Quinnipiac shall make good faith efforts to complete all facility improvements in accordance with the schedule . . . .
>
> The provisions of this Consent Decree concerning **the Referee's authority** to monitor compliance and to investigate and determine disputes, and concerning the Court's authority to enforce the Consent Decree, shall remain in effect until all of the facility improvements described in this Consent Decree are completed.

I will continue to monitor the planning, municipal approvals and construction matters described below and to use my discretionary authority to provide plaintiffs counsel appropriate access to facility plans.  As part of this work I have discussed with Quinnipiac an overall approach to athletics facilities planning that includes not only the required facilities but also other facility issues that can affect development of both Tier 1 and non-Tier 1 sports (see Section **6** below).

    **2.**  When the Consent Decree was approved in April 2013, the parties hoped that Quinnipiac could secure **municipal approval for the field hockey and soccer/lacrosse stadia** in time to begin their construction and the permanent **rugby** improvements (the expanded pitch will overlap the present soccer field) at the end of spring term 2014, with the new facilities opening for fall term 2015.  Although Quinnipiac has pursued the permit processes consistently, final approvals have not yet been granted as of the date of this Report: it is hoped that approvals will be granted in early September 2016, with an expedited construction schedule and the hope that the facilities will open for fall term 2017.

Counsel for both parties and I reviewed initial stadium plans in November 2014, and reviewed this spring the most recent stadium plans submitted to the municipal authorities. The latter discussion included plans for the rugby pitch (which do not need municipal approval) and locker-room and plans for practice, competition, and academic scheduling and transportation for the field hockey and women's and men's lacrosse teams, which will not have on-campus fields during the construction year. Quinnipiac provided supplemental plans in early May 2016.

Based on this review and on past discussions, I believe these will be appropriate facilities; that they will make a significant differences for the teams that play in them[5]; that they can help resolve questions about locker-rooms both for the teams that play in them and for other teams (see items **5, 6 and 7** below); and that the "transition-year" plans are adequate[6]. I will continue to review final plans, actual construction, and related operational matters that have been discussed with both parties[7]. Quinnipiac also should assure that clear and appropriate policies are in place for athletes' use of strength and conditioning facilities this summer, and that any needed locker-room maintenance or repairs are completed before teams need to occupy those spaces for fall term practice.

     **3.** The **volleyball facility** was provided new lighting in May 2016 that meets NCAA regular-season and championship standards, and will have a completely redone playing surface this summer. Combined with new rules for exclusive use of the facility during practice and competition periods, which began in 2015-16, and with continued attention to minimizing use of this facility by other groups at other times, these changes will constitute a significant upgrade for this facility.

     **4.** Planning for the **indoor track and field facility** will begin once approvals for the stadia are secured, but no later than early fall 2016, with construction anticipated to begin in summer 2017 and to be complete by the June 30, 2018, Decree deadline.

     **5**. As reported previously, pursuant to the Decree's provision for additional spending at the Referee's direction I asked Quinnipiac to construct in the Mt. Carmel building a **strength and conditioning** facility dedicated to varsity athletics. This facility opened for fall term 2015 and provides greater flexibility for scheduling all teams' dedicated use, as well as added hours for Tier 1 teams under Quinnipiac's new policy in that regard (varsity teams previously had shared a facility with recreational users, with limited hours). At the same time, Plaintiffs have questioned the long-term adequacy of

---

[5] Although it appears that the municipal approvals will not include approval for lights, under current municipal rules, the facility infrastructures will be constructed so that lights can be installed if municipal rules change.

[6] I have asked that the transition plans include consideration of concerns from track and field student-athletes about transport to and from off-campus sites, and about academic scheduling, so that a comprehensive solution is in place for all affected sports in 2016-17 and for track and field until the indoor facility is open.

[7] Including, for example: scoreboards, provision for team laundry services, concessions, the locker-room interiors, and the use of adjacent facilities for press conferences, and other events related to contests.

this facility, noting among other factors that the TD Bank "strength" facility is used by only four teams, while the remaining Tier 1 teams share the Mt. Carmel facility with all the non-Tier 1 teams.

      **6.** Following discussions this spring, Quinnipiac has submitted preliminary plans for **locker-room** changes in the Mt. Carmel facility once teams move to locker-rooms in the new stadiums.  These plans include single-team spaces for softball and golf and women's tennis (the latter two teams do not currently have Mt. Carmel locker-rooms); upgrades for track and field (which was moved to a larger, single-team space this year) and volleyball; and use of additional space for some combination of coaches' offices, a visiting-team locker-room (visiting teams currently are bused to the TDBank facility), and an officials' locker-room.  Facilities will have new lighting, wall finishes, carpets and lockers, and structural changes if needed.

      **7.** Given the many variables associated with facilities – including the later construction schedule, the change in athletics leadership, and the relationship between facilities and program substance, especially for Tier 1 teams – I have discussed with Quinnipiac the value of having **an overall facilities plan** that addresses all major possible issues at once.  I believe it now is essential to have such a plan, and that it should include the following items in addition to the stadium, volleyball and indoor track and field facilities noted above:

      \*  a long-term approach to strength and conditioning facilities for all teams, including consideration of "tiering" issues;

      \*  a schedule and expected completion date for the Mt. Carmel locker-room changes described above, including whatever decisions still need to be made, with an overall review once all changes are made;

      \*   a review of coaching office arrangements, given recent and projected increases and considering appropriate tier differences; and,

      \*  consideration of a possible outdoor track and field facility (acknowledging that such a facility is not required by the Decree).

I would expect to have a preliminary discussion of all these issues with Quinnipiac as more detailed planning for the track and field facility resumes, as soon as possible once the new stadium construction process is in motion.


**D.  Tiering**

      **1. "Proportionality"**

The Consent Decree provides that:

> The parties recognize that Quinnipiac currently treats men's and women's basketball and ice hockey as tier one sports (also denominated as "sports of emphasis").  Quinnipiac will take measures to elevate two (2) additional women's teams to tier one as follows:  [field hockey by the start of the 2013-14 year, and a fourth women's sport within six months of the Decree's approval, or Oct. 13,

> 2013, in each case with the sport having the full NCAA numbers of grants-in-aid and coaches, and with the facility requirements noted above].

The Decree also provides that:

> If Quinnipiac adds more men's teams to tier one during the term of the Consent Decree, then it must also add a proportionate number of women's teams or female athletes to tier one.

In addition to field hockey, Quinnipiac elected to elevate women's soccer and women's and men's lacrosse to Tier 1 status. In February 2014 I found preliminarily that this change met the proportionality test quoted just above as to the number of teams, whether or not it did so as to the number of athletes, and whether or not the language quoted above would be the framework that the Court might apply to any "tiering" questions apart from the Decree's specific provisions.

Plaintiffs have continuously noted their disagreement with this view. However as I reported to the Court in June 2015, as part of the parties' resolution of a number of procedural matters plaintiffs agreed not to pursue formal objections to my conclusions until at least the end of the 2014-15 year; plaintiffs have not filed formal objections to this date[8].

### 2. Support

It is essential for every new Tier 1 team to receive support, and to provide its athletes with competitive experiences, that are consistent with that status -- both because that is what the Decree and Title IX anticipate, and because any proportionality analysis assumes that teams identified as Tier 1 are in fact operating in that way. In this regard:

---

[8] I note here two issues related to tiering, but not central to this Report, in order to provide a complete record of the major issues considered over the past year.

First, unrelated to Quinnipiac's continuing support for women's rugby, the parties disagree about how earlier rulings of the Court affect whether rugby should be included in the tiering proportionality analysis. As my "proportionality" conclusion is the same whether or not rugby is included, I have not felt it necessary to resolve this matter. I do want to repeat my conclusions, expressed in prior Reports, that Quinnipiac has fulfilled its Decree commitments for supporting women's rugby.

Second, after discussions between the parties about how Acrobatics and Tumbling is listed on Quinnipiac's EADA form, Quinnipiac has changed its listing of A&T from "Gymnastics (W) - Institutional Name: Acrobatics and Tumbling" to "Other Sports: Acrobatics and Tumbling", effective with the fall 2016 posting of 2015-16 EADA data. Plaintiffs maintain that under earlier rulings of the Court, as to how A&T should be considered for Title IX compliance purposes, A&T should be omitted altogether from the EADA form. I believe the Court's rulings do not have this effect and that Quinnipiac's approach is appropriate: the EADA website requires an institution to list all sports sponsored at the varsity level, and also makes clear that the pattern of sports considered in assessing Title IX compliance may be different from what is reported on EADA forms.

\*  Quinnipiac has fulfilled the Decree's specific Tier 1 commitments noted above, it has developed additional criteria for distinguishing between Tier 1 teams and other teams, and the institutional budgeting changes described in Section **E** have made a positive difference[9].

\*  Tier 1 teams are receiving substantially more support than before the Decree, and their budgets are set under a clearer and more accountable financial system (as is true of all teams).

\*  At the same time, field hockey, women's soccer and lacrosse athletes will not have the experience that both parties originally believed would be in place, at this point in the Decree, until the new facilities are open (as is true also for men's soccer and rugby athletes).

\*  As discussed in Section **E**, the 2016-17 budget will be only the second under the new budgeting approach and the first that the new Athletic Director has been able to affect from the beginning.

Taken together, these points mean that whether the new Tier 1 teams are appropriately resourced over the long run – that is, how the changes that have begun actually will be consolidated to provide true equity and an ongoing Tier 1 experience in the future -- will not be fully clear until the 2017-18 academic year at the earliest.

This makes it all the more important, as I have discussed with Quinnipiac, that Athletics has a clear focus as it assumes more of the overall institutional responsibility in this area.  That is, sustaining and completing the progress that has been made will require **intentional and regular attention to gender equity and competitive success across teams in each Tier, to provide the right context for making tiering and other resource decisions.**  And while the Decree identifies Tier 1 teams specifically, that attention needs to assure that **all** sports feel supported and do actually receive consistent, adequate and gender-equitable resources.

This is especially important from a Title IX perspective when, as here, women's teams and women athletes are a majority of non-Tier 1 teams and athletes, and any perception that non-Tier 1 teams are not well supported can translate into a concern that women athletes are being treated adversely.  Establishing a clear identity and approach to non-Tier 1 resources (and, as noted in Section **B-3** above, communicating that approach) will demonstrate to those teams what resources and opportunities are in fact being provided; make those sports' identities visible in Athletics and throughout the campus, so that the sports are viewed positively and generate interest; and maximize institutional and community enthusiasm.

---

[9] In addition to the Tier 1 attributes enumerated in the Decree, I asked Quinnipiac to further define competitive and resource expectations for Tier 1 teams, reflecting the prior experience for men's and women's basketball and ice hockey.  Quinnipiac has identified, as differentiating factors, resources to recruit student-athletes nationally, eligibility for fifth-year and summer school athletic financial aid, preference for strength and conditioning scheduling and longer hours for this activity, additional medical training staff coverage, additional non-league scheduling resources as needed, limited differences in varieties of game uniforms and frequency of their replacement, and specific sports information, promotion and marketing activities.

This identity can build on developments that already have occurred and/or to which Quinnipiac already is committed to, including the new (Mt. Carmel) strength and conditioning facility discussed in Section **C** above, changes in locker-room facilities and assignments (Section **D**), the new budgeting approach (Section **E)** and changes in sports communication and marketing (Section **F**).

### 3. Soccer

As discussed in the June 2015 Report, plaintiffs have expressed concern as to whether the differences in approaches for women's and men's **soccer** are sufficient to clearly identify them as Tier 1 and non-Tier 1 sports, respectively, and also have argued (correctly) that the distinction is essential for any "proportionality" calculations. They note that both teams will use the new stadium and will have essentially the same percentage of the NCAA maximum number of athletic grants and substantially the same support for uniforms and equipment.

The comparison of these two sports which Quinnipiac prepared at my request shows additional women's soccer resources as to the actual number of athletic grants (the NCAA grant maximum is higher for women's soccer), availability of summer-school aid, access to supervised strength and conditioning, the number of and replacement cycle for game uniforms, and in having full-time second assistant coach. Quinnipiac also has focused more clearly this year on women's soccer's recruiting and scheduling resources (including additional funds for scheduling higher RPI teams in 2016-17), and sports information and promotion. I believe the totality of these differences can be the basis for a valid tier distinction between women's and men's soccer, while still maintaining appropriate resources and competitive expectations for the men's team.

Apart from different specific support provided to each team, however, I believe that true Tier 1 status for women's soccer requires a clear plan for sustained Tier 1 competitive success and for a consistently good Tier 1 experience for women's soccer athletes. The changes that have been made for women's soccer suggest that the Director does have such a plan in mind. However, I believe the unique "tiering" question posed by this sport is best answered through a formal written plan that demonstrates specifically how women's soccer has Tier 1 emphasis and expectations and how there will be a focus on Tier 1 success -- not only through continued "quantifiable" resource differences, but also through systematic and adequately-resourced approaches to recruiting, scheduling, promotion and visibility, and the team's overall goals and improvement.

### E. <u>Team budgets, resources and benefits</u>

### 1. Process

The Consent Decree required the Referee, within 120 days of the Decree's effective date (roughly, by the beginning of fall term 2013), "[to] conduct a baseline review of the Quinnipiac athletic department's compliance with the treatment and benefits requirement of Title IX and with the requirements of the Consent Decree". When I first reviewed athletic finances in the summer of 2013, however, it was apparent that there was no basis for conducting such a review: budget and expenditure data were not accurate or reliable; expenditures were changed frequently during each year on an ad hoc, coach-

initiated basis; and there had not previously been advertent attention to gender equity, or to sport comparisons generally, in setting ongoing budgets.

As described in earlier Reports, therefore, I have focused in the past three years both on implementation of an accurate, accountable and gender equitable budget system -- to support not only a meaningful "treatment" review, but also appropriate budgeting in the long tem – and on ongoing interim resource changes based on what we have learned through that work. I believe the athletic budgeting system and current budgets do now provide the basis both for a valid "treatment and benefits" review, and for providing "resources" equity and compliance as part of regular Athletics decision-making.

First, I believe Quinnipiac now has an accountable athletics budget system, reflecting a number of important changes:  implementation of an overall "zero-based" institutional budgeting system; both institutionally and in Athletics, clearer and more centralized definition of budget needs, with the expectation that annual budgets will be "real" and adhered to; the addition of financial management personnel specifically for and in athletics; and the substantial involvement of senior administrators in considering gender equity in determining actual athletics expenditures, first in the Provost's office and then through the involvement of the new Athletic Director.

Second, the actual athletic budgets are substantially different.  The 2015-16 team budgets, developed in the spring of 2015 and then adapted in some respects by the new Director that summer, build on substantial ad hoc increases that were included in the 2013-14 and 2014-15 budgets.  They also are based on accurate data, on a more deliberate application of Title IX and gender equity considerations and of the Decree's specific provisions, and on the Director's initial view of the resources needed for competitive success in all sports within the Metro Atlantic Athletic Conference, the ECAC Hockey League, and the Big East Field Hockey League.

All this work has been well begun, but as noted earlier, actually assuring that this system will provide appropriate resources will require purposeful and sustained senior leadership – not only as to individual budget decisions, but in providing an overall decisional framework that focuses on gender equity.  As discussed above (Section **D-2**), the budget system now must complete the clear definition of Tier 1 and non-Tier support and assure adequate funding within those categories – and must do so at a time when the many facility changes scheduled for the next few years will create new financial and administrative needs.  Budgeting also should recognize that, notwithstanding the increases already provided to various teams, the underlying pre-Decree budgets did not reflect any prior Title IX analyses.

The analyses that follow divide team resources into two categories.  "Template" resources are those that can be budgeted across all sports more or less formulaically, or for which policies will be identical for all sports, with few variations expected in either case.  What I call "judgment" resources are likely to involve different expenditures in order to seek the same level of results, varying according to the different contexts of different sports, both nationally and from year to year for specific teams.

    **2. "Template" resources**

    **a. Summer school and "fifth-year" athletic financial aid**

This aid is available to all qualified students on all Tier 1 teams, and only to those athletes, and I have not identified any problems in this area.

### b. Team equipment and uniforms

I asked Quinnipiac to develop a common matrix for equipment and uniforms for all teams, which was first used in spring 2015 in developing the 2015-16 team budgets. I believe this matrix is complete and that it treats all teams equally[10]. My review of actual 2015-16 expenditures for six selected teams – women's and men's lacrosse and soccer, and softball and baseball – indicated that coaches' choices to make different spending decisions were both minimal, and appropriate exercises of their discretion.

Quinnipiac's reports also note adjustments to some team budgets in this area, and with regard to meals (below), in response to student-athlete feedback: that type of feedback,

whether from the student-athlete surveys or otherwise, can be an important part of assuring that the underlying budget templates are appropriate and equitable.

### c. Team hotels and meals

Review of actual hotel and meal costs across teams indicates no variations other than those due to different costs in different "away" cities or to coach/team meal preferences based on the timing of games and travel. Quinnipiac has a standard per diem, and women's and men's teams traveling to the same destinations (e.g. for league games) stay at the same or comparable facilities.

### d. Methods of transportation

Women's and men's teams travel similarly to the same destinations, almost always by bus and with no variations by gender in the type of vehicle. There is no gender pattern in the limited instances when teams travel by airplane.

### e. Winter/spring-break housing

Housing arrangements for teams that remain on campus during breaks are based on what dormitories remain open during those breaks, and do not discriminate by gender.

### f. Academic or other arrangements

Quinnipiac does not provide priority registration for athletes or for any other student groups, especially in light of the different curricular reasons that take students off campus and could be the basis for special requests. Instead, it seeks to make accommodations as necessary, including through use of a new course registration system that helps the institution identify high-demand courses, and through specific assistance to student-athletes in the registration process.

---

[10] Tier 1 teams have 3 rather than 2 sets of game uniforms, and a more frequent replacement cycle for uniforms.

I appreciate Quinnipiac's reluctance to provide priority registration as an institutional policy, and I believe that Quinnipiac's policies and practices should be effective in this area. However, plaintiff's counsel report continued questions in some regards, which Quinnipiac should continue to pursue, and I would encourage Quinnipiac to review the ways in which communicates to athletes about both its overall policies and the help that is available to them.

As noted elsewhere, plans for the teams that would be practicing off-campus in 2016-17 during construction of the new stadiums should address any specific concerns (including meal availability) that might arise for those team members.

### 3. "Judgment" resources[11]

I believe that Quinnipiac is generally providing equally effective resources to its women's and men's teams (differentiated by tier as appropriate) in these areas. At the same time, the caveats noted above at the end of Section **E-1** all are especially relevant in these categories.

#### a. Recruiting

Recruiting resources that are potentially equally effective for different sports are likely to involve different budgets, based on factors such as each sport's national recruiting context and calendar, the relative roles of in-season and summer or other off-season recruiting, the geographic distribution of prospective-student athletes who will be attractive athletic and admissions candidates and who will be interested in matriculating, and the particular needs of each team each year.

I reviewed policies and expectations for recruiting for all teams, including how budgets are adapted to coaches' views of teams' changing needs from year to year; teams' competitive and recruiting expectations and recruiting budgets; competitive results; recent changes from part-time to full-time coaching positions in some sports to facilitate recruitment (in addition to those changes required by the Decree); and recruiting budgets and specific activities for women's and men's lacrosse and soccer and for softball and baseball. On this basis I believe that recruiting resources are provided appropriately within each Tier.

#### b. Non-league scheduling

League schedules provide the majority of contests in most sports and are identical for teams in the same sport (though possibly with alternating home/away rotations in single round-robin sports). The core issue in scheduling thus is providing resources for non-league scheduling that will equally effectively serve all sports' competitive needs in any particular year. Again, scheduling issues will vary with opponents' geographic availability (home and away) and with teams' needs from year to year (e.g., a relatively hard schedule to strengthen a veteran team, or an easier one to give confidence to a younger team?).

---

[11] Given its importance and the detail of my comments about Sports Information, Communication and Promotion, this resource area is discussed separately in Section **F**.

As with recruiting, I reviewed policies and expectations for non-league scheduling for all tams, including adapting to coaches' views of teams' changing needs from year to year; schedules, competitive expectations and scheduling budgets for each team; competitive results; and specific schedules for women's and men's lacrosse and soccer and for softball and baseball. On this basis I believe that scheduling resources are provided appropriately within each Tier.

### c. Athletic training

I have reviewed the assignment of athletic trainers annually beginning with 2013-14, including which individuals are assigned to which teams, which teams have full-time trainers and which have graduate assistants, in-season coverage at away contests, and off-season coverage. As is true at most if not all institutions generally, this is an area where the "fit" between the trainer and the team is important, and one in which there usually is some staff turnover each year.

My overall conclusion is that assignments in this area are appropriate, with good use made of new positions. As with some of the "template" areas noted above, this also is an area in which more focused communication with teams about policies and assignments likely would be helpful.

### d. Strength and conditioning

As noted in Section **C-**5, the major possible issue in this area is that different facilities are used for different teams. The strength and conditioning coaching staff seems to be highly regarded across men's and women's teams in both tiers, and has been augmented since the Decree took effect, and the system of preferential assignments and additional hours for the new Tier 1 teams seems to have worked well since the Mt. Carmel facility opened in fall 2015.

As provided in Section **C-6**, long-term gender equity in this area, within each tier, should be addressed through an overall facilities that includes this important support activity.

### e. Locker-rooms

Locker-room allocations and the need for shared locker-rooms for women's teams have improved with some reassignments after the summer 2014 Mt. Carmel alterations and with attention to maintenance needs, and will permit a major improvement: the new stadiums' six locker-rooms should be appropriate for those teams (3 Tier 1 women's teams, 1 tier 1 men's team, 1 women's and 1 men's non-Tier 1 team), and the Mt. Carmel changes noted in Section **C-6** should provide appropriate locker-rooms for the remaining women's non-Tier 1 teams.

### f. Coaching

Quinnipiac has complied with the Decree's requirements for full-time coaching positions and for coaches' salaries. In addition, in 2016-17 there will be a separate head coach for men's cross-country, which will result in more coaching available for women's cross-country and track and field, and assistant-coach positions in volleyball, softball and baseball will be changed from part-time to full-time. Over the course of the Decree I also

have reviewed the qualifications, experience, results and compensation of both continuing and new head coaches.

On this basis, I believe that overall coaching resources are appropriate, and it is clear that the Director has high competitive expectations for all sports, regardless of gender. At the same time, and as I have discussed with Quinnipiac, I believe that senior leadership attention to coaching is essential to assuring that all sports will compete successfully over time. Similarly, while I recognize the difficulties in assessing salary patterns across different sports, especially when coaches have been hired over different periods of times, I have discussed with Quinnipiac my view that it would be useful to review its approach to compensation for new and continuing coaches.

### F. Sports information, communication, and promotion

Successful efforts to generate attendance, media and public recognition and campus and community enthusiasm are vital to building strong team traditions and to achieving competitive success, by enhancing athletes' experiences and supporting recruitment of student-athletes and recruitment and retention of coaches and staff. These factors all matter especially when an institution is seeking to demonstrate new commitments and resources for women's athletics, and to make the new successes of women's teams and women athletes clear to its campus, its alumni communities, and the public[12].

As discussed in earlier Reports, I thus have worked extensively with Quinnipiac as it has begun to develop a more deliberate and comprehensive approach in this area and to respond to plaintiffs' questions and suggestions. Quinnipiac has made positive changes in this area, with a more systematic focus on its women's teams, and I believe the Athletic Director is committed to continued improvement and to assuring that efforts are consistent across teams[13]. At the same time, this remains an area with substantial work still to be done, partly because the Director has been involved for only one year.

It is thus a positive development that the Director has appointed a committee, chaired by the new Deputy Director, "to oversee gender equity in association with the work of the sports information office." This committee has a broad charge, including "develop[ing] a plan designed to enhance overall coverage for the QU athletic programs with a particular emphasis on highlighting women's coaches, student-athletes and programs." I would

---

[12] It also can be harder to directly measure the effect of sports information and promotion efforts than in more formulaic areas of team support (e.g., inventory and replacement cycles for equipment and uniforms), and thus harder to know what constitutes truly equally effective resources for women and men athletes. And different levels of public and media interest in different sports make it harder both to identify potentially effective efforts in any particular sport, and to correlate such efforts with specific results (e.g., improved long-term attendance), than in other areas, such as resources for recruiting in new geographic areas or at more or different summer events.

[13] For example, the Director has combined all sports information and promotion staff within Athletics (some TD Bank Arena staff previously had reported to institutional Communications), has combined separate offices in a single facility, and has added and/or is seeking budget approval for additional permanent staff positions.

add to that charge explicit consideration by the committee of needs, opportunities, and programming for the new Tier 1 teams.

I also would note the following points for the committee's work:

    \*  It is essential to have adequate and well-matched staffing for all sports, adequate for full implementation of the Sports Information Director's templates for all sports and across all venues (below).  In this regard it is important to remember that all sports information staffs have unexpected and conflicting opportunities and time demands during each competitive season, especially when many teams in a season do well and reach post-season competition at the same time.

    \*  The Director of Sports Information has developed, and this year began to implement, initial templates for gender-equitable overall programming and team coverage, specific approaches for Tier 1 teams, and additional emphases on all "non-TD Bank" teams -- for example, in more extensive use of video streaming and social media, and in identifying special events and community involvement opportunities.  This year's work should place a high priority on assuring that there is in fact consistent support for all teams throughout their seasons[14].

    \*  The new stadiums will offer new opportunities for special events, attendance promotions, video streaming and broadcasts, and alumni and other events, and the transition year allows for planning to take full and prompt advantage of these changes when those facilities open.  But those opportunities also will provide a challenge:  there will be new expectations even for an expanded staff, and Department leadership will need to assure that any adjustments to plans or staffing continue to provide all women's teams, in both Tiers, with necessary support and attention.

    \*  It is equally important both to provide clear support for the "off-campus" teams during the transitional year, when their "home" games will be less accessible to other students, and for non-Tier 1 teams generally, both in the transition year and once the new facilities are open (see **D-2**).

    \*  Finally, the overall approach should have ways to measure effectiveness as well as effort over time, and to provide for differing activities for different sports as that is appropriate.  Together, the quality of Quinnipiac's teams and of the new facilities provide a good foundation for developing fan bases for all teams, especially in combination with departmental and team community service and outreach activities.

---

[14]  For example, discussions abut the 2015-16 year included assuring that all home events in all sports are announced consistently to the campus community, following through on the new practice of meeting with each coach at the beginning of the year, and implementing uniform policies for supporting and recognizing teams that play in post-season events at any level.